UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PUBLIC EMPLOYEES FOR ENVIRONMENTAL      )
RESPONSIBILITY                          )
2000 P St., N.W., Suite 240             )
Washington, DC 20036,                   )
                                        )
CETACEAN SOCIETY INTERNATIONAL          )
P.O. Box 953                            )
Georgetown, CT 06829,                   )
                                        )
LOWER LAGUNA MADRE FOUNDATION           )
P.O. Box 153                            )
Port Mansfield, TX 78598,               )
                                        )
CALIFORNIANS FOR RENEWABLE ENERGY       )
5439 Soquel Drive                       )
Soquel, CA 95073,                       )
                                        )
THREE BAYS PRESERVATION                 )
864 Main Street                         )
Osterville, MA 02655,                   )
                                        )
ALLIANCE TO PROTECT NANTUCKET SOUND     )
4 Barnstable Road                       )
Hyannis, MA 02601,                      )
                                        )
CINDY LOWRY                             )
139 William St. #1                      )
Portland, ME 04103,                     )
                                        )
BARBARA DURKIN                          )
48 Moore Lane                           )
Northboro, MA  01532,                   )
                                        )
MARTHA POWERS                           )
P.O. Box 962                            )
West Yarmouth, MA 02673,                )
                                        )
                      Plaintiffs,       )
                                        )
              v.                        )
                                        )
MICHAEL R. BROMWICH, Director           )
U.S. Bureau of Ocean Energy Management, )

Regulation and Enforcement                    )
1849 C Street, N.W.                            )
Washington, DC 20240,                          )
                                               )
KENNETH SALAZAR, Secretary                     )
U.S. Department of the Interior                )
1849 C Street, N.W.                            )
Washington, DC  20240,                         )
                                               )
RONALD GOULD, Acting Director                  )
U.S. Fish and Wildlife Service                 )
1849 C Street, N.W.                            )
Washington, DC  20240,                         )
                                               )
                          Defendants.          )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs seek relief from Defendants' violation of federal environmental and

wildlife protection laws in connection with Defendants' decision to authorize the construction

and operation of a marine offshore wind power project that will kill federally listed bird species,

harm the critically imperiled North Atlantic Right Whale, and have other deleterious impacts on

federally protected wildlife.  The U.S. Department of the Interior's Bureau of Ocean Energy

Management, Regulation and Enforcement – until recently known as the Minerals Management

Service ("MMS") – and Fish and Wildlife Service ("FWS") have violated and are continuing to

contravene various provisions of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.,

by issuing and relying on an unlawful biological opinion for the proposed wind power facility

that will allow the project to kill Roseate Terns and Piping Plovers without sufficient safeguards

based on the best available science and FWS's own determination of reasonable and prudent

measures to minimize take.  The Bureau – which this Complaint will continue to refer to as

MMS – has contravened and continues to violate the Migratory Bird Treaty Act ("MBTA"),

16 U.S.C. § 703 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by

authorizing a project that will kill migratory birds without obtaining authorization to do so. Further, MMS is violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the APA, 5 U.S.C. § 706, by issuing an Environmental Impact Statement that ignores or fails to take a "hard look" at both alternatives to the lease applicant's proposed project and the numerous ways in which the project will be harmful to wildlife and particularly to Right Whales and migratory birds.

## JURISDICTION

2.      This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g) and 28 U.S.C. § 1331.

## PARTIES

3.      Plaintiff Public Employees for Environmental Responsibility ("PEER") is a Washington D.C.-based nonprofit, non-partisan public interest organization.  PEER serves and protects current and former federal and state employees of land management, wildlife protection, and pollution control agencies who seek to promote an honest and open government and help hold governmental agencies accountable for faithfully implementing and enforcing the environmental laws entrusted to them by Congress.  PEER represents thousands of local, state and federal government employees nationwide.  PEER's members and staff derive scientific, recreational, conservation, and aesthetic benefits from the area in and around Cape Cod, Massachusetts.

4.      MMS's decision to allow this project – the first federally approved offshore project in the country – to proceed regardless of substantial legal deficiencies injures PEER's members and staff by setting the precedent that wind power facilities will be permitted without sufficient consideration to their effects on natural resources such as birds and whales.  MMS's

decision to ignore repeated requests from FWS that the agency obtain or consider sufficient data

under NEPA, in order to meet an arbitrary deadline, harms the occupational and recreational

interests of PEER's members by fostering a culture in federal agencies where environmentally-

oriented employees are overruled.  Further, because PEER's members like to observe birds and

whales that are highly migratory and transient in nature, Defendants' violations of the ESA,

MBTA, and NEPA harm their recreational and educational interests in viewing these animals in

the wild.

     5.     The mission of Plaintiff Cetacean Society International ("CSI") is to minimize

cetacean killing and captures, to maximize human activities that neither harm nor harass

cetaceans, and to enhance public awareness of and concern for cetaceans and the marine

environment.  CSI is concerned that the scientific analysis of the potential harm from the Cape

Wind project remains inadequate, particularly regarding the recent use of the habitat by a

significant percentage of the North Atlantic Right Whale (Eubalaena glacialis) population.

     6.     Many CSI members enjoy watching Right Whales in New England waters.

Members' concerns for this critically endangered species support CSI's continual advocacy to

conserve and protect Right Whales, particularly regarding research funding, entanglements, ship-

strikes, anthropogenic noise, habitat degradation and harassment.  CSI members' aesthetic,

educational, professional, and recreational interests have been harmed by MMS's failure to

assess, with an adequately revised Supplemental Environmental Impact Statement ("SEIS"), the

documented seasonal presence of a significant percentage of the population near the Cape Wind

site.

