**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, *et al.*,<br><br>Plaintiff<br><br>v.<br><br>TOMMY P. BEAUDREAU, *et al.*,<br>Defendants, and<br><br>CAPE WIND ASSOCIATES, LLC,<br><br>Defendant-Intervenor. | CASE NO.  10-cv-1067-RBW-DAR (consolidated) |

**COMBINED MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR
CAPE WIND ASSOCIATES LLC'S MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO THE PEER ET AL. PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

---

Geraldine E. Edens
D.C. Bar No. 437056
Christopher H. Marraro
D.C. Bar No. 395152

BAKER & HOSTETLER LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, D.C.  20036
(202) 861-1594
Fax: (202) 861-1783

Counsel for Cape Wind Associates, LLC

Dated: December 7, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

    The Endangered Species Act .............................................................................................. 3

    The Migratory Bird Treaty Act .......................................................................................... 4

STATEMENT OF FACTS ........................................................................................................ 5

    Regulatory History of the Project ....................................................................................... 5

    Nantucket Sound ................................................................................................................. 7

    Agency Analysis of Potential Avian Impacts Was Comprehensive and Science-Based .......... 8

    FWS Rigorously Evaluated Potential Impacts on Threatened and Endangered Avian
    Species Using the Best Available Science and Commercial Data ......................................... 10

    A Scientifically-Based Avian and Bat Mitigation and Monitoring Plan Will Minimize
    Potential Impacts to Avian Species ..................................................................................... 15

    NMFS Rigorously Evaluated Potential Impacts on Threatened and Endangered Right
    Whales and Sea Turtles Using the Best Available Science and Commercial Data .................. 15

STANDARD OF REVIEW ....................................................................................................... 19

ARGUMENT ........................................................................................................................... 20

    I.   THE FWS AND BOEM COMPLIED FULLY WITH THE ENDANGERED
       SPECIES ACT .......................................................................................................... 20

       A.  FWS Appropriately Consulted with BOEM and CWA Regarding Reasonable
          and Prudent Measures ......................................................................................... 21

       B.  Reasonable and Prudent Measures Cannot Significantly Impact the Project ........... 23

    II.  BOEM DID NOT VIOLATE THE MIGRATORY BIRD TREATY ACT ...................... 27

       A.  BOEM Cannot Be Liable Under the MBTA for Approving the Project .................. 29

       B.  Plaintiffs' Reading of the Statutory Language Would Lead to Absurd Results ........ 32

    III. NMFS AND BOEM COMPLIED FULLY WITH THE ENDANGERED
        SPECIES ACT .......................................................................................................... 35

       A.  NMFS Rigorously Analyzed Data on Right Whales and Provided a Clear
          Explanation for Its No Jeopardy Opinion Based Upon the Best Scientific
          Data Available ..................................................................................................... 35

       B.  NMFS Reasonably Concluded That Crew Boats Transiting the Area During
          Project Operation Would Not Adversely Impact Right Whales .............................. 38

       C.  NMFS Assessed All Effects of a Longer Geophysical Survey on Sea Turtles .......... 43

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Littoral Soc'y v. Herndon,*
720 F. Supp. 942 (S.D. Fla. 1988).........................................................................21

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council,*
462 U.S. 87, 103 S.Ct. 2246 (1983) .....................................................................19

*\*Bennett v. Spear,*
520 U.S. 154, 117 S.Ct. 1154 (1997) ......................................................22, 23, 27

*Cabinet Mountains Wilderness v. Peterson,*
685 F.2d 678 (D.C. Cir. 1982)..............................................................................19

*Care Net Pregnancy Center of Windham County v. U.S. Dep't of Agriculture,*
2012 WL 4801777 (D.D.C. 2012) ........................................................................20

*\*Center for Biological Diversity v. Pirie,*
201 F. Supp.2d 113 (D.D.C. 2002)..................................................................29, 30

*Citizens Interested in Bull Run, Inc. v. Edrington,*
781 F. Supp. 1502 (D.Or. 1991) ...........................................................................31

*Ctr. for Biological Diversity v. Pirie,*
191 F. Supp.2d 161 (D.D.C. 2002)...............................................................4, 29, 30

*\*Ctr. for Biological Diversity v. Salazar,*
770 F. Supp.2d 68 (D.D.C. 2011)..........................................................................40

*Curry v. U.S. Forest Serv.,*
988 F. Supp. 541 (W.D.Pa. 1997) .........................................................................31

*Defenders v. Guitierrez,*
532 F.3d 913 (D.C. Cir. 2008)..............................................................................42

*Defenders v. Navy,*
No. CV 210-014, 2012 WL 3886412 (S.D. Ga. Sept. 6, 2012)............................42

*EME Homer City Generation, L.P. v. EPA,*
696 F.3d 7 (D.C. Cir. 2012)..................................................................................33

*Ethyl Corp. v. EPA,*
541 F.2d. 1 (D.C. Cir. 1976)..................................................................................19

*Gerber v. Norton,*
194 F.3d 173 (D.C. Cir. 2002)..............................................................................23

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
80 F. Supp.2d 1137 (W.D. Wash. 2000) ..............................................................42

*Hill v. Norton*,
275 F.3d 98 (D.C. Cir. 2001)..................................................................4, 5, 19

*Humane Soc'y of the U.S. v. Glickman*,
No. 98-1510, 1999 U.S. Dist. LEXIS 19759 (D.D.C. July 6, 1999) ......................31

*\*Humane Soc'y of the United States v. Glickman*,
217 F.3d 882 (D.C. Cir. 2000)...........................................................4, 5, 29, 31

*Hüls Am., Inc. v. Browner*,
83 F.3d 445 (D.C. Cir. 1996)..............................................................................19

*In re Franklyn C. Nofziger*,
925 F.2d 428 (D.C. Cir. 1991)............................................................................33

*Jackson v. Metro. Edison Co.*,
419 U.S. 345, 95 S.Ct. 449 (1974) .....................................................................29

*Kleppe v. Sierra Club*,
427 U.S. 390, 96 S.Ct. 2718 (1976) ...................................................................19

*Lynch v. Overholser*,
369 U.S. 705, 82 S.Ct. 1063 (1962) ...................................................................32

*Mahler v. U.S. Forest Serv.*,
927 F. Supp. 1559 (S.D. Ind. 1996).....................................................................31

*Marsh v. Oregon Natural Res. Council*,
490 U.S. 36, 109 S.Ct. 1851 (1989) .......................................................37, 38, 39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29, 103 S.Ct. 2856 (1983) ..............................................................19, 20

*Nat'l Wildlife Fed'n v. Norton*,
332 F. Supp.2d 170 (D.D.C. 2004).................................................................21, 42

*National Wildlife Federation v. Norton*,
2005 WL 2175874 (E.D. Cal. 2005) ...................................................................23

*Natural Res. Defense Council v. Kempthorne*,
506 F. Supp.2d 322 (E.D. Cal. 2007) ..................................................................42

*\*Newton County Wildlife Ass'n v. U.S. Forest Serv.*,
113 F.3d 110 (8th Cir. 1997) ...................................................................5, 30, 33

iii

*Oregon Natural Res. Council v. Allen,*
   476 F.3d 1031 (9th Cir. 2007) ..................................................................24, 25

*Seattle Audubon Society v. Evans,*
   952 F.2d 297, 302 (9th Cir. 1991) .............................................................30, 33

*Sierra Club v. Martin,*
   110 F.3d 1551 (11th Cir. 1997) .......................................................................5

*United States v. Apollo Energies,*
   611 F.3d 679 (10th Cir. 2010) .......................................................................32

*United States v. Brigham Oil & Gas,*
   840 F. Supp.2d 1202 (D.N.D. 2012) .........................................................32, 34

*United States v. CITGO Petroleum Corp.,*
   No. C–06–563, 2012 WL 3866857 (S.D. Tex. Sept. 5, 2012) ..............................32

*United States v. FMC Corp.,*
   572 F.2d 902 (2d Cir. 1978) ...............................................................34, 36, 37

*United States v. Moon Lake Elec.,*
   45 F. Supp.2d 1070 (D.D.C. 1999) ................................................................33

*United States v. Ray Westall Operating, Inc.,*
   No. CR 05-1516-MV, 2009 U.S. Dist. LEXIS 130674 (D.N.M. Feb. 25, 2009) ...................32

*United States v. Ron Pair Enters.,*
   489 U.S. 235, 109 S.Ct. 1026 (1989) .............................................................33

*Vill. of Bensenville v. FAA,*
   457 F.3d 52 (D.C. Cir. 2006) ........................................................................29

*Wetlands Water Dist. v. Dep't of the Interior,*
   376 F.3d 853 (9th Cir. 2004) ....................................................................26, 27

## STATUTES

5 U.S.C. § 551 *et seq.* ...................................................................................4

5 U.S.C. § 706 ..........................................................................................19

16 U.S.C. § 703 ...............................................................................4, 5, 29, 31

16 U.S.C. §§ 703-712 ...................................................................................1, 3

16 U.S.C. § 1536 ..........................................................................................1

16 U.S.C. § 1536(a)(2) ...................................................................................22

16 U.S.C. § 1536(b)(4)(ii) ............................................................................................23

Energy Policy Act of 2005, Pub. L. 109-58 (Aug. 8, 2005) ..........................................6

National Environmental Policy Act, 42 U.S.C. § 4321-4370h ......................................1

Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* ..............................passim

Rivers and Harbors Act, 33 U.S.C. § 401 *et seq.* .........................................................6

**OTHER AUTHORITIES**

50 C.F.R. Part 224.103(c)(i) ........................................................................................41

50 C.F.R. § 10.12 .........................................................................................................33

50 C.F.R. § 402.14(i)(2) ...............................................................................................24

50 C.F.R. § 402.14(d) ...................................................................................................21

50 C.F.R. § 402.14(g)(8) ..............................................................................................22

50 C.F.R. § 402.14(h)(3) ............................................................................................3, 4

51 Fed. Reg. 19,926 ......................................................................................................22

51 Fed. Reg. 19,926-7 ..................................................................................................21

51 Fed. Reg. 19,937 ......................................................................................................24

76 Fed. Reg. 56,735, 56,736 (Sept. 14, 2011) .............................................................44

77 Fed. Reg. 1501 (Jan. 10, 2012) ...............................................................................28

H.R. Conf. Rep. 97-835 (1982) ....................................................................................21

## LIST OF ACRONYMS

| | |
|---|---|
| ABMP | Avian Bat Monitoring Plan |
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| BOEM | Bureau of Ocean Energy Management |
| COP | Construction and Operations Plan |
| Corps | US Army Corps of Engineers |
| CWA | Cape Wind Associates |
| DOA | Department of Agriculture |
| EA | Environmental Assessment |
| ESA | Endangered Species Act |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FWS | Fish and Wildlife Service |
| FWS BiOp | Fish and Wildlife Service Biological Opinion |
| ITS | Incidental Take Statement |
| MAS | Massachusetts Audubon Society |
| MBTA | Migratory Bird Treaty Act |
| MLLW | Mean Level Low Water |
| NMFS | National Marine Fisheries Service |
| 2008 BiOp | Biological Opinion issued by the National Marine Fisheries Service on November 13, 2008 |
| 2010 BiOp | Biological Opinion issued by the National Marine Fisheries Service on December 30, 2010 |
| OCS | Outer Continental Shelf |
| ROD | Record of Decision |
| RPM | Reasonable and Prudent Measure |
| WTG | Wind Turbine Generator |

## INTRODUCTION

Plaintiffs seek to thwart the first U.S. offshore wind energy project that will produce clean electrical energy and launch a new offshore wind industry.  As the first of its kind in the United States, the Cape Wind Project's potential environmental impacts and benefits are thoroughly understood and documented.  For over 10 years, multiple agencies throughout the federal government have rigorously studied the Project, which has resulted in administrative records (the "Record") totaling more than 54,000 documents and hundreds of thousands of pages.  It is hard to identify another environmentally beneficial project, indeed any project whatsoever, whose potential environmental impacts have been more carefully analyzed.  The Project enjoys the enthusiastic support of *amici curiae* Natural Resources Defense Council, Conservation Law Foundation, and the Massachusetts Audubon Society – three prominent environmental organizations whose missions are to protect wildlife and natural resources.  This alone speaks volumes as to the thoroughness of the analyses conducted by the federal agencies.

