

# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Washington, DC 20240



Ms. Brona Simon
State Historic Preservation Officer
Massachusetts Historical Commission
The MA Archives Building
220 Morrissey Boulevard
Boston, MA 02125

**JUN 1 2 2009**

**Re: MMS Response to MHC Comments on the Finding of Adverse Effect for the Proposed Cape Wind Energy Project, Nantucket Sound, Massachusetts**

Dear Ms. Simon:

This letter is in response to the comments submitted in your letter dated February 6, 2009, regarding the MMS Finding of Adverse Effect (Finding) for the proposed Cape Wind Energy project, Nantucket Sound, Massachusetts. It is our intent with this letter to respond fully to the specific issues and concerns you have raised in your letter. The MMS also requests the concurrence of the Massachusetts Historical Commission (MHC) on the Finding of Adverse Effect, and requests that the MHC move forward with the MMS and the Advisory Council on initial drafting of a Memorandum of Agreement (MOA).

## 1. NEPA Review and Finding of Adverse Effect

Regarding your concern that the MMS Final Environmental Impact Statement (FEIS) was prepared without the benefit of the Finding, please note that the FEIS presents the same information and conclusions as the Finding document of December 29, 2008. If there are specific examples where you believe this not to be the case, we would appreciate you bringing those to our attention.

Regarding your comment that the documentation provided in the Finding is "incomplete and insufficient," we respectfully disagree. All documentation required by 36 C.F.R. § 800.11 has been provided or is referenced in the Finding. Further explanation responsive to comments received on the Finding at the January 29, 2009, Section 106 Consultation meeting was provided in a supplemental report to the Finding. This February 17, 2009 report prepared by PAL, *Briefing Memorandum, Cape Wind Energy Project: Response to Section 106 Consultation Meeting, January 29, 2009*, was distributed to all consulting parties. We hope that this supplemental report and our subsequent discussions have satisfied your concerns regarding documentation. We seek your concurrence in our Finding of Adverse Effect as supplemented.

## 2. Method and Rationale for Historic Property Identification

The method and rationale for the historic property identification effort is explained in Section 3.0 of the Finding, and was further clarified in the supplemental report by PAL dated February 17, 2009. This supplemental report was prepared in response to your



2

February 6, 2009, letter and to comments, including those of Mr. Ed Bell of your office, received at the January 29, 2009, Section 106 Consultation meeting.

Section 3.1.1 of the Finding details the methods that were used in the original identification effort by the U.S. Army Corps of Engineers (USACE) in consultation with the Massachusetts Historical Commission. The MMS expanded the identification effort beyond that of the USACE to include historic properties for which National Register eligibility had not yet been evaluated. During the Section 106 Consultation process, consulting parties brought additional historic properties to the attention of the MMS. At the September 9, 2008, Section 106 Consultation meeting, the MMS asked the consulting parties to submit, in writing, the names of the additional historic properties they thought should be evaluated both for National Register eligibility and for potential adverse effects from the proposed project. A total of 30 additional properties were identified for evaluation by the consulting parties. Section 3.1.2.3 of the Finding discusses the procedures the MMS used in the evaluation of these additional 30 historic properties. There was no "sampling" methodology used in identifying historic properties within the Area of Potential Effect of the proposed project.

## 3. Wind Turbine Generator (WTG) Height
The (WTG) height used in the visual simulation studies was the currently proposed 440 ft. height, not the originally proposed 417 ft WTG height; therefore, the visual simulations accurately reflect the visual effect of the proposed project to onshore historic properties. The 440-foot height was the basis for the analysis contained in the October 2008 Draft EIS as well. The MMS Finding of Adverse Effect concludes that there would be adverse visual effects on 29 historic properties from the proposed project; therefore, we agree with your statement that the undertaking as a whole will have an adverse effect on National Register eligible and listed properties, including National Historic Landmarks.

## 4. Alternatives Analysis
Ever since scoping for the Cape Wind project was initiated by the USACE in March of 2002, consideration of effects to historic and cultural properties resulting from the undertaking has been an important topic of analysis in the NEPA process as well as the Section 106 process. Regarding the consideration of feasible project alternatives in the FEIS, all alternatives, including the proposed action, were subject to an initial set of screening criteria which included (a) **meeting the purpose and need statement**, (b) **economic viability** and (c) **technological feasibility**. First, in accordance with the CEQ regulations for implementing NEPA, the alternatives to the proposed action must be derived from the stated purpose and need. Second, to the extent that MMS considered economic feasibility in the FEIS, it was limited to determining whether potential alternatives to the proposed action were sufficiently economically viable to warrant detailed analysis as a reasonable alternative to the proposed action under NEPA. Economic viability was not determined by the potential profit margin of the developer, but rather by the projected cost to consumers per kilowatt hour of the electricity produced

by an alternative, combined with the projected level of efficiency in producing electricity from each alternative location (for example, please see Table 3.2.1-1 in the FEIS). Third, technological feasibility was determined by MMS considering existing technology utilized successfully on a commercial scale today, taking into account the physical setting within which a project can be constructed, operated and maintained. The physical screening criteria included such factors as water depth, storm wave height, wind speed, distance to an onshore transmission system, and seafloor substrate.

For example, alternatives with transmission cable lengths over 31 miles were deemed not feasible as it would result in the use of cable technology that is either too expensive or has not been proven to be commercially available technology for offshore wind facilities (see FEIS Table 3.2.1-1). Such long transmission lines would be necessary for a location 25 miles offshore such as Phelps Bank, and for the Nauset alternative. Nauset was a "deep water" alternative, and while some consulting parties have argued that deepwater and/or floating turbines are a technologically-feasible alternative to the proposed project, the fact is that such technology is not commercially available today nor has it been determined to be feasible for commercial-scale wind energy projects. While the MMS fully supports the advancement of deep water technologies, experts agree that such technology—especially floating turbines—is years and perhaps up to a decade or more away from commercial viability. This timeframe does not meet the requirements of Massachusetts' Renewable Portfolio Standards statute; therefore, it did not meet the purpose and need for the project.

A. Geographic Alternatives Considered

The MMS FEIS for the Cape Wind Energy Project evaluated nine alternative geographic locations along the coast from Maine to Rhode Island. The sites were chosen based on geographic diversity, having at least some potential in terms of wind resources, and the necessary area required for the proposed facility size. The Phelps Bank site was chosen at the request of the Massachusetts CZM Office that an alternative be evaluated for a site located more than 25 miles offshore with water depths less than 150 feet, and the Offshore Nauset site was chosen to compare a deep water alternative. Ultimately, two of the geographic alternatives met the screening criteria and thus were fully analyzed in the FEIS—Monomoy Shaols and South of Tuckernuck Island. The geographic alternatives considered include:

- Offshore Portland, Maine
- Offshore Cape Ann, Massachusetts
- Offshore Boston, Massachusetts
- Offshore Nauset Massachusetts
- Nantucket Shoals
- Phelps Bank
- East of Block Island, Rhode Island, Monomoy Shoals
- South of Tuckernuck Island

B. Non-Geographic Alternatives Considered

Three non-geographic alternatives were considered and evaluated in the FIES, as well as a "no action" alternative:

- Smaller Alternative (half the MW capacity of the proposed action at the same location)
- Condensed Array Alternative
- Phased Development Alternative (Phase 1 and Phase 2)
- No Action Alternative

### C. Other Alternatives Considered

The MMS also considered onshore, near-shore and dispersed sites, as well as other forms of renewable energy production, including:

- Near Shore Waters
- Dispersed Sites
- Tidal In-Stream Energy Conversion (TISEC) Device
- Wave Energy
- Solar (Photovoltaic and Thermal Electric)
- Ocean Thermal
- Floating Wind Turbines

Both the range of alternatives considered and the criteria for determining feasibility under NEPA, in this circumstance, provide sufficient rationale for inclusion or exclusion of the same alternatives under the section 106 process, which similarly requires that alternatives be "reasonable." See 36 CFR §800.11.

### 5. Alternatives Analysis and Effects on Historic Properties

While the effects on historic properties surrounding Nantucket Sound would generally be less for the alternatives located outside the Sound, seven such alternative sites were eliminated by the application of the screening criteria and, in accordance with CEQ § 1502.14, were not subject to detailed analysis within the FEIS.

The geographical and non-geographical alternatives that were determined to be reasonable and feasible include: **Monomoy Shoals**, **South of Tuckernuck Island**, **Smaller Project**, **Phased Development**, **Condensed Array, and No Action Alternative.** These were subjected to detailed environmental analysis in the FIES, and the results are presented in Sections 3.3.5 and 3.3.6 of the FEIS.

Table 3.3.5-1 of the FEIS summarizes the impacts for the reasonable alternatives to the proposed action. The table includes categories for visual resources and cultural resources. The Monomoy Shoals and South of Tuckernuck Island Alternatives would use the same near-shore cable route, landfall site, and onshore cable route as the proposed action and, therefore, would have the same direct effect on onshore historic properties (i.e. cultural resources) as the proposed action. Since a detailed marine sensitivity assessment and marine archaeological reconnaissance survey were not undertaken for these two alternative sites, it cannot be determined if any offshore historic properties

CW0000109919

5

would be affected if the proposed facilities were sited at these alternative locations. However, the preservation potential for offshore Euro-American and Native American historic properties near the South of Tuckernuck Island Alternative is expected to be low because of its exposed location to the open waters of the Atlantic Ocean, which would increase the amount of marine erosion to which the area has been subjected. Because marine archaeological surveys and appropriate mitigative measures would be required prior to development of either the Monomoy Shoals or the South of Tuckernuck alternatives, the potential impacts would be comparable to the proposed action.

The Monomoy Shoals site is expected to have less visual effects to above-ground historic properties than the proposed action since it is further from the populated and historic areas of Cape Cod. The South of Tuckernuck Island Alternative also is expected to have less visual effects to above-ground historic properties except for those on Nantucket Island and the east end of Martha's Vineyard, which would be greater than for the proposed action.

The three non-geographic alternatives all fall within the geographic confines of the proposed project at Horseshoe Shoal. The *Smaller Project Alternative* contains half the number of WTGs and thus, half the generation capacity of the proposed project. This alternative would result in a reduced breadth of visual impacts when looking out at the horizon from Nantucket or Cape Cod. The *Phased Development Alternative* would use the same site as the proposed project and would use the same transmission cable system layout. This alternative would entail two separate phases of construction; the first phase consisting of 65 wind turbines installed in the western half of the proposed project area, and the second phase consisting of the installation of the remaining 65 wind turbines in the eastern half of the proposed project area. The two phases would be separated by a period of monitoring operations. Visual impacts would be the same as for the proposed project once this alternative was fully operational. The *Condensed Array Alternative* would reduce the overall area of the array from 25 square miles to 16 square miles, reducing the overall breadth of the project. However, the concentration of structures would be increased and thus could create a different visual impact than the proposed project.

### 6. Continuing Tribal Consultation and Identification Efforts
The one specific Traditional Cultural Property (TCP) included in the list of adversely affected properties was identified to the MMS during a separate Section 106 Consultation meeting on September 8, 2008, with the Aquinnah Wampanoag and Mashpee Wampanoag Tribes. The MMS has evaluated this property as eligible for the National Register of Historic Places. It also has a view of the proposed project; therefore, it was included in the list of historic properties that would have an adverse effect from the proposed project, but the property is not on Tribal land, and there would be no direct physical impacts to the property from the proposed project. The property is so sensitive that the MMS was concerned that even presenting information on the nature of the property might bring it into jeopardy.

The MMS is continuing Section 106 consultations with the Aquinnah Wampanoag, Mashpee Wampanoag, and Narragansett Tribes to identify any additional Tribal areas of traditional cultural and religious importance that may be eligible for the National Register and have an adverse effect from the proposed project. This was one of the main topics of discussion at the recent Tribal-only 106 Consultation meeting on June 3, 2009. If additional National Register-eligible Tribal sites that will be subject to adverse effects from the proposed project are identified in subsequent Tribal consultations, the MMS will supplement its Finding of Adverse Effect to include any additional adversely affected historic properties that may be identified.

### 7. MHC Review of Vibracore Sampling

The original vibracores within the offshore project area were analyzed by the Public Archaeology Laboratory (PAL) and the results of the analysis and the recommendations for mitigation were reported in their March 2004 report, *Marine Archaeological Reconnaissance Survey, Cape Wind Energy Project, Nantucket Sound, Massachusetts*. The Massachusetts Board of Underwater Archaeological Research (MBUAR) concurred with the findings and recommendations of the report in a letter to PAL dated May 11, 2004. The MHC concurred with the report and with the MBUAR recommendations in a letter dated May 19, 2004. The mitigation recommended was incorporated into the project design.

The MMS appreciates the offer of the MHC to review and comment on the scope, methodology, and results of the additional vibracore sampling planned for the proposed project area. This proposed coordination effort can be embodied in the MOA for the proposed project. The MOA can also incorporate a plan for dealing with "unanticipated discoveries" that is acceptable to the Section 106 Consulting parties and consistent with the provisions of 36 CFR § 800.13.

### 8. Drafting of an MOA

The MMS has spent considerable time and effort in identifying and evaluating reasonable alternatives to the proposed action. The screening and scoping of alternatives under NEPA is valid and applicable to the NHPA 106 process. The reasonable alternatives to be considered by the Department are those identified in the FEIS and described above—the proposed action, two geographic alternatives, three non-geographic alternatives, and the no action alternative. The proposed action will be the presumed undertaking for purposes of the MOA. The MMS requests the concurrence of the MHC on the Findings Document and the Adverse Effects Determination, and requests that the MHC move forward along with the MMS and the Advisory Council on initial drafting of an MOA. The Record of Decision for the proposed project will incorporate the results of the completed Section 106 process, including any MOA negotiated by the Section 106 Consulting parties.

CW0000109921

The MMS looks forward to working with the MHC on an MOA for the Cape Wind Energy Project. If you have additional concerns or would like further information, please feel fee to contact me at 703-787-1736 or by email at melanie.stright@mms.gov.

Sincerely,

Melanie J. Stright, PhD
Federal Preservation Officer
Minerals Management Service


CC:  List of Section 106 Consulting Parties

CW0000109922



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Washington, DC 20240



**OCT 0 9 2009**

Ms. Brona Simon
State Historic Preservation Officer
220 Morrissey Boulevard
Boston, Massachusetts 02125

Dear Ms. Simon:

In accordance with Section 106 of the National Historic Preservation Act of 1966, as amended (16 U.S.C. 470f), and its implementing regulation, 36 CFR 800, "Protection of Historic Properties," and as authorized by the U.S. Department of Interior Minerals Management Service (MMS), we are hereby initiating consultation with the State Historic Preservation Officer of the Massachusetts Historical Commission regarding the proposed Cape Wind Energy Wind Project and the Determination of Eligibility of Nantucket Sound to the National Register of Historic Places. Please find enclosed the necessary documentation per §800.11.

The MMS kindly asks for your review of, and concurrence with the enclosed determination. Please respond in writing to MMS within the thirty-day time period pursuant to §800.3(c) 4.

The MMS respectfully requests an expedited review of this information as per conversations and meeting minutes taken during the Section 106 Consultation meeting on June 16, 2009.

You may send your response to the following address:

Minerals Management Service
Attention: Christopher Horrell Ph.D. R.P.A.
1201 Elmwood Park Blvd
New Orleans, Louisiana 70123

If your office concurs with the determination in this submission, please sign and date on the line below, and return the documentation as noted above.

If your office does not concur, we request that any concerns or objections are clearly expressed in writing so that MMS may continue the consultation process with your office.



CW0000109924

2

In the case of non-concurrence, please indicate if there are other sources of information that should be investigated, or if there are other parties, tribes, or members of the public you believe should be included in the consultation process. Thank you for your prompt attention to this matter.

Sincerely,

_FOR_

Christopher E. Horrell Ph.D.  R.P.A.
Acting Federal Preservation Officer

CONCURRENCE: _____    _____
State Historic Preservation Officer                      Date:


Enclosures:    National Register Eligibility Determination
               Mashpee Wampanoag Horseshoe Shoal Resolution
               Wampanoag Tribe of Gay Head, Aquinnah letter dated September 17, 2009

CW0000109925

# MINERALS MANAGEMENT SERVICE
# NATIONAL REGISTER ELIGIBILITY DETERMINATION
# FOR NANTUCKET SOUND AS A
# TRADITIONAL CULTURAL PROPERTY AND HISTORIC PROPERTY

The potential visual impact of the proposed Cape Wind Energy Project on the cultural practices of the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah) was raised as a concern during government to government and Section 106 consultations. Discussions during consultations with the Native American Tribes local to the Cape Wind Project Area have involved Nantucket Sound on three levels: Nantucket Sound as an inundated prehistoric landscape (which the Tribes inhabited prior to the rise of sea level); Nantucket Sound as a water body; and Nantucket Sound as a viewshed of the eastern horizon. In determining the eligibility of Nantucket Sound for the National Register of Historic Places (NRHP) as a Traditional Cultural Property (TCP), the Minerals Management Service (MMS) has considered Nantucket Sound on all three levels using six criteria provided by the National Park Service (NPS; from National Register Bulletin 38 in the form of a worksheet), as decisive factors. The MMS has also considered the eligibility of Nantucket Sound for the NRHP as a historic property, and as a sacred site under Executive Order No. 13007. After due consideration of the guidelines for all three levels, consultation with the affected Native American Tribes, discussion with the National Park Service and the Advisory Council for Historic Preservation, and review of the applicable Executive Orders and National Historic Preservation Act (NHPA) regulations, *the MMS has determined that Nantucket Sound is not eligible for inclusion on the NRHP as a TCP or as a historic property, on any of the three levels. Furthermore, Nantucket Sound does not qualify as a sacred site.*

This determination with regard to Nantucket Sound as a distinct entity does not, however, preclude the fact that the viewshed over Nantucket Sound may be a *contributing element* to the possible NRHP eligibility of other TCPs and/or historic properties of Native American Tribal affiliation whose locations are used for the purpose of observing this eastern viewshed. The MMS continues to work with the Tribes to learn the nature of this contributing element in order to determine the eligibility of these individual sites.

## INFORMATION SOURCES FOR THIS ANALYSIS

In order to gain a better understanding of the Tribes' ties to Nantucket Sound and to adequately reflect the importance of specific locations and the associated ceremonies and traditions that take place there, the MMS conducted a series of government to government consultations, Section 106 consultations, and site visits with the Wampanoag Tribe of Gay Head (Aquinnah) and the Mashpee Wampanoag Tribe on Martha's Vineyard and Cape Cod between August 3-5, 2009. In addition to the interviews with THPO Washington and THPO Green, the MMS reviewed statements from transcripts made during NHPA Section 106 Consultation meetings and correspondence written by the Tribes. MMS has also conducted a literature search and review from various available sources of information related to both the history and culture of the Wampanoag and other New England Tribes, as well as regulations, applicable guidance (in particular, National Register Bulletins 12 and 21 (boundaries), 15 (general and water bodies) and 38 (TCPs)) and literature related to the Section 106 process, the eligibility of properties for listing on the Federal Register of Historic Places, and the evaluation of Traditional Cultural Properties (TCPs). A bibliography of literature sources reviewed is included at the end of this document. Correspondence from the Tribes is also enclosed, and was considered as a reference for this Determination.

