**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, et al., <br><br> Plaintiffs, <br><br> v. <br> TOMMY P. BEAUDREAU, et al., <br><br> Defendants, and <br><br> CAPE WIND ASSOCIATES, LLC, <br><br> Intervenor. | Civil No. 10-cv-01067-RBW <br><br> consolidated with: <br> No. 10-cv-01079-RBW <br> No. 10-cv-01073-RBW <br> No. 11-cv-01238-RBW |
| ALLIANCE TO PROTECT NANTUCKET SOUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JEWELL, et al., <br><br> Defendants, and <br><br> CAPE WIND ASSOCIATES, LLC, <br><br> Intervenor. | **FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS ALLIANCE TO PROTECT NANTUCKET SOUND ET AL.'S AND TOWN OF BARNSTABLE'S MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| TOWN OF BARNSTABLE MASSACHUSETTS, <br><br> Plaintiff, <br><br> v. <br><br> JEWELL, et al., <br><br> Defendants, and <br><br> CAPE WIND ASSOCIATES, LLC, <br><br> Intervenor. | |

THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH)

Plaintiff,

v.

TOMMY P. BEAUDREAU, et al.,

Defendants, and

CAPE WIND ASSOCIATES, LLC,

Intervenor.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATUTORY AND REGULATORY BACKGROUND.............................................1

I.    Statutory Background ......................................................................................1

    A.    National Environmental Policy Act .......................................................1

    B.    Outer Continental Shelf Lands Act.........................................................2

    C.    Coast Guard and Maritime Transportation Act .......................................4

    D.    National Historic Preservation Act .........................................................4

FACTUAL BACKGROUND ...................................................................................6

I.    The Cape Wind Energy Project ......................................................................6

II.    BOEM's Review of the Cape Wind Project Under NEPA and OCSLA ............7

III.    The Coast Guard's Terms and Conditions.......................................................10

IV.    The NHPA Section 106 Process .....................................................................11

STANDARD OF REVIEW ......................................................................................13

I.    Administrative Procedure Act.........................................................................13

II.    Summary Judgment ......................................................................................14

ARGUMENT ..........................................................................................................14

I.    The Coast Guard's Actions Are Not Reviewable Under the APA and,
Even Assuming That They Are, the Coast Guard Fully Complied with
the CGMTA ..................................................................................................14

    A.    The Terms and Conditions Are Not Final Agency Action and
Therefore Are Not Reviewable Under the APA .....................................14

    B.    The Coast Guard's Issued Reasonable Terms and Conditions to
Ensure Marine Navigation Safety .........................................................17

        1.    The Coast Guard's Development of the Terms and Conditions ................17

a.     Revised Navigational Risk Assessment.........................................18

b.     UK Guidance Regarding Renewable Energy Installations............19

c.     The Coast Guard's NVIC 02-07 ...................................................20

d.     The Coast Guard's Terms and Conditions Address the
Navigational Safety Issues Relating to the Project.......................20

2.     After Issuing the Terms and Conditions, the Coast Guard
Continued to Analyze Issues Relating to Marine
Navigation Safety.....................................................................................22

a.     The Coast Guard Conducted Further Review of Radar
Impacts and Ordered an Independent Study .................................22

b.     The Coast Guard Prepared Analyses of Impacts to
Navigational Safety and Submitted them to BOEM.....................24

C.     Plaintiffs' Alleged Violations of the CGMTA Are Without Merit.......................26

1.     The Coast Guard Imposed Specific Requirements on Cape
Wind to Provide for Navigational Safety....................................................26

2.     The Coast Guard Appropriately Interpreted the Statute and
Did Not Shift the Burden of Navigational Safety to Users of
Nantucket Sound.......................................................................................30

3.     The Coast Guard Was Not Required to Issue Terms and
Conditions for All of the Alternatives Identified in the FEIS...................33

4.     The Coast Guard's Evaluation of Impacts to Navigational
Safety Is Not Arbitrary and Capricious ....................................................34

a.     The Coast Guard's Determinations Regarding Marine
Navigational Safety Are Entitled to a High Degree
of Deference..................................................................................34

b.     The Coast Guard's Determinations Are Supported by
the Record .....................................................................................36

c.     The Coast Guard's Assessment of Radar Impacts Is Not
Arbitrary and Capricious...............................................................38

        d.      The Coast Guard's Determination Regarding a
Buffer Zone Is Not Arbitrary and Capricious ...............................43

II.     BOEM Complied with NEPA and OCSLA With Respect to Marine Navigation.............48

III.    BOEM's Analysis of G & G Data Complied with OCSLA and NEPA ..........................48

    A.     BOEM Analyzed Extensive G & G Survey Data Before Approving the
Project and Required Cape Wind to Conduct Supplemental Surveys
Prior to Construction ..............................................................................49

    B.     BOEM's Decision to Permit Cape Wind to Submit Additional
G & G Survey Data After the COP Was Submitted But Prior to
Construction Complied With OCSLA and BOEM's Regulations........................53

    C.     BOEM's Analysis of G & G Survey Data Complied With NEPA.......................56

IV.    BOEM's and the Corps' Compliance with Section 106 of the NHPA ............................58

    A.     The Section 106 Review Process...................................................................58

    B.     BOEM's Section 106 Consultation was Timely ....................................................62

    C.     BOEM's Process for Identifying Historic Properties was Reasonable
and Conducted in Good Faith ................................................................64

V.     BOEM and the Corps Fully Complied with NEPA ..........................................68

    A.     The FEIS Fully complied with NEPA ..................................................68

         1.     The Purpose and Need Statement Was Reasonable...................................68

         2.     The FEIS Analyzed a Reasonable Range of Alternatives ........................72

         3.     BOEM Considered the Reasonably Foreseeable Environmental
Impacts of the Project ................................................................73

             a.     The FEIS Took a Hard Look at the Reasonably
Foreseeable Impacts to Birds ........................................74

                 i.     BOEM's Monitoring Data Were Sufficient and
Additional Data Were Not Essential for BOEM
to Choose Among Alternatives.........................................74

                 ii.    The Avian and Bat Monitoring Was Appropriate

iii

and Further Demonstrates BOEM's "Hard Look" at Impacts to Birds .............................................................77

b.     The FEIS Took a Hard Look at the Reasonably Foreseeable Impacts on Aviation ....................................................................78

c.     The FEIS Took a Hard Look at Cumulative Impacts ...................80

B.     BOEM Complied with NEPA Prior to Approving the COP...................................82

1.     Approval of the COP Was Not a New Major Federal Action ..................82

2.     BOEM Considered New Information About Environmental Impacts, Including to Whales, and Reasonably Concluded that No Supplemental EIS Was Required .........................................................85

3.     BOEM Allowed Extensive Opportunities for Public Comment and and Appropriately Responded to Comments .............................................87

VI.     Summary Judgment Should Be Granted for Defendants on the Remaining Claims .........89

CONCLUSION....................................................................................................................... 90

# TABLE OF AUTHORITIES

## Cases

*Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008)..........................................35

*Am. Soc'y of Dermatology v. Shalala*, 962 F. Supp. 141 (D.D.C. 1996)......................................90

*Balt. Gas and Elec. Co. v. NRDC, Inc.*, 462 U.S. 87 (1983) ........................................................2

*Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659 (D.C. Cir. 1996)................................................16

*Banner Health v. Sebelius*, 715 F. Supp. 2d 142 (D.D.C. 2010) ................................................13

*Bennett v. Spear*, 520 U.S. 154 (1997) ......................................................................................15

*Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 12-1106,
    2013 WL 1954200 (D.C. Cir.  May 14, 2013)..................................................................86

*Cassidy v. Chertoff*, 471 F.3d 67 (2d Cir. 2006)........................................................................35

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................................14

*Chem. Weapons Working Grp. v. U.S. Dep't of Def.*, 655 F. Supp. 2d 18 (D.D.C. 2009)...........80

*\*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ..................31, 34

*\*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) .............69, 70, 71, 72

*\*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)................................13, 14, 38

*\*City of Alexandria v. Slater,* 198 F.3d 862 (D.C. Cir. 1999) ....................................68, 69, 70, 72

*City of Grapevine v. Dep't of Transp.,* 17 F.3d 1502 (D.C. Cir. 1994) ........................................72

*City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261 (D.C. Cir. 2002)..........................................86

*City of Williams v. Dombeck,* 151 F. Supp. 2d 9 (D.D.C. 2001) .................................................81

*Coal. on Sensible Transp. v. Dole*, 826 F.2d 60 (D.C. Cir. 1987)................................................2

*Colo. Env'tl Coal.v. Dombeck,* 185 F.3d 1162 (10th Cir. 1999)..................................................76

*\*Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246 (D.C. Cir. 2003) ..................................31, 35

*Corridor H Alts., Inc. v. Slater*, 166 F.3d 368 (D.C. Cir. 1999) ...................................................5

*Davis v. Latschar*, 202 F.3d 359 (D.C. Cir. 2000).......................................................................5

*Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275 (D.C. Cir. 1981) ................................................13

*Escondido Mutual Water Co. v. La Jolla Band of Mission Indians*,
466 U.S. 765, 104 S. Ct. 2105 (1984)................................................................. 16

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*,
109 F. Supp. 2d 30 (D.D.C. 2000) ..................................................................... 15

*Fund for Animals, Inc. v. BLM*, 460 F.3d 13 (D.C. Cir. 2006)................................... 16

*Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455 (D.C. Cir. 1998) ....................... 17

*Grunewald v. Jarvis*, -- F. Supp. 2d --, 2013 WL 987770 (D.D.C. Mar. 14, 2013) ..... 89

*Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005) .......................................... 80

*Idaho v. ICC*, 35 F.3d 585 (D.C. Cir. 1994) .......................................................... 80

*Izaak Walton League of Am. v. Marsh*, 655 F.2d 346 (D.C. Cir. 1981) ...................... 90

*Jicarilla Apache Tribe v. Morton*, 471 F.2d 1275 (9th Cir. 1973) ............................. 76

*Karst Env't. Educ. and Prot., Inc. v. EPA*, 475 F.3d 1291 (D.C. Cir. 2007)................ 13

*Louisiana Ass'n of Indep. Producers v. FERC*, 958 F.2d 1101 (D.C. Cir. 1992) ......... 15

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ............................................... 14

*Lun Kwai Tsui v. Attorney General*, 445 F. Supp. 832 (D.D.C. 1978)......................... 14

*\*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989);................................... 13, 85, 86

*Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008) ......... 87

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ............ 53

*\*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
417 F.3d 1272 (D.C. Cir. 2005)................................................................. 14, 15

*\*Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174 (4th Cir. 2005) ...... 29, 33, 36

*\*Nat'l Comm. for the New River, Inc. v. FERC*,
373 F.3d 1323 (D.C. Cir. 2004)........................................... 35, 37, 38, 43, 57, 78, 80, 86

*\*Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210 (D.D.C. 1990)......... 29, 47

*\*Nat'l Mining Ass'n v. Mine Safety and Health Admin.*, 599 F.3d 662 (D.C. Cir. 2010) ...... 16, 17

*\*Natural Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115 (D.D.C. 2007)............ 81, 82, 89

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ..................................... 78

*No. Plains Res. Council, Inc. v. Surface Trans. Bd.* 668 F.3d 1067 (9th Cir. 2011). ................... 57

*Ocean Conservancy v. Gutierrez,* 394 F. Supp. 2d 147 (D.D.C. 2005), *aff'd, sub nom Oceana,*
   *Inc. v. Gutierrez,* 488 F.3d 1020 (D.C. Cir. 2007) ........................................................... 81

*Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. US Army Corps of Engineers,*
   570 F.3d 327 (D.C. Cir. 2009) .......................................................................................... 67

*\*Pub. Employees for Envtl. Responsibility v. U.S. Dep't of the Interior,*
   832 F. Supp. 2d 5 (D.D.C. 2011) ................................................................................. 67, 87

*Pub. Utils. Comm'n v. FERC,* 900 F.2d 269 (D.C. Cir. 1990) ............................................... 2

*\*Quechan Indian Tribe of Fort Yuma v. U.S. Dep't of the Interior,*
   547 F Supp. 2d 1033 (D. Ariz. 2008) .......................................................................... 64, 65

*Reliable Automotive Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
   324 F.3d 726 (D.C. Cir. 2003) ......................................................................................... 15

*\*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989) .................................. 1, 87

*S. Utah Wilderness Alliance v. Norton,* 237 F. Supp. 2d 48 (D.D.C. 2002) ............................ 70

*\*Sierra Club v. Adams,* 578 F.2d 389, 394 (D.C. Cir. 1978) ............................................. 2, 72

*Sierra Club v. Salazar,* 894 F. Supp. 2d 97 (D.D.C. 2012) ................................................... 5

*Silentman v. Federal Power Comm'n,* 566 F.2d 237 (D.C. Cir. 1977) ................................... 68

*Sisseton-Wahpeton Oyate v. U.S. Dep't of State,* 659 F. Supp. 2d 1071 (D.S.D. 2009) ............. 65

*\* Styrene Info. and Research Ctr., Inc. v. Sebelius,*
   --F. Supp. 2d -- 2013 WL 1984235 (D.D.C. May 15, 2013) ........................ 32, 35, 39, 89

*Styrene Info. & Research Ctr. v. Sebelius,* 851 F. Supp. 2d 57 (D.D.C. 2012) .......................... 56

*\*Theodore Roosevelt Conservation P'ship v. Salazar,* 605 F. Supp. 2d 263 (D.D.C. 2009)
   *aff'd,* 616 F.3d 497 (D.C. Cir. 2010) .................................................. 75, 76, 77, 78, 82

*\*Theodore Roosevelt Conservation P'ship v. Salazar,*
   661 F.3d 66 (D.C. Cir. 2011) ................................................. 68, 70, 74, 75, 77

*\*Tongass Conservation Soc'y v. Cheney,* 924 F.2d 1137 (D.C. Cir. 1991) ......................... 70, 76

*Town of Barnstable, Mass. v. FAA,* 659 F.3d 28 (D.C. Cir. 2011) ...................................... 80

*Trudeau v. FTC,* 456 F.3d 178, 185 (D.C. Cir. 2006) ....................................................... 15

*\*United States v. Mead Corps,* 533 U.S. 218 (2001) ................................................... 31, 34

vii

*Valley Cmty. Pres. Comm'n v. Mineta*, 231 F. Supp. 2d 23 (D.D.C. 2002) ................................... 5

*\*Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978)................ 14, 46, 47, 49, 50, 73

*\*Village of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir.  2006)................................... 74, 75, 76, 77

*Wilderness Soc'y v. Norton*, 434 F.3d 584 (D.C. Cir. 2006) ....................................... 27

*\*Wilmina Shipping AS v. U.S. Dept' of Homeland Sec.*, -- F. Supp. 2d -- ,
 2013 WL 1225382 (D.D.C. Mar. 27, 2013)............................................... 31, 35

*Wilson v. Block*, 708 F.2d 735 (D.C. Cir. 1983) .......................................................... 65

## Statutes

5 U.S.C. § 551 .................................................................................................. 13, 15, 17

5 U.S.C. §§ 701-706 ............................................................................................. 15

5 U.S.C. § 702 ...................................................................................................... 15

5 U.S.C. § 704 ...................................................................................................... 15

5 U.S.C. § 706 ...................................................................................................... 13

14 U.S.C. § 2 ........................................................................................................ 35

16 U.S.C. § 470a .................................................................................................... 5

16 U.S.C. §470f ............................................................................................. 5, 58, 62

16 U.S.C. § 470hh ................................................................................................. 60

16 U.S.C. § 470s .................................................................................................... 5

16 U.S.C. § 811 ................................................................................................... 16

33 U.S.C. § 403 ..................................................................................................... 7

33 U.S.C. § 1221 ....................................................................................... 32, 35, 38

33 U.S.C. § 1601 ................................................................................................. 31

33 U.S.C. § 2241 ........................................................................................... 44, 45

43 U.S.C. § 4332 ....................................................................................... 2, 71, 76, 83

43 U.S.C. § 1337 ....................................................................... 2, 3, 4, 5, 8, 55, 56, 68

Fed. R. Civ. P. 56(a) ............................................................................................ 14

Pub. L. 107-295, 116 Stat. 2064 (Nov. 25, 2002) ................................................ 32, 35, 38

Pub. L. 109-241, 120 Stat. 516 (July 11, 2006) .......................................................... 4, 5

Pub. L. 109-58, 119 Stat. 594 (Aug. 8, 2005) .................................................... 2, 3, 7, 9

## Regulations

30 C.F.R § 103(b) ...................................................................................................... 54

30 C.F.R. § 585.613(b) ................................................................................................. 5

30 C.F.R. § 585.101 ..................................................................................................... 4

30 C.F.R. 585.103(a)(1) ............................................................. 54, 57, 58, 59, 71

30 C.F.R. 585.103(b)(3) ......................................................................................... 54, 55

30 C.F.R.§ 585.200(a) .................................................................................................. 3

30 C.F.R. §§ 585.600, 585.605 .............................................................................. 3, 5

30 C.F.R. §§ 585.600, 585.620 ............................................................... 4, 5, 11, 57

30 C.F.R. § 585.613 ..................................................................................................... 3

30 C.F.R. § 585.620 ..................................................................................................... 9

30 C.F.R. § 585.626 ................................................................................................... 67

30 C.F.R. § 585.627 ................................................................................................... 57

30 C.F.R. § 585.628 ............................................................................... 4, 5, 83, 84

30 C.F.R. § 585.700. ............................................................................................. 55, 56

30 C.F.R. § 585.705 ................................................................................................... 55

36 C.F.R. § 60.3 ........................................................................................................... 5

36 C.F.R. § 800.1 ......................................................................................................... 5

36 C.F.R. § 800.16 ................................................................................................. 5, 58

36 C.F.R. § 800.3 ....................................................................................................... 63

36 C.F.R. §§ 800.4, 800.5 ................................................ 5, 58, 61, 65, 66, 68, 69, 71

36 C.F.R. § 800.7 ....................................................................................................... 12

40 C.F.R. §§ 1500–1508 ................................................................................................... 2

40 C.F.R. § 1502.9 .............................................................. 9, 10, 83, 84, 87, 96, 97

40 C.F.R. § 1503.1 ......................................................................................................... 88

40 C.F.R. § 1508.20 ............................. 57, 59, 71, 73, 76, 77, 81, 84, 85, 89, 93, 96, 97, 100, 102

40 C.F.R. § 1508.13 ................................................................................. 94, 96, 100

40 C.F.R. § 1508.7 ......................................................................................................... 80

43 C.F.R. § 46.420(a)(2) ............................................................................................. 68

51 Fed. Reg. 15,618, 15,620 (Apr. 25, 1986) ......................................................... 76

74 Fed. Reg. 3635 (Jan. 21, 2009) .............................................................................. 8

74 Fed. Reg. 19,638 (April 29, 2009) .................................................................. 3, 4

75 Fed. Reg. 10,500 (Mar. 8, 2010) ................................................................. 9, 10, 89

76 Fed. Reg. 64,432 (Oct. 18, 2011) ......................................................................... 3

77 Fed. Reg. 5552 (Feb. 3, 2012) ...................................................................... 46, 47

77 Fed. Reg. 19321 (Mar. 30, 2012) ....................................................................... 49

**Legislative Materials**

152 Cong. Rec. S 6439 (June 22, 2006) .................................................................. 16

## TABLE OF ACRONYMS

| | |
|---|---|
| ABMP | Avian and Bat Monitoring Program |
| APA | Administrative Procedure Act |
| ARPA | Automatic Radar Plotting Aid |
| ATON | Aids to Navigation |
| BiOp | Biological Opinion |
| BOEM | Bureau of Energy Management |
| CEQ | Council on Environmental Quality |
| CGMTA | Coast Guard and Maritime Transportation Act of 2006 |
| COLREGS | International Regulations for Preventing Collisions at Sea 1972 |
| COP | Construction and Operations Plan |
| Corps | U.S. Army Corps of Engineers |
| CVA | Certified Verification Agent |
| CW | Cape Wind |
| CWA | Clean Water Act |
| DEIS | Draft Environmental Impact Statement |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPAct | Energy Policy Act of 2005 |
| FAA | Federal Aviation Administration |
| FDR | Facility Design Report |
| FEIS | Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| FIR | Fabrication and Installation Report |

| | |
|---|---|
| FONNSI | Finding of No New Significant Impact (FONSI, pg. 94) |
| FPA | Federal Power Act |
| G&G | Geophysical & Geotechnical |
| HRG | High Resolution Geophysical |
| MCA | Maritime and Coastguard Agency |
| MGN | Marine Guidance Note |
| MOU | Memorandum of Understanding |
| MTSA | Marine Transportation Security Act |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NIOSH | National Institute of Occupational Safety and Health |
| NVIC | Navigation and Vessel Inspection Circular |
| OCS | Outer Continental Shelf |
| OREI | Offshore Renewable Energy Installations |
| OSCLA | Outer Continental Shelf Lands Act |
| OSRP | Oil Spill Response Plan |
| PWSA | Ports and Waterways Safety Act |
| RHA | Rivers and Harbors Act |
| ROD | Record of Decision |
| SAP | Site Assessment Plan |
| SEIS | Supplemental Environmental Impact Statement |
| SUT | Society for Underwater Technology |
| TSC | Technology Services Corporation |
| UK | United Kingdom |

USCG        United States Coast Guard

**INTRODUCTION**

The U.S. Bureau of Ocean Energy Management ("BOEM") has conducted a thorough review of the proposal by Cape Wind Associates ("Cape Wind") to construct and operate the nation's first major offshore wind farm.  Approval of the project, including the prior review conducted by the U.S. Army Corps of Engineers ("Corps"), took over ten years and involved coordination with several federal agencies.  BOEM proceeded cautiously and subjected the project to a rigorous review.  Through that process, as well as the review of the extensive public comments submitted regarding the project, including comments submitted by Plaintiffs the Alliance to Protect Nantucket Sound et al. ("Alliance") and the Town of Barnstable ("Barnstable"), BOEM has thoroughly analyzed and considered all of the environmental and technical issues relating to the project.  At the end of that process, BOEM has approved a project that not only is environmentally and technically sound, but will serve as a model for other renewable energy projects in the future.  Plaintiffs have failed to show that the actions taken by the agencies violated the applicable statutes or were arbitrary or capricious. Accordingly, summary judgment should be granted for Defendants on all of Plaintiffs' claims.

**STATUTORY AND REGULATORY BACKGROUND**

I.      **Statutory Background**

        A.      **National Environmental Policy Act**

The National Environmental Policy Act ("NEPA") serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S. Ct. 1835, 1845 (1989).

To meet these dual purposes, NEPA requires that an agency prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality's ("CEQ") regulations, 40 C.F.R. §§ 1500–1508, provide guidance to agencies in applying NEPA.

NEPA requires that an agency take a "hard look" at the reasonably foreseeable environmental consequences of the proposed action and its alternatives. *See Pub. Utils. Comm'n v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990). In reviewing the sufficiency of an agency's NEPA compliance, "[t]he role of the courts is simply to ensure that the agency had adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary or capricious." *Balt. Gas and Elec. Co. v. NRDC*, 462 U.S. 87, 97-98, 103 S. Ct. 2246, 2252 (1983) (citations omitted). A court should not "fly speck" an EIS. *Sierra Club v. Adams*, 578 F.2d 389, 393 (D.C. Cir. 1978); *see also* 40 C.F.R. § 1500.3 ("it is the Council's intention that any trivial violation of these regulations not give rise to an independent cause of action"). While it "is . . . always possible to explore a subject more deeply and to discuss it more thoroughly," the "line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).