     7.     Plaintiff Lower Laguna Madre Foundation ("LLMF") is a nonprofit membership

organization whose purpose is to preserve and protect the natural resources of the South Texas

intercoastal bay system for the present day and for posterity.  To this end, LLMF encourages balanced economic use and conservation of the Lower Laguna Madre.  It informs and educates the public about the life of the bay, serves as its advocate, and vigilantly monitors its use.  LLMF opposes the construction and operation of wind power facilities on the Texas coast, and believes that the process by which offshore wind power projects are approved in federal waters elsewhere will affect the review process in Texas.  Since Cape Wind is the first federally approved offshore wind power project, LLMF believes that MMS's and FWS's failure to comply with environmental law and to conduct the necessary wildlife studies to gauge this project's impact on birds and whales has set a detrimental precedent for wind power projects along the Texas coast and in the Gulf of Mexico.

8.      Several bird species spend their summers in Massachusetts and their winters along the Texas coast, such as Double-crested Cormorants, American Bitterns, Mallards, Blue-winged Teals, Hooded Mergansers, Northern Harriers, Ospreys, Spotted Sandpipers, Forster's Terns, Eastern Phoebes, Tree Swallows, House Wrens, Marsh Wrens, Hermit Thrushes, Gray Catbirds, Brown Thrashers, Eastern Towhees, Field Sparrows, Chipping Sparrows, and Vesper Sparrows.  Members of LLMF enjoy viewing these species.  MMS's decision to allow the Cape Wind power project to proceed without complying with the MBTA harms these members' recreational and aesthetic interests by increasing the likelihood that these birds will be killed by turbines, thereby reducing the opportunity to view these birds in Texas and increasing the risk of diminished populations.

9.      Plaintiff CAlifornians for Renewable Energy ("CARE") is a nonprofit corporation that works to educate and encourage the use of alternative forms of renewable energy to avoid

dependence on declining supplies of fossil fuels, and the harmful air emissions their use entails. All of CARE's members are residential customers.

10.     The Defendants' illegal actions harm the interests of CARE's members by allowing Cape Wind Associates a competitive advantage over land-based wind farm developers who must meet stricter requirements for environmental mitigation and monitoring, including pre-construction monitoring for species protected by the ESA. CARE is a party to a settlement agreement with the County of Alameda, California and several wind turbine operators, who own and operate wind farms in the Altamont Pass Wind Resources Area (APWRA) located in Northern California, that requires an independent science-based mitigation and monitoring program that was absent from the Cape Wind project approval process.

11.     Plaintiff Three Bays Preservation, Inc. ("Three Bays") is a nonprofit environmental organization created to preserve, maintain, protect and enhance the aquatic environment and related ecosystems of the three bay estuary comprised of West Bay, North Bay, and Cotuit Bay and environs, in Barnstable County, Cape Cod, Massachusetts, and to take action to forestall and minimize threats to the health of the Three Bays system.

12.     Members of Three Bays enjoy spending time in the three bay estuary, which exchanges waters with Nantucket Sound with each tide, and also recreate along nearby coastline that borders the Sound.  They appreciate observing the local wildlife, including birds and whales, of Nantucket Sound, and the failure of MMS and FWS harms their aesthetic and recreational interests in viewing wildlife and experiencing ecologically healthy biological communities in the bays and along the coast of Nantucket Sound.

13.     Plaintiff the Alliance to Protect Nantucket Sound (the "Alliance") is a nonprofit environmental organization dedicated to the long-term preservation of Nantucket Sound.  The

Alliance was formed in 2001 in response to Cape Wind Associates' proposal to build a wind power facility in the Sound.  The Alliance's goal is to protect Nantucket Sound in perpetuity through conservation, environmental action, and opposition to inappropriate industrial or commercial development. The Alliance supports formal designation of Nantucket Sound as a marine protected area.

14.     Members of the Alliance's board of directors enjoy observing Roseate Terns, Piping Plovers, migratory birds, and Right Whales.  They view these animals from their boats, in their yards, and on whale watches.  The failure of FWS and MMS to comply with the ESA has harmed members of the Alliance's board of directors by failing to provide adequate protection to Roseate Terns and Piping Plovers, reducing the likelihood that these people will have the opportunity to view these federally protected bird species on Cape Cod, in Nantucket Sound, or on nearby islands.  Similarly, MMS's failure to comply with the MBTA harms the recreational and aesthetic interests of Alliance's board members in viewing birds in close proximity to the Sound.  MMS's failure to comply with NEPA harms their recreational and aesthetic interests by increasing the risk that whales, including endangered Right Whales, will be harmed, harassed, or killed by the project.