Plaintiffs seek summary judgment on claims brought pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-712.[1]  Plaintiffs' ESA claims challenge the biological opinions ("BiOps") issued by the two expert wildlife agencies, the U.S. Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively, the "Services").  Plaintiffs do not dispute FWS's determination that the Project will not jeopardize any listed avian species.[2]  Instead, they argue that FWS has a nondiscretionary duty to determine what reasonable and prudent measures

---

[1] In their Complaint, Plaintiffs also brought a claim pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321-4370h, but represented to the Court at the Sept. 28, 2012 status conference that they would not brief that claim.

[2] Nor do they dispute FWS's very conservative estimate that the Project may incidentally injure only 4 to 5 terns per year and only one piping plover every two years.

("RPMs") are appropriate to minimize adverse effects on birds without consideration of the expertise of the lead agency, Bureau of Ocean Energy Management ("BOEM"), or the Project applicant Cape Wind Associates ("CWA"), and without regard to the economic impacts on the Project.  However, Plaintiffs cannot escape three fatal points of law: (1) that ESA Section 7 is only an interactive "consultation" provision that requires FWS *to consult with* BOEM and *to solicit input from* CWA; (2) that reasonable and prudent measures "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only *minor* changes;" and (3) that the "best scientific and *commercial data* available" standard demands that FWS consider the economic consequences of an RPM.

Despite a four year consultation process with NMFS that produced two BiOps and over 600 pages of facts and analyses citing an astonishing 270 scientific studies and investigations, the overwhelming majority of which are peer-reviewed, Plaintiffs challenge NMFS's reasoned expert findings that right whales are infrequent visitors to Nantucket Sound, that CWA's use of two 50-foot crew boats during Project operation does not pose a risk to right whales, and that NMFS did not adequately consider the potential effects of CWA's preconstruction survey work on sea turtles.  Plaintiffs' attack on the NMFS BiOp is unfounded and is based upon a gross distortion of the Record.   Plaintiffs also erroneously discount the strict mitigation measures imposed by NMFS.

Finally, Plaintiffs ask this Court to take the unprecedented step of expanding the MBTA to require all federal agencies – and by logical extension all state and local agencies – to seek a permit before approving any structure that may incidentally harm migratory birds.  No court has ever held that a federal agency violates the MBTA if it does not seek a permit prior to authorizing a non-governmental third party to undertake a lawful action.  The MBTA imposes

liability only when the government itself *directly engages* in activities that harm migratory birds, *e.g.*, government agency captures or kills birds or drops bombs on an island killing birds. It is unimaginable that Congress intended federal, state, and local agencies to seek MBTA permits before authorizing any and all projects that could potentially injure birds. FWS is not required to, nor capable of, issuing and enforcing such an incalculable number of permits.

STATUTORY AND REGULATORY FRAMEWORK

**The Endangered Species Act**

Section 7 of the ESA requires a federal agency, in this case BOEM, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." *Id*. at § 1536(a)(2). To determine if a proposed action may adversely affect a species, the action agency prepares a Biological Assessment ("BA"). If the BA concludes that a project may adversely affect a species, the agency must engage in formal consultation with one of the Services. *Id.* At the completion of the consultation process, the Service will issue a BiOp reflecting its expert judgment regarding the effect of the proposed action on the species or its habitat. *Id*. at § 1536(b)(3)(a).

Using "the best scientific and commercial data available," the Services opine on whether the proposed action is likely to jeopardize the listed species. 50 C.F.R. § 402.14(h)(3). When the Services conclude that an action will not jeopardize a listed species, as is the case here, they will issue an incidental take statement ("ITS") identifying the expected incidental impact on the listed species. *Id*. at § 402.14(i). The ITS creates a safe harbor against the prohibition on "take" under section 9 of the ESA. *Id*. If the amount or extent of the take specified in the ITS is exceeded, reinitiation of formal consultation is required. *Id*. at § 402.16. Thus, the ITS serves as

a check on the Services' expert opinions that the incidental take of a listed species will not jeopardize the listed species.

The ESA directs the Services to include in their ITS "those reasonable and prudent measures that the [Services] consider[] necessary or appropriate to minimize" impacts to listed species, as well as the "terms and conditions" that the agency must comply with in order to ensure that the measures are implemented.  *Id*. at §§ 402.14(i)(1)(ii), (iv).  "Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only *minor* changes."  *Id*. at § 402.14(i)(2) (emphasis added).

**The Migratory Bird Treaty Act**

The Migratory Bird Treaty Act is a criminal statute enacted in 1918 to implement a treaty between the United States and Great Britain (on behalf of Canada) for the protection of migratory birds.  *See Humane Soc'y of the United States v. Glickman,* 217 F.3d 882, 883 (D.C. Cir. 2000).[3]  The MBTA makes it "unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture [or] kill" any native migratory bird species unless permitted by FWS.  16 U.S.C. § 703.

The "MBTA provides no private cause of action . . . ."  *Ctr. for Biological Diversity v. Pirie*, 191 F. Supp.2d 161, 175 (D.D.C. 2002), *vacated on mootness grounds*, Nos. 02-5163, 02-5180, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003).  In the D.C. Circuit, claims against the federal government for agency activities that constitute a violation of the MBTA must be brought as a challenge to a final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C.

---

[3]     The MBTA has been amended to cover conventions with Mexico, Japan, and the former Soviet Union.  *See Hill v. Norton,* 275 F.3d 98, 100-01 (D.C. Cir. 2001).

§ 551 *et seq. See Hill v. Norton*, 275 F.3d 98, 103 (D.C. Cir. 2001) ("Because the MBTA does

not create a private right of action . . . [agency action] can only be challenged under the APA.").

In such cases, the D.C. Circuit considers the text of § 703, rather than § 707's criminal

provisions.[4] *See Humane Society*, 217 F.3d at 887.

## STATEMENT OF FACTS

The Cape Wind Project is our Nation's first offshore wind energy project and involves

the construction and operation of 130 wind turbine generators ("WTGs") arranged in a grid

pattern in the shallow waters of Horseshoe Shoal of Nantucket Sound.[5]   The Project is designed

to deliver a maximum of 454 megawatts of clean electrical energy, and will be connected to the

existing electric transmission system that serves Cape Cod and the New England region.   In

average wind conditions, Cape Wind's power output will supply approximately 75 percent of the

electrical demand to Cape Cod and the islands of Martha's Vineyard and Nantucket.   While

significantly advancing state and federal renewable energy goals, it will also launch a new

industry in the U.S. for offshore renewable energy.

**Regulatory History of the Project**

For over 10 years the Project has undergone one of the longest and most extensive state

and federal regulatory reviews ever conducted for an energy project.   Numerous federal, state,

and local agencies have reviewed the Project and have consistently determined that its benefits

far outweigh its potential impacts.   The extraordinary regulatory timelines are attributable to the

---

[4]     Other Circuits disagree, stating that a claim under the MBTA cannot be pursued against the federal
government.   *See e.g.*, *Sierra Club v. Martin*, 110 F.3d 1551, 1556 (11th Cir. 1997); *Newton County Wildlife Ass'n
v. U.S. Forest Serv.*, 113 F.3d 110, 115-16 (8th Cir. 1997).

[5]     The leased area of the Project is approximately 46 square miles, but the physical footprint of the Project
itself is only 25 square miles.

unrelenting opposition of well-funded and litigious special interests, who have prompted regulators to use exceptional and exacting care in conducting their reviews.

In 2001, CWA filed an application for a permit to construct the Project with the U.S. Army Corps of Engineers ("Corps") under the Rivers and Harbors Act, 33 U.S.C. § 401 *et seq.* After three years of extensive scientific and economic study and extraordinary public input, the Corps issued a 3,800 page draft environmental impact statement ("EIS") in November 2004. CW111956.  Shortly thereafter, Congress passed the Energy Policy Act of 2005, Pub. L. 109-58 (Aug. 8, 2005), which amended the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, to empower the Department of Interior to approve alternative energy projects on the Outer Continental Shelf ("OCS").  The Secretary of the Interior has delegated primary regulatory responsibility for alternative energy projects on the OCS to BOEM.

BOEM then prepared a second, even more exhaustive EIS.  BOEM issued a draft EIS for public comment in January 2008.  CW111956.  After conducting four public hearings and receiving thousands of public comments, BOEM completed a final EIS in January 2009 ("FEIS").  *Id.*  In April 2010, BOEM prepared an Environmental Assessment ("2010 EA") "to evaluate post-FEIS information," and the Secretary of the Interior issued a Record of Decision ("ROD") documenting the Department's decision to grant CWA a lease on the OCS for construction of the Project ("Lease ROD").  CW111957.  The Lease was executed on October 6, 2010.  CW119275.  In April 2011, BOEM prepared a second EA ("2011 EA") to evaluate post-lease information and issued a ROD approving CWA's Construction and Operations Plan ("COP") for the Project ("COP ROD").  CW119697.  CWA has all of the federal and state permits necessary to begin construction.  CWA conducted pre-construction geophysical and geotechnical field work from July 5 through November 3, 2012.

6

**Nantucket Sound**

The Project is located in Nantucket Sound ("Sound"), a body of water that is approximately 23 miles long and between 6 and 22 miles wide, bordered by Cape Cod on the north, Nantucket on the southeast, and Martha's Vineyard on the west.[6]  The Sound is not a pristine water body, nor is it critical habitat for birds or marine mammals.  Rather, the Sound is heavily used for industrial, commercial, and recreational purposes.  CW388834.  The Sound has two main shipping lanes that are used by cruise ships, passenger ferries, research vessels, and bulk goods carriers, including barges transporting petroleum products.  CW65353; 388927-388929.  In 2004, there were 1.4 million commercial and 104,722 charter/party boat landings in the area.  CW141604; 141599.  In the summer months, one ferry line operates 88 trips per day through the Sound, at an average speed of 14 to 15 knots, as well as three high speed ferry routes within one mile of the Project area, where ferries travel up to 34 knots.  CW356446; CW65354.  Another line operates 10 transits per day with its high speed ferry and also operates a daily freight vessel.  CW48473.  Many of these commercial vessels have drafts in excess of 20 feet.  CW388927; 388929.

Large numbers of commercial and charter fishing vessels operate in certain portions of the Sound.  An estimated 200 to 250 fishing vessels regularly cross the Sound to reach offshore fishing banks, while other vessels fish at certain areas within the Sound.  CW65356.  The Sound is also heavily used for recreational boating, with recreational vessels ranging from small runabouts to very large yachts.  CW65340-41.  Yachts include world class power boats and sailboats of all sizes.  *Id*.  Sailboat and powerboat races at extreme speeds are held annually on

---

[6]     Within the Sound, the Project will be constructed on Horseshoe Shoal, a very shallow area with water depths ranging from .5 to 60 feet MLLW (mean level low water).  CW65187; NMFS1422.  Largely because of its shallow depths, no large whales, including right whales, have *ever* been sighted on Horseshoe Shoal.  NMFS1501.

the Sound.  CW388846.  There are no speed restrictions on any commercial fishing or recreational vessels operating in the Sound.

CWA expects to operate only two daily crew boats to support Project operations. CW237420.  The boats will be approximately 50 feet in length with a draft of approximately 4 to 5 feet.  Contrary to Plaintiffs' assertions, the boats will depart exclusively from Falmouth, Massachusetts and *will not* traverse Buzzards Bay.  *Id.*  Instead, the boats will travel exclusively within the Sound, similar to the typical heavy vessel traffic occurring in Nantucket Sound on a regular basis.  CW65351.