CW0000109926

## NRHP CRITERIA FOR HISTORIC PROPERTIES[1]

The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects **that possess integrity of location, design, setting, materials, workmanship, feeling, and association,** and:

- A. That are associated with events that have made a **significant contribution to the broad patterns of our history**; or
- B. That are **associated with the lives of persons significant in our past**; or
- C. That **embody the distinctive characteristics** of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
- D. That **have yielded or may be likely to yield, information important in prehistory or history**.

Listed historic properties generally fall into one of five categories: buildings, historic districts, objects, sites, or structures. Other categories include rural historic landscapes, vessels and shipwrecks, and traditional cultural properties.

## NRHP CRITERIA FOR TRADITIONAL CULTURAL PROPERTIES[2]

**To be eligible for listing in the National Register, a traditional cultural property must meet all of the following six criteria** (bolded sections come directly from National Register Bulletin 38):

1. **Be a tangible place.** The NRHP does not list cultural practices or beliefs. Tangible means that one must be able to physically locate the property. It does not mean that one has to have physical, man-made features or items at the place.
2. **Be important to the community today** and play the same role in the community's traditions as it did in the past.
3. **Have been important for at least 50 years.** The use of the property, however, does not have to be continuous over the last 50 years, but there should be a pattern of use or continued value.
4. **Have Integrity.** By regulation integrity means integrity of **location, design, setting, materials, workmanship, feeling, and association.** The importance of each of these elements varies depending on the nature of the property. For TCPs, integrity can often be evaluated in terms of the strength of the **property's association with the traditions** of the community and the **property's condition.** The **association** between the place and the community's traditions must be strong. For example, if the traditional activity can be carried out anywhere, then there is no link between the activity and the place. The **property's condition** is just as important to consider. If commercial buildings surround a TCP that should have a pristine natural environment, then the property has little integrity of condition.
5. **Have definable boundaries.** A TCP listed in the NR **must have definable, or at least defensible, boundaries.** Defensible boundaries should be based on the **characteristics of the property, how it is used, and why it is important.**
6. **Meet NR Criteria.** Like any other property, to be listed in or eligible for listing in the NR, a TCP must meet one or more of the NR Criteria. **TCPs do not have a criteria all their own.** TCP are almost always listed under Criterion A and sometimes B (see above) for their association with

---

[1] This section is reproduced from the website http://www.nps.gov/history/nr/listing.htm

[2] This section is reproduced from a document entitled, *Traditional Cultural Property Worksheet,* an informal document provided to the MMS by the National Park Service as a reference to National Register Bulletin 38.

CW0000109927

historical events or broad patterns of events or the lives persons significant in our past, but **not all TCPs are eligible for the NRHP.**

## NANTUCKET SOUND AS AN INUNDATED PREHISTORIC LANDSCAPE

The MMS considered the NRHP eligibility of the seabed (the inundated prehistoric landscape) submerged below the waters of Nantucket Sound as a TCP as well as a conventional historic property. The MMS evaluated the results of a series of marine archaeological surveys that were conducted on the seabed within the offshore proposed project area (Horseshoe Shoal) by the Public Archaeology Laboratory, Pawtucket, Rhode Island. These reports include:

- *Marine Archaeological Sensitivity Assessment, Cape Wind Energy Project (June 2003)*
- *Preliminary Marine Archaeological Sensitivity Assessment: Cape Wind Energy Project Alternatives: Horseshoe Shoal; Combination New Bedford/Buzzards Bay and Reduced Horseshoe Shoal; Monomoy and Handkerchief Shoals; Tuckernuck Shoal; and South of Tuckernuck Island, Massachusetts (January 2004)*
- *Marine Archaeological Reconnaissance Survey: Cape Wind Energy Project (March 2004)*
- *Cape Wind Terrestrial Alternative: Massachusetts Military Reservation, Bourne and Sandwich, Massachusetts (March 9, 2004)*
- *Supplemental Marine Archaeological Reconnaissance Survey of Revised Layout Offshore Project Area (January 26, 2006)*

A careful evaluation of the seismic and vibracore data obtained in the above-listed studies concluded that no identifiable sites on or underlying the sea floor with material remains or artifacts were found in the proposed project area; the Massachusetts State Historic Preservation Office (SHPO) and Massachusetts Board of Underwater Archaeological Resources (in the Massachusetts Office of Coastal Zone Management) both concurred with the findings and in doing so vetted the survey sample and methodology (including depth of sample and sample location) as adequate. Therefore, the seabed cannot meet any of the criteria for eligibility of a historic "property" since there is no evidence remaining of human habitation.

A site that is a natural landscape with no observable evidence of human activity may be considered for its cultural significance as a TCP only where its historical or cultural significance can be documented. Although oral histories of habitation of the seabed area before it was inundated do survive, the requirement of integrity of condition of the seabed property (Bulletin 38 at 11-12) cannot be met because the archeological data suggests that any evidence of human habitation has been removed and scoured away by marine transgression. In addition, although the seabed of Horseshoe Shoal as a former residence is clearly important in the history of the Native American Tribes, the requirement of integrity of relationship to that location is not met because of the lack of continued access to the now-inundated area; it is not a location where cultural or spiritual practices are – or can be – currently carried out.

After review of the relevant guidance *the MMS concludes that the submerged landform under Nantucket Sound is not eligible for listing as a TCP* because: there is no identifiable archaeological resource; due to the lack of access it does not play the same role in the community's traditions as it did in the past; it does not have sufficient integrity of setting, association, condition, or cultural relationship to the location; it does not have definable boundaries with regard to how it is used and why it is important. Because of lack of physical integrity, it does not meet NRHP criteria.

CW0000109928

## NANTUCKET SOUND AS A WATER BODY

The MMS closely examined the NRHP criteria and specifically referred to the following National Register Bulletins to determine whether Nantucket Sound as a water body should be considered eligible as a TCP:

- *Guidelines for Evaluating and Documenting Traditional Cultural Properties, National Register Bulletin 38.*
- *Defining Boundaries for National Register Properties (1997), National Register Bulletins 12 and 21.*
- *How to Apply the National Register Criteria for Evaluation, National Register Bulletin 15.*

Although Nantucket Sound as a water body is a tangible place; is important to the community today; and has been important for at least 50 years, it does not have sufficient integrity of cultural relationship to the location for the *entire Sound*. Furthermore, it does not have definable boundaries with regard to how it is used and why it is important. Under Bulletin 15, listing of water bodies is discouraged. "The National Register excludes from the definition of "site" natural waterways or bodies of water that served as determinants in the location of communities or were significant in the locality's subsequent economic development. ...The features most appropriate to document this significance are the properties built [or utilized] in association with the waterways." While it is true that the affected Native American Tribes have illustrated through oral histories their historic utilization of Nantucket Sound in traditional subsistence practices as well as in cultural and religious practices, it is consistent with NR Bulletin 15 guidelines to document the discrete individual locations of subsistence harvesting and processing (i.e., shell middens or habitation locations), or of cultural and religious practices (both archaeological and TCPs) themselves (i.e., shore-based locations rather than on portions of a water body). Both the physical proximity to Nantucket Sound as well as the viewshed of the eastern horizon across Nantucket Sound may be *contributing factors* to the potential NRHP eligibility of these individual, shore-based locations. However, the entire Nantucket Sound as a water body itself is not the appropriate entity for consideration.

After review of the relevant guidance and several consultations with personnel in the office of the NRHP discussing in general the eligibility of water bodies, ***the MMS concludes that the water body of Nantucket Sound is not eligible for listing as a TCP*** because: under Bulletin 38, sufficient integrity of the location and of cultural relationship to the location cannot be established for the entire 600-square-mile Sound; under Bulletin 21, reasonable boundaries around the entire 600-square-mile Sound cannot be established; and under Bulletin 15, "The National Register excludes from the definition of 'site' natural waterways or bodies of water."

## NANTUCKET SOUND AS A VIEWSHED OF THE EASTERN HORIZON

Both the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah) have informed the MMS that the view of the rising eastern sun over Nantucket Sound is an integral part of the local cultural and religious practices. However, in order for the MMS to consider this view under the National Historic Preservation Act, the MMS needs to know the location of the affected property or properties from which this view is being taken – the location of the cultural practice or religious ceremony taking place while viewing – in order to consider the affects of the undertaking on the property or properties. From a specific location, the MMS will judge whether the property is 1) within the Area of Potential Effect (APE; i.e., the project is within the viewshed) and 2) whether the property qualifies as a TCP. For

CW0000109929

purposes of this analysis, MMS has been asked to consider the entire eastern viewshed bounded only by the coastlines of Cape Cod and Martha's Vineyard, with no reference point or viewing location[3].

During site visits with the local Native American Tribes, the MMS was shown a number of properties for consideration as TCPs, most of which were not within the project's APE. Two discrete properties (in addition to the one already listed in the *Finding of Adverse Impact* document) are both located within the project's APE and do meet the integrity of relationship (use and association) criteria. Since the viewshed from these properties of cultural significance will be affected, and it is likely that the viewshed is a *contributing factor* in the possible eligibility of these sites to the NRHP, these properties themselves will be considered as potential TCPs. **The Nantucket Sound, however, is not the appropriate location from which to consider the viewshed; rather, the areas of traditional cultural practice from which the view is experienced will be considered for eligibility as TCPs.**

Therefore, after review of this guidance and several consultations with personnel in the office of the NRHP, *we conclude that the viewshed of the eastern horizon across Nantucket Sound does not meet NR eligibility criteria as an historic property, and is not eligible for listing as a TCP* because: it is not a tangible place;[4] it does not have integrity of location and setting; does not have definable boundaries; is without integrity of relationship; and therefore does not meet NRHP criteria. Again, the MMS will continue to consider the viewshed of the eastern horizon across Nantucket Sound as a *contributing element* in consideration of the eligibility of sites identified by the affected Native American Tribes.

## FURTHER DISCUSSION[5]

Nantucket Sound (as a water body, as a viewshed, or as an inundated prehistoric landscape) does not meet the definition of "sacred site" found in Executive Order 13007. The Executive Order No. 13007 "Indian Sacred Sites" defines sacred sites:

---

[3] The information provided by the tribes in support of this "entire viewshed" assertion as a TCP does not meet the criteria of continuity of use and association. While some Wampanoag tribal members likely practice private ceremonies at various locations along east-facing coastlines overlooking the Sound, viewing places deemed adequate for these spiritual observances could be anywhere on the island that has a view of the sunrise over the Sound. Therefore, the requirement of association with a particular site has not been met (similar to the "baptism in any water" example from Bulletin 38 at 11). In addition, the element of continuity of association and use of all of these potential sites over time by the tribal community as a whole (National Register Bulletin 38 at 11-12) has not been met, and therefore neither the entire viewshed nor the coastlines would qualify as a TCP. MMS feels that further investigation or information will not alter this conclusion; both tribes have provided all of the information they feel comfortable with releasing through interviews, transcripts and written correspondence already in the project record.

[4] "This Bulletin does not address cultural resources that are purely 'intangible'—i.e. those that have no property referents" (Parker and King 1998:3).

[5] This section is reproduced from an internal memorandum to Rodney Cluck, MMS Office of Alternative Energy Programs, from Tim Baker, Office of the Solicitor, Division of Mineral Resources, Branch of Petroleum Resources, dated July 18, 2008, regarding *Issues Related to Claims of Sacred Sites and Historic Properties on the Outer Continental Shelf (OCS) in Nantucket Sound.*

CW0000109930

"Sacred site" means any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site." E.O. 13007 Section 1(b)(ii).

The Executive Order expressly restricts sacred sites to those locations that are "… specific, discrete, narrowly delineated location[s]…"  These Executive Order requirements exclude broadly defined locations such as Nantucket Sound as a water body and the eastern horizon and would definitely exclude the submerged landform given that it is not accessible for "ceremonial use."

Neither the entirety of Nantucket Sound as a water body nor as a viewshed of the eastern horizon meet the definition of "historic property" found in the NHPA and in the ACHP regulations at 36 CFR 800.16. The ACHP regulations define historic properties, but link that definition to the criteria to be eligible for inclusion in the NRHP. The criteria of eligibility for inclusion in the NRHP are set out in regulation 36 CFR 60.4. To be eligible for inclusion in the NRHP, a historic site must be associated with important events or person(s), and/or embody distinctive artistic values and/or yield important information about the past. The claims that Nantucket Sound and the eastern horizon are historic properties have not been supported by any reference to the regulatory criteria to be eligible for inclusion in the NRHP such as linking these areas to an important event or person(s).

While Nantucket Sound as a water body and as a viewshed of the eastern horizon do not satisfy the criteria to be eligible for inclusion in the NRHP, they are to be excluded from such consideration according to the guidance in the "How to" publication.  The regulation setting forth the criteria to be eligible for inclusion in the NRHP points to other official publications for further guidance including the "How To" publications: e.g., *How to Apply the National Register Criteria for Evaluation (Bulletin 15)*. The "How To" guidance also "…excludes from the definition of 'site' natural waterways or bodies of water that served as determinants in the location of communities or were significant in the locality's subsequent economic development."

There is the concept of "cultural landscapes" in official National Park Service literature; much like TCPs, cultural landscapes are a type of subset of "sites" potentially eligible to be included in the NRHP. According to "36 Preservation Briefs" (a National Park Service Publication authored by Charles Birnbaum), there are four types of cultural landscapes, "historic sites, historic designed landscapes, historic vernacular landscapes, and ethnographic landscapes."   According to this publication, ethnographic landscapes include "religious sacred sites."  The definition of cultural landscapes, in this publication, is generally linked to something concrete such as an important event or person.  It defines cultural landscapes as "… associated with a historic event, activity, or person or exhibiting other cultural or aesthetic values."  Consequently, neither the Nantucket Sound as a water body, as an inundated prehistoric landscape, nor as a viewshed of the eastern horizon would be considered as a religious site and ethnographic landscape, and would not likely meet this definition of cultural landscapes. There is no evidence linking these sites to a relevant historic event, activity or person. Further, even if one met the definition of a "cultural landscape," the Nantucket Sound as a water body, as a viewshed of the eastern horizon, or as an inundated prehistoric landscape would still have to satisfy the regulatory criteria to be eligible for inclusion in the NRHP to qualify as a historic property, and none of these do.

CW0000109931

In conclusion, the Nantucket Sound (as a water body, as a submerged landscape, or as the viewshed of the eastern horizon) does not satisfy the criteria of eligibility for inclusion in the NRHP, nor does it meet the definition of "historic property" under 36 CFR 800.16, nor does it qualify as a "sacred site" under Executive Order No. 13007 and, therefore, does not qualify as a historic property under the NHPA.

## CONCLUSION

Based on a thorough and extensive assessment of the NRHP Criteria and the analysis of the results of marine archaeological surveys, *the MMS has determined that neither the water body of Nantucket Sound itself, nor the seabed underlying Nantucket Sound, nor the viewshed of the eastern horizon as a discrete entity (devoid of a viewing location) across Nantucket Sound would be eligible for listing on the NRHP as a TCP, a historic property, or a sacred site*. With all of these points taken together, the MMS has decided it will not at this time submit documentation to the NRHP for the purpose of seeking a formal eligibility determination of Nantucket Sound (the water body, the submerged landscape, or the eastern horizon devoid of a viewing location) as a TCP or as a historic property (pursuant to 36 CFR 800.4(c)(2)). However, the MMS will continue to consider for NRHP eligibility the locations identified by the Tribes during site visits that may be affected by the proposed project that are both within the currently defined APE and potentially possessing characteristics of historic properties or TCPs. Written permission from the Tribes will be sought prior to circulating proposed eligibility determinations or officially nominating these properties.

CW0000109932

**Sources Considered**

Thomas F. King, Places That Count:  Traditional cultural properties in cultural resource management. (2003)

Washington, D.C. U.S. Dept of the Interior, National Park Service, Cultural Resources, Park Historic Structures & Cultural Landscapes, (1998- ), Landscapes Lines (2005)

Silverman, David J.,   Faith and boundaries: colonists, Christianity, and community among the Wampanoag Indians of Marth's Vineyard, 1600-1871. (2005)

Travers, Milton A., The Wampanoag Indian federal of the Algonquin Nation; Indian neighbors of the Pilgrims. (1961).

Travers, Milton A., The Wampanoag Indian Tribes of Martha's Vineyard:  the Story of the Capowacks o Nope, the Takemmy – Wampanoags, the Nunpaug-Wampanoags, the Aquinnah-Wampanoags, the Acuinnah-Wampanoags of Catachukutcho (Gay Head tribe), the Chappaquiddick – Wampanoags

John R. Swanton, The Indian Tribes of North America.  Originally Published 1952 as Bureau of American Ethnology Bulletin Number 145 (Fourth Printing 1984)

Robert S. Grumet, Historic Contact:  Indian People and Colonists in Today's Northeastern United States in the Sixteenth Through Eighteenth Centuries.  (1995)

William C. Sturtevant, Handbook of North American Indians.  (1978)

Laurie Weinstein-Farson, The Wampanoag.  (1989)

Patricia L. Parker and Thomas F. King, U.S. Department of the Interior, National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties (rev. 1998)

National Register Bulletins 12 and 21: *Defining Boundaries for National Register Properties (1997)*

National Register Bulletin 15: *How to Apply the National Register Criteria for Evaluation*



# Mashpee Wampanoag Tribe

P.O. Box 1048
Mashpee, M.A. 02649
(508)477-0208

## 2009-RES-022
## Horseshoe Shoal Resolution

**WHEREAS,** the Mashpee Wampanoag Tribe is federal recognized Tribe entitled to the immunities and privileges available to Indian tribes by virtue of their government - to -government relationship with the United States; and

**WHEREAS,** the Mashpee Wampanoag Tribe is a member of the Great Wampanoag Nation, known as "The People of the First Light" and have since time immemorial occupied the land and waters from Narragansett Bay to the Neponset estuaries and maintained a spiritual, cultural and traditional connection to their traditional homeland; and

**WHEREAS,** as the People of the First Light; one of the most important components of our religious, cultural and ceremonial practices is our ability to embrace and give prayer of thanksgiving to the first light . These ceremonial, spiritual and religious practices require an unobstructed view of the sunrise over Nantucket Sound; and

**WHEREAS,** the Wampanoag people have walked these lands for nine thousand years, including both upland and land under the ocean and we must preserve the spiritual integrity and sanctity of the eastern horizon, vista and horizon view-shed, central to our religion ; and

**WHEREAS,** our oral traditions teach us that our people lived , raised families, hunted, fished and buried our dead on this land now known as Horseshoe Shoals and their descendents still live on Cape Cod and Martha's Vineyard and carry on our culture, traditions and religion; and

**WHEREAS,** the Wampanoag Tribe, the Colonies, the state of Massachusetts and the United States share a long maritime history and a National Treasure that has significant spiritual, cultural, traditional and historic value to all.

**NOW THEREFORE, BE IT RESOLVER** that the Mashpee Wampanoag Tribe requests the National Park Service (NPS)  determined that Nantucket Sound is a **Traditional Cultural Property;** and

CW0000109934

**BE IT FURTHER RESOLVED** that the Mashpee Wampanoag Tribe since time immemorial has a traditional, cultural, spiritual and religious connection to the Sound and have determined that Nantucket Sound is a **Traditional Cultural Property**; and

**BE IT FINALLY RESOLVED** that the Mashpee Wampanoag Tribe approves and submits this resolution to the National Park Service (NPS)

## CERTIFICATION

We, the undersigned Chairman and Secretary of the Tribal Council of the Mashpee Wampanoag Tribe, hereby, certify that the Tribal Council is composed of 13 members of whom 10 constituting a quorum, were present at a meeting thereof, duly and regularly called, noticed, convened and held on the 15th day of July, 2009, and that the foregoing Resolution was duly adopted by the affirmative vote of 9 members, with 0 opposing, and with 0 not voting.