### B.   Outer Continental Shelf Lands Act

The Energy Policy Act of 2005 ("EPAct"), Pub. L. 109-58, 119 Stat. 594 (2005), amended the Outer Continental Shelf Lands Act ("OCSLA") by adding provisions relating to the leasing of the Outer Continental Shelf ("OCS") for the purpose of producing renewable energy. Specifically, Section 388(a) of EPAct, codified in subsection 8(p) of OCSLA, 43 U.S.C. § 1337(p), authorizes the Secretary of the Interior to issue leases, easements, or rights-of-way for

offshore renewable energy projects.  *See* EPAct § 388(a), 119 Stat. at 748, 43 U.S.C. §

1337(p)(1).

Pursuant to subsection 8(p) of OCSLA, the Secretary, in consultation with the U.S. Coast

Guard and other relevant federal agencies may grant a lease, easement, or right-of-way on the

Outer Continental Shelf for the purpose of producing or supporting "production, transportation,

or transmission of energy from sources other than oil or natural gas," which includes renewable

energy production.  43 U.S.C. § 1337(p)(1)(C).  The Secretary is instructed to: ". . . ensure that

any activity under this subsection is carried out in a manner that provides for – (A) safety; (B)

protection of the environment; (C) prevention of waste; (D) conservation of the natural resources

of the outer Continental Shelf; (E) coordination with relevant Federal agencies; (F) protection of

national security interests of the United States . . . ."  43 U.S.C. § 1337(p)(4).  BOEM has issued

regulations governing the leasing process and management of offshore renewable energy

projects.  *See* 74 Fed. Reg. 19,638 (Apr. 29, 2009); *see also* 30 C.F.R. Part 585.[1]

The regulations establish a three-step process for the approval of renewable energy

projects.  The first step is the issuance of a lease, which allows the lessee to develop a renewable

energy project at the site, subject to the approval of BOEM and other agencies.  30 C.F.R. §

585.200(a).  The second step is the submission of a Site Assessment Plan ("SAP"), which must

be approved by BOEM before the lessee conducts site assessment activities at the lease site.  30

C.F.R. §§ 585.600, 585.605.  BOEM is required to prepare a "NEPA analysis, as appropriate" in

conjunction with its determination on whether to approve a SAP.  30 C.F.R. § 585.613(b).  The

third step is the submission by the lessee of a Construction and Operations Plan ("COP"),

---

[1] The regulations were initially contained in 30 C.F.R. Pt. 285.  In 2011, the rules were
reorganized and moved to 30 C.F.R. Pt. 585, but there were no substantive changes to the
regulations and the internal numbering of the sections remained the same.  *See* 76 Fed. Reg.
64,432 (Oct. 18, 2011).  The current regulations are cited herein.

describing all of the planned facilities and proposed activities, including construction, operation,

and decommissioning of the project.  30 C.F.R. §§ 585.600, 585.620.  BOEM must prepare "an

appropriate NEPA analysis" before deciding whether to approve a COP.  30 C.F.R. § 585.628(b).

The project cannot proceed until BOEM has approved the COP.  30 C.F.R. § 585.620(c).

### C.  Coast Guard and Maritime Transportation Act

Roughly a year after EPAct was enacted, Congress passed the Coast Guard and Maritime

Transportation Act of 2006 ("CGMTA"), Pub. L. 109-241, 120 Stat. 516 (2006).  Section 414 of

the CGMTA provides, in its entirety, as follows:

Sec. 414.  Navigational Safety of Certain Facilities

(a) Consideration of Alternatives – In reviewing a lease, easement, or right-of-way for an offshore wind energy facility in Nantucket Sound under section 8(p) of the Outer Continental Shelf Lands Act (43 U.S.C. 1337(p)), not later than 60 days before the date established by the Secretary of the Interior for publication of a draft environmental impact statement, the Commandant of the Coast Guard shall specify the reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety with respect to the proposed lease, easement, or right-of-way and each alternative to the proposed lease, easement, or right-of-way considered by the Secretary.

(b)  Inclusion of Necessary Terms and Conditions – In granting a lease, easement, or right-of-way for an offshore wind energy facility in Nantucket Sound under section 8(p) of the Outer Continental Shelf Lands Act (43 U.S.C. 1337(p)), the Secretary shall incorporate in the lease, easement, or right-of-way reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety.

120 Stat. at 540.

### D.  National Historic Preservation Act

Section 106 of the National Historic Preservation Act (NHPA) requires that federal

agencies

having authority to license any undertaking shall, . . . prior to the issuance of any license, . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the

> National Register [of Historic Places] . . . [and] afford the Advisory Council for
> Historic Preservation . . . a reasonable opportunity to comment with regard to
> such undertaking.

16 U.S.C. § 470f.[2]  Section 106 "is a procedural statute designed to ensure that . . . the agency

takes into account any adverse effects on historical places."  *Valley Cmty. Pres. Comm'n v.*

*Mineta*, 231 F. Supp. 2d 23, 32 (D.D.C. 2002) (internal quotations and citation omitted).  Section

106 does not mandate any particular outcome in the agency's decision-making, or that the

agency act in a manner that preserves historic properties.  *See Davis v. Latschar*, 202 F.3d 359,

370 (D.C. Cir. 2000).

The Advisory Council on Historic Preservation ("Advisory Council" or "Council") has

promulgated regulations defining how federal agencies meet their responsibilities under Section

106.  *See* 16 U.S.C. § 470s; 36 C.F.R. Part 800.  The regulations require "consultation among the

[agency] and other parties with an interest in the effects of the undertaking on historic

properties."  36 C.F.R. § 800.1(a); *see id.* § 800.16(f) (defining "consultation").  The consultation

process generally includes three steps: (1) identification of "historic properties" within the area

of potential effect; (2) evaluation of the proposed undertaking's effects on those properties; and

(3) consideration of measures to resolve any adverse effects found to exist.  *See Corridor H Alts.,*

*Inc. v. Slater*, 166 F.3d 368, 370 (D.C. Cir. 1999); 36 C.F.R. §§ 800.4, 800.5, 800.6.  The

regulations envision that the resolution of adverse effects will be documented in a memorandum

of agreement.  *See id.* § 800.6(b).  However, if an agency determines that further consultation

would not be productive, it may also terminate the consultation process.  *See id.* § 800.7.  In so

doing, the agency must provide the consulting parties with written notice of the termination, *id.* §

---

[2] The National Register, maintained by the Keeper of the National Register, 36 C.F.R. § 60.3(f),
is "composed of districts, sites, buildings, structures, and objects significant in American history,
architecture, archeology, engineering, and culture."  16 U.S.C. § 470a(a)(1)(A); *see Sierra Club*
*v. Salazar*, 894 F. Supp. 2d 97, 101–02 (D.D.C. 2012).

800.7(a); the agency head must request comment from the Advisory Council, *id.* §§ 800.7(a)(1),

800.11(g); and, in reaching a final decision on the undertaking, the agency head must consider

the Council's comments and document the agency's decision.  *Id.* § 800.7(c)(4).

## FACTUAL BACKGROUND

## I.      The Cape Wind Energy Project

Cape Wind proposed to construct, operate, and eventually decommission a wind energy

facility in Horseshoe Shoal on the OCS in Nantucket Sound.  CW 65102; CW 119956; CW

119698.[3]  The Cape Wind Energy Project is the first offshore wind energy project to be proposed

in the United States.  CW 120593.  Horseshoe Shoal, the site of the project, is located in federal

waters between Cape Cod, Martha's Vineyard, and Nantucket Island.  CW 65831 (map).  The

project would be located approximately 5.2 miles off the southern coast of Massachusetts, 9

miles northeast of Martha's Vineyard, and 13.8 miles northwest of Nantucket Island.  CW

65103; CW 65831.  The facility is designed to generate an average of 182 megawatts of

electricity and to a maximum electrical output of 468 megawatts.  CW 65102.  This would

provide approximately three-quarters of the electricity needed by Cape Cod and the surrounding

islands.  CW 111956.

The project would include the construction of 130 wind turbine generators, an electrical

services platform, and electrical transmission cables.  CW 65102.  They would be oriented along

a northwest to southeast alignment to take advantage of the prevailing winds.  *Id.*  In Nantucket

Sound, winds are generally from the northwest in the winter and from the southwest in the

---

[3] Each page of BOEM's administrative record is identified by a unique Bates number on the lower right-hand corner, generally beginning with a "CW" prefix.  Bates numbers CW 139788 and below are in the Part I record (ECF No. 98-2).  Most Bates numbers CW 139789 and higher are in the Part II record (ECF No. 105-2).  Additional documents within the latter range are found in three record supplements, as are Bates numbers with the prefixes "CW_PRIV" and "CWDUPE" (ECF Nos. 115-2, 115-3, 145-2, 145-4, 145-6, 187-2, 187-3, 187-4).

summer.  *Id.*  The wind turbines would be spaced 0.39 to 0.62 miles apart and arranged in a grid

pattern covering approximately 25 square miles.  CW 65102-03; CW 65107.  Each wind turbine

would have a maximum overall height of 440 feet.  CW 65103.  The turbine rotors are 364 feet

in diameter and will sweep from an area from 75 to 440 feet high.  *Id.*  The water depths in

Horseshoe Shoal where the turbines would be placed range from 0.5 to 60 feet.  *Id.*  The turbines

would be connected to an electrical services platform by buried underwater cables.  CW 65103-

04; CW 119755 (graphic).  The project would be decommissioned after its operations term

expires in approximately 26 years, at which point the wind turbines and other infrastructure

would be removed from Nantucket Sound.  CW 65126–27; CW 119279.

## II.    BOEM's Review of the Cape Wind Project Under NEPA and OCSLA

In November 2001, Cape Wind sought authorization for the project from the Corps under

Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403.  CW 65037.  The Corps acted as the

lead permitting authority for the project because prior to the enactment of EPAct, there was not a

specific regulatory scheme governing renewable energy leasing on the OCS.  *See id.*  As the

initial lead agency for federal review, the Corps held public meetings between 2002 and 2004 in

Boston, Cambridge, Cape Cod, Nantucket, and Martha's Vineyard.  CW 1817–18; CW 4550;

CW 65037.  The Corps released a Draft Environmental Impact Statement in November 2004.

CW 4522–47.  BOEM was a cooperating agency in the Corps' NEPA review.[4]  CW 4548–49.

With the passage of EPAct in 2005, s*ee* Pub. L. No. 109-58, § 388, 119 Stat. 594, 744,

BOEM became the lead agency for federal review of the proposed Cape Wind Project.  CW

65037.  Due to the savings provision in EPAct § 388(d), 119 Stat. at 747, BOEM did not require

---

[4] During the administrative review process, the Department of the Interior reorganized the office
that is now BOEM.  The authority that now resides with BOEM was previously held by the then-
Minerals Management Service and, later, the Bureau of Ocean Energy Management, Regulation,
and Enforcement.  To avoid confusion, this brief will refer to them collectively as "BOEM."

the re-submission of application materials that Cape Wind had already submitted to the Corps. CW 111956. In addition, because Cape Wind had already obtained approval from the Corps to conduct site assessment activities and had been conducting such activities, including the construction of a meteorological tower, BOEM considered that, for purposes of the new renewable energy regulatory scheme under OCSLA § 8(p), 43 U.S.C. § 1337(p), a SAP (site assessment plan) had already been approved. *See* CW 119270; 111957. BOEM determined, however, that Cape Wind was required to submit additional materials in support of its application for an OCS lease and that it would have to comply with the recently issued regulations governing offshore renewable energy leasing, 30 C.F.R. Part 585. CW 111957. Consistent with the regulations, BOEM required that a COP (constructions and operations plan) be submitted and approved before the Cape Wind Project could proceed. CW 111957-58.

In conjunction with the review process under the new requirements of OCSLA and BOEM's regulations, BOEM determined that a new Draft Environmental Impact Statement ("DEIS") would be needed. CW 65037; CW 111956. BOEM initiated a public scoping period for the NEPA process for the Cape Wind Project in May 2006. CW 65097 (citing 71 Fed. Reg. 30,693 (May 30, 2006)); *see* CW 22045–46. In addition to requesting comments from the public, BOEM considered all of the written comments previously submitted to the Corps, as well as all of the comments made during the four public scoping meetings conducted by the Corps. CW 65097; CW 111956. BOEM issued its DEIS in January 2008. CW 65038; CW 65097; CW 65710. BOEM held a 90-day public comment period on the DEIS and conducted four public meetings regarding the DEIS. CW 65097; CW 65710; CW 111956. After considering the public comments, BOEM issued a Final Environmental Impact Statement ("FEIS") in January 2009. CW 65034; CW 65710; CW 111956; *see also* 74 Fed. Reg. 3635 (Jan. 21, 2009).

The preparation of the FEIS did not end the NEPA review or the approval process under OCSLA regarding the Cape Wind Project. Before issuing a decision on whether to issue a lease to Cape Wind, BOEM prepared an environmental assessment ("2010 EA") to evaluate information analyses that became available after the issuance of the FEIS and to determine whether this information warranted the preparation of a supplemental EIS ("SEIS").  CW 112029-32; *see also* 40 C.F.R. § 1502.9.  The 2010 EA considered additional information and comments regarding potential effects of the project.  CW 112033-52.  It was circulated for a 30-day public comment period on March 8, 2010.  CW 111957; *see also* 75 Fed. Reg. 10,500 (Mar. 8, 2010).  After reviewing all of the information, BOEM concluded that there were no significant new circumstances or information that would change the analysis in the FEIS and therefore concluded that it was not necessary to prepare an SEIS.  CW 111957; *see also, e.g.,* CW 112034 (individual finding in the 2010 EA).  Accordingly, on April 28, 2010, BOEM issued record of decision ("2010 ROD") approving the decision to issue a commercial lease to Cape Wind.  CW 111957.

BOEM issued the lease to Cape Wind on October 6, 2010.  CW 119269.  Consistent with the 2010 ROD and BOEM's regulations, the lease granted Cape Wind the "exclusive right and privilege" to construct and operate a wind energy facility in the project area in Nantucket Sound. CW 119270.  But the Lease did not allow construction to begin immediately and made construction and operation of the project contingent upon BOEM's approval of a COP submitted by Cape Wind.  CW 119270; *see also* 30 C.F.R. §§ 585.620(c), 585.628(f).  The Lease also contains a number of terms, conditions, and stipulations that were required to be met by Cape Wind before the project could be constructed.  CW 119290-342.  Among other things, the Lease

requires Cape Wind to abide by all of the Coast Guard's Terms and Conditions for the project

and any additional requirements imposed by the Coast Guard.  CW 119319.

Cape Wind submitted a COP to BOEM on October 29, 2010 and updated it on February

4, 2011.  CW 119697; CW 120581.  BOEM provided notice to the public regarding the receipt of

the COP on its Internet website.  CW 119705.  On February 22, 2011, BOEM posted a notice on

its website announcing that it would be preparing another environmental assessment ("2011

EA") to determine whether an SEIS was necessary and requesting comments regarding new

information received since the completion of the FEIS.  CW 119705; CW 119790 (notice).  In

the 2011 EA, BOEM considered additional information relating to potential construction and

operation of the project, including comments received after the 2010 EA and 2010 ROD,

comments received regarding the preparation of the 2011 EA, and information and analyses in

the COP.  CW 119753-82.  After considering all of the new information and comments, BOEM

found that there were no new significant impacts associated with the Cape Wind Project that had

not been previously considered in the FEIS and therefore an SEIS was not warranted.  CW

119745-48; *see also* CW 119699.  On April 18, 2011, BOEM issued another record of decision

("2011 ROD") approving Cape Wind's COP and allowing construction of the project to proceed.

CW 119698; CW 119705-06.

## III.    The Coast Guard's Terms and Conditions

In accordance with the requirements of CGMTA § 414, the Coast Guard issued its Terms

and Conditions for the proposed Cape Wind Project to BOEM on August 2, 2007.  USCG 1074.[5]

---

[5] "USCG" refers to the documents in the administrative record, e-mail supplement, and second e-mail supplement submitted by the Coast Guard.  *See* Administrative Record Index (ECF No. 61-1) (USCG 1 – USCG 6053); E-mail Supplement Index (ECF No. 120-2) (USCG 14861- USCG 30001); Second E-mail Supplement Index (ECF No. 143-1) (USCG 6065 – USCG 14818).  "USCG SUPP" refers to the documents in the Coast Guard's document supplement.  *See* Document Supplement Index (ECF No. 120-3) (USCG SUPP 1 – USCG SUPP 2411).

The Terms and Conditions require that the wind farm be designed and constructed so as to minimize impacts to marine navigation. USCG 1078.  The wind farm must have the following design features:  (1) each wind turbine must be marked with private aids to navigation ("ATON"), (2) the turbines must be operated from a control center that can shut down any or all of the turbines within two minutes, and (3) each turbine must be equipped with safety lines, mooring attachments and access ladders to assist mariners in an emergency.  Further, prior to construction, Cape Wind was required to submit a researched analysis to BOEM and the Coast Guard addressing the potential impacts on marine radar and proposing mitigation to address these effects.  USCG 1079.  BOEM and the Coast Guard are to review this analysis and make a determination as to whether the impacts to radar constitute "an acceptable risk to navigation safety" and whether the proposed mitigation measures are sufficient.  *Id.*

In addition, before construction can begin, the Terms and Conditions require Cape Wind to submit a plan for the control center, an ice-breaking plan, and a plan for construction of the turbines and appropriate notice to mariners.  USCG 1080-81.  Each of these plans must be approved by BOEM in consultation with the Coast Guard.  *Id.*  Cape Wind also must submit monthly and quarterly status reports to BOEM and the Coast Guard and report any complaints from mariners regarding the project.  USCG 1081.  Further, Cape Wind is required to attend quarterly public meetings of the Southeastern Massachusetts Port Safety Forum ("SE Mass. Port Safety Forum") and shall provide briefings on the status of construction and any issues encountered regarding navigation safety.  USCG 1082.  The Coast Guard may regularly review and inspect the project and amend the Terms and Conditions on the basis of new information.  USCG 1082.

## IV.    The NHPA Section 106 Process

Prior to BOEM becoming the lead agency for the Cape Wind Project, the U.S. Army

Corps of Engineers began reviewing potential impacts on historic properties.  *See* CW 112018; CW 2454; CW 253133–44 (chronology through 2010).  The Corps made a finding of adverse effect in July 2004 (*see* CW 253136), and drafted a programmatic agreement to attempt to resolve any adverse effects.  *See* CW 2520–33; CW 5126–27.  After EPAct, BOEM commenced its Section 106 process in late 2005.  All told, BOEM conducted more than twenty-one meetings with the Massachusetts State Historic Preservation Officer, the Advisory Council, and other consulting parties.  CW 112019–20.  Using information developed by the Corps, input received from the consulting parties, and its own studies, BOEM issued a Section 106 Finding of Adverse Effect in December 2008.  CW 29999–30045 (excluding appendices).

    After the Finding of Adverse Effect, and in response to recommendations from the Advisory Council, BOEM continued efforts to identify historic properties.  Most notably, after BOEM requested a formal determination from the Keeper of the National Register of Historic Places, Nantucket Sound itself was determined to be a historic property eligible for listing on the National Register.  CW 118638–45.  BOEM issued a Revised Section 106 Finding of Adverse Effect in January 2010.  *See* CW 274576–629.  Thereafter, BOEM continued already-ongoing consultation to resolve adverse effects.  In an unprecedented effort, the Secretary of the Interior personally convened a consultation meeting in Washington, D.C, in mid-January 2010.  *See* CW 112054–55.  The Secretary continued those efforts over the following months.  *See* CW 112020–22.  Some of the consulting parties, however, maintained that the only satisfactory mitigation would be to reject the proposed project.  *See* CW 256216, CW 256219.  The Secretary therefore concluded that any further consultation under Section 106 would not be productive and, following the procedures identified in regulation (36 C.F.R. § 800.7(a), (c)), terminated the consultation and requested Advisory Council comment.  *See* CW 256212–24.  The Secretary

took the Council's comments into account in reaching a decision on the Cape Wind lease.  *See* CW 112696–702; CW 109328–41.  As a result of the Section 106 process, BOEM included in the ROD certain mitigation measures aimed at avoiding or minimizing impacts to historic and cultural resources, including a requirement that the turbines be designed and configured to minimize the effects of the visual setting of historic properties.  *See* CW 111994–95; CW 109333.

## STANDARD OF REVIEW

### I.  Administrative Procedure Act

The substantive statutes under which Plaintiffs have brought suit contain no private right of action, and, consequently, must be brought pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*  *See Karst Env't. Educ. and Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).  Under the APA, agency decisions may only be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375-76, 109 S. Ct. 1851, 1860 (1989).  Review under the "arbitrary and capricious" standard is "highly deferential . . . [and] presumes the agency's action to be valid."  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted).  The reviewing court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S. Ct. 814, 824 (1971).  The plaintiff holds the burden to demonstrate that an agency has violated the APA.  *Banner Health v. Sebelius*, 715 F. Supp. 2d 142, 153 (D.D.C. 2010).  A court's review is limited to the administrative record before the

agency at the time of its decision.  *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549,

98 S. Ct. 1197, 1214 (1978); *Overton Park*, 401 U.S. at 419-20, 91 S. Ct. at 25.

## II.     Summary Judgment

Summary judgment is appropriate if there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In APA actions,

the Court's review is based on the agency's administrative record.  *See Lujan v. Nat'l Wildlife*

*Fed'n*, 497 U.S. 871, 883-84, 110 S. Ct. 3177, 3186 (1990).  Thus, there are no material facts

essential to the Court's resolution of the litigation, and the Court need not, indeed, may not,

"find" underlying facts.  *See id.*; *Lun Kwai Tsui v. Attorney General*, 445 F. Supp. 832, 835

(D.D.C. 1978).  Rather, the only issues presented are issues of law.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Nat'l Ass'n of Home Builders v. U.S. Army Corps*

*of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("'[C]laims that an agency's action is arbitrary

and capricious or contrary to law present purely legal issues.'") (quoting *Atl. States Legal Found.*

*v. E.P.A.*, 325 F.3d 281, 284 (D.C. Cir. 2003)).

## ARGUMENT

## I.     The Coast Guard's Actions Are Not Reviewable Under the APA and, Even Assuming That They Are, the Coast Guard Fully Complied with the CGMTA

As a threshold matter, the Coast Guard's issuance of the Terms and Conditions is not a

final agency action reviewable under the APA, and therefore Plaintiffs' CGMTA claims must be

dismissed for lack of a valid cause of action.  Even assuming that the Coast Guard's actions are

reviewable, they should be upheld because the Coast Guard has met its obligations to issue terms

and conditions "necessary . . . for navigational safety."  CGMTA § 414(a), 120 Stat. at 540.

### A.     The Terms and Conditions Are Not Final Agency Action and Therefore Are Not Reviewable Under the APA

Plaintiffs' claims challenging the Coast Guard's issuance of the Terms and Conditions

fail to challenge final agency action and therefore fail to state a legally cognizable claim.

Plaintiffs' claims may only be brought pursuant to the limited cause of action provided in the

judicial review provisions of the APA, 5 U.S.C. §§ 701-06.  *See Trudeau v. FTC*, 456 F.3d 178,

185 (D.C. Cir. 2006).  The APA authorizes suit by "[a] person suffering legal wrong because of

agency action, or adversely affected or aggrieved by agency action within the meaning of the

relevant statute."  5 U.S.C. § 702.  "Agency action" is defined in the APA to include "the whole

or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

failure to act."  5 U.S.C. § 551(13).  Further, the agency action complained of must be a "final

agency action."  5 U.S.C. § 704; *Nat'l Ass'n of Homebuilders v. U.S. Army Corps of Eng'rs*, 417

F.3d 1272, 1279 (D.C. Cir. 2005).  Final agency actions are those that "mark the consummation

of the agency's decisionmaking process" and "by which rights or obligations have been

determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178,

117 S. Ct. 1154, 1168 (1997) (internal quotation marks and citations omitted).

Here, the Coast Guard's actions do not constitute final agency action under the APA.