15.     Plaintiff Cindy Lowry has dedicated 25 years of her life to the protection of oceans and marine wildlife, including seabirds and marine mammals.  She formerly served as the executive director of the environmental group Greenpeace in Alaska.  In 1988, she played a leading role in rescuing Gray Whales trapped in the ice off the coast of Barrow, Alaska, and her actions will be featured in a forthcoming film entitled "Everybody Loves Whales."  During the ensuing years, she served as the director of other environmental organizations: Maine Chapter of Defenders of Wildlife, Alaska Wildlife Alliance, Friends of Sea Otters, Fund for Maine's Future,

and Sea Otter Defense Initiative.  She also worked as a consultant to the Maine Department of

Conservation.  In 2003, she founded the Oceans Public Trust Initiative ("OPTI"), a project under

the International Marine Mammal Project of Earth Island Institute. The project was developed

out of a concern over the rapid expansion of offshore renewable energy development, as well as

oil and gas, under the Bush Administration.  Foremost among her concerns is the Cape Wind

project, because its approval has not followed any of the principles advocated by OPTI and

because she believes it would destroy the Nantucket Sound marine ecosystem. Through OPTI

she participated extensively in all aspects of the Cape Wind review.

16.     Ms. Lowry personally experiences and enjoys the wildlife resources that are at

risk as a result of the Cape Wind project.  She observes gulls, terns, eiders, buffleheads, long-

tailed ducks, cormorants, guillemots, sandpipers, scoters, mergansers, loons, ospreys, bald

eagles, and blue herons in her home state of Maine; because the migratory routes for these

species pass through Nantucket Sound and then into Maine, Ms. Lowry believes that her

opportunities to observe these and other bird species is directly harmed by the project.  She also

enjoys observing Long-Finned Pilot, Fin, and Minke Whales, Short-Beaked Common Dolphins,

Harbor Porpoise, and Harbor Seals by motorboat and sailboat, and from shore.  She also looks

for Right Whales.

17.     Defendants' violation of NEPA and the MBTA will impair Ms. Lowry's

scientific, recreational, and aesthetic interests in migratory birds and Right Whales, by permitting

birds to be killed and harmed and by allowing Right Whales to be killed, harmed, and/or

harassed.  Further, MMS's failure to issue an SEIS also harms her ability to participate in the

NEPA process and to obtain information regarding the adverse impact associated with the

project's effects on Right Whales.  The agency's failure to issue an SEIS also injures her

recreational interest in viewing other whales, porpoise, and seals by eliminating the likelihood that MMS would require mitigation measures for Right Whales that would also reduce the project's harm to other marine mammals.

18.     Plaintiff Barbara Durkin is a private citizen, and a member of CAlifornians for Renewable Energy (CARE) and Save the Eagles International.  Her independent research focus for the last seven years has been on impacts to wildlife by wind turbines.  Ms. Durkin actively participates in rulemaking on both the federal and state levels to ensure adequate protection of endangered and migratory wildlife, and the observation of laws that protect the public trust.

19.     Ms. Durkin enjoys taking trips to the ocean where she observes water birds and whales from boats.  She travels from her home in Central Massachusetts to Cape Cod and the islands during the spring, summer, fall, and winter to observe wildlife and nature present in Nantucket Sound, in close proximity to the Cape Wind project site.  She photographs and paints a variety of species present in this region, including Scarlet Tanagers, Roseate Terns, and Piping Plovers.  The failure of both FWS and MMS to comply with the ESA injures Ms. Durkin's aesthetic and recreational interests by authorizing the Cape Wind project without sufficient safeguards in place to mitigate the project's effects on Piping Plovers and Roseate Terns, increasing the likelihood that these birds will be injured or killed.  The agencies' failure to use the best available science in the biological opinion for these bird species further injures her informational interest in learning about the birds and in supporting their conservation.

20.     Ms. Durkin has whale and bird watched while sailing and deep sea fishing in Nantucket Sound from early spring through late fall, and during every summer she can recall since her childhood.  She enjoys watching the Humpback and Fin Whales migrating with their calves at dawn when the waters of Nantucket Sound are almost still at their surface.  MMS's

failure to issue an SEIS harms Ms. Durkin's aesthetic, recreational, and informational interests in observing whales in Nantucket Sound and learning how the Cape Wind project will affect marine mammals.

21.     Ms. Durkin also enjoys watching birds near her home in Northboro, Massachusetts.  Ospreys, Bald Eagles, and other birds of prey are the species she finds most captivating.  She enjoys watching Ospreys nurturing their young and diving for herring and alewives.   Many of the species of birds that she enjoys observing inland – including Ospreys – migrate over Nantucket Sound.  MMS's approval of the Cape Wind project without complying with the MBTA injures Ms. Durkin's aesthetic and recreational interests by increasing the likelihood that the birds she observes will be injured or killed by the wind power turbines, and by increasing the risk of diminished populations of these birds.

22.     Plaintiff Martha Powers grew up visiting West Yarmouth annually and she has lived there since 2004.  As an environmentalist and someone who cares about animals, she takes great interest in the wildlife that inhabits Cape Cod and Nantucket Sound, as well as the birds who migrate through the area.  She is concerned that the Cape Wind project will harm Cape Cod's biological communities by killing and disturbing a wide variety of animals ranging from horseshoe crabs and migratory bats to endangered birds and whales.

23.     Ms. Powers enjoys viewing the Piping Plovers who nest on the beach near her house, and she often brings visitors to the beach to view the birds from a short distance.  She anticipates the time each year when plover hatchlings will emerge from their nests, and she will continue to visit the beach each spring to view the plovers.  The failure of FWS and MMS to comply with the ESA injures her aesthetic and recreational interests by diminishing her enjoyment of viewing the plovers because she knows that they are at increased risk of being

killed by wind turbines.   Ms. Powers also enjoys viewing terns, warblers, goldfinches, and Ospreys, and she sometimes feeds titmice, chickadees, and nuthatches from the palm of her hand.  MMS's violation of the MBTA harms her recreational interest in these birds by increasing the likelihood that the Cape Wind project will kill these birds, diminishing opportunities for her to engage in these activities.  Further, because Ms. Powers enjoys observing Ospreys from the location where the project's electrical transmission lines will come ashore, MMS's failure to consider alternatives to the project under NEPA will harm her ability to visit that land to view the birds by eliminating any possibility that the project will be located elsewhere, or configured differently.