**Agency Analysis of Potential Avian Impacts Was Comprehensive and Science-Based**

The FEIS contains a comprehensive analysis of potential effects upon avian species based upon an extensive body of literature and case studies, as well as Project-specific field studies.[7]  The avian section of the FEIS and the related Appendices consist of more than 250 pages of analysis which include the work of some of the nation's leading ornithological experts.

CWA and the Massachusetts Audubon Society ("MAS") conducted wide-ranging field studies to identify avian species and distributions within the Project area.  CW65219.  These included 125 systematic aerial surveys during different seasons to identify bird migration, 17 boat surveys to evaluate avian behavior and to estimate flight heights, and radar surveys during spring and fall migration periods.  *Id.*  Migratory bird flight patterns were examined closely and collision risk was assessed.  Collision rates at existing land-based wind farms and at offshore

---

[7]     For example, field studies in the Record include: Preliminary Avian Risk Assessment (CW76740); Six Surveys of Waterbirds in Nantucket Sound (CW76794); Fall 2003 and Winter 2004 Waterbirds Survey (CW76843); Long-Tailed Duck Report Winter 2005-2006 (CW76892); Winter Nocturnal Duck Survey 2005 (CW76941); Spring and Summer 2002 Waterbirds Survey (CW76980); A Late Winter and Early Spring 2002 Waterbirds Survey (CW77023); Final Mobile Avian Radar Systems 2002 Monitoring Report (CW77055); Final Mobile Avian Radar Systems 2005 Monitoring Report (CW77131); Final Mobile Avian Radar Systems 2006 Monitoring Report (CW77193); Summer 2003 Waterbirds Survey (CW77256); and Fall 2002 and Winter 2003 Waterbirds Survey (CW77290).

farms in Europe were also examined, which demonstrated very low potential mortality rates (*e.g.*, 0 to 4.5 fatalities/turbine/year).  CW65459.  By comparison, it is estimated that "tens of millions of birds are killed annually by colliding with buildings, transmission lines, and vehicles."  CW65460.  Indeed, "free ranging rural cats kill between 7.8 million and 217 million birds per year just in Wisconsin alone."  *Id.*  The MAS – an organization whose mission is to protect birds – concluded, based upon its extensive review of the Record, that the Project would "not pose an ecologically significant threat to the birds and associated marine habitat of Horseshoe Shoal, Nantucket Sound."  CW119396.

Notwithstanding the fact that "the FEIS includes extensive analyses of potential impacts of the [Project] to various categories of birds (raptors, passerines, coastal/shorebirds and marine birds) as well as a framework for avian monitoring and an extensive literature review," BOEM continued to evaluate new information regarding potential impacts to avian species in the 2010 EA, including allegations investigated by the Inspector General and also raised by Plaintiffs (*see* PEER Br. at 9 and 15), that BOEM did not perform the full complement of avian radar studies requested by the FWS.[8]  These studies, however, would not have yielded useful data relevant to ESA concerns because the available technology is unable to distinguish between avian species.  FWS31888 (quoting a FWS Endangered Species Supervisor stating more radar would not have

---

[8]     In 2008, several individuals filed complaints with the Department of the Interior Inspector General ("IG") alleging that BOEM acted improperly in its review of the Cape Wind Project.  After an extensive investigation, the IG concluded that all regulatory agencies concurred that BOEM's timelines did not affect their overall conclusions on the Project.  FWS31870.  Further, many of the allegations dismissed by the IG focused on the additional avian radar analysis requested by a FWS biologist and BOEM's consultation with the FWS.  Indeed, the IG reported that FWS employees admitted that FWS letters critical of BOEM reflected "personal opinions."  FWS31883.  Moreover, the critical comments were primarily attributable to a FWS biologist who was reassigned for "combative and unprofessional behavior" of a "problem child" and a "combat biologist who liked throwing up road blocks," and who was "uncooperative" and operated in an "intimidating manner."  FWS31890-91.  The FWS Northeast Regional Director conceded that the biologist's critical comment letter to BOEM had "gone overboard" and was "unprofessional," and the FWS Assistant Regional Director for Ecological Services concurred that the biologist letters were "overreaching our authority."  FWS31892.

enhanced the BiOp "because the radar would not be able to distinguish between different species"); *see also* FWS79 (stating that "state-of-the-art radar technology is unable to identify birds to species."); FWS31888; FWS31845 (stating that "the suggested studies were impracticable, cost-prohibitive and not likely to produce useful information").

In its 2011 EA, BOEM again examined closely the potential impacts to migratory birds and discussed at length the mitigation measures developed to reduce impacts to birds. CW119764-5.  BOEM explained that the FEIS employs an adaptive management approach to mitigation that will "employ technology and methods for assessing impacts of the proposed action and then using monitoring results to drive changes in mitigation requirements and readjustments to monitoring as needed."  CW349027.  The Lease also contains best management practices that obligate CWA to "evaluate avian use of the Project area and design the Project to minimize or mitigate the potential for bird strikes and habitat loss."  CW349028.  The Avian and Bat Mitigation and Monitoring Plan ("ABMP"), more fully described below, sets forth the adaptive management measures that will be employed.

**FWS Rigorously Evaluated Potential Impacts on Threatened and Endangered Avian Species Using the Best Available Science and Commercial Data**

"There is an extensive [ESA Section 7] consultation history on the Cape Wind Project that spans the time frame from July 2001 to [Nov. 2008] and consists of several hundred articles of correspondence, including letters, telephone conversation records, electronic communications and meeting summaries."  FWS5.  At the conclusion of the consultation process in November 2008, FWS issued its BiOp ("FWS BiOp"), which concluded that the Project is "not likely to jeopardize the continued existence" of the roseate tern or the piping plover.  FWS75.  The FWS estimated that "on average, four to five roseate terns per year (80 to 100 terns over the 20-year life of the Project) are likely to be taken (injured or killed) as a result of collisions" with the

turbines.  *Id*.  FWS also provided an "upper bound estimate of one piping plover collision every two years" (a maximum of 10 over the life of the Project).  *Id*.

FWS's determination was the product of an independent review of the best available scientific information on roseate terns and piping plovers, including information available from other wind projects.  With respect to roseate terns, the available science demonstrated that "terns occur with less frequency and regularity in the Horseshoe Shoal Project area than in other coastal areas of Nantucket Sound," terns are "very unlikely to forage as far away as the Horseshoe Shoal Project area," terns are a "diurnal" species so their "use of the Project area will primarily occur during daylight hours," terns are expected to "regularly avoid collisions" with the turbines, terns fly overwhelmingly "at altitudes below the rotor-swept zone," and, during times when there is decreased visibility, tern "occurrence on Horseshoe Shoal will similarly decrease."  FWS26; 28; 40-42.  The Record refutes Plaintiffs' assertion that the Project area is "crucial to the species' survival and recovery."  PEER Br. at 6.  With respect to piping plover, no piping plovers were observed in the Project area during the extensive field studies conducted by CWA and MAS.  Nevertheless, FWS conservatively assumed that some migrating piping plovers may cross the Project area and included an ITS as a precaution.  FWS74.

FWS estimated the incidental take in the ITS (four to five roseate terns per year and one piping plover every two years) using a collision risk model developed by noted ornithologists.  FWS45.  FWS did not blindly accept the conclusions from the model, but instead independently assessed each factor and adjusted the model considering the comments of an ornithologist retained by Plaintiffs.  FWS44-49; 57-59.  Where there was scientific uncertainty, *e.g.*, whether terns might fly in the Project area during periods of poor visibility, FWS gave the benefit of the doubt to the species and corrected the model to assume that terns flew during those conditions.

11

FWS46.  The resulting ITS is a very conservative estimate of the number of birds that may be impacted by the Project.[9]

The Project will also provide benefits to the roseate tern by contributing to the Bird Island restoration project.  Bird Island is the second largest roseate tern nesting colony for the species in the western North Atlantic and it is deteriorating due to erosion and salt water intrusion.  FWS9.  The Corps is studying ways to restore the island.  As a condition of its state permit approvals, CWA committed to contribute $780,000 to the restoration project (approximately 21 percent of the total cost).  FWS10.  FWS determined that the Bird Island restoration project "will offset *any* potential roseate tern mortality that may occur from the Cape Wind Project."  FWS75 (emphasis added).

FWS found that four reasonable and prudent measures were "necessary and appropriate" to minimize the incidental take of roseate terns and piping plovers: (1) pre- and post-construction monitoring to assess the effects and incidental take of the Project; (2) specifying measures for roseate terns and piping plover in the oil spill response plan; (3) review of pre- and post-construction monitoring activities and perching deterrents; and (4) reporting requirements. FWS75-76.  FWS considered other RPMs during the consultation process, but rejected them. For example, FWS had suggested an RPM that required operational shutdowns during periods of reduced visibility, but FWS questioned from the outset whether such a measure would be economically and practicably feasible.  FWS77; FWS2110.  FWS therefore consulted with BOEM and CWA both before and after the draft BiOp was finalized on October 31, 2008, to determine if the proposed operational adjustment RPM was reasonable and prudent.  FWS213-14

---

[9]     The original model estimated 0.3 to 2.3 roseate terns would be killed per Project year, but the FWS conservatively estimated that 4 to 5 terns per year would be killed.  FWS45-46.

(consultation history noting extensive telephone and email correspondence with BOEM and CWA regarding draft RPMs on Oct. 3, 6, 8, 16, 21, Nov. 10, 12, 13, 20).[10]

CWA provided detailed information to BOEM demonstrating that the proposed RPM of an "operational shutdown" would have "a direct material adverse effect on the dependable operational revenues of the Project, which in turn [would] materially affect CWA's ability to obtain financing for the Project."  This is because shutdowns would occur during an indeterminable number of "peak" period hours when the supply of energy to the electrical system on a reliable basis is of critical operational and economic importance, and which are essential to the Project's stated purpose of "enhancing the region's electric reliability."  FWS424-31.  CWA also provided an opinion from its financial advisors that the proposed RPM would "have a material adverse impact on lenders and power purchasers of the Project's total electricity production as well as the timing of that production, which in turn [would] likely impact the overall economic viability of the Cape Wind Project."  *Id.*  BOEM similarly educated FWS that the proposed RPM would "in fact alter the scope and timing of the Project" and that in its regulatory experience, an "optional shutdown of a wind project's turbine generators [would] have an impact on revenues from a project."  FWS351.  BOEM provided biological reasons as to why the proposed RPM was unreasonable, including that there was no relationship between the visibility limitation and the ability of terns and plovers to detect and avoid collisions with man-made structures, that migration typically occurs when visibility is good, and that there was insufficient information to associate collision risk to visibility conditions.  FWS443-44.  FWS ultimately acknowledged that there was no biological basis for the proposed visibility criteria

---

[10]     Plaintiffs' assertion that FWS abruptly jettisoned the draft RPM one day after receiving BOEM's formal comment letter is not supported by the Record.  *See* PEER Brief at 12.

and that there was no certainty that the measure would decrease the risk to terns.  FWS2110;

215; 2120; 11913.  Accordingly, based on "information provided in the [BOEM] May 2008

biological assessment, subsequently provided Project information, and other information," FWS

concluded that

> the operational adjustment (shut down of turbine rotors to a neutral position) is
> not reasonable because it does not meet the RPM regulatory definition as a
> 'reasonable measure' as it modifies the scope of the Project in a manner that is
> adverse to the Project's stated purpose and need, that is *to make a substantial
> contribution to enhancing the region's electrical reliability* and achieving the
> renewable energy requirements under the Massachusetts and regional renewable
> portfolio standards.

FWS1; 77 (emphasis added).