DATED THIS 15th day of July, 2009

_Cedric Cromwell_
Cedric Cromwell, Chairman
Mashpee Wampanoag Tribal Council

ATTEST:

_Marie Stone_
Marie Stone, Secretary
Mashpee Wampanoag Tribal Council

CW0000109935

Tribal Historic
Preservation Office



Protecting & Preserving
Our Culture

September 17, 2009

National Park Service
National Register of Historic Places
1201 Eye St., NW (2280)
Washington, DC 20005
Attn: Ms. Janet Snyder-Matthews, PHD

Dear Ms. Snyder-Matthews,

The Tribal Historic Preservation Officer of the Wampanoag Tribe of Gay Head
(Aquinnah) being duly authorized by the governing body of the Tribe, hereby requests
an official determination of eligibility for the eastern vista viewshed over Nantucket
Sound, located off the coast of Cape Cod, Massachusetts, for inclusion in the National
Register of Historic Places. This request is being made pursuant to the Cape Wind
Project application through the Section 106 process of the National Historic Preservation
Act.

Since time immemorial, the Wampanoag and/or Indigenous Northeastern Woodlands
Indian People have; either traversed, fished, cultivated, interred our ancestors and/or
occupied the entire area including the location currently under consideration for this
undertaking.

We consider the eastern vista viewshed over Nantucket Sound, located off the coast of
Cape Cod, Massachusetts, eligible for inclusion in the National Register of Historic Places
as the Wampanoag People consider this viewshed a Traditional Cultural Property.

We are the Wampanoag People, "The People of the First Light or Dawn", this is how we
identify ourselves and how other Tribes recognize us. The unobstructed view of this
expanse of water, bordered by the south shore of Cape Cod on it's north side, by
Nantucket on the southern side and Martha's Vineyard on it's western side is of utmost
importance to the Wampanoag People.

The WTHPO asserts that the eastern vista viewshed is essential to the Wampanoag
People for our cultural beliefs, identity and spirituality. This viewshed is one of the
places where our People historically had, and continue, to have a connection in

CW0000109936

practicing our cultural ceremony and traditions.  Here is where we still arrive to greet the new day, watch for celestial observations in the night sky and follow the migration of the sun and stars in change with the seasons.  This viewshed has remained undefiled; affording our People continuous use since time immemorial and it defines our place in the indigenous world; for ourselves, for our sister Mashpee Wampanoag tribe, to our extended Native families and the Peoples across Turtle Island.

Our oral history proclaims that we walked across this expanse of land, now covered by water, and our leader Moshup created Noepe, (currently called Martha's Vineyard), and it's surrounding islands, including Nantucket.  This is the path the Aquinnah Wampanoag people took to arrive at our present location and defines our relationship to the rest of the Wampanoag Nation and other American Indian tribes in New England and beyond. Our history has been, and continues to be, defined by this unique placement on Mother Earth.

In addition to the designation as a Traditional Cultural Property, we consider the eastern vista viewshed over Nantucket Sound, located off the coast of Cape Cod, Massachusetts, eligible for inclusion in the National Register of Historic Places under the following criteria:

**Criteria A.** " Properties that are associated with events that have made a significant contribution to the broad patterns of our history"; *and*
**Criteria D.** "Properties that have yielded or may be likely to yield, information important in prehistory or history."

Evidence of our ancient history has been brought forth from the floor of the Nantucket Shoals, long forgotten archeological data of a time when our Peoples would have walked miles out to what is now the Continental Shelf, to carry out our ancient ceremonial practices and foraging for sustenance from the ocean.  Although there have been re-discoveries of archeological evidence, the continuing advancement of archeological and scientific methodologies will yield further confirmation of our oral histories.

We respectfully submit this nomination to the Keeper to determine its eligibility for placement in the National Register of Historic Places.


In Balance, Harmony and Peace,

Bettina M. Washington
Tribal Historic Preservation Officer
Wampanoag Tribe of Gay Head (Aquinnah)

cc: Ken Salazar, Secretary of the Interior
    Larry Echohawk, Asst. Secretary of the Interior
    John Fowler, ACHP
    John P. Eddins, ACHP
    John L. Berrey, ACHP
    Tobias J. Vanderhoop, Culture and Historic Commission, WTGH(A)
    George Green, Jr., THPA, Mashpee Wampanoag Tribe

CW0000109937

John Brown, THPO, Narragansett Indian Tribe
Brona Simon, SHPO, Commonwealth of Massachusetts
Senator John F. Kerry, Commonwealth of Massachusetts
Representative William D. Delahunt, Commonwealth of Massachusetts
Chris Horrell, Mineral Management Services
Andrew Kruger, Mineral Management Services

CW0000109938



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Washington, DC 20240



**NOV 1 7 2009**

Ms. Brona Simon
State Historic Preservation Officer
220 Morrissey Boulevard
Boston, Massachusetts 02125

Dear Ms. Simon:

In accordance with Section 106 of the National Historic Preservation Act of 1966, as amended (16 U.S.C. 470f), and its implementing regulation, 36 CFR 800, "Protection of Historic Properties," and as authorized by the U.S. Department of the Interior Minerals Management Service (MMS), we are hereby initiating consultation under 36 CFR 800.4(a) (2) with the State Historic Preservation Officer of the Massachusetts Historical Commission regarding our evaluation of several sites for eligibility.

Our conclusion is that two of the sites visited are eligible for listing in the National Register of Historic Places as Traditional Cultural Properties, and will be adversely affected by the proposed project. Our conclusions for the remainder of the sites visited is either that they do not lie within the Area of Potential Effect for the project, or that they do not meet the eligibility criteria (36 CFR 60.4) for listing in the National Register of Historic Places.

Please find enclosed the necessary documentation per §800.11. The MMS became aware of these sites during visits with the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah) between August 3 and August 5, 2009.

The MMS kindly asks for your review of, and concurrence with, the enclosed determinations.

Please respond in writing to MMS within the thirty-day time period pursuant to §800.3(c) (4). The MMS respectfully requests an expedited review of this information. You may send your response to the following address:

Minerals Management Service
Attention: Christopher Horrell Ph.D. R.P.A.
1201 Elmwood Park Blvd
New Orleans, Louisiana 70123



CW0000109939

Page 2

If your office concurs with the determinations in this submission, please sign and date on the line below and return this letter to the address listed above. If your office does not concur, we request that any concerns or objections are clearly expressed in writing so that MMS may continue the consultation process with your office. Thank you for your prompt attention to this matter.

Sincerely,

Christopher E. Horrell Ph.D.  R.P.A.
Acting Federal Preservation Officer

CONCURRENCE: _____

Signed, State Historic Preservation Officer.

Date: _____

Enclosures



**Mashpee Wampanoag Tribe**
483 Great Neck Rd. P.O. Box 1048 Mashpee, MA 02649
Phone (508) 477-0208 Fax (508) 477-1218

November 1, 2009

Christopher Horrell Ph.D.R.P.A.
Acting Federal Preservation Officer
Minerals Management Service
Gulf of Mexico OCS region
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394

Dear Dr. Horrell,

I n response to your draft version of site visits among MMS and the Mashpee Wampanoag Tribe (The Tribe).The Tribe feels that the modeling done by Cape Wind is impossible to prove or predict fuel spills, we on Cape Cod are subject to loss of our home insurance because the modeling tells them we are due for a category 5 hurricane. Again MMS depends on the proponent to provide this information, but even if true, it will only effect historic property when it happens and should have been addressed" early in the undertakings planning process so a broad range of alternatives may be considered during the planning process for the undertaking" (36 CFR part 800 §800.1(c)) instead of starting the process after the release of the DEIS.

### August 5, 2009-Visit with the Mashpee Wampanoag Tribe

I am pleased to say that the site visit was accurately described and can be shared with the SHPO. The Tribe does not want this information released in a public document for fear of destruction of sites and invasion of ceremonial privacy. The Tribe approved the site visits to comply with the request from the MMS, even though MMS had all ready determined adverse effect on a sacred historic burial ground listed in the FEIS. This was an expression of our good faith effort to provide the agency the information needed for their deliberations. We are always concerned when we share our sacred places with government agencies, especially with agencies that have not followed their own regulation.

### Amending Determination of Adverse Effect

I was also pleased to read that "MMS recommends that the "Minerals Management Service Documentation of Adverse Effect" document be amended to include two additional Traditional Cultural Properties that are eligible for listing on the National Register and will be adversely affected by the proposed project." This makes it hard for me to understand why we cannot consider the alternatives contained in sec three to "avoid, minimize, or mitigate "as the regulation states. Avoidance of adverse effects should be first and foremost to protect religious freedoms of America's first citizens also our ancestor buried beneath the waters of Nantucket Sound

CW0000109941

Besides the fact that our religious freedom are impacted and our ancestors may be impacted is that 26 register properties will be effected, we are sacrificing a National Treasure and shared resources for the profits of a single group of investors

Finally I look forward to continuing the 106 process.

Respectfully Yours,

*George "Chuckie" Green*

George "Chuckie" Green
Tribal Historic Preservation Authority
Mashpee Wampanoag Tribe


Cc.

Sen. Paul Kirk
Rep. William Delahunt
Assist Sec Larry Echo-Hawk
Dr. Andrew Kruegar MMS
John Fowler ACHP

CW0000109942

# MINERALS MANAGEMENT SERVICE
# NATIONAL REGISTER DETERMINATION OF ELIGIBILITY
# FOR THE WAMPANOAG SITES ON CAPE COD AND MARTHA'S VINEYARD, MA

The potential visual impact of the proposed Cape Wind Energy Project on the cultural and religious practices and associated Traditional Cultural Properties (TCPs) of the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah) was raised as a concern during initial government to government consultations between the Minerals Management Service (MMS) and the Tribal Historic Preservation Officers (THPOs). According to the Tribes, their cultural and religious practices are dependent upon maintaining the ability to view the first light, the eastern horizon vista and viewshed. Furthermore, it was expressed that a number of places sacred to the Tribes – and not previously identified to the MMS – would potentially be impacted by the proposed project. As a result, the MMS conducted a series of site visits with the Tribes, between August 3 and 5, 2009, to conclude the process of identifying historic properties under 36 CFR 800.4 of the National Historic Preservation Act (NHPA).

## NRHP CRITERIA FOR HISTORIC PROPERTIES[1]

The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects **that possess integrity of location, design, setting, materials, workmanship, feeling, and association**, and:

A. That are associated with events that have made a **significant contribution to the broad patterns of our history**; or
B. That are **associated with the lives of persons significant in our past**; or
C. That **embody the distinctive characteristics** of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
D. That **have yielded or may be likely to yield, information important in prehistory or history**.

Listed historic properties generally fall into one of five categories: buildings, historic districts, objects, sites, or structures. Other categories include rural historic landscapes, vessels and shipwrecks, and traditional cultural properties.

## NRHP CRITERIA FOR TRADITIONAL CULTURAL PROPERTIES[2]

**To be eligible for listing in the National Register, a traditional cultural property must meet all of the following six criteria** (bolded sections come directly from National Register Bulletin 38):

---

[1] This section is reproduced from the website http://www.nps.gov/history/nr/listing.htm; bolding has been added.
[2] This section is reproduced from a document entitled, *Traditional Cultural Property Worksheet*, an informal document provided to the MMS by the National Park Service as a reference to National Register Bulletin 38.

CW0000109943

1. **Be a tangible place**. The NRHP does not list cultural practices or beliefs. Tangible means that one must be able to physically locate the property. It does not mean that one has to have physical, man-made features or items at the place.
2. **Be important to the community today** and play the same role in the community's traditions as it did in the past.
3. **Have been important for at least 50 years**. The use of the property, however, does not have to be continuous over the last 50 years, but there should be a pattern of use or continued value.
4. **Have Integrity**. By regulation integrity means integrity of **location, design, setting, materials, workmanship, feeling, and association**. The importance of each of these elements varies depending on the nature of the property. For TCPs, integrity can often be evaluated in terms of the strength of the **property's association with the traditions** of the community and the **property's condition**. The **association** between the place and the community's traditions must be strong. For example, if the traditional activity can be carried out anywhere, then there is no link between the activity and the place. The **property's condition** is just as important to consider. If commercial buildings surround a TCP that should have a pristine natural environment, then the property has little integrity of condition.
5. **Have definable boundaries.** A TCP listed in the NRHP **must have definable, or at least defensible, boundaries.** Defensible boundaries should be based on the **characteristics of the property, how it is used, and why it is important.**
6. **Meet NR Criteria**. Like any other property, to be listed in or eligible for listing in the NR, a TCP must meet one or more of the NR Criteria. **TCPs do not have a criteria all their own**. TCPs are almost always listed under Criterion A and sometimes B (see above) for their association with historical events or broad patterns of events or the lives persons significant in our past, but **not all TCPs are eligible for the NRHP.**

## INFORMATION SOURCES FOR THIS ANALYSIS

In addition to the interviews with THPO Washington and THPO Green, the MMS reviewed statements made in transcripts of NHPA section 106 consultation meetings to date and correspondence written by the tribes during the course of the government-to-government and section 106 consultation processes for the project. MMS has also conducted a literature search and review from various available sources of information related to both the history and culture of the Wampanoag and other New England tribes, as well as regulations, guidance and literature related to the section 106 process, the eligibility of properties for listing on the Federal Register of Historic Places, and the evaluation of Traditional Cultural Properties (TCPs). A bibliography of literature sources reviewed is included at the end of this document. MMS would like to note that both Tribes have had the opportunity to offer written comments on a draft of the analysis presented in this document. The MMS received comments from both Tribes, and they are included as an attachment to this document with permission.

CW0000109944

**CONSIDERATION OF EXPANDING THE AREA OF POTENTIAL EFFECT (APE)**

Both the Mashpee Wampanoag and the Wampanoag Tribe of Gay Head (Aquinnah) have requested that the Area of Potential Effect (APE) be expanded. At the June 3, 2009 Tribal Section 106 Consultation meeting, and again during site visits on August 3, 2009, THPO Washington requested that the MMS consider expanding the APE due to concerns that oil spills from construction and maintenance vessels and oil delivery vessels could impact the Gay Head Cliffs as well as Tribal shellfish and aquaculture grounds near Gay Head on Martha's Vineyard. THPO Washington further explained that the local population would suffer culturally and economically should an oil spill occur and cause environmental damage to fishing areas or clamming areas in bays whose inlets are located along the northern edge of the island. Additionally, according to THPO Washington, the potential discoloration of the red cliff face that could result from such an incident would disrupt the ability of the Tribe to continue to tell the story of Moshup and preclude ceremonial worship as it has been practiced in this area for centuries.

The MMS has considered the Tribes' request and, in a letter from the MMS to THPO Washington and THPO Green, dated June 26, 2009, determined that expanding the APE is not warranted due to the extremely remote chances of a Cape Wind-related oil spill ever occurring or impacting Tribal areas. The final environmental impact statement (FEIS) presents a comprehensive and state-of-the-art oil spill analysis, and results indicate that most of the potential for oil spills is from vessels already transiting the Nantucket Sound area. These spills would occur regardless of the Cape Wind project ever being built. Additionally, there is a very low probability for the occurrence of spills associated with maintenance and oil delivery boats for the Cape Wind Project. Modeling results show that there would be an estimated one spill in 16,677 years from work boats, and an estimated one spill in 500,000 years from oil delivery boats. See FEIS Section 5.2.2.1; it references two reports: *Report No. 3.3.5-1: Oil Spill Probability Analysis for the Cape Wind Energy Project in Nantucket Sound; Report No. 4.1.3-1: Simulation of Oil Spills from the Cape Wind Energy Project Electric Service Platform in Nantucket Sound.* In addition, the impacts of these types of effects have been analyzed and considered as potential environmental impacts in the FEIS rather than impacts to historic properties. Although MMS does recognize that impacts to historic and cultural resources could also result from an environmental incident, we believe that the appropriate place for such an analysis, which has already been completed, is in the FEIS. MMS has determined that the APE should not be expanded to include areas that could be impacted by an oil spill where the probability of such an occurrence is infinitesimally small.

## I. Site Visits among the MMS and the Mashpee Wampanoag Tribe

Dr. Andrew Krueger (MMS) and Dr. Christopher Horrell (MMS) conducted site visits on August 5, 2009 with Tribal Historic Preservation Officer (THPO) George "Chuckie" Green of the Mashpee Wampanoag Tribe. MMS met THPO Green at the Mashpee's Tribal Headquarters and site visits commenced at various locations throughout Mashpee, MA.

3

CW0000109945

During site visits, THPO Green identified to MMS two sites that MMS believes qualify as TCPs: ███████

██████████████████████████████████████████ Due to the sensitive nature of these sites and the ceremonies that take place there, the exact location and certain physical characteristics of the sites are not described in this document at the request of the Mashpee Wampanoag Tribe. After due consideration of the National Register and Advisory Council guidance, consultation with the affected Native American Tribes, discussion with the National Park Service and the Advisory Council for Historic Preservation, and review of the applicable Executive Orders and NHPA regulations, the MMS has determined that the ████████████ is eligible for listing in the NRHP as a TCP and as an archaeological site under Criteria A and D. Furthermore, the MMS has determined that ██████████████████ is eligible for listing in the NRHP as a TCP under Criterion A.

## THE SHELL MIDDEN SITE

During the site visits, THPO Green identified a Shell Midden site (Figure 1), which is located within the Area of Potential Effect (APE) (Figure 2)[3]. This site is not located on Tribal Lands. Shell middens are archaeological features composed mainly of mollusk shells and may also contain the debris of human activities and the remains of their meals. Shell middens are essentially trash heaps that represent areas where aquatic resources were processed directly after harvest and prior to use or storage in another location. Some shell middens are directly associated with villages, as a designated village dump site, or they may be associated with individual households and often contain a detailed record of what food was eaten or processed as well as many fragments of stone tools and other household goods.



---

[3] Due to the sensitive nature of this cultural resource and its association with a known Mashpee site, the exact location of this site is being kept confidential.

CW0000109946

At the time of the site visit, it was evident that the Shell Midden site had been exposed over time by natural coastal processes, such as winds and storm waves that come ashore and buffet the coastline. These processes had resulted in the erosion of a cliff wall, which has helped to expose the midden feature.   According to THPO Green, this particular midden is associated with a known Mashpee archaeological site and is extremely important to the Mashpee Wampanoag Tribe.  Furthermore, this particular site is actively used by larger groups to perform special ceremonies at different times of the year, particularly during the winter and summer solstices.



THPO Green expressed that the importance of this cultural landscape to the Tribe will be compromised as a result of the undertaking.



The Shell Midden site as an archaeological site is potentially eligible for listing in the NRHP under Criteria A and D as it may possess integrity of location, design, setting, materials, workmanship, feeling, and association, as well as being potentially associated with events that have made a significant contribution to the broad patterns of our history, and/or may be likely to yield information important in prehistory or

5

history. Additional archaeological exploration of the midden feature and the associated habitation or subsistence site would be necessary to confirm eligibility to the NRHP as an archaeological site and to further elucidate the exact nature of the site's contributions to history and prehistory.