The CGMTA did not authorize the Coast Guard to issue a permit or other approval for the

project – it only authorized the Coast Guard to submit Terms and Conditions to BOEM for

incorporation into a lease.  CGMTA § 414(a)-(b).  Because the Coast Guard's Terms and

Conditions were transmitted only to BOEM, they had no immediate effect.  The Terms and

Conditions did not "impose[] an obligation, den[y] a right, or fix[] some legal relationship."

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C.

Cir. 2003) (citation omitted).  Nor did the Terms and Conditions have any "direct and immediate

. . . effect on the day-to-day business" of Cape Wind or anyone else, including Plaintiffs.  *Nat'l*

*Ass'n of Homebuilders*, 417 F.3d at 1278.  Further, the Terms and Conditions would only have

legal effect "on the contingency of future administrative action." *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 22 (D.C. Cir. 2006) (citation omitted).  The Terms and Conditions only had any legal effect when BOEM made the decision to issue a lease to Cape Wind and incorporated the Terms and Conditions into the Lease.  CW 119319-22.  Accordingly, the Terms and Conditions are not, themselves, final agency action.

Further, as indicated in the legislative history, CGMTA § 414 is modeled after the procedure for the Federal Energy Regulatory Commission's ("FERC") issuance of licenses for hydroelectric power plants under the Federal Power Act ("FPA").  *See* 152 Cong. Rec. S 6439, 6440 (June 22, 2006) (statement of Mr. Stevens).  Similar to CGMTA § 414, the FPA required FERC to include conditions imposed by other agencies, and the Supreme Court found that FERC had no discretion to change those conditions.  *See Escondido Mutual Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772-79, 104 S. Ct. 2105, 2110-13 (1984).  Section 18 of the FPA provides that FERC "shall require construction, maintenance, and operation by a licensee at its own expense . . . such fishways as may be prescribed by the Secretary of Interior or the Secretary of Commerce."  16 U.S.C. § 811.  In a suit brought by a hydroelectric power operator, the D.C. Circuit found that FERC, and not the Department of the Interior, was "the appropriate named respondent."  *Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659, 662 (D.C. Cir. 1996).

Similarly, in a challenge to the enforcement of exposure standards for miners, the court found that the National Institute of Occupational Safety and Health ("NIOSH") was not a proper party even though it had provided information that was used by the Mine Safety and Health Administration in its decision.  *See Nat'l Mining Ass'n v. Mine Safety and Health Admin.*, 599 F.3d 662, 672 (D.C. Cir. 2010).  As the court explained, "Statutes such as the Mine Act and Federal Power Act authorizing rulemaking contributions by other agencies do not thereby make

the other agencies parties in a subsequent judicial challenge." *Id.* (citing *Bangor Hydro-Elec.*, 78

F.3d at 662); *see also Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468-69 (D.C. Cir.

1998) (discussing provisions of the Overflights Act that require the FAA to adopt

recommendations from the National Park Service regarding impacts to the affected park).

Just as with the FPA and other statutory schemes that require one agency to accept the

conditions of another, the Coast Guard has no role in the final decision and it is not a proper

party under D.C. Circuit precedent.  The parallel to the provisions of the FPA was made explicit

in the legislative history.  Accordingly, the claims against the Coast Guard must be dismissed.

> **B.      The Coast Guard Issued Reasonable Terms and Conditions to
>           Ensure Marine Navigation Safety**

Assuming that the Coast Guard has taken a final agency action, it has fully complied with

the requirements of CGMTA § 414 by issuing Terms and Conditions that, in the determination of

the Commandant, provide for navigational safety and by evaluating and addressing marine

navigational safety issues relating to the project.

> **1.      The Coast Guard's Development of the Terms and Conditions**

In developing the Terms and Conditions, the Coast Guard considered a number of

factors, including:  the Coast Guard's experience and familiarity with the project, the Revised

Navigational Risk Assessment prepared for Cape Wind by ESS (USCG 907), the Coast Guard's

draft Navigation and Vessel Inspection Circular ("NVIC") 02-07, *Guidance on the Coast*

*Guard's Roles and Responsibilities for Offshore Renewable Energy Installations (OREI)* (USCG

1086),  and UK guidance regarding wind farms (USCG 409).  USCG 23942.  These factors are

discussed below.

### a.        Revised Navigational Risk Assessment

In November 2006, ESS completed its Revised Navigational Risk Assessment regarding the Cape Wind Project.  USCG 907.  The initial assessment was prepared at the request of the Corps after receiving input from the Coast Guard regarding the analyses of navigational risk that should be contained in the Corps DEIS.  USCG 916.  The revised assessment considered comments on the initial version submitted by a consulting firm hired by the Alliance.  USCG 520; USCG 912; *see also* USCG 323.  It also incorporated updated information and design changes that had been made since the initial assessment in 2003.  USCG 916-17.  In preparing the assessment, ESS conducted a survey of the types of vessels that operate in Nantucket Sound, their typical operating routes, seasonal traffic variations, and special events occurring in Nantucket Sound.  USCG 920-29.  The revised assessment addressed a number of subjects relating to navigation safety, including vessel movement, USCG 929-31, risk of collisions and potential impacts of collisions with turbines, USCG 935-44, search and rescue operations, USCG 949-54, and impacts on marine radar.  USCG 956-60; *see also* USCG 433 (study by the United Kingdom's ("UK") Maritime and Coastguard Agency ("MCA") and QinetiQ of radar impacts at the North Hoyle Wind Farm); USCG 1121 (study by MCA and Marico Marine of radar impacts at the Kentish Flats Wind Farm).

In the Revised Navigational Risk Assessment, Cape Wind committed to a number of mitigation measures designed to avoid or minimize the effects identified by ESS, which include the following design and operational features:  (1) turbines will be able to withstand up to six-inch thick ice floes, (2) manual shutdown of turbines in icing conditions, (3) Seabed Scour Control Mats or rock armor around the turbines to limit changes to the sea floor, (4) Aids to Navigation ("ATON"), such as lights and signals, within the wind farm to assist mariners, (5)

unique alphanumeric markers on each turbine, (6) immediate shutdown of turbines upon request from the Coast Guard, (7) Cape Wind vessels will assist mariners in distress, (8) helipad on the electrical services platform for use by the Coast Guard, and (8) developing information to be provided to mariners regarding the effects of the turbines on marine radar.  USCG 962; *see also* USCG 947-48.

### b.      UK Guidance Regarding Renewable Energy Installations

Based on its experiences with wind farms in the UK, the MCA issued guidance regarding offshore renewable energy installations ("OREI") in August 2004.  USCG 409.  This guidance document, Marine Guidance Note ("MGN") 275, contained a number of recommendations regarding the siting, design, and operation of renewable energy facilities, including wind farms. *Id.*  MGN 275 recommended, among other things, conducting a traffic survey to gather information on the types of vessels using the area and their customary transit routes, determining whether the structures could pose a danger to vessels, assessing how navigation within or near the site would be affected, examining how communications systems would be affected, and determining how the structures would be marked and lighted.  USCG 413-16.  It also recommended applying safety and mitigation measures depending on the types and level of risk presented at the site.  USCG 417.

MGN 275, Annex 4, contains specific recommendations regarding the design and operation of a wind farm.  USCG 418.  Some of the key design features identified are:  marking the turbines with clearly visible identifiers, equipping turbines with controls that allow them to be operated from a control center, establishing procedures for the safe shutdown of the turbines, allowing the control center to fix and maintain the positions of the rotors, using nacelle hatches that can be opened from the outside to enable rescuers to gain access, and including access

ladders to be used in an emergency.  *Id.*  In addition, the guidance calls for a control center that is manned 24 hours a day, a chart with the GPS coordinates of the turbines, and the capability to shutdown the turbines immediately upon the request of the Maritime Rescue Co-ordination Centre.  USCG 416-17.

The MCA issued an updated guidance document, MGN 371, in August 2008.  USCG 1777.  MGN 371 retains most of the previous guidance and provides additional recommendations, including a template for assessing the distances between wind farms and shipping routes, and recommended procedures for helicopter rescues.  USCG 1786-90, 1793.

### c.      The Coast Guard's NVIC 02-07

The Coast Guard's NVIC 02-07 was developed contemporaneously with the Terms and Conditions for the Cape Wind Project and was issued in March 2007.  USCG 1086.  It provides guidance on the criteria that the Coast Guard will consider when analyzing an application for an OREI.  USCG 1087.  Based on the guidance, an applicant should be prepared to submit a detailed analysis of the potential risks of the project, including navigational and safety risks and the risks to Coast Guard missions.  USCG 1091.  The analysis should address the risks of collisions and the effects on communication systems and radar.  USCG 1098-99.  The Coast Guard's guidance also contains recommendations regarding the marking of individual turbines and incorporates many of the design and operational recommendations in the UK guidance, e.g., a central control center, nacelle hatches that can be opened from the outside, access ladders, and the capability to shut down the turbines upon the request of the Coast Guard.  USCG 1100-02.

### d.      The Coast Guard's Terms and Conditions Address the Navigational Safety Issues Relating to the Project

The Coast Guard's Terms and Conditions, issued on August 2, 2007, address safety concerns relating to the project, including potential vessel traffic, search and rescue operations,

and communications.  The Terms and Conditions incorporate significant elements of the UK

guidance available at the time, MGN 275, including the placement of unique identifiers and

ATONs (such as lighting), control mechanisms to enable shutdown of the turbines, and access

ladders for use in emergencies.  *Compare* USCG 418 *with* USCG 1078.  Similar design

requirements are contained in the Coast Guard's NVIC 02-07.  USCG 1100-02.  The Coast

Guard also acted in accordance with the NVIC 02-07 by requiring Cape Wind to conduct an

analysis of the navigational safety risks associated with the project, USCG 1091, which Cape

Wind did with the Revised Navigational Risk Assessment.  USCG 907.

The Coast Guard also ensured navigation safety by requiring the submission of certain

plans that must be approved by BOEM, in consultation with the Coast Guard, before the project

can proceed.  Cape Wind must submit a plan for marking the turbines with ATONs and unique

identifiers, as well as a plan for the control center, a plan for breaking ice within the wind farm

as necessary for navigation safety, and a plan for the construction of the turbines, including

planned mitigation and a notice to mariners regarding the construction operations.  USCG 1078-

81.  Perhaps most significant, in light of the concerns regarding the potential impacts on marine

radar, the Coast Guard required Cape Wind to submit a research analysis to BOEM and the

Coast Guard addressing the potential impacts on marine radar and proposing mitigation to

address these effects.  USCG 1079.  The Terms and Conditions gave BOEM and the Coast

Guard the authority to review Cape Wind's analysis of the impacts on communications and

radar, determine whether the project could be operated safely as proposed by Cape Wind, and

determine whether the mitigation proposed by Cape Wind allows for acceptable risk to

navigation.  USCG 1079.

Through the Terms and Conditions, the Coast Guard also retained a significant degree of control over the project to ensure navigational safety.  Cape Wind must submit monthly and quarterly status reports to BOEM and the Coast Guard and report any complaints from mariners regarding the project.  USCG 1081.  Any change to any of the required plans or the project requires the approval of BOEM and the Coast Guard.  USCG 1082.  Further, the Coast Guard may regularly review and inspect the project and amend the Terms and Conditions on the basis of new information.  *Id.*  The Coast Guard may also reevaluate any of the analyses submitted by Cape Wind at any time and require changes to the Terms and Conditions based on its reevaluation.  *Id.*

**2.  After Issuing the Terms and Conditions, the Coast Guard Continued to Analyze Issues Relating to Marine Navigation Safety**

As required by CGMTA § 414(a), the Coast Guard submitted the Terms and Conditions to BOEM before the completion of the DEIS, and they were circulated for public comment, along with the DEIS, in January 2008.  CW 25024; CW 25413; *see also* CW 65097; CW 65710. The Coast Guard continued to be involved in the review of the project both to ensure compliance with the CGMTA and in its role as a cooperating agency in the NEPA process.

**a.  The Coast Guard Conducted Further Review of Radar Impacts and Ordered an Independent Study**

In its comments on the DEIS in March 2008, the Alliance submitted a report by Dr. Brookner regarding the impacts of the project on marine radar.  USCG 1595; *see also* CW 74869.  In his report, Dr. Brookner asserted that the wind farm would create a heightened risk of vessel accidents in Nantucket Sound.  USCG 1604.  As required by the Terms and Conditions, Cape Wind commissioned Marico Marine (the same company that conducted a radar study at the Kentish Flats Wind Farm) to conduct a study of radar impacts for the proposed project, and that study was completed in August 2008.  USCG 1685.  The analysis in the Marico Marine Study

was based largely on the experiences in the UK, and the study concluded that mariners are aware of the impacts of turbines on marine radar and can navigate safely in and around wind farms. USCG 1767.

Since the two analyses disagreed and neither specifically analyzed the impacts of proposed project, the Coast Guard commissioned the Technology Services Corporation ("TSC") to conduct an additional study of radar impacts.  USCG 2285.  TSC is a 40-year old company providing engineering services and specialized hardware to the Federal Aviation Administration ("FAA"), U.S. Department of Defense, and other government agencies.  USCG 2286.  It provides shipboard radar support for the Aegis cruiser and destroyer fleet.  *Id.*  The study was funded by the Coast Guard so as to avoid any potential bias or conflict of interest.  *Id.*

On October 7, 2008, representatives of the Coast Guard participated in a workshop regarding the potential impacts of the Cape Wind Project on marine navigation and radar at a meeting of the SE Mass. Port Safety and Security Forum.  *See* USCG 1846-47; USCG 1878-83; USCG 2123-32 (Doc Nos. 92-96).  At the meeting, Dr. Eli Brookner made a presentation regarding his views on the potential impacts of the project on marine radar.  *See* USCG 1859.  In addition, the Coast Guard announced its intention to commission a further research study to evaluate the potential impacts on marine radar (which became the TSC Study).  USCG 1916.

In early December 2008, the Coast Guard participated in a teleconference with interested stakeholders informing them of the preliminary findings of the TSC Study and the Coast Guard's assessment of the impacts on marine radar.  *See* USCG 2123 (Doc. No. 122); CW 358496 (transcript of December 5, 2008 teleconference).  TSC submitted its final study to the Coast Guard in mid-December.  *See* USCG 2284; CW 75941.  On December 18, 2008, at another meeting of the SE Mass. Port and Security Forum, the Coast Guard conducted a workshop, in

which it presented the findings of the TSC study.  *See* USCG 2331-42 (PowerPoint

presentation); *see also* USCG 2314-26 (agenda and script for the meeting).

**b.     The Coast Guard Prepared Analyses of Impacts to
Navigational Safety and Submitted them to BOEM**

Prior to the completion of the TSC Study, on November 14, 2008, the Coast Guard

submitted a memorandum to BOEM responding to comments submitted on the DEIS and

providing the Coast Guard's initial analysis of the impacts of the project on marine navigational

safety.  USCG 1988.  The Coast Guard found that the project would have moderate impact on

navigation safety and that mitigation could reduce the risks to navigation safety to an acceptable

level.  *Id.*  The Coast Guard also found that the impacts to Coast Guard missions would be

negligible.  *Id.*; *see also* USCG 2010-13.

The Coast Guard found, among other things, that the wind farm would be unlikely to

result in the disruption of traffic patterns or create choke points.  USCG 2001-02.  It also found

that fishing vessels should be able to navigate safely through the array given the spacing between

the turbines and the natural restrictions on commercial fishing in the shallow shoals.  USCG

2005.  The Coast Guard noted that the spacing between the towers is greater than the distances

between other natural and man-made obstacles in the sound, which mariners are able to avoid.

USCG 2007.  Further, the turbines will be well marked and lighted, making them easier to avoid.

*Id.*  The Coast Guard noted that radar is an issue that warranted further study and that it would

await the findings of the TSC Study later in the year.  USCG 2004.

Following the completion of the TSC Study in December 2008, the Coast Guard

submitted a further analysis to BOEM in its January 13, 2009 memorandum to address the

impacts of the project on marine radar.  USCG 5969.[6]  In evaluating the impacts of the project on

--------

[6] The Coast Guard's analysis was submitted to BOEM at the end of December 2008 and included

marine radar, the Coast Guard considered the TSC Study, USCG 2284, the Marico Marine Study regarding the Cape Wind Project, USCG 1685, and Dr. Brookner's Report regarding impacts on marine radar, USCG 1595, among other documents.  USCG 5977-78.  All of the studies found that a combination of beam width expansion, side lobes, and false echoes make radar more difficult to interpret.  USCG 5978-79; *see also* USCG 1754-55, 1767; USCG 2310-11.[7]  But these impacts are greater for targets that are farther away and less for targets that are close to the radar.  USCG 5979.  In addition, false echoes are transient and tend to disappear or move as the vessel or the target vessel moves.  USCG 2310; USCG 5979.

The TSC Study made a number of additional findings that were significant to the Coast Guard's analysis.  TSC found that the wind farm would not affect the ability of vessels either inside or outside of the wind farm to detect another vessel outside the wind farm.  USCG 5979. But it would affect the ability of a vessel either outside or inside of the wind farm to detect another vessel within the wind farm.  USCG 5979-80.  In both of those instances, however, an operator could, using sufficient care, distinguish target vessels on the radar display.  *Id.* Significantly, the closer a vessel gets to a turbine, the clearer the radar display becomes because the nacelle (which causes a significant portion of the reflection) is too high to disturb radar signal.  USCG 5980.  The Coast Guard concluded that vessels would be able to safely navigate within and around the wind farm and that the impacts of the proposed project on marine radar would be moderate.  USCG 5980.

Following its review of the public comments submitted regarding the FEIS, the Coast

---

in the FEIS.  CW 63795.
[7] Beam width expansion and side lobes cause the target to be displayed horizontally on the radar display.  USCG 2287; USCG 5978.  False echoes are produced when a radar beam bounces off one target and then to another target (or targets) and then back to the antenna.  USCG 2288; USCG 5979.

Guard submitted a final communication regarding the project to BOEM on June 24, 2009.

USCG 6036.  The Coast Guard did not change any of the Terms and Conditions and did not alter

its overall assessment of the impacts of the project.  USCG 6041.  The Coast Guard's issuance of

the Terms and Conditions, as well as its subsequent analysis of navigational safety issues, fully

satisfied the Coast Guard's obligations under CGMTA § 414.

> **C.**    **Plaintiffs' Alleged Violations of the CGMTA Are Without Merit**

Plaintiffs argue that the Coast Guard violated CGMTA § 414 for four main reasons:  (1)

the Terms and Conditions do not contain any specific requirements and contain only vague

promises of future actions; (2) the Coast Guard misinterpreted the statute by impermissibly

shifting the burden of navigational safety to users of Nantucket Sound; (3) the Coast Guard was

required to issue Terms and Conditions for any alternatives to the project; and (4) the Coast

Guard's evaluation of safety impacts was arbitrary and capricious.  *See* Plaintiffs' Memorandum

in Support of Motion for Summary Judgment (corrected version) ("Plf. Mem.") at 16-44 (ECF

No. 286-1).  These arguments are without merit.

> **1.**    **The Coast Guard Imposed Specific Requirements on Cape Wind to Provide for Navigational Safety**

Plaintiffs argue that the Coast Guard's Terms and Conditions are insufficient because

they consist of "little more than vague generalities and a promise to ensure navigational safety

later."  Plf. Mem. at 18.  This argument simply mischaracterizes the Terms and Conditions that

were actually issued.  As discussed in section I.B.1.d., *supra*, the Terms and Conditions contain

specific requirements regarding the design and operation of the project.  USCG 1078-81.  The

fact that the Coast Guard required the submission of certain plans for its approval does not show

any inadequacy in the Terms and Conditions.  *See* Plf. Mem. at 19.  Quite the opposite, those

conditions show that the Coast Guard took its obligation to provide for navigational safety

seriously and that it would do so by continuing to be involved in the review of the project after fulfilling its statutory duty to issue the Terms and Conditions.

Further, the Terms and Conditions are not promissory. They were incorporated in the Lease and therefore are enforceable. CW 119319. This is precisely the procedure required by the statute, which directed the Secretary of Interior to "incorporate in the lease, easement, or right-of-way reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety." CGMTA § 414(b). If Cape Wind does not comply with the Terms and Conditions in the Lease, the Lease may be cancelled or suspended or other penalties may be imposed. CW 119271-72. Accordingly, Plaintiffs' assertion that the Terms and Conditions are only vague and promissory is baseless.

Plaintiffs assert that the Terms and Conditions are inadequate because they are not consistent with the Coast Guard's NVIC 02-07 regarding the Coast Guard's role in reviewing offshore renewable energy projects. *See* Plf. Mem. at 19-20. As an initial matter, the NVIC 02-07 was developed contemporaneously with the Terms and Conditions, but it relates to the Coast Guard's consideration of renewable energy projects generally and not to the Coast Guard's obligations under CGMTA § 414. *See* USCG 1087; *see also* USCG 11034. Further, an internal guidance document is not enforceable against the Coast Guard. *See Wilderness Soc'y v. Norton*, 434 F.3d 584, 596-97 (D.C. Cir. 2006). In any event, the Terms and Conditions are entirely consistent with the guidance in NVIC 02-07. For example, the guidance calls for the applicant to conduct a detailed navigational risk assessment containing analyses of the types of vessels in the area, waterway characteristics, potential for collisions, and potential effects on Coast Guard missions. USCG 1098-1110. Cape Wind provided that analysis in the Revised Navigational Risk Assessment. USCG 907; *see* section I.B.1.a., *supra*. The Coast Guard also submitted

mitigation, i.e., the Terms and Conditions, for consideration during the NEPA process.  *See* USCG 1074.  Thus, the NVIC 02-07 appropriately informed the Coast Guard's Terms and Conditions.  *See* USCG 1993 ("The Coast Guard is satisfied that the Cape Wind proposal meets the intent of NVIC 02-07.")

Plaintiffs are simply incorrect that the Terms and Conditions did not address the potential impacts of radar.  *See* Plf. Mem. at 20.  Given that prior studies had shown potential impacts on radar and the concern expressed regarding this issue, the Terms and Conditions appropriately required further study of this issue before the project could be built.  USCG 1079.  Specifically, the Coast Guard required that Cape Wind submit a "researched analysis" addressing whether the turbines "as designed and their location would interfere in any way with marine communications or navigation systems or produce radar reflections, blind spots, shadow areas, or other radar effects that would have a significant adverse impact on the safety of navigation."  *Id.*  The Coast Guard reserved full discretion to review the analysis submitted by Cape Wind and determine whether the analysis and recommended mitigation would ensure a "level of navigation safety acceptable" to the Coast Guard.  *Id.*  Plaintiffs' assertions that the Coast Guard's analysis of the radar issues was insufficient, *see* Plf. Mem. at 20-21, are addressed in section I.C.4.c., *infra*.