24.      Ms. Powers also enjoys viewing whales from shore.  When she learns about aggregations of whales, she visits and often brings visitors to areas on Cape Cod where they can be seen.  In the past, she has seen Right Whales and Humpback Whales.  MMS's failure to prepare a SEIS to address the project's effects on Right Whales harms Ms. Powers' aesthetic and recreational interests in viewing these animals.

25.      Defendant Michael R. Bromwich is the Director of MMS, the agency within the Department of the Interior responsible for overseeing leases and easements of submerged lands in federal waters for energy production projects, including offshore wind power facilities.

26.      Defendant Kenneth Salazar is the Secretary of the Interior and has ultimate responsibility for the Department of the Interior and agencies within the Department, including MMS and FWS.

27.      Defendant Ronald Gould is the Acting Director of FWS, the agency within the Department of the Interior responsible for implementing the ESA, including making determinations such as the one at issue in this case.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

### A.    Statutory Framework

#### 1.    The Endangered Species Act

28.    Prompted by the "esthetic, ecological, educational, historical, recreational, and scientific value" of all of the country's species of fish, wildlife and plants, 16 U.S.C. § 1531(a)(3), Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  Id. § 1531(b). The ESA defines the term "conservation" as the use of "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided [by the ESA] are no longer necessary" – that is, to recover species so that they no longer need ESA protection.  Id. § 1532(3).  The Act imposes duties on the Secretary of the Interior, which have been delegated to the Director of the FWS.  50 C.F.R. § 402.01(b).

29.    The ESA requires the Secretary to issue regulations listing species as "endangered" or "threatened" based on the present or threatened destruction, modification, or curtailment of a species' habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting the species' continued existence.  16 U.S.C. § 1533(a)(1).

30.    Once listed as endangered or threatened, a species receives a number of important protections.  First, under the ESA and its implementing regulations, it is illegal for anyone to "take" an endangered or threatened species.  Id. § 1538(a)(1); see also 50 C.F.R. §§ 17.21, 17.31. The term "take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Section 10 of the

ESA provides an exception to the strict prohibition against "taking" an endangered or threatened species under which, in exchange for being permitted to "take" one or more members of the species, an individual must commit to a plan to "conserve" the species.  Id. § 1539(a)(1)(B), (a)(2)(A).

31.     Second, under section 7(a)(1) of the ESA, each federal agency must "utilize [its] authorities in furtherance of the purposes" of the ESA, id. § 1536(a)(1), and under section 7(a)(2), "[e]ach federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  Id. § 1536(a)(2).  In fulfilling these requirements, "each agency shall use the best scientific and commercial data available."  Id.

32.     To ensure that the mandate of section 7 of the ESA is carried out, Congress, along with the federal officials charged with implementing the ESA, have established a detailed consultation process that must be followed by federal agencies whose actions may affect endangered or threatened species.  Under this process, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If such a determination is made, the agency must, prior to making any final decision, enter into "formal consultation" with the FWS, id., by requesting that FWS issue a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  Id. § 402.14(g)(4); see 16 U.S.C. § 1536(b).

33.     When FWS concludes that agency action will result in incidental take that does not rise to the level of jeopardy to the entire species, FWS must issue a statement as part of a biological opinion that specifies the impact of the incidental take and sets forth the terms and conditions with which the action agency and private applicants must comply.  Id. § 1536(b)(4). As part of the incidental take statement, the ESA provides that FWS "shall provide the Federal agency and the applicant concerned, if any, with a written statement that . . . specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize [the] impact."  Id. (emphasis added).

34.     Section 7(d) prohibits "any irreversible or irretrievable commitment of resources" to a project before it has completed the section 7 consultation process and FWS has had an opportunity to determine whether, and the conditions under which, a project impacting listed species should be permitted to proceed, because the commitment of resources would have "the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" the agency should consider.  Id. § 1536(d).

35.     Reinitiation of formal consultation is required and "shall be requested by the Federal agency or by the Service where discretionary Federal involvement . . . has been retained or is authorized by law" and if, among other reasons, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16.

### 2.     The Migratory Bird Treaty Act

36.     Enacted to fulfill the United States' treaty obligations to protect migratory birds, the MBTA provides that "[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill . . . any migratory bird." 16 U.S.C. § 703(a) (emphasis added).  The Secretary has compiled a list of bird species protected under the MBTA, which includes a number of neotropical land bird migrant species, loons, grebes, cormorants, scoters, mergansers, gulls, terns, wading birds, and raptors, including Roseate Terns, Piping Plovers, and most migratory birds.  50 C.F.R. § 10.13.