In April 2010, 17 months after the FWS BiOp was finalized by FWS, Plaintiffs submitted

to BOEM and FWS an opinion from a retained consultant that argued that the proposed RPM

would not have a material economic impact on the Project.  FWS31682-98.  Based on this

analysis, the Plaintiffs demanded reinitiation of consultation with FWS.  FWS31680.  However,

CWA submitted a detailed response demonstrating that Plaintiffs' analysis was flawed because it

understated the adverse economic impact by incorrectly assuming that CWA would be selling all

of its energy output into the hourly spot markets, by failing to consider substantial lost revenues

from the sale of renewable energy credits and other environmental attributes, and by understating

the adverse effect of shutdowns during peak demand hours most critical to system reliability and

economics, as well as other erroneous assumptions.  CW109229.  Consequently, the 2010 EA

concluded that the absence of a shutdown provision "has a scientific as well as an economic

basis," and that there was no credible new information that would warrant reinitiation of

consultation.  CW112055-6.

14

**A Scientifically-Based Avian and Bat Mitigation and Monitoring Plan Will Minimize Potential Impacts to Avian Species**

As required by the FWS BiOp, CWA submitted an ABMP to BOEM and FWS.  FWS78; CW119314.  BOEM and FWS concluded that the ABMP "is most appropriate given the information currently available regarding avian species in the Project area and current assumptions regarding the reasonably foreseeable impacts of the Project."  CW119766.  The ABMP was scientifically peer-reviewed, was concurred with by FWS on September 6, 2012, and was approved by BOEM on November 20, 2012.

The ABMP requires both pre-construction studies that will field test monitoring techniques and post-construction monitoring protocols that include radio telemetry, avian acoustic monitoring, anti-perching monitoring, bat surveys, beached bird surveys, radar analysis, aerial surveys, boat surveys, and marine radar surveillance.  *Id*.  The monitoring efforts will inform the extent and scope of the adaptive management regime.  *Id*.  The focus of the ABMP will be on "discerning impacts to certain groups of migratory birds determined in the [draft] EIS and FEIS to be most at risk."  CW119767.  From these monitoring studies, the agencies will "develop monitoring triggers in terms of levels of collisions or mortality thresholds for species other than terns and plovers as appropriate."  *Id*.

**NMFS Rigorously Evaluated Potential Impacts on Threatened and Endangered Right Whales and Sea Turtles Using the Best Available Science and Commercial Data**

In order to assess potential impacts to listed marine mammals and sea turtles, BOEM began an active, informal consultation with NMFS in January 2006.  NMFS1.  Formal consultation was initiated in May 2008, resulting in NMFS issuing its first BiOp in November 2008 ("2008 BiOp").  Subsequent to the 2008 BiOp, right whales were sighted in Rhode Island Sound.  Out of an abundance of caution, BOEM reinitiated consultation with NMFS in July 2010 and NMFS undertook a new analysis.  NMFS issued its second BiOp in December 2010 ("2010

BiOp").  Both BiOps reached reasoned conclusions based upon the best scientific and

commercial data available and contained well-articulated explanations for the opinions expressed

in them.

"Throughout 2006 and 2007 NMFS provided technical assistance to [BOEM] as they

drafted a new [draft EIS] and Draft BA."  NMFS689.  Frequent informational conference calls

occurred and correspondence was exchanged regularly between BOEM and NMFS regarding the

Project and listed species potentially located in the Project vicinity.  NMFS2-27.  In May 2008,

BOEM released an extensive BA that fully described the listed species potentially found in the

vicinity of the Project including right whales and listed sea turtles and comprehensively

evaluated the scientific literature and discussed potential effects of the Project on listed species.

Even a cursory look through the table of contents reveals that the agencies were engaged in a

rigorous evaluation.  There are approximately 180 different sections of the BA that discuss listed

species and evaluate the effects of the Project on them including over 75 sections that are

devoted specifically to analyzing listed whales and turtles.

In May 2008, BOEM requested that NMFS engage in formal consultation.  NMFS26.

Again, this process involved interactive consultation between the two agencies where NMFS

prepared a draft BiOp, with BOEM commenting on the draft.  NMFS424; 475; 575; 580; 583;

634; 642.  During this formal consultation process, NMFS expressly evaluated comments from

Plaintiff Alliance to Protect Nantucket Sound ("Alliance") on the May 2008 BA concerning

whales and turtles.  NMFS's eight page analysis of the Alliance's comments states that NMFS

"considered all of the information presented in this letter and took the comments on the BA into

consideration" in preparing the BiOp.  NMFS643.  On November 13, 2008, the NMFS Assistant

Regional Administrator for Protected Resources recommended approval of the BiOp to the

Regional Administrator in a well-reasoned and fully explained memorandum.  NMFS661.  On

November 13, NMFS issued the 2008 BiOp.  NMFS685.  The BiOp includes *25 pages of*

*references* to scientific literature.  NMFS790.  The 2008 BiOp concludes in relevant part that

"the proposed action is not likely to adversely affect right . . . whales and, therefore, is not likely

to jeopardize the continued existence of these whale species."  NMFS685

        With regard to sea turtles, the 2008 BiOp concluded that "the proposed action may

adversely affect but is not likely to jeopardize the continued existence" of listed sea turtles.  For

listed sea turtles, the NMFS BiOp included five RPMs designed to "minimize the incidental

take" by noise: (1) requiring a "750 meter exclusion zone" during pile driving "monitored by a

NMFS-approved endangered species monitor for at least 60 minutes prior to pile driving"; (2)

providing a "500 meter exclusion zone" for the high resolution geophysical survey "monitored

by a NMFS-approved endangered species monitor for at least 60 minutes prior to the survey";

(3) providing "acoustic measurement of the first pile being driven to confirm the sound levels

modeled"; (4) providing a "soft start" prior to pile driving; and (5) providing for a clear zone of

all sea turtles within the exclusion zone for at least 60 minutes prior to pile driving or start of the

high resolution geophysical survey.  NMFS791-92.

        In April 2010, right whales were sighted in Rhode Island Sound – many miles from the

Project area.  Within days, NMFS began evaluating this new information.  NMFS983-84; 987.

Thereafter, on July 13, 2010, BOEM formally requested a reinitiation of consultation between

itself and NMFS in light of new information regarding the right whale sightings.  NMFS1073.

NMFS prepared a new draft BiOp and sought comment from both BOEM and EPA.[11]  On

---

[11]        EPA issued a Clean Air Act to CWA and fulfilled its ESA obligations through consultation with NMFS.

December 30, 2010, NMFS issued its second BiOp ("2010 BiOp").  NMFS1413.  After analyzing the new data concerning the 2010 right whale sightings, NMFS again opined "that the proposed action is not likely to adversely affect right . . . whales and, therefore, is not likely to jeopardize the continued existence of these species."  NMFS1534.  NMFS based its opinion on the fact that there were very few right whale sightings in the Sound; that these sightings were located on the far western and eastern extremes; that "nearly all [of these] occur[ed] at least 18 km from the Project site"; that "[o]nly one sighting has occurred closer to the Project site (April 2010), and still was outside Horseshoe Shoal, approximately 5km [about 2.5 miles] from the Project site"; that "the best available information indicates that the presence of right whales in Nantucket Sound [in 2010] was related to the presence of forage within Rhode Island Sound and that the whales observed in Nantucket Sound were transiting away from the area"; that "the sightings from 2010, support[s] the conclusion that right whales are rare visitors to Nantucket Sound, with usage on the western and eastern extremes of the sound most likely and that these whales are transient in the area"; and that the habitat within the Sound is "inconsistent with the habitat where right whales are typically found."  NMFS1501-02.

With regard to listed sea turtles, NMFS evaluated the impacts of a longer (five months vs. one month) high resolution geophysical survey than that which was analyzed in the November 2008 BiOp.  It confirmed that 13-28 sea turtles may be exposed to harassing levels of sound during the high resolution geophysical survey work.  NMFS1536.  The 2010 BiOp once again confirmed the effectiveness of the monitoring and mitigation measures currently in place to protect listed sea turtles during the high resolution geophysical survey.

## STANDARD OF REVIEW

Plaintiff's ESA and MBTA claims are reviewed under section 706 of the APA, 5 U.S.C.

§ 706. *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) (ESA);

*Hill v. Norton*, 275 F.3d at 103 (MBTA).  The standard of review under the APA is a narrow one

and deference to the agency's judgment is particularly appropriate where the decision at issue

"requires a high level of technical expertise . . . ." *Kleppe v. Sierra Club*, 427 U.S. 390, 412,

96 S.Ct. 2718, 2731 (1976); *Ethyl Corp. v. EPA*, 541 F.2d. 1, 36 (D.C. Cir. 1976) (stating that

courts should "look at the decision not as a . . . biologist . . . , but as a reviewing court exercising

our narrowly defined duty of holding agencies to certain minimum standards of rationality.");

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 103, 103 S.Ct. 2246 (1983)

("When examining this kind of scientific determination . . . a reviewing court must generally be

at its most deferential."); *Hüls Am., Inc. v. Browner,* 83 F.3d 445, 452 (D.C. Cir. 1996) ("[W]e

will give an extreme degree of deference to the agency when it is evaluating scientific data

within its technical expertise.") (internal quotation marks omitted).  Accordingly, to satisfy its

obligations under the APA, a federal agency need only "cogently explain why it has exercised its

discretion in a given manner . . . ." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 48-49, 103 S.Ct. 2856 (1983).  Agency action should therefore be upheld if the

agency has "considered the relevant factors and articulated a rational connection between the

facts found and the choice made." *Baltimore Gas & Elec.*, 462 U.S. at 105, 103 S.Ct. 2246

(1983).  A court should overturn an agency decision only where the agency "relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence or was so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2867.

Recently, in *Care Net Pregnancy Center of Windham County v. U.S. Dep't of*

*Agriculture,* this Court set forth the summary judgment standard in an action such as this for

judicial review of agency action under the APA:

> Summary judgment is the proper mechanism for deciding, as a matter of law, whether an
> agency action is supported by the administrative record and consistent with the APA
> standard of review.  But due to the limited role of a court in reviewing the administrative
> record, the typical summary judgment standards set forth in Rule 56(c) are not applicable.
> Rather, under the APA, it is the role of the agency to resolve factual issues to arrive at a
> decision that is supported by the administrative record, whereas the function of the
> district court is to determine whether or not as a matter of law the evidence in the
> administrative record permitted the agency to make the decision it did.  In other words,
> when a party seeks review of agency action under the APA, the district judge sits as an
> appellate tribunal, and [t]he entire case on review is a question of law.

2012 WL 4801777 (D.D.C. 2012) (Walton, J.), (citations and internal quotation marks omitted).

## ARGUMENT

I.    **THE FWS AND BOEM COMPLIED FULLY WITH THE ENDANGERED
      SPECIES ACT**

After a seven year consultation history with two federal agencies (BOEM and the Corps),

during which extensive data was collected and hundreds of scientific studies were reviewed,

FWS concluded that the Project is "not likely to jeopardize the continued existence" of the

roseate tern and the piping plover.  FWS73.  The "best scientific and commercial data available"

demonstrated that very few roseate terns and piping plovers are likely to collide with the wind

turbines, and those that may represent a very small fraction of the population.  FWS34.

Nevertheless, to account for uncertainty and to give the benefit of the doubt to the species, FWS

conservatively estimated that "on average, four to five roseate terns per year (80 to 100 terns

over the 20-year life of the Project)" and "one piping plover . . . every two years" (a maximum of

10 over the life of the Project) are likely to be taken (injured or killed) as a result of collisions

with the turbines.  FWS75.  As a matter of law, a BiOp represents FWS's expert judgment that the Project will not violate the ESA.  *See Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp.2d 170, 176 (D.D.C. 2004) ("The BiOp represents FWS's judgment about whether the proposed action complies with the ESA.").