Nevertheless, The Shell Midden site is eligible for listing in the NRHP as a TCP under Criteria A and D based upon the nature, frequency, and long history of Wampanoag ceremonies that take place here. According to Mashpee Wampanoag oral tradition, the Shell Midden site – as a place of cultural and religious significance and a location of ceremonial practice – has been in continuous use for millennia. It is a tangible place, is important to the Mashpee Wampanoag community today, and has been so for over 50 years. As a part of a cultural landscape it has integrity of location, setting, feeling, association, and condition and has definable boundaries.





---

[4] Due to the sensitive nature of this cultural resource and its association with a known Mashpee site, the exact location of this site is being kept confidential.

6

CW0000109948



7

CW0000109949





## BOUNDARIES

Unlike the assertion that the eastern viewshed over the Sound (in the absence of any identified viewing locations) should be determined to be a TCP by itself, these two locations are discrete sites (tangible properties) used by the Tribe on a regular basis for ceremonies, and a reasonable boundary around each of these sites can be determined.  It is unnecessary to describe such boundaries in detail in this document (also because it is important to keep their precise locations confidential) except to resolve the

8

CW0000109950

matter of inclusion of the portion of the eastern viewshed over the Sound. The viewshed, although critical to the spiritual observances that take place here, is an associative contributing element to the property's setting, rather than a physical or tangible portion of the property used. ████████████ ██████████████████████████████████████████████████████████████████████████ To draw a boundary at the waterline, however, does not in any way diminish MMS' responsibility to consider and attempt to mitigate or avoid the adverse effects of visual intrusions by the turbines from outside the boundary that may risk compromising the integrity of the setting of these TCPs (*See* NR Bulletin 38 at 21).

## CONCLUSION

Based on a thorough and extensive assessment of the NRHP Criteria for historic properties and TCPs, interviews with THPO Green, statements made in transcripts of NHPA Section 106 consultation meetings to date and correspondence written by the Tribes during the course of the government-to-government and Section 106 consultation processes for the project, the MMS has determined that the Shell Midden site is eligible for listing in the NRHP as a TCP and as an archaeological site under Criteria A and D. The MMS also has determined that ████████████████████ is eligible for listing in the NRHP as a TCP under Criterion A. As a result, the MMS will amend the *Section 106 Finding of Adverse Effect* document to include the eligibility of these two TCPs and that a contributing element to their NRHP eligibility – an unobstructed view of the eastern rising sun – will be indirectly adversely affected by the proposed project.

## II. Site Visits among the MMS and the Wampanoag Tribe of Gay Head (Aquinnah)

MMS staff conducted site visits on August 3-4, 2009 with Tribal Historic Preservation Officer (THPO) Bettina Washington of the Wampanoag Tribe of Gay Head (Aquinnah). Meeting attendees included: Dr. Andrew Krueger (MMS), Dr. Christopher Horrell (MMS), Mr. Poojan Tripathi (MMS), Ms. Wyndy Rausenberger (DOI Solicitor's Office), Mr. Dave Saunders (BIA), and Ms. Karen Adams (USCOE). A welcome meeting occurred on the fist day at the Aquinnah's Tribal Headquarters, and site visits commenced at various locations throughout Martha's Vineyard, MA.

The Wampanoag Tribe of Gay Head (Aquinnah) believes that ████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ THPO Washington and the Wampanoag Tribe of Gay Head (Aquinnah) argue that the construction of the Cape Wind Energy Project in Nantucket Sound would destroy the ████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████

CW0000109951

## THE GAY HEAD CLIFFS (GAY HEAD CLIFFS NATURAL LANDMARK)

The Gay Head Cliffs (Figure 5) are ████████████████████████████████████████
████ The Tribe owns the face of the Cliffs, while the Town of Aquinnah owns from the top edge of the Cliffs backward. The Cliffs are composed of one hundred and fifty feet of sediment from six glaciers - including red and white clays, green sands, white quartz, black organic soil, and lignite.████████████

████████████████ The Circle, the Cliffs, and the beachfront area below the cliffs were formerly used by the Tribe for seasonal pageants and storytelling, where the Legends of Moshup Pageant and other cultural practices were carried out. However, the cliffs have become severely eroded over time, such that the cliff face, including a culturally important cave, has collapsed and fallen onto the former beach, making the beach inaccessible and/or unsafe for such a gathering. The pageant location has since been moved to a tribal property (Boyer's Hill) that also includes the Aquinnah Tribal Headquarters building.

10

CW0000109952

All of the businesses located on the lands at the tops of the Cliffs are currently owned and operated by tribal members and the land on which these businesses are located is leased from the Town of Aquinnah by the Tribe. These businesses serve visitors and provide for their seasonal needs from April to October. The Cliffs were designated as a Natural Landmark in October of 1965 and serve today as a major tourist attraction for Martha's Vineyard (Figure 6). According to THPO Washington, their tribal community has spent at least the last 150 years welcoming the public to the Cliffs and the area serves as one of the two economic districts for the Tribe.



**Figure 6. Plaque at Gay Head Cliffs.**

The view from the cliff tops is generally to the west, and the project could not be viewed from there (see FEIS Vol. II at A-238, Fig. 5.3.3-4). From the highest point atop the Gay Head Cliffs, the closest proposed turbines are approximately 24 miles distant and blocked by higher ground on Martha's Vineyard (See FEIS Vol II at A-239, Fig. 5.3.3-5).

The Gay Head Cliffs are considered sacred by the Wampanoag Tribe of Gay Head (Aquinnah) and may be eligible for listing as a TCP, but additional information on the continuity of the nature and frequency of any Wampanoag ceremonial practices at this site would be required before such a determination could be made, especially in light of the fact that the location of these cultural practices have been moved away from the Cliffs over time.

The Wampanoag Tribe of Gay Head (Aquinnah) believes the Cliffs qualify as a TCP. While we do not question the continued importance of the Cliffs to the Wampanoag cultural practices and legends, **the MMS will not make a determination as to whether this site qualifies as a TCP because the Gay Head Cliffs are not within the APE of the proposed Cape Wind Energy Project.** This location would not be

11

CW0000109953

adversely affected by the proposed project.

## THE CIRCLE

The Circle (Figure 7) ███████████████████████████████████████████
███████████████████████████████████████ The land on which the Circle is located is
currently owned by the Town of Aquinnah with the Tribe having first right of refusal should any parcel
come open for sale. ██████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

█████████████████ members of which maintain a series of shops and other attractions that line the path
to the viewing area of the Gay Head Cliffs.



The Circle has been used by the Tribe for ceremonial purposes over several generations as well as into
the present. The Aquinnah's largest celebration, the annual Powwow, takes place within the Circle, and
the powwow logo is "Dancing within the Circle," which speaks to how the Tribe interprets and visualizes
the cultural and traditional importance of the area..

Little information is available beyond the Circle's use as a place for individual worship and community
activities.  While it may be possible that there are █████████████████████████ such
information was not provided to the MMS at the time of the site visit.  The Circle may qualify as a
Traditional Cultural Property (TCP) only because of its association with the ████████ Gay Head Cliffs and
the    legends    of    Moshup    (For    story    of    Moshup,    see    following    link:
http://www.wampanoagtribe.net/Pages/Wampanoag_Way/other), but additional information on the nature

12

CW0000109954

and frequency of any Wampanoag ceremonial practices at this site would be required before such a determination could be made.

The Wampanoag Tribe of Gay Head (Aquinnah) believes the Circle qualifies as a TCP. **The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project.** This location would not be adversely affected by the proposed project.



The Wampanoag Tribe of Gay Head (Aquinnah) believes ▇▇▇▇▇▇▇▇▇ qualifies as a TCP. **The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project.** This location would not be adversely affected by the proposed project.



13

## MET TOWER ON TRIBAL LAND

The primary reason for visiting this property was to show MMS a meteorological (MET) data tower that has been erected on Tribal Lands owned by the Wampanoag Tribe of Gay Head (Aquinnah). The Tribe is using the 150-foot MET tower (Figure 9) to collect data to determine whether the wind resource is sufficient to produce electricity for both the Tribe's needs and the Vineyard community. The location of the met tower is well inland, at a place chosen in part because it would not interfere with any views of the Sound, or of other culturally important sites, from any other location. The Tribe wanted to illustrate to MMS that its potential development of wind power inland is not inconsistent with its position of opposing wind projects that are proposed at certain offshore locations due to the cultural significance of the Sound to the Tribe. THPO Washington wanted to show that the Tribe is not against wind power, and also that the Tribe was not constructing a wind tower in the Circle near the Cliffs as others had claimed. This site is not considered a TCP by the Tribe, nor does it meet the criteria to be eligible for listing in the National Register of Historic Places. This site is not within the APE of the proposed Cape Wind Energy Project and it would not be adversely affected by the proposed project.



**Figure 9. MET Tower erected for measuring meteorological data on Aquinnah Tribal Lands.**

## PONDS FOR AQUACULTURE NEAR MENEMSHA

Ponds for aquaculture (Figure 10) are located along the northwestern section of the island near Menemsha Harbor adjacent to the Menemsha Public Beaches. Menemsha Beach is on the north side of Chilmark and directly faces Vineyard Sound. Menemsha Pond is adjacent to what is locally known as Red Beach or the "Pond" beach area. It is almost completely separate from the Vineyard Sound, joined only by Menemsha Creek. It is connected to Nashaquitsa Pond and Squibnocket Pond and is the only outlet to the Vineyard Sound for these bodies of water. These ponds are brackish and are the focal point for present day Aquinnah Wampanoag aquaculture projects. The Tribe has a small oyster farm within the waters of Menemsha Pond and the Pond is an economic mainstay for tribal members during scallop

14

season. In fact, THPO Washington stated that the Tribe's Natural Resources Department has invested approximately $150,000 into the scalloping program and another $90,000 into preserving the water quality of Menemsha Pond over the last three years. The Tribe's water quality building is located on Tribal Lands near the south end of the Pond.

THPO Washington stated that this aquaculture location represents a larger part of Wampanoag culture and from time immemorial has been vital as a component to their sustenance and quahog used in wampum making.   These ponds are no longer owned by the Tribe (e.g. they are not tribal lands) but have been utilized for subsistence and commercial clamming on a continuous basis by the Tribe for many generations. THPO Washington expressed her concern that these ponds could be adversely impacted by an oil spill and reaffirmed her belief that the APE for the proposed project should be expanded to take this into account.

Based upon the limited information provided about the nature and frequency of any Wampanoag ceremonies that take place here, it is impossible to determine if this is property would qualify as a TCP. Furthermore, THPO Washington did not describe this location as a place used for cultural or religious ceremonies, but instead as an historic subsistence area.   Additionally, the project area cannot be viewed from this location.

The Wampanoag Tribe of Gay Head (Aquinnah) believes that Menemsha Pond qualifies as a TCP. **The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project.** This location would not be adversely affected by the proposed project.



**Figure 10. Ponds Used for Aquaculture.**

15

CW0000109957

## CHRISTIANTOWN

Christiantown is located on the northwest interior of the island. Christiantown was established in 1660 by Josias the Sachem of Takemmy as a means to assimilate Native Americans into Anglo-Christian society. ███████████████████████████████████████████

███████████████████████ With the likely approval of the British Crown, the town was established as a one square mile track. Today, little remains except a ████████ (Figure 7-10) and a small church building. ████████████████████████████████████████████████████████████████████

This site is potentially eligible for listing on the National Register of Historic Places under Criterion B and C, but further archaeological and historic research would be required to make such a determination. Based upon the limited information provided about the nature and frequency of any Wampanoag ceremonies that take place here, it is impossible to determine if this is site would qualify as a TCP. THPO Washington did not describe the area as one used for cultural ceremonies or practices, and it has no views of the Sound.

**The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project.** This location would not be adversely affected by the proposed project.



**Figure 11. Plaque for Christiantown.**

CW0000109958



Figure 12. Signage describing Christiantown.



Figure 13. Mayhew Chapel at the site of Christiantown.

17

CW0000109959



Figure 14. Door of the Mayhew Chapel located at Christiantown.



The Tribe is not seeking a TCP designation for this site. There is little information that suggests that this sanctuary is eligible for listing in the National Register of Historic Places. Based upon the limited information provided about this site and the nature and frequency of any Wampanoag ceremonies that take place here, it is impossible to determine if this site would qualify as a TCP. The seascape faces northwest toward the Sound and thus the proposed project cannot be viewed from this location. **The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project.** This location would not be adversely affected by the proposed project.

18

CW0000109960



The Tribe is not seeking a TCP designation for this site. There is little information that suggests that this site is eligible for listing in the National Register of Historic Places. Based upon the limited information provided about this site and the nature and frequency of any Wampanoag ceremonies that take place there, it is impossible to determine if this property would qualify as a TCP. The proposed project cannot be viewed from this location. **The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project.** This location would not be adversely affected by the project.

19

CW0000109961



The ▮▮▮ appear to be eroding away due to the constant wind and wave action from the North Atlantic

The archaeological site excavated by Harvard University may be eligible for listing on the National Register of Historic Places under Criterion A and D. Based upon the limited information provided about this site, the cliffs, and the nature and frequency of any Wampanoag ceremonies that take place here, it is impossible to determine if these locations would qualify as TCPs. THPO Washington did not describe this site as a location used by the Tribe for cultural ceremonies.

The Tribe is not seeking a TCP designation for this site. **The MMS will not make a determination as to whether this site and associated beach qualifies as a TCP or is eligible for listing on the National Register of Historic Places because it is not within the APE of the proposed Cape Wind Energy Project.** This location would not be adversely affected by the proposed project.



CW0000109962





This site is not eligible for listing in the NRHP because it does not meet Criteria A, B, C or D for eligibility. While some Wampanoag tribal members likely practice private ceremonies ███████████ based on the limited nature and frequency of any Wampanoag ceremonial practices at this site to date as described by THPO Washington, the element of continuity of association and use of the site over time by the tribal community as a whole (National Register Bulletin 38 at 11-12) has not been met, and therefore this site does not qualify as a TCP.

21

CW0000109963



## JOSEPH SYLUM STATE BEACH

Joseph Sylum State Beach is located on the east side of Martha's Vineyard.  This state park consists of two miles of beach along Beach Road between Oak Bluff and Edgartown. (The section in Edgartown is also known as "Bend-in-the-Road Beach").

the view

22

CW0000109964

of the rising sun would not be obstructed from this viewpoint. Therefore, although this site is within the APE for the proposed project, it does not appear that spiritual practices that require an unobstructed view of the rising sun would be adversely affected.

There is little information that suggests that this site is eligible for listing in the National Register of Historic Places.

This location would not be negatively affected by the proposed project.

There is little information that suggests that this site is eligible for listing in the National Register of Historic Places. Based upon the limited information provided about this site and the nature and frequency of any Wampanoag ceremonies that take place here, it is impossible to determine if this is site would qualify as a TCP. The proposed project is not visible from this inland location due to distance

CW0000109965

and topography. **The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because , this site is not within the APE of the proposed Cape Wind Energy Project.** This location would not be negatively affected by the proposed project.

Since MMS was unable to get access to the ▮▮▮▮▮▮▮▮ it could not be determined whether the site would have a view of the project area, but this is unlikely due to the flat topography and inland location of the site.  The Tribe's lack of continued access or use of the site prevents its designation as a TCP; the Tribe's association with this site would not be adversely affected by the proposed project.

24



No information about any archaeological resources in this area was made available to MMS. This site is not eligible for listing in the NRHP because it does not meet Criteria A, B, C or D for eligibility. Based upon the limited information provided about this site and the nature, frequency and continuity of any Wampanoag ceremonies that take place here and the limited access to the area, the element of integrity of relationship is not met for this site; this site does not qualify as a TCP.



## AMENDING THE FINDING DOCUMENT

All of the properties shown to MMS by the Wampanoag Tribe of Gay Head (Aquinnah) and the Mashpee Wampanoag Tribe are important because they represent the cultural landscape and religious practices of the Wampanoag people who have occupied this region for over a millennium. MMS recognizes the cultural significance and religious importance of these sites to the Tribes. In an effort to make the best management decisions, MMS has taken time to consider each of the sites and assess whether they would be impacted by the proposed Cape Wind Energy Project.

The MMS appreciated the opportunity to spend the day with Mr. George "Chuckie" Green to visit sites that are important to the Mashpee Wampanoag Tribe. THPO Green showed MMS two properties, still

25

CW0000109967

used but no longer owned by the Tribe, that immediately face the proposed project. The first was a shell midden that is adjacent to a known former Mashpee Wampanoag village. According to THPO Green, this site is an extremely sacred location where solstice and other ceremonies important to the Wampanoag occur. This site is likely eligible for listing in the National Register of Historic Places under Criteria A and D. In addition, THPO Green showed the MMS an important place of worship ███████ ████████████████ where the Wampanoag also conduct solstice and other important ceremonies on a regular basis.  Because these sites both possess integrity of association and use, they are eligible for listing on the NRHP under Criterion A.  Based upon the information provided about these sites relating to the nature and frequency of Wampanoag ceremonies that take place there, and because discrete boundaries can be determined for both sites, MMS has determined that these sites qualify as TCPs. Based on the information collected during site visits with the Mashpee Wampanoag Tribe, the MMS recommends that the "Minerals Management Service Documentation of Section 106 Finding of Adverse Effect" document be amended to include two additional Traditional Cultural Properties that are eligible for listing on the National Register and will be adversely affected by the proposed project.

The MMS appreciated the opportunity to spend two days with Ms. Bettina Washington to visit sites that are important to the Wampanoag Tribe of Gay Head (Aquinnah). However, MMS has determined that *no property or site visited* during site visits with the Aquinnah would be both eligible for listing on the National Register of Historic Places and adversely impacted by the proposed project. In most instances, the sites were not located within the APE of the proposed project, meaning the wind facility would not be visible. Accordingly, in these cases the MMS declined to make a determination as to whether the site would be eligible for listing on the National Register of Historic Places or whether the site could be considered a TCP. In two locations ███████████████████████ he proposed project would likely be visible depending on atmospheric conditions. However, neither of these two locations is eligible for listing on the National Register of Historic Places. Additionally, due to the limited nature and frequency of any ceremonies that take place at these locations, they do not qualify as TCPs. In conclusion, none of the sites within the APE that were visited on Martha's Vineyard will be adversely affected by the proposed project. It should be noted, however, that the Wampanoag Tribe of Gay Head (Aquinnah) feel strongly that all of these sites are interconnected and that the construction of the proposed project in Nantucket Sound will ultimately destroy their cultural and religious practices. Based on the information collected during site visits with the Wampanoag Tribe of Gay Head (Aquinnah), the MMS recommends that the "Minerals Management Service Documentation of Section 106 Finding of Adverse Effect" document not be amended to include any of the sites shown to MMS by the Wampanoag Tribe of Gay Head (Aquinnah).