In an attempt to discredit the Terms and Conditions, Plaintiffs cite internal Department of Interior e-mails regarding the draft Lease terms.  *See* Plf. Mem. at 21 (citing CW 257721-26).  The Terms and Conditions were mentioned twice.  The first instance was a suggestion to incorporate the Terms and Conditions by reference instead of setting them forth in the Lease.  CW 257721.  The second was a suggestion to modify the terms of the lease to make it clear that the obligations were owed to BOEM and not to third parties, such as the Coast Guard.  CW 257724.  BOEM adopted both suggestions.  As to the latter, the Lease states that Cape Wind

must comply with any "superseding post-lease requirements" issued by the Coast Guard, CW

119319, rather than stating that the "Coast Guard reserves the right to amend these Terms and

Conditions . . . ." USCG 1082.  Plaintiffs' suggestion, *see* Plf. Mem. at 22, that this minor

wording change, obviously meant to improve clarity, somehow led to a violation is entirely

unfounded.  Moreover, any wording changes in the Lease had no effect on the binding nature of

the Terms and Conditions because the Lease did expressly incorporate all of the Terms and

Conditions in their entirety:  "The Lessee shall implement all mitigation measures identified by

the USCG [in the Terms and Conditions], including the provisions below." CW 119319.

Finally, Plaintiffs point to an internal Coast Guard e-mail relaying questions from Rear

Admiral Pekoske, the official who signed the Terms and Conditions.  USCG 17353.  The fact

that the official signatory asked some questions (which were ultimately resolved) does not

demonstrate that the Terms and Conditions were inadequate.  *See Nat'l Fisheries Inst., Inc. v.

Mosbacher*, 732 F. Supp. 210, 227 (D.D.C. 1990) ("That the administrative record . . . reflects a

certain amount of disagreement among the countless individuals involved in developing or

commenting on [the agency's planned action] is inevitable and indicates that the debate was as

open and vigorous as Congress intended."); *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d

174, 198-99 (4th Cir. 2005) (An agency's  decision should be assessed based on its objective

validity and not on "the alleged subjective intent of agency personnel divined through selective

quotation of e-mail trails.").  Rather, it shows that the Coast Guard gave careful consideration to

the Terms and Conditions before issuing them.

In an attempt to show that the Terms and Conditions are not sufficiently specific,

Plaintiffs also point to the November 14, 2008 memorandum.  Plf. Mem. at 25 (citing CW

66393).  In that document, the Coast Guard explained that it did not require the submission of the

plans for lighting and other safety factors until prior to construction because the technologies affecting such plans can change.  CW 66393.  Further, the Coast Guard explained that it "routinely collaborates with developers, shipbuilders, transportation system users, and others . . . throughout the design and construction processes to ensure the best design, construction, and operation of aids to navigation, operations centers, construction/maintenance schedules . . . ."  *Id.*  This was an entirely reasonable explanation and hardly demonstrates that the Coast Guard ignored a decisionmaking procedure mandated by Congress.  *See* Plf. Mem. at 25 (citing *NRDC v. Herrington*, 768 F.2d 1355, 1396 (D.C. Cir. 1985)).[8]  Accordingly, Plaintiffs are simply mistaken that the Coast Guard did not follow the direction in CGMTA § 414 to issue Terms and Conditions to provide for navigational safety.[9]

### 2.   The Coast Guard Appropriately Interpreted the Statute and Did Not Shift the Burden of Navigational Safety to Users of Nantucket Sound

Plaintiffs argue that the Coast Guard impermissibly interpreted the statute by shifting the burden of navigational safety to the public.  *See* Plf. Mem. at 26.  The Coast Guard did no such thing.  As discussed above, the Coast Guard issued a number of substantive Terms and Conditions that are applicable to Cape Wind, not the public.  Plaintiffs' related argument is that, in determining whether the existing Terms and Conditions were sufficient to ensure navigational safety, the Coast Guard was prohibited from considering the requirements of existing regulations governing navigational safety and potential new rules or voluntary standards to further ensure navigational safety in and around the wind farm.  *See* Plf. Mem. at 26, 28.  To the contrary,

---

[8] The Coast Guard responded to letters from Congress, *see* Plf. Mem. at 25 n.17, in a number of letters.  *See*, *e.g.*, CW 48337; CW 110513; USCG SUPP 957; USCG SUPP 966; USCG SUPP 1151.

[9] Plaintiffs' arguments regarding the sufficiency of mitigation to address radar impacts, *see* Plf. Mem. at 25 (citing CW 75984) are addressed in section I.C.4.c., *infra*.

CGMTA § 414 does not limit the Coast Guard's consideration of such factors, and its interpretation of the law was reasonable.

The Coast Guard was required to "specify the reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety . . . ." CGMTA § 414(a). The statute contained no restrictions on what the Coast Guard could consider in determining the appropriate Terms and Conditions for the project. When Congress has not specifically addressed an issue, the agency's interpretation of the statutory terms should be upheld as long as it is "based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-45, 104 S. Ct. 2778, 2781-82 (1984); *see also United States v. Mead Corps*, 533 U.S. 218, 227, 121 S. Ct. 2164, 2171 (2001). Given the ambiguity in the statute, the Coast Guard's interpretation that it was permitted to consider existing rules and potential new rules and voluntary standards governing use of the waterways in developing the Terms and Conditions is entitled to substantial deference. *See Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . .").

Deference to the Coast Guard's interpretation is especially appropriate here because of the Coast Guard's expertise in marine navigation safety and because the statute gives the Coast Guard unbounded authority to make the determination regarding navigation safety. *See Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003) (affording deference to the Coast Guard's interpretation of the COLREGS[10] based on "the Coast Guard's expertise . . . in maritime safety"); *Wilmina Shipping AS v. U.S. Dept' of Homeland Sec.*, -- F. Supp. 2d -- , Civ. No. 11-2184, 2013 WL 1225382, at *11 (D.D.C. Mar. 27, 2013) (affording deference to the

---

[10] The Convention on the International Regulations for Prevention of Collisions at Sea, 1972 ("COLREGS"), as ratified by Congress. *See* 33 U.S.C. § 1601 *et seq.*

Coast Guard's interpretation of the Ports and Waterways Safety Act ("PWSA") because "Congress left it to the Coast Guard to use its expertise as the regulatory agency entrusted with the administration of the statute" to make the determination at issue).

The Coast Guard's interpretation was a permissible one.  Given that the COLREGS are existing regulations applicable to users of Nantucket Sound, it was entirely appropriate for the Coast Guard to consider their applicability to the project.  *See* Plf. Mem. at 28; CW 75985.  In addition, the Coast Guard's consideration of other mitigation that could be developed in the future, such as specially marked channels, recommended vessel routes, or the creation of regulated navigation areas, was entirely reasonable.  CW 75985.  Such mitigation measures are consistent with the NVIC 02-07 and UK guidance.  *See* USCG 417; USCG 1111; USCG 1790. Further, as noted in the Terms and Conditions, the Coast Guard has the authority under multiple statutes to "manage risk on the nation's waterways, including all of the waters within Nantucket Sound."  USCG 1076; *see also* PWSA, 33 U.S.C. § 1221 *et seq.*; Marine Transportation Security Act ("MTSA"), Pub. L. 107-295, 116 Stat. 2064 (2002).  There is no indication in CGMTA § 414 that the Coast Guard was to abandon or ignore its obligations under these other statutes. Accordingly, the Coast Guard's interpretation should be upheld.

Finally, Plaintiffs cite internal e-mails in an attempt to show that the Coast Guard's decision regarding the buffer zone was based on improper considerations.  *See* Plf. Mem. at 27. That determination is discussed in section I.C.4.d., *infra*, and should be judged in accordance with the Coast Guard's stated rationale and not on the "subjective motivation of agency decisionmakers."  *Styrene Info. and Research Ctr., Inc. v. Sebelius*, -- F. Supp. 2d -- , No. 11-1079 (RBW), 2013 WL 1984235, at *12 (D.D.C. May 15, 2013) (Walton J.) (quoting *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279 (D.C. Cir. 1998).  It should not be evaluated based

on the Coast Guard's "alleged subjective intent of agency personnel divined through selective quotation of e-mail trails." *Nat'l Audubon Soc'y*, 422 F.3d at 198-99.

### 3. The Coast Guard Was Not Required to Issue Terms and Conditions for All of the Alternatives Identified in the FEIS

Plaintiffs are incorrect that CGMTA § 414 required the Coast Guard to issue Terms and Conditions for all of the alternatives set forth in the DEIS. *See* Plf. Mem. at 22. Plaintiffs are attempting to import a requirement in the NEPA regulations into the CGMTA. *See id.* at 23 (citing 40 C.F.R. § 1502.14). Plaintiffs draw that inference from the fact that the Terms and Conditions were required to be issued prior to BOEM's issuance of the DEIS. *See id.* But that was not stated in the statute, and there is no reason to believe that Congress thereby required the Coast Guard to issue separate Terms and Conditions for all alternatives set forth in the DEIS. Requiring the Coast Guard to do that 60 days before the DEIS was even issued would be self-contradictory. Further, there were a number of alternatives that were considered in the DEIS that were removed from detailed consideration due to physical constraints and other limitations. CW 24486-92. Congress could not have intended the Coast Guard to issue Terms and Conditions for multiple alternatives that would not have been viable.

Plaintiffs suggest that CGMTA § 414 was enacted so that the Coast Guard could provide input during the NEPA process regarding navigational safety. *See* Plf. Mem. at 23. By the time the statute was enacted, however, the Coast Guard was already acting as a cooperating agency in the NEPA process based on its existing regulatory authority regarding navigation safety. CW 24371-72. CGMTA § 414 did nothing to change the Coast Guard's role in the NEPA process, and the Coast Guard continued to be involved as a cooperating agency pursuant to its existing regulatory authority throughout the NEPA process. CW 25011; CW 65714; *see also* USCG 1076. In short, there is nothing in the statute itself to indicate that the provision was anything

more than a timing requirement designed to ensure that the Terms and Conditions were circulated to the public during the NEPA process.[11]

In any case, the Coast Guard interpreted the requirement to consider "each alternative to the proposed lease . . ." differently.  CGMTA § 414(a).  The Coast Guard interpreted this language to mean that it should consider alternatives to the proposed lease that were presented to it by the Secretary.  *See* USCG 1077.  Thus, the Coast Guard stated when it transmitted the Terms and Conditions that Cape Wind's proposal, as set forth in its plans submitted to BOEM through the end of 2006, was "the only Cape Wind proposal of which the Coast Guard was aware at the time."  USCG 1077.  The Coast Guard also indicated that additional Terms and Conditions would "be developed and provided separately should an alternative to the proposal . . . be submitted to the Secretary."  *Id.*  The Coast Guard reasonably interpreted ambiguous statutory language, and its interpretation is entitled to deference. *Chevron*, 467 U.S. at 842-45, 104 S. Ct. at 2781-82; *see also Mead*, 533 U.S. at 227, 121 S. Ct. at 2171.

### 4.      The Coast Guard's Evaluation of Impacts to Navigational Safety Is Not Arbitrary and Capricious

Plaintiffs argue that the Coast Guard's analyses and conclusions regarding marine navigational safety are arbitrary and capricious.  Plf. Mem. at 29.  Plaintiffs have failed to meet their burden, particularly in light of the highly deferential standard of review owed to the Coast Guard's determinations in its area of expertise.

### a.      The Coast Guard's Determinations Regarding Marine Navigational Safety Are Entitled to a High Degree of Deference

The Coast Guard is the expert agency charged by multiple statutes with promoting

---

[11] Plaintiffs cite an internal Coast Guard e-mail discussing NEPA, but it is discussing NEPA in the context of the NVIC 02-07, which would be applicable to other projects, not to the CGMTA § 414 process applicable to the Cape Wind Project.  USCG 12742.  Moreover, even it does not state that the Coast Guard would provide multiple versions of terms and conditions addressing different NEPA alternatives.  *See id.*

navigational safety on the nation's waterways.  *See Collins*, 351 F.3d at 1253; *see also* Coast

Guard Act, 14 U.S.C. § 2 ("The Coast Guard shall – (1) enforce or assist in the enforcement of

all applicable Federal laws on, under, and over the high seas and waters subject to the

jurisdiction of the United States . . . ."); PWSA, 33 U.S.C. § 1221 *et seq.*; MTSA, Pub. L. 107-

295, 116 Stat. 2064 (2002).  The Coast Guard's determinations regarding marine navigational

safety are entitled to a high degree of deference.  *See Cassidy v. Chertoff*, 471 F.3d 67, 84 (2d

Cir. 2006) ("Expert determinations by the Coast Guard . . . , which are based on an explicit

Congressional delegation of legislative authority . . . are entitled to significant deference."); *see*

*also Wilmina Shipping AS*, 2013 WL 1225382, at *11.

Further, the Coast Guard was called upon to analyze scientific studies relating to radar

and other issues and its determinations in these highly technical areas are entitled to extreme

deference.  *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008)

("Where a 'highly technical question' is involved, 'courts necessarily must show considerable

deference to an agency's expertise.'") (citation omitted); *Nat'l Comm. for the New River v.*

*FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) ("When an agency 'is evaluating scientific data

within its technical expertise,' an 'extreme degree of deference to the agency' is warranted.")

(citation omitted); *Styrene Info. and Research Ctr.*, 2013 WL 1984235, at *15 ("[W]here, as

here, a court is reviewing an agency's evaluation of scientific data within its technical area of

expertise, the arbitrary and capricious standards of review is extremely deferential.") (quotation

marks and citation omitted).  Accordingly, the Coast Guard's analysis of these highly technical

issues should be afforded a high degree of deference.

### b.      The Coast Guard's Determinations Are Supported by the Record

Plaintiffs make a number of arguments regarding the Coast Guard's November 14, 2008

memorandum, all of which are baseless.  *See* Plf. Mem. at 30-33.  First, they argue that the Coast

Guard's determinations in the memorandum are invalid because the TSC Study regarding the

impacts of radar had not yet been completed.  *See id.* at 30.  This ignores the fact that the Coast

Guard stated at the beginning of the memorandum that the radar issue remained outstanding and

that it expected the radar study to be released in December 2008.  CW 66389; *see also* CW

66405.  The Coast Guard indicated that it would provide additional analysis after the TSC Study

was completed, which it did.  CW 66389.

Second, Plaintiffs assert that the Coast Guard determined that project "will not make

navigation within the Project site more difficult."  Plf. Mem. at 31.  This statement appears

nowhere in the memorandum.  Rather, the Coast Guard found, pending the results of the TSC

Study and analysis of the results, that the project would have "a moderate impact on navigation

safety, but sufficient mitigation measures are available to reduce [the] risk to an acceptable

level."  CW 66389.  Plaintiffs also call attention to the Coast Guard's statement that the "spacing

between [the] towers is far greater than the spacing between other natural and man-made

navigational obstacles in Nantucket Sound, all of which mariners avoid routinely."  CW 66408.

Indeed, that statement appears in the memorandum and Plaintiffs offer no record evidence to

refute it.[12]  The offhand statement in an e-mail by Lt. Commander Kovatch, USCG 23731, who

had no involvement in the Coast Guard's determinations, is irrelevant to the Court's evaluation

---

[12] Plaintiffs' arguments regarding the impacts on ferry traffic, *see* Plf. Mem. at 31 n.22, are addressed in section I.C.4.d., *infra*.

of the Coast Guard's determinations.  *Nat'l Audubon Soc'y*, 422 F.3d at 198-99; *see* Plf. Mem. at 32.[13]

Third, Plaintiffs point to a statement in the Coast Guard's response to a comment regarding obstructions to navigation, which states:  "In inclement weather smaller vessels (or vessels of any size) would be less prevalent in the Horseshoe Shoal area and should in any case be transiting at slower (more cautious) speeds."  CW 66406.  Plaintiffs assert, based on a 2006 e-mail, USCG 23205, that the Coast Guard did not sufficiently consider the impacts of fog on navigation within the wind farm.  Plf. Mem. at 32.  But, in fact, just a few pages earlier, the Coast Guard addressed a comment regarding fog.  CW 66395.  The Coast Guard stated that, as result of fog lights and signals, as well as adherence to the COLREGS, "although the presence of fog may require more vigilance and slower speeds, mariners should be able to transit safely within and in the vicinity of the wind farm during periods of fog."  *Id.*

Finally, Plaintiffs argue that the Coast Guard's assessment of impacts on search and rescue operations is invalid.  Plf. Mem. at 33.  The Coast Guard's analysis of its own search and rescue capabilities falls squarely within the Coast Guard's expertise and is owed a high degree of deference.  *See Nat'l Comm. for the New River*, 373 F.3d at 1327.  In any event, Plaintiffs' selective reading of the Coast Guard's analysis does not demonstrate that the Coast Guard's analysis was arbitrary and capricious.  The Coast Guard's analysis of search and rescue operations over an 11 year period showed that an aircraft was employed 8% of the time (four instances), but in only one of those instances was an aircraft actually used to effect a rescue.  CW 66400.  Moreover, the area would be within the established response time for Coast Guard vessels stationed in the area.  *Id.*  Further, the ATONs and identifying markers, the monitoring of

---

[13] Captain Brimblecom, quoted by Plaintiffs in a 2002 e-mail, USCG 20395, also had no involvement in the project.  *See* Plf. Mem. at 15.

the area, and the safety lines and access ladders on the turbines are expected to reduce the frequency of rescue operations and to aid in detecting and assisting stranded mariners.  CW 66401.  Accordingly, the Coast Guard's expert opinion is that impacts to search and rescue operations will be negligible, and that opinion is entitled to great deference.  *See id.*[14]

In sum, the Coast Guard's findings are amply support by the record, and Plaintiffs have failed to show that the Coast Guard did not consider any relevant factor in its analysis.  *See Citizens to Preserve Overton Park*, 401 U.S. at 416.

### c.   The Coast Guard's Assessment of Radar Impacts Is Not Arbitrary and Capricious

After analyzing the results of the TSC Study, other studies relating to the impacts of radar, and its knowledge of Nantucket Sound and the users of the waterway, the Coast Guard determined that the impacts of the wind farm on marine navigation would be moderate and could be mitigated to an acceptable level.  CW 75974; CW 75983.  The Coast Guard's determination in its area of expertise and analyzing highly technical information is entitled to an "extreme degree of deference."  *Nat'l Comm. for the New River*, 373 F.3d at 1327.  While Plaintiffs may disagree with the Coast Guard's determination, they have not shown that it is arbitrary and capricious under this highly deferential standard of review.

Plaintiffs begin by simply mischaracterizing the TSC Study.  Nowhere does the TSC Study say that radar "will not be an effective navigational tool within and in the vicinity of the Project."  Plf. Mem. at 34.  To the contrary, the TSC Study modeled a number of scenarios involving vessels transiting within the wind farm and along the neighboring channels, which demonstrated that vessels could be tracked using radar.  USCG 2293-310; CW 75950-67.  Likewise, the study does not show that "[d]egraded radar performance will also extend beyond

---

[14] The Coast Guard has small and medium vessels to rescue mariners in shallow water.  *See* http://www.uscg.mil/acquisition/rbs/default.asp; http://www.uscg.mil/acquisition/rbm/.

the immediate Project area." Plf. Mem. at 34. Indeed, the study states just the opposite: "Targets outside the wind farm are easily detected and easily noticed." USCG 2310. Plaintiffs urge the Court to view the videos and reach its own conclusions. Plf. Mem. at 34. The Court should refrain from accepting the invitation to act as a radar expert. *See Styrene Info. and Research Ctr.*, 2013 WL 1984235, at *15.

Finding no support for their assertions in the TSC Study itself, Plaintiffs point to a statement by Captain Perry (who signed the Coast Guard's December 2008 assessment of radar impacts, CW 75972) to the effect that tracking of vessels would be difficult. Plf. Mem. at 34-35 (citing USCG 23403). Captain Perry made the statement during the December 5, 2008 teleconference with interested stakeholders. USCG SUPP1103. While Captain Perry acknowledged that the wind farm will create some difficulties for radar operators, his comments as a whole during the teleconference expressed confidence that the difficulties were manageable and could be mitigated with measures commonly implemented by the Coast Guard. *See*, *e.g.*, USCG SUPP 1102 ("Using existing and just general . . . waterways management, things the we can put in place, some safety measures and risk management measures, it's really doable within the existing footprint." ); *id.* ("The picture on the radar provided enough information that would not be too burdensome to interpret to navigate safely."); USCG SUPP 1114 (". . . I am very comfortable right now that mitigation exists that are achievable that allow this project to go forward in the existing footprint."); *see also* USCG SUPP 1131.[15]

Plaintiffs next charge that the Coast Guard did not sufficiently consider the impacts on ARPA (automatic radar plotting aid), a tool that mariners use in conjunction with radar. Plf.

---

[15] Plaintiffs also cite a short e-mail from Ronald Beck generally describing potential radar impacts. USCG 18712. Plf. Mem. at 34-35. The e-mail shows only that the results of the TSC Study were discussed within the Coast Guard.

Mem. at 35.  Indeed, the Coast Guard did address the use of ARPA and the potential impacts on

ARPA due to the wind farm.  CW 75976-77.  ARPA enhances the radar display by allowing the

operator to track an object's speed and direction, thus allowing the user to predict future

scenarios.  CW 75976-77.  It is required on ferries, as well as towing and research vessels.  CW

75976.  The Coast Guard recognized that ARPA would be affected by a wind farm, just as radar

would.  CW 75977.  Both the North Hoyle Study and the Marico Marine Study on Nantucket

Sound recognized the potential for "target capture" or "target swap," meaning that the ARPA

may confuse a wind turbine for a vessel and lose track of the vessel.  USCG 507; USCG 1756.

Marico Marine found that target capture was "the exception rather than the rule" and would

require that the vessel be in very close proximity to the capturing object.  USCG 1756.  Further,

target capture is not unique to turbines and occurs with other objects, such as buoys.  *Id.*

　　　In any event, the Coast Guard recognized that there could be impacts on ARPA for the

vessels that use it.  CW 75977.  It noted that ARPA is only one of many tools used by mariners

to ensure navigational safety.  *Id.*  The Coast Guard noted that mariners must comply with the

COLREGS, which require mariners to consider the limitations of their radar systems in

determining safe speeds.  *Id.*  The Coast Guard recognized that certain vessels are required by its

regulations to have ARPA.  CW 75976.[16]  As Plaintiffs point out, internal communications also

indicate that the Coast Guard considered impacts on ARPA.  *See* USCG 21528.  Captain Perry

also addressed Massachusetts Steamship Authority Captain Greg Gifford's remarks regarding

ARPA during the December 5, 2008 teleconference.  USCG SUPP 1120.  He explained:

> The vessels I've been on, you're not using only ARPA, you['re] using all
> available tools but when you['re] in close quarters or in a channel type of
> restricted visibility . . . of a navigation scenario and a crossing situation you know

---

[16] Plaintiffs do not indicate which section of 33 C.F.R. Pt. 209 requires the Corps to dredge the
Main Channel.  *See* Plf. Mem. at 35.  Anyway, these regulations are irrelevant to the claims here.

> your ARPA is somewhat limited because of the other navigational things around there.  And the rules of the road I think play a much greater role that what you're getting out of an ARPA in a navigational scenario such as that.

USCG SUPP 1121.  This is consistent with Captain Perry's stated rationale in the December 2008 memorandum.  CW 75977.  Thus, the record amply demonstrates that the Coast Guard considered impacts on ARPA in making its determination.

Plaintiffs then argue that the Coast Guard's determination that impacts to marine navigation would be "moderate" is inconsistent with its findings with respect to radar that, in certain situations, would "significantly adversely impact" the ability to detect another vessel in the wind farm.  CW 75984.  But, as the Coast Guard explained, these impacts would be reduced by mitigation and rules already in place, along with potential additional mitigation if necessary. *Id.*  Plaintiffs' assertions that the mitigation identified by the Coast Guard is insufficient to ensure navigational safety are addressed below.