37.     The Secretary of the Interior is authorized to promulgate regulations for the taking of migratory birds otherwise protected by the MBTA when doing so would be compatible with migratory bird conventions.  16 U.S.C. § 704(a).  The Secretary has delegated this authority under the statute to FWS, which has promulgated regulations allowing the taking of migratory birds, after the issuance of a permit from FWS, for hunting, possessing, buying, selling, importing, exporting, and "special purpose activities," as well as "depredation" of birds that are causing agricultural or horticultural harm.  50 C.F.R. §§ 21.11, 21.27, 21.42.  FWS's regulations reiterate the statute's fundamental prohibition on the taking of migratory birds "except as may be permitted under the terms of a valid permit issued pursuant to the provisions of [the agency's MBTA regulations]."  Id. § 21.11.

### 3.     The National Environmental Policy Act

38.     NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1.  Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and

enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." Id. § 1500.1(b)-(c).

39.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), including situations where several separate actions may have a cumulatively significant impact on the environment. 40 C.F.R. § 1508.27(b)(7).

40.     This statement – known as an Environmental Impact Statement ("EIS") – must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332.  NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Id. § 4332(2)(E).

41.     To determine whether an EIS is required in situations where an EIS is not normally prepared, federal agencies must prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4.  An EA must provide sufficient evidence and analysis to support the agency's determination of whether a proposed action will significantly affect the environment, thus requiring an EIS.

42.     At the time of its decision to take a proposed action, the agency must prepare a concise public "record of decision," which must identify all reasonable alternatives and "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."  Id. § 1505.2.

43.     A Supplemental EIS must be prepared if the agency makes "substantial changes in the proposed action that are relevant to environmental concerns" or if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  Id. § 1502.9(c).

   **B.     <u>Facts Giving Rise to Plaintiffs' Claims</u>**

       **1.     <u>Cape Wind Associates' Application for a Lease in Nantucket Sound and MMS's Consideration of the Application</u>**

44.     In 2001, Cape Wind Associates applied to the U.S. Army Corps of Engineers ("Corps") – which had jurisdiction over offshore wind power projects at that time – for a permit to allow the construction of an enormous wind power project in the federal waters of Nantucket Sound.  Many individuals and organizations – including several Plaintiffs – commented on the Cape Wind application to the Corps, arguing that three full years of studies were necessary to determine bird use of the area and raising concerns about the project's effects on marine mammals.  MMS stated that it considered this correspondence and the oral comments made at public hearings as scoping comments in the development of its draft EIS.  In 2005, Congress enacted the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, which made MMS principally responsible for federal approval and oversight of offshore wind power projects including the Cape Wind project.

45.     Cape Wind Associates' application to MMS sought permission to construct and operate 130 wind turbines, a transformer station, and an array of submarine cables on Horseshoe

Shoal, an extremely large area of submerged land in the federal waters of Nantucket Sound, off the coast of Massachusetts.  The enormous turbines would be driven into the seabed, with an overall height of 440 feet and a rotor diameter of 364 feet.  See U.S. Dep't of Energy, Wind Power Today (brochure) at 2-3, http://www1.eere.energy.gov/windandhydro/pdfs/41330.pdf (stating that "[y]ou can park 24 average-sized cars end to end across the diameter of [a 364-foot] rotor" and showing that a 440-foot turbine is taller than the Statue of Liberty).  The transformer station would consist of a steel structure supporting a platform of 100 feet by 200 feet with a helicopter deck, rising approximately 100 feet above the waterline.  The total project area would encompass 25 square miles, or 15,980 acres, of federal waters.

46.     Celebrated as a regionally significant location for water birds, the location of the proposed project is also part of the Atlantic flyway, the primary migratory route for birds on the East Coast.  MMS has acknowledged the area's significance to migratory birds: "Large numbers of migrating landbirds pass over Horseshoe Shoal at a wide range of altitudes during the autumn and spring . . . .  [Birds who] migrate through Nantucket Sound are estimated to be in the millions."  MMS, Cape Wind Energy Project: Final EIS at 4-49 (Jan. 2009) (emphasis added).  Among the migrants are federally endangered Roseate Terns (Sterna dougalli), who rest and feed on the mainland shore directly north of the project site at what MMS characterizes as "the largest pre-migratory [resting and feeding] habitat for roseate terns in North America," id. at 4-131, and federally threatened Piping Plovers (Charadrius melodus), who breed along the shores of Nantucket Sound.  See id. at 4-132.

47.     The area also serves several important roles for marine mammals.  Grey Seals breed and give birth to their pups on islands in Nantucket Sound, and large numbers of Harbor Seals can be seen resting on local beaches.  Other species that use Nantucket Sound and the

surrounding area include Hooded Seals, Atlantic White-Sided Dolphins, Atlantic Spotted

Dolphins, Risso's Dolphins, Short-Beaked Common Dolphins, Harbor Porpoises, Long-Finned

Pilot Whales, Minke Whales, Dwarf Sperm Whales, and Pygmy Sperm Whales.   Further,

federally listed Humpback Whales, Fin Whales, and North Atlantic Right Whales regularly visit

southern New England waters.  Two waterbodies near the project site – the Great South Channel

and Cape Cod Bay – are part of the Right Whale's critical habitat, and in March 2010, a very

large number of Right Whales aggregated in Nantucket Sound and in waters to the southeast,

apparently to feed and engage in other biologically important behaviors.

> **2.**      **Draft Environmental Impact Statement and Public Comments**

48.      On May 30, 2006, MMS published in the Federal Register a notice of its intent to

prepare a draft EIS on the project.  71 Fed. Reg. 30,693 (May 30, 2006).