Plaintiffs do not challenge FWS's "no jeopardy" determination, FWS's reliance on the best available science, or FWS's very conservative estimate of incidental take.  Instead, Plaintiffs present strained statutory interpretation and delegation arguments to contend that FWS had a nondiscretionary duty to determine what RPMs were necessary and appropriate, without consideration of the expertise of the action agency BOEM or CWA regarding the economic consequences for the Project in competitive energy markets (an issue well beyond FWS's expertise).  Plaintiffs' argument disregards the purpose of the Section 7 consultation process and the respective roles of the action agency and the applicant, ignores that RPMs must be formulated using the "best scientific *and commercial* data available," and dismisses long-standing FWS regulations and guidance that limit RPMs only to *minor* project changes.

### A.    FWS Appropriately Consulted with BOEM and CWA Regarding Reasonable and Prudent Measures

Congress intended Section 7 to be a "*consultation*" provision requiring the relevant agencies to consult and for the applicant to "be involved in every aspect of the consultation process."  *See* H.R. Conf. Rep. 97-835 (Joint Explanatory Statement of the Committee of Conference) at 26 (1982) ("The applicant should be involved in *every aspect* of the consultation process.") (emphasis added); *see also* 51 Fed. Reg. 19,926-7 ("[T]he 1982 Amendments provide an opportunity for permit or license applicant involvement in all phases of the consultation procedures."); *Am. Littoral Soc'y v. Herndon*, 720 F. Supp. 942, 949 (S.D. Fla. 1988) (permit applicant plays an active role in the consultation process); 50 C.F.R. § 402.14(d) ("The Federal

agency shall provide any applicant with the opportunity to submit information for consideration

during the consultation.").   This makes sense because the action agency and the applicant can

provide technical expertise about a proposed project that FWS would not otherwise have.[12]

Consultation was particularly appropriate in this case, where FWS's assistant regional director

conceded that the operational and economic implications of the RPM was beyond FWS's

experience or its institutional "capability, expertise, or credibility."  FWS223.

In addition, the involvement of BOEM and CWA in the development of the RPMs

ensured that the RPMs were based on "the best scientific and *commercial data* available." 16

U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8) ("In formulating its Biological Opinion, any

reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will

use the best scientific and commercial data available . . .").  The Supreme Court explained that

"[t]he obvious purpose of the requirement that each agency 'use the best scientific and

commercial data available' is to ensure that the ESA not be implemented haphazardly, on the

basis of speculation or surmise."  *Bennett v. Spear,* 520 U.S. 154, 176, 117 S.Ct. 1154 (1997).  In

addition:

> While this no doubt serves to advance the ESA's overall goal of species
> preservation, we think it readily apparent that another objective (if not indeed the
> primary one) *is to avoid needless economic dislocation produced by agency
> officials zealously but unintelligently pursuing their environmental objectives.
> That economic consequences are an explicit concern of the ESA* is evidenced by
> § 1536(h), which provides an exemption from § 1536(a)(2)'s no-jeopardy
> mandate where there are no reasonable and prudent alternatives to the agency
> action and the benefits of the agency action clearly outweigh the benefits of any

---

[12]       Plaintiffs' reference to the 1973 legislative history of the ESA conveniently ignores that in 1978, 1979, and
1982 Congress made substantive and procedural amendments to Section 7.  In the 1979 Amendments, Congress
added a reasonable information standard by providing that the consultation and resultant biological opinion be based
upon the "best scientific and commercial data available."  The 1982 Amendments established several new processes
under Section 7, including the issuance of an "incidental take statement" along with a biological opinion.  Congress
also stressed the importance of the role of the applicant in the process. 51 Fed. Reg. 19,926.

alternatives. We believe the "*best scientific and commercial data" provision is
similarly intended, at least in part, to prevent uneconomic (because erroneous)
jeopardy determinations.*

*Id.* at 176–77, 117 S.Ct. 1154 (emphasis added).  Accordingly, in the course of developing the

draft BiOp, FWS consulted repeatedly with both BOEM and CWA to assess whether the

suggested RPM that would require temporary shutdowns of the wind Project would be

economically and practicably feasible.  FWS2110.  Plaintiffs' view that FWS must develop

RPMs in isolation from BOEM and CWA and without regard to economic consequences simply

disregards the purpose of the consultation process and FWS's obligation to consider the

economic impacts on a project.[13]

## B.    Reasonable and Prudent Measures Cannot Significantly Impact the Project

Consistent with the Supreme Court's direction that "economic consequences are an

explicit concern of the ESA," FWS regulations state that "reasonable and prudent measures,

along with the terms and conditions that implement them, cannot alter the basic design, location,

---

[13]    Plaintiffs' reliance on *Gerber v. Norton,* 194 F.3d 173 (D.C. Cir. 2002) is misplaced because, unlike here, that case was decided under ESA section 10.  In *Gerber*, the plaintiffs challenged FWS's failure to make a finding that a permittee "would minimize the impacts of the taking 'to the maximum extent practicable.'"  *Id.* at 184 (citing 16 U.S.C. § 1539(a)(2)(B)).  The requirement to make such a finding is a mandatory obligation under Section 10 before FWS (in that case the action agency) can issue a permit.  *See Id.* § 1539(a)(2)(B)(ii) (directing the Secretary to issue a permit if, among other things, "the Secretary finds . . . that the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking.").  Section 7 of the ESA, however, imposes no similar requirement on FWS as the consulting agency regarding the identification of RPMs.  Instead, Section 7 directs the Secretary to provide an applicant "with a written statement that . . . specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(ii).  Congress specifically omitted from the language of Section 7 the obligation to make a "finding" similar to that contained in Section 10.  In addition, section 10's mandate that Habitat Conservation Plans minimize impacts "to the maximum extent practicable" is in marked contrast to FWS Section 7 regulations requiring RPMs to have only a minor impact on a project.  Also, in *Gerber* there was no evidence in the record that the developer provided any analysis as to why additional mitigation was not practicable.  Here, both BOEM and CWA provided detailed analysis on the economic impacts of the RPM on the Project, as well as biological reasons as to why it was not reasonable.  *See National Wildlife Federation v. Norton,* 2005 WL 2175874, *18 (E.D. Cal. 2005) (distinguishing *Gerber* and upholding permit noting that unlike *Gerber* where the FWS relied only on the developer's word, and "no supporting economic analysis was sought or considered" on whether additional mitigation was not practicable.).

scope, duration, or timing of the action and may involve only *minor* changes."  50 C.F.R.

§ 402.14(i)(2) (emphasis added).  FWS explained in its preamble to the rule that "reasonable and

prudent measures were intended to minimize the level of incidental taking, but Congress also

intended that *the action go forward essentially as planned*."  51 Fed. Reg. 19,937 (emphasis

added).  FWS further explains that the test for reasonableness is "whether the proposed measure

would cause more than a minor change."  ESA Consultation Handbook ("Handbook") at 4-50

(March 1998) ("Measures are considered reasonable and prudent when they are consistent with

the proposed action's basic design (e.g., narrowing of disturbed right-of-way at known species

locations), location (e.g., temporary storage of equipment or other materials), scope, duration,

and timing.").  Moreover, the Handbook recognizes that financial costs imposed on a project

may be "critically significant."  *Id; see also Oregon Natural Res. Council v. Allen,* 476 F.3d

1031, 1039 n.7 (9th Cir. 2007) (citing examples of allowable RPMs including "education of

employees about the species, reduction of predation of the species, removal or avoidance of the

species, or monitoring").

The RPM proposed by FWS in the draft BiOp would have required an indeterminable

number of shutdowns of the wind turbines based upon "seasonal, visibility, and weather

parameters."  FWS1302-3.  FWS initially presumed that because the shutdowns would be limited

to certain seasonal periods and times of day, the RPM should impose "only [] minor changes to

the Cape Wind Project."  *Id*.  However, FWS also questioned from the outset whether such a

measure would be economically and practicably feasible.  FWS2110.  FWS therefore

appropriately consulted with BOEM and CWA regarding the potential impacts on the Project.

FWS213-4.

In proposing the RPM, FWS did not fully understand how electrical generation projects are financed in today's electricity markets, where renewable energy projects are typically developed on a project-financed basis, and where dependable operation and revenue are essential factors.  CWA provided detailed information demonstrating that the proposed RPM would have "a direct material adverse effect on the dependable operational revenues of the Project, which in turn [would] materially affect CWA's ability to obtain financing for the Project" because shutdowns would occur during "peak" days and hours when the supply of energy to the electrical system *on a reliable basis* is of critical importance and essential to meeting the purpose and need of the Project.  FWS424-31.  CWA explained that:

> In a project-financed wind project, the lender will be paid solely from the revenues generated from the sale of electricity. . . . Any operational restrictions imposed on a project directly impact the project's ability to produce power, which in turn impacts the operating revenues of the project and creates a greater credit-risk profile.

FWS427-28.[14]  Also, Barclays, CWA's financial professionals, told BOEM that the RPMs would "have a material adverse impact on lenders and power purchasers of the Project's total electricity production as well as the timing of that production, which in turn will likely impact the overall economic viability of the Cape Wind Project."  FWS426.  Barclays further informed the agency that "we expect these potential shut down periods to have an adverse impact on the cash flows, the amount of third party financing that we expect the Project can support, the attractiveness of the Project to power purchasers and the Cape Wind Project's overall economic viability, including its ability to generate competitively priced energy."  *Id.*  BOEM similarly educated

---

[14]    Further, "[i]t is also important to acknowledge that obtaining project financing for the first offshore wind farm in the United States will be challenging.  Adding additional risk and uncertainty would significantly add to this burden and could render the Project not financeable."  FWS428.

FWS that the proposed RPM would "in fact alter the scope and timing of the Project" and that in its regulatory experience, an "optional shutdown of a wind project's wind turbine generators will have an impact on revenues from a project."[15]  FWS351.  Based on the information provided, FWS found that the proposed operational shutdown was not "biologically necessary to avoid jeopardy to the species" and further that it was "not reasonable to require a costly RPM for uncertain biological effect." CW112056; FWS11913; 215; 2120 (no biological basis for the proposed visibility criteria and no certainty that the measure would decrease the risk to terns).

The proposed RPM for the Project unquestionably altered the scope and timing of the Project and did not involve only a minor Project change.  *See Wetlands Water Dist. v. Dep't of the Interior*, 376 F.3d 853, 876 (9th Cir. 2004) (holding RPM to be arbitrary and capricious because redirecting water flows would have broad system-wide effects and therefore not a minor change).  FWS's decision not to include the proposed RPM in the final BiOp was not, as Plaintiffs contend, a delegation of its nondiscretionary duty to impose the RPM; rather, it was a reasoned conclusion within the context of the Section 7 consultation process, relying on the best available scientific and *commercial* information provided by BOEM and CWA.  FWS422 ("based on the information provided . . . , I am removing RPM 2 from the internal draft BO"); FWS31540 ("the Service rejected this operational adjustment as an RPM" based on BOEM and CWA analyses of economic impacts).  FWS admittedly did not have the experience or expertise

---

[15]     BOEM further explained that the formula for calculating operating fees for a project uses a "capacity factor" that measures actual production versus full production in a given time period).  "The shutdown of a wind project's wind turbine generators, as proposed by RPM No. 2 could significantly impact the project's capacity factor and consequently revenues." FWS352.  CWA also explained that the proposed RPM would directly undermine the Project's contribution to system reliability, as the independent system operator (ISO-New England) measures the reliability of wind generated electricity by its consistent performance during "reliability hours" (ending "1400 through 1800 each day of the summer period").  FWS454.

regarding the operational and economic impacts of the RPM on the Project; therefore, it

appropriately consulted with and relied upon information obtained from both BOEM and CWA.