26

CW0000109968

**Bibliography**

Thomas F. King,  Places That Count:  Traditional cultural properties in cultural resource
     management. (2003)

Washington, D.C. U.S. Dept of the Interior, National Park Service, Cultural Resources,
     Park Historic Structures & Cultural Landscapes, (1998- ), Landscapes Lines (2005)

Patricia L. Parker and Thomas F. King, U.S. Department of the Interior, National Register Bulletin
     38:  Guidelines for Evaluating and Documenting Traditional Cultural Properties (rev.
     1998)

National Register Bulletins 12 and 21: *Defining Boundaries for National Register Properties*
     (1997)

National Register Bulletin 15: *How to Apply the National Register Criteria for Evaluation* (1997)

CW0000109969

CW0000109970



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Washington, DC 20240



Ms. Janet Snyder-Matthews, Ph.D.
National Park Service
Keeper of the Register
National Register of Historic Places
1201 Eye Street, NW (2280)
Washington, DC 20005

**NOV 1 8 2009**

RE: National Register Eligibility Opinion for Nantucket Sound as a Traditional Cultural Property, Cape Wind Energy Project.

Dear Dr. Matthews:

On October 9, 2009, in accordance with Section 106 of the National Historic Preservation Act (NHPA) of 1966, as amended (16 U.S.C. 470f), and its implementing regulation, 36 CFR 800, the MMS submitted its *"National Register Eligibility Determination for Nantucket Sound as a Traditional Cultural Property and Historic Property"* to the Massachusetts State Historic Preservation Officer (SHPO) of the Massachusetts Historical Commission.

In its submission to SHPO, the MMS concluded that Nantucket Sound is not eligible for listing as a Traditional Cultural Property (TCP) or a historic property on the National Register of Historic Places (NRHP) because it does not meet any of the Criteria of Eligibility (36 CFR Part 60). On November 5, 2009, SHPO concluded that Nantucket Sound "is a Wampanoag Traditional Cultural Property that meets the Criteria of Eligibility for listing in the National Register of Historic Places under Criteria A, B, C, and D at the local level of significance."

The MMS disagrees with SHPO and stands by its original determination that Nantucket Sound is not eligible for listing as a TCP or historic property on the NRHP. Because of this disagreement, the MMS hereby seeks a formal Determination of Eligibility (36 CFR Part 63) from the Keeper of the National Register pursuant to 36 CFR 800.4(c)(2).

There are two attachments to this cover letter. Attachment 1 includes a brief description of the proposed Cape Wind Energy Project. Attachment 2 includes a discussion on points made in the SHPO's eligibility determination opinion with which the MMS disagrees. In addition, after consulting the regulations and talking with staff at the National Register, the MMS has included the following documentation to help the Register in its evaluation, (submitted via hard copy and electronic file):

- MMS Nantucket Sound eligibility determination, with attachments (October 9, 2009)
- SHPO Nantucket Sound opinion (November 5, 2009)
- MMS eligibility determination for Wampanoag sites on Cape Cod and Martha's Vineyard (submitted to SHPO on November 17, 2009 and currently under consideration)



CW0000109971

- NPS report on impacts to NHLs (October 20, 2009)
- MMS Finding of Adverse Effect (December 2008)
- Letter from the Advisory Council on Historic Preservation to MMS (June 23, 2009)
- NOAA Nautical Chart #13237 showing proposed project area (white dotted line shows Federal/State jurisdictional boundary)
- **Report No. 4.3.4-1.** Public Archeological Laboratory (PAL). 2006. Cape Wind Energy Project Visual Impact Assessment of Revised Layout on Multiple Historic Properties: Final Environmental Impact Report. Nantucket Sound: Cape Cod, Martha's Vineyard, and Nantucket, Massachusetts. PAL Report No. 1485.05. Prepared for Cape Wind Associates, L.L.C., Boston, Mass. Pawtucket, R.I. September 2006.
- **Report No. 4.3.5-2.** Robinson, D. S., B. Ford, H. Herbster, and J. N. Waller, Jr. 2003. Marine Archaeological Sensitivity Assessment, Cape Wind Energy Project, Nantucket Sound, Massachusetts. Submitted by Public Archeological Laboratory. PAL Report No. 1485. Submitted to Cape Wind Associates, L.L.C., Boston, Mass. Pawtucket, R.I.
- **Report No. 4.3.5-3.** Robinson, D. S., B. Ford, H. Herbster, and J. N. Waller, Jr. 2004. Marine Archaeological Reconnaissance Survey Cape Wind Energy Project, Nantucket Sound, Massachusetts. Submitted by Public Archeological Laboratory. PAL Report No. 1485. Submitted to Cape Wind Associates, L.L.C., Boston, Mass. Pawtucket, R.I.
- **Report No. 4.3.5-4.** Public Archeological Laboratory (PAL), 2006. Supplement Report, Cape Wind Energy Project Nantucket Sound Massachusetts, Supplemental Marine Archaeological Reconnaissance Survey of Revised Layout Offshore Project Area. PAL Report No. 1485.06. Prepared for Cape Wind Associates, L.L.C., Boston, Mass. Pawtucket, R.I.
- **Report No. 5.3.3-2.** Environmental Design & Research, P.C. 2003. Visual Simulation Methodology. Cape Wind Project. Cape Cod, Martha's Vineyard and Nantucket, Massachusetts. Prepared for Cape Wind Associates, L.L.C., Boston, Mass. Syracuse, N.Y. November, 2003.

Should you have any questions or need additional clarification on any issue, please feel free to contact me anytime by phone (504)-736-2796, email Christopher.Horrell@mms.gov, or write to 1201 Elmwood Park Blvd., New Orleans, LA 70123.

Sincerely,

Christopher E. Horrell, Ph.D. R.P.A.
MMS Federal Preservation Officer

Enclosures

CW0000109972

# ENCLOSURE 1

## Cape Wind Energy Project Description

In November 2001, Cape Wind Associates, LLC applied for a permit from the U.S. Army Corps of Engineers (USACE) under the Rivers and Harbors Act of 1899 to construct an offshore wind power facility on Horseshoe Shoal in Nantucket Sound, Massachusetts.  Following the adoption of the Energy Policy Act of 2005 (EPAct) and its associated amendments to the Outer Continental Shelf Lands Act (OCSLA), the Department of the Interior was given statutory authority to issue leases, easements, or rights-of-way for renewable energy projects on the Outer Continental Shelf (OCS).  Accordingly, Cape Wind Associates, LLC, submitted an application to MMS in 2005 to construct, operate, and eventually decommission an offshore wind power facility on Horseshoe Shoal in Nantucket Sound, Massachusetts.

The project calls for 130, 3.6± megawatt (MW) wind turbine generators, each with a maximum blade height of 440 feet, to be arranged in a grid pattern in 25 square miles of Nantucket Sound (Federal waters), just offshore Cape Cod, Martha's Vineyard, and Nantucket Island.  With a maximum electric output of 468 megawatts and an average anticipated output of 182 megawatts, the facility is projected to generate up to three quarters of the Cape and Islands' electricity needs. Each of the 130 wind turbine generators would generate electricity independently. Solid dielectric submarine inner-array cables (33 kilovolt) from each wind turbine generator would interconnect within the array and terminate on an electrical service platform, which would serve as the common interconnection point for all of the wind turbines. The proposed submarine transmission cable system (115 kilovolt) from the electric service platform to the landfall location in Yarmouth is approximately 12.5 miles in length (7.6 miles of which falls within Massachusetts' territorial waters).

Nantucket Sound is a roughly triangular body of water generally bound by Cape Cod, Martha's Vineyard, and Nantucket Island.[1] Open bodies of water include Vineyard Sound to the west and the Atlantic Ocean to the east and south. Nantucket Sound encompasses between 500-600 square miles of ocean, most of which lie in Federal waters. The Cape Wind Energy Project would be located completely in Federal waters, aside from transmission cables running ashore through Massachusetts territorial waters. For reference, the northernmost turbines would be approximately 5.2 miles (8.4 km) from Point Gammon on the mainland; the southernmost turbines would be approximately 11 miles (17.7 km) from Nantucket Island (Great Point), and the westernmost turbines would be approximately 5.5 miles (8.9 km) from the island of Martha's Vineyard (Cape Poge) (see Figure 2.1.1-2). For additional information, please see the MMS Renewable Energy Projects page at:
http://www.mms.gov/offshore/RenewableEnergy/Projects.htm.

---

[1] U.S. Geological Survey. Geographic Names Phase I data compilation (1976-1981). Various editions. 31-Dec-1981. Primarily from U.S. Geological Survey 1:24,000-scale topographic maps (or 1:25K, Puerto Rico 1:20K) and from U.S. Board on Geographic Names files. In some instances, from 1:62,500 scale or 1:250,000 scale maps.

CW0000109973

**ENCLOSURE 2**

**MMS Response to the Massachusetts SHPO opinion on the eligibility of Nantucket Sound for listing as a Traditional Cultural Property (TCP) on the National Register of Historic Places**

The Minerals Management Service (MMS) is consulting with stakeholders, including the Massachusetts State Historic Preservation Officer (SHPO), the Mashpee Wampanoag Tribe, and the Wampanoag Tribe of Gay Head (Aquinnah) in Section 106 consultations under the National Historic Preservation Act for the Cape Wind Energy Project. Section 106 consultations and Government-to-Government consultations with the Tribes are ongoing.

The Energy Policy Act of 2005 (EPAct) amended Section 388 of the Outer Continental Shelf Lands Act (OCSLA), giving the Secretary of the Interior the authority to issue leases, easements, and rights-of-way for renewable energy development on the OCS. The Secretary has delegated this authority to the MMS. The MMS would like to clarify the distinction between Federal and State jurisdiction in and around the project area. The proposed project would be located entirely in Federal waters (with the exception of buried transmission lines running ashore), but would indirectly affect some onshore properties within the State of Massachusetts. The MMS's practice has been to assume a function similar to that of a SHPO with regard to archaeological finds resulting from MMS authorized activities where both the undertaking and the cultural resources are located wholly on the OCS (e.g. shipwrecks affected by oil and gas activities), and thus the custom has been to resolve issues of eligibility, if applicable, directly with the Keeper of the National Register. Here, Nantucket Sound falls partly in Massachusetts waters and partly on the OCS. The MMS would like to note that neither the waters of Nantucket Sound nor the project area lies on Tribal lands. Moreover, there are no Tribal lands that fall within the Area of Potential Effect (APE) of the undertaking.

In its *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook (2008)* (pg 19), the Advisory Council on Historic Preservation cites to *National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties (Bulletin 38),* which makes clear that for a Traditional Cultural Property to be found eligible for the National Register, it must meet the existing criteria for eligibility as a building, site, structure, object, or district. *National Register Bulletin: How to Apply the National Register Criteria for Evaluation (Bulletin 15)* also clearly defines categories of historic property types, and both bulletins explain that the National Register is not used to list intangible values, even "significant" ones. Contrary to the established guidance, SHPO erroneously asserts that a TCP is an additional "special historic 'property type'" in and of itself. SHPO then construes language at page 11 of Bulletin 38 ("the NR discourages the nomination of natural features without sound documentation of their significance") to conclude that the general prohibition against the eligibility of waterbodies, an established tenet in Bulletin 15 at page 5 ("...the National Register excludes from the definition of 'site' natural waterways or bodies of water..."), does not apply to Nantucket Sound, or in fact to any appropriately documented TCP. We recognize that a few discrete bodies of water have, on rare occasions, been found to meet eligibility requirements. Nantucket Sound, however, is a vast, 600-square mile body of water open to the North Atlantic Ocean. It is not a small or

CW0000109974

small or isolated waterway that possesses easily discernable boundaries. The MMS does not read the Bulletin 38 discussion at page 11 as superseding the guidance provided in Bulletin 15.[2]

The MMS does not disagree that Nantucket Sound is important to the Tribes, and has been throughout history, as demonstrated in the rich ethnographic/ethnohistoric documentation that SHPO cited in her opinion document. MMS appreciates the comprehensive research SHPO conducted and included in her opinion document. However, for reasons discussed herein, and those that MMS included in its original determination submitted to Massachusetts SHPO on October 9, 2009, the MMS concludes that Nantucket Sound is not eligible for listing on the National Register as a Traditional Cultural Property or as a historic property.

**Criterion A**
SHPO argues that Nantucket Sound qualifies as a TCP under Criterion A due to its association with the ancient and historical Native American exploration and settlement of the area, and with the central events of the Wampanoag origin story of Moshup and Squant/Squannit. While these historic activities and events involving Moshup certainly are important to the Wampanoag culture and tradition, the MMS disagrees with SHPO that the vastness of Nantucket Sound can indeed be considered a "site" or "property" in this context. Nantucket Sound is not a specific site that can be considered under this criterion. No single event or pattern of events is associated with any particular location on or within the Sound.

SHPO relies heavily upon ethnohistoric data in describing the contribution of Nantucket Sound on the development of the Wampanoag culture. It should be noted, however, that SHPO cites many maritime activities that took place outside the Sound as examples of contributing events. While Nantucket Sound's bountiful marine resources were an important factor in the development of the Wampanoag socioeconomic culture, this impact is not in any way unique; the significance is diminished by the fact that the same argument could be made for any coastal maritime community, including that of the descendents of the Anglo-Europeans and more recent settlers, who likewise depended upon shell fishing, fishing, and whaling for subsistence and commerce. Under the SHPO's analysis, any place that is culturally significant would also be eligible for listing. Not every TCP is eligible (as discussed in Bulletin 38, pages 1, 2, 3, 11-12). SHPO fails to draw a distinction between culturally important places and historic places.

Bulletin 38 at pp12-13 offers an example of how an appropriately designated property under Criterion A should exhibit the contributions made by the social or ethnic group in question. As stated, "...the ongoing participation of an ethnic or social group in an area's history, reflected in a neighborhood's buildings, streetscapes or patterns of social activity, constitutes such a series of events." This is not the case for Nantucket Sound, however; the ongoing participation/contribution of the Tribes to the area's history is not exhibited by, or visible upon viewing, the setting or seascape of Nantucket Sound. This illustrates once again that the water body is not the appropriate object upon which the cultural context depends.

---

[2] It is notable that natural waterways are explicitly excluded from the list in Bulletin 15 at page 5 that includes "natural features (such as a rock formation) having cultural significance" as appropriate examples of sites.

**Criterion B**

SHPO argues that Nantucket Sound qualifies as a TCP under Criterion B due to its association with Moshup and Squant/Squannit. Criterion B is traditionally meant to refer to historically significant human beings rather than worshiped figures, mythical creatures, Gods, or demigods, as suggested in the many examples cited in Bulletin 15. However, as discussed in Bulletin 38, a "person" under Criterion B may refer to gods or demigods who feature in the traditions of a group. While there is no doubt that Moshup and Squant are individually significant within a historic context to the Wampanoag People, and that they are associated with portions of Nantucket Sound through the Wampanoag's story, the places associated with Moshup and Squant/Squannit in documented ethnography, folklore, and cited literature point more to how the significance of these individuals relate to a specific site on land (the Cliffs of Gay Head on the West end of Martha's Vineyard). Importantly, although Moshup is credited with the creation of Nantucket Island and the open water that exists between Martha's Vineyard and the Elizabeth Islands (which are actually located to the west of Nantucket Sound, between Vineyard Sound and Buzzard's Bay, outside of the Area of Potential Effect), according to the Wampanoag story, Moshup himself is not responsible for the creation of Nantucket Sound. No archaeological sites, structures, districts, or properties associated with Moshup and Squant/Squannit are located on Nantucket Sound itself.

**Criterion C**

SHPO argues that Nantucket Sound qualifies as a TCP under Criterion C as a "significant and distinguishable entity" integral to the Wampanoag traditions, practices, narratives, culture and religion. Bulletins 15 and 38 make clear that Criterion C is intended to apply to "constructed entities—that is, buildings, structures, or built objects," (i.e. man-made structures), not large geographical landscapes, seascapes or water bodies. According to the Bulletin 15 at page 17, a significant and distinguishable entity whose components may lack individual distinction is termed a "district." Districts possess a significant concentration, linkage, or continuity of sites, buildings, structures, or objects united historically or aesthetically by plan or physical development. SHPO has misinterpreted and misapplied this criterion to Nantucket Sound. Nantucket Sound (some 600 square miles) does not qualify as a TCP or historic property, as suggested in the SHPO's opinion, because Nantucket Sound is not a man-made structure, and there is no evidence of any archaeological sites, buildings, structures, objects, or other archaeological features that are united historically by plan or physical development on or within the Sound.

**Criterion D**

SHPO argues that past and future archaeological data collected from Nantucket Sound has yielded and is likely to yield important cultural, historical, and scientific information "through archaeology, history, and ethnography," and thus qualifies as a TCP under Criterion D. SHPO also characterizes the presence of organic material in some core samples as "a major scientific discovery." The MMS disagrees. The MMS recognizes that humans occupied the Nantucket Shelf Region up to 12,500 BP when Nantucket Sound was dry land. However, while there may be discrete areas or spot finds (see discussion in Report 4.3.5-3) where submerged prehistoric cultural resources could be discovered, the entire seafloor under Nantucket Sound should not be considered an archaeological "site," and the data suggests that the majority of such evidence likely has been removed through time via marine transgression, sea level rise, and other

CW0000109976

geological processes.[3] The requirement for integrity of the physical condition of the seabed is not met. Regardless, the MMS does not believe that Nantucket Sound qualifies as a TCP or historic property under Criterion D. As stated in Report 4.3.5-2, page 39, "...the data indicate that a majority of the offshore study area has a low probability for containing submerged prehistoric cultural resources, because of extensive disturbance to the formerly exposed and inhabitable pre-inundation landscape that has resulted from the marine transgression of the area." Importantly, even for a more discrete location such as the proposed project area of Horseshoe Shoal, all survey and vibracore data collected to date show no indication or evidence of human habitation nor a continuously intact preserved paleolandscape. It is important to note that SHPO's conclusions represent an inappropriate characterization of the vibracore data evaluated in the attached reports; while in certain locations contextually intact paleosols were found, this should not be interpreted as a stratigraphically and/or continuously "intact upland deciduous forest floor," and certainly not an "intact, submerged ancient landscape" as SHPO alleges. Similarly, while the discovery of organic deposits in some core samples indicate the former presence of a shallow aquatic, terrestrial, or forest environment, this in itself does not provide direct evidence of human habitation.

---

[3] The *National Register Bulletin 15* (at pg. 49) does provide an example of sites that are considered not eligible under Criterion D (sites that have "lost [their] stratigraphic context due to subsequent land alterations"); under these circumstances the site would not possess integrity of location.



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Washington, DC 20240



**OCT 0 9 2009**

Ms. Brona Simon
State Historic Preservation Officer
220 Morrissey Boulevard
Boston, Massachusetts  02125

Dear Ms. Simon:

In accordance with Section 106 of the National Historic Preservation Act of 1966, as amended (16 U.S.C. 470f), and its implementing regulation, 36 CFR 800, "Protection of Historic Properties," and as authorized by the U.S. Department of Interior Minerals Management Service (MMS), we are hereby initiating consultation with the State Historic Preservation Officer of the Massachusetts Historical Commission regarding the proposed Cape Wind Energy Wind Project and the Determination of Eligibility of Nantucket Sound to the National Register of Historic Places.  Please find enclosed the necessary documentation per §800.11.

The MMS kindly asks for your review of, and concurrence with the enclosed determination. Please respond in writing to MMS within the thirty-day time period pursuant to §800.3(c) 4.

The MMS respectfully requests an expedited review of this information as per conversations and meeting minutes taken during the Section 106 Consultation meeting on June 16, 2009.