First, the Coast Guard identifies the mitigation in the Terms and Conditions.  Plaintiffs repeat their mantra that the Terms and Conditions contain no real requirements, but they fail to explain how the very real design and operational conditions required by the Coast Guard, particularly the requirement for lighting and signals in accordance with international standards, will not mitigate impacts to navigation.  *See* USCG 1078-80.  Plaintiffs dismiss the importance of the control center, access ladders, and mooring lines, but the first two are recommended in UK guidance.  USCG 416-19; USCG 1791-93.  Indeed, helicopter trials conducted at the North Hoyle Wind Farm noted the importance of being able to lock the wind turbines in an emergency to enable helicopters to operate within the wind farm. USCG 533; USCG 548.

Second, the Coast Guard noted that the COLREGS "contain a variety of measures to mitigate hazards to navigation, such as proceeding at safe speed for the prevailing circumstances, maintaining a proper continuous lookout."  CW 75985.  As Rear Admiral Gabel aptly stated, the

COLREGS "comprehensively define a mariner's responsibilities with regard to avoiding collisions in the vicinity of the proposed wind farm and elsewhere."  USCG 13245.  Certainly, mariners can use radar among other tools to comply with the COLREGS.  *See id.*; CW 75977. But the reverse is also true.  Complying with the COLREGS requirements on vessel speed, proper lookouts, and safety precautions, will help make navigation safe within the wind farm even if radar is impacted.  CW 75985; *see also* USCG SUPP 2136-37.

The Coast Guard also indicated that it may, with the input from waterway users, create specially marked channels, recommended vessel routes, or a regulated navigation area.  CW 75985.  The Coast Guard has not indicated that such measures will be necessary, but such measures are highly reasonable and are consistent with the NVIC 02-07 and UK guidance.  *See* USCG 417; USCG 1111; USCG 1790.  Plaintiffs repeat their argument that such mitigation would impermissibly "shift the burden" to waterway users.  To the contrary, such measures would likely be welcomed by users of the Sound and would hardly be burdensome, as indicated by the fact that similar measures are already in place in nearby Buzzards Bay.  CW 75985.  Nor would such measures be inconsistent with the Coast Guard's prior stated intention not to restrict access to the project area.  *See* Plf. Mem. at 40.  The Coast Guard is merely suggesting the possibility of marking channels and establishing rules regarding "speed, traffic patterns, and communications," within the wind farm; it has not suggested that users will be denied access to the area.  CW 75985.

Finally, the fact that the Coast Guard is considering such measures in the future does not undermine its determination that impacts would be moderate.  *See* Plf. Mem. at 40.  Rather, the Coast Guard was entitled to consider the effects of existing and potential mitigation in determining whether impacts would be moderate.  *See* Section I.C.2., *supra*.  The Coast Guard

concluded that "waterway[] users may need to adjust somewhat to account for navigating within, and in the vicinity of, the proposed [wind farm]," but "vessels should be able to do so safely even in restricted visibility." CW 75985-86. Plaintiffs have not shown that this determination was arbitrary and capricious.

>    **d.    The Coast Guard's Determination Regarding a Buffer Zone Is Not Arbitrary and Capricious**

In the December 2008 memorandum, the Coast Guard addressed the need for a buffer zone:

> Given the risk mitigation strategies and tools discussed above, and the characteristics of the waterway users in Nantucket Sound, buffer zones are not needed. This is significant in determining the impact on navigational safety for this project because the channels that exist along the borders of the proposed [wind farm] and the associated obstructions, many marked by aids-to-navigation, that are near the edges of these channels. Two factors came into play in making the determination that buffer zones are not needed. First, for vessels transiting in the vicinity of the proposed [wind farm], the impact on radar was minimal for the distances an operator would need to track and make navigational decisions. The other reason is that deep draft vessels do not operate in the vicinity of the proposed [wind farm]. Unlike the vessels that do operate in the vicinity of the proposed [wind farm], which need relatively short distances to maneuver, deep draft vessels need significantly greater areas to maneuver due to stopping distances, turning radius, etc. This circumstance does not exist in Nantucket Sound.

CW 75986; *see also* 5983. Plaintiffs fail to show that this determination was arbitrary and capricious, given the "extreme degree of deference" that must be afforded to the Coast Guard's determination. *Nat'l Comm. for the New River*, 373 F.3d at 1327.

Plaintiffs claim that the Coast Guard was incorrect in stating that the impacts on radar for vessels transiting in the vicinity of the wind farm were minimal for the distances an operator would need to track and make navigational decisions. *See* Plf. Mem. at 43. Indeed, as Plaintiffs point out, the Coast Guard concluded based on the findings in the TSC Study that vessels outside the wind farm would be significantly affected in detecting vessels within the wind farm. CW

75984.  But, the Coast Guard also concluded based on the TSC Study (as indicated just a page earlier in the document) that the impacts of radar "tend to be more of a problem at some distance from the radar than close in" and therefore "vessels in the vicinity of the radar may be detected more easily than vessels some distance away."  CW 75983.  Thus, "[o]perators in the vicinity of the proposed [wind farm] should have little problem identifying vessels nearby that could pose a threat of collision in time to react to that contact."  *Id.*  Accordingly, the Coast Guard's determination regarding the buffer zone is firmly grounded in the findings of the TSC Study and the Coast Guard's own findings regarding the impacts on radar.

Plaintiffs also claim that "deep draft vessels" do, in fact, operate in the vicinity of the proposed project, contrary to the Coast Guard's findings.  Plaintiffs' misunderstand what is meant by a "deep draft vessel."  As discussed in the Revised Navigational Risk Assessment, the largest vessels that would operate in the channels around the wind farm are small cruise ships with a draft of 15-25 feet, passenger ferries with a draft of 10-15 feet, and bulk goods vessels with a draft of 15-20 feet.  USCG 920-23.  This is consistent with the information in the FEIS, which indicates that the cruise ships operating in the Main Channel would have a draft of 13 to 20 feet.  CW 65614.  These are not deep draft vessels, which would include large cruise ships or tankers with considerably greater drafts.[17]  The FEIS refers to these small cruise ships as deep draft vessels, but that is not what the Coast Guard meant by the term.  Moreover, the FEIS demonstrates that there are no truly deep draft vessels that operate in the area:  "There are no major or significant Port Facilities that handle large deep draft traffic . . . in the vicinity of the site of the proposed action."  CW 65350.

---

[17] Statutory authority governing the Army Corps of Engineers defines a "deep-draft harbor" as one "constructed to a depth of more than 45 feet."  33 U.S.C. § 2241(a).

Further, the FEIS notes that the Middelgrunden Wind Farm near Copenhagen, Denmark actually is located approximately 500 yards (457 m) away from a major shipping channel. CW 65614. According to the Danish government, approximately 25,000 to 30,000 vessels navigate in the channel annually and there have been no reported occurrences of collisions of ships traveling in this channel. CW 65614; *see also* USCG 931. The Cape Wind Project also was reconfigured to move the nearest turbine roughly 500 feet farther away from the Main Channel. CW 65614. The nearest turbine would now be approximately 499 yards from the edge of the Main Channel, almost exactly like the Middelgrunden Wind Farm, and other turbines would be farther away. USCG 1852; *see also* CW 66403; USCG 19712. Thus, there is precedent for locating a wind farm near actual shipping channels that accommodate much larger vessels.

The Coast Guard's determination also was based on all of the existing and potential mitigation and "the characteristics of the waterway users" in Nantucket Sound. CW 75986. The turbines will be well marked and lighted, making them easier to avoid. CW 66408. The most frequent users of the channels around the wind farm are ferries. CW 66402-03. The ferry routes to the east between Hyannis and Nantucket are at least 1.3 miles away and therefore would not be affected, even considering potential impacts on radar. CW 66403; CW 75979. Track-lines provided by ferry operators showed that ferries may tack along this route and may tack up to half a mile within the footprint of the proposed wind farm. CW 75980.[18] But the Coast Guard found that there is 2.3 miles of space to tack to the east and therefore ferry operators should be able to adjust their routes to avoid tacking into the wind farm. *Id.*; *see also* CW 66403. Further, the

---

[18] The Coast Guard reviewed two years of written logs from six ferry captains and found no evidence that such tacking had occurred. CW 75980. Interviews with ferry captains revealed only one caption who claimed to tack frequently along this route. *Id.*

lighted turbines would provide a visual reference, thereby aiding ferry captions during tacking maneuvers.  CW 75980; *see also* CW 66408.

The Coast Guard also determined that ferry routes to the northwest between Hyannis and Martha's Vineyard were sufficiently far away so as not to be affected.  CW 75979; *see also* CW 65615 (stating that the ferry route to the north is .86 miles away at the closest point).  This finding was based, in part, on the fact that only "highly-maneuverable high-speed ferries" operate on that route and that Horseshoe Shoal is very shallow in that area and therefore ferry operators already take precaution to stay a safe distance away.  CW 75980.  Finally, the Coast Guard found that the distance to the Main Channel would be sufficient.  CW 75979.  Although the center of the Main Channel would come within 1166 yards of a turbine, that is nearly as wide as the channel (1300 yards).  CW 66403.  Further, through interviews with ferry captains, the Coast Guard found that many operate to the south of the Main Channel to avoid Horseshoe Shoals.[19]  CW 75979.  Thus, the Coast Guard's determination is supported by the record and is not arbitrary and capricious.

Plaintiffs argue that MGN 371 required the Coast Guard to establish a buffer zone.  *See* Plf. Mem. at 41.  But the guidance document specifically notes that it "is not a prescriptive tool but needs intelligent application."  CW 278585.  Further, requirements for particular wind farms should be based on marine traffic surveys showing the types of vessels operating in the area – larger vessels "will require larger domains."  *Id.*  Plaintiffs also point to statements referenced in a call for commercial leasing issued by BOEM in February 2012.  *See* 77 Fed. Reg. 5552 (Feb. 3, 2012).  This document clearly was issued after the Coast Guard's determinations and therefore

---

[19] It is worth noting that 23 ferry captains, pilots, and mates of the largest ferry operator in the area submitted a letter to BOEM on January 8, 2010 stating that the wind farm "would not have an adverse affect to the safe navigation in this area."  USCG SUPP 2140.

should not be considered.  *See Vt. Yankee*, 435 U.S. at 549, 98 S. Ct. at 1214.  Moreover, the

Coast Guard's statements are only general recommendations, which may be applied to a variety

of circumstances, and are not prescriptions for particular projects.  77 Fed. Reg. at 5556.

Ultimately, in approving particular projects, the Coast Guard will need to consider the types of

vessels that travel in the areas, traffic patterns, and other factors.  *See id.*[20]

 The fact that a draft of the Terms and Conditions includes a 1.5 mile buffer (from the

middle of the channel, not the edge) shows only that the Coast Guard gave due consideration to

including one.  *See* USCG 23946.  Similarly, the many e-mails and internal documents cited by

Plaintiffs, *see*, *e.g.*, USCG 15563; USCG 20187; USCG 24889, show that the agency debated

and carefully considered this issue.  *See Nat'l Fisheries Inst.*, 732 F. Supp. at 227.  The Coast

Guard unequivocally did not "subordinate public safety considerations to the economics of a

private project."  Plf. Mem. at 45.  The Coast Guard noted in a summary of correspondence from

the Alliance that a 2 or 3 mile setback would not "be economical," but it also stated that, based

on its evaluation of the scientific data, the current setback distance is "sufficient to allow

recreational and commercial navigation and Coast Guard missions to proceed."  USCG 19712.

Further, during the December 5, 2008 teleconference, Captain Perry emphatically rejected the

charge that economic concerns restricted the Coast Guard's ability to require changes to the

project for safety reason.  *See* USCG SUPP 1131 ("I was not afraid to do that.").

 In sum, Plaintiffs have failed to show that the Coast Guard's actions were arbitrary or

capricious or that it did not meet its obligations under CGMTA § 414.

---

[20] The Atlantic Coast Port Access Study Interim Report, *see* Plf. Mem. at 15 n.8, also post-dated the Coast Guard's determinations and is in draft form and therefore should not be considered.  It too is general and nature and does not proposed hard and fast rules.  Interim Report at 12-13.

II.     **BOEM Complied with NEPA and OCSLA With Respect to Marine Navigation**

As discussed above, the Coast Guard's analysis of impacts to marine navigation was sound.  Likewise, BOEM's analysis of those issues was valid and complied with BOEM's obligations under NEPA and OCSLA.  The FEIS contains a thorough analysis of the potential impacts to marine navigation.  *See* CW 65349-56; CW 65613-19.  Plaintiffs disagree with the statement in the 2010 ROD that shallow water depths will restrict most commercial traffic from entering the project area.  CW 111977.  But that is consistent with the FEIS and accurately reflects the vessel traffic in the project area.  *See* CW 65614 ("Due to the characteristics of the waterway, most commercial traffic is restricted by its draft and for safety reasons to the navigational channels marked by the USCG . . . .").  Although ferries may currently tack into the area, they have ample space to the east to conduct those maneuvers.  CW 65615; *see also* CW 75980.  Further, the FEIS accurately reflects the Coast Guard's finding that overall impacts to marine navigation would be "moderate" when taking into account impacts to radar.  CW 65615, 65616, 65619; *see also* CW 112028.  In short, Plaintiffs have identified no errors in BOEM's NEPA analysis or in its determinations under OCSLA.[21]

III.    **BOEM's Analysis of G & G Data Complied with OCSLA and NEPA**

BOEM's review of geophysical and geotechnical ("G & G) survey data for the project met the requirements of OCSLA and NEPA.  BOEM permitted Cape Wind to submit supplemental G & G survey data prior to construction rather than with the COP, but that was permitted under BOEM's regulations and did not prevent BOEM from conducting a thorough review of environmental and safety issues.

---

[21] To the extent that the Corps' decision relies on the analysis of marine navigation in the FEIS, it too has complied with NEPA.  *See* Plf. Mem. at 46 n.31.

A.  **BOEM Analyzed Extensive G & G Survey Data Before Approving the
Project and Required Cape Wind to Conduct Supplemental Surveys Prior to
Construction**

Cape Wind conducted G & G surveys during the time that the project was under review

by the Army Corps from 2001 – 2005.  CW 65173; *see also* CW 4953-58; CW 76182; CW

266035; CW 282662.  These surveys were conducted in accordance with standards agreed upon

between Cape Wind and the Corps at the time they were conducted.  CW 4956; CW 5129.  As

described in the FEIS, the geophysical surveys were designed to collect data using remote

sensing technology that would enable BOEM to evaluate the feasibility of installing the turbines

and foundation design and to analyze surface and subsurface sediments in relation to the

proposed submarine transmission cables.  CW 65173-74.  Geotechnical investigations, which

involve collecting samples from the sea floor, were conducted in order to allow BOEM to

analyze sediment characteristics in the areas of the proposed turbine and along the proposed

cable routes.  CW 65174-75.  Cape Wind also conducted a marine archaeological survey in 2003.

CW 65338; CW 78258.  This survey also was conducted in accordance with standards agreed to

by the Corps.  CW 78271.

At the time that Cape Wind conducted the surveys, there were no regulations or official

guidance governing G & G surveys for renewable energy projects.  CW 221416.[22]  The Society

for Underwater Technology ("SUT") did not issue draft guidance until March 2005, CW 227006,

and BOEM did not issue guidance until November 2012.[23]  Given the lack of specific

regulations, internal discussions were conducted with the involvement of BOEM geologists to

---

[22] The Draft Programmatic Environmental Impact Statement: Geological and Geophysical
Exploration on the Atlantic Outer Continental Shelf, 77 Fed. Reg. 19321 (Mar. 30, 2012), *see*
Plf. Mem. at 47, post dated the decision and are in draft form and therefore should not be
considered.  *Vt. Yankee*, 435 U.S. at 549, 98 S. Ct. at 1214.
[23] *See* http://www.boem.gov/Renewable-Energy-Program/Regulatory-
Information/Index.aspx#Notices_to_Lessees,_Operators_and_Applicants.

determine what the appropriate standards for the surveys should be.  CW 223492-93.  In October 2006, a staff geologist prepared a detailed analysis of the surveys that had been conducted to date.  CW 174071.  The geologist found that Cape Wind "conducted an informative reconnaissance-level survey of the project areas and provided geological and geophysical data and information to characterize, in general, the surface morphology, foundation zone sediments, and geologic hazards."  CW 174076.  He also found, however, that based on standards developed in the oil and gas leasing context, the G & G data was not sufficient to "adequately delineate in detail" the geologic hazards around the turbines.  *Id.*  Specifically, with regard to the surveys that had been conducted, the resolution, line spacing, and penetration of the seabed were considered insufficient when compared to standards used for oil and gas leasing.  *See id.*

In meetings with Cape Wind, BOEM conveyed that it believed additional surveys should be conducted, and Cape Wind disagreed.  *See* CW 223899; CW 187904.  Cape Wind also expressed concern with the costs associated with additional surveys, but those factors did not enter into BOEM's analysis.  CW 223899.  Despite Cape Wind's disagreement, BOEM determined that it should apply "the most conservative guidelines we have for oil and gas" to the project.  *Id.*  Cape Wind subsequently submitted a memorandum to BOEM arguing that the existing G & G and archeological surveys "provided a reasonable and adequate degree of preconstruction information about surface and subsurface conditions, especially given its relatively quiescent tectonic setting, the shallow area of physical effect, and the relatively low inherent risk of operations (as compared to the oil and gas industry)."  CW 187904.  Nevertheless, BOEM stood firm in requiring additional survey work.  *See* CW 174255-56; CW 221455.

In the FEIS, BOEM analyzed the existing G & G and archaeological surveys.  The geophysical data were used to characterize the seafloor morphology and sediment transport.  CW 65175-77.  The geophysical and geotechnical data were used to characterize the subseafloor geology and to analyze the impacts on sediments of installing the submarine cables and from sediment scouring around the turbines.  CW 65177-79; CW 65388-90; CW 65392-97.  The results of the archaeological survey were also analyzed in the FEIS.  CW 65338; CW 65601-02.  Data gathered from these surveys indicated that certain areas in the easternmost portion of the project area contained evidence of prehistoric land surfaces, although no archaeologically significant material was found.  CW 30034-35; CW 65601-02.  Nevertheless, the turbine array was modified to avoid this area.  CW 65601-02; *see also* IV.A.2., *infra*.  BOEM indicated that if any additional prehistoric land surfaces were identified in further surveys, those areas must also be avoided or further analyzed before construction could occur.  CW 65602.  Further, BOEM would require that if any archaeological resources were encountered during construction or decommissioning, those activities would have to immediately stop.  *Id.*; *see also* CW 112038.

There is nothing in the FEIS to indicate that the existing surveys were insufficient for the purpose of analyzing potential impacts to the environment or impacts on cultural resources.  As explained in the 2010 EA:

> In addition, [BOEM] has sufficiently clarified and disclosed potential seabed impacts again in its Revised Findings Document, included in the project record, and provided an opportunity for public review and comment on the Revised Finding.  Concerns expressed regarding spiritual, as well as physical impacts associated with seabed-related activity have been identified throughout the process, and have prompted the special attention given to seabed-related activities.  Supplemental analysis would not add further substance to the discussion in the record that will inform the Secretary's decision.

CW 112040; *see also* CW 274612-27.  Importantly, BOEM made this finding well before it made a decision to allow Cape Wind to submit supplemental G & G surveys prior to construction rather than with the COP.

As BOEM indicated in the FEIS, if a lease were approved, G & G surveys would be conducted, in order to "further characterize the surface and subsurface geological conditions within [the project area] in preparation for final design and construction."  CW 65131.  These additional surveys were not needed for baseline environmental and safety reasons.  Rather, as explained in the 2010 ROD, the data from these additional surveys will be "designed to collect sufficient information, coupled with previous site-specific field data, to further characterize the surface and subsurface conditions . . . in preparation for final design adjustment and construction."  CW 111982.  Further, Cape Wind will conduct a supplemental high resolution geophysical ("HRG") survey for the purpose of "avoiding or minimizing impacts to historic and pre-historic resources."  CW 111994; *see also* CW 119758 (explaining in the 2011 EA that the surveys would be conducted "[f]or the purpose of ensuring that cultural resources are adequately protected and that the structural design of the project is sound").  To ensure that impacts to archaeological resources on the seafloor are minimized or avoided, Cape Wind also would be required to extract core samples from the location of each turbine to be examined by an archaeologist and a tribal representative.  CW 111995.  Areas that are likely to have shipwrecks or other culturally significant objects would be off limits to ground disturbance and an appropriate buffer zone would be established around such areas.  *Id.*

Prior to the issuance of the lease, BOEM held additional discussions with Cape Wind to allow Cape Wind another opportunity to address BOEM's concerns with the existing surveys. *See* CW 235004; CW 235267.  During the course of these discussions, Cape Wind indicated that

they may not be able to complete the additional survey work before obtaining project financing

and that the required additional survey work would cost approximately $30 million.  CW

177710; CW 235267.  Project financing, in turn, would be difficult to secure until the COP was

approved and the litigation was resolved.  CW 147710.  BOEM conducted internal deliberations

in order to determine how to proceed with respect to the Lease and whether to permit a departure

from the BOEM regulations regarding submission of the COP.  *See* CW 147719.  Based on its

internal deliberations, BOEM determined that it would allow a departure from its regulations and

permit Cape Wind to submit the result of its supplemental G & G surveys prior to construction

rather than prior to approval of the COP.  CW 241408.  Accordingly, the Lease contains

provisions requiring that additional G & G surveys be completed "[p]rior to the commencement

of construction or any bottom disturbing activities related to construction."  CW 119292; *see

also* CW 119292-303.[24]  The COP ROD details specific requirements for the surveys and what

those surveys should identify.  CW 119701-04.[25]

### B. BOEM's Decision to Permit Cape Wind to Submit Additional G & G Survey Data After the COP Was Submitted But Prior to Construction Complied With OCSLA and BOEM's Regulations

BOEM's decision to allow a departure from its OCSLA regulations for purposes of the

submission of the COP complied with its regulations and was not arbitrary or capricious.  The

regulations permit BOEM to allow a departure from its regulations in order to "[f]acilitate the

---

[24] BOEM did not conclude that additional surveys would be required before submission of the COP.  *See* Plf. Mem. at 51 (citing CW_PRIV 7889-2; CW_PRIV 5657; CW 258090; CW 267463).  These internal discussions are irrelevant to the Court's determination.  *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659, 127 S. Ct. 2518, 2530 (2007) ("[T]he fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.").

[25] Plaintiffs cite a Jan. 21, 2011 letter from BOEM to Cape Wind, *see* Plf. Mem. at 47 (citing CW 376758), but they point to nothing in the letter to indicate that BOEM required additional surveys to be conducted before approving the COP.

appropriate activities on a lease or grant." 30 C.F.R. 585.103(a)(1).  The regulations also require

that "[a]ny departure approved under this section and its rationale must:  (1) [b]e consistent with

subsection 8(p) of the OCS Lands Act; (2) [p]rotect the environment and the public health and

safety to the same degree as if there was no approved departure from the regulations; (3) [n]ot

impair the rights of third parties; and (4) [b]e documented in writing."  30 C.F.R. § 585.103(b).

BOEM has met these requirements.

First, due to the fact that financing for the supplemental G & G surveys could not be

obtained without an approved COP and resolution of the litigation, the departure from the

regulations facilitated the activities under the Lease.  *See* 30 C.F.R. § 585.103(b)(1).