49.      During the scoping period for MMS's draft EIS, Plaintiffs and many others

submitted detailed comments urging the agency to develop or obtain fuller and more precise

information on the species, numbers, timing, and altitudes of birds passing through the project

area, especially at night during the spring and fall migrations.  Plaintiffs further expressed

concerns about the project's effects on endangered Roseate Terns and other federally listed

wildlife species, and alerted MMS to the presence of species protected by the MBTA.

50.      Plaintiffs submitted comments that described how wind turbines kill birds through

direct collisions, human disturbance, and habitat loss and modification.  They also described how

construction and decommissioning of structures in the ocean, as well as the laying of cable, can

harm, harass, and disturb birds, marine mammals, and the prey species on which they depend.

Plaintiffs explained that marine mammals in particular show an aversion to loud noises, and thus

the pile driving associated with the construction of turbines are likely to harm and harass those animals in the area.

51.     On January 18, 2008, MMS published a notice in the Federal Register that the draft EIS was available for public comment.  73 Fed. Reg. 3,482 (Jan. 18, 2008).  In total, MMS received more than 42,000 comments on the draft EIS for this highly controversial energy facility.

52.     The Alliance to Protect Nantucket Sound submitted 224 pages of comments, which raised significant concerns about the project's effect on wildlife.  The comments also urged MMS to reject the draft EIS's Purpose and Need – which essentially read as a description of the developer's own proposal – because it foreclosed the consideration of other alternatives.

53.     Several leading bird experts submitted comments critical of MMS's draft EIS.  In his April 2008 comments to MMS, Dr. Ian C. T. Nisbet, a professional environmental scientist who has studied bird movements around Nantucket Sound since 1958 and who has served as a member of the Recovery Team for the endangered Roseate Tern, stated that the field studies and analysis in MMS's draft EIS was "inadequate, biased, and in some cases incompetent."  Dr. Nisbet urged MMS to conduct, or require the developer to conduct, additional field work to clarify uncertainties about bird use of the area, such as the altitude at which terns fly across Nantucket Sound, in order to develop a more accurate assessment of the bird mortality that the project would be expected to cause.

54.     William Evans, the scientist who pioneered the modern study of avian night flight calls as a tool for investigating night migration, also submitted a report stating that the analysis of the project's impact on night-migrating passerines (song birds) in MMS's draft EIS was "not well done" and that the conclusions presented were "not supported by the studies cited."

Further, Mr. Evans' comments emphasized that the draft EIS failed to acknowledge significant data gaps regarding whether lit turbines will attract aggregations of migratory landbirds looking for rest stops.

55.     Dr. K. Shawn Smallwood, an independent scientist who had conducted extensive research on bird collisions with American wind turbines and had developed the field and analytical methods in use today, criticized MMS's analysis of mitigation techniques in the DEIS. He stated that adaptive management – a wait-and-see approach that allows developers to modify projects based on observed impacts in the field – "is impossible in a wind farm setting without strong incentives for the project owners to modify wind turbine operations to reduce [bird kills]." He urged MMS to require a substantial performance bond from Cape Wind Associates linked to thresholds of bird mortality, to keep the developer accountable for bird deaths caused by its turbines, but pointed out that there is no methodology yet developed for counting dead birds under wind turbines at sea.  Thus, he concluded that selecting the best site for a wind power project, based on sufficient pre-construction bird studies, remained the most important measure for minimizing impacts to birds.

56.     During this time, and over the course of eight years, FWS, which is entrusted with protection of endangered species and migratory birds, repeatedly advised MMS to conduct three full years of radar studies to quantify bird movement across Horseshoe Shoal at the height of the rotor-swept zone (the altitude at which turbine blades would strike and kill wildlife), or require the applicant to do so.  See Department of the Interior Office of the Inspector General, Investigative Report of Cape Wind Associates, LLC Redacted ("Investigative Report") at 11 (Jan. 8, 2010) (stating that a FWS biologist "never understood" why the project applicant did not conduct the three-year radar study "that FWS recommended in 2001 at the inception of the

project").  FWS emphasized that the three-year time period is important in order to collect robust

data that provide an accurate picture of bird use of the airspace over Nantucket Sound despite

annual and seasonal variations.

57.     Marine mammologists also criticized MMS's analysis of impacts of the project's

effects on whales in the DEIS.  Kimberly Amaral, a biologist in a marine mammal acoustics

laboratory at the Woods Hole Oceanographic Institution who had worked with an extensive

historical collection of verified and voucher marine mammal recordings for the previous eight

years, criticized MMS's use of methodologies for characterizing whale hearing capacities that

had not been adopted by the National Marine Fisheries Service, the federal agency responsible

for implementing the ESA for marine species.  Ms. Amaral also raised concerns that MMS's

DEIS failed to adequately address the behavioral effects of underwater noise during construction.

Additionally, she stated that she remained concerned "about the increased potential for vessel

strikes with . . . whales due to increased vessel traffic and speed."

58.     Other experts who severely criticized MMS's draft EIS include Dr. Russell P.

DeFusco, an ornithologist with 25 years' experience in ecological and ornithological modeling

using remote sensing technologies such as radar; Dr. Richard Veit, a researcher with specialized

experience in surveying pelagic (ocean-dwelling) birds from ships and airplanes; Dr. Robert J.

Hofman, who had served for 25 years as Scientific Program Director of the Marine Mammal

Commission; and Dr. Randall Reeves, chairman of the International Union for the Conservation

of Nature/ Species Survival Commission's Cetacean Specialist Group and a member of the

Marine Mammal Commission's Committee of Scientific Advisors.