If FWS had ignored the commercial data provided by CWA and BOEM, as Plaintiffs

contend they should have done, FWS would have violated the ESA by failing to use the best

available scientific and commercial data.  As a result, the Project would have suffered "needless

economic dislocation" in pursuit of zealous environmental objectives, precisely the result the

Supreme Court warned against.  *Bennett,* 520 U.S. at 176-77, 117 S.Ct. 1154 (observing that the

"best scientific and commercial data" provision is intended, at least in part, to prevent

uneconomic (because erroneous) determinations); *Wetlands Water Dist.,* 376 F.3d at 876

(holding that an RPM that involves more than a "minor change" to a project is arbitrary and

capricious).  Such a result would have been clearly contrary to Congress's intent that a project go

forward essentially as planned, especially where FWS has determined that the Project would not

violate the ESA.

## II.      BOEM DID NOT VIOLATE THE MIGRATORY BIRD TREATY ACT

Plaintiffs ask this Court to take the unprecedented step of expanding the MBTA to

require that all federal agencies – and by logical extension all state and local agencies – to seek a

MBTA permit prior to authorizing any project, building, cell tower, or structure with the

potential to incidentally injure migratory birds.  No court has held that a federal agency violates

the MBTA for not seeking a MBTA permit prior to granting a permit for a lawful action to be

undertaken at some future time by a non-governmental third party.

Plaintiffs' argument is unreasonable and flawed.  The MBTA imposes liability on the

government only when it *directly engages* in activities that take migratory birds without a permit,

*e.g.*, where a government agency itself captures or kills birds or drops bombs on an island where

birds are present.  The government cannot be held liable for a *potential future offense* by a third

party, which may never occur.  Even a third party could not be held criminally liable under the

Act unless and until a migratory bird is actually taken.  Plaintiffs' broad reading of the statute

would also lead to absurd results contrary to congressional intent.  It offends common sense to

assume that Congress intended federal, state, and local agencies to seek MBTA permits before

authorizing any action by a third party that could potentially injure migratory birds at some time

in the future.  The number of potential permits would be incalculable and would require infinite

agency resources to process and enforce.

Accordingly, FWS has never promulgated a permit scheme for the incidental take of

migratory birds pursuant to lawful activities of non-governmental third parties.[16]  Instead, FWS

carries out its mission to protect migratory birds by fostering relationships with federal and state

agencies through memoranda of understanding to minimize potential takes.  Here, BOEM and

FWS require CWA to implement an extensive monitoring and mitigation plan that will allow the

agencies to adaptively manage potential impacts to migratory birds.[17]

---

[16]     Plaintiffs point to a 2012 NMFS application for a Special Use permit in relation to the regulation of the
Hawaii Longline Fishery.  PEER Br. at 29.  However, "the permit would be the first of its kind under our [FWS's]
Special Purpose permitting regulations," 77 Fed. Reg. 1501 (Jan. 10, 2012), and should not be regarded as
precedent setting.  *See* FWS Final EA;
http://www.fws.gov/pacific/migratorybirds/pdf/NMFS%20Permit%20Final%20EA.pdf.  The "issuance of this
permit will not establish national standards for conditions under which we might authorize incidental take of
migratory birds in the future."  Final EA at 9.  The decision to issue a permit to NMFS was distinctive because of a
number of unique factors, including "the litigation history that compelled NMFS to apply for the permit; and
NMFS's regulations requiring the use of specific measures to reduce seabird bycatch."  *Id*.  Further, nothing in the
permit suggests that NMFS would be subject to liability had it not obtained the permit.

[17]     Plaintiffs' assertion that BOEM and FWS have agreed to simply obtain monitoring data to reflect deaths of
migratory species misrepresents the facts and the agencies' approach to adaptive management.  BOEM explained
that "given the relative dearth of information available regarding the non-ESA species [in the Project area] an
attempt to formulate triggers that would invoke the need for adaptive management would amount to pure
speculation."  CW242442.  Thus, the ABMP will collect valuable information concerning species' use of the Project
area, which the agencies will use to assess and implement appropriate adaptive management measures as needed.

### A.      BOEM Cannot Be Liable Under the MBTA for Approving the Project

Federal agencies are not liable for the acts of non-governmental third parties.  *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453 (1974) (State not liable for act of a utility even though the utility company was heavily regulated by the State); *Vill. of Bensenville v. FAA*, 457 F.3d 52, 64 (D.C. Cir. 2006) (FAA not liable for approval of city's relocation of cemetery during airport construction).  This holds true even when a federal agency approves or authorizes a private project.  *Vill. of Bensenville*, 457 F.3d at 64 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives;") (*quoting Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982). Rather, to impose liability under the MBTA, the government itself must engage in the activity that, directly or indirectly, actually injures migratory birds.

Plaintiffs cite no case supporting their theory of liability to the government for the future acts of non-governmental third parties, and the D.C. Circuit's opinion in *Humane Society*, 217 F.3d 882, does not support their argument.  In *Humane Society* the plaintiffs brought a suit against the Department of Agriculture ("USDA") seeking to enjoin its Integrated Goose Management Program, wherein the government would reduce the expanding goose population through the use of various measures including "nest and egg destruction, and capture and killing" of geese.  *Id.* at 884.  The question before the court was "whether the Migratory Bird Treaty Act prohibits *federal agencies from killing or taking migratory birds* without a permit."  *Id.* at 883 (emphasis added).  The court held that "the broad language of § 703 applies to actions of the federal government," and enjoined USDA from killing geese.  *Id.* at 887.

The government's purposeful acts were also the basis for this Court's finding a violation of the MBTA in *Center for Biological Diversity v. Pirie*, 201 F. Supp.2d 113 (D.D.C. 2002).  In *Pirie*, the plaintiffs sought to enjoin the Navy from conducting live-fire training exercises on an

island that directly resulted in the death of migratory birds.[18]   The Court held that the direct

actions of the Navy, *i.e.,* bombing the island, violated the MBTA.  *Pirie*, 191 F. Supp.2d at 174

("[D]efendants are knowingly engaged in activities that have the direct consequence of killing

and harming migratory birds.").

Accordingly, the cases in this Circuit hold that the government violates the MBTA only

when it *directly engages* in taking migratory birds without a permit.  These cases do not hold, as

Plaintiffs argue, that the government violates the MBTA when it authorizes a non-governmental

third party to engage in lawful activities that may incidentally injure a migratory bird at some

future point in time.

Courts that have addressed government liability under the MBTA for its indirect actions,

*e.g.*, approving sales of timber that could take migratory birds, have held that the MBTA does

not prohibit such conduct.  For example, in *Newton County Wildlife Association v. U.S. Forest

Service,* the Eighth Circuit declined to extend the MBTA to the Forest Service's authorization of

timber sales even though the parties acknowledged that timber harvesting would potentially lead

to the death of birds.  113 F.3d 110, 115 (8th Cir. 1997).  The court stated that "the MBTA's

plain language prohibits conduct *directed at migratory birds*."  *Id*. (emphasis added).  On this

basis, the court held that "[s]trict liability may be appropriate when dealing with hunters and

poachers. But it would stretch this 1918 statute far beyond the bounds of reason to construe it as

an absolute criminal prohibition on conduct, such as timber harvesting, that *indirectly* results in

the death of migratory birds."  *Id*. (emphasis in original).  Similarly, in *Seattle Audubon Society*

---

[18]       The government was conducting air-to-surface gunnery exercises in which aircraft delivered 500-pound bombs and air-to-ground missiles to the island.  The bombing of the island by the government undeniably resulted in the death of migratory birds.  *Id.* at 165.

*v. Evans,* the Ninth Circuit held that the MBTA does not prohibit the Forest Service and the

Bureau of Land Management from authorizing the sale and logging of timber within areas that

may provide suitable habitat for the northern spotted owl.  952 F.2d 297, 302 (9th Cir. 1991)

(stating that the terms "take" and "kill" mean "physical conduct of the sort engaged in by hunters

and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in

1918.").  As this Court observed in *Humane Society*, "the Eighth and Eleventh Circuits likely are

correct to reason that Congress did not envision that the MBTA would be construed 'as an

absolute criminal prohibition on conduct, such as timber harvesting that indirectly results in the

death of migratory birds.'"  *Humane Soc'y of the U.S. v. Glickman*, No. 98-1510, 1999 U.S. Dist.

LEXIS 19759, *35 (D.D.C. July 6, 1999) (*citing Newton,* 113 F.3d at 115), *aff'd, Humane Soc'y*,

217 F.3d at 888 ("§ 703 does not prohibit 'conduct, such as timber harvesting, that indirectly

results in the death of migratory birds.'"); s*ee also Curry v. U.S. Forest Serv.,* 988 F. Supp. 541

(W.D.Pa. 1997) (holding MBTA was not the proper statutory basis upon which to contest a

Forest Service timber sale and concluding that the loss of migratory birds as a result of logging

operations did not constitute a taking or killing prohibited by the MBTA ); *Mahler v. U.S. Forest

Serv.,* 927 F. Supp. 1559 (S.D. Ind. 1996) (declining to enjoin a proposed plan, holding that

indirect taking of migratory birds as a result of logging during nesting season did not fall within

the MBTA implementing regulations' definition of a "taking"); *Citizens Interested in Bull Run,

Inc. v. Edrington,* 781 F. Supp. 1502 (D.Or. 1991) (holding that diminishment of habitat for the

northern spotted owl under a proposed Forest Service timber sale would not result in a "taking"

in violation of the MBTA).[19]

---

[19]     Plaintiffs' attempt to analogize BOEM's approval of the Project to cases upholding convictions under the
MBTA cases stretches credulity and ignores the fundamental principle that the government cannot be held liable for

---

*continued on next  page…*

BOEM's approval of the Project is a governmental action that is even more remote than the Forest Service's approval of timber sales, because the Forest Service approves timber sales as a means of managing forests for which it has statutory responsibility.  Here, BOEM simply granted CWA a lease and approved its COP for the construction of a wind project on the OCS.  In so doing, BOEM is not taking any purposeful action itself directed at taking migratory birds.  As set forth above, Plaintiffs' reasoning that BOEM should be held liable for a violation of the MBTA based solely on its approval of the Project has no support in law.

**B.      Plaintiffs' Reading of the Statutory Language Would Lead to Absurd Results**

The doctrine of absurd results belies Plaintiffs' urging that the statutory language prohibiting the taking of migratory birds "at any time, by any means or in any manner," imposes liability on a government agency for approving an otherwise lawful future activity by a non-governmental third party.  The potential scope of government liability would be inconceivable and contrary to congressional intent.

Statutory construction is not confined to the "bare words of a statute."  *Lynch v. Overholser,* 369 U.S. 705, 710, 82 S.Ct. 1063 (1962).  Where "the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters * * * [in which

---

*…continued from previous page*

the acts of third parties.  PEER Br. at 31.  In these cases, private parties – not the government – engaged in unlawful acts that led to the incidental take of migratory birds.  *See, e.g.*, *United States v. CITGO Petroleum Corp.*, No. C–06–563, 2012 WL 3866857 (S.D. Tex. Sept. 5, 2012) (oil company failed to cover open-top waste oil tanks in violation of the Clean Air Act and Texas law); *United States v. Apollo Energies,* 611 F.3d 679, 686 (10th Cir. 2010) (FWS warned failure to bird-proof oil drilling equipment led to deaths of migratory birds was unlawful, but company nevertheless failed to do so.).  In contrast, convictions have not been upheld where private parties engage in lawful activities but nonetheless incidentally take migratory birds.  *See e.g., United States v. Brigham Oil & Gas*, 840 F. Supp.2d 1202, 1203-09 (D.N.D. 2012) (stating that "take" "refers to a purposeful attempt to possess wildlife through capture"); *United States v. Ray Westall Operating, Inc.*, No. CR 05-1516-MV, 2009 U.S. Dist. LEXIS 130674, 17-18 (D.N.M. Feb. 25, 2009) (stating that the MBTA does not extend "the prohibition against killing migratory birds to acts or omissions that are not directed at migratory birds but which may indirectly kill migratory birds").

case] the intention of the drafters, rather than the strict language, controls.'' *United States* v. *Ron Pair Enters.,* 489 U.S. 235, 242, 109 S.Ct. 1026 (1989).  Thus, "statutes will be construed to avoid unreasonable and absurd results."  *In re Franklyn C. Nofziger,* 925 F.2d 428, 434 (D.C. Cir. 1991) (stating there are "legions of court decisions" where the Supreme Court and the circuit courts have applied the ''absurd results'' doctrine to avoid the literal application of a statute).