You may send your response to the following address:

Minerals Management Service
Attention: Christopher Horrell Ph.D. R.P.A.
1201 Elmwood Park Blvd
New Orleans, Louisiana  70123

If your office concurs with the determination in this submission, please sign and date on the line below, and return the documentation as noted above.

If your office does not concur, we request that any concerns or objections are clearly expressed in writing so that MMS may continue the consultation process with your office.



2

In the case of non-concurrence, please indicate if there are other sources of information that should be investigated, or if there are other parties, tribes, or members of the public you believe should be included in the consultation process. Thank you for your prompt attention to this matter.

Sincerely,

*FOR*

Christopher E. Horrell Ph.D.  R.P.A.
Acting Federal Preservation Officer

CONCURRENCE: _____
State Historic Preservation Officer                     Date:

Enclosures:   National Register Eligibility Determination
              Mashpee Wampanoag Horseshoe Shoal Resolution
              Wampanoag Tribe of Gay Head, Aquinnah letter dated September 17, 2009

CW0000109979

# MINERALS MANAGEMENT SERVICE
# NATIONAL REGISTER ELIGIBILITY DETERMINATION
# FOR NANTUCKET SOUND AS A
# TRADITIONAL CULTURAL PROPERTY AND HISTORIC PROPERTY

The potential visual impact of the proposed Cape Wind Energy Project on the cultural practices of the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah) was raised as a concern during government to government and Section 106 consultations. Discussions during consultations with the Native American Tribes local to the Cape Wind Project Area have involved Nantucket Sound on three levels: Nantucket Sound as an inundated prehistoric landscape (which the Tribes inhabited prior to the rise of sea level); Nantucket Sound as a water body; and Nantucket Sound as a viewshed of the eastern horizon. In determining the eligibility of Nantucket Sound for the National Register of Historic Places (NRHP) as a Traditional Cultural Property (TCP), the Minerals Management Service (MMS) has considered Nantucket Sound on all three levels using six criteria provided by the National Park Service (NPS; from National Register Bulletin 38 in the form of a worksheet), as decisive factors. The MMS has also considered the eligibility of Nantucket Sound for the NRHP as a historic property, and as a sacred site under Executive Order No. 13007. After due consideration of the guidelines for all three levels, consultation with the affected Native American Tribes, discussion with the National Park Service and the Advisory Council for Historic Preservation, and review of the applicable Executive Orders and National Historic Preservation Act (NHPA) regulations, *the MMS has determined that Nantucket Sound is not eligible for inclusion on the NRHP as a TCP or as a historic property, on any of the three levels. Furthermore, Nantucket Sound does not qualify as a sacred site.*

This determination with regard to Nantucket Sound as a distinct entity does not, however, preclude the fact that the viewshed over Nantucket Sound may be a *contributing element* to the possible NRHP eligibility of other TCPs and/or historic properties of Native American Tribal affiliation whose locations are used for the purpose of observing this eastern viewshed. The MMS continues to work with the Tribes to learn the nature of this contributing element in order to determine the eligibility of these individual sites.

## INFORMATION SOURCES FOR THIS ANALYSIS
In order to gain a better understanding of the Tribes' ties to Nantucket Sound and to adequately reflect the importance of specific locations and the associated ceremonies and traditions that take place there, the MMS conducted a series of government to government consultations, Section 106 consultations, and site visits with the Wampanoag Tribe of Gay Head (Aquinnah) and the Mashpee Wampanoag Tribe on Martha's Vineyard and Cape Cod between August 3-5, 2009. In addition to the interviews with THPO Washington and THPO Green, the MMS reviewed statements from transcripts made during NHPA Section 106 Consultation meetings and correspondence written by the Tribes. MMS has also conducted a literature search and review from various available sources of information related to both the history and culture of the Wampanoag and other New England Tribes, as well as regulations, applicable guidance (in particular, National Register Bulletins 12 and 21 (boundaries), 15 (general and water bodies) and 38 (TCPs)) and literature related to the Section 106 process, the eligibility of properties for listing on the Federal Register of Historic Places, and the evaluation of Traditional Cultural Properties (TCPs). A bibliography of literature sources reviewed is included at the end of this document. Correspondence from the Tribes is also enclosed, and was considered as a reference for this Determination.

## NRHP CRITERIA FOR HISTORIC PROPERTIES[1]

The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects **that possess integrity of location, design, setting, materials, workmanship, feeling, and association**, and:

- A. That are associated with events that have made a **significant contribution to the broad patterns of our history**; or
- B. That are **associated with the lives of persons significant in our past**; or
- C. That **embody the distinctive characteristics** of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
- D. That **have yielded or may be likely to yield, information important in prehistory or history**.

Listed historic properties generally fall into one of five categories: buildings, historic districts, objects, sites, or structures. Other categories include rural historic landscapes, vessels and shipwrecks, and traditional cultural properties.

## NRHP CRITERIA FOR TRADITIONAL CULTURAL PROPERTIES[2]

**To be eligible for listing in the National Register, a traditional cultural property must meet all of the following six criteria** (bolded sections come directly from National Register Bulletin 38):

1. **Be a tangible place.** The NRHP does not list cultural practices or beliefs. Tangible means that one must be able to physically locate the property. It does not mean that one has to have physical, man-made features or items at the place.
2. **Be important to the community today** and play the same role in the community's traditions as it did in the past.
3. **Have been important for at least 50 years.** The use of the property, however, does not have to be continuous over the last 50 years, but there should be a pattern of use or continued value.
4. **Have Integrity.** By regulation integrity means integrity of **location, design, setting, materials, workmanship, feeling, and association**. The importance of each of these elements varies depending on the nature of the property. For TCPs, integrity can often be evaluated in terms of the strength of the **property's association with the traditions** of the community and the **property's condition**. The **association** between the place and the community's traditions must be strong. For example, if the traditional activity can be carried out anywhere, then there is no link between the activity and the place. The **property's condition** is just as important to consider. If commercial buildings surround a TCP that should have a pristine natural environment, then the property has little integrity of condition.
5. **Have definable boundaries.** A TCP listed in the NR **must have definable, or at least defensible, boundaries.** Defensible boundaries should be based on the **characteristics of the property, how it is used, and why it is important.**
6. **Meet NR Criteria.** Like any other property, to be listed in or eligible for listing in the NR, a TCP must meet one or more of the NR Criteria. **TCPs do not have a criteria all their own.** TCP are almost always listed under Criterion A and sometimes B (see above) for their association with

---

[1] This section is reproduced from the website http://www.nps.gov/history/nr/listing.htm
[2] This section is reproduced from a document entitled, *Traditional Cultural Property Worksheet,* an informal document provided to the MMS by the National Park Service as a reference to National Register Bulletin 38.

historical events or broad patterns of events or the lives persons significant in our past, but **not all TCPs are eligible for the NRHP.**

## NANTUCKET SOUND AS AN INUNDATED PREHISTORIC LANDSCAPE

The MMS considered the NRHP eligibility of the seabed (the inundated prehistoric landscape) submerged below the waters of Nantucket Sound as a TCP as well as a conventional historic property. The MMS evaluated the results of a series of marine archaeological surveys that were conducted on the seabed within the offshore proposed project area (Horseshoe Shoal) by the Public Archaeology Laboratory, Pawtucket, Rhode Island.  These reports include:

- *Marine Archaeological Sensitivity Assessment, Cape Wind Energy Project (June 2003)*
- *Preliminary Marine Archaeological Sensitivity Assessment: Cape Wind Energy Project Alternatives: Horseshoe Shoal; Combination New Bedford/Buzzards Bay and Reduced Horseshoe Shoal; Monomoy and Handkerchief Shoals; Tuckernuck Shoal; and South of Tuckernuck Island, Massachusetts (January 2004)*
- *Marine Archaeological Reconnaissance Survey: Cape Wind Energy Project (March 2004)*
- *Cape Wind Terrestrial Alternative:  Massachusetts Military Reservation, Bourne and Sandwich, Massachusetts (March 9, 2004)*
- *Supplemental Marine Archaeological Reconnaissance Survey of Revised Layout Offshore Project Area (January 26, 2006)*

A careful evaluation of the seismic and vibracore data obtained in the above-listed studies concluded that no identifiable sites on or underlying the sea floor with material remains or artifacts were found in the proposed project area; the Massachusetts State Historic Preservation Office (SHPO) and Massachusetts Board of Underwater Archaeological Resources (in the Massachusetts Office of Coastal Zone Management) both concurred with the findings and in doing so vetted the survey sample and methodology (including depth of sample and sample location) as adequate.  Therefore, the seabed cannot meet any of the criteria for eligibility of a historic "property" since there is no evidence remaining of human habitation.

A site that is a natural landscape with no observable evidence of human activity may be considered for its cultural significance as a TCP only where its historical or cultural significance can be documented. Although oral histories of habitation of the seabed area before it was inundated do survive, the requirement of integrity of condition of the seabed property (Bulletin 38 at 11-12) cannot be met because the archeological data suggests that any evidence of human habitation has been removed and scoured away by marine transgression.  In addition, although the seabed of Horseshoe Shoal as a former residence is clearly important in the history of the Native American Tribes, the requirement of integrity of relationship to that location is not met because of the lack of continued access to the now-inundated area; it is not a location where cultural or spiritual practices are – or can be – currently carried out.

After review of the relevant guidance *the MMS concludes that the submerged landform under Nantucket Sound is not eligible for listing as a TCP* because: there is no identifiable archaeological resource; due to the lack of access it does not play the same role in the community's traditions as it did in the past; it does not have sufficient integrity of setting, association, condition, or cultural relationship to the location; it does not have definable boundaries with regard to how it is used and why it is important. Because of lack of physical integrity, it does not meet NRHP criteria.

## NANTUCKET SOUND AS A WATER BODY

The MMS closely examined the NRHP criteria and specifically referred to the following National Register Bulletins to determine whether Nantucket Sound as a water body should be considered eligible as a TCP:

- *Guidelines for Evaluating and Documenting Traditional Cultural Properties, National Register Bulletin 38.*
- *Defining Boundaries for National Register Properties (1997), National Register Bulletins 12 and 21.*
- *How to Apply the National Register Criteria for Evaluation, National Register Bulletin 15.*

Although Nantucket Sound as a water body is a tangible place; is important to the community today; and has been important for at least 50 years, it does not have sufficient integrity of cultural relationship to the location for the *entire Sound*. Furthermore, it does not have definable boundaries with regard to how it is used and why it is important. Under Bulletin 15, listing of water bodies is discouraged. "The National Register excludes from the definition of "site" natural waterways or bodies of water that served as determinants in the location of communities or were significant in the locality's subsequent economic development. ...The features most appropriate to document this significance are the properties built [or utilized] in association with the waterways." While it is true that the affected Native American Tribes have illustrated through oral histories their historic utilization of Nantucket Sound in traditional subsistence practices as well as in cultural and religious practices, it is consistent with NR Bulletin 15 guidelines to document the discrete individual locations of subsistence harvesting and processing (i.e., shell middens or habitation locations), or of cultural and religious practices (both archaeological and TCPs) themselves (i.e., shore-based locations rather than on portions of a water body). Both the physical proximity to Nantucket Sound as well as the viewshed of the eastern horizon across Nantucket Sound may be *contributing factors* to the potential NRHP eligibility of these individual, shore-based locations. However, the entire Nantucket Sound as a water body itself is not the appropriate entity for consideration.

After review of the relevant guidance and several consultations with personnel in the office of the NRHP discussing in general the eligibility of water bodies, *the MMS concludes that the water body of Nantucket Sound is not eligible for listing as a TCP* because: under Bulletin 38, sufficient integrity of the location and of cultural relationship to the location cannot be established for the entire 600-square-mile Sound; under Bulletin 21, reasonable boundaries around the entire 600-square-mile Sound cannot be established; and under Bulletin 15, "The National Register excludes from the definition of 'site' natural waterways or bodies of water."

## NANTUCKET SOUND AS A VIEWSHED OF THE EASTERN HORIZON

Both the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah) have informed the MMS that the view of the rising eastern sun over Nantucket Sound is an integral part of the local cultural and religious practices. However, in order for the MMS to consider this view under the National Historic Preservation Act, the MMS needs to know the location of the affected property or properties from which this view is being taken – the location of the cultural practice or religious ceremony taking place while viewing – in order to consider the affects of the undertaking on the property or properties. From a specific location, the MMS will judge whether the property is 1) within the Area of Potential Effect (APE; i.e., the project is within the viewshed) and 2) whether the property qualifies as a TCP. For

CW0000109983

purposes of this analysis, MMS has been asked to consider the entire eastern viewshed bounded only by the coastlines of Cape Cod and Martha's Vineyard, with no reference point or viewing location[3].

During site visits with the local Native American Tribes, the MMS was shown a number of properties for consideration as TCPs, most of which were not within the project's APE. Two discrete properties (in addition to the one already listed in the *Finding of Adverse Impact* document) are both located within the project's APE and do meet the integrity of relationship (use and association) criteria. Since the viewshed from these properties of cultural significance will be affected, and it is likely that the viewshed is a *contributing factor* in the possible eligibility of these sites to the NRHP, these properties themselves will be considered as potential TCPs. **The Nantucket Sound, however, is not the appropriate location from which to consider the viewshed; rather, the areas of traditional cultural practice from which the view is experienced will be considered for eligibility as TCPs.**

Therefore, after review of this guidance and several consultations with personnel in the office of the NRHP, *we conclude that the viewshed of the eastern horizon across Nantucket Sound does not meet NR eligibility criteria as an historic property, and is not eligible for listing as a TCP* because: it is not a tangible place;[4] it does not have integrity of location and setting; does not have definable boundaries; is without integrity of relationship; and therefore does not meet NRHP criteria. Again, the MMS will continue to consider the viewshed of the eastern horizon across Nantucket Sound as a *contributing element* in consideration of the eligibility of sites identified by the affected Native American Tribes.

## FURTHER DISCUSSION[5]

Nantucket Sound (as a water body, as a viewshed, or as an inundated prehistoric landscape) does not meet the definition of "sacred site" found in Executive Order 13007. The Executive Order No. 13007 "Indian Sacred Sites" defines sacred sites:

---

[3] The information provided by the tribes in support of this "entire viewshed" assertion as a TCP does not meet the criteria of continuity of use and association.  While some Wampanoag tribal members likely practice private ceremonies at various locations along east-facing coastlines overlooking the Sound, viewing places deemed adequate for these spiritual observances could be anywhere on the island that has a view of the sunrise over the Sound. Therefore, the requirement of association with a particular site has not been met (similar to the "baptism in any water" example from Bulletin 38 at 11).  In addition, the element of continuity of association and use of all of these potential sites over time by the tribal community as a whole (National Register Bulletin 38 at 11-12) has not been met, and therefore neither the entire viewshed nor the coastlines would qualify as a TCP. MMS feels that further investigation or information will not alter this conclusion; both tribes have provided all of the information they feel comfortable with releasing through interviews, transcripts and written correspondence already in the project record.

[4] "This Bulletin does not address cultural resources that are purely 'intangible'—i.e. those that have no property referents" (Parker and King 1998:3).

[5] This section is reproduced from an internal memorandum to Rodney Cluck, MMS Office of Alternative Energy Programs, from Tim Baker, Office of the Solicitor, Division of Mineral Resources, Branch of Petroleum Resources, dated July 18, 2008, regarding *Issues Related to Claims of Sacred Sites and Historic Properties on the Outer Continental Shelf (OCS) in Nantucket Sound.*

CW0000109984

"Sacred site" means any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site." E.O. 13007 Section 1(b)(ii).

The Executive Order expressly restricts sacred sites to those locations that are "… specific, discrete, narrowly delineated location[s]…"  These Executive Order requirements exclude broadly defined locations such as Nantucket Sound as a water body and the eastern horizon and would definitely exclude the submerged landform given that it is not accessible for "ceremonial use."

Neither the entirety of Nantucket Sound as a water body nor as a viewshed of the eastern horizon meet the definition of "historic property" found in the NHPA and in the ACHP regulations at 36 CFR 800.16. The ACHP regulations define historic properties, but link that definition to the criteria to be eligible for inclusion in the NRHP. The criteria of eligibility for inclusion in the NRHP are set out in regulation 36 CFR 60.4. To be eligible for inclusion in the NRHP, a historic site must be associated with important events or person(s), and/or embody distinctive artistic values and/or yield important information about the past. The claims that Nantucket Sound and the eastern horizon are historic properties have not been supported by any reference to the regulatory criteria to be eligible for inclusion in the NRHP such as linking these areas to an important event or person(s).

While Nantucket Sound as a water body and as a viewshed of the eastern horizon do not satisfy the criteria to be eligible for inclusion in the NRHP, they are to be excluded from such consideration according to the guidance in the "How to" publication.  The regulation setting forth the criteria to be eligible for inclusion in the NRHP points to other official publications for further guidance including the "How To" publications: e.g., *How to Apply the National Register Criteria for Evaluation (Bulletin 15)*. The "How To" guidance also "…excludes from the definition of 'site' natural waterways or bodies of water that served as determinants in the location of communities or were significant in the locality's subsequent economic development."

There is the concept of "cultural landscapes" in official National Park Service literature; much like TCPs, cultural landscapes are a type of subset of "sites" potentially eligible to be included in the NRHP. According to "36 Preservation Briefs" (a National Park Service Publication authored by Charles Birnbaum), there are four types of cultural landscapes, "historic sites, historic designed landscapes, historic vernacular landscapes, and ethnographic landscapes."   According to this publication, ethnographic landscapes include "religious sacred sites."  The definition of cultural landscapes, in this publication, is generally linked to something concrete such as an important event or person.  It defines cultural landscapes as "… associated with a historic event, activity, or person or exhibiting other cultural or aesthetic values."  Consequently, neither the Nantucket Sound as a water body, as an inundated prehistoric landscape, nor as a viewshed of the eastern horizon would be considered as a religious site and ethnographic landscape, and would not likely meet this definition of cultural landscapes. There is no evidence linking these sites to a relevant historic event, activity or person. Further, even if one met the definition of a "cultural landscape," the Nantucket Sound as a water body, as a viewshed of the eastern horizon, or as an inundated prehistoric landscape would still have to satisfy the regulatory criteria to be eligible for inclusion in the NRHP to qualify as a historic property, and none of these do.

CW0000109985

In conclusion, the Nantucket Sound (as a water body, as a submerged landscape, or as the viewshed of the eastern horizon) does not satisfy the criteria of eligibility for inclusion in the NRHP, nor does it meet the definition of "historic property" under 36 CFR 800.16, nor does it qualify as a "sacred site" under Executive Order No. 13007 and, therefore, does not qualify as a historic property under the NHPA.

## CONCLUSION

Based on a thorough and extensive assessment of the NRHP Criteria and the analysis of the results of marine archaeological surveys, *the MMS has determined that neither the water body of Nantucket Sound itself, nor the seabed underlying Nantucket Sound, nor the viewshed of the eastern horizon as a discrete entity (devoid of a viewing location) across Nantucket Sound would be eligible for listing on the NRHP as a TCP, a historic property, or a sacred site*. With all of these points taken together, the MMS has decided it will not at this time submit documentation to the NRHP for the purpose of seeking a formal eligibility determination of Nantucket Sound (the water body, the submerged landscape, or the eastern horizon devoid of a viewing location) as a TCP or as a historic property (pursuant to 36 CFR 800.4(c)(2)). However, the MMS will continue to consider for NRHP eligibility the locations identified by the Tribes during site visits that may be affected by the proposed project that are both within the currently defined APE and potentially possessing characteristics of historic properties or TCPs.   Written permission from the Tribes will be sought prior to circulating proposed eligibility determinations or officially nominating these properties.