Second, the environment and public health and safety will be protected to the same

degree as if no departure were approved.  *See* 30 C.F.R § 103(b)(2).  The departure from the

regulations approved by BOEM did not allow Cape Wind to forgo the submission of the

supplemental G & G surveys.  That work was required by the 2010 ROD, consistent with

BOEM's earlier determination that additional surveys should be conducted in accordance with

the standards for oil and gas leasing.  *See* CW 111982; CW 111994.  Rather, BOEM simply

allowed Cape Wind to postpone the submission of the additional survey data until after approval

of the COP, but prior to construction.  CW 241409.  Pursuant to the Lease, "construction or any

bottom-disturbing activities related to construction" will not be permitted until the surveys are

conducted.  CW 119292.  Cape Wind must submit a "report detailing its survey results," which

BOEM will have the opportunity to review.  *See* CW 119295.  Further, pursuant to the Lease,

BOEM may order Cape Wind to cease operations if there are any activities that could "cause any

under harm or damage to the environment" or "create unsafe conditions."  CW 119271-72.

The departure also did not impact BOEM's preconstruction reviews that serve to protect the environment and ensure safety.  Specifically, before commencing construction, Cape Wind must submit a facility design report ("FDR") providing details on the design of the project and a fabrication and installation report ("FIR") describing how the facilities will be assembled.  30 C.F.R. §§ 585.700, 585.701, 585.702; *see also* CW 119698 (conditioning the approval of the COP on compliance with the regulations).  BOEM has 60 days to review the report and issue objections to the report, and construction cannot begin until BOEM's objections are resolved.  30 C.F.R. § 585.700(b).  Further, Cape Wind is required to have a certified verification agent ("CVA") review the FDR and FIR.  30 C.F.R. § 585.705; *see also* CW 119702.  The CVA is an independent industry expert who will review and certify the plans and ensure that the project's facilities are designed, fabricated, and installed in conformance with accepted engineering practices.  30 C.F.R. §§ 585.701(d), 585.702(c), 585.705.  These preconstruction reviews are in no way impeded by BOEM's departure allowing Cape Wind to provide supplemental survey data after approval of the COP but before construction begins.  Accordingly, with or without the departure allowed by BOEM, no construction activities will occur until BOEM is satisfied that the project can proceed in a manner that is safe and protective of the environment.

Third, permitting Cape Wind to submit supplemental G & G surveys prior to construction rather than with the COP did not impair the rights of any third parties, 30 C.F.R. § 585.103(b)(3), and BOEM documented its departure from its regulations in writing, 30 C.F.R. § 585.103(b)(4). *See* CW 241408-09.[26]

---

[26] The departure was also explained and documented in an internal memorandum that was withheld from the administrative record as deliberative material and appears on BOEM's Dec. 16, 2011 Privilege Log as CW 387828-35 (ECF No. 105-3).  As this Court has correctly held, deliberative documents are, as a matter of law in this Circuit, not part of BOEM's administrative record. *See* May 16, 2013, Order at 5 (ECF No. 273).  Nevertheless, should the Court deem that

Finally, BOEM complied with OCSLA.  As discussed above, the departure allowed by BOEM in no way decreased the BOEM's ability to provide for safety or protection of the environment.  *See* 43 U.S.C. § 1337(p)(4)(A)-(B).  BOEM determined, after reviewing all of the environmental and technical analyses, that the project should be approved.  CW 119698.  But that approval was subject to BOEM's retention of the authority to review the FDR and FIR, *see id.*, and to prevent the construction of the project until any objections that BOEM had were resolved.  30 C.F.R. § 585.700(b).  Accordingly, BOEM complied with OCSLA.

### C.    BOEM's Analysis of G & G Survey Data Complied With NEPA

BOEM's analysis of G & G data in the FEIS met the requirements of NEPA.  As discussed above, BOEM analyzed the extensive G & G and archaeological survey work already in existence and used the data to evaluate seafloor morphology and sediments, as well as archaeological resources.  *See* CW 65173-79; CW 65338; CW 65388-97; CW 65601-02.  There is nothing in the record to suggest that BOEM believed that the existing information was insufficient for purposes of analyzing environmental impacts, and Plaintiffs have pointed to no deficiencies in the analysis.  Indeed, BOEM noted in the 2010 EA that it already had sufficient information "regarding spiritual, as well as physical, impacts associated with seabed-related activity" to analyze the environmental impacts of the project.  CW 112040.  The purpose of conducting the additional G & G surveys was not to obtain information for the analysis of environmental impacts.  Rather, it was "to further characterize the surface and subsurface conditions . . . in preparation for final design adjustment and construction," CW 111982, and to

---

it needs additional rationale beyond what is stated in BOEM's administrative record, the Court may consider the internal memorandum under one of the exceptions allowing for consideration of extra-record evidence.  *See, e.g., Styrene Info. & Research Ctr. v. Sebelius*, 851 F. Supp. 2d 57, 63 n.4 (D.D.C. 2012) (recognizing an exception "when agency action is not adequately explained in the record before the court" (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).  Should that need arise, Defendants would submit the document at the Court's request.

"avoid[] or minimize[e] impacts to historic and pre-historic resources."  CW 111984; *see also*

CW 119758.  Thus, BOEM fully met its obligations under NEPA to analyze potential impacts

and to circulate its analysis for public comment, as well as the requirements of its regulations.

*See* 30 C.F.R. § 585.627; *see also Nat'l Comm. for the New River*, 373 F.3d at 1328.

      Given that BOEM already had sufficient G & G data to assess environmental impacts to

the seafloor and to offshore cultural resources, its characterization of additional surveys as

mitigation was appropriate.  Those surveys were designed for the purpose of "avoiding or

minimizing impacts to historic and pre-historic resources."  CW 111994.  Thus, they are

intended for the very purpose envisioned by the NEPA regulations.  *See* 40 C.F.R. § 1508.20 (the

definition of mitigation in the CEQ regulations includes "[a]voiding the impact . . . or

"[m]inimizing the impact . . . .").  Plaintiffs' assertions that these supplemental surveys were

necessary to characterize the seafloor and sub-seafloor for purposes of BOEM's environmental

analysis are baseless because BOEM already had sufficient information to conduct its analyses.

Plaintiffs' arguments are further undermined by the extensive analysis of the G & G survey data

and the plans based on that data presented in the COP.  *See* CW 120623-696; CW 120752-831.

      The circumstances in this case are nothing like those in a Ninth Circuit opinion cited by

Plaintiffs.  *See No. Plains Res. Council, Inc. v. Surface Trans. Bd.* 668 F.3d 1067, 1085 (9th Cir.

2011).  There, the court found that conducting surveys of sage-grouse and other species only

after project approval was insufficient to meet the requirements of NEPA.  *See id.*  But, unlike

that case, BOEM has reviewed a substantial amount of G & G data that has allowed it to assess

the impacts of the project on the environment.  The fact that BOEM required additional

supplemental surveys to ensure that cultural resources will not be harmed and to fine tune the

final construction plans does not violate NEPA.

## IV.   BOEM's and the Corps' Compliance with Section 106 of the NHPA

Federal Defendants have already submitted substantial argument on BOEM's compliance with Section 106.  *See* ECF Nos. 208, 226.  Among other things, the prior briefs detail how BOEM complied with Section 106 by properly concluding the consultation process and requesting and responding to Advisory Council comments.  *See*, *e.g.*, Fed. Defs.' Mem. in Opp'n to Wampanoag Tribe of Gay Head (Aquinnah's) Mot. for Summ. J. at 30–35 (ECF No. 208).  Federal Defendants incorporate those prior briefs by reference here.  Rather than contest BOEM's compliance with Section 106 on the whole, the Alliance quibbles with BOEM's processes and methodologies for identifying historic properties and assessing potential effects.  None of these arguments have merit.

### A.   The Section 106 Review Process

The first two phases of the Section 106 consultation process are to identify "historic properties" within the area of potential effect and assess any adverse effects on those properties.[27]  *See* 36 C.F.R. §§ 800.4, 800.5.  The area of potential effect for the Cape Wind project included onshore areas where the ground would be disturbed or that had a view of the project, and offshore seafloor and associated marine areas that would be disturbed.  CW 30010.  The Advisory Council supported that definition.  CW 107609–10.  Regulations required that BOEM "make a <u>reasonable and good faith</u> effort to carry out appropriate identification efforts" within that area.  36 C.F.R. § 800.4(b)(1) (emphasis added).  BOEM's efforts more than met that standard.

<u>Onshore Historic Properties.</u>  BOEM recognized early on that any impact to onshore historic properties would largely be visual—the project, located anywhere from about five to

---

[27] "Historic properties" are defined as those that are listed or eligible for listing on the National Register.  36 C.F.R. § 800.16(*l*); *see* 16 U.S.C. § 470f.

thirteen miles offshore, could be seen from land.  *See* CW 30012.  To identify those historic

properties, BOEM initially relied upon a technical report developed for the Corps.  CW 30012.

That report identified sixteen existing onshore historic properties within the area of potential

effect.  CW 30032; CW 142317–85; *see also* CW 274590; CW 78105–97 (identifying any

historic properties affected by onshore powerline construction).

Some interested parties, however, expressed concerns over BOEM's property

identification methodology.  *See* CW 48460–61.  In response, and after discussions with the

Advisory Council, *see* CW 44617, BOEM used Section 106 consultations to identify additional

onshore historic properties.  *See* CW 44617; CW 30027; CW 274604–11.  BOEM held Section

106 consultation meetings in Boston in July 2008, and Hyannis, Massachusetts, in September

2008.  CW 109749.  As a result of these consultation meetings, BOEM identified eighteen more

onshore historic properties within the area of potential effect.  CW 30027.  Of those eighteen,

twelve had a view towards the proposed project, which, when added to the sixteen previously

identified, amounted to a total of twenty-eight identified onshore historic properties that the

proposed project had the potential to adversely affect.  CW 30033; CW 274610–11.

To assess the visual effects on those historic properties, BOEM used models to simulate

views toward the project from twelve locations that represented the worst-case scenarios for

visual impacts.  CW 300012, CW 30018–26; *see also* CW 274590–604.  BOEM concluded that

the proposed undertaking would adversely affect "the twenty-eight above-ground historic

properties . . . ."  CW 30036–37; CW 30041–43; *see also* CW 274615–16.

Offshore Historic Properties.  With respect to offshore properties, BOEM relied upon

assessments and surveys of the area of potential effect in Horseshoe Shoal.  *See* CW 30033–35;

*see* CW 78198–256 (2003 assessment); CW 78257–367 (2004 survey); CW 78368–75 (2006

survey); *see also* CW 274612–14.  From those surveys, BOEM learned that some of the offshore

area of potential effect would have previously been dry land.  CW 30034–35.  While no actual

cultural or archaeological material was uncovered, data nonetheless indentified some small and

localized undisturbed organic deposits—what was likely formerly a forest, wetland, and lake

environment—in the proposed turbine array's easternmost area.  CW 30035; CW 78328.  The

wind turbines were re-arranged to avoid disturbing those areas.  CW 30035; CW 274613.  No

evidence of any archaeological material was found in the area of potential effect.

Initial historical assessments also identified forty-five vessels that had been lost near, and

could now be historic shipwreck sites in, the area of potential effect.  CW 30034; CW 274612.

Marine archaeological surveys for magnetic anomalies and sonar contacts identified twenty-nine

potential anomalies, additional analyses of which identified three potential shipwreck locations.[28]

CW 30034; CW 274613.  BOEM required that all bottom-disturbing activities avoid these

locations.  CW 30039; CW 274613.  The Massachusetts Board of Underwater Archaeological

Resources stated its satisfaction with the survey.  CW 30067–68.  The Alliance's reference to

"95 shipwrecks in the waters around 'Horseshoe Shoal,'" *see* Plf. Mem. at 59 (citing CW

360373), ignores the fact that the project, and its area of potential effect, does not cover the

entirety of the Shoal, let alone the waters around it.  *See* CW30010 (identifying offshore area of

potential effect as the seafloor and associated marine areas that would be disturbed).  What may

exist outside the area of potential effect is irrelevant for purposes of Section 106.  Regardless,

BOEM considered the document to which the Alliance cites.  *See* CW 30034; CW 274612.

BOEM's Finding of Adverse Effect.  In December 2008, BOEM issued a Finding of

Adverse Effect on historic properties, CW 29999–30045, CW 109738–45, and provided the

---

[28] The exact location of these sites is kept confidential pursuant to the Archaeological Resources
Protection Act, 16 U.S.C. § 470hh.

Advisory Council an opportunity to comment.  *See* CW 225180; CW_PRIV 2294 to CW_PRIV

2294-0002.  BOEM then convened another Section 106 consultation meeting in Boston in

January 2009.  *See* CW 109749.  BOEM also continued its dialog with the Advisory Council,

meeting in March 2009 to discuss the Finding and Section 106 consultations.  *See* CW 107595–

97 (follow-up letter to meeting).  The Council assessed consultation efforts to-date and offered

suggestions for moving forward.   Notably, the Council disagreed with comments that BOEM's

property identification effort was lacking.  The Council stated "that the work that has been done

so far meets the needs of moving the Section 106 process forward."  CW 107596.

  The Council also later suggested three additional efforts that BOEM could undertake, two

of which are relevant here: (1) obtain the National Park Service's view on the nature of the visual

impacts to two National Historic Landmarks' settings and views; and (2) resolve whether

Nantucket Sound is eligible for listing on the National Register as a historic property.[29]  CW

107605–06.  BOEM implemented the Advisory Council's suggestions.  First, BOEM sought

advice from the National Park Service on the two National Historic Landmarks.  BOEM had

concluded that NHPA Section 110(f) was not applicable because the undertaking would only

have indirect effects on the two landmarks.  *See* CW 109747; CW 164248–50.  The National Park

Service agreed.  *See* CW 111903–21.  Second, pursuant to 36 C.F.R. § 800.4(c)(2), BOEM

referred the question of Nantucket Sound's eligibility to the Keeper of the National Register for a

formal determination.  CW 109971–92.  The Keeper ultimately determined that Nantucket Sound

was a historic and traditional cultural property eligible for listing.  CW 118638–45.

  Using that and other information gained as part of further Section 106 consultation,

---

[29] The third suggestion was to gain information from tribes on any additional tribally-significant
historic properties.  BOEM's implementation of that suggestion is discussed in Federal
Defendants' briefing on the Aquinnah Tribe's claims.  *See* Defs.' Opp'n to Aquinnah's Mot. for
Summ. J. at 19–20 (ECF No. 208).

BOEM issued a Revised Finding of Adverse Effect on January 13, 2010.  *See* CW 274576–629.

The Alliance makes only two arguments with respect to BOEM's Section 106 process.  First, the

Alliance argues that BOEM did not initiate consultation early enough in its administrative

review.  *See* Plf. Mem. at 61–62.  Second, the Alliance maintains that BOEM's initial and later

efforts to identify historic properties were insufficient.  *See* Plf. Mem. at 63–66.  The Alliance is

wrong on both arguments.

### B.      BOEM's Section 106 Consultation was Timely

The Alliance misinterprets Section 106's timing requirements and largely ignores the vast

historic property review that occurred.  For one, BOEM's consultations did not conflict with

Section 106's timing requirement.  The statute does not include a date by which federal agencies

must begin consultation.  Instead, the agency's decision date is the key; the statute requires that

federal agencies consider effects on historic properties <u>prior to approving</u> the undertaking.  *See*

16 U.S.C. § 470f.  The Secretary complied with that requirement here, issuing the ROD that

awarded the lease to Cape Wind in April 2010 after requesting and responding to Advisory

Council comment.  This occurred nearly two years after the July 2008 consultation meeting on

which the Alliance focuses (Plf. Mem. at 62), four months after BOEM completed its Revised

Finding of Adverse Effect, and nearly two months after BOEM concluded the consultation

process.  Further, BOEM did not approve actual project construction until April 2011.  *See* CW

119696–706.  That sequencing fully complied with Section 106's timing requirements.  The

Alliance's response to the years of review, meetings, discussions, and a revised finding is that the

consultation process was an "empty formality."  Plf. Mem. at 62.  Thus, somewhat confusingly,

the Alliance supports its contention that the Section 106 process started too late by arguing that it

effectively ended too early.  Regardless, the facts do not support either contention.

None of the record documents to which the Alliance cites demonstrate that BOEM ended its Section 106 review prematurely.  The Alliance's reference to the fact that BOEM was preparing the FEIS in July 2008 does nothing more than repeat a practical reality.  *See* Plf. Mem. at 62.  NEPA information is intended to inform agency-decision making, necessarily requiring that the information be compiled during the decision-making process.  Section 106 regulations may encourage agencies to coordinate their NEPA and Section 106 review, but do not require that the two processes occur together.  *See, e.g.,* 36 C.F.R. § 800.3(b) ("should coordinate . . . as appropriate").  Similarly, the Alliance's reference to BOEM being under a "five-month deadline" in July 2008 is of little import.  *See* Plf. Mem. at 62 & n.47, 64.  Nothing prevents agencies from setting internal goals, and additional review meant that BOEM did not actually issue the ROD until nearly two years later.  The document that the Alliance claims demonstrates that a ROD was partially drafted by July 2008 (Plf. Mem. at 62) actually dates to April 2009.  *See* CW 163068 (April 9, 2009 e-mail sending Excel sheet).  Regardless, staff preparation of draft documents do not demonstrate that the review process had ended.  And the document to which the Alliance refers to allege that the lease was already drafted (Plf. Mem. at 62) actually discusses agency efforts to develop lease forms for the then-new renewable energy offshore leasing program.  *See* CW 180629–33.

The record also does not support the contention that Section 106 review started too late.  Federal Defendants began to consider potential impacts to historic properties well before July 2008.  *See* CW 253133–44 (chronology through 2010).  Before BOEM became the lead agency, the Corps made a finding of adverse effect in July 2004 (*see* CW 253136), and the Advisory Council entered the Section 106 process as a consulting party in April 2005.  CW 112696.  Once BOEM took over as lead agency, BOEM and the Corps met with, among others, the Advisory

Council and the Massachusetts Historic Preservation Officer in November 2005. *See* CW

112019. Even one of the Alliance's citations shows BOEM conferring with the Advisory

Council in August 2006. *See* CW 224296. Where, as here, potential effects on historic

properties are discussed throughout the administrative review process, the fact that "formal"

Section 106 consultations may have occurred later in the process does not mandate an overly-

formulaic conclusion that consultation was untimely. *See Quechan Indian Tribe v. U.S. Dep't of*

*Interior*, 547 F. Supp. 2d 1033, 1048 (D. Ariz. 2008).

### C.   BOEM's Process for Identifying Historic Properties was Reasonable and Conducted in Good Faith

The Alliance similarly ignores both the law and the facts with respect to BOEM's efforts

to identify historic properties. The Alliance argues that BOEM's identification efforts were

insufficient for two reasons: (1) BOEM relied upon the Corps' methodology, the adequacies of

which were never remedied; and (2) Section 106 required BOEM to undertake a more-

comprehensive survey. *See* Plf. Mem. at 63–65. Two points show the flaw in both arguments.

First, BOEM did undertake additional identification efforts in 2008 in response to

comments that the Corps' methodology was inadequate. BOEM requested that consulting

parties—including the Alliance—identify any additional onshore properties that they believed

should be included in the analysis. CW 274604. This led to the identification of eighteen

additional historic properties that BOEM considered in its Finding of Adverse Effect. CW

274604–05. The Advisory Council did not express any concern over BOEM's onshore

identification efforts in its comments on the Secretary's decision to terminate the Section 106

process. CW 112696–702. Similarly, with respect to offshore identification, the Council stated

that the "survey effort appears to have been sufficient to assess the potential for archaeological

resources . . . ." CW 112700.

Second, Section 106 simply does not require an exhaustive survey of historic properties. "The regulations do not expressly require agencies in all cases completely to survey impact areas, and in fact recognize that the need for surveys will vary from case to case." *Wilson v. Block*, 708 F.2d 735, 754 (D.C. Cir. 1983) (citing 36 C.F.R. §§ 800.4(a)(1), (2)); *see Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082–83 (D.S.D. 2009); *Quechan Indian Tribe of Fort Yuma*, 547 F Supp. 2d at 1046–47.  Indeed, the regulations do not require on-the-ground surveys at all, stating that identification efforts "may include background research, consultation, oral history interview, sample field investigation, and field survey."  36 C.F.R. § 800.4(b)(1) (emphasis added); *see also* § 800.4(a) (requiring agencies to review existing information and seek additional information, as appropriate, from other entities).  Here, the Corps and BOEM relied upon some seafloor surveying.  That reliance demonstrates compliance with Section 106, not a violation of it.

The context surrounding the Alliance's cited statement that BOEM "has 'no idea what is on the seafloor or what is beneath'" illustrates the faulty premise in the Alliance's argument.  *See* Plf. Mem. at 60 (quoting CW 388760).  For one, the surveys that did occur clearly met their intended goal to provide information on the seafloor—BOEM required Cape Wind to adjust the turbine array to avoid certain areas.  Further, the complete sentence from which the Alliance pulls its quotation makes clear that the author is referring to seafloor areas *between* the survey map's grid-lines.  CW 388759–60 ("The spaces within the grid do not have survey coverage . . . .").  Any survey methodology other than one that covers every inch of the seafloor would leave some areas unsurveyed.  Section 106 did not require BOEM to survey every inch of the seafloor.

Instead, Section 106 requires a "reasonable and good faith" identification effort.  36 C.F.R. § 800.4(b)(1).  Despite its section heading, the Alliance (rightly) does not make any

allegation of bad faith.  And BOEM's efforts easily meet the reasonableness standard.

With respect to onshore resources, identification included: an initial inventory of historic resources and review of Massachusetts Historic Commission databases and records (CW 274589; CW 78105–97); identification of historic structures that may suffer visual effects from the project (CW 274590–04; CW 142317–85); consultation with interested parties to identify any other locations that may qualify for listing on the National Register (CW 274604–05); and significant efforts to identify traditional cultural properties of local tribes that may have a view of the project.  *See* Defs.' Opp'n to Aquinnah's Mot. for Summ. J. at 14–15, 19–20 (ECF No. 208).

With respect to offshore resources, the identification effort included: a marine sensitivity assessment of more than 15,000 acres of Nantucket Sound (CW 274612; CW 78198–256); a marine archaeological reconnaissance survey and analysis of the project area, which included remote sensing and sediment samples of the seafloor (CW 274612–13; CW 78257–367); a supplemental marine archaeological reconnaissance survey (CW 274612; CW 78368–75); and consideration of Nantucket Sound itself as a property eligible for listing on the National Register (CW 274613).  The Alliance cites to several post-Section 106 documents showing debate within BOEM as to the adequacy of offshore surveys.  *See* Plf. Mem. at 59 (citing, e.g., CW 313586, which is an attachment to a September 9, 2010, e-mail).  But that debate—in addition to being nothing more than debate—does not change the fact that the surveys that were conducted complied with Section 106's requirements.  Even the Advisory Council, in comments to the Secretary following termination, noted that the surveys "appear[ ] to have been sufficient to assess the potential for archaeological resources in the Section 106 process."  CW 112700.

More importantly, however, the identification process worked.  As a result of the identification efforts, BOEM required Cape Wind Associates to relocate some turbines to avoid

certain areas (CW 274613), and the Secretary adopted measures to avoid or minimize the effects

on historic properties.  *See* CW 111975–76, CW 111994–95.  The Secretary also required

additional pre-construction surveying of the seafloor at the turbine locations.  CW 119292–99.