### 3.    **Final Environmental Impact Statement**

59.    In January 2009, MMS issued a final EIS purporting to evaluate the proposed wind power facility's environmental impacts.

60.    In the EIS, MMS defined the Purpose and Need as "to provide and operate an alternative energy facility that utilizes the unique wind resources in waters offshore of New England" on a large scale, ignoring comments that criticized this approach as being merely a description of Cape Wind Associates' own proposed project. The narrow scope presented by the agency foreclosed any meaningful review of other renewable energy projects as alternatives to the proposed project, including those that would utilize wind power technology on land.

61.    MMS also ignored or downplayed the significant concerns raised about the project's impacts on birds and whales. Despite the repeated and strong recommendations of FWS – the expert wildlife agency – that MMS should itself conduct, or require the applicant to submit, three full years of radar studies to quantify bird movement across Horseshoe Shoal, MMS refused to do so. The only radar studies conducted in relation to the lease were three brief studies in 2002, 2005, and 2006, none of which exceeded three months in duration. Cape Wind Associates specifically refused to conduct studies during inclement weather, when wintering ducks and seabirds would be at greatest risk of collision with wind power turbines.

62.    MMS also discounted the concerns of expert ornithologists, selecting as its preferred alternative a project that was projected to kill thousands of birds per year – including federally listed Roseate Terns and Piping Plovers.

63.    MMS's EIS dismissed the project's effect on Right Whales by stating, "Based upon the underdevelopment of whale prey species in Nantucket Sound, it is highly unlikely that whales would be migrating through, nursing, or feeding in Nantucket Sound." EIS at 5-194.

### 4.   Environmental Assessment and MMS's Refusal to Prepare a Supplemental EIS

64.     On March 4, 2010, MMS issued a draft EA that addressed developments since the issuance of the EIS and that determined that no supplemental EIS was required.

65.     In response, Plaintiffs submitted a letter urging MMS to require temporary, seasonal shut downs of wind turbines during bird migrations to reduce mortality.  Plaintiffs submitted this letter both as comments on the EA and as a notice of intent to sue under the ESA citizen suit provision.  They enclosed an economic analysis that demonstrated that temporary and seasonal shut downs would have a negligible effect on Cape Wind Associates' profits – profits which were themselves predicated on large federal subsidies for the project.

66.     On April 26, 2010, the Alliance to Protect Nantucket Sound further alerted MMS to important developments related to endangered Right Whales:

> Aerial surveys conducted by the National Marine Fisheries Service (NMFS) have confirmed that almost 100 right whales have been seen feeding to the west and the south of Martha's Vineyard, generally heading north and east and possibly into Nantucket Sound. In addition, a mother/calf pair has been located within Nantucket Sound, and a new Dynamic Management Area (DMA) has been established to protect right whales in the Sound. The April 14 DMA shows three whales present, and a March 12 DMA shows fourteen in the same area. Significant numbers of right whales also have been sighted directly within the travel route for work vessels from Quonset, Rhode Island.

67.     On April 28, 2010 – only two days after the Alliance to Protect Nantucket Sound's comments on the draft EA – MMS released a final EA.  The EA found that no SEIS was necessary because although new information suggested that Right Whales were more likely to be present in the area, and in greater numbers, than previously recognized, "there is no basis to conclude that an increased level of harassment or take would result."  The EA did not directly address the fact that the EIS had dismissed the project's potential impact on Right Whales

because it was believed to be "highly unlikely" that they would be present in the project area at all.

68.     The same day – April 28, 2010 – the Secretary of the Interior announced that MMS had decided to grant a lease to Cape Wind Associates for operation of a wind power facility, and MMS issued a Record of Decision ("ROD") stating that MMS would issue a lease upon Cape Wind's satisfaction of certain requirements.  On information and belief, the ROD and EA were issued on April 28, 2010 because Defendants had established an arbitrary schedule for decision-making for political reasons – regardless of legal, scientific, or other concerns counseling in favor of a different timetable.

69.     At no time did MMS seek, or indicate its intent to seek, authorization from the Secretary of the Interior to permit the killing of birds protected by the MBTA.

## 5.     Consultation Under the Endangered Species Act

70.     In the course of approving the project, MMS consulted with FWS on Cape Wind Associates' application to construct and operate a wind power facility in federal waters traversed by federally endangered Roseate Terns and in close proximity to the beaches where threatened Piping Plovers nest.  In its biological opinion on the Cape Wind application, FWS determined that the wind power facility will kill at least 80 to 100 Roseate Terns and up to ten Piping Plovers over the first twenty years of the project.

71.     FWS estimated these expected levels of take of the Roseate Tern and Piping Plover based on the same data that the agency had previously dismissed as insufficient to measure the proposed project's impact on birds.  In comments on MMS's draft EIS for the project earlier that same year, FWS stated that the "paucity of site-specific information" on migratory birds prevented MMS from accurately characterizing the project's environmental

impact.  FWS, <u>Comments on DEIS</u> at 2 (Apr. 21, 2008).  Without collecting additional data, requiring the developer to do so, or giving the benefit of the doubt to the federally listed species, FWS used the <u>same data</u> to project the levels of take that it determined did not rise to the level of jeopardy to the species under the ESA.