The legislative history of the MBTA makes clear that the Act was passed to restrict human activity *directed at wildlife.  See United States v. Moon Lake Elec.,* 45 F. Supp.2d 1070, 1079-83 (D.D.C. 1999) (discussing the legislative history of the MBTA).  This includes hunters, poachers, and other actors engaged in physical conduct that could take, kill, or capture a migratory bird, regardless of whether the activity is intentional or unintentional.  *See Seattle Audubon Soc'y,* 952 F.2d 297, 302 (9th Cir. 1991) (stating that the statutory definition of "take" describes "physical conduct of the sort engaged in by hunters and poachers, conduct that was undoubtedly a concern at the time of the statute's enactment in 1918"); *see also Newton Cnty.,* 113 F.3d 110 (8th Cir. 1997).  Consistent with the legislative history, the regulatory definition of "take" is to "pursue, hunt, shoot, wound, kill, trap, capture, or collect," all of which are action verbs involving an actor engaging in physical conduct directed at migratory birds.  50 C.F.R. § 10.12 (1997).  Congress's intent that liability attach only to the person that engages in the physical conduct that results in an actual take of migratory birds is further evidenced by the fact that § 707(a) imposes criminal liability on the person engaging in the wrongful act.  *Id.* (providing that "any person . . . who shall violate any provisions of said convention or this subchapter . . . shall be deemed guilty of a misdemeanor").  "Statutory text 'cannot be construed in a vacuum.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *EME*

*Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 33 (D.C. Cir. 2012) (*quoting Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012)).  BOEM's approval of the Cape Wind Project is simply not the type of direct physical conduct contemplated by Congress to impose liability under the MBTA.

Taking Plaintiffs' reading of the statutory provision to its logical end-point illustrates the absurdity of their position.  FWS estimates that building window strikes account for 97 million to 976 million bird deaths a year.  *See United States v. Brigham Oil & Gas, L.P.*, 840 F. Supp.2d 1202, 1212-13 (D.N.D. 2012).   Thus, under Plaintiffs' reading, every local planning board or state or federal agency would be liable if it did not obtain an MBTA permit before approving permits for the construction of tall buildings.  Similarly, MBTA permits would be required to cover the permitting of the tens of millions of kilometers of domestic power lines, which conservatively kill tens of thousands of birds annually.  CW185799.  And, BOEM would be required to get MBTA permits not just for the Project, but for every offshore oil and gas operation it authorizes.[20]   Indeed, every local agency that licenses cats could arguably be brought within the reach of the MBTA because cats kill hundreds of millions of birds a year.  *Id.*

As the Second Circuit stated "construction [of the MBTA] that would bring every killing within the statute, such as deaths caused by automobiles, airplanes, plate glass modern office buildings or picture windows in residential dwellings into which birds fly, would offend reason and common sense." *United States v. FMC Corp.*, 572 F.2d 902, 905 (2d Cir. 1978).  Bringing federal, state, and local approvals of third party actions within the reach of the MBTA similarly offends reason and common sense.

---

[20]    The irony here is that wind turbines are responsible for an incredibly low number of bird fatalities annually, *i.e.*, less than 0.1 percent of the total birds killed per year in Wisconsin alone by domestic cats (which kill between 7.8 million and 217 million birds per year in Wisconsin).  CW157322, CW157559.

III.    **NMFS AND BOEM COMPLIED FULLY WITH THE ENDANGERED SPECIES ACT**

Providing real substance to the philosophy set forth in the Handbook, NMFS placed

"biology first" and based its determination of no jeopardy for right whales and sea turtles "on a

careful analysis of the best scientific and commercial data."  Handbook at 1-2.  For example,

NMFS's 2010 BiOp thoroughly reviewed the biology, abundance estimates and trends, habitat,

distribution, population dynamics, sources of anthropogenic mortality including ship strikes and

net entanglements of right whales.  NMFS devoted over ten pages to these topics on right whales

alone and cited more than 110 scientific studies.  NMFS1424-32; 1480; 1487-88.  NMFS's

expertise on these topics is undeniable, having "completed a comprehensive review of the status

of right whales in the North Atlantic and North Pacific Oceans" in 2006.  NMFS1424.  Similarly

for sea turtles, NMFS carefully addressed these same topics and painstakingly reviewed the

scientific and commercial data for listed sea turtles in the action area focusing on population and

the acoustic effects of the Project on the sea turtles.  NMFS1490-1495; 1496-1498; 1515-1516;

1518-1523, 1525-1529; 1532-1534.

A.      **NMFS Rigorously Analyzed Data on Right Whales and Provided a Clear Explanation for Its No Jeopardy Opinion Based Upon the Best Scientific Data Available**

NMFS carefully reviewed "the best information on the use of Nantucket Sound . . . by

large whales. . . . "  NMFS1498.  NMFS devoted at least six pages to reviewing all of the

available scientific and commercial data reported on whale sightings and use of the Project area

and nearby water bodies by listed whales.  Three pages were also included on the 2010 right

whale sightings that resulted in the reinitiation of consultation between NMFS and BOEM.

NMFS1498-1502.  In stating that "right whales have been intensely studied in…Massachusetts

waters" NMFS evaluated many sources of information including NOAA's Sighting Advisory

System, NMFS's investigations, the Cetacean and Turtle Assessment Program study data, the

Ocean Biogeographic Information System database, NMFS's Northeast Fisheries Science Center

database (NEFSC), and Southeast Fisheries Science Center and NEFSC aerial and shipboard

surveys, and approximately 20 peer reviewed studies.  NMFS1425-26; 1499-1502.  These data

cover a fifteen year period from 1997 to the present.  *Id*.  After careful analysis of the best

scientific and commercial data available, NMFS reasonably concluded that "right whale use of

Nantucket Sound is likely to be rare, sporadic and extremely limited in duration and frequency,"

and "extremely unlikely [to] occur within the Project footprint (*i.e.*, the WTG [wind turbine

generator] site or along the cable routes.)."  NMFS1502; CW106220.

　　　　Plaintiffs' attack on the NMFS 2010 BiOp assessment of right whale occurrence is

unfounded and is based upon a gross distortion of the Record.  Plaintiffs state that "[i]n April

2010, however, 96 right whales aggregated in the waters in and around Nantucket Sound."

Plaintiffs argue from this contention that "the 2010 BiOp's assertion that extensive sightings in

2010 "supports" a prior finding of "rare" use of Nantucket Sound (citation omitted), is patently

arbitrary and capricious."[21]  PEER Br. at 35; 38.  However, the 2010 BiOp conclusively

establishes that only a small fraction of the 96 whales were observed in the Nantucket Sound and

they were all located on the "western and eastern extremes of the Sound," far from the Project

site.[22]  NMFS1501; 1575.  Moreover, NMFS's expert judgment was that these whales were

---

[21]　　Plaintiffs also argue that BOEM violated ESA Section 7 because it failed to re-initiate consultation after right whales "congregated in the area" in 2011 and 2012.  Plaintiffs' argument fails because the 2011 and 2012 right whale sightings occurred in Rhode Island Sound, which is far from the action area of Nantucket Sound. NMFS2138.

[22]　　NMFS reported four sightings located at the edges of the Sound: (1) three "unknown" species located 1.5 nm off Oak Bluffs, Martha's Vineyard (Apr. 17, 2010); (2) two right whales at the entrance to Vineyard Sound (Apr. 18, 2010); (3) one or two "probable" right whales (Apr. 19, 2010); and (4) six sightings of right whales at the eastern edge (Apr. 6, 2010).

"quickly transit[ing away]" from the Sound and "there is no evidence of any persistent aggregations of right whales in Nantucket Sound." *Id.* The BiOp further emphasizes that "no right whales have ever been documented within Horseshoe Shoal, where the wind facility will be built with nearly all sightings within Nantucket Sound occurring at least 18 km from the Project site." Indeed, only one sighting has ever occurred closer, and that was at least "5 km from the Project site." *Id.* NMFS's conclusion that right whale use of the Sound "is likely to be rare, sporadic and extremely limited in duration and frequency" is supported by other evidence in the Record including satellite tracking studies by Mate *et al*. (1997). NMFS1502.

It is not surprising that right whales are rare visitors to Nantucket Sound. NMFS's expert reasoning is that "the habitat within Nantucket Sound is inconsistent with the habitat where right whales are typically found." NMFS1502. NMFS further explained its reasoning stating clearly that "[t]he lack of whales in this area is consistent with the finding that these habitats are shallower than the areas where these whales typically occur and are outside of their normal coastal migratory route." *Id.* This opinion has substantial support in the Record. Right whales are huge mammals ranging from 45-55 feet in length and weighing up to 70 tons (NMFS58) and the water in the Sound is very shallow, with depths only up to 70 feet with the waters of Horseshoe Shoal being even shallower. CW65416. Moreover, Sound waters are not sufficiently productive for the right whale's copepod prey. CW65300.

NMFS's expert opinion, supported by the Record, that "right whale occurrence in Nantucket Sound is rare with transient individuals likely to overlap only sporadically" is a rational conclusion based upon the best scientific and commercial data available and should not be disturbed. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 36, 109 S.Ct. 1851 (1989) (holding Army Corps' rejection of conflicting scientific data entitled to deference).

**B.     NMFS Reasonably Concluded That Crew Boats Transiting the Area During Project Operation Would Not Adversely Impact Right Whales**

Plaintiffs argue that "the BiOp arbitrarily dismisses the likelihood that vessels will collide with right whales" because CWA will operate two 50-foot crew boats capable of transiting at up to 21 knots.  PEER Br. at 38.  Plaintiffs' argument fails because it is factually incorrect and grossly exaggerates the Record.

Plaintiffs are wrong that the 50-foot crew boats will be traveling from New Bedford through Buzzards Bay to the Project site.  *Id.*  The Record is clear that the crew boats will be transiting from Falmouth, Massachusetts directly into the Sound, where, as discussed above, "only rarely would whales enter."  NMFS1511.  At the time the 2010 BiOp was prepared, NMFS understood that the location of the crew boat staging had not been determined, but that they were "likely to be staged out of New Bedford and/or Falmouth."  NMFS1420.  However, the COP, which was finalized after the 2010 BiOp, places crew boat transiting from Falmouth only.  CW237420.  Thus, the only Project related boats that would exceed 10 knots are the 50-foot operational crew boats and they will transit directly into Nantucket Sound where according to NMFS's conclusion right whale occurrence is "rare." [23]

Nevertheless, NMFS rationally concluded based upon support in the Record that maintenance/crew support vessels transiting from New Bedford are "not likely to adversely affect right…whales."  NMFS1515.  Four clearly explained reasons underpin NMFS's conclusion.

---

[23]     The February 2011 COP refers also to "possibly the maintenance support vessel [transiting] from New Bedford" during the Project's operation period.  CW237420.  However, such vessels would typically be larger vessels that would not exceed the 10 knot speed restriction.  CW237375 ("The only vessels that are anticipated to be traveling at greater speeds [than 10 knots] are crew boats."); *see also* CW65382.