CW0000109986

**Sources Considered**

Thomas F. King,  Places That Count:  Traditional cultural properties in cultural resource
management. (2003)

Washington, D.C. U.S. Dept of the Interior, National Park Service, Cultural Resources,
Park Historic Structures & Cultural Landscapes, (1998- ), Landscapes Lines (2005)

Silverman, David J.,   Faith and boundaries: colonists, Christianity, and community among the
Wampanoag  Indians of Marth's Vineyard, 1600-1871. (2005)

Travers, Milton A., The Wampanoag Indian federal of the Algonquin Nation; Indian neighbors of
the Pilgrims. (1961).

Travers, Milton A., The Wampanoag Indian Tribes of Martha's Vineyard:  the Story of the
Capowacks o Nope, the Takemmy – Wampanoags, the Nunpaug-Wampanoags, the
Aquinnah-Wampanoags, the Acuinnah-Wampanoags of Catachukutcho (Gay Head
tribe), the Chappaquiddick – Wampanoags

John R. Swanton, The Indian Tribes of North America.  Originally Published 1952 as Bureau of
American Ethnology Bulletin Number 145 (Fourth Printing 1984)

Robert S. Grumet, Historic Contact:  Indian People and Colonists in Today's Northeastern United
States in the Sixteenth Through Eighteenth Centuries. (1995)

William C. Sturtevant, Handbook of North American Indians. (1978)

Laurie Weinstein-Farson, The Wampanoag. (1989)

Patricia L. Parker and Thomas F. King, U.S. Department of the Interior, National Register Bulletin
38: Guidelines for Evaluating and Documenting Traditional Cultural Properties (rev.
1998)

National Register Bulletins 12 and 21: *Defining Boundaries for National Register Properties*
*(1997)*

National Register Bulletin 15: *How to Apply the National Register Criteria for Evaluation*

CW0000109987



**Mashpee Wampanoag Tribe**
P.O. Box 1048
Mashpee, MA. 02649
(508)477-0208

**2009-RES-022**
**Horseshoe Shoal Resolution**

**WHEREAS,** the Mashpee Wampanoag Tribe is federal recognized Tribe entitled to the immunities and privileges available to Indian tribes by virtue of their government - to -government relationship with the United States; and

**WHEREAS,** the Mashpee Wampanoag Tribe is a member of the Great Wampanoag Nation, known as "The People of the First Light" and have since time immemorial occupied the land and waters from Narragansett Bay to the Neponset estuaries and maintained a spiritual, cultural and traditional connection to their traditional homeland; and

**WHEREAS,** as the People of the First Light; one of the most important components of our religious, cultural and ceremonial practices is our ability to embrace and give prayer of thanksgiving to the first light .These ceremonial, spiritual and religious practices require an unobstructed view of the sunrise over Nantucket Sound; and

**WHEREAS,** the Wampanoag people have walked these lands for nine thousand years, including both upland and land under the ocean and we must preserve the spiritual integrity and sanctity of the eastern horizon, vista and horizon view-shed, central to our religion ; and

**WHEREAS,** our oral traditions teach us that our people lived , raised families, hunted, fished and buried our dead on this land now known as Horseshoe Shoals and their descendents still live on Cape Cod and Martha's Vineyard and carry on our culture, traditions and religion; and

**WHEREAS,** the Wampanoag Tribe, the Colonies, the state of Massachusetts and the United States share a long maritime history and a National Treasure that has significant spiritual, cultural, traditional and historic value to all.

**NOW THEREFORE, BE IT RESOLVER** that the Mashpee Wampanoag Tribe requests the National Park Service (NPS)  determined that Nantucket Sound is a **Traditional Cultural Property;** and

CW0000109988

**BE IT FURTHER RESOLVED** that the Mashpee Wampanoag Tribe since time immemorial has a traditional, cultural, spiritual and religious connection to the Sound and have determined that Nantucket Sound is a **Traditional Cultural Property**; and

**BE IT FINALLY RESOLVED** that the Mashpee Wampanoag Tribe approves and submits this resolution to the National Park Service (NPS)

## CERTIFICATION

We, the undersigned Chairman and Secretary of the Tribal Council of the Mashpee Wampanoag Tribe, hereby, certify that the Tribal Council is composed of 13 members of whom 10 constituting a quorum, were present at a meeting thereof, duly and regularly called, noticed, convened and held on the 15th day of July, 2009, and that the foregoing Resolution was duly adopted by the affirmative vote of 9 members, with 0 opposing, and with 0 not voting.

DATED THIS 15th day of July, 2009

_Cedric Cromwell_
Cedric Cromwell, Chairman
Mashpee Wampanoag Tribal Council

ATTEST:

_Marie Stone_
Marie Stone, Secretary
Mashpee Wampanoag Tribal Council

CW0000109989

Tribal Historic
Preservation Office



Protecting & Preserving
Our Culture

September 17, 2009

National Park Service
National Register of Historic Places
1201 Eye St., NW (2280)
Washington, DC 20005
Attn: Ms. Janet Snyder-Matthews, PHD

Dear Ms. Snyder-Matthews,

The Tribal Historic Preservation Officer of the Wampanoag Tribe of Gay Head
(Aquinnah) being duly authorized by the governing body of the Tribe, hereby requests
an official determination of eligibility for the eastern vista viewshed over Nantucket
Sound, located off the coast of Cape Cod, Massachusetts, for inclusion in the National
Register of Historic Places. This request is being made pursuant to the Cape Wind
Project application through the Section 106 process of the National Historic Preservation
Act.

Since time immemorial, the Wampanoag and/or Indigenous Northeastern Woodlands
Indian People have; either traversed, fished, cultivated, interred our ancestors and/or
occupied the entire area including the location currently under consideration for this
undertaking.

We consider the eastern vista viewshed over Nantucket Sound, located off the coast of
Cape Cod, Massachusetts, eligible for inclusion in the National Register of Historic Places
as the Wampanoag People consider this viewshed a Traditional Cultural Property.

We are the Wampanoag People, "The People of the First Light or Dawn", this is how we
identify ourselves and how other Tribes recognize us. The unobstructed view of this
expanse of water, bordered by the south shore of Cape Cod on it's north side, by
Nantucket on the southern side and Martha's Vineyard on it's western side is of utmost
importance to the Wampanoag People.

The WTHPO asserts that the eastern vista viewshed is essential to the Wampanoag
People for our cultural beliefs, identity and spirituality. This viewshed is one of the
places where our People historically had, and continue, to have a connection in

CW0000109990

practicing our cultural ceremony and traditions. Here is where we still arrive to greet the new day, watch for celestial observations in the night sky and follow the migration of the sun and stars in change with the seasons. This viewshed has remained undefiled; affording our People continuous use since time immemorial and it defines our place in the indigenous world; for ourselves, for our sister Mashpee Wampanoag tribe, to our extended Native families and the Peoples across Turtle Island.

Our oral history proclaims that we walked across this expanse of land, now covered by water, and our leader Moshup created Noepe, (currently called Martha's Vineyard), and it's surrounding islands, including Nantucket. This is the path the Aquinnah Wampanoag people took to arrive at our present location and defines our relationship to the rest of the Wampanoag Nation and other American Indian tribes in New England and beyond. Our history has been, and continues to be, defined by this unique placement on Mother Earth.

In addition to the designation as a Traditional Cultural Property, we consider the eastern vista viewshed over Nantucket Sound, located off the coast of Cape Cod, Massachusetts, eligible for inclusion in the National Register of Historic Places under the following criteria:

**Criteria A.** " Properties that are associated with events that have made a significant contribution to the broad patterns of our history"; *and*
**Criteria D.** "Properties that have yielded or may be likely to yield, information important in prehistory or history."

Evidence of our ancient history has been brought forth from the floor of the Nantucket Shoals, long forgotten archeological data of a time when our Peoples would have walked miles out to what is now the Continental Shelf, to carry out our ancient ceremonial practices and foraging for sustenance from the ocean. Although there have been re-discoveries of archeological evidence, the continuing advancement of archeological and scientific methodologies will yield further confirmation of our oral histories.

We respectfully submit this nomination to the Keeper to determine its eligibility for placement in the National Register of Historic Places.


In Balance, Harmony and Peace,

Bettina M. Washington
Tribal Historic Preservation Officer
Wampanoag Tribe of Gay Head (Aquinnah)

cc: Ken Salazar, Secretary of the Interior
    Larry Echohawk, Asst. Secretary of the Interior
    John Fowler, ACHP
    John P. Eddins, ACHP
    John L. Berrey, ACHP
    Tobias J. Vanderhoop, Culture and Historic Commission, WTGH(A)
    George Green, Jr., THPA, Mashpee Wampanoag Tribe

CW0000109991

John Brown, THPO, Narragansett Indian Tribe
Brona Simon, SHPO, Commonwealth of Massachusetts
Senator John F. Kerry, Commonwealth of Massachusetts
Representative William D. Delahunt, Commonwealth of Massachusetts
Chris Horrell, Mineral Management Services
Andrew Kruger, Mineral Management Services

CW0000109992



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Washington, DC 20240

**JUN 2 6 2009**

Ms. Bettina Washington
Tribal Historic Preservation Officer
Wampanoag Tribe of Gay Head (Aquinnah)
20 Black Brook Road
Aquinnah, Massachusetts  02535

**RE: MMS Response to Tribal Concerns Regarding the Cape Wind Energy Project**

Dear Ms. Washington:

This letter is in response to specific concerns that you and Mr. George (Chuckie) Green raised at the last Tribal Section 106 Consultation meeting on June 3, 2009, for the proposed Cape Wind Energy Project, Nantucket Sound, Massachusetts.  This letter also responds to a letter that MMS received from Mr. Green on June 17, 2009.  It is our intent with this letter to respond fully to the specific issues and concerns you have raised.  A similar letter is being sent to Mr. Green.

## 1. Request to Conduct a Balloon Test

At the Tribal Section 106 Consultation meeting, Ms. Washington requested that the MMS again consider conducting a balloon test in the proposed project area of Horseshoe Shoals, Nantucket Sound, to simulate visual impacts of erected turbines.  The MMS has considered this request, weighed its merits, and has determined that it will not conduct a balloon test nor will it require the applicant to conduct a balloon test.  In addition to the host of technical, environmental, and fiscal concerns discussed at the June 3 meeting, the MMS does not believe that a balloon test would accurately reflect the true nature of visual impacts from erected turbines.  The Final Environmental Impact Statement (FEIS) for the Cape Wind Energy Project includes a comprehensive visual impact assessment which presents both daytime and nighttime visual simulations from various locations around the Cape and Islands.  These simulations were developed using state of the art software and they were conservative in nature by representing worst case views (i.e. maximum visibility conditions) from selected historic structures and other recreational areas.  The MMS believes these simulations provide the most accurate depictions of any visual effects of the proposed project.  Full details on how the simulations were prepared are provided in the FEIS Report No. 5.3.3-2.

## 2. Request to Expand the Area of Potential Effect (APE)

At the Tribal Section 106 Consultation meeting, Ms. Washington requested that the MMS consider expanding the Area of Potential Effect (APE) in the Finding of Adverse Effect due to concerns that oil spills from construction and maintenance vessels and oil delivery vessels could impact Tribal shellfish and aquaculture grounds of Gay Head on Martha's Vineyard.  The MMS has considered this request and determined that expanding the APE in this case is not warranted due to the extremely remote chances of a Cape Wind-related oil spill ever occurring or impacting Tribal areas.  The FEIS presents a comprehensive and state-of-the-art oil spill analysis, and



CW0000110047

results indicate that most of the potential for oil spills is from vessels already transiting the Nantucket Sound area. These spills would occur regardless of the Cape Wind project ever being built. Additionally, there are unlikely to be any spills associated with maintenance and oil delivery boats for the Cape Wind Project. Modeling results show that there would be an estimated one spill in 16,677 years from work boats, and an estimated one spill in 500,000 years from oil delivery boats. For additional information please see Report No. 4.1.3-1 "Simulation of oil Spills from the Cape Wind Energy Project Electric Service Platform in Nantucket Sound" and Report No. 3.3.5-1 "Oil Spill probability analysis for the Cape Wind Energy Project in Nantucket Sound."

If additional National Register-eligible Tribal sites that would be subject to adverse effects from the proposed project are identified in subsequent consultations, the MMS will supplement its Finding of Adverse Effect to include these properties as appropriate.

## 3. Consideration of Alternatives

In the letter dated June 17, 2009, Mr. Green requested clarification on the consideration of alternatives to the proposed action on Horseshoe Shoals. In its initial scoping efforts under the National Environmental Policy Act (NEPA), the MMS considered over 20 alternatives to the proposed action, including nine geographic alternatives, three non-geographic alternatives, and a no action alternative. Reasonable alternatives were objectively evaluated in the development of the FEIS in accordance with the CEQ regulations. To select alternatives for detailed evaluation, the MMS first developed a screening process aimed at eliminating those project alternatives which did not meet the purpose and need statement and which were not technically feasible and economically viable. Only the alternatives that met the screening criteria, along with the proposed action and no action alternative, were subject to detailed environmental analysis in the FEIS.

Through the application of the screening criteria, seven alternatives (including the proposed action and the no action alternative) were determined to be "reasonable" and were analyzed accordingly. To answer Mr. Green's question directly, those seven alternatives remain as a viable option for the Secretary of the Interior to choose, and the MMS has consistently stated this during the Section 106 Consultations. Please refer to Section 3.0 of the FEIS "Alternatives to the Proposed Action" for a more thorough discussion of how alternatives were selected and evaluated.

## 4. Conducting Meaningful and Good-Faith Consultations

Through letters addressed to the MMS and in recent Section 106 Consultation meetings, both the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah) have suggested that the MMS has failed to consult with the Tribes in a meaningful and good-faith manner. The MMS works on a government-to-government basis with Native American Tribes, pursuant to Executive Order 13175. As a part of the government's Treaty and Trust responsibilities, the government-to-government relationship was formally recognized by the Federal government on November 6, 2000. The following summary of meetings documents the good faith efforts that

4

ongoing over the life of a project. Should the proposed project be approved and constructed, this important relationship between the affected Tribes and the Department would continue through construction, operations, and eventual decommissioning.

If you wish to further discuss your views and concerns regarding the effects of the proposed Cape Wind Energy Project on Tribal areas of traditional cultural and religious importance, you may contact the MMS Federal Preservation Officer, Dr. Melanie J. Stright, at 703-787-1736, or by email at melanie.stright@mms.gov.

Sincerely,

Andrew D. Krueger, PhD
Minerals Management Service
Renewable Energy Program

Similar letter being sent to: Mr. George (Chuckie) Green

CW0000110049



# United States Department of the Interior

## MINERALS MANAGEMENT SERVICE
Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394



In Reply Refer To: MS 5411

OCT 1 6 2009

Ms. Bettina Washington
Tribal Historic Preservation Officer
Wampanoag Tribe of Gay Head (Aquinnah)
20 Black Brook Road
Aquinnah, Massachusetts 02535-1546

Dear Ms. Washington,

The Minerals Management Service (MMS) would like to thank you and the Wampanoag Tribe of
Gay Head (Aquinnah) for taking the time to meet with us on August 3-4, 2009. As you know, this
was the final series of site visits and concludes the identification of historic properties process (36
CFR 800.4) of the NHPA Section 106 Process for the proposed Cape Wind Energy Project.

As promised, please find enclosed a draft copy of the assessment of the sites that were shown to
the MMS during these site visits. MMS respectfully requests that you submit any comments
and/or critiques of this assessment that you deem necessary. Your comments and concerns will be
considered and incorporated as appropriate into the final version of the assessment to ensure that
MMS fully captures the information that you and the Wampanoag Tribe of Gay Head (Aquinnah)
want to convey to the MMS.

While the section 106 process requires MMS to apply information received and identify those
properties that are historic (i.e., eligible for the National Register) that may be adversely affected
(36 CFR 800.4(b)), and also requires that we consult with the Massachusetts State Historic
Preservation Office (SHPO) to obtain concurrence with the MMS findings and determinations (36
CFR 800.4(c), that does not mean that all of the information in the enclosed analysis must be
conveyed. You may suggest redactions to the document, or request that the information be
conveyed only verbally to the SHPO. The relevant portions of the NHPA statute and regulations
related to confidentiality are attached (the "Secretary" is represented by the NR for these
purposes). It should be noted that the NR takes the view that it can only protect information
related to properties found to be eligible. Following our discussions related to confidentiality and
your other comments, as part of the Section 106 Process, relevant necessary information will be
conveyed to the SHPO and incorporated in the Findings Document. Unfortunately, because the
affected sites within the APE are no longer on tribal lands, 36 CFR 800.3(d) does not cover our
situation.

MMS respectfully requests that this information be provided to our office no later than 15 days
from receipt of this letter. If no comments are received by that time, we will consider our analysis
final.



2

While it is much preferred to have your comments in writing, we also want to invite you to discuss this in a group call. Please contact me to set up a time at your convenience.

We look forward to continuing working with the Wampanoag Tribe of Gay Head (Aquinnah) in a manner respectful of tribal sovereignty and cooperation. Should you have any questions or wish to discuss this further, please do not hesitate to contact me at (504) 736-2796 or Christopher.Horrell@mms.gov.

Sincerely,

Christopher E. Horrell Ph.D. R.P.A.
Acting Federal Preservation Officer

Enclosures:
Site Visit Assessment
Statute and Regulation language from NHPA Section 304; 36 CFT 800.11(c)

Section 304 of NHPA
[16 U.S.C. 470w-3(a) — Confidentiality of the location of sensitive historic resources]

(a) The head of a Federal agency or other public official receiving grant assistance pursuant to this Act, after consultation with the Secretary, shall withhold from disclosure to the public, information about the location, character, or ownership of a historic resource if the Secretary and the agency determine that disclosure may —
(1) cause a significant invasion of privacy;
(2) risk harm to the historic resources; or
(3) impede the use of a traditional religious site by practitioners.

[16 U.S.C. 470w-3(b) — Access Determination]
(b) When the head of a Federal agency or other public official has determined that information should be withheld from the public pursuant to subsection (a) of this section, the Secretary, in consultation with such Federal agency head or official, shall determine who may have access to the information for the purpose of carrying out this Act.

[16 U.S.C. 470w-3(c) — Consultation with the Advisory Council]
(c) When the information in question has been developed in the course of an agency's compliance with section 106 or 110(f) of this Act, the Secretary shall consult with the Council in reaching determinations under subsections (a) and (b) of this section.

* * *

36 CFR 800.11(c): (c) Confidentiality.

(1) Authority to withhold information. Section 304 of the act provides that the head of a Federal agency or other public official receiving grant assistance pursuant to the act, after consultation with the Secretary, shall withhold from public disclosure information about the location, character, or ownership of a historic property when disclosure may cause a significant invasion of privacy; risk harm to the historic property; or impede the use of a traditional religious site by practitioners. When the head of a Federal agency or other public official has determined that information should be withheld from the public pursuant to these criteria, the Secretary, in consultation with such Federal agency head or official, shall determine who may have access to the information for the purposes of carrying out the act.