At most, the Alliance's criticisms of the identification efforts amount to a disagreement over

survey methodologies.  But Federal Defendants' "choice of methodology, particularly regarding

a scientific endeavor such as this, is a matter deserving of substantial deference."  *Public Emps.*

*for Envtl. Responsibility v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 26 (D.D.C. 2011)

(citation omitted). [30]

Perhaps recognizing BOEM's timely and thorough compliance with Section 106, the

Alliance attempts to create different Section 106 requirements from BOEM's OCSLA

regulations at 30 C.F.R. § 585.626.  *See* Plf. Mem. at 57–60.  The Alliance argues that § 585.626

<u>requires</u> the agency to conduct G&G surveys in order to comply with Section 106.  *See* Plf.

Mem. at 60.  The Alliance is wrong.  Section 106 does not require field surveys at all.  *See* 36

C.F.R. § 800.4(b)(1); *accord Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. US*

*Army Corps of Engineers*, 570 F.3d 327, 334 (D.C. Cir. 2009) (finding that Section 106 does not

establish a clear duty to evaluate historic properties within any certain timeframe or in any

certain manner).  Plaintiffs also misinterpret the OCSLA regulations.  The provision states that

---

[30] The Alliance takes issue with a recommendation from BOEM's contractor that, in response to comments, BOEM should assess the adequacy of its identification efforts.  *See* Plf. Mem. at 63–64 (quoting CW 195859).  But the Alliance conveniently omits the very next sentence from the document: "If [BOEM] determines that a [good faith effort] to identify has been conducted, its response should be as such."  CW 195859.  That is clearly the path that BOEM chose.  The recommendation also keenly notes: "Arbitrary statements such as 'there are other properties which were not included' are not specific enough to be helpful to the process . . . ; if properties have been missed, the [commentor] should be prepared to direct [BOEM] to each one individually for consideration, as requested."  *Id.*  EM&A's recommendations also pre-date BOEM's Revised Finding of Adverse Effect.  *See* CW 195855–58 (Oct. 21, 2008, e-mail to which recommendations are attached).

an operator must submit G&G survey data (30 C.F.R. § 585.626(a)(2), (4)) and archeological

survey data (30 C.F.R. § 585.626(a)(5)) with its COP.  Nothing states that the latter must be

comprised of the former, or what data would be adequate.  Regardless, as discussed in section

III.B., *supra*, BOEM complied with its OCSLA regulations with respect to the surveys.

## V.      BOEM and the Corps Fully Complied with NEPA

Plaintiffs argue that BOEM and the Corps[31] violated NEPA by, among other things not

examining an appropriate range of alternatives to the project, not sufficiently analyzing the

environmental impacts, particularly impacts to wildlife, and not conducting sufficient additional

NEPA analysis before approving the COP.  Plaintiffs' arguments are refuted by the record and

the applicable legal principles.

### A.      The FEIS Fully Complied with NEPA

#### 1.      The Purpose and Need Statement Was Reasonable

Plaintiffs argue that BOEM's statement of purpose and need is deficient, Plf. Mem. at 75-

77, generally because it included utilizing the area's unique offshore wind resources—the very

resources the project was designed to take advantage of.  Far from being arbitrary, such a

description properly takes into account the objectives of the project applicant, the public interest,

and the will of Congress.  *See* 43 U.S.C.  1337(p)(3) (granting Interior the authority to issue

offshore wind energy leases).

NEPA requires that an agency identify the purpose and need for action, 40 C.F.R. §

---

[31] NEPA regulations provide that for a project implicating the jurisdiction of multiple federal
agencies, it is appropriate for a single lead agency to take primary responsibility for the
preparation of the EIS, and for other cooperating agencies to collaborate in and rely upon that
analysis.  *See* 40 C.F.R. §§ 1501.5, 1501.6, 1506.3; *Silentman v. Fed. Power Comm'n,* 566 F.2d
237, 240 (D.C. Cir. 1977).  Here, BOEM was the lead agency, and the Corps was a cooperating
agency.  *See, e.g.,* CW 65084; CW 65098.  The Corps properly relied upon and expressly
adopted BOEM's NEPA analysis in its record of decision.  CW 119707; *see* 40 C.F.R. § 1506.3;
*Hammond v. Norton*, 370 F. Supp. 2d 226, 261 (D.D.C. 2005).

1502.13, and the regulations specifically call for the agency to "consider the needs and goals of the parties involved in the application or permit as well as the public interest." 43 C.F.R. § 46.420(a)(2). Courts "generally defer to the agency's reasonable definition of objectives." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (citations omitted); *City of Alexandria v. Slater,* 198 F.3d 862, 867 (D.C. Cir. 1999) (courts evaluate whether an agency's objectives are reasonable "with considerable deference to the agency's expertise and policy-making role.").

Here the description of the purpose and need for the project is reasonable. The FEIS identified the purpose of the project as:

> to provide an alternative energy facility that utilizes the unique wind resources in waters offshore of New England using a technology that is currently available, technically feasible, and economically viable, that can interconnect with and deliver electricity to the New England Power Pool (NEPOOL), and make a substantial contribution to enhancing the region's electrical reliability and achieving the renewable energy requirements under the Massachusetts and regional renewable portfolio standards (RPS).

CW 65082. The statement of purpose and need is made in the context of Cape Wind's proposal, which the FEIS recognizes is "to build, operate, and eventually decommission a wind energy facility . . . in Nantucket Sound." *Id.* The choice of location is not a coincidence; rather, the unique wind resources of this area make the location a critical component of the project.

This statement of purpose and need is perfectly reasonable and complies fully with NEPA. Plaintiffs' primary argument is that BOEM's statement of purpose and need "is unreasonably narrow for the simple reason that BOEM is not permitted to define the purpose by referring to the project itself." Plf. Mem. at 75. But Plaintiffs provide no citation to support this assertion. Indeed, taking the project proponent's plans and goals into account when defining a project is entirely reasonable, provided for in the applicable regulations, and repeatedly approved

by this Circuit.

"When an agency is asked to sanction a specific plan . . . the agency should take into account the needs and goals of the parties involved in the application." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (citing 43 C.F.R. § 46.420(a)(2), other citations omitted).  As the Court stated in *Busey*:

> An agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate alternative ways of achieving *its* goals, shaped by the application at issue and by the function that the agency plays in the decisional process. Congress did expect agencies to consider an applicant's wants when the agency formulates the goals of its own proposed action. Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be.

938 F.2d at 199.  This Circuit has consistently upheld purpose and need statements that called for the purpose of constructing a given project, so long as the agency also considered broader objectives.  *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (acceptable purpose and need was "to act upon the Proponents' proposal . . . to expand the level of development by drilling 4,399 new producing wells and to relax seasonal restrictions in certain areas."); *see also S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 53 (D.D.C. 2002); *City of Alexandria*, 198 F.3d at 867-68; *Davis v. Latschar*, 83 F. Supp. 2d 1, 8 (D.D.C. 1998), *aff'd*, 202 F.3d 359 (D.C. Cir. 2000.  That is exactly what the agency has done here.  BOEM's purpose and need included the broader objectives of providing electivity to the New England Power Pool, increasing reliability, and supporting renewable energy requirements. That it did so in the context of the particular application that prompted the action is entirely reasonable.

## 2.     The FEIS Analyzed a Reasonable Range of Alternatives

Plaintiffs argue that BOEM should have considered onshore alternatives, deepwater alternatives, other sites, and mitigation alternatives.  Plf. Mem. at 74.  These arguments are without merit.  BOEM conducted a thorough alternatives analysis and eliminated certain

alternatives from detailed study.  As to the eliminated alternatives, BOEM was obligated to

"'briefly discuss the reasons for their having been eliminated.'" *Tongass Conservation Soc'y v.*

*Cheney*, 924 F.2d 1137, 1140-41 (D.C. Cir. 1991) (quoting 40 C.F.R. § 1502.14(a)). The record

demonstrates that the BOEM met this standard by explaining why the proposed alternatives were

unreasonable given BOEM's objectives.

NEPA requires that an agency consider "alternatives to the proposed action" in an EIS,

including a "no action" alternative and "all reasonable alternatives."  42 U.S.C. § 4332(2)(C); 40

C.F.R. § 1502.14(a), (d).  A "rule of reason governs 'both *which* alternatives the agency must

discuss, and the *extent* to which it must discuss them.'"  *Busey*, 938 F.2d at 195 (citation

omitted).  The range of alternatives is determined by the project's statement of purpose and need.

*Id.* at 195 ("The goals of an action delimit the universe of the action's reasonable alternatives.").

An agency's analysis of alternatives should be upheld "so long as the alternatives are reasonable

and the agency discusses them in reasonable detail." *Id.* at 196.

Here, the FEIS included a thorough analysis of alternatives.  *See* CW 65134-71 (FEIS

Section 3: Alternatives); CW 65626-81 (FEIS Section 5.4: Alternatives Evaluated Further in

Detail).  Initially, BOEM developed a screening process aimed at identifying those project

alternatives which did not meet the purpose and need, were not technically feasible, or were not

economically viable.  CW 65134-38 (describing screening factors).  BOEM then explained its

reasons for eliminating these alternatives.  CW 65142-45.  The FEIS evaluates all remaining

reasonable alternatives including alternatives in nine geographic locations along the coast from

Maine to Rhode Island and three non-geographic alternatives including a no action alternative.

CW 65145-71; CW 65626-81.

Plaintiffs fail to demonstrate that BOEM's analysis was not reasonable.  First, despite

Plaintiffs' arguments to the contrary, Plf. Mem. at 74, the FEIS does analyze onshore

alternatives, and its explanation of why onshore facilities were eliminated from detailed analysis

is perfectly reasonable.  *See* CW 65142-43.  The FEIS explains that there are limited contiguous

sites within Massachusetts that are capable of accommodating commercial wind facilities.  *Id.*

Further, many areas of Massachusetts have "marginal" or only "fair" wind resources, CW 65143,

as opposed to the "excellent-to-outstanding" wind resources offshore in project area.  CW 65346.

The fact that onshore wind facilities are being proposed or have been approved in other areas, as

Plaintiffs claims, Plf. Mem. at 76 n.59, is irrelevant.  BOEM was required only to consider a

reasonable range of alternatives and it did so.  And significantly, BOEM only has authority to

issue leases for *offshore* sites, and therefore consideration of numerous onshore alternatives that

it could never approve would serve no purpose.  *See City of Alexandria*, 198 F.3d at 869

(analysis of alternatives outside jurisdiction of the action agency "make little sense for a discrete

project within the jurisdiction of one federal agency."); *see also City of Grapevine v. Dep't of

Transp.,* 17 F.3d 1502, 1506 (D.C. Cir. 1994) (an agency's "consideration of alternatives may

accord substantial weight to the preferences of the applicant") (citation omitted).

    Plaintiffs' next argument is that BOEM arbitrarily did not consider offshore sites east of

Block Island and elsewhere south of Nantucket Sound that Plaintiffs identified in comments.[32]

Plf. Mem. at 77.  This argument misunderstands the applicable legal standard.  The agency

decides both which alternatives to consider and which to consider in detail, and this decision is

entitled to deference.  *Busey*, 938 F.2d at 195.  While the agency may respond to comments,

simply identifying an alternative in comments is not sufficient to require the agency to consider

---

[32] Plaintiffs argue that BOEM should have analyzed deepwater technology.  *See* Plf. Mem. at 78 n.63.  BOEM considered such technology but screened it out due to technological limitations. CW 65138; CW 65145; CW 65141; CW 256122.  BOEM further analyzed such technologies in the 2010 EA. *See* CW 112034-37.

it in depth—that decision is left to the discretion of the agency.  *Id.*  So long as the agency

responds to the comment in a reasonable way, this is sufficient.  *See Sierra Club v. Adams,* 578

F.2d 389, 394, 396 (D.C. Cir. 1978).

Here, Plaintiffs identified several alternative sites in comments and BOEM responded to

these comments in the FEIS.  *See* CW 205548.  That certain areas considered in the FEIS were

later opened to other wind development projects after the project was approved, Plf. Mem. at 78

n. 62, is irrelevant because the decision should be evaluated based on the record at the time.  *See*

*Vt. Yankee*, 435 U.S. at 549, 98 S. Ct. at 1214.  Further, the fact that there is interest in the future

development of the East of Block Island site in no way demonstrates that its exclusion from

consideration for the Cape Wind Project was unreasonable.  It was excluded due to extreme

storm waves and also because the underlying geology was not compatible with WTG installation

and embedment of submarine cables.  CW 65142; *see also* CW 205227 (FEIS Table 3.2.1-1:

Physical Screening and Economic Modeling).  Plaintiffs also argue that wave height was applied

inconsistently to screen out alternatives.  Plf. Mem. at 77 & n.61.  But that was not the case, and

Plaintiffs fail to consider that the FEIS used multiple factors to screen alternatives.  *See*, *e.g.*, CW

65142.  In sum, BOEM considered a reasonable range of alternatives in compliance with NEPA.

### 3.  BOEM Considered the Reasonably Foreseeable Environmental Impacts of the Project

BOEM extensively analyzed the reasonably foreseeable environmental impacts of the

project in compliance with NEPA's requirement to take a "hard look" at such impacts.  The FEIS

analyzed in detail the direct, indirect, and cumulative impacts of the proposed action and all

reasonable alternatives (including the no action alternative) on a host of environmental resources.

Aside from the issues addressed above, Plaintiffs argue primarily that the FEIS does not

adequately consider the environmental impacts of the project because:  (1) BOEM did not gather

three years of radar data related to birds in the area as some FWS scientists suggested, (2) the

analysis of the impacts to aviation was insufficient, and (3) the cumulative impact analysis was

not sufficiently broad.  Plf. Mem. at 68-79.  These arguments do not demonstrate that the FEIS is

insufficient.

> ### a.    The FEIS Took a Hard Look at the Reasonably Foreseeable Impacts to Birds

The FEIS contains an extensive discussion of the reasonably foreseeable impacts of the

project on birds. *See* CW 65218-32 (FEIS 4.2.4: Description of the affected environment:

Avifauna); CW 65444-79 (FEIS 5.3.2.4:  Impacts on Avifauna); CW 65696-97 (FEIS 6.2.7:

Cumulative impacts on avian resources and protected bird species); CW 65722-23 (FEIS 9.3.1.3:

Avifuana monitoring and mitigation); CW 227392-422 (FEIS Appendix N: Framework for the

Avian and Bat Monitoring Plan); CW 205542-53 (FEIS Appendix L: responses to comments

regarding birds); CW 204615-30; CW 204667-68; 204699-742 (FEIS Appendix G: Biological

Assessment: Species and critical habitat description: Avian species).  This analysis was informed

by a reasonable baseline level of data using BOEM's preferred methodology, and supplemented

with an extensive adaptation and mitigation plan—an approach that has repeatedly been

approved in this Circuit.  This is sufficient to demonstrate a "hard look" at impacts on birds.

> ### i.    BOEM's Monitoring Data Were Sufficient and Additional Data Were Not Essential for BOEM to Choose Among Alternatives

Plaintiffs argue that BOEM did not collect an appropriate baseline level of data related to

bird impacts, insisting that an additional three years of radar data was required to make a

reasoned choice among alternatives.  Plf. Mem. at 68-69.  However, BOEM, in conjunction with

the Massachusetts Audubon Society and Cape Wind, collected an unprecedented amount of

avian data.  The FEIS describes these methods:  four years of surveys amounting to hundreds of

individual aerial and boat surveys, as well as radar surveys that were employed to estimate avian occurrence and distribution within the affected area during different seasons.  CW 65218-19; CW 204636-58.  This methodology was adopted by BOEM, the action agency, and is reasonable and entitled to deference.  *Vill. of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006) (judgments regarding development of the baseline against which alternatives would be assessed are the sorts of "expert analytical judgments" to which courts should defer).

Plaintiffs make much of FWS's suggestions that BOEM collect an additional three years of radar data.[33]  BOEM considered FWS's suggestions, but found that the type of radar capable of detecting birds had an inadequate range and was not multi-directional.  CW 67699.  The type of radar that could be used to cover the relevant distances in the project area from outside of structures in Nantucket Sound was incapable of tracking smaller objects such as birds from shore to the meteorological tower.[34]  *See id.*  Ultimately, BOEM scientists considered FWS's suggestion, but concluded that the existing surveys were sufficient.  CW 67697-700; CW 112042-43.

That BOEM adopted a different course than suggested by FWS does not demonstrate their decision is arbitrary.  "Although an agency should consider the comments of other agencies, it does not necessarily have to defer to them when it disagrees."  *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 276 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir.  2010) (quoting *Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 289

---

[33] It was not a uniform opinion within FWS that such data were needed.  *See* FWS 0042 (radar studies were "of little value in this evaluation" and that "the available data provide[d] reasonable approximations . . . .").  Indeed, the author of the "Houston we have a problem" e-mail researched the issue further and concluded that the type of radar he originally advocated would not be useful, as it was "incapable of detecting . . . birds."  FWS 31886.

[34] Further the cost of such data collection would have been exorbitant, requiring a jack-up barge and a generator running non-stop for three years.  *See, e.g.*, CW 244774; FWS 31885-86.

(4th Cir.1999)); *Hammond v. Norton*, 370 F. Supp. 2d 226, 252 (D.D.C. 2005) (agency "does not

have to follow the EPA's comments slavishly—it just has to take them seriously." (citing *Busey*,

938 F.2d at 201)).

Plaintiffs cite 40 C.F.R. § 1502.22 to bolster their argument that the additional three years

of radar data were required prior to releasing the FEIS.  Plf. Mem. at 68-72.  The regulation does

not support their argument.  It directs agencies faced with incomplete information to "make clear

that such information is lacking."  Then:

> If the incomplete information relevant to reasonably foreseeable significant
> adverse impacts is essential to a reasoned choice among alternatives and the
> overall costs of obtaining it are not exorbitant, the agency shall include the
> information in the environmental impact statement.

40 CFR 1502.22(b) (emphasis added).  BOEM conducted an extensive, detailed examination of

the alternatives.  *See* section V.A.2., *supra*. Plaintiffs have entirely failed to demonstrate that the

additional years of radar data would be "essential" to choosing among these alternatives.  This

distinction is crucial – it prevents project opponents from turning an EIS into an informational

snipe-hunt and ensures that the resulting document is "analytic rather than encyclopedic."  40

C.F.R. § 1502.2.

To prove a violation of section 1502.22, Plaintiffs have to do more than flyspeck an EIS

for perceived or actual data gaps, or data that another agency requested.  Rather, they must show

that the gaps are so "essential" to a consideration of significant impacts and alternatives that to

proceed without this information would be arbitrary and capricious.  *See Colo. Envtl. Coal. v.

Dombeck,* 185 F.3d 1162, 1172 (10th Cir. 1999) (no violation of section 1502.22 where plaintiffs

did not establish that missing data was essential); *Jicarilla Apache Tribe v. Morton,* 471 F.2d

1275, 1280-81 (9th Cir. 1973) (issuance of EIS before study completed does not violate NEPA);

*Tongass Conservation Soc'y*, 924 F.2d at 1143-44 (additional survey not required); *Theodore*

*Roosevelt Conservation P'ship*, 605 F. Supp. 2d at 281 ("the Court cannot say BLM violated

NEPA by failing to wait for [Plaintiffs' requested] study") (citing *Conservation Law Found. v.*

*FERC*, 216 F.3d 41, 46 (D.C. Cir. 2000)); *see also* 51 Fed. Reg. 15,618, 15,620 (Apr. 25, 1986)

(§ 1502.22 amendments intended to prevent "endless hypothesis and speculation").  Plaintiffs

have not even attempted to make such a substantive showing.

Here, BOEM adopted a scientifically sound methodology for evaluating the reasonably

foreseeable impacts on birds, and this allowed a reasoned choice among alternatives.  BOEM did

not use the methodology and compile the type of data Plaintiffs—and some within FWS—would

have preferred; however, this Circuit has held that an agency's reliance on even "outdated data"

is not arbitrary or capricious.  *Theodore Roosevelt Conservation P'ship*, 605 F. Supp. 2d at 273

(citing *Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir. 2006)).  Here the data was far from

"outdated"—BOEM's approach provided sufficient information to evaluate the environmental

impacts to birds and to make a reasoned choice among the alternatives; as such it complies with

NEPA.  Plaintiffs' contention is at odds with the record as a whole, and the deference owed to

BOEM's scientific judgment.  *See Nat'l Comm. for the New River*, 373 F.3d at 1327 (scientific

judgment are entitled to an "extreme degree of deference"); *see also N. Slope Borough v. Andrus*,

642 F.2d 589, 601 (D.C. Cir. 1980) (court must consider entirety of an EIS when assessing

adequacy of NEPA analysis).

    **ii.**    **The Avian and Bat Monitoring Was Appropriate
and Further Demonstrates BOEM's "Hard
Look" at Impacts to Birds**

Plaintiffs argue that the Avian and Bat Monitoring Plan ("ABMP")[35] cannot be used to

---

[35] The ABMP describes the baseline data and steps to both monitor impacts to birds (and bats) and mitigate adverse impacts to them.  *See* CW 227393-422 (FEIS Appendix L: Framework for the Avian and Bat Monitoring Plan).  This plan was the result of a memorandum of understanding ("MOU") between BOEM and FWS under Executive Order 13186, designed to

satisfy NEPA because its requirements to collect further data and mitigate any impacts are post-decisional.  Plf. Mem. at 72.  Courts in this circuit have rejected exactly this argument.  In *Theodore Roosevelt Conservation Partnership*, the court explicitly rejected appellants' argument that a similar adaptive management plan "violates NEPA's requirement to evaluate environmental impacts *before* actions are taken."  616 F.3d at 515 (citations omitted).  In rejecting this argument the Court specifically reasoned that "[a]llowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA. It is certainly not arbitrary or capricious." *Id.* at 517.

Here, BOEM has rationally responded to the uncertainty inherent in a first-of-its-kind project on the OCS by developing the ABMP.  In cooperation with FWS, Cape Wind, the Massachusetts Audubon Society, and other groups, BOEM conducted avian studies, and reviewed four years of data to evaluate the presence of birds in the area and evaluate potential impacts to those birds.  *See* CW 227403-04.  The agency then established the ABMP, which FWS joined in approving.  *See* CW 227393-422.  This plan identifies technology and methods for assessing impacts of the proposed action and then using monitoring results to drive changes in mitigation requirements and readjustments to monitoring as needed.  This approach is reasonable, and further demonstrates that the FEIS took a "hard look" at impacts to birds.

### b.     The FEIS Took a Hard Look at the Reasonably Foreseeable Impacts on Aviation

BOEM also adequately analyzed impacts to aviation prior to approving the COP.  The FEIS describes the airports in the area and how they may be affected by the project.  CW 65348-50; CW 65357-58; CW 65612-13; CW 65619-26.  The FEIS explained that the initial project

---

integrate migratory-bird-conservation principles, conservation measures, and management practices into agency decision-making. CW 352083-99.

proposal with turbines of 426 feet would have "no substantial adverse effect" on aviation.  CW 65612; *see also* CW 66349.  The FEIS noted that, based on a redesign of the project which increased the height of the rotors to 440 feet, the Federal Aviation Administration ("FAA") had decided to conduct additional analysis of the potential impacts on aviation and that, at the time of the issuance of the FEIS, that analysis was still pending.  CW 65612; CW 65714-15; *see also* CW 26803; CW 66374.  After the completion of the FEIS, the FAA issued a Notice of Presumed Hazard regarding the wind turbines in February 2009.  CW 362866.  The FAA's notice indicated that FAA was conducting further study of the impacts of the wind farm on aviation.  *Id.*  BOEM discussed the Notice of Presumed Hazard and the pending study in the 2010 EA and ROD.  CW 111977; CW 112050-51.