72.     Further, the agency ignored its own previously published interim guidance on avoiding and minimizing wildlife impacts from wind turbines.  In this guidance, FWS recommended that wind power developers collect three years of monitoring data – including data collected by radar – in areas of high seasonal concentrations of birds prior to construction. Ignoring its previous conclusions, FWS rejected site-specific radar data from Nantucket Sound in its biological opinion and instead relied on the very data the agency had previously rejected as being insufficient to estimate take.

73.     Additionally, even though FWS had found that the applicant should shut down wind turbines on a temporary and seasonal basis to reduce bird kills, as a term and condition of the incidental take authorization in its draft biological opinion, the agency did not require such mitigation in the final biological opinion solely because <u>MMS and the lease applicant</u> rejected a shut down as too costly.  FWS had planned to require this operational modification to benefit Roseate Terns, but feathering turbines during period of adverse weather would have also benefited passerines, who normally fly above the height of turbines but who are forced to lower altitudes during fog and rain.  After MMS forwarded to FWS comments from the project applicant, Cape Wind Associates, which asserted that the temporary and seasonal shut down was too costly, FWS issued a final biological opinion that did not incorporate any shut down requirement into the incidental take statement for the project.  FWS stated that <u>it</u> "considered" temporary shut down as a reasonable and prudent measure to minimize impacts on listed species,

but that "it was <u>determined by MMS and [Cape Wind Associates] to **not** be reasonable and prudent</u>."  FWS, Final Biological Opinion, Cape Wind Associates, LLC, Wind Energy Project, Nantucket Sound, Massachusetts at 74-75 (Nov. 21, 2008) (emphasis added, bold in original). FWS never made an independent finding of whether a temporary shut down would be reasonable and prudent under the circumstances, but rather jettisoned the measures in the final biological opinion merely because the lease applicant and the action agency resisted them.

74.     MMS and FWS did not reinitiate consultation when Plaintiffs submitted an economic analysis demonstrating that the shut down measure would result in an insignificant loss of profits and thus was both reasonable and prudent.

75.     On March 15, 2010, April 7, 2010, and April 9, 2010, Plaintiffs gave notice to the Secretary of the Interior, FWS, and MMS of their intent to sue under the ESA citizen suit provision.  These notices supplemented the 60-day notice letters that the Alliance to Protect Nantucket Sound sent on September 2, 2008 and November 6, 2008 under the citizen suit provision of the ESA.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim One: Violations of the Endangered Species Act

76.     By failing to independently determine reasonable and prudent measures necessary or appropriate to minimize incidental take of federally listed species, FWS has violated the ESA, 16 U.S.C. § 1536(b), and the APA.  5 U.S.C. § 706.

77.     By preparing a biological opinion under the ESA that fails to use the best available scientific information available in evaluating jeopardy and permissible take, FWS has violated the ESA, 16 U.S.C. § 1536(a), and the APA.  5 U.S.C. § 706.

78.     By issuing a record of decision that indicates that MMS will grant a lease to Cape Wind Associates to construct an offshore wind power facility under an invalid biological opinion, MMS has violated the ESA's prohibition against any action that will jeopardize the continued existence of a species, 16 U.S.C. § 1536(a), and is also violating the ESA's prescription against the irreversible or irretrievable commitment of resources before a valid consultation has been concluded.  See 16 U.S.C. § 1536(d).

79.     By refusing to reinitiate consultation when Plaintiffs submitted information demonstrating that mitigation measures originally proposed by FWS would have at most a de minimis effect on the viability of the project, MMS and FWS violated the ESA.  See 50 C.F.R. § 402.16.

80.     Defendants' actions have injured and continue to injure plaintiffs in the manner described in paragraphs 3 to 24.

### Claim Two: Violations of the Migratory Bird Treaty Act and the APA

81.     By approving a project certain to kill migratory birds without obtaining a permit or other authorization – as required under the plain language of section 703 of the MBTA, 16 U.S.C. § 703, and its implementing regulations – MMS has acted in a manner that is arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA.  5 U.S.C. § 706.

82.     MMS's actions have injured and continue to injure plaintiffs in the manner described in paragraphs 3 to 24.

**Claim Three: Violations of the National Environmental Policy Act and the APA**

83.     MMS has violated NEPA by issuing an EIS that makes conclusions about the proposed offshore wind power facility's impact on birds without obtaining or considering sufficient data.

84.     MMS has violated NEPA by refusing to issue an SEIS despite "significant new circumstances [and] information relevant to environmental concerns and bearing on the proposed action or its impacts" – including the presence of a large aggregation of Right Whales in the action area.  40 C.F.R. § 1502.9(c).

85.     MMS has violated NEPA by unlawfully limiting its consideration of alternatives in its EIS for the project to the lease applicant's project design.

86.     MMS's actions in failing to comply with NEPA are arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA.  5 U.S.C. § 706.

87.     MMS's actions have injured and continue to injure plaintiffs in the manner described in paragraphs 3 to 24.


WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     declare that defendants have violated the ESA, MBTA, NEPA, and the APA;

(2)     vacate and enjoin Defendants' authorization of Cape Wind Associates' proposal to construct and operate a wind power facility in federal waters;

(3)     award Plaintiffs their costs, attorneys' fees, and other disbursements for this action, including any expert witness fees; and

(4)     grant Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

_____
Eric R. Glitzenstein (D.C. Bar No. 358287)

_____
William S. Eubanks II (D.C. Bar No. 987036)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206
Fax (202) 588-5049
eglitzenstein@meyerglitz.com
beubanks@meyerglitz.com

June 25, 2010