First, NMFS concluded that whales are "infrequent" in Buzzards Bay and only "occasional large whales . . . are likely to occur in Buzzards Bay."  NMFS1499; 1514.  The available data show that "records of large whales in Buzzards Bay are limited" and that only three right whales have been observed in Cape Cod Canal since 1957, which connects Buzzards Bay to Cape Cod, the last one being seen over 10 years ago.  *Id.*  Additionally, right whales use North Atlantic waters primarily for feeding on zooplankton copepods which are most abundant in Massachusetts waters between February and April when their prey is most abundant.  NMFS973; 1425; 1438.  Yet NMFS found that "most" of the preventative maintenance and service that is associated with the 50-foot crew boats during the operations period is "expected to occur during the summer months when the weather is most favorable."  NMFS1421.  Accordingly, there is little overlap between when large whales frequent the Cape Cod area and when the 50-foot crew boats are expected to transit the area making an interaction even more remote.

Second, while acknowledging that ship strikes are a source of human caused whale mortality, NMFS concluded from the data that ship strikes remain "rare, stochastic events" and that "no vessel strike events have been reported in the action area."  NMFS1510.  Further, NMFS's judgment is that ship strikes are more likely to occur when *large* vessels are traveling at high speeds, *i.e.,* ships over 80-100 m.[24]  NMFS1514.  By contrast, the 50-foot crew boats are far smaller at approximately 17m and have "increased maneuverability" over large ships, a fact that NMFS deemed important.  NMFS1514.  Further, such crew boats have less momentum than

---

[24]     *See* NMFS1554.  Kraus (1990) reports that right whale mortalities examined appeared to be from propellers 5 to 10m in diameter from vessels exceeding 100 m in length.  Laist *et al.* (2001) concludes that massive injuries on stranded ship-struck whales suggest large vessels are the principal source of severe injuries to whales.  *Id.*

larger and heavier vessels, and "are easier to bring to an emergency stop" to avoid potential collisions.  CW65382.

Third, the Record demonstrates that there is pervasive ship and boat traffic already in Buzzards Bay and the Project area.  Indeed, in 2004, there were 1.4 million commercial and 104,722 charter/party boat landings in the area.  CW141604; 141599.  Thus, NMFS concluded based upon the best available commercial information that the two additional transits per day by the 50-foot crew boats during the operations period "represents a minimal increase in overall vessel traffic in the area."  NMFS1514.  With regard to this *de minimis* increase of boat traffic, NMFS recognized that there is scientific uncertainty in the relationship between a percentage increase in vessel traffic and likely ship strikes, but rationally concluded that the slight increase in vessel traffic would not necessarily translate into any ship strike events.  This is because ship strikes remain relatively rare with "no vessel strike events hav[ing] been reported in the area," whales are "infrequent" and only "occasional" in Buzzards Bay and are "rare" in the Sound, and CWA will be using vessels that do not typically collide with whales.  NMFS1510; 1531. NMFS's conclusion was a rational choice based on the evidence in an area of scientific uncertainty.  "[A] court confronted with subject matter characterized by scientific and technological uncertainty 'must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives.'"  *Ctr. for Biological Diversity v. Salazar*, 770 F. Supp.2d 68, 78 (D.D.C. 2011) (*quoting Costle*, 578 F.2d at 339).

Fourth, to address any scientific uncertainty, NMFS imposed strict restrictions and mitigation measures "to further reduce the likelihood of a project vessel interacting with a whale."  NMFS1510.  Thus, the 50-foot crew boats must post a lookout on each transit and each lookout will receive training on identifying right whales.  Indeed, right whales at or near the

surface are easily spotted because they have a conspicuous "V" blowhole spray which no other whale has.  NMFS58.  Because 50-foot crew boats have a shallow draft of about 5 feet (CW388930), whales within that 5 foot depth are likely to be at the surface well in advance of a boat's arrival and would be seen by the trained lookout on a highly maneuverable vessel.

Additionally, NMFS requires the 50-foot crew boats to abide by stringent guidelines that require speed reductions to 13 knots within 2 miles of a whale sighting and diminishing to 7 knots at one-half mile.  NMFS1510-11.  These requirements are made enforceable on CWA through the provisions of the BOEM lease.  CW119311.  Moreover, it is unlawful for any vessel to approach within 500 feet of a right whale.  50 C.F.R. Part 224.103(c)(i); NMFS1478.

Plaintiffs' arguments are all unavailing.  They first argue that whales are likely to occur in Buzzards Bay.  PEER Br. at 38.  Notwithstanding the fact that the 50-foot crew boats will not traverse Buzzards Bay, Plaintiffs overstate NMFS's actual conclusion that large whale occurrence is "infrequent" and "occasional" in Buzzards Bay and "rare" in the Sound.

Next, Plaintiffs erroneously state as "fact" that 15,000 to 20,000 additional vessel crossings will be added by the Project crew boats over the 20 year life of the Project.  PEER Br. at 40.  However, Plaintiffs' "fact" is misleading because NMFS found that "most" of the crew boat crossings will be associated with routine maintenance that is planned during the summer months when whales are not in the area.  Given the 1.5 million commercial and charter boat landings in the area and thousands more recreational vessels, the additional trips are insignificant, particularly when placed in context of the NMFS findings that *no* ship strikes have ever been reported in the action area and large whales are "occasional," and "infrequent" in Buzzards Bay and "rare" in Nantucket Sound.

Finally, Plaintiffs make a red-herring argument that NMFS "abrogate[d] its duty to assess the increased risk to right whales from these vessels." PEER Br. at 41. NMFS performed a full qualitative assessment of the risk and its expert judgment was that ship strikes are more likely where high vessel traffic coincides with high species density. NMFS1512. Given this reasoned judgment, NMFS first found that species density in the action area is sparse. It next found that massive numbers of recreational, commercial and fishing vessels use the relevant waters and found that two additional transits per day by the crew boat represents a minimal increase over existing use by other vessels. It evaluated when the crew boats operate and found that most planned maintenance would be during the summer months when whales are not present. It evaluated the type of boats used and found that they were more maneuverable than large ships that are largely responsible for most ship strikes. It then "ground truthed" its analysis and found that no ship strikes have ever occurred in the action area.

Plaintiffs rely on *Nat'l Wildlife Fed'n*, 524 F.3d 917 (9th Cir. 2008),[25] but it is easily distinguishable. There, the court affirmed the district court's ruling of an inadequate BiOp because NMFS bifurcated its analysis of the federal project on listed salmon and failed to analyze all the impacts together. Here, NMFS analyzed all of the federal action and did not

---

[25]     Plaintiffs' other cases either support Defendants or are off-point. *Defenders v. Navy*, No. CV 210-014, 2012 WL 3886412, at *21 (S.D. Ga. Sept. 6, 2012), supports Defendants' position because the court found persuasive that "there have been no ship strikes involving Navy vessels in the area" for decades in upholding NMFS no jeopardy BiOp for right whales and Navy sonar use; *Defenders v. Guitierrez*, 532 F.3d 913 (D.C. Cir. 2008), also supports Defendants as it concluded that NMFS's determination regarding ship strike and whales was to be accorded deference. There, the court affirmed as not "arbitrary and capricious" the denial of a petition for emergency rulemaking regarding ship strikes and right whales; *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp.2d 1137, 1150 (W.D. Wash. 2000), is off-point because although the court invalidated the Bi-Op, it did so because "NMFS admit[ted] that at least some of the information it needed was available but could not be analyzed in the time allowed;" *Natural Res. Defense Council v. Kempthorne*, 506 F. Supp.2d 322, 360 (E.D. Cal. 2007), is also off-point because, there, FWS failed to incorporate the available 2004 Fall Midwater Trawl data into the BiOp that showed the lowest abundance of Delta smelt ever recorded in predicting the impact of water diversion operations in the California Bay Delta. Unlike *Greenpeace and Kempthorne*, there is no challenge here by Plaintiffs that NMFS omitted available key studies.

segregate its analysis.  Indeed, it considered all of the factors including other vessels traversing the area and whale density in the action area.  Accordingly, NMFS's rational conclusion that the Project will not jeopardize listed whales is based upon the best scientific data available and is adroitly explained in the agency's BiOp.

### C.      NMFS Assessed All Effects of a Longer Geophysical Survey on Sea Turtles

Plaintiffs argue that NMFS both failed to consider the potential impacts of a longer geophysical survey on listed sea turtles than assessed in the 2008 BiOp and failed to account for the entire survey area in making its assessment for the BiOp.  PEER Br.at 44-45.  Plaintiffs' arguments are factually wrong.

First, NMFS comprehensively considered the potential effects of the longer survey on sea turtles and rationally concluded that the longer survey would not result in additional impacts. NMFS quantitatively assessed the sound impacts of the high resolution geophysical survey and concluded that the underwater sound would dissipate to non-impact levels at no more than about 380 meters from the survey equipment.  Thus, NMFS imposed a 500-meter "exclusion zone" around the survey vessel and also required that the exclusion zone be monitored for 60 minutes prior to ramp up of the equipment because the "normal dive range" of a sea turtle is 5-40 minutes."  NMFS1527; 1538.  Further, NMFS evaluated sea turtle distribution in the action area and sea turtle behavior and concluded there will be only "minimal impact" on their foraging and resting behavior and any changes to individuals' movements are expected to be "minor," "localized" and "short-term."  NMFS1518-1523; 1525-1526; 1532-1534.  NMFS also judged that it would be "extremely unlikely" for a sea turtle to move toward the survey vessel because of the emanating sound.  NMFS1528.  Based upon sound isopleths constructed from data from the actual survey equipment, NMFS determined that only an "extremely small" area will be

43

subject to disturbing levels of sound (0.38 sq. km) during the survey at any one time and the ability of sea turtles to move through the area "will not be affected."  NMFS1402; 1528.

When NMFS became aware of the expanded survey duration, it reassessed its initial opinion and sought data to confirm the sound isopleths and sought data regarding the distance between vessels to assure that the acoustics would not cross and underwater sound compounded. NMFS1400; 1411.  It also confirmed its estimate of the number of sea turtles in the action area where the survey would be conducted.  Using the best scientific data available, including an "important" 2002-2004 Mass Audubon survey that reported on sea turtles in the Project area, it analyzed the number of sea turtles likely to be exposed.  It estimated this range (13-28 turtles)[26] by first calculating the sea turtle density from the available studies (turtles/km) and multiplying that number by its estimate of the area where noise levels would be between 160 – 180 dB. Plaintiffs complain because the survey duration is longer than set forth in the 2008 BiOp.  But the NMFS estimate rationally relies on sea turtle density and the mathematical area of sound impact for its conclusion and the Plaintiffs cannot show why such method is arbitrary.

Plaintiffs are equally wrong that NMFS did not consider the entirety of the survey area. Indeed, NMFS was conservative in its analysis and employed 148 square kilometers as the survey area when the actual survey area is only 110 square kilometers.  (*Compare* NMFS1527 *with* 76 Fed. Reg. 56,735, 56,736 (Sept. 14, 2011) (Stating that "high resolution geophysical survey would cover approximately 110 square kilometers . . . ").  Moreover, the BiOp states unequivocally that "the survey area includes the entire Wind Turbine Array *and the 115 kV submarine cable route*" which contradicts Plaintiffs' allegation.  NMFS1415 (emphasis added).

---

[26]     Indeed, the Mass Audubon study found only three confirmed leatherback turtles in 2004 in the Project zone; one in 2003, and none in 2002.  CW297018.

NMFS fully considered the effects of the longer geophysical survey on listed sea turtles in reaching its conclusions.  Accordingly, Plaintiffs argument should be rejected.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant CWA's Motion for Summary Judgment and deny the PEER Plaintiffs' Motion for Summary Judgment.

Dated: this 7th day of December 2012.

Respectfully submitted,

 /s/  Geraldine E. Edens
Geraldine E. Edens (D.C. Bar No. 437056)
Christopher H. Marraro (D.C. Bar No. 395152)

BAKER & HOSTETLER LLP
1050 Connecticut Ave., NW
Washington, D.C.  20036
(202) 861-1594
Attorneys for Cape Wind Associates, LLC