(2) Consultation with the Council. When the information in question has been developed in the course of an agency's compliance with this part, the Secretary shall consult with the Council in reaching determinations on the withholding and release of information. The Federal agency shall provide the Council with available information, including views of the SHPO/THPO, Indian tribes and Native Hawaiian organizations, related to the confidentiality concern. The Council shall advise the Secretary and the Federal agency within 30 days of receipt of adequate documentation.

(3) Other authorities affecting confidentiality. Other Federal laws and program requirements may limit public access to information concerning an undertaking and its effects on historic properties. Where applicable, those authorities shall govern public access to information developed in the section 106 process and may authorize the agency official to protect the privacy of non-governmental applicants.

***

# Site Visits among the MMS and the Wampanoag Tribe of Gay Head (Aquinnah)

*Draft Version for Tribal Comment*
*October 16, 2009*

The Minerals Management Service (MMS) recognizes the longstanding cultural traditions and spiritual practices █████████████████████████████████████████ ██████████████████████████████████████████████ Furthermore, MMS understands that there are cultural practices and traditional linkages that exist between both Tribes and Nantucket Sound, and that a deep understanding of these beliefs, practices and traditions are difficult for non-tribal members to fully comprehend or put into words.

The potential visual impact of the proposed project on the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah) was raised as a concern during initial government to government consultations between the MMS and the Tribal Historic Preservation Officers (THPO). █████████████████████████████████████████████ █████████████████████████ The Tribes have said that they have information related to specific properties or sites that would be adversely affected by the proposed wind project. In order to gain a better understanding of the Tribes' ties to Nantucket Sound and to adequately reflect the importance of specific locations and the associated ceremonies and traditions that take place there, the MMS conducted a series of site visits with the Wampanoag Tribe of Gay Head (Aquinnah) and the Mashpee Wampanoag Tribe on Martha's Vineyard and Cape Cod between August 3-5, 2009.

## Information Sources for this Analysis

In addition to the interviews with THPO Washington and THPO Green, the MMS reviewed statements made in transcripts of NHPA Section 106 consultation meetings to date and correspondence written by the Tribes during the course of the government-to-government and Section 106 consultation processes for the project.

## Consideration of Expanding the Area of Potential Effect (APE)

At the June 3, 2009 Tribal Section 106 Consultation meeting, and again during site visits on August 3, 2009, THPO Washington requested that the MMS consider expanding the APE due to concerns that oil spills from construction and maintenance vessels and oil delivery vessels could impact the Gay Head Cliffs as well as █████████████ THPO Washington further explained that the local population would suffer culturally and economically should an oil spill occur and cause environmental damage to ████████████████████ in bays whose inlets are located along the northern edge of the island. Additionally, according to

CW0000110056

THPO Washington, the potential discoloration of the red cliff face that could result from such an incident would disrupt the ability of the Tribe to continue to tell the story of Moshup and preclude ceremonial worship as it has been practiced in this area for centuries.

The MMS has considered the Tribes' request (refer to letter from the MMS to THPO Washington and THPO Green, dated June 26, 2009) and determined that expanding the APE is not warranted due to the extremely remote chances of a Cape Wind-related oil spill ever occurring or impacting Tribal areas. The final environmental impact statement (FEIS) presents a comprehensive and state-of-the-art oil spill analysis, and results indicate that most of the potential for oil spills is from vessels already transiting the Nantucket Sound area. These spills would occur regardless of the Cape Wind project ever being built. Additionally, there is a very low probability for the occurrence of spills associated with maintenance and oil delivery boats for the Cape Wind Project. Modeling results show that there would be an estimated one spill in 16,677 years from work boats, and an estimated one spill in 500,000 years from oil delivery boats. See FEIS Section 5.2.2.1; it references two reports: *Report No. 3.3.5-1: Oil Spill Probability Analysis for the Cape Wind Energy Project in Nantucket Sound; Report No. 4.1.3-1: Simulation of Oil Spills from the Cape Wind Energy Project Electric Service Platform in Nantucket Sound.* In addition, the impacts of these types of effects have been analyzed and considered as potential environmental impacts in the FEIS rather than impacts to historic properties. Although MMS does recognize that impacts to historic and cultural resources could also result from an environmental incident, we believe that the place for such an analysis, which has already been completed, is in the FEIS. MMS has determined that the APE should not be expanded to include areas that could be impacted by an oil spill where the probability of such an occurrence is infinitesimally small.

## August 3-4, 2009—Visit with the Wampanoag Tribe of Gay Head (Aquinnah)

MMS staff conducted site visits on August 3-4 with Tribal Historic Preservation Officer (THPO) Bettina Washington of the Wampanoag Tribe of Gay Head (Aquinnah). Meeting attendees included: Dr. Andrew Krueger (MMS), Dr. Christopher Horrell (MMS), Mr. Poojan Tripathi (MMS), Ms. Wyndy Rausenberger (DOI Solicitor's Office), Mr. Dave Saunders (BIA), and Ms. Karen Adams (USCOE). A welcome meeting occurred on the fist day at the Aquinnah's Tribal Headquarters, and site visits commenced at various locations throughout Martha's Vineyard, MA.

The Wampanoag Tribe of Gay Head (Aquinnah) believes that [REDACTED] THPO Washington and the Wampanoag Tribe of Gay Head (Aquinnah) argue that the construction of the Cape Wind Energy Project in Nantucket Sound would destroy the [REDACTED]

CW0000110057

### The Gay Head Cliffs (Gay Head Cliffs Natural Landmark)

The Gay Head Cliffs (Figure 1) ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ They are composed of one hundred and fifty feet
of sediment from six glaciers - including red and white clays, green sands, white quartz,
black organic soil, and lignite.

All of the businesses located on the lands at the tops of the Cliffs are currently owned and

3

CW0000110058

operated by tribal members and the land on which these businesses are located is leased from the Town of Aquinnah. These businesses serve visitors and provide for their seasonal needs from April to November. The cliffs were designated as a Natural Landmark in October of 1975 and serve today as a major tourist attraction for Martha's Vineyard (Figure 2).



Figure 2. Plaque at Gay Head Cliffs.

The view from the cliff tops is generally to the west, and the project could not be viewed from there (see FEIS Vol. II at A-238, Fig. 5.3.3-4). From the highest point atop the Gay Head Cliffs, the closest proposed turbines are approximately 24 miles distant and blocked by higher ground on Martha's Vineyard (See FEIS Vol II at A-239, Fig. 5.3.3-5).

The Gay Head Cliffs are considered sacred by the Wampanoag Tribe of Gay Head (Aquinnah) and may be eligible for listing as a TCP, but additional information on the continuity of the nature and frequency of any Wampanoag ceremonial practices at this site would be required before such a determination could be made, especially in light of the fact that the location of these cultural practices have been moved away from the cliffs over time. While we do not question the continued importance of the cliffs to the Wampanoag cultural practices and legends, the MMS will not make a determination as to whether this site qualifies as a TCP because the Gay Head Cliffs are not within the APE of the proposed Cape Wind Energy Project. This location would not be negatively affected by the proposed project.

### The Circle

The Circle (Figure 3) is ████████████████████████
████████████████████████████████████████████

4

CW0000110059

members of which maintain a series of shops and other attractions that line the path to the viewing area of the Gay Head Cliffs.

such information was not provided to the MMS at the time of the site visit.

As indicated above, little information is available beyond the Circle's use as a place for individual worship and community activities. The Circle is unlikely to be eligible for listing on the National Register of Historic Places because it does not meet criterion A, B, C, or D for eligibility. The Circle may qualify as a Traditional Cultural Property (TCP) only because of its association with the ▉▉▉▉ Gay Head Cliffs and the legends of Moshup (For story of Moshup, see following link: http://www.wampanoagtribe.net/Pages/Wampanoag_Way/other), but additional information on the nature and frequency of any Wampanoag ceremonial practices at this site would be required before such a determination could be made.

The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project. This location would not be negatively affected by the proposed project.

5



The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Hisoric Places because this site is not within the APE of the proposed Cape Wind Energy Project. This location would not be negatively affected by the proposed project.

## MET Tower on Tribal Land

The primary reason for visiting this property was to show MMS a meteorological (MET) data tower that has been erected on Tribal Lands owned by the Wampanoag Tribe of Gay Head (Aquinnah). The Tribe is using the 150-foot MET tower (Figure 5) to collect data to determine whether the wind resource is sufficient to produce electricity for both the Tribe's needs and the Vineyard community. The location of the met tower is well inland, at a place chosen in part because it would not interfere with any views of the Sound, or of other culturally important sites, from any other location. This site is not considered a TCP by the Tribe nor does it meet the criteria to be eligible for inclusion on the National

6

CW0000110061

Register of Historic Places. This site is not within the APE of the proposed Cape Wind Energy Project and it would not be negatively affected by the proposed project.



Figure 5. MET Tower erected for measuring meteorological data on Aquinnah Tribal Lands.

## Ponds for Aquaculture Near Menemsha

Ponds for aquaculture (Figure 6) are located along the northwestern section of the island near Menemsha Harbor adjacent to the Menemsha Public Beaches. These ponds are brackish and are the focal point for present day Aquinnah Wampanoag aquaculture projects. THPO Washington stated that this aquaculture location represents a larger part of Wampanoag culture and is vital as an additional component to their sustenance. These ponds are no longer owned by the Tribe (ie. they are not tribal lands) but have been utilized for subsistence and commercial clamming on a continuous basis by the Tribe for many generations. THPO Washington expressed her concern that these ponds could be adversely impacted by an oil spill and reaffirmed her belief that the APE for the proposed project should be expanded to take this into account.

These ponds are unlikely to be eligible for listing on the National Register of Historic Places because they do not meet criterion A, B, C, or D for eligibility. Based upon the limited information provided about the nature and frequency of any Wampanoag ceremonies that take place here, it is impossible to determine if this is property would qualify as a TCP. THPO Washington did not describe this location as a place used for cultural or religious ceremonies, but instead as an historic subsistence area. The project area cannot be viewed from this location.

The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project. This location would not be

7

CW0000110062

negatively affected by the proposed project.



Figure 6. Ponds Used for Aquaculture.

## Christian Town

Christian Town is located on the northwest interior of the island. Christian Town was established in 1660 by Josias the Sachem of Takemmy as a means to assimilate Native Americans into Anglo-Christian society. With the likely approval of the British Crown, the town was established as a one square mile track. Today, little remains except a cemetery (Figure 7-10) and a small church building. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

This site is potentially eligible for listing on the National Register of Historic Places under Criterion B and C, but further archaeological and historic research would be required to make such a determination. Based upon the limited information provided ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ THPO Washington did not describe the area as one used for cultural ceremonies or practices, and it has no views of the Sound.

The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project. This location would not be negatively affected by the proposed project.

8



Figure 7. Plaque for Christian Town.



Figure 8. Signage describing Christiantown.

9

CW0000110064



Figure 9. Mayhew Chapel at the site of Christiantown.



Figure 10. Door of the Mayhew Chapel located at Christiantown.

CW0000110065



There is little information that suggests that this sanctuary is eligible for inclusion on the National Register of Historic Places. Based upon the limited information provided about this site and the nature and frequency of any Wampanoag ceremonies that take place here, it is impossible to determine if this site would qualify as a TCP. The seascape faces northwest toward the Sound and thus the proposed project cannot be viewed from this location. The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project. This location would not be negatively affected by the proposed project.



11

CW0000110066



There is little information that suggests that this site is eligible for inclusion on the National Register of Historic Places. Based upon the limited information provided about this site and the nature and frequency of any Wampanoag ceremonies that take place there, it is impossible to determine if this is property would qualify as a TCP. The proposed project cannot be viewed from this location. The MMS will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because this site is not within the APE of the proposed Cape Wind Energy Project. This location would not be negatively affected by the project.

The ▮▮▮ appear to be eroding away due to the constant wind and wave action from the North Atlantic. ▮▮▮

The archaeological site excavated by Harvard University may be eligible for listing on the National Register of Historic Places under Criterion A and D. Based upon the limited information provided about this site, the cliffs, and the nature and frequency of any Wampanoag ceremonies that take place here, it is impossible to determine if these locations would qualify as TCPs. THPO Washington did not describe this site as a location used by the Tribe for cultural ceremonies.

The MMS will not make a determination as to whether this site and associated beach qualifies as a TCP or is eligible for listing on the National Register of Historic Places because it is not within the APE of the proposed Cape Wind Energy Project. This location would not be negatively affected by the proposed project.



13

CW0000110068



**Day Two; August 4—Locations Visited on the Eastern side of the Island of Martha's Vineyard**



This site is not eligible for listing on the National Register of Historic Places because it does not meet criterion A, B, C, or D for eligibility.  While some Wampanoag tribal members likely practice private ceremonies along these cliffs, based on the limited nature and frequency of any Wampanoag ceremonial practices at this site to date as described by THPO Washington, the element of continuity of association and use of the site over time by the tribal community as a whole (National Register Bulletin 38 at 11-12) has not been met, and therefore this site would not qualify as a TCP.

14

### Joseph Sylum State Beach

Joseph Sylum State Beach is located on the east side of Martha's Vineyard. This state park consists of two miles of beach along Beach Road between Oak Bluff and Edgartown. (The section in Edgartown is also known as "Bend-in-the-Road Beach").

the view of the rising sun would not be obstructed from this viewpoint. Therefore, although

15

this site is within the APE for the proposed project, it does not appear that spiritual practices that require an unobstructed view of the rising sun would be adversely affected.

There is little information that suggests that this site is eligible for inclusion on the National Register of Historic Places.

This location would not be negatively affected by the proposed project.

The proposed project is not visible from this inland location due to distance and topography. The MMS

16

will not make a determination as to whether this site qualifies as a TCP or is eligible for listing on the National Register of Historic Places because , this site is not within the APE of the proposed Cape Wind Energy Project. This location would not be negatively affected by the proposed project.



Since MMS was unable to get access to the [REDACTED] it could not be determined whether the site would have a view of the project area, but this is unlikely due to the flat topography and inland location of the site. The Tribe's lack of continued access or use of the site prevents its designation as a TCP.

CW0000110072



This site is not eligible for inclusion on the National Register of Historic Places because it does not meet criterion A, B, C, or D for eligibility. No information about any archaeological resources in this area was made available to MMS. Based upon the limited information provided about this site and the nature, frequency and continuity of any Wampanoag ceremonies that take place here and the limited access to the area, this site does not qualify as a TCP.

## Amending the Findings Document

All of the properties shown to MMS by the Wampanoag Tribe of Gay Head (Aquinnah) are important because they represent the cultural landscape and religious practices of the Wampanoag people who have occupied this region for over a millennium. MMS recognizes the cultural significance and religious importance of these sites to the Tribes. In an effort to make the best management decisions, MMS has taken time to consider each of the sites and assess whether they would be impacted by the proposed Cape Wind Energy Project.

The MMS appreciated the opportunity to spend two days with Ms. Bettina Washington to visit sites that are important to the Wampanoag Tribe of Gay Head (Aquinnah). However, MMS has determined that no property or site visited during site visits with the Aquinnah

CW0000110073

would be eligible for listing on the National Register of Historic Places or adversely impacted by the proposed project. In most instances, the sites were not located within the APE of the proposed project, meaning the wind facility would not be visible. Accordingly, in these cases the MMS declined to make a determination as to whether the site would be eligible for listing on the National Register of Historic Places or whether the site could be considered a TCP. In two locations ████████████████ the proposed project would likely be visible depending on atmospheric conditions. However, neither of these two locations is eligible for listing on the National Register of Historic Places. Additionally, due to the limited nature and frequency of any ceremonies that take place at these locations, they do not qualify as TCPs. In conclusion, none of the sites within the APE that were visited on Martha's Vineyard will be adversely affected by the proposed project. It should be noted, however, that the Wampanoag Tribe of Gay Head (Aquinnah) feel strongly that all of these sites are interconnected and that the construction of the proposed project in Nantucket Sound will ultimately destroy their cultural and religious practices.

In addition, THPO Washington has requested that the APE be expanded as the Tribe feels that there is a potential for an oil spill during the transportation of dielectric cooling fluid to the offshore electric service platforms. THPO Washington argues that an oil spill would impact culturally sensitive sites and severely impact the social-economic standing of the Wampanoag Tribe of Gay Head (Aquinnah). The MMS previously considered this request and decided the APE will not be expanded, as explained in a letter written to THPO Washington and THPO Green on June 26, 2009.

Based on the information collected during site visits with the Wampanoag Tribe of Gay Head (Aquinnah), the MMS recommends that the "Minerals Management Service Documentation of Section 106 Finding of Adverse Effect" document not be amended to include any of the sites shown to MMS by the Wampanoag Tribe of Gay Head (Aquinnah).

19

CW0000110074

# References

Etkin, Dagmar S, (Environmental Research Consulting) Report No. 3.3.5-1: *Oil Spill Probability Analysis for the Cape Wind Energy Project in Nantucket Sound. Cape Wind Energy Project: Final Environmental Impact Statement* (2006).

Grumet, Robert S., *Historic Contact: Indian People and Colonists in Today's Northeastern United States in the Sixteenth Through Eighteenth Centuries* (1995).

King, Thomas F., *Places That Count: Traditional cultural properties in cultural resource management* (2003).

Knee, K., C. Swanson, T. Isaji, N. Whittier, and S. Subbayya (2006). (Applied Science Associates, Inc.). Report No. 4.1.3-1: *Simulation of Oil Spills from the Cape Wind Energy Project Electric Service Platform in Nantucket Sound. Cape Wind Energy Project: Final Environmental Impact Statement.* MMS EIS-EA, OCS Publication No. 2008-040. Minerals Management Service, U.S. Department of the Interior (2009).

Minerals Management Service EIS-EA, OCS Publication No. 2008-040. Minerals Management Service, U.S. Department of the Interior (2009).

Minerals Management Service, *Cape Wind Energy Project: Final Environmental Impact Statement.* MMS EIS-EA, OCS Publication No. 2008-040. Minerals Management Service, U.S. Department of the Interior (2009).

Parker, Patricia L. & King, Thomas F., *National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties.* National Park Service, U.S. Department of the Interior (1990).

Silverman, David J., *Faith and boundaries: colonists, Christianity, and community among the Wampanoag Indians of Martha's Vineyard, 1600-1871* (2005).

Sturtevant, William C., *Handbook of North American Indians* (1978).

Swanton, John R., *The Indian Tribes of North America.* Originally Published 1952 as Bureau of American Ethnology Bulletin Number 145 (Fourth Printing 1984).

Travers, Milton A., *The Wampanoag Indian federal of the Algonquin Nation; Indian neighbors of the Pilgrims.* (1961).

Travers, Milton A., *The Wampanoag Indian Tribes of Martha's Vineyard: the Story of the Capowacks o Nope, the Takemmy – Wampanoags, the Nunpaug-Wampanoags, the Aquinnah-Wampanoags, the Acuinnah-Wampanoags of Catachukutcho (Gay Head tribe), the Chappaquiddick – Wampanoags.*

U.S. Department of the Interior, National Park Service, *Cultural Resources,*

CW0000110075

*Park Historic Structures & Cultural Landscapes, (1998- ), Landscapes Lines* (2005).

Weinstein-Farson, Laurie, The *Wampanoag* (1989).

CW0000110076