Prior to the issuance of the Lease, in May 2010, the FAA completed its study and issued a Determination of No Hazard.  CW 78989.  The determination contained certain requirements, CW 78989, 78995-96, which BOEM incorporated into the terms of the Lease.  CW 119317-18.  In the 2011 EA, prepared before the approval of the COP, BOEM considered the results of an additional study evaluating whether the project would result in flight cancellations or delays at local airports.  CW 119746, 119770-71; *see also* CW 237637-39.  BOEM did not delegate its NEPA obligations to the FAA.  *See Idaho v. ICC*, 35 F.3d 585, 595 (D.C. Cir. 1994).  Rather, in the FEIS and two subsequent EAs, BOEM thoroughly considered the FAA's determinations and conducted a thorough analysis of the impacts on aviation.  *See*, *e.g.*, *Nat'l Comm. for the New River*, 373 F.3d at 1328.[36]

---

[36] Plaintiffs note that they challenged the FAA's Notice of No Hazard and the court remanded the determination to the FAA.  *See Town of Barnstable, Mass. v. FAA*, 659 F.3d 28 (D.C. Cir. 2011).  The FAA has since conducted an additional analysis and issued another No Hazard Determination, which Plaintiffs have again challenged.  *See Town of Barnstable, Mass. v. FAA*, No. 12-1362 (D.C. Cir.) (filed Aug. 22, 2012).  These subsequent proceedings are irrelevant to

      **c.**      **The FEIS Took a Hard Look at Cumulative Impacts**

Plaintiffs argue that the FEIS's cumulative impacts analysis has an "improperly

constrained" scope because it focuses on the project area, Plf. Mem. at 79-80, and that the FEIS

does not sufficiently address reasonably foreseeable activities. To the contrary, cumulative

impacts are analyzed within a reasonable area, and the EIS fully discusses these impacts.

"Cumulative impact is the impact on the environment which results from the incremental

impact of the action when added to other past, present, and reasonably foreseeable future actions

regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40

C.F.R. § 1508.7.  "The identification of cumulative effects is a task committed 'to the special

competency' of the agency preparing an EIS."  *Hammond*, 370 F. Supp. 2d at 245 (quoting

*Kleppe v. Sierra Club*, 427 U.S. 390, 413, 96 S. Ct. 2718, 2732 (1976)).  In particular, an

agency's selection of the geographic area for the cumulative impacts analysis is entitled to

deference.  *Kleppe*, 427 U.S. at 414, 96 S. Ct. 2718, 2732 ("[D]etermination of the extent and

effect of [cumulative impacts] . . . and particularly identification of the geographic area within

which they may occur is a task assigned to the special competency of the appropriate agencies.").

In this case, BOEM appropriately considered cumulative impacts of the project in the

FEIS.[37]  The FEIS examines these impacts over a broad geographic area: "northeastward from

Nantucket Island to Monomoy Island including Monomoy Shoals and northwestward from

Nantucket Island through Narragansett Bay to Quonset Rhode Island including Martha's

Vineyard."  CW 65682.  Far from ignoring comments about this area, Plf. Mem. at 77-78,

---

the determination as to whether BOEM's NEPA process for the decisions it has already made
was sufficient.

[37] *See* CW 065682-709 (FEIS section 6: Cumulative Impacts Analysis). The FEIS discusses the
cumulative impacts of offshore and onshore wind projects, CW 65683-87, and construction
projects located outside the cumulative impact study area, CW 65689-90.  It specifically
addresses the cumulative impacts of the project on, *inter alia*, birds, CW 65696-97, and marine
mammals, CW 65694-95.

BOEM properly addressed comments regarding the area considered and concluded, "This geographic study area includes a broad scope of onshore and offshore projects that have been constructed or may have the potential to be constructed in the future."  CW 65682; *see also* CW 205512-13.

Pointing to a proposed wind power facility near Long Island[38] as an example of a project that should have been included in the cumulative impacts analysis, Plaintiffs suggest that the cumulative impact analysis area should be the entire "Atlantic flyway" as migratory birds pass through this area.  That would require the agency to analyze all areas in which affected bird species might be as part of the cumulative impact area.  BOEM reasonably determined that this was not the appropriate area for the analysis.  It should be noted that impacts to birds—including those that travel outside the cumulative impact area—are discussed elsewhere.[39]  And in the cumulative impacts section, the FEIS addresses ocean development projects that are outside of the cumulative impacts study area.  CW 65689-90.  But Plaintiffs' view would explode the bounds of the cumulative impact area beyond the immediate geographic scope of the project and require an unreasonable level of analysis. *See*, *e.g.*, *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 164 (D.D.C. 2005), *aff'd sub nom. Oceana, Inc. v. Gutierrez*, 488 F.3d 1020 (D.C. Cir.  2007) (holding Plaintiffs' overly broad "application of the cumulative impacts misreads or overlooks the "'rule of reason'") (citation omitted).

The second and related argument that Plaintiffs make is that BOEM failed to include reasonably foreseeable activities, specifically, a proposed facility in Rhode Island, the proposed

---

[38] This proposed project in the very initial stages of consideration. *See* "Long Island-New York City Offshore Wind Project" at http://www.boem.gov/Renewable-Energy-Program/State-Activities/New-York.aspx.

[39] *See*, *e.g.*, CW 65444-79 (FEIS 5.3.2.4:  Impacts on Avifauna); CW 65696-97 (FEIS 6.2.7: Cumulative impacts on avian resources and protected bird species); CW 227392-422 (FEIS Appendix N: Framework for Avian and Bird Monitoring Plan)

Mid-Atlantic Wind Park, and a proposed facility off the Virginia coast.  Plf. Mem. at 80 n.67.

Plaintiffs have not identified any information in the record to demonstrate that these projects

were sufficiently advanced so as to require discussion in the EIS.  At the time BOEM was

preparing the FEIS, the projects Plaintiff identify were not sufficiently concrete to warrant

inclusion in the cumulative impacts analysis.[40]  *See NRDC v. Kempthorne*, 525 F. Supp. 2d 115,

123 (D.D.C. 2007) ("Although plaintiffs argue that BLM failed to consider two specific pending

development proposals . . . these projects had only begun to work their way through the NEPA

approval process when the FEIS was compiled.").[41]

### B.       BOEM Complied with NEPA Prior to Approving the COP

Pursuant to the terms of the lease and 2010 ROD, Cape Wind submitted a COP to

BOEM, and, in accordance with applicable NEPA regulations, BOEM examined new

information that had become available since the decision to issue the Lease, and considered

whether there was any significant new information that would require the preparation of an

SEIS.  *See* 40 C.F.R. § 1502.9(c)(i).  As detailed in the COP, the 2011 EA, and the 2011 ROD,

the proposed project described in FEIS remained substantially the same.  *See* CW 065102-

65133l; CW 119696; CW 119745.  BOEM concluded that there was no new significant

information relating to the project or its impacts on the environment that would required the

---

[40] However, DeepWaterWind's proposed facility off Rhode Island was discussed in the 2010 EA. CW 112052.  This project as well as several other projects were considered in the 2011 EA. Both EAs concluded that these projects do not represent significant new cumulative impacts or affect the validity of the assumptions and analysis in the FEIS.  CW 112052; CW 119775-77.

[41] That does not mean that the cumulative impacts of these projects will be ignored; rather, the NEPA review for these projects will take into account their cumulative impact as well as that of the Cape Wind Project. *See, e.g.*, CW 119775-76 (describing environmental review undertaken for proposed pioneer array, including cumulative impact analysis for that project); s*ee Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 278 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir.  2010).

preparation of an SEIS.  CW 119745.  This decision is well supported by the record, and

Plaintiffs' arguments to the contrary are without merit.

### 1.    Approval of the COP Was Not a New Major Federal Action

Before addressing whether an SEIS would be required under applicable NEPA

regulations and case law, Plaintiffs assert that the approval of the COP was a separate major

federal action from the approval of the Lease and therefore required the preparation of a new

EIS.  Plf. Mem. at 81.[42]  This argument is based on a faulty interpretation of BOEM's regulations

and the approval process for the Cape Wind Project.  Contrary to Plaintiffs' assertions, the

regulations do not require that BOEM prepare an EIS at the COP stage.  Rather, they require that

BOEM "prepare an appropriate NEPA analysis."  30 C.F.R. § 585.628(b).

In the case of the Cape Wind Project, BOEM prepared the FEIS, which considered all of

the environmental impacts of issuing a lease and approving the construction and operation of the

Cape Wind Project.  *See*, *e.g.*, CW 65034; CW 111957.  After considering additional information

in the 2010 EA as well as all of the information in the FEIS, BOEM decided to issue the Lease.

CW 112029; CW 111957.  In the 2011 EA, prepared before approval of the COP, BOEM

analyzed new information that came to the attention of the agency since the decision to issue the

Lease.  CW 119750.  BOEM determined that the project was substantially unchanged since the

completion of the FEIS and that there was no new significant new information relating to the

project or its impacts such that an SEIS was required.  CW 119745-48.  This was entirely

consistent with the CEQ's NEPA regulations, 40 C.F.R. § 1502.9(c)(i), and BOEM's OCSLA

regulations, which provide the agency with multiple opportunities to conduct a NEPA analysis

and only require "an appropriate NEPA analysis" at the COP stage.  *See* 30 C.F.R. §§

---

[42] The requirement to conduct a NEPA analysis is triggered by proposals for "major Federal actions significantly affecting the quality of the human environment."  43 U.S.C. § 4332(2)(C).

585.613(b), 585.628(b).[43]

Plaintiffs argue that analysis and information contained in a January 21, 2011 letter from BOEM to Cape Wind shows that BOEM's NEPA analysis was deficient.  *See* Plf. Mem. at 82 (citing CW 376759).  That letter relates primarily to the completeness of the draft COP under BOEM's OCSLA regulations, not the sufficiency of the information for purposes of NEPA.  *See* CW 376758-65.  The letter also states that more information was needed before BOEM could "begin the environmental review of the COP."  CW 376758.  But this letter pre-dated the approval of the COP and therefore demonstrates only that BOEM solicited and considered additional information before issuing the 2011 EA and approving the COP in the 2011 ROD. CW 119697-98; CW 119750-51.  Plaintiffs are simply ignoring the fact that BOEM conducted additional NEPA analysis after the completion of the FEIS.[44]

Further, Plaintiffs are mistaken that the FEIS does not analyze potential oil spill impacts. *See* Plf. Mem. at 83.  The FEIS contains a thorough analysis of the risks of oil spills and the potential effects of such spills and also appends a draft Oil Spill Response Plan ("OSRP").  CW 65383-85; CW 65422-24; CW 65507-08; 65564-65; CW 66745.  In the 2011 EA, BOEM specifically addressed the concern the first responders from Barnstable would be responsible for oil spill cleanup.  CW 119773.  BOEM stated that Cape Wind would have primary responsibility to contain and respond to oil spills, as set forth in the final OSRP submitted with the COP.  CW 119773; CW 120863; *see also* CW 111984.  The OSRP states that Cape Wind personnel can be on the scene within one hour of an oil spill, and Cape Wind's contractor can respond within two

---

[43] The fact that BOEM may choose to prepare an EIS at a later stage of the approval process for other projects, see Plf. Mem. at 81 & n.68, is immaterial because here BOEM had already prepared an FEIS analyzing all phases of the project.

[44] Plaintiffs' argument that BOEM's analysis of G & G survey data was insufficient is addressed in section III, *supra*.

hours.  CW 120910, 120912.  Further, the risk of any oil spill is low, and any spill is likely to be

small (90% likelihood that it would be less than 50 gallons).  CW 65383.[45]

> ### 2.   BOEM Considered New Information About Environmental Impacts, Including to Whales, and Reasonably Concluded that No Supplemental EIS Was Required

An SEIS is required when "[t]here are significant new circumstances or information

relevant to environmental concerns and bearing on the proposed action or its impacts."  40

C.F.R. § 1502.9(c)(1).  As the Supreme Court has explained:

> [A]n agency need not supplement an EIS every time new information comes to
> light after the EIS is finalized.  To require otherwise would render agency
> decisionmaking intractable, always awaiting updated information only to find the
> new information outdated by the time a decision is made.

*Marsh*, 490 U.S. at 373, 109 S. Ct. at 1859.  Rather, a "supplemental EIS is only required where

new information 'provides a *seriously* different picture of the environmental landscape.'" *Nat'l*

*Comm. for the New River*, 373 F.3d at 1330 (quoting *City of Olmsted Falls, Ohio v. FAA*, 292

F.3d 261, 274 (D.C. Cir.  2002)); *see also Marsh*, 490 U.S. at 374, 109 S. Ct. at 1859) (an EIS

should be supplemented only if new information shows that the environment will be affected "in

a significant manner or to a significant extent not already considered.").  An agency's decision

not to prepare an SEIS is reviewed under the arbitrary and capricious standard.  *Olmsted Falls*,

292 F.3d at 274.   "The determination as to whether information is either new or significant

'requires a high level of technical expertise'; thus, we 'defer to the informed discretion of the

[agency].'"  *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 197

---

[45] Plaintiffs are mistaken that the worst case oil spill is greater than 42,000 gallons, the volume of oil in the electrical services platform.  *See* Plf. Mem. at 83 n.72; *see also* CW 119773-74.  The chances of colliding with the platform are remote because any vessel would have to be significantly off course and pass a number of turbines.  CW 195587.  The chances of any vessel colliding with a turbine and causing an oil spill were analyzed and found to be extremely low. *See* CW 65382; CW 65385; CW 195610-21.  In the unlikely event of a tanker spill, such a spill is likely to be less than 600 gallons.  CW 195618.  The requirement that all oil tankers be double-hulled by 2015 would further reduce the probability of an oil spill from a tanker.  CW 195590.

(D.C. Cir. 2013) (quoting *Marsh*, 490 U.S. at 377, 109 S. Ct. at 1861).

Here, the 2011 EA/FONNSI adequately considered the new information that had come to light since the decision to issue the Lease. One such piece of new information discussed in the EA is information regarding right whale sightings in the vicinity of the Sound. CW 119760. Specifically, the EA notes that in the spring of 2010 right whales were observed in Rhode Island Sound and nearby waters (though not in the area proposed for construction). CW 119761. The EA explains that BOEM brought the whale sightings to the attention of NMFS in a July 13, 2010 letter and re-initiated consultation with NMFS regarding impacts to whales. *Id.*; *see also* CW 119354; CW 119780. NMFS analyzed the effects of the Proposed Action on marine mammals, including whales, in light of this information. And in December 2010, NMFS issued a Biological Opinion, which concluded that even though increased numbers of right whales had been sighted in Rhode Island Sound, the proposed project would not adversely affect these whales or jeopardize the continued existence of the species. *See* CW 120497-98. The EA further notes that the sighting of the whales does not alter the analyzed environmental impacts in the FEIS and 2010 EA, as vessels must abide by monitoring and avoidance requirements during transit. CW 119761-62; CW 242418-36. *See Michigan Gambling Opposition v. Kempthorne,* 525 F.3d 23, 29 (D.C. Cir. 2008) (further environmental review not needed where the agency has shown that "safeguards in the project sufficiently reduce the impact to a minimum") (quoting *TOMAC v. Norton,* 433 F.3d at 861).

Ultimately, the 2011 EA concluded that "the aggregation of right whales in Rhode Island Sound, and the literature review do not, singularly or cumulatively, significantly alter the impacts to marine mammals . . . that were described in the FEIS and the 2010 EA." CW 119761-62. Thus, far from "ignoring" the impact of right whales, BOEM, in conjunction with NMFS,

considered the new information and rationally concluded that this information did not require the preparation of an SEIS.  This conclusion is reasonable and entitled to deference because the information about the whales did not show that the environment would be affected "in a significant manner or to a significant extent not already considered."  *Marsh*, 490 U.S. at 374, 109 S. Ct. at 1859; *see also Pub. Emps. for Envtl. Responsibility*, 832 F. Supp. 2d at 31 ("While this Court does not dispute that small changes may create a significant impact, it has no basis to find that defendants have ignored such impacts in this case.").

Finally, Plaintiffs briefly criticize the EAs for not including a sufficient alternatives analysis.  Plf. Mem. at 87-88.  However, alternatives were examined in great depth in the FEIS. *See* section V.A.2., *supra*.  No further alternatives analysis was necessary because that analysis had already been conducted and the purpose of the EAs was to consider whether new information warranted an SEIS, not to redo the entire NEPA analysis.  *See* CW 112032; 40 C.F.R. § 1502.9.  In addition, the 2010 EA evaluated new information regarding deepwater wind turbine placement technology and concluded that those technologies were only in the exploratory phases.  CW 112034-36.  The 2011 EA also considered whether there was any new information bearing on the alternatives analysis in the FEIS and concluded that there was not.  CW 119756. Accordingly, the analysis in the EAs was appropriate.

### 3.    BOEM Allowed Extensive Opportunities for Public Comment and Appropriately Responded to Comments

Plaintiffs claim that BOEM did not allow sufficient opportunity to comment on the EAs. Plf. Mem. at 87-89.  These arguments are not consistent with the extensive record of public comment at every stage of environmental review.  Both the FEIS and the EAs were fully compliant with applicable regulations and the environmental review undertaken in this case clearly allowed sufficient public comment.

Under NEPA, agencies must permit the public to "play a role in both the decisionmaking process and the implementation of that decision." *Methow Valley,* 490 U.S. at 349, 109 S. Ct. at 1845. To this end, the CEQ regulations require that, after preparing a draft EIS, the agency request comments from other federal agencies, appropriate state and local agencies, affected Indian tribes, any relevant applicant, the public generally, and, in particular, interested or affected persons or organizations. *Id.* at 350, 109 S. Ct. at 1846; 40 C.F.R. § 1503.1.

When an agency prepares an EA, the regulations provide for them to involve the public in the process "to the extent practicable," 40 C.F.R. § 1501.4(b). "[T]he agency has significant discretion in determining when public comment is required." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 519 (quoting *TOMAC*, 433 F.3d at 861). And indeed, "public input during the EA process is not required." *TOMAC*, 433 F.3d at 861 (citation omitted).

Here, the sheer mass of comments received and responded to by BOEM belies Plaintiffs' claims that they have had insufficient opportunity to comment on the environmental consequences of the proposed action. *See* CW 205425 (noting more than 45,000 comments were received on the DEIS); CW 205423-633 (FEIS Appendix L: Comments on DEIS). Even the particular components Plaintiffs complain were not subject to public scrutiny in fact received comment in the DEIS and FEIS. *See* CW 205517-18 (FEIS Appendix L: response to comments on the OSRP); *see also* CW 227392-422. Contrary to Plaintiffs' assertion, the Oil Spill Response Plan (OSRP) was not new with the COP: a draft OSRP was provided Appendix D in the FEIS. CW 66745 (FEIS Appendix D: Oil Spill Response Plan).

BOEM also allowed more than sufficient comment on the EAs. The 2010 EA was circulated for a 30-day comment period. CW 111957; 75 Fed. Reg. 10,500. For the 2011 EA, BOEM provided a notice on its website announcing the preparation of an EA for the COP,

solicited public comment, and posted the COP on its website.  CW 119705; CW 119781; CW

236482.  Indeed, Plaintiffs themselves submitted extensive comments.[46]

This level of public involvement and comment goes above and beyond what is required

by the applicable regulations and case law.  *See NRDC*, 525 F. Supp. 2d at 121 ("[P]laintiffs'

contend that BLM *should* have circulated the draft EAs for public comment . . . .  This argument

is also to no avail because neither the applicable regulations, nor relevant caselaw, require such

notice and comment.").

Finally, Plaintiffs' claim that there is significant new information relating to the project

that BOEM has not considered is baseless.  *See* Plf. Mem. at 88.  Indeed, the topics mentioned,

e.g., the designation of the sound as a tribal cultural property, right whales, and unrelated Coast

Guard guidance are addressed above or in prior briefing.  Plaintiffs are also incorrect that BOEM

did not address the purported changing of the staging area from Quonset, Rhode Island to

Bedford, Massachusetts.  BOEM stated expressly in the 2011 EA that "the staging area has not

been moved, and remains Quonset Point."  CW 119753.

## VI.   Summary Judgment Should Be Granted for Defendants on the Remaining Claims

Plaintiffs did not put forth any argument or evidence in support their claims under the

Clean Water Act ("CWA") and Rivers and Harbors Act ("RHA").  *See* Alliance Am. Compl.

Fifth and Sixth Claims for Relief (ECF No. 69); Barnstable Am. Compl. Ninth Claim for Relief

(ECF No. 68).  Plaintiffs also did not address in their briefing certain aspects of their other

claims.  Because Plaintiffs failed to support these claims, those claims are waived.  *See*

*Grunewald v. Jarvis*, -- F. Supp. 2d --, No. 12-cv-1738 (RLW), 2013 WL 987770, *11 (D.D.C.

---

[46] *See* CW 246589; CW 243685 (comments of APNS); CW 228942; CW 229837; CW 119674
(comments of PEER); CW 229833; CW 243024 (comments of Meyer Glitzenstein & Crystal);
CW 246631 (comments of the Town of Barnstable); CW 246626 (comments of Wampanoag
Tribe of Gay Head/Aquinnah); CW 246518 (comments of Barbara Durkin).

Mar. 14, 2013) (finding that a plaintiff had waived a claim brought pursuant to the APA by not

addressing the claim in its opening summary judgment brief); *Am. Soc'y of Dermatology v.*

*Shalala*, 962 F. Supp. 141, 143 n.1 (D.D.C. 1996) ("The Court deems those claims abandoned as

they are not mentioned in plaintiffs' motion for summary judgment."), *aff'd*, 116 F.3d 941 (D.C.

Cir. 1997).  Accordingly, summary judgment should be granted for Defendants on Plaintiffs'

CWA and RHA claims and other claims to the extent they were not addressed in Plaintiffs'

summary judgment brief.

## CONCLUSION

In sum, BOEM, the U.S. Coast Guard, and the U.S. Army Corps have satisfied their

obligations under the applicable statutes, and summary judgment should be granted for

Defendants.

Respectfully submitted this 12th day of July, 2013.

ROBERT G. DREHER
Acting Assistant Attorney General

*/s/ Luther L. Hajek*
LUTHER L. HAJEK, D.C. Bar No. 467742
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-1376
Facsimile: (303) 844-1350
E-mail: Luke.Hajek@usdoj.gov

KRISTOFOR R. SWANSON, Colo. Bar No. 39378
REUBEN SCHIFMAN, New York Bar
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611

Washington, D.C. 20044
Telephone: (202) 305-0248, (202) 305-4224
Facsimile: (202) 305-0506
E-mail: Kristofor.Swanson@usdoj.gov
　　　　Reuben.Schifman@usdoj.gov

JESSICA O'DONNELL, D.C. Bar No. 473166
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Telephone: (202) 305-0851
Facsimile: (202) 514-8865
E-mail: Jessica.O'Donnell@usdoj.gov

ERIK E. PETERSEN, D.C. Bar No. 489073
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0339
Facsimile: (202) 305-0275
E-mail:  Erik.Petersen@usdoj.gov

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2013, I electronically filed the foregoing FEDERAL

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS ALLIANCE TO

PROTECT NANTUCKET SOUND ET AL.'S AND TOWN OF BARNSTABLE'S MOTIONS

FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTIONS FOR SUMMARY

JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification

of such to counsel of record.

*/s/ Luther L. Hajek*
LUTHER L. HAJEK