

# Alliance to Protect Nantucket Sound

Comments on the
U.S. Army Corps of Engineers
Draft Environmental Impact Statement
for the
Cape Wind Project

## Exhibits for Volume I

February 24, 2005

CW0000005943

# EXHIBITS FOR VOLUME I

**Exhibit No.** **Exhibit Description**

1. Letter from Col. Thomas Koning, Army Corps of Engineers to APNS (January 10, 2005).

2. APNS Technical Consultants Contributing to Comments on DEIS.

3. *Alliance to Protect Nantucket Sound, et al v. U. S. Department of the Army, et al* No. 03-2604, 2005 WL 357636 (1st Cir. Feb. 16, 2005).

4. Aaron M. Flynn, *Wind Energy: Offshore Permitting*, CRS Report for Congress (Nov. 1, 2004).

5. Letter from Thomas F. Caver, Dept. Dir. Civils Works, Dept. of the Army to Representative Rodney Frelinghuysen (Sept. 3, 2003).

6. Letter from Rebecca Watson, Asst. Sec. Minerals Management Service to Vice President Richard B. Cheney (June 20, 2002).

7. Final Report: *Chapter 24: Managing Offshore Energy and Other Mineral Resources*, U.S. Commission on Ocean Policy (Sept. 20, 2004).

8. Center for Coastal Studies, *Review of State and Federal Marine Protection of the Ecological Resources of Nantucket Sound* (Jan. 28, 2003).

9. Provincetown Center for Coastal Studies, *Toward an Ocean Vision for the Nantucket Shelf Region* (January 2005).

10. Memorandum, Office of the Solicitor, U.S. Dept. of the Interior to Director of Fish and Wildlife Service (Jan. 19, 2001).

11. Gray & Pape, *A Review of the "Cultural Resources" and "Visual Studies" Sections of the Environmental Impact Statement Prepared for the Cape Wind Energy Project* (Feb. 2005).

12. Candace Jenkins, *Identification of Potentially Eligible Properties Cape Wind Energy Project* (Feb. 16, 2005).

13. Letter from APNS to Col. Koning, Army Corps (Oct. 5, 2004); Timothy J. Reilly, Report: *Proposed Wind-Generated Power Plant in Nantucket Sound: Oil and Hazardous Substance Information Needs* (Oct. 5, 2004).

14. Cornelia Dean, *Much Heat and a Deep Split Over a Cape Cod Wind Farm,*

CW0000005944

New York Times (Jan. 12, 2005) .

15.     a) Letter from Governor Mitt Romney, Commonwealth of Massachusetts, to Lt. General Robert Flowers, U.S. Army Corps of Engineers (April 2, 2003); b) Letter from Thomas Reilly, Office of the Attorney General, Commonwealth of Massachusetts to Thomas Sansonetti *et al.*, U.S. Dept. of Justice (Oct. 17, 2002).

16.     Letter Governor Mitt Romney, Commonwealth of Massachusetts to Maj. General Carl Strock, U.S. Army Corps of Engineers (July 26, 2004).

17.     David Abel and Beth Daley, *Border bid may imperil wind farm*, Boston Globe article(Feb. 16 2005).

18.     Kevin Dennehy, *Bay State gets a bit bigger*, Cape Cod Times (Feb. 23, 2005).

19.     Email from Dennis Duffy, Cape Wind Assoc. to Helen Golde, Dept. of Energy (Feb. 13, 2004).

20.     Email from Helen Golde, Dept. of Energy to Carla Sullivan, National Oceanic Atmospheric Administration (Feb. 9, 2004).

21.     Transmittal Letter from Terry Orr, Environmental Science Service, Inc. to Karen Adams, U.S. Army Corps of Engineers (April 2, 2002) with enclosure: Cape Wind Associates, LLC, *New England Region Alternative Siting Analysis* (Apr. 2, 2002).

22.     Jennifer Atkinson, *et al.*, *The Wild Sea, Saving our Marine Heritage*, Conservation Law Foundation (Sept. 2000).

23.     Press Advisory, Conservation Law Foundation, *Notes on Cape Wind DEIS* (Aug.-Sept. 2004).

24.     Letter from Jeffrey R. Martin, ESS Environmental Science Services, Inc. to Brian Valiton, U.S. Army Corps of Engineers (Sept. 4, 2001).

25.     Letter from Christine Godfrey, Department of the Army to Charles Natale, Environmental Science Services, Inc. (Sept. 6, 2002).

26.     Environmental Notification Form, Commonwealth of Massachusetts, EOEA No. 12643.

27.     Letter from Charles J. Natale, Environmental Science Services, Inc. to Karen Adams, Army Corps of Engineers (Nov. 21, 2001).

28.     Letter from Col. Thomas Koning, Army Corps of Engineers to Douglas

Yearley, APNS (Nov. 8, 2002).

29.   Letter from Jessica Almy, Cape Wildlife Center to Col. Thomas Koning, Army Corps of Engineers (May 5, 2003).

30.   Jay Fitzgerald, *Critics hit corps' Cape mill report*, Boston Herald (Nov. 9, 2004).

31.   a)  Letter from Sue Nickerson, APNS to Col. Koning, Army Corps of Engineers (Oct. 25, 2004);
      b).  Letter from Sue Nickerson, APNS to Col. Koning, Army Corps of Engineers (Oct. 29, 2004).

32.   Email from Karen Adams to Interagency team (data unknown, March-April 2002).

33.   Email from Jane Mead, Massachusetts CZM to Interagency team (May 24, 2002).

34.   Garrad Hassan and Partners LTD, *Review of Offshore Wind Project Features* (Final Draft).

35.   Email from Colin Morgan, Garrad Hassan and Partners to Karen Adams, Army Corps of Engineers (July 23, 2003).

36.   Email from Karen Adams, Army Corps of Engineers to Colin Morgan, Garrad Hassan and Partners (July 29, 2003).

37.   Conclusion page from Garrad Hassan and Partners (Final version 1).

38.   Letter Susan Nickerson, APNS to Col. Brian A. Green (May 17, 2004).

39.   Email from T. Timmerman, Environmental Protection Agency to Karen Adams, Army Corps of Engineers (Oct. 15, 2003).

40.   Email from V. Lang, United States Fish and Wildlife to Karen Adams, Army Corps of Engineers (Oct. 16, 2003).

41.   Letter from Dennis Duffy, Cape Wind Associates to Karen Adams, Army Corps of Engineers (Sept. 23, 2003).

42.   Letter from Dennis Duffy, Cape Wind Associates to Karen Adams, Army Corps of Engineers (Jan. 5, 2005).

43.   Todd B. Bates, Asbury Park Press (Jan. 10, 2005).

44.   Release from Congressman Frank Pallone, Jr., *Pallone Demands Federal*

*Environmental and Socio-Economic Assessment of Wind Farm Proposals* (Sept. 27, 2004).

45.     Comments of the American Wind Energy Assoc. to the Draft Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States (Dec. 10, 2004).

46.     Certificate of the Secretary of Environmental Affairs on the Environmental Notification Form (Apr. 22, 2002).

47.     Letter from Barry Drucker, Minerals Management Service to Karen Adams, Army Corps of Engineers (Mar. 20, 2002).

48.     Letter Margo Fenn, Cape Cod Commission to Karen Adams, Army Corps in Engineers (Mar. 28, 2002).

49.     Email from Jane Mead to Brian Valiton (Mar. 29, 2002).

50.     Letter from Michael J. Bartlett, U.S. Fish and Wildlife to Col. Brian Osterndorf, Army Corps of Engineers (Apr. 1, 2002).

51.     Letter from Robert W. Varney, Environmental Protection Agency to Col. Brian Osterndorf, Army Corps of Engineers (Apr. 5, 2002).

52.     Letter from Charles J. Natale, Environmental Science Services to Karen Adams, Army Corps of Engineers (Nov. 21, 2002).

53.     Letter from Dennis Duffy, Cape Wind Assoc. to Col. Brian Osterndorf, Army Corps of Engineers (Apr. 16, 2002).

54.     Letter from Terry Orr, Environmental Science Services to Karen Adams, Army Corps of Engineers (Apr. 19, 2002).

55.     Letter from Mark C. Calpin, Hale and Dorr to Karen Adams, Army Corps of Engineers (Mar. 10, 2003).

56.     Massachusetts Technology Collaborative; Karen Adams Power Point Presentation (Mar. 12, 2003).

57.     Email from Dennis Duffy, Cape Wind Assoc. to Karen Adams, Army Corps of Engineers (Oct. 20, 2003).

58.     Letter from Margo Fenn, Cape Cod Commission to Karen Adams, Army Corps of Engineers (Oct. 9, 2003).

59.     Letter from John Almeida, Army Corps of Engineers to Jena MacLean, counsel APNS (July 14, 1004).

CW0000005947

60.        Letter from Philip Warburg, Conservation Law Foundation to Patrick Wood, Chairman Federal Energy Regulatory Commission (May 5, 2004).

61.        Letter from Susan Nickerson, APNS to Col. Brian A. Green (May 25, 2004).

62.        Letter from Philip Warburg, Conservation Law Foundation to Col. Brian A. Green, Army Corps of Engineers (June 10, 2004).

63.        Letter from Susan Nickerson, APNS to Col. Brian A. Green (June 29, 2004).

64.        Letter from Vernon Lang, U.S. Fish and Wildlife to Karen Adams, Army Corps of Engineers (Dec. 11, 2002).

65.        Letter from Margo Fenn, Cape Cod Commission to Karen Adams, Army Corps of Engineers (Dec. 19, 2002).

66.        Letter from Margo Fenn, Cape Cod Commission to Karen Adams, Army Corps of Engineers (Oct. 9, 2002).

67.        Alexander Soule, *New Mass. Wind plans aloft*, Boston Business Journal (Oct. 22, 2004).

68.        Source: Department of Energy.

69.        Danish Offshore Wind Turbine Performance.

70.        Cape Wind Estimated Performance Estimated Using NOAA Wind Speed Data For Nantucket Sound.

71.        Cape Wind Output Projections Using Elevation Adjustment of Monitoring Tower Readings.

72.        Cape Wind Output Projections Based Upon 8.89 m/sec Average Wind Speed.

73.        Cape Wind Output Calculations Based Upon 8.5 m/sec Average Wind Speed From New England Wind Map.

CW0000005948

*1*

CW0000005949



DEPARTMENT OF THE ARMY

January 10, 2005

Executive Office

Ms. Susan Nickerson
Save Our Sound Alliance to Protect Nantucket Sound
396 Main Street
Hyannis, MA 02601

Dear Ms. Nickerson:

I am writing you in response to your letter dated December 28, 2004, which followed my November 16, 2004, letter to you. In your most recent letter, you suggest that the Corps may have misunderstood your previous requests to meet and discuss legal issues, clarifying that you requested to meet with my legal staff, not with me. Thank you for this clarification. However, I likewise decline your request to meet with my legal staff to discuss legal matters relating to the Cape Wind project.

In a July 8, 2004 letter, your attorney, Ms. Jena MacLean, similarly requested a meeting with Assistant District Counsel John Almeida. In his response to your attorney, Mr. Almeida explained that such a meeting would not result in a productive exchange, in light of his need to protect attorney-client privileges. I share Mr. Almeida's concerns. However, as both Mr. Almeida and I stated in our previous letters on the subject, I encourage you to submit written comments on legal matters or other issues of concern to you, as you have done in the past. You have raised various legal concerns, and we have received and considered them. Moreover, to affirm your understanding stated in the second to last paragraph of your letter, the comments you have previously submitted will be part of the record for the Cape Wind project, regardless of whether such comments were received during or before the public comment period for the DEIS.

In your letter, you state that "the applicant has been allowed to step over the line of proper involvement in this DEIS preparation," and appear to suggest that the Corps has improperly relied upon the legal analysis of the Cape Wind permit applicants. I would like to reiterate, as I stated in my November 16, 2004, letter to you, that while both your organization and the permit applicant have submitted their legal opinions to the Corps, I rely upon my Office of Counsel for legal advice. I have not requested nor relied on legal

advice or opinions from your attorneys, the applicants' attorney, or other attorneys outside the federal government, although as noted above, I carefully consider all materials in the record.

Sincerely,

Thomas L. Koning
Colonel, Corps of Engineers
District Engineer

CW0000005951

2

CW0000005952

# Alliance to Protect Nantucket Sound Experts

## Erich K. Bender

During Dr. Bender's 37 years with BBN Technologies, he held positions ranging from staff engineer in applied physics to senior V.P. for Intellectual Property. His tenure there also involved work in the physical sciences, acoustics technologies and speech and language processing areas, including the engineering of noise control solutions for transportation, construction, and mining equipment, as well as analysis of psychoacoustic and economic impacts. Dr. Bender received an M.S. and an Sc.D. from the Massachusetts Institute of Technology, and completed the Greater Boston Executive Program at MIT's Sloan School. He is a Fellow of the Acoustical Society of America and has published over 30 technical papers in acoustics and systems dynamics. He has served as a Trustee of the BBN Retirement Trust (for nine years) and on various professional-society committees.

## Cary Bullock

Cary Bullock, a successful business owner and entrepreneur with thirty years of experience in the energy industry, is presently serving as a Project Manager and Principal Consultant at Prime Directions. He has founded and/or held a number of senior executive positions in several New England based energy companies, including one of the largest 'green power' companies in the US, and the largest wind power developer in the United States at that time. Mr. Bullock received his M.S. in Electrical Engineering from MIT, and is a registered professional engineer in the Commonwealth of Massachusetts. He is an expert in project/process management, technology performance measurement, and environment-friendly energy technologies. He has been a consultant to many electric and gas utilities as well as to many Fortune 500 companies on energy matters. In 2000, *Harts Energy Markets' Century of Power* named Cary Bullock as one of the 100 most influential people in the gas and electric industry in the 20th Century. In 2001, he was named as one of the top 50 leaders in utility IT. In 2002, he was also named as a finalist by Ernst and Young for the New England Entrepreneur of the Year Award. Mr. Bullock has served on the Boards of numerous companies, is the author of several books and numerous articles.

## Ray Clark

Mr. Clark is currently President of The Clark Group, a consortium of senior level policy professionals that provides a wide range of client services, including Washington representation, strategic planning and policy development. He received his master's degree in Environmental Management from Duke University. From the outset of his career, he utilized and developed his environmental expertise serving in many capacities, for the State of Alabama, at the U.S. Army Chemical and Military Police Schools, at the U.S. Army Corps of Engineers, in the Office of the Secretary of the Army, and as Senior Policy Analyst then Acting Chair and finally Associate Director of the White House Council on Environmental Quality. In these posts, Mr. Clark was involved in environmental protection policy and strategy development, budget formulation, staff supervision and recruitment, and testifying before Congress. Most recently, he served as the Principal Deputy Assistant Secretary of the Army for Installations and Environment, and was named by the Secretary of Defense as Acting Assistant Secretary during the transition between the Clinton and Bush Administrations. During this service, Mr. Clark directed Army housing and energy initiatives, pioneered an effort to privatize environmental remediation and to ensure cost-effective cleanup, and led the conversion of closed Army installations to community economic development assets. His most recent publications examined NEPA and offered perspectives on impact assessment. He has earned several awards, including the Exceptional Public Service Award in 2001.

## Cam Daley

Cam Daley is a Partner and a Principal Consultant at Prime Directions. He brings over 30 years of experience as a consultant and senior executive within the energy industry, having provided consulting services to both electric utilities and independent energy owners and developers, as well as operations and engineering-related

CW0000005953

advisory services to a number of clients in both New York and New England. He holds an M.S. in Power Engineering from Rensselear Polytechnic Institute, and is a registered professional engineer in the Commonwealth of Massachusetts. Mr. Daley also draws on over 25 years of senior level operations and engineering experience in the area of generation, transmission, and distribution of electricity. He successfully directed the siting and permitting for an early-stage, research-grade demonstration windmill on Moon Island in Boston Harbor. He also led an organization dedicated to the commercialization of hydrogen based fuel cells. Mr. Daley has served on both the NEPOOL and REMVEC Executive and Operations Committees, and has participated in a large number of community outreach forums where he worked in cooperation with community leaders to resolve concerns by local residents over power plant siting and operational issues. He has also provided testimony before the Massachusetts Energy Facilities Siting Council and the Massachusetts Department of Telecommunications and Energy.

**Russell DeFusco, Ph.D.**

Dr. Russell DeFusco, USAF (ret.) of BASH Incorporated has a degree in Biology from the US Air Force Academy, a master's degree in Wildlife Biology from Colorado State University, and a Ph.D. in Ecology/Ornithology from the University of Colorado. He was an Ecologist and Chief of the USAF's Bird Aircraft Strike Hazard Team specializing in minimizing bird and other wildlife conflicts with aircraft operations. He has worldwide experience in habitat management, population controls, remote sensing of animals and landscapes, and ecological modeling. Dr. DeFusco has conducted and sponsored research in radar ornithology, bird avoidance modeling, mishap investigations, ecological assessments, and other related fields. He served as the director of the Human Performance Laboratory and Professor of Biology at the USAF Academy and now runs an environmental consulting firm specializing in bird hazards and wildlife management. He works with the DOD, FAA, and private organizations in the development of radar and other remote sensing technologies, ecological modeling, and wildlife management techniques to minimize conflicts and conserve wildlife. He is a member of the International Bird Strike Committee and on the Steering Committee of the Bird Strike Committee USA/Canada.

**Robert Dooling, PhD.**

Dr. Robert Dooling is Professor of Psychology, Co-Director of the Center for the Comparative and Evolutionary Biology of Hearing, and Associate Vice-President for Research at the University of Maryland College Park. He has an M.S. in Biology and a Ph.D. in Psychology and over 200 research publications, books, and chapters on hearing and vocal communication in birds. Much of his work has focused on the masking effects of noise on hearing in birds as well as the auditory damage resulting from acoustic overexposure. He is a member of a number of scientific professional societies including the Acoustical Society of America, the American Association for the Advancement of Science, the American Psychological Society, the Animal Behaviour Society, and the Association for Research in Otolaryngology, among others. His research has been supported by the National Institute of Deafness and Communication Disorders of the NIH. Dr. Dooling has received a number of grants and scientific awards over his career including Research Scientist Career Development Awards from NIH and the Alexander von Humboldt Senior Scientist Award.

**Tim Eichenberg**

Tim Eichenberg is an environmental attorney and consultant, and Adjunct Professor of Law, based in San Francisco, who has published more than 25 articles and reports on environmental issues. He has served as Legal Counsel for the California Coastal Commission, The Ocean Conservancy, Oceana, and Environmental Defense Center. He is a former Chair of the Clean Water Network in Washington, D.C., and founded the Casco Baykeeper Program in Maine. Mr. Eichenberg teaches Ocean and Coastal Law at the Vermont Law School, and also has lectured at the University of Maine School of Law, Golden Gate University School of Law, and the Environmental Law Institute. He holds a B.A. from Earlham College, a J.D. from the Washington University School of Law, and was awarded post-doctoral fellowship in marine policy at the Woods Hole Oceanographic Institution. He is a member of the Bar in California and Washington, D.C.

CW0000005394

**William Evans**

Bill Evans pioneered the modern study of avian night flight calls as a tool for investigating avian night migration. He recently co-authored a seminal identification catalogue of passerine flight calls -- this work enables researchers for the first time to acquire detailed species information of birds in active night migration. Mr. Evans initiated the Cornell Laboratory of Ornithology's avian night flight call research in 1994 and in 1998 founded the nonprofit called Old Bird to advance the application of acoustic monitoring of avian night flight calls for scientific and educational purposes. The specific research focus of this organization is on using acoustics for long-term monitoring of various songbird species and for mitigating bird mortality at tall man-made structures. Mr. Evans's work has been described in The New York Times, New Scientist, NPR, BBC, PBS, Science and many popular conservation and birding magazines. His publications on acoustic monitoring of avian nocturnal migration are available online at www.oldbird.org/pubs.htm.

**Charles Flagg, Ph.D.**

Dr. Charles Flagg is currently a Research Professor at the Marine Sciences Research Center, Stony Brook University, Stony Brook, NY. He obtained his Ph.D. in 1977 in physical oceanography from the M.I.T./W.H.O.I. Joint Program in Oceanography. His research has concentrated on the physical dynamics and hydrographic structure of the waters of continental shelves and coastal estuaries using a wide variety of observational and modeling techniques. He is also an authority on the use of shipboard acoustic Doppler techniques to measure water velocities on volunteer observing ships. He has produced more than 40 peer-reviewed publications, numerous technical reports and presented many papers to professional societies.

**J. William Futrell**

J. William Futrell, president of Sustainable Development Law Associates, is a consultant in environmental management, working with policy makers on development strategies and capacity building. This work follows his activities as President of the Environmental Law Institute from 1980 to 2003 and as an officer and director of the Sierra Club from 1970 to 1980. He has represented state and local agencies and environmental groups in litigation and has testified before U.S. Congressional Committees frequently on land use, energy policy, and urban environment issues. He has worked with USAID and other international agencies in 15 countries and serves as the North American vice-chair of the International Union for Conservation of Nature's Commission on Environmental Law. The American Bar Association recognized his work with its award for Distinguished Achievement in Environmental Law and Policy in 2004.

**Col. Ronald Gatewood USMC (Ret)**

After a career in U.S. Marines, Colonel Ronald Gatewood USMC (Ret) founded two aviation management and airport development firms. His last assignment with the Marine Corps was as the Senior Marine Planner who developed plans and policies for the Commandant of the Marine Corps and provided input to the Joint Chiefs of Staff. He has extensive hands-on aviation management experience in all phases of aviation, including transportation planning, facility planning and construction, flight operations, maintenance, logistics, real estate development, and financial planning. Colonel Gatewood has 27 years as a command pilot with extensive flying experience in the United States, Asia, and Africa. He was an attaché with the U.S. Department of State and held the position of Director of Logistics for U.S. Southern Command. While in that position he assisted in the planning for the withdrawal of U.S. Forces from Panama and for Operation Just Cause. Among other awards, he has the Distinguished Flying Cross (4 Awards), Legion of Merit, Defense Meritorious Service Medal, and Joint Service Commendation Medal (2 Awards). Colonel Gatewood has a B.S. in Industrial Education from Purdue University and an M.S. in Business Administration from Webster University, and is a graduate of both the Naval War College—a graduate level executive program focusing on operational analysis, efficient administration, organizational staff functioning, management decision making, and defense economics—and the Inter-American Defense College—a graduate level military college that studies the elements of national power. Currently he is on the Board of Directors of EarthWalk Communications, Inc. and the Virginia Aviation Business Association.

CW0000005955

**James R. Gilbert, Ph.D.**

Dr. James Gilbert is presently Professor of Wildlife Ecology and Marine Science at the University of Maine. He received an M.S. in Ecology from the University of Washington and a Ph.D. in Wildlife from the University of Idaho. His primary experience has been on assessment of marine mammals, especially pinnipeds. Dr. Gilbert has field experience with marine mammals in Antarctica, Alaska and Russia, as well as the State of Mississippi and the New England Coast. He has been working with harbor seals and gray seals in New England for the last 24 years.

**Raymond L. Harris**

Based on his experience building more than a dozen advanced airborne and ground-based radars for military and commercial applications and conducting numerous airborne, shipboard, and ground-based measurement programs, Mr Harris provides consulting services in the areas of advanced radar system design and analysis, synthetic aperture radar remote sensing, diagnostic measurements of stealth targets, radar countermeasures, and high-speed radar data acquisition systems. Mr. Harris holds one M.S. in Electrical Engineering and another in Management Science, both from the Johns Hopkins University, and is a Life Senior Member of the Institute of Electrical and Electronic Engineers. Founder and CEO of Metratek, Inc.—a builder of innovative radar systems supporting stealth vehicle development and airborne remote sensing and a provider of radar measurement services—Mr. Harris has served on Blue-Ribbon Committees for FAA Radar, F-14 Navy Fighter Study, Strategic Defense Initiative, USMC, the USS Stark Investigation, and DARPA.

**David Harrison, Jr., Ph.D.**

Dr. David Harrison is a Senior Vice President at NERA Economic Consulting, a firm of about 450 consulting economists with ten offices in the United States and seven offices abroad. Dr. Harrison directs NERA's environment practice. Dr. Harrison has participated actively for more than 30 years as a consultant, academic and public official in the analysis of air quality regulations, including the development of emissions trading programs and other innovative means of increasing the flexibility and reducing the costs of environmental regulation. He was a member of the advisory committee for the RECLAIM program, an innovative emissions trading program in the Los Angeles air basin, and has advised on numerous other programs including the acid rain trading program and the averaging, banking and trading programs developed for mobile sources. Most recently, Dr. Harrison has led NERA efforts to assist the European Commission and various European governments with regard to the European Union Emissions Trading Scheme for carbon dioxide. Dr. Harrison and NERA colleagues currently are assisting the UK government in the development of their National Allocation Plan for the EU ETS. Dr. Harrison is a frequent speaker on these issues in the U.S. and abroad. Before joining NERA, Dr. Harrison was an Associate Professor at the John F. Kennedy School of Government at Harvard University, where he taught energy and environmental economics and policy, microeconomics, regional development, and other courses for more than a decade. He also served as a Senior Staff Economist on the President's Council of Economic Advisors, where he had responsibility for environment and energy policy issues. He is the author or co-author of five books or monographs on environmental policy and numerous articles in professional journals. Dr. Harrison received an M.Sc. in Economics from the London School of Economics, where he was the Rees Jeffreys Scholar, and a Ph.D. in Economics from Harvard University, where he was a Graduate Prize Fellow.

**Thomas A Hewson, Jr.**

Since 1981, Mr. Hewson has been a principal at Energy Ventures Analysis Inc in Arlington, Virginia, where he directs the firm's electric modeling and environmental practices. He provides annual forecasts of power capacity, generation, fuel costs, emission allowance costs and electricity prices and fuel prices for utility systems throughout the US. Over the past 28 years, Mr. Hewson has authored numerous studies on the impact of environmental legislation on the electric power industry for major electric utility systems, major power consumers, the Electric Power Research Institute, Gas Research Institute, environmental control vendors, fuel suppliers and transporters. He has testified before Congress and several state legislatures, public utility commissions and in several court proceedings on electric utility industry issues. Mr. Hewson has evaluated state renewable portfolio standards effect on electric prices and generation mixes, provided assessments of

CW0000005956

proposed wind projects in over seven states and participated in several expert panels on wind issues in the United States and Canada. Mr. Hewson has a B.S.E. in Civil Engineering from Princeton University.

### Robert J. Hofman, Ph.D.

Dr. Hofman received B.S. and M.S. degrees from Indiana University of Pennsylvania in 1962 and 1967 respectively. He taught biology at Warren Harding High School in Warren, Ohio from 1962 to 1967. He received his Ph.D. in 1975 from the Department of Ecology and Behavioral Biology, College of Biological Sciences, at the University of Minnesota. His dissertation research was on the biology and ecology of Antarctic seals. From 1975 until June 2000, Dr. Hofman was the Scientific Program Director of the Marine Mammal Commission, a federal agency established by the 1972 Marine Mammal Protection Act to overview all federal activities bearing on the conservation and protection of marine mammals. In this position, he managed a small research program, organized workshops and reviews of other agencies' marine mammal research programs, facilitated Commission reviews of domestic and international policies and programs affecting marine mammals, and represented the Commission at both national and international meetings where issues of interest to the Commission were considered. Dr. Hofman retired in June 2000 and, since then, has been working as a consultant on a number of marine mammal issues, and writing a history of the Marine Mammal Protection Act and the Marine Mammal Commission.

### Ad. J. Kalmijn, Ph.D.

Dr. Kalmijn is presently Senior Research Oceanographer Emeritus, an active physical oceanographer in the Biophysics of Sensory Systems, at the Scripps Institution of Oceanography, University of California, San Diego, La Jolla, California. He received his Ph.D. degrees *cum laude* in Physics and Biology from the University of Utrecht. Dr. Kalmijn is the discoverer of the electric sense in sharks and rays, and a specialist in low-frequency, underwater, near-field hearing. He is also an authority on electric and magnetic effects of industrial and military installations on marine animals. He has done extensive research on the biophysics of electric and magnetic field detection in sharks and rays, and has developed shark-inspired applications, nanovolt sensors, detection algorithms, and ionic electrodes/amplifiers. Dr. Kalmijn is widely published in U.S. and European peer-reviewed publications.

### Dirk Kooman

Dirk Kooman presently serves as Principal Consultant at Prime Directions. He is an expert in wind development and off-shore siting issues, having been involved with both land-based and off-shore wind projects in Europe for a number of years. Mr. Kooman holds a master's degree in Coastal Engineering and Fluid Dynamics from Delft Technical University. He started his career as a research engineer with the Storm Surge Barrier project, part of the famous Delta Plan to protect the southwestern part of the Netherlands against flooding. He held various positions in this multi billion Euro project in the seventies and eighties, finally serving as the Research and Design Manager of that project and as a member of the Board. He continued as Managing Director of an Offshore and Steel Structure Company and was invited to become CEO of the Dutch Wind turbine manufacturing company NedWind. Early in 1995, he started his own consulting company involved in the development, financing, and operations of wind energy projects. Mr. Kooman has developed and operated a number of wind farms in the Netherlands, and initiated the development of the first offshore wind farm in the Netherlands in 1998. He was invited to establish the international renewable energy business for Nuon (the second largest utility company in the Netherlands). In his role at Nuon, he has managed the expansion of their renewable energy business resulting in the development of a number of renewable energy projects in seven countries outside the Netherlands and two subsidiary companies in Spain and the United Kingdom. He has served as a member of the Steering Committee for the first Dutch offshore 100 MW Wind farm, with Nuon and Shell as sponsors.

### Thomas H. Kunz, Ph.D.

Thomas H. Kunz received a Ph.D. from the University of Kansas and is currently Professor of Biology and Director of the Center for Ecology and Conservation Biology at Boston University, where he has been on the faculty for the past 33 years. His research focuses on the ecology, behavior, and conservation biology of bats.

CW0000005957

He has conducted research in the continental United States, India, Malaysia, Trinidad, Ecuador, and Costa Rica. He is the author of over 180 publications and is the editor of *Ecology of Bats* (Plenum Press, 1982); *Ecological and Behavioral Methods for the Study of Bats* (Smithsonian Institution Press, 1988); co-editor (with P.A. Racey) of *Bat Biology and Conservation* (Smithsonian Institution Press, 1998), and co-editor (with M.B. Fenton) of *Bat Ecology* (University of Chicago Press, 2003). He is an elected Fellow of the American Association for the Advancement of Science, Past-President of the American Society of Mammalogists, and a recipient of the Gerrit S. Miller Jr. Award (presented in 1984 by the North American Symposium on Bat Research) and the C. Hart Merriam Award (presented in 2000 by the American Society of Mammalogists). His research is frequently covered in video documentaries by BBC, National Geographic Society, Discovery Channel, and Texas Parks and Wildlife, as well as various print and radio media. He is currently funded by grants from the National Science Foundation and the National Park Service, where his research focuses on assessing the ecological and economic impact of Brazilian free-tailed bats on agroecosystems and the influence of anthropogenic factors on the incidence of rabies infections in two species of North American insectivorous bats. Much of his current research employs infrared thermal imaging to census colonies of bats and to investigate their nightly dispersal and foraging behavior in different landscapes.

**Richard S. ("Steve") LeGore, Ph.D.**

An independent consultant, Dr. LeGore has held the positions of President of Mote Environmental Services, Inc. at Mote Marine Laboratory; Director of Battelle Ocean Sciences, Duxbury; AVP for International and Industrial Programs at Environmental Science and Engineering, Inc.; and Director of Marine Sciences at NALCO Environmental Sciences. He has an M.S. in Invertebrate Pathology and a Ph.D. in Pollution Ecology from the University of Washington College of Fisheries. Dr. LeGore currently serves as pro bono Executive Director of the Association of Marine Laboratories of the Caribbean, an organization of 30 marine research and education institutions throughout the Greater Caribbean Region. He has conducted numerous projects in the United States, and his international experience includes projects in Abu Dhabi, Armenia, Bahrain, Brunei, Egypt, Georgia, Indonesia, Kuwait, Malaysia, North Sea, Norway, Puerto Rico, Qatar, Romania, Sabah, Sarawak, Saudi Arabia, Scotland, Thailand, Vietnam and Yemen. Project sponsors include The World Bank, USAID, UN International Maritime Organization, U.S. National Commission on Water Quality, several multinational oil companies, and foreign government natural resource management agencies. Dr. LeGore has published 20 peer-reviewed papers and written 150 technical reports.

**Phillip S. Lobel, Ph.D.**

Dr. Lobel is Professor of Biology (Ichthyology) at Boston University. In addition to ichthyology (phylogeny, ecology, behavior and biogeography), his research specialties include bioacoustics, fisheries oceanography and coral reef ecology. Dr. Lobel received his Ph.D. in Biology from Harvard University, where he was a Post-Doctoral Fellow in Oceanography. He has conducted field studies of descriptive physical oceanography, conservation biology, ecological impact assessment studies, marine pollution and fisheries management, and has worked with state, federal and corporate entities on various matters—outfall monitoring, biological review and assessment, the problem of dredging and ciguatera—involving EIS evaluations. Currently, Dr. Lobel is the lead scientist responsible for establishing the Department of Defense's Coral Reef Protection plan. See http://osiris.cso.uiuc.edu/denix/Public/ES-Programs/Conservation/Legacy/Coral/coral.html and https://www.denix.osd.mil/denix/Public/ES-Programs/Conservation/Legacy/Coral-Reef/Plan/coralreef.html.

**Erik Martin**

Erik Martin is the Scientific Director for Ecological Associates, Inc., a private environmental consulting company in Jensen Beach, Florida. He earned his B.S. in Biological Science from Florida State University. Mr. Martin has over 30 years of professional experience as a marine biologist and has been active for the last 24 years in the fields of sea turtle research and conservation. His research has addressed the effects of coastal construction, beach restoration, and power plant operation on sea turtles. He has served as a consultant to governments and non-governmental organizations concerning proper management of artificial lighting to minimize impacts to sea turtles. Mr. Martin has served as a member of the World Conservation Union's Marine Turtle Specialist Group since 1990 and has been formally recognized by the U.S. Fish and Wildlife Service and

CW0000005958

the State of Florida for his contributions to sea turtle research and conservation.  He has authored numerous technical reports and scientific publications on sea turtles.

**RADM John F. McGowan**, U.S. Coast Guard (Ret.)

Jack McGowan's experience includes over 30 years in service rising to the rank of Rear Admiral in the U.S. Coast Guard.  RADM McGowan's last operational assignment was Commander, Ninth Coast Guard District, leading the region's 7,000 Coast Guard members for eight northern states.  He graduated from the Coast Guard Academy in 1969 and served in various tours of duty including Captain of the Port for the coast of Maine and New Hampshire.  He has extensively advised on maritime safety, security, navigation and in environmental protection matters.  RADM McGowan's experience culminated with formation of The McGowan Group, LLC as a maritime consulting company, specializing in providing systems-approach integrated marine solutions. RADM McGowan holds two degrees from the Massachusetts Institute of Technology.  He is a published authority and has spoken in various arenas including those sponsored by the Pugh Foundation and by the FBI. He has received the Legion of Merit, the Secretary of Transportation's Gold Medal, and the Bay of Fundy Visionary Award.

**Ernie Niemi**

Ernie Niemi is Vice President of ECONorthwest, an economics and financial consulting firm with offices in Oregon and Washington.  He has an M.C.R.P. from Harvard and has taught cost-benefit analysis and economic development at the University of Oregon's Department of Planning, Public Policy, and Management.  Mr. Niemi's publications include The Ecosystem-Economy Relationship: Insights from Six Forested LTER Sites, National Science Foundation (with P.N. Courant and W.E. Whitelaw), November 1997; Assessing Economic Tradeoffs in Forest Management (with E. Whitelaw), Forest Service, PNW-GTR-403. August 1997; The Economic Consequences of River and Wetland Restoration: A Conceptual Manual (with T.M. Power) U.S. EPA Region 8. March, 1998; and "The Sky Will Not Fall: Economic Responses to Protection of At-Risk Species and Natural Ecosystems," Fisheries 27 (1): 24-28. 2002.

**James F. Palmer, Ph.D.**

James F. Palmer is an independent consultant in matters relating to landscape aesthetics, and Professor of Landscape Architecture at SUNY ESF.  He received his Ph.D. and M.L.A. from the University of Massachusetts, Amherst.  Dr. Palmer has conducted and published peer-reviewed landscape perception and recreation research for 25 years, including a long-term study on Cape Cod.  He co-authored the primary reference in the area of visual assessment, as well as the U.S. Army Corps of Engineers' VIA procedure.  His research has received professional recognition, including the election to Fellow of the American Association of Landscape Architects.

**William Pedersen**

Bill Pedersen, a lawyer in private practice, is one of the country's leading authorities on the Clean Air Act, and on environmental law in general.  During his thirteen years at EPA he served as Associate General Counsel for Air - the country's chief Clean Air Act lawyer - among other positions.  His private law practice also focuses on the Clean Air Act.  In 1977 and 1990 Congress incorporated suggestions from his law review articles into the Clean Air Act.  He has taught environmental law at Harvard Law School and the University of Michigan Law School.

**Robert J. Pierce, Ph.D.**

Dr. Pierce has been President of Wetland Science Applications and the Wetland Training Institute since 1989. He received an M.A. and a Ph.D. from Miami University, with emphasis on aquatic ecology and fish physiology.  Dr. Pierce chaired a national committee for the COE to develop a testing protocol for the Section 404(b)(1) Guidelines, and served on the COE/EPA interagency committee, which wrote the policy portion of the current Guidelines.  While working in the Regulatory Branch at COE Headquarters, he had national oversight on the COE general permit program, including the Nationwide Permits; acted as technical monitor for the COE wetland research program, which developed the 1987 Delineation Manual; was proponent

CW0000005959

of two wetland training courses; and served on both the National review panel for plants that occur in wetlands and the interagency committee which developed the 1989 Manual. Dr. Pierce is credited with numerous publications, has provided testimony before Congress and presentations at professional meetings, and has taught numerous courses on regulatory policy, wetland delineation, wetland soils and hydrology, functions and values, and field ecology for the COE, the WTI and Johns Hopkins University.

### Arthur Popper, Ph.D.

Dr. Popper is professor in the Department of Biology at the University of Maryland. He has served as chair of Biology and is currently co-director of the Center for Comparative and Evolutionary Biology of Hearing. His research interests center around the structure, function, and evolution of the vertebrate auditory system. Current basic science research interests also include mechanisms of sound source localization by fishes. More applied research is involved with issues of the effects of high intensity sounds such as air-guns, windmills, pile driving, sonars and other high intensity anthropogenic signals on fish, and on the effects of lower intensity, but long-term, sounds on hearing and fish physiology. Dr. Popper's research has been supported for over 30 years by grants from NIH, NSF, ONR, NASA, NSF, and private agencies. He has published over 160 journal articles and 25 edited books, and is co-editor of the Springer Handbook of Auditory Research, considered the definitive work on hearing. He is on the editorial board of several international journals, and has served as consultant to numerous private and government agencies. He is a member of many national and international scientific organizations, and is a Fellow of the Acoustical Society of America and of the American Association for the Advancement of Science. Dr. Popper was recently designated a Distinguished Scholar-Teacher by the University of Maryland in recognition of his contributions to both research and education at that campus.

### Randall Reeves, Ph.D.

Dr. Randall Reeves is a consultant based in Hudson, Quebec (near Montreal, Canada). His main areas of interest and expertise are marine mammal biology and conservation. He has a master's degree in Public Policy from Princeton and a doctorate in Geography from McGill. During the 1980s and early 1990s he was involved in field research with bowhead whales in Alaska, the Canadian Arctic and Greenland, and with right whales in the western North Atlantic. He has also conducted extensive research on river dolphins in Asia and South America and on the history of whaling worldwide. As chairman of the IUCN Species Survival Commission's Cetacean Specialist Group since 1996, Dr. Reeves has been responsible for preparing and evaluating Red List assessments, drafting action plans for threatened species and populations, and advising government agencies, intergovernmental bodies and non-governmental organizations on science and conservation issues. He has published numerous articles in scientific journals and co-authored or co-edited several books including, most recently, Conservation and Management of Marine Mammals (Smithsonian Institution Press, 1999) and Guide to Marine Mammals of the World (Alfred A. Knopf, 2002).

### Timothy J. Reilly

Timothy J. Reilly is a marine environmental scientist with over 19 years of experience specializing in oil and hazardous substance spill fate and effects. He holds a master's degree in Hazardous Waste Management/Environmental Chemistry from the University of Minnesota. Mr. Reilly has responded to hundreds of oil and chemical spills domestically and internationally, providing scientific support on issues such as natural resources at risk, human health, and strategies for response and remediation. He has directed multi-million dollar research and development efforts that address the impacts of oil spills and methods to reduce environmental impacts during spill response operations. He is an internationally recognized expert in the field of natural resource damage assessments (NRDA), and has led many NRDA projects following oil and hazardous substance releases. Mr. Reilly has conducted projects in tropical, temperate, desert and arctic environments, and is adept at unique environmental issues facing these regions. He is a Principal at Lighthouse Technical Consultants, Incorporated, an environmental and professional services firm in Rockport, Massachusetts.

### Peter Rosen, Ph.D.

Dr. Rosen is currently Associate Professor, Chair, and Marine Studies Coordinator in the Department of Earth and Environmental Sciences at Northeastern University. He received an M.S. in Geology from the University

CW0000005960

of Massachusetts, and a Ph. D. in Marine Science from the College of William and Mary. His research specialization is coastal geology, and his investigations include erosion processes of Nantucket, evolution of Boston Harbor shorelines, barrier beach development, Duxbury, evolution of Chesapeake Bay beaches, sediment transport by ice in Labrador, coastal structure impacts in Massachusetts, sand dune processes in eastern Canada and Israel, and gravel beach processes in eastern Massachusetts. Dr. Rosen has been a visiting professor at the Center for Coastal Studies, Federal University of Rio Grande in Brazil; a research fellow with the Geological Survey of Canada, Bedford Institute of Oceanography, Nova Scotia; and an assistant marine scientist at the Virginia Institute of Marine Science. His publications number over 100, including two books, and his honors include the Clemens Herschel Award, Boston Society of Civil Engineers; Environmental Achievement Award, Move Massachusetts 2000; Excellence in Teaching Award, Northeastern University.

### Lois Schiffer

Lois Schiffer is a partner at Baach Robinson & Lewis in Washington, D.C., where she practices in the area of environmental law, including counseling, litigation, planning, and mediation. From 1993 to 2001, Ms. Schiffer was the Assistant Attorney General for the Environment and Natural Resources Division at the U.S. Department of Justice, with responsibility for litigation on behalf of all federal agencies related to pollution, natural resources, wildlife, certain Indian issues, and land condemnation. She has argued cases before a number of Courts of Appeals and the U.S. Supreme Court. She also worked on international environmental issues and legislation related to the environment. She has for almost 20 years been an adjunct professor of environmental law at Georgetown University Law Center, and in Spring 2004 was a Lecturer at Harvard Law School. She has worked extensively on the National Environmental Policy Act, including litigating cases, giving speeches, and writing articles. Ms. Schiffer's previous work includes: Senior Vice President for Public Policy at the National Audubon Society; General Counsel at National Public Radio; and staff attorney at the Women's Rights Project of the Center for Law and Social policy. Ms. Schiffer has authored many articles on environmental law topics. She is the recipient of the Charles Fahy Distinguished Adjunct Professor Award, and of the Edmund J. Randolph Award for outstanding service at the Department of Justice. She serves on the boards of the Keystone Center, DC Appleseed, and the International Senior Lawyers Project, and is a delegate from the District of Columbia Bar to the American Bar Association Board of Governors. She is a Member of the American Law Institute and a Fellow of the American Bar Foundation. She has served on the Boards of a number of non-profit organizations, including the District of Columbia Bar and American Rivers. She is a graduate of Harvard Law School (1969) and Radcliffe College (1966).

### John R. Stilgoe, Ph.D.

John R. Stilgoe, Orchard Professor in the History of Landscape Development, Department of Visual & Environmental Studies, Faculty of Arts and Sciences at Harvard University, has taught at Harvard since 1977. He is author of many books, including *Common Landscape Of America*, *Metropolitan Corridor: Railroads and the American Scene*, *Borderland: Origins of the American Suburb*, *Alongshore*, *Outside Lies Magic*, and, most recently, Lifeboat: *A History of Courage, Craveness, and Survival at Sea*, his next book, *Landscape and Image*, will appear in May, 2005 (University of Virginia Press). Professor Stilgoe teaches graduate-level courses on the history and future of the North American Built environment, the forces changing contemporary environments, coastal landscapes, and environments in mediated format (especially digitized video). His current research focuses on rural landscape, metropolitan sprawl, and regions inhabited by or owned by economic and cultural elites.

### John R. Twiss, Jr.

After over 25 years as the Executive Director of the Marine Mammal Commission in Washington, D.C. and Bethesda, MD, Mr. Twiss now works as a wildlife consultant, while serving on the Council of the National Whale Conservation Fund. He received his B.A. from Yale University in 1961, and subsequently worked in logistic support of polar research for the U.S. Government; as the National Science Foundation Representative in charge of the U.S. summer scientific field program in Antarctica; in the International Division of Smith Kline & French Laboratories; as vice president of EPC Laboratories; as scientific leader of the National Science Foundation Southern Ocean oceanographic expedition and consultant on oceanographic equipment development; and as Acting Head and Special Assistant to the Head of the International Decade of Ocean

CW0000005961

Exploration, for the National Science Foundation. Mr. Twiss is also a member of numerous committees on oceanographic and environmental issues.

### Richard Veit, Ph.D.

Richard Veit is Professor and Chairman of the Biology Department at The College of Staten Island/City University of New York. His research involves ecology and behavior of vertebrate animals, primarily birds. He has studied the distribution at sea and foraging behavior of pelagic birds in the Antarctic since 1982 with American, British and French teams of biologists and oceanographers. These studies have been funded by the National Science Foundation/Office of Polar Programs. Dr. Veit also initiated a study of long-term change in pelagic bird populations of the California Current System in 1987; this project is ongoing and has already demonstrated significant linkage between climate change and seabird decline. During summers since 1998, Dr. Veit has worked for The Nature Conservancy on the islands of Tuckernuck and Muskeget off Nantucket, Massachusetts helping to promote conservation of endangered birds. During the same time period, he has studied the offshore distribution and foraging behavior of long-tailed ducks.

### Mark Weissman

Mark Weissman is currently serving in his twelfth year as an appointed member of the Massachusetts Marine Fisheries Advisory Commission, which regulates the rule-making of the Massachusetts Division of Marine Fisheries. He has an S.B. from M.I.T. and an M.A. from Rutgers University. Mr. Weissman was a founding director and the first chairman of the Massachusetts chapter of the Coast Conservation Association, and has 55 years experience as a recreational fishermen, 40 years of it fishing in Nantucket Sound. During his career, he has worked as an instructor at Rutgers University and Carnegie-Mellon University, a statistician at Harvard University, a senior editor and writer of environmental science textbooks at Houghton Mifflin Company, and president or vice-president of four business start-ups. Mr. Weissman holds five U.S. Patents.

### Roman N. Zajac, Ph.D.

Dr. Zajac is Professor and Coordinator of the Graduate Program in Environmental Science at the University of New Haven. He received both his M.S. in Zoology and his Ph.D. in Ecology from the University of Connecticut. Dr. Zajac is credited with 41 peer-reviewed publications, as well as 78 technical reports and 10 CD-based publications. Last year alone, he spoke by invitation at several environmental workshops and symposia around the country, on such topics as applications of landscape ecology approaches to coastal systems; developing a benthoscape ecology for coastal sea floor environments; coastal landscapes, seascapes and benthoscapes of Long Island Sound; developing landscape pattern indicators for the coastal zone; and the state of the nation's ecosystems project. Previously, Dr. Zajac was invited to address a NATO workshop in Poland on assessing coastal impacts, and a Scale Expert workshop in Australia on applications of underwater remote sensing for assessing sea floor habitats and communities.

### Rick Zimbone

Rick Zimbone serves as the Managing Director and a Principal Consultant at Prime Directions. He is a seasoned executive and entrepreneur with over 30 years of experience in the energy industry. Mr. Zimbone holds an M.B.A. from Boston University. Specializing in strategic planning and organizational effectiveness, he has provided strategic and management consulting services to a number of energy and energy services companies. He started up and served as CEO for Energy New England, LLC., an energy and energy services company providing wholesale power brokering, power trading and risk management services to publicly owned power companies throughout New England. As President and CEO of Boston Edison's unregulated venture capital investment group, Mr. Zimbone directed the screening and analysis of over two hundred investment opportunities, led the acquisition and start-up of a number of energy related companies, and bore P&L responsibility for six operating subsidiaries. He also has extensive operations and engineering experience in the power supply industry. He has successfully licensed and received approvals for the siting of a large combined cycle power plant, and has managed an 800 MW fossil fueled power plant and has directed the maintenance and construction activities for over 3000 MW of fossil fueled generation. Mr. Zimbone has extensive experience and an in-depth understanding of power pool management and operations. He has been responsible for overseeing the successful design, installation and operation of an underwater transmission cable from a waste

CW0000005962

treatment facility to a transmission substation. Mr. Zimbone also has testified on numerous occasions before the Massachusetts Department of Telecommunications and Energy. In addition, he has participated in a number of community outreach forums, and has served on the NEPOOL Operations Committee, as well as the REMVEC Executive and Operations Committees.

CW0000005963

**3**

CW0000005964

Westlaw.

2005 WL 357636
--- F.3d ---
(Cite as: 2005 WL 357636 (1st Cir.(Mass.)))

# H

### Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.
ALLIANCE TO PROTECT NANTUCKET SOUND,
INC.; Ronald G. Borjeson; Wayne G. Kurker;
Shareen Davis; Ernest R. Eldredge; David Ellsworth;
Robert Hazelton; Osterville
Anglers Club, Inc.; Hyannis Anglers Club, Inc.,
Plaintiffs, Appellants,
v.
UNITED STATES DEPARTMENT of the ARMY;
Thomas E. White, in his Official Capacity
as Secretary of the Army; United States Army Corps
of Engineers; Lt. General
Robert B. Flowers, in his Official Capacity as Chief of
Engineers for the
United States Army Corps of Engineers; Colonel
Thomas L. Koning, in his
Official Capacity as District Engineer for the United
States Army Corps of
Engineers; Cape Wind Associates, LLC, Defendants,
Appellees.
No. 03-2604.

Heard Sept. 16, 2004.
Decided Feb. 16, 2005.

**Background:** Residents' association and others
challenged decision of United States Army Corps of
Engineers to issue permit under Rivers and Harbors
Appropriation Act authorizing construction of
scientific measurement devices station on outer
continental shelf (OCS) off Nantucket Sound.
Permittee intervened. The United States District Court
for the District of Massachusetts, 288 F.Supp.2d 64,
Tauro, J., granted summary judgment for Corps and
permittee, and association appealed.

**Holdings:** The Court of Appeals, Torruella, Circuit
Judge, held that:

(1) Corps' authority to issue permits for construction
on OCS was not restricted to structures related to
mineral extraction;

(2) Corps was under no duty to evaluate sufficiency
of applicant's averred property interests in OCS;

(3) Corps did not act arbitrarily by granting permit
without inquiring into additional authorization for
station; and

(4) Corps was not required to circulate for public
comment draft finding of no significant impact
(FONSI) or environmental assessment (EA) prepared
in conjunction with permit application.

Affirmed.

**[1] Navigable Waters** ⟶43(3)

270k43(3) Most Cited Cases
Army Corps of Engineers' authority under Outer
Continental Shelf Lands Act (OCSLA) to issue
permits under Rivers and Harbors Appropriation Act
for construction of "all installations and other devices
permanently or temporarily attached to the seabed"
was not restricted to structures related to mineral
extraction, despite phrase in same provision, "which
may be erected [on seabed] for the purpose of
exploring for, developing, or producing resources
therefrom." 33 U.S.C. § 403; 43 U.S.C. § 1333(a)(1)
and (f); 33 C.F.R.
§ 320.2(b).

**[2] Navigable Waters** ⟶43(3)
270k43(3) Most Cited Cases
Army Corps of Engineers, in deciding whether to
issue permit under Rivers and Harbors Appropriation
Act for structure to be placed on outer continental
shelf (OCS), was under no duty to evaluate sufficiency
of applicant's averred property interests in OCS; rather,
Corps' only obligation was to remind applicant of need
to possess all requisite property interests. 33 U.S.C. §
403; Outer Continental Shelf Lands Act (OCSLA), 43
U.S.C. § 1333; 33 C.F.R. § § 320.4(g)(6), 325.1(d)(7).

**[3] Navigable Waters** ⟶43(3)
270k43(3) Most Cited Cases
On application to Army Corps of Engineers for permit
under Rivers and Harbors Appropriation Act for
construction of scientific measurement devices station
on outer continental shelf (OCS), no additional
authorization was necessary, beyond Act permit, and
thus Corps did not act arbitrarily and capriciously by
finding "negligible impact" on property ownership
and granting permit without inquiring into such
additional authorization; station involved no real
infringement on federal interests in OCS, since
structure was temporary, station was non-exclusive,
i.e. required to accept data collection devices form

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

:005 WL 357636
--- F.3d ---
(Cite as: 2005 WL 357636 (1st Cir.(Mass.)))

government and others, and permittee was required to furnish data from station to government. Administrative Procedures Act, 5 U.S.C.A. § 706(2)(A); 33 U.S.C. § 403; Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1333.

**[4] Environmental Law ☜596**
149Ek596 Most Cited Cases
Army Corps of Engineers was not required to circulate for public comment draft finding of no significant impact (FONSI) or environmental assessment (EA) prepared in conjunction with application for permit under Rivers and Harbors Appropriation Act for construction of scientific measurement devices station on outer continental shelf (OCS), on theory that nature of proposed structure was "one without precedent"; similar pile-driven structures had been erected in same general area, and whether or not similar structures had been erected without additional authorization beyond Corps' grant of permit was irrelevant. National Environmental Policy Act of 1969, 42 U.S.C.A. § § 4342, 4344; 40 C.F.R. § 1501.4(e)(2)(ii).

**[5] Environmental Law ☜596**
149Ek596 Most Cited Cases
Council on Environmental Quality (CEQ) regulations promulgated to ensure federal agencies' compliance with NEPA do not require circulation of draft Environmental Assessment (EA) for public comment, except under expressly limited circumstances. National Environmental Policy Act, 42 U.S.C.A. § § 4342, 4344; 40 C.F.R. § 1501.4(e)(2).

Appeal from the United States District Court for the District of Massachusetts, Joseph L. Tauro, U.S. District Judge.

Benjamin S. Sharp, with whom Donald C. Baur, Perkins Coie LLP, Franklin H. Levy and Duane Morris, LLP, were on brief, for appellants.

David C. Shilton, Attorney, United States Department of Justice, with whom Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division, Gerard T. Leone, Acting United States Attorney, Anton P. Giedt, Assistant United States Attorney, Jon M. Lipshultz, John A. Bryson, and Richard Santino, of cousel, Army Corps of Engineers, Concord, MA, were on brief, for the federal appellees.

Timothy J. Dacey, with whom Kurt W. Hague and Goulston & Storrs, P.C., were on brief, for appellee Cape Wind Associates, LLC.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and LYNCH, Circuit Judge.

TORRUELLA, Circuit Judge.

**\*1** On November 20, 2001, Cape Wind Associates, L.L.C. ("Cape Wind") submitted an application to the U.S. Army Corps of Engineers ("Corps") for a navigability permit under Section 10 of the Rivers and Harbors Act of 1899 ("Section 10"), 33 U.S.C. § 403, [FN1] to construct and operate an offshore data tower in an area of Nantucket Sound known as Horseshoe Shoals. Horseshoe Shoals is located on the Outer Continental Shelf ("OCS"), land subject to federal jurisdiction and control under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331.

The proposed tower was to consist of a platform and a fixed monopole approximately 170 feet high, supported by three steel piles driven into the ocean floor. Various instrumentation was to be attached to the data tower in order to gather data for use in determining the feasibility of locating a wind energy plant on Horseshoe Shoals. A separate permit application for the wind energy plant--a complex originally proposed to include 170 wind turbines with blade rotors rising 423 feet above mean sea level, occupying twenty-six square miles of Horseshoe Shoals--was submitted to the Corps in November 2001. That application is not at issue in the instant appeal, and we therefore will not engage in any analysis of the Corps's authority to permit construction of the wind energy plant.

On December 4, 2001, the Corps announced that it was considering Cape Wind's application for the data tower, and invited the public to submit comments during a period that included two public hearings and ended on May 13, 2002. On August 19, the Corps issued a Section 10 permit authorizing Cape Wind to construct and maintain the data tower, subject to the imposition of sixteen special conditions, including that Cape Wind remove the data tower within five years, that it post a $300,000 bond for emergency repairs or removal, and that it share the data collected with, and permit the installation of additional data-gathering equipment by, government agencies, research institutions, and others. Department of the Army Permit No. 199902477 (Aug. 19, 2002). The permit was accompanied by an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § § 4331-32.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000005966

Appellants subsequently filed an action against the Corps in the District of Massachusetts, arguing that (1) the Corps lacked authority to issue a Section 10 permit for the data tower; (2) the Corps acted arbitrarily and capriciously, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), by granting Cape Wind's permit application in spite of Cape Wind's lack of property rights on the OCS; and (3) the Corps failed to comply with NEPA requirements for evaluating the data tower's environmental impacts. Upon the receipt of cross motions for summary judgment, the district court granted summary judgment in favor of the Corps and intervenor Cape Wind. We review that decision *de novo*, construing the evidence in the light most favorable to appellants. *See Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir.2001). We will uphold the grant of summary judgment if there is no genuine issue of material fact and appellees are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We affirm the decision of the district court.

## I. Discussion

### A. Corps jurisdiction

"2 [1] The reach of the Corps's Section 10 permitting authority on the OCS turns on a question of statutory interpretation. Congress passed OCSLA in 1953 to assert federal jurisdiction over the OCS and to establish a regulatory framework for the extraction of minerals therefrom. *See* 43 U.S.C. § 1332; *see also Ten Taxpayer Citizens Group v. Cape Wind Assocs.*, 373 F.3d 183, 188 (1st Cir.2004) ("A major purpose of the OCSLA was to specify that federal law governs on the [OCS] ....") (internal quotation marks omitted). Accordingly, OCSLA extended the Corps's Section 10 regulatory authority "to prevent obstruction to navigation in the navigable waters of the United States ... to artificial islands and fixed structures located on the [OCS]." 43 U.S.C. § 1333(f) (1953). In 1978, this grant of authority was amended to apply instead to "the artificial islands, installations, and other devices referred to in subsection (a) of this section." 43 U.S.C. § 1333(e) (2004). Subsection (a), in turn, extends federal jurisdiction to:

> *all* artificial islands, and *all* installations and other devices permanently or temporarily attached to the seabed, *which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom*, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources.

*Id.* at § 1333(a)(1) (emphasis supplied). Appellants argue that the clause "which may be erected thereon for the purpose of exploring for, developing, or

producing resources therefrom," is restrictive, and limits the Corps's permitting authority on the OCS to structures related to the extraction of mineral resources. [FN2] Thus, they argue, the Corps lacked authority to grant a Section 10 permit for construction of Cape Wind's data tower. The Corps, on the other hand, has determined that its Section 10 authority "was extended to artificial islands, installations, and other devices located on the seabed, to the seaward limit of the [OCS], by section 4(f) of [OCSLA] as amended." 33 C.F.R. § 320.2(b) (internal citation omitted).

The district court determined that the "which may be" clause of Subsection (a) was not restrictive. *See Alliance to Protect Nantucket Sound, Inc. v. United States Dep't of the Army*, 288 F.Supp.2d 64, 75 (D.Mass.2003) (finding that OCSLA's text supports the Corps's position that Section 10 jurisdiction extends to all OCS structures "including, but not limited to, those that '*may be* ' used to explore for, develop, or produce resources" (quoting 43 U.S.C. § 1333(a)(1)) (emphasis supplied by district court)). Thus, the district court held, the Corps has authority to grant a Section 10 permit for all structures on the OCS, regardless of their function.

We find the statutory text in question ambiguous. It is not apparent whether the reference to Subsection (a) inserted into Subsection (e) in 1978 refers to "all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed," 43 U.S.C. § 1333(a)(1), or only to all such installations used to explore, develop or produce resources. In light of this ambiguity, the Corps and Cape Wind invite us to defer to the Corps's interpretation of its authority, *see* 33 C.F.R. § 320.2(b), under the *Chevron* doctrine. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In this case, however, we find it unnecessary to reach the question of *Chevron* deference because legislative history reveals, with exceptional clarity, Congress's intent that Section 10 authority under OCSLA not be restricted to structures related to mineral extraction. [FN3] *See id.* at 843 n. 9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *Strickland v. Comm'r, ME. Dept. of Human Servs.*, 48 F.3d 12, 19-20 (1st Cir.1995) (evaluating legislative history to determine whether Congressional intent was unambiguously expressed).

*3 In the conference report for the 1978 OSCLA

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000005967

2005 WL 357636
— F.3d ---
(Cite as: 2005 WL 357636 (1st Cir.(Mass.)))

Page 4

amendments, Congress explained that the changes to Subsection (e)

were technical only and there was no intent to change present law. The existing authority of the Corps of Engineers ... applies to all artificial islands and fixed structures on the [OCS], *whether or not they are erected for the purpose of exploring for, developing, removing and transporting resources therefrom.* The amendment ... is not intended to change the scope of this authority, but merely to conform the description of the types of structures, no matter what their purpose, to the types of structures listed in subsection (a), namely all installations and other devices permanently or temporarily attached to the seabed. It is not the intention of the conferees to limit the authority of the Corps [ ] as to structures used for the exploration, development, removal, and transportation of resources.

H.R. Conf. Rep. No. 95-1474 ("Conference Report") at 82 (1978), *reprinted in* 1978 U.S.C.C.A.N. 1674, 1681 (emphasis supplied). [FN4] Appellants suggest that the intent expressed in the above-quoted language was not that Corps authority be unlimited with regard to the *purpose* of the structure in question, but rather with regard to different *types* of structures within the subset of structures related to exploring for, developing, removing or transporting minerals. This interpretation strains the Conference Report language well beyond the meaning it can bear, especially in light of Congress's awareness when it amended OCSLA that the Corps had issued Section 10 permits for OCS structures unrelated to mineral extraction on several occasions between 1953 and 1978, implying its approval of the exercise of such jurisdiction. *See* Conference Report at 81 ("[The Corps's existing] authority has been used ... to regulate the construction and location of ... artificial fishing reefs, radio towers, and a proposed gambling casino which was to be constructed on reefs. It *also* applies to structures erected for the purpose of exploring for and transporting resources ...." (emphasis supplied)). Appellants' efforts to counter this legislative history with language from the Senate Report from the original 1953 OCSLA that could be read to imply a limitation of Corps permitting authority to structures intended for mineral resource development is unavailing. The Corps's current authority is determined by OCSLA as amended in 1978, and the Conference Report addresses Congress's intent at that time. *See also United States v. Commonwealth Energy Sys. & Subsidiary Cos.,* 235 F.3d 11, 16 (1st Cir.2000) ("The most dispositive indicator of congressional intent is the conference report.").

Congress made clear that "[t]he existing authority of the Corps ... applies to all artificial islands and fixed structures on the [OCS], whether or not they are erected for the purpose of exploring for, developing, removing, and transporting resources therefrom." Conference Report at 82. This express legislative intent is determinative of the scope of the Corps's authority. Accordingly, we hold that the Corps had jurisdiction to issue a Section 10 permit for Cape Wind's data tower.

**B. Property interest**

*4 Appellants argue that the Corps failed to properly consider Cape Wind's lack of a property interest in the OCS land on which it sought to build the data tower when it granted the Section 10 permit.

**1. Agency regulations**

[2] Appellants first argue that the Corps has a regulation, 33 C.F.R. § 325.1(d)(7), that requires that the applicant actually have necessary property rights in the area of the project and make an affirmation to that effect. The regulation states: "The application must be signed by the person who desires to undertake the proposed activity.... The signature of the applicant ... will be an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application...." *Id.* Of course, the regulation does not say that the applicant must actually possess, or possess in the future, the requisite property rights, but only that the applicant must make an affirmation to that effect.

The Corps responds to appellants' argument by referring to another of its regulations, which provides that:

A *[Corps] permit does not convey any property rights ... or any exclusive privileges. Furthermore a [Corps] permit does not authorize any injury to property or invasion of rights or any infringement of Federal,* state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application. The [Corps] will not enter into disputes but will remind the applicant of the above. *The dispute over property ownership will not be a factor in the Corps public interest decision.*

33 C.F.R. § 320.4(g)(6) (emphasis supplied); *see also* Environmental Assessment and Statement of Findings at 13 (Aug. 19, 2002) (paraphrasing § 320.4(g)(6) in response to comments about Cape

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000005968

Page 5

Wind's lack of property interest).

The Corps indicated in its response to comments about Cape Wind's lack of a property interest, and articulated more fully during the course of this litigation, that it deems § 320.4(g)(6) to require only that it remind applicants of their need to possess all requisite property interests. In the Corps's view, § 320.4(g)(6)'s requirement that a "dispute over property ownership will not be a factor in the Corps public interest decision" applies to preclude consideration of a dispute over the adequacy of an applicant's property interests in the project site. *See* Environmental Assessment at 14.

Appellants argued before the district court that the requirement that applicants affirm possession of the requisite property interests for the proposed activity, 33 C.F.R. § 320.4(g)(6), means that such property interests must, in fact, be possessed by the applicant. Because Cape Wind had no property interest in the proposed data tower site, nor could it obtain such an interest under current law, its Section 10 permit application ought to have been denied. The district court rejected this argument, deferring instead to the Corps's interpretation that § 320.4(g)(6) requires only an affirmation from the applicant, which Cape Wind provided. According to the district court, § 320.4(g)(6), as interpreted by the Corps, fit in as "part of a [regulatory] scheme designed to keep the Corps out of property disputes." *Alliance*, 288 F.Supp.2d at 77. Accordingly, not only did the regulation relieve the Corps of any obligation to consider the sufficiency of Cape Wind's property interests, but it precluded such consideration altogether. *Id.* at 77-78.

*5 The face of § 320.4(g)(6) evidences the Corps's intent not to be involved in private property disputes. And as to disputes over public land, § 320.4(g)(6), by its own terms, says that a permit does not "convey any property rights ... or any exclusive privileges." Thus, the regulation does not purport to address disputes over public property, but rather attempts to insulate the Corps from addressing those disputes. Appellants' argument that the regulations impose an obligation on the Corps in a Section 10 case to resolve disputes over the ownership of public (or private) property is simply wrong.

Even if the regulation did not clearly support the Corps's interpretation on its face, the Corps's interpretation would nonetheless be entitled to deference. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (holding that agency's interpretation during

administrative adjudication of its own regulations "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted); *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 98 (1st Cir.2002) (deference appropriate where language of regulations "admits of differing interpretations, and the [agency] chooses reasonably among them"). Deference would be appropriate even though the interpretation was offered in a less formal session than the interpretation in *Thomas Jefferson*. *See Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (deferring to agency interpretation contained in amicus brief submitted in dispute between private parties); *see also Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (limiting *Auer* deference to ambiguous regulations); *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 567 (1st Cir.2004) (affording "some weight" to Justice Department's interpretation of its regulation "even though the Department's gloss is offered only in a brief rather than in some more formal manner"). [FN5]

We find that the Corps's reading of § 320.4(g)(6) is a reasonable one: the regulation's text states first that an applicant must affirm possession of the requisite property interests, then that the Corps "will not enter into disputes but will remind the applicant of the above"--that is, the Corps will remind the applicant of its need to possess the requisite property interest. The regulation next states that "[t]he dispute over property ownership will not be a factor in the Corps public interest decision." "The dispute" refers back to the category of disputes that result in a reminder of the need to obtain all required property interests. It is reasonable, in this context, to determine that "the dispute over property ownership" into which the Corps may not enter includes a dispute over whether the applicant has acquired all requisite property interests--that is, a dispute over the sufficiency of the applicant's property interests. Further, the goal of preventing the Corps from expending its resources on evaluating the legal question of the sufficiency of property interests is a reasonable one. This is so whether the dispute is over the sufficiency of the applicant's interests as opposed to those of other private property holders in the area, or as opposed to those of the federal government, especially since the Corps is permitted to consider the potential *impact* of the project on others' property interests during its public interest review. *See 33 C.F.R. § 320.4(a)(1)* (listing "considerations of property ownership" as factor to consider in determining whether, and under what conditions, to grant permit). Accordingly, we find that the district court did not err in deferring to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Corps's interpretation of its regulations and its decision not to evaluate the sufficiency of Cape Wind's property interests in the OCS.

**2. Public interest review**

*6 Appellants also argue that the Corps's duty to act in the public interest required it to consider the effect that granting Cape Wind's application would have on the federal government's interest in the OCS. The Corps is not shielded from this line of attack by its reliance on § 320.4(g)(6). Appellants properly point out that the Corps must consider, despite § 320.4(g)(6), the impact of a permit issuance on federal property rights in various ways, as part of its general public interest review. *See* 33 C.F.R. § 320.4(a)(1) (impact of project on "considerations of property ownership" must be a factor in the Corps's analysis); *United States v. Alaska,* 503 U.S. 569, 590-91, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992) (§ 320.4(g)(6) does not prohibit Corps from considering effect of proposed port construction on federal-state boundary in submerged waters, under 33 C.F.R. § 320.4(f)). Here, as we explain below, the Corps reasonably found that the data tower's impact on federal property rights would be "negligible," Environmental Assessment at 4, and thus appellants' public interest argument fails.

**3. Reliance on Cape Wind's affirmation**

[3] Finally, appellants argue that Cape Wind's affirmation that it possessed the requisite property interests was obviously false, as there exists no mechanism by which private entities can obtain a license to construct a data tower on the federally controlled OCS. The Corps's grant of a Section 10 permit on the basis of this false affirmation was therefore arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Again, this line of attack is not deflected by reference to Corps regulations. Appellants note that agency decisions based on false factual information run afoul of the Administrative Procedure Act. *See, e.g., Missouri Serv. Comm'n v. FERC,* 337 F.3d 1066, 1075 (D.C.Cir.2003) ("Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking.").
[FN6] Appellants' argument hinges on the veracity of Cape Wind's affirmation, which in turn depends, appellants argue, on whether authorization in addition to a Section 10 permit is necessary for construction of the data tower. [FN7] The first part of our opinion holds that a Section 10 permit is *necessary* for all structures on the OCS unless otherwise indicated by law, but does not determine whether such a permit is

*sufficient* to authorize building on the federally controlled OCS.

Whether, and under what circumstances, additional authorization is necessary before a developer infringes on the federal government's rights in the OCS is a thorny issue, one that is unnecessary to delve into in the instant case. The data tower at issue here involves no real infringement on federal interests in the OCS lands. To start, the structure is temporary, of five years' duration, more than two of which have now passed. The tower is also not exclusive--it must accept data collection devices form the government and others, and it must give the data to the government. The tower is a single structure, and it provides valuable information that the Corps requires in order to evaluate the larger wind energy plant proposal. The Corps's public interest evaluation of the data tower resulted in a finding of "negligible impact" on property ownership and stated that collection of the data is in the public interest. Environmental Assessment at 4-5. It is inconceivable to us that permission to erect a single, temporary scientific device, like this, which gives the federal government information it requires, could be an infringement on any federal property ownership interest in the OCS.

*7 Thus, the question of infringement of federal property interests is entirely hypothetical in this case. As a result, appellants' arguments based both on the arbitrary and capricious provision in the APA and the public interest standards discussed in *Alaska* are misplaced. We do not here evaluate whether congressional authorization is necessary for construction of Cape Wind's proposed wind energy plant, a structure vastly larger in scale, complexity, and duration, which is not at issue in the present action. Our analysis is limited to whether additional Congressional authorization is necessary for the data tower, which does not infringe on any federal property interest, and we conclude that it is not.

**C. National Environmental Policy Act**

[4][5] The Council on Environmental Quality ("CEQ") is authorized to enact regulations to ensure federal agencies' compliance with NEPA. *See* 42 U.S.C. § § 4342, 4344. Appellants argue that the Corps violated CEQ regulations by failing to circulate for public comment a draft EA and FONSI. We evaluate agency action to determine if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

CEQ regulations require that an "agency shall

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000005970

involve ... the public, to the extent practicable, in preparing [an EA]," 40 C.F.R. § 1501.4(b), and that "[a]gencies shall ... make diligent efforts to involve the public in preparing and implementing their NEPA procedures[,] ... provide public notice of ... the availability of environmental documents so as to inform those persons ... who may be interested or affected," and "[s]olicit appropriate information from the public," Id. § 1506.6. Appellants inform us that the Ninth Circuit has held that, under these regulations, "[t]he public must be given an opportunity to comment on draft EAs." See Citizens for Better Forestry v. United States Dep't of Agric., 341 F.3d 961, 970 (9th Cir.2003) (quoting Anderson v. Evans, 314 F.3d 1006, 1016 (9th Cir.2002), opinion amended and reissued without change to this section, 371 F.3d 475 (9th Cir.2004)). Appellees reject this interpretation, citing contrary precedent from a number of other circuits and noting that the quoted language in Citizens for Better Forestry was dicta. Appellees argue that the Corps met the requirement of involving the public "to the extent practicable" in preparing the EA by issuing public notice of Cape Wind's application, providing a comment period that they later extended to over five months, carrying out two public hearings, noting and responding to public comments in the EA, and conferring with federal and state environmental agencies. We agree. Nothing in the CEQ regulations requires circulation of a draft EA for public comment, except under certain "limited circumstances." 40 C.F.R. § 1501.4(e)(2).

Appellants argue that one of those circumstances [FN8] applies to this case: A draft FONSI must be made available for public comment when "[t]he nature of the proposed action is one without precedent." Id. § 1501.4(e)(2)(ii). Appellants argue that the data tower proposal is "without precedent" because Nantucket Sound is a pristine, undeveloped area and because "there is no precedent for permitting a privately-owned structure for wind energy, or even related research, on OCS lands." The Corps, however, determined that "[t]here is precedent for this type of structure in Massachusetts's waters," in the form of a data tower in Martha's Vineyard. Environmental Assessment at 10. The district court agreed, relying on the Corps's findings that while "[t]here are no other similar structures or devices in Horseshoe Shoals," a data tower was permitted in state waters off Martha's Vineyard, and Cape Wind's data tower was "not inconsistent with other pile supported structures in the marine environment in Nantucket Sound." Id. at 2; see Alliance, 288 F.Supp.2d at 78-79.

*8 We find that the Corps's determination that the

data tower is not without precedent, on the basis of physically similar structures in nearby waters, was reasonable. We do not agree with appellants' argument that construction of structures like the data tower on the OCS without additional authorization from Congress is without precedent, but even if that were so, it would suggest only that issuance of the permit is legally unprecedented. The CEQ regulations, however, are designed to address environmental impact. Based on the Corps's findings about the existence of similar pile-driven structures in Martha's Vineyard and near the shore of Nantucket Sound, we can see nothing unprecedented about the way this data tower will impact the environment. [FN9] Thus, we find that the Corps fully complied with its obligations under NEPA and CEQ regulations to engage with the public in preparing the EA and FONSI.

## II. Conclusion

For the reasons stated above, the judgment of the district court is affirmed.

FN1. Section 10 delegates authority to the Corps to issue permits for projects that impact on the navigability of United States waters. 33 U.S.C. § 403.

FN2. While the term "resources" is not defined in OCSLA, "exploration," "development," and "production" are all defined in terms of "mineral," which is in turn defined as "includ[ing] oil, gas, sulphur, geopressured-geothermal and associated resources, and all other minerals which are authorized by an Act of Congress to be produced from 'public lands'." 43 U.S.C. § 1331(k), (l), (m), (q).

FN3. Appellants' argument that the district court erred by elevating the importance of legislative history to supercede that of the plain language of OCSLA is without merit in this case. Even were the text less ambiguous, a reviewing court may consider legislative history to determine "whether there is clearly expressed legislative intention contrary to [the statutory] language, which would require [the court] to question the strong presumption that Congress expresses its intent through the language it chooses." INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)(internal quotation marks omitted); see also Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1, 10, 96 S.Ct.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1938, 48 L.Ed.2d 434 (1976) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' ").

FN4. The need to bring the types of structures referred to in Subsection (e) into agreement with those referred to in Subsection (a) becomes apparent when one considers the amendments made to the latter in 1978. The original text of Subsection (a) extended federal jurisdiction over "all artificial islands and *fixed structures* which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom." 43 U.S.C. § 1333(a) (1953) (emphasis supplied). Because of the development of relatively impermanent structures, which did not clearly fall within the "fixed structures" rubric, Congress amended Subsection (a) in 1978 to apply instead to "all artificial islands and *all installations and other devices permanently or temporarily attached to the seabed,* which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom." *See* H.R.Rep. No. 95- 590, at 128 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1534 (emphasis supplied) (explaining that change in Subsection (a) was made because "the Committee intends that federal law is ... to be applicable to all activities on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are attached to the seabed"). The reference to "fixed structures" in the predecessor of the current Subsection (e), 43 U.S.C. § 1333(f) (1953), was accordingly revised to refer instead to those structures "referred to in subsection (a)," 43 U.S.C. § 1333(e) (2005).

FN5. While deference is not due to interpretations that are *"post hoc* rationalizations offered by an agency seeking to defend past agency action against attack," *Auer,* 519 U.S. at 462, or to interpretations that have varied erratically over time, *see South Shore,* 308 F.3d at 102, we find neither of these stumbling blocks in the instant case. The Corps's interpretation was issued simultaneously with the permit, and so does not appear to be a post hoc rationalization.

Further, the Corps has consistently taken the position that nothing in Section 10 requires it to resolve property disputes.

FN6. Indeed, at oral argument, the Corps's attorney stated that if an applicant sought a permit to build a structure for extraction purposes under OCSLA and affirmed possession of all requisite property interests, but was refused a lease by the Department of the Interior, then the Corps would consider the lack of an Interior lease and would deny the permit.

FN7. Congress has established regulatory schemes for certain types of structures on the OCS. OCSLA itself sets up a system of oil and gas leases that require both a lease from the Secretary of the Interior as well as a Corps permit. *See* 43 U.S.C. § 1331 *et seq.* The Ocean Thermal Energy Conversion Act of 1980, 42 U.S.C. § 9101 *et seq.,* authorizes the creation of large thermal energy plants by requiring a license from the National Oceanic and Atmospheric Administration, while the Coast Guard is authorized to make rules ensuring safety of navigation. *Id.* § § 9111, 9118. The Deepwater Ports Act of 1975, 33 U.S.C. § 1501 *et seq.,* requires a license from the Secretary of Transportation in order to authorize construction of deepwater ports. *Id.* § 1503. The National Fishing Enhancement Act of 1984, 33 U.S.C. § 2101 *et seq.,* in contrast, does not require approval for artificial reefs placed on the OCS beyond a Section 10 permit. *Id* § 2104.

FN8. The other circumstance, when "[t]he proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement," § 1501.4(e)(2)(i), has not been argued to apply in this case.

FN9. To the extent that appellants' arguments are concerned with unprecedented impact of the proposed wind energy plant, that project is not at issue in the current action.

**Briefs and Other Related Documents** (Back to top)

.                    03-2604                    (Docket)
(Nov. 24, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000005972

2005 WL 357636
--- F.3d ---
(Cite as: 2005 WL 357636 (1st Cir.(Mass.)))

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000005973

**4**

CW0000005974

Order Code RL32658

# CRS Report for Congress

Received through the CRS Web

# Wind Energy:
# Offshore Permitting

**November 1, 2004**

Aaron M. Flynn
Legislative Attorney
American Law Division

*Congressional Research Service ❖ The Library of Congress*

CW0000005975

# Wind Energy: Offshore Permitting

## Summary

Technological advancements and tax incentives have driven a global expansion in the development of renewable energy resources. Wind energy, in particular, is now often cited as the fastest growing commercial energy source in the world. Currently all U.S. wind energy facilities are based on land; however, multiple offshore projects have ben proposed and are moving through the permitting process.

It would seem relatively clear that the United States has the authority to permit and regulate offshore wind energy development within the zones of the ocean under its jurisdiction. The federal government and coastal states each have roles in the permitting process, the extent of which depends on whether the project is located in state or federal waters. Currently, no single federal agency is responsible for permitting activities on the submerged lands in federal waters, with regulatory authority allocated among various agencies based on the nature of the resource to be exploited. In addition to basic jurisdictional questions, it is not necessarily clear that current federal law should be interpreted to apply to offshore wind energy facilities or whether new laws will be needed.

The Army Corps of Engineers (Corps) has been exercising jurisdiction under the Rivers and Harbors Act and the Outer Continental Shelf Lands Act. Recently, in *Alliance to Protect Nantucket Sound v. United States Department of the Army*, a federal district court held that the Corps' jurisdiction under these laws was legally sound and upheld the Corps' decision to permit a preliminary data collection tower in federal waters. The reasoning of the court may be applied to the permitting of the larger-scale wind energy project itself, although the decision has been appealed and certain issues remain unresolved. Currently, it is arguable whether the Army Corps' jurisdiction extends to renewable energy projects in federal waters, and there would appear to be no present mechanism for providing an applicant with the necessary property rights to begin construction.

Several bills have been introduced in the 108th Congresses to address this issue, offering two distinct approaches to regulation. H.R. 793 would place authority for granting easements and rights-of-way on submerged federal lands in the hands of the Secretary of the Department of the Interior. Several versions of the Energy Policy Act of 2003, H.R. 6, and S. 2095, contain similar provisions. On the other hand, H.R. 1183 would place regulatory authority in the Secretary of the Department of Commerce by amending the Coastal Zone Management Act to allow specifically for renewable energy projects and the designation of ocean areas that would make suitable candidates for development.

This report will discuss the current law applicable to siting offshore wind facilities, the recent court challenges to the federal offshore permitting process, and the above-mentioned legislation that addresses offshore wind energy regulation. This report will be updated as events warrant.

CW0000005976

# Contents

Ocean Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Federal and State Permitting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Corps Regulation Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Use of the OCS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Recent Legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# Wind Energy: Offshore Permitting

Technological advancements and tax incentives have driven a global expansion in the development of renewable energy resources. Wind energy, in particular, is now often cited as the fastest growing commercial energy source in the world.[1] Currently, unlike much of Europe,[2] all wind power facilities in the United States are based on land; however, multiple offshore projects have now been proposed, including the Cape Wind project off the coast of Massachusetts and Winergy's proposals off the coasts of Massachusetts, New York, New Jersey, Delaware, Maryland, and Virginia.[3] These projects are relatively large undertakings requiring substantial investment; proposed wind farms off the coast of Massachusetts, consisting of approximately 170 turbines, are estimated to cost between $500 million and $700 million.[4]

There are multiple policy questions related to the feasibility and relative attractiveness of developing wind energy; however, the focus of this report is the current law applicable to siting offshore wind facilities, including the interplay between state and federal jurisdictional authorities. This report will also discuss the recent court challenges to the federal offshore permitting process and recent legislation that would address offshore wind energy regulation. This report will be updated as events warrant.

**Ocean Jurisdiction.** The jurisdiction of coastal nations over the world's oceans extends across various adjoining zones by operation of international conventions and by the domestic laws and proclamations of individual governments. Jurisdiction over U.S. waters is divided into four functional areas:, the Territorial Sea, the Contiguous Zone, the Exclusive Economic Zone, and state-controlled waters. The federal government has differing levels of authority in each of these zones, vis-a-vis the states and vis-a-vis other nations. Even within these U.S. zones, all nations enjoy freedom of navigation and overflight as well as other internationally lawful uses of the sea, subject to the regulatory jurisdiction granted the coastal state

---

[1] *See* U.S. DEP'T OF ENERGY & U.S. DEP'T OF THE INTERIOR, WHITE HOUSE REPORT IN RESPONSE TO THE NATIONAL ENERGY POLICY RECOMMENDATIONS TO INCREASE RENEWABLE ENERGY PRODUCTION ON FEDERAL LANDS at 6 (Aug. 2002).

[2] For an overview of offshore wind farm regulation in the United Kingdom, *see*, Nathanael D. Hartland, *The Wind and the Waves: Regulatory Uncertainty and Offshore Wind Power in the United States and United Kingdom*, 24 U. PA. J. INT'L ECON. L. 691 (2003).

[3] Betsie Blumberg, *Wind Farms: An Emerging Dilemma for East Coast National Parks, in* NATIONAL PARK SERVICE, NATURAL RESOURCE YEAR IN REVIEW–2003 63 (March 2004).

[4] Testimony of Attorney General Thomas F. Reilly, Subcommittee on Energy and Mineral Resources, Hearing Regarding HR 793, 108th Cong. (March 6, 2003) (*available at* [http://resourcescommittee.house.gov/108cong/energy/2003mar06/reilly.htm]).

CW0000005978

CRS-2

over such things as setting optimum fishing allowances.[5] It would seem relatively clear, however, that, generally, the United States would have sufficient jurisdiction over each of its zones to authorize the construction and operation of offshore wind projects.

U.S. authority as against other nations begins at its coast — called the baseline — and extends 200 nautical miles out to sea. The first twelve nautical miles comprise the U.S. territorial sea.[6] Under the 1982 United Nations Convention on the Law of the Sea[7] (UNCLOS III), a coastal nation may claim sovereignty over the air space, water seabed, and subsoil within its territorial sea.[8] U.S. Supreme Court precedent and international practice indicate that this sovereignty authorizes coastal nations to permit offshore development within its territorial sea.[9]

The U.S. contiguous zone extends beyond the territorial sea to twenty-four nautical miles from the baseline. In this area, a coastal nation may regulate to protect its territorial sea and to enforce its customs, fiscal, immigration, and sanitary laws.[10] The exact contours of U.S. authority in the contiguous zone are not clearly defined, although the U.S. does not claim full sovereignty.[11] However, in addition to the jurisdiction specifically applicable to the contiguous zone, the jurisdiction the United States exercises over the EEZ is also applicable.

The U.S. EEZ extends 200 nautical miles from the baseline. In accordance with international law, the U.S. has claimed sovereign rights to explore, exploit, conserve, and manage EEZ natural resources of the sea-bed, subsoil, and the superadjacent waters.[12] U.S. jurisdiction also extends over "other activities for the economic exploitation and exploration of the zone, *such as the production of energy from the water, currents and winds*"[13] and, subject to some limitations, "the establishment and use of artificial islands, installations and structures; marine scientific research; and

---

[5] Restatement (Third) of the Foreign Relations Law of the United States, § 514 (1986).

[6] Proc. No. 5928 (Dec. 27, 1988).

[7] United Nations Convention on the Law of the Sea, Dec. 10, 1982, 21 I.L.M. 1261 (entered into force Nov. 16, 1994)(hereinafter UNCLOS III).

[8] UNCLOS III arts. 2.1, 2.2, 3; *see also* United States v. California, 332 U.S. 19 (1947); Alabama v. Texas, 347 U.S. 272, 273-74 (1954).

[9] *See* United States v. California, 436 U.S. 32, 36 (1978); United States v. Alaska, 422 U.S. 184, 199 (1975); Alabama v. Texas, 347 U.S. 272, 273-74 (1954); United States v. California, 332 U.S. 19 (1947).

[10] UNCLOS III art. 33.

[11] United States v. De Leon, 270 F.3d 90, 91 n.1 (1st Cir. 2001); *see also* Vermilya-Brown Co. v. Connell, 335 U.S. 377, 381 (1948); Cuban Am. Bar Ass'n v. Christopher, 43 F.3d 1412, 1425 (11th Cir.1995) (control and jurisdiction is not equivalent to sovereignty).

[12] UNCLOS III arts. 56, 58.

[13] *Id.* art. 56.1 (emphasis added).

CW0000005979

CRS-3

the protection and preservation of the marine environment."[14]  In almost all situations, the U.S. EEZ overlaps geographically with the Outer Continental Shelf (OCS), a geologically distinct area of appurtenant seabed referenced in several federal laws.[15]

Thus, it would seem clear that as against other nations, the United States would have legal authority to permit wind energy projects within the full range of its territorial sea, contiguous zone, and EEZ.

The relative jurisdiction of the federal government and the states is also of importance.  The Submerged Lands Act of 1953[16] assured coastal states title to the lands beneath coastal waters in an area stretching, in general, three geographical miles from the shore.[17]  Thus states, subject to federal regulation for "commerce, navigation, national defense, and international affairs" and the power of the federal government to preempt state law, may regulate the coastal waters within this area.[18]  The remaining outer portions of waters over which the United States exercises jurisdiction are federal waters.[19]

In sum, it would seem relatively clear that the U.S. federal government would have permitting authority, supported by international law, for offshore wind farms.  However, federal authority would be limited by the internationally recognized right of free passage and by the jurisdiction granted to the states under the Submerged Lands Act.

**Federal and State Permitting.**  For *onshore* wind projects on federal public lands, the Department of the Interior, through the Bureau of Land Management, has created a comprehensive regulatory program under the Federal Land Policy and Management Act,[20] but no similarly comprehensive federal statutory or regulatory scheme exists for *offshore* wind energy development at this time.  Still, the Army Corps of Engineers has undertaken the lead role in the federal permitting process, although some have questioned the Corps' statutory authority to issue permits for wind energy facilities.  States may also play a role in the permitting process in some

---

[14] *Id.* art. 56.1(b).

[15] *See* U.S. Commission on Ocean Policy, An Ocean Blueprint for the 21st Century: Final Report of the U.S. Commission on Ocean Policy, Primer on Ocean Jurisdictions: Drawing Lines in the Water, Pre-Publication Copy 41-44 (2004), *available at* [http://www.oceancommission.gov/documents/prepub_report/primer.pdf].

[16] 43 U.S.C. §§ 1301-1303, 1311-1315.

[17] *Id.* § 1301(a)(2). State jurisdiction typically extends three nautical miles (approximately 3.3 miles) seaward of the coast or "baseline." Texas and the Gulf coast of Florida have jurisdiction over an area extending 3 "marine leagues" (9 nautical miles) from the baseline. Louisiana's jurisdiction extends 3 "imperial nautical miles" (imperial nautical mile = 6080.2 feet) seaward of the baseline.  43 U.S.C. § 1301(a)(2).

[18] *Id.* §§ 1314(a), 1311(a)(2).

[19] *Id.* § 1302.

[20] 43 U.S.C. §§ 1701 *et. seq.*

CW0000005980

CRS-4

instances, although their jurisdiction is more limited with regard to offshore projects located in federal waters. The following paragraphs will describe the nature of the permitting process as it is currently being implemented and the challenges to existing Corps practice.

*Federal Regulation.* Currently, the Army Corp of Engineers has taken the lead role in the federal permitting process, claiming jurisdiction under the Rivers and Harbors Act (RHA),[21] as amended by the Outer Continental Shelf Lands Act (OCSLA).[22] The Corps has jurisdiction under these laws to regulate obstructions to navigation within the "navigable waters of the United States"[23] and, under what are arguably more limited circumstances, on the Outer Continental Shelf — thus the Corps has authority over structures in state and federal navigable waters. No federal legislation explicitly addresses the permitting of offshore renewable energy facilities, and the Corps position is based on what some argue is an overly broad interpretation of its statutory authority. In addition to the Corps' review for navigability-related purposes, the views of other federal agencies that have jurisdiction by law or special subject matter expertise, along with the views of state and local agencies, are taken into consideration during the environmental review process mandated by the National Environmental Policy Act (NEPA).[24]

NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions. In general, NEPA and its implementing regulations require various levels of environmental analysis depending on the circumstances and the type of federal action contemplated. Certain actions that have been determined to have little or no environmental effect are exempted from preparation of NEPA documents entirely and are commonly referred to as "categorical exclusions."[25] In situations where a categorical exclusion does not apply, an intermediate level of review, an environmental assessment (EA), may be required. If, based on the EA, the agency finds that an action will not have a significant effect on the environment, the agency issues a "finding of no significant impact" (FONSI), thus terminating the NEPA review process. On the other hand, major federal actions that are found to significantly affect the environment require the preparation of an environmental impact statement (EIS), a document containing detailed analysis of the project as proposed, as well as other options, including taking no action at all. NEPA does not

---

[21] 33 U.S.C. §§ 407-687.

[22] 43 U.S.C. §§ 1331-1356a.

[23] Corps regulations define the "navigable waters of the United States" as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4. Under the RHA, navigable waters "includes only those ocean and coastal waters that can be found up to three geographic miles seaward of the coast." Alliance To Protect Nantucket Sound, Inc. v. U.S. Dept. of Army 288 F.Supp.2d 64, 72 (D.Mass.,2003); *see also* 33 C.F.R. § 329.12(a). On the OCS, however, the Corps' regulatory jurisdiction extends beyond that three-mile limit for, at least certain purposes. 43 U.S.C. § 1333(a)(1), (e).

[24] 42 U.S.C. §§ 4321 *et. seq.*

[25] 40 C.F.R. § 1508.4 (2003).

CW0000005981

CRS-5

direct an agency to choose any particular course of action; the only purpose of an EIS is to ensure that environmental consequences are considered. Thus, in practice, NEPA review will provide information on wind energy projects beyond mere impacts on navigability, and will include impacts to:

> existing resources of the final alternative sites in terms of physical oceanography and geology; wildlife, avian, shellfish, finfish and benthic habitat; aesthetics, cultural resources, socioeconomic conditions, and air and water quality. Human uses such as boating and fishing will also be described.[26]

In addition to the role interested parties and cooperating agencies may play under NEPA, certain federal agencies have independent sources of jurisdiction over specific ocean resources. Thus, they would also likely be involved in the permitting of offshore wind energy facilities. Some of the most relevant authorities are the Endangered Species Act (ESA)[27] and the Migratory Bird Treaty Act (MBTA).[28]

Briefly, each of these laws makes it illegal to inflict certain kinds of harm upon designated species of plants and animals. The ESA prohibits any person, including private entities, from "taking" a "listed" species.[29] "Take" is broadly defined as "to

---

[26] *See* U.S. ARMY CORPS OF ENG'RS, ENVIRONMENTAL IMPACT STATEMENT: SCOPE OF WORK, WIND POWER FACILITY PROPOSED BY CAPE WIND ASSOCIATES, LLC 3, *available at* [http://www.nae.usace.army.mil/projects/ma/ccwf/windscope.pdf] (last visited Feb. 20, 2004).

[27] 16 U.S.C. §§ 1531-1544. It should also be noted that it is perhaps arguable that the ESA does not apply in certain U.S. waters or extraterritorially. However, section 9, which prohibits the taking of listed species, specifically states that it applies in the U.S. territorial sea and upon the high seas (i.e. areas beyond national jurisdiction). 16 U.S.C. § 1538(a)(1)(A), (C). So far, all U.S. wind farm proposals have been within the boundaries of the U.S. territorial sea and would thus appear to be covered by section 9. The section 7 consultation provision described above does not appear to expressly address applicability in U.S. waters or extraterritorially; however, the law states that it applies, to "any action authorized, funded, or carried out" by a federal agency, and regulations implementing section 7 make clear that consultation is required for actions taken within the United States and on the high seas. 16 U.S.C. § 1536; 50 C.F.R. § 402.01. The extent to which the phrase "within the United States" includes portions of the ocean under U.S. sovereignty or control is unclear; however, it may arguably include the territorial sea, over which the U.S. exercises full sovereignty. The application of the ESA in areas under the jurisdiction of other nations would be more questionable but is beyond the scope of this report. *See* Lujan v. Defenders of Wildlife, 504 U.S. 555, 589 (1992) (Stevens, J., concurring). In addition to ESA language pertaining to jurisdiction, the OCSLA does state that "[t]he Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations ... to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State....," lending credence to the idea that the ESA will apply in U.S. waters. 43 U.S.C. § 1333(a)(1).

[28] 16 U.S.C. §§ 703-712.

[29] Under the ESA, species are listed as either "endangered" or "threatened" based on the risk of their extinction. An "endangered" species is "any species which is in danger of extinction (continued...)

CRS-6

harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct."[30]   Additionally, a federal agency permitting or undertaking action that could impact a protected species is subject to section 7 of the ESA, which requires consultation with the U.S. Fish and Wildlife Service (FWS) or the National Marine Fisheries Service (NMFS or NOAA Fisheries), depending upon the species affected.[31]

The section 7 consultation process involves several initial steps leading to a determination of whether a listed species or its designated critical habitat is present in a project area.[32]  If a species or critical habitat is present, then the permitting/acting federal agency must prepare a biological assessment, evaluating the potential effects of the action.[33]  If the acting federal agency determines that a project may adversely affect a listed species or critical habitat, formal consultation and preparation of a biological opinion is required.[34]  The biological opinion contains a detailed analysis of the effects of the agency action and contains the final determination as to whether the proposed action is likely to jeopardize the species or destroy or adversely modify its critical habitat.[35]  If review results in a jeopardy or adverse modification determination, the biological opinion must identify any "reasonable and prudent alternatives" that could allow the project to proceed.[36]  Projects that will result in a level of injury to a species or habitat that will fall short of jeopardizing survival may still be approved subject to certain terms.[37]  The agency may be allowed to "take" some individuals of a listed species without triggering penalties under the act. These incidental takings are to be described in a statement accompanying the biological opinion.[38]  Takings allowed under the consultation process are deemed consistent

---

[29] (...continued)
throughout all or a significant portion of its range ...."  A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §§ 1532(6), (20).

[30] 16 U.S.C. § 1532(19).

[31] *Id.* § 1536(2).

[32] 50 C.F.R. § 402.12(c) (2004). It should also be noted that some protections also attach to "candidate" species, i.e. those proposed but not officially listed. Under current law, an agency must "confer" with the appropriate Secretary if agency action will likely jeopardize the continued existence of any candidate species or adversely modify critical habitat proposed for designation. This is distinct from the section 7 consultation process, less formal, and meant to assist planning early in the process should the species be listed and more definite protections attach. *See* 16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10.

[33] 50 C.F.R. § 402.12(b), (d) (2004).

[34] *Id.* § 402.14(e).

[35] *Id.* § 402.14(h).

[36] *Id.* § 402.14(h)(3).

[37] *Id.* § 402.14(i).

[38] *Id.* § 402.14(i)(1)(i)-(v).

CW0000005983

CRS-7

with the ESA and, thus, are not subject to the penalties under the act and no other authorization or permit is required.[39]

The MBTA is the domestic law that implements the United States' obligations under separate treaties with Canada, Japan, Mexico and Russia for the protection of migratory birds.[40] The MBTA generally prohibits the taking, killing, possession, transportation, and trafficking in of migratory birds, their eggs, parts, and nests.[41] Like the ESA, the general ban on taking protected birds can be waived under certain circumstances. Pursuant to section 704, the Secretary of the Interior is authorized to determine if, and by what means, the take of migratory birds should be allowed.[42] FWS is responsible for permitting activities that would otherwise violate the MBTA. Its regulations at 50 C.F.R. § 21 make exceptions from permitting requirements for various purposes and provide for several specific types of permits, such as import and export permits, banding and marking permits, and scientific collection permits.[43] More general permits for special uses are also provided for under the regulations, although an applicant must make "a sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification."[44] It would not appear that FWS has promulgated regulations specific to the sort of unintentional harm caused by the rotating turbines of wind energy projects, thus it is not clear that the permitting process provided for under current regulations is immediately applicable to wind energy projects.[45] The Service has, however, adopted voluntary, interim guidelines for minimizing the wildlife impacts from wind energy turbines.[46] As these guidelines indicate, compliance does not shield a company from prosecution for MBTA violations; however, "the Office of Law Enforcement and Department of Justice have used enforcement and prosecutorial discretion in the past regarding individuals, companies, or agencies who have made good faith efforts to avoid the take of migratory birds."[47]

---

[39] 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(5).

[40] Birds that receive protection under the MBTA are listed at 50 C.F.R. 10.13 (2003).

[41] 16 U.S.C. § 703.

[42] 16 U.S.C. § 704.

[43] 50 C.F.R. §§ 21.11-21.26 (2003).

[44] Id. § 21.27.

[45] See 69 Fed. Reg. 31074 (June 2, 2004) ("Current regulations authorize permits for take of migratory birds for activities such as scientific research, education, and depredation control. However, these regulations do not expressly address the issuance of permits for incidental take.").

[46] U.S. Fish and Wildlife Service, Interim Guidelines to Avoid and Minimize Wildlife Impacts from Wind Turbines, (May 2003) (available at [http://www.fws.gov/r9dhcbfa/wind.pdf].

[47] U.S. Fish and Wildlife Service, Memorandum, Service Interim Guidance on Avoiding and Minimizing Wildlife Impacts from Wind Turbines at 2 (May 2003).

CW0000005984

CRS-8

*State Regulation.* States may also play a regulatory role, whether the project is proposed for construction in federal or state waters. State jurisdiction over projects located in federal areas is substantially circumscribed; however, under the Coastal Zone Management Act[48] (CZMA) states are explicitly granted some regulatory authority. In general, the CZMA encourages states to enact coastal zone management plans to coordinate protection of habitats and resources in coastal waters.[49] The act establishes a policy of preservation alongside sustainable use and development that is compatible with resource protection.[50] Under the act, state coastal zone management programs that are approved by the Secretary of Commerce receive federal monetary and technical assistance. State programs must designate land and water conservation measures and permissible uses,[51] and must address various sources of water pollution.[52] Of particular importance here, the CZMA also requires that the federal government and federally permitted activities comply with state programs.[53] Responding to a Supreme Court decision that excluded OCS oil and gas leasing from state review under the CZMA, Congress amended the "consistency review" provision to include the impacts on a state coastal zone from federal actions in federal waters.[54] Thus, states have some authority to assure themselves that federally-permitted projects in federal waters will not result in a violation of state coastal zone management regulation.

In addition to consistency review, projects to be constructed in state waters, including any cables that would be necessary to transmit power back to shore, are subject to all state regulation or permitting requirements. Coastal zone regulation varies significantly among the states. The CZMA itself establishes three generally acceptable frameworks: (1) "[s]tate establishment of criteria and standards for local implementation, subject to administrative review and enforcement;" (2) "[d]irect State land and water use planning and regulation;" and (3) regulation development and implementation by local agencies, with state-level review of program decisions.[55]

---

[48] 16 U.S.C. §§ 1451-1464.

[49] Coastal U.S. states and territories, including the Great Lakes states are eligible to receive federal assistance for their coastal zone management programs. Currently, there are 33 approved state and territorial plans. Of eligible states, only Illinois does not have an approved program. *See* National Oceanic and Atmospheric Administration, Office of Ocean and Coastal Resource Management, State and Territory Coastal Management Program Summaries, *available at* [http://www.ocrm.nos.noaa.gov/czm/czmsitelist.html].

[50] *Id.* § 1452(1), (2).

[51] *Id.* § 1455(d)(2), (9)-(12).

[52] *Id.* § 1455(d)(16).

[53] *Id.* § 1456(c).

[54] *Id*; Sec'y of the Interior v. California, 464 U.S. 312, 315 (1984).

[55] 16 U.S.C. § 1455(d)(11).

CRS-9

Within this framework, several states, such as New Jersey, California, and Rhode Island, centralize authority for their programs in one agency.[56] In New Jersey, for instance, the state Department of Environmental Protection (through the Coastal Management Office within the Commissioner's Office of Policy, Planning, and Science) is the lead agency for coastal zone management under several state laws.[57] The majority of states, however, operate coastal zone management programs under "networks" of parallel agencies, with various roles defined by policy guidance and memoranda of understanding.[58]   In Massachusetts, for instance, coastal zone management is tended to by a variety of agencies, including the Departments of Environmental Protection, Environmental Management, Fisheries and Wildlife, and Food and Agriculture, the Metropolitan District Commission, the Energy Facilities Siting Board, and the Executive Office of Transportation and Construction.[59]   Based on a series of MOUs, each agency is obligated to issue and apply state regulations and permits consistently with the state's coastal zone management program.[60]   Thus, depending on the state with jurisdiction, offshore wind energy projects can be subject to comprehensive regulation with permitting authority located within multiple state and local level agencies.

**Corps Regulation Challenge.**   The authority of the Army Corps of Engineers to permit offshore wind energy projects has already been challenged in court in *Alliance to Protect Nantucket Sound v. United States Department of the Army*.[61]   The case deals with the two primary obstacles to the current federal system applied to offshore wind energy permitting: (1) the limits of Corps jurisdiction on the outer continental shelf and (2) the current lack of administrative authority to convey OCS property rights for renewable energy.[62]   In September 2003, a Massachusetts district court granted summary judgment in favor of the Army Corps interpretation, at least with respect to construction of an initial data gathering tower, although it would appear that its reasoning would be applicable to the larger-scale wind farm project itself.   At present, the case is on appeal with the United States Court of

---

[56] *See* Rusty Russell, *Neither Out Far Nor In Deep: The Prospects for Utility-Scale Wind Power in the Coastal Zone*, 31 B.C. ENVTL. AFF. L. REV. 221, 240-41 (2004).

[57] E.g. Freshwater Wetlands Protection Act N.J.S.A. 13:9B; Flood Hazard Area Control Act, N.J.S.A. 58:16A; Wetlands Act of 1970, N.J.S.A. 13:9A; Waterfront Development Act, N.J.S.A. 12:5-3; NJ Water Pollution Control Act - N.J.S.A. 58:10A; Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19; Tidelands Act, N.J.S.A. 12:3.

[58] Rusty Russell, *supra* note 23, at 241.

[59] MASSACHUSETTS OFFICE OF COASTAL ZONE MGMT., MASSACHUSETTS COASTAL ZONE MANAGEMENT PLAN 113-121 (Mar. 2002), *available at* [http://www.state.ma.us/czm/managementplan.pdf].

[60] *Id.* at App. E.

[61] Alliance to Protect Nantucket Sound v. United States Department of the Army, 288 F.Supp.2d 64 (D. Mass. 2003).

[62] *Id.* at 67. Additional arguments were also presented regarding the adequacy of the Corps' NEPA analysis.

CRS-10

Appeals for the First Circuit.[63]  The following paragraphs discuss the generally applicable jurisdiction concerns as well as the interpretation accepted in the *Alliance* case.

*Corps OCS Jurisdiction.*  The first major issue facing offshore wind energy projects is the applicability of the Rivers and Harbors Act and the Outer Continental Shelf Lands Act to these projects.  Section 10 of the Rivers and Harbors Act authorizes the Army Corps to review and permit any project that would obstruct the "navigable waters of the United States."[64]  Under this law, as interpreted by the Corps, jurisdiction is limited to state-controlled waters.[65]  Thus, it would seem relatively clear that the Corps has permitting jurisdiction under the Rivers and Harbors Act for any wind energy project that would be sited in state-controlled portions of the territorial sea.  The OCSLA extends the Corps' jurisdiction to the OCS, although it is arguable that renewable energy projects to be sited in federal waters are beyond the scope of the Corps' extended jurisdiction.  In general, the OCSLA authorizes the Department of the Interior to lease certain mineral resources of the submerged lands in federal waters.[66]  Leasing of the seabed can thus only occur for specified purposes.  43 U.S.C. § 1333(e) of the OCSLA extends Corp navigability permit jurisdiction to the OCS.  It states:

> The authority of the Secretary of the Army to prevent obstruction to navigation in the navigable waters of the United States is extended to the artificial islands, installations, and other devices referred to in subsection (a) of this section.[67]

43 U.S.C. § 1333(a), referenced in (e) states, in relevant part:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, *which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom,* or any such installation or other device (other than a ship or vessel) for the purpose of *transporting* such resources ....[68]

The meaning of this section is subject to differing interpretations.  Arguably, the language of these provisions indicates that Corps permitting authority on the OCS is limited to those structures that might be built and used for the purpose of exploring for, developing, producing, or transporting the resources that have been extracted from the seabed.  Such an interpretation would appear to exclude wind energy

---

[63] *See* Appellants' Designation of the Contents of the Appendix and Statement of Issues, Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army, 288 F. Supp. 2d 64 (D. Mass. 2003), appeal docketed, No. 03-2604 (1st Cir. Nov. 24, 2003).

[64] 33 U.S.C. § 403.

[65] 33 C.F.R. § 329.12.

[66] *See generally* 43 U.S.C. § 1337.

[67] 43 U.S.C. § 1333(e).

[68] 43 U.S.C. § 1333(a)(1).

CW0000005987

CRS-11

facilities from the Corps' authority. On the other hand, the court in the *Alliance* case found significance in the use of the word "may," holding that Corp jurisdiction extends to all structures that *may or may not* be used to explore for, develop, or produce resources.[69] It is arguable, however, that the phrase "may be" implies only that construction may or may not occur and does not indicate that the designated purposes are optional. Thus, the language of the statute can be read so as to deny Corps jurisdiction over offshore renewable energy projects; however, OCSLA legislative history and agency interpretation indicate that Congress did not intend to limit the Corps' authority to structures used for mineral exploration, development, extraction, or transportation, as discussed below.

Army Corps regulations do not explicitly address the extent of its authority on the OCS. They do recognize that Corps jurisdiction over the OCS is based on the OCSLA, stating that Corps jurisdiction has been extended to "artificial islands, installations, and other devices located on the seabed, to the seaward limit of the outer continental shelf...."[70] Notably, unlike the OCSLA itself, this provision does not make reference to the purpose for which these structures are used, arguably indicating that the Corps interprets its jurisdiction broadly. Additionally, Guidance Letter 88-08, a Corps policy statement and not itself enforceable law, interprets the legislative history of the OCSLA to indicate that Congress intended that the Corps regulate all OCS structures regardless of the purpose served, including even such things as offshore gambling casinos.[71] The Letter does not provide the analysis leading up to this conclusion; however, the court in the *Alliance* case relied heavily on the statute's legislative history in upholding the Corps interpretation, according the Corps deference under the *Chevron* standard.[72]

As originally enacted, the OCSLA provided that the jurisdiction of the Corps "extended to artificial islands and fixed structures located on the outer Continental

---

[69] Alliance to Protect Nantucket Sound v. United States Department of the Army, 288 F. Supp.2d 64, 75 (D. Mass. 2003).

[70] 33 C.F.R. § 320.2(b).

[71] Army Corps of Engineers, Regulatory Guidance Letter 88-08 (July 20, 1988), *available at* [http://www.usace.army.mil/inet/functions/cw/cecwo/reg/rgls/rgl88-08.htm]. Guidance Letter 88-08 was set to expire in 1990; however, the Corps indicates that unless superseded by subsequently issued regulations or guidance letters, "the guidance provided in RGL's generally remains valid after the expiration date." *See* Army Corps of Engineers, Regulatory G u i d a n c e   L e t t e r s ,   a t [http://www.usace.army.mil/inet/functions/cw/cecwo/reg/rglsindx.htm]. Regulations and subsequent guidance letters do not appear to address or revise the Corps position contained in the 1988 opinion.

[72] As established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, an agency's interpretation of a statute it is charged with administering it is entitled to special deference. If Congressional intent is not clear from the face of a statute, agency interpretation is generally upheld so long as it is reasonable. Chevron, 467 U.S. at 842-45 (1984). If Congressional intent is clear from the face of the statute, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843.

CW0000005988

CRS-12

Shelf," making no explicit reference to the purpose of such structures.[73] The provision was subsequently amended, taking on its current form so as to reference the resource development purposes of OCS structures. However, as the legislative history indicates, at the time of the amendment, Congress understood the Corps' jurisdiction under the OCSLA to apply to all artificial islands and fixed structures on the OCS, regardless of purpose.[74] Further, the conference report indicates that Congress did not intend to limit the Corps' jurisdiction in this respect, but rather to conform the section to other amended provisions.[75]

**Use of the OCS.** An additional issue relevant to the construction of offshore wind facilities is the matter of who is authorized to use the federally-controlled submerged lands of the OCS. Because any wind turbines would be attached to the seabed of the OCS, some authorization to occupy the submerged lands of the OCS would be required before construction could legally take place. Use of federal lands, including the OCS, requires some form of permission, such as a right-of-way, easement, or license.[76] Use or occupancy of the OCS without such authorization arguably constitutes common law trespass.[77] However, the Court of Appeals for the Fifth Circuit has held that because the United States does not own the OCS in fee simple, it cannot claim trespass based on unauthorized construction on OCS.[78] On the other hand, the court stated, "[n]either ownership nor possession is, however, a necessary requisite for the granting of injunctive relief," because the United States has paramount rights to the OCS and an interest to protect.[79] Thus damages, available under trespass, may not be available for unauthorized construction on the OCS, while injunctive relief would appear possible even under more constrained interpretations of U.S. authority.

It appears that no federal agency, including the Army Corps of Engineers, which permits structures only for navigability purposes, can authorize the occupation and use of OCS lands for wind or other renewable energy purposes under current law. In the *Alliance* case, the plaintiffs claimed that the Corps had acted unlawfully by issuing its permit knowing that the project applicant would not be able to acquire the

---

[73] Act of Aug. 7, 1953, ch. 345, 67 Stat. 462 § 4(f).

[74] H.R. Conf. Rep. No. 95-1474 at 82 (1978), reprinted in U.S.C.C.A.N. at 1674, 1681.

[75] *Id.*

[76] Several federal laws would appear to indicate that Congress intends usage of the OCS to be undertaken only when permission has been expressly granted. *See* 43 U.S.C. § 1332(1), (3) ("the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition ....;" *see also* 42 U.S.C. § 9101(a)(1)(stating that the purpose of the Ocean Thermal Energy Conversion Act is to "authorize and regulate the construction, location, ownership, and operation of ocean thermal energy conversion facilities.").

[77] *See* 43 U.S.C. § 1333(a)(2)(A) (applying the criminal and civil laws of states adjacent to the OCS as federal law); see also Guy R. Martin, *The World's Largest Wind Energy Facility in Nantucket Sound? Deficiencies in the Current Regulatory Process for Offshore Wind Energy Development*, 31 B.C. Envtl. Aff. L. Rev. 300, n.96 (2004).

[78] United States v. Ray, 423 F.2d 16, 22 (5th Cir. 1970).

[79] *Id.*

CW0000005989

CRS-13

requisite property rights to construct its project.[80] The court did not directly address the issue of whether property rights on the OCS could be granted for renewable energy projects under the current administrative system; however, the court did decide that the Army Corps is not required to validate existing property rights or otherwise become involved in ongoing property disputes prior to issuing a navigability-related permit.[81] The Alliance to Protect Nantucket Sound argued, and continues to argue on appeal, that because the applicant for the permit could not legally obtain the requisite property rights, the Corps was in violation of its own regulations.[82] Corps regulations state:

> A DA [Department of the Army] permit does not convey any property rights, either in real estate or material, or any exclusive privileges. Furthermore, a DA permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application. The district engineer will not enter into disputes but will remind the applicant of the above. The dispute over property ownership will not be a factor in the Corps public interest decision.[83]

The Corps interprets these regulations to require only that an applicant affirm that it possesses or will possess the requisite property rights prior to construction. The court found the agency's interpretation to be "entirely consistent with its regulations."[84] Thus, in accordance with this decision, the Corps does not have a responsibility to deny a permit even when property rights cannot presently be obtained; however, construction on the OCS without first obtaining these rights would remain unlawful.

**Recent Legislation.** Several bills that address offshore wind facility siting have been introduced. H.R. 793 would amend the OCSLA to authorize the Secretary of the Department of the Interior to grant easements or rights-of-way on the OCS for activities, such as renewable energy projects, not otherwise authorized in the OCSLA or other law.[85] Among other things, H.R. 793 would require the Secretary to establish "reasonable forms of annual or one-time payments" that are not based on "throughput or production" for any property interests granted under its provisions, and would also authorize the Secretary to establish "fees, rentals, bonus, or other

---

[80] Alliance to Protect Nantucket Sound v. United States Department of the Army, 288 F.Supp. 2d 64, 67 (D. Mass. 2003).

[81] *Id.* at 77-78.

[82] *See id.* at 77.

[83] 33 C.F.R. § 320.4(g)(6).

[84] Alliance to Protect Nantucket Sound, 288 F.Supp.2d at 78.

[85] H.R. 793, 108th Cong. (2003); *see also* H.R. 5156, 107th Cong. (2002).

CRS-14

payments" that would not appear to be subject to these limitations.[86] Additionally, the bill would require the Secretary to consult with other federal agencies and to prescribe any necessary regulations to assure "safety, protection of the environment, prevention of waste, and conservation of the natural resources of the outer Continental Shelf, protection of national security interests, and the protection of correlative rights therein."[87]

Very similar language is contained in several versions of the Energy Policy Act of 2003, H.R. 6[88] and S. 2095.[89] Section 321 of both bills contains a measure not found in H.R. 793 that would exclude projects that have been constructed before the date of the bill's enactment or for which a request for proposal has been issued by a public authority from resubmitting "documents previously submitted" or obtaining "reauthorization of actions previously authorized."[90]

A different approach is taken in H.R. 1183,[91] which would amend the Coastal Zone Management Act to provide for the location and permitting of renewable energy facilities in the marine environment.[92] Unlike H.R. 793, this bill would apply solely to the siting of renewable energy facilities, defined in the bill as "a source of energy that is regenerative and is produced without depleting or otherwise diminishing the resource from which such energy is derived. Such term includes, but is not limited to, solar, thermal, and wind energy sources."[93] The bill would establish a federal licensing program, managed under the authority of the Secretary of Commerce, for facilities in federal waters. Among other things, the bill contains provisions requiring environmental, national security, and safety regulation in consultation with other agencies and would require the Secretary of Commerce to identify those waters under federal jurisdiction that have the greatest renewable energy potential.[94]

**Conclusion.** Interest in developing offshore wind energy resources continues to grow, and projects are already in the initial stages of development. It would seem clear that the United States, vis-a-vis other nations, would have the right to permit offshore development in its territorial sea and on the Outer Continental Shelf, subject to state authority over offshore areas under the Submerged Lands Act. Currently,

---

[86] H.R. 793, 108th Cong. § 1(b) (2003) (amending 43 U.S.C. 1337 and adding new subsection (p)).

[87] *Id.*

[88] H.R. 6, 108th Cong., § 321 (2003).

[89] S. 2095, 108th Cong. § 321 (2004).

[90] *Id.* § 321(c).

[91] H.R. 1183, 108th Cong. § 2(b) (2003).

[92] *Id.* § 101.

[93] *Id.* § 3(a) (amending 16 U.S.C. 1453 and adding new subsection (17)).

[94] *Id.* § 202.

CW0000005991

CRS-15

there is no federal law that authorizes an agency to transfer property rights or license the use of federal offshore areas for renewable energy purposes.   It is also questionable whether the Army Corps of Engineers, which has jurisdiction under the Rivers and Harbors Act and the Outer Continental Shelf Lands Act to permit obstructions to navigability, is authorized to issue permits for offshore wind development under current law.  Multiple pieces of legislation have been introduced to respond to these concerns and would create significantly different regulatory regimes.   At this time, however, offshore wind energy projects continue to move forward despite legal uncertainty and a lack of comprehensive regulation.

CW0000005992

**5**

CW0000005993



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
WASHINGTON, D.C. 20314-1000

SEP 3 _ .

REPLY TO
ATTENTION OF:

Operations Division
Regulatory Branch

Honorable Rodney Frelinghuysen
House of Representatives
2442 Rayburn House Office Building
Washington, D.C. 20515-0920

Dear Congressman Frelinghuysen:

This is in response to your letter of June 25, 2003, requesting that the U.S. Army Corps of Engineers prepare a programmatic Environmental Impact Statement (EIS) for offshore wind energy production. Although the exact number of proposed structures is debatable, it does appear that there is a new industry emerging.

As you are aware, our New England District is currently developing the project specific EIS for the proposal by Cape Wind Associates, LLC off the coast of Massachusetts. Under the Corps authorities in Section 10 of the Rivers and Harbors Act, we can issue a permit for the installation of structures on the Outer Continental Shelf (OCS). As part of our decision process, we do conduct a full public interest review and, in compliance with the National Environmental Policy Act, this will include consideration of the cumulative impacts associated with this application. However, the geographic range of the District's analysis is designed to assess potential alternatives to the Cape Wind proposal and not to assess potential offshore wind energy project locations in a broader, programmatic context.

Please be assured, however, that we are coordinating with our field offices to ascertain the viability of other offshore wind energy proposals and, therefore, the need for a programmatic EIS to provide a more comprehensive analysis. We are also coordinating with the President's Energy Task Force and other federal agencies since some of the issues (e.g., property ownership on the OCS and a national policy on wind energy) are beyond the Corps statutory authorities. I appreciate your interest in the Headquarters Regulatory Program and its applicability to offshore wind energy projects. My staff will keep you apprised of Corps decisions in this regard. If you have any questions regarding the application of national Regulatory Program policy to the Cape Wind project, contact Mr. Kirk Stark of my staff at (202) 761-4664.

Sincerely,

Thomas F. Caver, Jr., P.E.
Deputy Director of Civil Works

**6**

CW0000005995



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

JUN 20 2002

Honorable Richard B. Cheney
President of the Senate
Washington, D.C. 20510

Dear Mr. Cheney:

Enclosed is a draft bill to provide authority to the Secretary of the Interior to grant easements or rights-of-way for energy-related projects on the Outer Continental Shelf (OCS). This legislation is being proposed by the Department of the Interior in support of the administration's National Energy Policy initiative to simplify permitting for energy production in an environmentally sound manner. This would be accomplished by establishing a uniform permitting process, coordinated among all of the appropriate Federal agencies, for energy-related project approvals that occur on the OCS.

We recommend that this draft bill be introduced, referred to the appropriate committee for consideration, and enacted.

Generally, mechanisms do not currently exist by which an applicant can obtain approval from the Federal Government to utilize the OCS for non-oil and gas related activities. Similarly, there exists no designated Federal agency that is tasked with the authority to protect the Federal interest in the OCS and to manage such activities to ensure that they are conducted in a safe and environmentally sound manner. Applicants seeking to conduct activities on the OCS that are not specifically oil or gas related have no guidance or clear direction by which to ascertain which Federal agency or agencies must be consulted in order to obtain the necessary permits to further the development of projects on the OCS.

This draft bill has been developed in an effort to remedy the problems noted above by amending the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.) to authorize the Secretary of the Interior to grant easements and rights-of-way for energy projects. The legislation would apply to both traditional and non-traditional energy projects, including, but not limited to, renewable energy projects such as wind, wave and solar energy as well as proposed offshore liquified or compressed natural gas facilities. This authority would function in much the same way that the Secretary currently oversees the development of oil and gas activities on the OCS.

The draft bill would also authorize the Secretary to allow energy or non-energy related uses of existing OCS facilities and structures previously constructed for energy purposes such as offshore staging facilities to support deep water oil and gas activities and offshore emergency medical facilities. This authority would allow the Secretary the flexibility to meet the needs of the public to ensure maximum efficient use of existing OCS structures while ensuring that any activities are undertaken in a safe and environmentally sound manner.

CW0000005996

2

The bill is not meant to supersede the existing authority of any other Federal agency with regard to the permitting of such projects and expressly contains a provision to that effect. It also requires the Secretary of the Interior to coordinate with other appropriate agencies in considering the merits of applications for projects on the OCS. A section-by-section analysis of the draft bill is enclosed that describes the various provisions of the legislation in detail.

The Office of Management and Budget has advised us that there is no objection to the submission of this proposal to Congress and that enactment of this proposal would be in accord with the program of the President.

Sincerely,

Rebecca W. Watson
Assistant Secretary
Land and Minerals Management

Enclosures

CW0000005997

**7**

CW0000005998

*Final Report*
*Pre-Publication Copy*


U.S. COMMISSION ON
OCEAN POLICY

CHAPTER 24:
## MANAGING OFFSHORE ENERGY AND OTHER MINERAL RESOURCES

*Chapter 6 recommended development of a coordinated offshore management regime that would be comprehensive, transparent, and predictable, bring a fair return to the public, and promote a balance between economic and environmental considerations. The management of nonliving resources in federal waters raises many of the same fundamental policy questions. From the well developed, but politically contentious, outer Continental Shelf oil and gas program to new and emerging offshore uses that lack comprehensive management regimes, much can be learned. But much work also remains in developing a consistent system for unlocking the treasures of the sea while protecting the marine environment and providing affected parties a voice in decisions.*

## EXERCISING JURISDICTION OVER NONLIVING RESOURCES IN FEDERAL WATERS

In addition to its responsibilities for living marine resources, the federal government also exercises jurisdiction over nonliving resources, energy and other minerals located in the waters and seabed of the more than 1.7 billion acres of the outer Continental Shelf (OCS). Offshore oil and gas development has the most mature and broadest management structure of all such resources. It also has the longest and richest history, characterized by major changes to the underlying law that established the more comprehensive administrative regime, as well as intense political conflict resulting from divisions among stakeholders and tensions inherent in American federalism. The development of other ocean energy resources—some of which are newly emerging technologies—have differing levels of management, but none are currently making any noteworthy contributions to domestic production numbers. Historically, there also have been varying expressions of commercial interest in non-energy minerals in the U.S. exclusive economic zone (EEZ), but only sand and gravel have been used in recent years by coastal states and communities, because of a change which eased access to those resources.

## MANAGING OFFSHORE OIL AND GAS RESOURCES

As noted in Chapter 2, from its beginning, the federal offshore oil and gas program faced controversy over ownership issues, as states unsuccessfully sued the federal government over control of offshore waters. Once that issue was settled legislatively, there was a short but relatively stress-free period. Conflict, however, soon emerged over issues of management, environmental risks, and the costs and benefits of energy exploration and production on the OCS that continues to this day. Proponents point to the program's contributions to the nation's energy supplies and economy, significant improvements in its safety and environmental record, and noteworthy technological achievements. Opponents argue that offshore oil activities harm coastal communities economically and the marine environment unacceptably. The ongoing debate is carried out in the halls of Congress, federal agencies, state and local governments, trade associations, and nongovernmental organizations. OCS oil and gas development is a classic example of the politics of multiple-use resource

CW0000005999

*Final Report*
*Pre-Publication Copy*


U.S. COMMISSION ON
OCEAN POLICY

*Specifically, Ocean.US, NOAA, and MMS should work with the oil and gas industry to:*

- *employ industry resources, such as pipelines, platforms, and vessels as part of the IOOS.*
- *incorporate nonproprietary data into IOOS informational products and larger environmental databases, while protecting the security of proprietary data and meeting other safety, environmental, and economic concerns.*

## ASSESSING THE POTENTIAL OF OFFSHORE METHANE HYDRATES

Conventional oil and gas are not the only fossil-based fuel sources located beneath ocean floors. Methane hydrates are solid, ice-like structures composed of water and natural gas. They occur naturally in areas of the world where methane and water can combine at appropriate conditions of temperature and pressure, such as in thick sediment of deep-ocean basins, at water depths greater than 1,650 feet.

The estimated amount of natural gas in the gas hydrate accumulations of the world greatly exceeds the volume of all known conventional gas resources.[20] A 1995 U.S. Geological Survey (USGS) estimate of both marine and Arctic hydrate resources revealed the immense energy potential of hydrates in the United States.[21] These deposits have been identified in Alaska, the east and west coasts of the United States, and in the Gulf of Mexico. USGS estimated that the methane hydrates in U.S. waters hold a mean value of 320,000 trillion cubic feet of natural gas, although subsequent refinements of the data have suggested that the estimate is a slightly more conservative 200,000 trillion cubic feet.[22] Even this more conservative estimate is enough to supply all of the nation's energy needs for more than 2,000 years at current rates of use.[23]

However, there is still no known practical and safe way to develop the gas and it is clear that much more information is needed to determine whether significant technical obstacles can be overcome to enable methane hydrates to become a commercially viable and environmentally acceptable source of energy.

In the United States, federal research concerning methane hydrates has been underway since 1982, was intensified in 1997-98, and received further emphasis with the passage of the Methane Hydrate Research and Development Act in 2000. That Act established an interagency coordination mechanism that includes the U.S. Departments of Energy, Commerce, Defense, and the Interior, and the National Science Foundation, and directed the National Research Council to conduct a study on the status of research and development work on methane hydrates. This study is scheduled for release in September 2004.

**Recommendation 24 4. The National Ocean Council (NOC), working with the U.S. Department of Energy and other appropriate entities, should review the status of gas hydrates research and development to determine whether methane hydrates can contribute significantly to meeting the nation's long-term energy needs. If such contribution looks promising, the NOC should recommend an appropriate level of investment in methane hydrates research and development, and determine whether a comprehensive management regime for industry access to hydrate resource deposits is needed.**

## DEVELOPING OFFSHORE RENEWABLE ENERGY RESOURCES

Environmental, economic, and security concerns have heightened interest among many policy makers and the public in renewable sources of energy. Although offshore areas currently contribute little to the nation's supply of renewable energy, the potential is significant and could include wind turbines, mechanical devices driven by waves, tides, or currents, and ocean thermal energy conversion, which uses the temperature difference between warm surface and cold, deep-ocean waters to generate electricity.

CW0000006000


U.S. COMMISSION ON
OCEAN POLICY

## Offshore Wind Energy Development

While the offshore wind power industry is still in its infancy in the United States, it is being stimulated by improved technology and federal tax credits that have made it more attractive commercially. Additionally, developers are looking increasingly to the lead of European countries such as Denmark, the United Kingdom, and Germany, where growing numbers of offshore projects are being licensed.

In fact, the United States already has a wind energy management program applicable on some federal lands onshore. This comprehensive program is carried out by DOI's Bureau of Land Management under broad authority provided by the Federal Land Policy and Management Act.

Conversely, there is no comprehensive and coordinated federal regime in place to regulate offshore wind energy development or to convey property rights to use the public space of the OCS for this purpose. In the absence of a specific regime, the U.S. Army Corps of Engineers (USACE) is the lead federal agency responsible for reviewing and granting a permit for this activity. Its authority, however, is based on Section 10 of the Rivers and Harbors Act, which, although it has a public interest requirement, primarily regulates obstructions to navigation, including approval of any device attached to the seafloor.

In reviewing a proposed project under Section 10, the USACE is required by the National Environmental Policy Act to consult other federal agencies. Depending on the circumstances, these agencies and authorities may include:

- The U.S. Coast Guard, which regulates navigation under several federal statutes.
- The Federal Aviation Administration, which regulates objects that may affect navigable airspace pursuant to the Federal Aviation Act.
- The U.S. Environmental Protection Agency, which may conduct a review for potential environmental impacts of a project pursuant to the Clean Water Act and Clean Air Act.
- The National Marine Fisheries Service (NMFS), which may review projects for potential impacts to fishery resources pursuant to the Magnuson-Stevens Fishery Conservation and Management Act. In addition, NMFS' review includes assessing potential impacts to endangered or threatened species under the Endangered Species Act or the Marine Mammal Protection Act.
- The U.S. Fish and Wildlife Service, which may review projects for potential impacts to endangered species or marine mammals under its jurisdiction pursuant to the Endangered Species Act or the Marine Mammal Protection Act.
- In addition, depending on its location, a wind energy project or at least the Section 10 permit may be subject to review by one or more state coastal management programs in accordance with the CZMA federal consistency provisions.

The Section 10 review process stands in stark contrast both to the well established DOI regulatory program for onshore wind energy and, in the marine setting, to the robust regulatory program for offshore oil and gas that has developed under the OCSLA. Using the Section 10 process as the primary regulatory vehicle for offshore wind energy development is inadequate for a number of reasons. First and foremost, it cannot grant leases or exclusive rights to use and occupy space on the OCS. It is not based on a comprehensive and coordinated planning process for determining when, where, and how this activity should take place. It also lacks the ability to assess a reasonable resource rent for the public space occupied or a fee or royalty for the energy generated. In other words, it lacks the management comprehensiveness that is needed to take into account a broad range of issues, including other ocean uses in the proposed area and the consideration of a coherent policy and process to guide offshore energy development.

CW0000006001



U.S. COMMISSION ON
OCEAN POLICY

---

**Box 24.3 A Mighty Wind Blows in Cape Cod**

The first proposal for offshore wind energy development in the United States is testing the ability of the federal system to manage this emerging industry. The proposal calls for use of approximately 23 square miles of Nantucket Sound, some 5.5 nautical miles off the coast of Cape Cod, Massachusetts. It would consist of 130 wind turbines, each of which would be sunk into the ocean floor and reach up to 420 feet above the ocean surface. The project would generate an annual average of approximately 160 megawatts of electrical power.[24]

This project has divided local citizens, elected officials, environmentalists, business interests, and other stakeholders. Supporters cite the project's potential to reduce pollution, global warming, and reliance on foreign oil, while opponents warn of bird deaths, harm to tourism, interference with commercial and sports fishing, and obstructed views.

Despite the controversy, the project is proceeding through the review process contained in Section 10 of the Rivers and Harbors Act. In the meantime, proposals for offshore wind development projects up and down the East Coast are proliferating.

---

## Wave Energy Conversion—Current and Tidal

Various technologies have been proposed to use wave or tidal energy, usually to produce electricity. The wave energy technologies for offshore use include floating or pitching devices placed on the surface of the water that convert the horizontal or vertical movement of the wave into mechanical energy that is used to drive a turbine. Currently, the offshore wave, tidal, and current energy industry is in its infancy. Only a small proportion of the technologies have been tested and evaluated.[25] Nonetheless, some projects are moving forward in the United States, including one to install electricity-producing wave-energy buoys more than 3 nautical miles offshore Washington State, in the Olympic Coast National Marine Sanctuary. Internationally, there is considerable interest in wave, tidal, and current energy, but the projects are almost all in the research and development stage.

The Federal Energy Regulatory Commission (FERC) asserts jurisdiction, under the Federal Power Act (FPA), over private, municipal, and state (not federal) hydropower projects seaward to 12 nautical miles. FERC has formally asserted jurisdiction over the Washington State project, and is likely to assert jurisdiction over all forms of wave, tidal, or current energy projects whose output is electricity, from the shoreline out to 12 nautical miles offshore, on the basis that they are "hydropower" projects under the FPA.

Although in issuing a license for a wave, current, or tidal project, FERC is directed by the FPA to equally consider environmental and energy concerns, it is not an agency with a broad ocean management mission. As with wind energy, several other federal laws may apply to ocean wave projects. For example, NEPA, the federal consistency provision of the CZMA, the National Historic Preservation Act, and the Fish and Wildlife Coordination Act may apply, as may the consultation provisions of the Endangered Species Act and the Marine Mammal Protection Act. But there is no comprehensive law that makes clear which of these individual laws may be applicable, nor is there any indication that overall coordination is a goal, thus leaving implementation to mixed federal authorities.

## Ocean Thermal Energy Conversion

The surface waters of the world's tropical oceans store immense quantities of solar energy. Ocean thermal energy conversion (OTEC) technology could provide an economically efficient way to tap this resource to produce electric power and other products. The U.S. government spent over $200 million dollars in OTEC research and development from the 1970s to the early 1990s that produced useful technical information but did not result in a commercially viable technology.[26]

CW0000006002



Early optimism about the potential of OTEC led to the enactment of the Ocean Thermal Energy Conversion Act in 1980, and the creation of a coordinated framework and licensing regime for managing that activity if and when economic considerations permitted. NOAA issued regulations to implement the Act, but because of investor risk for this capital-intensive technology and relatively low fossil fuel prices, no license applications were ever received and NOAA subsequently rescinded the regulations in 1996. Thus, the United States currently has no administrative regulatory structure to license commercial OTEC operations.

## Comprehensive Management for Offshore Renewable Energy

Offshore renewable technologies will continue to be studied as a means of reducing U.S. reliance on potentially unstable supplies of foreign oil, diversifying the nation's energy mix, and providing more environmentally benign sources of energy. Similar to offshore aquaculture described in Chapter 22, the offshore renewable processes described in this section present obvious examples of the shortcomings in federal authority when it comes to regulating specific new and emerging offshore activities. As long as federal agencies are forced to bootstrap their authorities to address these activities, the nation runs the risk of unresolved conflicts, unnecessary delays, and uncertain procedures. What is urgently needed is for the National Ocean Council to develop a comprehensive offshore management regime (as recommended in Chapter 6) that considers all offshore uses within a larger planning context. A coherent and predictable federal management process for offshore renewable resources that weighs the benefits to the nation's energy future against the potential adverse effects on other ocean users, marine life, and the ocean's natural processes, should be fully integrated into the broader management regime.

**Recommendation 24 5. Congress, with input from the National Ocean Council, should enact legislation providing for the comprehensive management of offshore renewable energy development as part of a coordinated offshore management regime.**

*Specifically, this legislation should:*
- *be based on the premise that the oceans are a public resource.*
- *streamline the process for licensing, leasing, and permitting renewable energy facilities in U.S. waters.*
- *subsume existing statutes, such as the Ocean Thermal Energy Conversion Act.*
- *ensure that the public receives a fair return from the use of the resource and that development rights are allocated through an open, transparent process that considers state, local, and public concerns.*

# MANAGING OTHER MARINE MINERALS

The ocean floor within the U.S. EEZ contains vast quantities of valuable minerals other than oil and gas, but the economics of recovering them, especially in areas far offshore, are not welcoming. These resources include more than 2 trillion cubic meters of sand and gravel reserves on the Atlantic shelf of the OCS alone, enormous phosphate deposits off the East Coast from North Carolina to northern Florida, titanium-rich heavy mineral sands from New Jersey to Florida, manganese nodules from South Carolina to Georgia, high-grade calcium carbonate sands off Florida, gold and platinum deposits off Alaska, polymetallic sulfides off Oregon, barite resources off southern California, and quantities of cobalt and platinum off Hawaii. It is likely that substantial amounts of other valuable minerals will be identified in the future as exploration proceeds. Access to these minerals for commercial recovery, including offshore sand and gravel for use as construction aggregate, is through the competitive leasing process of the OCSLA.

In 1994, Congress authorized coastal communities to use sand and gravel from the OCS for public works projects without going through the statute's bidding process. Since then, MMS has used this authority to allow federal, state, and local agencies to mine OCS sand to protect shorelines, nourish beaches, and restore wetlands. Between 1995 and 2004, MMS provided over 20 million cubic yards of OCS sand for 14 coastal

CW0000006003

**8**

CW0000006004

# REVIEW OF STATE AND FEDERAL MARINE PROTECTION OF THE ECOLOGICAL RESOURCES OF NANTUCKET SOUND



## CENTER FOR COASTAL STUDIES
### JANUARY 28, 2003



CW0000006005

# REVIEW OF STATE AND FEDERAL MARINE PROTECTION OF THE ECOLOGICAL RESOURCES OF NANTUCKET SOUND

## CENTER FOR COASTAL STUDIES
115 BRADFORD STREET
P.O. BOX 1036
PROVINCETOWN, MASSACHUSETTS 02657

JANUARY 28, 2003

COVER: SOCIALIZING GRAY SEALS (*HALICHOERUS GRYPUS*) ON A CAPE COD BEACH
PHOTO – OWEN NICHOLS, CCS © 2002

CW0000006006

## i.    Executive Summary

On October 22, 2002, the Center for Coastal Studies (CCS) was contacted by U.S. Representative William Delahunt (MA-10[th] District) to provide a review of the existing literature pertaining to the biological resources and environmental protection of the waters of Nantucket Sound. In response to this request, CCS has prepared the following document, detailing the biological significance of the species contained therein, as well as a review of pertinent existing and proposed state and federal protection of these waters. The purpose of this review is to gather existing facts regarding the biodiversity and ecological significance of the region and to highlight areas where additional study may be necessary.

Nantucket Sound contains significant ecological, commercial and recreational resources that have been at the heart of several past nominations for enhanced environmental protection and conservation policies within the region. The biological diversity and unique habitat areas of Nantucket Sound led the Commonwealth of Massachusetts to nominate the area for National Marine Sanctuary status in a 1980. The resources of Nantucket Sound were again deemed worthy of consideration for National Marine Sanctuary status by the resource evaluation committee appointed by the National Marine Sanctuary Program in 1983. These resources are equally significant today. Nantucket Sound is a recognized habitat for many state and federally protected species, including roseate terns, piping plovers, leatherback sea turtles, loggerhead sea turtles, Kemp's Ridley sea turtles, and grey seals.

Our review uncovered several localized studies and species-specific biological surveys throughout published literature, unpublished reports and on-going data collection. While of intrinsic value, these studies have not addressed management mechanisms for integrating and coordinating environmental management for resident or migratory species that rely on the Sound. As a result, much of the available information considers only pieces of an ecological whole, resulting in fragmented understanding of dynamic ecosystem processes and species interactions.

Current management focuses upon ecologically arbitrary divisions of a contiguous coastal resource resulting from overlapping state and federal jurisdiction of these waters. Past state and federal nominations to protect these waters as a national marine sanctuary suggest the inherent ecological, commercial, and recreational values of Nantucket Sound. CCS recommends a multi-disciplinary taskforce study of the Nantucket Sound biogeographical region to assess the existing habitat, species utilizations, and commercial and recreational values of the area in order to facilitate consistent environmental management and conservation of protected marine resources. The existing data collected by state, federal, and private agencies will greatly facilitate such a study by providing a base for designing a broad study of the entire system. Development of comprehensive ecosystem management begins with thorough, scientific evaluation of the resources and processes of the entire system designed to support a unified environmental policy for the continued use, study and protection of this valuable coastal resource.

**ii.**     **Table of Contents**

| | | |
|---|---|---|
| *i.* | *Executive Summary* | *i* |
| *ii.* | *Table of Contents* | *ii* |
| *iii.* | *List of Figures* | *iii* |
| 1.0 | Introduction | 1 |
| 2.0 | Geography of Nantucket Sound | 2 |
| 3.0 | Overview of State and Federal Marine Protected Areas | 3 |
| | 3.1  Massachusetts Ocean Sanctuary | 3 |
| | 3.2  National Marine Sanctuary System | 4 |
| |     3.2.1  Nomination Criteria and History | 4 |
| 4.0 | Marine Protection in Nantucket Sound | 5 |
| | 4.1  Cape and Islands Ocean Sanctuary | 6 |
| | 4.2  National Marine Sanctuary Nominations | 8 |
| |     4.2.1  1980 Nomination | 8 |
| |     4.2.2  1983 Nomination | 10 |
| 5.0 | Review of Jurisdictional History of Nantucket Sound | 11 |
| 6.0 | Marine Resources of Nantucket Sound | 13 |
| | 6.1  Marine Mammals | 14 |
| | 6.2  Avian Species | 16 |
| | 6.3  Fisheries | 18 |
| 7.0 | Summary | 19 |
| | 7.1  Future Scientific Assessment | 19 |
| | 7.2  Recommendations and Conclusions | 21 |
| 8.0 | Literature Cited | 23 |
| Appendix A | Table 1 and Table 2 | 25 |

Appendix B    Nomination Letter for a Marine Sanctuary in Nantucket Sound

                      Prepared by Executive Office of Environmental Affairs and Office of the Attorney General
                      December 22, 1980

Appendix C    National Marine Sanctuary Site Evaluations

                      Recommendations and Final Reports

                      Prepared by Chelsea International Corporation
                      June 7, 1983

CW0000006008

### iii.　　　　List of Figures

Figure 1: Nantucket Sound (from NOAA Chart 13200)　　　　　　　3

Figure 2: Bathymetry of Nantucket Sound and Nantucket Shoals　　　4

Figure 3: Massachusetts Ocean Sanctuary Boundaries　　　　　　　7

Figure 4:  Proposed Boundary for Nantucket Sound National Marine Sanctuary　　9
　　　　in 1980 Executive Office of Environmental Affairs Nomination

Figure 5: Gray seal (*Halichoerus grypus*) (CCS © 2002)　　　　　　15

Figure 6: Common Eiders (*Somateria mollissima*) socializing.  (CCS © 2002)　　17

CW0000006009

## 1.0   Introduction

The Center for Coastal Studies (CCS) is a non-profit research, education and conservation organization with over 25 years of service on a variety of coastal and marine issues. On October 22, 2002, CCS received a written request from U.S. Representative William Delahunt to provide a review of the existing literature pertaining to the biological resources and environmental protection of the waters of Nantucket Sound.  Of particular interest in this regard were past attempts to gain marine sanctuary status for the waters of Nantucket Sound, as well as an overview of present ecological significance of the region.

The initial efforts to classify the waters of Nantucket Sound as a marine sanctuary were undertaken by the state Legislature with the passage in 1970 of the Massachusetts Ocean Sanctuaries Act. This legislative action authorized the creation of five ocean sanctuaries, with Nantucket Sound explicitly included within the Cape and Islands Ocean Sanctuary. Subsequent jurisdictional disputes culminated with federal jurisdiction over the central waters of Nantucket Sound, and a "hole-in-the-doughnut" scenario of unprotected federal waters nearly completely surrounded by protected state waters. To resolve the dilemma of dual management, the Commonwealth in 1980 advanced a proposal to designate Nantucket Sound as a National Marine Sanctuary.  In 1983, Nantucket Sound was placed on the Site Evaluation List for National Marine Sanctuary status by a resource evaluation committee appointed by the National Marine Sanctuary Program.   To date, however, Nantucket Sound remains a multi-jurisdictional region, with state jurisdiction over the state ocean sanctuary waters and federal jurisdiction over the central, "hole-in-the-doughnut" portion of the Sound.

CCS has completed a preliminary review of available literature pertaining to the marine resources of Nantucket Sound.  This review serves to document published and unpublished data regarding marine and coastal resources of the area, and to

1

CW0000006010

highlight areas where further and/or more intensive studies may be needed to fully evaluate the current status of this system. In preparing this review, it has become apparent that the jurisdictional boundaries that regulate management and research activities are incompatible with a holistic, ecosystem-based approach to managing the resources within and relying upon the dynamic and non-fragmented ecosystem of the Nantucket Sound region.

The Commonwealth has demonstrated a will to protect and conserve the resources of Nantucket Sound since its initial attempt to classify those waters as an ocean sanctuary. In 1980, the Commonwealth presented a compelling argument for federal recognition of those resources by nominating Nantucket Sound for National Marine Sanctuary status. The National Marine Sanctuary Program's site selection committee acknowledged and confirmed the Commonwealth's interest in protecting Nantucket Sound in its 1983 Final Report.

The Nantucket Sound region is unquestionably a healthy and productive ecosystem. However, the complexities of the jurisdictional arrangement have needlessly complicated scientists' and managers' ability to fully assess the ecological significance of the region and many of its marine species. Therefore, CCS concurs with the Commonwealth's 1980 recommendation that Nantucket Sound be managed as a single ecological unit so as to ensure that the entire region receive the level of environmental protection afforded to those portions of the Sound within the Cape and Islands Ocean Sanctuary.

## 2.0   Geography of Nantucket Sound

Nantucket Sound includes 163 square nautical miles of water and seabed between Cape Cod, Vineyard Sound, the islands of Martha's Vineyard and Nantucket extending seaward beyond Monomoy and Nantucket Islands. An approximate latitudinal boundary spans from 41° 12' N to 41° 40' N, while the longitudinal boundary spans approximately from 69° 55' W to 70° 36' W.

2

CW0000006011



_Figure 1_ -- Nantucket Sound (from NOAA Chart 13200)

Nantucket Sound borders shallow shoal waters of the Atlantic Shelf to the east, deeper Atlantic Shelf waters to the south, Vineyard Sound to the west and Cape Cod to the North. The submerged land within 3 miles from mean low water is within the boundaries of the Cape and Islands Ocean Sanctuary. Waquoit Bay National Estuarine Research Reserve (NERR) borders Nantucket Sound on the northern shore. Monomoy National Wildlife Refuge comprises the northeastern terrestrial boundary of the Sound.

Nantucket Sound is situated at a confluence of the cold Labrador currents and the warm Gulf Stream. This creates a unique coastal habitat representing the southern range for Northern Atlantic species and the northern range for Mid-Atlantic species. The transitional ecology of the region is consistent with both the biogeographic location and the transitional geology of the glacially deposited sediments that form Nantucket Sound. Nantucket Sound is characterized by an extreme richness of biological diversity, containing habitats that range from open sea to salt marshes. The complex networks of habitat utilization and species competition within the Sound remains an area for significant scientific research.

3

CW0000006012

The largest of the many shoals within Nantucket Sound is Horseshoe Shoal. Horseshoe Shoal covers approximately 35 square miles with depths averaging between 13 and 40 feet. The major navigational channel in Nantucket Sound is Main Channel, adjacent to the southern edge of Horseshoe Shoal. Nantucket Sound is subject to changes in the physical dynamics of its many shoals, with fluctuations caused by regional climatological and oceanographic phenomena.



*Figure 2* -- Bathymetry of Nantucket Sound and Nantucket Shoals

## 3.0   Overview of State and Federal Marine Protected Areas

### 3.1   Massachusetts Oceans Sanctuaries

The Massachusetts Oceans Sanctuary Act (M.G.L. c. 132A, §§ 13-16, 18) attempts to *protect the ecology or the appearance of the ocean, the seabed and subsoil from any exploitation, development or activity that would seriously alter or endanger those resources* (M.G.L. c. 132A, §§ 12A, 321 CMR Section 5.00). This statute does not regulate fisheries or living resource extraction, but does regulate non-renewable resource development, discharging, marine construction,

3

CW0000006013

and shoreline alteration. Proposal for construction, development, or alteration of these waters are regulated through the Massachusetts Department of Environmental Management and Massachusetts Office of Coastal Zone Management. These sanctuaries extend three (3) miles from the state's coast. However, in the case of the Cape Cod Bay Ocean Sanctuary this limit was extended to envelop the entirety of the Bay.

## 3.2    National Marine Sanctuary System

The National Marine Sanctuary system was established to *identify, manage, and conserve areas of the marine environment that are nationally significant due to conservation, recreational, ecological, historical, scientific, educational, cultural, archaeological or aesthetic qualities* (National Marine Sanctuaries Act, 16 USC Section 1431). The regulations for National Marine Sanctuaries are sanctuary-specific and intended to provide selected areas comprehensive protection of the marine resources contained therein. The National Marine Sanctuary Program is administered by the National Ocean Service of the National Oceanic and Atmospheric Administration (NOAA).

### 3.2.1   Nomination Criteria and History

National Marine Sanctuaries can be designated in two ways: administratively, through the actions of the Secretary of Commerce; and legislatively, through an act of Congress. Prior to September 7, 1982 any person could recommend a site for consideration. Subsequent to 1982, NOAA's National Marine Sanctuaries Program contracted with Chelsea International Corporation of Washington D.C. to prepare a Site Evaluation List from which future marine sanctuaries might be chosen. From the Site Evaluation List, active candidates for sanctuary designation are chosen for their conservation, ecological, recreational or aesthetic values. Sanctuary designation requires the Secretary of Commerce to publish a notice of intent in the *Federal Register* informing the public of NOAA's intention to consider an area for sanctuary designation. A draft environmental impact statement on the proposed designation, the draft management plan, and draft regulations are prepared. This draft environmental impact statement (DEIS) must

4

CW0000006014

include a resource assessment report and maps which depict the boundaries of the area.

During the review period the proposal goes before the House Committee on Resources and the Senate Committee on Commerce, Science and Transportation. Finally, the Secretary must publish a notice to designate a national marine sanctuary in the *Federal Register* and include final regulations. Another 45-days of Congressional review must elapse before a sanctuary is designated.

Sanctuaries are managed according to site-specific management plans prepared by the National Oceanic and Atmospheric Administration's (NOAA), with multiple opportunities for public comments. The philosophy behind National Marine Sanctuary management is what NOAA calls an "*ecosystem approach to marine environmental protection.*" While sanctuary management plans are site-specific, sanctuary regulations generally prohibit discharging materials into the protected area, alteration of the seabed, disturbance of cultural resources, and oil, gas and mineral production (with a grandfather clause for preexisting operations).

## 4.0   Marine Protection in Nantucket Sound

Nantucket Sound is a multi-jurisdictional biogeographical region. The Commonwealth of Massachusetts is responsible for management of the waters and sea floor of the Cape and Islands Ocean Sanctuary, including all submerged lands within 3 miles of the low water line (Appendix A, Table 1). Meanwhile, the federal government has jurisdiction over all waters and sea floor more than 3 miles from the Massachusetts coastline (Appendix A, Table 2). Because the portions of the Cape and Islands surrounding the Sound are some 25-30 nautical miles apart in some areas, the 3-mile envelope of the state-protected sanctuary excludes a significant portion of the interior of the Sound. The result is that this one, contiguous ecosystem is owned and managed by two distinct entities without a formal, unified management strategy.

5

CW0000006015

There have been both state and federal efforts to integrate management of Nantucket Sound under various marine protected area designations. While the issue of jurisdictional boundaries in Nantucket Sound is essentially a political issue, management of the marine resources of the Sound is best achieved through an ecosystem-based approach to managing the biogeographical region. The fact that both the Commonwealth of Massachusetts and the U.S. government have proposed Nantucket Sound for National Marine Sanctuary status (described in Section 4.2, below) suggests that there is a general consensus regarding the level of ecological richness and environmental integrity of the Nantucket Sound region.

## 4.1   Cape and Islands Ocean Sanctuary

When Massachusetts passed the Ocean Sanctuaries Act (M.G.L. c. 132A, §§ 13-16, 18), in 1970, this action authorized the creation and maintenance of five (5) Ocean Sanctuaries. The Ocean Sanctuaries are managed by the Massachusetts Executive Office of Environmental Affairs (EOEA), with management activities carried out by several other state agencies, including 1) the Department of Environmental Management, 2) the Division of Marine Fisheries, 3) the Department of Environmental Protection, 4) the Office of Coastal Zone Management.

The Massachusetts Ocean Sanctuaries Act obliges the Department of Environmental Management (DEM) to protect the sanctuaries from any development or activity that would damage the ecology or aesthetics of the area. Specifically prohibited within Massachusetts Ocean Sanctuaries are the construction of physical structures on the seabed, the building of offshore or floating power plants, the drilling through or removal of mineral resources, gases or oils. Also banned are dumping of wastes and incineration of private or commercial wastes by any ship moored or floating within a sanctuary.

The Cape and Islands Ocean Sanctuary is defined in M.G.L c. 132A §§ 13:

> The Cape and Islands Ocean Sanctuary is bounded and described as follows:
> Beginning at a point on the mean low-water line at the southernmost point
> of Monomoy Point; thence due south to a point in the Atlantic Ocean three miles
> due south (180 Degrees True) of the mean low-water line at the southernmost
> point of Monomoy Point; thence due east (90 Degrees True) to the Exterior Line

CW0000006016

of the Boundary of the Commonwealth as established on the aforementioned
Marine Boundary Map; thence in a generally southerly and then westerly
direction along said Exterior Line to the point of intersection with the extension
of the lateral boundary of Rhode Island and Massachusetts; thence northerly
along said lateral boundary to the mean low-water line near Quicksand Point;
thence following the mean low-water line around Buzzards Bay, the Cape Cod
Canal to the Bourne-Sandwich town boundary, and the southern portion of Cape
Cod to the point of intersection in Pleasant Bay with the western boundary of the
Cape Cod National Seashore; thence southerly along said boundary;
thence by the shortest distance to the mean low-water line of Monomoy Island;
thence to the point beginning by following the mean low-water line of the
western side of Monomoy Island; and meaning and intending to include the area
seaward of the mean low-water lines of Nantucket, Martha's Vineyard,
Elizabeth and other islands; and *meaning and intending to include the following
bodies of water: Nantucket Sound*, Vineyard Sound, Buzzards Bay, the Cape
Cod Canal, Pleasant Bay, and portions of the Atlantic Ocean. [emphasis added]



*Figure 3* -- Massachusetts Ocean Sanctuaries

The Massachusetts Legislature made clear its intention to include the entirety of
Nantucket Sound in the Cape and Islands Ocean Sanctuary. Later nominations for

7

CW0000006017

National Marine Sanctuary status for Nantucket Sound (see Section 4.2), demonstrate that the Commonwealth has had a long-standing interest in promoting an integrated system for managing the Sounds resources.   In fact, a major rationale for the Commonwealth's 1980 nomination was to gain equal protection for the both state and federal waters, as well as to combine management authority in a unique and relatively holistic way.

## 4.2.1   National Marine Sanctuary Nominations for Nantucket Sound

## 4.2.2   1980 Nomination

In 1980, the Massachusetts Secretary of Environmental Affairs and the Attorney General nominated Nantucket Sound for National Marine Sanctuary status pursuant to Title III of the Marine Protection, Research and Sanctuaries Act of 1972 (16 U.S.C. 32 §§1431-1445, also known as the National Marine Sanctuaries Act). The National Marine Sanctuaries Act authorizes the Secretary of Commerce to designate and manage areas of the marine environment with special national significance due to their conservation, recreational, ecological, historical, scientific, cultural, archeological, educational, or aesthetic qualities. The primary objective of this law is to protect marine resources, such as unique habitats. The Act also directs the Secretary to facilitate all public and private uses of Sanctuary resources that are compatible with the primary objective of resource protection.

CW0000006018



*Figure 4* – Proposed Boundary for Nantucket Sound National Marine Sanctuary in 1980 Nomination

The 1980 Nantucket Sound nomination was an attempt by the Commonwealth to secure protection for the portion of the Sound not within the Cape and Islands Ocean Sanctuary. This comprehensive nomination compiled available documentation demonstrating a host of ecologically and economically significant marine resources within this area, including finfish, shellfish, marine mammals, reptiles, birds, and rare and endangered marine plants. The 1980 nomination pointed to the need for additional research into the presence of cultural resources, fisheries, sea birds and marine mammals within Nantucket Sound. The central waters of Nantucket Sound were nominated "for their value as a habitat area, species area, unique area and a recreational and aesthetic area." (EOEA 1980 Nomination p. 5)

The Commonwealth's 1980 nomination pointed to the significant amount of conservation and recreation areas in the region of Nantucket Sound. The large extent of protected land and wetlands surrounding Nantucket Sound likely serves as habitat for the rich variety of species using the Sound. The Commonwealth's

9

CW0000006019

nomination also advocated protection of the important educational, historic and cultural values of the numerous shipwrecks scattered throughout the Sound.

Under the 1980 nomination, NOAA would have ultimate responsibility for the overall management of the proposed Sanctuary, while EOEA would be responsible for daily on-site management operations. The 1980 nomination was designed at increasing the level of integrative management, by improving the federal consistency with the Massachusetts Ocean Sanctuaries Act. According to the Commonwealth's nomination:

> *The absence of marine sanctuary protection for the federal waters in the center of the Sound would negate efforts by the Commonwealth of Massachusetts to insure the environmental protection of the marine resources of this important water body through its Ocean Sanctuaries Program. Nantucket Sound must have a coordinated management regime… if the ecological, recreational, historic and aesthetic resources of the Sound are to be adequately protected.*

This nomination specified a holistic approach for management of the Sound, but implementation may have been complex due to the overlapping responsibilities under the proposed management arrangement.   It is not clear whether this complexity affected its consideration by NOAA.   No action was taken with respect to this nomination because NOAA did not have a program plan for the sanctuary system in place until 1983.   As a result, the nomination was neither administratively accepted nor declined – in fact we found no record that the nomination had been formally acknowledged by the program until its mention in the later 1983 nomination, described below.

### 4.2.3  1983 Nomination

On August 4, 1983, Nantucket Sound, and a larger region including Nantucket Shoals and Oceanographer Canyon, were selected for the Site Evaluation List published in the *Federal Register* (Vol. 48, No. 151).   Three other sites from the North Atlantic region were placed on the Site Evaluation list along with the proposed Nantucket Sound site. Of these sites, Stellwagen Bank was selected for sanctuary designation.

10

CW0000006020

According to the National Marine Sanctuary Site Evaluations Recommendation and Final Reports (Chelsea International Corporation 1983):

> *The North Atlantic region contains two distinct biogeographic regimes...These two regimes meet in the area south of Cape Cod, and the transition area itself is as important as the two major regimes.*

Nantucket Sound is clearly a unique transitional area supporting significant biological productivity and diversity. In reviewing the Nantucket Sound proposal, the resource evaluation committee recognized the obstacles inherent in managing multi-jurisdictional areas and the need to incorporate ecosystem boundaries into less pliable management boundaries. The large "swath" included in the several Nantucket Sound proposals was considered a general "study area boundary" owing to the lack of ecosystem-focused research in the region.

Despite a clear representation of the ecological, economic, and aesthetic values contained in Nantucket Sound, the area was not selected for inclusion in the marine sanctuary program. Several governmental and private agencies commented on behalf of Nantucket Sound, citing the ecological significance of the area. Such agencies include the Massachusetts Marine Fisheries Commission, the Cape Cod Museum of Natural History, the Massachusetts Division of Fisheries and Wildlife, and the Humane Society of the United States, among others.

## 5.0   Review of Jurisdictional History of Nantucket Sound

As a component of the 1980 nomination, the Commonwealth of Massachusetts referenced case law that might aid in the conclusion that the Sound was of particular ecological significance, linked to the ecological continuity between state and federally owned portions of these waters. Under statute (43 U.S.C. 29 §§1301, 1311) and case law (*United States v. Maine*, 423 U.S. 1 (1975)), states have jurisdiction over all submerged lands within the 3-geographical mile zone, and the U.S. has title to the seabed more than 3-miles from shore. This is the

11

CW0000006021

jurisdictional delineation that is currently recognized in Nantucket Sound. This jurisdiction is in no way reflective of larger ecosystem boundaries, which are the increasing focus of integrated coastal zone management regimes.

The present multi-jurisdictional status of Nantucket Sound is a result of the federal effort to quiet title to the seabed along the Atlantic coast (*United States v. Maine et al.*, 475 U.S. 89 (1986)). Several states took exception to sections of the 1986 Special Master's Report on delimitation of the jurisdictional boundaries. One such exception was made by Massachusetts regarding the status of Nantucket Sound (*Massachusetts Boundary Case*, 475 U.S. 89, 94 n.9). The Commonwealth's argument has its roots in the American interpretation of English common law. Under common law, "county waters" were defined by an ambiguous line-of-sight test, which was presumed to have been met for purposes of the proceeding. The Commonwealth's case rested on the position that "ancient title" was conferred to the succeeding local jurisdiction by the English Crown in the Treaty of Paris, which ended the Revolutionary War. Furthermore, the Commonwealth argued that the United Nations' Convention of the Territorial Seas and Contiguous Zone ("Convention" 15 U.S.T. 1607, T.I.A.S. No. 5639 (1958)), provides for "historic bays." The U.S. argued that the United Nations report entitled "Juridicial Regime of Historic Waters, Including Historic Bays (U.N. Doc. A/CN.4/143 (1962)) presented a 3-part definition of a historic bay including: 1) exercise of authority over the area, 2) with continuity of authority, and 3) acquiescence of foreign nations - the maritime equivalent of title acquired by adverse possession - which was not met by the Commonwealth with respect to Nantucket Sound. The term "ancient title" is not defined in the Convention, but according the U.N. report "to base the title on occupation is to base it on a clear and original title which is fortified by long usage."

The Report of the Special Master in the *Massachusetts Boundary Case* concluded that Nantucket Sound had an historic role in the development the colonial economy of Nantucket and Martha's Vineyard. However, the United States Supreme Court ruled that "the Commonwealth did not effectively "occupy" Nantucket Sound so as to obtain "clear original title" and fortify that title "by long

12

CW0000006022

usage" before the seas were recognized to be free. The Supreme Court wrote that "Unless we are to believe that the self-interested endeavors of every seafaring community suffice to establish 'ancient title' to the waters containing the fisheries and resources it exploits, without regard to the continuity of usage or international acquiescence necessary to establish 'historic title', solely because exploitation pre-dated the freedom of the seas, then the Commonwealth's claim cannot be recognized."

The Nantucket Sound jurisdictional boundaries delineated by the U.S. Supreme Court (475 U.S. 89, 94) have produced an "enclave" of federally owned waters partially surrounded by state waters. No distance between mainland and/or the fringe islands exceeds 10 geographical miles. At the widest reach, between Monomoy and Great Point, the eastern entrance to Nantucket sound is 9.2 miles. Given the 3-mile state boundary, enclosing the embayment would require a straight line only 3.2 miles long. The western entrance to Nantucket Sound leads directly from Vineyard Sound, which, as mentioned, is within state jurisdiction. Beyond Vineyard Sound are either state waters (Buzzards Bay) or high seas, such that Nantucket Sound communicates vessels from high seas through state waters to high seas. Nantucket Sound meets the definition of inland waters as set forth by the U.S. in 1930.

## 6.0   Marine Resources of Nantucket Sound

Nantucket Sound possesses significant marine habitat for a diversity of ecologically and economically important species. Directly adjacent to the deeper waters of the Great South Channel, the Sound has particular significance for several federally-protected species including the gray seal (*Halichoerus grypus*), roseate tern (*Sterna dougallii*), piping plovers (*Charadrius melodus*), leatherback sea turtle (*Dermochelys coricea*), Atlantic Ridley sea turtle (*Lepidochelys kempi*) and a variety of commercially and recreationally valuable fisheries. Despite this, there has been insufficient scientific study of the area to assess the status of these habitats or the living marine resources of the Sound. The following sections

13

highlight the dominant, economically significant, or conspicuous species presently inhabiting the region.

### 6.1.1 Marine Mammals

The waters of Nantucket Sound provide habitat potential for several species of seals and porpoises, including the gray seal, harbor seal, and harbor porpoise. Once hunted to the edge of extinction within the Gulf of Maine, harbor and gray seal populations are once again on the rise within this region. These waters are of particularly significant to gray seals which have a well-documented and growing breeding colony in Nantucket Sound, representing the southern-most breeding colony in the world, and the only known breeding colony in the United States. The breeding population at Muskeget Island rose from a maximum of 13 in the 1970's to over 1,500 in the 1990's. This rise can be attributed to increasing environmental awareness and their protection under the Marine Mammal Protection Act.

The gray seal is listed as "special concern" species on the Massachusetts List of Endangered, Threatened and Special Concern Species (321 CMR 10.60). While the species is not endangered globally, other North Atlantic grey seal populations are listed under the World Conservation Union (IUCN) Red List. The status of the gray seal population and the level of human-caused mortality and serious injury in U.S. waters is unknown, but populations are believed to be increasing.

CW0000006024



*Figure 6* -- Gray seal (*Halichoerus grypus*) spotted in the Sound. (CCS © 2002)

The Western North Atlantic gray seal population is divided into two non-interbreeding communities, with 93% of the southern community located within Nantucket Sound. This division of breeding communities renders the Nantucket Sound habitat essential to the sustenance of this population. Additionally, this dichotomy provides a fertile area of study into intra-species genetics and population studies significant to this and other marine and terrestrial mammal species. With respect to the genetic uniqueness of this population, the gray seals' dependence on the waters of Nantucket Sound strongly support protection of these and adjacent waters employing an ecosystem approach to management.

In contrast to the literature pertaining to gray seals, our review of the limited number of scientific surveys of the Sound has revealed a scarcity of cetacean sightings within this specific body of water. These limited findings may be explained in part by the shallow depth of the region, but may also be linked to the minimal, if any, systemic observation of the area. As an example, CCS has frequently observed cetaceans within equally shallow water in and around

15

CW0000006025

Provincetown, Massachusetts, as species may follow food sources migrating from more suitable deepwater habitats. Similarly, waters directly adjacent to Nantucket Sound have been shown to be of particular significance to a host of marine mammals, linked to major migratory routes for several species. While the predominantly shallow waters of the Sound may limit the direct habitat potential for charismatic marine mammal species, the shoal waters are of keystone significance to essential food species that drive the larger marine ecosystem.

To better assess the significance of the region, CCS is coordinating efforts to perform an aerial survey of Nantucket Sound and adjacent waters to specifically address the lack of quantitative study. Specifically, Endangered North Atlantic right whales (*Eubalaena glacialis*) are known to congregate seasonally in the Great South Channel and Cape Cod Bay, and have been reported in Vineyard Sound, Buzzards Bay and Cape Cod Canal. In fact, there have been three (3) sightings of right whales in Nantucket Sound since 1959. Adjacent to a significant migratory passage for a diversity of whale species, sightings of humpbacks, pilot whales, and finback whales have also been reported within the Sound. Had regular surveys been conducted historically in the Sound, the potential exists for more definitive evidence of cetacean utilization of this habitat.

## 6.2    Avian Species

The Nantucket Sound eco-region contains pristine estuaries, extensive shoals and long stretches of undeveloped coastline. Vast numbers of seabirds and waterfowl congregate to utilize near-shore shoals to feed and rest, especially during the winter season. The region includes parts of the largest winter habitat for waterfowl on the east coast of the United States. The Monomoy National Wildlife Refuge exemplifies the diversity and productivity of the Nantucket Sound region's avian habitat. Protected waters, shoals, tidal flats, salt marshes, dunes and beaches combine to create one of the most significant bird habitats in New England. The extensive conservation acreage adjacent to Nantucket Sound allows many terrestrial species to utilize distinct habitat niches in the region. The abundance and diversity of avian species within the Nantucket Sound eco-region

16

CW0000006026

warrant considerable future research before spatial and temporal scales of utilization are comprehensively understood.

Located within the Atlantic Flyway, Nantucket Sound possesses great habitat significance for a host of avian species, providing breeding, nesting resting and foraging habitat. As detailed in available documentation on Nantucket Sound, common eiders (*Somateria mollissima*), black scoters (*Melavitta nigra*) and surf scoters (*M. perspicillata*) congregate in the fall and winter within the shoal waters in the hundreds of thousands, while various species of terns are abundant in the coastal zone including the common tern (*Sterna hirundo*), least tern, (*S. albifrons*), roseate tern (*S. dougallii*) and arctic tern (*S. paradisaea*). The roseate tern is classified as an endangered species. The coast of Nantucket Sound is breeding habitat for the piping plover (*Charadrius melodus*), a threatened species.



*Figure 6* – Common Eiders (*Somateria mollissima*) socializing. (CCS © 2002)

While a variety of public and private organizations frequently observe avian species within this region, no formal survey of species diversity, habitat utilization, or breeding success has been reported for Nantucket Sound.

17

CW0000006027

Assessment of actual habitat value and ecosystem services provided by this region will be an important facet of evaluating the ecological significance of the Sound.

### 6.3.1  Fisheries

Of particular significance within Nantucket Sound is the economic and recreational value of finfisheries and shellfisheries.  Massachusetts Division of Marine Fisheries trawl surveys conducted over the last 25 years revealed approximately 80 species of finfish and shellfish within the Sound.  While these data are valuable, the survey provides only a descriptive evaluation of the status of the system, suggesting that further scientific analysis should be completed. Much of the fisheries diversity has been maintained in Nantucket Sound; however, trawl survey data has not been fully analyzed by CCS scientists for trends in species abundance and ecological significance.  Regardless of the present diversity, the exceptional waters of the Sound remain a significant habitat for spawning and nursery grounds for a host of economically significant species. In fact, these waters have been classified Class SA (Coastal and Marine Classes) under the 314 CMR 4.00 Massachusetts Surface Water Quality Standards.  This designation represents the highest standard for coastal marine waters, cited for the protection and propagation of fish, shellfish and other marine life.

Nantucket Sound is the most significant horseshoe crab (*Limulus polyphemus*) habitat in the state, and among the most undisturbed spawning habitat remaining on the east coast.  Juvenile and adult horseshoe crabs burrow in sandy shoals and muddy seabed, with adults migrating to beaches to spawn. Horseshoe crab spawning events are thought to be critically important to the avian species using the Atlantic Flyway during migration. Horseshoe crab eggs are a major food resource for birds, and reductions in breeding success by horseshoe crabs are thought to play a role in reductions in migratory shorebird populations.  The link between horseshoe crab spawning success and avian populations has been documented in other estuaries, but this dynamic remains to be investigated in Nantucket Sound.

CW0000006028

From the literature reviewed, it is clear to CCS that Nantucket Sound possesses significant habitat for a diversity of commercially and recreationally important fish, marine mammal and avian species.  As compelling as these data are, it is equally clear that further study should be completed to provide a timely and accurate representation of the present coastal and marine resources of the Sound. Furthermore, future study should consider individual species counts within a larger, ecosystem concept.  The purely descriptive reports of the past should be replaced by estimates of diversity, species interactions, sustainability, and ecosystem health or stability to more accurately portray the present and future of this ecosystem – towards developing suitable management strategies.

## 7.0   Summary

Presently, Nantucket Sound is managed by several different state and federal agencies, as described above. The result of these ecologically arbitrary divisions of a contiguous marine ecosystem is that managers are unable to gain a comprehensive understanding of the spatial and temporal ecosystem dynamics and marine resources. Individual private and governmental agencies focus upon isolated components of a complex and diverse ecosystem. Increasingly, ecologists, environmental managers, and regulatory agencies have recognized the value of ecosystem-scale strategies for the protection of natural resources. Fragmented management polygons have been shown to lead to increased edge effects, compartmentalization of species and/or habitats, and discrepancies in policies and management arrangements. Within a marine environment, fragmentation can hinder comprehensive assessment of marine resources and evaluation of recreational uses or anthropogenic impacts on the biogeographical region.

### 7.1   Future Scientific Assessment

Our review of existing literature demonstrates that ecosystem-scale studies with directed management strategies are limited to date.  Finite studies of portions of

19

CW0000006029

the resource or studies directed at one species or group of species results in a fragmented understanding of the system as a whole and only speculative estimates of ecosystem processes. While all reports suggest the region is relatively healthy, ecologically rich, and economically valuable, CCS concludes that a comprehensive study of the system as an ecological unit is required to confirm and understand these findings on an ecosystem-scale before broad management decisions can be made. Given this approach, subsequent management strategies should be designed for one contiguous ecological unit, rather than for finite management polygons. This peer-reviewed assessment protocol must be developed both to establish a baseline and to serve as a template for future, ongoing study of these waters. Establishing these protocols would insure that informed management strategies be developed, and their efficacy fully evaluated, to promote continued sustainable use of this important ecosystem.

A comprehensive ecological assessment of the Nantucket Sound biogeographical area would require a multi-disciplinary research team to develop a system-wide understanding of 1) physical oceanographic and geological processes 2) marine and benthic community structure and ecology 3) fisheries 4) marine mammal and reptile habitat and 5) avian habitat. Each of these broad research areas contains crucial skill sets from which to use the existing literature, rapid assessment surveys and other research tools to develop an understanding of the marine environment. A reasonably comprehensive ecological assessment of Nantucket Sound, as discussed above, could be achieved within roughly one year. Such an assessment would naturally include an ecosystem mapping component.

While existing literature addresses many of the physical and geologic processes in Nantucket Sound, a comprehensive review of the region should focus on patterns of marine habitat available within the dynamic shoal environments. Submerged aquatic vegetation, including eel grass (*Vallisneria spiralis*), provides essential habitat for juvenile fish and shellfish, and a benthic survey of Nantucket Sound should be part of a comprehensive ecosystem study. Fisheries have been regularly surveyed in Nantucket Sound such that this area of research should be relatively rich in data. Analysis in this area should specifically address ecological

20

CW0000006030

implications of shellfish and finfish dynamics. There is significant on-going marine mammal research in the Nantucket Sound region, and this information should clearly be included in a comprehensive study. As noted, the Nantucket Sound region has exceptional habitat for an abundant mix of avian species, however, there is insufficient data on community patterns, habitat pressures, and population dynamics affecting this region.

## 7.2    Recommendations and Conclusions

Within Nantucket Sound and adjacent waters, the development of an ecosystem-scale, scientifically based management strategy requires a formal and integrated examination of the existing and projected marine resources, ecosystem services, anthropogenic uses, and impacts. Having been managed in a fragmented manner has led to a sparse and disjointed understanding of the resources within these waters, further supporting the need for a unified management strategy.

Based on the results of a preliminary investigation, CCS supports the notion of state and federal coordination to manage these waters, using one, mutually acceptable management strategy that promotes the exchange of data between management groups. While the most direct means of achieving an ecosystem approach to management would be for the entirety of the Sound to be managed by one entity, such an agreement may be difficult to establish. The 1980 nomination by EOEA and the Attorney General of Nantucket Sound as a marine sanctuary outlined a novel, holistic approach to provide a united management regime for the Sound. However, the specific mechanics of implementation and maintenance under joint jurisdiction may have required further review. The proposed management and ultimate responsibility of the resulting sanctuary would reside with two separate entities, not meeting today's standards for national marine sanctuary and potentially complicating management processes. Regardless of its merits or shortcomings, no action was taken with respect to this nomination because NOAA did not have a program plan for the sanctuary system in place until 1983.

21

CW0000006031

The fact that the state Legislature, the Executive Office of Environmental Affairs, the state Attorney General, and the National Marine Sanctuary resource evaluation committee have found that Nantucket Sound warrants increased environmental protection, possibly including sanctuary status, demonstrates a general consensus regarding the ecological, economic, recreational and aesthetic importance of that region. CCS found no evidence to support the position that the ecological significance of the Nantucket Sound region has been diminished since those proposals were made. Nantucket Sound remains a pristine and tremendously productive ecosystem worthy of environmental conservation and protection.

Despite past nominations' failure to gain national marine sanctuary status, experience shows that such a cooperative management arrangement may be achieved, as evidenced by the Channel Island National Marine Sanctuary in California and the Hawaiian Islands Humpback Whale National Marine Sanctuary. By defining bio-regions, these sanctuaries established management polygons based on scientific determination of contiguous marine ecosystems or functional habitat units that best served to protect, study and manage waters on an ecosystem-scale. This type of determination is very much aligned with NOAA's fundamental management philosophy for the sanctuary program that pledges "*an ecosystem approach to marine environmental protection.*" Given the new paradigm of broad-based, ecosystem-scale management in science and environment policy, CCS recommends that future management of the marine and coastal resources of Nantucket Sound begin with comprehensive ecological study. Once such a study is completed, a more thorough and effective management strategy can be developed to guide appropriate management and policy decisions for this important coastal resource.

CW0000006032

## 8.0   Literature Cited

Atkinson, Jennifer and Tracy Hart, 2001. "Conservation Coast to Coast: Comparing State Action on Marine Protected Areas in California, Washington and U.S. Gulf Of Maine." Conservation Law Foundation: Boston, Massachusetts.

Auster, P.J., K. Joy and P.C. Valentine. 2001. "Fish species and community distributions zzas proxies for seafloor habitat distributions: The Stellwagen Bank National Marine Sanctuary example (Northwest Atlantic, Gulf of Maine)." Environmental Biology of Fishes, 60 (4): 331-346.

Basta, D.J., M.T. Murphy. 2001. Fostering Sanctuary-Aquarium Partnerships to Promote Marine Conservation -- a Commentary from the National Marine Sanctuary System.   Marine Technology Society Journal 35(1):86-88.

Bleicher, S.A. 1984. Reflections on the failure of NOAA's ocean management office. Journal of Coastal Zone Management 11(4):353-367.

Chelsea International Corporation, 1983. "National Marine Sanctuary Site Evaluations: Recommendations and Final Reports." NA-82-SAC-00647. NOAA: Washington, D.C.

Clayton, Gary, Charles Cole and Steven Murawski, 1978. "Common Marine Fishes of Coastal Massachusetts." Massachusetts Cooperative Extension Service: Amherst, Massachusetts.

Conservation Law Foundation, 2000. "The Wild Sea: Saving Our Marine Heritage." Conservation Law Foundation: Boston, Massachusetts.

Davis, J.P. and R.T. Sisson. 1988. "Aspects of the biology relating to the fisheries management of New England populations of the whelks *Busycotypus canaliculatus* and *Busycon carica.*" Journal-of-Shellfish-Research. 1988; 7 (3): 453-460.

Ehler, C.N. and D.J. Basta. 1993. Integrated management of coastal areas and marine sanctuaries. A new paradigm. Oceanus 36(3):6-13.

Eldredge, M. 1993. Stellwagen Bank. New England's first sanctuary. Oceanus 36(3):72-74.

Federal Register. Department of Commerce, NOAA. 1983. "Announcement of a National Marine Sanctuary Program Final Site Evaluation List." Volume 48, No. 151.

Foster, N.   1986.   National marine sanctuaries -- saving offshore ecosystems.   Sea Technology27(11):25-27.

Harvey, S.   1983.   Title III of the Marine Protection, Research and Sanctuaries Act: Issues in program implementation.   Journal of Coastal Zone Management 11(4):169-198.

Lazell, J.D., 1980. "New England Waters Critical Habitat for Marine Turtles." *Copeia. Volume 2.* American Society of Ichthyologists and Herpetologists: Lawrence, Kansas.

CW0000006033

Massachusetts Executive Office of Environmental Affairs, Office of Coastal Zone Management, Department of Environmental Management, Division of Marine Fisheries, Office of the Attorney General, 1980. "Nomination Letter for a Marine Sanctuary in Nantucket Sound." Pub. No. 12247-62-100-1-81-CR.

Morin, T. 2001. Sanctuary Advisory Councils: Involving the Public in the National Marine Sanctuary Program. Coastal Management 29(4):327-339.

NOAA, 1998. "Turning to the Sea: America's Ocean Future." NOAA: Washington, D.C.

The Ocean Conservancy. 2001. "Marine and Coastal Protected Areas in the U.S. Gulf of Maine Region." Washington, D.C.

Office of Coastal Zone Management. 1982. National Marine Sanctuary Program. Program Development Plan. NOAA/OCZM, WASHINGTON, DC (USA), 90 pp.

O'Hara, CJ, 1980. "Bedform Morphology of Nantucket Sound, Massachusetts." USGS: Woods Hole, Massachusetts.

Oldale, Robert, 1992. "Cape Cod and the Islands: The geologic story." Parnassus Imprints, East Orleans, Massachusetts.

Robinson, B.H. 1993. New technologies for sanctuary research. Oceanus 36(3):75-80.

Rough, V. 1995. Gray seals in Nantucket Sound, Massachusetts, winter and spring, 1994. Final report to Marine Mammal Commission, Contract T10155615, 28 pp. NTIS Pub. PB95-191391.

Sobel, J. 1993. Conserving biological diversity through marine protected areas. A global challenge. Oceanus 36(3):19-26.

Stanbury, K.B. and R.M Starr. 1999. Applications of Geographic Information Systems (GIS) to habitat assessment and marine resource management. Acta Oceanologica 22(6):699-703.

United Nations, 1958. "Convention of the Territorial Seas and Contiguous Zone." 15 U.S.T. 1607, T.I.A.S. No. 5639

United Nations, 1962. "Juridicial Regime of Historic Waters, Including Historic Bays." U.N. Doc. A/CN.4/143

United States of America v. State of Maine, et al., 475 U.S. 89 (1986).

CW0000006034

## Appendix A    *Table 1*: Massachusetts Laws and Regulations

| Resource/Issue | Applicable Legislation | Regulations | Agencies |
|---|---|---|---|
| Areas of Critical Environmental Concern | MGL c. 21A §2(7); St. 1974, c. 806 s. 40(e) | 301 CMR 12.00 | DEM |
| Coastal Development or Use | MGL c. 91; MGL c. 6A § 2-7 MGL c. 21A, s. 4A | 310 CMR 9.00 | DEP |
| | | 301 CMR 20.00-24.00 | CZM |
| Dredging and Filling | MGL c. 21 § 26-35 | 310 CMR 9.00 | DEP |
| Emergency Response/ Spill Reporting | MGL c. 21E (State Superfund Law) | 310 CMR 40.0000 (Mass. Contingency Plan) | DEP |
| Endangered Species (Natural Heritage Program) | MGL c. 131 s. 23 | 321 CMR 10.00 | DFW |
| Environmental Notification Forms/Impact Reports | MGL c. 30 §61-62H (Mass. Environmental Policy Act [MEPA]) | 301 CMR 11.00 | EOEC |
| Historic Preservation | MGL c. 9 §26-27C | 950 CMR 71.00 | MHC |
| Marine Fisheries | MGL c. 130 | 322 CMR 1.00-12.00 | DFW |
| Ocean Sanctuaries Act | M.G.L. c. 132A, §§ 13-16, 18 | 302 CMR 3.00 | DEM |
| Scenic/ Recreational Rivers Orders | MGL c. 21A, s. 2(28) | 302 CMR 3.00 | DEM |
| Water Pollution Control | MGL c. 21 § 26-53 (Mass. Clean Waters Act) | 257CMR 2.00 310 CMR 41.00 314 CMR 1.00 - 15.00 314 CMR 4.00 314 CMR 9.00 | DEP |
| Waterways Licensing | MGL c. 91 (Public Waterfront Act) | 310 CMR 9.00 | DEP |
| Wetlands | MGL c. 131 s. 40 (Wetlands Protection Act) | 310 CMR 10.00 | DEP CCC |

Key: CCC= Cape Cod Commission; CZM= Office of Coastal Zone Management; DEM= Dept. of Environmental Management; DEP= Dept. of Environmental Protection; DFW=Dept. of Fish and Wildlife and Environmental Law Enforcement; MHC= Mass. Historical Commission

CW0000006035

# Appendix A     *Table 2*: Applicable Federal Laws

| Resource/Issue | Applicable Legislation | Agencies |
|---|---|---|
| Atlantic Coastal Fisheries Cooperative Management Act | 16 U.S.C. §§ 5101-5108 | NOAA<br>Atlantic States Marine Fisheries Commission |
| Coastal Zone Management Act | 16 U.S.C. §§ 1451-1465 | NOAA<br>NERR<br>CZM |
| Endangered Species Act | 16 U.S.C. §§ 1531-1544 | NOAA<br>EOEA |
| Estuarine Areas Act | 16 U.S.C. §§ 1221-1226 | NOAA |
| Federal Water Pollution Control Act (Clean Water Act) | 33 U.S.C. §§ 1251-1387 | EPA |
| Magnuson-Stevens Fishery Conservation and Management Act | 16 U.S.C. 1801-1882 | NOAA |
| Marine Mammal Protection Act | 16 U.S.C. §§ 1361-1421h | NOAA |
| Marine Protection, Research, and Sanctuaries Act (Marine Sanctuaries Act) | 16 U.S.C. §§ 1431-1445a | NOAA |
| Migratory Bird Conservation Act | 16 U.S.C. §§ 715-715r | Migratory Bird Conservation Commission |
| National Environmental Policy Act (NEPA) | 42 U.S.C. §§ 4321-4347 | Council on Environmental Quality<br>Office of Environmental Quality |
| National Wildlife Refuge System Administration Act | 16 U.S.C. §§ 668dd-668ee | FWS |
| Outer Continental Shelf Lands Act | 43 U.S.C. §§ 1331-1356 | DOI<br>CZM |

Key: CZM=Massachusetts CZM; DOI= Dept. of Interior; EPA= Environmental Protection Agency; FWS= U.S. Fish and Wildlife Service; NERR= National Estuarine Research Reserve; NOAA= National Oceanic and Atmospheric Administration

26

CW0000006036

9

CW0000006037



# Toward an Ocean Vision for the Nantucket Shelf Region

### Part I.
Review of the
Environmental Characteristics of the
Nantucket Shelf Region

### Part II.
Management Options for
Resource Protection and Sustainable Uses

Provincetown Center for Coastal Studies
Provincetown, Massachusetts

January 2005

CW0000006038



**Provincetown Center for Coastal Studies**
Coastal Solutions Initiative
115 Bradford Street
Provincetown, MA 02657

CW0000006039

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ..... 1

PART I.   REVIEW OF THE ENVIRONMENTAL CHARACTERISTICS
          OF THE NANTUCKET SHELF REGION

1. BACKGROUND ..... 6

2. HOW THIS STUDY WAS DONE ..... 7

3. GEOGRAPHIC AREA OF THIS REVIEW ..... 7

4. GEOLOGY ..... 8
   4.1. Pre-Cretaceous Landscape ..... 9
   4.2. Late Cretaceous and Early Tertiary Coastal Plain ..... 9
   4.3. Late Tertiary and Pleistocene River Valleys ..... 9
   4.4. Pleistocene Glaciation and the Formation of Cape Cod and the Islands ..... 10
   4.5. Relative Sea Level Rise ..... 11
   4.6. Sedimentary Environments ..... 12
   4.7. Benthic Habitat Mapping ..... 12
   4.8. Issues and Data Gaps ..... 15

5. BATHYMETRY ..... 16
   5.1. Bathymetry Charts ..... 16
   5.2. Issues and Data Gaps ..... 17

6. PHYSICAL OCEANOGRAPHY ..... 17
   6.1. Vineyard Sound, Nantucket Sound and Nantucket Shoals ..... 18
   6.2. Gulf of Maine ..... 18
   6.3. Tidal Mixing Fronts ..... 20
   6.4. Shelf-Slope Currents ..... 20
   6.5. Issues and Data Gaps ..... 20

7. CHEMICAL OCEANOGRAPHY ..... 21
   7.1. Older Studies ..... 21
   7.2. Issues and Data Gaps ..... 21

8. BIOLOGICAL PRODUCTIVITY ..... 22
   8.1. Importance of Productivity Studies in Ecology ..... 22
   8.2. Nutrients and Primary Production ..... 22
   8.3. Issues and Data Gaps ..... 24

9. BENTHIC FAUNA ..... 24
   9.1. Background ..... 24
   9.2. Effect of Sediment Type ..... 24
   9.3. Biomass ..... 25
   9.4. Biogeography ..... 26
   9.5. Issues and Data Gaps ..... 26

10. FISH, FISHERIES AND SHELLFISH ..... 27
    10.1. Commercial Fisheries ..... 29
    10.2. Recreational Fisheries ..... 29
    10.3. Anadromous Fish ..... 29
    10.4. Catadromous Fish ..... 31
    10.5. Shellfish ..... 31
    10.6. Issues and Data Gaps ..... 31

11. MARINE MAMMALS ..... 32
    11.1. Marine Mammal Occurrences ..... 32
    11.2. Issues and Data Gaps ..... 34

12. BIRDS ..... 34
    12.1. Coastal and Marine Species ..... 34
    12.2. Issues and Data Gaps ..... 37

13. SEA TURTLES ..... 37
    13.1. Sea Turtles in Massachusetts ..... 37
    13.2. Issues and Data Gaps ..... 37

14. DISCUSSION ..... 37

15. REFERENCES ..... 38

PART II.  MANAGEMENT OPTIONS FOR RESOURCE PROTECTION
          AND SUSTAINABLE USES

1. INTRODUCTION ..... 44

2. HUMAN USES AND SOCIOECONOMIC VALUES ..... 45

3. COASTAL MANAGEMENT ISSUES ..... 47

4. EXISTING OCEAN MANAGEMENT AND PROTECTION ..... 50
   4.1. Federal Ocean Protection ..... 51
   4.2. State Ocean Protection ..... 52
   4.3. Other Approaches – Marine Protected Areas and Ocean Zoning ..... 53

5. KEY PRINCIPLES IN OCEAN MANAGEMENT ... 54
   5.1. Ecosystem-Based Management ... 54
   5.2. Integrated Coastal and Ocean Management ... 54
   5.3. Adaptive Management ... 55

6. CRITERIA FOR DESIGNATING MARINE PROTECTED AREAS ... 55
   6.1. Ecological Criteria for Marine Reserve Design ... 55
   6.2. Combined Socioeconomic and Ecological Criteria for Siting of a Marine Protected Area ... 57

7. EVALUATION OF POSSIBLE MARINE PROTECTION AND MANAGEMENT APPROACHES FOR THE NANTUCKET SHELF REGION ... 57

8. REFERENCES ... 60

## LIST OF FIGURES

Figure

1. The Nantucket Shelf Region ... 6
2. Geological Time Scale ... 8
3. Depth to Submerged Coastal Plain Rocks ... 9
4. Direction of Flow of Glacial Ice ... 10
5. Thickness of Glacial Drift Deposits ... 10
6. Existing Sea Floor Topography ... 11
7. Georges Bank During the Past 16,000 Years ... 11
8. Benthic Habitat Mapping of Georges Bank, Using Multisensor Approach ... 12
9. Photographs of the Seabed Showing Some Typical Georges Bank Habitats ... 13
10. Sun-illuminated Map of Stellwagen Bank National Marine Sanctuary and Massachusetts Bay with Backscatter Intensity Draped over Topography ... 14
11. A View of the SEABOSS From Below ... 14
12. An Oblique View of the SEABOSS on Deck Between Stations ... 14
13. Examples of Still Photographs Taken of Different Habitats with the SEABOSS During USGS Studies ... 14
14a. Summary Map Showing Tidal Currents, Mean Currents, Area of Sand Waves, and Locations of Fine-Grained Holocene Deposits ... 15
14b. Medium Grain Size of Surface Sediments in the Georges Bank Area ... 15
15. Sediment Grain Size ... 16
16. NOAA Bathymetric Chart ... 16
17. Tidal Current Chart. Buzzards Bay, Vineyard and Nantucket Sounds ... 18
18. Tidal Current Chart. Buzzards bay, Vineyard and Nantucket Sounds ... 18
19. Bigelow's (1927) Classical Circulation Schematic for the Gulf of Maine Region in Summer Months ... 19
20. Schematic Map of the Summer Subtidal Circulation in the Gulf of Maine ... 19
21. Predicted Frontal Positions for Tidal and Summertime Wind Mixing, Using Tidal Dissipation Rates Calculated from Greenberg's (1983) Model ... 19
22. Seagrass and Algae Distributions ... 22
23. Remote Sensing Satellite Data on Ocean Color (chlorophyll) in the Gulf of Maine and Nantucket Shelf Region for January, February, March, and April 2004 ... 23
24. Anadromous Fish Runs ... 30
25. Suitable Shellfish Habitat Map ... 31
26. Seasonal Patterns of the Top 10% of Total Cetacean Biomass Per Unit Effort Values ... 32
27. Distribution of Sightings of Right Whales (Eubalaena glacialis) in the Western North Atlantic, Identifying the Five Primary Habitats Which are Currently Known ... 32
28. All Right Whale Sightings in and Near the Proposed Great South Channel Critical Habitat Between 1975-1989 ... 33
29. Principal Waterbird Colonies on the Massachusetts Coast ... 34
30. Nantucket Sound Study Area and Associated Features, Including Aerial and Boat Transect Routes, and the Area of Proposed Wind Farm, Major Tern Colonies ... 36
31. Summary Distribution Map of Terns by Species Observed During the 2003 Breeding Season Aerial Surveys of Nantucket Sound ... 36
32. Existing Federal and State Protected Ocean Areas ... 50
33. Ocean Zones Within a Nantucket Shelf Marine Protected Area ... 59

## LIST OF TABLES

1. Spring Catch at 522 Nantucket Sound Stations ... 27
2. Fall Survey Catches at 516 Stations in Nantucket Sound ... 28
3. Relative Abundance of Finfish in Waquoit Bay ... 28
4. Relative Abundance of Finfish in Bass River ... 29
5. Marine Mammals Occurring Between Cape Cod and Cape Hatteras ... 32
6. Principal Areas in Massachusetts Where Waterbirds Form Colonies ... 35
7. Marine and Coastal Birds Observed Along the Atlantic Coast ... 36
8. Goals for Siting of a Marine Reserve Network in the Channel Islands, California ... 55
9. Application of Ecological Criteria for Marine Reserve Design in the Channel Islands, Southern California ... 56
10. Social and Economic Criteria Used to Select the Locations of Marine Protected Areas ... 57

## Acknowledgements

The Provincetown Center for Coastal Studies wishes to thank the following individuals and organizations, without whose assistance this report would not have been possible.

The Horsley Witten Group, in particular Jo Ann Muramoto and Kevin King, compiled information, designed the layout, and prepared the draft and final reports, assisted by Jim Fair, formerly of the Massachusetts Division of Marine Fisheries.

Bill Schwab, U.S. Geological Survey (USGS), Woods Hole, MA, and David Twichell, USGS, Woods Hole, MA, provided information on geological studies of the region.

Nancy Soderberg, reference librarian at USGS, Woods Hole, MA, provided copies of geological maps, reports, and papers.

Bruce Tripp of the Rinehart Coastal Research Center, Woods Hole Oceanographic Institution, Woods Hole, MA, lent many publications and reports concerning the southern Gulf of Maine, Great South Channel, and Georges Bank.

The staff of Waquoit Bay National Estuarine Research Reserve lent four volumes of a comprehensive study of offshore birds performed for the Minerals Management Service.

The staff of Waquoit Bay National Estuarine Research Reserve lent articles and books from their library.

Paul Cavanaugh of the Manomet Center for Conservation Sciences lent four volumes of a comprehensive study of offshore birds performed for the Minerals Management Service.

The Center would also like to thank the following individuals who reviewed the draft report and provided comments and recommendations:

Andy Solow, Director of the Marine Policy Center, Woods Hole Oceanographic Institution, Woods Hole, MA; Peter Auster, Science Director, National Undersea Research Center, University of Connecticut, Groton, CT; Bruce Tripp, Research Associate, Rinehart Coastal Research Center, Woods Hole Oceanographic Institution, Woods Hole, MA; David Twichell, USGS, Woods Hole, MA, and Armando Carbonell, Senior Fellow, Lincoln Institute of Land Policy, Cambridge, MA.

Any opinions or recommendations expressed within this report do not necessarily represent the opinions of the people or institutions listed above.



Photo credits:

_Cover_
Wave: http://oceanography.tamu.edu/
Common Tern: Illinois Raptor Center : Http://www.illinoisraptorcenter.org
MassGIS aerial photo
Footprint: NOAA photo library
Fish school: NOAA photo library

_Inside Cover_
Sail boats: Nantucket community sailing: Http://www.operaboatscup.com/Img20.jpg
Birdwatching: The Kennebecasis Naturalist Society: www.macbe.com/kns/images/may03/binoculars.jpg
Surf casting: NOAA photo library
Women on beach: NOAA photo library
Fishing boat: NOAA photo library
Fishing party, Riptide Charters: www.ripidecharters.com
Beach scene painting composite: Laguna Plein Air Painters Association, www.scottburdick.com/Photographs

Page 1: seascape: Mark S. Strauss, Ph.D., University of Pittsburgh
Page 3: NOAA photo library, swordfishing boat: K. King, seascape: Mark S. Strauss, Ph.D., University of Pittsburgh
Page 5: People on beach: Matt Lysaki, Syracuse University, http://web.syr.edu/~mvlyaski/
Page 41: Sail boat: www.taborsummer.org, NOAA photo library
Page 49: NOAA photo library
Page 53: NOAA photo library



We wish to thank the photographers and Web developers of the National Oceanic and Atmospheric Administration Web Site for the use of many of the photographs used in this document.

http://www.photolib.noaa.gov/

# Toward an Ocean Vision for the Nantucket Shelf Region

## EXECUTIVE SUMMARY



*"...User conflicts can and do arise when incompatible activities take place in the same area. A comprehensive offshore management regime is needed for the balanced coordination of all offshore uses."*
— U.S. Commission on Ocean Policy (June, 2004)

*"U.S. ocean and coastal resources should be managed to reflect the relationships among all ecosystem components, including human and nonhuman species and the environments in which they live. Applying this principle will require defining relevant geographic management areas based on ecosystem, rather than political, boundaries."*
— U.S. Commission on Ocean Policy (June, 2004)

*"New ocean management structures are needed to promote consistent, coordinated ocean management policies and to ensure that the geographic divisions among federal and state management authorities support rather than prevent sound ecosystem management across a variety of jurisdictions"*
— The Massachusetts Task Force on Ocean Management (March, 2004)




### Introduction

The ocean off the coast of Massachusetts has been the focal point for a growing number of activities and proposals in recent years. Proposals to construct the nation's first offshore wind power project have attracted recent attention, however other Massachusetts offshore waters have also been examined for potential energy facilities, offshore aquaculture sites, cable crossings, sand and gravel mining, oil and gas drilling, transportation routes and a variety of commercial and recreational activities. Ongoing issues include the implementation of fisheries management plans and marine mammal protection strategies.

The number of competing and often conflicting uses of the ocean has become problematic. Despite widespread interest in the development of renewable energy and aquaculture, proposals for these large-scale offshore facilities have revealed significant gaps in federal authority relating to the leasing of public underwater lands and permitting of offshore uses. Technological advances will undoubtedly continue to increase the number of prospective uses of ocean resources. In the face of these challenges, the ocean is an invaluable and vulnerable resource that merits a thoughtfully planned and balanced comprehensive management plan.

January, 2005

Toward an Ocean Vision for the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006043

In 2003, the Provincetown Center for Coastal Studies issued a report entitled "Review of State and Federal Marine Protection of the *Ecological Resources of Nantucket Sound*," documenting previous initiatives to establish a clear and consistent science-based policy of resource protection and management. Over a period of more than 30 years, specific actions toward this end have included the following:

o The state legislature in 1972 included Nantucket Sound in the Cape and Islands Ocean Sanctuary Act. This action was intended to provide full protection of the seabed and the Sound, which the state considered as being within state jurisdiction, just as all of Cape Cod Bay is considered to be state waters. In the late 1980's, however, the U.S. Supreme Court ruled that the state had not proven its colonial claim to the entire Sound and that the waters beyond three miles from the mean low water mark were not under state jurisdiction, resulting in a "gap" in state jurisdiction in the center of Nantucket Sound.

o In 1980 the Massachusetts Attorney General and Secretary of Environmental Affairs nominated all of Nantucket Sound as a national marine sanctuary. In the nomination, various state agencies, including the Office of Coastal Zone Management and Division of Marine Fisheries, documented the region's ecological significance and its importance to such economic uses as fishing and tourism. The 1980 nomination envisioned a joint federal-state management of the sanctuary, similar in concept to the management plans now in place in the Florida Keys and California's Channel Islands.

o In response to three different oil and gas lease sales on Georges Bank proposed by the federal government in the late 1970's and early 1980's, Massachusetts repeatedly asserted its interests and role in decisions being made about the use of ocean resources off its coast.

o In 1983 a scientific panel commissioned by the National Oceanic and Atmospheric Administration included Nantucket Sound and other portions of the outer continental shelf south and east of Nantucket Sound in a short list of areas for future designation as a national marine sanctuary.

January, 2005

These actions were ahead of their time in recognizing the principle of *ecosystem-based management*. Ecosystem-based management of ocean and land resources is now widely accepted as the key to successful resource protection and management. Ecosystem-based management is the cornerstone of three recent major ocean public policy studies released in 2004: the Pew Oceans Commission, the U.S. Commission on Ocean Policy, and the Massachusetts Task Force on Ocean Management. In the words of the U.S. Ocean Commission:

*"U.S. ocean and coastal resources should be managed to reflect the relationships among all ecosystem components, including human and nonhuman species and the environments in which they live. Applying this principle will require defining relevant geographic management areas based on ecosystem, rather than political, boundaries."*

In this study, we have taken the principle of ecosystem-based management to the next logical step for Massachusetts by defining the "relevant geographic management areas" to include the state and federal waters south and east of Cape Cod, Martha's Vineyard, and Nantucket, out to the edge of the continental shelf. We refer to these areas collectively as the **Nantucket Shelf Region**. Our definition is based on the finding that these areas are inextricably linked by large-scale physical, biological, and oceanographic features and processes and share many important natural and socioeconomic features.

Part I of the report describes the ecological features that characterize this region and identifies issues and data gaps that warrant further scientific investigation to enhance our understanding of the region. Part II describes a number of management tools and techniques that may be useful as part of a comprehensive management scheme. In the following pages, the report describes the need for a common vision for the future of Nantucket Shelf and suggests some of the first steps in a planning process that could achieve and implement that vision.

## Why Nantucket Shelf Region?

The Nantucket Shelf Region includes Vineyard Sound, Nantucket Sound, Nantucket Shoals, the continental shelf south of Martha's Vineyard, the Great South Channel, and Georges Bank. Scientific literature indicates that these areas form part of a large, shallow, coastal shelf eco-region that is characterized by a common geological origin, extremely dynamic sedimentary environment, tidally well-mixed water, high biological productivity, and unique ecological features. The Nantucket Shelf Region can be subdivided into three related ecosystems: *marine estuarine* (Nantucket Sound and Vineyard Sound), *offshore shoals* (Nantucket Shoals and Georges Bank), and *mid-shelf environment* (Great South Channel and the shelf area south of Martha's Vineyard).

The Nantucket Shelf Region serves as a dynamic transition zone between the Gulf of Maine Region to the north, which is influenced by the colder waters of the Labrador Current, and the warmer waters of the Middle Atlantic region and Gulf Stream to the south. This fundamental physical boundary between warm and cold water masses provides the setting for mixing and mingling of northern and southern species at the extreme ends of their geographic ranges, resulting in a zone of high biodiversity.



The Nantucket Shelf Region.

CW0000006044






The Nantucket Shelf Region is one of the most heavily used ocean areas in the Northeast due to its bountiful natural resources, proximity to major population centers, and rich fishing grounds. It has a long and rich historic and cultural significance for the citizens of Massachusetts, and has high economic value for all of New England. At the same time, the area is increasingly subject to significant impacts from a myriad of human activities that threaten its quality, productivity and sustainability.

An incomplete patchwork of different federal and state ocean management jurisdictions currently exists in the Nantucket Shelf Region. The jurisdictional patchwork has a number of holes in it, in areas where preliminary (and sometimes old) scientific information suggests that the natural resources must be the same as in nearby protected areas. The absence of a single coordinating framework for ocean protection in the Nantucket Shelf Region has resulted in coastal and ocean protection that is inconsistent, with protection for some resources in one area and no protection for the same resources in an adjacent area.

This report finds that the Nantucket Shelf Region is of such ecological and socioeconomic importance that it should be the first offshore area in Massachusetts to benefit from a comprehensive ocean resources management plan. Comprehensive ocean management and protection is called for by the U.S. Commission on Ocean Policy, the Pew Oceans Commission and the Massachusetts Task Force on Ocean Management.

### Development of an Ocean Resources Management Plan

The development of a successful and useful **Ocean Resources Management Plan** will largely depend upon 1) creating an effective planning process and 2) identifying key participants who can bring their knowledge, planning and management abilities to the table. A productive planning process will utilize the best available scientific information, identify and implement suitable tools, provide for the broadest public participation and input, build consensus among participants, and require commitment, cooperation and leadership from all interested parties.

One ocean management tool to consider is the designation of the Nantucket Sound Region as a "marine protected area", setting the stage for defined uses and activities. In the U.S., a Marine Protected Area (MPA), as defined by Executive Order 13158 (May 26, 2000) is *"any area of the marine environment that has been reserved by federal, state, territorial, tribal or local laws or regulations to provide lasting protection for part or all of the natural and cultural resources therein."* Many other countries use marine protected areas as an ocean and coastal management tool, and it is particularly suitable where there are many overlapping jurisdictions or where the region is large and encompasses many interests.

Although the term "marine protected area" has only come into general use in the U.S. since Executive Order 13158, the concept includes a variety of areas created under such federal laws as the National Marine Sanctuaries Act, National Wildlife Refuge System Administrative Act, National Park Service Organic Act, and Magnuson-Stevens Fisheries Conservation and Management Act, among others. The public policy goals of each of the programs created by these laws vary, as do the management objectives within specific areas.




A national marine protected area designation could provide a comprehensive and flexible framework for the protection and management of the Nantucket Shelf Region, leading to better coordination and more effective management of its resources.

Another innovative ocean management tool highlighted in all three ocean studies is ocean zoning within the context of a marine protected area. Just as in land zoning, areas of the ocean could be identified for activities most compatible with the natural and socioeconomic values and carrying capacities of that area.

As one example, sustainable fisheries management within the Nantucket Shelf Region is highly desirable. Human uses of the area include recreational and commercial fishing and shellfishing, which are important to the local economy. The Nantucket Shelf Region also provides important nursery and migration habitat for commercially and recreationally important fish species. These socioeconomic and ecological values can both be protected through careful management for sustainable fisheries rather than prohibition. While sustainable fisheries management under the mandate of the Magnuson-Stevens Act is currently the guiding management tool for Georges Bank, only a congressional moratorium prevents exploration for oil and gas. This inconsistency of public policy represents a continuous threat to the fishery.

As a second example, areas used by endangered species for breeding and nesting should be protected as critical habitat areas. In particular, nearly the entire North American population of roseate terns passes through the Cape and Islands region and stops in Monomoy to nest and feed. While Monomoy is managed as a national wildlife refuge and more than 90% of the refuge is protected as a national wilderness area, far less protection applies to nearby state and federal waters. Terns also fly to Buzzards Bay, which is included in EPA's National Estuary Program. Existing critical habitat areas such as the Great South Channel (protected especially for the right whale) may also be linked ecologically. However, designation of the entire Nantucket Shelf Region as a critical habitat would probably not be warranted.

CW0000006045

A guiding body is needed to conduct the planning process that would result in an Ocean Resources Management Plan for the Nantucket Shelf Region. This report builds on another key recommendation of the U.S. Commission on Ocean Policy by recommending the creation of a **Nantucket Shelf Regional Coordinating Committee**. The Nantucket Shelf Regional Coordinating Committee would be charged with developing a comprehensive plan for the protection, preservation, and sustainable use of the abundant resources of the Nantucket Shelf Marine Protected Area; and furthermore, to create a detailed implementation plan that emphasizes coordination of existing authorities and agencies and provides specific recommendations about additional legislative, regulatory or scientific steps that are required to fully achieve its mandate.

Various models for public process already exist, including those provided by the National Estuary Program, National Estuarine Research Reserves, and National Marine Sanctuaries. Generally, these models call for steering committees comprised of both technical and non-technical components (e.g., scientists, resource managers, coastal decision makers, citizens, businesses, resource users, etc.). The public process involves public meetings of the steering committee, stakeholders, the public, and representatives of relevant agencies.

The Nantucket Shelf Regional Coordinating Committee could be administered jointly by the federal National Oceanic and Atmospheric Administration (NOAA) and the state Executive Office of Environmental Affairs (EOEA). The active participation of the three Regional Planning Agencies (Cape Cod Commission, Martha's Vineyard Commission, Nantucket Planning and Economic Development Commission) would represent local and regional interests and highlight the land-ocean linkages. The Massachusetts Coastal Zone Management Program (CZM) within EOEA and linked closely to NOAA would bring valuable coastal and ocean planning, policy and technical expertise.

Lastly, management of the Nantucket Shelf Marine Protected Area will require both short-term and long-term process studies and long-term monitoring studies of geology, oceanography, biology, ecology, and climate. The creation of a **Nantucket Shelf Ocean Observatory** program is recommended to serve as a regional science and outreach source of information.

A great deal of work has already been completed that supports the ocean vision outlined in this report. The two national ocean commissions and state task force on ocean management have laid the groundwork for a more comprehensive ocean resources management system. The numerous existing but disjointed protected areas within the Nantucket Shelf Region signify the richness and diversity of the ecosystem. The regional planning agencies and state coastal zone management program are familiar with the socioeconomic and environmental interests of the region. However, the lack of a single unifying management and protection framework hampers coordinated management of the region.

The designation of the Nantucket Shelf Region as a marine protected area (MPA) would acknowledge its special environmental and economic values and provide a needed unifying framework; and the creation of a Nantucket Shelf Regional Coordinating Committee charged with the responsibility for developing a comprehensive ocean resources management plan, are the next two logical steps toward realizing a sustainable ecosystem-based vision for the Nantucket Shelf Region.



Toward an Ocean Vision for the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

5

CW0000006046

Considerably more scientific and socioeconomic research is needed to develop a specific ocean zoning approach. However, an initial zoning concept for the Nantucket Shelf Region, based on available information, might include four zones as follows:

**Ocean Zone 1:** Including the state and federal waters south of Cape Cod and around the islands of Nantucket and Martha's Vineyard, including Nantucket and Vineyard Sounds and Buzzards Bay. This area is characterized by aesthetic and cultural values, active recreational boating and fishing, marine science and education, increasing coastal development, a coastal economy that is heavily dependent on the natural resources and scenery, and an often-disjointed network of existing coastal protected or managed areas, including the Cape Cod National Seashore, Monomoy National Wildlife Refuge and Wilderness Area, Waquoit Bay National Estuarine Research Reserve, Mashpee National Wildlife Refuge, and the Massachusetts Cape and Islands Ocean Sanctuary.

**Ocean Zone 2:** Nantucket Shoals and Georges Bank. These two areas share many ecological and socioeconomic features, such as shallow sandy benthic habitat; high-energy environment; important fisheries habitat; distance from land; ecological transition area between the Great South Channel and the two shoals; moderate recreational use; high cultural value; and a hazard to shipping. Georges Bank is actively managed for fisheries and fishery closures are in effect in some areas. The threat of oil and gas drilling in Georges Bank remains.

**Ocean Zone 3:** Great South Channel. This area is important for both ecological reasons (feeding ground for endangered right whales and humpback whales, fish, and high productivity) and socioeconomic reasons (commercial shipping). The area contains a federal critical habitat for endangered Northern Atlantic Right Whales, and the fishery is seasonally closed.

**Ocean Zone 4:** Outer Continental Shelf. This area includes the large area of continental shelf south of Martha's Vineyard, Nantucket Shoals, and the Great South Channel out to the edge of the continental shelf. It is characterized by its open ocean character; highly dynamic water processes; moderate recreational value; fisheries habitat; and low to moderate risk for shipping. Relatively little is known about the ecological values of this area.

## The Nantucket Shelf Region



January, 2005

Toward an Ocean Vision for the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006047

## Part I.
## Review of the Environmental Characteristics
## of the
## Nantucket Shelf Region

### I. BACKGROUND

Seen from space, the great sweep of Cape Cod and its submerged banks and shoals are one of the most prominent geographic features of the Northeastern coast. Cape Cod and the islands of Martha's Vineyard and Nantucket represent only the highest points of a much larger peninsula that has been drowned by the rising sea as Ice Age glaciers melted. The submerged areas include Nantucket Shoals, Nantucket Sound, Vineyard Sound, Georges Bank, and Stellwagen Bank. (Figure 1).

In fact, Nantucket Sound, Vineyard Sound, Nantucket Shoals, the Great South Channel, the continental shelf south and west of Martha's Vineyard, and Georges Bank form one continuous shallow continental shelf environment which shares a common geological origin (Emery, 1987). This larger cape, much of which is submerged now, forms much of the continental shelf off the Massachusetts coast and juts out into the North Atlantic Ocean. In this literature review, this area will be called the "Nantucket Shelf Region".

This prominent geographic feature has long been known as a major biogeographic transition zone, an area where southern species of plants and animals meet and mix with northern species. Cape Cod and nearby shelf areas form the southern boundary of the Gulf of Maine, a huge, highly productive shelf sea dominated by the cold Labrador Current flowing south from the Canadian Arctic and subject to intense cooling during the winter. The Nantucket Shelf Region also forms the northern boundary of the Middle Atlantic region that is warmed by warm core rings from by the northward flowing Gulf Stream. This region represents a major biogeographic boundary for land plants, fishes, invertebrates, and many other species of plants and animals.

Nantucket Sound has been the subject of much attention recently, due to a proposed wind farm. An earlier proposal in the 1980's to protect Nantucket Sound suffered from a lack of scientific information to support protection. Now, two decades later, due to the pressures posed by human uses of Nantucket Sound, advances in coastal research, and advances in resource management and protection, it is time to reevaluate the current state of scientific information concerning the area in order to reevaluate our management of the area.



Figure 1. The Nantucket Shelf Region; Horsley Witten Group, MASSGIS

This broad area of continental shelf most likely shares many physical, chemical and biological processes. But do we know what these are? Studies of Nantucket Sound relating to a proposed wind energy project typically focus on the area of the proposed project and on Nantucket Sound itself. Such a narrow focus may miss important features. Before one can evaluate the need for marine protection, one first needs to understand the largescale ecological and natural values of a region.

Ecosystem-based resource protection and management is not new to land managers. But for ocean managers, this is a new concept. An ecosystem-based approach first identifies the important or unique ecological features of a region. The characterization of the ecological values of a region is then used as the basis for designing appropriate measures for protection or management of these ecological features.

January, 2005

Part I    Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies; Coastal Solutions Initiative

6

CW0000006048

There are few comprehensive studies of Nantucket Sound, Nantucket Shoals, or indeed of the Nantucket Shelf Region, from the broader vantage point of an entire shelf ecosystem, such as the comprehensive studies of Stellwagen Bank (Valentine et al., 2001; Ward, 1995; Auster et al., 2001; Pett and McKay, 1990; U.S. Department of Commerce (NOAA) 1993; USGS 1998; Georges Bank (Backus, 1987; Emery, 1987; Twichell, 1987; Walsh et al., 1987; Butman, 1987; Collie et al., 1997; Franks and Chen, 2001; USGS 2001; Valentine and Lough, 1991), the Great South Channel (Kenney and Wishner, 1994) or the Gulf of Maine (Brooks, 1992; Christensen, 1989; Durbin et al., 1994; Oldale et al., 1973; Greenberg, 1983; Bigelow, 1927). Information gaps are significant, and thus a review of scientific information concerning important natural features and processes of this area must be based upon comparison with nearby better-studied areas, inference or extrapolation based on scientific knowledge of similar processes or features elsewhere. Nevertheless, there are distinctive features of the Nantucket Shelf Region which deserve to be considered for management or protection.

Part I of this report is meant to provide an objective review of the state of scientific knowledge concerning the Nantucket Shelf Region. The goals of Part I are to:

o   Review and summarize existing scientific knowledge concerning the major physical, biological and ecological processes of the Nantucket Shelf Region;

•   Identify data gaps and evaluate their significance; and

•   Provide a factual, objective basis for further discussion of the values of the Nantucket Shelf Region in Part II of this report.

Part II of this report describes existing marine protection and management approaches, and describes criteria for evaluating whether a given marine area should be protected or not. Part II is meant to foster discussion of the values of this region and whether this area or portions of it should be protected or managed.

## 2. HOW THIS STUDY WAS DONE

A key goal of this review is to provide an accurate, objective summary of information concerning the Nantucket Shelf Region. This review therefore utilizes only published, peer-reviewed scientific sources of information (i.e., scientific articles, books, reports, maps, abstracts, and scientific and technical studies or reports produced by or for government agencies). On occasion, books dealing with a specific topic from a layman's point of view, such as nature guides or an in-depth essay or study of a topic, are used. Maps, figures, and

diagrams from the original sources are included; very few diagrams were created specifically for this review. This was done to provide transparency and to demonstrate the original source of the information.

In this review, emphasis was put on identifying largescale processes and features of the region. Thus, the review is not intended to be a comprehensive and in-depth review of all the features of this region.

Significant scientific data gaps are identified. Whenever possible, their significance is evaluated according to best professional opinion and existing available scientific or technical literature. If hypotheses, conjectures, speculations, or questions are posed, they are clearly identified and are based on sound science, and best professional opinion.

The report begins by briefly describing distinct geographic areas in the Nantucket Shelf Region, and then proceeds to describe major physical and ecological features of the region. The second part of the report evaluates marine protection criteria and models.



Fishing boat on Nantucket Sound. Anne Smrcina photo

## 3. GEOGRAPHIC AREA OF THIS REVIEW

In this review, the broad shallow shelf area covered by Nantucket Sound, Nantucket Shoals, the Great South Channel and the area south of Martha's Vineyard is called the Nantucket Shelf Region. The goal of this review is to identify largescale physical and ecological processes characteristic of the Nantucket Shelf Region. Information concerning such regional processes covers a wide geographic area that includes the entire shelf region east and south of Cape Cod, extending to the edge of the continental shelf between 100 meters and 200 meters depth. The review draws upon information concerning Nantucket Sound, Nantucket Shoals, the Great South Channel, Vineyard Sound, Georges Bank, the nameless area of continental shelf south of Martha's Vineyard, and the continental shelf area encompassing these geographic regions.

Each of these geographic areas is briefly described below.

**Nantucket Sound** is defined as the roughly triangular area of continental shelf that lies between the southern shore of Cape Cod (between Monomoy and Mashpee), and the islands of Martha's Vineyard and Nantucket (Figure 1). Nantucket Sound constitutes a small, shallow marine basin whose edges are formed by the islands of Nantucket, Martha's Vineyard and Monomoy, the submerged shoals associated with these islands, and by the Cape (U.S. Department of Commerce, Coast and Geodetic Survey Chart No. 1209, 1970). At its western end, Nantucket Sound merges with Vineyard Sound.

**Nantucket Shoals** is a broad area of shallow sandy shelf that extends south, southeast and east of the island of Nantucket. The area has a complex, dunelike topography that reflects the strong tidal currents. On the crest of the shoals and in the troughs between them are small linear sand waves that are largely at right angles to the dune crests, although some of the larger sand waves on the crest of the shoals parallel the current. In this area, the shoals consist of reworked glacial sediments that have been deposited over a silt bed of unknown thickness containing Eocene plant spores and pollen (Uchupi and Austin, 1987). Phelps Bank, nearly 50 miles southeast of Nantucket, represents the most seaward extent of the Shoals, with water depths of 40 to 60 meters. Nantucket Shoals is truncated by the Great South Channel to its east and southeast.

**The Great South Channel** is a submarine valley that runs in a north-south direction, out of the Gulf of Maine, cutting its way between the hilly mass of Georges Bank on the east and the high sandy plateau of Nantucket Shoals on the west. At its shallowest, the channel formed by this underwater valley is about 50 meters deep. The valley links Wilkinson Basin in the southern Gulf of Maine, where water depth exceeds 150 meters, with the continental shelf southeast of Nantucket Shoals. The terminus of the Great South Channel is on the outer shelf near Hydrographer Canyon (Uchupi, 1965).

Ships approaching or leaving the Gulf of Maine or Massachusetts Bay use the Great South Channel to skirt the treacherous shallows of Nantucket Shoals and Georges Bank. The Great South Channel is also one of the major spring feeding grounds for the western North Atlantic population of a critically endangered species of whale, the Right Whale (*Eubalaena glacialis*). The Right Whale congregates by the dozen in this area, because their favorite food source, a copepod, typically undergoes a spring population explosion in this area. The South Channel Ocean Productivity Experiment, or SCOPEX, was designed to evaluate the productivity in this area (Kenney and Wishner, 1994).

CW0000006049

South of Martha's Vineyard, there is a broad expanse of shelf that is characterized by the lack of shallow offshore shoals. This southern New England shelf area slopes down gradually to the edge of the continental shelf above Atlantis Canyon, at a depth of about 120 meters. Here, the gradient steepens, dropping 300 meters in a distance of a little over 50 kilometers, to the continental slope below (Uchupi, 1965).

**Georges Bank** is a shallow elongate bank on the continental shelf east of New England (Figure 1), with water depths ranging from 3 to 150 meters. The area covered by Georges Bank is roughly 40,000 kilometers squared (km²). It is bordered on the north by the deeper waters of the Gulf of Maine, while the Atlantic Ocean forms the southern margin (Valentine and Lough, 1991). Tidal currents flow dominantly northwest and southeast. Georges Bank is eroding since no new sediment is reaching it from the continent. Sand is winnowed from Georges Bank by strong tidal and storm currents, leaving behind gravel "pavement" in the northeastern area, and coarse sand-gravel in the middle portion (Valentine and Lough, 1991). Sand ridges 20 to 30 meters high exist on the crest of the bank in the northeastern area, formed by rapid currents, much as strong winds deposit sand dunes if enough sand is present (Twichell et al., 1987).

The water over Georges Bank is well-mixed due to the strong currents and waves, and form a distinct water body separated by oceanographic fronts from the stratified water of the Gulf of Maine and the Atlantic Ocean. These different water masses have different temperatures, salinity, nutrient concentrations, and differ in their capacity to support phytoplankton and zooplankton and the animals that feed upon these (Valentine and Lough, 1991).

Georges Bank was once a rich fishery due to the strong, well-mixed, highly productive waters, but the fisheries are now depleted due to overfishing. By the late 1980's, many Georges Bank fishery populations such as cod, haddock, herring, and scallops had declined, while others such as skate and dogfish populations had expanded rapidly (NOAA, 1991, in Valentine and Lough, 1991).

Between Georges Bank and the New York Bight, there are 10 major submarine canyons leading from the shelf into the slope environment. These are, going from north to south: Corsair Canyon, Lydonia Canyon, Gilbert Canyon, Oceanographer Canyon, Welker Canyon, Hydrographer Canyon, Veatch Canyon, Atlantis Canyon, Block Canyon, and Hudson Canyon (Uchupi, 1965; Shepard and Dill, 1966; reviewed in Pratt, 1973).

Typically these submarine canyons are relatively straight canyons with a V-shaped profile reflecting their origin as stream-cut valleys, with sloping walls that may be as steep as 30 degrees in places. Sedimentary rock and semi-consolidated sediments are frequently exposed on the canyon walls, creating a terraced pattern (Pratt, 1973).

Submarine canyons are widely believed to result from stream erosion of the continental shelf during periods of low sea level during glacial periods (Ross, 1968). At its lowest, sea level would have been about 300 meters lower than today's sea level, exposing the continental shelf to the air and to terrestrial erosion processes (Emery, 1987).

Silts are the predominant sediment in the floors of these downward-sloping canyons, carried there by intermittent strong currents flowing down the shelf and into the heads of the canyons (Pratt, 1973; Butman, 1988). At the bases of the canyons, on the continental slope at depths of over 2000 meters, there are depositional fans, or deltas, of fine-grained silts. Currents flowing down the canyons were documented by early studies (Trumbull and McCamis, 1967; Ross, 1968; and Dillon and Zimmerman, 1970) and by later studies (Butman, 1988).

## 4. GEOLOGY

The Nantucket Shelf Region has been submerged by the sea and reemerged as dry land many times. This area was a continental shelf for many millions of years prior to the onset of glaciation in the Pleistocene. Before the Pleistocene, parts of the shallow continental shelf were above sea level and consisted of a coastal zone of plains and low hills that gradually became lower toward the east, where an ancient shoreline stood (Strahler, 1966). See Figure 2 for a geological time scale (Raup and Stanley, 1978).

The landforms that we call Cape Cod, Nantucket, and Martha's Vineyard did not come into being until very recently, during the last or Wisconsin stage of glaciation which began some 50,000 to 70,000 years ago (Strahler, 1966). These modern landforms result from the deposition of boulders, cobbles, gravel and sand as terminal moraines and ice-contact deposits formed as the glaciers were receding. Below this veneer of glacially-deposited sand, gravel and boulders lies a series of ancient landscapes, stacked like the layers of a cake.



Shoals of Nantucket after NOBSCA

The information concerning these ancient, pre-Pleistocene landscapes comes from seismic reflection profiling studies of the sediments and rocks underlying Nantucket Sound and nearby regions, performed in the 1970's and 1980's (O'Hara, et al., 1976; O'Hara and Oldale, 1980; O'Hara and Oldale, 1987). The seismic reflection profiling studies by O'Hara and Oldale were conducted in order to assess sand and gravel resources, evaluate the environmental impacts of offshore mining of sand and gravel and of offshore disposal of solid waste and dredged materials, to identify and map offshore geology and to determine the geologic history of this area of the shelf. These seismic reflection studies provide a significant portion of the total scientific knowledge that we have concerning Nantucket Sound.



Figure 2. Geological Time Scale.
From Raup and Stanley (1978)

Part I    Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006050

### 4.1. Pre-Cretaceous Landscape

Beneath Nantucket Sound, the oldest, deepest rocks are believed to be of Mesozoic age or older, formed before the Cretaceous Period. The bedrock is crystalline basement rock that represents the North American continental plate. Sedimentary rock is deposited on top of the crystalline basement. During the Mesozoic Era, as the North American continental plate moved apart from the European and North African continental plates, the Atlantic Ocean widened, in a tectonic process called rifting. The sedimentary rocks formed from sediments deposited in a shallow sea that covered the continental shelf, which were later consolidated into solid rock by metamorphic processes (Oldale et al., 1973).

The Mesozoic landscape sloped gently towards the south, and was cut by streams and rivers that flowed south and southeast towards the opening Atlantic Ocean. These rivers flowed down from the North American continental highlands.

### 4.2. Late Cretaceous and Early Tertiary Coastal Plain

During the last part of the Mesozoic (Late Cretaceous) and continuing into the early Tertiary, coastal sediments were deposited in a thick layer on the bedrock shelf, thickening towards the ocean. These coastal plain sediments included both consolidated and unconsolidated sands and silty clays containing some gravel (Oldale et al., 1973). The coarse grain size of these sediments suggests that they were deposited underwater in a nearshore shallow environment, perhaps much like offshore conditions today.

In Nantucket Sound, there is an unconformity between portions of the Pre-Cretaceous bedrock and later Late Cretaceous-Tertiary sediments, indicating that portions of the ancient bedrock were exposed to erosion. The eroded fragments of pre-Cretaceous crystalline rock ended up as part of the Late Cretaceous coastal plain deposits.

### 4.3. Late Tertiary and Pleistocene River Valleys

During the late Tertiary and early Pleistocene, the area of Nantucket Sound was filled by coastal plain sediments. A major unconformity shows that this landscape underwent massive erosion. The erosion of this landscape is perhaps best seen in an extensive erosional scarp, or eroded cliff, that faced north, which is now buried beneath the more recent glacial sediments of Nantucket Sound. This buried eroded cliff runs east-west and extends from eastern Georges Bank to western Long Island Sound. Evidently, the area south of this scarp was a highland or range of hills that eroded. The streams and rivers that

flowed north into the valley representing the proto-Nantucket Sound had their headwaters in this range of coastal hills that ran from west to east for hundreds of miles, parallel to the Atlantic coast. (O'Hara and Oldale, 1987).

Similarly, the plains to the north of the proto-Nantucket Sound valley were eroded by numerous streams and rivers that flowed south (Figure 3) and then out of the east to the Sound, towards the area of the present-day Great South Channel. These streams cut long, linear southwest-trending valleys that flowed towards the center of Nantucket Sound. Some of these streams, in the northern part of Nantucket Sound, may have cut down into the underlying pre-Cretaceous bedrock, exposing that ancient rock.

Drainage from the proto-Nantucket Sound was towards the east. The east-flowing river (outside the area in Figure 3 mapped by O'Hara and Oldale) broke through the line of hills at a water gap and then flowed south across the exposed continental shelf to the Atlantic Ocean. The Great South Channel may have been the water gap that allowed drainage of the Nantucket Sound area towards the sea (O'Hara and Oldale, 1987). The Great South Channel may also have drained the western Gulf of Maine (Oldale et al., 1973). Today, the Great South Channel still connects the southern Gulf of Maine with the North Atlantic, but the Late Tertiary watersheds that drained into it along the line of hills which it breached are now buried beneath Pleistocene glacial sediments of Nantucket Sound and Cape Cod and flooded by the rising sea.



Figure 3. Depth to Submerged Coastal Plain Rocks.
O'Hara and Oldale (1987).

January, 2005

Part I    Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006051

### 4.4. Pleistocene Glaciation and the Formation of Cape Cod and the Islands

The continental glaciers that formed present-day Cape Cod and the Islands were but small outliers of the great Laurentide Ice Sheet, the massive glacier that covered northern North America during the Pleistocene. This massive ice sheet, 10,000 feet thick or more at its greatest, flowed out from its center at Labrador towards the continental shelf. In eastern North America, the ice mainly flowed south and east.

The direction of flow of the Pleistocene glaciers that crept down from the north was probably influenced by the preexisting linear valleys cut by the south- and north-flowing streams during Late Tertiary times. Like grooved pavement, the valleys probably acted to entrain the glacial ice, which would have settled deep into the valleys (O'Hara, 1981b). The Late Tertiary linear valleys may have helped to determine the shape of the Nantucket Shelf region by influencing the direction of flow of the Pleistocene glaciers.

The landforms of Cape Cod, Nantucket, Martha's Vineyard, Nantucket Shoals, the Great South Channel, and much of Georges Bank were formed by glacial processes in the last Ice Age, the Wisconsin stage. Nantucket and Martha's Vineyard were formed by the bulldozer action of glaciers pushing sediments ahead as the Laurentide Ice Sheet flowed south from New England and Canada.

Such sediments deposited in front of a glacier are called terminal moraines. A terminal moraine also receives the sediments that are carried by the ice and deposited as the glacier melts at its terminus. A terminal moraine typically reflects the shape of the end, or terminus, of the glacier that molded it. When the glacier retreats, it leaves behind the terminal moraine.

The terminal moraines that form the high spines of Nantucket and Martha's Vineyard were formed by distinct lobes of glacial ice. The Nantucket Sound lobe marked the farthest advance of glacial ice in the Nantucket Shelf region (Figure 4, from Strahler, 1966). Long Island and Block Island were also formed at the same time and in the same manner (Strahler, 1966). Cape Cod was not yet formed. Nantucket and Martha's Vineyard are therefore older than the Elizabeth Islands and the Buzzards Bay and Sandwich Moraines, which were deposited later, during the second stillstand of ice (Strahler, 1966).

Figure 4. This map of southeastern New England shows by arrows the directions of flow of ice of the Wisconsin Stage as well as the two positions of ice standstill (dashed lines). (Based on a map in Woodworth and Wigglesworth's Geography and Geology of the Region Including Cape Cod, 1934). From Strahler (1966).



About 18,000 years BP, the glaciers began melting and retreated northward, and then halted. This second ice margin position, or stillstand, was held for several thousand years. Now the ice margin of the Cape Cod Bay lobe and the Buzzards Bay lobe ran through a line defined by the recessional moraines of the Elizabeth Islands and Cape Cod, in particular the Buzzards Bay Moraine and the Sandwich Moraine, which were deposited then. Meltwater streams eroded the moraines and washed sediment down to form the broad, gently sloping glacial outwash plains that form most of the southern and eastern portions of Cape Cod. A glacial lake formed in Nantucket Sound at the melting edge of the retreating ice sheet (Gutierrez et al., 2003).

In Nantucket Sound, glacial drift sediments were deposited in the narrow linear valleys that existed before the Pleistocene glaciation. Thicknesses of these Pleistocene glacial drift sediments reach over 100 meters in some of the deeper valleys, and thin to 10 meters or so in areas that were high (see Figure 5, O'Hara and Oldale 1987). The current bathymetry of Nantucket Sound (see Figure 6, from O'Hara and Oldale, 1987) reflects a combination of glacial and post-glacial sediment deposition processes.



Figure 5. Thickness of Glacial Drift Deposits. O'Hara and Oldale (1987).

Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

Part I

CW0000006052



Figure 7. Georges Bank during the past 16,000 years (BP = Before Present): (top) Georges Cape (14,000 years BP), (middle) Georges Island (11,500 years BP), and (bottom) Georges Bank (present) formed as sea level rose at the end of the Pleistocene epoch. Emery (1987).

During this period of exposure to sun, wind and rain, the continental shelf received precipitation, underwent weathering and erosion, and drained towards the sea, (Strahler, 1966). Fresh groundwater accumulated in the subsurface of the exposed Nantucket Shelf region (Kohout et al., 1977). Streams and rivers cut down through the exposed sediments of the continental shelf, heading for the edge of the continental shelf only miles away. The submarine canyons, such as Oceanographer Canyon, that plunge off the edge of the continental shelf were probably formed during this lowstand, carved out by the great glacial rivers that entered the sea closer to the edge of the continental shelf.

What animals and plants lived here? The animals and plants and habitats of this coastal glacial ecosystem probably would have resembled a present-day Arctic coastal ecosystem, but there is scant information from the Nantucket Shelf region from this brief emergent period. Mastodon teeth and bones have been recovered (Emery).

About 12,000 years ago, rapid global warming caused the glaciers to shrink rapidly and sea level to rise (Strahler, 1966). The rapid warming event caused a rapid retreat of the glaciers, and meltwater streams eroded and carried sediment out to form glacial outwash plains. Nantucket Sound remained a lake until about 9,500 years BP, when sea level was 30 meters below its present level (Uchupi et al., 1996). Beginning about 7,600 years BP, rising sea level drowned the lake and the shoreline migrated inland as the sea inundated the coastal valleys and plains (Guiterez et al., 2003). By about 1,000 years BP, sea level reached its approximate present level. Since then, sea level continues to rise at the rate of approximately one foot per century over the past century, and it is expected to rise at least 19 inches over the next century (IPCC, 2002).

Figure 6. Existing Sea Floor Topography, O'Hara and Oldale (1987).

The area of the Great South Channel, which may have been a Tertiary water gap in an east-west line of coastal hills (O'Hara and Oldale, 1987), was covered by a different glacial lobe, the Great South Channel Lobe (Strahler, 1966). The intersection between the South Channel Lobe and the Nantucket Sound ice lobe coincides with the eastern edge of Nantucket Sound. Today, water depths are still shallow at the eastern edge of Nantucket Sound, because of the ridge of glacial sediments deposited in the gap between the Great South Channel ice lobe and the Nantucket Sound ice lobe (Figure 6, from O'Hara and Oldale, 1987).

4.5. Relative Sea Level Rise

During glacial times, sea level was nearly 300 to 500 feet (100 to 160 meters) lower than today's levels, because of the huge amount of seawater locked up in glacial ice. The Nantucket Shelf region was exposed land (Figure 7, from Emery, 1987). The shoreline was much closer to the edge of the continental shelf than its present position, which today is near the 200-meter depth contour (Uchupi, 1965). During a glacial period of low sealevel, water depths would have quickly deepened to hundreds of meters a short distance offshore.

Part I    Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

January, 2005

### 4.6. Sedimentary Environments

Sediments in the Nantucket Shelf Region are of the type that geologists call clastic, that is, formed by the disintegration of rock into small particles. Water, waves, wind, erosion, abrasion, temperature extremes and the weathering action of soil microorganisms break down rock into sediment particles. These sediments are then carried into the sea by rivers and streams. Clastic sediments have been deposited in this area of the continental shelf for many millions of years, beginning in the late Cretaceous.

New England and areas to the north do not have massive coral reefs or reefs built up of other limestone-forming invertebrates. Biogenic sediments, or sediments that are deposited by algae, reef-forming corals and other invertebrates that secrete limestone, are uncommon in this region. Unfortunately for coral reef-lovers, the cool temperate waters are not favorable for growth of carbonate-secreting, reef-forming animals, since the minerals they secrete are not stable for long due to the cool temperatures, which tend to dissolve carbonate.

Other biogenic sediments, such as opal-like silica, are deposited by diatoms, a type of microscopic algae. Diatoms are common in offshore waters and in the Gulf of Maine, and can form spring and summer blooms. There is, however, no information on biogenic silica production in the Nantucket Shelf Region.

Clastic sediments can have many different compositions reflecting the parent rock. The more resistant and long-lived sediment grains consist of the harder rocks and minerals such as quartz, rutile, ilmenite, garnet, and other tough igneous and metamorphic minerals derived from the weathering of granite, gneiss, diorite, and basalt. Such sediment grains of more resistant minerals tend to weather more slowly to form gravel, sand, silt and clay. Softer sediment grains of feldspar, soapstone, schist, and other soft minerals and rocks tend to weather more quickly into fine-grained clays. Limestone (carbonate) and basalt can also weather to form gravel, sand, silt and clay.

The clastic sediments of the continental shelf of New England reflect the nearby parent rocks and sediments, namely, the pre-Cretaceous igneous and metamorphic bedrock of the North American continent, younger sedimentary rocks and sediments from the Tertiary period, and even more recent Pleistocene glacial drift carried from many areas of the Northeast. Although one may find pebbles or cobbles of limestone or basalt, extensive sand deposits composed of limestone or basalt are not common in New England because massive limestones and basalt are not common rocks in New England.

January, 2005

Sediment grain size is an important attribute in the marine environment. The size of a sediment grain may seem irrelevant to us. However, to a tiny invertebrate living on or beneath the sediments or a fish laying eggs on the bottom, sediment grain size is a critically important feature. Fish feed upon the many invertebrates that live in and on the sediments. Some invertebrates prefer to live in or on muds, while others prefer sand. Certain fish and shellfish prefer gravels and sands to muds, silts or clays.

Sediment grain size depends on the type of parent rock, the length of time the sediment grain has been weathering, how far the sediment grain has been carried by water or wind (relating to abrasion time), and the wave and current energy in an area. Bigger waves and faster currents with more energy can move larger sediment grains than smaller waves or slower currents. A fast current can winnow out the fine silts and clays and sands, leaving behind coarser gravels, pebbles and cobbles. Currents that slow down deposit their sediment loads because they no longer have enough energy to keep moving sediment grains.

### 4.7. Benthic Habitat Mapping

National Marine Sanctuaries are marine and coastal areas of special biological significance. The National Marine Sanctuary System, administered by NOAA, requires seabed and habitat maps to serve as a basis for managing sanctuary resources and for conducting research. Also, since the decline of the Northeast fisheries, the need to understand, identify and protect essential fish habitat has become critical.



Figure 8. Benthic habitat mapping of Georges Bank, using multisensor approach. From USGS Fact Sheet FS-061-01.

Part I   Review of the Environmental Characteristics of the Nantucket Shelf Region   Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006054

As a result, geologists and biologists of the U.S. Geological Survey, the National Marine Fisheries Service and National Marine Sanctuaries System of NOAA, and universities have conducted detailed studies of the physical and biological characteristics of benthic habitats in a number of National Marine Sanctuaries and important fishing grounds. These marine habitat geology and fish ecology studies were conducted to study the interplay of geologic factors and biological habitat needs of species, and to better understand how physical habitat influences the survival and success of important fish and shellfish species (Valentine et al., 2001; Valentine and Lough, 1991; Lough et al., 1989; Collie et al., 1997; Auster et al., 2003; USGS Fact Sheet 078-98, May 1998; USGS Fact Sheet FS-142-00, December 2000; USGS Fact Sheet FS-061-01, July 2001).

Using multibeam bathymetry and sidescan sonar, underwater video, underwater photography, and sediment sampling at thousands of stations, marine scientists are mapping underwater topography, sedimentary bedforms (sand dunes, sand waves, ripples, channels), sediment grain size, benthic fauna, and the behavior of fish and invertebrates, the effects of habitat disturbance by storms, fishing gear and moving sand, and habitat preferences among different fish and invertebrate species. The multisensor mapping approach can document habitat characteristics at many size scales, ranging from several to many square miles (megahabitat), hundreds to tens of meters (local habitat), and several meters down to several centimeters (microhabitat).

Seabed mapping surveys have been carried out in Stellwagen Bank National Marine Sanctuary (NMS), and Georges' Bank to define and map biological habitats, assess natural and human disturbance of habitats, and identify areas where contaminants might accumulate (Valentine, Cochrane and Scanlon, MTS Journal, Vol. 37, No. 1, p. 10-17).

In Georges Bank, several years of such studies show that: (USGS Fact Sheet FS-061-01; Valentine and Lough, 1991)

- Herring spawning sites are located on gravel bottom only where currents are strongest;
- Juvenile cod survive best on gravel habitat, especially where sponges, tube worms, and other attached species (epifauna) increase the complexity of the seabed, possibly because predation is reduced (juvenile cod are less visible against gravel bottoms and where there are other organisms that provide cover);
  o Attached species are not able to colonize gravel habitat that is buried occasionally by moving sand, depending on periodicity;




Figure 9. Photographs of the seabed showing some typical Georges Bank habitats.  See Figure 10 for locations. A, Undisturbed gravel habitat with epifauna of tube worms and other attached species. B, Gravel habitat disturbed by scallop dredges and lacking epifauna. C, Moving sand habitat (strong bottom currents) with sand dollars in ripple troughs. D, Non-moving sand habitat (weak currents) with sea scallops. USGS Fact Sheet FS-061-01.

- Dredging and trawling on gravel habitat remove epifauna and decrease habitat complexity, but fishing gear apparently has less long-term impact on sand habitat, especially where sand is moved by bottom currents, depending on periodicity;
- Scallops prefer habitats of gravel and nonmoving sand (weak bottom currents);
- Closure of large areas to fishing allowed depleted sea scallop populations to increase markedly in 4 to 6 years;
  o Some sand-dwelling flounder species possibly prefer moving sand (strong bottom currents), but others prefer nonmoving sand habitats.

Figures 8 and 9 show the location of the benthic habitat mapping studies on Georges Bank, and examples of benthic habitat (from USGS Fact Sheet FS-061-01).

In Georges Bank and in Stellwagen Bank National Marine Sanctuary, multisensor studies at several thousand stations have provided information on the different habitats present, including the value of sediment bedforms (i.e., sand waves and ripples, troughs) for fish habitat, species preferences for sediment grain size, damage to benthic habitats from mobile fishing gear, the value of undisturbed seabed as habitat for fish and other organisms, and the beneficial fishery habitat effects of removing disturbances to allow the seabed to recover from impacts (Auster et al., 2003; Auster et al., 2001; Auster et al., 1996; Valentine et al., 2001). Examples of benthic habitats and habitat disturbance are shown in Figures 10, 11, 12 and 13 (from USGS Fact Sheet 1998).

Multisensor methods have proved extremely useful in monitoring the effects of fishing gear on benthic habitats and essential fish habitat. Combined with studies of benthic invertebrates and benthic production, sidescan sonar and benthic imaging have shown that mobile fishing gear (trawlers and dredgers) significantly reduces benthic productivity and biomass of Atlantic sea scallops, sea urchins, and polychaete worms on eastern Georges Bank; when such impacts ceased for several years, benthic productivity increased by factors of 5 to 10 or more (Hermsen et al., 2003). On Stellwagen Bank, similar surveys showed that mobile fishing gear altered the physical habitat by removing sedimentary structures (sand waves, depressions) and by removing benthic organisms that provide structural habitat complexity (e.g., sponges, hydrozoans, bryozoans, amphipod tubes, shell aggregates, holothurians, crabs, etc.). Reduced habitat complexity can result in increased predation on juvenile fish and ultimately reduce recruitment (Auster et al., 1996).

In eastern Georges Bank, large sand waves, analogous to underwater sand dunes, have formed in response to rapid storm and tidal currents with speeds ranging from 10 to 100 centimeters per second. Sand waves usually lie at right angles to the direction of the prevailing current.

January, 2005

Part 1   Review of the Environmental Characteristics of the Nantucket Shelf Region   Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006055






Figure 11. A view of the SEABOSS from below (with base plates removed; see fig. 2). Photograph by Dann Blackwood, USGS. The instruments are as labeled: A, forward-looking video camera; B, lights for forward-looking video camera; C, downward-looking video camera; D, lights for downward-looking video camera; E, 35-millimeter still camera; F, strobe light for still camera; G, modified Van Veen grab sampler; H, depth sensor; I, junction box; J, parallel lasers for scale; K, angled laser for range. From USGS Fact Sheet FS-142-00 (December 2000).



Figure 13. Examples of still photographs taken of different habitats with the SEABOSS during USGS studies. Area shown in each photograph measures about 51 to 76 centimeters. A. Four starfish together on a muddy bottom in the New York Bight. B. Juvenile scallops swimming over a sandy bottom on Georges Bank. C. A boulder mound in western Massachusetts Bay that is providing habitat for lobster and fish. D. Mussels clustered on bedrock in Niantic Bay in Long Island Sound. E. Sand lance schooling over coarse sand in the Stellwagen Bank National Marine Sanctuary. F. A goosefish camouflaged on a muddy sand bottom in the Stellwagen Bank National Marine Sanctuary. From USGS Fact Sheet FS-142-00 (December 2000).




Figure 12. An oblique view of the SEABOSS on deck between stations. Photograph by Dann Blackwood, USGS. From USGS Fact Sheet FS-142-00 (December 2000).



Figure 10. Sun-illuminated map of Stellwagen Bank National Marine Sanctuary and Massachusetts Bay with backscatter intensity draped over the topography. Red indicates high-backscatter material including coarse sand, gravel, and rock; green indicates sand; blue indicates mud. Within each backscatter color interval, the intensity varies from dark to light depending on the sun illumination. The image illustrates the wide variety of sedimentary environments in this region of the coastal ocean. The transitions between sediment types are often very sharp. Topographic features observed here were formed for the most part by glacial processes. Glacial ice containing rock debris moved across the region, sculpting its surface and depositing sediment to form basins, knolls, banks, and other features. Later many of the smaller features were formed during a final period of ice stagnation and melting. Today, the sea floor is mainly modified by storm currents and waves from the northeast. These currents erode sand and mud from the shallow banks and transport them into the basins. Stellwagen Bank and Jeffreys Ledge are shallow banks (20-40 m water depth) covered with sand and gravel. Stellwagen Basin (80-100 m) is floored with mud. In deeper water (85-140 m) in the northeastern part of the image, a fine hummocky pattern on the sea floor was created by gouges (5-10 m deep and up to 120 m wide) caused by icebergs that grounded in the muddy sand at the close of the last period of glaciation. Present and past disposal sites (white arrows) are characterized by high-backscatter material and are especially distinct when the background material is fine grained sediment, such as in Stellwagen Basin. The easternmost arrow points to the presently active Massachusetts Bay Disposal Site. The yellow rectangle in the western part of the map is the location of the new ocean outfall that will discharge treated sewage effluent from the Boston metropolitan area into Massachusetts Bay. USGS Fact Sheet 078-98 (May 1998).

Part 1    Review of the Environmental Characteristics of the Nantucket Shelf Region    Provincetown Center for Coastal Studies, Coastal Solutions Initiative

14

They are formed much as desert sand dunes are formed, by a current that carries sand grains forward and then drops the sand grains as the current slows in travelling up the face of the growing dune. The sand waves on Georges Bank reach amplitudes (height from bottom to top of a sand wave) of up to 25 meters (75 feet) with a wavelength of 50 to 300 meters between wave crests, although most are 1 to 10 meters in height with correspondingly smaller wavelengths (Twichell et al. 1987). Megaripples are smaller sand waves that have heights of less than 1 meter and wavelengths of 1 to 15 meters between wave crests. Sand waves may move or migrate at a rate of 12 meters per year, while portions of sand waves may move as much as 60 meters per year (Twichell et al. 1987).

Sand waves and megaripples are absent where surface tidal currents are less than 40 centimeters per second and typically are found in water that is less than 60 meters deep. Sand waves and sand ripples exist in the Great South Channel and on Nantucket Shoals, where surface tidal currents exceed 60 centimeters per second, where sand waves are 5 to 10 meters high (Figures 14a and 14b, Twichell et al. 1987). In the floors of the troughs or depressions between sand wave crests, gravel lag deposits are often found, representing larger heavier particles left behind when the lighter finer sand is swept forward by currents to form the sand waves. Sand waves may build up on both sides of the crests where the ebb tidal current and the flow tidal current are roughly equivalent in speed, in which case the crest of the waves may lie obliquely at an angle to the direction of the ebb and flow tidal currents (Twichell et al., 1987).

Similar but smaller sand waves and sand ripples occur on Stellwagen Bank, where the tidal currents are weaker, reaching speeds of 20 to 30 centimeters per second (Auster et al, 2003; Valentine et al., 2001). Using the Seabed Observation and Sampling System (SEABOSS), researchers have found that silver hake, a predator species that feeds on fish and squid, prefer sand wave habitat, possibly because it provides shelter from current flows and from larger predators (Auster et al., 1995; Valentine, 2000). Furthermore, fish size was related to sand wave morphology as well as current velocities, and prey. Studies like this that integrate underwater landscapes with ecology provide far more useful information for resource managers than studies that address only one issue at a time.

These results show that seabed mapping provides resource managers with information on where the best benthic habitat may exist in an area, and how benthic habitat can be impacted

by mobile fishing gear. Seabed mapping can be used to monitor long-term use and recovery of benthic habitats over large areas. Seabed mapping has proved highly useful for making management decisions involving commercial and recreational fishing, habitat disturbance, engineering projects, tourism, and cultural resources (USGS and NOAA/National Marine Sanctuary Program, 2003). Seabed mapping is one of the most essential and invaluable tools for understanding, managing and protecting marine habitats. This cannot be overemphasized.

In Nantucket Sound, the USGS has collected information on sediment grain size, using sediment sampling (Figure 15). This study, performed by USGS scientists Larry Poppe and Chris Polloni, is one of the few recent scientific studies centering on Nantucket Sound (Poppe and Polloni, 2000). Their broad survey shows that sand predominates over most of the area, with occasional pockets of silty clay (e.g., in the oval basin west of Nantucket). Gravel deposits also occur as long linear east-west ridges at the eastern end of Vineyard Sound (western end of Nantucket Sound) and gravel also forms mounds here and there around the margins of Nantucket Sound. Yet the Stellwagen studies demonstrate how complex the seafloor geology and habitat are, and how even thousands of sediment samples are inadequate to describe the seafloor environment.

### 4.8. Issues and Data Gaps

Multisensor seabed mapping techniques have not been applied to studying the benthic habitats of Nantucket Sound, or Vineyard Sound, Nantucket Shoals or large areas of the Great South Channel or Georges Bank. Given the proximity to government scientific agencies and research institutions, this is surprising, but the information gap is probably due to the fact that neither of these areas is located within a marine sanctuary, and the fisheries that once existed in Nantucket Sound have been depleted. This information gap is an important one.

As a result, we know little about the benthic habitats that may be present in Vineyard and Nantucket Sounds and Nantucket Shoals, except indirectly through fisheries information and sediment grain size mapping. We know nothing about the potential impacts to benthic habitat in these areas from mobile fishing gear, which has been documented in the Gulf of Maine (Auster et al., 1996). This is one of the most significant data gaps identified in this literature review.



Figure 14a. Summary map showing tidal currents, mean currents, area of sand waves, and locations of fine-grained Holocene deposits. From Twichell et al. (1987).

Figure 14b. Median grain size of surface sediments in the Georges Bank area. (Schlee (1973), modified). From Twichell et al. (1987).

January, 2005

CW0000006057

In short, while the sedimentary and benthic habitats of Georges Bank and portions of the Great South Channel have been studied in depth, only the structural geology, glacial history, and sediment grain size of Nantucket Sound and Nantucket Shoals have been studied to any extent. Benthic habitat of Vineyard Sound, Nantucket Sound and Nantucket Shelf have yet to be characterized at the level of detail of the Stellwagen Bank studies.

## 5. BATHYMETRY



Figure 16.  NOAA Bathymetric Chart. U.S. Department of Commerce, Coast and Geodetic Survey Chart No. 1209, 1970.

### 5.1. Bathymetry Charts

Existing NOAA navigational charts provide bathymetry of the Nantucket Shelf region.  Such charts are developed for navigational purposes.  A 1970 NOAA bathymetry chart of Nantucket Sound is shown in Figure 16 (U.S. Department of Commerce, Coast and Geodetic Survey Chart No. 1209, 1970).  Such maps are useful for largescale assessment, but may be less suitable for evaluating benthic habitat values due to the scale of mapping.

Figure 15.  Sediment Grain Size.  From Poppe and Polloni (2000).

Sand waves and ripples provide important habitat for fish on Georges Bank and Stellwagen Bank.  Do sand waves exist in Nantucket Sound?  If so, do the troughs between sand waves, or the gravelly ridges mapped by Poppe and Polloni (2000), provide essential fish habitat?  A sidescan sonar study was performed for a proposed wind energy project describes sand waves (Cape Wind Farm DEIR); however, the sidescan sonar data were not provided in the DEIR, and so the existence of such sand waves cannot be confirmed.  However, given the tidal currents in the Nantucket Sound and Nantucket Shoals areas (see section on Circulation), underwater sand waves probably do occur.  Mapping such sedimentary bedforms would be important for mapping essential fish habitat and benthic habitat.

Are the long gravel and sand ridges remnants of glacial deposits, or are they deposits formed by winnowing by the strong tidal currents?  These sand ridges and shoals are probably completely the result of tidal currents, but this is an area that needs further study.  The length and east-west orientation of these features suggests that these features are associated with the terminal moraines formed by the retreating ice, since they are roughly parallel with the glacial ice front.  It does not seem likely that they are submerged drumlins, like the east-southeast submerged drumlins found in Massachusetts Bay, which reflect the flow direction of the ice sheet in that region (Oldale et al., 1994), because the flow direction of the ice sheet in the Nantucket Sound region was probably north-south.  Uchupi and his colleagues found that the sediments of Nantucket Sound represent a complex history related to the inundation of the area as sea level rose during the latest Holocene transgression (Uchupi et al., 1996).

January, 2005

CW0000006058



Research data buoy deployment.
*photo: NOAA Library*

Bathymetric maps show the topography of Nantucket Shoals and Nantucket Sound is best characterized as irregular and broken, with ridges that are both linear and irregularly sinuous, mounds, and plateaus, with channels between these topographic highs. The largest expanses of water that could be called basins are situated in two areas: 1) an oval basin just west of the island of Nantucket, surrounded on three sides by Tuckernuck Shoal, Tuckernuck Bank, and the long horn of Nantucket's spit, and 2) An irregular basin, lying between the above mentioned basin, Lewis Bay on Cape Cod, and Monomoy Island (U.S. Department of Commerce, Coast and Geodetic Survey Chart No. 1209, 1970).

Water depths in Nantucket Sound vary from less than half a meter (1 foot) to approximately 23 meters (70 feet), relative to mean low water (Coast and Geodetic Survey Chart No. 1209, 1970). The deepest areas of Nantucket Sound are found approximately 3 nautical miles due south of Waquoit Bay, at the western end of Nantucket Sound adjacent to Vineyard Sound; approximately 4 nautical miles south of West Bay, approximately 8.5 nautical miles south of West Bay; immediately south of the southern end of Monomoy Island (Butler Hole); several small areas north of Nantucket; and in Muskeget Channel lying off the southeastern end of Martha's Vineyard. With the exception of one or two small areas north of Nantucket, most of these deeper areas lie within long, elongate basins that are probably associated with areas of rapid current flow that have helped to shape these features. Their orientation corresponds with the major directions of tidal current flow into and out of Nantucket Sound (see Section on Physical Oceanography).

### 5.2. Issues and Data Gaps

A study of how and whether bathymetry has changed over time, throughout the Nantucket Shelf Region, does not appear to have been done. This is important to know because changes in bathymetry and sediment transport can affect benthic habitats. Such a study would also shed light on changes in circulation in response to climate change, the effects of major storms on sediment movement and distribution, and the effects of shallow nearshore sediments on abating storm wave energy.

High-resolution bathymetry data would provide a necessary foundation for many other studies, such as habitat mapping, and for resource management.

Long-term studies of bathymetry would also be useful for evaluating whether sand transport from the shelf to nearshore regions can occur via waves, tides and currents; this is a little-studied area of coastal geology, since most attention typically has focused on sand transport from nearshore to shelf regions. A recent workshop on coastal change addressed such issues and the need for developing an ocean observatory system (Workshop on "The Moving Shoreline: Coastal Change in Response to Rising Sea Level, April 26 – April 29, Woods Hole Oceanographic Institution, Rob Evans, Department of Geology and Geophysics, Conference Chairman).

January, 2005

### 6. PHYSICAL OCEANOGRAPHY

Physical oceanography is the science of the movement of the sea. It deals with circulation, tides, waves, currents and the physical processes that cause the ocean to move. Physical oceanographers in particular seek to understand why and how the ocean moves, and are therefore most interested in processes. Examples of important processes include:

- Advection (mixing of different water masses);
- Stratification (formation of layers of water with different properties);
- Buoyancy (tendency of a less dense body of water to rise relative to a denser body of water);
- Tides (created by the constantly changing gravitational attractions of moon, sun and earth as these move relative to each other);
- Gradient-driven flow (water flows down to a lower area due to gravity);
- Coriolis force (the earth's daily rotation under a body of water causes that water body to slowly spin clockwise or counterclockwise); and
- Interactions between some or all of the above processes.

These major physical oceanographic processes can affect the chemistry, ecology, geology, and climate of a region. Very often, understanding the physical oceanography of an area, one can predict the chemistry, ecology, sedimentation, and erosion of a region. Physical oceanographers rely upon field measurements of the properties of water: current velocities, tidal ranges, wave heights, water temperature, salinity, density and so on. Such data is combined with knowledge of basic physical processes that cause water masses to move. Computer mathematical models are created to understand how water masses move and change over time, based on selected processes and field data. The results of such models are compared with observations to see whether the models accurately match observed conditions.

Scientific knowledge concerning the physical oceanographic processes of the Nantucket Shelf Region is patchy. Much is understood about the physical oceanography of the Gulf of Maine (and by extension Nantucket Shoals and the eastern margin of Nantucket Sound) and Georges Bank. In a general sense and at a large scale, the physical oceanography of the New England continental shelf is well understood. Specific areas have been studied more than others, for example, the off-shelf currents leading down to the submarine canyons at the head of the continental slope (see studies by Brad Butman and others).



Research data buoys ready for deployment.
*photo: NOAA Library*

However, a major information gap exists where Nantucket Sound and Vineyard Sound are concerned, largely due to the lack of modern detailed and focused scientific studies aimed at understanding the physical oceanographic processes in these areas. We probably know more about the physical oceanography of Georges Bank, Stellwagen Bank, and the Gulf of Maine than we do about our own backyard, Nantucket Sound and Vineyard Sound.

CW0000006059

## 6.1. Vineyard Sound, Nantucket Sound and Nantucket Shoals

The tidal range in Vineyard Sound and Nantucket Sound is relatively small, ranging from 1.5 to 3 feet in various areas, with lower tidal ranges occurring on shorelines facing the open ocean and higher tidal ranges occurring in coastal embayments and other semi-enclosed areas. Nantucket Sound and Vineyard Sound receive little river runoff; therefore, despite the low tidal range, their circulation is dominated by strong (upwards of 2 knots) reversing semi-diurnal tidal currents (Bumpus et al., 1973). The net drift movement of water is towards the east, amounting to about 200 cubic meters per tidal cycle, or about 5 percent of the total easterly and westerly tidal flow (Bumpus et al., 1971). Salinity ranges from 30 to 32.5 parts per thousand. There is little or no vertical stratification of the water column due to the turbulent mixing by tidal current over the uneven bottom of the sounds, and meet Pritchard's definition of a Type D vertically homogenous estuary (Pritchard, 1955).

In Vineyard Sound and Nantucket Sound, the ebb tide current flows to the west while the flood tide current flows to the east, towards the Great South Channel (Figures 17 and 18, Eldridge, 2003). During the ebb tide, a tidal current flows south between Nantucket and Martha's Vineyard, through Muskegat Channel, into the Nantucket Shoals region, reversing during the flood tide. Average maximum current velocities range from 2 knots (103 centimeters per second) on flood tides in Pollock Rip Channel southeast of Monomoy, to 4.5 knots (231 centimeters per second) on flood tides in Woods Hole channel, at the western end of Vineyard Sound and sometimes exceeding 7 knots (360 centimeters per second) in the latter area (Eldridge, 2003). On Nantucket Shoals, tidal currents also dominate water movement and surface tidal currents exceed 60 centimeters per second (Twichell et al., 1987).

These tidal current speeds are much faster than the minimum current speed needed to form sand waves and megaripples, which is 40 centimeters per second (Twichell et al., 1987), so where there is plenty of sand available, it is likely that sand waves and megaripples have formed in Vineyard Sound and Nantucket Sound. Since the ebb and flood tide currents are almost equally strong (easterly flow is slightly greater), it would not be surprising to find sand waves that have built up and down on both sides of the wave crest, as occurs in Georges Bank (Twichell et al.,1987). However, no scientific studies of sedimentary bedforms and benthic habitat in Nantucket Sound or Vineyard Sound have been done, as mentioned previously.

## 6.2. Gulf of Maine

The Gulf of Maine is a marginal sea that is nearly isolated from the Atlantic Ocean by Georges Bank, Browns Bank, the Great South Channel ridge, and Cape Cod. Its waters are cold, chilled by both the Labrador Current and by severe winter cooling brought about by the gulf's location in the lee of the North American continent and isolation from the warmer deeper waters of the North Atlantic Ocean (Brooks, 1992). The gulf contains three major basins with varying depths: Wilkinson Basin (275 meters deep), Jordan Basin (275 meters deep), and Georges Basin (379 meters deep).

The main connection between the Gulf of Maine and the Atlantic Ocean is the Northeast Channel, a glacially-scoured drowned valley with a sill depth of 230 meters. At this sill depth, deeper Atlantic slope water can enter the Gulf of Maine. The Great South Channel is shallower and only allows limited exchange of water with the upper layers of the Atlantic, with a sill depth of about 70 meters, despite the fact that it is a low point in the submarine ridge that runs from Nantucket Shoals to Georges Bank (recall its former role as a water gap in pre-Pleistocene times, according to O'Hara and Oldale (1987).



Figure 17. Tidal Current Chart. Buzzards Bay, Vineyard and Nantucket Sounds. 3 hours after flood starts at Pollock Rip Channel or 1 hour after low water at Boston. Velocities shown are at Spring Tides. See Note at bottom of Boston Tables: Rule-Of-Thumb for Current Velocities. (Pollock Rip Ch. is SE of Monomoy Point). From Eldridge (2003).



Figure 18. Tidal Current Chart. Buzzards Bay, Vineyard and Nantucket Sounds. 3 hours after EBB starts at Pollock Rip Channel or 1 hour after high water at Boston. Velocities shown are at Spring Tides. See Note at bottom of Boston Tables: Rule-Of-Thumb for Current Velocities. (Pollock Rip Ch. is SE of Monomoy Point). From Eldridge (2003).

January, 2005

Part 1    Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006060

Non-tidal circulation in the Gulf of Maine is basically counterclockwise, with a smaller clockwise gyre in the eastern gulf, and counterclockwise circulation in the western and southern gulf (Brooks, 1992). Flow around the edge of Georges Bank is clockwise. At the extreme southern end of the Gulf of Maine, water flow diverges from the main gulf counterclockwise circulation and follows the edge of the Nantucket Shelf region south and then west (Figures 19 and 20 from Bigelow (1927) and Brooks, 1992). The divergence is an area where upwelling of deeper nutrient-rich water occurs in response to the diverging water masses, and is thus an area where production should be higher.

The contour-hugging current flows around Nantucket Shoals, along depth contours of 20 meters or greater, bending around the Shoals much as a ship might avoid the Shoals. In the spring and summer, surface currents become stronger as heating and stratification increase; while during the winter the gyre-like circulation weakens and the surface water inside the gulf drifts slowly seaward over the banks (Brooks, 1992).

In the nearshore areas of the Gulf of Maine, fresher waters are less salty and dense, and during the summer form a thin layer on top of the saltier, denser Atlantic ocean water entering the gulf through the Northeast Channel (which is called Maine Bottom Water). In the winter, due to intense cooling of water at the surface of the ocean, chilled water sinks and forms an intermediate layer of water called Maine Intermediate Water, which by its sinking causes the overturn or mixing of nearly two-thirds of the water column.





Figure 20. Schematic map of the summer subtidal circulation in the Gulf of Maine. The circulation is separated into a near surface component (at depths below 150 m; dashed lines) showing the flow of dense salty slope water. The net deep inflow of slope water entering the Gulf of Maine through the Northeast Channel is mixed vertically by several mechanisms (e.g., coastal upwelling, seasonal overturning, boundary mixing) and leaves the Gulf of Maine in the flow above 100 m. No comparable map exists for the circulation during other seasons. Brooks (1992).

Figure 21. Predicted frontal positions for tidal and summertime wind mixing, using tidal dissipation rates calculated from Greenberg's (1983) model. The positions of the log (h/D) = 1.9 contour (...) and the 50 m isobath (—– are also shown. Figure from Loder and Greenberg (1986). Brooks (1992).



Figure 19. Bigelow's (1927) classical circulation schematic for the Gulf of Maine region in summer months, based on multiple experiments with surface drift bottles, hydrography, and plankton distributions. Bigelow (1927) and Brooks, (1992).

In the Gulf of Maine, current speeds in upper surface layers in areas away from the banks are typically 30 to 50 centimeters per second, but in narrow channels and over sills, deep current speeds can be several times greater.

The Gulf is also known for its tidal resonance, which means that the tides are reinforced or amplified due to the basin's configuration and orientation (long axis running from northeast to southwest) relative to the moon's orbit about the earth (apparent east to west motion). Tidal heights increase eastward, exceeding 15 meters in the Bay of Fundy. Tidal currents resulting from the amplified tides can reach velocities of more than 1 meter per second in the upper Bay of Fundy, shallower areas and inner edge of Georges Bank, and the western end of the Scotian Shelf, while in the southwestern gulf the tidal currents are typically a few tens of centimeters per second (Brooks, 1992).

### 6.3. Tidal Mixing Fronts

Tidal fronts are formed when tidally well-mixed water meets less well-mixed water. Due to the large tidal variation and rapid tidal currents, there is vigorous tidal mixing of the waters of Georges Bank, the western Nova Scotia shelf, and most of the Bay of Fundy and small areas along the coast of Maine. Where these tidally well-mixed waters meet the stratified fresher water along the coast or the upper warmer water layer during the summer, tidal fronts form. Wind-mixing also causes water to overturn, or convect. An example of wind-mixing is blowing across the top of a cup of coffee with a layer of cream added; the cream disperses downward because the "wind" creates friction along the fluid's surface, which causes the liquid to move, which displaces liquid, leading to convection.

Mixing throughout the vertical water column is thorough during the winters, due to wind-driven mixing and the convection brought about by cold surface water sinking to the bottom. When wind-mixing is added to tidal mixing, the resulting tidal fronts are shown in Figure 21 (Brooks, 1992). Tidal fronts occur in the above-mentioned areas, and also in some eastern Maine coastal bays, over the carp of Browns Bank, near Grand Manan Island, and Nantucket Shoals. A tidal mixing front was observed along the eastern edge of Nantucket Shoals during the SCOPEX oceanographic cruises, indicating tidally mixed waters inside the area of a Nantucket shoals (Chen et al., 1994a, b).

Thorough mixing of ocean layers is important for stimulating productivity of phytoplankton and zooplankton and the ensuing food chain. As Brooks (1992) says, *"One of the important consequences of the tidal stirring is to bring deep dissolved nutrients upward into the surface layers, where the enhanced light can result in higher biological productivity, so that the areas near and inside the tidal fronts shown in Figure 6 (Figure 2 in this review) also tend to support high primary and secondary production. For example, the tidally-stirred waters of the eastern gulf and Georges and Browns Banks support one of the world's richest fisheries (Yentsch and Garfield, 1981)."* (Brooks, 1992). Note that the area inside the tidal front boundary in Figure 19 includes the Nantucket Shelf Region (e.g., Nantucket Shoals, Nantucket Sound, Vineyard Sound), and Buzzards Bay.

Physical oceanography, therefore, suggests that the Nantucket Shelf Region should be a biologically productive area, due to thorough mixing of the water column by strong tidal currents. Vigorous mixing promotes high oxygen levels in the water column, and in general, well-mixed, well-aerated water bodies can support greater numbers and more diversity of organisms than water with low or no oxygen. The prediction concerning enhanced productivity due to high mixing rates is borne out by remote sensing observations of primary productivity (chlorophyll concentrations) in the Nantucket Shelf Region, discussed in a later section in this review. Biodiversity is discussed in a later section as well.

### 6.4. Shelf-Slope Currents




Physical Oceanographers recovering a water sampling apparatus.
photo NOAA library

In the Nantucket Shelf Region, water depths are generally too shallow to allow intrusion of deeper slope water, such as the slope water intrusion that occurs at the north end of the Gulf of Maine, over the Northeast Channel sill (Brooks, 1992). But the reverse - flow of water from the shallow Nantucket Shelf Region to deeper water - is conceivable, perhaps by analogy with the Gulf of Maine situation where winter chilling creates a dense layer that sinks to form the cold Maine Intermediate Water layer.

USGS studies of the outer continental shelf south and southwest of Martha's Vineyard indicate that so-called "cross-shelf currents" flow down off the edge of the continental shelf towards the continental slope, particularly in areas where there are preexisting submarine canyons cut into the edge of the continental shelf (Butman, 1988; Butman, 1987; Bumpus, 1973). Tidal forces appear to be responsible for causing the currents, which are found in water depths of 200 to 300 meters. In a 1972 study, a shelf-

slope water was measured at 950 meters depth on the continental slope (Wunsch and Hendry, 1972). The Nantucket Shoals Flux Experiment also documented a net downslope current at 200 meters depth (Beardsley et al., 1985). Although such currents are typically weak, with speeds of 1 to 5 centimeters per second, they carry continental shelf materials (sediments, nutrients, organisms, organic detritus) towards the deeper slope environment. Such off-shelf currents that transport water and suspended sediments into the upper continental slope environment appear widespread off the New England shelf (Butman, 1988; Ross, 1968).

Turbidity currents, which are underwater flows of sediment-laden water from underwater landslides and river deltas, can travel hundreds of miles, depositing sediments far over the abyssal ocean plain. Underwater submarine fans on the continental slope, continental rise, and abyssal plain represent the accumulation of sediment deposited by many such turbidity events. In many cases, large submarine fans such as the Hudson Canyon fan, represent the seaward end of the deposits carried by rivers. Turbidity flows originating from the Gulf of Maine have deposited sediments far out over the Atlantic slope, rise and abyssal plain (Horn et al., 1971, in Leeder, 1982).

### 6.5. Issues and Data Gaps

Physical oceanographic studies of Nantucket Sound / Vineyard Sound water mixing, water residence time, seasonal changes, and transport to other ocean areas, such as the Great South Channel and outer continental shelf and slope, are lacking. Such studies would be invaluable for evaluating current and past productivity of the region, and for predicting how productivity will change over time. There are no studies, for example, of how much nutrient loading Nantucket Sound and Vineyard Sound can withstand before showing impacts; up to now, we have assumed that the rapid tidal currents will flush pollutants out of the sounds. Also, adjacent areas may eventually be impacted eventually.

Although tidal currents flow between Nantucket Sound and the southern Gulf of Maine and the Great South Channel, the interactions between Nantucket Sound and the other two bodies of water have not really been investigated. This is a significant information gap, particularly given coastal nutrient inputs into Nantucket and Vineyard Sounds and high primary productivity in the Nantucket Sound-Vineyard Sound area, based on remote sensing of ocean color. The proximity of Nantucket Sound to the Great South Channel, where high nutrient and chlorophyll concentrations support copepod blooms, which in turn support high densities of right whales (Kenney et al., 1995; Kenney and Wishner, 1994; Durbin et al., 1994a and 1994b;

Wishner et al., 1994; Macaulay et al., 1994; Wimm et al., 1994; Kenney and Wimm, 1986; Kenney et al., 1986), suggests an important ecological connection between the three bodies of water. But this remains to be investigated.

The relationship between currents and sedimentary bedforms, such as sand waves, ripples, depressions, and sediment grain size needs to be investigated because these are key features of benthic habitat for important fish and invertebrate species. There are no studies of this type for Vineyard or Nantucket Sounds.

Studies show that there is considerable transport of continental materials into the deep sea in general. There is no information concerning whether such transport occurs from the Nantucket Sound shallow shelf into adjacent deeper waters. The possible linkage between productivity in shallow continental shelf areas and deeper outer shelf and continental slope areas needs to be investigated further, since there are currents that can transport sediments and other materials to deeper areas of the ocean. Is there a possible linkage between shelf nutrients and slope ecosystems? This is an important topic for oceanographic research into the biogeochemical cycling of nutrients between major regions of the ocean, and certainly bears on deep-sea fisheries on the upper continental slope.

The high degree of mixing in the Nantucket Shelf Region, combined with the high primary productivity in this region, nutrient loading into coastal estuaries of Cape Cod and the Islands, the regional productivity in terms of fisheries, the highly productive Great South Channel attracts endangered Right Whales, suggest that a larger ecoregional approach is needed. A better understanding is needed about how the physical oceanography of Nantucket and Vineyard Sounds dovetails with the regional oceanographic processes of Nantucket Shoals, the Gulf of Maine, Georges Bank, the Great South Channel and the outer continental shelf and slope.

## CHEMICAL OCEANOGRAPHY

Chemical oceanography is the study of the chemical composition of the sea and, more importantly, the many chemical, biological and physical processes that cause the ocean to differ in composition from area to area. Chemical oceanographers want to find out how much of a particular substance exists in the ocean, how it got there, how long it will take to disappear or be consumed, what affects the composition, and what composition tells us about these other shadowy processes.

Biogeochemical cycling is one particular interest of chemical oceanographers. This refers to the transfer of an element, say, between water, sediments, air and living organisms (acting as "reservoirs" to store and hold an element), and the many physical, chemical and biological processes that carry the element between these reservoirs. Elements such as carbon, nitrogen, sulfur, and certain trace elements, which are the building blocks of living organisms, are of great interest for those who study biogeochemical cycling and chemical oceanography.

The biogeochemical cycling of carbon between the ocean, continental shelf, land plants and organisms, and the atmosphere, is of great interest now, because of the role of carbon dioxide in trapping heat in the earth's atmosphere (global warming). Nitrogen cycling is important in the ocean because of eutrophication – an excess of nutrients, particularly nitrogen, brought about by man's activities.



Oceanographer collecting water samples for analysis photo NOAA Navy

### 7.1. Older Studies

Chemical oceanographic studies that include the Nantucket Sound region are rare, older and large-scale in scope (Kester and Courant, 1973), compared to chemical oceanographic studies of nutrients and organic matter cycling in the Gulf of Maine (Townsend, 1997; Kelly, 1997; Christensen, 1989), nutrients, metals and organic pollutants in Georges Bank (Walsh et al., 1987; Bothner et al., 1987; Farrington and Boehm, 1987), and nutrients in the Great South Channel (Durbin et al., 1995a and 1995b). Massachusetts Bay and Boston Harbor have been extensively studied in terms of their sediment chemistry and pollutants, because of the monitoring required for the Boston Harbor sewage outfall and the Massachusetts Bay Disposal Site.

The older study by Kester and Courant describes dissolved oxygen concentrations, which are in the range of 5 to 6 milliliters per liter off the Massachusetts coast. Nutrient loading studies of Cape Cod embayments are even more numerous, due to concerns about coastal nutrient loading and eutrophication and thanks to the Massachusetts Department of Environmental Protection (DEP) Estuaries Project and the Cape Cod Coastal Embayment Project (see Cape Cod Commission, 1998). However, none of the coastal embayment studies will examine long-term nutrient loading of Vineyard and Nantucket Sounds.

A good example of a chemical oceanographic process study is that by Christensen (1989), who examined transport of carbon from the continental shelf of the Gulf of Maine into the adjacent continental slope. His approach used measurements of sulfate reduction and carbon oxidation rates in sediments, which store organic matter. Sulfate reduction is a bacterial process that turns organic matter into carbon dioxide and hydrogen sulfide under low-oxygen, reducing conditions in sediments. Christensen's measurements showed that the amount of carbon falling to bottom sediments (the flux, or the carbon received in sediments) was 47 grams of carbon per meter squared per year, and that sediment processes that used carbon and oxygen, including denitrification and carbon burial, totaled 52.1 grams of carbon per meter squared per year – that is, carbon received roughly equaled carbon spent or permanently buried.

Christensen's study suggested that, for the semi-enclosed Gulf of Maine located on a wide shelf, little export of organic carbon to the deep slope might be expected. In contrast, on a narrow shelf like that off the state of Washington, about 22 to 50 percent of the primary production may be exported from the shelf to the slope (Christsen, 1989). This type of study looking at nutrient transport is needed for the Nantucket Shelf Region, particularly given concerns about coastal nutrient loading and our untested assumption that strong tidal currents in the sounds will flush all coastal pollutants away.

### 7.2. Issues and Data Gaps

There is much that could be done to understand the chemical oceanography of Nantucket Sound, Vineyard Sound, and Nantucket Shoals. Chemical oceanographic studies in these areas are non-existent and constitute a significant data gap that should be addressed by ocean managers. We need to know: 1) basic distributions and concentrations of natural compounds, nutrients, and pollutants, and 2) Chemical oceanographic processes that change, distribute or create these materials. The lack of such basic information will hinder any resource management efforts to, say, restore fisheries or other natural resource values.

# 8. BIOLOGICAL PRODUCTIVITY

## 8.1. Importance of Productivity Studies in Ecology

Ecology is the study of relationships between living organisms, their activities, and their environment. Ecologists study biological functions and processes such as photosynthesis, respiration, the transfer of energy from primary producers (plants) to herbivores to predators, the rates at which such processes occur, the physical and chemical environments where these processes take place, and the kinds of organisms which are responsible for specific processes. Measuring and understanding biological productivity of different types of organisms is important for judging the success or impacts on a species, for measuring biodiversity, energy transfer between trophic levels, and ecosystem functioning. It is also critical information for resource managers.

Ecology also requires sound taxonomy, which is the science of correctly identifying and understanding the ancestral relationships between species of organisms and their evolution. Incorrect identification of a species can lead to incorrect assessments of its role in ecological processes and its place in the evolutionary tree. The science of biological taxonomy has languished in recent decades as ecological studies have gained in prominence and as sophisticated tools for conducting ecological studies have improved and proliferated.

In the open waters of the Nantucket Shelf Region, and particularly in Nantucket Sound, Vineyard Sound, and Nantucket Shoals, marine ecological studies, biological productivity studies and marine invertebrate taxonomic scientific studies are scarce. Studies of birds, marine mammals, and fish are more common. Still, there is no comprehensive study of this area as a regional ecosystem.

## 8.2. Nutrients and Primary Production

Primary production is the organic matter created through photosynthesis by organisms such as plants, algae and phytoplankton. Primary production forms the basis of the food chain.

Seagrasses, which are vascular plants, provide one important source of primary production, particularly in shallow coastal ecosystems. Eelgrass (*Zostera marina*) is the principal seagrass on the Massachusetts coast, while widgeon grass (*Ruppia maritima*) is present in areas of lower salinity along the Cape Cod and Buzzards Bay coast. Seagrasses provide food and habitat for a wide variety of commercially important fish and shellfish species and for many other plants and animals. Seagrasses require clear water that allows light transmission in order to photosynthesize, although the leaves filter and trap suspended particles, and therefore their growth is limited to the depth where light penetration is adequate to support photosynthesis. In the clearer waters of Nantucket Sound, the depth limit for growth of eelgrass is more than 6 meters below mean lower low water (MLLW), while in the more turbid waters of portions of Buzzards Bay and Cape Cod, the depth limit is less than 3 meters below MLLW.

The Massachusetts Department of Environmental Protection (DEP) Wetlands Conservancy program has completed a project to map the state's submerged aquatic vegetation, working with assistance from NOAA's Coastal Change Analysis Program (C-CAP) and NOAA's Coastal Services Center. The project was conducted from 1994 through 1997, and used aerial photography and fieldwork to map coastal submerged aquatic vegetation (see http:// www.state.ma.us/mgis/eelgrass.htm ). A MassGIS map showing distribution of eelgrass around Nantucket Sound is shown in Figure 22. Note that the mapping project does not cover areas further offshore because vascular plants do not grow in deeper water (see comment above concerning depth limitation).



Figure 22. Seagrass and Algae Distributions. Data from MASSGIS, map by Horsley Witten Group.

Part 1   Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

22

CW0000006064

Eelgrass was formerly more widespread along the Cape Cod shoreline. Some causes for loss are: 1) Poor water quality, caused by both nutrient loading and the resulting eutrophication and boating activity causing resuspension of sediments, results in reduced sunlight reaching plants; 2) Physical damage to plants from boating and propeller turbulence; and 3) other environmental impacts.

In deeper offshore waters, the most important primary producers are phytoplankton, microscopic aerobic algae of various species, which grow suspended in the water column. Phytoplankton will grow and multiply as long as there are enough nutrients, oxygen and sunlight, and they are not limited in the area which they can cover because they are not rooted. Their growth is limited to the photic zone, the upper 10 meters or so of the water column where enough light of the preferred wavelength can penetrate to allow photosynthesis to occur. Phytoplankton, together with bacteria and other microorganisms, form the all-important base of the food chain in marine ecosystems.

One primary ecological question for any ecosystem is, how much primary production is occurring? Primary production can be measured in many ways, including biomass, growth rates, respiration rates, rate of nutrient uptake, and pigment content. Phytoplankton contain characteristic photosynthetic pigments, of which chlorophyll is the best-known, most abundant and most widely measured. Chlorophyll is frequently used as an indicator of primary productivity in the oceans, although it is not the only pigment that is biologically important.

Chlorophyll in water can be measured using chemical analysis or through remote sensing of ocean color, using satellites. Remote sensing of ocean color, measuring wavelengths that specifically include the color of chlorophyll, can be used to rapidly map large areas of the ocean, in contrast to shipboard water sampling and chemical analysis of chlorophyll. This method, utilizing coastal zone color scanning (CZCS) imagery for chlorophyll, has been used since the late 1970's to remotely map chlorophyll and hence primary production, and to track seasonal and other changes in production (Yoder et al., 2001). For example, Yoder's study focused on a large area of the outer continental shelf off the U.S. east coast, including portions of Georges Bank, the area south and southwest of Martha's Vineyard, and south to Cape Hatteras. This study did not include the Gulf of Maine or Nantucket Sound or the eastern portion of Nantucket Shoals.



Figure 23. Remote sensing satellite data on ocean color (chlorophyll) in the Gulf of Maine and Nantucket Shelf region for January, February, March and April, 2004. These data were downloaded from the Regional Association for Research on the Gulf of Maine (RARGOM) website at http://zeus.mbl.edu/rargom and the Gulf of Maine Ocean Observing System (GoMOOS) website.

CW0000006065



Seafloor image southeast of Nantucket Island, NOAA Photo Library

A clamshell type grab sampler, NOAA Photo Library

Scientists studying primary productivity in the Gulf of Maine have identified several areas where primary production by phytoplankton occurs year-round: Georges Bank, Nantucket Shoals, Browns Bank, and nearshore coastal areas (Thomas et al., 2003). Primary production is affected by bathymetry, temperature, salinity, nutrient concentrations, and tidal mixing of the water column. In deeper parts of the ocean, primary production is limited to the spring and fall. The year-round primary production on Georges Bank is significant because the important fisheries located here and the stresses on this fishery. The year-round primary production in Nantucket Shoals was noted, but was not a focus of Thomas's study.

The SeaWIFS satellite has been used by scientists to map chlorophyll in the Gulf of Maine for several years (see Figure 23 and Thomas et al., 2003). These data, (available online through the Regional Association for Research on the Gulf of Maine (RARGOM) website at http://rarcm.mbl.edu/rargom and the Gulf of Maine Ocean Observing System (GoMOOS) website), were collected in early 2004; older data from previous years are

SeaWIFS
January, 2005

available from the website. These maps show that, beginning in January 2004, primary production was already occurring in the shallow Nantucket Shoals and Nantucket Sound area, and on Georges Bank. By April, primary production had expanded to include more of the Massachusetts coast, Georges Bank, and the Gulf of Maine.

This time-series sequence shows that the Nantucket Shelf Region has intense primary production beginning in winter and continuing through the spring and summer. Primary productivity appears to expand outward from this area. Is this apparent expansion real, and why does it occur? The Nantucket Shelf Region also has high primary production compared to other coastal areas. This is significant for fish, shellfish and other marine organisms, and particularly important for commercial and recreational fisheries and for the animals that feed upon these.

### 8.3. Issues and Data Gaps

So far, there have not been any studies focusing on the primary production within Nantucket Sound, Vineyard Sound or on Nantucket Shoals. It would be important to learn more about such primary production, and how such primary production supports other organisms. If fisheries were to be restored in Nantucket Sound and Vineyard Sound, for example, it would be important to know to what extent the fisheries could be supported by the primary production that occurs here.

The potential effects of coastal nutrient pollution on primary production in Vineyard Sound, Nantucket Sound, or the Nantucket Shelf also have not been addressed through any scientific studies. Coastal nutrient pollution occurs through stormwater runoff, groundwater leachate from septic systems and sewage treatment facilities, boating discharges, agricultural discharges, and other point and nonpoint sources that enter the coastal environment (Natural Resources Council, 2000). Typically, studies of coastal nutrient loading have focused on coastal embayments and nearshore areas, with the exception of monitoring studies of wastewater discharges from ocean outfalls such as the Boston Harbor sewage outfall. Although Nantucket and Vineyard Sounds are swept twice-daily by vigorous tidal currents, the long-term cumulative effects of nutrient inputs on these coastal ecosystems should be investigated. A long-term Ocean Observatory would be suitable for performing such long-term monitoring.

## 9. BENTHIC FAUNA

### 9.1. Background

Benthic fauna include invertebrates and certain fish species which live on or in bottom sediments. Benthic fauna include many trophic types: those which graze on algae (grazers), those which strain seawater to get the plankton (filter-feeders), those which feed on plankton and organic matter (suspension-feeders, detritivores), predators, and scavengers. Benthic fauna are an important food source for fish, marine mammals and birds.

Studies of benthic fauna in the Nantucket Shelf Region, focusing on Georges Bank, are summarized by Theroux and Grosslein (1987). In 1871, the U.S. Fish Commission was established to determine the causes of decline in certain fisheries, including investigating benthic fauna; prior to this, benthic faunal studies were primarily done by academic researchers and private scientific societies. After World War II, the Commission's work was expanded, with an emphasis on quantitative population estimates. The Bureau of Commercial Fisheries and the present National Marine Fisheries Service, the successors to the U.S. Fish Commission, continued to investigate benthic fauna due to interest in fisheries, oil drilling, marine mining, and ocean dumping in the Georges Bank-Cape Cod area (Theroux and Grosslein, 1987).

More recent programs investigating the benthic environment of the New England shelf include NOAA's Northeast Monitoring Program (NEMP), the National Marine Fisheries Service' Marine Mapping

Assessment and Prediction Program (MARMAP), the Ocean Pulse Program (OP) of the Northeast Fisheries Center (NEFC), and the Woods Hole Oceanographic Institution's Georges Bank Study Group. Benthic sampling for benthic fauna studies has been done at several hundred stations in Nantucket Sound, Nantucket Shoals, the southern New England shelf, Georges Bank, and the Gulf of Maine (reviewed in Theroux and Grosslein, 1987; Pratt, 1973).

These studies show that on Georges Bank and the New England region, among 39 groups of benthic macroinvertebrates, four are typically predominant: annelids, crustaceans, mollusks, and echinoderms. However, depending on a number of other factors, such as sediment grain size, water temperature, bathymetry, and whether biomass or numerical densities are used, the relative percentages of these groups varies from area to area (Theroux and Grosslein, 1987).

### 9.2. Effect of Sediment Type

Sediment type is one of the most important determinants of the distribution and type of bottom-dwelling invertebrates, although water depth, water temperature and other physical and biological factors are important as well. On Georges Bank, for example, coarse to fine sands support the highest biomasses of macroinvertebrates; the coarser the sand, the higher the biomass supported (e.g. coarse sand supports a benthic biomass of 371 grams per meter squared (g/m²), while fine sand sustains a mean biomass of over 220 g/m²). Silt and clay support a moderately high biomass of about 200 g/m². Mean densities of individuals are highest in the coarsest sands (exceeding 2,000 individuals per meter squared) and decrease as grain size decreases (e.g., clay supports 775 individuals per meter squared) (Theroux and Grosslein, 1987).

24

Sand fauna are benthic faunal species which are found on clean sand in water depths shallow enough to allow sediment transport to occur at least intermittently (Pratt, 1973). Such habitat is found from sandy beaches offshore to depths of several meters of 30 to 50 meters offshore, depending on exposure. Nantucket Shoals and much of Nantucket Sound and Vineyard Sound and the area south of the Elizabeth Islands provide such sand habitat. Other areas include the shelf areas connecting Cape Cod, Block Island and Long Island.

Sand movement is characteristic of these areas, as evidenced by ripple marks and sand waves, and sediment and water movement is significant. Animals that live in such areas must be adapted to such changing dynamic conditions where burial or undermining of the organism may occur frequently. The benefits of living in such a dynamic environment include high oxygen levels in the water column and in sediments, and abundance of suspended food particles (Pratt, 1973).



Surf Clams. NOAA Photo Library

Important sand fauna species from Nantucket Shoals, Georges Bank and other areas of the sandy shelf region extending from Cape Cod down to Long Island Sound are listed below (from Wigley, 1958, as summarized by Pratt, 1973):

1) Polychaete worms: *Scoloplos fragilis, Nephtys bucera, Nephtys picta, Nereis arenaceodonta, Sthenelais limicola, Spiophanes bombyx, Ophelia, Goniadella, Clymenella* sp., *Aricidea* sp., and *Magelona* sp. (deposit feeders);

2) Bivalves: *Spisula solidissima* (surf clam); *Astarte castanea; Ensis directus* (razor clams; suspension feeders), *Tellina agilis* (deposit feeder).

3) Gastropoda: *Polinices duplicatus* and *Lunatia heros* (predators of bivalves).

4) Amphipods: haustorids (suspension feeders), phoxocephalids and lysianassids (deposit feeders and scavengers).

5) Decapods: *Crangon septemspinosus* (shrimp) and *Cancer irroratus* (crab) (omnivores and scavengers).

6) Echinoderm: *Echinarachnius parma* (Sand dollar, deposit feeder).

7) Ascidians: *Amaroucium* (sea pork) and *Mogula arenata* (sea squirt or tunicate) (suspension feeders).

8) Anthozoa: *Paranthus rapiformis* (anemone) (suspension feeder) in southern area (Mid-Atlantic region).

Silty sand is sand that contains up to 25% silt. The occurrence of a significant amount of fine-grained silts generally indicates that the wave and current energy regime is less than in an area where sand or gravel predominate. The energy regime in an area of silty sand is typically less than the energy regime found in sandy areas. However, sandy areas that are located in deeper water may have moderate energy regimes like the energy regime found in silty sands or sandy silts closer to shore. In such cases, a quiet deep sandy area may have fauna similar to the fauna found in silty sand habitats (Pratt, 1973).

Benthic macroinvertebrates that are found in silty sand include suspension feeders and deposit feeders living in tubes and burrows. There is often vertical structure within the infaunal community. The types of benthic organisms found in silty sands of southern New England in water depths of 40 to 58 meters includes polychaetes (deposit feeders), bivalves (suspension feeders), including the ocean quahog (*Arctica islandica*), amphipod crustaceans (deposit feeders, suspension feeders), anemones (suspension feeders), and sea cucumbers (deposit feeders) (Wigley and McIntyre, 1964). Silty sands provide important habitat for the benthic organisms that provide food for fish. Northern groundfish (e.g., cod, haddock, hake, yellowtail flounder, lobsters and crabs) feed on benthic organisms found on silty sands during the winter (Pratt, 1973).

Silt-clay sediments are not common or extensive in offshore waters, being rather characteristic of estuarine sediments and deeper shelf and slope sediments. However, there is an area with a high silt-clay content 40 miles onto the shelf in Southern New England (i.e., the Mud Patch). Silt-clay sediments in deeper shelf and slope areas are not necessarily comparable with silt-clay sediments in shallower estuaries and nearshore environments, because the deeper shelf and slope sediments may represent deposits laid down during lower sea level during a glacial period (summarized in Pratt, 1973; McMaster and Garrison, 1966; McKinney and Friedman, 1970).



Sea Stars. NOAA Photo Library

Characteristic silt-clay benthic fauna include deposit-feeding echinoderms (heart urchin, *Briaster fragilis*), brittle stars (*Ophiura sarsi, O. robusta,* and *Amphiura otteri*), sea star (*Ctenodiscus crispatus*), deposit-feeding polychaetes and bivalves. Wigley and

MacIntyre sampled this fauna off southern New England at 69 to 99 meters water depth, and found high densities of mollusks, mostly bivalves (200 to 500 per square meter), abundant polychaetes, and abundant brittle stars (100 to 700 per square meter). Another study of this area reported 5,314 benthic organisms per square meter, comprising 41% polychaetes, 23% ophiuroids, 19% bivalves, 5.5% coelentera, and 3.4% crustaceans (Sanders, Hessler and Hampson, 1965). The silt-clay fauna is thus important for supporting populations of groundfish as well as migrating continental shelf edge lobsters (Pratt, 1973).

### 9.3. Biomass

Benthic productivity is important in maintaining the food chain of the ocean. In fact, the term "fish-food biomass" means the organic biomass in sediments available for fish to feed upon. The higher this number, the more food is available for bottom-feeding fish (Pratt, 1973). Benthic productivity is measured by biomass per unit area (grams of organism tissue per meter squared) and by the numbers of individuals per unit area. In the New England shelf area, biomass and population density both tend to decrease as water depth increases. For example, on Georges Bank, benthic biomass is greatest in depths between 25 and 150 meters, while population density tends to be greatest at midshelf depths (50 to 99 meters depth). (Theroux and Grosslein, 1987).

Often a thin layer of fine-grained flocculent organic matter covers the sediment surface, derived from the settling remains of plankton, fecal pellets, animals and plants living in the water column above. This results in a sediment that typically has more organic matter (2%) than sand (1% or less), and hence has greater food value. For example, Wigley and McIntyre (1964) sampled the benthic fauna off southern New England at depths of 40 to 58 meters, and reported an average dry weight concentration of amphipods in sediment of 2-6 g/m2 dry weight (reported in Pratt, 1973). Closer to shore, Lee (1944) measured dry weight of all benthic organisms at 4.6 g/ m2, and the concentration of fish food organisms (excluding large bivalves and echinoderms) was 2.3 g/m2.

Lee (1944) described a quantitative survey of fishing areas in Menemsha Bight off Martha's Vineyard and reported that sandy areas had lower fish-food biomass than silty-sand areas, less than 1 g/m2 dry weight. However, Wigley (1965) shows a dry weight biomass of greater than 10 g/m2 in stable sand areas surrounding Nantucket Shoals (Pratt, 1973). Butterfish, scup and summer flounder remain in areas of sandy bottom in the Mid-Atlantic Bight through much of the year (Pratt, 1973).

Part 1   Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006067



Scientists recover a Chain-dredge on Georges Bank. NOAA Photo Library

## 9.5. Issues and Data Gaps

Because of the importance of benthic fauna in maintaining ocean productivity, and because of concerns about the state of the offshore fisheries in the Nantucket Shelf Region, the study of benthic fauna productivity, ecology, and taxonomy remains important. As climate changes, the physical factors that affect distributions and biomass of benthic fauna, such as water temperature, currents that affect sediment distributions, and primary productivity may change, thus affecting benthic fauna. Monitoring changes in benthic ecology and benthic fauna will continue to be important for understanding the overall ecology and living resources of the Nantucket Shelf Region.

Detailed mapping of benthic sediment characteristics and essential fish habitat should be done throughout the Nantucket Shelf Region, building on earlier studies of benthic fauna. Such information would provide a basis for better management of commercial and recreational fisheries in the region. The USGS has recently mapped sediment grain size off the northeast coast, including Nantucket Sound, Nantucket Shoals and the areas offshore of Cape Cod (Poppe and Polloni, 2000). This map provides a regional map of the sediment distribution in this area, and it provides an extremely useful tool for estimating where essential fish habitat may be located, based on extrapolation from other studies of Georges Bank and Stellwagen Bank. However, this mapping effort does not match the degree of detail achieved in high-resolution benthic mapping of Stellwagen Bank, for example.

The comprehensive approach used by USGS-NMFS, utilizing multisensor (sidescan and multibeam sonar, video photography, still photography, sediment sampling) to map and analyze benthic habitats should be applied to mapping Nantucket and Vineyard Sounds, Nantucket Shoals, the Great South Channel, and Georges Bank. The detailed information gained from such a comprehensive approach would provide resource managers with information needed to manage essential fish habitat and other important habitat.

---

2) An area of overlap, mixing, or transition between southern and northern fauna

Stephenson and Stephenson (1954) studied intertidal biota from Cape Cod to Cape Hatteras and concluded that the fauna represented a mixture of cold-temperate animals found north of Cape Cod and warm-temperate animals found south of Cape Hatteras. Kinner (1978) suggested that polychaetes in the Georges Bank-Cape Hatteras region fell into an overlap zone containing both northern and southern species. Bowen et al. (1979) studying benthic crustaceans in the Middle Atlantic Bight also came to this conclusion, finding that Cape Cod formed the northern range limit for numerous warm-water species of crustacea, although Cape Hatteras formed a more effective barrier for some species.

3) Southernmost limit of a cold-temperate Boreal province

Coomans (1962) studying mollusk distributions, decided that this region was mainly Boreal, since only about 10% of the species were endemic and most of the rest were of boreal (cold-water northern) origin. Most of the seastars and starfish in Georges Bank and the Gulf of Maine are related to boreal/subarctic groups, but some species reached their southern range limits along strong bottom-temperature gradients along the margins of Georges Bank and Nantucket Shoals (Franz, Worley and Merrill, 1981).

Theroux and Grosslein (1987) conclude that the benthic zoogeography of Georges Bank has yet to be definitively studied, that while most species are associated with cold-water fauna, there are significant southern associations, and that Georges Bank and nearby areas are clearly within a zone of rapid transition.



Scientists deploy a Blake-corer on Georges Bank. NOAA Photo Library

---

## 9.4. Biogeography

In terms of biogeography, the science of the geography of organisms, the offshore region between Cape Hatteras and Georges Bank, from 35 degrees N to about 42 degrees N, is complex and consists of a mixture of warm-water and cold-water species, as well as a number of species endemic to the area. Historically this region has been placed in any one of three benthic faunal provinces, described by Hazel (1970) and reviewed in Theroux and Grosslein (1987):

• A separate province, often called the Virginian Province, with a mild-temperate fauna, lying between a cold-temperate province to the north of Cape Cod (Nova Scotian or Boreal province), and a warm-temperate province (Carolinian) south of Cape Hatteras;

• An area of overlap or transition with a mixture of cold-temperate and warm-temperate fauna, not unique to the region, lying between the Nova Scotian and Carolinian provinces.

• A cold-temperate Boreal Province extending all the way from Cape Cod and Georges Bank to Cape Hatteras (south of which is the warm-temperate Carolinian province).

Different studies support one or another of these zoogeographic provinces, and are summarized in Theroux and Grosslein (1987) and below.

1) Separate province (Virginian province) lying between warmer southern and colder northern provinces

Hall (1964) studied mollusk distributions relative to temperatures required for successful reproduction, and concluded that the Cape Cod/Cape Hatteras region belonged in a separate Virginian province. Hazel (1970) studying ostracodes in a separate Virginian province, distinct, noting that the warm summer/fall temperatures off Cape Cod, the depth of the Northeast Channel and the high summer temperatures on Georges Bank were all barriers to the southward extension of many cold-water northern species, and similarly that a number of warm-water species reached their northern limit in eastern Georges Bank or off Cape Cod. Briggs (1974) felt that the entire region from Cape Hatteras to the Strait of Belle Isle should be a separate province, the Western Atlantic Boreal Zoogeographic region, based on the criteria of 10% endemism for province status. Watling (1979) showed that 18% of amphipods found from Cape Hatteras to Georges Bank were endemic, thus supporting the Virginian province (reviewed in Theroux and Grosslein, 1987).



CW0000006068

# 10. FISH, FISHERIES AND SHELLFISH

Cape Cod forms a geographic boundary between the warm waters of the Mid-Atlantic Bight (Virginian zoogeographic province) and the colder waters of the Gulf of Maine (Acadian zoogeographic province), creating a transitional zone in Nantucket Sound and the adjacent shelf areas where warm and cold currents mix, and migratory species reach the extremes of their respective ranges (Ayvazian et al., 1992). This highly productive, dynamic environment sustains a diverse array of marine fish and invertebrate species that support commercial and recreational fisheries, contributing significantly to the economy of the region.

Since 1978, the Massachusetts Division of Marine Fisheries has conducted annual research cruises in spring and fall, utilizing a standardized otter trawl to assess population trends of demersal species. The database provides the most complete assessment of numbers and relative abundance of demersal species in Nantucket Sound during spring and fall. Although some fast-swimming pelagic species are not susceptible to the trawl gear, and a few species may be absent during the survey periods, it is the best long-term database available for Massachusetts Territorial Waters. During this period, over 100 species of fish and invertebrates have been captured, weighed and measured in Nantucket Sound.

Spring survey tows (Table 1) are characterized by adult fish, which migrate into Nantucket Sound for feeding and/or spawning purposes. Historically, the most numerous have been northern searobin (*Prionotus carolinus*), longfin squid* (*Loligo pealeii*), scup (*Stenotomus chrysops*), windowpane flounder (*Scophthalmus aquosus*), winter flounder (*Pseudopleuronectes americanus*), Atlantic herring (*Clupea harengus*) juveniles, little skate (*Leucoraja erinacea*), butterfish (*Peprilus triacanthus*), winter skate (*Leucoraja ocellata*) and Atlantic cod (*Gadus morhua*) juveniles).

Fall survey tows (Table 2) include a larger number of species, characterized by many juvenile fish for which Nantucket Sound is a nursery area where temperature and available food promote rapid growth. Most numerous have been scup, longfin squid*, butterfish, black sea bass (*Centropristis striata*), bay anchovy (*Anchoa mitchilli*), striped anchovy (*Anchoa hepsetus*), northern searobin, little skate, smooth dogfish (*Mustelus canis*) and winter skate.

In addition to longfin squid, which is included with the finfish because of its similar life history characteristics, ecological importance and abundance, there are a number of invertebrate species that are susceptible to the survey gear, have been captured in great abundance, and are included here because of their importance in the demersal ecology. These include spider crabs (*Majidae sp*.), lady crab (*Ovalipes ocellatus*), Atlantic rock crab (*Cancer irroratus*), knobbed whelk (*Busycon carica*), and channeled whelk (*Busycotypus canaliculatus*).

A close examination of these data yields insights on the inter-specific relationships that make Nantucket Sound a productive marine ecosystem and important habitat for many species. By examining both weights and numbers of fish captured, the importance of the area as a nursery ground for a number of valuable commercial and recreational species is revealed (J. King, personal communication). The large number of juveniles, both those that are produced in the sound, like squid, and those that are produced outside the sound and migrate or drift in, like cod, thrive on benthic invertebrates and zooplankton in this productive environment, and grow to provide critical recruitment to these migratory populations. Some of the most numerous species, like anchovies, and the large numbers of juveniles of other species, like squid and scup,

---

Table 1. Spring catch at S22 Nantucket Sound stations.

Part I.   Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

27

are forage for migratory predators that seasonally enter the sound to feed when conditions are favorable. These species, including striped bass, summer flounder, bluefish, Spanish mackerel, bonito and false albacore depend on the concentration of abundant prey species on shoals and sand waves as a critical part of their life histories, sustaining seasonal growth and increasing reproductive potential. The role of Nantucket Sound as a spawning/nursery area and seasonal feeding area qualifies it as essential fish habitat for most of the species listed above. The concentration of predators and prey on shoal areas and other bottom features creates fishing opportunities for commercial and recreational fishermen.

The estuaries along the south shore of Cape Cod represent a different habitat for a similar suite of species. Curley et al. (1971) and (1975) listed a total of 40 finfish species in Waquoit Bay, and 43 species in Bass River (Tables 3 and 4, respectively). The important role of these estuaries in providing nursery areas and primary productivity, contributing to the ecology of Nantucket Sound, cannot be overemphasized.



Table 3. Relative Abundance of All Species Taken at Seven Finfish Sampling Stations in Waquoit Bay, 1967–1969.

| Species | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan.*¹ | Feb.*¹ | Mar. | Apr. | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tidewater silverside | 997 | 107 | 674 | 671 | 1,561 | 2,290 | 107 | | | 812 | 19 | 844 | 7,862 |
| Mummichog | 1,273 | 1,087 | 017 | 2,150 | 1,147 | 9 | 16 | | | 0 | 47 | 528 | 7,148 |
| Atlantic silverside | 655 | 60 | 1,300 | 726 | 150 | 93 | 136 | | | 10 | 33 | 200 | 3,070 |
| Striped killifish | 428 | 16 | 27 | 201 | 353 | 88 | 10 | | | 10 | 30 | 50 | 1,023 |
| Fourspine stickleback | 43 | 131 | 79 | 67 | 49 | 66 | 14 | | | 30 | 37 | 43 | 640 |
| Winter flounder | 37 | 76 | 64 | 70 | 65 | 11 | 7 | | | 49 | 49 | 49 | 599 |
| Northern pipefish | 146 | 31 | 31 | 36 | 33 | 26 | 2 | | | 1 | 6 | 41 | 528 |
| Cunner | 0 | | 64 | 64 | 16 | 8 | 7 | | | | | 33 | 199 |
| Sheepshead minnow | 15 | 4 | 33 | 22 | 16 | 4 | 1 | | | 8 | 10 | 14 | 169 |
| Threespine stickleback | 12 | 47 | 47 | 24 | 16 | | | | | | | | 131 |
| Rainwater killifish | | | 22 | 24 | 10 | 9 | | | | | | 5 | 120 |
| Atlantic menhaden | 9 | 21 | 39 | | | | | | | | | | 110 |
| Tautog | 23 | 50 | 71 | 2 | 6 | | | 9 | | | | | 110 |
| American eel | | | 2 | 1 | 1 | | | | | | | | 83 |
| Alewife | 23 | 26 | | | | | | | | | | 5 | 76 |
| Atlantic tomcod | | | | | | | | | | | 3 | 2 | 52 |
| Northern puffer | | | 3 | 3 | | | | | | | | | 46 |
| Scup | | | | 5 | 1 | | | | | | | | 41 |
| Grubby | 11 | | 6 | | 8 | | 1 | | | | 2 | | 36 |
| White hake | 15 | 1 | | 1 | 12 | | | | | | | | 35 |
| Oyster toadfish | | | 1 | | 9 | | | | | | 5 | 15 | 16 |
| Pollock | 5 | 2 | | 2 | | 13 | | | | | | | 14 |
| American sand lance | | | | | | | | | | | | 2 | 12 |
| Rainbow smelt | | 1 | 3 | | | | | | | | | | 10 |
| Atlantic needlefish | | | | | 2 | | | | | | | | 9 |
| Blueback herring | | | 2 | | | | | | | | | | 8 |
| Northern searobin | | | | | | | | | | | | | 8 |
| Rock gunnel | | | | | | | | | | | | | 6 |
| Summer flounder | 3 | 3 | | | 2 | | | | | | | | 4 |
| Atlantic cod | | | | | | | | | | | | | 4 |
| Bluefish | | | | | | | | | | | | | 3 |
| Ninespine stickleback | | | | | | | | | | | | | 2 |
| Black seabass | | | | | | | | | | | | | 2 |
| Golden shiner | | | | | | | | | | | | | 1 |
| Longhorn sculpin | | | | | | | | | | | | | 1 |
| Lumpfish | | | | | | | | | | | | | 1 |
| Striped bass | | | | | | | | | | | | | 1 |
| Striped mullet | | | | | | | | | | | | | 1 |
| Striped searobin | | | | | | | | | | | 1 | | 1 |
| Blackspotted stickleback | | | | | | | | | | | | | 1 |

* ¹ No sampling was conducted in January due to ice.
* ¹ Only Station 4 (East Fish) was sampled in February.

Table 2. Fall survey catches at 516 stations in Nantucket Sound.

January, 2005

Part I   Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006070



## 10.1. Commercial Fisheries

Nantucket Sound has historically supported a variety of important commercial fisheries for finfish and invertebrate species that have contributed to the local character and economy since the colonial era. Traditional methods, which in some cases predate the earliest European settlement, are commonly used in the area.

Fish weirs, which consist of netting hung on wooden poles driven into the bottom, with a long leader guiding fish into a heart-shaped trap, are one of the oldest forms of passive fishing, still practiced on the shoals west of Monomoy Island, in the eastern end of the sound and along the south shore of Cape Cod. Schooling fish typically encounter the leader as they follow the shoreline, and swim into the trap. Landings in recent years have included Atlantic, king, and Spanish mackerel, squid, scup, butterfish, and bluefish, and have exceeded a million pounds in recent years (Division of Marine Fisheries).

Hooks on baited longlines, rod and reel, or handlines are used by a large fleet of small dayboats fishing from Chatham, Harwich, and other Cape and Islands Towns. Cod are targeted during early spring and late fall on Nantucket Shoals and the Great South Channel and east of Cape Cod, and some boats travel farther offshore to fish for haddock. Some of these boats switch to bluefin tuna and striped bass during the summer and early fall to take advantage of the migrations of these high-value species. Other species commonly landed by hook and line include pollock, bluefish, summer flounder, scup and black sea bass. Harpoons are also used to take bluefin tuna east of Cape Cod. Gillnets, although not allowed in Nantucket Sound or in state waters to the south, are fished by a number of Chatham vessels east of Cape Cod.

A variety of baited pots and traps hauled to the surface are used to fish for lobster, black sea bass, scup and conchs. Although few lobster pots are fished inside the sound, lobster vessels from Cape and Islands ports fish at the extreme eastern and western ends, in Vineyard Sound and south of the Islands. Black sea bass and conch are potted throughout the sound. A total of 35 vessels fished black sea bass pots in 2000, and landed a reported 625,902 pounds. In the same year, 39 conch potters reported landings of 1,078,956 pounds (Division of Marine Fisheries).

Larger vessels towing otter trawls fish seasonally in the sound as quotas and regulations allow. They fish mainly for squid, flounders (summer flounder, winter flounder, and windowpane), scup, conchs and horseshoe crabs. Landings by trawlers in 2000 included 637,522 pounds of squid and 508,785 pounds of summer flounder, most from Nantucket and Vineyard Sounds (Division of Marine Fisheries). South and east of Cape Cod these vessels also pursue groundfish, including cod, haddock, and yellowtail flounder.

**Table 4.** Numerical Rank of Finfish Species Taken in Bass River During Monthly Beach Seine Sampling, 1970-1971

| | 1020 6/25 | 1/3 7/25 | 1/12 7/25 | 3/16 | 4/6 | 4/21 | 5/5 | 6/2 | 7/1 | 7/21 | 8/2 | 8/18 | 9/16 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlantic silverside | 907 | 403 | 357 | 398 | 57 | 1246 | 348 | 70 | 4110 | 3125 | 2069 | 1499 | 3283 | 19,872 |
| tidewater silverside | 3412 | 4087 | 596 | 15 | 11 | | 53 | 186 | 1441 | 350 | 350 | | 6 | 10,176 |
| mummichog | 507 | 962 | 315 | 17 | 8 | | 44 | 561 | 535 | 755 | 3558 | 1664 | 59 | 9,551 |
| striped killifish | 527 | 265 | 275 | | | | 1 | 105 | 618 | 1120 | 1991 | 1664 | 19 | 6,609 |
| fourspine stickleback | 160 | 384 | 54 | 34 | 9 | | 126 | 93 | 23 | | 184 | 10 | 7 | 1,036 |
| Atlantic menhaden | | | | | | | | | | | 600 | | | 600 |
| American sand lance | | | 5 | 494 | 5 | | | | | | | | | 505 |
| Atlantic herring | | | | | | 160 | | | | | | | | 160 |
| northern puffer | | | | | | | | | | | 116 | | 21 | 142 |
| Atlantic menhaden | 4 | | | | | | | | 16 | 10 | 27 | 21 | 36 | 135 |
| northern pipefish | 36 | 1 | | | | | | 6 | 10 | 4 | 33 | | 5 | 97 |
| striped mullet | | | | | | | | | | | 8 | 26 | 56 | 90 |
| green crab | | | | | | | | | | | 19 | 18 | 58 | 86 |
| winter flounder | 6 | 6 | 9 | | | 1 | | 13 | | 2 | 8 | | | 57 |
| sheepshead minnow | 18 | 3 | 1 | | | | | | | | 18 | | | 41 |
| scup | | | | | | | | 14 | 4 | | | | 36 | 36 |
| silverfin | 2 | | 6 | | | | | 15 | 1 | | | | 1 | 32 |
| American eel | | | | | 1 | 14 | | 1 | | 4 | 1 | 5 | | 26 |
| striped searobin | | | | | | | 14 | 6 | | | 12 | | | 23 |
| fourspine stickleback | | | | | | | | | | | | 3 | | 22 |
| black sea bass | 16 | | | | | | | | | | | | | 16 |
| oyster toadfish | 1 | 1 | | | | | | | | | | | 3 | 16 |
| rainwater killifish | 2 | 1 | | | | | | | | | | | | 9 |
| blue runner | | 1 | | | | | | | | | | | | 7 |
| bluefish | 1 | | | | | 2 | | | | | | | | 7 |
| Atlantic tomcod | | | | | | | | | | | | | | 6 |
| sheback herring | | | | | | | | | | | | | | 5 |
| American kingfish | | | | | | | | | | | | | | 5 |
| tautog | | | | | | | | | | | | | | 5 |

| | 1070 6/25 | 1/10 7/25 | 12/25 7/25 | 2/23 | 3/9 | 4/8 | 5/11 | 6/6 | 7/6 | 4/6 | 8/18* | 8/18* | *7/3 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| fourspine stickleback | | 4 | | 17 | 18 | 2 | | | 4 | | | 59 | 59 | 207 |
| winter flounder | | | | 17 | 18 | 9 | 20 | 6 | 6 | | 35 | 10 | | 63 |
| black sea bass | | | | | | | 1 | | | | 31 | 1 | 2 | 37 |
| oyster toadfish | | | | | 12 | 5 | | 4 | | 3 | | 1 | 32 | 37 |
| tautog | | | | 1 | 3 | 9 | | 15 | 12 | 3 | 1 | 1 | | 36 |
| American eel | | | | | | | | | | | 17 | | 1 | 36 |
| scup | | | | | | | | | | | | | 1 | 35 |
| mummichog | | | | | | | | | | | 20 | 2 | | 25 |
| northern pipefish | | | | | | | | 1 | | 4 | | 7 | | 13 |
| Atlantic tomcod | | | | | | 2 | | 2 | | | 2 | | | 15 |
| tidewater silverside | | | | | 6 | | 2 | 6 | | 3 | | | | 8 |
| common searobin | | | | | | | | | | | | 1 | | 7 |
| cunner | | | | | | | | | | | 2 | | | 7 |
| alewife | | | | | 2 | | | | | | | | | 6 |
| hogchoker | | | | | | | | | | | 4 | | | 5 |
| Atlantic silverside | | | | | | | | | | | | | | 5 |
| orange filefish | | | | | | | | | | | | | | 4 |
| rainbow smelt | | | | | | | | | | | | | | 3 |
| lookdown | | | | | | | | | | | | | | 2 |
| northern puffer | | | | | | | | | | | | | | 2 |
| planehead filefish | | | | | | | | | | | | | | 1 |
| striped bass | | | | | | | | | | | | | | 1 |
| striped searobin | | | | | | | | | | | | | | 1 |
| threespine stickleback | | | | | | | | | | | | | | 1 |

*Supplementary night sampling

Part II.   Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

Commercial fishing for migratory species found south of Cape Cod is subject to fisheries management plans developed outside Massachusetts, either by the Atlantic States Marine Fisheries Commission or the Mid-Atlantic Fisheries Management Council, and most species are subject to strict quotas. Although the center of Nantucket Sound beyond three miles from shore is Federal water (Exclusive Economic Zone), it falls under the fisheries management authority of the Commonwealth, and is subject to regulations of the Division of Marine Fisheries. Commercial landings from lower Cape Cod ports (Provincetown – Chatham) totaled 15.4 million pounds worth 15.2 million dollars. (NOAA Fisheries). A large percentage of these landings are from the Nantucket Shelf and the Great South Channel.

Although it is difficult to separate the number of Nantucket Sound anglers from the rest of the Massachusetts coastline, they surely number in the hundreds of thousands. Statewide, about 800,000 marine anglers generate nearly a billion dollars in annual economic activity, and Nantucket Sound is one of the most popular fishing areas. From early spring to late fall a succession of migratory species are available to local anglers and tourists. In early spring, winter flounder and white perch are found in the estuaries. Spring brings tautog, scup and black sea bass, along with the premier sport fish, striped bass. Late spring brings bluefish and summer flounder.

More exotic species like bonito, false albacore and Spanish mackerel arrive in mid-summer and stay through early fall when the warmest water temperatures occur. South of the Islands, at the edge of the shelf, offshore sportfishing vessels fish for large oceanic pelagic species, such as blue marlin, white marlin, swordfish, bluefin tuna, yellowfin tuna, blue shark and mako shark. Fishing occurs from shore and from boats. Large numbers of private vessels. Approximately 150 charter and party vessels are available for hire, making it easy for visitors to access productive fishing areas. The close association with tourism makes recreational fishing one of the most important activities contributing to the economy of Cape Cod and the Islands.



Most of the rivers and large streams entering Nantucket Sound from Cape Cod and the Islands provide spawning habitat or access to freshwater ponds for spawning by river herring. Blueback herring spawn in the rivers, while alewives ascend the rivers to freshwater ponds to spawn. River herring are an important component of the forage base, providing food for striped bass and other large predators during the spawning run and when spent fish return to the Sound. During fall, large schools of juvenile herring, migrating from fresh to salt water are preyed upon by a wide variety of fish and avian predators, forming an important component of the forage base. Figure 24 shows the location of anadromous fish runs and fish passage facilities bordering Nantucket Sound.



Figure 24. Anadromous Fish Runs. Data from MASSGIS, map Horsley Witten Group.

Most of the rivers and streams in the area are inhabited by American eels. The entire population of this species spawns in the Sargasso Sea area of the South Atlantic. Larvae drift north in the Gulf Stream and eventually reach the shoreline. Since they have no control over where they reach landfall, they are assumed to ascend the nearest freshwater stream and morph into elvers, then juvenile eels. They may live for many years in fresh water before making the return journey to spawn, while some stay in the brackish estuaries. The adults are trapped commercially and are valued as food by certain ethnic groups, while the juveniles are prized as bait for striped bass.

CW0000006072

Given the rich and abundant fisheries and fishing activities that exist in Vineyard and Nantucket Sounds, it is surprising that no systematic in-depth benthic habitat surveys, like those conducted by the USGS and NMFS for Stellwagen Bank and Georges Bank, have ever been conducted in these areas, for the purpose of assessing the condition of the benthic habitat and informing coastal fisheries managers. The lack of such studies is a serious and significant information gap that should be addressed by coastal managers seeking to restore essential fish habitat.

The importance of nursery habitat needs to be understood thoroughly. In a recent review of the science of nursery habitats in marine and coastal ecosystems, a panel of scientists concluded that, although the concept of nursery habitat has been used by resource managers, nursery habitat has not been clearly defined and therefore identification of valuable nursery habitat has been hindered (Beck et al., 2003). The best measure of nursery habitat value may be tracking the number of individuals that move from juvenile to adult habitats, while the best single measure of the value of juvenile habitats is the total biomass of individuals added to adult populations.



Shellfisherman photo-John Tennant



**Figure 25. Suitable Shellfish Habitat Map. Data from MASSGIS, map Horsley Witten Group.**

European Oyster
Ocean Quahog
Quahog
Razor Clam
European Oyster
Bay Scallop
Blue Mussel
Sea Scallop
Soft-Shelled Clam

## 10.5. Shellfish

In Massachusetts, coastal towns have primary management authority over their shellfish resources within their boundaries. Each of the towns bordering the sound has a variety of shellfish species that provide a source of employment and recreation. These include the hard clam or quahog, soft-shelled clam, blue mussel, American oyster, and bay scallop. Also under town control with state oversight are a number of private aquaculture operations raising shellfish in controlled culture. A total of 31 sites in the estuaries bordering the sound are licensed to aquaculturists raising quahogs and oysters (Moles, 2002). Offshore, there are state-managed species such as surf clam and ocean quahog, which are harvested by large dredge vessels around and south of the Islands. There are also offshore populations of bay quahog in the eastern end of the sound and on the shoals that are harvested by dredge boats. Just outside state waters on the shelf east of Chatham and Nantucket there are vessels dredging for sea scallop and blue mussel. Figure 25 shows the mapped areas of known shellfish habitat in nearshore areas of the Nantucket Shelf area (from MassGIS).

## 10.6. Issues and Data Gaps

Rapid development of the coastal zone of the Cape and Islands has created challenges for shellfish managers, including greatly increased numbers of recreational and commercial harvesters and increased non-point contamination of growing waters. From 1990 to 2002, Cape Cod's population grew 21% to nearly 250,000 year-round residents (Cape Cod Times, 7/27/04). Thanks to aggressive local, regional and state programs to abate non-point pollution, most areas are still suitable for shellfishing, at least on a seasonal basis, and DMF programs to monitor bacterial contamination and paralytic shellfish poison ensure that the public can continue to safely enjoy the benefits of safe shellfish resources.

January, 2005

CW0000006073



Figure 27. Distribution of sightings of right whales (*Eubalaena glacialis*) in the western North Atlantic, identifying the five primary habitats which are currently known. Kenney et al. (1995).

In the area between Cape Cod and Cape Hatteras, the following marine mammals are found (Pilson and Goldstein, 1973) (Table 5). Food preferences are noted.

Table 5. Marine Mammals Occurring Between Cape Cod and Cape Hatteras (Pilson and Goldstein, 1973).

| Family | Genus and Species | Common name | Food |
|---|---|---|---|
| Odobenidae | *Odobenus rosmarus* | Walrus | Clams |
| Phocidae | *Phoca vitulina* | Common (harbor) seal | Fish |
| | *Halichoerus grypus* | Gray seal | Fish, squid |
| | *Pagophilus groenlandicus* | Harp seal | |
| | *Cystophora cristata* | Hooded seal | Fish, squid, shrimp, mussels, starfish |
| Balaenidae | *Balaena glacialis* | Right whale - Endangered | Planktonic crustaceans (e.g., copepods) (others) |
| Balaenopteridae | *Balaenoptera acutorostrata* | Minke whale | Fish (esp. herring) |
| | *Balaenoptera borealis* | Sei whale - Endangered | Plankton (e.g., copepods) |
| | *Balaenoptera physalus* | Fin whale - Endangered | Pelagic crustaceans (e.g., euphasiids), capelin, and herring |
| | *Balaenoptera musculus* | Blue whale (Gulf of Maine)- Endangered | Plankton and krill |
| | *Megaptera novaeangliae* | Humpback whale - Endangered | Krill, capelin, sand lance, and herring-sized fish |

# 11. MARINE MAMMALS

## 11.1. Marine Mammal Occurrences

In the Nantucket Shelf region, the Great South Channel, Stellwagen Bank and Georges Bank are the premier areas for congregation, feeding and passage of marine mammals, including seals, right whales, humpback whales, fin whales, and Atlantic white-sided dolphins (Figures 26, 27). Sharks and pelagic and demersal fish and seabirds also are attracted to this area because of the copepod blooms that occur in spring.

Few whales enter Nantucket or Vineyard Sound, although some have been observed over the years (Pilson and Goldstein, 1973). Smaller marine mammals such as seals and dolphins do enter the Sounds.



Figure 26. Seasonal patterns of the top 10% of total cetacean biomass per unit effort values. Kenney and Winn (1986).

From this list, it is apparent that the marine mammals found in this region are either carnivorous or planktivorous; that is, none feed upon vegetation solely. This is probably related to their caloric needs to sustain their large body masses. For example, a Right Whale needs a food density of 7.57 to 2,395 kilocalories per cubic meter (1 kilocalorie = 1 dietary calorie (for humans)) in order to maintain itself (Kenney et al., 1986). This energy requirement is believed to drive the Right Whale to seek out areas of the ocean where their favorite food is highly concentrated, much as humans seek out supermarkets.

This concentration of food required is about 1 to 3 orders of magnitude greater than the highest concentrations of calories found in the Great South Channel, an area where the spring bloom of a particular species of copepod, *Calanus finmarchicus*, provides such a nutritional boost, attracting Right Whales to congregate here in high densities (Kenney and Wishner, 1994; Kenney et al., 1994; Kenney et al., 1986). Figure 28 shows all right whale sightings in the Great South Channel between 1975 and 1989 (National Marine Fisheries, 1991).



Right Whale, photo NOAA photo library

Figure 28. All right whale sightings in and near the proposed Great South Channel critical habitat between 1975 and 1989. Sightings within the proposed critical habitat are shown by + symbols; sightings outside by "o". bathymetry shown in meters. N = 942 sightings. From National Marine Fisheries Service (1991).

Right whales must therefore have to be efficient in collecting their food, given that the optimum food concentration occurs only occasionally. The Right whale is also unusual in that it is an apex predator, yet feeds low on the food chain, on copepods, in particular *Calanus finmarchicus* (Kenney and Wishner, 1995). Only several hundred Right whales exist in the western North Atlantic population, and together with the Southern hemisphere population, they are the most endangered large whale species in the world. Aside from hunting, the lack of dense food sources in the ocean may account for their failure to recover as a species (Kenney et al., 1995).

**(Table 5, continued) Marine Mammals Occurring Between Cape Cod and Cape Hatteras** (Wilson and Goldstein, 1973)

| Family | Genus species | Common name | Food |
|---|---|---|---|
| Delphinidae | *Tursiops truncatus* | Bottle-nosed dolphin | Fish, birds, sea lettuce (*Ulva*), other. |
| | *Grampus griseus* | Grampus or Risso's dolphin | Squid |
| | *Lagenorhynchus albirostris* | White-beaked dolphin | Whiting, whelk, capelin, cod, squid, hermit crabs, other crustaceans |
| | *Lagenorhynchus acutus* | White-sided dolphin | Herring and squid |
| | *Stenella dubia* | Spotted dolphin | Fish and cephalopods (e.g., squid, octopus) |
| | *Delphinus delphis* | Common dolphin | Fish |
| | *Pseudorca crassidens* | False killer whale | Squid, octopus, fish |
| | *Globicephala melaena* | Pilot whale | Squid, cod |
| | *Globicephala macrorhyncha* | Short-finned pilot whale | Squid, cod |
| | *Orcinus orca* | Killer whale | Seals, porpoises, sea otters, birds, fish, squid, octopus, leatherback turtles |
| Monodontidae | *Phocoena phocoena* | Harbor porpoise | Pilchard, herring, mackerel, whiting, hake, pollock |
| | *Delphinapterus leucas* | Beluga or white whale | Anadromous fish, squid, bottom-living fish, invertebrates |
| Physeteridae | *Physeter catodon* | Sperm whale | Squid, octopus, halibut, bottom fish, sharks |
| | *Kogia breviceps* | Pygmy sperm whale | Squid, crabs, shrimp |
| | *Kogia simus* | Dwarf sperm whale | Squid, crabs, shrimp? |
| Ziphiidae | *Mesoplodon bidens* | North Sea beaked whale | Squid? |
| | *Mesoplodon mirus* | True's beaked whale | Squid, octopus, occasionally fish |
| | *Mesoplodon densirostris* | Dense-beaked whale | No information |
| | *Ziphius cavirostris* | Goose-beaked whale | Cuttlefish and squid? |
| | *Hyperoodon ampullatus* | North Atlantic bottle-nosed whale | Squid, occasionally herring and other fish. |

January, 2005

Part I   Review of the Environmental Characteristics of the Nantucket Shelf Region   Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006075

The nutrient processes that sustain the growth of phytoplankton that *Calanus* feeds upon are not well understood. In a program to study the physical oceanography, biology, and chemistry of the Great South Channel, called the South Channel Ocean Productivity Experiment (SCOPEX), Kenney and Wishner (1995) cited three possible mechanisms for the high concentrations of *Calanus* and other zooplankton in the Great South Channel:

Hypothesis 1: The *in situ* productivity hypothesis. There is an increase in primary productivity because of added nutrients from upwelling and/or mixing in the Great South Channel, and a transfer of energy up the food chain, resulting in increased zooplankton abundance.

Hypothesis 2: The advection hypothesis. There is a continuous advection of zooplankton from source regions outside the Great South Channel into the Great South Channel, where the hydrographic features (e.g. circulation patterns, tides, basin geometry, etc.) result in a concentration of zooplankton. The concentration mechanisms may involve an interaction between the oriented swimming behavior of the zooplankton and the regional hydrography.

Hypothesis 3: The behavior hypothesis. There is a behavioral (possibly ontogenetic) tendency to form dense patches ("swarming"). This would not necessarily require any overall increase in average water column abundances in zooplankton.

The SCOPEX studies did not provide evidence for localized upwelling that would bring nutrient-rich water to the surface to enhance primary productivity, and Kenney and Wishner concluded that the *in situ* productivity hypothesis could be ruled out. Copepods do appear to be carried into the area in a southward-flowing low salinity plume on the western side of the Great South Channel. This suggests that the advection hypothesis may be true. The behavior hypothesis was partially addressed during the SCOPEX experiments (Durbin et al., 1995), although this study focused on vertical rather than lateral migration.

Even less is understood is the role of the Nantucket Shelf region, and in particular Nantucket Sound and Nantucket Shoals, in nutrient cycling and dynamics. The Nantucket Sound and Nantucket Shoals regions are very well mixed due to the strong tides, currents and winds in this area. In fact, there is a distinct boundary between the well-mixed Nantucket Shoals water and the water flowing through the Great South Channel. This boundary, or "mixing front", is located approximately 10 km east of Nantucket Shoals (Chen et al., 1994a, 1994b). This mixing front located east of Nantucket Shoals is significant for ecosystem dynamics because it represents a place where the well-mixed water of the Sound and Shoals, carrying nutrients, salt, and any pollutants from human activities on land, feeds into the more stratified or layered waters of the Great South Channel.

## 11.2. Issues and Data Gaps

Little or no information is available concerning nutrients in Vineyard Sound, Nantucket Sound and Nantucket Shoals, and how such nutrients may affect offshore shelf ecosystems. Available data concerning nutrient loading come from studies of coastal embayments along Cape Cod. These data indicate that developed coastal embayments are generally suffering from nutrient loading. Once nutrients and other pollutants enter Nantucket Sound or Vineyard Sound, however, they are generally assumed to be diluted by rapid mixing. One major question is how much nutrient loading Nantucket Sound or Nantucket Shoals could accommodate before beginning to show signs of ecological stress. The impact upon marine mammals has yet to be studied.

January, 2005

It is clear that marine mammals depend upon fish, shellfish and other invertebrates for their food, and that the collapse of marine fisheries and damage to benthic habitats must therefore affect marine mammal populations. There are no studies of benthic habitat, prey densities and marine mammal ecology, for Nantucket or Vineyard Sounds or Nantucket Shoals. Such studies have been conducted on Georges Bank and in the Gulf of Maine for humpback whales and fin whales and one of their important prey species, sand lance (*Ammodytes americanus*) (Payne et al., 1985; Meyer et al., 1979). In order to help restore these populations, which include endangered species, a holistic ecosystem restoration must take place which includes restoration of benthic habitat for invertebrates and restoration of fish populations.

If the Nantucket Shelf region serves an important role in fisheries and benthic habitat (as is indicated by the fisheries activities), then we may hypothesize a "spillover effect" of prey populations that spread into adjacent shelf regions via the rapid currents; this remains to be tested, however. This hypothesis is like the "advection hypothesis" posed by Kenney and Wishner (1995) to explain why copepods are abundant in the Great South Channel; they appear to be carried in, or advected into, the Great South Channel, where they proceed to mature.



## 12. BIRDS

### 12.1. Coastal and Marine Species

The shores of Cape Cod and the islands provide important migratory, resting, breeding and nesting areas for a large number of migratory coastal and marine birds. In particular, pelagic birds and waterbirds have formed colonies in various coastal areas (Figure 29 and Table 6, Veit and Petersen, 1993). Several of the largest tern colonies in New England are located within 20 miles of Horseshoe Shoals. Approximately 50 percent of the North American population of federally endangered Roseate Terns breeds in Buzzards Bay (U.S. Fish and Wildlife Service, 1998) and in 2003, approximately 10,000 pairs of Common Terns nested at Monomoy (Carolyn Mostello, personal communication to Perkins et al., 2003). In late summer during the fall migration, the Roseate Terns that stage in Chatham may represent nearly the entire North American population of Roseate Terns (Trull et al., 1999).





Figure 29.  Principal Waterbird Colonies on the Massachusetts Coast. From Veit and Petersen (1993).

Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

Part I

CW0000006076

(Table 6. continued)

Shaded rows represent areas bordering Nantucket and Vineyard Sounds.

| Colony Name | Double-crested Cormorant | Great Egret | Snowy Egret | Little Blue Heron | Cattle Egret | Black-crowned Night-Heron | Glossy Ibis | Laughing Gull | Herring Gull | Great Black-backed Gull | Roseate Tern | Common Tern | Arctic Tern | Least Tern |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Monomoy | | | | | | | | | | | | | | |
| Nantucket | | | 13 | | | 64 | | | 1,350 | 800 | | 150 | | |
| Muskeget Island | | | | | | | | | 250 | 950 | | | | 240 |
| Tuckernuck Island | | | | | | 44 | | | 800 | 690 | | | | |
| Coatue | | | | | | 9 | | | 970 | 670 | | | | |
| Ostro | | | 80 | | | | | | 9 | | | | | |

Although land observations and banding studies of birds are abundant due to public interest in birdwatching, these types of studies provide data only at points where humans catch or observe the birds, which are generally on land or occasionally at sea. The detailed migration paths and patterns of birds through the Nantucket Shelf area has generally not been studied, with one exception: a study by the Massachusetts Audubon Society, conducted in 2003, to study tern activity within Nantucket Sound during the 2003 breeding season, and in particular activity of the endangered Roseate Tern (Perkins et al., 2004). This study is important because it used rigorous methods for observing and documenting avian use of airspace over the water.

Perkins' team used aerial flights and boat surveys across a portion of Nantucket Sound (Horseshoe Shoals) and collected data on abundance, distribution, behavior, flight heights, and temporal changes in behavior of Common Terns and the federally endangered Roseate Tern (Figures 30 and 31, Perkins et al., 2004). Their results showed that:

1) The greatest numbers of birds of both species were documented early in the survey period (May through the first half of June); numbers decreased thereafter, with one peak in late July.

2) Most of the birds observed on Horseshoe Shoals were traveling rather than fishing or sitting on the water ("rafting").

3) Slightly greater numbers of birds were recorded on the southern part of Horseshoe Shoals, possibly in response to stronger currents that create stronger upwelling, bringing plankton and baitfish near the surface for terns to feed upon;

4) The Monomoy colony contained about 63 percent of all the breeding Common Terns in Massachusetts (approximately 10,000 pairs).

5) The altitude range of all traveling terns was between 5 and 250 feet, with an average height of 29 feet (median height of 25 feet).

6) Horseshoe Shoals may be more important as a migratory stopover point or "refueling" area than as a feeding area for locally nesting resident terns.

Other state-listed endangered or threatened birds that utilize the shores of the Cape and islands include the Piping Plover (*Charadrius melodus*) and potentially the Bald Eagle (*Haliaeetus leucocephalus*) (Massachusetts Natural Heritage and Endangered Species Program).

Table 7. Principal areas in Massachusetts where waterbirds form colonies (Veit and Petersen, 1993).

| Colony Name | Double-crested Cormorant | Great Egret | Snowy Egret | Little Blue Heron | Cattle Egret | Black-crowned Night-Heron | Glossy Ibis | Laughing Gull | Herring Gull | Great Black-backed Gull | Roseate Tern | Common Tern | Arctic Tern | Least Tern |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Milk Island | 717 | | | | | | | | 1330 | 700 | | | | |
| Kettle Island | | | 33 | | | 18 | 11 | | 437 | 46 | | | | |
| House Island | | | | | | | | | 280 | 75 | | | | |
| Eagle Island | 304 | | 2 | | | 42 | | | 375 | 50 | | | | |
| Egg Rock | | | 40 | | | 60 | 10 | | 135 | 62 | | | | |
| Spectacle Island | | | | | | | | | | 36 | | | | |
| Middle Brewster | | | 124 | | | 270 | | | 920 | | | | | |
| Calf Island | 92 | | 25 | | | 50 | 1 | | 1400 | 110 | | 810 | | |
| Stag Rocks | | | | | | | | | 17 | 8 | | 149 | | |
| Clark's Island | 886 | | 2 | | | 235 | | | 1813 | 156 | | | | |
| Plymouth Beach | | | 2 | 127 | | | | | 6 | | | 1114 | 6 | 17 |

| Colony Name | Double-crested Cormorant | Great Egret | Snowy Egret | Little Blue Heron | Cattle Egret | Black-crowned Night-Heron | Glossy Ibis | Laughing Gull | Herring Gull | Great Black-backed Gull | Roseate Tern | Common Tern | Arctic Tern | Least Tern |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cape Cod's Beach | | | | | | | | | | | | 856 | | |
| Dead Neck/ Sampson's Island | | | | | | | | 254 | 300 | 91 | | 168 | 6 | 13 |
| New Island | | | 1 | | | 92 | | 890 | 970 | 91 | 93 | 1340 | | |
| North Monomoy Island | | | | | | | | | 13,691 | 4051 | | 7260 | 6 | |
| South Monomoy Island | | | 85 | | | | | | 500 | 902 | 1650 | 810 | | |
| Bird Island | | | | | | | | | | | | | | |
| Ram Island | | | | | | | | | 658 | 130 | | | | |
| Weepecket Island | 1135 | | | | | | | | 950 | 200 | | | | |
| Nashawena Island | | | 30 | | | | | | 383 | 18 | | 245 | | |
| Penikese Island | | | 2 | | | | | | 175 | 5 | | 750 | | 60 |
| Muskeget Island | | | | | | | | | | | | | | |

Part I   Review of the Environmental Characteristics of the Nantucket Shelf Region   Prometheus Center for Coastal Studies, Coastal Solutions Initiative

CW0000006077

In all, a total of 190 species of marine and coastal birds have been observed along the entire Atlantic coast from Florida to Maine (Table 7). Of these, which approximately 131 species have been observed along the Massachusetts coast along the Atlantic Flyway, in the nearshore area or far offshore (Hoopes et al. 1994, 4 volumes). These species are listed below (note that many of these sightings would be rare, occasional, observed only far offshore, or accidental).

Table 7. Marine and Coastal Birds observed along the Atlantic Coast. From Hoopes et al. 1994.

| | | | |
|---|---|---|---|
| Red-Necked Grebe | Black Tern | Harlequin Duck | Sanderling |
| Horned Grebe | Black Skimmer | Common Eider | Bar-Tailed Godwit |
| Pied-Billed Grebe | Black-Browed Albatross | King Eider | Willet |
| Common Loon | Northern Fulmar | Black Scoter | Ruff |
| Arctic Loon | Cory's Shearwater | White-Winged Scoter | Buff-Breasted Sandpiper |
| Red-Throated Loon | Greater Shearwater | Surf Scoter | Eurasian Curlew |
| Atlantic Puffin | Manx Shearwater | Ruddy Duck | Whimbrel |
| Black Guillemot | Audubon's Shearwater | Canada Goose | Black-bellied Plover |
| Common Murre | Black-Capped Petrel | Brant | Killdeer |
| Thick-Billed Murre | Leach's Storm-Petrel | Barnacle Goose | Piping Plover |
| Razorbill | Wilson's Storm-Petrel | Mute Swan | Ruddy turnstone |
| Dovekie | White-Faced Storm-Petrel | Wood Stork | American Oystercatcher |
| Great Skua | White-Tailed Tropicbird | American Bittern | Northern Harrier |
| South Polar Skua | Brown Booby | Least Bittern | Bald Eagle |
| Pomarine Jaeger | Northern Gannet | Great Blue Heron | Peregrine Falcon |
| Parasitic Jaeger | Great Cormorant | Great Egret | Osprey |
| Long-Tailed Jaeger | Double-Crested Cormorant | Snowy Egret | Belted Kingfisher |
| Ivory Gull | Common Merganser | Tricolored Heron | |
| Black-Legged Kittiwake | Red-Breasted Merganser | Little Blue Heron | |
| Glaucous Gull | Hooded Merganser | Cattle Egret | |
| Iceland Gull | Mallard | Green-Backed Heron | |
| Great Black-Backed Gull | American Black Duck | Black-Crowned Night Heron | |
| Lesser Black-Backed Gull | Gadwall | Yellow-Crowned Night Heron | |
| Herring Gull | Eurasian Wigeon | King Rail | |
| Ring-Billed Gull | American Wigeon | Virginia Rail | |
| Common Black-Headed Gull | Green-Winged Teal | Sora | |
| Laughing Gull | Blue-Winged Teal | Yellow Rail | |
| Franklin's Gull | Northern Pintail | Red Phalarope (oceanic) | |
| Bonaparte's Gull | Wood Duck | Black-Necked Stilt | |
| Little Gull | Redhead | Long-Billed Dowitcher | |
| Ross's Gull | Canvasback | Stilt Sandpiper | |
| Sabine's Gull | Greater Scaup | Red Knot | |
| Forster's Tern | Lesser Scaup | Purple Sandpiper | |
| Common Tern | Ring-Necked Duck | Pectoral Sandpiper | |
| Arctic Tern | Common Goldeneye | White-Rumped Sandpiper | |
| Roseate Tern | Barrow's Goldeneye | Dunlin | |
| Least Tern | Bufflehead | Semipalmated Sandpiper | |
| Bridled Tern | Oldsquaw | Western Sandpiper | |



Figure 30. Nantucket Sound study area and associated features, including aerial and boat transect routes, and the area of proposed wind farm, major tern colonies. Figure 1 from Perkins et al. (2004).

Figure 31. Summary distribution map of terns by species observed during 2003 breeding season aerial surveys of Nantucket Sound. Number of terns seen at any one location represents the combined total of three aerial surveys and the magnitude indicated by the diameter of the circle. Perkins et al. (2004).

Part I.   Review of the Environmental Characteristics of the Nantucket Shelf Region
Providence Center for Coastal Studies, Coastal Solutions Initiative

CW0000006078

## 12.2.  Issues and Data Gaps

It would be useful to develop a three-dimensional map of the airspace above the Massachusetts coastline and the Nantucket Shelf Region, showing observations of marine and coastal birds, migration routes and activities. Using modern computerized methods and Geographic Information System (GIS) mapping, this could eventually be done. The resulting database and map would be useful for resource managers looking for comprehensive information in order to manage many species, rather than managing for one or two species.

The role of healthy fisheries and benthic habitats in sustaining many coastal and marine birds should be quantified. The relationship between oceanic productivity and coastal and marine bird activity should also be quantified, as many of these species are endangered or threatened or otherwise rare.



## 13. SEA TURTLES

## 13.1.  Sea Turtles In Massachusetts

Sea turtles are turtles which live their entire lives at sea, with the exception of coming ashore to lay their eggs on tropical beaches. Five species of sea turtles can occur in Massachusetts offshore waters, and all four are state-listed and/or federally listed as endangered or threatened. They include:

- ○ Hawksbill sea turtle (*Eretmochelys imbricata*) – Endangered
- ○ Kemp's Ridley sea turtle (*Lepidochelys kempii*) – Endangered
- ○ Leatherback sea turtle (*Dermochelys coriacea*) – Endangered
- ○ Loggerhead sea turtle (*Caretta caretta*) – Threatened
- ○ Green turtles (*Chelonia mydas*) – Endangered

Sea turtles generally spend more time in the warm waters of the Caribbean, mid-Atlantic or Gulf of Mexico, but some travel to cooler temperate waters. Three species commonly use Stellwagen Bank for foraging: the leatherback, the loggerhead, and Kemp's Ridley.

The Leatherback has been known to travel as far north as Labrador. Loggerheads are the most numerous of the sea turtles found along the New England coast, but they cannot tolerate cold water and are not found north of Stellwagen Bank. Kemp's Ridley is particularly susceptible to cold and they frequently die of exposure; studies indicate that the waters south of Cape Cod may be the northern limit of their range (reviewed in Ward, 1995).

Threats to sea turtles in the marine environment include:

- ○ Entanglement at sea in longlines, fish trap warps, buoy anchor lines, and other ropes and cables
- ○ Ingestion of marine debris
- ○ Commercial fisheries
- ○ Boat collisions
- ○ Oil and gas exploration, development transportation and storage
- ○ Pollution

Sea turtles are in extreme jeopardy worldwide. Because they nest on tropical or subtropical beaches, many of which are outside the U.S., impacts include destruction of their nesting habitat by coastal development, beach nourishment, dredging, and other nearshore or onshore activities (National Marine Fisheries Service and U.S. Fish and Wildlife Service, 1991; 1992; 1993).

## 13.2.  Issues and Data Gaps

The effect of commercial fisheries on sea turtle populations in the Nantucket Shelf area, both through direct impacts (entanglement in indirect effects (damaging benthic habitat and causing prey food, such as invertebrates and shellfish, to become scarce), needs to be better understood. A comprehensive benthic habitat monitoring program using multisensor methods, like those conducted by the USGS and NMFS, should be conducted to evaluate habitat impacts.

Similarly, the effects of coastal pollution on sea turtles needs to be evaluated, particularly as coastal development increases along the southeastern Massachusetts coast.

Methods to help stranded or cold-stunned sea turtles need to be improved. A National Marine Life Center has been built in Buzzards Bay to provide such care for stranded or cold-stunned or injured sea turtles and smaller marine mammals.

Global climate change may result in changing large-scale ocean circulation. Sea turtles prefer warm water, so if ocean circulation of the mid-Atlantic and New England coast changes, it may affect the routes and distribution of sea turtles.

## 14. DISCUSSION 

Vineyard Sound, Nantucket Sound, Nantucket Shoals, the shelf south of Martha's Vineyard, and the Great South Channel all form part of a large shallow coastal shelf ecosystem that is characterized by a common geological origin, highly dynamic sedimentary environment, shallow clear water that is vigorously mixed and well-aerated by fast tidal currents, and high phytoplankton productivity. Because of these shared features, this area should be treated as one marine ecological unit, the Nantucket Shelf region. Other nearby areas which share a similar geological origin and physical characteristics include Georges Bank and Stellwagen Bank.

The Nantucket Shelf ecosystem can be summed up in the following ways:

- ● Highly dynamic water flow and circulation, creating well-oxygenated and well-flushed system;
- ● Highly dynamic sediment system is probable, based on current speeds and sediment grain size, but more information is needed to map benthic habitats. It is probable that sedimentary bedforms (e.g., sand waves, sand ripples, other features) exist that would provide essential fish habitat;
- ● High primary productivity year-round, and may serve as a source of nutrients and plankton for adjacent offshore areas through advection and transport by rapid tidal currents out of Nantucket and Vineyard Sounds, but this should be confirmed through scientific studies;
- ● Transition zone between southern and northern biogeographic provinces;
- ● Located in an important bird migration corridor, the Atlantic Flyway (birds, sea turtles, fish, whales);
- ● Islands and shorelines provide important nesting, breeding, and feeding habitat for coastal birds and seals, including some state-listed and federally-listed endangered species;

Part 1.     Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006079



- Coastal areas contain suitable shellfish habitat, which could be improved by improving water quality; Nantucket Shelf region and its estuaries are rich in fish, although the fishery was probably more extensive in the past, and the area doubtless serves as a nursery habitat for Anadromous and Catadromous fish. Nursery habitat ecology deserves more scientific study.
- Contains rich whale feeding grounds in the Great South Channel, fed by blooms of copepods that may be advected from elsewhere. This area should be protected due to the importance of the area for the endangered right whale.
  - Extensive area of shallow shelf sands may absorb storm wave energy and lessen coastal erosion; and
  - Data gaps are significant and include: lack of information on sedimentary environments and benthic habitats, impacts on benthic habitats, benthic ecology and taxonomy, physical oceanography, residence times, water quality, water and nutrient advection into and out of the area and implications for the area serving as a "feeder" zone to nearby marine waters, longterm effects of coastal water quality on nearby coastal areas, nursery areas for fish and other species based on tagging studies, effects of declining fisheries and other living resources on predators (birds, marine mammals) and marine ecology in general.

Remote-sensing of ocean color for chlorophyll mapping indicates that the Nantucket Shelf Region, like Georges Bank, Stellwagen Bank and other shallow shelf areas, has high primary productivity year-round. This remarkable fact suggests that the Nantucket Shelf Region should be as productive a fishery as Georges Bank once was.

The year-round primary productivity, combined with the tidal currents that race across Vineyard and Nantucket Sounds and Nantucket Shoals, also suggest that nutrients and plankton may be carried into adjacent areas, such as the Great South Channel. The Great South Channel is remarkable for its copepod blooms which attract the endangered right whale and other marine mammals and fish. Although our hypothesis that the Nantucket Shelf Region acts as a source of nutrients to adjacent areas is only conjecture, the one single lesson of ecology is that all ecosystems are ultimately connected through physical, chemical and biological processes. This is especially true for ecosystems located next to each other.



## 15. REFERENCES

Auster, P.J., Lindholm, J., Schaub, S., Funnell, G., Kaufman, L.S., and Valentine, P.C. 2003. Use of sand wave habitats by silver hake. Journal of Fish Biology, Volume 62, p. 143-152.

Auster, P.J., Joy, K. and Valentine, P.C. 2001. Fish species and community distributions as proxies for seafloor habitat distributions: the Stellwagen Bank National Marine Sanctuary example (Northwest Atlantic, Gulf of Maine). Environmental Biology of Fishes, Volume 60, p. 331-346.

Auster, P.J., Malatesta, R.J., Langton, R.W., Watling, L., Valentine, P.C., Donaldson, C.L.S., Langton, E.W., Shepard, A.N. and Babb, I.G. 1996. The impacts of mobile fishing gear on seafloor habitats in the Gulf of Maine (Northwest Atlantic): implications for conservation of fish populations. Reviews in Fisheries Science, Volume 4, Number 2, p. 185-202.

Ayvazian, S.G., Deegan, L.A., and Finn, J.T. 1992. Comparison of habitat use by estuarine fish assemblages in the Acadian and Virginian Zoogeographic Provinces. Estuaries, Vol. 15, No. 3, p.368-383.

Beardsley, R.C., Chapman, D.C., Brink, K.H., Ramp, S.R. and Schlitz, R. 1985. The Nantucket Shoals Flux Experiment (NSFE 79), Part I: A basic description of the current and temperature variability. Journal of Physical Oceanography, Volume 15, p. 713-748.

Beck, M.W., Heck, K.L., Jr., Able, K.W., Childers, D.L., Eggleston, D.B., Gillanders, B.M., Halpern, B.S., Hays, C.G., Hoshino, K., Minello, T.J., Orth, R.J., Sheridan, P.F., and Weinstein, M.P. 2003. The role of nearshore ecosystems as fish and shellfish nurseries. Issues in Ecology, No. 11, Spring, 2003, p. 1-12. Published by the Ecological Society of America.

Bigelow, H.B. 1927. Physical oceanography of the Gulf of Maine. Fisheries Bulletin, Volume 40, p.511-1027.

Bigelow and Schroeder's Fishes of the Gulf of Maine. Third Edition. Smithsonian Institution Press. Washington and London.

Bothner, M.H., Gilbert, T.R., and Bankston, D.C. 1987. Trace Metals. In: Backus, R.H. (Ed.), Georges Bank. Published by the MIT Press, p. 177-184.

Bowen, M.A., Smyth, P.O., Boesch, D.F., and Montifrans, J.V. 1979. Comparative biogeography of benthic macrocrustaceans of the Middle Atlantic (U.S.A.) continental shelf. In: Symposium on the Composition and Evolution of Crustaceans in the Cold and Temperate Waters of the World Ocean. J.D. Costlow and A.B. Williams, conveners; A.B. Williams, ed. Bulletin of the Biological Society of Washington 3: 214-255.

Briggs, J.C. 1974. Marine Zoogeography. McGraw-Hill Series in Population Biology. McGraw-Hill, New York, 450 pp.

Brooks, D.A. 1992. A brief overview of the physical oceanography of the Gulf of Maine. In: Wiggin, J. and Mooers, C.N.K. (Eds.), Proceedings of the Gulf of Maine Scientific Workshop, Woods Hole, Massachusetts, 8-10 January, 1991. Published December, 1992. Urban Harbors Institute, University of Massachusetts at Boston, p. 51-74.

Part 1    Review of the Environmental Characteristics of the Nantucket Shelf Region
Pew-Interwest Center for Coastal Studies, Coastal Solutions Initiative

CW0000006080

Bumpus, D.F. 1973. A description of the circulation on the continental shelf of the United States. Progress in Oceanography, Volume 6, p. 111-157.

Bumpus, D.F., Lynde, R.E., and Shaw, D.M. 1973. Physical Oceanography. In: Saila, S.B. (Ed.), Coastal and Offshore Environmental Inventory: Cape Hatteras to Nantucket Shoals. Marine Publication Series No. 2, University of Rhode Island, Kingston, Rhode Island, 72 p.

Bumpus, D.F., Wright, W.R., and Vaccaro, R.F. 1971. Sewage disposal in Falmouth, Massachusetts. II. Predicted effects of the proposed outfall. Journal Boston Society of Civil Engineers, Volume 58, p.255-277.

Butman, B. 1988. Downslope Eulerian mean flow associated with high-frequency current fluctuations observed on the outer continental shelf and upper slope along the northeastern United States continental margin: implications for sediment transport. Continental Shelf Research, Volume 8, Issues 5-7, p. 811-840.

Butman, B. 1987. The effect of winter storms on the bottom. In: Backus, R.H. and Bourne, D.W. (Eds.), Georges Bank. The MIT Press, Cambridge, Massachusetts, p. 74-77.

Cape Cod Times Editorial, 7/27/04, "Saving Our Beaches"

Cape Cod Commission. 1998. Cape Cod Coastal Embayment Project: Project Overview. Excerpted from the Interim Final Report, September 1998. Available from the Internet at http://www.capecodcommission.org/water/ccceview.htm.

Chen, C., Beardsley, R.C., and Limeburner, R. 1994a. Variability of water properties in late spring in the northern Great South Channel. In: Kemney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 415-431.

Chen, C., Beardsley, R.C. and Limeburner, R. 1994b. Variability of currents in late spring in the northern Great South Channel. In: Kemney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 451-473.

Christensen, J.P. 1989. Sulfate reduction and carbon oxidation rates in continental shelf sediments, an examination of offshelf carbon transport. Continental Shelf Research, Vol. 9, Issue 3, p. 223-246.

Collie, J.S., Escanero, G.A., and Valentine, P.C. 1997. Effects of bottom fishing on the benthic megafauna of Georges Bank. Marine Ecology Progress Series, Volume 155, p. 159-172.

Coomans, H.E. 1962. The marine mollusk fauna of the Virginian area as a basis for defining zoogeographical provinces. Beaufortia 9(58): 83-104.

Curley, J.R., R.P. Lawton, J.M. Hickey, and J.D. Fiske. 1971. A Study of the Marine Resources of the Waquoit Bay – Eel Pond Estuary. Monograph Series No. 9, Massachusetts Division of Marine Fisheries.

Curley, J.R., K.E. Reback, D.L. Chadwick, and R.P. Lawton. 1975. A Study of the Marine Resources of Bass River. Monograph Series No. 16, Massachusetts Division of Marine Fisheries.

Durbin, E.G., Durbin, A.G. and Beardsley, R.C. 1994. Springtime nutrient and chlorophyll $a$ concentrations in the southwestern Gulf of Maine. In: Kemney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 433-450.

Durbin, E.G., Campbell, R.G., Gilman, S.L. and Durbin, A.G. 1994. Diel feeding behavior and ingestion rate in the copepod $Calanus finmarchicus$ in the southern Gulf of Maine during late spring. In: Kemney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 539-570.

Durbin, E.G. Gilman, S.L., Campbell, R.G., and Durbin, A.G. 1994. Abundance, biomass, vertical migration and estimated development rate of the copepod $Calanus finmarchicus$ in the southern Gulf of Maine during late spring. In: Kemney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 571-591.

Eldridge Tide and Pilot Book. 2003. Published by Marion Jewett White, Robert Eldridge White, Jr., and Linda Foster White. 711 Atlantic Avenue, Boston, MA 02111.

Emery, K.O. 1987. Georges Cape, Georges Island, Georges Bank. In: Backus, R.H. and Bourne, D.W. (Eds.), Georges Bank. The MIT Press, Cambridge, Massachusetts, p. 38-39.

Farrington, J.W. and Boehm, P.D. 1987. Natural and Pollutant Organic Compounds. In: Backus, R.H. (Ed.), Georges Bank. Published by the MIT Press, p. 195-209.

Franks, P.J.S., and Chen, C. 2001. A 3-D prognostic numerical model study of the Georges Bank ecosystem. Part II: biological-physical model. Deep-Sea Research, Vol. 48, p.457-482.

Franz, D.R., Worley, E.K., and Merrill, A.S. 1981. Distribution patterns of some common seastars on the Middle Atlantic continental shelf of the Northwest Atlantic (Gulf of Maine to Cape Hatteras). Biological Bulletin 160: 394-418.

Greenberg, D.A. 1983. Modeling the mean barotropic circulation in the Bay of Fundy and the Gulf of Maine. Journal of Physical Oceanography, Vol. 13, p.886-904.

Gutierrez, B.T., Uchupi, E., Driscoll, N.W. and Aubrey, D.G. 2003. Relative sea-level rise and the development of valley-fill and shallow-water sequences in Nantucket Sound, Massachusetts. Marine Geology, Vol. 193, p. 295-314.

Hall, C.A., Jr. 1964. Shallow-water marine climates and molluscan provinces. Ecology 45(2): 226-234.

Collecting trip at Quisset Harbor, summer students from MBL, woman at center said to be Gertrude Stein. – historic collection, NOAA Photo Library

CW0000006081

Hazel, J.E. 1970. Atlantic continental shelf and slope of the United States - ostracod zoogeography in the southern Nova Scotian and northern Virginian faunal provinces. U.S. Geological Survey Professional Paper 529-E, 21 pp.

Hermsen, J.M., Collie, J.S. and Valentine, P.C. 2003. Mobile fishing gear reduces benthic megafaunal production on Georges Bank. Marine Ecology Progress Series, Volume 260, p. 97-108.

Hoopes, E.M., Cavanaugh, P.M., Griffin, C.R. and Finn, J.T. January 1994. Synthesis of Information on Marine and Coastal Birds of the Atlantic Coast: Abundance, Distribution, and Potential Risks from Oil Activities. Volume I: Executive Summary. Prepared for the U.S. Department of the Interior, Minerals Management Service, OCS Study, MMS 93-001, Atlantic OCS Region, 381 Elden Street, Suite 1109, Herndon, VA 22070. Prepared by Massachusetts Cooperative Fish and Wildlife Research Unit, Holdsworth Natural Resources Center, University of Massachusetts, Amherst, MA 01003-0130. 7 p.

Hoopes, E.M., Cavanaugh, P.M., Griffin, C.R. and Finn, J.T. January 1994. Synthesis of Information on Marine and Coastal Birds of the Atlantic Coast: Abundance, Distribution, and Potential Risks from Oil Activities. Volume II: Species Accounts, Abundance, Distribution, and Status. Prepared for the U.S. Department of the Interior, Minerals Management Service, OCS Study, MMS 93-001, Atlantic OCS Region, 381 Elden Street, Suite 1109, Herndon, VA 22070. Prepared by Massachusetts Cooperative Fish and Wildlife Research Unit, Holdsworth Natural Resources Center, University of Massachusetts, Amherst, MA 01003-0130. 178 p.

Hoopes, E.M., Cavanaugh, P.M., Griffin, C.R. and Finn, J.T. January 1994. Synthesis of Information on Marine and Coastal Birds of the Atlantic Coast: Abundance, Distribution, and Potential Risks from Oil Activities. Volume III: Potential Effects and Risks from Oil and Gas Activities. Prepared for the U.S. Department of the Interior, Minerals Management Service, OCS Study, MMS 93-001, Atlantic OCS Region, 381 Elden Street, Suite 1109, Herndon, VA 22070. Prepared by Massachusetts Cooperative Fish and Wildlife Research Unit, Holdsworth Natural Resources Center, University of Massachusetts, Amherst, MA 01003-0130. 127 p.

Hoopes, E.M., Cavanaugh, P.M., Griffin, C.R. and Finn, J.T. January 1994. Synthesis of Information on Marine and Coastal Birds of the Atlantic Coast: Abundance, Distribution, and Potential Risks from Oil Activities. Volume IV: Bibliography. Prepared for the U.S. Department of the Interior, Minerals Management Service, OCS Study, MMS 93-001, Atlantic OCS Region, 381 Elden Street, Suite 1109, Herndon, VA 22070. Prepared by Massachusetts Cooperative Fish and Wildlife Research Unit, Holdsworth Natural Resources Center, University of Massachusetts, Amherst, MA 01003-0130. 555 p.

Hopkins, T.S. and Garfield, N. 1981. Physical origins of Georges Bank water. Journal of Marine Research, Volume 39, p. 465-500.

Horn, D., Ewing, M., Horn, B.M., and Delach, M.N. 1971. Turbidites of the Hatteras and Sohm Abyssal Plains, Western North Atlantic. Marine Geology, Volume 11, p. 287-323.



Rounsefell, G.A., tagging haddock at the fisheries station about 1952-1953.
Photographer: Gabaoff, Paul, - historic collection - NOAA Photo Library

IPCC. 2002. Climate change 2001: The scientific basis. Intergovernmental panel on climate change (IPCC), Geneva, Switzerland, www. IPCC.ch.

Kelly, J.R. 1997. Nutrients and human-induced change in the Gulf of Maine -- "One, if by land, and two, if by sea". In: Wallace, G.T. and Braasch, E.F. (Eds.), Proceedings of the Gulf of Maine Ecosystem Dynamics, A Scientific Symposium and Workshop, 16-19 September, 1996, St. Andrews, New Brunswick. Published by the Regional Association for Research on the Gulf of Maine (RARGOM), RARGOM Report No. 97-1, p. 169-181.

Kenney, R.D. and Wishner, K.F. 1994. The South Channel Ocean Productivity Experiment. In: Kenney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p.373-384.

Kenney, R.D., Wim, H.E. and Macaulay, M.C. 1995. Cetaceans in the Great South Channel, 1979-1989: right whale (Eubalaena glacialis). Continental Shelf Research, Vol. 15, No. 4/5, p.385-414.

Kenney, R.D., Wim, H.E., and Macaulay, M.C. 1994. Cetaceans in the Great South Channel, 1979-1989: right whale (Eubalaena glacialis). In: Kenney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 385-414.

Kenney, R.D. and Winn, H.E. 1986. Cetacean high-use habitats of the Northeast United States continental shelf. Fishery Bulletin, Vol. 84, No.2, p.345-082.

Kenney, R.D., Hyman, M.A.M., Owen, R.E., Scott, G.P., and Winn, H.E. 1986. Estimation of prey densities required by western North Atlantic right whales. Marine Mammal Science, Vol. 2, No. 1, p. 1-13.

Kester, D.R. and Courant, R.A. 1973. Chemical Oceanography. In: Saila, S.B. (Ed.), Coastal and Offshore Environmental Inventory: Cape Hatteras to Nantucket Shoals. Marine Publication Series No. 2, University of Rhode Island, Kingston, Rhode Island, 36 p.

King, Jeremy. 2004. Resource Assessment Project Leader. Massachusetts Division of Marine Fisheries. Personal communication.

Kinner, P.C. 1978. The distribution and ecology of errantiate polychaetes on the continental shelf from Cape Cod to Cape Hatteras. Master's thesis, University of Delaware, 159 pp.

Kohout, F.A., Hathaway, J.C., Folger, D.W., Bothner, M.H., Walker, E.H., Delaney, D.F., Frimpter, M.H., Weed, E.G.A., and Rhodehamel, E.C. 1977. Fresh groundwater stored in aquifers under the continental shelf: implications from a deep test well, Nantucket Island, Massachusetts. Water Resources Bulletin, Vol. 13, No. 2, p.373-386.

CW0000006082

Kooi, H. and J. Groen. 2001. Offshore continuation of coastal groundwater systems: predictions using sharp-interface approximations and variable-density flow modeling. Journal of Hydrology, Vol. 246, p.19-35.

Lazell, J.D. 1980. New England waters: critical habitat for marine turtles. Copeia, No. 2, p.290-295.

Lee, R.E. 1944. A quantitative survey of the invertebrate fauna in Menemsha Bight. Biological Bulletin, Vol. 86, p. 83-97.

Leeder, M.R. 1982. Sedimentology: Process and Product. George Allen & Unwin, Boston, London, and Sydney, 344 p.

Lough, R.G., Valentine, P.C., Potter, D.C., Audiore, P.J., Bolz, G.R., Neilson, J.D., and Perry, R.I. 1989. Ecology and distribution of juvenile cod and haddock in relation to sediment type and bottom currents on eastern Georges Bank. Marine Ecology Progress Series, Volume 56, p. 1-12.

Greenberg, D.A. 1986. Predicted positions of tidal fronts in the Gulf of Maine region. Continental Shelf Research, Volume 6(3), p. 397-414.

Macaulay, M.C. Wishner, K.F. and Daly, K.L. 1994. Acoustic scattering from zooplankton and micronekton in relation to a whale feeding site near Georges Bank and Cape Cod. In: Kenney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 509-537.

Massachusetts Department of Environmental Protection (DEP) Wetlands Conservancy Program. 1998. Mapping submerged rooted vascular beds. See http://www.state.ma.us/mgis/eelgrass.htm ).

McMaster, R.L. and L.E. Garrison. 1966. Mineralogy and origin of southern New England shelf sediments. Journal of Sedimentary Petrology, Vol. 36, p. 1131-1142.

Meyer, T.L., Cooper, R.A., and Langton, R.W. 1979. Relative abundance, behavior, and food habits of the American sand lance, Ammodytes americanus, from the Gulf of Maine. Fishery Bulletin, Vol. 77, No.1, p.243-253.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1993. Recovery Plan for Hawksbill Turtles in the U.S. Caribbean Sea, Atlantic Ocean, and Gulf of Mexico. National Marine Fisheries Service, St. Petersburg, Florida, 52 p.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1991. Recovery Plan for U.S. Population of Atlantic Green Turtle (Chelonia mydas). National Marine Fisheries Service, Washington, D.C., 52 p.

National Marine Fisheries Service. 1991. Recovery Plan for the Northern Right Whale (Eubalaena glacialis). Prepared by the Right Whale Recovery Team for the National Marine Fisheries Service, Silver Spring, MD. 86 p.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1992. Recovery Plan for Leatherback Turtles (Dermochelys coriacea) in the U.S. Caribbean, Atlantic and Gulf of Mexico. National Marine Fisheries Service, Washington, D.C., 65 p.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1991. Recovery Plan for U.S. Population of Loggerhead Turtle (Caretta caretta). National Marine Fisheries Service, Washington, D.C., 58 p.

National Oceanic and Atmospheric Administration. National Marine Fisheries Service. 1991. Status of the fishery resources of the northeastern United States for 1990. NOAA Technical Memorandum NMFS-F/NEC 81, 130 p.

National Research Council. 2000. Clean Coastal Waters: Understanding and Reducing the Effects of Nutrient Pollution.

Oldale, R.N., Knebel, H.J., and Bothner, M.H. 1994. Submerged and eroded drumlins off northeastern Massachusetts. Geomorphology, Volume 9, Issue 4, p. 301-309.

O'Hara, C.J. 1981b. Preglacial morphology of the Inner Continental Shelf of southeastern Massachusetts and its influence on late Pleistocene glacial deposition and drift morphology. Geological Society of America Abstracts with Programs, Vol. 13, No. 7, p. 521.

O'Hara, C.J. and Oldale, R.N. 1980. Maps showing geology and shallow structure of eastern Rhode Island Sound and Vineyard Sound, Massachusetts. U.S. Geological Survey Miscellaneous Field Studies Map 1186, 5 sheets, scale 1:125,000.

O'Hara, C.J. and Oldale, R.N. 1987. Maps showing geology, shallow structure, and bedform morphology of Nantucket Sound, Massachusetts. U.S. Geological Survey Miscellaneous Field Studies Map MF-1911. Prepared in cooperation with the Massachusetts Department of Public Works and the Army Corps of Engineers, New England Division. 4 sheets.

O'Hara, C.J., Oldale, R.N. and Robb, J.M. 1976. Late Tertiary, Pleistocene, and Holocene development of the Inner Continental Shelf off southeastern Massachusetts. Geological Society of America Abstracts with Programs, Vol. 8, No. 6, p. 1033.

Oldale, R.N., Uchupi, E., and Prada, K.E. 1973. Sedimentary framework of the western Gulf of Maine and the southeastern Massachusetts offshore area. U.S. Geological Survey Professional Paper 757, 10 p.

Seine, O.E. and R.A. Goffin, measuring mackerel in Eel Pond, Fisheries lab, Woods Hole, summer 1936. Photographer Gabaoff, Paul - historic collection - NOAA Photo Library

January, 2005

Part 1.   Review of the Environmental Characteristics of the Nantucket Shelf Region
Province town Center for Coastal Studies, Coastal Solutions Initiative

CW0000006083

Payne, P.M., Nicolas, J.R., O'Brien, L. and Powers, K.D. 1986. The distribution of the humpback whale, *Megaptera novaeangliae*, on Georges Bank and in the Gulf of Maine in relation to densities of the sand eel, *Ammodytes americanus*. Fishery Bulletin, Vol. 84, No.2, p.271-277.

Perkins, S., Allison, T., Jones, A. and Sadoti, G. April 2004. A survey of tern activity within Nantucket Sound, Massachusetts, during the 2003 breeding season. Prepared by Massachusetts Audubon Society for the Massachusetts Technology Collaborative.

Pett, S. and McKay, C.J. 1990. Part I: Technical Report on the Resources and Uses of Stellwagen Bank. In: Archer, J.H. (Ed.), The Resources and Uses of Stellwagen Bank. Prepared by Urban Harbors Institute, with funding by the Center for Marine Conservation, Washington, D.C. 20036, 77 p.

Pilson, M.E.Q. and Goldstein, E. 1973. Marine Mammals. In: Saila, S.B. (Ed.), Coastal and Offshore Environmental Inventory: Cape Hatteras to Nantucket Shoals. Marine Publication Series No. 2, University of Rhode Island, Kingston, Rhode Island, 48 p.

Poppe, L.J. and Polloni, C.F. 2000. USGS East-Coast Sediment Analysis: Procedures, Database, and Georeferenced Displays. U.S.G.S. Open-File Report 00-358.

Pratt, S.D. 1973. Benthic Fauna. In: Saila, S.B. (Ed.), Coastal and Offshore Environmental Inventory: Cape Hatteras to Nantucket Shoals. Marine Publication Series No. 2, University of Rhode Island, Kingston, Rhode Island, 70 p.

Pritchard, D.W. 1955. Estuarine circulation patterns. Proceedings of the American Society of Civil Engineers, Volume 81, p. 1-11 (separate 717).

Raup, D.M. and Stanley, S.M. 1978. Principles of Paleontology, 2nd Edition. W.H. Freeman and Company, San Francisco, 479 p.

Ross, D.A. 1968. Current action in a submarine canyon. Nature, Vol. 218, p. 1243-1244.

Sanders, H.L., Hessler, R.R. and Hampson, G.R. 1965. An introduction to the study of deep-sea benthic faunal assemblages along the Gay Head-Bermuda transect. Deep-Sea Research, Vol. 12, p. 845-867.

Stephenson, T.A. and Stephenson, A. 1954. Life between tide marks in North America. Parts IIIA, B. Nova Scotia and Prince Edward Island. Journal of Ecology 42(1): 14-70.

Theroux, R.B. and Grosslein, M.D. 1987. Benthic Fauna. In: Backus, G. (Ed.), Georges Bank, pp. 283-295. Published by MIT Press, Cambridge, MA.

Thomas, A.C., Townsend, D.W. and Weatherbee, R. 2003. Satellite-measured phytoplankton variability in the Gulf of Maine. Continental Shelf Research, Vol. 23, p. 971-989.

Townsend, D.W. 1997. Cycling of carbon and nitrogen in the Gulf of Maine. In: Wallace, G.T. and Braasch, E.F. (Eds.), Proceedings of the Gulf of Maine Ecosystem Dynamics, A Scientific Symposium and Workshop, 16-19 September 1996, St. Andrews, new Brunswick. Published by the Regional Association for Research on the Gulf of Maine (RARGOM), RARGOM Report 97-1.

Trull, P., Hecker, S., Watson, M.J. and Nisbet, I.C.T. 1999. Staging of Roseate Terns (*Sterna dougallii*) in post-breeding period around Cape Cod, Massachusetts, USA. Atlantic Seabirds, Volume 1 (4): p. 145-158.

Twichell, D.C., Butman, B. and Lewis, R.S. 1987. Shallow structure, surficial geology, and the processes currently shaping the Bank. In: Backus, R.H. and Bourne, D.W. (Eds.), Georges Bank. The MIT Press, Cambridge, Massachusetts, p.31-37.

U.S. Fish and Wildlife Service and National Marine Fisheries Service. 1992. Recovery Plan for the Kemp's Ridley Sea Turtle (*Lepidochelys kempii*). National Marine Fisheries Service, St. Petersburg, Florida, 11 p.

U.S. Fish and Wildlife Service. 1998. Roseate Tern Recovery Plan: Northeastern Population, First Update. USFWS, Hadley, MA.

Uchupi, E., Driscoll, N., Ballard, R.D., and Bolmer, S.T. 2001. Drainage of late Wisconsin glacial lakes and the morphology and late Quaternary stratigraphy of the New Jersey-southern New England continental shelf and slope. Marine Geology, Volume 172, Issues 1-2, p. 117-145.

Uchupi, E. 1965. Map showing relation of land and submarine topography, Nova Scotia to Florida. U.S. Geol. Surv. Misc. Geol. Invest. Map I-451.

Uchupi, E. and Austin, J.A., Jr. 1987. Morphology. In: Backus, R.H. (Ed.), Georges Bank, p. 25-30. Published by the MIT Press, 593 p.

Uchupi, E., Giese, G.S., Aubrey, D.G., and Kim, D.J. 1996. The late Quaternary construction of Cape Cod, Massachusetts: a reconsideration of the W.M. Davis model. Geological Society of America Special Paper 309, 69 p.

U.S. Department of Commerce, Coast and Geodetic Survey Chart No. 1209. 1970. Nantucket Sound and Approaches. Bathymetric Chart No. 1209, published by the U.S. Department of Commerce, Environmental Science Services Administration, Coast and Geodetic Survey, 1 sheet.

U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Sanctuaries and Reserves Division. July 1993. Stellwagen Bank National Marine Sanctuary Final Environmental Impact Statement / Management Plan. Volume I. Sanctuaries and Reserves Division, 1305 East-West Highway, Silver Spring, MD 20910, 149 p.

U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Sanctuaries and Reserves Division. July 1993. Stellwagen Bank National Marine Sanctuary Final Environmental Impact Statement / Management Plan. Volume II. Appendices. Sanctuaries and Reserves Division, 1305 East-West Highway, Silver Spring, MD 20910.

H.C. Bumpus, laboratory director, 1898-1901
Photographer: Gabriel, Paul – historic collection - NOAA Photo Library

January, 2005

Part 1     Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006084

U.S. Geological Survey and NOAA/National Marine Sanctuaries Program. August 2003. Workshop report: Mapping Maritime Heritage Resources in the National Marine Sanctuaries. US Geological Survey and NOAA/National Marine Sanctuary Program's Joint Seabed Mapping Initiative, 14-15 August, 2003, Alpena, MI.

U.S. Geological Survey Fact Sheet 078-98, May 1998. Mapping the Sea Floor and Biological Habitats of the Stellwagen Bank National Marine Sanctuary Region.

U.S. Geological Survey Fact Sheet FS-061-01, July 2001. Habitat Geology Studies on and near Georges Bank, off New England.

Valentine, P.C. 2000. Seabed Observation and Sampling System. U.S. Geological Survey Fact Sheet FS-142-00.

Valentine, P.C. and Lough, R.G. 1991. The Sea Floor Environment and the Fishery of Eastern Georges Bank. U.S.Geological Survey Open-File Report 91-439, 25 p.

Valentine, P.C., Cochrane, G.R. and Scanlon, K.M. 20___. Mapping the Seabed and Habitats in National Marine Sanctuaries — Examples from the East, Gulf and West Coasts. MTS Journal, Volume 37, No. 1, p. 10-17.

Valentine, P.C., Middleton, T.J., and Fuller, S.J. 2001. Sea floor maps showing topography, sun-illuminated topographic imagery, and backscatter intensity of the Stellwagen Bank National Marine Sanctuary Region off Boston, Massachusetts. USGS Open-File report 00-410, 2001 (CD published), and 2002 (online version published).

Veit, R.R. and Peterson, W.R. 1993. Birds of Massachusetts. Published by the Massachusetts Audubon Society, 514 p.

Wallace, G.T. and Braasch, E.F. (Eds.). 1996. Proceedings of the Gulf of Maine Ecosystem Dynamics: A Scientific Symposium and Workshop, 16 – 19 September, 1996, St. Andrews, New Brunswick. Regional Association for Research on the Gulf of Maine (RARGOM) Report 97-1, 351 p.

Walsh, J.J., Whitledge, T.E., O'Reilly, J.E., Phoel, W.C., and Draxler, A.F. 1987. Nitrogen cycling on Georges Bank and the New York Shelf: a comparison between well-mixed and seasonally stratified water. In: Backus, R.H. and Bourne, D.W. (Eds.), Georges Bank. The MIT Press, Cambridge, Massachusetts, p. 234-241.

Ward, N. 1995. Stellwagen Bank: A Guide to the Whales, Sea Birds, and Marine Life of the Stellwagen Bank National Marine Sanctuary. Down East Books, Camden, Maine, 232 p.

Watling, L. 1979. Zoogeographic affinities of northeastern North American gammaridean Amphipoda. In Symposium on the Composition and Evolution of Crustaceans in the Cold and Temperate Waters of the World Ocean. J.D. Costlow and A.B. Williams, conveners. A.B. Williams, ed. Bulletin of the Biological Society of Washington 3: 256-282.

Wiggin, J. and Mooers, C.N.K. (Eds.). 1992. Proceedings of the Gulf of Maine Scientific Workshop, Woods Hole, Massachusetts, 8-10 January 1991. Gulf of Maine Council on the Marine Environment. Urban Harbors Institute, University of Massachusetts at Boston, 394 p.

Wishner, K.F., Schoenherr, J.R., Beardsley, R. and Chen, C. 1994. Abundance, distribution and population structure of the copepod *Calanus finmarchicus* in a springtime right whale feeding area in the southwestern Gulf of Maine. In: Kenney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 475-507.

Winn, H.E., Goodyear, J.D., Kenney, R.D., and Petricig, R.O. 1994. Dive patterns of tagged right whales in the Great South Channel. In: Kenney, R.D. and Wishner, K.F. (Eds.), The South Channel Ocean Productivity Experiment: SCOPEX. Continental Shelf Research, Vol.15, No. 4/5, p. 593-611.

Yentsch, C.S. and N. Garfield, III. 1981. Principal areas of vertical mixing in the waters of the Gulf of Maine, with reference to the total productivity in the area. In: Gowr, J.F.R. (Ed.) Oceanography From Space. Plenum, New York, p. 303-3212.

Yoder, J.A., O'Reilly, J.E., Barnard, A.H., Moore, T.S. and Ruhsam, C.M. 2001. Variability in coastal zone color scanner (CZCS) chlorophyll imagery of ocean margin waters off the US East Coast. Continental Shelf Research, Vol. 21, p.1191-1218.



Collecting tar in Martha's Vineyard conducted by H.M. Smith, 1923. right to left: Chittenden, Galtsoff, Smith, unknown, Bigelow. Photographer: Galtsoff, Paul - historic colección.- NOAA Photo Libary

Part I.   Review of the Environmental Characteristics of the Nantucket Shelf Region
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

January, 2005

43

CW0000006085

# Part II.
# Management Options For Resource Protection and Sustainable Uses



## 1. INTRODUCTION

The Nantucket Shelf Region is one of the most heavily used ocean areas in the Northeast, due to its bountiful natural resources, proximity to major population centers, and rich fishing grounds. A wide range of coastal management issues, human activities and cultural values characterize this area. The region's natural resources and beauty are threatened by increasing coastal development, associated water quality problems, conflicting uses, and increasing intensity of use. There is no comprehensive regional coastal and ocean management plan for this important ocean sector.

Part II of this report explores possible options for comprehensive protection and management of the Nantucket Shelf Region. The goal of this analysis is to identify and recommend measures that will protect the key environmental, ecological, and human values of this region while allowing and promoting sustainable human activities.

Part II begins with a discussion of recent calls for ocean protection and the timeliness of ocean protection. Section 2 describes the ocean-based human uses and socioeconomic values of the Nantucket Shelf Region. Existing coastal management issues facing the region are described in Section 3. Section 4 describes existing ocean management approaches that have been used in the region or considered for other ocean areas. Key principles for sound ocean management are described in Section 5. Section 6 discusses ecological and socioeconomic criteria for siting Marine Protected Areas. Section 7 evaluates possible ocean management approaches that could be applied to the Nantucket Shelf Region.

The management and protection of the Nantucket Shelf Region is currently provided through a myriad of local, state, regional and federal laws and agencies that are disjointed, sometimes conflicting, and occasionally lacking the appropriate authority to manage. Regional ecosystem-based management may be the solution to disjoint and incomplete ocean management. This is a conclusion reached by a number of state and federal commissions and agencies which have recommended that the U.S. should provide better protection of its coastal and ocean waters. These include the following:

o The U.S. Commission on Ocean Policy has recommended increasing protection of our oceans, applying Marine Protected Areas as a protection approach, increasing scientific research on the oceans, using ecosystem-based management, and providing more outreach concerning the importance of the oceans (U.S. Commission on Ocean Policy, 2004).

• The Pew Ocean Commissions Report (2003) identified 9 major challenges for America's oceans, including nonpoint and point source pollution, invasive species, aquaculture wastes, climate change, bycatch, habitat alteration, overfishing, and coastal development.

• Executive Order 13158, May 26, 2000, calls for the establishment of Marine Protected Areas to "help protect significant natural and cultural resources within the marine environment for the benefit of present and future generations," (Federal Register, Volume 65, No. 105, May 31, 2000, Presidential Documents).



Whale Watch out of Hyannis Photo: ISM

o In 2003, the Governor established the Massachusetts Ocean Management Initiative, whose goals are to proactively manage ocean resources within the 3-mile state jurisdictional limit, work with federal agencies to improve ecosystem-based management of ocean resources in federal waters, and improve management and protection of environmental, planning and public trust issues in both state and federal waters (see http://www.mass.gov/czm/oceanmgtinitiative.htm).

o The science of managing ocean reserves is at the leading edge of natural resource management policy because of rapid and radical degradation of the world's oceans (U.S. Commission on Ocean Policy, 2004; Lubchenco et al., 2003; Cicin-Sain and Knecht, 1998).

o At the international level, the use of Marine Protected Area (MPA) designation is being utilized in many countries and is strongly supported by many international ocean programs. International agencies like USAID and the World Bank are funding MPAs and regional ocean protection initiatives (NOAA Coastal Services Center, March 2002; U.S. Commission on Ocean Policy, 2004).

The need for regional ocean protection is a worldwide need, because the oceans represent a common heritage for all of mankind.

January, 2005

Part II:   Management Options For Resource Protection and Sustainable Uses
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006086

# 2. HUMAN USES AND SOCIOECONOMIC VALUES

The Cape and Islands have a long tradition of maritime activities and environmental protection. These human uses and cultural values were described in the 1980 Nomination Letter for a National Marine Sanctuary in Nantucket Sound, but they also apply to the larger Nantucket Shelf Region discussed here (Massachusetts Coastal Zone Management, Department of Environmental Management, Division of Marine Fisheries, 1980). The region contains regionally and nationally significant historic, recreational, scientific, socioeconomic and aesthetic resources that are ocean-based. These are described in more detail below.

## Maritime Tradition

The sea has shaped the history, life and culture of the Nantucket Shelf Region. In the 16th century, fishermen from Portugal and other European countries discovered the rich fishing grounds of Georges Bank and Cape Cod. The Pilgrims and other English colonists arrived and began settling Cape Cod, Martha's Vineyard and Nantucket in the early 17th century. During the 18th and 19th centuries, colonists and settlers cleared and sold timber to shipyards, set up a salt industry to evaporate seawater to obtain the salt, and provided ship-building and maintenance services. Tourism became important in the second half of the 19th century and has continued to be an important industry ever since.



The New England fishing and whaling trade reached its peak during the early 19th century. At its peak, the Nantucket whaling fleet of 88 vessels sailed far afield in search of whales, even into the remote South Pacific, returning to Nantucket to offload their precious cargo. Nantucket was the leading whaling port in the world then, and was also the third largest city in Massachusetts, after Boston and Salem (Nantucket Chamber of Commerce website at http://www.nantucketchamber.org/visitor/trivia.html). In recognition of its important role in national and international maritime history, the entire island of Nantucket was included in the U.S. National Register of Historic Landmarks in 1975 (Massachusetts Coastal Zone Management, Department of Environmental Management, Division of Marine Fisheries, 1980).



Today, the Cape and Islands continue to provide a variety of maritime uses and maritime industries. These include commercial and recreational boating, fishing and shellfishing; shellfish aquaculture; working boatyards and marinas; oceanographic and coastal research and education; and coastal tourism. A number of military facilities exist in the area, including a Coast Guard facility in Woods Hole, Pave Paws radar facility in Bourne, the Massachusetts Military Reservation, and an facility at the Cape Cod National Seashore. Commercial and private aviation facilities are busy, due to the popularity of the Cape and Islands as a tourist destination and the need for regular commuting services, and the Barnstable Municipal Airport is the third busiest airport in the Commonwealth of Massachusetts.



photo: NOAA photo library

## Human Uses and Activities

Cape Cod, Martha's Vineyard and Nantucket and its surrounding waters have long been one of the most popular tourist destinations along the East Coast. The popularity of this region is due to its natural scenery, proximity to major urban centers, agreeable summer climate, and easy access. Each year, hundreds of thousands of people visit the beaches, while others participate in recreational boating and fishing, swimming, and other water sports. The low topographic relief encourages bicycling, walking and family activities. In the well-mixed, productive waters of Nantucket and Vineyard Sounds and beyond, water quality is good and promotes recreational shellfishing, fishing and boating.

Boating is an important recreational activity in the Nantucket Shelf Region. The proximity of the islands to the mainland of Massachusetts promotes traffic to and from the islands and Cape Cod and the mainland. The narrow channels and fast currents of Vineyard Sound and Nantucket Sound provide challenging sailing within close proximity to Boston, Providence, and other growing communities in Southeastern Massachusetts. Ferry service exists between Provincetown and Boston, Cape Cod and the Islands, and New Bedford and the islands. The shallow shoals surrounding Nantucket and Vineyard Sounds excludes large commercial vessels, thus making the region attractive for recreational boaters.

Coastal tourism is a vital part of the year-round economy of the Cape and Islands. For year-round residents who work in service industries (restaurants, rental accommodations, transportation, retail shops and markets, etc.), tourism is essential for maintaining adequate annual incomes. Economic data collected by the Cape Cod Commission indicates that in 2003, nearly one-third of all Cape Cod jobs were related to travel (travel is defined by the Massachusetts Office of Travel and Tourism as including 16 categories of public and auto transportation, travel arrangement, retail, food, accommodations, entertainment and recreation industries). In 2001, annual travel-related jobs on Cape Cod alone averaged 29,506, or 32.9% of the 89,761 public and private-sector jobs in Barnstable County. At their peak in July, travel-related jobs accounted for 39.3% of all 102,131 Cape jobs. Jobs in eating and drinking establishments led all industries, averaging 12.1% of all Cape jobs (10,845 jobs). At their peak in July of 2001, jobs in this sector were 15.7% (16,072 jobs) of the total number of jobs (Cape Cod Commission, August 14, 2003).



Martha's Vineyard businesses are even more dependent on seasonal tourism. The Martha's Vineyard Commission reports that in a recent survey of business owners, 77.8% of businesses relied upon seasonal tourism, and at least one-third of all businesses said that more than 75% of their businesses were dependent on tourism (http://almanac.vineyardconservationsociety.org/mvc-mainpage.shtml).

Part II   Management Options for Resource Protection and Sustainable Uses
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

January, 2005

CW0000006087

46

As another indicator of the importance of coastal tourism, Cape Cod's state room tax revenues (state 5.7% room occupancy tax) reached $12.5 million in 2003. This figure represents 15% of the total statewide ($83.1 million) collection of room tax revenues (Cape Cod Commission, August 14, 2003). In economic terms, therefore, the tourism industry is important for Cape Cod and the Islands and provides a significant portion of the state's economy.

## Coastal and Marine Science, Technology and Education

Coastal and marine science, technology and education figure prominently in the history, culture and economics of the Nantucket Shelf Region. The unusual concentration of educational and scientific institutions, museums, reserves, and parks devoted to marine science, technology and education is unique in the Northeast. High-tech small businesses and industries based upon oceanographic instrumentation and marine products and technology have sprung up as an outgrowth of science and technology institutions in the area.



Marine Biological Laboratory scientists. photo: NOAA today

Scientific research in marine biology and oceanography became established in the late 19th century, beginning with the Marine Biological Laboratory, followed by the Woods Hole Oceanographic Institution in the early 20th century. There are research facilities for the NOAA National Marine Fisheries Service and U.S. Geological Survey in Woods Hole, while a number of non-profit scientific research organizations are also located in the region (e.g., Woods Hole Research Center, Nantucket Field Station, Center for Coastal Studies).

Marine educational institutions include SEA (Sea Education Association), the Waquoit Bay National Estuarine Research Reserve (WBNERR), and a network of marine educators coordinated through the Woods Hole Science and Technology Education Partnership (WHSTEP).



Researchers investigating an oil spill. photo: WHOI

Oceanographers deploy a sensing instrument. photo: WHOI

Recovers attempt to free an entangled whale. photo: WHOI

WBNERR also serves as a hub of coastal environmental education and management activities that involve the Department of Environmental Management, NOAA, and the Massachusetts Office of Coastal Zone Management. Marine animal research and rescue operations include the National Marine Life Center and the Cape Cod Stranding Network in Bourne, Massachusetts Audubon Sanctuary in Wellfleet, NOAA National Marine Fisheries Service, and the Center for Provincetown Coastal Studies. The Massachusetts Maritime Academy in Bourne provides marine and military training in marine engineering, navigation, coastal issues, and practical seamanship.

A number of non-profit and government agency-operated museums and natural history centers are located in the Nantucket Shelf Region (e.g., Cape Cod Museum of Natural History, Cape Cod National Seashore, respectively). Technical assistance for addressing a variety of coastal and environmental issues is available from a number of agencies, including the Buzzards Bay Project, the Cape Cod Commission, the Martha's Vineyard Commission, Barnstable County Extension, regional Coastal Zone Management for the Cape and Islands, and Wampanoag Tribal natural resource departments.

To recap, the open waters of the Nantucket Shelf Region are the wellspring of the history, economy, culture, science, and natural beauty of the region. Tourism and recreational activities in the Cape and Islands literally depend upon the attractive, open, undeveloped character of the coastal and ocean waters of the region. Coastal and marine science, technology and education are particularly active in the region and are an important economic and cultural force.



photo: NOAA photo library

### Aesthetic Value

In the 21st century, although maritime industries such as marinas and fishing continue, the principal outstanding value of the entire region may lie in its natural beauty. The natural beauty of the Nantucket Shelf Region is based upon open, undeveloped coastal and ocean vistas. The coastal scenery of the Cape and Islands encompasses dunes, beaches, low hills, coastal plains, salt marshes, islands and scenic water vistas. The extensive beaches, quiet estuaries, the proximity to important whale feeding grounds off Provincetown, the rich bird life, and other natural features, are highly attractive to those who enjoy nature.

Protecting the natural scenery of the Cape, Martha's Vineyard and Nantucket is a high priority for the residents of the region. Local voters have approved land protection and management measures such as regional development agencies (Cape Cod Commission, Martha's Vineyard Commission, Nantucket Regional Planning Council), regional growth management planning, Cape Cod Land Bank, active volunteerism, and the passage of local ordinances protecting natural resources.

Thus, despite the rapid pace of coastal development, many coastal land areas are protected or managed through local zoning or regional planning, or through designation as a national park, wildlife refuge, National Estuary, or other means of protection. Coastal waters within the 3-mile state jurisdiction are protected from development activities under the Massachusetts Ocean Sanctuaries Act, which designated three state ocean sanctuaries in southeastern Massachusetts: Cape and Islands Ocean Sanctuary, Cape Cod Bay Ocean Sanctuary, and Cape Cod Ocean Sanctuary. However, significant areas of coastal waters outside the 3-mile state limit remain unprotected.





Coastal erosion, photo: WHOImcmaster.com



Cape Cod shoreline, photo: MASSGIS

# 3. COASTAL MANAGEMENT ISSUES

There are many coastal management issues in the Nantucket Shelf Region, owing to its popularity as a tourist destination, coastal development, and the many recreational and commercial activities that are ongoing or possible. Some of these activities have already caused environmental impacts. Some of the most significant coastal management issues are listed below:

- o Coastal development and population growth;
- o Water quality impacts (contaminated groundwater plumes, coastal nutrient loading, nonpoint source pollution, atmospheric deposition of pollutants, floatables, pathogens);
- o Fishery activities;
- o Boating;
- o Offshore mining of sand, gravel, oil and gas;
- o Other potential uses requiring infrastructure and/or disturbance of natural resources (e.g., proposed wind farm, potential future desalinization for water supply, outfall pipes, etc.);
- • Offshore utilities;
- • Poor air quality during the summer;
- • Sea level rise and climate change;
- • Coastal erosion and flooding.
- o Habitat loss resulting from all of the above;
- o Significant information gaps concerning offshore resources;
- o Environmental contamination and security issues related to the presence of military installations (e.g., Massachusetts Military Reservation, Pave Paws radar installation) and energy facilities (e.g., Canalside power plant, Plymouth nuclear power plant); and
- • The incomplete patchwork of different coastal protection and management measures in Southeastern Massachusetts.

Some important ocean management issues are described in more detail below.

## Coastal Development

Coastal population growth and development pose some of the biggest environmental challenges for coastal managers (U.S. Commission on Ocean Policy, 2004). Coastal development poses one of the most significant impacts on coastal and marine ecosystems, because it has such wide-ranging effects. Coastal development and increasing human use of the coastal zone generally impacts water quality, decreases habitat, lessens

quality of life, increases coastal hazards related to sea level rise, and increases need for energy, water and public infrastructure for the expanding population. Increased nonpoint and point source discharges of nutrients, pathogens, and other contaminants are inevitable. As the population grows, so too will the cumulative impacts on the marine ecosystem increase.

Cape Cod, Nantucket and Martha's Vineyard experienced some of the most rapid population growth in Massachusetts, based on the 2000 U.S. census. While the statewide population growth rate between 1990 and 2000 was 1.3%, Barnstable County, Nantucket County and Duke's County year-round populations increased by 3.3%, 12.6%, and 4.1%, respectively. Cape Cod alone was estimated to rank fifth in the state in terms of overall population growth by July 2003 (Cape Cod Commission, August 5, 2004, http://www.capecodcommission.org). In the 2000 census, Cape Cod's year-round population was 222,220, and the summer population reportedly swells to more than three times this number (http://www.barnstablecounty.org/). The year-round populations of Nantucket County and Duke's County (Martha's Vineyard) in the 2000 U.S. census were 9,520 and 14,987, respectively.

Cape Cod, Martha's Vineyard and Nantucket have regional development commissions which regulate larger development projects and provide guidance for smaller development projects. These are the Cape Cod Commission, the Martha's Vineyard Commission, and the Nantucket Planning and Economic Development Commission, respectively.

The long-term cumulative effects of coastal pollutant loading on the Nantucket Shelf Region have not been studied with the goal of developing a detailed model of how coastal pollutants behave in the Nantucket Shelf region. Studies of coastal pollutant loading typically focus on coastal embayments on Cape Cod and the Islands and assume that once pollutants reach marine waters, they will be flushed away by the rapid currents. But the larger questions of the long-term effect or whether the Nantucket Shelf thereby acts as a source of pollutants to nearby areas of the shelf have not been posed.

Similarly, the long-term cumulative effects of a number of human activities and natural processes on the entire Nantucket Shelf Region have not been studied.

January, 2005

Part II   Management Options For Resource Protection and Sustainable Uses
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006089

Since many of the species that spawn and feed seasonally in Nantucket Sound are migratory species, subject to fisheries in other states and the EEZ, they have presented a challenge to regulators, since conservation efforts in one jurisdiction may not be supported in others. Regional fishery management plans, backed by state regulations to control effort in these fisheries, are necessary to achieve coordinated management. The Mid-Atlantic Fisheries Management Council and the Atlantic States Marine Fisheries Commission have instituted hard quotas on migratory species such as squid, scup, summer flounder, black sea bass, and striped bass. In addition to management by gear restrictions and size limits, quotas are an efficient way to control harvest and allocate fishing effort among the states. Modern management plans are designed to allow recovery of depleted species by preventing overfishing throughout the range of each species, at all life stages.

The importance of the Nantucket Shelf Region as a spawning / nursery area for many species, providing important recruitment to populations outside the area, is well - recognized. Similarly, juvenile protection in this area would not be effective unless complemented by protection from small mesh fisheries in the wintering areas to the south and east, and allocated effort on migrating adults.

**Boating and Navigation Impacts**

Recreational boating activities are popular in Vineyard and Nantucket Sounds. Yet the environmental impacts of such activities are seldom considered. Impacts of boating include proliferation of docks, sediment resuspension due to water turbulence, noise, marine animal strikes, and water quality impacts.

Although scientific research is limited, available studies indicate that small-boat navigation can cause resuspension of sediments in the water column through propeller-driven turbulence (reviewed in Barr, 1993; Crawford et al. (Eds.) and various articles, 1998). In a number of studies, Yousef (1974) and Yousef et al. (1978, 1980) found that a 50 horsepower outboard motor had an effective mixing depth of 4.6 meters and bottom sediments were readily resuspended by the same outboard motor in water depths of 1.5 meters or less in a period of 5 minutes of boating activity. The resulting decrease in water clarity and increase in turbidity can cause decreases in seagrass productivity, affect fish, increase concentration of nutrients in the water column, and generally impact water quality (Short et al., 1991; Sherk et al., 1975; Servizi and Martin, 1992; Rhoads et al., 1975; Orth and Moore, 1983; Short et al., 1989).

Boating activity also generates wakes, which can increase bank erosion (Mason and Bryant, 1975; Moss, 1977; Liddle and Scorgic, 1980; Hilton and Phillips, 1982; Garrad and Hey,1988a, 1988b, 1989)

Navigational channels in coastal areas generally require maintenance dredging in order to keep them open. Dredging is often done to help improve water quality in coastal ponds. There can be temporary adverse effects on water quality due to sediment and nutrient resuspension during dredging. Shoreline alteration and habitat alteration can also occur as a result of dredging.



**Water and Wastewater**

Water quality and water quantity can both deteriorate as coastal communities expand.
Although freshwater rivers and streams on the Cape and Islands are small in terms of flow, they serve as conduits for watershed pollutants to enter the sea.
Increased withdrawal of groundwater and surface water for drinking water supplies will tend to deplete the groundwater aquifer and cause streams to become less of a factor in estuarine inputs.
Although groundwater recharge could increase as a result of more septic systems that would be needed to handle the wastewater of a growing population, this may occur at slower rates than stream flow rates.
Managing water supply at a time when the demand will be growing and the supply will be shrinking will be problematic.



Contamination from wastewater treatment facilities and septic systems already poses significant threats to coastal embayments on Cape Cod and the Islands. The DEP Estuaries Project is focusing on nitrogen loading to coastal embayments on Cape Cod. The potential long-term impact of wastewater on water quality in the Nantucket Shelf Region has not been evaluated, partly because it is always assumed that the vigorous tidal action will disperse and dilute any discharged treated wastewater. However, the efficacy of the reversing tidal currents in dispersing pollutants should be evaluated for the Sounds, as well as the long-term effect of nutrient loading.

**Fisheries Impacts**

Although most fishing gear, especially mobile gear, has unintended effects on substrates and benthic communities, damage has been minimized through effective regulation by state, regional and federal agencies. A series of area and seasonal fisheries closures have protected spawning and nursery areas at appropriate times. Similarly, the mesh size of towed nets is regulated to control the bycatch of juvenile and non-target species. Gillnets have been banned in state waters south of Cape Cod to prevent bycatch of non-target species and in the Great South Channel Critical Habitat to protect right whales. Other sectors have increased, including hook and fishpot fisheries. These gears produce less bycatch of juvenile and non-target species, but must be limited in scope to prevent overfishing, and regulated to prevent or minimize entanglements of mammals, birds and turtles.

Salt water intrusion may also occur as a result of the rate of sea level rise over the next century is 19 inches (IPCC, 2002). Cape Cod, Nantucket and Martha's Vineyard each have sole-source aquifers that would be subject to saltwater intrusion as sea level rises. Managing water supply at a time when the demand will be growing and the supply will be shrinking will be problematic.

One potential consequence is decreased freshwater flow into Vineyard and Nantucket Sounds. If this were to happen, salt water intrusion may also occur.

CW0000006090

### Sea-Level Rise and Climate Change

As a result of global warming due to both natural and manmade causes, sea level has been rising quickly and is expected to continue to rise (IPCC, 2002). Best scientific estimates of the rate of sea level rise over the next century is that sea level will rise on average by 19 inches (IPCC, 2002). The U.S. Geological Survey has been evaluating coastal vulnerability to sea level rise along the nation's coasts, including the Atlantic Coast and the Cape Cod National Seashore, through the National Coastal Vulnerability Study (Thieler et al., 2002; Thieler et al., 2001; Thieler and Hammar-Klose, 1999). Based on such studies, much of the shoreline along the Outer Cape, from Monomoy Island to Provincetown, already lies within a high-hazard area due to the probability of increased flooding and storm wave damage as sea level continues to rise. These studies highlight the seriousness of global warming and sea-level rise on these coastal areas.

Global warming also may result in changes in currents and storm frequency and intensity. As the atmosphere warms, hurricanes and storms may become more intense and coastal erosion would increase as a result. The patterns of ocean circulation may change. Southern species will move north. Such largescale changes in the environment need to be taken into account when planning for protection and management of a region.

The sandy shoals of the Nantucket Shelf Region may potentially play a role in absorbing storm wave energy and lessening storm damage due to waves and currents. The potential role of offshore shoals in lessening storm damage in the Nantucket Shelf Region needs to be better understood. The Nantucket Shelf Region is one of the few areas along the Massachusetts coast where significant sand deposits lie offshore. Paradoxically, the Massachusetts coastline is experiencing net erosion due to sand loss from coastal sand systems, partly due to rising sea level and partly due to coastal armoring which has blocked sand transport and sand sources (Thieler et al., 2001).

### Oil and Gas Exploration, Mining and Development



Oil rig. *photo: NOAA*

In 1980, the Massachusetts Coastal Zone Management identified oil and gas exploration and development on Georges Bank as a potential concern for Nantucket Sound, due to the potential for environmental, ecological and aesthetic impacts from oil transportation, oil spills, pipelines, and associated infrastructure and maintenance activities. Nantucket Sound itself was not identified as a potential oil and gas field. Shifting sediment bedforms leading to instability of oil mining platforms, leading to oil spills and impacts on water quality, fish habitat, waterfowl, marine mammals, and sea turtles were also cited as concerns. Navigation was cited as a concern. An oil spill occurring during the nesting season for endangered bird species (Roseate tern) would endanger a major portion of the entire North American population of this species and could impact many other species. An oil spill could have disastrous consequences on the tourist-driven economy if it occurred during the warmer months. The 2003 Bouchard oil spill in Buzzards Bay, involving approximately 98,000 gallons of thick No. 6 oil, resulted in the oiling of approximately 93 miles of coastline, hundreds of birds killed, and long-term impacts on coastal habitat and aesthetic values that are still being evaluated.

### Other Proposed Uses

A proposed wind farm involving the placement of 130 wind turbines on the sea floor of Nantucket Sound has generated much concern due to potential impacts on environmental and human values. Concerns range from impacts on recreational boating, bird strikes by the turbine blades, impacts on aesthetic and visual values, and use of a public resource for profit.



Wind farm. *photo: NOAA*

Another example of potential use of the outer continental shelf is mining of sand and gravel for shoreline beach nourishment. This concept was being discussed in the late 1990's by a number of state and federal agencies and coastal stakeholders. Due to concerns regarding impacts on essential benthic fish habitat, however, the concept has been abandoned for now (R. Haney, Coastal Zone Management, personal communication). Yet the demand for beach nourishment will grow as sea level rises, and offshore sources may provide an economical solution when the cost is compared with buying sand from upland sources (which involves environmental alteration).

### Habitat Loss

Habitat loss can occur in airspace, in the water, on the ground and in submerged sediments through a variety of human activities. Habitat loss in coastal areas can occur through coastal development, shoreline alteration, human activities and presence, and habitat degradation. Impacts on benthic habitat can occur through the use of mobile fishing gear and through boating activities that cause sediment resuspension and turbulence. Habitat loss in the water column generally occurs through degraded water quality as a result of pollutants and resuspended sediments, which in turn can cause nuisance or harmful algal blooms. Loss of avian habitat in airspace is probably one of the least well-studied aspects of ecology. Structures that intrude into airspace, such as tall buildings, microwave towers, cellphone towers, utility lines and poles, etc., can pose considerable hazards and cause significant mortalities among birds. In general, avian habitat loss in the Nantucket Shelf Region will be greatest in coastal and nearshore areas, and least in the areas which are less accessible to humans or their activities.

### Information Gaps

Despite the region's significant resources, heavy recreational and commercial uses, significant environmental issues, and its strategic position in terms of economy, coastal population and national security, there are some surprising and significant data gaps concerning important natural resources. These data gaps are surprising because they occur in areas that are close to major population centers and in areas where coastal environmental issues have received much attention. Aside from coastal studies along the shore and in coastal embayments, the detailed ecology, physical oceanography, benthic habitat, sedimentology, marine biology, and water quality of the offshore areas in Nantucket Sound and Vineyard Sound are not well-studied. Georges Bank and the Gulf of Maine are better studied, scientifically speaking, than Nantucket Sound, Vineyard Sound, Nantucket Shoals, or the large area of continental shelf south of Martha's Vineyard (Wallace and Braasch, 1996; Wiggin and Mooers, 1992; Backus, 1987).

## Incomplete Patchwork of Ocean Protection

*Massachusetts coastal waters are protected by a patchwork of different federal and state ocean management jurisdictions. These jurisdictions do not necessarily overlap, nor are they necessarily contiguous. The resulting patchwork has a number of holes in it, in areas where preliminary (and sometimes old) scientific information suggests that the natural resources must be the same as in nearby protected areas. The absence of a single coordinating framework for ocean protection in the Nantucket Shelf Region results in coastal and ocean protection which is patchy and inconsistent.*

## 4. EXISTING OCEAN MANAGEMENT AND PROTECTION

Existing ocean and coastal protection measures include designation of Massachusetts Ocean Sanctuaries for ocean areas within the 3-mile state jurisdictional limit, designation of Buzzards Bay as a National Estuary, designation of the Gerry E. Studds National Marine Sanctuary in Stellwagen Bank, Cape Cod National Seashore (a national park), and Monomoy National Wildlife Refuge and Wilderness Area. Farther offshore, areas of Georges Bank and the Great South Channel are managed for fisheries.

Despite this extensive patchwork of near-shore protection measures, the central area of Nantucket Sound, the area of Nantucket Shoals, large areas of the shelf south of Martha's Vineyard, and Georges Bank are not protected from development. The 1980 nomination of Nantucket Sound as a National Marine Sanctuary by the Massachusetts Office of Coastal Zone Management (CZM) recognized the many values of Nantucket Sound.

Protection or management options can provide various benefits, depending on the option selected. In all cases, protection and management options help to conserve or restore able economic uses of the resources. The benefits conferred depend on the area's size, location, and permanence, as well as the level and extent of protection provided (Recchia et al., 2001). The degree of limitation on human activities varies greatly, and depends upon the ultimate goals for nominating a protection or management area.

Historically, ocean management areas have included harbors and ports, navigation channels, fisheries closure areas, oil and gas drilling leases, dredged material disposal areas, marine disposal sites, buffer zones around ocean outfalls, munitions testing areas, and sensitive habitats such as coral reefs, seagrass beds, rare species habitat, and others. Typically such ocean management areas are managed for a narrowly defined interest and are generally limited in area.

Designation of marine protected areas in oceanic habitats, as opposed to coastal and onshore habitats, is a more recent phenomenon (Courtney and Wiggin, 2003). Marine protected areas, or MPAs, includes a wide variety of coastal and ocean areas managed according to specific regulations. The term is used in a general sense, although the definition of an MPA used by The World Conservation Union (IUCN) forms the basis for most definitions: "Any area of intertidal or subtidal terrain, together with its overlying

water and associated flora, fauna, historical and cultural features, which has been reserved by law or other effective means to protect part or all of the enclosed environment." (Courtney and Wiggin, 2003). For comparison, the U.S. Government, in Executive Order 13158, defines an MPA as: "any area of the marine environment that has been reserved by Federal, State, territorial, tribal or local laws or regulations to provide lasting protection for part or all of the natural and cultural resources therein." (Executive Order 13158, 2000).

Marine protected areas primarily protect and conserve biological diversity, habitat and natural resources, but the range of human uses that may be accommodated, the level of protection, size of area, and type of MPA vary widely. Within an MPA, different areas may be designated for differing uses, depending on the resources present, their value and sensitivity, and human uses. The U.S. Commission on Ocean Policy, in its April 2004 preliminary report, recommended that marine protected areas be used as one management tool to protect and manage important areas of the ocean (U.S. Commission on Ocean Policy, 2004).



Figure 32. Existing Federal and State Protected Ocean Areas. Data from MassGIS.

January, 2005

Part II   Management Options For Resource Protection and St, Sustainable Uses
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006092

The Gulf of Maine provides some examples of local, state and federal approaches to managing coastal and marine areas. The Ocean Conservancy has published a useful and succinct review of "Marine and Coastal Protected Areas in the United States Gulf of Maine Region" (Recchia et al., 2001). Other information on regional values and existing protected coastal and marine areas was obtained from a 2003 white paper by the Provincetown Center for Coastal Studies, 2003).

### 4.1.   Federal Ocean Protection

Federal jurisdiction over the nation's ocean and coastal waters extends out to the 200-mile limit, and therefore provides the greatest jurisdiction. At the federal level, there are a number of existing management and/or protection options for coastal and marine areas in the Gulf of Maine and Nantucket Shelf region (Recchia et al., 2001). These are listed below.

○ National Marine Sanctuaries
○ National Estuary Program
○ National Estuarine Research Reserves
○ National Wildlife Refuges
○ Critical Habitat Areas
○ Federal fishery closure areas

The key features of each of these options are briefly described below.

### National Marine Sanctuary System (NMS System)

The U.S. National Marine Sanctuaries Act of 1972 allows designation of marine areas to protect critical marine and cultural resources and allow sustainable use. Overall management authority is granted through specific legislation, which may provide coordination and/or supercede other authorities. Canada and Australia have adopted similar legislation to protect marine areas (Canadian Conservation Afreas Act, 2002; Great Barrier Reef Marine Park Act, 1975) (Courtney and Wiggen, 2003).



National Marine Sanctuaries (NMSs) are designated to provide comprehensive protection for their marine resources. NOAA administers the National Marine Sanctuary system. They are established to identify, manage, and conserve marine areas that are nationally significant to "conservation, recreational, ecological, historical, scientific, educational, cultural, archeological or esthetic qualities" (Recchia et al., 2001). Generally, National Marine Sanctuary designation prohibits development of non-renewable resources and limits marine discharging, dumping and marine construction. Few NMSs directly regulate fishing or extraction of other living resources.

Stellwagen Bank National Marine Sanctuary is the only NMS in the Gulf of Maine and southeastern Massachusetts. Stellwagen Bank was designated as an Sanctuary in 1992 due to concerns about the potential impacts of proposed and current activities, including oil and gas mining, and because it is prime feeding habitat for many whale species.

### National Estuary Program (NEP)



The National Estuary Program (NEP) was established under the federal Clean Water Act to identify, restore, and protect nationally significant estuaries that are threatened by pollution, development or overuse. The NEP focuses on watershed and estuarine protection, particularly water quality protection and related issues. Designation as an NEP does not provide automatic protection nor regulatory protection, but provides a mechanism for various local, state and federal agencies to develop a "Comprehensive Conservation and Management Plan" (CCMP) to protect the site using existing agencies. At each estuary site, a local committee comprising stakeholders, citizens, agencies, scientific and academic institutions, industry, and estuary users develop the CCMP and implement it.

In the Gulf of Maine and southeastern Massachusetts, there are four NEP sites:   Massachusetts Bays Program (including Cape Cod and Boston Harbor), the New Hampshire Estuaries Project, the Casco Bay Estuary Project, and the Buzzards Bay Estuary Program (Recchia et al., 2001).

### National Estuarine Research Reserves (NERRs)

Under the federal Coastal Zone Management Act, estuarine sites may be designated as a National Estuarine Research Reserve (NERR), forming part of a network of nationwide NERRs. NERRs are chosen to represent habitat types within specific ecoregions and are set up to conduct scientific research over a long term, including long-term monitoring. Other NERR goals are to protect rare species, provide public access, and provide public outreach concerning the marine environment. NERR designation does not automatically confer regulatory protection. Like an NEP site, an NERR is managed locally by local, state and federal agencies using federally-approved management plans that apply state law to coastal and territorial waters. Within an NERR, habitat alteration and coastal development are prohibited, and habitat restoration is frequently a goal. NERRs generally have not restricted fishing for hunting. NERRs are managed by state agencies. NOAA's Estuarine Reserve Division manages the NERR system (Recchia et al., 2001). There is one existing NERR within the Nantucket Shelf region, on Vineyard Sound:  this is the Waquoit Bay National Estuarine Research Reserve (WBNERR).

### National Wildlife Refuges



National Wildlife Refuge sites are designated to "conserve, manage and restore wildlife and their associated habitats for the benefit of present and future generations." Coastal sites may include islands and nearshore areas to protect migratory birds, seabirds, or anadromous fish (e.g., Atlantic salmon). Terrestrial portions of Refuge sites are owned by the federal government and are protected from development. However, many marine resources and habitats are generally not protected. Activities such as cable-laying, marine discharges, dredging, dumping, fishing, hunting, development of non-renewable resources, shoreline alterations, coastal development, and coastal habitat alteration are forbidden. NWRs are managed by the U.S. Fish and Wildlife Service in the Department of the Interior (Recchia et al., 2001).

CW0000006093



The Mashpee National Wildlife Refuge and the Monomoy National Wildlife Refuge are the only NWRs in the Nantucket Shelf region. Monomoy National Wildlife Refuge also contains a federally-designated Wilderness Area, which is managed under the 1986 Wilderness Act. In 1970, 94% of the Refuge area was designated as a Wilderness Area, under the 1964 Wilderness Act, which prohibits any development, alteration or disturbance. Monomoy is the only Wilderness Area in southern Massachusetts (http://www.capecodconnection.com/monomoy/monomoy.htm ).

### Critical Habitat Areas

Under the federal Endangered Species Act, Critical Habitat Areas in specific geographic areas can be designated to conserve, protect and restore threatened or endangered species that may require special protection or management in order to survive. Further development is not necessarily prohibited or restricted. Only activities that are likely to destroy or adversely affect the area or the species or their habitat, or activities that require a federal permit or license or receive federal funding, are affected. Either the U.S. Fish and Wildlife Service or the National Marine Fisheries Service or both may oversee a Critical Habitat Area, depending upon whether the species involved is found on land or in the ocean, respectively.

Two Critical Habitat Areas have been designated in the Gulf of Maine, both to protect the endangered northern Right Whale. Cape Cod Bay and the Great South Channel both are Critical Habitat Areas. Some protection applies year-round, but is strongest when whales are present. Restrictions on fishing apply. Other regulated or limited activities include marine discharging and dumping, non-renewable resource extraction, dredging, and cable-laying (Recchia et al., 2001).

### Federal Fishery Closure Areas

Closure of fishing has been shown to be an effective means of restoring depleted fisheries. Fishery closures are areas which are closed to some or all forms of fishing in order to restore depleted species. Typically they are designated to serve a specific fishery objective, such as rebuilding a depleted stock or protecting spawning or nursery areas, rather than conservation. However, other marine species can benefit from fishery closures, depending on the type, duration, and extent of closures. Closures can provide more effective protection to marine ecosystems than more conventional marine protected areas. Fishery closures are designated under the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), for "*zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specific types of fishing vessels or with specified types and quantities of fishing gear.*"

The National Marine Fisheries Services (NMFS) has implemented some fishery closures in the Gulf of Maine, including year-round comprehensive protection for marine species and habitats: the Western Gulf of Maine Closed Area (partly overlaps with Stellwagen Bank National Marine Sanctuary); Closed Area I (partly overlaps Great South Channel Northern Right Whale Critical Habitat Area); and Closed Area II (northeastern Georges Bank). These areas were established to support rebuilding overfished groundfish stocks (cod, haddock, flounder) and are closed year-round to many types of fishing, including bottom trawling. Additional areas are closed seasonally or to some types of fishing activities (Recchia et al., 2001).

Of the several federal options described above, only National Marine Sanctuaries, Federal Fishery Closure Areas, and Critical Habitat Areas can be applied to open ocean areas. NEPs and NERRs are restricted to nearshore estuaries, although Nantucket and Vineyard Sounds can be considered estuaries. Federal Wilderness Areas and National Parks have not been applied to open ocean areas, although the recently-designated Boston Harbor Islands National Park incorporates coastal waters.

### 4.2   State Ocean Protection

State protection of coastal waters is limited to state waters, which extend only out to the 3 mile-limit from Mean High Water. Existing state managed/protected areas in the Gulf of Maine (Figure 32, Recchia et al., 2001).

- Massachusetts Ocean Sanctuaries
- State fishery closure areas
- State Essential Habitat for Endangered Species

The key features of these state marine protection areas are described below.

### Massachusetts Ocean Sanctuaries

State ocean sanctuaries in Massachusetts protect the ecology and the appearance of the ocean and the seabed from exploitation, development, or other activity that would alter or endanger these resources. State ocean sanctuaries extend from Mean Low Water to the 3-mile state limit. Designation does not regulate fisheries or extraction of other living marine resources, but does limit discharges, dumping, extraction of non-renewable resources, marine construction, and shoreline alteration. The program is administered by the Massachusetts Coastal Zone Management Office and Department of Environmental Management (Recchia et al., 2001).

There are three existing Ocean Sanctuaries in southern Massachusetts: Cape Cod Bay Ocean Sanctuary, Cape Cod Ocean Sanctuary (along the Outer Cape), and the Cape and Islands Ocean Sanctuary. There are two additional Ocean Sanctuaries in northern Massachusetts (South Essex Ocean Sanctuary and North Shore Ocean Sanctuary) (Figure 32, from MassGIS data). The three Ocean Sanctuaries in southern Massachusetts exclude significant areas of Nantucket Sound, Nantucket Shoals, and nearby ecologically similar areas.

### Massachusetts State Fishery Closure Areas

Like the fisheries closures implemented under the federal Magnuson-Stevens Act in federal waters, the Massachusetts Division of Marine Fisheries implements fishery closures in Massachusetts state waters. Similar to the federal closures, most closures are seasonal. There are no areas closed to all fishing. State estuaries and harbors are designated as Inshore Net Areas, within which fishing nets and mobile gear (i.e., bottom trawls and scallop dredges) are generally prohibited year-round, but scallop dredges are allowed pursuant to town regulations. (Recchia et al., 2001)



CW0000006094

## State Habitat for Rare Species

The Massachusetts Division of Fisheries and Wildlife oversees protection of rare and endangered species, vernal pools, and critical or endangered habitats, through its Natural Heritage and Endangered Species Program (NHESP). Critical habitat for rare species is identified and mapped, and provides the basis for reviewing and commenting upon proposed projects in or near rare species habitat. The Massachusetts Endangered Species Act (MESA) and portions of other resource regulations (e.g., state Wetlands Protection Act regulations, etc.) protect rare species and prohibit or limit disturbance or development of habitat which has been documented to contain state-listed species. All federally listed species occurring in Massachusetts are also state-listed to avoid discrepancies. State habitat for rare species is generally very limited in area and is delineated based on documented observations of state-listed species and information on their habitat needs.

### 4.3. Other Approaches - Marine Protected Areas and Ocean Zoning

Marine protected areas for ocean protection provide one approach for comprehensive ocean management and protection. This is a tool that has become available in the last several years since a Presidential Executive Order was issued in 2000 calling for increased designation of Marine Protected Areas (MPAs) to protect ocean resources (Executive Order 13158, 2000). The U.S. Commission on Ocean Policy, in its 2004 report, recommended that marine protected areas be used as one management tool to protect and manage important areas of the ocean (U.S. Commission on Ocean Policy, 2004).

Executive Order 13158 on Marine Protected Areas defines a Marine Protected Area (MPA) as: "any area of the marine environment that has been reserved by Federal, State, territorial, tribal or local laws or regulations to provide lasting protection for part or all of the natural and cultural resources therein." (Executive Order 13158, 2000). For comparison, the World Conservation Union (IUCN) defines a Marine Protected Area as: "Any area of intertidal or subtidal terrain, together with its overlying water and associated flora, fauna, historical and cultural features, which has been reserved by law or other effective means to protect part or all of the enclosed environment." (Courtney and Wiggin, 2003).

Marine protected areas include a wide variety of coastal and ocean areas managed according to specific regulations. Marine protected areas are intended to protect and conserve biological diversity, habitat, natural resources, sustainable uses, and cultural heritage for future generations. The range of human uses that may be accommodated, the level of protection, size of area, and type of MPA vary widely. Within an MPA, different areas may be zoned for differing uses and degrees of activity, depending on the resources present, their value and sensitivity, and sustainable human uses (see NOAA and Department of the Interior website on Marine Protected Areas at http://www.mpa.gov/what_is_an_mpa/sap_terminology.html).

Designation, establishment or recommendation of a Marine Protection Area, based on Executive Order 13158, is undertaken by the Department of Commerce (NOAA) and the Department of the Interior, with input from other Federal agencies (e.g., Department of the Interior, Environmental Protection Agency, USAID, Department of State, Department of Transportation, the National Science Foundation, Department of Defense, and others). Recommendation and establishment of an MPA requires science-based identification and prioritization of natural and cultural resources for protection, assessment of ecological linkages, assessment of areas needing special protection of natural and cultural resources, identification of threats and gaps in protection, identification of emerging threats and user conflicts, identification of

equitable management solutions to reduce threats and conflicts, assessment of the economic effects of such management, and identification of linkages with international marine protected area programs ((Executive Order 13158, 2000).

Ocean zoning is a regulatory plan to implement planning and protection. Ocean zoning consists of the division of a marine area into districts and within these districts regulating activities to achieve specific goals. The uses may differ between districts, depending on the goals of each district. Certain uses may be prohibited in some zones, due to the sensitive nature of the zone, but may be allowed in other zones where sensitivity is less or non-existent. Ocean zoning requires development of a map that outlines the boundaries of the districts, followed by development and implementation of a set of regulations for each district or zone created.

The advantages of ocean zoning include:

- ○  Reduction of user conflicts by separating incompatible uses;
- ○  Distributing uses according to an area's suitability for that use;
- ●  Providing a flexible approach to management and protection on a site-specific basis;
- ●  Adding predictability to the management and regulatory system; and
- ●  Providing a way to coordinate management of a region (Courtney and Wiggin, 2003).

Ocean zoning faces some challenges. These are:

- ○  Multi-dimensional nature of the ocean (physically and legally);
- ○  Lack of consistent spatial data;
- ○  Lack of accurate, up-to-date information on the resources;
- ●  Importance of a scientific objective in setting up boundaries;
- ●  Accessibility to agencies, users and stakeholders; and
- ●  Movement of living and non-living resources across zoning boundaries.

Some examples of marine zoning already exist. These include the Town of Edgartown Surface Water District on Martha's Vineyard, including all waters seaward of Mean High Water (MHW) in the town's harbors and coves; Town of Orleans Watershed Zoning for Pleasant Bay ACEC; New Jersey Marine Conservation Zoning to protect critical coastal habitat from Mean High Water out to 300 feet in the area of the Sedge Islands; National Marine Sanctuaries; and Marine Parks.

Courtney and Wiggin (2003) proposed ocean zoning for the Gulf of Maine, following an Ocean Zoning Forum held in 2002 by the Gulf of Maine Council on the Marine Environment. The goal of the Council was to promote marine sustainability in the Gulf of Maine; that is, manage uses, protect habitat and conserve biodiversity in the marine environment.



Part II        Management Options For Resource Protection and Sustainable Uses
Providence Center for Coastal Studies, Coastal Solutions Initiative

CW0000006095

# 5. KEY PRINCIPLES OF OCEAN MANAGEMENT

Given the ecological and human values of the Nantucket Shelf region, existing and potential management issues, increasing population pressures, and the Ocean Commission's recommendations regarding the need for ocean protection, it is time to consider nominating the Nantucket Shelf region for marine protection. What are the key principles of sound ocean management?

## 5.1. Ecosystem-Based Management

Ecosystem-based management and protection of resources should be one of the most important goals of marine protection (U.S. Ocean Commission on Ocean Policy, 2004). Ecosystem-based management is based on the principle that the best resource management and protection is firmly grounded in a sound understanding of the ecosystems being managed. Ecosystem-based resource management takes account of the complex relationships between all living organisms, including humans, and the environment in which they live. Complex issues that cross traditional jurisdictional boundaries and disciplines can be addressed (U.S. Commission on Ocean Policy, 2004).

Ecosystem-based management also incorporates change. Ecosystem-based decisions acknowledge that the environment can change, even in the absence of anthropogenic influences. Adaptive management also allows for new and improved scientific information and management tools to be used as they become available (Busch et al., 2003).

Ecosystem-based management is an alternative to traditional management of marine resources (e.g., single-species or single-resource management) because it is multidisciplinary and interdisciplinary. The U.S. Commission on Ocean Policy has recommended that ecosystem-based management approaches be used for protection and management of marine resources because of the complexity of marine ecosystems (U.S. Commission on Ocean Policy, 2004).



WHOI scientist investigating an oil spill. photo WHOI

Ecosystem-based decisionmaking includes addressing the following:

1) Consideration of the health and vitality of ecosystems into the indefinite future;
2) The larger landscape and connections among other landscapes, and
3) Stakeholders' perspectives and human goals.

Ecosystem-based management requires attention to ecosystem integrity, interagency cooperation, specific management measures for specific areas, and time-series data for multiple species and habitats.

The benefits of utilizing ecosystem-based management include the following:

○ Avoiding costly mistakes. Ecologically-based decisionmaking ensures that costly ecological mistakes in resource management are avoided;
○ Well-coordinated, comprehensive management that takes account of natural processes. Entire ecological processes (feeding relationships, nutrient cycling, production, etc.) and ecological units (e.g., colonies, species, breeding populations, age-classes, etc.) are protected and managed in a comprehensive manner rather than managing for one or two species or a single process. This helps to avoid a piecemeal, uncoordinated approach to resource management.
● Boundaries are based on natural features. Resource areas are delineated along natural ecological boundaries rather than artificial political boundaries, allowing for efficient management of an ecological resource or function;
○ Stakeholder issues are taken into account. Stakeholder concerns and human issues are considered,
● Adaptive management allows for improvements and change as information and knowledge improve. Resource management takes account of change in the environment and changes and improvements in knowledge and management tools. Adaptive management is described in more detail below.

Recently, ecosystem-based resource management in the marine realm has been proposed by several organizations. The U.S. Commission on Ocean Policy recommended that ocean and coastal managers use ecosystem-based management.

## 5.2. Integrated Coastal and Ocean Management

Integrated coastal and ocean management is a resource management principle that is applicable to managing and protecting a large and diverse region such as the Nantucket Shelf. Integrated coastal and ocean management can be defined as *"a continuous and dynamic process by which decisions are made for the sustainable use, development, and protection of coastal and marine areas and resources. First and foremost, the process is designed to overcome the fragmentation inherent in both the sectoral management approach and the splits in jurisdiction among levels of government at the land-water interface. This is done by ensuring that the decisions of all sectors (e.g., fisheries, oil and gas production, water quality) and all levels of government are harmonized and consistent with the coastal policies of the nation in question. A key part of ICM is the design of institutional processes to accomplish this harmonization in a politically acceptable manner."* (Cicin-Sain and Knecht, 1998). The goals of integrated coastal and ocean management are:

● To achieve sustainable development of coastal and marine areas;
● To reduce vulnerability of coastal areas and their inhabitants to natural hazards;
● To maintain essential ecological processes, life support systems, and biological diversity in coastal and marine areas;

January, 2005

Part II    Management Options For Resource Protection and Sustainable Uses
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

54

CW0000006096

In addition, the processes involved in integrated coastal and ocean management are characterized by the following:

- Multi-purpose goals, planning and activities
- Analyzes implications of development, conflicting uses and interrelationships among physical processes and human activities, and
- Promotes linkages and harmonization between sectored coastal and ocean activities.

Integrated coastal and ocean management provides a flexible, protective, science-based approach that incorporates stakeholder and public interests, in a manner that is consistent with adaptive management principles (Cicin-Sain and Knecht, 1998).

## 5.3.  Adaptive Management

Adaptive management is a third goal of resource protection and management. Adaptive management involves developing resource management plans and policy based on up-to-date scientific information concerning resources, monitoring the effects of these plans and policies on resources, modifying plans and policies as needed to achieve overall resource goals, and using science and policy to formulate and modify plans and policies. Future planning is done in a flexible manner to accommodate unforeseen events (Walter et al., 2000; Allison et al., 2003; Walters, 1997).

Although large areas of the Nantucket Shelf Region remain largely unexplored, there is sufficient information to indicate that the entire Nantucket Shelf Region provides significant ecological and recreational values. The U.S. Commission on Ocean Policy (2004) recommends that marine protection and management be based on sound science, but where such science is incomplete, protection and management actions should nevertheless proceed and build the capacity for collecting relevant scientific information. An adaptive management approach is recommended for the Nantucket Shelf Region, in addition to ecosystem-based management and integrated management.

## 6.  CRITERIA FOR DESIGNATING MARINE PROTECTED AREAS

Criteria are measures of value, and the designation of marine protected areas begins with identifying criteria for judging the need for and type of protection and management.  The identification of suitable criteria for designating protection is a necessary step in identifying an area to be protected, whether it is on land or in the ocean.

Possible criteria for designating a marine protected area fall into two categories:  ecological criteria and socioeconomic criteria.  The science and social science of resource protection in the U.S. has matured in the last century and a half since the first national parks were designated in the late 1800's.  Resource managers today are keenly aware of the need to take account of socioeconomic factors as well as ecological factors in designing, managing and protecting natural resources.  This is especially true for marine resources, which span a wide geographic area.

Examples of possible ecological and socioeconomic criteria for designation of a marine protected area are described below.

## 6.1.  Ecological Criteria for Marine Reserve Design

A good example of ecological criteria for a marine reserve is provided by a study of the design of a network of marine reserves for conservation and fisheries management in the Channel Islands off the California coast (Airame et al., 2003).  The Channel Islands are managed under a variety of state and federal jurisdictions, including the Channel Islands National Park, Area of Special Biological Significance, Channel Islands Biosphere Reserve, Channel Islands National Marine Sanctuary, and Santa Barbara Channel Ecological Preserve.  The need to evaluate and improve resource management was driven by a steady deterioration of marine resources despite the state and federal management overlaps.

Agencies, organizations, fishermen, environmentalists, and others first developed a set of goals.  These goals are listed below (from Airame et al., 2003):

Table 8.  Goals for Siting of a Marine Reserve Network in the Channel Islands, California.  (Airame et al., 2003).

| Goal Categories | Goals for Marine Reserves |
|---|---|
| Ecosystem biodiversity | To protect representative and unique marine habitats, ecological processes, and populations of interest in the Channel Islands National Marine Sanctuary |
| Sustainable fisheries | To achieve sustainable fisheries by integrating marine reserves into fisheries management |
| Economic variability | To maintain long-term socioeconomic viability while minimizing short-term socioeconomic losses to all users and dependent parties |
| Natural and cultural heritage | To maintain areas of visitor, spiritual, and recreational opportunities which include cultural and ecological features and their associated values |
| Education | To foster stewardship of the marine environment by providing educational opportunities to increase awareness and encourage responsible use of reserves |

Table 8 provides a succinct yet comprehensive set of goals for a marine protection area.  Based on these goals, the stakeholders then developed a set of regional ecological criteria, or set of ecological values, to help identify areas and suites of potential reserves.  The concept of suites of reserves includes networks of reserves that provide organized management of ecological features throughout several areas or overlapping jurisdictions in order to achieve goals.  Thus the ecological criteria are intended to overcome several criticisms of conventional resource protection:  1) Protection of a single resource without consideration of other resources can cause overall ecosystem damage; 2) A single resource that is distributed throughout several jurisdictions may not be managed adequately throughout all of the jurisdictions because of inconsistent goals; and 3)  Existing types of individual reserves may not be adequate to manage an entire ecosystem.

Part II   Management Options For Resource Protection and Sustainable Uses
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006097

The regional ecological criteria developed by the Channel Islands stakeholders are given in Table 9.

Table 9. Application of ecological criteria for marine reserve design in the Channel Islands, Southern California. (Airame et al. 2003).

| Ecological Criteria | Application to the Channel Islands | Limitations |
|---|---|---|
| Biogeographical representation | Three major biogeographical regions were identified using data on biota and substrate type. | Boundaries of biogeographical regions are not fixed. |
| Habitat representation | Representative and unique marine habitats in each biogeographical region were classified using depth, exposure, substrate type, dominant plant assemblages, and a variety of additional features. | Data on the distributions of habitat types may be limited. |
| Habitat heterogeneity | This was not incorporated as a specific criterion, but the analysis required representation of 30–50% of all habitats within the smallest area possible, this selecting areas of high habitat heterogeneity. | Data on the distributions of habitat types may be limited. |
| Vulnerable habitats | To ensure adequate representation, vulnerable habitats were considered as unique habitat types. | Data on the distributions of vulnerable habitats may be limited. |
| Species of special concern and critical life history stages | Island coastlines and emergent rocks were weighted according to the distributions of sea haul-outs and seabird colonies. The algorithm selected areas of high sea and bird diversity. Other species were not weighted due to insufficient data on their distributions. | Data on distributions and life-history characteristics of species of special concern may be limited. |
| Exploitable species | Habitats likely to support exploitable species, especially rockfishes (e.g., emergent rocks and submerged rocky features) were included for specific representation. | Data on distributions and life-history characteristics of exploitable species may be limited. |

(Table 9, continued)

| Ecosystem functioning and linkages | Not used. | Determining the extent to which ecosystem linkages constrains reserve design may be difficult. |
|---|---|---|
| Ecosystem services | Locations of Channel Islands National Park kelp forest monitoring sites were not included as a formal criterion, but borders of potential reserves will be adjusted, if needed, to include some of those sites. | Sufficient information on ecosystem services may not be available. |
| Human threats and natural catastrophes | The reserve size needed to meet reserve goals in a stable environment was multiplied by a factor that accounts for the frequency of severe disturbances. | Data on the frequency of severe disturbances may be limited. |
| Size and connectivity | At least one, and no more than four, reserves should be placed in each of the three biogeographical regions. For one region (650 square nautical miles), two to three reserves were recommended. | Optimal number of reserves will generally depend on the size of each biogeographical region. Reserve placement will depend on plant and animal dispersal among sites. |



CW0000006098

These ecological criteria provide a good example of the way in which ecological factors are incorporated into resource management and protection, resulting in ecosystem-based management. Although the criteria were developed for the Channel Islands, they are applicable in their general sense to the Nantucket Shelf region as well. Specific details of each ecological criterion would have to be developed for the Nantucket Shelf Region.

## 6.2. Combined Socioeconomic and Ecological Criteria for Siting of a Marine Protection Area

In addition to ecological criteria, socioeconomic criteria are important in designing and siting a marine protection area. An example of socioeconomic criteria for selecting marine protection areas was summarized by Roberts et al. (2003), based on information from the Swedish Environmental Protection Agency and others. This example is reproduced in Table 10.

Table 10. Social and economic criteria used to select the locations of marine protected areas. (Roberts et al., 2003).

| Value | Criteria |
|---|---|
| Economic | Number of fishermen dependent on the area. |
| | Value for tourism. |
| | Potential contribution of protection to enhancing or maintaining economic value. |
| Social | Ease of access. |
| | Maintenance of traditional fishing methods. |
| | Presence of cultural artifacts/wrecks. |
| | Heritage value. |
| | Recreational value. |
| | Educational value. |
| | Aesthetic appeal. |
| Scientific | Amount of previous scientific work undertaken. |
| | Regularity of survey or monitoring work done. |
| | Presence of current research projects. |
| | Educational value. |
| Feasibility / practicality | Social/political acceptability. |
| | Accessibility for education/tourism. |
| | Compatibility with existing uses. |
| | Ease of management. |
| | Enforceability. |

(Information for Table 10 was summarized by Roberts et al. (2003) from the Swedish Environmental Protection Agency (Naturvårdsverket, 1995; Kelleher and Kenchington, 1992; Nordic Council of Ministers (Nordiska Ministerrådet 1995); Salm and Price, 1995; Hockey and Branch, 1997; Agardy, 1997; and Nilsson, 1998).



January, 2005

The relative importance of socioeconomic vs. ecological criteria, however, can differ, depending on the area, or depending on timing. For example, in the early stages of considering marine protection for an area, information on ecological and/or socioeconomic resources may not be complete. Typically, a marine protected area such as an estuarine research reserve might first be identified by its ecological values, followed by a growing appreciation of its socioeconomic values. Given that the appreciation of socioeconomic vs. ecological values may differ in time and according to the particular area, how can socioeconomic and ecological criteria be incorporated into a single system of criteria?

The answer lies in developing marine reserve networks that can maintain ecological values, such as biodiversity and ecosystem functioning at large scales, and where the values of ecosystem goods and services for people depend upon meeting the ecological goals, as described in Roberts et al. (2003).

This approach is applicable to the Nantucket Shelf Region, where socioeconomic values (appreciation of natural beauty, tourism, recreation, marine education) revolve about the ecological and natural values of the region. The Nantucket Shelf Region may be an example of an area where the socioeconomic values are important and well-defined in the public's mind, while appreciation of ecological values may be lagging due to gaps in scientific understanding.



## 7. EVALUATION OF POSSIBLE MARINE PROTECTION AND MANAGEMENT APPROACHES FOR THE NANTUCKET SHELF REGION

In this section, possible management and protection models are evaluated in terms of their potential usefulness for protecting and managing the values of the Nantucket Shelf Region. Different types of marine protected areas afford differing degrees of protection.

Of the many kinds of MPAs considered, most are suitable for managing or protecting watershed or coastal areas, and their marine jurisdiction ends at either a nearshore boundary (e.g., Mean High Water), a specified coastal boundary or at most to the limit of jurisdiction of the agency that oversees their management.

Currently, seven types of MPAs address or could address strictly marine or marine estuarine areas:

- National Estuary Program sites;
- National Estuarine Research Reserves;
- National Marine Sanctuaries;
- Critical Habitat Areas for marine organisms;
- Fishery Closed Areas or other federally-managed fisheries areas;
- Massachusetts Ocean Sanctuaries; and
- Ocean zoning.

Of these strictly marine or estuarine MPAs, only Fishery Closed Areas and Critical Habitat Areas strictly limit or temporarily prohibit fishing activities. Most of these allow or limit other activities, while National Marine Sanctuaries and the Cape Cod National Seashore prohibit development of nonrenewable resources.

Part II        Management Options For Resource Protection and Sustainable Uses
               Provincetown Center for Coastal Studies, Coastal Stakment Initiative

Of these MPAs, federal jurisdiction is the greatest, up to 200 miles from shore. Thus National Marine Sanctuaries, federal Critical Habitat Areas, and Federal Fishery Closure Areas provide the most jurisdiction. Extensive jurisdiction is important for an area so large as the Nantucket Shelf, portions of which lie outside of the 3-mile state jurisdictional limit.

The degree of protection afforded by MPAs also differs greatly. Most MPAs allow a variety of activities. Some limit or restrict activities. Only National Marine Sanctuaries prohibit specific activities (development of non-renewable resources).

## National Marine Protected Area

State jurisdiction is generally limited to the 3-mile limit, and could not be used to protect the resources of the outer Nantucket Shoals, or the central portion of Nantucket Sound, or the shelf south of Martha's Vineyard, much less the Great South Channel. The most extensive jurisdiction is federal. For an area as large as the Nantucket Shelf region and its ecosystems, federal jurisdiction would provide the best coverage. This narrows the options to National Marine Sanctuary, Federal Fishery Closure Areas, Critical Habitat Area, or other Federal option.

While fisheries management within the area of Nantucket Shelf is highly desirable, the prohibition of fishing is not. Human uses of the area include recreational fishing and shellfishing, and these are important to the local economy. Too, the important functions of the Shelf region are nursery habitat and migration habitat. These functions can be protected through careful management for sustainable fisheries rather than prohibition of fishing. Protection of the area solely for fisheries also would overlook many of the other important natural and human values of the Nantucket Shelf.

The areas used by endangered species for breeding and nesting should be protected as Critical Habitat Areas. In particular, nearly the entire North American population of Roseate terns passes through the Cape and Islands region and stops in Monomoy to rest and feed. Terns also fly to Buzzards Bay, which is a National Estuary. Existing Critical Habitat Areas, such as the Great South Channel, which may be ecologically linked, should be incorporated as well. But designation of the entire Nantucket Shelf as a Critical Habitat Area is probably not warranted.

Outreach and scientific research are important activities that should be provided. Scientific research in particular needs to be ramped up in order to understand a coastal area that is just at our doorstep, so to speak. Designation as a National Estuary or National Estuarine Research Reserve (NERR) would provide these important activities of outreach and research but would not provide much regulatory protection. NEPs or NERRs can be overlaid on another type of MPA in order to provide protection, outreach and research.

A National Marine Protected Area (MPA), managed by NOAA, would provide the most comprehensive, flexible, and yet protective form of protection and management, particularly if it incorporates ocean zoning. Ocean zoning can be done within the context of one or more of these MPAs, and provides a flexible tool for managing large areas, subject to the shortcomings described above. For example, a Marine Protected Area may be divided into management and use zones depending on the need to protect sensitive resources, uses, and appropriate ecosystem-based management tools. Ocean zoning provides a highly flexible and effective tool. Ocean zoning areas would need to be designated, but could be developed around the major ecoregions and values already identified.

The Nantucket Shelf Region could be designated as a new Federal Marine Protected Area, zoned into different ocean zones according to the relative importance of ecological and socioeconomic factors within each of the zones.



## Example of Possible Ocean Zones Within the Nantucket Shelf Region (see Figure 33)

**Ocean Zone 1:** National Marine Sanctuary designation for Nantucket Sound, Vineyard Sound, and Buzzards Bay. The designation would provide the highest degree of protection for both ecological and socioeconomic values, and would acknowledge the high degree of socioeconomic value placed upon the open ocean. This area is characterized by aesthetic and cultural values, active recreational boating and fishing, marine science and education, increasing coastal development, a coastal economy that is heavily dependent on the natural scenery, many management issues, and a network of several existing coastal protected or managed areas (Cape Cod National Seashore, Monomoy National Wildlife Refuge and Wilderness Area, Waquoit Bay NERR, Buzzards Bay National Estuary Program, Mashpee National Wildlife Refuge, and Massachusetts Ocean Sanctuaries). Other features in common include their marine estuarine nature, highly dynamic sediment and water processes, important fisheries and nursery functions; important avian habitat including nesting, breeding and airspace habitat. This zone is characterized by well-defined socioeconomic values that revolve about the undeveloped ocean, and less well-defined ecological values, particularly marine ecological values, that should be the subject of further study. Hazards include rising sea level and moderate to high coastal erosion, resulting in high coastal vulnerability. The area represents a moderate to high risk for shipping due to its shallow depth, variable shoals, and rapid currents.

**Ocean Zone 2:** Nantucket Shoals and Georges Bank. These two areas share many ecological and socioeconomic features: shallow sandy benthic habitat; high-energy environment (wind, waves and currents); important fisheries habitat; distance from land; ecological transition area between Great South Channel and the two Sounds; moderate recreational use; high cultural value; and a hazard to shipping. Georges Bank is actively managed for fisheries and fishery closures are in effect in some areas.

**Ocean Zone 3:** Great South Channel. This area is important for both ecological reasons (feeding grounds for endangered Right whales, fish and other marine animals, high productivity) and socioeconomic reasons (commercial shipping). The area contains a federal Critical Habitat for the Right whale and the fishery is seasonally closed.

**Ocean Zone 4:** Outer Continental Shelf. This area includes the large area of continental shelf south of Martha's Vineyard, Nantucket Shoals, and the Great South Channel, out to the edge of the continental shelf. The area is characterized by its open ocean character, highly dynamic water processes, high rate of coastal erosion, moderate recreational value, fisheries habitat, high aesthetic value, and low to moderate risk for shipping. Relatively little is known about the ecological values of this area.

Part II   Management Options For Resource Protection and Sustainable Uses   Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006100



Figure 33.   Ocean Zones Within a Nantucket Shelf Marine Protected Area:

(1)   **Ocean Zone 1:** National Marine Sanctuary designation for Nantucket Sound, Vineyard Sound, and Buzzards Bay.

(2)   **Ocean Zone 2:** Nantucket Shoals and Georges Bank.

(3)   **Ocean Zone 3:** Great South Channel.

(4)   **Ocean Zone 4:** Outer Continental Shelf.

CW0000006101

**8. REFERENCES**

Agardy, T.S. 1997. Marine protected areas and ocean conservation. Academic Press, Dallas, Texas, USA.

Airame, S., Dugan, J.E., Lafferty, K.D., Leslie, H., McArdle, D.A. and Warner, R.W. 2003. Applying ecological criteria to marine reserve design: a case study from the California Channel Islands. Ecological Applications, Volume 13(1) Supplement, p. S170-S184.

Allison, G.W., Gaines, S.D., Lubchenco, J.L., and Possingham, H.P. 2003. Ensuring persistence of marine reserves: catastrophes require adopting an insurance factor. Ecological Applications, Volume 13(1), Supplemental, p.S8-S24. Ecological Society of America.

Backus, R.H. and Bourne, D.W. (Eds.). Georges Bank. The MIT Press, Cambridge, Massachusetts, p. 38-39.

Barr, B.W. 1993. Environmental impacts of small boat navigation: vessel/sediment interactions and management implications. Proceedings of the Coastal Zone '93 Conference, New Orleans, Louisiana.

Cape Cod Commission. August 14, 2003. Cape Collects $12.5 million in 2003 State Room Tax; Up 3% from Fiscal Year 2002.

Cape Cod Commission. August 5, 2004. Population – Latest Estimates. In Cape Cod Commission REPORTER, Volume 14, Number 12. Available at http://www.capecodcommission.org

Center for Coastal Studies. 2003. Review of state and federal marine protection of the ecological resources of Nantucket Sound. Center for Coastal Studies, 61+ p.

Chelsea International Corporation. June 7, 1983. National Marine Sanctuary Site Evaluations: Recommendations and Final Reports. Prepared by Chelsea International Corporation, 1718 P St., NW, Washington, DC 20036 for National Oceanic and Atmospheric Administration, Office of Ocean and Coastal Resource Management, Sanctuary Programs Division, Contract No. NA-82-SAC-00647.

Cicin-Sain, B. and Knecht, R.W. 1998. Integrated Coastal and Ocean Management: Concepts and Practices. Center for the Study of Marine Policy, Graduate College of Marine Studies, University of Delaware. Island Press, Washington, D.C., 518 p.

Courmey, F. and Wiggin, J. January 2003. Ocean Zoning for the Gulf of Maine: A Background Paper. Prepared for the Gulf for Maine Council for the Marine Environment, by Good Harbor Consulting and Urban Harbors Institute, University of Massachusetts, Boston, 31 pp.

Crawford, R.E., Stolpe, N.E. and Moore, M.J. 1998. The Environmental Impacts of Boating: Proceedings of a Workshop Held at Woods Hole Oceanographic Institution, Woods Hole, MA, USA, December 7 to 9, 1994. Woods Hole Oceanographic Institution Technical Report WHOI-98-03.

Federal Register, Volume 65, No. 105, May 31, 2000, Presidential Documents, Marine Protected Areas.

Garrad, P.N. and Hey, R.D. 1989. Sources of suspended and deposited sediment in a Broadland river. Earth Surface Processes and Landforms, Volume 14, p. 41-62.

Garrad, P.N. and Hey, R.D. 1988a. River management to reduce turbidity in navigable Broadland rivers. Journal of Environmental management, Volume 27, p. 273-288.

Garrad, P.N. and Hey, R.D. 1988b. The effect of boat traffic on river regime. In: White, W.R. (Ed.), Proceedings from the International Conference on River Regime, John Wiley and Sons, Ltd, London, p. 395-409.

Hilton, J. and Phillips, G.L. 1982. The effect of boat activity on turbidity in a shallow broadland river. Journal of Applied Biology, Volume 19, p. 143-150.

Hockey, P.A.R. and Branch, G.M. 1997. Criteria, objectives and methodology for evaluating marine protected areas in South Africa. South African Journal of Marine Science 18: 369-383.

IPCC. 2002. Climate Change 2001: the scientific basis. Contribution of Working Group 1 to the Third Assessment Report of the Intergovernmental Panel on Climate Change. IPCC. Geneva, Switzerland, 563 p. Available on the web at www.ipcc.ch.

Kelleher, G. and Kenchington, R. 1992. Guidelines for establishing marine protected areas. A marine conservation and development report. World Conservation Union (IUCN), Gland, Switzerland.

Liddle, M.J. and Scorgie, H.R.A. 1980. The effects of recreation on freshwater plants and animals: a review. Biol. Conserv. Volume 17, p. 183-206.

Lubchenco, J., Palumbi, S.R., Gaines, S.D., and Andelman, S. 2003. Plugging a hole in the ocean: the emerging science of marine reserves. Ecological Applications, Volume 13(1), Supplement, pp.S3-S7. Copyright 2003 by the Ecological Society of America.

Mason, C.J. and Bryant, R.J. 1975. Changes in the ecology of the Norfolk Broads. Freshwater Biology, Volume 5, p. 257-270.

Massachusetts Coastal Zone Management, Department of Environmental Management, Division of Marine Fisheries. 1980. Nomination Letter for a Marine Sanctuary in Nantucket Sound, Pursuant to Title III of the Marine Protection, Research and Sanctuaries Act of 1972. Publication No. 12247-62-100-1-81-CR.

Moss, B. 1977. Conservation problems in the Norfolk Broads and rivers of East Anglia, England: phytoplankton, boats, and the causes of turbidity. Biol. Conservation, Volume 12, p. 95-114. Nantucket Chamber of Commerce. See website at http://www.nantucketchamber.org/visitor/trivia.html.

Naturvårdsverket. 1995. Aktionsplan för biologisk mångfald (Action plan on biological diversity). [In Swedish]. Rapport 4463. Naturvårdsverket (Swedish Environmental Protection Agency), Stockholm, Sweden.



January, 2005

Part II

Management Options For Resource Protection and Sustainable Uses
Provincetown Center for Coastal Studies, Coastal Solutions Initiative

CW0000006102

Nilson, P. 1998. Criteria for the selection of marine protected areas. Report 4834. Swedish Environmental Protection Agency, Stockholm, Sweden.

NOAA Coastal Services Center. March 2002. Marine Protected Areas Needs Assessment. Final Report. Prepared by the NOAA Coastal Services Center in cooperation with the National Marine Protected Areas Center.

Nordiska Ministerrådet (Nordic Council of Ministers). 1995. Marina reservat i Norden, Del I. (Marine protected areas in the Nordic countries, Part 1.) [In Swedish]. TemaNord 553, Nordiska Ministerrådet (Nordic Council of Ministers), Copenhagen, Denmark.

Orth, R.J. and Moore, K.A. 1983. Chesapeake Bay: an unprecedented decline in submerged aquatic vegetation. Science, Volume 222: p. 51-53.

Pew Oceans Commission. May 2003. America's Living Ocean: Charting a Course for Sea Change. Leon Panetta, Chairman. Pew Oceans Commission.

Recchia, C., Farady, S., Sobel, J. and Cimner, J. 2001. Marine and Coastal Protected Areas in the United States Gulf of Maine Region. Published by The Ocean Conservancy, 96 p.

Rhoads, D.C., Tenore, K. and Browne, M. 1975. The role of resuspended bottom mud in nutrient cycles of shallow embayments. In: Cronin, L.E. (Ed.), Estuarine Research, Volume 1, p. 563-582. Academic Press, Inc., New York.

Roberts, C.M., Andelman, S., Branch, G., Bustamante, R.H., Castilla, J.C., Dugan, J., Halpern, B.S., Lafferty, K.D., Leslie, H., Lubchenco, J., McArdle, D., Possingham, H.P., Ruckelshaus, M., and Warner, R.R. 2003. Ecological criteria for evaluating candidate sites for marine reserves. Ecological Applications, Volume 13(1), Supplement, p. S199-S214.

Salm, R. and A. Price. 1995. Selection of marine protected areas. In: S. Gubbay (Ed.). Marine Protected Areas: Principles and Techniques for Management. Chapman and Hall, London, UK, p.15-31.

Servizi, J.A. and Martin, D.W. 1992. Sublethal responses of Coho Salmon (*Oncorhynchus kisutch*) to suspended sediments. Canadian Journal of Fisheries and Aquatic Science, Volume 49, p. 1389-1395.

Sherk, J.A., O'Connor, J.M., and Neumann, P.A. 1975. Effects of suspended and deposited sediments on estuarine environments. In: Cronin, L.E. (Ed.). Estuarine Research, Volume II, p. 541-558. Academic Press, New York.

Short, F.T., Wolf, J. and Jones, G.E. 1989. Sustaining eelgrass to manage a healthy estuary. Proceedings of the Sixth Symposium on Coastal and Ocean Management/ASCE, July 11-14, 1989, Charleston, SC.

Short, F.T., Jones, G.E., and Burdick, D.M. 1991. Seagrass Decline: Problems and Solutions. In: Proceedings of the Coastal Zone '91 Conference, Long Beach, CA, p. 439-453.

Thieler, E.R., Williams, S.J. and Pendleton, E.A. 2002. Coastal Vulnerability Assessment of National Park Units to Sea Level Rise. See the National Coastal Vulnerability Study at http://woodshole.er.usgs.gov/project-pages/cvi/ or see the USGS online fact sheet at http://pubs.usgs.gov/fs/fs095-02/

Thieler, E.R. and Hammar-Klose, E.S. 1999. National Assessment of Coastal Vulnerability to Sea-Level Rise: U.S. Atlantic Coast. U.S. Geological Survey, Open-File Report 99-593, 1 sheet.

Thieler, E.R., O'Connell, J.F. and Schupp, C.A. 2001. The Massachusetts Shoreline Change Project: 1800s to 1994. U.S. Geological Survey Administrative Report, 39 p., 76 map sheets at 1:10,000.

U.S. Census 2000 data, summarized in Cape Cod Times. http://www.capecodonline.com/census/islandpopulation.htm

U.S. Commission on Ocean Policy. 2004. An Ocean Blueprint for the 21st Century. Final Report to the President, September 20, 2004.

Walters, C. 1997. Challenges in adaptive management of riparian and coastal ecosystems. Conservation Ecology (online), Volume 1(2), p.1. Available from the Internet at URL: http://www.consecol.org/vol1/iss2/art1

Walters, C., Korman, J., Stevens, L.E., and Gold, B. 2000. Ecosystem modeling for evaluation of adaptive management policies in the Grand Canyon. Conservation Ecology 4(2). Available from the Internet at URL: http://www.consecol.org/vol4/iss2/art1

Yousef, Y.A. 1974. Assessing Effects on Water Quality by Boating Activity. U.S. EPA, EPE Technical Services, EPA-670/2-74-072.

Yousef, Y.A., McLellon, W.M., Fagan, R.H., Zebuth, H.H. and Larrabee, C.R. 1978. Mixing Effects Due to Boating Activities in Shallow Lakes. Final Report to the U.S. DOI, Office of Water Research and Technology, Florida Technological University, Environmental Systems Engineering Institute, ESEI Technical Report No. 78-10.

Yousef, Y.A., McLellon, W.M. and Zebuth, H.H. 1980. Changes in phosphorus concentrations due to mixing by motorboats in shallow lakes. Water Research, Volume 14, p. 841-852.

Wallace, G.T. and Braasch, E.F. (Eds.), Proceedings of the Gulf of Maine Ecosystem Dynamics, A Scientific Symposium and Workshop, 16-19 September 1996, St. Andrews, new Brunswick. Published by the Regional Association for Research on the Gulf of Maine (RARGOM), RARGOM Report 97-1.

Wiggin, J. and Mooers, C.N.K. (Eds.). 1992. Proceedings of the Gulf of Maine Scientific Workshop, Woods Hole, Massachusetts, 8-10 January 1991. Gulf of Maine Council on the Marine Environment, Urban Harbors Institute, University of Massachusetts at Boston, 394 p.



CW0000006103

10

CW0000006104

P.02/10



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

JAN 1 9 2001

Memorandum

To:      Director, Fish and Wildlife Service

From:    Solicitor

Subject: Application of the Migratory Bird Treaty Act Beyond Three Nautical Miles From
         the U.S. Coastline

The Migratory Bird Treaty Act (MBTA) implements a series of bilateral agreements between the
United States and neighboring countries that require the parties to protect migratory birds. The
MBTA prohibits, through criminal sanctions, the taking, possession, sale, transportation, etc., of
birds protected by the treaties. 16 U.S.C. § 703. Nothing in the MBTA expressly deals with the
geographic scope of its application.

You asked us to provide an opinion on whether the MBTA can be applied beyond the three
nautical mile (NM) territorial sea of the United States. For the reasons that follow, we have
concluded that the MBTA can be enforced extraterritorially against (a) United States citizens for
acts taken in U.S. waters beyond three NMs and in international waters, and (b) citizens of any
country for acts taken on U.S.-flagged vessels in U.S. waters beyond three NMs and international
waters.

As a preliminary matter, we note that, like all generally applicable U.S. laws, the MBTA applies
within the three-NM territorial sea of the United States. The 1982 United Nations Convention on
the Law of the Sea permits coastal States to claim up to a twelve-NM territorial sea and a 200-
NM exclusive economic zone (EEZ) from baselines determined in accordance with the
Convention. This opinion does not address whether the Presidential Proclamations regarding the
U.S. assertion of a twelve-NM territorial sea and a 200-NM EEZ apply to the MBTA. See
footnote 7, infra. If they did, the MBTA would apply to all persons within those respective areas.

As used in this opinion, therefore, "U.S. waters beyond three NMs" refers to the U.S. territorial
sea from three to twelve miles and the U.S. EEZ. "International waters" is used to refer to waters
beyond the territorial jurisdiction or EEZ of any sovereign. "International waters" is preferred
here to the term "high seas" to avoid confusion stemming from the latter term's evolving
meaning. "High seas" has traditionally referred to waters outside the territorial jurisdiction of
any sovereign, see Restatement (Third) of the Foreign Relations Law of the United States § 521
cmt. a, and it is used in that context in reference to case law discussed below; however, the
term's more current usage is to refer to waters outside the EEZ of any sovereign. This opinion
takes no position on whether the MBTA may apply within the EEZ of another country; should
the issue arise, we would address it in consultation with the State Department.

## I.   PRESUMPTION AGAINST EXTRATERRITORIAL APPLICATION

"Congress has the authority to enforce its laws beyond the territorial boundaries of the United States. Whether Congress has in fact exercised that authority [in a particular statute] is a matter of statutory construction." EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991) (ARAMCO) (citation omitted). To provide guidance on such questions of construction, the U.S. Supreme Court has created and applied a general presumption that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949). This presumption operates in civil actions, see, e.g., Smith v. United States, 507 U.S. 197, 203-04 (1993) (Federal Tort Claims Act does not apply in Antarctica), and criminal actions, see United States v. Mitchell, 553 F.2d 996, 1002 (5th Cir. 1977) (Marine Mammal Protection Act does not apply in territorial waters of foreign nation); see also United States v. Bowman, 260 U.S. 94, 98 (1922) (acknowledging application of presumption to some criminal statutes). Overcoming the presumption requires a "clear expression" of congressional intent. ARAMCO, 499 U.S. at 248; Steele v. Bulova Watch Co., 344 U.S. 280, 285 (1952); Foley Bros., 336 U.S. at 285.

## II.   *BOWMAN*: LIMITED EXCEPTION FOR SOME CRIMINAL CASES

The Supreme Court has also created an exception to the presumption against extraterritorial application for a certain type of criminal statute. When the "nature of the offense" mandates that the statute be read to reach outside the territory of the United States, the Court finds it appropriate to infer extraterritorial application even absent express direction from Congress. United States v. Bowman, 260 U.S. 94 (1922). In that case, the Supreme Court considered whether it was appropriate to extend federal criminal jurisdiction extraterritorially in the case of fraud against a federally-owned corporation. The Court recognized two types of criminal prohibition, and held that the presumption applies to the first, but not the second type.

> Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which must affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard. . . .

> But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the

2

CW0000006106

scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

Id. at 98. Thus, the Court held that the presumption against extraterritorial application did not apply to criminal statutes to protect the government itself. Some such statutes cannot by definition apply to actions outside of the U.S., but others cannot be effective without extraterritorial application. Statutes in the latter category can be applied to actions beyond U.S. territory even without the express direction of Congress. In Bowman, the Court concluded that the statute at issue should be applied extraterritorially.[1]

Bowman may be viewed as an exception to the presumption against extraterritorial application, and hence to the requirement that there be a clear expression of congressional intent. That is, "if the nature of the law does not mandate its extraterritorial application [i.e., the Bowman exception does not apply], then a presumption arises against such application. To overcome the presumption and to apply the statute beyond the territory of the United States, the Government must show a clear expression of congressional intent." United States v. Mitchell, 553 F.2d 996, 1002 (5th Cir. 1977) (citations omitted).

## III.    APPLICATION OF THE *BOWMAN* EXCEPTION TO THE MBTA IN INTERNATIONAL WATERS

As noted earlier, while the MBTA implements a series of bilateral agreements between the United States and neighboring countries, nothing in its text expressly deals with the geographic scope of its application. This means that there is no "clear expression" of congressional intent to overcome the presumption against extraterritorial application, if that presumption applies to the MBTA. Therefore, the MBTA may be applied extraterritorially only if it falls within the ambit of the Bowman exception to that presumption.

The Supreme Court has not had occasion to address the extraterritorial application of a criminal statute since Bowman. Although the "defense of government" rationale might seem to place severe limits on Bowman's scope, lower courts have shown a willingness to apply that rationale expansively or to ignore this portion of Bowman completely. In cases where the courts have

---

[1] The facts of Bowman made it relatively easy for the Court to infer extraterritorial application: The crime was fraud against the United States Shipping Board Emergency Fleet Corporation, a corporation owned entirely by the United States. The Court reasoned that fraud against a shipping enterprise was likely to be committed either at sea or in a foreign port, so Congress must have intended extraterritorial application. In addition, the law was enacted to protect the government itself, not to protect individuals or their property. Id. at 98.

3

discussed the interests of the federal government at all, they have generally given Bowman a broad scope. For example, in Stegeman v. United States, 425 F.2d 984 (9th Cir.), cert. denied, 400 U.S. 837 (1970), the Ninth Circuit appeared to equate "defense of government" with "important interests of government." Thus, because bankruptcy laws preventing concealment of assets were "enacted to serve important interests of government, not merely to protect individuals who might be harmed by the prohibited conduct," extraterritorial intent was appropriately inferred. Id. at 986; see also United States v. Aguilar, 883 F.2d 662 (9th Cir. 1989) (immigration conspiracy), cert. denied, 498 U.S. 1046 (1991); United States v. Larsen, 952 F.2d 1099, 1100-01 (9th Cir. 1991) (drug trafficking).[2]

The MBTA does not clearly implicate "the right of the Government to defend itself." Bowman, 260 U.S. at 98. However, like the bankruptcy laws at issue in Stegeman, protection of migratory birds is an "important interest of government" that has long been recognized at the highest levels of the government. See Missouri v. Holland, 252 U.S. 416, 435 (referring to the MBTA: "Here a national interest of very nearly the first magnitude is involved.").

Most courts engaging in a Bowman analysis have concentrated on the second prong of the test, asking whether failure to apply the statute extraterritorially would greatly curtail that statute's usefulness. If the answer is yes, they have found it unnecessary to find a threat to the government. See United States v. Baker, 609 F.2d 134, 137 (5th Cir. 1980) ("The nature of the enactment here in question mandates an extraterritorial application under the second category [i.e., curtailing the statute's usefulness] described in Bowman."). Courts have found this to be the case in laws relating to customs, Brulay v. United States, 383 F.2d 345, 350 (9th Cir.) (conspiracy to smuggle), cert. denied, 389 U.S. 986 (1967); United States v. Walczak, 783 F.2d 852 (9th Cir. 1986) (false statements on customs forms); immigration, United States v. Castillo-Felix, 539 F.2d 9, 13 (9th Cir. 1976) (inducing aliens to enter the United States); drug trafficking, United States v. Baker, supra; and child pornography, United States v. Thomas, 893 F.2d 1066, 1068-69 (9th Cir.), cert. denied, 498 U.S. 826 (1990).

Like the statutes at issue in those cases, the effectiveness of the MBTA would be greatly curtailed if it applies only in United States territory. Many of the birds protected by the MBTA, such as the northern fulmar, see, e.g., Convention for the Protection of Migratory Birds, Aug. 16, 1916, U.S.-Great Britain (for Canada), art. I, para. 3 (including fulmars, as well as a variety of other pelagic birds, in the list of protected migratory birds), spend most of their lives on or over international waters. If the scope of the MBTA does not extend this far, the MBTA will provide little or no protection to such birds, despite its express goal of protecting them.

---

[2] Courts in a number of cases also have applied Bowman to statutes that required no expansion of the "defense of government" rationale. E.g., United States v. Layton, 855 F.2d 1388 (9th Cir. 1988) (attempting to murder member of Congress), cert. denied, 489 U.S. 1046 (1989); United States v. Cotten, 471 F.2d 744 (9th Cir.) (conspiracy to steal government property), cert. denied, 411 U.S. 936 (1973).

4

CW0000006108

Moreover, both the treaty with Japan and the treaty with Russia protect only birds that migrate between those countries and the United States. Convention for the Protection of Migratory Birds, Mar. 4, 1972, U.S.-Japan, art. II, para. 1(a); Convention Concerning the Conservation of Migratory Birds, Nov. 19, 1976, U.S.-U.S.S.R., art. I, para. 1(a). As neither of these countries share a land border (or an extensive border between territorial waters) with the United States, such migration requires that the birds fly over international waters. If the MBTA is not interpreted to apply in international waters, there will be a gap in the protection of the birds that were the subject of these treaties.[3]

Threats to migratory birds in international waters have gained increasing national and international attention. For example, in 1989, the United Nations banned large-scale high seas driftnets, G.A. Res. 44-225, in part to reduce seabird bycatch; the United States implemented this resolution in the High Seas Driftnet Fisheries Enforcement Act, 16 U.S.C. § 1826 et seq.; see also 50 C.F.R. 679.24(e) (regulations under the Magnuson-Stevens Act, 16 U.S.C. § 1801 et seq., imposing gear and procedure requirements to reduce seabird bycatch in particular U.S. fishery). These important but narrow limitations are insufficient to address the many threats facing seabirds protected by the MBTA in international waters.

A number of recent decisions have added a third element to the Bowman analysis: namely, that extraterritorial application of the statute at issue be consistent with the principles of international law. See, e.g., United States v. Vasquez-Velasco, 15 F.3d 833, 839-41 (9th Cir. 1994). International law principles require, in turn, that there be a recognized basis for the assertion of jurisdiction. See Chua v. United States, 730 F.2d 1308, 1312 (9th Cir. 1984), cert. denied, 470 U.S. 1031 (1985); Restatement (Third) of the Foreign Relations of the United States § 402 (1987) (Restatement).

The interpretation of the MBTA set forth in this Opinion is entirely consistent with principles of international law. First, application of the MBTA to those (including foreign nationals) aboard U.S.-flagged vessels is consistent with international law. See Restatement (Third) of the Foreign Relations Law of the U.S. § 502 (1986) ("The flag state may exercise jurisdiction to prescribe, to

---

[3] Moreover, the treaty with Russia expressly contemplated extraterritorial application of the parties' respective implementing legislation to areas (presumably including those in international waters) designated as especially important to bird conservation. See Convention Concerning the Conservation of Migratory Birds, Nov. 19, 1976, U.S.-U.S.S.R., art. IV, para. 3. Although the U.S. and Russia have not yet designated any such areas, if they did so, the U.S. would be to required to assert extraterritorial jurisdiction in such areas "to the maximum extent possible." Id. The MBTA should be interpreted as broad enough to allow this. The Supreme Court has expressly recognized that Congress could, and did in the MBTA, provide more protection to migratory birds than required by the underlying treaties. Andrus v. Allard, 444 U.S. 51, 62 n.18 (1979). Thus, the United States need not wait until such an area is designated to assert jurisdiction over actions taken in international waters.

5

CW0000006109

adjudicate, and to enforce, with respect to the ship or any conduct that takes place on the ship.") Second, application of the MBTA to United States citizens (whether or not on U.S.-flagged vessels) in international waters also is consistent with international law, as nationality is an accepted basis for jurisdiction. See Thomas, 893 F.2d at 1069 (prosecution of United States citizen for acts of child pornography occurring in Mexico was consistent with international law); Restatement § 402(2); cf. Skiriotes v. Florida, 313 U.S. 69, 73 (1941) ("the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed") .[4]

In fact, it is the MBTA's international genesis that makes application of the Bowman exception to it particularly appropriate. The MBTA was designed to implement international agreements to protect migratory birds. These treaties were necessary because individual countries proved unable to protect migratory birds without international cooperation: Birds do not respect political boundaries, whether on land or sea. In this context, it is reasonable to assume that Congress intended the MBTA to apply as broadly as would be consistent with international law.

Few courts have engaged in a Bowman analysis and then refused to give the statute in question extraterritorial effect; therefore, the outer limits of the application of Bowman have not been well defined. The Second Circuit has distinguished Bowman and applied the presumption against extraterritorial application (1) where U.S. criminal laws were enforced against foreign citizens for acts taken in foreign territory, United States v. Pizzarusso, 388 F.2d 8 (2d Cir.) (falsification of visa application; court applied presumption but found clear expression of congressional intent to overcome it and approved extraterritorial application), cert. denied, 392 U.S. 936 (1968), and (2) in civil actions, Kollias v. D&G Marine Maintenance, 29 F.3d 67 (2d Cir. 1994) (Longshore and Harbor Workers' Compensation Act not intended to apply extraterritorially), cert. denied, 260 U.S. 94 (1995).[5]

---

[4] Vasquez-Velasco suggests that to be consistent with international law, the extraterritorial exercise of jurisdiction must be reasonable. 15 F.3d at 840. We believe the limited extraterritorial application described in this Opinion is reasonable as against U.S. citizens and foreign nationals on U.S.-flagged vessels. Moreover, Restatement § 403(1) indicates that the exercise of jurisdiction must be reasonable only "with respect to a person or activity having connections with another state." Enforcement of the MBTA against United States citizens in international waters would not appear to implicate another state.

[5] The Kollias opinion noted two recent Supreme Court decisions that have refused to uphold extraterritorial application and used these as a basis to suggest that Bowman is "limited to its facts" and may apply only to criminal statutes, "and perhaps only [to] those relating to the government's power to prosecute wrongs committed against it." 29 F.3d at 71. The Supreme Court cases cited involved the Federal Tort Claims Act, Smith v. United States, 507 U.S. 197 (1993), and to Title VII of the Civil Rights Act of 1964, EEOC v. ARAMCO, 499 U.S. 244

6

Finally, in United States v. Mitchell, 553 F.2d 996 (5th Cir. 1977), the Fifth Circuit, in an appeal of a criminal conviction, declined to apply the Marine Mammal Protection Act (MMPA), 16 U.S.C. § 1361 et seq., to acts committed by a United States citizen while in foreign waters. The MMPA expressly applies in United States waters and on the high seas. Id. § 1372(a). The acts that formed the basis for Mitchell's criminal conviction were in compliance with the laws of the government exercising sovereignty where the acts were committed. In its Bowman analysis, the court noted that, under international law, each sovereign controls the natural resources within its own territory. 553 F.2d at 1002-03. Moreover, limiting application of the MMPA to United States waters and the high seas would not frustrate that statute's purpose. Id. at 1003. The court concluded: "We cannot then infer from the nature of the MMPA that Congress intended to apply its restrictions to the territories of foreign sovereigns." Id. Having rejected the Bowman exception, the court applied the presumption against extraterritorial application, and found that neither the statute nor legislative history provided the "clear expression" necessary to overcome the presumption. Id. at 1003-04.

The cases which have declined to follow Bowman are all distinguishable from application of the MBTA to U.S. citizens and persons on U.S.-flagged vessels in international waters. Cases involving only civil statutes, such as Kollias, are distinguishable from the cases involving criminal statutes to which Bowman directly speaks. Pizzarusso is distinguishable because it involved extraterritorial application of a criminal statute to a foreign national in foreign territory. Finally, the result in Mitchell is distinguishable because it involved prosecution of a U.S. national for actions taken within the territorial waters of another sovereign. 553 F.2d at 1002-03.

Mitchell is worth considering further because of the superficial similarity between the MMPA and the MBTA. Specifically, the court in Mitchell noted that (1) the MMPA is a natural resources statute, (2) such statutes are inherently domestic in nature, (3) each sovereign has authority over natural resources in its territory, and (4) another sovereign may strike a balance different from that struck by the Congress. The court concluded: "The traditional method of resolving such differences in the international community is through negotiation and agreement rather than through the imposition of one particular choice by a state imposing its law extraterritorially." Id. at 1002. While the MBTA is a natural resources statute like the MMPA, the statutes are otherwise quite different. Unlike the MMPA and most other natural resource statutes, the MBTA is the direct result of the sort of international "negotiation and agreement" that the Mitchell court identified as the appropriate mechanism for international natural resource protection.[6] As discussed above, the international genesis of the MBTA means that it cannot be

(1991), two statutes which focus on domestic concerns.

> [6] Several treaties relating to marine mammals predate the MMPA, but the statute (particularly with regard to the take prohibitions at issue in Mitchell) was not enacted to implement any such treaty. In fact, it was intended, among other things, to spur future treaty negotiations regarding the conservation of marine mammals. See 16 U.S.C. §§ 1361(4), 1378.

7

CW0000006111

considered "inherently domestic in nature," and supports its application to certain persons in international waters. Moreover, the interpretation of the MBTA contained in this Opinion does not affect the authority of other sovereigns over natural resources in their territories, as it limits extraterritorial application of the MBTA to international waters, which are not within the territory of any sovereign. Cf. Skiriotes v. Florida, 313 U.S. 69, 73 (1941) (upholding application of Florida law protecting marine sponges to Florida citizen for actions taken on the high seas). Thus, this opinion is consistent with both the result and the reasoning of Mitchell.

Based on the foregoing analysis, I conclude that the MBTA fits the Bowman exception and can be enforced extraterritorially against United States citizens for acts taken in international waters, and against citizens of any country for acts taken on U.S.-flagged vessels in international waters.[7]

## IV.   OUR PREVIOUS OPINIONS

This office has issued three prior memorandum opinions involving extraterritorial application of the MBTA. Each of these opinions was directed to questions not here at issue and is therefore distinguishable. The first concluded that the MBTA did not apply to actions of United States corporations in the territory of other sovereigns. Memorandum from Assistant Solicitor, Fish and Wildlife, to Chief, Division of Law Enforcement, Fish and Wildlife Service, Re: Extraterritorial application of section 2 of the Migratory Bird Treaty Act (Dec. 11, 1980). The second concluded that the MBTA did not apply to actions of Japanese fishermen outside of the territory of the United States. Memorandum from Assistant Solicitor, Fish and Wildlife, to Office of Migratory Bird Management, FWS, Re: U.S. - Japan Migratory Bird Treaty (Mar. 27, 1981). The third concluded that President Reagan's proclamation establishing the U.S. Exclusive Economic Zone did not change the jurisdictional scope of the MBTA. Memorandum from Assistant Solicitor, Fish and Wildlife, to Director, Fish and Wildlife Service, Re: Application of the Migratory Bird

---

[7]   This opinion does not address whether the Presidential Proclamations regarding the U.S. assertion of a twelve-NM territorial sea (Proclamation 5928 (Dec. 27, 1988)), and a 200-mile EEZ (Proclamation 5030 (Mar. 10, 1983)) apply to the MBTA. If these Proclamations are interpreted as extending the reach of the MBTA, the MBTA would apply to all persons within those respective areas, and not be limited to U.S. citizens and anyone on U.S.-flagged vessels. Caveats in or accompanying these proclamations limit the extension of existing domestic laws within the expanded territorial sea and the EEZ. The Office of Legal Counsel of the Department of Justice (OLC) has opined that "[t]he issue in determining the effect of the proclamation on domestic law is whether Congress intended for the jurisdiction of any existing statute to include an expanded territorial sea." Legal Issues Raised by Proposed Presidential Proclamation To Extend the Territorial Sea, 12 Op. O.L.C. 238, 253 (1988). This analysis was specifically applied to the jurisdiction of the Antiquities Act, 16 U.S.C. 431 et seq., in an OLC opinion of September 15, 2000, which concluded that the Antiquities Act did in fact apply to both the extended territorial sea (three to twelve miles) and within the EEZ.

8

CW0000006112

F

Treaty Act Within the 200 Mile Exclusive Economic Zone (Oct. 6, 1987). Those conclusions are consistent with this opinion.

Some language in those opinions is, however, inconsistent with our conclusions here. The first opinion, for example, noted:

> Since the migratory bird treaties are implemented by the laws of the party countries, and non-party countries can also protect migratory birds, it appears that the primary function of the Act is to implement the treaties within the United States. Moreover, U.S. citizens in foreign countries are subject to the laws of those countries. Thus, limiting the prohibitions of [the MBTA] to the territory of the United States does not "leave open a large immunity" for violations committed by U.S. citizens abroad.

Dec. 11, 1980, Opinion at 3-4 (citations omitted) (emphasis added). The emphasized portion of the quotation suggests a conclusion that the MBTA applies solely to the territory of the United States. But the opinion did not address the question addressed here, of whether the purposes of the MBTA can be effectuated without its application in international waters, to the extent consistent with international law. We disavow a literal reading of that quotation, for the reasons set out above.

In our second opinion, we relied on the first one to conclude that Japanese fisherman would be subject to prosecution under the MBTA only if the violations occurred in U.S. territorial waters. This opinion must be modified with the caveat that the MBTA would be applicable to such fisherman if the violations occurred on U.S.-flagged vessels in international waters.

Our third opinion, without additional analysis, stated that we had concluded in the previous two opinions that the MBTA applies only in U.S. territory. We reject this dictum to the extent that it conflicts with this opinion.

To summarize, none of our previous opinions addressed the question at issue here, although those opinions contain language stating broad conclusions unsupported by analysis. To the extent that any of the broad characterizations found in those opinions conflict with this opinion, the earlier opinions are superseded.

## V.   CONCLUSION

Application of the MBTA in international waters beyond three nautical miles serves an important governmental interest, and limiting its application would severely curtail its usefulness, particularly with regard to certain species of protected birds. Therefore, under Bowman, the nature of the MBTA requires its application to United States citizens, and any person aboard a U.S.-flagged vessel, for acts taken in international waters.

9

TOTAL P.13

CW0000006113

11

CW0000006114



# GRAY & PAPE
##### INC.
## CULTURAL RESOURCES CONSULTANTS
1318 MAIN STREET    CINCINNATI, OHIO    45202-7614    (513) 287-7700    FAX (513) 287-7703

**A Review of the "Cultural Resources" and "Visual Studies" Sections of the Draft Environmental Impact Statement Prepared for the Cape Wind Energy Project**

*Introduction and Summary*

At the request of the Alliance for the Preservation of Nantucket Sound, Gray and Pape reviewed sections of the Draft Environmental Impact Statement (DEIS) prepared for the proposed Cape Wind project that address above-ground resources to determine whether the efforts to identify historic properties and assess the potential effects of the project were adequately addressed. We reviewed tables, figures, and appendices, including background reports prepared by Public Archaeology Laboratory, Inc. (PAL), in addition to the main body of the report.

Gray and Pape was specifically requested to review the National Historic Landmark (NHL) nominations for the Kennedy Compound (the "Kennedy Compound NHL") and the Nantucket Historic District ("Nantucket Island NHL") to determine whether the boundaries of these properties require reevaluation as stipulated in 36 CFR 800.4. Gray and Pape concludes that the boundaries for both NHLs should be reevaluated, particularly in terms of considering the historically significant and character-defining setting of each NHL. The DEIS, in determining that the proposed Cape Wind project will have an adverse effect on both NHLs, acknowledges that the waters of Nantucket Sound, including Horseshoe Shoals, are part of the historically significant and character-defining setting of both NHLs.

Gray and Pape agrees with the assessment of PAL, the U.S. Army Corps of Engineers (the Corps) and the Massachusetts State Historic Preservation Officer (SHPO) (Massachusetts Historical Commission) that construction of the Cape Wind Energy Project at the preferred alternative location of Horseshoe Shoals in Nantucket Sound will cause direct adverse effects to numerous historic properties, including both the Kennedy Compound NHL and Nantucket Island NHL.

*Evaluation of Effects to NHLs from the Cape Wind Energy Project*

The Corps implements Section 106 through its own regulations, "Processing of Department of the Army Permits: Procedures for the Protection of Historic Properties, Appendix C" (33CFR Part 325). According to Paragraph 15 of Appendix C an undertaking has an effect on a designated historic property "when the undertaking may

MAIN OFFICE: CINCINNATI, OHIO • MID-ATLANTIC OFFICE: RICHMOND, VIRGINIA

PREHISTORIC & HISTORIC SITE SURVEY, EVALUATION, TESTING & EXCAVATION • RESTORATION ARCHAEOLOGY
ORAL HISTORY & ARCHIVAL RESEARCH • PRESERVATION TAX CONSULTING • HISTORIC ARCHITECTURAL ANALYSIS

CW0000006115



## GRAY & PAPE

— INC.—

### CULTURAL RESOURCES CONSULTANTS

1318 MAIN STREET    CINCINNATI, OHIO    45202-7614    (513) 287-7700    FAX (513) 287-7703

alter characteristics of the property that qualified the property for inclusion in the National Register." The regulations provide that in determining whether an undertaking has an effect, "alteration to features of a property's location, setting, or use may be relevant, and depending on a property's important characteristics, should be considered." An adverse effect occurs when the effect on a designated historic property "may diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." Adverse effects may include, but are not limited to, "alteration of the character of the property's setting when that character contributes to the property's qualification for the National Register" and "[i]ntroduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting."[1]

In the DEIS the Corps determined that the Cape Wind project will have an adverse effect on two NHLs: the Kennedy Compound NHL and the Nantucket Island NHL.[2]  The Visual Impacts report prepared by PAL, upon which the findings of adverse effects to historic properties is based, does not limit its finding to visual effects, and concludes that the Cape Wind project "will have an adverse effect" on both the Kennedy Compound NHL and the Nantucket Island NHL.[3]

The fact that in its assessment of effects to historic properties from the Cape Wind project the Corps treats visual effects separately from physical effects, suggests that perhaps the Corps intends to suggest that visual effects are not direct effects.  If so, this is fallacious reasoning.  PAL and the Corps acknowledge that the effects from the Cape Wind project to historic properties in the project's area of potential effects (APE), including the Kennedy Compound NHL and Nantucket Island NHL, will change and diminish the Nantucket Sound setting of these properties.  Since these changes are physical changes to elements of the historic properties themselves, they constitute direct effects, with impacts that are both physical and visual in nature.

Appendix C of 33 CFR 325 makes no distinction between direct and indirect effects. It simply establishes a procedure for determining whether an undertaking will have an adverse effect upon a designated historic property. The Advisory Council on Historic Preservation's regulations, 36 CFR 800, state that an adverse effect is found when an undertaking may alter "directly or indirectly, any of the characteristics of a historic

---

[1] 33 CFR 325, Appendix C: Procedures for the Protection of Historic Properties, Paragraph 15: Criteria of Effect and Adverse Effect.
[2] DEIS at Section 5.10.4.3.2, pp. 5-206 and 5-207, 208.
[3] DEIS at Appendix 5.10F, pp. 38 and 42.

MAIN OFFICE: CINCINNATI, OHIO • MID-ATLANTIC OFFICE: RICHMOND, VIRGINIA

PREHISTORIC & HISTORIC SITE SURVEY, EVALUATION TESTING & EXCAVATION • RESTORATION ARCHAEOLOGY
ORAL HISTORY & ARCHIVAL RESEARCH • PRESERVATION TAX CONSULTING • HISTORIC ARCHITECTURAL ANALYSIS

CW0000006116



## GRAY & PAPE

INC.

### CULTURAL RESOURCES CONSULTANTS

1318 MAIN STREET    CINCINNATI, OHIO    45202-7614    (513) 287-7700    FAX (513) 287-7703

property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."[4]

Nantucket Sound comprises a significant portion of the setting for the Kennedy Compound NHL and the Nantucket Island NHL. The setting is an integral part of each NHL, although neither of the original Inventory-Nomination Forms submitted to and describing the properties for the National Register of Historic Places (NRHP) specifically mentions their setting. In the Inventory-Nomination Form for the Kennedy Compound NHL the historic resources is described as "six acres of waterfront property on Nantucket Sound" that includes "sweeping views of the ocean." The statement of significance for the Kennedy Compound also suggests the significance of Nantucket Sound to the property, noting that it was at this location that the Kennedy children learned to sail and engage in other competitive activities.[5] In the Inventory-Nomination Form for the Nantucket Island NHL, the historic property is described as encompassing the entire island. The described boundaries are somewhat imprecise; however, stating that "[t]he landmark designation is the entire island of Nantucket, approximately 75 miles in circumference and 30,000 acres in area."[6] It is unclear whether "the entire island" is defined based upon average high or low tide lines, or whether it includes any areas of shallow, inshore waters.

ACHP regulations provide that a historic property, including the appropriateness of its boundaries, should be reevaluated during a Section 106 review where prior evaluations may be incorrect or out-of-date, due to "[t]he passage of time, changing perceptions of significance, or incomplete prior evaluations."[7] The original nominations of both Nantucket Island NHL and the Kennedy Compound NHL may be said to be incorrect or out-of-date with regard to the extent of the properties' boundaries due to one or all of the criteria for reevaluation. PAL and the Corps appear to admit the need for a reevaluation of boundaries by stating that the Nantucket Sound setting in which the Cape Wind project is proposed is an integral part and a characteristic of both NHLs.

---

[4] 36 CFR 800.5(a)(1).
[5] Barry Mackintosh, "Kennedy Compound National Register of Historic Places Nomination Form" (September 1972), Sections 7 and 8.
[6] Patricia Heintzelman, "Nantucket Historic District National Register of Historic Places Nomination Form" (February 1975), Section 7, 3.
[7] 36 CFR 800.4(c)(1).

MAIN OFFICE: CINCINNATI, OHIO • MID-ATLANTIC OFFICE: RICHMOND, VIRGINIA

PREHISTORIC & HISTORIC SITE SURVEY, EVALUATION, TESTING & EXCAVATION • RESTORATION ARCHAEOLOGY
ORAL HISTORY & ARCHIVAL RESEARCH • PRESERVATION TAX CONSULTING •HISTORIC ARCHITECTURAL ANALYSIS

CW0000006117



## GRAY & PAPE
—— INC. ——
### CULTURAL RESOURCES CONSULTANTS
1318 MAIN STREET    CINCINNATI, OHIO    45202-7614    (513) 287-7700    FAX (513) 287-7703

Despite a preference for using natural features as boundaries, NRHP guidance provides for including elements of a property's setting. In the past, these considerations led to the recognition that the appropriate setting for a collection of farm buildings often includes significant areas of land. Similarly, the NRHP has in recent years recognized the significance and eligibility of cultural landscapes as historic properties. Given the close associations that both the Kennedy Compound and Nantucket Island NHLs have with the sea and maritime industries, the non-inclusion of some portion of the surrounding waters appear contrary to prevailing NRHP guidance regarding the setting and landscape of historic properties, and is analogous to the former practice of listing farm buildings in the NRHP without including any of the farmland associated with the buildings.

NRHP guidance provides for including elements of a property's setting within the listed boundaries. Boundaries are intended to "encompasses the resources that contribute to the property's significance" and usually include the immediate surroundings and "the appropriate setting," while excluding buffer zones and open space. These two statements may appear to be contradictory, but the selection of boundaries for historic properties is acknowledged to be a "judgment based on the nature of the property's significance, integrity, and physical setting."[8] According to NRHP guidance "natural features of the landscape may be included when they are located within the district or were used for purposes related to the historical significance of the property."[9] To illustrate this point an example is provided of a district comprised of several farmsteads partially bounded by a creek. The guidance states that the creek may be included within the boundaries of the historic property if it was important in the siting of the farms, served as a source of power, or furnished "natural resources exploited by the farmsteads."[10]

In the case of the Kennedy Compound NHL the property's significance is tied to its association with the Kennedy family. The NHL inventory-nomination form notes that the property commands sweeping views of Nantucket Sound and was the location where the Kennedy children learned to sail and engage in other important competitive activities. This clearly indicates that the waters of Nantucket Sound are part of the historically significant setting for the NHL.

---

[8] Donna J. Seifert, *National Register Bulletin: Defining Boundaries for National Register Properties* (Washington, DC: National Park Service, 1995, revised 1997), 1-2.
[9] Ibid., 2.
[10] Ibid.

MAIN OFFICE: CINCINNATI, OHIO • MID-ATLANTIC OFFICE: RICHMOND, VIRGINIA

PREHISTORIC & HISTORIC SITE SURVEY, EVALUATION, TESTING & EXCAVATION • RESTORATION ARCHAEOLOGY
ORAL HISTORY & ARCHIVAL RESEARCH • PRESERVATION TAX CONSULTING • HISTORIC ARCHITECTURAL ANALYSIS

CW0000006118



# GRAY & PAPE

———— INC. ————

## CULTURAL RESOURCES CONSULTANTS

1318 MAIN STREET   CINCINNATI, OHIO   45202-7614   (513) 287-7700   FAX (513) 287-7703

The Nantucket Island NHL is considered nationally significant as a "near pristine natural coastal environment with a well-preserved collection of structures reflecting its early development, its emergence as [a] major whaling center in the middle of the nineteenth century, and its subsequent summer resort expansion."[11] The near shore waters surrounding Nantucket clearly constitute a natural resource exploited by the island's residents and were used for purposes related to the historical significance of the property. The waters immediately surrounding the island supplied sustenance to the island's residents in the form of fish, whales, seals, birds, and shellfish. The waters served as the fields and pastures of many of the island's residents, in a nearly identical fashion to the fields and pastures of land-bound farmers. Island residents knew and exploited the near shore fishing and shell fish grounds in a sophisticated manner. If Nantucket is historically significant for its associations with the maritime industries of New England, then the natural features of the near shore sound surely "were used for purposes related to the historical significance of the property."[12]

One significant aspect of Nantucket's setting is the fact that it is an island, separated from the mainland and, until recently, only approachable from the mainland by a vessel traversing the waters of Nantucket Sound. The singular fact that Nantucket is an island contributed significantly to its popularity as a summer resort.[13] The distinctiveness of Nantucket as a place, a destination only reachable by a passage across water, and bounded by scenic, unbroken ocean vistas, attracted visitors and significantly contributed to the island's popularity as a resort.

The sea passage to the island, by private vessel or ferry, remains a special event, permitting the traveler to prepare oneself for arrival at a special destination and, in the case of Nantucket, a historic property. In essence, Nantucket Sound serves as the foreground to the historic property. The island's setting in the ocean, and the leisurely, ritualized approach over the water, constitute important elements of the historic property's setting. Placing the proposed wind farm astride this approach will significantly alter the setting of the historic property by altering the approach to the property. On board ferries and other vessels passing to and from the mainland and the island, the wind farm

---

[11] PAL, "Technical Report: Visual Impact Assessment of Multiple Historic Properties, Cape Wind Project," Appendix 5.10-F to Cape Wind DEIS, 30.
[12] Quote from Seifert, *Defining Boundaries*, 2.
[13] In 1982 the period of significance of the Nantucket Historic District was expanded to include resources constructed between 1900 and ca. 1930. One of the justifications advanced for this expansion was the economic importance of the island's summer resort trade, beginning in the 1870s and continuing to the present.

MAIN OFFICE: CINCINNATI, OHIO • MID-ATLANTIC OFFICE: RICHMOND, VIRGINIA

PREHISTORIC & HISTORIC SITE SURVEY, EVALUATION, TESTING & EXCAVATION • RESTORATION ARCHAEOLOGY
ORAL HISTORY & ARCHIVAL RESEARCH • PRESERVATION TAX CONSULTING • HISTORIC ARCHITECTURAL ANALYSIS

CW0000006119



## GRAY & PAPE

— INC —

### CULTURAL RESOURCES CONSULTANTS

1318 MAIN STREET    CINCINNATI, OHIO    45202·7614    (513) 287·7700    FAX (513) 287·7703

will constitute a significant visual intrusion, akin to that the Gettysburg Tower represented at Gettysburg National Military Park. While not located within the historic district, the wind farm, like the now demolished observation tower, will significantly affect the setting of the historic property, dramatically altering the feeling and association of the sea passage to this distinct and nationally significant historic property. As the Corps has acknowledged and the Massachusetts State Historic Preservation Office has concurred, this constitutes an adverse effect under both 33 CFR 325 and 36 CFR 800.

Consequently, because the Cape Wind project will change and diminish the character of the setting of both the Nantucket Island NHL and Kennedy Compound NHL, and because this setting is both an integral and critical element of these historic properties and a character-defining feature essential to the NRHP eligibility of each property, the Cape Wind Project will adversely affect both the Nantucket Island NHL and the Kennedy Compound NHL.

The fact that the NHL boundaries contained in the nomination forms for the Kennedy Compound NHL and the Nantucket Island NHL do not encompass any of the waters of Nantucket Sound is not surprising, since NRHP guidance regarding the establishment of boundaries is clearly focused on establishing boundaries for terrestrial resources and specifically calls for the use of natural features "such as a shoreline" in the selection of appropriate boundaries.[14] Nevertheless, given the close associations that these properties have with the sea and maritime industries, the non-inclusion in the Nantucket Island NHL listing of the waters of Nantucket Sound is analogous to the former practice of listing farm buildings in the NRHP without including any of the farmland associated with the buildings.

It should be noted that the NRHP has made exceptions to the general policy of discouraging the nomination or listing of significant bodies of water. The Isles of Shoals Historic District in Maine and New Hampshire, listed in the NRHP in 1974, includes the islands, ledges, and "limited surrounding waters" that comprise the archipelago. Valcour Bay, on Lake Champlain in Clinton County, New York, was listed on the NRHP in 1979 as the site of a significant Revolutionary War naval battle. Similarly, Plattsburgh (Cumberland) Bay, located a short distance north of Valcour Bay, was listed in 1976 as the site of a naval action during the War of 1812.[15] The latter two nominations are not

---

[14] Seifert, *Defining Boundaries*, 3.
[15] James L. Gavin, "Isles of Shoals National Register of Historic Places Inventory-Nomination Form" (February 1974); Richard Greenwood, "Valcour Bay National Register of Historic Places Inventory-

MAIN OFFICE: CINCINNATI, OHIO • MID-ATLANTIC OFFICE: RICHMOND, VIRGINIA

PREHISTORIC & HISTORIC SITE SURVEY, EVALUATION, TESTING & EXCAVATION • RESTORATION ARCHAEOLOGY
ORAL HISTORY & ARCHIVAL RESEARCH • PRESERVATION TAX CONSULTING • HISTORIC ARCHITECTURAL ANALYSIS

CW0000006120



# GRAY & PAPE
INC.
## CULTURAL RESOURCES CONSULTANTS
1318 MAIN STREET    CINCINNATI, OHIO    45202-7614    (513) 287-7700    FAX (513) 287-7703

directly applicable to the Nantucket Historic District, since they were nominated and listed as sites, defined in NRHP guidance as "the location of a significant event." Nevertheless, it is important to note that they represent the placement of nearly 3,500 acres of water on the NRHP to commemorate the scene of a battle, despite NRHP guidance that states "[o]rdinarily ... properties primarily commemorative in nature ... shall not be considered eligible for the National Register."[16]

The waters of Nantucket Sound represent a vital part of the setting of the Nantucket Historic District and the Kennedy Compound. Refinement and redefinition of the district's boundaries should consider the significant role that Nantucket Sound played in the settlement, development, history, and economy of Nantucket. If so considered, it appears that the boundaries of the NHL district could appropriately be expanded to include those portions of Nantucket Sound considered to constitute the setting of the Nantucket Island NHL and the Kennedy Compound NHL.

The Corps and PAL have concluded, in the DEIS, that the proposed Cape Wind project on Horseshoe Shoals will have an adverse effect upon the setting of the two NHLs. This strongly suggests that a reevaluation of the boundaries of these NHLs should include Horseshoe Shoals as an important component of the properties' historically significant setting. This conclusion is most consistent with the findings of the Corps and PAL that the proposed Cape Wind Project will have an adverse effect on both properties by altering the character of the properties' setting and by introducing a visual element that is out of character with the properties and their settings.

*Conclusion*

For the reasons discussed above, we conclude that the Cape Wind project will directly and physically alter the shape and outline of the horizon and the water views of the sound from the Kennedy Compound NHL and Nantucket Island NHL. These effects will physically and directly alter, and diminish the integrity of, the character-defining element of the Nantucket Sound setting that is a physical part of these resources and renders them eligible for the National Register and as National Historic Landmarks.

---

Nomination Form" (December 1975); Richard Greenwood, "Plattsburgh (Cumberland) Bay National Register of Historic Places Inventory-Nomination Form" (January 1976). The Plattsburgh nomination also includes two buildings.
[16] National Park Service, *National Register Bulletin: How to Complete the National Register Registration Form* (Washington, DC: National Park Service, 1997), 15, 37.

---

MAIN OFFICE: CINCINNATI, OHIO ● MID-ATLANTIC OFFICE: RICHMOND, VIRGINIA

PREHISTORIC & HISTORIC SITE SURVEY, EVALUATION, TESTING & EXCAVATION ● RESTORATION ARCHAEOLOGY
ORAL HISTORY & ARCHIVAL RESEARCH ● PRESERVATION TAX CONSULTING ● HISTORIC ARCHITECTURAL ANALYSIS

CW0000006121



# GRAY & PAPE
#### INC
## CULTURAL RESOURCES CONSULTANTS

1318 MAIN STREET    CINCINNATI, OHIO    45202-7614    (513) 287-7700    FAX (513) 287-7703

Therefore, the Cape Wind energy project will directly and adversely affect both the Kennedy Compound and the Nantucket Island NHLs.

GRAY AND PAPE, INC.

By:

Title:   Senior Historian

MAIN OFFICE: CINCINNATI, OHIO • MID-ATLANTIC OFFICE: RICHMOND, VIRGINIA

PREHISTORIC & HISTORIC SITE SURVEY, EVALUATION, TESTING & EXCAVATION • RESTORATION ARCHAEOLOGY
ORAL HISTORY & ARCHIVAL RESEARCH • PRESERVATION TAX CONSULTING • HISTORIC ARCHITECTURAL ANALYSIS

CW0000006122

12

CW0000006123

**IDENTIFICATION OF POTENTIALLY ELIGIBLE PROPERTIES**
**CAPE WIND ENERGY PROJECT**

Prepared for:
Alliance to Protect Nantucket Sound, Inc.

Prepared by:
Candace Jenkins
Consultant in Architectural History and Historic Preservation

*Candace Jenkins*

February 16, 2005

CW0000006124

## Consideration of National Register-eligible Properties

The Alliance to Protect Nantucket Sound, Inc. asked me to review the sections of the Cape Wind Draft Environmental Impact Statement (DEIS) that deal with historic above-ground resources to determine if all eligible resources have been considered by the Army Corps of Engineers (Corps) as required under federal law. I reviewed DEIS tables, figures, and appendices, including background reports prepared by the Public Archaeology Laboratory, Inc. (PAL), in addition to the main body of the report.

The DEIS relies on the Corps regulations for its definition of historic properties. Those regulations differ from Section 106 of the National Historic Preservation Act (NHPA) in a very important way: they limit consideration of indirect effects, including visual effects, to properties "designated" for inclusion on the National Register of Historic Properties (National Register), and ignore properties merely eligible for inclusion on the National Register.

Section 106 of the NHPA and the implementing regulations of the Advisory Council on Historic Preservation (ACHP), "Protection of Historic Properties" (36CFR800) require Federal agencies to consider the effects of their actions on historic properties and to take the effects into account during project planning and implementation. Historic properties are defined as properties "included in or eligible for inclusion in the National Register." (36CFR800.16(1)(1), 16 U.S.C. § 470f). Executive Order 11593, which was issued in recognition of the large numbers of historic properties throughout the nation, and the time and effort necessary to complete designation documentationextended the obligation of agencies like the Corps to consider eligible properties.

The Corps implements Section 106 through its regulations, "Processing of Department of the Army Permits, Procedures for the Protection of Historic Properties, Appendix C" (33CFR Part 325). Under Appendix C, the Corps assesses indirect effects only for designated historic properties (33CFR Part 325, App. C § 15(b)), defined as those "listed in the National Register of Historic Places (National Register) or which have been determined eligible for listing in the National Register pursuant to 35 CFR part 63" or those determined eligible for listing by consensus of the SHPO and the Corps. By excluding other eligible historic properties, the Corps regulationsproduce a much smaller universe of historic properties than that mandated by Section 106 and the ACHP regulations.

In the case of the Cape Wind project, the Corps deviated slightly from its regulations and considered some properties listed in the State Register of Historic Places that were not otherwise listed in or determined eligible for listing in the National Register.The Corps' efforts added only a handful of properties, none of which were determined to be affected by the project. A substantial number of potentially eligible properties were not considered by the Corps.

The DEIS explains the Corps' methodology in the introductory section, but throughout the report there are references to designated and eligible properties, creating the impression that all eligible properties were considered. In fact, no eligible properties other than some local historic districts that are listed in the State Register of Historic Places were considered. Moreover, neither the DEIS nor the background reports clearly explain how the original list of all designated properties on Cape Cod and the Islands ("Known Historic Properties Within Potential Visual Range of the Cape Wind Park; Appendix 5.10-B) was reduced to the much shorter list of properties actually field-checked for potential visibility ("Historic Properties and Districts Assessed for Wind Park Visibility for the Cape Wind Project; Table 5.10-1) to the final list of twelve that received visual simulation studies (Recommended Section 106 Findings of Effect for Aboveground Historic Properties within the Cape Wind Project Visual APE; Table 5.10-5).

CW0000006125

During review of these documents, it has become clear that the DEIS methodology was insufficient to yield a true picture of effects on historic resources. In addition, it is apparent that the numbers of adverse effect findings were directly proportional to the National Register activity of the local communities within the project area. Barnstable,MA is the only community that has undertaken a comprehensive evaluation and designation of National Register properties. Thus, it is not surprising that Barnstable heads the list of adverse effect findings with six properties. In contrast, less active communities like Dennis and Harwich have no adverse effect findings, not because historic properties do not exist, but because they have not been identified, evaluated and designated.

I conducted a limited review of the Inventory of the Historic Assets of the Commonwealth maintained by the Massachusetts Historical Commission (MHC) to identify potentially eligible properties with likely views of the Project. I confined myself to properties that had been recommended for listing by professional consultants as the result of comprehensive surveys or had been evaluated by MHC staff through their National Register Eligibility Opinion process. This very conservative approach produced a list of 23 properties including 11 individual properties and 12 historic districts that included total of approximately 1,562 individual components. A full review of the inventory forms for each town followed by fieldwork to identify additional properties would undoubtedly identify additional properties. It should be noted that many of the properties listed below are turn-of-the-century summer resort communities that were planned and sited to take advantage of proximity to Nantucket Sound and the views thereof.

## Eligible Properties Not Assessed by the Corps

Three properties in Tisbury fall under the Army Corps definition of designated properties and appear to have been left off of Table 5.10-1: Historic Properties and Districts Assessed for Wind Park Visibility.
• William Street NRHD, Tisbury (listed NR property) (approximately 56 components)
• Seaman's Reading Room, Tisbury (consensus DOE property)
• Ritter House, Tisbury (listed NR property)

## Potentially Eligible Properties Not Assessed by the Corps (Listed by Community)

### Falmouth

#### • *Falmouth Heights HD, Falmouth (approximately 500 components)*
The Falmouth Heights National Register District is significant as the first planned summer resort colony in a town and region that continue to be dominated by that industry. Dating to 1871, the district epitomizes the key characteristics of early seaside resorts. Those characteristics include fine beaches and a scenic location on Vineyard Sound, a land division pattern of small house lots relieved by large public parks, a narrow, winding street system that invites pedestrian rather than automobile use, and an architectural mix of late-19th century Gothic Revival style cottages, turn-of-the-century Colonial Revival and Shingle Style residences, and early-20th century Craftsman bungalows. The district as a whole is significant in the areas of Community Planning and Development, Entertainment and Recreation, and Architecture.

The Falmouth Heights National Register District is important primarily at the local level with a period of significance that extends from its establishment in 1871 through 1940 when development was complete and the area was at its zenith as a popular summer destination. Subsequently, the district entered a period of decline that has only recently been reversed. During that period and the years immediately preceding it, all four of its historic hotels, an observatory/chapel, and a small

CW0000006126

number of dwellings were demolished. Nevertheless, the great majority of buildings that were present during the period of significance remain today and retain substantial integrity to that period. Many are in the process of rehabilitation, often with respect for historic character. In addition, the original subdivision plan including the street system, building lots, and parks remains nearly intact, and the seaside setting remains unspoiled.

Thus, the Falmouth Heights National Register District possesses substantial integrity of location, design, setting, materials, workmanship, feeling, and associations. It clearly illustrates the evolution of the Town of Falmouth, of Cape Cod, and of coastal New England as renowned summer resorts in the 19th and 20th centuries. The key characteristics cited above are immediately recognizable and create a unique sense of place that clearly distinguishes Falmouth Heights. The district meets criteria A and C of the National Register of Historic Places.

• *Maravista HD, Falmouth (approximately 25 components)*
The name of this area means "view of the sea" in Portuguese. Located just east of Falmouth Heights, it developed as summer resort area in early 20th century.

• *Menauhant HD, Falmouth (approximately 45 components)*
Menauhant is a summer resort area that originated in 1874 and continued to develop through the early 20th century. It once included a hotel and long wharf that extended into Nantucket Sound. Buildings and setting are well preserved.

• *Church Street HD, Falmouth (contains Nobska Light) (approximately 25 components)*
Church Street originated in the early-18th century, but its historical significance dates to the late-19th and early-20th centuries when it became the site of a lighthouse and developed as a summer resort. The area began to assume its present character as an enclave of large summer homes by 1880. Henry H. Fay, son of Joseph Story Fay, and John M. Glidden (see 70, 80 Church St), a principal in the Pacific Guano Company, had erected large estates at the southern tip of the point; they were accessed by a winding road off Woods Hole Road. Frank Foster had also built an estate on the west side of Church Street that ended just mid-way down the point (see 45 Church St). All of these are clearly shown on an 1887 Birds Eye (along with the old tavern, and the estates of A.C. Harrison (see 55 Church St) and W.O. Luscombe (demo'ed 1967) all on the west side of Church Street.

By 1908, little had changed except the addition of the Robert Bacon estate south of the tavern (see 93 Church St). In the 1920s, the Glidden estate was substantially remodeled and the Carlton estate (see 90 Church St) was developed around the core of its former water tower. The Colonial Revival style Cooper House (60 Church St) was added in 1929.


**Yarmouth**

• *15 Windmere Road, Yarmouth*; full Cape ca. 1750-1775

• *193 Berry Ave, Yarmouth*; Shingle Style summer resort hotel ca. 1900

• *268 South Sea Ave, Yarmouth*; half-Cape

• *Corey House, Great Island, Yarmouth*

• *205 South Street, Yarmouth*; Three-quarter Cape, ca. 1770

- **Park Ave. HD, Yarmouth (approximately 25 components)**
Collection of late 19th and early 20th century summer resort houses overlooking Nantucket Sound; unusually intact summer colony that has not been impacted by the extent of alterations and modern infill seen in other similar areas along Yarmouth's Nantucket Sound coast; includes #239-267-Park Avenue.

- **Mass. Ave. HD, Yarmouth (approximately 25 components)**
Collection of late 19th and early 20th century summer resort houses overlooking Nantucket Sound; unusually intact summer colony that has not been impacted by the extent of alterations and modern infill seen in other similar areas along Yarmouth's Nantucket Sound coast; includes #286-292-Massachusetts Avenue between Broadway and Webster Street, Webster Street, and the east side of Columbus Avenue.

## Harwich

- **Hithe Cote, 32 Snow Inn Road, Harwich**

## Chatham

- **Stage Harbor Light, Chatham**
Stage Harbor Light possesses integrity of location, design, setting, materials, workmanship, feeling, and associations with Chatham's maritime history. Commissioned in 1880, it guarded the entrance to Stage Harbor until it was decommissioned in 1935. Although the lantern/lens was removed at the time, the complex remains nearly intact from the 19th century. This is in contrast to many other lighthouse complexes that have been extensively remodeled with artificial siding, new window sash, and interior modernizations. The undeveloped marine setting is an important component of the light's significance. Stage Harbor Light meets criteria A and C of the National Register.

- **Capt. Joshua Nickerson House, 190 Bridge Street, Chatham**
The Captain Joshua Nickerson House possesses integrity of location, design, setting, materials, workmanship, feeling, and associations with Chatham's early 19th century maritime history as well as its later 19th and early 20th century summer resort development. This large and elegant Federal period dwelling, constructed in c1810 overlooking the Mitchell River, illustrates the wealth that some of Chatham's sea captains began to amass after the Revolution. Operated in the 1870s as the Sportsmen's House and the Monomoy House, attracting hunters from the Boston area, it is part of the first phase of Chatham's summer resort development. Returning to use as a private summer home owned by out-of-staters in the early 20th century, it also has clear associations with the second phase. The Nickerson House meets criteria A and C of the National Register.

- **Jonathan Higgins House, 300 Stage Neck Road, Chatham**
Mid-18th century half-Cape moved from Wellfleet in 1939 and restored by architect/architectural historian; may be significant as example of Colonial Revival period in Chatham; located on bluff overlooking Oyster River and Nantucket Sound

- **Stage Harbor Road HD, Chatham (approximately 50 components)**
The Stage Harbor Road Area possesses integrity of location, design, setting, materials, workmanship, feeling, and strong associations with Chatham's period of maritime prosperity. This road developed as an important internal roadway, connecting Main Street with Stage Harbor and its maritime industries. The area's history continues to be reflected in its large and diverse collection of

CW0000006128

18th, 19th, and 20th century dwelling houses that remain with few modern intrusions. The area meets criteria A and C of the National Register.
Includes that portion of Stage Harbor Road that runs north-south between Oyster Pond and Champlain Road as well as the unpaved Atwood Lane. (129-576 Stage Harbor Road and 79 Atwood Lane)

**• Champlain Road HD, Chatham (approximately 25 components)**
The Champlain Road area is located on the south side of Stage Neck, originally known as Great Neck or Saquanset. Champlain Road appears to date from the early 19th century. The road itself does not appear on the 1836 map, but eight houses are shown strung out along the north bank of Stage Harbor with a large saltworks at the west end. This area, perhaps better than any other, illustrates the predominant role of the sea in Chatham's developmental history. Today, the historic houses are almost all located on the north side of the road facing the harbor; includes the portion of Champlain Road (Street #s 15-205) that parallels Stage Harbor and runs east-west between Stage Harbor Road and the point where Champlain Road turns sharply northward

## Oak Bluffs

**• Cottage City HD, Oak Bluffs (approximately 386 components)**
This recently designated local historic district is now listed in the State Register of Historic Places. It also includes many individual properties that have been recommended for NR listing, especially Waban, Ocean, Nashawena, and Naushon Parks which face directly onto Nantucket Sound. "This area was named for Morris Copeland, an architect whose 1871 "Plan for Oak Bluffs" was the blueprint for the community. The proposed Cottage City Historic District consists of 386 properties. Architectural styles of the proposed district are predominately gingerbread cottages constructed in the 19[th] century..... In addition to the cottages, the district includes three houses of worship, the Cottage City Town Hall, the country's oldest continuously operating carousel, a gazebo and twelve small parks." (MHC eligibility opinion) The area also has strong associations with Oak Bluffs' Afro-American history.

**• Vineyard Highlands HD, Oak Bluffs (approximately 300 components)**
This was the third major area developed in central Oak Bluffs following Wesleyan Grove and the Oak Bluffs Land & Wharf Co. area further east. In 1870 several Methodist clergy and laymen connected with the Camp Meeting Association to form the Vineyard Grove Company that proceeded to buy the original acreage and to expand their holdings to about 200 acres. The area was designed by Charles Talbot using the earlier developments as models, including small house lots balanced by numerous parks, all tied together by a curvilinear street system. Summer resort-related development continued into the 20th century.

The area includes several properties related to Oak Bluffs Afro-American heritage. These sites were recorded in a 1999 survey and 21 were recommended for individual listing in the NRHP.

## Tisbury

**• West Chop HD, Tisbury (approximately 100 components)**
This is a well-preserved planned summer resort community with an impressive collection of Shingle Style houses. Occupying the northernmost tip of Tisbury, it includes the West Chop Lighthouse and offers unobstructed views of Nantucket Sound from many locations. It meets criteria A and C of the NRHP.

CW0000006129

# CANDACE JENKINS
*Consultant in Architectural History & Historic Preservation*

## PROFESSIONAL EXPERIENCE

1984-present **ARCHITECTURAL HISTORY & HISTORIC PRESERVATION CONSULTANT**

Providing a full range of services including documentary research, architectural and historical surveys, National Register nominations, expert witness testimony, environmental impact reports, building reuse studies, historic structure reports, Historic American Building/Engineering Survey documentation, and historic preservation plans, for a variety of public and private sector clients.

1977-84 **MASSACHUSETTS HISTORICAL COMMISSION (SHPO)**

1/83-5/84 **Preservation Planning Director.** Directed staff efforts to identify, evaluate, and designate properties of historical and architectural significance throughout the state. Major program activities included National and State Registers of Historic Places, Local Historical Commissions, Local Historic District Commissions, Certified Local Governments, Survey & Planning Grants, Inventory of the Historic Assets of the Commonwealth, State Reconnaissance Survey, and technical assistance to public.

5/80-12/82 **Registration Director.** Administered statewide evaluation programs including opinions of historical and architectural significance, nominations to the National Register of Historic Places, development and maintenance of 40,000 property State Register of Historic Places. Provided interface with environmental review and tax certification activities.

2/73-4/80 **National Register Coordinator.** Evaluated historical and architectural significance of cultural resources for the purposes of nomination to the National Register of Historic Places and compliance with state and federal environmental review statues. Developed statewide approach to Multiple Resource and Thematic National Register nominations.

1/77-1/78 **Assistant Grants Manager.** Assisted in implementation of Federal grants-in-aid program. Reviewed and approved plans for the restoration, rehabilitation and adaptive reuse of historic structures throughout the state. Directed staff effort to increase total FY78 grant allocation for Massachusetts.

## EDUCATION

M.A. 1977 **BOSTON UNIVERSITY:** American & New England Studies Program;
National Endowment for the Humanities Fellow.
Historic Preservation Studies with concentration in architectural history and preservation management.

B.A. 1974 **SMITH COLLEGE:** Art/Architectural History major.

CW0000006130

## PRIMARY SERVICES

- National Register of Historic Places nomination documentation
- Surveys of historic and architectural resources
- Local Historic District establishment and analysis
- Historic Structure Reports including detailed building histories and physical evolution; evaluation of significant interior and exterior features; and building and site histories
- Environmental Impact Reports including interpretation of local, state, and federal preservation legislation; evaluation of effects to historic resources; and development of mitigation measures
- Preservation Plans including integration of historic preservation issues into community-wide planning and zoning documents
- Historic preservation law/expert witness testimony on historic resources and issues
- Historic building and campus reuse studies
- Historic American Building/Engineering Survey recordings
- Architectural/historical research
- Public presentations and slide lectures

## QUALIFICATIONS

Candace Jenkins is an experienced consultant who is recognized for her in-depth understanding of a full range of historic preservation issues and programs. Her experience is derived from service as the Preservation Planning Director of the Massachusetts Historical Commission (SHPO), and from participation in over 100 consulting projects. Most of those projects have been subject to stringent review by the National Park Service, State Historic Preservation Offices, and other historic preservation agencies, and have thus met the highest standards. Working for both private and public clients, Ms. Jenkins has documented a wide range of property types embracing buildings, structures, landscapes, and areas. Projects have included fifteen cultural resource surveys, forty-four National Register of Historic Places nominations for individual properties, districts, and multiple-property submissions, sixteen Historic Structure and Landscape Reports, nine restoration support studies, eight master plans and planning studies, twelve local historic preservation plans and planning projects, ten Building and Campus Reuse studies, thirty-two Environmental Impact Reports, seven Historic American Building Survey/MHC recordation projects, three local historic district studies, and seven appearances as an expert witness.

All of these projects have provided extensive experience with the written, photographic, and cartographic materials available at local, state, and national archives. Ms. Jenkins has used these sources to thoroughly document the histories of thousands of historic resources, and to develop the broad contexts within which they exist. The projects have also taught her to identify and analyze specific character-defining elements of historic buildings and areas, and to apply the federal Criteria of Effect and Adverse Effect. Her clear and rational approach has successfully resolved development issues with the concerns of both public and private preservation constituencies in all of her projects.

Candace Jenkins established an independent consulting firm in 1984, providing the full range of services listed above. The firm works both independently, and as a specialized consultant to diverse teams of architects, planners, and engineers. Clients are drawn from both the private and public sectors, and include developers, property owners, towns, state and federal agencies, and regional commissions. Candace Jenkins is included on the Massachusetts Historical Commission List of Preservation Consultants who meet the Secretary of the Interior' Standards.

CW0000006131

# SELECTED PROJECTS LIST

## Environmental Impact Reports, Building Reuse Studies, Master Plans, Historic Recordation Documents (HABS, HAER, MHC)

- New England Hydro-Quebec Transmission Facility Survey/EIR, Massachusetts/New Hampshire  1985 - 1986

- GWEN Communications Network Survey/DEIR/EIR, Massachusetts and Rhode Island   1989 - 1990

- Old King's Highway/Route 6A Corridor Analysis and Plan, Brewster 1991 - 1992

- Freedom Trail Master Planning Study, Boston   1994 - 1995

- McLean Hospital Reuse, Planning, and Development Study, Belmont    1997 - 1998

- Barnstable County Hospital Photographic Recordation Project, Bourne  2003

## Historic Structure/Landscape Reports

- Massachusetts State House Historic Structure Report, Boston   1984 - 1985

- Trayser Museum Complex Historic Structure Report, Barnstable    1986

- Federal Buildings Historic Structure Reports, New England  1989 - 1994
  - *United States Customs House: New Bedford, Massachusetts (1832-1836)*
  - *United States Customs House: Portland, Maine (1867-72)*
  - *United States Court House, Post Office, and Customs House: Providence, Rhode Island (1904-1908)*
  - *United States Court House and Post Office: New Haven, Connecticut (1913-1919)*
  - *United States Court House, Post Office and Federal Building: Boston, Massachusetts (1928-1933)*
  - *United States Court House, Post Office and Federal Building: Hartford, Connecticut (1930)*
  - *United States Court House and Post Office: Worcester, Massachusetts (1930-1931)*
  - *United States Postal Annex: Providence, Rhode Island (1937-1938)*

- Union Station Historic Structure Report, Worcester  1994

- Old Manse Historic Structure Report, Concord   1994 - 1995

- Poor Farm Historic Structure Report and MPPF grant application, Falmouth      1998

## Nominations to the National Register of Historic Places

- Barnstable Multiple Resource Area, Barnstable  1985 - 1986

- Dune Shacks, Provincetown and Truro   1988

- Southside Historic District, Methodist Campground Historic District, Bray Farm, Yarmouth   1989

- Eldredge Memorial Library, Chatham    1991

- Old King's Highway National Register District, Brewster  1993

- Gloucester Multiple Property National Register Nomination, Gloucester 1993 - 1995

- Stony Brook/Factory Village National Register District, Brewster    1996

- West Falmouth National Register District; Town Poor House, Falmouth    1997

CW0000006132

- Cove and Bridge Road Cemeteries; Town Center and Collins Cottages Districts, Eastham    1997 - 1998
- Falmouth Heights Historic District, Waquoit Historic District, Teaticket School, Falmouth    1999-2000
- Old Center Historic District, Bridge Road-Dyer Prince Road Historic District, Eastham    1999-2000
- Old Village Historic District, Chatham    2000
- Elnathan Nye House, Falmouth    2001

## Historical Surveys and Preservation Planning

- Historical Resources Survey and Preservation Plan, Barnstable  1984 - 1985
- Cape Cod Historic District Analysis, Barnstable County    1989
- Falmouth Historical Resources Survey, Falmouth  1989 - 1990
- Barnstable Preservation Plan Update, Barnstable  1989 - 1990
- Chatham Historical Resources Survey, Chatham  1990 - 1991
- Sandwich Historical Resources Survey, Sandwich  1992 - 1993
- Falmouth Local Comprehensive Plan, Falmouth  1995
- Old King's Highway/Route 6A Cultural Landscapes Survey  1995
- Hyannis Main Street/Waterfront Local Historic District, Barnstable  1995 - 1996
- Bridge Road/Dyer Prence Road Survey Area, Eastham  1997 - 1998
- Massachusetts Historic Cemeteries Preservation Initiative, Statewide    1999-2001
- Yarmouth Local Comprehensive Plan, Yarmouth  2000-2001

## Expert Witness/Court Testimony

- Expert Witness, Old King's Highway Regional Historic District Commission   1986
- Expert Witness, Back Bay Architectural Commission  1990 - 1991
- Expert Witness, Old King's Highway Regional Historic District Commission  1990 - 1992
- Expert Witness, Massachusetts Attorney General's Office   1992
- Expert Witness; Cape Cod Commission   1992
- Expert Witness; Neighborhood Association; Old King's Highway Regional Historic District   1998
- Expert Witness; Neighborhood Association; Chestnut Hill Historic District    1999

## Selected Lectures and Publications

| October 1991 | *The Architectural Heritage of Cape Cod.*<br>Slide lecture delivered to Cape Cod Commission, Sense of Place Heritage Tourism Study Group |
| October, 1991 | *Discovering the Architecture of Falmouth and Cape Cod.*<br>Slide lecture delivered to Woods Hole Historical Collections Noontime Conversations |
| January, 1992 | *Discovering the Architecture of Yarmouth and Cape Cod.*<br>Slide lecture delivered to Yarmouth Historical Society |

CW0000006133

| | |
|---|---|
| March, 1992 | *Discovering the Architecture of Bourne and Cape Cod.*<br>Slide lecture delivered to Bourne Historical Society |
| Winter, 1992 | *The Development of Falmouth as a Summer Resort, 1850 - 1900.* Spritsail. Volume 6, #1.<br>Woods Hole Historical Collections |
| June, 1995 | *Exploring the Architecture of Cape Cod*<br>All-day bus tour for Society of Architectural Historians New England Chapter. |
| February, 1996 | *Windows on the Past: Falmouth's Architectural Heritage.*<br>Slide lecture delivered to Falmouth Historical Society |
| November, 1996 | *Brewster's Old King's Highway National Register Historic District*<br>Slide lecture delivered to Brewster Historical Society |
| November, 1997 | *Brewster's Factory Village National Register Historic District*<br>Slide lecture delivered to Brewster Historical Society |
| February, 1997 | *Gray Shingles and Pink Granite: The Architectural Heritage of West Falmouth*<br>Slide lecture delivered to Falmouth Historical Society |
| September, 1998 | *Between the Forest and the Bay: A History of West Falmouth as Revealed in its Historic Buildings and Landscapes.* Published by West Falmouth Civic Association. |
| December, 1998 | *Preserving Cape Cod.* Slide lecture delivered to Annual Meeting of Historic Highfield. |
| April, 1999 | *Windows on the Past: Cape Cod's Architectural Heritage.* Slide lecture delivered to Historical Society of Old Yarmouth and Society for the Preservation of New England Antiquities. |
| May, 1999 | *A Step Back in Time - A tour of historic Wings Neck - Hidden Architectural Treasures.*<br>Afternoon tour sponsored by the Bourne Society for Historic Preservation. |
| November, 1999 | *Eastham Through Time*<br>Slide lecture delivered to Eastham Historical Society Annual Meeting. |
| August, 2000 | *Windows on the Past: Cape Cod's Architectural Heritage.* Slide lecture delivered to Orleans Historical Society. |
| August, 2000 | *Preserving the Old Village* Slide lecture delivered to Annual Meeting of Chatham Old Village Ass. |
| September, 2000 | *The Architecture of Falmouth's South Sea: Waquoit and Falmouth Heights*<br>Slide lecture delivered to Falmouth Historical Society 99th Annual Meeting. |

CW0000006134

**13**

CW0000006135



**Alliance to Protect
Nantucket ⚓ Sound**

396 Main St., Suite 2  Hyannis, MA 02601    508-775-9767
www.saveoursound.org

October 5, 2004

Ms. Christine Godfrey
U.S. Army Corps of Engineers
696 Virginia Road
Concord, MA  01742

Dear Ms. Godfrey:

This letter is submitted to the U.S. Army Corps of Engineers New
England District (USACE/NED) with regard to oil and hazardous
substance information that should be included in the Draft
Environmental Impact Statement (DEIS) currently being prepared to
evaluate environmental impacts associated with the construction and
operation of an offshore wind-powered electric generating facility
proposed by Cape Wind Associates, LLC in Nantucket Sound.

This letter is respectfully submitted by the Alliance to Protect Nantucket
Sound.  We are pleased to provide input to USACE/NED regarding this
important issue that thus far appears to have been ignored by the
applicant in the DEIS preparation process.  The issue of oil and
hazardous substances impacts to Nantucket Sound and surrounding
areas is of great concern to the Alliance and the public.  Indeed, there
are numerous examples of petroleum-based spills of much smaller
quantities that have resulted in significant adverse impacts to coastal
and marine environments and communities.  The purpose of this report
is to ensure that the issue is adequately addressed in the DEIS and
factored into the Corps' decision making under section 10.

Accompanying this letter is a report we submit for your review and
action.  This report details reasonable risks and, correspondingly, real
potential for impacts to the Nantucket Sound coastal and marine
environment posed by the proposed storage of approximately 41,000
gallons of dielectric cooling oil and diesel at the electrical service

Christine Godfrey
October 5, 2004
Page 2

platform (ESP), as well as the lube oils and glycol/water mixtures at the
ESP and wind turbine generator units.

In addition to identifying the risks and potential impacts associated with
oil and hazardous substances at the proposed offshore wind-generated
power plant, the accompanying report provides specific
recommendations for studies and information that should be conducted
or gathered with the results of these efforts reported in the DEIS.

For example, in response to the risk of bulk oil spillage and the potential
for spill impacts (e.g., mortalities to invertebrates, fish and birds as well
as closures to aquaculture, fishing, boating and beach recreation
activities in Nantucket Sound following a spill), predictive modeling
studies are recommended to be conducted, using either of two
internationally-recognized fate and effects spill models. These models
integrate important spill information and data, such as spill source, spill
scenarios, fate and pathway of spilled materials, and local natural and
economic resources at risk, to predict the reasonable effects of a spill
release from the proposed offshore facility. Further, a spill prevention,
control and countermeasure plan is recommended (and required per 40
C.F.R. Part 112) in the report along with a battery of specific response-
related questions to address spill prevention and response issues. To
address the risk of resuspending and redistributing buried sediments
historically contaminated with oil and hazardous substances during
offshore facility construction, the accompanying report describes
specific studies and related issues that should be conducted and
addressed in the DEIS.

As discussed in the enclosed report, it is clear that the bulk transformer
and diesel oils stored on the electrical service platform (approximately
41,000 gallons) and the other miscellaneous industrial chemical
products stored on the platform and the wind turbine generators pose a
reasonable and significant threat to the natural resources and economies
of Nantucket Sound and surrounding coastal environs. Not considering

CW0000006137

Christine Godfrey
October 5, 2004
Page 3


spill and sediment resuspension/redistribution impacts would result in an incomplete environmental impact analysis.

Thank you for your attention and further consideration regarding these matters. If you have any questions regarding this correspondence, please contact me.

Very truly yours,

Sue Nickerson, Executive Director
Alliance to Protect Nantucket Sound


cc: Senator Edward Kennedy
    Senator John Kerry
    Congressman William Delahunt
    Governor Mitt Romney
    Massachusetts Attorney General Thomas Reilly
    Karen Kirk Adams, U.S. Army Corps
    James Connaughton, Council on Environmental Quality
    Dinah Bear, Council on Environmental Quality
    Horst Greczmiel, Council on Environmental Quality
    Elizabeth Higgins, U.S. Environmental Protection Agency
    Timothy Timmerman, U.S. Environmental Protection Agency
    Vernon Lang, U.S. Fish and Wildlife Service
    Edward LeBlanc, U.S. Coast Guard
    Barry Drucker, Minerals Management Service
    Susan Snow Cotter , Massachusetts Coastal Zone Management
    Office
    Jack Terrill, National Marine Fisheries Service
    Al Benson, U.S. Dept. of Energy
    Ellen Roy Herzfelder, Executive Office Environmental Affairs

CW0000006138

Christine Godfrey
October 5, 2004
Page 4


Mary Griffin, Executive Office Environmental Affairs
Arthur Pugsley, Massachusetts Environmental Policy Act Office
Phil Dascombe, Cape Cod Commission
Truman Henson, Cape Cod Commission
Beverly Wright, Wampanoag Tribe of Gay Head Indians
John Pagini, Nantucket Planning and Economic Development
Commission

CW0000006139

# Proposed Wind-Generated Power Plant in Nantucket Sound: Oil and Hazardous Substance Information Needs




A Report

Prepared For:

Alliance to Protect Nantucket Sound, Incorporated
Hyannis, Massachusetts

Prepared By:

Timothy J. Reilly,
Principal
Lighthouse Technical Consultants, Incorporated
Rockport, Massachusetts
And
Mark Reed, Senior Scientist, and Boye A. Høverstad, Research Scientist
SINTEF Materials and Chemistry, Trondheim, Norway

October 5, 2004

1

CW0000006140

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **1.0** | **INTRODUCTION** | 3 |
| | 1.1   Oil and Hazardous Substances at Proposed Offshore Wind-Generated Power Plant | 3 |
| | 1.2   Potential for Impacts from Oil and Hazardous Substances | 3 |
| | 1.3   Report Contents | 5 |
| **2.0** | **OIL AND HAZARDOUS SUBSTANCE RELEASE ISSUES** | 6 |
| | 2.1   Spill Impact Modeling | 6 |
| | 2.2   Spill Prevention Control and Countermeasure Plan | 9 |
| **3.0** | **SEDIMENT RESUSPENSION AND REDISTRIBUTION RELATED TO OIL AND HAZARDOUS SUBSTANCES** | 11 |
| **4.0** | **CONCLUSIONS** | 19 |
| **5.0** | **REFERENCES** | 20 |

**TABLE**

| 1 | Summary of Information Needs and Requirements Regarding Oil and Hazardous Substance Issues that Should Be Addressed in Cape Wind DEIR/DEIS/DRI | 13 |
|---|---|---|

*Cover Page Photograph/Image Credits: Offshore Wind Turbine Generators: courtesy of GE Wind Energy and U.S. Department of Energy's Wind and Hydropower Technologies Program (web link: http://www.eere.energy.gov/windandhydro/wind_offshore.html ); Map of Proposed Cape Wind Project Preferred Alternative site: courtesy of James Warren, Cape Cod Times (web link: http://www.capecodonline.com/special/windfarm/ )*

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006141

# 1.0   INTRODUCTION

This report has been prepared for the Alliance to Protect Nantucket Sound by Lighthouse Technical Consultants, Incorporated (in association with SINTEF Materials and Chemistry) in regard to oil and hazardous substance information that should be included in the Draft Environmental Impact Report (DEIR)/Draft Environmental Impact Statement (DEIS)/Development of Regional Impact (DRI) developed to evaluate environmental impacts associated with the construction and operation of an offshore wind-powered electric generating facility proposed by Cape Wind Associates, LLC in Nantucket Sound. It is the intent of this report to provide the Alliance to Protect Nantucket Sound with substantive information on oil and hazardous substance issues associated with the proposed wind-generated power plant to facilitate meaningful input on such issues to the U.S. Army Corps of Engineers New England District (USACE/NED) during its environmental impact analysis of this proposed facility.

## 1.1   Oil and Hazardous Substances at Proposed Offshore Wind-Generated Power Plant

It is our understanding that the following oil and hazardous substances may be stored and used at the proposed wind-generated power plant:

At Electrical Service Platform:
- 4 x 10,000 gallon storage tanks of dielectric cooling oil for the Main (step-up) transformers;
- 1 x 1,000 gallon storage tank of diesel oil for Emergency Diesel Generator; and
- Small quantities of greases and lube oils for pumps, fans, air compressor.

In each Wind Turbine Generator:
- 190 gallons of gear oil in gear box;
- Mineral oil for hydraulics (unspecified quantity); and
- Water/Glycol mixture for cooling system (unspecified quantity).

## 1.2   Potential for Impacts from Oil and Hazardous Substances

The proposed quantities of bulk-stored oil and hazardous substances at the offshore wind-generated power plant's Electrical Service Platform (i.e., 41,000 gallons of diesel and dielectric cooling oils) are of a volume that, if catastrophically released, may cause

3

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006142

serious injuries to coastal and marine natural and economic resources. In fact numerous examples exist of petroleum-based spills that have resulted in significant impacts to coastal and marine environments and have involved much less oil than the bulk amounts stored on the proposed Electrical Service Platform. Examples of such oil spill incidents include the 1998 Tesoro oil spill in Oahu, Hawaii involving just under 5,000 gallons (see www.darp.noaa.gov/southwest/tesoro/pdf/tes-frp1.pdf for additional impact information); the Dredge Stuyvesant spill that released 2,000 gallons into Humboldt Bay, California in 1999 (see: www.incidentnews.gov/incidents/incident_3.htm for additional information); and the 2000 Fort Lauderdale Mystery Spill offshore of southwest Florida that released just over 20,000 gallons about 10 miles offshore (see www.darp.noaa.gov/library/pdf/flfdarp.pdf for details of impacts). Some examples of impacts from spills have included:

- Mortalities to (especially) egg and larval fish and invertebrate life stages in the water column and, in some cases, substantial juvenile and adult life stages;
- Mortalities to bird resources coming into contact with spilled oil slicks and beached oil;
- Chronic contamination of intertidal sediments (especially in wave-sheltered mudflats and marshes) that can persist on an order of years to decades as in the case of continuing contamination of the West Falmouth marsh sediments near Woods Hole, MA contaminated by the 1969 *Florida* Barge diesel spill incident (Carlowicz 2003));
- Beaches closed to recreational use during cleanup operations;
- Finfish and shellfishing closures; and
- Closures of harbors to boat traffic during spill response operations.

The fate and effects of spills resulting from the proposed offshore wind-generated power plant could be predicted through modeling studies. Using modeling as an environmental impact assessment tool is described in Section 2.1 of this report.

Given the 1) proximity of the proposed wind-generated power plant on Horseshoe Shoal to shipping lanes; 2) potential for extreme storm events south of Cape Cod (e.g., hurricanes); and 3) the rich marine ecology and economic importance of Nantucket Sound, the DEIR/DEIS/DRI should fully consider the impacts of catastrophic releases of these bulk-stored substances on the habitats and natural resources of Nantucket Sound. Not considering such spill impacts would result in an incomplete environmental impact analysis. New England's recent experience with spills in and near shipping lanes in Southern New England (e.g., January 1996 *North Cape* oil spill incident on Rhode Island outer coast and April 2003 Bouchard *Barge 120* oil spill in Buzzard's Bay) reminds us that spills of bulk oil and hazardous substances can and do occur in our coastal waters with substantial impacts to marine/coastal resources and economies (e.g, fishing, boating, and Cape and Islands tourism).

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006143

Additionally, the DEIR/DEIS/DRI should address contaminant impacts associated with re-suspended (previously-contaminated) sediments during wind-generated power plant and submarine transmission line installation and ongoing facility operations.

**1.3    Report Contents**

In the following sections of this report, types of information that must be added to the DEIR/DEIS/DRI are identified and described with regards to:

- Oil and Hazardous Substance Releases (Section 2.0)
  - Spill Impact Modeling (Section 2.1)
  - Spill Prevention, Control and Countermeasures (Section 2.2)
- Further contamination and impacts associated with re-suspended benthic and intertidal sediments (Section 3.0).

These information needs are summarized in Table One.  Conclusions from this analysis are presented in Section 4.0, and references are found in Section 5.0.

Finally, although the contents and comments in this report focus on the preferred alternative (i.e., the wind-generated power plant located at Horseshoe Shoal and the preferred submarine routing landfall located at base of New Hampshire Avenue in Yarmouth), the same informational requirements for oil and hazardous substance environmental considerations, with suitable site-specific variations, must be applied to all considered Cape Wind offshore project alternative sites before they can be considered to have been adequately investigated.

5

CW0000006144

# 2.0   OIL AND HAZARDOUS SUBSTANCE RELEASE ISSUES

Given the intended transport and storage of bulk quantities of oil and hazardous substances at the proposed offshore wind-generated power plant facility, the DEIR/DEIS/DRI for this project should address environmental impacts resulting from potential releases of these bulk materials as well as strategies for preventing, controlling and responding to such spills. This chapter describes the types of information that the DEIR/DEIS/DRI should address regarding predictive spill impact modeling studies (Section 2.1) and spill prevention control and countermeasure planning (Section 2.2).

## 2.1   Spill Impact Modeling

Computer-based modeling is commonly used to determine the potential environmental and economic impacts of oil and hazardous substance spills resulting from proposed facilities housing bulk oil and hazardous substances, such as the Electrical Service Platform and (potentially) the Wind Turbine Generators (if mineral oils and glycol are stored in bulk amounts). Generally, models follow a risk assessment paradigm in order to predict impacts from a spill. Accordingly, data inputs and components of a spill model include:

- *Spill Source*: What was spilled? This question is addressed by knowing the type, quantity, chemical composition, physical and toxicological properties of spilled material(s);

- *Spill Scenario*: How, when and where did the spill occur? Location of release(s), release details (i.e., duration of release, quantity of release, was release above water surface or underwater), and time of year of release (seasonal distribution and abundance of natural resources such as birds and fish in area) are addressed when modeling spill scenarios. Because spills have different impacts at different times of the year (due to dynamic ecosystem conditions such as spawning, migratory habits of fish, birds, marine mammals, sea turtles, etc.) understanding the impacts of future potential spills at the wind-generated power plant requires spill modeling scenarios to be developed for each month of the year;

- *Fate/Pathway of Spilled Materials*: Where did the spilled oil and/or hazardous substance go following spillage? Did it volatilize? Spread on the sea surface? Mix in the water column? Bind to sediments? Come into contact with other marine resources? Etc. Factors used to model the fate or pathway of spilled oil and chemicals include (*inter alia*):
  - Physical and chemical properties of spilled substance;
  - Bathymetry of area;

6

CW0000006145

     o   Coastal Geomorphology (shoreline types) in area;
     o   Atmospheric conditions (esp. wind and temperatures) at time of release
     o   Currents in area at time of release; and
     o   Total suspended sediment load

- *Resources at Risk*: What resources are in the area of a spill trajectory at a given time of the year, and are these resources vulnerable and sensitive to spilled substances? The types of coastal and nearshore resources in Nantucket Sound have varying vulnerability (i.e., susceptibility to spill exposure) and sensitivity (i.e., potential for injurious effects from spilled oil, if exposed) based on location, life history and behavioral habits of species and resources. Accordingly, it is important to understand which species and populations are vulnerable and sensitive, as well as locations of sensitive shoreline environments (e.g., marshes and tidal flats), that are at risk to impacts from spills. Data sets such as the National Oceanic and Atmospheric Administration's (NOAA) Office of Response and Restoration (ORR) Environmental Sensitivity Index (ESI) atlas for Massachusetts (and, particularly, the Nantucket Sound area) provide a good overview of the location, sensitivity, seasonality and vulnerability of at risk resources and coastal environments in the area (more information regarding ESI atlases and ordering maps can be obtained from NOAA's ESI website at: http://response.restoration.noaa.gov/esi/esiintro.html ). This ESI atlas resource is useful to spill response planning. However, the ESI atlas does not provide necessary population data for species of interest. Specific species and population data can be obtained from the Natural Resource Damage Assessment Model for Coastal and Marine Environments (NRDAM/CME) Type A Model Database for the Nantucket Sound area (see Table 1 and below).

- *Effects of a Spill Release*: If exposed, directly or indirectly, vulnerable and sensitive habitats, coastal/nearshore resources and the public's use of these resources (i.e., for aquaculture, fishing and other commercial/recreational purposes) may be significantly injured or impaired from a spill occurring from the wind-generated power plant facility. Such impacts include lethal and sublethal impacts to coastal organisms and economic impacts to commercial and recreational activities. Certain models (see below) have commonly been used to predict spill impacts to exposed resources and, in certain models, quantify the level of injuries and damages resulting from the spill.

There are a number of models (and underlying data) that may be used for predicted spill impact modeling purposes. NOAA's Office of Response and Restoration (ORR) has

7

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006146

several models used in spill planning and assessment (see weblink at:
http://response.restoration.noaa.gov/software/software.html ) including:

- GNOME The General NOAA Oil Modeling Environment (GNOME) is an oil
  trajectory model that predicts how wind, currents, and other processes might
  move and spread oil that has spilled on the water.

- ADIOS The Automated Data Inquiry for Oil Spills (ADIOS) program is an oil
  weathering model that runs on personal computers and incorporates an
  extensive database of crude oils and petroleum products.

- TAP The Trajectory Analysis Planner (TAP) shows how spilled oil might
  move and spread within a particular body of water, and how it might affect
  sensitive sites, such as seabird rookeries or marine mammal hauling grounds.

Though these software programs from NOAA are useful in generally understanding some
of the impacts from a potential release from the wind-generated power plant (especially,
when used in concert with ESI maps), they do not adequately describe egg/larval and
other pelagic losses, nor QUANTIFY mortalities to marine and coastal resources (i.e,
biomass of resources killed as a result of a spill). Such quantification of potential losses
is critical to understanding the potential risks and impacts of bulk oil and hazardous
substance storage and spillage at the wind-generated power plant, respectively.

In order to quantify marine resource losses resulting from a future spill incident at the
wind-generated power plant, a model must be used that effectively INTEGRATES spill
source, scenario, fate and manifested toxicological effects. Such models are commonly
used in oil spill response and planning. At least two models are available for this
purpose: SIMAP and OSCAR/NRDAM, both developed as updated versions of the U.S.
Department of Interiors Natural Resource Damage Assessment Model for Coastal and
Marine Environments (NRDAM/CME; also known as the Type A Model). These models
have been developed to model – and quantify – spill impacts to coastal and nearshore
resources. More information about the SIMAP model can be found at the following web
link: http://www.appsci.com/simap/simap.htm . Information on OSCAR is available at
the web link: http://www.sintef.no/units/chem/environment/oscar.htm.

*It is specifically recommended that one of these models be used to develop a reasonable
spill scenarios, including a worst-case spill scenario – i.e., a rapid, catastrophic release
of all bulk stored transformer and diesel oils (totaling approximately 41,000 gallons)
into Nantucket Sound. Spill impact modeling based on these scenarios should be
conducted during each month of the year to determine impacts to dynamic populations
of both resident and migratory species.*

*Cape Wind Project
Oil and Hazardous Substance Issues Report
Lighthouse Technical Consultants, Inc.
October 5, 2004*

CW0000006147

The resulting modeling effort should report the following types of information and include:

- Spill scenarios used in modeling (including a worst-case scenario) and rationale for selection
- Description and appropriateness of algorithms used in modeling
- Chemical constituents of diesel, dielectric cooling (transformer), and gear oils used in analysis (a wide variety of dielectric cooling oils exist, significantly impacting the behavior and toxicity of such substances, if spilled – see McShane (2000) for a discussion of types and environmental considerations associated with dielectric cooling oils)
- Description of model implementation (methodology)
- Description and appropriateness of datasets used in modeling, including:
  - Currents
  - Wind speeds and directions
  - Temperature
  - Species and population data
  - Toxicological data
- Results of analysis FOR EACH SCENARIO:
  - Water and sediment contaminant concentrations
  - Shoreline impacts
  - Species-specific lost biomass
  - Lost somatic (foregone) production due to mortalities from spill.

In summary, a spill fate and effects model (such as SIMAP) determines and quantifies potential impacts from a spill release by modeling 1) representative spill sources and scenarios (source), 2) how it travels through the environment once spilled (fate), 3) what resources it comes into contact with following the spill (exposure), and 4) calculates the manifested effect of those exposures (effects). It is this spill impact modeling that needs to be accomplished in a defensible and comprehensive manner for the Cape Wind project and included in the DEIR/DEIS/DRI. Modeling information needs are summarized in Table One.

## 2.2    Spill Prevention Control and Countermeasure Plan

The DEIR/DEIS/DRI should state that since more than 1,320 gallons of oil are proposed to be at the wind-generated power plant (especially, the Electrical Services Platform), a Spill Prevention Control and Countermeasure (SPCC) Plan will need to be developed for this proposed offshore facility. The SPCC plan should satisfy the requirements for such plans found at 40 CFR 112 (Oil Pollution Prevention and Response; Non-Transportation-Related Onshore and Offshore Facilities).

9

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006148

Further, the DEIR/DEIS/DRI should discuss whether the facility is designed to handle a catastrophic release (i.e., 41,000 gallons of transformer and diesel oils) of stored products:

- What types of tanks will be used at the Electric Service Platform (ESP)?
- What types of secondary containment have been designed to capture released oil and what is the volume of the secondary containment chambers?
- What is the anticipated frequency of transporting bulk oils to the ESP? What volumes will be transported? Under what sea states/weather conditions will such transports of bulk oils be aborted?
- Will there be special precautions/actions taken to reduce risk of spillage during extreme storm events?
- What types of spill response equipment (i.e., containment booms and sorbents) will be on-site at the ESP in event of an uncontained oil release? If not stored on-site, where will this response equipment be stored? Will there be sufficient quantities and types of equipment to contain catastrophic releases?
- How will leaks be observed and reported when no one is on-site at time of spill?
- What percentage of time is the wind-generated power plant (especially, the ESP) un-manned?
- Who will be the retained spill response contractor for spills from the wind-generated power plant?
- Given the remoteness of the wind-generated power plant, what is the expected response time for personnel responding to a spill at this offshore facility?
- Have there been spills reported from similar offshore wind-generated power plants in the past? If so, how did these spills occur? How will these incidents not occur in the proposed Cape Wind facility?

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006149

## 3.0   SEDIMENT RESUSPENSION AND REDISTRIBUTION RELATED TO OIL AND HAZARDOUS SUBSTANCES

The construction of the wind-generated power plant on Horseshoe Shoal and the placement of the submarine transmission line between the ESP and Yarmouth will result in resuspension of unconsolidated benthic and intertidal sediments (clays, silts, sand and gravel). Also, sediments may become resuspended and redistributed during facility operation due to continuing sediment scour from bottom currents. These sediments may have been previously contaminated by many possible sources, including past industrial accidents (spills), bilge releases, permitted discharges or atmospheric deposition.

Resuspension and redistribution of contaminated sediments that have been buried over time can result in new exposures of previously deposited oil and hazardous substances to existing intertidal, nearshore, benthic and demersal biological resources, essentially mimicking a new oil and chemical release.

Accordingly, the DEIR/DEIS/DRI should address the nature, extent and degree of environmental impacts associated with contaminated sediment resuspension and redistribution from construction and facility operation activities.

The nature, spatial extent and degree of environmental impacts associated with contaminated sediment resuspension will depend on a number of factors, including:

- Trenching method for transmission line and inter-array cables;
- Wind tower monopile driving method;
- Benthic and intertidal conditions, for example:
  o Sediment matrix composition and size throughout site,
  o Site bathymetry
  o Unique site characteristics that may result in substantial sediment resuspension (e.g., large "sand waves")
  o Wind and current patterns, and
  o Wave patterns (especially at landfall)
- Water column stratification (affects vertical and horizontal sediment dispersion;
- Degree of contamination of sediments throughout site:
  o Target contaminants of concern, for example:
    □ Petrogenic hydrocarbons (especially, PAHs)
    □ Heavy metals
    □ Chlorinated organics (e.g., PCBs, DDT, DDE, Dioxins, etc.)
  o Vertical contaminant profile in sediments
  o Horizontal extent of contamination

11

CW0000006150

- Appropriate Sediment Quality Guidelines to determine magnitude of sediment contaminant issue.

The DEIR/DEIS/DRI should address these factors and others, which allow the public to reasonably evaluate the environmental impacts of resuspending previously contaminated sediments during wind-generated power plant and submarine transmission line construction activities. It is presumed that a set of statistically representative sediment samples (surface and core samples) will be collected and analyzed for contaminants of reasonable concern using scientifically accepted field and laboratory protocols (i.e., involving an approved Quality Assurance Project Plan, QAPP).

Due to the three-dimensionally expansive geographic nature of this project within the benthic and intertidal zones, it is imperative that a clear rationale be presented in the DEIR/DEIS/DRI that describes the statistical reliability and validity of the selection of sediment sampling locations AS WELL AS the logic behind the vertical (sub)sampling of core samples for contaminant of concern concentrations. The extent of vertical (sub)samples should be reasonably related to the potential for exposure during construction operations.

The DEIR/DEIS/DRI should include the procedures and methodologies used in field sediment sampling and analysis, including quality assurance and quality control considerations. This may be added to an appendix to the DEIR/DEIS/DRI, as appropriate.

Using information described here, modeling contaminated sediment redistribution resulting from construction activities can be an effective approach to clearly communicating the nature, extent and degree of this disturbance. Such predictive modeling tools may be used with results communicated in the DEIR/DEIS/DRI.

Finally, an analysis of the degree and extent of ongoing sediment resuspension and redistribution during facility operations (e.g., due to sediment scour resulting from bottom currents) should be conducted and reported in the DEIR/DEIS/DRI.

A summary of information needs regarding sediment resuspension and redistribution can be found in Table One.

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006151

| Table One | | |
|---|---|---|
| **Summary of Information Needs and Requirements Regarding Oil and Hazardous Substance Issues that Should Be Addressed in Cape Wind DEIR/DEIS/DRI** | | |
| **Information Requirement** | **Description of Information Requirement** | **Rationale for Needing this Information to Evaluate DEIR/DEIS/DRI** |
| **Accidental Releases of Oil and Hazardous Substances/Spills** | | |
| *Sources* | | |
| Types of oil and hazardous substances | List the types of oil and hazardous substances on site. | Essential information for determining potential spill impacts. |
| Physical, chemical and toxicological properties of bulk oil and hazardous substances on site. | The physical, chemical and toxicological properties of each substance should be identified (esp. bulk stored substances such as dielectric cooling oil and diesel). This includes chemical composition by GC/MS (especially, with respect to total polyaromatic hydrocarbons), density, viscosity, and toxicity. Other useful parameters include wax and asphaltene content, which affect emulsification potential. | Physical and chemical properties of potentially spilled substances largely affect their fate in the marine environmental with respects to volatilization, mixing in the water column, remaining as a slick, etc.<br><br>Concentrations of certain types of compounds within oil have significant impacts on toxicological effects of these substances down to the low parts per billion range (i.e., polyaromatic hydrocarbons). Therefore, it is important to have chemical analytical information of potential spilled oil and hazardous substances to assess the potential toxicity of such spilled substances. |
| Quantities stored on-site | List the known volumes of oil and hazardous substances stored/used on site. | Volume of stored oil and hazardous substances will allow for appropriate environmental impact spill modeling. |
| Storage mode and locations | Described the location and mode of storage (i.e,. type and volume of storage tanks) on site. | Location of oil and hazardous substances are key inputs to spill modeling. |
| *Feasible Release/Spillage Scenarios* | | |
| Identification of release scenarios | A set of possible release scenarios, with information on probability of occurrence. | The risk of impacts from the proposed project depends on the probability of the accident taking place, and the impacts of the accident. Omitting conceivable scenarios from the report should have justification in terms of their low risk. |
| Scenario details | Data for each selected scenario should include location, substance spilled, amount and duration of release. Due to seasonal marine ecosystem/population dynamics in | The conditions of a release (location, duration of release, season, material and quantities involved) will significantly affect the modeled spill impact results.  Scenario details |

13

CW0000006152

| | Nantucket Sound, such scenarios should be run for each month of the year to analyze impacts to significant species assemblages present. Finally, a catastrophic (complete, instantaneous) release during an extreme storm event should be conducted. | allow an analysis of reasonable possible spill scenarios. |
|---|---|---|
| *Modeled Fate of Released Substances* | | |
| An oil spill model that predicts fate of spilled oil in Nantucket Sound using local environmental conditions and proposed project specifications | An accepted oil spill model (such as SIMAP, OSCAR/NRDAM, or equivalent) should be used to model the fate of spilled oil and hazardous substances using the scenarios and bulk-stored substances (i.e., dielectric cooling oil, gear oil, and diesel fuel) listed above. Results from oil fate modeling should include water and sediment contaminant concentrations, and extent and degree of shoreline impacts.<br><br>A description of the appropriateness of the algorithms used in the model and the implementation methodology of the model should be provided as part of the modeling report. | In order to understand the risks from an oil spill, it is necessary to determine the fate of oil and hazardous substance(s) once spilled. |
| Databases necessary to run oil spill fate prediction model in Nantucket Sound, including bathymetry, habitats, winds and currents. | In addition to the physical and chemical properties of spilled substance(s), receiving environmental data are required to predict oil fate under defined scenarios, including: <u>Bathymetry</u>: a topographic map of the seafloor in a gridded electronic format of relatively high resolution (e.g., 1 km$^2$), including projection specifications; <u>Habitats</u>: A gridded system identical to the topographic bathymetry map of seafloor and shoreline habitats; and <u>Wind and Currents</u>: For simulation of accidental releases, extended period of wind and current data (approx. 10 years) should be provided to enable statistically rigorous calculations. Wind and current data for modeling a release during an extreme storm event should also be collected. | Bathymetric data allows for modeling sedimentation of dissolved and dispersed oil, and is also vital for sediment transport modeling.<br><br>Habitat data allows for modeling of exposure to shoreline habitats of varying vulnerable and sensitivity to spilled substances.<br><br>Wind and current data are drivers in determining oil and sediment transport. Wind and waves also affect mixing of oil from the surface into the water column, so the wind used as input to an oil spill simulation is central to predicted spill fate. |
| *Modeled Effects of Release Scenarios on Resources at Risk from Accidental Spillage of Oil and Hazardous Substances* | | |

14

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006153

| An oil spill model that predicts effects of spilled oil on Nantucket Sound natural resources using local and proposed project conditions | An accepted oil spill model (such as SIMAP) should be used to model the effects of spilled oil and hazardous substances using the scenarios, bulk-stored substances (i.e., dielectric cooling oil, gear oil and diesel fuel), and corresponding fates described above.  Results from oil fate modeling should include quantitative predictions of species-specific mortalities (in kilograms of biomass lost).  Additionally, lost somatic (i.e., body) growth as a result of these mortalities should be calculated using modeling (i.e., foregone production).<br><br>A description of the appropriateness of the algorithms used in the model and the implementation of the model should be provided as part of the modeling report. | Modeled losses of Nantucket Sound biological assemblages resulting from reasoned spill scenarios provide the public an opportunity to understand and evaluate potential environmental impacts in the event a spill occurs at the wind-generated power plant.<br><br>Modeled losses could be calculated for invertebrates, fish, birds, reptiles, mammals and lost beach use.<br><br>Impacts from spills to sensitive shoreline/nearshore habitats could also be determined (i.e., tidal flats, marshes, aquaculture sites) |
| Databases necessary to run oil spill effects prediction model in Nantucket Sound, including biological and beach use databases. | Databases that provide biological and beach use information to determine what natural resources are at risk from the modeled spill scenarios are used to generate predictive mortalities and lost beach use resulting from an oil spill, using accepted toxicological and public use algorithms.<br><br>A biological database should contain monthly mean abundance by species and habitat type.  Moreover, the database should enumerate benthic, pelagic, nearshore and intertidal Nantucket Sound biological resources present, in a format such as the U.S. Department of Interior's Natural Resource Damage Assessment Model for Coastal and Marine Environment (NRDAM/CME) biological database, or as used in SIMAP, with updates reflecting any project-specific biological surveys conducted. | The biological and beach use databases are used to support the modeling of species-specific impacts resulting from a modeled release of oil or hazardous substances from the wind-generated power plant. |
| Spill Prevention Control and Countermeasure (SPCC) Strategies | | |
| SPCC Plan | | |
| Spill Prevention Control and Countermeasure (SPCC) Plan | An SPCC plan is required to address spill prevention and response strategies for those substances with volumes greater than 1,320 gallons | SPCC plans required per 40 CFR 112 |

15

CW0000006154

| | that are stored in larger than 55-gallon drums. | |
|---|---|---|
| *Miscellaneous Considerations* | | |
| Other spill prevention and response issues to address in DEIR/DEIS/DRI | Example SPCC issues that should be addressed in the DEIR/DEIS/DRI<br><br>- Type, quantity and location of oil and hazardous substances on-site.<br><br>- Types of tanks used at the Electric Service Platform (ESP).<br><br>- Types of secondary containment designed to capture released oil and volume of the secondary containment chambers.<br><br>- Anticipated frequency of transporting bulk oils to the ESP.<br><br>- Volumes to be transported.<br><br>- Under what sea states/weather conditions will such transports of bulk oils/hazardous substances be aborted?<br><br>- Special precautions/ actions taken to reduce risk of spillage during extreme storm events.<br><br>- Types of spill response equipment (i.e., containment booms and sorbents) on-site at ESP in event of an uncontained oil release.<br><br>- If not stored on-site, where will this response equipment be stored?<br><br>- Will there be sufficient quantities and types of equipment to contain releases?<br><br>- Leak detection systems.<br><br>- What percentage of time is the wind-generated power plant (especially, the ESP) un-manned?<br><br>-Who will be the retained spill response contractor for spills from the | These spill prevention, control and countermeasure issues allow the public to better understand actual risks of spillage of oil and hazardous substances at the proposed wind-generated power plant facility. |

16

CW0000006155

| | wind-generated power plant? | |
| | | |
| | - Given the remoteness of the wind-generated power plant, what is the expected response time for personnel responding to a spill at the wind-generated power plant? | |
| | | |
| | - Have there been spills reported from similar offshore wind-generated power plants in the past?  If so, how did these spills occur? | |
| | | |
| | - How will these incidents not occur in the proposed Cape Wind facility? | |
| **Sediment Contamination and Resuspension Issues** | | |
| Trenching method for transmission line and inter-array cables | State which method will be used for trenching and laying transmission line.   State what the depth/width profile of the dug trench will be. Include technical data for the chosen trenching method, including:<br>- Description of jet plow<br>- Estimates on the ratio of backfill to spreading. | Trenching method employed can have a significant effect on sediment resuspension and spreading. |
| Wind Tower Monopile Driving Methods | State which method will be used for driving monopiles.   Include technical data for the chosen driving method, including:<br>- Description of monopile driver<br>- Estimates on the magnitude of sediment spreading during driving | Monopile driving may result in significant resuspension and spreading |
| Benthic/Intertidal conditions | Sea floor and intertidal conditions, including:<br>- Sediment composition<br>- Bathymetry<br>- Unique site characteristics (e.g., sand waves)<br>- Wind and current patters<br>- Water column stratification<br>- Degree of sediment contamination (PAH, heavy metals, chlorinated organics).<br>- Vertical and horizaontal extent of contamination. | These benthic conditions can significantly affect the degree and extent of resuspension and redistribution of sediments<br><br>The nature and degree of contamination of sediments is important to understanding the scope of pollutant redistribution and exposure to coastal and aquatic organisms. |
| Quality assurance and study design considerations | Demonstrate that sediment samples collected are statistically representative of the study areas (i.e., explain rationale for sediment sample | Given the expansiveness of the study area, site conditions can vary significantly within the site. Accordingly, it is important that |

17

CW0000006156

| | locations).<br>Demonstrate that field and laboratory procedures and analyses follow generally accepted methodologies. | sediment samples collected are representative of field conditions.<br><br>Further field and laboratory methods and procedures should follow accepted methodologies in order to be useful in determining re-suspension and contamination potential from disturbed benthic and intertidal sites. |
|---|---|---|
| Analysis of resuspension and redistribution of benthic and intertidal sediments during proposed facility operations | A scour analysis of bottom and intertidal sediments at Horsehoe Shoal and the transmission line route should be conducted to determine the degree and extent of sediment resuspension and redistribution during offshore facility operations. | An understanding of the degree and extent of sediment resuspension and redistribution during proposed facility operations is important to understanding the extent of previously buried contaminated sediment exposure to resident and migratory biota *on an ongoing basis*. |
| Sediment Quality Guidelines (SQG) | Guidelines for the toxicity of contaminated sediments (e.g., Long et al., 1995) are useful in comparing to sediment contaminant concentrations in Nantucket Sound sediment samples. Such SQGs should be included with sediment sample analytical results. | SQG's provide one way of determining the relative toxicity of sediments. |

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006157

## 4.0   CONCLUSIONS

Based on information presented in this report, it is clear that the bulk transformer and diesel oils stored on the Electrical Service Platform (approximately 41,000 gallons) and the other miscellaneous industrial chemical products stored on the ESP and the Wind Turbine Generators pose a reasonable threat to the natural resources and economies of Nantucket Sound and surrounding coastal environs. Major threats posed by these oils and hazardous substances include the potential for spillage into Nantucket Sound and the resuspension and redistribution of contaminated sediments, resulting in new exposure to historically buried pollutants.

Numerous examples exist of petroleum-based spills that have resulted in significant impacts to coastal and marine environments and have involved much less oil than the bulk amounts stored on the proposed Electrical Service Platform. Some examples of impacts from spills have included:

- Mortalities to (especially) egg and larval fish and invertebrate life stages in the water column and, in some cases, substantial juvenile and adult life stages;
- Mortalities to bird resources coming into contact with spilled oil slicks and beached oil;
- Chronic contamination of intertidal sediments (especially in wave-sheltered mudflats and marshes) that can persist on an order of years to decades as in the case of continuing contamination of the West Falmouth marsh sediments near Woods Hole, MA contaminated by the 1969 *Florida* Barge diesel spill incident (Carlowicz 2003));
- Beaches closed to recreational use during cleanup operations;
- Finfish and shellfishing closures; and
- Closures of harbors to boat traffic during spill response operations.

The fate and effects of spills resulting from the proposed offshore wind-generated power plant could be predicted through modeling studies.

This report lists a number of types of information and modeling studies that, if conducted, will address the potential environmental impacts posed by these oil and chemical threats. It is believed that by including this information in the DEIR/DEIS/DRI for the Cape Wind Project, the public will be able to most effectively and expeditiously evaluate the actual environmental impacts posed by the Cape Wind project on the natural resources and economy of Nantucket Sound.

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006158

# 5.0   REFERENCES

Applied Science Associates. 2004. SIMAP Model Information. See website at:
http://www.appsci.com/simap/simap.htm . Narragansett, RI.

Carlowicz, M. 2003. Oil from spill lingers in West Falmouth Marsh. See website at:
http://www.whoi.edu/home/about/currents9_no4_oilspill.html . Woods Hole Currents.
Spring 2003.

Incident News Website. 2004. Stuyvesant Spill Home Page. See this website at:
http://www.incidentnews.gov/incidents/incident_3.htm .

Long, E. R., D. D. MacDonald, S. L. Smith, and F. D. Calder. 1995. Incidence of adverse
biological effects within ranges of chemical concentrations in marine and estuarine
sediments. Environmental
Management 19 (1): 81-97.

McShane, C.P. 2000. New safety dielectric coolants for distribution and power
transformers. See article at following website:
http://www.cooperpower.com/Library/pdf/00048.pdf . IEEE Industry Applications
Magazine. May/June 2000. pages. 24-33.

National Oceanic and Atmospheric Administration. 2004a. Environmnental Sensitivity
Index website at: http://response.restoration.noaa.gov/esi/esiintro.html . Office of
Response and Restoration. Seattle, WA.

National Oceanic and Atmospheric Administration. 2004b. Models used in spill
planning and assessment. See website at:
http://response.restoration.noaa.gov/software/software.html . Office of Response and
Restoration. Seattle, WA.

National Oceanic and Atmospheric Administration. 2004c. Buzzards Bay Oil Spill
Website: http://www.darp.noaa.gov/northeast/buzzard/index.html . Damage Assessment
and Restoration Program. Silver Spring, MD.

National Oceanic and Atmospheric Administration. 2004d. *North Cape* Oil Spill
Website: http://www.darp.noaa.gov/northeast/north_cape/index.html . Damage
Assessment and Restoration Program. Silver Spring, MD.

CW0000006159

National Oceanic and Atmospheric Administration and Florida Department of
Environmental Protection. 2002. Final Damage Assessment and Restoration
Plan/Environmental Assessment for the Fort Lauderdale Mystery Oil Spill: Fort
Lauderdale, Florida and Vicinity. See at following website:
http://www.darp.noaa.gov/library/pdf/flfdarp.pdf .

SINTEF Materials and Chemistry. 2004 OSCAR Model Information. See website at:
http://www.sintef.no/units/chem/environment/oscar.htm. Trondheim, Norway.

U.S. Department of Commerce, U.S. Department of Interior and State of Hawaii. 2000.
Final Restoration Plan and Environmental Assessment for the August 24, 1998 Tesoro
Hawaii Oil Spill (Oahu and Kauai). See weblink at:
http://www.darp.noaa.gov/southwest/tesoro/pdf/tes-frp1.pdf

21

*Cape Wind Project*
*Oil and Hazardous Substance Issues Report*
*Lighthouse Technical Consultants, Inc.*
*October 5, 2004*

CW0000006160

14

CW0000006161

Westlaw.                                                            The New York Times

./12/05 NYT A17                                                           Page 1

./12/05 N.Y. Times A17
2005 WLNR 406101

New York Times (NY)
Copyright (c) 2005 The New York Times. All rights reserved.

January 12, 2005

Section: A

Much Heat and a Deep Split Over a Cape Cod Wind Farm

CORNELIA DEAN

Four formal hearings are held on proposal to install giant wind farm in offshore
waters south of Cape Cod; plans call for 130 turbines in 24-square-mile grid off
Cape; consensus appears to be as far away as ever, with advocates and opponents
deeply divided on project and vast majority still ambivalent; map (M)

CONCORD, Mass., Jan. 11--After four formal hearings, one so packed with passionate
speakers that it had to be reconvened for a second time on Tuesday afternoon, the
public has just about had its say on a proposal to install a giant wind farm in
offshore waters south of Cape Cod.

But consensus appears to be as far away as ever, with advocates and opponents
deeply divided on the project and the vast majority still ambivalent.

On Tuesday, the project was variously described as relying on outdated technology
or as a beautiful alternative to strip mining, the equivalent of industrializing
the Grand Canyon or a way to lead the nation once again to independence, this time
energy independence.

"Five percent on each side are passionate," and the remaining 90 percent are
unsure, Larry Rosenberg, a spokesman for the Army Corps of Engineers, said at a
public information session convened on Saturday by the Massachusetts Technology
Collaborative, a state agency.

The project, put forward by Cape Wind Associates of Boston, a private concern,
involves 130 turbines arranged in a grid occupying 24 square miles of Horseshoe
Shoals, in Nantucket Sound. Each tower, with its turbines and blades, would reach
420 feet above the water.

Karen **Adams**, who supervises the permitting process for the corps of engineers,
said it would be at least six or seven months before the corps made a decision on
the permit. Several state and local agencies have yet to weigh in first, Ms. **Adams**
said, "and they all have to say yes" for the permit to be approved.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000006162

1/12/05 NYT A17                                                              Page 2

Although the session on Tuesday was the last public hearing, the public comment
period has been extended through Feb. 24.

Advocates said the turbine array would ultimately produce about three-fourths of
the electricity now used on Cape Cod, Nantucket and Martha's Vineyard, reducing
the region's reliance on fossil fuels. That, in turn, would reduce the risk of
global warming, the nation's dependence on imported oil, pollution and
pollution-related diseases like asthma, they said. Others said they liked the idea
of a wind farm because it would bring jobs to the region, the towers would attract
fish and the wind farm might become a tourist attraction.

Opponents say that the project might be a good idea, but that Nantucket Sound is
the wrong place. They note that the installation would be the first of its kind in
the nation and say that it relies on unproved technology that has run into trouble
elsewhere. In particular, they criticized the corps draft environmental impact
study for the proposal. As is routine, it was paid for by the project applicant,
Cape Wind, an arrangement that opponents said tainted its generally upbeat
assessment.

Some opponents, including Senator Edward M. Kennedy, whose family compound in
Hyannisport would have a view of the towers, said no projects should be approved
in Horseshoe Shoals, or other federal waters, until the nation had a more coherent
policy for dealing with offshore lands generally.

Two recent reports, one by the United States Commission on Ocean Policy and the
other by the Pew Oceans Commission, made similar recommendations, and last month
the White House announced that it would pursue the idea.

Greg Watson, a vice president at the technology collaborative, said his group had
not taken a stand on the proposal, even though much of its mission involved the
encouragement of renewable energy like wind.

The collaborative organized the session on Saturday "as a neutral broker," Mr.
Watson said, because it was important that the public have confidence that the
project, if it went forward, was being done right. Otherwise he said, "it will set
back the cause of renewable energy."

Map of Massachusetts highlighting site of proposed wind-power project: Plans call
for 130 turbines in a 24-square-mile grid off Cape Cod.

---- INDEX REFERENCES ----

INDUSTRY:  (Energy Industry Environmental Issues (1EN22); Renewable Energy Sources
(1RE65))

REGION:  (Massachusetts (1MA15); USA (1US73); Americas (1AM92); New England
(1NE37); North America (1NO39))

Language:  EN

OTHER INDEXING:  (ARMY CORPS OF ENGINEERS; CAPE WIND; CAPE WIND ASSOCIATES; CORPS;
CORPS OF ENGINEERS; GRAND CANYON; MASSACHUSETTS; MASSACHUSETTS TECHNOLOGY
COLLABORATIVE; PEW OCEANS COMMISSION; WHITE HOUSE) (Adams; Edward M. Kennedy; Greg

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000006163

1/12/05 NYT A17                                                        Page 3

Watson; Karen Adams; Larry Rosenberg; Martha; Nantucket; Watson) (Electric Light
and Power; Wind; Windmills) (Cape Cod (Mass); Massachusetts)

EDITION: Late Edition - Final

Word Count: 824
1/12/05 NYT A17
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CW0000006164

15

CW0000006165



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE DEPARTMENT
STATE HOUSE   ●   BOSTON, MA 02133
(617) 725-4000

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

April 2, 2003

Lieutenant General Robert B. Flowers
Chief of Engineers and Commander
United States Army Corp of Engineers
2600 Army Pentagon
Washington, D.C. 20310-2600

Dear Lieutenant General Flowers:

Knowing of the Administration's desire to have our country develop a comprehensive and robust energy policy, I write to make you aware of the potential for expanded use of offshore wind power to meet the growing electricity needs of the Northeast and how state and federal agencies can cooperate to address some of the concerns that it raises.

I am a strong supporter of renewable energy generally and wind power in particular. It is a clean, low-cost form of renewable energy using resources indigenous to the Northeast. The most productive locations for wind power in the Northeast are offshore where the wind is strong and the waters are shallow. We have already received proposals for projects that, if built, would add more than 1350 MWs of electric generating capacity to our region's supply, and more can be expected.

Although some of these projects would be located within three miles of the state shoreline and fall within the reach of state jurisdiction and permitting, other proposed projects would be located largely outside state jurisdiction in federal waters. These proposed wind power projects have revealed significant gaps in state and federal authority to permit offshore uses and lease ocean space. Federal law allows projects to be sited on a "first-come, first-serve" basis rather than through competitive review of proposals, fails to provide for leases to govern wind power development or for payment of lease fees or royalties by developers, and does not require consultation with the Governors of affected states. Federal law also fails to assign an appropriate role to the nation's leading oceans agency, the National Oceanic and Atmospheric Administration, and does not enable NOAA to direct wind power development to environmentally sound areas. There is an immediate need for federal and state government to take public trust responsibilities for the ocean seriously.

CW0000006166

Since offshore wind projects (as well as other offshore facilities such as gas pipelines and radio towers) present certain new and as yet unanswered questions, I have initiated a state "ocean management" process to examine if and how Massachusetts's regulations and procedures are adequate to protect the public interest. While it is not prudent to halt offshore wind projects now undergoing either state or federal agency review, we will complete our regulatory assessment expeditiously so that any new requirements, if needed, can be applied fairly to relevant projects.

One notable example of a project where both state and federal reviews are currently underway is the so-called "Cape Wind" project proposed for the center of Nantucket Sound. I am very concerned that this project will diminish the visual beauty of an important natural resource. This area of our state is critical to the tourist industry, and an essential component of the economy of Cape Cod and the Islands. For this reason, I will be filing at the appropriate time comments with the Army Corps of Engineers opposing the approval of the Cape Wind project. I trust that those comments will receive full and thoughtful consideration by the Corps in its ongoing review proceedings.

Thank you for your attention. I look forward to working with you on gaining greater energy independence for our country and the northeast region.

Sincerely,

*M. Tt Romney*

cc:  Senator Edward Kennedy
     Congressman William Delahunt
     Mr. Andrew Card
     Chairman James Connaughton

CW0000006167



**THE COMMONWEALTH OF MASSACHUSETTS**
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON. MASSACHUSETTS 02108-1698

THOMAS F. REILLY
ATTORNEY GENERAL

(617) 727-2200

October 17, 2002

Thomas L. Sansonetti
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Gale Norton, Secretary
U.S. Department of Interior
1849 C Street, N.W.
Washington, D.C. 20240

Lieutenant General Robert B. Flowers
Chief of Engineers & Commander
U.S. Army Corps of Engineers
441 G Street, NW
Washington, DC 20314-1000

Re: Off-Shore Wind Projects

Dear Assistant Attorney General Sansonetti, Secretary Norton & General Flowers:

As you are likely aware, a private entity has proposed to build a large wind project in Nantucket Sound.  In particular, the proposed project would consist of 170 wind turbines spread over approximately twenty-five square miles four and one-half miles from Cape Cod.  The project developer has applied for various approvals, including permits from the Army Corps of Engineers pursuant to Section 10 of the Rivers and Harbors Act of 1899, as amended.  The Corps has already issued a permit for one aspect of the project (a test tower) while the rest of the project undergoes environmental review.  Based on my review of the applicable law, I do not believe the project may proceed under existing federal law even if it obtains the requested approvals.  I am therefore writing to urge you to review this issue; I also urge the Corps in particular to refrain from undertaking any further action relative to off-shore facilities until the issues I will more fully describe below are resolved.  Due to the significance of the pending project for the people and environment of Massachusetts, my review of the pending development of Nantucket Sound is on-going.

October 17, 2002
Page 2

It is undisputed that the construction of alternative energy projects are not subject to the leasing program established by the Outer Continental Shelf Lands Act for mineral extraction projects. Nor are alternative energy projects covered by the Department of the Interior leasing program that generally applies to private use of "public lands." See Federal Land Policy Management Act, 43 U.S.C. 1701, et seq. In a pending law suit, opponents to the project are arguing that the application for a Section 10 permit for the test tower should not have been considered by the Corps because the project proponents have not acquired a lease or other property interest to occupy the sea bed. Whatever the eventual outcome of this particular litigation, there appears to be a more significant underlying legal question at issue: not whether the granting of a Section 10 authority would be valid absent a leasing program, but whether it would be sufficient to allow a private party to occupy federal land.

The Corps appears to be taking the position that Section 10 authorizes it to grant a private party sufficient authority to occupy the sea bed of the Outer Continental Shelf. Given that the Corps' jurisdiction under Section 10 appears limited (directed at least primarily at whether a project poses a navigational hazard), the legal basis of the Corps' position is not obvious. While the Outer Continental Shelf Lands Act itself refers to the issuance of Section 10 permits by the Corps, I do not see how that reference broadens the scope of the Corps' jurisdiction beyond that provided in Section 10.

In fact, the Department of the Interior apparently agrees that current law does not authorize the siting of alternative energy projects on the Outer Continental Shelf. The Department of the Interior took such a position in recent testimony before Congress. See Testimony of Johnnie Burton, Director, Minerals Management Service, U.S. Department of the Interior to the House Subcommittee on Energy & Mineral Resources, July 25, 2002. Additionally, Representative Barbara Cubin, Chairwoman of the Subcommittee on Energy and Mineral Resources, recently introduced a bill designed to plug the hole in existing law by establishing a leasing program for non-extractive uses of the Outer Continental Shelf. H. 5156. I have enclosed a letter that expresses my support for such legislative efforts, while pointing out many ways in which I believe the legislation needs to be improved. The needed improvements include the creation of a comprehensive process that assures meaningful participation by all interested parties, including the states.

I urge you to reconsider how the federal government should proceed at this time in light of this state of affairs. I do not believe the public is well served when private development of a valuable public resource occurs without clear legal authority; the potential for bad precedent and lasting harm is too great. I am deeply concerned, as well, that the public, directly or through its representatives, has not had an adequate opportunity to consider all the consequences of giving away an invaluable public resource to the very first private developer to seek its use.

CW0000006169

October 16, 2002
Page 3

     I urge you to work together to review the issues and to formulate a unified legal position for the federal government on this question.  Based on our expectation that your review will confirm the Department of the Interior's position that additional authority is needed, I also urge you to work with Congress to address this hole in the law.  Until Congress has specified what leasing process should be required, I ask the Corps to defer undertaking any further action on pending or future permit applications and to avoid creating undue expectations in project proponents.

Sincerely,

Thomas F. Reilly

cc.    Robert M. Andersen, ACE Chief Counsel
      Thomas L. Koning, ACE District Engineer
      Joseph McInerny, ACE Acting District Counsel
      William G. Myers III, Solicitor, DOI
      Anthony Giedt, U.S. Attorney's Office

CW0000006170

16

CW0000006171



**THE COMMONWEALTH OF MASSACHUSETTS**
EXECUTIVE DEPARTMENT
STATE HOUSE • BOSTON 02133
(617) 725-4000

MITT ROMNEY
GOVERNOR

KERRY HEALEY
LIEUTENANT GOVERNOR

July 26, 2004

Major General Carl Strock
Chief of Engineers and Commander
United States Army Corps of Engineers
2600 Army Pentagon
Washington, D.C. 20310-2600

Dear Major General Strock:

As I am sure you are aware, certain questions have arisen concerning the Commonwealth of Massachusetts' state boundaries – particularly in Nantucket Sound. These boundary questions are significant since they may have an impact on the Commonwealth's jurisdiction over the proposed off-shore wind farm being reviewed by the Army Corps of Engineers (ACE). My Executive Office of Transportation (EOT) is working with the Mineral Management Service (MMS) to clarify this issue.

As you know, the proposed Wind Farm, Cape Wind, is currently proposed to reside entirely in Federal waters. If it is determined that the Commonwealth's boundaries should in fact extend further in to Nantucket Sound, Cape Wind may choose to redraw its proposal or it will need to petition the state for certain regulatory determinations. This may dramatically alter the proposal your agency is currently reviewing.

It is my understanding that ACE is working to complete a draft Environmental Impact Statement (EIS) on this proposal. While we work with MMS to expeditiously address these boundary questions, I respectfully ask that your agency withhold releasing the draft. The unprecedented nature of the proposed project in such an environmentally sensitive area presents an exceptional case that warrants a thorough review of the boundary issue prior to release of the draft EIS. Releasing the draft EIS prior to answering these boundary questions may prove premature and lead to unnecessary confusion if the proposed project is subsequently altered.

I appreciate the thorough review your agency is providing and do not underestimate the amount of work your staff have already invested in this process. However, I do believe these questions are important enough to warrant such action. Thank you for your consideration.

Sincerely,

Mitt Romney

Printed on Recycled Paper

17

CW0000006173

Boston.com / News / Local / Mass. / Border bid may imperil wind farm
Case 1:10-cv-01067-RBW   Document 339-22   Filed 09/11/13   Page 232 of 491
Page 1 of 2



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# Border bid may imperil wind farm

The Boston Globe

**By David Abel and Beth Daley, Globe Staff | February 16, 2005**

In a move that could give Governor Mitt Romney more power over the proposed Cape Cod wind farm, state and federal officials appear to have come up with a unique plan: Move the coastline.

State officials said yesterday that a pile of rocks the size of a sport utility vehicle in Nantucket Sound may redefine the borders of Massachusetts, expanding state waters about 12 square miles. The expansion would push back federal waters, which could imperil a developer's bid to erect the country's first offshore wind farm, 130 turbines in the sound.

The US Minerals Management Service is expected to post a notice about the border change in the Federal Registry by the end of the month, said Jon Carlisle, a spokesman for the Executive Office of Transportation, which oversees state boundaries. State waters stretch 3 miles from where officials draw the border. Federal waters extend from that point to another 200 miles offshore.

"From our review of the landmass, that's the appropriate new border," said Carlisle, who declined to comment on whether Romney pushed for the new borders to curtail the wind project. "Really one thing has nothing to do with another."

Romney and other state politicians, such as Senator Edward M. Kennedy, oppose the project's planned location, but they have limited power to block it if it is entirely within federal waters.

Last July, Romney asked the Army Corps of Engineers to postpone its long-awaited review of the proposed wind farm, arguing the newly discovered rocks might require changing the state border.

If that happened, he suggested in a letter, the developer might have to redraw plans or seek new permits from state agencies. "This may dramatically alter the proposal your agency is currently reviewing," the governor wrote. An Army Corps official dismissed the request at the time as a thinly veiled attempt to stop the project.

While details remained sketchy last night, the new boundary appears to cut into as much as 10 percent of the wind farm's proposed footprint, affecting 10 to 13 turbines, state officials said.

Cape Wind Associates, the project's developer, has seen its proposed turbines become a focal point in a growing national debate over ocean management. A company official said last night that they had not seen the proposal, but that they doubted it would seriously affect the project. The company has already reduced its original proposal by 40 turbines.

A US Army Corps of Engineers draft environmental impact report on the project is in a public comment period until later this month. The Army Corps is expected to make a final ruling on whether the project can be constructed within the next year, the biggest hurdle for Cape Wind must overcome.

"We are going to await receiving this document, and we want to evaluate it closely before we respond," said Mark Rodgers, a Cape Wind spokesman. "At this time, it does not appear this will have any significant impact on the Cape Wind Project."

The effort to change the state's borders began about a year ago, after the Minerals Management Service asked the Massachusetts Highway Department to survey the landmass, which is about 2½ miles off Cape Cod, Carlisle said. The Highway Department, which documents state lines, determined the landmass to be a "natural occurrence" and recommended the federal agency change the state's borders, he said.

CW0000006174

18

CW0000006175





**Rockland Trust**
Member FDIC

Free Checking with free ATMs everywhere.®
Now that you're not tied to your bank's ATMs just imagine where you can go.

# CAPE COD TIMES

home | news | sports | business | weather | arts | classifieds | subscribe | real estate |

Search: Find a section [GO!]  Archives: 7 days | 6 years    Search A by Business Type [GO!] by Business Nam

**News**
- Archives search
- Business
- Contact us
- Corrections
- District court
- Entertainment
- Discussion forums
- Local news
- Daily lottery
- Obituaries
- Opinion/Editorials
- Special projects
- Sports
- Weather forecasts

**Features**
- Cape Cod View
- Crossword puzzles
- Feature stories
- Food & recipes
- Health & science
- Movies
- Outdoors
- Personals
- Photo galleries
- PrimeTime magazine
- Television listings
- Weddings

**Advertisement**



**Marketplace**
- Used and new cars
- Classifieds
- Dining guide
- Employment
- Real estate
- Subscribe to Times

**Related To**

🖨 Print-fri

✉ E-mail

🔍 Searc

📋 Daily h

Advertisem

February 23, 2005

## Bay State gets a bit bigger

**By KEVIN DENNEHY**
**STAFF WRITER**

The federal government yesterday granted Massachusetts' request to redraw state boundaries in Nantucket Sound, leaving a corner of a controversial wind farm project in state waters.

According to a federal mapping survey completed last fall, a rocky formation off Yarmouth, called Bull Rock, is now considered the outer edge of the Massachusetts coast. The state controls up to three miles out into the Sound from that point. A couple of weeks ago, state officials requested the redrawn boundary, and jurisdiction over more of the Sound.

**Related**

▶ For more on the proposed offshore wind farm projects, see our special resources.
▶ Locator map of site

Cape Wind Associates, which was careful in its proposal to keep its offshore wind farm in federal waters, will have to relocate about 10 of the 130 wind turbines or face tougher state scrutiny.

The U.S. Army Corps of Engineers is currently deciding whether to issue a permit that would allow Cape Wind to build the turbines on Horseshoe Shoal.

The U.S. Minerals Management Service, which ultimately decides state and federal boundaries, said the new coastal map, which carves 12 square miles of the Sound from federal oversight, had nothing to do with the Cape Wind project.

"It happens to coincide with this issue, but we're doing this (as part of) a nationwide issue," said Gary Strasburg, a spokesman for the agency.

The Minerals Management Service, which is part of the U.S. Department of the Interior, is reassessing state and federal boundaries in each state. Massachusetts is just the first to be completed,

CW0000006176

Strasburg said.

Cape Wind officials did not say how the new map would affect their project, although spokesman Mark Rodgers said the company had several options.



The principal regulatory agency is the Army Corps. Currently, state oversight is largely limited to the underwater cable that would link the turbines to the shore.

Increased state involvement in the project could make it a tough sell for Cape Wind. Numerous state officials, including Gov. Mitt Romney and Attorney General Thomas Reilly, are outspoken opponents of the proposal.

(Published: February 23, 2005)



---

**Back to Cape Cod Times**

**Contacts:** news@capecodonline.com | retailsales@capecodonline.com
cape cod online | capeweek | primetime | on cape | cape cod times | classifieds
**Copyright © 2005 Cape Cod Times. All rights reserved.**

CW0000006177

19

CW0000006178

**Subject: FW: NOAA Situation/White House Task Force**
   **Date:** Tue, 17 Feb 2004 09:22:56 -0500
   **From:** "Golde, Helen" <Helen.Golde@hq.doe.gov>
       **To:** "'carla.sullivan@noaa.gov'" <carla.sullivan@noaa.gov>

Carla-- We should talk about this when you get the chance today.

-- Helen

-----Original Message-----
From: Dennis Duffy [mailto:dduffy@emienergy.com]
Sent: Friday, February 13, 2004 3:35 PM
To: Golde, Helen
Subject: NOAA Situation/White House Task Force

Helen,

As we have discussed, we are very concerned to learn that NOAA seems to be
initiating a proposal to shift the Federal/state border in a manner that
could possibly affect the jurisdictional status of the Cape Wind project.
Our concerned is heightened by the fact that there have been a series of
behind-the-scenes political attempts to derail the ongoing permit review
process, which is now in its third year.  One such attempt was the
circulation of a legislative rider that would have shifted our proposed site
from Federal to State ownership.  Such attempt stalled once it was brought
to light, and it now seems odd that a similar initiative would surface
within the same timeframe.

We would like to get a meeting with the responsible people at NOAA as soon
as possible.  We'd also like to see the factual materials and documentation
that has been used to support the proposed change of status .  I also also
want to learn the source of this initiaitve and the extent, if any, that
political forces aimed at blocking the windfarm were involved.

Thanks for your  help.

Dennis J. Duffy
Cape Wind Associates
617-904-3100, x.112

CW0000006179

20

CW0000006180

nore Cape Wind info

**Subject:** more Cape Wind info
**Date:** Mon, 9 Feb 2004 10:35:22 -0500
**From:** "Golde, Helen" <Helen.Golde@hq.doe.gov>
**To:** "'Carla Sullivan'" <carla.sullivan@noaa.gov>,
" (Mike.Aslaksen@noaa.gov)" <Mike.Aslaksen@noaa.gov>

I just spoke with Dennis Duffy at Cape Wind. Here is the scoop on the proposed State waters expansion:

There was an old lighthouse a few miles off of Hyannis, MA called Bishop and Clerks Light. The lighthouse has been cestroyed, but there is currently a beacon in the old lighthouse location. This web link includes a picture of the current beacon.

http://www.lighthouse.cc/bishop/history.html

Mr. Duffy has heard that the State of Massachusetts is interested in designating the rock that this beacon sits on as an island, which would expand Mass state waters. This expansion would encompass a significant number of the planned wind turbines in State waters (he wasn't sure how many, but perhaps as many at a quarter of the turbines, which he says might kill the project).

Regarding the meeting on Thursday, he said that the staffer from Sen Chaffee's office had set up the meeting for them, but she will not be attending. They are not coming to discuss RI issues, per se. Attending the meeting on Thursday will be Dennis Duffy (Cape Wind VP), Jim Gordon (Cape Wind Pres.), and Jerry Harrington and Chris Vitale from Capitol City Group (don't hold me to the spelling on any of these guys names). Duffy did say that one of the things he will want to talk about is Mass desire to extend joint planning into Fed waters, which he feels exceeds their authority. He asked me about the people he was scheduled to meet with and when I told him who Eldon Hout is he was glad cause he wants to discuss this issue about Mass state authority under CZMA. (at least that's how I understood it).

You might consider having someone from CO-OPS attend the meeting, as they can address questions about what it would take to have the rock designated as an island, etc.

Hope this helps.

-- Helen


---------------------------------------------------

Helen M. Golde

White House Task Force for Energy Project Streamlining

202-586-6554

helen.golde@hq.doe.gov

CW0000006181

21

CW0000006182

**ENVIRONMENTAL SCIENCE SERVICES, INC.**
38 Worcester Street, Suite 240, Wellesley, MA  02482
(781) 431-0500 / Fax (781) 431-7434

# LETTER OF TRANSMITTAL

TO: Karen Adams

US Army Corps of Engineers - NED

696 Virginia Road

Concord, MA.  01742

| DATE : 04/02/02 | PROJECT NO.  E159-009.5 |
|---|---|
| PROJECT: Cape Wind | |
| ATTENTION: Karen Adams | |
| | |
| | |
| | |

**WE ARE SENDING YOU**

☐ Attached      ☐ Under separate cover via _____ the following items:
☐ Shop drawings   ☐ Prints        ☐ Plans    ☐ Samples      ☐ Specifications
☐ Copy of letter    ☐ Change order   ☐ Other _____

| COPIES | DATE | NO. | DESCRIPTION |
|---|---|---|---|
| 1 | 04/02/02 | | New England Region Alternative Siting Analysis    (Working Draft – Summary) |
| | | | |
| | | | |
| | | | |
| | | | |

**THESE ARE TRANSMITTED as checked below:**

☐ **Final**           ☒ **Draft**             ☐ Draft Internal
☐ For approval     ☐ Approved as submitted   ☐ Resubmit        _____
☐ For your use      ☐ Approved as noted     ☐ Submit          _____
☐ As requested      ☐ Returned for corrections  ☐ Return          _____
☐ For review and comment              Other:
☐ For bids due                    Prints returned after loan to ESS

REMARKS:  Karen: Here's the draft "white paper" on the New England Alternative Analysis for Cape Wind.  If you feel that it

will be useful in our discussions on Thursday, please let me know and I will bring a supply of copies.   Thanks.

COPY TO: _____

SIGNED _____

Terry L. Orr

*190*

RECEIVED  APR - 3 2002

j:\e159\e159-009\transmit adams alternatives.doc

CW0000006183

## CAPE WIND ASSOCIATES, LLC
## NEW ENGLAND REGION ALTERNATIVE SITING ANALYSIS

*Overview:*

The purpose of the proposed Cape Wind Project is to install and operate a commercial scale merchant electrical generating facility located in New England, utilizing renewable wind energy as its fuel source. A New England regional siting analysis was conducted in order to identify potential alternative sites that could accommodate a Project of this type.

Due to large infrastructure and capital costs, the variability of wind energy output, the relatively high cost of operating and maintaining a wind energy project, established constraints on transmission load flow / line capacities, and the economies of scale associated with such a project, Cape Wind Associates (CWA) has determined that the Project must be capable of generating a minimum average output of approximately 170 MW in order for it to be financially sustainable.

Based on this stated purpose and economically viable size / scale, a series of siting criteria were identified, and applied to both onshore and offshore sites throughout New England in order to identify viable alternatives.

*Basic Assumptions:*

- o   New England
- o   Wind Power
- o   Utility Scale Project (minimum average output of 170 MW)

*Primary Siting Criteria:*

- o   Quality of the Wind Resource. A wind power classification of 4 or greater as designated by the US Department of Energy National Renewable Energy Lab (Wind Energy Resource Atlas of the United States – 1986; Figures 1 and 2)
- o   Suitable available land or offshore area (minimum of 10,000 acres)
- o   Electrical Connection (New England Geographic Transmission Map through 2015 ISO New England 3-14-00 attached as Figure 3)
  - ◦   Proximity to regional load center
  - ◦   Proximity to existing transmission infrastructure
  - ◦   Available capacity on existing transmission infrastructure

CW0000006184

## ONSHORE ALTERNATIVES

Upland sites were investigated in areas of New England which were mapped as having a wind power classification of 4 or higher, including western Maine, the mountains of New Hampshire and Vermont, western Massachusetts and the Cape and Islands.

In general the following characteristics apply to onshore wind power installations (as compared with offshore installations):

- Commercially available land and associated acquisition costs, along with other installation costs, must be offset by power output in order to make the project economically feasible.
- Wind shear is greater on land – due to roughness of the landscape – requiring taller towers to reach the quality winds.  Taller towers are more visible.
- State of the art (ie: larger) MW machines are difficult to transport into remote / mountainous locations where wind resources tend to be adequate, due to the shear size of the components. Roadways / railway infrastructure in these areas is often limited.  Helicopter installation is possible but technically difficult.
- Greater potential impact on birds and wildlife due to greater amounts of land alteration / loss of habitat.

**Maine / New Hampshire:**
CWA evaluated a number of sites in Maine, and benefited from EMI's knowledge of and experience with the electrical transmission system from their development of the Rumford Generating Plant in Rumford Maine.  Sites such as Boundary Mountain were evaluated, but all were considered infeasible primarily due to the lack of electrical transmission infrastructure and capacity to connect to the New England Power Pool.  A "bottleneck" exists in southern New Hampshire due to a limited number of high voltage transmission lines with available capacity, so any future power facility built in Maine or New Hampshire lacks the certainty that the power produced could be moved to market due to the congestion at the NH / ME / MA intersection.  In addition to the bottleneck entering Massachusetts, the high voltage lines that do exist in Maine and southern New Hampshire are located closer to the coast and away from the mountainous locations that would have any potential for wind power generation.

**Vermont:**
CWA investigated sites in Vermont, including Searsburg, and conducted partnership discussions with KMS Mountain Energy about potential small scale upland wind projects in the state.  Ultimately it was decided that siting a utility scale project in the mountainous areas of Vermont where the wind regime was adequate was not feasible due to the lack of available area, and the impracticality of installation due to infrastructure limitations (limited roads for construction and limited transmission lines to handle power output).

CW0000006185

**Connecticut and Rhode Island:**
The wind resources throughout Connecticut and Rhode Island are not adequate to support a land based commercial wind power project (most of the area is designated as Wind Power Class 2 or 3).

**Massachusetts:**
Two distinct regions of Massachusetts met the minimum criteria for onshore wind project development. The wind resources in Western Massachusetts, and Cape Cod and the Islands were adequate for further site investigation.

The wind resources in the higher elevations of western Massachusetts are designated as Wind Power Class 4 however project development throughout the area faces similar constraints as those identified in Vermont. CWA investigated sites near Brody Mountain and Mt. Tom, but concluded that upland project development was infeasible due to lack of available land area and the impracticality of installation due to infrastructure limitations.

The Islands of Nantucket and Martha's Vineyard have adequate wind resources however available land area, adequate for a utility scale project, does not exist on either island and capacity is not available over the existing transmission cables to interconnect with the regional transmission grid on Cape Cod.

CWA has investigated project development at the Massachusetts Military Reservation / Otis Air Force Base in Sandwich Massachusetts. Although a significant amount of open space exists on the site that may be adequate for a smaller scale project, the assessment of the site has concluded that it is not feasible for a utility scale project for the following reasons:
- the quality of the wind resource is marginal (class 3) due to topography and existing structures, requiring taller towers that would be more visible and extend further into military airspace;
- the site is in close proximity to residential neighborhoods;
- the Air Force base is undergoing increased military activity and renewal / extension of the National Guard lease;
- there has been increased military air traffic to and from the site since September 2001;
- unexploded ordinance may exist in open areas formerly used for training that would be considered for turbine siting, and
- there are several environmental concerns, including EPA superfund designation.

Based on this analysis and evaluation of upland sites throughout New England, Cape Wind Associates has determined that an onshore utility scale wind power project in the New England area is not practicable.

## OFFSHORE ALTERNATIVES

A number of offshore locations were investigated and evaluated prior to the identification of the proposed site in Nantucket Sound. Wind power classifications of 4 or greater exist along the entire New England coastline and sites from Maine to Connecticut were considered.

In general the following characteristics apply to offshore wind power projects (as compared with onshore applications):

- The quality of the wind resource is greater over water than over land due to the relative smoothness of the water surface. As a result there is less wind shear and turbines can be installed on shorter towers.
- Smoother, less turbulent wind results in less wear and tear and longer operational life for wind turbines.
- Use of state-of-the-art megawatt size turbines is practical and not constrained by land based infrastructure limitations, allowing for fewer units to achieve the desired energy generating capacity.
- Offshore turbine foundation installations are more expensive than comparable onshore foundations.
- Operations and maintenance costs are higher for offshore installations.
- Available open areas and land acquisition costs are not limiting factors.
- Projects can be sited further away from population centers, minimizing visual impacts.

Two primary siting considerations for any offshore installation are the water depth and the exposure of the site to open ocean. Both of these factors pose significant design, installation and operational considerations that greatly affect the feasibility of offshore sites (see figure 4).

*Water Depth*:
As installations are designed for deeper waters the size of the foundation must become both taller and larger in diameter to accommodate the increased stresses that will be placed on it. As water depths increase, the options become more limited as to the type of foundation installation that is technically possible. The driven monopile foundation is practical to an approximate depth of 15 meters (50 feet). It is the most economically feasible and creates the least environmental impact on the seabed.

Deeper water installations will likely require a tripod design that involves three piles widely spread, each of which will require a certain amount of scour protection depending upon the currents and seabed conditions. This design is not only more expensive to construct, but would impact a greater area of seabed than the monopile design, and would have an increased potential for environmental impact.

CW0000006187

*Sheltered vs. Exposed Locations:*
The extent to which a site is exposed to the open ocean impacts the design and operation of the facility. The design of each wind turbine must take into consideration the significant wave height expected for the specific location. Designing for higher wave heights results in increased installation and operation costs and considerations. Locations that are sheltered from the long fetch distances associated with exposed open ocean locations will have much lower significant wave heights.

Access platforms on each turbine need to be located above significant wave height. Platforms are attached to the foundation at the interface with the turbine tower. Exposed locations with higher significant wave heights require taller foundations with shorter towers to achieve the desired hub height. Higher platforms result in fewer opportunities for installation and maintenance due to more frequent hazardous weather conditions.

Generally speaking, most of the exposed offshore sites that are subject to very large significant wave conditions are also areas of deeper waters, thus compounding the design, installation and operation difficulties. For these reasons many offshore areas with substantial wind resources were deemed infeasible.

**Maine:**
All potential locations off the coast of Maine are completely exposed to the open Atlantic ocean and would be subject to a significant wave design height of 50 feet or greater. Water depths increase rapidly from shore and quickly exceed even the deepest design limits of 50 meters. Judged on these two criteria alone, CWA has determined that installation off the Maine coast is infeasible. Regardless of the difficulties in siting the turbines offshore, the lack of transmission capacity or "bottleneck" described previously in the Onshore Alternatives discussion still exists for any power brought ashore along the Maine / New Hampshire coastline.

**Massachusetts:**
Installation of electrical power generating plants is specifically prohibited within 3 miles of the Massachusetts coastline (Ocean Sanctuaries Act), so only sites outside of the 3mile limit were evaluated.

*Cape Ann to Cape Cod Bay*
Sites within this area are deep water, exposed sites which would impact the Boston Harbor Shipping Channel, the Stellwagen Bank National Marine Sanctuary, approaches to Logan Airport, and significant marine mammal migratory routes. Wind resources in this area are classified as Class 6; however, due to the reasons stated previously, this area is infeasible for project development.

CW0000006188

*East of Monomoy*

This area has some of the highest wind resources in New England (class 6); however, any development would be subject to deep water, open ocean exposures with significant wave design heights of 50 feet or greater. In addition, the main north – south marine shipping lane to Boston Harbor passes through the area, and it is critical habitat for the Northern Right Whale. Electrical interconnection to the New England power grid would require significant upland infrastructure improvements to the system in the Chatham area, or impractically long cable runs into Nantucket Sound with landfall on the south shore of Cape Cod. As a result, installation in this area is infeasible.

*Nantucket Sound*

Nantucket Sound is sheltered from the long fetch distances and open ocean exposures and is subject to significant wave design height of approximately 12 feet. The wind resources in the Sound are higher than most coastal areas of the contiguous United States (wind class 5), and the Sound has areas of relatively shallow water depth, outside the 3 mile limit of the Ocean Sanctuaries Act. Areas in Nantucket Sound are within reasonable distances to electrical interconnection with the New England transmission grid through high voltage lines on Cape Cod. Nantucket Sound was deemed to be a feasible and practicable location for project development. For further siting evaluation within Nantucket Sound, refer to Section 4.0 (Alternatives Analysis) in the 11/21/01 US Army Corp of Engineers Section 10/404 Individual Permit Application.

*Nantucket Shoals*

Areas southeast of Nantucket Island have many of the same characteristics as those East of Monomoy, with the exception that shallower water depths occur throughout the extremely variable geographic area. The area's direct exposure to the open Atlantic ocean presents a significant wave design height of 50 feet or greater, which even in shallower waters would require deeper installation of larger foundations and would result in operations and maintenance limitations that have been previously described. Electrical interconnection directly to the Cape Cod mainland is impractical due to distance, and interconnection through Nantucket via the existing 46kV submarine cable to Harwich is infeasible due to size, design and capacity constraints. CWA has analyzed installation in this area and has found it to be infeasible.

*Rhode Island Sound*

Areas south and west of Martha's Vineyard have lower quality wind resources (wind classes 3-4), than most other locations along the New England coastline. Sites in this area are exposed, deepwater sites, and would impact the Buzzard's Bay Traffic lane and the Narragansett Bay Traffic lane. In addition, an excessive amount of unexploded ordinance exists in the area south of No Man's Land, and

CW0000006189

interconnection distances would be substantial.  Project development in this area is considered infeasible.

*Long Island Sound*
The wind resources within Long Island Sound are wind power class 3 and considered inadequate for development of a utility scale wind project.

22

CW0000006191

QH
91.75
.W52
2000



# THE *Wild* SEA

### SAVING OUR MARINE HERITAGE

JENNIFER ATKINSON

PRISCILLA M. BROOKS

ANTHONY C. CHATWIN

PETER SHELLEY

**Conservation Law Foundation**

CW0000006192

CHAPTER FOUR

# The Case for MPAs



I N ORDER TO ENSURE A HEALTHY, biologically diverse, and productive Gulf of Maine, our strategies must be systematically targeted at reducing pollution, maintaining sufficient spawning stock of all marine species so that reproduction rates are not jeopardized, and protecting marine habitats to ensure that the marine system can sustain its native plants and animals. Most of our marine conservation efforts to date have been targeted at rebuilding the spawning biomass of only the commercially important species of fish and shellfish and at reducing pollution of the marine environment.

Very little attention has been paid to physically protecting the marine habitats in which these species are born, live, reproduce, and die. Even less attention has been paid to the conservation of all the other organisms that currently have no commercial value, yet may hold the key to the health of the ecosystem. The importance of a well-designed system of marine protected areas (MPAs) in the Gulf of Maine is that it provides a rational, scientifically driven mechanism to conserve and restore the magnificent biodiversity that should be the fundamental hallmark of the Gulf.

## Anatomy of an MPA

MPAs come in many shapes and sizes and need to be specifically designed to conserve the marine environment. They also promote the preservation and restoration of our marine heritage including important or unique habitats, rare plants or animals, or key biological communities. A protected area in the sea is not a single concept. It is as multi-dimensional as the biodiversity it fosters.

Sites can and should differ based on the conservation issues they address, the management schemes they employ their size, and their success. Depending upon the area, conservation goals can vary from a strict preservation standard to a biologically sustainable multi-use approach. For example, in some sites, protection is absolute—no human uses are allowed. In other sites, protection is flexible—most activities can continue, but are managed in a new, more coordinated way.

On land, the range of terrestrial protected areas suggests a rich vocabulary of area distinctions that have been identified over the centuries. Years of familiarity have even given names the connotation of a certain approach to conservation. We have national parks, state parks, city parks, national wildlife refuges, private sanctuaries and preserves, wilderness areas, town conservation land, national and state forests, public and private arboretums—to name just a few. Each one of these areas is set

CW0000006193

**The NOS marine sanctuaries and estuarine reserves divisions**

Although much smaller than NMFS, a far greater proportion of NOAA's National Ocean Service is dedicated directly to the designation and management of MPAs. The National Marine Sanctuary Division manages 12 National Marine Sanctuaries (NMSs) nationwide, one of which is off the Massachusetts coast, and the Estuarine Reserves Division oversees a system of 22 state-operated National Estuarine Research Reserves (NERRs), three of which either border on or are within the Gulf of Maine.

Of the two programs in this division, the Sanctuary Program most closely resembles the idea of a "protected area in the sea." Although the entire area of all the sanctuaries combined nationally equals less than one percent with all federal waters,[6] they remain the only federal programs with an irrefutable and specific mandate to conserve and coordinate management of discrete areas of the marine environment.

*National Marine Sanctuary Program*

The sanctuary system is considered the flagship of all the federal MPA programs.[7] Although often referred to as the national parks of the sea, national marine sanctuaries are in fact something quite different. Unlike national parks, their mission is not simply one of preservation. Instead, sanctuaries are established to coordinate the conservation and management of areas of "special national significance based upon ecological, cultural, recreational, or aesthetic values."[8]

To be established, each site must meet four basic criteria: 1) the site must be nationally significant; 2) "existing governmental authorities are inadequate or should be supplemented to ensure coordinated and comprehensive conservation and management...;" 3) designation will provide or improve "coordinated and comprehensive conservation and management" of the site and its resources; and 4) the site's size and nature must be suited to "coordinated and comprehensive conservation and management."[9] Once established, a sanctuary's role is to promote research, enhance education, and facilitate all compatible public and private uses while furthering the conservation of critical resources such as whales, historic shipwrecks, coral reefs, or fishing grounds.

The conceptual emphasis of the program is on the conservation of complete systems through multiple-use management. In practice, however, few uses are prohibited in these sites. In fact, less then one percent of the combined sanctuary program area is off-limits to all commercial and extractive recreational uses.[10] Instead, each of the 12 currently designated sites (a 13th protecting cultural resources in the Great Lakes is scheduled for completion soon) allows most uses while protecting special values through individual management plans.[11] For example various sanctuaries have regulated different combinations of human activities such as: oil and gas exploration and drilling, undersea mining, commercial tourism activities (such as whale watching), fishing, construction of floating or submerged structures, diving, mooring, research, or at-sea dumping or discharging.[12]

The national designation process for individual sites is currently officially dormant, leaving 29 potential candidates on the official Site Evaluation List (SEL) awaiting sanctuary designation.[13] An attempt was made in 1990 to reevaluate these recommendations and, where necessary, add or delete sites on the SEL, but it was abandoned due to funding shortfalls.[14]

If the SEL is reactivated, the agency will issue new site selection criteria.[15] Some of the current bills to reauthorize the Sanctuary Act, however, include a temporary moratorium on new sites until existing sites are sufficiently staffed and adequately managed. Meanwhile, those sites already on the SEL will remain there and are in theory still available for the next stage of the designation process, which is the selection of Active Candidates from the SEL by NOAA.

Once a site is selected to be an Active Candidate, Congress reviews the proposal and draft management plans and environmental impact statements are then prepared.[16] This period of public consultation has become an important part of the law's designation and management review process, sometimes consuming years in public meetings and consensus-building pro-



cesses.[17] Following a period of agency consultation, a proposed site can be designated a National Sanctuary by the Secretary of Commerce or by Congress.[18]

The first sanctuaries were generally small and focused on preserving or protecting specific components of the marine environment—not an ecosystem. For example, the U.S.S. Monitor National Marine Sanctuary, designated the first sanctuary in 1975, is intended to protect the historical attributes of the *USS Monitor's* sunken remains, a Civil War-era gunship resting on the seafloor 16 miles off of the North Carolina coast. This sanctuary is a far cry from the multiple use ecosystem protection envisioned by the legislation. It is only one square mile in area.[19]

All of the more recent sanctuaries have been created with an eye towards natural resource protection, research, and multiple use. The best example is the 1990 designation of the Florida

CW0000006194

Keys National Marine Sanctuary.[20] At nearly half the size of New Jersey, it is managed in part through three different types of no-take zones—sanctuary preservation areas, research-only areas, and an ecological reserve. Although these comprise only one percent of the sanctuary's 2,800 square nautical miles, they cover most of its coral reef habitat. Other protected habitats include mangrove communities, hard bottom areas, sand flats, and sea grass meadows.

Both these areas and the coral reefs are also managed by programs to monitor changes in wildlife populations and ecosystem function, protect water quality, promote science, install and maintain mooring buoys, mark channels, and educate the public. The early signs of success of the zoning activities have attracted interest among some marine protected area proponents in New England who believe that this region's only sanctuary, Stellwagen Bank National Marine Sanctuary, could benefit from similar zones as well.

Three New England sites are on the SEL, not yet selected as Active Candidates within the program. These sites include: the Narragansett Bay/Block Island Sound area; the Nantucket Sound and Shoals/Oceanographer Canyon area; and, in the Gulf of Maine, an area called the Midcoast, which extends along the Maine coast from the eastern edge of Casco Bay to the southwestern edge of Penobscot Bay and encompasses more than 100 species of birds, fish, shellfish, and marine mammals.[21] Whether a future reevaluation of the SEL will affect the status of these sites is unknown.

Besides Stellwagen, only one New England site has achieved Active Candidate status. In 1979 Georges Bank was added and then later removed as Active Candidate during the height of the controversy over the leasing of exploration sites for oil drilling. Its denial reflected the agency's assessment that this site was adequately protected by existing management programs.[22] Given the dramatic fishery declines of the 1990's, some may now question the accuracy of this assessment.

*National Sanctuaries in New England:*
*Gerry E. Studds Stellwagen Bank National Marine Sanctuary*
Encompassing a natural sandy undersea plateau is New England's only national marine sanctuary: the Gerry E. Studds Stellwagen Bank National Marine Sanctuary (NMS). Just over half the size of Rhode Island, the Stellwagen Bank NMS lies in an elongated rectangle connecting the sandy shores of Cape Cod with the rocky headlands of Cape Ann, Mass.[23] The bank itself is a primarily sandy feature, lying just 65 feet beneath the surface at its shallowest depths and more than 100 feet at its deepest.[24] Also encompassing Tillies Bank, Tillies Basin, and the southernmost portion of Jeffrey's Ledge, the sanctuary was created in 1992 after a decade of effort that began when the site was nominated by the Center for Coastal Studies and Defenders of Wildlife.[25] In the late 1980's, following congressional pressure led largely by then Massachusetts Rep. Gerry Studds,[26] Stellwagen became the nation's 11th marine sanctuary.

Relatively large compared to other sites in the sanctuary program, Stellwagen's authorizing legislation prohibits only one use —sand and gravel mining.[27] Existing laws as well as regulations

implementing its five-year management plan, however, prohibit several more: exploring, developing, or producing industrial materials; at-sea transfer of petroleum products; and the taking of any historical artifact or any seabird, reptile, or marine mammal. Still other activities cannot be conducted without a special sanctuary permit. Among these are discharging or depositing most materials directly or indirectly into the sanctuary's waters; drilling, dredging, or altering the seabed; constructing, placing, or abandoning any structure on the seabed (except for fishing, anchoring, or navigation); and possessing any historical artifact, seabird, reptile, or marine mammal.[28]

All other uses are managed from a multiple-use approach that, to date, does not involve any zoning of the site. Instead, the sanctuary staff attempt to cooperate with other agencies to promote coordinated use and management of the site's resources. Recently, they have participated in regulating whale watching (both commercial enterprises and private individuals), and in negotiations to reduce the threat of commercial ship strikes on endangered whales, especially the northern right whale.[29]

Many believe that the sanctuary needs to take a stronger stand in protecting the resources under its jurisdiction. It may be one of the only authorities that can regulate vessel speed, a rule that could help avert collisions between boats and whales.[30] Among others, the establishment of no-use zones for research is gaining favor, although these are likely to be opposed by fishermen. And some advocates want a more comprehensive zoning plan.

Notably, the sanctuary has not created any protective regulations concerning commercial fishing or its adverse effects on habitat, whales, seabirds, or other sanctuary resources.[31] Its current management plan deferred all fishery management author-



CW0000006195

tion to emerge in one state while keeping the situation open to conjecture in another. For MPA proponents, this creates both a challenge and an opportunity that must be more fully considered when state establishment efforts truly get underway.

## Massachusetts

Marked by a distinctive coastal geography that hooks into the waters of the Gulf, Massachusetts supports a much larger population and economy on its 1500 miles of shoreline than either Maine or New Hampshire.[13] Coastal industries contribute $70.7 billion dollars into the state's economy each year.[14] Up until recently, about $1 billion of this was from fishing,[15] which employed about 20,000 people as either fishermen or workers in related businesses.[16] Impressive as this number sounds, it is only a small portion of the state's six million residents, nearly half of whom live in Greater Boston.[17] As the state's principal port, Boston is one of 78 coastal communities occupying a coastline of bays, coves, and estuaries that actually exceed the overall length of California's shoreline.[18]

Given its geography, the remarkable number of people concentrated on its coast, and the significance of its coastal zone to the state's economy, the state's efforts to develop and promote a full range of MPAs in its coastal waters is not yet particularly impressive. Yet Massachusetts could lead the way if it chose to. Already it is the only Gulf of Maine state with legislation enabling regulatory MPAs, with designated MPA sites established under this law, and with a national marine sanctuary on its bor-

der. In addition, its Office of Coastal Zone Management is actively exploring marine research reserves for state waters.

The prospects, however, are limited. Most Massachusetts MPA authority resides within existing environmental management mandates that are not principally targeted on the conservation of marine biodiversity. These mandates are distributed among a diversity of competing state agencies within the Executive Office of Environmental Affairs: the Department of Fisheries, Wildlife and Environmental Law Enforcement; the Department of Environmental Management; the Department of Environmental Protection, the Massachusetts Coastal Zone Management Office, and the Massachusetts Board of Underwater Archeological Resources.

Absent a clear MPA mandate or policy from the state legislature, these agencies—which could both individually and collectively use their power to create MPAs—are largely subject to the political conditions that guide them. So far, these conditions have not been terribly favorable for MPA establishment. Those agencies that have taken steps in the direction of marine area protection created their programs many years ago through the limited options made available through existing legislation; or established proprietary marine protected sites incidental to a terrestrial conservation program; or designated regulatory areas as part of a program of fisheries or environmental management.

Unlike Maine or New Hampshire, the Massachusetts legislature enacted a law that extends the municipal boundaries of coastal communities three miles out to sea, making them virtu-



CW0000006196

ally co-extensive with state lines.[19] Within these lines, each municipality can exercise a significantly larger marine role than similarly situated communities to the north.

The state laws give municipalities a great deal of power over activities on submerged lands. They can permit the removal, fill, dredge, or alteration of coastal wetlands. They can also manage harvesting of shellfish, eel, and sea worm,[20] shellfish aquaculture,[21] and the siting of coastal fish weirs, fish traps, and pound nets.[22] Among their protected areas power is the ability to petition their county to establish shoreland reservations;[23] to "locate parks" within the city or town (although no municipal underwater parks are known to exist);[24] to acquire land and water areas for open space protection through their Conservation Commissions,[25] and to close shellfish flats for up to three years.[26] Notably, the state has not interpreted this latter provision to allow successive closure periods as they view the law as promoting recreational shellfish harvesting rather than conservation.[27]

## Public Trust Doctrine

Massachusetts settlers imported the Public Trust Doctrine from England as the legal touchstone for defining public rights in the intertidal and subtidal environment, but modified it extensively by colonial ordinance. This early ordinance has since been enacted into statute and significantly expanded by agency regulation.[28]

Even so, the doctrine remains relatively narrow. In fact, Massachusetts has one of least "public" shorelines in the nation (at least 19 of the 23 coastal states allow the public full access to the intertidal zone).[29] Massachusetts is one of the few states along the U.S. coast that permits private property ownership to the historic low tide line.[30] This means that much of the intertidal zone may be privately owned, although private property interests are subservient to the rights preserved in the Public Trust Doctrine. Massachusetts defines these lands as "private tidelands"—"tidelands held by a private party subject to an easement of the public for the purposes of navigation and free fishing and fowling and of passing freely over and through the water."[31] This law reflects the development of the doctrine in the courts which have interpreted these rights quite narrowly, limiting them to "fishing, fowling, and navigation" as well as the "natural derivatives"[32] of these practices, such as the right to enter private lands to fish on them or to get to another area to fish,[33] shellfish,[34] or gather floating seaweed.[35] Similarly, the right to navigation also includes the right to sail or drop anchor.[36] Notably, this interpretation does not include more leisurely activities such as strolling, beach combing, or nature study.[37] In the intertidal zone, the state bears exclusive responsibility for managing and enabling the reserved public uses up to the mean high water mark, including private uses on private lands that could interfere with these rights.

More expansive are the public rights the state is bound to preserve in the subtidal zone. Here, where there is no private ownership, the state is charged with protecting the public's interest in what the statute calls "Commonwealth tidelands"— "tidelands held by the commonwealth in trust for the benefit of the public or held by another party by license or grant of the commonwealth subject to an express or implied condition subsequent that it be used for a public purpose."[38]

## Executive Office of Environmental Affairs (EOEA)

Primarily responsible for the conservation and management of the state's natural environment, the EOEA operates as a super agency that encompasses a number of smaller state agencies with responsibilities for the natural environment. Among these are several with MPA potential including: 1) the Department of Fisheries, Wildlife and Environmental Law Enforcement, 2) the Department of Environmental Management, 3) the Department of Environmental Protection, 4) the Massachusetts Coastal Zone Management Office and 5) the Board of Underwater Archeological Resources. Each one has its own MPA or quasi-MPA authority, as reviewed below. Some have used their unique authority to designate sites and others have not.

### Department of Fisheries, Wildlife & Environmental Law Enforcement

This branch of the EOEA is responsible for protecting and managing the state's natural habitats, plants, wildlife, and marine species. Of its three divisions, two have MPA-related authority—the Division of Marine Fisheries and the Division of Fisheries and Wildlife. Although the latter is more commonly known for its management of terrestrial and freshwater aquatic resources, it does have several mandates that extend seaward, including the management of most marine wildlife other than fish. And where their fisheries jurisdictions have the potential for overlap, as in estuarine areas and tidal rivers or streams, Massachusetts law directs the two agencies to jointly set their jurisdictional boundaries.[39] Fish that fall within the Division of Marine Fisheries purview occupy waters labeled "coastal" or "territorial."[40] The Division of Fisheries and Wildlife is responsible for all the other fish that live in "inland waters."[41]



CW0000006197

*Division of Marine Fisheries (DMF)*—Charged primarily with the management and promotion of commercial and recreational fisheries in the state's coastal waters, this division also monitors contaminant levels in fish and shellfish, assesses the fishery impacts of coastal development, and assists municipal shellfish management.[42] Yet its potential for MPA work resides mainly within its fishery management authority to regulate "the opening and closing of areas within the coastal waters to the taking of any and all types of fish."[43]

This, however, is not an absolute authority. Prior to adopting certain management rules, the Director must first propose them to the state's Marine Fisheries Advisory Commission, which will approve or disapprove the regulation following public hearing.[44] For closing and opening areas, the Commission in turn is required to obtain the consent of the selectmen of any town or the mayor and council of any city affected by such a closure.[45] Once all necessary approvals are given, the Director of DMF can adopt, amend, or repeal a regulation.

Closure authority is quite extensive, arguably encompassing the power to create permanent no-fishing areas in state waters. However, no such action has yet been taken. Although Massachusetts has numerous fishery closures, most are either species-specific or gear-specific. Most last for a specified number of months each year. For example, to protect spawning fish between February and May, Massachusetts closes most of its inshore waters to commercial fishing for finfish.[46] At other times of year, certain areas are closed to mobile gear.[47] And all state waters from Plymouth to the New Hampshire border are closed part of the year to groundfish fishing.[48] During set periods, areas are closed to fishing for surf clams, sea urchins, lobsters, juvenile eels, as well as other species and gear types. DMF has also created a short-term closure to protect the northern right whale.[49] From January to mid May each year, gillnets are prohibited from the animal's critical habitat in Cape Cod Bay (*see also Appendix A*). Among all these fishery rules there are only a few year-round permanent closures. Among them is a lobster closure in Acushnet River Estuary[50] and a ban on commercial fishing for winter flounder in Mount Hope Bay,[51] both outside the Gulf of Maine.

*Division of Fisheries and Wildlife (DFW)*—The Division of Fisheries and Wildlife is principally tasked with the conservation and management of terrestrial and freshwater aquatic resources. DFW regulates human uses that affect both game and non-game wildlife species (except marine fish) on state lands and other habitats. As part of its role, the division can establish and manage different kinds of protected areas including wildlife management areas, wildlife sanctuaries, and nature preserves. In addition, the division can heighten thresholds for permitting for certain high-value wildlife sites. Although most of these protected area designations have targeted conservation of land or freshwater habitats, the authority may provide an venue for the creation of MPAs. A few of the DFW coastal sites, some of which were created for marine birds, may already encompass adjacent estuarine or salt waters beyond their intertidal boundaries.

The "Wildlife Management Area" (WMA) authority is the most common tool the division uses to set aside lands to conserve species and habitats. Technically, this label encompasses most of its land holdings, although internally, the division distinguishes between WMAs it promotes for outdoor recreation, such as hunting, trapping, fishing, and snowmobiling and those it does not. Sites where the division encourages public access



with maps, signs, and website information are labeled wildlife management areas. Sites referred to as "Natural Heritage Areas" are not promoted because they contain vulnerable or rare species or communities. The division also owns a little less than 700 acres of salt marsh as well as other areas, which it does not usually label as wildlife management areas.[52]

The actively promoted WMAs are maintained, generally without management plans, in their natural state and administered to allow a wide range of seasonal outdoor pursuits, and area acquisition is funded in part by user fees from some of these activities.[53] Of the 100 WMAs listed, several are coastal or estuarine areas in the Gulf of Maine. In the northeast, the William Forward WMA, located in Newbury and Rowley, contains a significant amount of intertidal salt marsh. In the southeast, the division owns a 76-acre portion of the Fox Island Salt Marsh in Wellfleet.

In the Division's two eastern districts there are 15 Natural Heritage Areas, which are more biologically sensitive than regular WMAs and also tend to be smaller. The division makes no maps to encourage public access nor do they mark the sites with signs. In essence, they use the relative anonymity of the sites to protect them from use.[54] Only one of these sites, Eagle Island in the Merrimack River estuary, is coastal.

Wildlife sanctuaries are a second category of protected areas the division owns and controls.[55] They are an entirely different kind of site. Mainly used during the 1920s and 30s, this designation enabled the establishment of 12 sites on properties donated to the state—the last one in 1945. Unlike the WMAs, these sites prohibit most human uses apart from hiking, birding, and quiet enjoyment.[56] The list of prohibited uses is extensive and includes not only hunting but also operating all kinds of vehicles.[57]

Among the 13 existing sites are seven coastal islands total-

CW0000006198

ing 228 acres that support seabirds, waterfowl, and shorebirds.[58] One site, Billingsgate Island off of Wellfleet is actually a half-acre, shifting sandbar that disappears at high tide and provides habitat for quahogs, grass shrimp, herring, menhaden, sea ducks, and harbor seals. Another site, Ram Island in the Merrimack River estuary, contains 20 acres of salt marsh that support mi-



gratory shorebirds and wintering waterfowl. Carr Island, adjacent to Ram Island, contains tidal creeks and marshes as well.

Nature preserve is the third designation the division employs to establish protected areas on state property.[59] Enacted into law about 10 years ago, it appears to be an obvious tool for creating MPAs in Massachusetts. Nature preserves can be established over any state-owned, EOEA-controlled area that contains "rare, exemplary, or other significant, natural, or biological communities or which contain significant features of native biodiversity."[60] This authority has not been significantly exercised to date anywhere in the state.

Administration of the dedication and management of these preserves is overseen by the Natural Heritage & Endangered Species Program. Sites are nominated into the program, however, by agencies within the EOEA. Ten citizens can also start the process by requesting an agency to nominate a site. If an agency grants the request, they work with the citizens to complete nomination documents.[61]

By regulation, all nature preserves are subject to a suite of regulations in addition to those contained in their protection plans. These include limits on public access, permit requirements for research, introducing plants or animals, and damaging vegetation, soil, rocks, or earth. Fishing, hunting, and trapping are allowed unless prohibited by the management plan.[62]

Although this law has been in place for 10 years, there is only one designated nature preserve in the state. It is located in the central town of Holden. Another has been nominated in an upland area of Barnstable on Cape Cod. According to program staff, however, there is growing interest in using the designation more actively. No plans, however, currently exist for any coastal or marine areas.[63]

Beyond these three types of proprietary protected areas, the division can also create at least two other kinds of regulatory protected areas. The first of these is the "estimated habitat" designation under the state's Wetland Protection Act.[64] Under this statute, proponents of projects that could alter wetlands (including intertidal and subtidal areas) must obtain permission from their local conservation commission before proceeding. Projects that would have short or long term adverse effects on the habitat of a species listed as rare must also be reviewed by the division's Natural Heritage & Endangered Species Program.

To assist in this process, the Natural Heritage Program has developed estimated habitat maps for rare wetland wildlife that are distributed to every municipality. Even though permits can only be issued theoretically for projects that will not have short- or long-term adverse effects on the habitat of rare or protected species, the Wetlands Act does not enable towns to deny a conservation permit to an applicant. It can only place conditions on a permit. At times, however, these may be so burdensome as to make the project infeasible.[65]

The division has designated all of Cape Cod Bay as Estimated Habitat for northern right whales (excluding an area from the immediate shoreline out to a few hundred yards offshore). Any development or construction activity within this area (which excludes the immediate shoreline) must be reviewed by NHES before being approved by a municipality.[66]

The other designation is "significant habitat" under the state's Endangered Species Act and regulations promulgated pursuant to it.[67] Massachusetts law allows any species of plant or animal to be listed as endangered or threatened by the Division of Fisheries and Wildlife.[68] Following a state species listing, the director may designate areas found to be significant habitat of that species.[69] These are "specific areas of the commonwealth" which contain "physical or biological features important to the conservation of a threatened or endangered species population" and "may require special management considerations or protection."[70] Unless otherwise allowed by permit or otherwise exempt under the law, alterations of these designated sites are illegal whether the area is privately or publicly owned.[71]

To date, Massachusetts has listed almost 100 animals and 200 plants as threatened or endangered.[72] Among these are a variety of marine and estuarine species including sea turtles, sea birds, shore birds, whales, and plants. Significant habitat designation could be used to protect the habitats of these and other listed species. Since the Act's passage, however, the state has not designated any areas, terrestrial or marine, as significant habitat despite promulgating an extensive regulatory process to do so.[73]

## Department of Environmental Management (DEM)

As the largest landholder in the state, this department is the primary agency for natural, historical, recreational, and cultural resource planning and management. It is composed of two major divisions—the Division of Forests and Parks and the Division of Resource Conservation. In general, the former oversees the day-to-day operations and resource management responsibilities at state-owned sites such as parks, trails, forests, reserves, and the Waquoit Bay National Estuarine Research Reserve (see Appendix A: Federal Laws and Regulations). The latter supports this work through resource assessment, design, planning,

CW0000006199

and science. Together they manage the ninth largest state forest and park system in the country.

The Division of Resource Conservation also oversees the administration of the Areas of Critical Environmental Concern Program, the Ocean Sanctuaries Program, and the Massachusetts Wildlands Program. The first two are regulatory designations that can be applied to marine areas to heighten their level of protection from particular human uses by setting higher environmental review standards. The latter is a heightened designation placed on DEM properties in recognition of their special characteristics.

Massachusetts is the only state in New England with a marine law that offers heightened environmental protections to specifically designated marine areas. The Ocean Sanctuaries Act,[74] passed in 1970, enabled the delineation of five ocean sanctuaries in Massachusetts waters during its first six years: Cape Cod Ocean Sanctuary, Cape Cod Bay Ocean Sanctuary, Cape and Islands Ocean Sanctuary, North Shore Ocean Sanctuary, and South Essex Ocean Sanctuary. These sanctuaries encompass most of the state's coastline and all of its waters from the mean low water line out to the boundary of its seaward jurisdiction. The only area excluded is the portion of Massachusetts Bay between Lynn to the north and Marshfield to the south.

Currently, the act states that the areas are to "be protected from any exploitation, development, or activity that would significantly alter or otherwise endanger the ecology or appearance of the ocean, seabed, or subsoil...."[75] Although this language would appear to provide very strict restrictions on use, only a few particular activities are actually prohibited. Because DEM only has the authority to review permits that other state agencies issue, the agency acts as the "caretaker" or trustee of the sanctuaries rather than the permitting authority. DEM implements the act by issuing regulations for other agencies to follow.

Among the activities specifically banned (by statute or by regulation) are:

○ structures on the seabed or in its subsoil;

○ offshore or floating electric generating stations;

○ drilling or removal of sand, gravel, or other minerals, gases, or oil;



○ dumping or discharge of commercial, domestic, municipal, or industrial waste;

○ commercial advertising;

○ incineration of solid waste on or in vessels;[76]

○ any activity that would "seriously alter" an ocean sanctuary;[77]

○ more than negligibly changing the flow, drainage, flushing, salinity distribution, sedimentation, flood storage, or table level of the waters;

○ more than negligibly changing the temperature, oxygen of other water quality characteristics; and

○ increasing development.

There are exceptions to all of these limitations. For example, the commercial and recreational harvest or propagation (i.e., aquaculture) of fish or shellfish is allowed in all five sanctuaries. Structures can be built too if they are determined by DEM to be "necessary to the public interest." Sand and gravel may be extracted for a DEM-approved shore protection or beach restoration project. Municipal wastewater may be discharged into the North Shore and South Essex sanctuaries and, under fairly uncommon conditions, in the other three sites as well. Another practice allowed under the law is the continued operation of facilities and discharges in place and properly licensed prior to the act's passage.[78]

DEM identifies the protection of "ecologically significant resource areas" and "complexes of marine resource areas of unique productivity" as two environmental policies to be pursued through its implementation of the act.[79] This language would seem to provide a means to limit particularly harmful fishing practices within sections of an ocean sanctuary. Yet actions have not yet been taken in pursuit of these policy objectives. As noted above, fishing and propagation of fish is allowed in ocean sanctuaries, so long as these activities are carried out in accordance with "sound conservation practices."[80] Although these sanctuaries have not been effective as MPAs, they have stopped some conflicting proposals, including oil and gas pipelines, sewage treatment plant outfalls, electrical energy cables, and oceanic windmill farms.[81]

DEM also administers the Areas of Critical Environmental Concern (ACEC) Program, a regulatory effort created in 1975.[82] As of 1998, there were more than 25 sites encompassing 170,000 acres. Of these, 14 are coastal and comprise 75,000 acres, including some intertidal as well as submerged lands.[83] They are defined as "areas within the Commonwealth where unique clusters of natural and human resource values exist and which are worthy of a high level of concern and protection."[84] Once designated, higher levels of environmental review are applied to them in order to conserve and protect their ecological and social value.

The ACEC designation process starts with a nomination that can come from a group of 10 citizens or from town officials, state or regional agency officials, or the governor.[85] To be eligible for ACEC nomination, an area must contain attributes of four or more of eleven listed features. Among these are

CW0000006200

several marine or estuarine areas features including: 1)"fishery habitats" which is limited to "anadromous/catadromous fish runs, fish spawning areas, fish nursery areas, or shellfish beds"; 2) "coastal features" which includes "barrier beach system, beach, rocky intertidal shore, or dune"; 3) "estuarine wetlands" which lists "embayment, estuary, salt pond, salt marsh or beach"; 4) "habitat resources" covering habitat for threatened or endangered plant or animal species, habitat for species of special concern, or other significant wildlife habitat"; and 5) "special use areas" described as undeveloped or natural areas, public recreation areas, or significant scenic site."[86] Once the secretary accepts the nomination,[87] a public review process is undertaken, leading to a final decision on designation. Once designated, sites are periodically reviewed.[88] After one year, designations can also be repealed or amended.[89]

DEM also administers a parks and reserves program to promote conservation and public recreation opportunities. Although mostly terrestrial areas with some beaches and rocky outcroppings at this time, nothing in the statute appears to exclude estuarine or marine sites from consideration. The statute also outlines three basic points of policy for this program. First, "so far as practicable," sites should "be preserved in their natural state." Second, "so far as possible" they should be "collectively self-supporting;" and third, "no commercial activities except those essential to the quiet enjoyment of the facilities by the people shall be permitted."[90] Such statutory policies are completely harmonious with MPA approaches.

Currently, however, Massachusetts has no state underwater parks or reserves. There are only 12 terrestrial sites adjacent to the sea such as beaches, sand dunes, woodlands, islands, and rocky outcroppings whose boundaries may include the intertidal zone.[91] Several encompass salt marsh areas such as Demarest Lloyd State Park in Dartmouth, Ellisville Harbor State Park in Plymouth, Horseneck Beach State Reservation in Westport Point, and South Cape Beach State Park which is also part of the Waquoit Bay National Estuarine Research Reserve.

Sites can be designated by DEM staff or the public.[92] Their purpose is to protect the best examples of Massachusetts species and communities on DEM property, as well as to promote environmental education, research, and the opportunity for a wilderness experience that provides "solitude and scenery."[93] To achieve this end, a number of use restrictions apply once the sites are established. These include a prohibition on motorized vehicles and on the destroying or collecting of geologic materials, vegetation, wildlife, or aquatic organisms. Hunting, fishing, and trapping can continue, however, if they were lawful prior to the designation.[94]

## Department of Environmental Protection

Tasked with issues related to the environmental quality of the state's air, water and lands, this agency is divided into multiple bureaus and divisions. Among these is the Bureau of Resource Protection, the agency assigned to identify and protect key coastal water resources as well as maintain public waterfront access. Although few of these programs use new designations to pro-

tect priority coastal areas, all of them contribute to the conservation and protection of the state's tidewaters. In addition, most have special provisions that recognize regulatory protected area designations administered or identified by other agencies, such as ACEC's significant habitats, estimated habitats, and for upland areas "priority habitats" protected under the Massachusetts Environmental Policy Act (MEPA).

The administration of a system of water quality classifications that determines the permissible level of pollutant discharge allowed into a water body is also fundamental to this agency's mission. "Outstanding Resource Waters", must be maintained and protected due to their "outstanding socio-economic, recreational, ecological and/or aesthetic values."[95] No new or increased direct discharges are allowed into these waters.[96] There are just under 30 marine or estuarine waters listed as "outstanding" in the state.[97]

Also significant to the management of marine waters is the department's licensing authority over activities on public trust lands (including intertidal, filled intertidal, and subtidal areas) such as construction, fill, dredge, and other projects under its Waterways Act, also referred to as Chapter 91.[98] For some activities in certain coastal areas, this law also works in partnership with the Wetlands Protection Act,[99] which enlists the DEP in a process involving municipal protection of coastal wetland resources (see "estimated habitat" above).

## Massachusetts Coastal Zone Management Office

Unlike the regulatory agencies above, the role of this agency is primarily policy development, planning, and technical assistance.[100] Its stated mission is "to provide policy leadership, assistance, and education to the network of agencies, communities, and individuals who are collectively responsible for the stewardship of coastal resources, in order to promote well-informed decisions, protect the integrity of natural systems, and respond effectively to human needs." In carrying out this mission, the MCZM is involved in several MPA- related activities. It administers the National Estuary Program in Massachusetts Bay. It also provides technical assistance to DEM in its designation of coastal ACECs.[101] Most recently, this office has also received federal funding to explore the development of research reserves within Massachusetts Ocean Sanctuaries.[102]

## Massachusetts Board of
## Underwater Archeological Resources

As part of its authority to protect artifacts of historical significance or value, the Board of Underwater Archaeological Resources is authorized to designate underwater archaeological preserves. Their purpose is "to recognize and protect those resources of substantial archaeological and/or historical value."[103] Permits for the exploration and extraction of archaeological resources may not be granted in underwater archaeological preserves and any disruption of the sites is prohibited.[104] Although access is guaranteed for recreational, scientific, and historical purposes, collecting is not to be allowed except for scientific or historical purposes. And even these artifacts remain the permanent property of the state.[105] To date, however, no such reserves

CW0000006201



have been created.[106] One site that contains the sunken *U.S.S. New Hampshire*, however, is under preliminary consideration for preserve status.[107]

There are a number of potential avenues for MPA establishment in Massachusetts among a variety of state agencies and possibly even municipalities. Currently the biggest hurdle to utilizing these laws is the lack of any obvious state interest in or support of the MPA concept. Although the state has had a "sanctuary" act for the sea for almost 20 years, it has done little to promote the MPA concept as evidenced by the relatively small number of sites under other designations. Neither has the presence of a National Marine Sanctuary sparked noticeable interest in a system of protected areas. Only the state's Coastal Zone Management Office appears to have an official intent to explore the role of marine reserves in these well-used waters. Whether this study will catalyze broader interest within the EOEA or the agencies it houses is yet to be seen.

## New Hampshire

Stretching seaward from its 18 miles of coastline, New Hampshire claims the smallest amount of submerged acreage of the three Gulf of Maine states. Totaling just 97.8 square miles of tidal wetlands, estuaries, and submerged lands, the area includes the state's three major harbors—Portsmouth/Little Harbor, Rye Harbor, and Hampton/Seabrook Harbor—17 coastal towns, and the Great Bay and Little Bay estuaries.

Activities within all these areas predominantly fall under state jurisdiction. Although municipalities have a role in some of the state processes that permit certain uses in marine and intertidal areas, the towns do not own marine or intertidal lands that are either adjacent to or within their town boundaries.[108] Nor do they have any original authority to exclude marine or intertidal uses that occur within town boundaries.

## Public Trust Doctrine

New Hampshire distinguishes itself from Maine and Massachusetts by defining the geographical extent of public ownership of coastal shorelands to the mean high tide mark.[109] As a result, almost all areas subject to the ebb and flow of the tide, whether navigable or not, are held in trust by the state for the public's benefit.[110] In New Hampshire, this means that the public has a right of use "for all useful and lawful purposes, to include recreational purposes, subject to the provisions of municipal ordinances relative to the 'reasonable use' of the public trust shorelands."[111] Recently the court has interpreted these "useful and lawful purposes" to include recreation, boating, bathing, fishing, hunting, skating, and ice-cutting.[112]

Governing the use of all these lands and waters are a complex of state statutes and regulations for fishing, environmental protection, port development, and other uses that are spread over several agencies. New Hampshire does not have MPA-enabling legislation. But there are several other laws that provide related protection and conservation programs that may provide some of the benefits of MPAs. The state already has a handful of modest protected sites unintentionally created adjacent to terrestrial protected areas.

CW0000006202

The Boston Globe
January 10, 1981

KING ON THE COAST

Edition: FIRST
Section: EDITORIAL PAGE
Page: ?????

Article Text:

In those sky's-the-limit, go-for-broke days in the late 1960s, Logan
Airport was thrusting runways and taxiways out over the flats along the
northern edge of Boston Harbor. There were days, back then, when the
fill- loaded dump trucks rumbled through East Boston with barely a
midnight breather. It seemed as if all the highway, shopping mall and
office construction sites in the state could not provide enough sand and
gravel to complete the grand dreams of Massport; there was talk of
sending dredges out off the coast and scooping up the sea bottom.

Edward J. King was the earth-mover at Massport in those days, and for
the environmentalists he was public-enemy-number-one. Now, as governor,
he has yet to receive any environmentalist-of-the-year awards, but in
one area at least, King fully deserves one.

There is a touch of irony in the story. To combat King the earth-mover,
the environmentalists, furious but powerless at the relentless filling
of salt marshes and tidal flats to build longer runways for louder jets,
got an Ocean Sanctuary Law through the Massachusetts Legislature. It was
one of those first-in-the-nation laws, designating virtually all the
state's coastal waters as sanctuaries and within them prohibiting the
mining of sand and gravel, the dumping of contaminated dredge materials
and other hazardous wastes, and the laying of oil and gas pipelines.

Most of the offshore waters within three miles of the coast are now

1

contained within five sanctuary areas, and Massport has long since
shortened its horizons. But the state law, restricted by its three-mile
limit, leaves unprotected much of Nantucket Sound, a vast 160-square
mile area lying between Cape Cod, Martha's Vineyard and Nantucket.

It is a treacherous area of fogs and unpredictable winds, of shoals and
tide rips. Once committed to a passage through the Sound, note the
authors of the local cruising guide, "one must be prepared to keep
going." It was during a sudden squall somewhere out in the Sound that
Queequeg first proved his mettle in the quest for Moby Dick, rescuing a
sailor who had been dashed overboard when the weather-sheet parted on
the main boom. "From that hour," said Ishmael,"I clove to Queequeg like
a barnacle; yea, till poor Queequeg took his last long dive."

Today, the Sound is where the cod and haddock come to spawn, and it is a
good fishing ground for the New Bedford draggers; some sport fishermen
claim it is the best place to go for Blues.

Given the memory of the trucks lumbering out to fill Bird Island Flats,
what should you have expected Edward J. King, now governor, to have
done? Drilled an oil well off Cross Rip Shoal, in the middle of
Nantucket Sound? Set up a gravel-mining operation off Handkerchief
Shoal? To the surprise of some, and to the future delight of many, he
has endorsed the nomination of the area of the Sound unprotectable by
the state law, as a federal marine sanctuary.

Taken alone, this action would stand as a significant step toward the
protection of the environment. If the nomination is accepted, nobody
will be able to sneak a pipeline down Nantucket Sound from the oil
exploration tracts on Georges Bank, or turn the Sound into a hazardous
waste dump site. It will remain as a rich spawning ground for groundfish
- and the challenges to the navigator will be only those designed by
nature.

The real significance of the federal nomination, however, is that it is
merely the latest in a series of actions taken by the King
administration aimed at protecting the Massachusetts coastline: that one
natural resource that is the unique object of envy by other states.

Over the past year, Gov. King, by executive order or through one or
another of the environmental affairs agencies, has adopted policies that
will protect the fragile barrier beaches and the dunes that lie behind
them from further construction, acquired several hundred acres of
coastline including the South Cape barrier beach and the promontory of
Halibut Point. Just last month King set in motion the drafting of tight
restrictions on the use of off- road vehicles on state lands. Both the
state regulations, and similar ones being considered by the federal
government for the Cape Cod National Seashore, are needed to prevent the
destruction of the dunes by the slicing, tearing action of dune-buggy
wheels.

The groundwork for many of these actions were, to be sure, laid during
the environmentally-minded administration of Gov. Dukakis; but many of
those on the Sierra-Audubon-Wildlife axis who enjoyed ready access to
Dukakis feared that King, with his pro-business and pro-development
orientation, would put many of those initiatives on the back-burner, if
not scrap them altogether.

Environmentalists hardly imagined that such projects would be moved

2

CW0000006204

along to completion by the King administration, and that several new actions would be initiated - including the attempt to give the Coastal Zone Management agency responsibility for a heightened level of environmental protection for the Boston Harbor Islands, an action which has drawn criticism from the utilities and other business interests.

Environmental Affairs Secretary John Bewick, CZM Director Edward Reilly, and other state environmental officials have come up with partial explanations for each of these actions. As one story goes, King's enthusiasm for barrier beach protection (accomplished by placing restrictions on the building of summer cottages, jetties, and the like) was sparked by the personal recollection of the governor's own family's summer cottage at Beachmont in Revere being washed away during a northeaster in the 1930s.

Gov. King's overall attitude on the environment is far from complete - the administration's record on the tougher issues of hazardous waste disposal and air pollution control are still far from certain. The King administration's valuable and welcome actions in defense of the coast taken over the past year will stand by themselves.

23

CW0000006206



PRESS ADVISORY

CONFIDENTIAL

This is an internal report for CLF staff only.

NOTES ON CAPE WIND DEIS:

During installation:

Wildlife summary: localized and temporary effects during construction/installation on the sea bed analogous to a storm. Pile driving will be a loud event – above and under water. Seals will need to be frightened off by tapping on piles before louder driving happens. No significant impact on fishery or fishing industry. No effect on whales, and there are few in Nantucket sound. Under-water noise created by pile driving will still be below "danger" standards. Some restrictions on boating during installation.

During operation:

Fishing: DEIS says Horseshoe Shoal is area of "low activity" for fishing, even though there are claims that 165 fishermen make 50% of their living there. Still, DEIS says no significant impact on fishery or fishing.

Marine Mammals: No significant effect on marine mammals. Few whales in Nantucket sound. It's too shallow for them and there is not a good food supply. Mostly Grey and Harbor Seals live there. They should return after installation. Once in operation, noise from turbines should be un-detectable just a short distance away.

Birds: Enormous number of birds, enormous amount of data available. Any new structure imposes some added risks. But, only 1% of all birds on shoal fly at rotor height. Those are almost all gulls. Study showed Rosette Terns hug the coast during migration – only came out to shoal for fishing and foraging which took place below rotor height of 35 feet. Not expected to be afflicted. Plovers are shore birds that would not travel that far out to sea. Forty thousand Long Tail Sea Ducks observed in the shoal – all flying below 35 feet. Problem is the gulls. They sometimes fly at 35 feet and they are not shy of strange things – in fact they assume something new/human is a food supply. They're usually right.

Economics: DEIS claims that without subsidies, when you factor in all the costs of the project (including decommissioning) it will create a per kilowatt hour cost of $.09. This is about twice the cost of a non-upgraded coal-fired plant, but about the same as modern plants being built today, especially when the cost of gas is high. Cape Wind fears this will be used by the Alliance against the project, but we believe the message is: the project is commercially viable; the specific eco-nomics are the developer's problem.

Tourism: the wind park will not harm tourism and may increase it very slightly.

Real Estate: no effect on real estate.

Navigation: FAA already approved it for aviation. No problem seen for sea navigation – but DEIS says there are some people who will still perceive it as a problem

Aesthetics: The DEIS includes lots of simulated photos showing the wind park from all angles, from land and sea, in "the worst case scenarios" meaning clearest day, most direct sun, etc. The photos portray the turbines as very visible. The most disturbing images are at night. FAA ap-proval is contingent upon every turbine having two lights, in case one should be blocked by a rotor and any given second. The interior turbines will have "low inten-sity" lights, still quite visi-ble. Every-other exterior turbine will have a "medium" intensity light – apparently quite a change from a completely dark night sky over the ocean. DEIS says the flashing red lights will create a visual change.

Positive Statements: Wind Park will provide improved air quality, possible economic benefits.

For more information contact:

Julia Bovey, Communications Director        (617) 350-0990,    HYPERLINK "mailto:jbovey@clf.org"
jbovey@clf.org

CW0000006207

24

CW0000006208

# ESS ENVIRONMENTAL SCIENCE SERVICES, INC.

ENVIRONMENTAL SCIENTISTS, ENGINEERS, AND PLANNERS

September 4, 2001

Mr. Brian E. Valiton
U.S. Army Corps of Engineers
696 Virginia Road
Concord, Massachusetts 01742

Re:   *Cape Wind Associates, LLC*
      *Proposed Renewable Energy Project, Nantucket Sound, Massachusetts*
      *ESS Project No. E159-000*

Dear Mr. Valiton,

In response to you request, Environmental Science Service s, Inc. (ESS) is pleased to provide the enclosed information regarding the renewable energy project proposed by Cape Wind Associates, LLC.   Specifically, we are providing two (2) copies each of a brief project description and relevant figures illustrating the proposed Project.   Please note that although the information provided herein is representative of the Project as it has developed to date, minor revisions and/or modification may be made in the coming weeks, particularly with respect to wind turbine size and design, and identification of the preferred submarine cable route and landfall site.

It is our understanding that you will review this information in preparation for our scheduled meeting of September 14, 2001 at your offices in Concord, MA.  We also understand that you will likely distribute additional copies of this information for internal review by others.   To reiterate, we have requested the September 14 meeting in order to discuss the Proponent's regulatory filing strategy and schedule.   We are particularly interested in discussing and identifying the USACE's role in the federal NEPA review process, and would like to present our thoughts and suggestions regarding state and federal agency review and coordination.

If you have any questions regarding the enclosed information, please do not hesitate to contact the undersigned at (781) 431-0500 ext. 103, or Terry Orr at ext. 190.  Otherwise, we will await your confirmation of time and place for the September 14 meeting.  Thank you very much for you time and efforts.

Sincerely,

Jeffrey R. Martin, Manager
Land Development and Coastal Services

000071

Cc:   Eric Hutchins, National Marine Fisheries Service
      File

RECEIVED

SEP - 5 2001

REGULATORY DIVISION

J:\E159\E159-005\ACE-LTR.doc

---

272 West Exchange Street, Suite 101, Providence, Rhode Island 02903
Telephone: (401) 421-0398    Facsimile: (401) 421-5731

888 Worcester Street, Suite 240, Wellesley, Massachusetts 02482
Telephone: (781) 431-0500    Facsimile: (781) 431-7434

www.essgroup.com

CW0000006209



# PROJECT DESCRIPTION

Cape Wind Associates, LLC proposes to construct a renewable energy project on Horseshoe Shoal, in Nantucket Sound. The Project consists of approximately 156 turbines (WGM, wind turbines) that will utilize wind power to generate electricity. Each turbine will utilize rotors having a maximum diameter of 100 meters, and is expected to generate up to 2.7 megawatts of electricity. The 156-turbine array will be located entirely within the federal waters of Nantucket Sound (see Figures 1 and 2 attached). The northern edge of the turbine array will be no less than 3 nautical miles from the nearest landform (Point Gammon). Most of the individual turbines will be more than 4 nautical miles from any landform.

The electricity generated from each turbine will be transmitted to an electrical service platform (or hub) centrally located within the proposed turbine array. The electricity produced will then be transmitted from the electrical service platform to shore by means of a 115 kV submarine cable. Upon reaching landfall the submarine cable will connect to an upland transmission cable that will ultimately interconnect to the regional electric power transmission grid on Cape Cod. Potential submarine cable landfall sites in Mashpee and Yarmouth have been identified and are being assessed for technical and environmental suitability. Landfall sites presently being studied are located in the vicinity of Popponesset Bay (Mashpee), and Lewis Bay (Yarmouth). The preferred landfall site is expected to be selected and presented in the MEPA Environmental Notification Form (ENF) and U.S. Army Corps of Engineers Individual Permit Application (to be filed in late October 2001).

In order to make the most efficient use of wind resources in Nantucket Sound, wind turbines will be arranged in rows that follow a northwest to southeast alignment. This alignment will position the turbines perpendicular to prevailing winds. Turbines will also be designed to articulate, allowing each turbine to pivot into the wind for optimal generation.

Turbines must be sufficiently spaced in order to minimize power losses associated with "wake effects." Because each turbine deflects air as it passes through its rotors, wind is slowed and made turbulent on the downstream side. A certain distance between rotors is required, therefore, to regain wind speed and linear flow. Based on a detailed assessment of the foregoing, the proposed turbine array has been configured to provide a distance of approximately 560 meters (1,837 feet) between turbines within each row, and approximately 880 meters (2,887 feet) between rows. Further refinements may be made to final design and turbine spacing due to geophysical conditions at the site, or in an effort to minimize environmental impacts.

000072

j:\e159\valiton.doc

CW0000006210

**25**

.

CW0000006211



**DEPARTMENT OF THE ARMY**
NEW ENGLAND DISTRICT, CORPS OF ENGINEERS
696 VIRGINIA ROAD
CONCORD, MASSACHUSETTS 01742-2751

REPLY TO:
ATTENTION OF:

**RECEIVED**
SEP 1 8 2002
**ESS**

September 6, 2002

Charles J. Natale Jr.
Senior Vice President and Managing Principal
Environmental Science Services, Inc
888 Worcester Street
Suite 240
Wellesley, Massachusetts 02482

Dear Mr. Natale;

As Environmental Science Services (ESS) is providing much of the information needed for the Environmental Impact Statement through the preparation of a joint Environmental Impact Report/Environmental Impact Statement, we would like to have ESS provide a statement to assure us that ESS has no financial or other interest in the outcome of the project. If this is correct, please sign and return the statement below as soon as possible.

Sincerely,

Christine A. Godfrey
Chief, Regulatory Division

I hereby certify under the pains and penalties of perjury, that ESS has no financial or other interest in the outcome of the project proposed by Cape Wind Associates, permit application number 200102913, beyond providing environmental consulting services on a time and materials basis.

Signature                                   date
CHARLES J. NATALE, JR. SELMAR V.P.
Name (printed) and title

CW0000006212

26

CW0000006213

## Commonwealth of Massachusetts
### Executive Office of Environmental Affairs ■ MEPA Office

**ENF**

# Environmental Notification Form

For Office Use Only
Executive Office of Environmental Affairs
EOEA No.: _12443_
MEPA Analyst: _Arthur Pugsley_
Phone: 617-626- _1029_

The information requested on this form must be completed to begin MEPA Review in accordance with the provisions of the Massachusetts Environmental Policy Act, 301 CMR 11.00.

| | |
|---|---|
| Project Name: Cape Wind Project | |
| Street: Nantucket Sound and 43 Shore Road, Yarmouth | |
| Municipality: Barnstable, Yarmouth, Nantucket Sound | Watershed: Cape Cod |
| Universal Transverse Mercator Coordinates: NAD83 | Latitude: 41° 30.50 minutes  Longitude: 70° 19.13 minutes |
| Estimated commencement date: April 2004 | Estimated completion date: September 2005 |
| Approximate cost: $650-700 Million | Status of project design: 15 %complete |
| Proponent: Cape Wind Associates, LLC c/o Mr. Leonard Fagan | |
| Street: 75 Arlington Street, Suite 704 | |
| Municipality: Boston | State: MA    Zip Code: 02116 |
| Name of Contact Person From Whom Copies of this ENF May Be Obtained: Terry Orr | |
| Firm/Agency: Environmental Science Services Inc. | Street: 888 Worcester Street, Suite 240 |
| Municipality: Wellesley | State: MA    Zip Code: 02482 |
| Phone: (781) 431-0500 ext. 190 | Fax: (781) 431-7434 | E-mail: torr@essgroup.com |

Does this project meet or exceed a mandatory EIR threshold (see 301 CMR 11.03)?    ☒Yes ☐No

Has this project been filed with MEPA before?    ☐Yes (EOEA No. _____ )    ☒No

Has any project on this site been filed with MEPA before?    ☐Yes (EOEA No. _____ )    ☒No

Is this an Expanded ENF (see 301 CMR 11.06/7) requesting: ☐Yes ☒No
a Single EIR? (see 301 CMR 11.06(8))    ☐Yes
a Special Review Procedure? (see 301 CMR 11.09)    ☐Yes    ☒No
a Waiver of mandatory EIR? (see 301 CMR 11.11)    ☐Yes    ☒No
a Phase I Waiver? (see 301 CMR 11.11)    ☐Yes    ☒No

Identify any financial assistance or land transfer from an agency of the Commonwealth, including the agency name and the amount of funding or land area (in acres): None. The Project will be 100% privately financed.

Are you requesting coordinated review with any other federal, state, regional, or local agency?
☒Yes (Specify: Cape Cod Commission/USACE-NED)    ☐No

List Local or Federal Permits and Approvals: USACE – Section 10/404 Individual Permit; Massachusetts Coastal Zone Management – Federal Consistency Certification; Cape Cod Commission – Development of Regional Impact (DRI) Review; FAA Notice of Proposed Construction or Alteration; Yarmouth and Barnstable Conservation Commission Review; Town of Yarmouth Street Opening Permit

Revised 10/99    Comment period is limited.  For information call 617-626-1020

---

**RARE SPECIES:** Does the project site include Estimated Habitat of Rare Species, Vernal Pools, Priority Sites of Rare Species, or Exemplary Natural Communities?    ☐Yes (Specify _____ )    ☒No.

**HISTORICAL /ARCHAEOLOGICAL RESOURCES:** Does the project site include any structure, site or district listed in the State Register of Historic Place or the Inventory of Historic and Archaeological Assets of the Commonwealth?    ☐Yes (Specify _____ )    ☒No.

If yes, does the project involve any demolition or destruction of any listed or inventoried historic or archaeological resources?    ☐Yes (Specify _____ )    ☐No

**AREAS OF CRITICAL ENVIRONMENTAL CONCERN:** Is the project in or adjacent to an Areas of Critical Environmental Concern?    ☐Yes (Specify _____ )    ☐No

**PROJECT DESCRIPTION:** The project description should include (a) a description of the project site, (b) a description of both on-site and off-site alternatives and the impacts associated with each alternative, and (c) potential on-site and off-site mitigation measures for each alternative (You may attach one additional page, if necessary.)

a) The 11.0± acre property on which the project will be constructed abuts Southbridge Street and is approximately 120 feet west of the intersection of Southbridge Street and Warren Road. It is a mostly wooded parcel draining from south to north, away from Southbridge Street and towards the Dark Brook Reservoir. An existing 36" diameter culvert discharges drainage from Southbridge Street onto the property. This drainage meanders through the wetlands becoming channelized before reaching the Dark Brook Reservoir. The channelized intermittent stream has an associated 100 year flood plain.

An 81 room hotel is to be constructed on a large pocket of upland area at the northern end of the site. Construction of a 5,100 s.f. restaurant will occur on the upland area abutting Southbridge Street. Access to the hotel will require a driveway crossing the BVW.

The site is located within the Town of Auburn's Highway Business (HB) zoning district. Development of the site will be in accordance with the Zoning By-law.

b) Four alternative means of access to the upland area were studied. Among the alternatives studied were: access from abutting properties (off site alternative), a 24' wide access drive with 1 to 1 side slopes, a 300' long bridge and a 22' wide access drive with retaining walls. The 22' wide access drive alternative is the preferred alternative.

The alternative with access to the upland from abutting properties would have the least wetlands impact. It is, however, not viable. Abutting property owners have been unwilling to negotiate for granting the required access. The 24' wide access drive with 1 to 1 side slopes would impact 17,659 square feet of BVW. The bridge alternative would fill 2,583 square feet of BVW and will impact an additional 4,800 square feet of BVW due to light deprivation. The 22' wide access drive with retaining walls would impact 1,494 square feet of BVW.

c) Each of the alternatives would entail wetlands replication on a 1 to 1 ratio as mitigation.

-3-

CW0000006214

Which ENF or EIR review threshold(s) does this project meet or exceed (see 301 CMR 11.03):

☐ Land　　☐ Rare Species　　☒ Wetlands, Waterways, & Tidelands
☐ Water　　☐ Wastewater　　☒ Transportation
☒ Energy　　☐ Air　　☒ Solid & Hazardous Waste
☒ ACEC　　☐ Regulations　　☒ Historical & Archaeological Resources

**HISTORICAL /ARCHAEOLOGICAL RESOURCES:** Does the project site include any structure, site or district listed in the State Register of Historic Places or the Inventory of Historic and Archaeological Assets of the Commonwealth?
☐ Yes (Specify _____)　　☒ No

If yes, does the project involve any demolition or destruction of any listed or inventoried historic or archaeological resources?
☐ Yes (Specify _____)　　☒ No

**AREAS OF CRITICAL ENVIRONMENTAL CONCERN:** Is the project in or adjacent to an Area of Critical Environmental Concern?
☐ Yes (Specify _____)　　☒ No

**PROJECT DESCRIPTION:** The project description should include (a) a description of the project site, (b) a description of both on-site and off-site alternatives and the impacts associated with each alternative, and (c) potential on-site and off-site mitigation measures for each alternative *(You may attach one additional page, if necessary.)*

The offshore wind energy project being proposed by Cape Wind Associates, LLC (the "Proponents" or "Cape Wind Associates") consists of the installation and operation of 170 Wind Turbine Generators (WTGs) on Horseshoe Shoal in Nantucket Sound. The WTGs will produce up to 420 megawatts (MW) of clean renewable energy using the natural wind resources off the coast of Massachusetts. Wind-generated energy produced by the WTGs will be transmitted to the mainland electric transmission system via a submarine cable interconnection to a selected landfall site in Yarmouth, Massachusetts. The submarine cable system will then interconnect with an overland cable system installed underground within existing public rights-of-sway (ROWs) and roadways in the Town of Yarmouth where it will interconnect with an existing NSTAR 115 kV electric transmission line. The clean renewable energy produced by the Wind Park will be transmitted by this cable system to the electric transmission system serving Cape Cod and the Islands and the New England region.

The Project will provide numerous benefits to Cape Cod and the Islands through improved air quality conditions, significant reduction of greenhouse gases, the creation of year-round jobs, the facilitation of technology transfer, and reduction in electricity costs to ratepayers. Preliminary energy production estimates for the Project suggest that production will coincide with the electricity demands of Cape Cod and the Islands. During the Summer months, production will be greatest during the late afternoon and early evening hours when consumption is at its peak. A similar pattern, although less pronounced, is expected for the other seasons. The presence of a large generating source relatively close to the demand centers on the Cape and Islands should have the effect of reinforcing the regional electricity grid.

The Project will help Massachusetts reduce its dependency on foreign oil or other natural resources presently used to produce energy in the New England region. By using a domestic, non-polluting and inexhaustible fuel source, the Project will displace approximately 170 MW of production which would otherwise be based on the burning of fossil fuels. Current forecasts for New England show severe capacity restraints for natural gas at the end of the decade. As the vast majority of new plant installation through the year 2010 is slated to be based on natural gas, this signals a looming regional energy crisis. The Project will help the Cape and Islands and the rest of Massachusetts to become more energy self-sufficient by utilizing an untapped and abundant local resource. Because there is no fuel cost component for the life of the Project, the cost of energy is fixed at financial close, thereby creating a natural hedge against oil and gas price spikes. The long-term savings to New England ratepayers is estimated to be over $800 MM over the estimated 20-year design life of the Project. The Project will also provide a unique opportunity for the Commonwealth of Massachusetts to lead the national energy initiative by hosting a large scale renewable energy project.

- 3 -

| Summary of Project Size & Environmental Impacts | Existing | Change | Total | State Permits & Approvals |
|---|---|---|---|---|
| **LAND** | | | | ☒ Order of Conditions |
| Total site acreage | .32 | | | ☐ Superseding Order of Conditions |
| New acres of land altered | | .11 | | ☐ Chapter 91 License |
| Acres of impervious area | 0 | 0 | 0 | ☒ 401 Water Quality Certification |
| Square feet of new bordering vegetated wetlands alteration | 0 | 0 | 0 | ☒ MHD or MDC Access Permit |
| Square feet of new other wetland alteration | | 278,785 | | ☐ Water Management Act Permit |
| Acres of new non-water dependent use of tidelands or waterways | | 0 | | ☐ New Source Approval ☐ DEP or MWRA Sewer Connection/ Extension Permit |
| **STRUCTURES** | | | | ☒ Other Permits *(including Legislative Approvals)* – Specify: |
| Gross square footage | NA | NA | NA | Massachusetts Energy Facility Siting Board – Certificate of Environmental Impact and Public Need. |
| Number of housing units | NA | NA | NA | |
| Maximum height (in feet) | NA | NA | NA | |
| **TRANSPORTATION** | | | | |
| Vehicle trips per day | NA | NA | NA | |
| Parking spaces | NA | NA | NA | |
| **WATER/WASTEWATER** | | | | |
| Gallons/day (GPD) of water use | NA | NA | NA | |
| GPD water withdrawal | NA | NA | NA | |
| GPD wastewater generation/ treatment | NA | NA | NA | |
| Length of water/sewer mains (in miles) | NA | NA | NA | |

**CONSERVATION LAND:** Will the project involve the conversion of public parkland or other Article 97 public natural resources to any purpose not in accordance with Article 97?
☐ Yes (Specify _____)　　☒ No

Will it involve the release of any conservation restriction, preservation restriction, agricultural preservation restriction, or watershed preservation restriction?
☐ Yes (Specify _____)　　☒ No

**RARE SPECIES:** Does the project site include Estimated Habitat of Rare Species, Vernal Pools, Priority Sites of Rare Species, or Exemplary Natural Communities?
☒ Yes (Specify: See attached NHESP Map.)　　☐ No

- 2 -

CW0000006215

For Office Use Only
Executive Office of Environmental Affairs
EOEA No.: _12644_
MEPA Analyst _Bill Gage_
Phone: 617-626- _1025_

**Commonwealth of Massachusetts**
Executive Office of Environmental
Affairs ■ MEPA Office

**ENF**

**Environmental
Notification Form**

The information requested on this form must be completed to begin MEPA Review in
accordance with the provisions of the Massachusetts Environmental Policy Act, 301 CMR
11.00.

| Project Name: | The Brigham and Women's Hospital, Inc.– Center for Advanced Medicine | |
|---|---|---|
| Street: | 68 Francis Street | Watershed: Charles River |
| Municipality: Boston | | Latitude: 42°33'56"N |
| Universal Transverse Mercator Coordinates: | | Longitude: 71°10'06"W |
| NAD27 328448.95E 4688173.77N | | |
| Estimated commencement date: | Winter 2002 | Estimated completion date Spring 2005 |
| Approximate cost: $175 million | | Status of project design: 5% complete |
| Proponent: The Brigham and Women's Hospital, Inc. | | |
| Street: 75 Francis Street | | |
| Municipality: Boston | | State: MA | Zip Code: 02115 |
| Name of Contact Person From Whom Copies of this ENF May Be Obtained: M. Cristina Warren | | |
| Firm/Agency: Epsilon Associates, Inc. | | Street: 150 Main Street |
| Municipality: Maynard | | State: MA | Zip Code: 01754 |
| Phone: 978.897.7100 | Fax: 978.897.0099 | E-mail: cwarren@epsilonassociates.com |

Does this project meet or exceed a mandatory EIR threshold (see 301 CMR 11.03)?
☐Yes  ☒No

Has this project been filed with MEPA before?
☐Yes (EOEA No. _____ )   ☒No

Has any project on this site been filed with MEPA before?
☐Yes (EOEA No. _____ )   ☒No

Is this an Expanded ENF (see 301 CMR 11.05(7)) requesting:
a Single EIR? (see 301 CMR 11.06(8))   ☐Yes  ☒No
a Special Review Procedure? (see 301CMR 11.09)   ☐Yes  ☒No
a Waiver of mandatory EIR? (see 301 CMR 11.11)   ☐Yes  ☒No
a Phase I Waiver? (see 301 CMR 11.11)   ☐Yes  ☒No

Identify any financial assistance or land transfer from an agency of the Commonwealth, including the
agency name and the amount of funding or land area (in acres):

It is anticipated that HEFA funding will be utilized.

As described in the Expanded ENF, the Proponent has conducted a thorough analysis of alternative site
locations for the proposed Project, considering both land based and offshore locations in southeastern
Massachusetts. The results of this analysis show that the preferred location of the proposed Wind Park
is in the offshore areas of Horseshoe Shoal. Nantucket Sound was selected for the siting of the Wind Park due to several factors including relatively shallow waters, proximity to shore, siting of the Wind Park due to several factors including relatively shallow waters, proximity to shore, and a consistent high energy, low turbulence wind resource. The proposed site also has sufficient available water sheet area to accommodate the Project and allow the continuation of existing water sheet uses, and is ideally located for the submarine cable interconnections to the mainland. After review of several potential site areas in Nantucket Sound, it was determined that Horseshoe Shoal provided the most suitable geographic location and physical characteristics for installation and operation of the proposed Wind Park.

During the Spring and Summer of 2001, Cape Wind Associates conducted extensive field studies in Nantucket Sound, Horseshoe Shoals, and the Cape Cod shorelines from Mashpee to Yarmouth. The purpose of these studies was to fully evaluate existing geological and oceanographic conditions on Horseshoe Shoal as well as to evaluate the potential environmental effects of the Project. Field investigations and studies were also conducted to identify and evaluate potential submarine cable routes, landfall locations, and overland cable routes for the interconnection of the Wind Park to the existing NSTAR electric transmission system servicing Cape Cod and the Islands. The studies and investigations indicate that construction and operation of the Wind Park will not result in any significant adverse environmental effects to existing seabed conditions, aquatic resources, and avian communities on Horseshoe Shoal. The Project has also been planned and designed to minimize potential impacts to commercial and recreational fishing activities and navigation. Construction of the Wind Park will utilize low-impact construction techniques such as monopile foundation systems, jet-plow embedment of submarine cable systems, horizontal directional drill methodologies at the cable landfall locations, and underground construction of the upland cable system. All feasible and practicable measures, to avoid or minimize potential impacts to the environment have been incorporated into the Project design and operation.

The results of the above mentioned studies and investigations are presented in the Expanded ENF and indicate that the proposed Project will result in net positive environmental effects. The proposed Wind Park will be a clean renewable energy facility that can deliver up to 420 MW of electric power serving the needs of Cape Cod and Islands and Massachusetts users. Operation of the Wind Park will result in significant reductions in air pollutant emissions from fossil fuel-burning plants presently servicing the New England region and producing the equivalent electric energy dispatched to the New England region and Cape Cod. Therefore, regional air quality conditions will be measurably improved by construction of the Project as well as a significant reduction in the production of greenhouse gases presently produced by fossil fuel-burning power plants serving New England.

CW0000006216

27

CW0000006217

# ≡S·S ENVIRONMENTAL SCIENCE SERVICES, INC.

ENVIRONMENTAL SCIENTISTS, ENGINEERS, AND PLANNERS

November 21, 2001

Ms. Karen Adams
Chief, Permitting Division
United States Army Corps of Engineers, New England District
696 Virginia Road
Concord, Massachusetts 01742-2751

*Re:*    ***Application of Cape Wind Associates, LLC for US Army Corps Approval of***
***The Cape Wind Project, Nantucket Sound and Yarmouth, Massachusetts***
***ESS Project No. E159-009***

Dear Ms. Adams:

On behalf of Cape Wind Associates, LLC., Environmental Science Services, Inc. (ESS) is
pleased to provide you with the attached Individual Permit Application, project plans, and
supporting documentation for the proposed Cape Wind offshore wind energy project.

This application package contains the following information:

- Application for Department of the Army Permit (ENG Form 4345), Project Description,
  and Project Plan Set

- Alternatives Analysis

- Environmental Effects Assessment

- Section 404(b)(1) Compliance Assessment

- Essential Fish Habitat Assessment

- Endangered Species Act Assessment

- Massachusetts Federal Consistency Certification

As you know, the proposed Cape Wind Energy Project is a clean renewable energy facility sited
in the offshore area of Nantucket Sound. The proposed project has the capacity to generate up to
420 megawatts of electric power to serve the needs the Northeastern Region, including
Massachusetts, Cape Cod, and the Islands. Cape Wind Associates has conducted extensive
technical reviews and field studies over the last twelve (12) months to fully evaluate the best
available site for the Project as well as the type and extent of environmental effects. Cape Wind
has also conducted extensive agency and public interest group outreach efforts to inform
stakeholders of the project and its benefits as well as gather comments and thoughts about this
exciting project.

j:\e159\acoe\acoeltr.doc



West Exchange Street, Suite 101, Providence, Rhode Island 02903          888 Worcester Street, Suite 240, Wellesley, MA 02482
phone: (401) 421-0398   Facsimile: (401) 421-5731   E-Mail: essri@ultranet.com   Telephone: (781) 431-0500   Facsimile: (781) 431-7434   E-Mail: essma@ultranet.com
Web Site: www.essgroup.com

CW0000006218



ESS Project No. E159
November 21, 2001                                                                              Page 2

We look forward your review of the Application and commencement of your regulatory permitting process.

If you have any questions or comments on the Application or its supporting documentation, please do not hesitate to contact me at 781 431-0500 extension 105 or by email at cnatale@essgroup.com.

Sincerely,

**ENVIRONMENTAL SCIENCE SERVICES, INC.**

Charles J. Natale, Jr.
Senior Vice President, Managing Principal

j:\e159\acoe\acoeltr.doc

   **ENVIRONMENTAL SCIENCE SERVICES, INC.**   

CW0000006219

28

CW0000006220



**DEPARTMENT OF THE ARMY**
NEW ENGLAND DISTRICT, CORPS OF ENGINEERS
696 VIRGINIA ROAD
CONCORD, MASSACHUSETTS 01742-2751

REPLY TO:
ATTENTION OF:

Regulatory Division
CENAE-R

November 8, 2002

Mr. Douglas P. Yearly
Alliance to Protect Nantucket Sound
396 Main Street, Suite 2
Hyannis, Massachusetts 02601

Dear Mr. Yearly,

This is in response to your August 16, 2002 letter regarding the Corps of Engineers (Corps) Environmental Impact Statement (EIS) for the Cape Wind Associates application to construct and operate a wind power facility on Horseshoe Shoals in Nantucket Sound, Massachusetts.

Specifically, you have raised a concern about the applicant and their consultant's role in the preparation of the EIS. Our approach has been guided by the Council on Environmental Quality's (CEQ) NEPA regulations, 40 CFR 1500-1508, and the Corps of Engineers NEPA Implementing regulations, February 3, 1988, 33 CFR 325 Appendix B (approved by the CEQ).

The CEQ NEPA regulations at 40 CFR 1506.5 state:
(a)     *Information* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an EIS, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the EIS either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers. It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

The Corps NEPA Implementing regulations at 33 CFR 325 Appendix B (8) state:
(f)     Contracting (2) Information required for an EIS also may be furnished by the applicant or a consultant employed by the applicant. Where this approach is followed, the district engineer will (i) advise the applicant and/or his consultant of the Corps information requirements, and (ii) meet with the applicant and/or his consultant from time to time and provide him with the district engineer's views regarding the adequacy of the data that are being developed, (including how the district engineer will view such data in light of any possible conflict of interest).

CW0000006221

Therefore, both the CEQ regulations and the Corps NEPA implementing regulations provide for the applicant, at the Corps direction and subject to the Corps approval, to furnish information necessary for the EIS. The EIS for this project is the Corps EIS and the Corps is wholly responsible for its content. In fact, the Corps has convened a large list of cooperating agencies, and hired it's own independent consultant to assist in directing the development of information, and its review and approval. The Corps staff, cooperating agency staff, and our independent consultants will be listed in the EIS. As you know the Corps and Massachusetts MEPA Office have agreed to produce a joint EIS/EIR to satisfy both federal and state permit review requirements. The MEPA office developed its independent scope of work for the EIR, and the Corps together with the cooperating agencies refined and added to the scope for the Federal EIS before the Corps issued it. I think its important to reemphasize that any information submitted by the applicant which the Corps decides to use in its EIS, will be fully reviewed by various experts including Corps staff, the cooperating agencies and the Corps independent consultants – and approved by the Corps.

Lastly, the applicant's consultant has provided the Corps a disclosure statement specifying they have no financial interest or other interest in the outcome of the project.

Thank you for your involvement in the process, and I look forward to your continued participation in the preparation of the EIS.

Sincerely,

Thomas L. Koning
Colonel, Corps of Engineers
District Engineer

-2-

CW0000006222

29

CW0000006223

RECEIVED
MAY 1 3 2003
Office of Counsel

Cape Wildlife Center
The Humane Society of the United States
185 Meadow Lane
West Barnstable, MA 02688

May 5, 2003

Colonel Thomas Koning
U.S. Army Corps of Engineers
District Engineers
New England District
696 Virginia Road
Concord, MA  01742-2751

Dear Colonel Koning:

In your letter of February 24, 2003, the U.S. Army Corps of Engineers declined our offer
to establish a working group to provide input on the environmental impact statement
(EIS) the Corps is preparing for the Cape Wind Project.  On behalf of the organizations
sponsoring this proposal, I am writing to express our general disappointment with your
response and our request for action to remedy the concerns that prompted our initial
request.

We presented our proposal in the hope that it would provide an opportunity for the Corps
to obtain information that would be beneficial to the review of this controversial project.
We strongly believe that there are insufficient data for an accurate evaluation of this
application.  In addition, it appears to us that the significant role the applicant has been
given in the environmental review process may undermine the objectivity and credibility
of the EIS.  The purpose of our proposal was to counterbalance these concerns to ensure a
comprehensive, objective NEPA review.

Please allow us to respond to your justifications for declining our offer.

First, your statement that "the EIS for a specific project will not provide a comprehensive
national policy regarding offshore wind projects" seems to suggest that the Corps is
underestimating the importance of this offshore wind energy application.  The Cape
Wind proposal is precedent setting in many respects.  It raises important jurisdictional
questions over offshore waters for wind projects.  Moreover, the EIS the Corps is
preparing will become the template for the consideration of all other offshore wind
energy proposals throughout the United States.  A comprehensive review is therefore
essential, but unfortunately, the Corps has not yet committed to a programmatic review of
the offshore wind energy program now evolving under the Corps purported jurisdiction.

The Corps' decision to permit the Cape Wind data tower was based on the claim that the
Corps has exclusive control over non-oil and gas OCS projects.  This, in addition to the
Corps' apparent refusal to recognize the need for a programmatic review or the

Colonel Thomas Koning
May 5, 2003
Page Two

importance of the Cape Wind EIS, greatly concerns us. While we disagree with the
Corps' jurisdictional assertion, the manner in which your agency handles the Cape Wind
project will doubtlessly establish the baseline for future reviews and, therefore, is
defining national policy. That seven additional applications have been filed for
Massachusetts alone confirms that there is a need for a programmatic review prior to any
action the Corps takes on the Cape Wind Project. We believe it is clear that a more open
and thorough review is needed.

Your letter also states that "the scope [for the Cape Wind EIS] continues to evolve and
changes have been incorporated." We are pleased to learn that the Corps understands
that the initial scoping process needs to be enhanced. We are also pleased to learn that
you understand that new issues have arisen. However, we are concerned that the Corps
has not yet taken the necessary action of formally reopening the scoping process on this
EIS. Instead, the only additional opportunity made available to the public has been in the
context of the Massachusetts Technology Collaborative (MTC) meeting structure. In
addition to our concerns with the MTC process noted below, we believe that the MTC
meetings exist outside of the purview of federal agency action, are not part of the Corps
record, and do not substitute for our proposed working group or a reopened scoping
period.

As your letter implies, the nature of the review of the Cape Wind project has changed
dramatically since the Corps initiated scoping in the spring of 2002. Off the coast of
Massachusetts alone, there are now a total of eight offshore wind projects proposed.
Nearly two dozen projects have been proposed throughout the New England and
mid-Atlantic regions. NEPA has been construed by the courts to require flexibility and
the reconsideration of initial assumptions in light of changed circumstances. We
therefore formally request that the Corps reinitiate scoping on this EIS to obtain
additional comment on issues such as purpose and need, alternatives, areas of
environmental impact, the need for bird studies, and cumulative effects. We also request
that the Corps suspend further processing of the EIS until that renewed public review has
been completed.

Your letter cites the MTC stakeholder meetings as an opportunity for the Corps to obtain
additional input. It is our view, however, that the meetings have been designed to
provide information to the public and designated "stakeholders" rather than to collect
information from these groups. Moreover, all the appearances are that the MTC process
has been skewed in favor of the Cape Wind Project. The MTC itself is charged with the
mission of promoting the development of alternative energy in Massachusetts. Thus, as a
threshold matter, the MTC does not provide an unbiased or objective forum.

CW0000006225

Colonel Thomas Koning
May 5, 2003
Page Three

In addition, we have been concerned by the manner in which the MTC conducted the proceedings and the decisions it has made regarding the exclusion of important stakeholders from full participation. For these reasons, we believe the proceedings are no substitute for supplemental scoping or the use of a stakeholder working group. For example, The Humane Society of the United States (HSUS) has not been permitted to participate as a stakeholder in the process, despite our repeated requests. We do not believe that any of the recognized "stakeholders" represent The HSUS's position, and we were frustrated to learn that as the nation's largest animal protection organization, with more than 7 million supporters, our organization is "too controversial" to be included among the stakeholders.

Our concern over the MTC's role is heightened by the fact that in a recent hearing held in the House of Representatives on legislation designed to establish authority for permitting offshore wind projects, the representative of the wind energy association, a private sector business entity, acknowledged that he has worked under contract for the MTC itself. We are troubled by the Corps' reliance upon an industry advocacy organization to serve as the vehicle for developing input and public comments on an EIS.

We also are concerned over the role that Cape Wind and its advocate for the permit, Environmental Sciences Services (ESS), have been allowed to play in the development of this EIS. It appears to us that the record demonstrates that the Corps has not taken the necessary steps to screen the applicant from the preparation of this EIS. Indeed, it is our understanding that ESS has been delegated with the primary responsibility for drafting the EIS. ESS's role appears to have expanded into making fundamental decisions regarding the scope of the EIS and the alternatives to be considered. This is very troubling to us, and our working group proposal was intended to have a balancing effect on the Corps' review. The fact that you have rejected our working group proposal heightens our concern over the validity and objectivity of your NEPA review.

In your letter you state that, "we believe we are taking a broad approach with the scope of alternatives being addressed." Nonetheless, at the MTC meeting, the Corps stated that it is essentially employing the screening criteria developed by Cape Wind itself, and that those criteria would effectively eliminate all alternatives except those handpicked by the developer to meet its economic and profit-making goals. Unfortunately, we see no evidence of a "broad approach" for the selection of alternatives to be considered in this EIS.

In addition, if the Corps is in fact relying upon the MTC process to develop its thinking and analysis, then we are compelled to ask how the agency is complying with the Federal Advisory Committee Act (FACA). 5 U.S.C. App. This law prohibits the use of any advisory committee, unless established as a matter of formal record. If the MTC is

Colonel Thomas Koning
May 5, 2003
Page Four

playing the role you ascribe to it, it would appear that FACA has been violated. Our proposal would have avoided that problem by operating under the auspices of the Corps NEPA process.

Your letter states that the Corps "has been reviewing and permitting work in navigable waters since 1899; including a broad public interest review since the 1960's." This assertion is of little comfort to our organizations. We are fully familiar with the nature of the Corps work under section 10 over an extended period of time and are aware that the Corps has never been engaged in the review of a project of this nature. Indeed, expertise on the relevant issues concerning offshore facilities lies with other agencies, such as the National Oceanic and Atmospheric Administration and the U.S. Fish and Wildlife Service. We make this observation not to denigrate the Corps' intentions, abilities, or hard work. Instead, we note it simply for the purpose of observing that your agency is not the appropriate agency to be making judgments involving these resources in offshore locations. In fact, we believe the Corps itself shares this view and is, for that reason, resisting undertaking the programmatic EIS that is clearly required for a new energy program involving new technology and covering a massive geographic scale. We would hope that recognition of this fact would motivate the Corps to accept a proposal, such as ours, which would provide an opportunity to obtain information and analyses from organizations that have devoted their mission statements and programs over an extended period of time to the marine environment, in general, and Cape Cod and Nantucket Sound, in particular.

We hope that you will reconsider your decision to reject our proposal for an independent working group to participate in the EIS process. At the very least, we request that the Corps formally reopen the scoping period on the EIS to incorporate additional public comments based on the dramatically changed circumstances now surrounding the Cape Wind project and other offshore wind proposals in this region and throughout the country and do so in the context of the legally required programmatic review dictated by NEPA and demanded by the practical considerations associated with what is now clearly established nascent federal program for a new energy technology that poses promise for renewable power but also threats for the marine environment. Please address any future correspondence to me at the Cape Wildlife Center, 185 Meadow Lane, West Barnstable, MA 02688. Thank you for considering this request.

Sincerely,

Jessica Almy
The Humane Society of the United States

CW0000006227

30

CW0000006228

**Herald.com** BUSINESS TODAY

# Critics hit corps' Cape mill report

By Jay Fitzgerald

*Tuesday, November 9, 2004*

**O**pponents vowed yesterday to step up their fight against a giant wind farm off the coast of Cape Cod amid accusations that a new U.S. Army Corps of Engineers study was inadequate and biased toward the developer who paid for it.

``This report does nothing to change (Gov. Mitt Romney's) opposition to the proposed wind farm,'' said Romney spokeswoman Shawn Feddeman, reacting to yesterday's long-delayed release of the Corps' draft environmental impact study, seen as largely favorable toward the project.

``(Romney) will continue to do everything in his power to prevent this project from happening, and we are exploring our options,'' said Feddeman.

``The Army Corps of Engineers is disregarding its duty to defend the public interest and, in essence, opening the door to a land rush in one of the commonwealth's greatest national resources,'' said Attorney General Tom Reilly.

State leaders' criticisms were echoed yesterday by U.S. Sen. Edward M. Kennedy [related, bio] (D-Mass.), who said he has ``serious questions'' about federal policies toward coastal projects.

A spokesman for the corps said the nearly 4,000-page study, the subject of much rumor and controversy even before it was released yesterday, was ``absolutely fair.''

The study doesn't take a position on the wind farm proposed by Cape Wind Associates, said corps spokesman Larry Rosenberg, noting it's standard procedure for applicants to pay the costs of a study, rather than taxpayers.

Still, opponents have questioned the corps' use of a California firm - TRC Environmental - to perform an analysis of alternate sites. TRC specializes in speeding wind power projects through the permitting process and could be in line for lucrative consulting work should Cape Wind come to pass.

Environmentalists defended the report - saying it clearly shows the project, while not perfect for the environment, would have less impact compared with other electricity producing power stations.

``Let's not hold the Cape Wind project to an impossible standard of `no adverse impacts,' '' said Philip Warburg, president of the Conservation Law Foundation.

But Ernie Corrigan, a spokesman for the Alliance to Protect Nantucket Sound, said the Corps' report was ``clearly biased.''

Public hearings will be held on the report, expected to be finalized by next year. The project, which calls for 130 420-foot-tall wind turbines on Nantucket Sound, still needs multiple state permits.

HERALD INTERACTIVE *TOOLS*

Get RSS Feed

Post Comments in Forum

View Graphic Version

Email to a Friend

Subscribe to the Boston Herald

RELATED BUSINESS *NEWS*

Democrats rib Romney over Citizens' job plan

Mitt supports govs on tougher Clean Air Act

Power play: New regs spur sales

Law firm pushes no-wind-win proposal

Storm hits power line approval; Cape Wind cries foul

RELATED NATIONAL *NEWS*

Parts of Texas blanketed with snow

Storms cause extensive damage in central Arkansas, thousands...

Kerry wants Romney to ante up for 'attack' trip

Romney on Kerry: 'Too conflicted' to be prez

A senator, moi? Governor insists he's uninterested

RELATED LOCAL *NEWS*

Gov used $45G of rec funds for Pats rally

Measuring up

Snow doubt about storm's impact; state officials hoping for...

Mitt: Pare welfare; Gov advocates tougher work reqs, 5-year...

State digs out from epic snowstorm

[ contact us ] .. [ print advertising ] .. [ online advertising ] .. [ FAQ's ] .. [ News Tips ] .. [ Electronic Edition ] .. [ Browser Up

**Click here for home delivery** or call 1.800.882.1211 for **Back Issues**

© Copyright by the Boston Herald and Herald Interactive Advertising Systems, Inc.
No portion of BostonHerald.com or its content may be reproduced without the owner's written permission. Privacy Commitment


Enterprise-level broadband service provided by **Intellispace: A Better Breed of Broadband**


Wireless broadb
provided by To

CW0000006229

**31**

CW0000006230



# SAVE OUR SOUND
### alliance to protect nantucket sound

October 25, 2004

Colonel Thomas Koning
U.S. Army Corp of Engineers
New England District
696 Virginia Road
Concord, MA 01742

Dear Colonel Koning:

On behalf of the Alliance to Protect Nantucket Sound, I am writing in response to the letter from Mr. Dennis Duffy, of the Cape Wind Associates (CWA), dated September 9, 2004. The September 9 letter is the latest in a series of communications to the Corps regarding the role CWA has played in defining the scope and content of the EIS on its proposed private energy plant for Nantucket Sound. The correspondence between CWA and the Alliance addresses the legal question of whether the Corps must defer to the applicant in defining the purpose and need of an EIS and, as an outgrowth of that step, limiting the range of alternatives. While that correspondence has previously been sent to Ms. Karen Adams, I am writing to you now to ensure that this correspondence is brought to your attention. We also request that the Corps bring this important issue to the attention of the appropriate officials at the Department of Defense, where the Draft Environment Impact Statement (DEIS) apparently is under review. As demonstrated by this correspondence, the DEIS is seriously flawed and must be substantially revised before it is released.

The Alliance first discovered that CWA had misrepresented NEPA case law to the Corps, EPA, and the U.S. Fish and Wildlife Service last March through documents released under FOIA. The question at issue was whether the Corps must accept CWA's definition of project purpose and need and definition of what alternatives to consider. CWA argued that the law was clear on this point.

The Alliance promptly prepared a detailed legal analysis on April 26, 2004 that demonstrates how CWA had presented a biased, incomplete presentation of the law. NEPA case law requires an action agency to take a much broader approach to EIS formulation than argued by CWA. The broader role is especially important here where public resources are to be used for private purposes and the agency is applying a broad public interest test.

CWA responded to the Alliance's analysis on May 7, 2004. The Alliance submitted another detailed memorandum on August 6, 2004, again discussing the errors in CWA's approach. The Alliance has supported its own two legal analyses with four independent peer review comments.

The Alliance twice requested to meet with the Corps to discuss this issue, as it is clear CWA has been in direct communication with the Corps to espouse its legal views. The Corps has refused to meet with us, necessitating this correspondence for the record.

This issue is of more than academic concern. Based upon the public meeting you conducted in October, 2003, it appears that the Corps is closely following the CWA prescription for EIS purpose and need and alternatives. The record reveals no independent analysis of this question by the Corps. CWA's vigorous attempts to defend its narrow view of the law confirm that this is an

---

396 Main Street, Hyannis, Massachusetts 02601 · 508-775-9767 · Fax 508-775-9725

a 501(c)(3) tax-exempt organization

CW0000006231

issue of great importance to the legitimacy of the NEPA process. Indeed, Mr. Duffy's most recent letter on this point can best be described as "back-pedaling" on the underlying legal issue and an effort on CWA's part to justify the approach the Corps has adopted on other grounds. This marks a notable retreat from CWA's previous self-assured and adamant views on the question of the applicant's control over EIS purpose and need.

Mr. Duffy once again invokes the standard CWA response to any party critical of its proposal, i.e., that the purpose of the objections raised is only to seek delay. To the contrary, the Alliance's goals continue to be to ensure a valid EIS process and a full, comprehensive and programmatic review of alternative energy potential. Under a proper EIS purpose and need, a far broader range of alternatives would be considered. The Corps' alternatives analysis should include alternate technologies (including those discussed in the Commonwealth's MEPA certificate), phased projects, smaller-scale projects, distributed projects, and conservation. In addition, recent events make clear the need to consider alternatives outside of the New England Corps' jurisdiction, a view that we have consistently advocated. Offshore projects in other locations are under serious consideration, and they clearly should be reviewed as alternatives to Nantucket Sound. Indeed, the Cape Wind project and the nearby Long Island Power Authority project have been linked together for practical purposes on several occasions, and under NEPA they have to be considered together.

By defining the EIS scope and alternatives as it has, the Corps has failed to consider numerous alternatives that are not only legally required but also essential to a review of the potential for alternative energy development that serves the public interest. A proposed action such as the CWA project, involving a new technology on an unprecedented scale seeking to make use of public lands in the absence of express authorization, environmental standards, or a programmatic review under the responsibility of an agency that lacks the relevant expertise is precisely the kind of the situation where NEPA can be of its greatest value to inform agency decision-making and fulfill the public interest. Unfortunately, the approach currently defined for the DEIS guarantees that this function of NEPA will not be fulfilled. The public interests are being sacrificed to the narrow profit motive of this applicant, which refuses to consider any approach that is not to its liking. The Corps' duty is defined by the public interest, and the public interest is not the equivalent of Cape Wind Associates' private business objectives.

The Alliance remains prepared to meet with the Corps at any time to discuss this important issue. Unless the DEIS is redefined, it is clear that a supplemental EIS will be required. Contrary to Mr. Duffy's protestations, addressing this issue will not cause delay. Instead, it will result in a more expeditious and comprehensive review of all alternatives and in a context not dictated solely by this applicant's desire to maximize profits or assuage its corporate hubris. The approach the Alliance has advocated also will ensure that a decision can be made that avoids the many adverse impacts on Nantucket Sound by identifying other acceptable means to pursue alternative energy. The Alliance sincerely hopes that the Corps will accept an offer to meet with us and to reformat the approach to the draft EIS.

Very truly yours,

Sue Nickerson
Executive Director

cc:    Senator Edward Kennedy

a 501(c)(3) tax-exempt organization

CW0000006232

Congressman William Delahunt
Governor Mitt Romney
Massachusetts Attorney General Thomas Reilly
Earl Stockdale, U.S. Army Corps
Lance Wood, U.S. Army Corps
Karen Kirk Adams, U.S. Army Corps
Lt. Gen. Carl Strock, U.S. Army Corps
Christine Godfrey, U.S. Army Corps
James Connaughton, Council Environmental Quality
Dinah Bear, Council Environmental Quality
Horst Greczmiel, Council Environmental Quality
Betsy Higgins, U.S. Environmental Protection Agency
Timothy Timmerman, U.S. Environmental Protection Agency
Vernon Lang, U.S. Fish and Wildlife
Edward LeBlanc, U.S. Coast Guard
Barry Drucker, Mineral Management Service
Truman Henson, Massachusetts Coastal Zone Management
Jack Terrill, National Marine Fisheries Service
Al Benson, U.S. Dept. of Energy
Ellen Roy Herzfelder, Executive Office of Environmental Affairs
Mary Griffin, Executive Office of Environmental Affairs
Arthur Pugsley, Massachusetts Environmental Policy Act Office
Phil Dascombe, Cape Cod Commission
Beverly Wright, Wampanoag Tribe of Gay Head Indians
John Pagini, Nantucket Planning and Economic Development Commission
Dennis Duffy, Cape Wind Associates

a 501(c)(3) tax-exempt organization

CW0000006233



# SAVE OUR SOUND
## alliance to protect nantucket sound

October 29, 2004

Colonel Thomas Koning
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742

Dear Colonel Koning:

In our letter of October 24, the Alliance to Protect Nantucket Sound wrote to you regarding the issue of alternatives to the proposed Cape Wind project. In particular, we emphasized again the improper role the project applicant has been allowed to play in the NEPA process.

Since writing that letter, it has come to our attention that an important effort is now underway to refine promising deepwater wind turbine technology. The Alliance has previously pointed out that technology of this nature should be considered as an alternative to the applicant's environmentally and economically harmful Nantucket Sound proposal. Under Cape Wind's narrow and incorrect view of the law, a promising technology of this nature would never be considered. Cape Wind's erroneous legal interpretation is that the Corps is bound by the applicant's economic objectives, which, as presented in this situation, equate to a massive wind energy plant in Nantucket Sound and nothing else. As the Alliance has now demonstrated in detail, this is an incorrect legal position and contrary to the Corps' duty to define an EIS purpose and need and range of alternatives based upon the public interest.

The enclosed article quotes the Cape Wind project's principal investor, Mr. James Gordon, as suggesting that the Nantucket Sound location should still be developed, despite the promise of deepwater technology, because it would serve as a test project for offshore wind energy. Needless to say, it is hardly in the public interest to sacrifice Nantucket Sound as a stepping stone to other more promising and less harmful technologies that are now reasonably foreseeable. The discussion in the enclosed article again demonstrates why the Corps cannot be handcuffed by the applicant's own narrow objectives. The Alliance hereby requests that, prior to its

---

396 Main Street, Hyannis, Massachusetts 02601  ·  508-775-9767  ·  Fax 508-775-9725

a 501(c)(3) tax-exempt organization

2

issuance for public comment, the draft EIS be revised to include alternatives using deepwater technology

Thank you for considering this request.

Very truly yours,

Susan L. Nickerson
Executive Director

cc:    Senator Edward Kennedy
       Congressman William Delahunt
       Governor Mitt Romney
       Massachusetts Attorney General Thomas Reilly
       Charles R. Smith, U.S. Army Corps
       Karen Kirk Adams, U.S. Army Corps
       Christine Godfrey, US Army Corps
       James Connaughton, Council Environmental Quality
       Dinah Bear, Council Environmental Quality
       Horst Greczmiel, Council Environmental Quality
       Elizabeth Higgins, U.S. Environmental Protection Agency
       Timothy Timmerman, U.S. Environmental Protection Agency
       Vernon Lang, U.S. Fish and Wildlife
       Edward LeBlanc, U.S. Coast Guard
       Barry Drucker, Mineral Management Service
       Susan Snow Cotter, Massachusetts Coastal Zone Management Office
       Jack Terrill, National Marine Fisheries Service
       Al Benson, U.S. Dept. of Energy
       Ellen Roy Herzfelder, Executive Office Environmental Affairs
       Phil Dascombe, Cape Cod Commission
       Truman Henson, Cape Cod Commission
       Dennis Duffy, Cape Wind Associates

a 501(c)(3) tax-exempt organization

CW0000006235

**32**

CW0000006236

To All: It is our sense that rather than wait for final agency comments on the Wind Farm EIS scoping notice, now is an opportune time to begin working on the basic project purpose and need portions of the EIS.

In accordance with our highway methodology, we intend to seek consensus and agreement on each of the aspects/issues to be addressed in the EIS process.

The proponent's application states that the project's purpose is "to generate up to 420 MW of clean, renewable wind - generated energy that will be transmitted and distributed to the New England regional power grid, including Cape Cod and the Islands..."

With regard to project need the applicant has made the following statements (from the project introduction in the application):

"The Project will provide numerous benefits to Cape Cod and the Islands through improved air quality conditions, significant reduction of greenhouse gases, the creation of year round jobs, the facilitation of technology transfer and reduction in electricity costs to ratepayers. Preliminary energy production estimates...suggest that production will coincide with the electricity demands of Cape Cod and the Islands. During the Summer months, production will be greatest during the late afternoon and early evening hours when consumption is at its peak. A similar pattern, although less pronounced, is expected for the other seasons. The presence of a large generating source close to the load demand centers on the Cape and Islands would also have the effect of reinforcing the reliability of this regional electric transmission and distribution system.

The Project will help Massachusetts reduce its dependency on foreign oil or other natural resources presently used to produce energy in the New England region. By using wind as a domestic, non-polluting and inexhaustible fuel source, the Project will displace approximately 170 MW of production that would otherwise be generated by the burning of fossil fuels. The New England Region currently relies heavily on the use of natural gas for its energy supply. Current forecasts for New England show severe capacity constraints for natural gas production at the end of the decade. The Project will help the Cape and Islands and rest of Massachusetts to become more energy self-sufficient by utilizing an untapped and abundant local resource.

Because there is no fuel cost component for the life of the Project, the cost of energy is fixed at financial close, thereby creating a natural hedge against oil and gas price spikes. The long term savings to New England ratepayers is estimated to be over $800 million over the estimated 20 – year design life of the Project. The Project will also provide a unique opportunity for the Commonwealth of Massachusetts to lead the national energy initiative by hosting a large scale renewable energy project."

Please review this project purpose and need statement to ascertain if you feel it serves as an adequate basis for defining the range of alternatives to be analyzed in the EIS. We will be asking the applicant to provide the data that explains the conclusions they have provided.

In order to come to some agreement on the scope of alternatives we will first need to have a mutual understanding of the Purpose and Need. Please provide comments to me on this aspect by April 1, 2002.

CW0000006237

Karen Adams

CW0000006238

**Purpose and Need**

The purpose of the proposed Cape Wind Project is to install and operate a commercial scale merchant electrical generating facility located in New England, utilizing renewable wind energy as its fuel source. Due to large infrastructure and capital costs, the variability of wind energy output, the relatively high cost of operating and maintaining a wind energy project, established constraints on transmission load flow / line capacities, and the economies of scale associated with such a project, the applicant has proposed a project capable of generating an average output of 170 MW, with a maximum installed capacity of 420 MW. The applicant states that this MW level and scale of project is necessary in order for the Project to be financially sustainable.

The applicant proposes to install and operate Wind Turbine Generators (WTGs) on Horseshoe Shoal in Nantucket Sound that will generate, on average, 170 MW of clean renewable energy using the natural wind resources off the coast of Massachusetts. This energy will be transmitted and distributed to the New England regional power grid, including Cape Cod and the Islands.

The Project need is based on the continued growth of electricity demand in the New England region, which is projected to increase up to 40% over the next twenty years. Presently the vast majority of electricity is produced by fossil fuel burning plants (coal, oil or natural gas) that are major contributing sources of air pollutants and green house gases. The applicant states that this Project is needed in order to meet a portion of the region's increasing demand for electricity with clean renewable energy that will:

- significantly improve regional air quality conditions;
- reduce greenhouse gas emissions by offsetting the use of fossil fuels;
- reduce the reliance on foreign fuel supplies;
- create a long term hedge against increasing fuel prices;
- reduce the overall cost to New England rate payers, and
- improve the reliability and diversity of the region's energy supply.

Preliminary energy production estimates suggest that production will coincide with the electricity demands of Cape Cod and the Islands. During the summer months, production will be greatest during the late afternoon and early evening hours when consumption is at its peak. A similar pattern, although less pronounced, is expected for the other seasons. A large generating source close to the load demand centers on the Cape and Islands will reinforce the reliability of this regional electric transmission and distribution system.

The applicant states that the Project will produce approximately the equivalent of Cape Cod's current energy requirements, and displace energy from fossil plants producing over 1,000,000 tons of carbon dioxide annually. Carbon dioxide is a major cause of greenhouse gases.

The applicant states that the Project will help Massachusetts reduce its dependency on foreign oil or other natural resources presently used to produce energy in the New England region. By using wind as a domestic, non-polluting and inexhaustible fuel source, the Project will displace

CW0000006239

approximately 170 MW of production that would otherwise be generated by the burning of fossil fuels. The New England Region currently relies heavily on the use of natural gas for its energy supply. Current forecasts for New England show severe capacity constraints for natural gas production at the end of the decade. The Project will help the Cape and Islands and the rest of Massachusetts to become more energy self-sufficient by utilizing an untapped and abundant local resource. The proposed Project will have the following annual fossil fuel offsets: oil – 113 million gallons/year, or coal – 570,000 tons/year, or natural gas – 10 billion cubic feet/year.

The applicant states that the proposed Project will have a long-term savings to New England ratepayers. This savings is estimated to be over $800 million over the estimated 20-year design life of the Project. If the proposed Project is not built, New England ratepayers will continue to pay higher electricity costs. Consumers will continue to pay a variable rate for electricity without the proposed Project, whereas the proposed Project would not have a fuel cost component for the life of the Project. The cost of energy produced by the Cape Wind project is fixed at financial close, thereby creating a natural hedge against oil and gas price spikes. The Project will also provide a unique opportunity for the Commonwealth of Massachusetts to lead the national energy initiative by hosting a large-scale renewable energy project.

**33**

CW0000006241

**Adams, Karen K NAE**

| | |
|---|---|
| **From:** | Mead, Jane (ENV) [Jane.Mead@state.ma.us] |
| **Sent:** | Friday, May 24, 2002 4:15 PM |
| **To:** | Adams, Karen K |
| **Cc:** | Godfrey, Christine A; Valiton, Brian E; eric.hutchins@noaa.gov; vernon_lang@fws.gov; Pugsley, Arthur (ENV); mfenn@capecodcommission.org; Timmermann. Timothy (E-mail); Skinner, Thomas (ENV); Truman Henson (E-mail); Babb-Brott, Deerin (ENV) |
| **Subject:** | RE: Comments on Draft Scope for Cape Wind EIS |

CZM has the following comments on the draft Scope of Work for the Cape
Wind Draft Environmental Impact Statement (DEIS).  The draft Scope
broadly outlines many of the major issues of concern.  We believe,
however, that some of the fundamental issues need further clarification:

Purpose and Need:  the draft Scope does not include a statement of
purpose and need.  Without such a statement, it is very difficult to
evaluate the Scope's effectiveness.   Is, for example, the purpose of
the project the generation of electricity or the generation of
wind-powered electricity?  Some of the later elements of the draft Scope
seem to suggest that wind power is the focus of the DEIS (e.g. the
Alternatives section is very specific about alternative locations, but
not about technologies).  While acknowledging that many technologies may
be eliminated from consideration, CZM's recollection is that the
alternatives were to be broader than a single technology.

Screening Criteria: we aren't sure if the draft language is suggesting
that Cape Wind will determine the criteria for screening alternatives.
We strongly believe that the Corps, in consultation with state and
federal resource agencies, should determine the criteria to be used and
that Cape Wind should perform analyses in compliance with those
criteria.  The method that the Corps will use to evaluate alternatives
should be included in the DEIS.

Massachusetts Renewable Energy Trust: the Trust's current and future
roles in this project should be included in the Scope to avoid any
future misunderstanding or misinterpretation of its role.

Project Description: the requested construction and decommissioning
descriptions apply to the "proposed structures" only.  For purposes of
impact comparison, construction methodologies for alternative types of
sites, including terrestrial or other marine sites, should be included
in the DEIS.

Alternatives: as mentioned above, this section seems to focus on
alternative locations.  The listed screening criteria also seem to
presuppose wind as the power source.  The statement of purpose and need
should clarify whether the project is being considered as wind-generated
electricity or as the broader generation of electricity and this section
defined accordingly.

Affected Environment:  reference is made to resource descriptions of the
"final alternative sites".  Will the "final" alternatives be determined
within the DEIS? Is the proposed data collection for "final"
alternatives for the purpose of making a final selection for further
review or will these data support the preferred alternative only?  How
will public or agency comments, which will be made in response to the
publication of the DEIS, affect the selection of "final" alternatives?
It's unclear where these data fit into the final permitting decisions.

Aviation: the draft scope recommends conclusion of an FAA process that
requires "precise coordinates of each tower" for inclusion in the DEIS.
As our understanding of the DEIS is that its purpose is to support a

1

CW0000006242

site selection decision-making process, we uncertain as to how the applicant can provide the information that the FAA requires within the proposed timeframe.

Navigation:  the Scope should include an analysis of the type and frequency of commercial and recreational marine traffic, the impact of local weather (particularly fog and storms) on marine traffic, a discussion of the marine safety history of the area with an analysis of the impact of structures on safety, and a discussion of liability for collisions with structures in the water.

Cultural Resources: the Massachusetts Underwater Archeological Board has a marine archeological survey protocol, which CZM will require for its review.

Other issues and questions not addressed in the draft Scope include:

Public Trust: federal jurisdiction over non-extractive uses of the OCS is being developed in the same timeframe as the Cape Wind project review.  CZM believes that the outcome of OCS resource allocation deliberations is a threshold issue for this proposed Cape Wind project. A major portion of the EIS should be devoted to an informative discussion of allocation of public resources, e.g. the water sheet, land under the ocean, habitat, and living resources.

Fiscal:  project financing, liability coverage, and bonds for decommissioning and habitat restoration should be included in the DEIS. The applicant has already asked to be grandfathered from the proposed OCS/renewable energy legislation but if they aren't grandfathered, it will have significant impacts on the feasibility of the project.  MMS has a good deal of experience with these issues and can be quite helpful.

Interconnect: the applicant should clearly demonstrate that the power generated would be accepted by NSTAR and the New England grid and that any associated closes are accounted for.

Pollutants: will fuels be stored on any of the structures associated with the project?  If so, an MMS permit is required.

State Waters: the Massachusetts Energy Facilities Siting Board has pointed out that one of the three possible locations within Nantucket Sound is substantially within State waters.

Thanks for the opportunity to comment on this draft.

CW0000006243

34

CW0000006244



# REVIEW OF OFFSHORE WIND FARM PROJECT FEATURES

| | |
|---|---|
| Client | **US Army Corps of Engineers** |
| Contact | Karen K. Adams |
| Document No | 3729/BR/01 |
| Issue No | A |
| Status | FINAL |
| Classification | Client's Discretion |
| Date | 23 July 2003 |

Author:

C A Morgan, P G Hodgetts, W W Schlez, C J A Versteegh

Checked by:

C A Morgan

Approved by:

A D Garrad

CW0000006245

## Revision History

| Issue No: | Issue Date: | Summary |
|-----------|-------------|---------|
| A | 23 Jul 03 | Original release |

| Circulation: | Copy No: |
|--------------|----------|
| GH Bristol | 1 |
| GH Glasgow | 2 |
| Client | 3 |

Copy No: _____

CW0000006246

# 1    INTRODUCTION

## 1.1    Background

US Army Corps of Engineers (USACE) has contacted Garrad Hassan and Partners Limited (GH) to provide an overview of the state-of-the-art of the development of offshore wind farms, specifically in relation to the site environment.

This work has been undertaken to the specification of USACE who are undertaking an environmental impact assessment of the proposed CWA offshore wind farm development at Horseshoe Shoal, Nantucket Sound, USA.

## 1.2    Objectives

USACE have defined the following objectives[1] :

- Provide a written analysis of the "state of the art" for offshore wind addressing whether and how the construction and operation is affected by water depth and wave conditions.

- Assess what advances are anticipated in this area in the next 2 to 3 years.

The above were to be achieved through a review of existing offshore wind farm projects and all projects anticipated to be constructed in the reasonably foreseeable future. The review was to gather key project and site parameters, primarily for comparison to those at the Horseshoe Shoal project, Nantucket, which is currently being assessed by USACE.

---

[1] Email from Karen K Adams, USACE, to Colin Morgan, GH, 26 June 2003.

CW0000006247

35

CW0000006248

**Adams, Karen K NAE**

| | |
|---|---|
| **From:** | Colin Morgan [morgan@garradhassan.com] |
| **Sent:** | Wednesday, July 23, 2003 11:44 AM |
| **To:** | Adams, Karen K |
| **Cc:** | Craig Olmsted |
| **Subject:** | Offshore wind farm sites review |



3729br01a.pdf

Karen

Please find attached our report on the above.  Please advise of any comments you may have and advise how many formal paper copies we should issue to (a) yourselves and/or (b) Cape Wind.

Colin Morgan

Direct dial: +44 (0) 117 972 9939
Mobile: +44 (0)7980 578 212
Tel: +44 (0) 117 972 9900
Fax: +44 (0) 117 972 9901

Garrad Hassan and Partners Limited
Registered in England, Company No. 1878456
Registered Office:
St Vincents Works
Silverthorne Lane
Bristol ES2 0QD
UK

www.garradhassan.com

CW0000006249

**36**

CW0000006250

## Adams, Karen K NAE

**From:**    Colin Morgan [morgan@garradhassan.com]
**Sent:**    Wednesday, July 30, 2003 5:34 AM
**To:**    Adams, Karen K
**Cc:**    Craig Olmsted
**Subject:** RE: Offshore Wind Farm Review

Karen

Modified version attached as requested.

Colin

-----Original Message-----
**From:** Karen.K.Adams@nae02.usace.army.mil [mailto:Karen.K.Adams@nae02.usace.army.mil]
**Sent:** 29 July 2003 16:16
**To:** morgan@garradhassan.com
**Subject:** RE: Offshore Wind Farm Review

*We've discussed it here and it appears that the simple solution is to just delete that very last sentence in 5.
Conclusions.    The document is complete without it.  Please finalize it and send one paper copy to me and at least
one to Cape Wind.   Thank you.*

> -----Original Message-----
> **From:** Karen.K.Adams@nae02.usace.army.mil [mailto:Karen.K.Adams@nae02.usace.army.mil]
> **Sent:** 24 July 2003 19:46
> **To:** colin.morgan@garradhassan.co.uk
> **Subject:** Offshore Wind Farm Review
>
> The first person that I had read the report misunderstood the very last sentence in the conclusion. If you have not yet mailed
> out the paper copy, please wait while I get some additional reactions.  Thank you.
>
> Karen K. Adams
> Corps of Engineers, New England District
> 696 Virginia Road
> Concord, MA 01742
> 978-318-8828,  1-800-363-4367 (from MA only) or 1-800 343-4789 ( other NE states)
> Karen.k.adams@usace.army.mil
>
> <<Adams, Karen K NAE.vcf>>

1/5/2004

CW0000006251

37

CW0000006252

Garrad Hassan and Partners Ltd          Document:3729/BR/01     ISSUE:A          FINAL

# 5   CONCLUSIONS

The work presented here has been undertaken for the US Army Corps of Engineers with the following findings:

1. A total of 23 wind farm projects have been identified, with total capacity over 2000 MW, which have been constructed recently or which GH consider certain or likely to come into commercial operation in the next 2 to 3 years.

2. For each of the offshore wind farm projects identified, the key project features and site characteristics have been identified, where available.

3. The survey has been aimed at providing a benchmark for the environmental assessment of the proposed Horseshoe Shoal site at Nantucket Sound. To that extent, it is evident that Horseshoe Shoal is, in most regards, at least as technically onerous as the majority of projects now being developed.

CW0000006253

**38**

CW0000006254



**Alliance to Protect**
**Nantucket Sound**

396 Main St., Suite 2  Hyannis, MA 02601   508-775-9767
www.saveoursound.org

May 17, 2004

Colonel Brian A. Green
U.S. Army Corp of Engineers
New England District
696 Virginia Road
Concord, MA  01742

**Re:   Improper Applicant Involvement in the Cape Wind Project EIS**

Dear Colonel Green:

The Alliance to Protect Nantucket Sound recently received several documents
pursuant to its December 10, 2003 Freedom of Information Act (FOIA) request that
are of great concern.  These documents, which were omitted from the Corps' initial
FOIA response, suggest that the U.S. Army Corps of Engineers has allowed Cape
Wind Associates to assume an advisory role in the development of what is the *Corps'*
environmental impact statement (EIS).  The Alliance has repeatedly expressed its
concerns regarding this potential problem.  These recently released documents
reinforce those concerns, and the Alliance would appreciate any light the Corps can
shed on what appears to be a breach in the objectivity of the EIS.

Sometime in the spring of 2003, the Corps contacted Garrad Hassan and Partners
Limited to prepare a report that would "provide an overview of the state-of-the-art of
the development of offshore wind farms, specifically in relation to the site
environment." Attachment 1.  Per instructions of Ms. Karen Adams, Permit Manager
for the Cape Wind project, the "review was to gather key project and site parameters,
primarily for comparison to those at the Horseshoe Shoal project, Nantucket, which is
currently being assessed by USACE." *Id.*

On July 23, 2003, Mr. Colin Morgan of Garrad Hassan emailed the requested report
to Ms. Adams, asking for comments and an estimate of the number of copies the
Corps and Cape Wind would require.  Attachment 2.  Mr. Morgan also carbon copied
Craig Olmstead, Cape Wind's Vice President of Project Development, on that same
email, but did not carbon copy the cooperating agencies.

CW0000006255

Colonel Brian A. Green
May 17, 2004
Page 2

On July 24, Ms. Adams replied to Mr. Morgan's email stating, "The first person that I had read the report misunderstood the very last sentence in the conclusion. If you have not yet mailed out the paper copy, please wait while I get some additional reactions." Attachment 3. Ms. Adams followed up with Mr. Morgan on July 29, recommending that the final sentence of the conclusion be deleted and asking Mr. Morgan to send a paper copy to her and one to Cape Wind. *Id.* Mr. Morgan removed the apparently offending sentence and forwarded the modified version to Ms. Adams and Mr. Olmstead on July 30. *Id.*

The conclusion that apparently caused the misunderstanding – due to its last sentence – provided, "The survey has been aimed at providing a benchmark for the environmental assessment of the proposed Horseshoe Shoal site at Nantucket Sound. *To that extent, it is evident that Horseshoe Shoal is, in most regards, as least as technically onerous as the majority of projects now being developed.*" *Id.* (emphasis added to deleted sentence). Attachment 4A. Per Ms. Adams' instructions, that sentence was deleted.

In its final form, the Garrad Hassan report conveyed only three conclusions: 1) that a total of 23 wind farm projects are likely or certain to come into operation in the next 2 to 3 years; 2) for each offshore project, the key project features and site characteristics have been identified; and 3) the survey was aimed at providing a benchmark for the review of the Horseshoe Shoal site. Attachment 4B. The only sentence that provided any analysis of how Cape Wind's proposed site compared to other wind farms (presumably one of the purposes of the report) is the one that was deleted. That sentence concluded there were no technical advantages to Horseshoe Shoal over other sites. *Id.* This is, of course, one of the key issues in the EIS.

Mr. Olmstead of Cape Wind was the only person carbon copied on the initial email. Since it seems that the deleted sentence was far from confusing, but rather was merely a comparison of the technical feasibility of proposed project to that of other projects, the Alliance is concerned that the sentence may have been deleted simply because it was not to the liking of Cape Wind.

If that is not the case, the Corps should release any other documents regarding this issue. The Corps' own FOIA regulations require: "An internal communication concerning a decision that subsequently has been made a matter of public record must be made available to a requester when the rationale for the decision is expressly adopted or referenced in the record containing the decision." 32 C.F.R.

CW0000006256

Colonel Brian A. Green
May 17, 2004
Page 3

§ 518.37(e)(5).  Moreover, the review of this report and the removal of this sentence
is a matter that apparently was the subject of communications with the applicant, and
therefore is not within the scope of exemption (b)(5).

In addition to our concerns over the reasons why the Corps requested the deletion of
this critically important sentence, the Alliance regards the circumstances surrounding
this report as an example of how the EIS process has been compromised by the Corps'
failure to follow standard procedures for selecting an EIS consultant and screening the
applicant from critical policy and legal decisions.  It is highly problematic that Cape
Wind's Vice President of Project Development, Mr. Olmstead, appears to have been
the only other party besides the Corps' permit manager who received a draft version of
the report to review.  This continuing involvement of the applicant in EIS policy and
legal determinations undermines the public trust in the process and is creating serious
legal deficiencies in the NEPA process.

For the record, Alliance restates its longstanding objection to the role the Cape Wind
and its permit advocate consultant have been allowed to play in this EIS process.
Thank you for considering the concerns raised in this letter.

Very truly yours,

Susan Nickerson
Executive Director

Attachments


cc:    See Attached List

CW0000006257

39

CW0000006258

Timmermann.Timothy@epam
ail.epa.gov       To:    "Adams, Karen K NAE"
                <Karen.K.Adams@nae02.usace.army.mil>,
10/15/03 06:28 AM       Vernon_Lang@fws.gov
         cc:     "Benson, Al, DOE'" <al.benson@hq.doe.gov>,
         "'angel.cases@faa.gov'" <angel.cases@faa.gov>,
         "Pugsley, Arthur (ENV)'"
         <Arthur.Pugsley@state.ma.us>,
         "'barry.drucker@mms.gov'" <barry.drucker@mms.gov>,
         'Dave Reynolds' <David_W_Reynolds@nps.gov>,
         "Babb-Brott, Deerin (ENV)'"
         <Deerin.Babb-Brott@state.ma.us>, "LeBlanc, Edward'"
         <ELeBlanc@MSOProv.uscg.mil>, "Terrill, Jack, NMFS'"
         <Jack.Terrill@noaa.gov>, 'Jane Mead'
         <Jane.Mead@state.ma.us>, "'Julie.Crocker@NOAA.gov'"
         <Julie.Crocker@NOAA.gov>, "Adams, Karen K NAE"
         <Karen.K.Adams@nae02.usace.army.mil>, "Laurie
         Perry,acting THPO" <laurie@wampanoagtribe.net>, "'CC
         National Seashore,Maria Burks'"
         <Maria_Burks@NPS.gov>, "Dascombe, Phil, CCC'"
         <pdascombe@capecodcommission.org>, "Holtham, Susan E
         NAE" <Susan.E.Holtham@nae02.usace.army.mil>
         Subject: RE: EIS public info meeting

Karen:

thanks for sending me the revised email message with all of the text.
We have a couple of thoughts we would like for you to consider as you
work to finalize your list of alternatives for presentation on October
29.

South of Tuckernuck or South of Martha's Vineyard, Combinations of
Tuckernuck (or Martha's Vineyard) or New Bedford and Nantucket Sound &

1

the New Bedford Site

Since the meeting there appears to be a shift away from the area south
of Martha's Vineyard to an area south of Tuckernuck. It is difficult to
provide advice as to which of alternative you should pursue without
additional information to understand the basis for such a decision.
While we support the concept of the Corps exploring a site or sites in
the general geographic area south of the islands, without more
information we find it difficult to support one site over another as
appropriately "representative." Similarly, we find it difficult to make
a recommendation on combinations of alternatives or whether the New
Bedford site should be advanced in the absence of more detailed
information.

Economics

Your message brings up the issue of economics and your goal to identify
differences in constraints and cost factors associated with the sites to
be studied for a project in the 200-1500MW size range. Last week at the
Wind Power Tutorial we heard Dr. Manwell opine that under certain
circumstances a 100MW offshore project could be commercially viable.
While we understand that there are many factors that must be considered
to determine the economics of a project in any location, we believe that
it would be helpful for the Corps to illustrate the project size for an
offshore wind project in the study area where project costs and
projected revenues are roughly equal (the "break even" point). In this
instance, if the break even point was illustrated for the applicant's
preferred site in Nantucket Sound, it would provide a starting point for
realistic discussions about project size and project impacts in the
preferred and alternative sites and would benefit reviewers and the
public, and allow for meaningful comparisons of relative impacts that
would be based on projects that could realistically be developed.

Timothy L. Timmermann
Environmental Scientist
Office of Environmental Review

U.S. Environmental Protection Agency-New England
1 Congress Street, Suite 1100  Mail Code RAA
Boston, Massachusetts 02114-2023

Tel: 617-918-1025
Fax: 617-918-1029
email: timmermann.timothy@epa.gov

CW0000006260

**40**

Vernon Lang

To: "Adams, Karen K NAE"
10/16/03 04:34 PM      <Karen.K.Adams@nae02.usace.army.mil>
cc: timmermann.timothy@epamail.epa.gov
Subject: RE: EIS public info meeting(Document link: Vernon Lang)

Karen: I think Tim Timmermann raises some good points in his 10/15/03 email
to you. I am beginning to get the sense that the only sites with a
comparable level of information will be the applicants sites in Nantucket
Sound. The others will likely have bits of information gathered for widely
different purposes and with different survey techniques. Another point is
that MMR, Tuckernut& New Bedford have not been proposed as wind farm sites
by any developer and consequently, the question may be posed as to why they
are representative sites.

Regarding my previous email, I once again read the Corps NEPA regs and see
questions with your approach. How are you going to define the underlying
purpose and need from the applicants perspective and the public's
perspective. The example in the regs. Part 325, App. B.9.b. (4) seems to
differ from the present approach.

In App. B. 9.b.(5a) it speaks to reasonable alternatives. Reasonable
alternatives must be those that are feasible and such feasibility must
focus on the accomplishment of the underlying purpose and need( of the
applicant or public) that would be satisfied by the proposed Federal
action. Since you do not have the underlying purpose and need defined yet,
is it possible that the cart is in front of the horse?

9.b. (5c) talks about project substitutes and design modications under the
rubric of functional alternatives. Don't we need to have the purpose and
need clearly defined before functional and geographic alternatives can be
dealt with?

1

41

CW0000006263



Cape Wind
Energy for Life

75 Arlington Street
Suite 704
Boston, MA 02116
617-904-3100
Fax: 617-904-3109
www.capewind.org

September 23, 2003

Ms. Karen Kirk Adams
Chief, Permits and Enforcement Branch
U.S. Army Corps of Engineers, Regulatory Division
696 Virginia Road
Concord, MA  01742

Re:   Cape Wind Associates; The Nature and Extent of Alternatives
      Analysis Required under NEPA for the Permitting Review of Private
      Commercial Proposals; Corps File No. 199902477

Dear Ms. Adams:

I.      Introduction

        On behalf of Cape Wind Associates, LLC ("CWA"), this letter discusses the
extent to which the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq.,
requires the Army Corps of Engineers (the "Corps") to evaluate "alternatives" in the specific
context of the permitting of a private proposal, such as that of CWA, to develop a commercial
project at a particular site.  As set forth below, the Federal courts have consistently held that the
alternatives analysis required under NEPA for such private proposals is less extensive than for
public proposals, and that the scope and depth of such analysis are properly limited by reference
to the stated business objectives of the commercial applicant, including its objectives as to
business strategy, commercial scale and economic viability.  Thus, both the scope and depth of
alternatives analysis in this instance should be determined with reference to CWA's stated
purpose of undertaking a major renewable energy project with the indicated economies of scale
and other practical attributes consistent with a viable commercial venture in the competitive
energy markets.

II.     Decisions of the Federal Courts Confirm the More Limited Scope and Extent of
        Alternatives Analysis Required for Private Permit Applications.

        In the leading case in this Circuit, Roosevelt Campobello Int'l Park Comm'n v.
E.P.A., et al., 684 F.2d 1041 (1st Cir. 1982) ("Roosevelt"), the Court upheld an environmental
impact statement ("EIS") for a private proposal to develop a commercial oil refinery and
associated deep-water terminal facilities.  The appellant in that case argued that the EIS was
flawed because the agency conducted "a less searching analysis of alternatives to this privately

CW0000006264

Ms. Karen Adams
September 23, 2003
Page 2

sponsored project than it would have had the project been publicly funded." Id. at 1046. As an
initial matter, the Court rejected such argument and confirmed that the scope and extent of
alternatives analysis for a private project is more limited than the analysis applicable to a public
project. The Court explained that the alternatives analysis of a private proposal has the more
limited objective of exploring only those alternatives that are a "substantially preferable" or
"obviously superior" means of meeting the applicant's purpose and thus need not, as in the case
of public proposals, continue to study alternatives until "the optimum" site is determined:

> EPA's evaluation of alternatives was explicitly based on the premise that
> its role in reviewing privately sponsored projects "is to determine whether
> the proposed site is environmentally acceptable", and not, as in the case of
> a publicly funded project, "to undertake to locate what EPA would
> consider to be the optimum site for a new facility." Therefore, EPA
> considered its purpose in this case to be to search for alternatives "that
> would be substantially preferable from an environmental standpoint."
> EPA concluded that "(t)his different purpose affects the extent of the
> information on alternatives necessary to make a decision." We are unable
> to fault EPA's reasoning. Petitioners concede that the substantive
> standard – "substantially preferable" – was correctly stated. Cf. New
> England Coalition on Nuclear Pollution v. NRC, 582 F.2d at 95-96
> ("obvious superiority").

Id. at 1046-1047. (emphasis added.) In light of this limited objective of the alternatives analysis
for private proposals, the Court went on to conclude that NEPA does not require that the
environmental impacts at each alternative site be considered in the same level of detail as the
proposed site. To the contrary, it held that NEPA requires that the alternative sites be studied
only to the extent necessary to determine whether they would be "substantially preferable" or
"obviously superior," such that, once an agency has sufficient information to determine that an
alternative site is not "obviously superior," it need not conduct exhaustive further analysis of that
site:

> No purpose would be served by requiring EPA to study exhaustively all
> environmental impacts at each alternative site considered once it has
> reasonably concluded that none of the alternatives will be substantially
> preferable to the proposed site. Moreover, the guideline adopted by EPA
> to limit its study of alternatives appears, in this case, to be consistent with
> the "rule of reason" by which a court measures federal agency compliance
> with NEPA's procedural requirements.

Id. at 1047.

The Court then proceeded to discuss and uphold the agency's method of
identifying and considering alternative sites largely by reference to the commercial applicant's
intention to undertake a large-volume business venture that would allow the "economies of
scale" that it deemed necessary to make the project "economically feasible":

CW0000006265

Ms. Karen Adams
September 23, 2003
Page 3

> EPA's choice of alternative sites was focused by the primary objectives of
> the permit applicant, the Pittston Co. Pittston stated that its basic
> consideration was to find a port with deep water near shore in order to
> accommodate [large-scale supertankers]. Only by using such supertankers
> could Pittston take advantage of economies of scale, thereby making the
> project economically feasible. Therefore, after Pittston had reviewed and
> rejected a number of sites lacking such deep water, EPA limited its
> consideration to the only [three other] ports providing deep water access.

Id. at 1047. These three alternative sites were then considered in greater detail, and each was
found to be "not substantially preferable," largely because of attributes inconsistent with the
business objectives of the applicant (including insufficient water depths to accommodate the
intended scale of commercial vessels, unavailability of suitable land and exposure to more
extreme marine conditions that would increase the hazard to commercial navigation.) Id. at
1048. Thus, the Court upheld the EIS alternatives analysis that was limited by the business
objectives of the private applicant, and which conducted analysis of the "finalist" group of
alternatives sites sufficient for each to be found "not obviously superior," with such finding
based largely upon physical limitations inconsistent with the applicant's business objectives.[1]

Numerous other Federal court decisions have similarly recognized the more
limited scope and substantive standard used to evaluate alternative sites in cases of private permit
applications. In Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991), cert.
denied, 502 U.S. 994 (1992), the Court, in a decision written by Judge Clarence Thomas, upheld
an EIS for a proposed commercial airport expansion. That EIS faced similar challenges to its
alternatives analysis, which had "briefly described some alternatives," but, after screening those
alternatives, "concluded that it had to consider in-depth the environmental impacts of only two
alternatives," the proposed airport expansion and the no-action alternative. Id. at 193. The
Court's opinion included the following statement of the agency's rationale for so limiting its
alternative analysis according to the objectives of the private applicant:

---

[1]   Notably, the Council on Environmental Quality ("CEQ") in its "Guidance Regarding NEPA Regulations,"
48 FR 34369 (1989), made favorable reference to the Roosevelt decision and clarified its earlier guidance, including
its "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 FR 18026
(1981), which had previously indicated that "reasonable alternatives" include those that are "practical or feasible
from the technical and economic standpoint in using common sense rather than simply desirable from a standpoint
of the applicant." The CEQ's 1989 guidance noted that Roosevelt affirmed an alternatives analysis that "limited its
consideration of sites to only those sites which were considered feasible, given the applicant's stated goals". The
CEQ further concluded that this holding of Roosevelt "is in keeping with the concept that an agency's
responsibilities to examine alternative sites has always been 'bounded by some notion of feasibility' to avoid NEPA
from becoming 'an exercise in frivolous boilerplate' and that there is 'no need to disregard the applicant's purposes
and needs in the common sense realities of a given situation in the development of all alternatives.'" Thus,
provisions of prior CEQ guidance documents, including the "Forty Questions" of 1981, should be interpreted in
light of the subsequent direction provided by Roosevelt and subsequent decisions of the Federal courts discussed
herein.

CW0000006266

Ms. Karen Adams
September 23, 2003
Page 4

> The scope of alternatives considered by the sponsoring Federal agency, where the Federal government acts as a proprietor, is wide ranging and comprehensive. Where the Federal government acts, not as proprietor, but to approve and support a project being sponsored by a local government or private applicant, the Federal agency is necessarily more limited. In the latter instance, the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.
>
> ☐ ☐ ☐
>
> In the present system of federalism, the FAA does not determine whether to build and develop civilian airports, as an owner/operator. ... Airline managements are free to decide which cities to serve based on market forces.

Id. at 197. The FAA then proceeded to "briefly explain" that it eliminated the alternatives of different configurations at the proposed site and at other sites within the metropolitan area because they would be inconsistent with the proponent's stated commercial objectives.

The Court, citing to Roosevelt, further explained that "[w]hen an agency is asked to sanction a specific plan, see 40 C.F.R. § 1508.18(b)(4), the agency should take into account the needs and goals of the parties involved in the application," and that "Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be." Id. at 197, 199. The Court further noted the practical limitations upon the ability of Federal agencies to alter or second-guess the stated commercial objectives and analysis of private parties, with particular reference to entrepreneurial ventures in a formerly regulated industry:

> [Plaintiffs'] view would require the FAA to canvas the business choices that [the commercial proponent] faced when it considered leaving Fort Wayne. But the agency has neither the expertise nor the proper incentive structure to do so (it has no shareholders who would suffer from mistaken judgments). And while Congress clearly wanted NEPA to extend federal agencies' range of vision to environmental concerns, it did not, so far as we can tell, aim at agencies' acquiring the skills of successful entrepreneurs. NEPA is supposed to make agencies more sensitive--but only, by definition, to matters environmental.

Id. at 197, n. 6. The Court then proceeded to uphold the elimination of alternatives, without further environmental review, once they were shown not to meet the applicant's business objective, citing in particular the "technological problems and extravagant costs" that would result from several alternative sites and alternative configurations that were eliminated from further study. Id. at 198.

Ms. Karen Adams
September 23, 2003
Page 5

In City of Grapevine, Texas v. Dept. of Transportation, 17 F.3d 1502 (D.C. Cir. 1994), cert. denied, 513 U.S. 1043 (1994), the Court, in an opinion written by Judge Ruth Bader Ginsburg, followed the opinion of Judge Thomas in Citizens Against Burlington and similarly upheld the EIS of a commercial airport expansion proposal, rejecting arguments that the FAA had improperly curtailed its consideration of alternatives to the stated economic purposes of the applicant. The draft EIS ("DEIS") in that case had originally considered only alternative configurations at the proposed site but, in response to comments on the DEIS, the final EIS also "briefly considered and rejected" several off-site alternatives, which were found to be either inconsistent with the stated purpose or dependent upon an "as yet an unproven concept" that would have been detrimental to the intended business development. Id. at 1506. Once again, the Court concluded that it was appropriate to frame the project's purpose and, hence, limit the alternatives analysis by reference to the "economic goals" of the petitioner:

> [T]he petitioners (and some of the amici) argued that it was improper for the FAA, in defining the purpose of the project, to consider the economic goals of the project's sponsor, the DFW Airport Board. This argument is foreclosed, however, by our decision in Citizens Against Burlington: Per then Judge Thomas, where a federal agency is not the sponsor of a project, "the Federal Government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project." 938 F.2d at 197-98. . . . Therefore, we conclude that the FAA's statement of purpose of the airport expansion project did not improperly constrain its consideration of alternatives in the FEIS.

Id. at 1506.

In another case citing to Roosevelt, Valley Citizens for a Safe Environment v. Aldrich, et al., 886 F.2d 458 (1st Cir. 1989), the Court, in an opinion of Judge Stephen Breyer, similarly upheld an EIS for the relocation of cargo airplanes from one airport base to another, rejecting arguments that the FAA had improperly curtailed further consideration of alternative sites once, for cost and other non-environmental reasons, such sites had been found to be "impractical" for the applicant's purpose. The Court confirmed that the appropriate objective of the alternatives analysis was to determine whether an alternative site might offer a "substantial measure of superiority" to the proposed site. Id. at 462. The Court then went on to hold that, once the agency had determined that an alternative site is "impractical" or not "substantially superior," it is not nonetheless required to continue on and subject that alternative to the full level of additional scrutiny applied to the proposed site, as follows:

Ms. Karen Adams
September 23, 2003
Page 6

The EIS makes clear that the Air Force will not send the C-5As to the other bases because of significant added construction costs or recruitment problems. It will not send them irrespective of environmental effects at those other bases; it will not send them even if there are no harmful environmental effects, even if no one in those areas thinks the planes are too noisy. What purpose, then, could a discussion of environmental effects at those other bases serve, at least as long as the Air Force makes clear it is prepared to evaluate those alternatives on the assumption that their "adverse environmental effects" are zero?

Id. at 462. The Court thus upheld as "perfectly reasonable" a two-page analysis demonstrating how each of the alternative sites was found to be "impractical" for the applicant's purposes due to "cost and other non-environmental objections," such that and the agency was not required to continue on with further consideration of environmental factors applicable to such alternatives sites.

III.   **More Recent Federal Decisions Continue to Apply the Rule of The Roosevelt Decision in Limiting the Scope and Extent of Alternatives Analysis for Private Permit Applications.**

More recent federal decisions continue to apply the rule set forth in Roosevelt in limiting the scope and extent of alternatives analysis for private permit applications. In Rosebud Sioux Tribe v. Grover, 104 F. Supp. 2d 1194 (D.S.D. 2002), vacated on other grounds, 286 F.3d 1031, (8th Cir. 2002), cert. denied 154 L.Ed.2d 1020 (2003), the Court rejected the argument that an environmental assessment ("EA") for a commercial project on Indian land contained an alternatives analysis that was improperly limited to the commercial scale of project proposed by the applicant:

In the initial paragraph of this section, the EA clearly provides that the size of the project facility and the waste management systems would remain the same for each alternative considered. The size and capacity of the project were specified by [the commercial proponent] based on economic feasibility. This situation is of particular significance in the context of a private corporation. ... Unlike the far more common situation in which the federal agency itself is pursuing the activity, the only federal involvement is approval of the land lease. A private entity interested in bringing economic development opportunities to the reservations must primarily consider its own economic interest. Therefore, the alternatives evaluated in an EA are likely to be fewer in number and defined by economic feasibility factors.

Ms. Karen Adams
September 23, 2003
Page 7

Id. at 1209.  The Court then when on to approve the deference afforded by the agency to the applicant with regard to its analysis of economic feasibility, a factor which limited the scope of the alternatives analysis:

> The Court agrees with Plaintiffs that the range of alternatives explored in the EA satisfies NEPA's requirements.  A private corporation, with an established reputation in [its] industry, knows which alternative is economically feasible – the preferred alternative.  Given the significant need for economic development in the region, it would not be an effective or logical public policy to require private corporations to consider various alternatives which may not be in their economic self interest, simply for the sake of considering alternatives in the EA.

Id. at 1209.

In Hoosier Environmental Council, Inc. v. U.S. Army Corps of Engineers, et al., 105 F. Supp. 2d 953 (S.D. Ind. 2000), the Court similarly upheld the alternatives analysis of the EIS for a proposed riverboat casino project against claims that the alternatives were improperly limited in accordance with the commercial objectives of the proponent.  In upholding the alternatives analysis, the Court in particular noted the substantial additional construction and rehabilitation costs that would be associated with alternative sites that were eliminated from further consideration, as well as the proponent's commercial objective of locating in close proximity to a major consumer market:

> To be practicable, an alternative must be capable of being done, "taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).  It was not arbitrary, capricious, unlawful or an abuse of discretion for the COE to consider that added costs, extensive rehabilitation, possible contamination, and the logistics of travel to the [alternative] site, rendered that site not a practicable alternative.  Nor was the assessment of any of the other alternative sites arbitrary or capricious.

Id. at 1002.

IV.   **Conclusion**

As set forth above, both the scope and extent of alternatives analysis in this case should be determined by reference to the commercial objectives of CWA, as a private applicant for a commercial project.  In particular, any alternative site that passes an initial screening process need only be studied to the extent necessary to determine whether it would be "obviously superior" to the proposed site.  Thus, once the Corps has sufficient information to determine that an alternative site is not "obviously superior" for the applicant's purposes, that site need not be

CW0000006270

Ms. Karen Adams
September 23, 2003
Page 8

subjected to additional levels of analysis that may be applied to the proposed site. Finally, each phase of the alternatives analysis should be framed by reference to CWA's stated objective of undertaking a major renewable energy project with the indicated economies of scale and other practical attributes (including availability of proven commercial technologies acceptable to the financial community, construction, operation and maintenance costs, marine conditions, wind resources, transmission availability and proximity to a major customer load center) that would support a viable commercial venture in the competitive energy markets.

Sincerely,

Dennis J. Duffy
Vice President

DJD/lrm
Enclosures

**42**

CW0000006272



Energy for Life

75 Arlington Street
Suite 704
Boston, MA 02116
617-904-3100
Fax: 617-904-3109



January 5, 2005

Ms. Karen Kirk-Adams
Chief, Permits and Enforcement Branch
United States Army Corp of Engineers
696 Virginia Road
Concord, MA 01742

Re:     **Cape Wind Associates: Regulatory Treatment of Incomplete or
        Unavailable Information under the National Environmental Policy
        Act ("NEPA"); ACOE File No. 199902477**

Dear Ms. Adams:

        I am writing to address the requirements under the NEPA and the regulations of
the Council on Environmental Quality ("CEQ Regulations") in the event of incomplete or
unavailable information. In particular, a concern has been raised over the perceived lack of
sufficient information as to the possible presence of winter sea ducks within the rotor-swept
airspace of the proposed project (i.e., the airspace from 75' to 417' above sea level at Horseshoe
Shoal) at night during foul weather and storm events. It has been suggested that, in the absence
of additional information, NEPA would require the ACOE to either reject the application or
evaluate the proposed project under a "worst case" assumption as to the potential presence of, or
impact upon, winter sea ducks under the stated conditions. Such conclusion, however, is
contrary to the provisions of the CEQ Regulations, which were amended in 1986 to expressly
rescind the former requirement that the permitting agency adopt "worst case" assumptions when
information is deemed incomplete or unavailable. Importantly, the regulations also now limit the
required analysis in such instances to those "reasonably foreseeable" concerns that are supported
by credible scientific evidence, and not concerns based upon conjecture. As set forth below, we
are confident that the ACOE has sufficient information to properly evaluate any such concerns in
accordance with the relevant provisions of such regulations.

CW0000006273

Karen Kirk Adams
January 5, 2005
Page 2

I.   **The NEPA Regulations Have Expressly Rejected the "Worst Case" Approach in the
     Event of Incomplete or Unavailable Information.**

      The CEQ Regulations contain express provisions (40 CFR § 1502.22,
"Incomplete or unavailable information") defining the appropriate regulatory course in the event
of incomplete or unavailable information. Such regulations anticipate that the EISs will proceed
notwithstanding incomplete or unavailable information, and were amended in 1986 for the
express purpose of eliminating the former requirement that the permitting agency proceed under
a "worst case" assumption. Section 1502.22 now provides that "when an agency is evaluating
reasonably foreseeable significant adverse affects on the human environment in an
environmental impact statement and there is incomplete or unavailable information, the agency
shall always make clear that such information is lacking," and proceed as follows:

      If the information relevant to reasonably foreseeable significant adverse impacts
      cannot be obtained because the overall costs of obtaining it are exorbitant or the
      means to obtain it are not known, the agency shall include within the
      environmental impact statement: (1) a statement that such information is
      incomplete or unavailable; (2) a statement of the relevance of the incomplete or
      unavailable information to evaluating reasonably foreseeable significant adverse
      impacts on the human environment; (3) a summary of existing credible scientific
      evidence which is relevant to evaluating the reasonably foreseeable significant
      adverse impacts on the human environment; and (4) the agency's evaluation of
      such impacts based upon theoretical approaches or research methods generally
      accepted by the scientific community. For the purposes of this section,
      "reasonably foreseeable" includes impacts which have catastrophic
      consequences, even if their probability of occurrence is low, provided that the
      analysis of the impacts is supported by credible scientific evidence, is not based
      on pure conjecture, and is within the rule of reason.

40 CFR § 1502.22(b).

      In its initial notice of the proposed amendment ("Proposed Amendment to Worst
Case Analysis Regulations"), the CEQ explained that "after an intensive review of the [former]
regulation, the Council has concluded that the worst case analysis is an unsatisfactory approach
to the analysis of the potential consequences in the fact of missing information." The CEQ
therein further explained that there had been substantial concern under the former rule over "the
limitless nature of inquiry established by this [worst case] requirement; that is, one can always
conjure up a worst case by adding an additional variable to a hypothetical scenario." The CEQ
went on to explain that, under the new rule, the range of study based upon the available
information would thus be limited to those potential concerns that were based upon credible
scientific analysis, and not those potential concerns based upon conjecture:

CW0000006274

Karen Kirk Adams
January 5, 2005
Page 3

> The Council believes that pure conjecture, that is, conjectural analysis, lacking a
> credible scientific basis is <u>not</u> useful to either decisionmaker or the public; rather,
> it could appear to be an indulgence in speculation for its own sake without a firm
> connection between credible science and hypothetical consequences of an
> agency's proposed action.

<u>Id.</u> In the CEQ Order releasing the final amended rule ("<u>Final Amendment Revoking Worst
Case Analysis Regulation</u>"), the CEQ similarly explained that the required scope of study was
limited "to reasonably foreseeable" impacts under the revised rule by adding the proviso "that
the analysis of such impacts is supported by credible scientific evidence, is not based on pure
conjecture, and is within the rule of reason." Thus, the current CEQ Regulations plainly intend
that EISs be completed in the event of incomplete or unavailable information, without resort to
(i) a "worst case" assumption or (ii) the evaluation of potential effects that are not demonstrated
to be "reasonably foreseeable" by credible scientific evidence.

II.   <u>The Federal Courts Have Confirmed the CEQ's Rescission of "Worst Case"
Regulation.</u>

The Federal Courts have confirmed the foregoing elimination by the CEQ of the
former requirement of "worst case" regulation when an EIS process resulted in incomplete or
unavailable information. In <u>Robertson v. Methow Valley Citizens Council, et al.</u>, 490 U.S. 332
(1989), the United States Supreme Court upheld an EIS that was prepared in the face of
unavailable information as to potential impacts upon a mule deer herd, and which did not include
a "worst case" analysis. The Supreme Court based its decision largely upon the revised CEQ
Regulations, which found to have showed a reasoned basis for revoking the "worst case"
approach:

> In 1986, however, CEQ replaced the "worst case" requirement with the
> requirement that federal agencies, in the face of unavailable information
> concerning a reasonably foreseeable significant environmental consequence,
> prepare "a summary of existing credible scientific evidence which is relevant to
> evaluating the ... adverse impacts" and prepare an "evaluation of such impacts
> based upon theoretical approaches or research methods generally accepted in the
> scientific community." 40 CFR § 1502.22(b) (1987). The amended regulation
> thus "retains the duty to describe the consequences of a remote but potentially
> severe impact, but grounds the duty in evaluation of scientific opinion rather than
> in the framework of a conjectural "worst case analysis." 50 Fed. Reg. 32237
> (1985).

CW0000006275

Karen Kirk Adams
January 5, 2005
Page 4

Robertson, 490 U.S. at 373. Notably, the Supreme Court also referenced the CEQ's explanation that the revised regulation would provide a better implementation of NEPA by generating information on those consequences of greatest real concern and relevance, "rather than distorting the decision making process by overemphasizing highly speculative harms, 51 Fed. Reg. 15624-15625 (1986); 50 Fed. Reg. 32236 (1985)."[1] Robertson, 490 U.S. at 374. The Court concluded that, "in light of this well-considered basis for the change, the new regulation is entitled to substantial deference," and thus upheld the EIS which reflected the available scientific information without resort to worst case analysis. Id.

### III.   The Available Information is Sufficient to Satisfy the Requirements of the Revised NEPA Regulations.

There should thus be no question that a "worst-case" assumption is not appropriate in this instance. There should also be no question that the information in question regarding the possible presence of winter sea ducks "cannot be obtained because the overall cost obtaining it exorbitant or the means to obtain it are not known." With respect to overall cost, the records shows plainly exorbitant costs, both as to the more than $1 million financial cost, as well as the cost in the risk to human safety of marine operations in winter months, particularly during the indicated storm conditions. With respect to practicable ability to obtain such information, the record also shows that physical limitations of radar installation on a stationary barge platform, both as to vertical and horizontal radar, indicating that currently available measures will likely not yield significant additional information, and would be particularly ineffective during the indicated periods of winter storms and precipitation.

---

[1]   See, e.g., Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162 (10th Cir. 1999) (Upholding EIS where "the participants in the environmental review process were well aware of the relevance of lynx population data to consideration of the [project], the scarcity of such data, and the studies and reports of the Forest Service used to evaluate Lynx impacts based on available distribution, denning and foraging habitat information"); NRDC v. Evans, 254 F.Supp.2d 434, 443 (S.D.N.Y. 2003) (Upholding EIS where the lead agency "included in the Envtl. Imp. Stmt. a statement that there was incomplete information; they described the relevance of the information to reasonably foreseeable adverse impacts, and the existing scientific evidence relevant to such impacts, and they included an evaluation of such impacts") (citations omitted); Lee v. USAF, 354 F.3d 1229 (10th Cir. 2004) (Where information is unavailable, the four steps of § 1502.22 are "only required in regard to 'reasonably foreseeable significant adverse impacts,'" and were thus not required regarding speculation over the possible effects of increased air traffic upon property values.) Also see Sierra Club v. Sigler, 695 F.2d 957, 937 (5th Cir. 1983) ("Uncertainty as to environmental consequences need not bar action as long as the uncertainty is forthrightly considered in the decision making process and disclosed in the EIS.")

CW0000006276

Karen Kirk Adams
January 5, 2005
Page 5

       Neither we nor our ornithologists are aware of credible scientific information that would indicate that a significant presence of winter sea ducks within the rotor-swept area during the periods in question is a "reasonably foreseeable" result. Further, even if such a presence could be deemed "reasonably foreseeable," there is ample existing data that would, under "theoretical approaches or research methods generally accepted by the scientific community," allow the Corps to make a reasoned and favorable evaluation of any potential concern. Our ornithologists are prepared to discuss the large body of relevant information and literature and its appropriate application to this matter. To summarize, the site-specific studies in the Sound from 2002-2004 and other marine locations since the late 1990s indicate that the wintering sea ducks tend to fly at very low altitudes at (usually not more than 35 feet above the water) and the literature regarding observations at other wind turbine locations confirm no sea duck collisions at offshore wind farms and further indicates the ability of such ducks to avoid structures by altering their flight path under varying conditions. Under the provisions of Section 1502.22 of the revised CEQ Regulations, the existing information and literature are plainly sufficient for the reasoned and "hard look" required by the NEPA.

       Very truly yours,

       Dennis J. Duffy
       Vice President

CW0000006277

**43**

CW0000006278

I.     **Published in the Asbury Park Press 1/10/05**

By TODD B. BATES
ENVIRONMENTAL WRITER

A new study on tapping wind power off the New Jersey coast shows that the state is on the right path by "pausing and taking a hard look at the appropriateness of industrial windmills in the ocean," according to a coastal environmental activist.

"It's a tremendously important and sensitive environment off of the Shore which ought to be dealt with with great care," Tim Dillingham, who heads the American Littoral Society, a Sandy Hook-based coastal conservation group, said Friday. He is also on a new blue-ribbon panel that will study the offshore windmill issue.

But Lester Starnes of Red Bank, a 55-year-old marine business owner in Atlantic Highlands, said he's been to Europe and Costa Rica and "they have windmills all over the place . . . and it doesn't affect the shoreline, and it's free energy."

Critics "have to have their head totally buried somewhere," Starnes said, adding that he can't comprehend all the "negative comment" about offshore windmills. "It's just the most viable thing that we need," he said.

Last week's unveiling of a state-funded study on the feasibility of putting wind turbines off New Jersey's coast drew an array of reactions from proponents and skeptics.

The $300,000 report, "New Jersey Offshore Wind Energy: Feasibility Study," dated December 2004, was written by Atlantic Renewable Energy Corp. of Richmond, Va., with help from technical consultants, for the state Board of Public Utilities.

Atlantic Renewable Energy is an independent developer of wind projects on the East Coast, including six projects in New York, Pennsylvania and West Virginia, according to the study.

The 200-plus-page document appeared on the BPU's Web site as New Jersey begins a 15-month moratorium on offshore windmills imposed by acting Gov. Codey last month. Codey created the nine-member blue-ribbon panel to study the issue and make policy recommendations on the appropriateness of developing offshore wind turbine facilities, according to Codey's executive order on the issue, posted on a state Web site.

The new study says "the only viable opportunities for significant large-scale wind development in New Jersey are considered to be offshore where wind resources are much stronger and where certain land use conflicts can be avoided."

The "conditionally viable" area for a wind turbine project off the New Jersey coast is largely beyond the state's three-mile jurisdiction and covers roughly from the Seaside Heights-Seaside Park area south to Cape May, according to the study.

Such areas still have "important siting considerations that must be investigated in greater detail if specific projects are contemplated," the study says. "It is likely that more in-depth study of environmental constraints would exclude additional offshore areas from considerations for development."

The study area extends from Raritan Bay, along the oceanfront and into Delaware Bay, the study says.

CW0000006279

It includes waters eight to 10 miles from the Jersey Shore and up to 100 feet deep, which is assumed to be the practical limit for wind turbine foundation designs within the next five years or so, the study says.

So far, all offshore wind projects have been installed in waters less than 65 feet deep, the study says. None has been built in the United States.

Winergy LLC of Shirley, N.Y., has proposed a wind farm with 98 electricity-generating turbines 3 1/2 miles off Monmouth County and 921 turbines at four locations off Cape May County, according to information from the company.

The turbines would be more than 400 feet high.

Winergy hopes to get approval for one of those sites, President Dennis Quaranta said recently.

Quaranta said last week he will read the study and "then I'll have lots of thoughts."

Atlantic Renewable Energy also has expressed interest in offshore wind farms.

Company project director Neil Habig said he couldn't comment on the study or on potential offshore projects.

James Lovgren, a commercial fisherman who lives in Brick and is a board member of the Garden State Seafood Association, said the commercial fishing industry is concerned about "having windmills basically on our fishing grounds, which would eliminate our fishing grounds."

"We can't just charge full speed ahead on this . . . without having some type of really good studies done," Lovgren said.

But Peter Murcko, a 61-year-old retiree who lives in Wall, said "we have to find alternative sources of power, and I think windmills off the coast of New Jersey is . . . the first step."

"We're wasting time on the moratorium," Murcko said. "We should try to get more studies completed . . . and then go from there. But my feeling is there's going to be a lot of opposition, and I don't feel it's going to be accomplished."

Asked if New Jersey would be able to block windmills in federal waters, which are beyond state waters, Codey has said it's an issue that may be taken to court.

Under the federal Coastal Zone Management Act, federal license or permit activities that affect any land or water use or natural resource in the coastal zone must be fully consistent with the "enforceable policies" of a state's coastal zone management plan, according to the National Oceanic and Atmospheric Administration Web site.

The federal commerce secretary can override a state's objection to federal permits and activities in some cases, the Web site says.

Sean Darcy, a spokesman for Codey, called the Atlantic Renewable Energy study "another valuable resource for Governor Codey's offshore windmill facilities panel to examine. It is important that all available data be weighed before the panel issues any findings."

Ted Korth, policy director of the New Jersey Audubon Society and a blue-ribbon panel member who opposed Codey's moratorium, said that based on generally a cursory review, the feasibility study 'should be very useful to move forward the discussion on offshore wind."

CW0000006280

The study clarifies a number of questions that "need to be answered and provides a great depth of background to help answer those questions," Korth said.

But Jennifer Samson, principal scientist for Clean Ocean Action, a Sandy Hook-based environmental coalition, said the study, "a literature review," is insufficient to determine the suitability of windmills in the ocean.

The American Littoral Society's Dillingham, who supported Codey's moratorium, said: "We're always skeptical about studies that are developed by folks that have a vested economic interest in the outcomes. I think that that shows up in the way that they present some of the findings.

"In its favor, the study acknowledges that it's not an environmental impact study and that there is information that remains to be developed as well as policy questions which remain to be answered," he said. "So this is not a definitive conclusion that windmills are appropriate off of the shore. It really is just an (inventory) of some certain existing information."

A statement from BPU President Jeanne M. Fox that was e-mailed to the Press said, "BPU has always pursued a balanced (approach) to securing New Jersey's energy future and will continue to do so.

"The study was not intended to substitute for an environmental review of any particular application or project," the statement said. "In particular, the study notes that there are still many considerations that must be investigated in greater detail. This study is just one of a number of resources available to Governor Codey's Blue Ribbon Panel."

Some activists and others say standards for regulating off-shore wind farms are inadequate or nonexistent, but industry officials say standards are adequate.

State standards for offshore windmills will be developed in a public process, and the Department of Environmental Protection hopes to have standards in place this year, DEP Commissioner Bradley M. Campbell has said.

DEP spokeswoman Elaine Makatura said Thursday that "we're not aware of any direction by the governor or the (blue-ribbon) panel to use this study to develop regulations . . . and we're not aware of any discussion of regulations" at this point. She added that it's too early in the process.

*Material from previous Press stories was included in this story.*

*Todd B. Bates: (732) 643-4237 or tbates@app.com*

CW0000006281

**44**

CW0000006282

# CONGRESSMAN FRANK PALLONE, JR.
## *Sixth District of New Jersey*

FOR IMMEDIATE RELEASE:
September 27, 2004

CONTACT: Andrew Souvall
or Jennifer Cannata
(202) 225-4671

## PALLONE DEMANDS FEDERAL ENVIRONMENTAL AND SOCIO-ECONOMIC ASSESSMENT OF WIND FARM PROPOSALS

### *Will Introduce Moratorium Legislation For Mid-Atlantic States*

Long Branch, NJ --- Concerned that the U.S. Army Corps of Engineers could allow the construction of a wind farm off the Monmouth County coast without any public input or an assessment of the environmental and economic impacts, U.S. Rep. Frank Pallone, Jr. (D-NJ) today requested the Army Corps not permit the construction of any offshore wind farm projects until the federal agency has completed a comprehensive assessment of all potential environmental and socio-economic impacts. The New Jersey congressman made the request in a letter to Lieutenant General Carl Strock, Commander of the U.S. Army Corps of Engineers.

The letter comes in response to a proposal by New York based Winergy, LLS calling for the construction of 1,019 wind turbines off the coast of New Jersey, encompassing 234 square miles of ocean space. One of the projects calls for the construction of 98 windmills 3.5 miles off the Monmouth County coast, reaching from Long Branch to Manasquan in Pallone's congressional district.

"New Jersey's shoreline is extremely valuable for a number of environmental and economic reasons," Pallone wrote in his letter to Lt. Gen. Strock. "Before you begin the process of determining whether and where to permit wind farms, government officials, area residents, and other stakeholder organizations must have a detailed conception of how these projects will impact shore tourism, the fishing industry, offshore recreation, local property values, water quality, and impacts to marine life and migratory bird populations."

Pallone called on the Army Corps to pay particular attention to the impacts that wind farms will have on the aesthetic quality of New Jersey's coastline. Pallone wrote that tourism is a vital part of New Jersey's economy, and voiced the concern of some area residents that wind farms could disrupt the view from the shore and negatively impact the number of tourists visiting New

2/22/2005

CW0000006283

Jersey's beaches.

Since proposals involving offshore wind farms are relatively new, Pallone also voiced concern that a structure is not currently in place outlining the requirements and procedures companies must meet in order to receive a permit to construct wind farms.

"I am also concerned that there does not seem to be a formalized process with strict guidelines to direct how you will issue permits for wind farms, assess these projects' impacts, and ensure public participation," Pallone continued in his letter. "I respectfully request that you develop such a process and inform me how you intend to do so."

The New Jersey congressman will also introduce legislation that would establish a moratorium on offshore wind farms in the Mid-Atlantic Region until a comprehensive assessment of all potential environmental and socio-economic impacts is completed, as well as public comments and forums.

###

---


CW0000006284

**45**

CW0000006285



American Wind Energy Association

# Comments of the American Wind Energy Association
## to the
### *Draft Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States*

The American Wind Energy Association (AWEA) and its members greatly appreciate the efforts of the Bureau of Land Management (BLM) to develop the *Draft Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States* (draft PEIS). BLM's desire to encourage renewable energy production, including wind energy, on federal lands is, as described in detail in the draft PEIS, beneficial for everyone involved in terms of economic benefits and clean electricity production.

The wind energy industry is pleased that the BLM developed the draft PEIS in order to bring standards and consistency to the BLM's consideration of environmental issues that are similar across all wind energy projects proposed on BLM-administered lands in the western U.S. As BLM officials such as Rebecca Watson, Assistant Secretary for Land and Minerals Management at the Department of the Interior, have indicated in the press, wind energy projects would continue to conform to site-specific analyses and public participation processes for individual projects. However, the ability to tier an Environmental Assessment (EA) off of the analyses in the PEIS and the decisions in the resultant Record of Decision (ROD) will allow all involved to focus on any site-specific issues and reduce the need for duplicative reviews for every wind energy project.

Below are selected statements and sections in the draft PEIS. In each case, AWEA's comments on the highlighted statement or section are provided and a recommendation is made. AWEA appreciates the opportunity to comment on the draft PEIS and looks forward to working with the BLM on the development of wind energy on public lands.

These comments reflect the views of the diverse membership of AWEA, including companies such as FPL Energy, Orion Energy, PPM Energy, SeaWest WindPower, Stoel Rives LLP, Tetra Tech, and Zilkha Renewable Energy.

**Application Process**

Statement: "*Tiering off project-specific environmental analyses.* The BLM proposes that future, project-specific environmental analyses for wind energy development would tier off of the analyses conducted in this PEIS and the decisions in the resultant Record of Decision (ROD), and thereby allow the project-specific analyses to focus just on the critical, site-specific issues of concern." [2.2]

- Comment: Clarify this statement to indicate the preference for EA's rather than site-specific EIS's unless there is significant public concern or significant impacts. In the *Interim Wind Energy Development Policy* language was included to this effect.

- Recommendation: Add the following language from the Interim Policy: "A comprehensive Environmental Assessment (EA) will usually be required, however, an Environmental Impact Statement (EIS) may be required if significant public controversy or a determination of significant adverse impacts is made. It may also be possible to combine the required environmental review process for a wind energy development project with applicable State or local environmental procedures for energy facility siting. This would both streamline the process and be consistent with Departmental policy on intergovernmental cooperation."

**Wildlife**

Statement: "Meteorological towers should not be located in or near sensitive habitats or in areas where ecological resources known to be sensitive to human activities   are present." [2.2.3.2.1]

- Comment: We are aware of many cases of meteorological towers placed near sensitive areas where no adverse impacts were found.

- Recommendation: "Meteorological towers should not be located in or near locations known to support ESA-protected species which are expected to be adversely and significantly impacted by the installation of the meteorological tower."

Statement: "The monitoring program should incorporate adaptive management strategies to ensure that potential adverse impacts of wind energy development are mitigated to the fullest extent possible throughout the life of the project." [2.2.3.2.2]

- Comment: A continuous monitoring program appears to address all of the unknowns that could arise, creating significant uncertainty for the wind project owner.

CW0000006287

- <u>Comment</u>:  Right-of-way holders should not be required to mitigate impacts "to the fullest extent possible throughout the life of the project." Certain impacts, such as visual impacts, cannot be mitigated while others can be mitigated only at a cost that is disproportionate to the impact.  This language should be amended to "mitigated to a level of insignificance, to the extent practicable."

- <u>Recommendation</u>: "If appropriate, the monitoring program should incorporate adaptive management strategies for a reasonable period of time to ensure that potential adverse impacts of wind energy development are mitigated to a level of insignificance, to the extent practicable."

<u>Statement</u>: " the location of turbines in areas with high bird usage, in known bird migration pathways, near wetlands and other bird-rich habitats, and in areas with a high incidence of fog and mist, should be avoided." [2.2.3.2.2]

- <u>Comment</u>: Scientifically-based avian studies and evaluation of proposed project sites can identify sites that pose a significant risk to avian species of concern. There are many existing wind projects that do not experience high rates of avian mortality but are near areas with high bird usage, in known bird migration pathways, near wetlands and other bird-rich habitats, and in areas with a high incidence of fog and mist.

- <u>Recommendation</u>: " the location of turbines in areas with high bird usage, in known bird migration pathways, near wetlands and other bird-rich habitats, and in areas with a high incidence of fog and mist, should be avoided *if site studies show the turbines would pose a significant risk to avian species of concern.*" [Emphasis indicates additional language proposed]

<u>Statement</u>: "turbines should be configured to avoid landscape features known to attract raptors" [2.2.3.2.2; 5.9.5.2.1]

- <u>Comment</u>: Scientifically-based avian studies and evaluation of proposed project sites can identify sites that pose a significant risk to raptor species of concern.

- <u>Recommendation</u>: "turbines should be configured to avoid landscape features known to attract raptors *only if a particular feature is heavily used by raptors and if site studies show placing turbines there would pose a significant risk to raptor species of concern.*" [Emphasis indicates additional language proposed]

<u>Statement</u>: "Procedures should be developed to mitigate potential impacts to special status species.  Such [mitigation] measures could include avoidance, relocation of project facilities or lay-down areas, and/or relocation of biota." [2.2.3.2.2]

3

CW0000006288

- Comment: Mitigation should be addressed to species of concern. "Species of concern" means species that might be in need of conservation action. (See http://endangered.fws.gov/glossary.pdf.) It includes species listed as threatened or endangered under the federal Endangered Species Act (ESA) and "candidate" species actively being considered for listing under the ESA.

- Recommendation: Replace "special status species" with "species of concern."

Statement: "New access roads and utility corridors should be configured to avoid high quality habitats and minimize habitat fragmentation." [5.9.5.2.1]

- Comment: Any required measures to protect habitats should be addressed to "species of concern" and must be practicable.

- Recommendation: "New access roads and utility corridors should be configured to avoid high quality habitats *of species of concern* and minimize fragmentation *of habitats of species of concern, to the extent practicable.*" [Emphasis indicates additional language proposed]

Statement: "Permanent meteorological towers, transmission towers, and other facility structures should be designed so that they cannot be used for perching or nesting by birds." [5.9.5.2.1]

- Comment: Developers cannot guarantee that no perching or nesting will occur on any structures in a project. For example, developers cannot prevent perching or nesting on an O&M building.

- Recommendation: "Permanent meteorological towers *and wind turbines* should be designed to *minimize the potential for perching and nesting by raptors, to the extent practicable. Overhead distribution lines should conform to the recommendations of the Avian Power Line Interaction Committee (APLIC) in its Suggested Practices for Raptor Protection on Power Lines (1996)."* [Emphasis indicates additional language proposed]

Statement: "Turbines and other project facilities should not be located in areas with known high bird usage; in known bird and/or bat migration corridors or known flight paths; near raptor nest sites; and in areas used by bats as colonial hibernation, breeding, and maternity/nursery colonies." [5.9.5.2.1]

- Comment: Scientifically-based avian and bat studies and evaluation of proposed project sites can identify sites that pose a significant risk to avian and bat species of concern. There are many existing wind projects that do not experience high rates of avian or bat mortality but are near areas with known high bird usage; in known bird and/or bat migration corridors or known flight paths; near raptor nest

4

CW0000006289

sites; and in areas used by bats as colonial hibernation, breeding, and maternity/nursery colonies.

- <u>Recommendation</u>: "Turbines and other project facilities should not be located in areas with known high bird usage; in known bird and/or bat migration corridors or known flight paths; near raptor nest sites; and in areas used by bats as colonial hibernation, breeding, and maternity/nursery colonies, *if site studies indicate that they would pose a high risk to species of concern.*" [Emphasis indicates additional language proposed]

<u>Statement</u>: "Buffer zones should be established around raptor nests, bat roosts, and biota and habitats of concern." [5.9.5.3.2]

- <u>Comment</u>: Scientifically-based avian and bat studies and evaluation of proposed project sites can identify sites that pose a significant risk to avian and bat species of concern. There are many existing wind projects that do not experience high rates of avian or bat mortality but are near raptor nests, bat roosts, or biota or habitats of concern.

- <u>Recommendation</u>: "Buffer zones should be established around raptor nests, bat roosts, and biota and habitats of concern *if the proposed turbines and other project facilities are shown to pose a significant risk to avian or bat species of concern.*" [Emphasis indicates additional language proposed]

<u>Statement</u>: "Higher-height vegetation should be encouraged along transmission corridors to minimize foraging in those areas by raptors." [5.9.5.4.3]

- <u>Comment</u>: This language appears to be specific only to the Altamont Pass Wind Resource Area and not applicable to wind projects in other locations. Additionally, there are other concerns, such as public safety (e.g. fire hazard) and maintenance issues that conflict with this recommendation.

- <u>Recommendation</u>: Delete this statement.

<u>Statement</u>: "Biota protected by state statutes should be relocated." [5.9.5.6]

- <u>Comment</u>: This statement is too broad. Biota means all the plant and animal life of a particular region. If plants protected by state statutes will be unavoidably impacted by the proposed turbines or other project facilities, one possible means of mitigating the impact is to relocate the impacted plants to another location, but relocation may not always be the best or most practical choice for mitigation. State law will dictate the preferred means of protecting biota protected under state statutes.

CW0000006290

- Recommendation: Delete this statement.


**Sound**

Statement: "Proponents of a wind energy development project should take measurements to assess the existing background noise levels at a given site and compare them with the anticipated noise levels associated with the proposed project." [2.2.3.2.2; 5.5.5]

- Comment: Project proponents should be required to comply with applicable state and local noise regulations. Most noise regulations do not require measurements of background noise levels prior to installation of the project. In many cases, there will not be any sensitive receptors close enough to the proposed turbines to hear the wind turbine noise, so these measurements will serve no useful purpose.

- Recommendation: Replace this statement with the following: "If there are residences, hospitals, retirement facilities, churches or other sensitive noise receptors within 1 mile of the proposed wind turbines, then project proponents should model the expected noise levels at the nearest receptor to ensure compliance with state and local noise standards applicable to the project."


Section: Low-Frequency Sound [3.3.5]

- Comment: A critical survey of published measurement results of infrasound from wind turbines concludes that wind turbines with the rotor located upwind of the tower produce only very low levels of infrasound [See reference below]. Even measured quite close to these turbines the infrasound level was found to be far below relevant assessment criteria, including the limit of human perception. In the evaluation of the environmental impact of wind turbines, such low infrasound levels are not significant.
  Reference:
  - Jørgen Jakobsen, Danish Environmental Protection Agency, **Infrasound Emission from Wind Turbines**, 11th International Meeting On Low Frequency Noise and Vibration and its Control, Maastricht, The Netherlands, 30 August to 1 September 2004.

- Comment: Wind turbines with a downwind rotor generate considerably higher infrasound levels, which may violate relevant assessment criteria in distances up to several hundred meters. At greater distances the infrasound level drops below these criteria, and experts have questioned whether the infrasound can be the cause of reported negative public reactions to large downwind turbines.
  Reference:

6

CW0000006291

- Jørgen Jakobsen, Danish Environmental Protection Agency, **Infrasound Emission from Wind Turbines,** 11th International Meeting On Low Frequency Noise and Vibration and its Control, Maastricht, The Netherlands, 30 August to 1 September 2004.

- Comment: Dr. Geoff Leventhall, noted acoustical expert and author of "A Review of Published Research on Low Frequency Noise and its Effects," has commented on the effects of low-frequency noise from wind turbines, as follows: "There is only a relatively small amount of low-frequency noise from wind farms, where low-frequency noise is taken to mean 10 Hz to about 200 Hz. The noise is mainly mechanical, and gear related. Considering infrasound as below 20 Hz, there is very little from wind turbines. You have to distinguish between what is technically interesting and what is relevant to subjective effects. Available information shows that infrasound levels at approximately 100 meters from a turbine rise to 60 to 70 dB at 10Hz, where the average hearing threshold is nearly 100 dB. I really do not expect infrasound from modern wind turbines to be an issue, but because of the publicity which has been given to low frequency noise, we have to take this on board in order to find out the true facts".
    References:
    - Bastasch, Mark. **Revising Oregon's Noise Regulations for Wind Turbines.** NOISE-CON 2004. Baltimore, Maryland. July 12-14, 2004.

- Comment: This section appears to be based on an older installations of downwind machines. It references subjective criteria and 'complaints'. This section is alarming and unnecessary given that *all modern turbines are upwind.*

- Recommendation: Modify this section to reflect the comments above.

Statement: "The human response to changes in decibel levels has the following characteristics (NWCC 1998): A 3-dB change in sound level is considered a barely noticeable difference; A 5-dB change in sound level will typically result in a noticeable community response; and, A 10-dB change, which is generally considered to be a doubling of the sound level, almost certainly causes an adverse community response." [4.5.1]

- Comment: This statement is overbroad and lacks context when applied to a wind project. At many project sites on BLM-administered lands, large fluctuations in broadband wind noise will be common, and an increase from 20 to 30 dB or even 30 to 40 dB would not likely be objectionable to the community.

- Recommendation: Delete this statement.

Statement: "Proponents of a wind energy development project should take measurements to assess the existing background noise levels at a given site and

CW0000006292

compare them with the anticipated noise levels associated with the proposed project (Section 4.5.2)." [5.5.5]

- Comment: Project proponents should be required to comply with applicable state and local noise regulations. Most noise regulations do not require measurements of background noise levels prior to installation of the project. In many cases, there will not be any sensitive receptors close enough to the proposed turbines to hear the wind turbine noise, so these measurements will serve no useful purpose.

- Recommendation: Replace this statement with the following: "If there are residences, hospitals, retirement facilities, churches or other sensitive noise receptors within 1 mile of the proposed wind turbines, then project proponents should model the expected noise levels at the nearest receptor to ensure compliance with state and local noise standards applicable to the project."

Statement: "Noisy activities should be scheduled to occur at the same time since additional sources of noise generally do not add a significant amount of noise." [5.5.5]

- Comment: It may be appropriate to include the time-of-day restrictions on noisy activities, but this statement implies that all blasting must be done at the same time, which is impractical and would significantly increase the amount of noise.

- Recommendation: Delete this statement.

**Visual**

Statement: "Turbine arrays and the turbine design should be integrated into the surrounding landscape. To accomplish this integration, several elements of design need to be incorporated." [5.11.6]

- Comment: This statement would be difficult or impossible to comply with in many cases. Turbine placement is usually not flexible, as the turbines must be located where they will operate most effectively, and changes in placement often substantially impact performance. Further, turbine placement, design and integration should not be implemented to the detriment of other environmental considerations and may not be economically viable.

- Recommendation: This statement should be deleted.

Statement: "The operator should avoid placement of ancillary structures on high land features and along "skylines". [5.11.6]

CW0000006293

- Comment: This statement is too broad. There is often no practical alternative to placing ancillary structures on high land features and along "skylines".

- Recommendation: "*To the extent practicable,* the operator should avoid placement of *substations or large operations buildings* on high land features and along 'skylines' *that are visible from nearby sensitive view points.*" [Emphasis indicates additional language proposed]

Statement: "The operator should bury power collection cables or lines on site." [5.11.6]

- Comment: It may be impracticable to bury power collection cables or lines where blasting is the only commercially reasonable method of burying the power line, or where the power line crosses a road, railroad, pipeline, power line, ravine, flowing water, wetland, or location that has plant species of concern.

- Recommendation: "*If practicable,* the project proponent should bury power collection cables or lines on site *unless burial would result in increased impacts or would violate applicable law.*" [Emphasis indicates additional language proposed]

## Noxious Weeds

Statement: "...the cleaning of vehicles prior to arrival at a location to avoid the introduction of invasive weeds should be required." [2.2.3.2.2]

- Comment: It is impracticable and unnecessary to clean every vehicle prior to its arrival at the project location.

- Recommendation: Replace this statement with the following: "Comply with federal, state, and local noxious weed control regulations. Provide a 'clean vehicle policy' while entering and leaving construction areas to prevent transport of noxious weed plants and/or seed."

## Hazardous Materials and Waste Management [Section 2.2.3.2.2]

- Comment: It should be sufficient for the BLM to require that an operator comply with all applicable state and federal hazardous materials and waste management laws.

9

- Recommendation: Replace this section with the following: "A wind project operator must develop a spill prevention and response plan and a stormwater pollution plan, if applicable, in compliance with federal and state law."

## Safety

Statement: " the health and safety program should establish a safety zone or setback from residences, roads, and other public access areas that is sufficient to prevent accidents resulting from various hazards." [2.2.3.2.2]

- Comment: The public has access to much of the land managed by the BLM. The inclusion of "other public access areas" is a vague term that could be interpreted to cover vast areas not appropriate to protect public safety.

- Recommendation: " the health and safety program should establish a safety zone or setback *for wind turbine generators* from residences *and occupied buildings*, roads, *railroad rights-of-way, transmission corridors and above-ground pipelines* that is sufficient to prevent accidents resulting from *the operation of wind turbine generators*." [Emphasis indicates additional language proposed]

Statement: "The project should be designed to establish a sufficient setback from turbines to the nearest residence to reduce EMF, shadow flicker, and exposure to low-frequency sound emissions. A minimum setback distance of 10 rotor diameters is recommended to reduce shadow flicker (Burton et al. 2001) and may be sufficient for EMF and low frequency sound." [5.8.2 Public Safety, (pg 5-34)]

- Comment: A 10 rotor diameter setback is excessive and unnecessary to address the issues of EMF, shadow flicker and low frequency sound, as discussed elsewhere in these comments.

- Recommendation: Delete the 10 rotor diameter setback recommendation and replace these statements with the following: "If operation of the wind turbines is expected to cause significant adverse impacts to nearby residences and occupied buildings from shadow flicker or low frequency sound, site specific recommendations for addressing these concerns should be incorporated into the project design."

## Shadow Flicker

Statement: "A minimum distance of 10 rotor diameters is recommended to reduce shadow flicker " [2.2.3.2.2]

CW0000006295

- <u>Comment</u>: A 10 rotor diameter setback to reduce shadow flicker is not based on any objective criteria. Shadow flicker at potential receptors depends on a number of different criteria including sun-angle, vegetative cover (or other landscape features), and topography. At distances of greater than 1000 feet between wind turbines and potential receptors, shadow flicker only occurs at sunrise or sunset when the shadows from moving turbine blades are sufficiently long, and generally for only a small number of hours per year. Shadow flicker can be prevented by switching on lights in an affected room, by covering a window with curtains, blinds or shutters, or by screening windows and/or receptors with trees, shrubs, fences or similar objects.

- <u>Comment</u>: There are no documented human or animal health impacts associated with shadow flicker. The shadow flicker frequency from modern wind turbines varies, but is generally between 0.6 to 1.0 Hz (less than 1 alternation per second), whereas the Epilepsy Foundation states that frequencies below 10 Hz are not likely to trigger photosensitive epilepsy seizures.

- <u>Recommendation</u>: Delete the 10 rotor diameter setback for shadow flicker or modify it to reflect the comments above.


## Lighting

<u>Statement</u>: "Additional warning information may also need to be conveyed to aircraft with onboard radar systems so that echoes from wind turbines can be quickly recognized." [2.2.3.2.4; 5.8.2] " the FAA should be consulted so that only white strobe lights with a minimum number of flashes per minute are used." [pg 5-65]

- <u>Comment</u>: The Federal Aviation Administration (FAA) is responsible for determining hazards to aircraft and air traffic, and for making lighting determinations. Recommendations such as this should be left to the appropriate agency, the FAA. The FAA is currently considering revisions to its wind power project lighting guidelines, and wind project developers should comply with the FAA's guidelines.

- <u>Recommendation</u>: Replace these statements with the following: "Projects must comply with applicable requirements of the FAA."


## Site Construction Activities

<u>Statement</u>: "All electrical collector lines should be buried adjacent to roads, unless it is necessary to install surface lines to avoid further habitat disturbance." [2.2.3.2.3]

11

CW0000006296

- <u>Comment</u>: If the environmental impacts associated with an above-ground electrical collector line (including avian impacts) are not expected to be significant, then above-ground lines should be a viable option. Additionally, it is sometimes not practical to bury the lines adjacent to roads. For example, if the road is on one side of a string of turbines and the transformers are located on the other side (to minimize the risk of a vehicle hitting a transformer, which itself could have adverse environmental impacts), then it may be more practical to bury the electrical collector line on the transformer side of the turbine string instead of next to the road.

- <u>Recommendation</u>: This comment should be deleted or modified to reflect the comment above.

<u>Statement</u>: "The footprints of substations are expected to be 1 acre (0.4 ha) or less in size " [3.1.2.4]

- <u>Comment</u>: Expected substation size may be more than 2 acres.

- <u>Recommendation</u>: Change this phrase to read "to be 5 acres or less in size."

<u>Statement</u>: "Because most towers are equipped with lifting devices of sufficient capacity to lower or raise individual drivetrain components, a crane should not be needed for such component replacements." [3.1.3]

- <u>Comment</u>: Many drivetrain components will require a separate crane.

- <u>Recommendation</u>: Delete this sentence.

**Regulatory Requirements**

<u>Statement</u>: "This section identifies the major laws, regulations, executive orders (E.O.s), compliance instruments, and policies that may impose environmental protection and compliance requirements on site monitoring and testing, construction, operation, and decommissioning phases of a wind energy project on BLM-administered land." [3.2]

- <u>Comment</u>: It would be beneficial to affirm that not all of the regulations listed apply to all wind projects.

- <u>Recommendation</u>: Add the following sentence after this statement: "This list of laws and regulations may not apply to every wind project."

CW0000006297

Statement: "Appendix E lists the relevant federal and state statutory authorities that establish permits, approvals, or consultations with which a wind energy project must comply." [3.2]

- Comment: See previous comment.

- Recommendation: "Appendix E lists the relevant federal and state statutory authorities that establish permits, approvals, or consultations with which a wind energy project must comply, *where applicable.*" [Emphasis indicates additional language proposed]

Statement: "Also, the construction of a wind energy project may be required to consider impacts on local populations, including E.O. 12898, 'Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations' (U.S. President 1994), and E.O. 13045, "Protection of Children from Environmental Health Risks and Safety Risks" (U.S. President 1997). Certain states may have specific requirements with regard to nuisances, including Arizona (Environmental Nuisances [Arizona Revised Statutes (ARS) 49-141 et seq.] and Light Pollution [ARS 49-1101 et seq.]) and New Mexico (Night Sky Protection Act [74-12-1 New Mexico Statutes Annotated (NMSA) 1978 et seq.])." [3.2]

- Comment: These E.O.s and statutes may not apply to wind projects. In any event, it ought to be recognized that (1) wind projects must be sited where there is an adequate wind resource and transmission access, which is often in rural areas that may have a significant minority population and low-income population, (2) wind projects pose few if any environmental health risks or safety risks to the local community, and (3) wind projects provide significant economic benefits to the community in the form of jobs, tax revenues for public schools and hospitals, and additional income for landowners which often include small farmers and ranchers.

- Recommendation: Modify this statement to reflect the comment above.

Statement: "*Land use.* Depending on the location of a proposed wind energy project, special land use determinations may need to be made, particularly if the project is to be sited in or would impact special or protected areas." [3.2]

- Comment: The term "special" used in this section is unclear.

- Recommendation: Add a definition of "special" as used in this context, require the BLM Field Office to identify "special" areas in local land use plans, or delete this statement.

13

Statement: "*Floodplains and wetlands.* While turbines would not be located in wetland areas or adjacent to other water bodies " [3.2]

- Comment: Turbines located in wetland areas or adjacent to other water bodies may be subject to separate legal requirements.

- Recommendation: Replace this statement with the following: "Project facilities may sometimes be located in wetland areas or adjacent to other water bodies, and these facilities should comply with statutory requirements and associated regulations established by the Army Corps of Engineers if applicable."

## Voltage Flicker [3.3.7]

- Comment: Voltage flicker or stability is not an environmental issue.

- Recommendation: This section should be deleted.

## Water

Statement: "Culverts of adequate size to accommodate the runoff of a 25- and 100- year storm for temporary and permanent roads, respectively, should be used when constructing stream or wash crossings." [5.3.5]

- Comment: The requirement to design stream and wash crossings for 25- and 100-year storms is appropriate for urban areas, not the rural settings where wind projects are generally located.

- Recommendation: Replace this statement with the following: "When constructing stream or wash crossings, culverts or water conveyances for temporary and permanent roads should be designed to comply with county standards, or, if there are no county standards, to accommodate the runoff of a 10-year storm."

## Electromagnetic Fields (EMF)

Statement: "A health and safety program should be developed to protect workers during construction, operation, and decommissioning of a wind energy project. The program should identify all applicable federal and state occupational safety standards, establish safe work practices for each task (e.g., requirements for personal protective equipment and safety harnesses; OSHA standard practices for safe use of explosives and blasting agents; measures for reducing occupational EMF exposures),   " [5.8.1]

14

CW0000006299

Statement: "Measures should be considered to reduce occupational EMF exposures, such as backing the generator with iron to block EMF, shutting down the generator when working in the vicinity, and/or limiting exposure time while the generator is running (Robichaud 2004)." [5.8.1]

Statement: "These hazards include risks associated with major construction sites, rare tower failures, human-caused fire, EMF exposure, aviation safety interference, EMI, low-frequency sound, and shadow flicker." [5.8.2]

- Comment:  Numerous studies have shown that EMF does not present a significant public health risk, even to workers who experience relatively high exposure levels.  Further, most government agencies that have studied this issue have not proposed safety standards for cancer, leukemia or similar health risks allegedly attributable to worker exposure to EMF.  For example, the National Institute for Occupational Safety and Health (NIOSH) and other government agencies do not consider EMF a proven health hazard (see http://www.cdc.gov/niosh/emf2.html).  Examples of the research results are available at http://www.powerlinefacts.com/Steering%20Committee%20Informaton%20Hearing/Expert%20Testimony/Valberg%20testimony.htm

- Recommendation: Modify these sections to reflect the comment above.


**Electromagnetic Interference (EMI)**

Statement: "These hazards include risks associated with major construction sites, rare tower failures, human-caused fire, EMF exposure, aviation safety interference, EMI, low-frequency sound, and shadow flicker." [5.8.2]

- Comment:  No specific standards exist for wind turbine generators with regard to EMI, though the standards contained in FCC Rules, Title 47, Chapter 1, Part 15 establish criteria for emissions from many electronic devices.  These rules establish that devices may not produce "Harmful Interference", defined as "Any emission, radiation or induction that endangers the functioning of a radio navigation service or other safety services or seriously degrades, obstructs or repeatedly interrupts a radio communications service operating in accordance with this chapter".  This language should state that EMI levels from wind projects should conform to the federal standards contained in FCC Rules, Title 47, Chapter 1, Part 15.

- Recommendation:  Require that wind projects comply with FCC rules (defined above), if applicable.

15

CW0000006300

**Agency Consultation and Coordination (Section 7.4)**

- <u>Comment</u>: This section of the PEIS indicates that BLM will be consulting with the U.S. Fish & Wildlife Service (USFWS) in accordance with the requirements of Section 7 of the ESA.

- <u>Recommendation</u>:  Assuming that the BLM receives a programmatic Biological Opinion (BO), the BO should contain language allowing site-specific BOs to tier off of the programmatic BO and allow for an expedited consultation schedule with flexibility in the amount of data needed.  The BLM has requested the option for such expedited Section 7 consultation in other programmatic consultations with the USFWS.

16

CW0000006301

**46**

CW0000006302

April 22, 2002


CERTIFICATE OF THE SECRETARY OF ENVIRONMENTAL AFFAIRS
ON THE
ENVIRONMENTAL NOTIFICATION FORM


PROJECT NAME            : Cape Wind Project
PROJECT MUNICIPALITY    : Barnstable, Yarmouth, and Federal
                          Waters of Nantucket Sound
PROJECT WATERSHED       : Cape & Islands
EOEA NUMBER             : 12643
PROJECT PROPONENT       : Cape Wind Associates LLC
DATE NOTICED IN MONITOR : November 24, 2001


Pursuant to the Massachusetts Environmental Policy Act (G. L.
c. 30, ss. 61-62H) and Section 11.03 of the MEPA regulations
(301 CMR 11.00), I hereby determine that this project **requires**
the preparation of an Environmental Impact Report (EIR).

<u>INTRODUCTION</u>

<u>Project Description</u>

As described in the Environmental Notification Form (ENF), the
proposed project involves the development of 170 Wind Turbine
Generators (WTGs) on a grid over approximately 26 square miles
of sub-tidal area in Nantucket Sound known as Horseshoe
Shoals[1].  The project will generate up to 420 megawatts (MW)
of electricity.  As currently proposed, each WTG will be 263
feet above mean sea level, with a total height up to 423 feet

---

1 The proponent has also proposed an individual data collection tower for the preferred project area.
This tower is located outside of Massachusetts waters and requires no cable connection to the mainland.
 The data tower project is not subject to MEPA.  I therefore will not address issues with the data
collection tower in this scope.  I note that the Massachusetts Office of Coastal Zone Management ("CZM")
is reviewing the data tower project under its federal Consistency Review authority.

CW0000006303

above mean sea level when rotor systems reach maximum height.

The project also involves development of submarine cables for interconnection of the WTGs; an elevated electric service platform; and placement of two 115 KV submarine and underground cables providing the interconnection of the WTG array to existing NSTAR transmission lines on Cape Cod.  The underground cables and portions of the submarine cables are located within Massachusetts or in the waters of the Commonwealth.  The WTG array itself is located in federal waters outside the Territorial Sea (but within the contiguous zone).

Purpose of MEPA Review

This project represents one of the most ambitious offshore renewable energy projects ever proposed anywhere in the world. It holds out the promise of making Massachusetts a worldwide leader in offshore renewable energy production.  Symbolically and substantively, it is an important step away from our society's crippling dependence on fossil fuels, with all their attendant environmental, social, economic, and political costs.  The project would also fulfill a major purpose of the Commonwealth's Electric Utility Industry Restructuring Act (Chapter 164 of the Acts of 1997), which is designed in part to encourage the development of locally produced renewable energy and energy technologies.  The project represents the hope for a cleaner and more sustainable energy supply through application of innovative and simple technology.  It is my hope that future generations will look back at our decisions at this time as the beginning of a revolution in energy production and use in the Commonwealth.  I wish to make it quite clear from the very beginning of the environmental review that this office strongly supports the goal of environmentally sensitive renewable energy.

Nonetheless, no matter how worthy a potential project may be, MEPA imposes a requirement on project proponents to understand and fully disclose the potential impacts of a project, both positive and negative; to study feasible alternatives to a project; and to avoid, reduce, or mitigate environmental impacts to the maximum extent feasible.  I intend to conduct a rigorous review of environmental impacts, as laid out in this Certificate. Given the unprecedented nature and scope of the project, it is imperative that the EIR present alternatives

CW0000006304

EOEA#12643            ENF Certificate            04/22/02

and analyze impacts in a straightforward, transparent manner. As Secretary of Environmental Affairs, I have a duty to ensure that that the MPEA review lays the foundations for a project that is well-planned, well-studied, and well-executed.

By any reckoning, the proposed project has generated significant public interest. Among them, the U.S. Army Corps of Engineers, the Executive Office of Environmental Affairs, and the Cape Cod Commission ("CCC") have held four well-attended formal scoping sessions, as well as informal meetings and two site visits. Few projects in the history of the MEPA program have generated so much written commentary. I have received thousands of letters and e-mails regarding the Cape Wind Project.

Many commenters have written in support and urge expedited approval on clean air and public policy grounds, while others have stated opposition and requested that I deny the project because of potential impacts on Nantucket Sound. Under MEPA, I do not have the authority to approve or deny the project. As part of the MEPA process, I will not make substantive judgments as to the proposed use of Horseshoe Shoals, nor can I act as an agent of appeal or affirmation of federal land use decisions. MEPA is not a zoning process, nor is it a permitting process. Rather, it is a process designed to ensure public participation in the state environmental permitting process, to ensure that state permitting agencies have adequate information on which to base their permit decisions and their Section 61 Findings, and to ensure that potential environmental impacts are described fully and avoided, minimized, and mitigated to the maximum feasible extent.

<u>JURISDICTION AND PROCESS</u>

<u>Required Permits and MEPA Jurisdiction</u>

The project is undergoing review pursuant to Section 11.03 (7)(b)(4) of the MEPA regulations, because the project involves development of a new electric transmission line greater than one mile in length with a capacity of 69 or more KV. The portion of the project within Massachusetts will require a 401 Water Quality Certificate and a Chapter 91 License from the Department of Environmental Protection (DEP); approval from the Massachusetts Energy Facilities Siting Board

3

CW0000006305

EOEA#12643            ENF Certificate            04/22/02

(EFSB); a construction permit from the Massachusetts Highway
Department; and an Order of Conditions from the Barnstable and
Yarmouth Conservation Commissions (and hence Superseding
Order(s) from DEP if one or both local Order(s) were
appealed).  In addition, the Massachusetts Coastal Zone
Management Office (CZM) will conduct Federal Consistency
Review of the project, including the portions of the project
located in federal waters.  The project will require a Section
10 permit from the United States Army Corps of Engineers (the
Army Corps is the lead agency in the federal environmental
review).

Because the proponent is not seeking financial assistance from
the Commonwealth for the project, MEPA jurisdiction extends to
those aspects of the project that are within the subject
matter of required or potentially required state permits and
that have the potential to cause significant Damage to the
Environment.  In this case, given the broad scope of the
Chapter 91 and EFSB permits, MEPA jurisdiction effectively
extends to all aspects of the project that are within
Massachusetts.  The MEPA mandatory EIR threshold related to
production of 100 or more MW of electricity does not apply to
the project because the WTG is located outside the
Commonwealth in federal waters.  The portion of the project
subject to MEPA does not meet or exceed any mandatory EIR
thresholds.  Nonetheless, for the reasons discussed elsewhere
in this Certificate, I find that the project has potentially
significant environmental impacts, and I am thus exercising my
discretion in requiring an EIR for the project.

Because MEPA (like the Cape Cod Commission Act) is the product
of state law, not federal law, MEPA review (and by extension
Cape Cod Commission review) technically applies only to those
portions of the project that are located within Massachusetts,
including its territorial waters (generally within 3 miles of
the low water mark of the shore).  I note that the proposed
WTG array is located outside of Massachusetts and, therefore,
is not subject to state regulatory requirements.  CZM has
broader jurisdiction because federal law (pursuant to the
Coastal Zone Management Act) specifically delegates review
authority over projects in federal waters to the Coastal Zone
Management Office of the adjacent coastal state, provided that
the state has a federally approved Coastal Zone Management
Plan.

4

CW0000006306

EOEA#12643            ENF Certificate            04/22/02

Nonetheless, despite the jurisdictional limitations on MEPA
review, the proponent has voluntarily filed (within the
meaning of Section 11.05 (8) of the MEPA regulations) an ENF
to allow MEPA review of the entire project, including the WTG
array. The proponent has also consented to a greatly extended
ENF review period to allow for maximum public input into the
scoping process, and to harmonize the timetables for the state
and federal environmental reviews. I commend the proponent
for these commitments. These commitments ensure that the
impacts of the project will receive full disclosure in the
state and regional review processes, and they ultimately will
facilitate the Consistency Review, as information necessary
for Consistency Review can be developed and refined in the EIR
process.


The state permitting agencies (with the exception of CZM as
described above) must base their permitting decisions and
Section 61 Findings upon the portions of the project within
Massachusetts. Therefore, in the scope below I have required
that the proponent disaggregate the impacts of the project in
the state territorial waters and overland from impacts that
are occurring within federal waters, since the latter
represent the aspects of the project that fall within the
"voluntary" nature of MEPA review but lie outside the scope of
state and local permitting. I have also included a separate
alternatives analysis for state permitting purposes, relating
solely to the cable route and its associated impacts.

Coordinated Review

In an addition to the EIR requirement, the project will
undergo review pursuant to the National Environmental Policy
Act (NEPA) in an Environmental Impact Statement (EIS) and
review by the Cape Cod Commission (CCC) as a Development of
Regional Impact (DRI). The proponent has committed to filing
one set of documents that fulfill the requirements of NEPA,
MEPA, and CCC. Both NEPA and MEPA regulations allow (and
encourage) the preparation of joint EIS/EIR documents. MEPA
and CCC have a formal process for coordinated EIR/DRI review
pursuant to a Memorandum of Understanding between the
agencies. As noted above, I believe coordinated review makes
sense, both in terms of allowing for maximum public and agency
understanding of the project and to ensure that review by
regulatory agencies is as efficient as possible. I therefore

CW0000006307

EOEA#12643            ENF Certificate            04/22/02

hereby allow the preparation of a joint EIS/EIR/DRI for the
proposed project.  I anticipate that the Army Corps will soon
release its scope to guide the preparation of the EIS.  I have
written this Certificate to harmonize the state requirements
with anticipated federal requirements to the maximum feasible
extent.

EIR SCOPE

## General

The EIR should follow the general guidance for outline and
content contained in Section 11.07 of the MEPA regulations as
modified by this Certificate.  Because of the coordinated
review, I will allow the proponent some flexibility in data
presentation. The EIR should contain a copy of each comment
letter received, as listed at the end of this Certificate.
The EIR need not reproduce every form letter; however, the EIR
should include one "template" example of each category of form
letter identified.

## Alternatives

The EIR should include an evaluation of alternative feasible
technologies for generating 420 MW of electricity, as well as
an assessment of alternative locations for the proposed
technology. I have received numerous comments requesting that
the proponent be required to study a "universe" of alternative
technologies and locations (or similar very broad language),
including alternative renewable technologies, some of which
have never been demonstrated to be technically or commercially
feasible.  While I believe a thorough screening analysis is
called for, I do not see the need for an EIR-level
alternatives analysis for the universe of potential
alternatives.  I note that several court cases involving NEPA
have determined that an EIS need not study alternatives that
are "only remote and speculative possibilities," otherwise the
EIS process risks becoming an "exercise of frivolous
boilerplate[2]."  The same principle holds for MEPA review of an
EIR as well.  I am therefore restricting the MEPA alternatives
analysis to those alternatives, discussed below, that meet a
reasonable standard of feasibility.

---

2 See Natural Resources Defense Council v. Morton, 148 U.S. App.D.C. 5, 15-16, 458 F.2d 827, 837-838
(1972) and Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 551 (1978)

CW0000006308

EOEA#12643            ENF Certificate            04/22/02

Clearly, traditional methods of electricity generation are
technically feasible alternatives (as evidenced by my recent
reviews of several large gas-fired power plants on the
Massachusetts mainland).  The viability of gas fired
electricity production is sufficiently demonstrated so as to
warrant inclusion in the alternatives analysis.  Note that I
am not suggesting it is necessarily appropriate to require
selection of a 420 MW gas-fired facility on the mainland as
the preferred alternative, simply that it is appropriate to
study the environmental impacts of such an alternative during
the EIR process.  Furthermore, nothing in this Certificate
should be read to imply that I believe the capacity of the
Massachusetts coast for wind power is limited to the scope of
the current project.  The point of the EIR alternatives
analysis will be to vary the project parameters of reasonable
feasible alternatives to disclose relative impacts so that the
general public and state agencies can be informed of relative
impacts.  (An analysis of feasible alternatives will also
prove necessary for CZM to make a determination regarding
"coastal dependency.")

The EIR should therefore contain a "generic" analysis for a
gas-fired mainland power plant with a capacity of 420 MW, to
determine such parameters as air emissions, water use,
fisheries, avian, visual, and other environmental impacts.
The generic discussion should include a coastal gas-fired
plant as well as an inland gas-fired plant.  For comparative
purposes, the EIR should also briefly discuss the impacts of
an oil-fired 420 MW plant and a coal-fired 420 MW plant.

The EIR should also include a discussion of alternative
locations for a wind facility.  The EIR should contain a
screening analysis of other potential sites (these may be
located in mountainous areas of western Massachusetts,
elsewhere on or off Cape Cod, or in other New England states
and adjacent federal waters).  The EIR should contain
sufficient information to understand why the proponent has
chosen Horseshoe Shoals and why other sites were deemed
infeasible for this particular project.  The EIR should
contain any alternatives necessary for CZM to conduct its
Consistency Review and to determine coastal dependency.  I
recommend that the proponent consult with CZM to determine the
range of alternatives necessary.  The EIR should also include
any alternatives deemed necessary for study by the federal

7

CW0000006309

EOEA#12643            ENF Certificate            04/22/02

government as part of the NEPA review.

The EIR should include an analysis of alternative routes for
the submarine and underground cable for the portion of the
route within Massachusetts or its coastal waters.  This
analysis should assume the proponent's preferred location in
Horseshoe Shoals for the WTG array.  The goal of this analysis
will be to provide relevant information for state permitting
agencies with Section 61 responsibilities for the project.
The analysis should demonstrate that the cable routing
minimizes impacts on benthic resources, water quality,
submerged aquatic vegetation, and the shoreline environment at
the landfall site.  The EIR should also demonstrate that the
overland route generally minimizes impacts, particularly
construction impacts on wetlands and sensitive receptors along
the route.

The EIR should also include any alternatives analysis required
by the 401 Water Quality Certification process, and any other
alternatives analysis required for state permitting purposes.

Permitting and Planning Consistency

The EIR should include a brief discussion of each state permit
or agency action required for the project.  The EIR should
demonstrate that the project could meet any applicable
performance standards.

As noted above and in the comments from legislative
Chairpersons of the Joint Committee on Government Regulations
and the Joint Committee on Energy, the project fulfills an
important goal of the 1997 Electric Utility Industry
Restructuring Act.  The EIR should briefly address the goals
and requirements of this landmark legislation.  The EIR should
also address consistency with other state policies concerning
energy and sustainability, including the provisions of
Executive Order 385 (Planning for Growth).  The EIR should
also discuss consistency with any local or regional open space
or growth plans (I anticipate that the DRI portion of the
coordinated document will fulfill the requirement to analyze
consistency with local/regional plans.)

Environmental Impacts

As noted above, the impacts from the array of WTGs within the

8

CW0000006310

EOEA#12643            ENF Certificate            04/22/02

proponent's preferred location lie outside the boundaries of
the Commonwealth.  I will therefore defer the detailed scoping
of environmental issues associated with the WTG array itself
(e.g., the necessity for detailed mapping of the Horseshoe
Shoals substrate or the use of specific technology to track
bird usage of the area) to the federal government.  However,
the EIR should address the issues outlined below, to the
extent that these issues are not addressed in the federal
scope.  (Of course, the EIR should also address any impacts in
any of the following categories that fall within the
jurisdiction of the Commonwealth, regardless of the
requirements of the federal scope.)

Avian Impacts

The EIR should include a thorough assessment of impacts to
birds. If the proponent prepares a formal risk assessment, any
subjective inputs should be clearly identified and appropriate
sensitivity analyses included.

The ENF claims that impacts to birds from the proponent's
preferred alternative should prove minimal, and that bird use
of the area is low.  However, these conclusions seem
premature, and the EIR should contain much greater analysis to
support the conclusions drawn.  The EIR should focus on
impacts to three categories of birds: migratory songbirds,
wintering seaducks, and rare and endangered birds including
Roseate and Common Terns and Piping Plovers.[3]

There are few operational offshore WTG arrays in the world,
and none nearly the size of the proposed project.  Therefore,
there is a considerable amount of uncertainty in gauging
potential impacts on birds.  It is thus essential that the EIR
present as much pre-construction data as possible on the
spatial and temporal characteristics of avian activity in the
Horseshoe Shoals area.  The EIR should also present enough
information on other alternatives studied to enable a
meaningful comparison of impacts among the alternatives
studied (I recognize that full-scale long-term study of all
potential alternative sites may not prove feasible).

Since the WTG array is located outside of the boundaries of

---

[3] The Roseate Tern is endangered at both the state and federal level.  The Piping Plover is threatened
at both the state and federal level. The Common Tern is a state Species of Special Concern.

9

EOEA#12643          ENF Certificate          04/22/02

Massachusetts, it is highly unlikely that the project would
result in the "take" of a state-listed species within the
meaning of the Massachusetts Endangered Species Act.
Nonetheless, I am concerned about potential impacts to rare
Massachusetts birds.  I note that the EIS will include a
biological assessment for purposes of the federal Endangered
Species Act (ESA).  Since the Common Tern is not a federally
listed species, the ESA assessment may not include impacts to
the Common Tern.  I request that the proponent include a
comparable biological assessment for the Common Tern in the
EIR.

The Massachusetts Audubon Society has noted a particular
concern for heightened mortality from unusual events, such as
storms.  The EIR should develop potential methods of assessing
impacts from such events, and consider a range of management
responses to reduce bird mortality.

The EIR should also assess impacts to birds from lighting of
the WTG array (see below under visual impacts for further
discussion of lighting impacts). The EIR should develop a
monitoring plan to gauge impacts post-construction, and
develop appropriate action thresholds and mitigation if
monitoring reveals a problem.

Fisheries Impacts

The EIR should include an assessment of impacts on fisheries
(both commercial and recreational), with particular focus on
potential impacts to fisheries habitat.  The EIR should also
assess potential indirect impacts caused by changes in water
movement and sediment transport from placement of the WTG
monopiles.  The EIR should disclose whether armoring is
proposed at the base of monopiles, and should evaluate
potential impacts (both positive and negative) from the
introduction of these "artificial reefs" in the Horseshoe
Shoals area.

The EIR should describe existing habitat conditions in
Nantucket Sound, and identify fish species and types expected
to occur in the project area.  The EIR should also describe
the temporal characteristics of the species present (i.e.,
what life stages of the various species are likely to be
encountered, and at what times of year).  The EIR should
evaluate the potential impacts of the WTG array and associated
10

CW0000006312

EOEA#12643            ENF Certificate            04/22/02

cables (construction, operation, and maintenance) on benthic
habitat and species composition and relative abundance in the
project area.  This analysis should include any impacts
related to specific life stages of effected species.

Visual

The visual impacts of the project have been mentioned more
than any other issue among comments received in opposition.
Even many comments strongly supportive of the project
recognize the change in the appearance of Nantucket Sound if
the project proceeds at the proposed location. (Whether the
WTG array will be beautiful or ugly has been hotly debated,
but such a subjective issue lies beyond the scope of the
environmental review process.)

The ENF includes visual projections from several vantage
points on the Cape and Islands.  The Massachusetts Historical
Commission (MHC) has identified numerous historic resources
within the project viewshed.  The resources are sufficiently
well spaced and geographically representative of the project
area as a whole such that analyzing the visual impacts on
historic resources will capture a good sense of the overall
visual impacts of the project.  Therefore, the EIR should
include a visual assessment (including additional computer-
generated photographic simulations) for the locations
specified in the MHC comment letter, including:

> ? The Cotuit, Wianno, Centerville, Craigville, and
>   Hyannis Port districts in Barnstable
> ? The South Yarmouth/Bass River Historic District
>   in Yarmouth
> ? Monomoy Point Light in Chatham
> ? Edgartown Village Historic District, Cape Pogue
>   Light, and Edgartown Harbor Lighthouse in
>   Edgartown
> ? Martha's Vineyard Campground Historic district
>   and East Chop in Oak Bluffs
> ? Nantucket Island National Historic Landmark,
>   including Nantucket Village, Crooked Record,
>   Monomoy and Wocuwinet areas, and the Nantucket
>   Cliffs
> ? Tuckernuck Island

11

CW0000006313

EOEA#12643            ENF Certificate            04/22/02

In the case of historic districts, the EIR need not analyze
visual impacts from every individual property within the
district, but should select a representative site within the
district that has an unobstructed view of the WTG array
relative to the other properties in the district.  For
districts and individual properties with frontage along the
water, the simulations should occur as viewed from the water's
edge looking toward the WTG array.

The EIR should also include an analysis of visual impacts from
lighting.  The EIR should discuss any federal lighting
requirements (particularly requirements of the Federal
Aviation Administration and United States Coast Guard).  The
EIR should also discuss whether any flexibility exists in
terms of lighting colors, intensity, orientation, and/or flash
frequency and duration.  The EIR should evaluate any trade-
offs between safety considerations and visual impacts on
Massachusetts landforms (as well as impacts on birds, per the
above discussion).

Noise

The EIR should include an analysis of noise impacts from the
project.  The EIR should analyze whether noise from the
project (as measured on the A-weighted scale and by octave
bands) will be measurable above background noise from the
nearest representative locations along the south coast of
Barnstable and Yarmouth and the east coast of the Vineyard.
The EIR should also model noise impacts as measured from the
base of the monopiles. For informational purposes, the EIR
should also address the ability of the project to meet the
performance standards contained in the DEP Noise Policy (DAQC
Policy 90-001).

The EIR should also evaluate the potential impacts of
underwater noise and vibrations from the WTG array, with
analysis of potential biological and ecological effects from a
change in the noise environment.

Rare Species

In addition to potentially effecting rare birds, the project
may have impacts on the habitat of the Grey Seal, a state
Species of Special Concern.  The EIR should discuss potential
impacts on the Grey Seal, and any other potential impacts on

12

CW0000006314

EOEA#12643            ENF Certificate            04/22/02

marine mammals, including the several species of state-
endangered and federally-endangered whales known to transit
Nantucket Sound.

## Land Alteration

The EIR should quantify the amount of land disturbed, both
land under water/salt marsh and uplands/inland wetlands.  The
EIR should discuss the resources present in lands proposed for
alteration, including benthic resources, archaeological
resources, and vegetation.

## Wetlands/Drainage

The EIR should include a reasonably scaled map that delineates
wetland boundaries and buffer zones present in the project
area. The plans should also note any applicable local buffer
zone requirements.  The EIR should explain the significance of
each wetland area to the interests enumerated in the Wetlands
Protection Act.  For each alternative, the EIR should quantify
the amount of direct wetland alterations proposed.  Eelgrass
beds are present in Lewis Bay near the proposed cable route.
The EIR should include a demonstration that the proposed
routing avoids or minimizes impacts to eelgrass beds and other
submerged aquatic vegetation.

## Water Quality

The EIR should address the water quality impacts of the
project, including impacts from the proposed jet plow method
of embedding the submarine cables.  The EIR should also
discuss impacts at the land fall site, and maximize the use of
horizontal directional drilling in this area to minimize
impacts.  The EIR should also address any informational
requirements of the Water Quality Certification process.

## Chapter 91/Public Trust

The EIR should include an analysis of the project impacts on
lands subject to the Massachusetts Public Trust Doctrine.  The
document should discuss potential impacts on navigation and

anchorage within the state Territorial Sea, and should discuss
any impacts on public access to Chapter 91 lands.

CW0000006315

EOEA#12643              ENF Certificate              04/22/02

The submarine cables qualify as an infrastructure crossing
facility under the state Waterways Regulations.  DEP must
consider an infrastructure crossing to be non-water dependent
(and thus categorically prohibited) under the Waterways
Regulations unless I make a determination, as part of the EIR
review, that the cable cannot reasonably be located or
operated away from tidal or inland waters (see 310 C.M.R.
9.12(2)(d)).  The EIR should therefore include sufficient
information for me to make a determination pursuant to the
applicable regulations.

The EIR should also discuss any federal public trust
implications of the project.  The EIR should include
discussion of impacts to recreational/commercial fishing and
boating, and public access in general, in the area proposed
for the WTG array.

Federal Consistency

As noted above, CZM jurisdiction extends over all aspects of
the project.  The EIR should address the concerns of CZM, and
provide sufficient information to facilitate the federal
Consistency Review.  The EIR should also address the
applicable specific policies of the Massachusetts Coastal Zone
Management Plan, including: Energy Policy #1; Habitat Policy
#1; Coastal Hazard Policies #1 and #2; Ports Policy #3; Public
Access Policy #1; Ocean Resources policies #1, #2, and #3; and
Growth Management Principle #1.

Historic/Archaeological Impacts

As noted above under visual impacts, the EIR should assess
visual impacts on the various historic districts and
properties identified by MHC in the project viewshed.  In
addition, the EIR should evaluate any impacts on historic
resources along the overland cable route.

Underwater areas of the proponent's preferred project area
(and potentially some alternative areas) have high sensitivity
for archaeological resources.  The EIR should analyze
potential impacts on underwater archaeological resources (both
shipwrecks and now-submerged prehistoric cultural artifacts).
 I strongly recommend that the proponent consult with MHC and
the Massachusetts Board of Underwater Archaeological Resources
to develop an appropriate scope for these studies.
                            14

CW0000006316

EOEA#12643             ENF Certificate             04/22/02

Decommissioning Plan

The EIR should include a plan to remove the turbines, towers,
cables, and other infrastructure in the event that the project
ceases operation.  The EIR should discuss the funding
mechanism for the decommissioning plan, and should outline the
steps that would be taken to ensure minimization of
environmental impacts during removal of structures.

Construction Period

The EIR should include an analysis of construction period
impacts, including impacts at the landfall site and impacts
associated with the proposed jetplow trenching method.  The
EIR should address construction impacts from the overland
route as well, and address any concerns of the Massachusetts
Highway Department for the work done within the state highway
layout.

Comprehensive Environmental Monitoring Program

Given the project's uniqueness, a considerable degree of
uncertainty exists surrounding project impacts post-
construction. To obtain meaningful data on impacts (and to aid
in potential future environmental reviews of offshore WTG
arrays both here and elsewhere), the EIR should outline a
Comprehensive Environmental Monitoring Program (CEMP).  For a
good recent example of the structure and goals of a CEMP, I
note the ongoing development of a CEMP for the
Maritimes/Hubline Project (EOEA #12355).

Comments and Circulation

The EIR should include a copy of each comment received.  The
EIR need not reproduce every form letter, but should include
one "template" from each form letter category noted below.
The EIR should respond to the substantive comments received,
including the substantive issues raised in the form letters.
The proponent should circulate a hard copy of the EIR to each
state agency from which the proponent will seek permits or
approvals.  The proponent should also circulate a copy of the
EIR to those submitting individual written comments, as listed
below.

15

CW0000006317

EOEA#12643             ENF Certificate              04/22/02

To save paper and other resources, I will allow the proponent
to circulate the EIR in CD-ROM format to individual
commenters, although the proponent should make available a
reasonable number of hard copies available on a first come,
first served basis, to accommodate those without convenient
access to a computer.  I do not consider those who submitted
form letters to be "commenters" within the meaning of Section
11.16(3) of the MEPA regulations.  Nevertheless, in the
interest of broad public dissemination of information, the
proponent should send a notice of availability of the EIR
(including relevant comment deadlines, locations where hard
copies may be reviewed and electronic copies obtained, and
appropriate addresses) to those who submitted form letters, if
(e-mail) addresses are available.  This notification may take
the form of electronic notification, as most form letters were
submitted via e-mail.

Mitigation

The EIR should include a summary of all mitigation measures to
which the proponent has committed.  The mitigation summary
should serve to form the basis of the proposed Section 61
Finding to be presented in the Final EIR.


_ April 22, 2002 _              _____

        Date                        Bob Durand

[list of commenters deleted]

BAD/ASP/asp

16

CW0000006318

**47**

CW0000006319



### MINERALS MANAGEMENT SERVICE
**International Activities and Marine Minerals Division**
**381 Elden Street, Mail Stop 4030**
**Herndon, Virginia 20170-4817**
**Tel: 703-787-1300**
**Fax: 703-787-1284**
**Email: barry.drucker@mms.gov**

## NOTE

**Date:** March 20, 2002

**To:** Karen Adams

**From:** Barry Drucker

**Subject:** Windfarm Project Purpose and Need

I have reviewed the project purpose and need material for the proposed Windfarm project faxed to me by Brian Valiton and offer the following comments and observations:

The information presented for the project purpose and need, as of now, reads like an advertisement for the Windfarm project. In fact, it almost sounds like an endorsement for the project. This is not the place to present a justification for putting a Windfarm in-place. In fact, some of the items mentioned in the first paragraph are impact-producing factors which will be evaluated in the EIS itself (air quality effects, greenhouse gases, etc.)

The purpose and need statements do not have to be long. In fact, they should be short, concise, and to-the-point. The 3rd paragraph within the quoted portion contains the kind of information that should form the basis for the project purpose statement. It should describe what the applicants want to do, why they want to do it offshore, and at least give some indication of the magnitude of the project.

The need should address what is seen as the need for the power generated by the proposal, either based on a shortfall in local supplies, or in the fact that power is expensive in the area and this would make it available to customers for less, or to more customers who can't afford it now.

The proceeding task of identifying and scoping out the alternatives should be carried out with caution. It is important to remember that the range of alternatives and the purpose and need statement are relative to each other. The purpose and need should not be modified such as to be so narrowly defined that one alternative, an endorsement of the project, is the only alternative besides the no-action presented.

CW0000006320



If you have any questions concerning these comments, please do not hesitate to contact me. Unfortunately, I still do not have access to email at work, so phone or fax are the only options there. Feel free to send email to my home email address: bdrucker@comcast.net.

Barry Drucker

cc. Carol Hartgen
    John Mirabella

**48**

CW0000006322



# CAPE COD COMMISSION

**3225 MAIN STREET**
**P.O. BOX 226**
**BARNSTABLE, MA 02630**
**(508) 362-3828**
**FAX (508) 362-3136**
**E-mail: frontdesk@capecodcommission.org**

March 28, 2002

Ms Karen Kirk Adams
Chief, Permits and Enforcement Branch
U.S. Army Corps of Engineers, Regulatory Division
New England Division
696 Virginia Road
Concord, MA 01742-2751

RE:   **Cape Wind Energy Project – Project Purpose and Need.**
      **US ACOE File #:200102913**

Dear Ms Adams:

Thank you for your memorandum seeking input on the project purpose and need for the
Cape Wind Environmental Impact Statement (EIS). The Cape Cod Commission has not
formally reviewed this material, however, the Commission staff have reviewed the
applicant's statement that the project's purpose is "to generate up to 420MW of clean,
renewable wind-generated energy that will be transmitted and distributed to the New
England regional power grid, including Cape Cod." Commission staff believe that this
statement of project purpose is too specific to allow a reasonable range of alternatives to
be studied under the EIS.

As all reasonable alternatives examined in detail in the EIS must meet the defined project
purpose, Commission staff believe that a more general statement is appropriate.
Therefore, we would recommend that the statement be edited to state that the project's
purpose is "to generate clean, renewable energy to be transmitted and distributed to the
New England regional power grid. " We believe that this more clearly states the
underlying purpose to which the agencies reviewing this application are responding.

Finally, your memorandum included a section of the applicant's project introduction,
which contains a number of unsubstantiated claims. We would agree with your statement
that further data is needed to explain these conclusions and that the claims made would
need to be fully supported by analysis in the joint Draft EIR/EIS for the project.

1

CW0000006323

Thank you for the opportunity to comment and participate in the development of the EIS for this project.

Sincerely,

Margo Fenn,
Executive Director

cc:     Leonard Fagan, Cape Wind Associates, LLC, 75 Arlington Street, Suite 704,
        Boston, MA 02116.
        Charlie Natalie, ESS Inc., 888 Worcester Street, Suite 240, Wellesley, MA 02482
        Arthur Pugsley, MEPA Analyst, Executive Office of Environmental Affairs, 251
        Causeway Street, Suite 900, Boston, MA 02114
        Tim Timmerman, EPA-New England, Region 1, 1 Congress Street Suite 1100,
        Boston,  MA  02114-2023

2

CW0000006324

49

CW0000006325

**Adams, Karen K NAE**

| | |
|---|---|
| **From:** | Mead, Jane (ENV) [Jane.Mead@state.ma.us] |
| **Sent:** | Friday, March 29, 2002 10:39 AM |
| **To:** | Valiton, Brian E NAE; Tim Timmermann (E-mail); Arthur Pugsley (E-mail); Eric Hutchins (E-mail); Terry Fleiger (E-mail); Phil Dascombe (E-mail); Sharon Pelosi (E-mail); Albert Benson (E-mail); Stephanie Morrison (E-mail); Karen K NAE Adams (E-mail) |
| **Cc:** | Skinner, Thomas (ENV); Truman Henson (E-mail); Babb-Brott, Deerin (ENV) |
| **Subject:** | RE: Wind Farm Purpose & Need |

CZM concurs with the comments provided by the Minerals Management Service on the attached statement of purpose and need. Based on the material that has been provided by the applicant, we would suggest the following statement of purpose and need:

The purpose of the proposed project is to generate electricity from renewable sources, specificly wind, for sale to the New England power grid. Renewable sources of energy are needed to provide additional power to meet demand and to reduce dependency on non-local, non-renewable energy sources. Wind energy is particularly appropriate as a renewable energy source because it is non-polluting, resulting in significant air-quality and public health benefits.

-----Original Message-----
**From:** Valiton, Brian E NAE [mailto:Brian.E.Valiton@nae02.usace.army.mil]
**Sent:** Monday, March 18, 2002 10:10 AM
**To:** Tim Timmermann (E-mail); Jane Mead (E-mail); Arthur Pugsley (E-mail); Eric Hutchins (E-mail); Terry Fleiger (E-mail); Phil Dascombe (E-mail); Sharon Pelosi (E-mail); Albert Benson (E-mail); Stephanie Morrison (E-mail)
**Cc:** Adams, Karen K NAE; Charles Natale (E-mail); Terry Orr (E-mail)
**Subject:** Wind Farm Purpose & Need

<<wfpurpose&needmar2002.doc>>
Memo on behalf of Karen Adams on Wind Farm Purpose and Need

4/26/2002

CW0000006326

**50**

CW0000006327



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
**New England Field Office**
**70 Commercial Street, Suite 300**
**Concord, New Hampshire 03301-5087**



April 1, 2002

Colonel Brian E. Osterndorf
District Engineer
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742-2751

Dear Colonel Osterndorf:

This responds to your January 23, 2002 letter and Federal Register Notice (67 FR 4414) requesting scoping comments on the proposed Cape Wind Energy Project, Nantucket Sound and Yarmouth, Massachusetts.

General Comments

By letter dated December 31, 2001, the Service provided preliminary scoping comments to Secretary Robert Durand on the expanded Environmental Notification Form for the Massachusetts environmental review process for the Cape Wind Project. We hereby incorporate our December 31, 2001 comments (copy enclosed) into these scoping comments as they were prepared with the intent of serving as scoping comments for a joint MEPA/NEPA process. Mr. Brian Valiton of your staff was provided a copy of the December 31, 2001 comments at the time they were issued to help insure an orderly coordination and scoping process.

Rather than reiterate the issues we raised in our December 31, 2001 letter to Secretary Durand, we would like to use this opportunity to focus on the fact that we believe the siting proposal by Cape Wind on outer continental shelf lands may benefit from a two-step evaluation process similar to that for oil and gas development. The first step should include a broad-based zoning or master planning analysis of the OCS lands off the New England coast to determine which lands and waters are environmentally suitable for potential development for wind, wave, and perhaps other forms of energy development. The second step would involve a detailed evaluation of those areas which are potentially suitable for projects like the Cape Wind Energy proposal.

-2-

Specific Comments

The lands on which the Cape Wind Energy Project would be situated are part of the federal outer continental shelf. Currently, we are unsure if any federal agency has the authority to lease or convey use of these lands for the development of an energy facility. This issue notwithstanding, it would be a more efficient and informative NEPA process if the alternatives analysis could step back and analyze the OCS lands off the New England Coast using a variety of siting and evaluation criteria and determine which areas of the OCS would be environmentally suitable for the development of offshore wind, wave, and perhaps other energy resources. This threshold examination would facilitate meeting the federal public trust responsibility by providing a public process in which decisions about zoning and uses of the OCS are made. Unfortunately, the Corps Notice of Intent on the Cape Wind Energy Project speaks only to the evaluation of alternative sites on Nantucket Sound, not to the broader public policy issue involving zoning and land use planning to identify appropriate uses of federal trust property and related trust resources. Without this important threshold step, the Corps, EOEA, cooperating agencies, and others cannot adequately examine a reasonable range of alternative sites for wind energy development on the OCS. For instance, absent the above broad scale siting and evaluation process, we would have no way of knowing whether or not Nantucket Sound would be determined to be an acceptable OCS area for potential development as a wind resource area. By moving forward as proposed in the Notice of Intent, the EIS process creates the presumption that Horseshoe Shoal and other Nantucket Sound sites are reasonable alternative sites for wind energy development when, in fact, they may not be suitable.

Accordingly, the Service believes the Corps should step back and conduct a zoning and siting evaluation of the OCS lands off the New England Coast for wind and wave energy development, using an open public process, as a necessary first step to create a more efficient NEPA process. The results of the zoning and siting evaluation should then be used to select reasonable alternative ocean sites (which may or may not include Nantucket Sound) for wind and wave energy development.

The range of alternatives in the EIS will clearly be affected by the manner in which the project purpose and need are defined. The Corps should define the project purpose and need more broadly than the applicant's stated purpose. We believe the project purpose should be defined as the production of electricity for use in the New England power grid. Under this broader project purpose, the alternatives in the EIS would need to include all reasonable generation sources, not just renewable energy; various sizes of generation capacity, not just a 420 mw-sized facility; and generation locations encompassing the entire New England Power grid, not just the Cape Cod area.

The Corps should consider utilizing a tiering concept to screen the universe of alternative generation sources, sizes and locations into smaller and smaller pools to get to a short list of reasonable alternatives. The Corps, EOEA, and the cooperating agencies should commit to developing screening criteria to tease apart the reasonable alternatives from the larger group of potential alternatives.

-3-

Regarding the search for alternative generation sources, sizes and locations, the EIS will need to examine the need for power in the New England power grid, consider whether excess capacity exists with existing facilities and whether excess capacity exists with approved but not yet constructed facilities. This analysis should also consider the various regional expansion projects associated with the Sable Island, N.S. natural gas field such as the proposed Neptune offshore direct current power line and an as-yet unnamed offshore natural gas pipeline that would serve various New England cities and the New York-New Jersey area. Other projects under consideration for development or decommissioning could also affect the need for power and the economics of various generation sources on the regional grid.

We anticipate that information on recently proposed, approved, or constructed energy projects including generation sources, sizes and locations could be obtained from the various state energy and planning offices, public utility commissions, energy facility siting board(s), and from the New England Power Pool. This recent market information should provide useful data for determining what constitutes a viable commercial scale facility within the various generation sources as well as providing data on total capacity of the various generation sources or categories in the New England power grid, e.g., natural gas, renewables, etc.

I am sure you will agree that getting the alternatives analysis properly framed is one of the biggest challenges facing the Corps, EOEA, and the cooperating agencies. The fact that both public property and resources are proposed for privatization with this first-of-its-kind large scale wind energy development makes the task more daunting. Should you have questions about these scoping comments, feel free to contact me or Mr. Vern Lang of this office at 603-223-2541.

Sincerely yours,

Michael J. Bartlett
Supervisor
New England Field Office

Enclosure

-4-

CC:   Reading File
       R. Dettmers, RO-MB
       K. O'Brien, LE-NH
       B. Valiton, US ACOE
       T. Timmermann, US EPA
       G. Smith, RO-SE
       B. Oliveira, GMNWR
       D. Rothstein, DOI-SOL
       P. Colosi, NMFS
       A. Raddant, DOI-OEPC
       B. Drucker, DOI-MMS
       A. Hoar, RO-ES
       H. Roddis, MA Audubon
       H. Heusmann, MADFW
       T. Orr, ESS
       M. Amaral, NEFO
       P. Morrison, NEFO
       M. Bartlett, NEFO
       W. Neidermyer, NEFO
       BFA-ERT
       OEPC
ES:   VLang:jd:4-1-02:603-223-2541

CW0000006331

**51**

CW0000006332



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 1
1 CONGRESS STREET, SUITE 1100
BOSTON, MASSACHUSETTS 02114-2023

OFFICE OF THE
REGIONAL ADMINISTRATOR

April 5, 2002

Colonel Brian E. Osterndorf
District Engineer
United States Army Corps of Engineers
696 Virginia Road
Concord, Massachusetts 01742-2751

RE: Cape Wind Project Draft Environmental Impact Statement Scoping Comments

Dear Colonel Osterndorf:

EPA New England appreciates the opportunity to comment on the scope of analysis for the preparation of a Draft Environmental Impact Statement (DEIS) for the Cape Wind Associates, LLC (Cape Wind) proposal to construct a wind-powered electrical generation facility (wind farm) in Nantucket Sound off the coast of Cape Cod, Martha's Vineyard and Nantucket. Based on the applicant's information, we understand that the project will feature 170 wind turbines spread across 28 square miles of Nantucket Sound that would produce up to 420 megawatts of energy. The 426 foot tall turbines would produce energy that would be transmitted via submarine cables to an electrical service platform where it would be converted and transferred to Cape Cod via two 115KV submarine cables. While preparing these comments, EPA has reviewed applicant-generated information contained in its application to the Corps of Engineers (Corps) for Section 10 authorization and recent comments offered by a number of state and federal agencies, as well as the public. This letter sets forth our specific concerns about the scope of analysis for the DEIS.

EPA commends the Corps for deciding early on that an EIS should be prepared pursuant to the National Environmental Policy Act (NEPA) to support decision-making regarding the Cape Wind proposal to construct a wind farm in Nantucket Sound. That decision paves the way for a comprehensive analysis of this challenging and precedent-setting project. In addition, EPA fully supports the efforts of the Corps and the Massachusetts Executive Office of Environmental Affairs to integrate their respective reviews within a combined DEIS/DEIR under NEPA and Massachusetts Environmental Policy Act (MEPA). This joint review should improve the public review process and streamline the environmental review for the project.

The Corps-sponsored scoping sessions were well attended and featured a valuable transfer of questions, concerns and suggestions about both the project and the types of information that should be included in the DEIS/DEIR. Discussion at each meeting demonstrated significant public interest in a comprehensive evaluation. Continued interagency coordination across

CW0000006333

-2-

federal, state and local jurisdictions will be critical for ensuring that the DEIS/DEIR adequately informs the various regulatory reviews that will follow.

As you know, the generation of electricity from fossil fuels is the single largest industrial source of air pollution in New England. Because of these fossil-fuel power plant emissions, New England continues to experience too many days of unhealthy air and too much degradation of the environment, including acidification of lakes and streams, mercury deposition, visibility impairment, greenhouse gas emissions, and excessive nitrogen loading to our ecosystems. In addition, apart from air emissions, fossil fuel burning power plants can cause environmental harm from their withdrawal of cooling water from, and their discharge of heated water to, the region's waterways. There are also many adverse environmental impacts associated with the extraction, refining and transportation of fossil fuels to be used in the New England market. Consequently, EPA New England strongly supports an increase in the amount of electricity generated in the region from renewable resources such as wind power. However, no shift to renewable energy, either through the development of this or any other project, can be made without a complete understanding of the environmental impacts and tradeoffs associated with each alternative.

EPA looks forward to coordinating with the Corps and other local, state and federal interests as work is done to determine the appropriate scope of analysis for the project and as specific investigations are developed to gauge the level of impact associated with each alternative under consideration. Off-shore wind farm operations, such as the one proposed by Cape Wind, raise a number of public policy concerns and environmental questions that must be carefully addressed. These issues are summarized below.

**Determination of the Range of Alternatives**

The Council on Environmental Quality's (CEQ's) regulations implementing NEPA at 40 CFR Part 1502.14 explain that a reasonable range of alternatives should be presented and compared in the DEIS to allow for a "clear basis for choice among options by the decision maker and the public." Moreover, CEQ's "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" explain that "Section 1502.14 requires the DEIS to examine all reasonable alternatives to the proposal. In determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant."

Framing an appropriate purpose and need statement is a key element in the development of a range of alternatives for analysis, as the alternatives flow directly from it. The proponent's application states that the project's purpose is "to generate up to 420 MW of clean, renewable wind-generated energy that will be transmitted and distributed to the New England regional power grid, including Cape Cod and the Islands...." While we think the applicant's proposed

-3-

purpose statement is a good starting point, we recommend it be modified to make it less constraining for the purposes of the NEPA analysis and determining the range of alternatives to be investigated in the DEIS/DEIR. As a starting point, we suggest that the purpose statement be modified by striking the words "clean" (as it is somewhat vague and open to interpretation) and "wind-generated" (too limiting) and the phrase "including Cape Cod and the Islands..." (as a geographic aspect is implied in the New England Power Grid component of the statement). Finally, we suggest that specific reference to a particular size for the project be dropped from the purpose statement and that it be replaced with language descriptive of a commercially viable renewable energy facility. With these changes, the basic project purpose statement would read, "The project's purpose is to develop a commercially viable renewable energy facility that will generate electricity distributed to the New England regional power grid."

EPA looks forward to working with the Corps and other federal agencies in a cooperative fashion to establish an appropriate basic project purpose through the Highway Methodology Process. The characterization of need provided by the applicant should be fully supported by the analysis provided in the DEIS/DEIR. Following that step, the agencies should work closely to agree on an acceptable range of alternatives to be considered in the DEIS/DEIR. At this point the range of alternatives could include renewable energy generation from a number of sources of different sizes/generation capacities, both on and offshore, or combinations of sources/types of facilities, that would supply power to the New England power grid. The analysis should fully analyze the rate of development of new wind technology and the likelihood that currently infeasible alternatives may become feasible in the near future (e.g., placement of turbines in deeper waters). The alternatives list would also, of course, include the applicant's proposal as well as the No-Build scenario.

**Analysis of Alternatives**

Once a complete list of alternatives is identified, the Corps should consider developing an interagency work group (including federal and state participation) to develop screening criteria, tailored to this case and linked directly to the statement of purpose and need, that will support decisions to eliminate or retain alternatives for additional analysis in the DEIS/DEIR. As alternatives advance through the screening process we expect that increasing levels of information and analysis will be necessary to evaluate tradeoffs and to support decision-making.

The Corps' analysis of alternatives will require a thorough and independent examination of the applicant's claims regarding a number of factors including:

- project size and proposed site;
- project need;
- potential benefits;
- potential costs/impacts; and,
- renewable energy technology.

-4-

At this point, the economics of the project are poorly understood and a greater level of information will be necessary to evaluate the proposed alternative as well as other alternatives that could achieve the project purpose. The discussion of alternatives should include the impact on electricity rates in New England and a discussion of fuel diversity, and the potential for future supply constraints, reliability problems, and price increases associated with over-reliance on a particular fuel source.

A thorough assessment of the relative environmental tradeoffs of each alternative should be provided in the DEIS/DEIR. As you know, the record is brimming with a wide range of important and thoughtful comments offered by our federal and state colleagues as well as by industry groups and the public. Each of these comments must be carefully considered during the development of the scope for the DEIS/DEIR. At this point in the scoping process the list of potential impacts that should be addressed is lengthy. While we recognize that the consideration of impacts must be tailored for each alternative under consideration, it currently appears that the list of issues to be explored includes: avian impacts, marine impacts (to recreational and commercial fisheries, marine mammals, benthic habitat, circulation, physical conditions, and overall ecology), visual impacts, noise and vibration impacts, aviation impacts, impacts to communication/transmission networks, commercial and recreational navigation/use, and direct and secondary impacts to the local/regional economy (recreation, tourism, fishing, coastal property values, etc.).

The analysis should discuss the environmental benefits/avoided impacts of alternatives under consideration when compared to each other and to other forms of non-renewable energy production. For example, the discussion should include avoided upstream environmental impacts associated with the mining of coal, the drilling for oil and natural gas, the refining of petroleum, and the transportation of these materials to New England. Other issues that should be part of the comparison include hazardous material usage and storage, thermal loads associated with fossil fuel fired plants, and the potential for impacts such as impingement and entrainment of fish and larvae in cooling water intakes at fossil fuel-fired plants. In addition, the analysis should describe the situations where an alternative might displace other forms of energy generation and the relative impacts/benefits of such a shift in energy production.

The DEIS/DEIR should establish a baseline from which impacts of the project alternatives can be discerned and evaluated. The same baseline information should then also be used going forward to evaluate the impacts of any project that may be constructed. The tradeoff analysis should also consider emissions offsets from criteria pollutants and $CO_2$ and the relative environmental costs incurred and avoided from the development of various forms of renewable energy. The tradeoff analysis should also address the environmental and societal impacts of climate change on the ecosystems being studied in the course of developing the EIS, and the incremental role that each renewable carbon-neutral energy generation project can play in mitigating those impacts. During the course of a recent interagency discussion, the Corps suggested that "topic specific" working groups would help focus the discussion on particular issues as the DEIS/DEIR is developed. We think this idea has merit and should be pursued.

-5-

## Public Trust Issues

The DEIS/DEIR must fully consider the public trust implications of siting a facility in federal waters. The proposed wind farm would spread across 28 square miles of Nantucket Sound. With the exception of two transmission cables and a portion of a proposed "wind wake buffer zone," the project will be located beyond the three mile limit of state waters in federal waters on the outer continental shelf (OCS). Increasing public concern has focused on the lack of an established process (exclusive of the Corps Rivers and Harbors Act Section 10 authority) through which the federal government can effectively deal with a number of precedent setting issues associated with the proposed project. These include but are not limited to: the lack of existing policy and regulation dictating which agency has authority over siting issues, whether competition should exist for development sites, how/whether easements/leases/fees should be required for the use of public property and its resources by a private corporation, and what sort of requirements should be imposed to ensure proper site restoration and management after the useful life of the project ends. These issues grow in importance as we learn about other proposals for offshore energy projects in New England and other coastal areas of the United States.

EPA, NOAA, and the Corps, among others, are participants in a Department of Interior working group focused on possible modifications to the Outer Continental Shelf Lands Act (OCSLA) that would address transmission of energy projects and renewable energy development on the OCS. To date, draft language for possible legislation focuses on the granting of easements/rights-of-way and the establishment of "fees to assure [that the public receives] fair market value for rights conveyed." The preliminary considerations also contemplate competitive or non-competitive granting of easements/rights-of-way. The DOI efforts are timely and each of these issues remains ripe for analysis in the DEIS/DEIR. Moreover, heightened public interest in the project warrants the establishment of clear public policy to fill the "gap in the process" in advance of decision-making that will follow the NEPA process. If this does not occur in a timely fashion outside the NEPA process, the Corps will need to thoroughly explore these public policy issues in the DEIS/DEIR.

The Cape Wind project is the first of what appears likely to be a number of proposals to develop renewable energy facilities off the coast of New England. We believe these projects, if properly sited to avoid impacts, may offer a tremendous opportunity to New England in moving toward a more sustainable and more diverse energy future. Given these implications, it is all the more imperative that the public trust issues raised by such projects be resolved thoughtfully and quickly. It is our belief that the project should not proceed through the permit process absent

CW0000006337

-6-

serious analysis of this private use of public trust resources for renewable energy development on the OCS. Several strategies to deal with the existing policy void are apparent:

- The Corps could proceed with the current DEIS/DEIR analysis in a manner that fully incorporates the results of ongoing decision-making of the interagency work group and/or subsequent legislative action;
- In recognition of the pressing need for clear public policy on this issue, and in view of the fact that multiple wind power proposals are under consideration for New England offshore waters, the Corps or another appropriate agency (e.g. the Department of the Interior) could develop a programmatic EIS that takes a comprehensive look at potential sites for offshore renewable energy development and provides information that can then be used for site specific applications for individual projects;
- The Corps could proceed with the DEIS for this project absent an external process to deal with the lack of clear policy–in this instance the Corps would conduct its own comprehensive investigation of public trust issues associated with the project and its alternatives.

We believe that an analysis with no consideration of public trust issues and absent any national policy/regulation that governs the use of OCS lands for renewable energy generation is not an appropriate option. EPA is concerned with the lack of policy/regulation and recommends that the agencies meet to discuss the various options to develop an appropriate strategy. We also recommend that the Corps consider coordinating with the Council on Environmental Quality on this challenging issue. EPA looks forward to reviewing the Corps' draft scope of work for the DEIS with particular attention to this fundamental issue and to future discussions about the merits of various approaches.

**Coordination/Communication**

Close interagency coordination throughout the preparation of the DEIS/DEIR is critical. To that end, EPA intends to work as a cooperating agency to help define the scope of analysis and to offer input on how specific issues should be addressed in the DEIS. We encourage the Corps to keep an open dialogue with local, state and federal agency representatives throughout the process, with particular attention to agencies such as the Cape Cod Commission that have a long history representing the interests of the resident population that feels it would be most impacted by the applicant's proposed project. The communication strategy should include updates on the DEIS at important milestones, as public policy around the use of the OCS evolves, and should consider the release of relevant study findings as they become available. The work by the Corps so far during the scoping process bodes well for an open public process.

Finally, we suggest that the Corps distribute a draft of the final scope for the DEIS to the interagency group to make sure that there is general consensus on the scope of alternatives and the impact analysis. We are willing to work with Corps staff to help facilitate this effort if necessary and we look forward to participating in upcoming interagency coordination meetings and reviewing draft documents as appropriate and as our resources allow. We hope that the

CW0000006338

-7-

Corps will allocate sufficient resources to support a comprehensive analysis and independent review of applicant generated information/analysis that will be incorporated into the DEIS. Should you have any questions or wish to discuss our concerns, please contact me or Timothy Timmermann of EPA New England's Office of Environmental Review at 617/918-1025. Thank you for the opportunity to provide scoping comments.

Sincerely,

Robert W. Varney
Regional Administrator

cc:

The Honorable Edward M. Kennedy, U.S. Senate
The Honorable John F. Kerry, U.S. Senate
Representative William Delahunt
Secretary Robert Durand, Executive Office of Environmental Affairs
Margo Fenn, Cape Cod Commission
Michael J. Bartlett, United States Fish and Wildlife Service
Peter D. Colosi, National Marine Fisheries Service
Barry Drucker, United States Department of Interior
Albert Benson, United States Department of Energy
J. Mark Robinson, Federal Energy Regulatory Commission
Thomas W. Skinner, Massachusetts Office of Coastal Zone Management
Vincent Malkoski, Massachusetts Division of Marine Fisheries
Charles J. Natale, Jr., Environmental Science Services, Inc.
Len Fagan, Cape Wind Associates, LLC

CW0000006339

**52**

CW0000006340

# ESS ENVIRONMENTAL SCIENCE SERVICES, INC.

VIRONMENTAL SCIENTISTS, ENGINEERS, AND PLANNERS

November 21, 2001

Ms. Karen Adams
Chief, Permitting Division
United States Army Corps of Engineers, New England District
696 Virginia Road
Concord, Massachusetts 01742-2751

*Re:*   *Application of Cape Wind Associates, LLC for US Army Corps Approval of*
        *The Cape Wind Project, Nantucket Sound and Yarmouth, Massachusetts*
        *ESS Project No. E159-009*

Dear Ms. Adams:

On behalf of Cape Wind Associates, LLC., Environmental Science Services, Inc. (ESS) is pleased to provide you with the attached Individual Permit Application, project plans, and supporting documentation for the proposed Cape Wind offshore wind energy project.

This application package contains the following information:

- Application for Department of the Army Permit (ENG Form 4345), Project Description, and Project Plan Set
- Alternatives Analysis
- Environmental Effects Assessment
- Section 404(b)(1) Compliance Assessment
- Essential Fish Habitat Assessment
- Endangered Species Act Assessment
- Massachusetts Federal Consistency Certification

As you know, the proposed Cape Wind Energy Project is a clean renewable energy facility sited in the offshore area of Nantucket Sound. The proposed project has the capacity to generate up to 420 megawatts of electric power to serve the needs the Northeastern Region, including Massachusetts, Cape Cod, and the Islands. Cape Wind Associates has conducted extensive technical reviews and field studies over the last twelve (12) months to fully evaluate the best available site for the Project as well as the type and extent of environmental effects. Cape Wind has also conducted extensive agency and public interest group outreach efforts to inform stakeholders of the project and its benefits as well as gather comments and thoughts about this exciting project.

j:\e159\acoe\acoeltr.doc



West Exchange Street, Suite 101, Providence, Rhode Island 02903                888 Worcester Street, Suite 240, Wellesley, MA 02482
hone: (401) 421-0398   Facsimile: (401) 421-5731   E-Mail: essri@ultranet.com   Telephone: (781) 431-0500   Facsimile: (781) 431-7434   E-Mail: essma@ultranet.com
Web Site: www.essgroup.com

CW0000006341



ESS Project No. E159
November 21, 2001                                                    Page 2

We look forward your review of the Application and commencement of your regulatory permitting process.

If you have any questions or comments on the Application or its supporting documentation, please do not hesitate to contact me at 781 431-0500 extension 105 or by email at cnatale@essgroup.com.

Sincerely,

ENVIRONMENTAL SCIENCE SERVICES, INC.

Charles J. Natale, Jr.
Senior Vice President, Managing Principal

j:\e159\acoe\acoeltr.doc

 ENVIRONMENTAL SCIENCE SERVICES, INC. 

CW0000006342

APPLICATION FOR DEPARTMENT OF THE ARMY PERMIT
(33 CFR 325)

OMB APPROVAL NO. 0710-0003
Expires October 1996

Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Service Directorate of Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302; and to the Office of Management and Budget, Paperwork Reduction Project (0710-0003), Washington, DC 20503. Please DO NOT RETURN your form to either of those addresses. Completed applications must be submitted to the District Engineer having jurisdiction over the location of the proposed activity.

### PRIVACY ACT STATEMENT

Authorities: 33 USC 401, Section 10; 1413, Section 404. Principal Purpose: These laws require permits authorizing activities in, or affecting, navigable waters of the United States, the discharge of dredged or fill material into waters of the United States, and the transportation of dredged material for the purpose of dumping it into ocean waters. Routine Uses: Information provided on this form will be used in evaluating the application for a permit. Disclosure: Disclosure of requested information is voluntary. If information is not provided, however, the permit application cannot be processed nor can a permit be issued.

One set of original drawings or good reproducible copies which show the location and character of the proposed activity must be attached to this application (see sample drawings and instructions) and be submitted to the District Engineer having jurisdiction over the location of the proposed activity. An application that is not completed in full will be returned.

### (ITEMS 1 THRU 4 TO BE FILLED BY THE CORPS)

| 1. APPLICATION NO. | 2. FIELD OFFICE CODE | 3. DATE RECEIVED | 4. DATE APPLICATION COMPLETED |
|---|---|---|---|
| #200102913 | | | |

### (ITEMS BELOW TO BE FILLED BY APPLICANT)

| 5. APPLICANT'S NAME | 8. AUTHORIZED AGENT'S NAME AND TITLE *(an agent is not require)* |
|---|---|
| Cape Wind Associates, LLC. Mr. Len Fagan, Project Manager | Environmental Science Services, Inc. Mr. Charles J. Natale Jr. , Senior Vice President, Managing Principal |

| 6. APPLICANT'S ADDRESS | 9. AGENT'S ADDRESS |
|---|---|
| 75 Arlington Street, Suite 704 | 888 Worcester Street., Suite 240 |
| Boston, MA 02116 | Wellesley, MA 02482 |

| 7. APPLICANT'S PHONE NOS. W/AREA CODE | 10. AGENT'S PHONE NOS. W/AREA CODE |
|---|---|
| a. Residence | a. Residence |
| b. Business  (617) 904-3100, ext. 122 | b. Business  (781) 431-0500, ext. 105 |

### STATEMENT OF AUTHORIZATION

I hereby authorize, Environmental Science Services, Inc.                    to act in my behalf as my agent in the processing of this application and to furnish, upon request, supplemental information in support of this permit application.

APPLICANT'S SIGNATURE                    11/21/01
                                                                                DATE

### NAME, LOCATION AND DESCRIPTION OF PROJECT OR ACTIVITY

12. PROJECT NAME OR TITLE (see instructions)

Cape Wind Project

| 13. NAME OF WATERBODY, IF KNOWN *(if applicable)* | 14. PROJECT STREET ADDRESS *(if applicable)* |
|---|---|
| Nantucket Sound and Lewis Bay | Landfall: 43 Shore Road, Yarmouth, MA |
| | Grid Interconnection: Willow Street, Yarmouth, MA |

15. LOCATION OF PROJECT

____Barnstable____          ____Massachusetts____
COUNTY                              STATE

16. OTHER LOCATION DESCRIPTIONS IF KNOWN *(see instructions)*  The wind turbine array will be located within the federal waters of Nantucket Sound, in the vicinity of Horseshoe Shoal. The northernmost turbines will be approximately 4.1 miles from the nearest land mass (Point Gammon), the southeastern most turbines will be approximately 11 miles from Nantucket, and the westernmost turbines will be approximately 5.5 miles from Martha's Vineyard. The preferred submarine cable landfall location is 43 Shore Road in Yarmouth, MA.                    RECEIVED

17. DIRECTIONS TO THE SITE                    NOV 21 2001

Landfall: Route 6 East to Exit #7 (Willow Street). Turn South on Willow Street and take first left onto Higgins Crowell Rd. Cross Route 28 onto Berry Avenue. Take the last right onto New Hampshire Avenue to the end. Turn right onto Shore Road. Number 43 is the second house on the left.
                                                                                REGULATORY DIVISION

Grid Interconnection: Route 6 East to Exit #7 (Willow Street). Turn North on Willow Street to the NSTAR 115 kV transmission line right-of-way north of Summer Street.

| ENG FORM 4345, Jul 97 | EDITION OF FEB 94 IS OBSOLETE. | (Proponent: CECW-OR) |
|---|---|---|

CW0000006343

1 8. **Nature of Activity** *(Description of project, include all features)* The proposed offshore wind energy project consists of the installation and operation of 170 Wind Turbine Generators (WTGs) on Horseshoe Shoal in Nantucket Sound. The WTGs will produce up to megawatts (MW) of clean renewable energy using natural offshore wind resources of Nantucket Sound. Wind-generated energy produced by the WTGs will be transmitted to the mainland electric transmission system from a centrally located Electric Service Platform (ESP) via a submarine cable interconnection to a selected landfall site in Yarmouth, Massachusetts. The submarine cable system will consist of two (2) 115 kilovolt (kV) solid dielectric cable circuits jet-plow embedded into the seabed. The submarine cable system will then interconnect with an overland cable system installed underground within existing public rights-of-way (ROW) and roadways in the Town of Yarmouth where it will interconnect with an existing NSTAR 115 kV electric transmission line. The clean renewable energy produced by the Wind Park will be transmitted by this cable system to the electric transmission system serving Cape Cod, the Islands and the New England region.

1 9. **Project Purpose** *(Describe the reason or purpose of the project, see instructions)*

The purpose of the Project is to generate up to 420 MW of clean, renewable wind-generated energy that will be transmitted and distributed to the New England regional power grid, including Cape Cod and the Islands. The approximate construction start date for the project is April 2004, with the Project commercially operating in September 2005.

## USE BLOCKS 20-22 IF DREDGED AND/OR FILL MATERIAL IS TO BE DISCHARGED

20. **Reason(s) for Discharge** Wind Turbine Generator foundation systems may require scour protection to avoid loss of load bearing capacity for the monopile foundation. Scour protection would require the placement of stone riprap or concrete matting on the seabed surface surrounding the foundation. Installation of the monopile foundation will be by impact hammer or vibration thereby minimizing bottom disturbance and turbidity. The submarine cable system will be jet-plow embedded into the seabed to a depth of approximately 6.0 feet. The landfall transition interconnection of the submarine cable system with the overland cable system will be constructed utilizing Horizontal Directional Drilling thereby avoiding direct disturbance of the seabed and shoreline areas.

21. **Type(s) of Material Being Discharged and the Amount of Each Type in Cubic Yards**

Approximately 100 cy of 3"-12" stone riprap will be placed around each WTG foundation, if necessary. Scour protection may not be required for each WTG and will be evaluated in the final design. If all 170 WTGs require post construction scour protection, a total of approximately 17,000 cy of 3"-12" stone riprap will be placed around the foundations.

22. **Surface Area in Acres of Wetlands or Other Waters Filled** *(see instructions)*

If scour protection is necessary, approximately .021 acres of the seabed will be affected at the base of each WTG. If all 170 WTGs require scour protection, a total of 3.6 acres of the seabed will be effected. No upland wetlands or other waters will be effected by the Project.

23. Is Any Portion of the Work Already Complete? Yes _____ No __X__   IF YES, DESCRIBE THE COMPLETED WORK

24. **Addresses of Adjoining Property Owners, Lessees, Etc., Whose Property Adjoins the Waterbody (if more than can be entered here, please attach a supplemental list).**

| | | | | |
|---|---|---|---|---|
| Zakher, Fouad | 49 Shore Road, | Yarmouth MA. | 02673 | Map 16 Parcel #1 |
| Fitzhugh, Michael | 43 Shore Road, | Yarmouth MA. | 02673 | Map 16 Parcel #2 |
| Town of Yarmouth | 37 Shore Road, | Yarmouth MA | 02673 | Map 16 Parcel #3 |
| Stigmarine Fathers Inc. | 32 New Hampshire Avenue, | Yarmouth MA | 02673 | Map 16 Parcel #58 |

25. **List of Other Certifications or Approvals/Denials Received from other Federal, State or Local Agencies for Work Described in This Application.**

| AGENCY | TYPE APPROVAL* | IDENTIFICATION NUMBER | DATE APPLIED | DATE APPROVED | DATE DENIED |
|---|---|---|---|---|---|

See Attachment A.

*Would include but is not restricted to zoning, building and flood plain permits

26. Application is hereby made for a permit or permits to authorize the work described in this application. I certify that the information in this application is complete and accurate. I further certify that I possess the authority to undertake the work described herein or am acting as the duly authorized agent of the applicant.

| SIGNATURE OF APPLICANT | DATE | SIGNATURE OF AGENT | DATE |
|---|---|---|---|
| | 11/21/01 | | 11/21/01 |

The application must be signed by the person who desires to undertake the proposed activity (applicant) or it may be signed by a duly authorized agent if the statement in block 1 1 has been filled out and signed.

18 U.S.C. Section 1 001 provides that: Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals, or covers up any trick, scheme, or disguises a material fact or makes any false, fictitious or fraudulent statements or representations or makes or uses any false writing or document knowing same to contain any false, fictitious or fraudulent statements or entry, shall be fined not more than $1 0,000 or imprisoned not more than five years or both.

*U.S.GPO:1994-520-478/82018

CW0000006344

**53**

CW0000006345

Cape Wind
Energy for Life.

75 Arlington Street
Suite 704
Boston, MA 02116
617-904-3100
Fax: 617-904-3109
www.capewind.org

April 16, 2002

Colonel Brian E. Osterndorf
District Engineer
United States Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA  01747-2751

Re:    **Cape Wind Project, File No. 200102913; Environmental**
       **Impact Statement Scoping Comments**

Dear Colonel Osterndorf:

Cape Wind Associates hereby offers comments respecting the scoping of its Draft
Environmental Impact Statement ("DEIS"), including response to certain of the concerns raised
by the U.S. Fish and Wildlife Service (by letter dated April 1, 2002, the "FWS"), EPA New
England (by letter dated April 5, 2002, "EPA") and the Massachusetts Office of Coastal Zone
Management (by letter dated April 5, 2002, "CZM"). Most importantly, we concur with the
general position of such agencies that "the development of renewable, non-polluting energy
sources" is an important national policy objective and that, on a more regional basis, "the
generation of electricity for fossil fuels is the single largest industrial source of air pollution in
New England" such that "an increase in the amount of electricity generated in the region from
renewable sources such as wind power" is in itself an important policy objective. See EPA at 2,
CZM at 1. While we share the foregoing basic objectives, we do have several concerns over
scoping positions raised by the agencies, as set forth below.

   1. **The ACE Should Conduct the Requisite Project Review in**
      **an Expedited Manner Consistent With Executive Order**
      **13212.**

As an initial matter, Cape Wind respectfully requests that the current permit review
proceed in a manner consistent with Executive Order 13212, "Actions to Expedite Energy-
Relating Projects". In recognition of the need "to take additional steps to expedite the increased
supply and availability of energy to our Nation", Executive Order 13212 directs each Federal
agency to conduct its statutory review of proposed energy facilities in an expedited manner, as
follows:

CW0000006346

Colonel Brian E. Osterndorf
April 16, 2002
Page 2

> The increased production and transmission of energy in a safe and
> environmentally sound manner is essential to the well-being of the
> American people.  In general, it is the policy of this Administration
> that executive departments and agencies (agencies) shall take
> appropriate actions, to the extent consistent with applicable law, to
> expedite projects that will increase the production, transmission, or
> conservation of energy.
>
> ***
>
> For energy-related projects, agencies shall expedite their review of
> permits or take other actions as necessary to accelerate the
> completion of such projects, while maintaining safety, public
> health, and environmental protections.  The agencies shall take
> such actions to the extent permitted by law and regulation, and
> where appropriate.

While the DEIS should certainly provide a full review of this proposal, it is also important that
each of the agencies remain mindful of the foregoing statement of Federal policy at each step of
this proceeding and, in particular, at the critical juncture of defining the scope of the DEIS.

### 2.  The ACE Has Full Authority Under Current Law to Review and Authorize the Location of the Proposed Structures on the Seabed.

Although not directly related to the scope of the DEIS, the implication has been
made that existing Federal law fails to provide a clear process for the review and authorization of
Cape Wind's proposed location of structures on the seabed beneath Federal waters. Such
implication, however, is incorrect and contrary to the clear and long-standing authority of the
ACE under Section 10 of the Rivers and Harbors Act, as confirmed by administrative practice
and the interpretative decisions of the Federal courts. The Federal courts have long held that the
ACE's powers under Section 10 constitute a delegation of Congressional authority, such that,
absent specific statutory provisions to the contrary, structures in Federal waters authorized by the
ACE under Section 10 are deemed under law to have been "affirmatively authorized by
Congress" without any further action. See, e.g., Citizens' Comm. for Env. Protection v. U.S.
Coast Guard, 456 F. Supp 101, 115 (D.N.J. 1978), following the seminal case of Wisconsin v.
Illinois, 278 U.S. 367, 412-413 (1929). With specific reference to such authority of the ACE for
structures on the Outer Continental Shelf, also see ACE Regulatory Guidance Letter No. 88-8
and Atlantic Development Corp. v. U.S., 379 F.2d 818, 826 (5th Cir. 1967). It is pursuant to this
delegated Congressional authority that the ACE has "affirmatively authorized" numerous

CW0000006347

Colonel Brian E. Osterndorf
April 16, 2002
Page 3

privately-owned structures (including the undersea cables currently traversing Nantucket Sound) on the seabed without additional action by Congress or other Federal agencies.[1]

There should also be no doubt that the provisions of current law and the ACE's regulations provide the mechanisms for a complete and well-defined review process, which includes consideration of each of the policy concerns raised to date, including any relating to the so-called "public trust" issues. Even if one assumes "public trust" concepts to be applicable, the ACE's review under Section 10 routinely balances the benefits and detriments associated with the location of private facilities in public waters. Indeed, the following standard of review for Section 10 currently set forth in the ACE's regulations at 33 CFR § 325.3(c) confirms that a comprehensive "public interest" balancing standard is applicable to the current permit proceeding:

> The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered including the cumulative effects thereof; among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. (Emphasis added.)

Thus, it is clear under current law that (i) the ACE has full authority to review and authorize the proposed structures in the seabed beneath Federal waters and (ii) the existing ACE procedures and regulations already provide for the full consideration of any relevant issues, including those relating to the placement of private structures on the seabed. The stated comments on the authority of the ACE thus present no basis for delay or disruption of the current proceedings.

---

[1] Although additional authority, by lease, permit or otherwise, may be required with respect to certain activities (such as proposals to extract, remove and sell publicly-owned minerals from beneath the outer continental shelf) where specifically provided by statute, no such activities are raised in this proceeding.

CW0000006348

Colonel Brian E. Osterndorf
April 16, 2002
Page 4

**3.   The ACE Should Reject the Proposal of FWS that the Current
       Proceedings be Suspended Pending the Completion of a
       Comprehensive and Open-Ended Federal Master Planning
       Process for the OCS.**

The ACE should reject the proposal of FWS that it "step back" (i.e., suspend indefinitely) the ongoing proceeding until such time as the Federal government has completed a "broad-based zoning or master planning analysis of the OCS lands off the New England Coast," a comprehensive planning exercise that it deems to be "a necessary first step". The FWS has not specified the number of years that it would take the Federal government to undertake and complete such a comprehensive project. Accordingly, the FWS proposal amounts to an effective suspension and moratorium on the present application, as well as any other offshore development proposals, for an indefinite period of years.

The ACE should decline to enact such a moratorium for the following reasons. First, such a proposal is clearly at odds with current Federal policy, including Executive Order 13212, which plainly directs all Federal agencies to expedite energy-related projects in a manner consistent with existing law and regulation. Second, although FWS is within the Department of the Interior ("DOI"), its position in this instance is directly contrary to the publicly stated policy position of the Secretary of Interior that the Nation should "seek the best ideas for reducing delays and bottlenecks in producing renewable energy." Remarks to National Conference on Renewable Energy, Nov. 28, 2001. Third, and as set more fully below, the ACE can fully review the current application without suspending proceedings or imposing an open-ended moratorium. Indeed, the task at hand is to study the range of reasonable alternatives to the proposed application, a task that can be accomplished in a full and expeditious manner without a delay of an undetermined period of years.

**4.   The ACE Should Retain the Applicant's Statement of Purpose.**

As initial matter, the scope of reasonable alternatives should be based upon the Applicant's stated purpose of the project, i.e., to install and operate a commercial scale (i.e., 420 mw) merchant electrical generating facility located in New England utilizing renewable wind energy as its fuel source. In particular, the ACE should reject the proposal of FWS that the Applicant's stated purpose be replaced with a wide-ranging purpose defined simply as "the production of electricity for use in the New England Power Grid," a statement which would exclude any objective of producing clean, renewable or wind power, as well as any objective of producing such power in a magnitude that would yield substantial societal benefits.[2] Such position would also deny the reality that Cape Wind set out, deliberately, to develop a substantial volume of clean and renewable wind energy at this location, largely in response to the State and Federal policies and incentives encouraging just such action. The examples of such renewable

---

[2] EPA, in contrast, would more properly limit the project's purpose to the development of "a commercially viable renewable energy facility" within New England.

Colonel Brian E. Osterndorf
April 16, 2002
Page 5

policy initiatives include the Renewable Portfolio Standards of Massachusetts, Connecticut, and Maine, the Federal Windpowering America Program, the establishment and recent extension of the production tax credit for renewable energy and, notably, the Federal policy of NEPA itself set forth at § 4331(b)(6) thereof that the Nation "enhance the quality of renewable resources." Thus, the Applicant's stated purpose properly reflects the actual and well-established purpose of the timely development of a substantial amount (420 MW) of clean and renewable wind energy (and not nuclear or fossil energy or an amount unable to make a substantial regional contribution), a purpose which is entirely consistent with well-established public policy objectives.

**5.  The Scope of the DEIS Should be Limited to a Reasonable Range of Alternatives.**

**A.  Introduction.**

The study of alternatives to the proposed action is a critical part of the DEIS process under NEPA, but it is well-established that the scope of study is bounded by feasibility and appropriately limited to "reasonable" alternatives, which are defined as "those that are practical or feasible from the technical and economic standpoint and using common sense". 46 Fed. Reg. 18026 (1981). The ACE should thus limit the detailed study of alternatives to those "reasonable" alternatives that are demonstrated, after initial viability screening, to be practical or feasible from a technical and economic standpoint, using common sense. Several of the suggestions from the commenting agencies, however, would go well beyond the foregoing bounds of an appropriate scope of DEIS. For example, the FWS urges a scope that would "screen the universe" of generation alternatives, without regard to fuel type or renewability. FWS implicitly would also require detailed alternative analysis of "potential development for wind, wave, and perhaps other forms of energy development" anywhere on the OCS, which would apparently include a range of potential technologies not commercially viable at this time. CZM also seeks a full alternative analysis of all types of potential energy sources and sites for generation within New England, without apparent reference to technology type or renewability. As set forth below, the ACE should reject such proposals as beyond the proper scope of alternative study.

CW0000006350

Colonel Brian E. Osterndorf
April 16, 2002
Page 6

## B. The DEIS should be limited to a reasonable number of alternative technologies.

Federal courts interpreting the provisions of the NEPA in the specific context of proposed power plants have consistently found that the scope of alternative study within an EIS is bounded by feasibility, subject to the common sense interpretation of the permitting agency. In <u>Vermont Yankee Nuclear Power Corp. v. NRDC</u>, 435 U.S. 519, 551 (1978), the United States Supreme Court confirmed the practical limitations upon the scope of study of potential alternatives in the context of the EIS for a nuclear power plant, as follows:

> NEPA, of course, has altered slightly the statutory balance, "requiring a detailed statement by the responsible on . . . alternatives to the proposed action." 42 U.S.C. § 4332(C). But, it should be obvious even upon a moment's reflection, the term "alternatives" is not self-defining. To make an impact statement something more than an exercise of frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility.

<u>Id.</u> The courts have gone on to interpret such concept of "feasibility" to require detailed consideration of those alternatives to proposed power plants that had been developed to the point of commercial viability within the project's proposed timeline. In <u>Carolina Environmental Study Group v. U.S.</u>, 510 F.2d 796, 800-801 (D.C. Cir. 1975), the court upheld the propriety of an EIS for a proposed nuclear reactor in the face of criticism that it did not give full consideration to the potential development of alternative and renewable technologies, and found that NEPA's requirements were appropriately limited to alternatives that had reached commercial viability, and not those "deemed only remote and speculative possibilities":

> The Study Group argues that because the nuclear plant is to operate for several decades, alternative power solutions which may be developed, such as oil shell, geothermal energy, and solar energy, should have been considered. That contention presupposes future developments which are both speculative developments in which are both speculative and remote.*** The requirement is not to explore every extreme possibility which might be conjectured. Rather, <u>we view NEPA's requirements as one of considering alternatives as they exist and are likely to exist.</u>

<u>Id.</u> (emphasis added). In <u>Natural Resources Defense Council v. Morton</u>, 458 F.2d 827, 837 (D.C. Cir. 1972), the court similarly upheld the EIS an offshore oil project where the plaintiffs had again argued that the potential for future developments in alternative energy technology were not fully considered. The court noted that the EIS stated that "while these possibilities hold great promise for the future, their impact on the energy supply will not likely be felt until after

CW0000006351

Colonel Brian E. Osterndorf
April 16, 2002
Page 7

1980 [some 8 years later], and will be dependent on environmental safeguards and technological developments." The court thus concluded that such alternatives required "no additional discussion at this juncture," but could be germane to subsequent energy project proposals "in the light of changes in technology or in the variables with energy requirements and supply." Id.

Thus, in the present context, the EIS should properly be limited to the study of those alternative technologies with demonstrated commercial feasibility that would allow implementation on a timeline consistent with that of the proposed project, i.e., the supply of renewable volumes by 2005 (i) to satisfy Renewable Portfolio Standard annual requirements, (ii) to address the recently documented concerns of ISO-New England as to system reliability by the winter of 2005 due to over-dependence upon natural gas for new electric generation[3], and (iii) to fulfill other more general policy objectives to implement cleaner renewable sources in an expeditious manner.[4]

### C. The DEIS should also be limited to a reasonable number of alternative sites.

The foregoing judicial guidance as to this practical and common sense limitations of NEPA study requirements also applies to the number of alternative wind power sites that must be studied. In the leading case of Seacoast Anti-Pollution League v. N.R.C., 598 F.2d 1221 (1st Cir. 1979), the First Circuit rejected arguments that an EIS for the Seabrook nuclear power plant failed to consider a sufficient number of alternative sites. The EIS in that case had studied sites located exclusively within the applicant's service area (i.e., in northern New England), and opponents argued that the lead agency was required to include consideration of additional alternative sites located in southern New England. In rejecting such argument, the Court provided as follows:

> While examining alternatives has been called the "linchpin" of NEPA's mandate, Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697-98 (2nd Cir. 1972), there is no single rule for determining how many and what kinds of alternatives to study in a given case; as the Supreme Court stated in Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 551, 98 S. Ct. 1197, 1215, 55 L. Ed. 2d 460 (1978), "Common sense . . . teaches us that the "detailed statement of alternatives" cannot be found wanting

---

[3] See report entitled Steady State and Transient Analysis of New England's Interstate Pipeline Delivery Capability, 2001-2005, dated February 2002 and posted in ISO-New England's website, noting that substantial amounts of (up to 3,960 MW) of gas-fired generation are deemed to be "at risk" by the winter peak of 2005.

[4] Even if additional renewable technologies do become commercially viable at some future, they would not necessarily need to be implemented to the exclusion of today's commercially viable wind energy. To the contrary, the substantial magnitude of renewable energy necessary to implement the shift in the overall regional generation portfolio intended by public policy would likely justify the development of such future technologies in addition to the development of the wind technologies that are commercially feasible today.

CW0000006352

Colonel Brian E. Osterndorf
April 16, 2002
Page 8

> simply because the agency failed to include every single device
> and thought conceivable by the mind of man." The issue here is
> whether the Commission should have compared the site at
> Seabrook, of which PSCO sought permission to build, with more
> alternative sites than it did.

Id. at 1223. The court went on to explain that a power plant EIS need not consider each of the potentially endless alternative sites, as follows:

> Vermont Yankee makes it clear that the NEPA requirement of
> studying alternatives may not be turned into a game to be played
> by persons who for whatever reason and with whatever depth of
> conviction are chiefly interested in scuttling a particular project.
> There would be no end to the alternatives that might be proposed if
> proponents had no obligation to do more than make a facially
> plausible suggestion that a particular alternative might be of
> interest . . . .

Id. at 1230-31. The First Circuit went on to conclude that the limited number of alternative sites studied in the EIS (each of which was located within the Applicant's service territory and none of which was found to be "obviously superior" to the preferred site) was sufficient to comply with NEPA, without consideration of additional potential sites located in southern New England. Also see Scenic Hudson Preservation Conference v. FPC, 453 F. 2d. 463 (2nd Cir. 1971), cert. denied, 32 L.Ed.2d 813 (1972), upholding the adequacy of an EIS which studied five alternative sites for a 2,000 MW electric generating project, all of which were located within a 100 mile radius of the preferred site. Thus, the DEIS should be limited to a reasonable number of alternative sites, and not the virtually infinite universe of potential alternative locations.

### 6. Conclusion

For the reasons set forth above, the ACE should proceed in a manner that balances the need to fully review this permit application on a "fully-informed and well-considered basis" with the Federal directive to expedite energy-related projects. In particular, the scope of the DEIS should be limited to a reasonable range of alternatives, in accordance with the foregoing authorities.

Thank you for your consideration.

Sincerely,

Dennis J. Duffy
Vice President

CW0000006353

**54**

CW0000006354

# ESS ENVIRONMENTAL SCIENCE SERVICES, INC.

ENVIRONMENTAL SCIENTISTS, ENGINEERS, AND PLANNERS

April 19, 2002

Karen Kirk Adams, Chief
Permits and Enforcement Branch
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, Massachusetts 01742-2751

RECEIVED
APR 23 2002
REGULATORY DIVISION

*Re:*   ***Requests from Inter-agency Scoping Meetings***
***Cape Wind Project EIS (USACE File # 200102913)***
***ESS Project No. E159***

Dear Karen:

This letter is meant to respond to your requests for additional information and clarification on several points that were made at recent inter-agency scoping meetings for the Cape Wind Project.

At the April 4, 2002 meeting at the USACE offices you requested more detailed information and background on the following areas related to the Purpose and Needs and Alternatives Analysis discussions:

**"Commercial" scale justification**

> In order to define, or to put into context what is considered a "commercial" scale project and why a 420 MW project is being proposed, CWA has explained that such a project would need to be connected to a primary transmission facility (PTF) of the ISO New England electrical transmission system. According to a review of ISO New England data (www.iso-ne.com) the average size of a permitted new or re-powered PTF (which would meet the definition of "commercial" scale as used above) is approximately 520 MW, as compared to the project's 420 MW. Note that the projected average output for the Cape Wind project would be approximately 170 MW or about a third of the average size of a typical recent commercial facility.

> A "commercial" scale project of this size is necessary in order to have any significant impact on the need for increased fuel diversity, reduced reliance on foreign fuel supplies, improved regional air quality, reduction in green house gas emissions and other environmental benefits addressed in the Purpose and Needs Statement.

> The economic viability of a project of this type depends on a large number of factors, but in the most simplistic terms the revenue from the output of energy produced must be greater than the cost for building the generation facilities and producing the electricity. There are a number of substantial "fixed" up-front costs associated with a project of this type which necessitate a "commercial" scale of approximately 400-500MW in order to ensure that the project is financially sustainable. These "fixed" or infrastructure costs, while being marginally variable with size, would include transmission costs (interconnection cables between turbines, an Electric Service Platform (ESP), the 115 kv

   j:\e159\e159-009\adams_general scope ltr.doc

---

888 Worcester Street, Suite 240
Wellesley, Massachusetts 02482
Telephone: (781) 431-0500  Facsimile: (781) 431-7434

401 Wampanoag Trail, Suite 400
East Providence, Rhode Island 02915
Telephone: (401) 434-5560  Facsimile: (401) 434-8158
www.essgroup.com

90 Route 6A, Unit 4B
Sandwich, Massachusetts 02563
Telephone: (508) 833-6226  Facsimile: (508) 833-9687

CW0000006355

ESS Project No. E159
April 19, 2002                                                                                              Page 2

cables from ESP to landfall, upland cabling, riser station at the Nstar interconnect), permitting costs, and financing costs.    These up-front infrastructure costs can conservatively run into the $200 million range – and the project still would not have constructed a single turbine or produced a single MW of electricity.   Add to these high infrastructure and development costs the price of each wind turbine generator (WTG), factor in the variability of the wind resource (which determines how much and how often each machine will actually be producing energy), and it is clear why a wind project of the scale proposed is necessary for financial sustainability.

**Primary Siting Criteria: Wind Power classification of 4 or greater**

The wind power classification is a direct function of the average wind speed in an area, as defined by the US Department of Energy National Renewable Energy Lab.    An area designated with a wind power class 4 has an estimated average wind speed of between 15.7 and 16.8 mph at a height of 50 meters.   An area designated as a lesser class 3 would have an estimated range of between 14.3 and 15.7 mph.   The energy content of the wind varies with the cube (the third power) of the average wind speed, so a potential difference of 1.25 mph in average wind speed (a conservative difference between a class 3 and a class 4 site)  equates to a 27% gain in a site's energy generating potential.

A wind project's <u>installed capacity</u> is the theoretical maximum that the project could produce.  For example a project consisting of 100 wind turbine generators (WTGs) each rated to produce 2.5 MW would have an installed capacity of 250 MW.  The actual amount of electricity produced by the project on average is less than its installed capacity due to many factors (collectively referred to as the project's <u>capacity factor</u>) including the arrangement of the turbines, surrounding topographic features influencing the wind resource, transmission line and other electrical and mechanical losses, the variability of the wind resource and the energy in the wind itself.  A wind power classification of 4 or greater is necessary in order for a commercial project to achieve a high enough capacity factor, and produce an economically viable project.

**Primary Siting Criteria: Minimum of 10,000 acres**

As wind passes through a turbine, wind energy is converted to electricity.  After passing through the turbine wind energy diminishes and the flow is interrupted.  This long trail of slower air is referred to as the downwind <u>wake.</u>

Wind turbines that are arranged in parks (or grids) need to be spaced at sufficient distance from each other to minimize the effects of downwind wake energy losses around the downstream WTGs.  The spacing between turbines allows the wind to smooth out and regain its linear flow and speed prior to reaching the next downstream WTG.

In order to achieve the commercial scale as proposed, with adequate spacing between turbines to maintain a high enough capacity factor for economic viability, a minimum area of 10,000 acres was chosen as the criteria for required site area.

j:\e159\e159-009\adams_general scope ltr.doc



**ENVIRONMENTAL SCIENCE SERVICES, INC.**



CW0000006356

At the April 8, 2002 meeting at the USACE offices, you requested more detailed information on the modeling that Cape Wind Associates has proposed for use in assessing impacts on the marine environment.

### Analytical Existing Conditions Modeling of Nantucket Sound

Cape Wind Associates (CWA) has contracted with Woods Hole Group Inc. (WHG) of Falmouth Massachusetts to evaluate the existing conditions in Nantucket Sound. WHG has proposed a desktop modeling investigation, designed to provide information that will help characterize the regional and local processes surrounding the alternative sites within Nantucket Sound. Specifically, the processes that will be evaluated include waves, currents, and sediment transport. An analytical existing conditions model will be developed and the wave climate, current regime, bathymetric variation, and sediment distribution will be evaluated.

Initially WHG will conduct a search and review of existing literature, including available data sources of wave, tide, current, and sediment characteristics for the Nantucket Sound region. This information will be supplemented by the site specific geophysical and geotechnical data collected by Ocean Surveys Inc. (OSI) during the summer of 2001 under the direction of CWA and ESS which extensively surveyed the area of Horseshoe Shoal and alternative cable routes.

The analytical existing conditions model will then be developed to characterize the existing wave, current, and sediment transport processes in the Nantucket Sound region. The model will provide the baseline information upon which an array of potential impacts can be compared and assessed. The model will be developed based on established analytical relationships, and results will be compared with available field measurements, including data obtained from the deployment of an Acoustic Doppler Current Profiler (ADCP).

WHG will conduct ADCP data collection by boat, along transects similar to those used in the Cape Wind avian field studies. A 1200kHz ADCP will be used to continuously record current characteristics over two tidal cycles. Current speed and direction values will be reported at 1-meter depth intervals throughout the water column. A differential GPS system will be used to provide positioning data. Data from both sensors will be integrated with a laptop computer and referenced to a common time base. Data will be displayed in real-time during survey operations to allow continuous quality control. After the survey, the ADCP data will be post-processed, analyzed, and graphically presented to identify the time-varying and spatial structure of the currents over Horseshoe Shoal and the surrounding area. In addition, the ADCP data will provide verification for the currents in the analytical existing conditions model.



**ENVIRONMENTAL SCIENCE SERVICES, INC.**



CW0000006357

ESS Project No. E159
April 19, 2002                                                         Page 4

I hope the information presented above is helpful in further defining the issues and questions raised in recent meetings as you develop the scope for the DEIS / DEIR.  If you have any questions, or need further clarification please to do not hesitate to contact me at 781-431-0500 x190.

Sincerely,

**ENVIRONMENTAL SCIENCE SERVICES, INC.**

Terry L. Orr
Project Manager

C:       Godfrey (ACOE)
         Valiton (ACOE)
         Holtham (ACOE)
         Pugsley (MEPA)
         Dascombe (CCC)
         Timmermann (EPA)
         Fagan
         Henson (MCZM)

j:\e159\e159-009\adams_general scope ltr.doc

**ESS**          ENVIRONMENTAL SCIENCE SERVICES, INC.          

CW0000006358

55

CW0000006359

# HALE AND DORR LLP

COUNSELLORS AT LAW

**haledorr.com**
60 STATE STREET · BOSTON, MA 02109
617-526-6000 · FAX 617-526-5000

MARK C. KALPIN

617-526-6176
mark.kalpin@haledorr.com

RECEIVED
MAR 11 2003
REGULATORY DIVISION

March 10, 2003

**By Facsimile and First Class Mail**

Karen Adams, Chief
Permits and Enforcement Branch
U.S. Army Corps of Engineers
Regulatory Division
696 Virginia Road
Concord, Massachusetts 01742

Re:   Cape Wind Project -- Scope of Alternatives Analysis Under NEPA

Dear Ms. Adams:

Cape Wind Associates, LLC ("Cape Wind") understands that a question has arisen concerning the extent to which the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, requires the U.S. Army Corps of Engineers (the "Corps") to identify, screen and evaluate "alternatives" to the proposed Cape Wind Project in the Environmental Impact Statement ("EIS") being prepared by the Corps. On behalf of my client, Cape Wind, this letter provides information that addresses that question.

Federal courts consistently have held that NEPA *does not* require a federal agency to analyze, in the same level of detail as the applicant's "proposed action," any minimum number of alternatives in an EIS. Instead, as discussed below and under facts similar to those present here, Federal courts have upheld EISs that briefly examined and rejected, through an initial screening process, each of the alternatives under consideration, and accordingly performed a detailed evaluation on only (a) the proposed action, or (b) the proposed action and the no action alternative. The law on this point is both conclusive and well-settled.

NEPA requires a Federal agency in an EIS to "[r]igorously explore and objectively evaluate all reasonable alternatives [to a proposed action], and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). NEPA's "'rule of reason' guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) ("If, therefore, the consideration of alternatives is to inform both the public and the agency decisionmaker, the discussion must be moored to 'some notion of feasibility.'" *Id.* (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551 (1978)).

CW0000006360

Karen Adams, Chief
March 10, 2003
Page 2

It is well-settled that the "range of reasonable alternatives is 'dictated by the nature and scope of the proposed action.'" *Strahan v. Linnon*, 967 F. Supp. 581, 602 (D.Mass. 1997) (quoting *City of Carmel-By-The-Sea v. U.S. Dept. of Transportation*, 95 F.3d 892, 903 (9th Cir. 1996). NEPA envisions that a federal agency will first identify and initially screen a wide range of alternatives to a proposed action, and then conduct a more detailed environmental evaluation of only those alternatives that are not rejected by the screening process (that is, the "reasonable" alternatives"). In this regard, the First Circuit Court of Appeals has stated that "no purpose would be served by requiring [an agency] to study exhaustively all environmental impacts at each alternative site considered once it has reasonable concluded that none of the alternatives would be substantially preferable to the proposed site." *Roosevelt Campobello International Park Commission v. U.S. Environmental Protection Agency*, 684 F.2d 1041, 1047 (1st Cir. 1982) (Emphasis added). *See also City of Bridgeton v. FAA*, 212 F.3d 448, 456 (8th Cir. 2000) ("An alternative that does not accomplish the purpose of the project in question is *un* reasonable and does not require detailed attention in the FEIS.") (emphasis in original).[1]

Based on this reasoning, the Federal courts consistently have upheld EISs which eliminated (through an initial screening process) each of the alternatives under consideration, and accordingly conducted a detailed environmental review of only: (a) the proposed action; (b) the proposed action and the no-action alternative; and/or (c) the proposed action, the no-action alternative, and alternatives which primarily were "variations" to the proposed action. Examples of these decisions include the following.

- *Tongass Conservation Society v. Cheney*, 924 F.2d 1137, 1138-1141 (D.C. Cir. 1991), which upheld as reasonable an EIS prepared by the Navy which, after initially screening and rejecting 13 of the 14 alternatives under consideration as not feasible, evaluated in detail only the "preferred alternative." In reaching this determination, the court concurred with the Navy's reasoning that "because the [proposed action] was the only feasible site, there was no reasonable alternative to evaluate; hence the EIS need only to have briefly discussed why the other preliminarily screened sites were not reasonable alternatives." *Id.*

- *Strahan v. Linnon*, 967 F. Supp. 581, 602-603 (D.Mass 1997), which upheld the Coast Guard's detailed analysis of only the "no action" alternative and the proposed action (the "APLMR Initiative") in its Final EIS. The court noted with approval that the "FEIS demonstrates a detailed comparison of the 'No Action Alternative' and the 'Preferred Alternative,' evaluating factors such as the potential impact on the physical, biological, and socioeconomic environments. ... [T]he FEIS also briefly

---

[1]     Of interest here, the First Circuit has warned that "*Vermont Yankee* makes it clear that the NEPA requirement of studying alternatives may not be turned into a game to be played by persons who – for whatever reasons and with whatever depth of conviction – are chiefly interested in scuttling a particular project. There would be no end to the alternatives that would be proposed if opponents had no obligation to do more than make a facially plausible suggestion that a particular alternative might be of interest, and could then, after awaiting the results, find reasons why the agency's survey was inadequate." *Seacoast Anti-Pollution v. Nuclear Regulatory Commission*, 598 F.2d 1221, 1230-31 (1st Cir. 1979) (emphasis added).

CW0000006361

Karen Adams, Chief
March 10, 2003
Page 3

evaluates and explains its reasons for rejecting [other alternatives]. ... I find that the discussion of alternatives, combined with the detailed response to comments is sufficient to trigger such judicial deference." *Id.*

- *Carmel-By-The-Sea v. U.S. Dept. of Transportation*, 123 F.3d 1142, 1157-1159 (9th Cir. 1997), upholding the U.S. Department of Transportation's ("DOT") decision to limit its detailed consideration of alternatives to the "no action" alternative and other alternatives which primarily were variations to the "proposed action." After determining that "[a]ll of the alternatives considered ..., aside from the "no action" proposal, sought either to expand Highway 1, or to build a new freeway through Hatton Canyon," the court decided that the "Draft [EIS] had previously considered and rejected several other proposals .... These proposals span the spectrum of "reasonable" alternatives and satisfied the requirements of [NEPA]." *Id.*

- *Laguna Greenbelt, Inc. v. U.S. Dept. of Transportation*, 42 F.3d 517, 523-524 (9th Cir. 1994), which determined that the DOT could, after considering and rejecting a number of alternatives during an initial screening process, evaluate in detail only the "no action" alternative, the "preferred alternative," and a variation to the "preferred alternative." In reaching this decision, the Court observed that "the EIS discusses in detail two build alternatives: the proposed corridor ... and a second option following the same alignment and having the same general lane configuration .... The EIS also discusses a third option, the no-build alternative. In addition, the EIS discusses six categories of alternatives that were evaluated in earlier environmental documents and or in the course of the [EIS] but were eliminated from more detailed analysis and ultimately rejected." *Id.* The court then determined that all six categories of alternatives "were rejected as not feasible or failing to meet to project's objective .... Thus, the EIS discusses in detail all the alternatives that were feasible and briefly discusses the reasons that others were eliminated. This is all NEPA requires – there is no minimum number of alternatives that must be discussed." *Id.* (emphasis added).

I understand that the Corps' EIS will identify and screen a number of alternatives, including the no action alternative, to the Cape Wind Project to determine whether any are reasonable and should be evaluated in further detail. The precedent identified above establishes conclusively that there is no 'minimum number" of alternatives that must successfully pass the initial screening process in the EIS so as to require further evaluation. Instead, provided the Corps fully articulates its reasoning, it would be proper for the Corps to eliminate the potential alternatives to the Project through an initial screening process, and fully evaluate in detail in the EIS only (a) the proposed action, (b) the proposed action and the no action alternative, or (c) the proposed action and alternatives which may constitute "variations" to the proposed actions.

Sincerely,

Mark C. Kalpin

CW0000006362

**56**

CW0000006363

# Range of Alternatives

- Practical & feasible in light of the underlying purpose & need for the proposal

- Not require costly & time-consuming evaluation of conjectural alternatives

CW0000006364

# Commercial scale

- Applicant proposed 420 MW facility
  » Recent projects in ISO-NE area range 200-1500MW
  » Corps has looked at +/-20% as reasonable for previous projects
  » Example: strip mall not considered a reasonable alternative to a regional shopping mall

57

CW0000006366

**Adams, Karen K NAE**

| | |
|---|---|
| **From:** | Dennis Duffy [dduffy@emienergy.com] |
| **Sent:** | Monday, October 20, 2003 3:05 PM |
| **To:** | Karen Kirk Adams (E-mail) |
| **Cc:** | arthur.pugsley@state.ma.us; barry.drucker@mms.gov; deerin.babb-brot@state.ma.us; pdascombe@capecodcommission.org; jane.meade@state.ma.us; al.benson@hq.doe.gov; timmerman.timothy@epamail.epa.gov; moskal_john@epamail.epa.gov |
| **Subject:** | Comments to Draft Alternatives Analysis |

Cape Wind wishes to reply briefly to Tim's alternatives comments of October 9. It has been suggested that the basic approach of the alternatives analysis should now be revised because of a statement reportedly made by Jim Manwell that "a 100 mw offshore project could be commercially viable." As set forth below, such a revision is not appropriate.

First, the factual premise for the comment is incorrect. Professor Manwell has confirmed to us that he did not opine that a 100 mw offshore project could be viable for New England. What he did say may have been taken out of context, and may refer to economic viability under European conditions and market supports, which are not relevant to the American situation.

Second, and in any event, a 100 mw facility would be too far removed from our commercial purpose of constructing a major 420 mw facility, with the economies of scale that would allow a more substantial (i.e., not the smallest possible) contribution to the region's electric supply portfolio and air quality, through sales into New England's competitive energy markets. It is well settled under NEPA that the business goals of a private applicant should be taken into account and, in the words of Judge Clarence Thomas, "Congress did not expect agencies to determine for the applicant what the goals of the applicant's [commercial] proposal should be."

Sincerely,

Dennis J. Duffy
Cape Wind Associates
617-904-3100, x.112

CW0000006367

**58**

CW0000006368



# CAPE COD COMMISSION

3225 MAIN STREET
P.O. BOX 226
BARNSTABLE, MA 02630
(508) 362-3828
FAX (508) 362-3136
E-mail: frontdesk@capecodcommission.org

October 9, 2003

Ms. Karen Adams
U.S. Army Corps of Engineers
New England Division
696 Virginia Road
Concord, MA 01742-2751

RE:   EIS Alternatives

Dear Ms Adams:

Thank you for the opportunity to participate in the inter-agency meeting at your offices on September 24, 2003 to discuss the alternatives and screening criteria for the Cape Wind Environmental Impact Statement (EIS). The following comments are those of the Commission staff as the Commission subcommittee has not reviewed the materials distributed at the September 24th meeting regarding the Corps approach to the EIS alternatives analysis, and in regard to the draft Peer Review comments and EIS appendices. The Commission staff continues to look forward to assisting the Corps in developing a thorough and objective EIS for this project.

*Meeting Notes*
We have received the draft notes of the September 24, 2003 meeting and in general believe they reflect the gist of much of the discussion. At the meeting, agencies represented were asked to comment on whether the sites under consideration were appropriate or could be excluded from further analysis. Commission staff at the meeting felt uncomfortable with commenting on many of these sites, particularly as the exact locus was undefined and that the participants had no opportunity to conduct their own assessment of the constraints for each site. There was also some disagreement on whether some of the identified constraints were accurate. For example, some questioned whether navigation issues for shipping at New Bedford would eliminate that site from consideration. Speaking for the Commission staff only, the fact that few comments were offered for individual sites at the meeting was more a reflection of a lack of information than a signal of agreement. Therefore, we would suggest that where it is indicated that there was a consensus or agreement, it should be clear that there was only partial agreement among the participants.

*Alternative Sites/Flexible application of Screening Criteria*
The Commission staff support the Corps recent more flexible application of the screening criteria for the alternatives analysis portion of the DEIS, rather than the pass/fail application previously proposed. In addition, we believe that the analysis of

1

CW0000006369

representative alternatives has merit for such a complex project and that as a broad concept, this approach is worth pursuing. In principal at least, this approach would seem to allow for a broader range of alternatives (and their relative impacts) to be evaluated in the DEIS.  However, Commission staff have some concerns over the steps taken to arrive at the representative sites.

We are concerned that the list of alternatives has not been developed by any methodical analysis of viable wind sites in New England. Instead, the sites under consideration have been accumulated via suggestions made at meetings based on independent knowledge. While this has certainly identified potential sites, the methodology could be open to criticism in that it does not objectively look at the region as a whole. We recognize the difficulty in evaluating a large, geographical area such as New England, however, it seems that such an exercise is vital in order for the EIS Alternative Analysis to be supportable. An approach that would potentially address this concern was suggested by the Peer Review group: "What would be helpful would be some analysis showing areas in New England with the required wind speed, the amount of land required, and the cost of transmission upgrades needed for grid access." This would clearly provide an objective base for the start of the analysis, from which the screening criteria could be applied.

### *Additional Suggestions*
We are encouraged by the consideration of multiple sites as an alternative to a single, large facility. We strongly believe that distributed facilities have many benefits, not the least of which is the potential for easier integration into the transmission system and potentially lesser environmental impacts. However, as we have commented in earlier correspondence, we don't believe that close geographical proximity is necessarily an appropriate factor when considering multiple sites, although it may affect the economic return on the project. Therefore, we would suggest that this constraint be reconsidered.

Based on the discussions at the September 24th meeting and the meeting we attended in Boston on September 29 and 30 sponsored by the Dept of Energy, it seems that a potential combination of sites worth considering would be a combination of Boston Harbor and New Bedford. The National Park Service has already begun a process of evaluating wind turbines in the Boston Harbor Islands Recreation Area and the Town of Hull is considering placing additional turbines offshore in the vicinity. It also appeared from the US Coast Guard that there would be room for turbines outside the navigational channels of New Bedford. This combination of smaller deployments would provide a more urban setting for offshore facilities and may in combination reach the lower end of the range of facilities.

Furthermore, as we have suggested in prior correspondence, we believe the following alternatives should also be considered:
*   Smaller facilities (i.e. fewer turbines) at Horseshoe Shoals
*   Alternative design configurations that may have less visual impact. For instance, the Middlegrunden facility was redesigned to be more visually pleasing. It would be useful to have an analysis of different sized turbines, particularly in locations closest to shore, that would potentially have less visual impact and keep the capacity within the range under consideration.

2

CW0000006370

- An analysis of whether choosing the largest machines available makes the most efficient use of the wind resource, at least as weighed against the watersheet area occupied, prevailing versus average wind conditions, turbine spacing, rotor diameter and visual impacts. For example, could a smaller turbine or rotor that operates at lower wind speeds produce sufficient energy to make a project viable and have less visual impacts and occupy less area of the Sound? Cape Wind is proposing to use the largest turbine currently available to maximize return on investment. The EIS should provide an assessment of whether this approach is in the public interest.

*Peer Review Summary*

With reference to the Draft EIS conclusions on alternatives, the Peer Review Summary notes that "there are many cases where the logic used to reach these conclusions is either flawed or is stretching reality" and that it "has the appearance of being written by advocates for the project rather than the USACE". The aim of the EIS is to provide unbiased and objective information, and as such, even the appearance of a conflict or subjectivity can severely undermine the integrity of the process. It is currently unclear to what extent the Peer Reviewers comments will be embraced, but our hope is that the Corps is able to remedy the situation by presenting a balanced view of the complex information available.

This comment could also be made in relation to the application of the screening criteria, and the Commission staff would suggest that the Corps make every effort to consistently apply the selected criteria. For instance, navigational issues and proximity to shipping lanes and flight paths are raised as constraints for a number of offshore sites, although they are not listed under the screening criteria and no description of what constitutes a conflict is included. In contrast, Table 3-6 which deals with the three Nantucket Sound sites, repeatedly references "minimal conflicts" with shipping and aviation for those sites, but provides no discussion of what constitutes a minimal conflict. At face value, it seems that this criterion has not been evenly applied and it would therefore be appropriate to expand on how the criteria are applied and the parameters of each.

As a number of independent sources have confirmed, including the Peer Reviewers, the relevance of these criteria <u>depends</u> on many factors. By some estimates an offshore project could be viable with as little as 100MW (or less) capacity. As the Commission pointed out in our December 19, 2003 letter, this figure is in sharp contrast to Cape Wind's capacity and the range of projects under consideration in the EIS (200MW-1,500MW). It is perhaps more appropriate for the range of facilities under consideration to be based on what is economically feasible for renewable facilities, rather than what has historically been connected to ISO-New England's grid. We have continually commented that the range currently being used is inappropriate to the project purpose and need. This concern seems to be shared by the Peer Reviewers who felt that there are "utility scale" wind projects less than 200MW" and that "Many wind power plants with capacities under 100MW are installed in the US". We strongly recommend that the Corps reconsider whether this range is appropriate.

The size of the project has a direct bearing on the application of a number of the screening criteria, most notably the transmission surplus and land/watersheet area needed. At the September 24th meeting, many sites were shown to have insufficient capacity or

3

CW0000006371

available area to accommodate the range established (200-1,500 MW). However, this analysis would be different if a smaller area was needed and if a smaller surplus in the transmission capacity was applied. As mentioned in the Peer Review Summary, there are also some rules of thumb applied to this analysis (particularly regarding turbine spacing, rotor diameter and available area) that may be flawed which would further affect the viability of alternative sites. Therefore it seems that elimination of some sites at this stage may be premature, given the comments made by the Peer Review group.

A common thread that runs throughout the Peer Review summary refers to the economic considerations in developing this kind of project. These factors have a direct bearing on the applicability of the screening criteria. For instance, the economic viability of a project is as much related to the financier's return on investment, as it is to wind speed, water depth, land/water area and distance from shore, etc. Therefore, the EIS should also include a broad and generalized economic feasibility analysis for an offshore wind farm that is not specific to Cape Wind to provide an insight into these issues. This should include a detailed discussion of how the price paid for energy and "green attributes" affect the economic viability of a project and how wind resource relates to this analysis.

The Peer Review summary also raises a significant issue related to the long-term viability of the project and that should the project fail, it would be "the worst possible environmental outcome." It seems that this would also be the worst possible outcome for the emerging offshore wind energy industry, renewable energy advocates in general and for the users and neighbors of Nantucket Sound. This concern is shared by many and should be addressed in the EIS for this experimental technology. A "failed, bankrupt project" at the location selected by Cape Wind is likely to set renewable wind energy development back for decades and thus it is imperative that provision be made to address this issue. For instance, a phased installation would provide some degree of testing for the technology and would be consistent with the precautionary approach to emerging technologies. Similarly, although bonding for removal/decommissioning is traditionally a mechanism for dealing with abandoned facilities, it seems unlikely that Cape Wind would be willing to provide a bond sufficient to ensure complete site restoration.

We hope that the Corps will give careful consideration to the comments made by the Peer Review group as the Draft EIS is prepared, thank you for the opportunity to comment.

Sincerely,

Margo Fenn,
Executive Director,
Cape Cod Commission

cc:    Cape Cod Commission Subcommittee Members (Aitchison, Ansel, Broidrick,
       Kadar, Taylor, Virgilio)
       Leonard Fagan, Cape Wind Associates, LLC, 75 Arlington Street, Suite 704,
       Boston, MA 02116.
       Charlie Natalie, ESS Inc., 888 Worcester Street, Suite 240, Wellesley, MA 02482

4

CW0000006372

Arthur Pugsley, EOEA – MEPA Unit, 251 Causeway Street, Suite 900, Boston, MA 02114
Jane Mead, Massachusetts Coastal Zone Management, 251 Causeway Street, Suite 900, Boston, MA 02114
Vernon Lang, US Fish and Wildlife, 70 Commercial Street, Suite 300, Concord, NH 03301
Tim Timmerman, EPA-New England, Region 1, 1 Congress Street, Suite 1100, Boston, MA 02114-2023

CW0000006373

**59**

CW0000006374



**DEPARTMENT OF THE ARMY**
NEW ENGLAND DISTRICT, CORPS OF ENGINEERS
696 VIRGINIA ROAD
CONCORD, MASSACHUSETTS 01742-2751

REPLY TO
ATTENTION OF

RECEIVED

JUL 1 9 2004

PERKINS COIE LLP

Office of Counsel                                                July 14, 2004

Ms. Jena MacLean
Perkins Coie
607 14th Street NW
Washington, D.C. 20005

Re: Proposed Meeting To Discuss Legal Issues

Dear Ms. MacLean:

I am writing in response to your letter dated July 8, 2004, in which you requested a
meeting with me to discuss legal issues relating to the Cape Wind project.  While I
appreciate your raising issues of concern regarding this project, I do not think a meeting
to discuss the legal issues you raised would be productive, as I would not wish to risk
waiving my clients' privileges by engaging in a conversation regarding the agency's
position on legal issues.  However, I would encourage you to submit any written
comments that you deem appropriate, as you have done in the past.

                                         Sincerely,

                                         John P. Almeida

                                         John Almeida
                                         Assistant District Counsel

CW0000006375

**60**

CW0000006376



# Conservation Law Foundation

Date:  May 5, 2004

Mr. Patrick H. Wood, III, Chairman
Federal Energy Regulatory Commission
838 First Street NE
Washington DC  20426

Re:    Regional Liquefied Natural Gas (LNG) Terminal Siting in New England

Dear Chairman Wood;

As you are aware, proposals for new Liquefied Natural Gas (LNG) terminals in New England and across the country have become extremely controversial.  From my perspective as President of the Conservation Law Foundation (CLF), New England's largest regional environmental organization with offices throughout New England, it is apparent that LNG terminal siting is a regional issue of great importance and with significant environmental implications.  CLF therefore proposes that the Federal Energy Regulatory Commission (FERC) work with the Governors of New England's coastal states and other federal officials to address the very complicated and controversial issues associated with LNG terminal siting through a New England region-wide approach.

CLF believes that New England's key regional policymakers need to engage in finding a solution to this issue, one that works for all New Englanders.  After careful consideration, we believe that the solution lies in a regional evaluation of the merits of adding one or more new LNG terminals to New England's energy base and the development of a regional strategic plan for new terminal siting prior to approval of any individual terminal.  This evaluation should include examination of opportunities at the state level to reduce overall energy demand through increased efficiency and to reduce demand for fossil fuels through increased use of renewable energies.  CLF does not have the answers to these critical questions about terminal siting, but we ask you, as regional policymakers, to develop and evaluate the information needed to make fair and informed decisions about the need for additional terminal capacity in New England and the siting of such terminals.  In the end, CLF's objective is to ensure that any new LNG terminal in New England is sited fairly, strategically, in an environmentally protective manner and on the basis of need.

To date, proposals for several potential LNG terminal sites have been advanced in New England, specifically in Maine, Massachusetts and Rhode Island.  These proposals, however, are advancing on a community-by-community basis.  As such, they are not part of a coherent strategy for evaluating the merits of one or more new terminal(s) for New England generally, or for any particular community specifically.  From CLF's perspective, this *ad hoc* approach has not been effective and will continue to founder.  It has pitted New England communities against one another in wrestling with the merits and the risks of specific proposals.  This has led to very unproductive results.

62 Summer Street,  Boston, Massachusetts 02110-1016 • Phone: 617-350-0990 • Fax: 617-350-4030 • www.clf.org

MAINE: 120 Tillson Avenue, Suite 202, Rockland, Maine 04841-3416 • 207-594-8107 • Fax: 207-596-7706
NEW HAMPSHIRE: 27 North Main Street, Concord, New Hampshire 03301-4930 • 603-225-3060 • Fax: 603-225-3059
RHODE ISLAND: 55 Dorrance Street, Providence, Rhode Island 02903 • 401-351-1102 • Fax: 401-351-1130

CW0000006377

## Conservation Law Foundation

One issue that must be addressed is how much natural gas New England needs. There is tremendous variability in forecasts for New England's demand for natural gas. This is in part because many forecasts are made in support of specific agendas. Demand for natural gas in New England is partially driven by an environmental agenda: natural gas is an important transitional fuel until we move to a comprehensive renewable energy base. Simply put, more natural gas supply means lower prices; lower prices mean that cleaner-operating natural gas plants supply more of New England's energy demand. Indeed, significant air quality benefits would accrue if the natural gas power plants that now make up a substantial portion of the generating base of New England are fully utilized. New England's Independent System Operator forecasts that in 2005 roughly 45 percent of our regional electrical generating capacity will utilize natural gas. The Massachusetts Division of Energy Resources and the US DOE Energy Information Administration similarly forecast a steady rise in the percentage of New England's electricity coming from these plants.

Analysis by your staff estimates that peak monthly natural gas use can be met with the existing import capacity through 2005, and that proposed additions to import capacity would provide adequate capacity through 2010. But that analysis assumes that in addition to planned additions to pipeline capacity, some of which are in construction, by 2010 there will be (a) at least one new major LNG terminal built in Eastern Canada, (b) significant expansion of the existing LNG terminal in Boston Harbor and (c) at least one other new major LNG terminal, or two to three smaller LNG terminals with roughly the same capacity as a single large facility, in New England.

There are currently four announced LNG terminal proposals in New England and two in Eastern Canada. One proposed terminal for Harpswell, Maine was voted down by the community under very acrimonious circumstances on March 9 and now may be off the table. That result immediately focused attention on an undefined proposal to build an LNG terminal on Sears Island, in Penobscot Bay, Maine. Three other proposed terminals are clustered at the upper end of Narragansett Bay, Rhode Island. All three would require LNG tankers to travel up the main shipping channel of Narragansett Bay through the heart of Rhode Island waters. There is also an existing LNG terminal in Everett, Massachusetts and many people are concerned about possible future plans for expanding that facility.

New or expanded LNG terminals present significant potential environmental impacts. The risk of a catastrophic event would seem to argue against siting in urban areas such as those in Rhode Island and Massachusetts. While the extent of this risk is the subject of considerable debate, CLF believes that such a risk is, at a minimum, sufficiently credible to require a complete review as part of a regional approach to siting. On the other hand, there are numerous potential environmental impacts to the less populated coastal areas of Maine. One reason the Harpswell site was voted down was due to potential impacts on lobster fishing. Although Sears Island offers access to a deepwater port with suitable infrastructure, it is Maine's largest undeveloped island and the project may require considerable dredging. Sears Island is also located in the upper reaches of Penobscot Bay, a tremendous scenic and natural resource and some of the richest lobstering grounds in the world. More generally, there is also concern that LNG terminal siting, including potential off-shore sites, may provide additional infrastructure that will encourage exploration and development of potential off-shore oil and gas resources such as Georges Bank, long defended by CLF and others from such drilling.

CW0000006378

**Conservation Law Foundation**

Complicated issues such as these lead us to conclude that the best approach would be regional and strategic and address these issues proactively. There may be several tools that can serve as vehicles for such an approach. One tool that FERC could use would be the development of a programmatic environmental impact statement (EIS). The National Environmental Policy Act (NEPA) provides for the preparation of programmatic EISs in order to evaluate "broad actions" geographically (e.g., by region) or generically (e.g., common timing, impacts, alternatives), and anticipates that connected, cumulative or similar actions should be evaluated in a single EIS. 40 C.F.R. §§ 1502.4(b)(c); 1508.25(a)(1)-(3). The programmatic EIS can then be used to facilitate and expedite the preparation of subsequent project-specific EISs ("tiering"), allowing those documents to concentrate only on site-specific issues. 40 C.F.R. §§ 1500.4-5; 1502.4(d); 1502.20. Alternatively, a separate but equally rigorous regional alternatives study involving federal, state, and private participants could accomplish similar results, leaving the environmental impact analysis to FERC and the individual project proponent(s).

CLF believes that undertaking a regional approach to LNG terminal siting represents an important opportunity to address this controversial issue in a strategic manner and propel consideration beyond the current, site-specific, polarized siting debates. Most importantly to all of us, a more rational approach to LNG siting could help reduce New England's dependence on dirtier fuels like coal and oil while ensuring that the terminal site selection process provides an economically sensible and environmentally acceptable result.

In the coming weeks, my staff will contact your office to discuss FERC's interest in participating in initial meetings designed to advance a regional approach to LNG terminal siting. I appreciate your time and consideration of this proposal and look forward to working with your office to resolve this issue of utmost importance to New England. You or your staff may also contact me directly at 617-350-0990.

Sincerely yours,

Phillip Warburg, President
Conservation Law Foundation

CC     Robert W. Varney, Regional Administrator, USEPA
       Governor John E. Baldacci, State of Maine
       Governor Craig Benson, State of New Hampshire
       Governor Donald L. Carcieri, State of Rhode Island
       Governor Mitt Romney, Commonwealth of Massachusetts
       Governor John G. Rowland, State of Connecticut
       Senator Edward M. Kennedy, Commonwealth of Massachusetts
       Senator John F. Kerry, Commonwealth of Massachusetts
       Senator Olympia J. Snowe, State of Maine
       Senator Susan M. Collins, State of Maine
       Senator Jack Reed, State of Rhode Island
       Senator Lincoln D. Chafee, State of Rhode Island
       Senator Judd Gregg, State of New Hampshire
       Senator John E. Sununu, State of New Hampshire
       Senator Christopher J. Dodd, State of Connecticut

CW0000006379

## Conservation Law Foundation

Senator Joseph I. Lieberman, State of Connecticut

CW0000006380

61

CW0000006381



**Alliance to Protect
Nantucket Sound**

**396 Main St., Suite 2  Hyannis, MA 02601    508-775-9767**
**www.saveoursound.org**

May 25, 2004

Colonel Brian A. Green
U.S. Army Corp of Engineers
New England District
696 Virginia Road
Concord, MA  01742

Dear Colonel Green:

The Alliance to Protect Nantucket Sound has consistently argued that a programmatic
and region-wide approach to the potential siting of offshore wind projects must be
undertaken <u>before</u> the consideration of individual projects, such as the proposed Cape
Wind project.  The grounds for such an approach include all of the following:

- offshore wind projects "in New England and across the country have become
  extremely controversial";

- offshore wind project "siting is a regional issue of great importance and with
  significant environmental implications";

- offshore wind projects are "very complicated and controversial" and "the
  solution lies in a regional evaluation of the merits of adding one or more
  [offshore wind projects] to New England's energy base and the development of
  a regional strategic plan for [project] siting prior to approval of any individual
  [facility]";

- there is no "coherent strategy for evaluating the merits of one or more
  [projects] for New England generally, or for any particular community
  specifically";

- the current "<u>ad hoc</u> approach has not been effective and will continue to
  founder";

- "there may be several tools that can serve as vehicles for such an approach";

- the most appropriate vehicle for such a review is "the development of a
  programmatic environmental impact statement" under the National

[39223-0001/DA041310.007]

CW0000006382

Colonel Brian A. Green
May 25, 2004
Page 2

    Environmental Policy Act, which is used to evaluate "broad actions
    geographically (e.g., by region) or generically (e.g., common timing, impacts
    alternatives), and anticipates that connected, cumulative or similar actions
    should be evaluated in a single EIS"; and

- such an approach, rather than project-specific, ad hoc analysis, such as is
  occurring now with great controversy, inefficiency, delay, and inadequate
  review, "can then be used to facilitate and expedite the preparation of
  subsequent project-specific EISs."

The Alliance first requested that the Corps adopt this approach by letter of April 1,
2004. The Safewind Coalition joined in this request in April, as well.

All of the above quotations, which the Alliance agrees with, come from a May 5,
2004 letter by the Conservation Law Foundation (CLF). Attachment 1. That letter is
written to the Chairman of the Federal Energy Regulatory Commission regarding the
potential development of Liquified Natural Gas terminals in New England. CLF's
logic makes perfect sense, not only for LNG energy development, but also for
offshore wind, and the Alliance again requests that the Corps suspend its
environmentally unsound, unlawful, and conflict-inducing review of individual
offshore wind projects such as the Cape Wind proposal in favor of the programmatic
EIS approach advocated by CLF for region-wide energy development. The recent
report of the U.S. Commission on Ocean Policy also calls for the use of a
programmatic analysis of offshore wind energy development before individual
projects are considered.

The need for such an approach is all the more evident now that a proposal has ripened
for another major offshore wind project only 200 or so miles from the site of the
proposed Cape Wind project. That project site on the southern coast of Long Island
is, of course, a viable alternative to Nantucket Sound, as are many other locations
considered and apparently ruled out by the Corps. Attachment 2. In fact, the Long
Island site is closer to the Nantucket Sound site than some of the other alternatives
that the Corps agreed to consider. There is no valid basis for precluding sites simply
because they are not located in New England.

While the Alliance takes no position on the merits of the Long Island site, it is clear
that the existence of such a project is further evidence of the need for a programmatic
EIS. It also is an alternative that must be considered to the Nantucket Sound locations

CW0000006383

Colonel Brian A. Green
May 25, 2004
Page 3

for the Cape Wind project. A programmatic EIS would clearly establish the basis upon which these and other sites could be considered, to use CLF's words, for purposes of developing a "regional strategic plan for siting prior to approval of any individual" project.

The Alliance again requests that the Corps adopt the legally-required, rational approach of undertaking a programmatic EIS of offshore wind before conducting any site-specific studies permit application reviews.

Very truly yours,

Susan Nickerson
Executive Director

Attachments

cc:    See attached list

CW0000006384

Cooperating Agency Listing

**Phil Dascombe**
**Cape Cod Commission**
3225 Main Street
Barnstable, MA 02630

**Theresa Flieger**
**Federal Aviation Administration**
12 New England Executive Park
Burlington, MA 01803

**Jim Fargo**
**Federal Energy Regulatory Commission**
888 First Street NE
Washington, DC 20426

**Timothy Timmerman**
**Environmental Protection Agency**
1 Congress Street, Suite 1100
Boston, MA 02114-2023

**Truman Henson**
**Massachusetts Coastal Zone Management Office**
3225 Main Street
Barnstable, MA 02630

**Arthur Pugsley**
**MEPA**
100 Cambridge Street, Suite 900
Boston, MA 02114

**Karen Kirk Adams**
**U.S. Army Corps of Engineers**
New England District
696 Virgina Road
Concord, MA 01742

**Vernon Lang**
**U.S. Fish and Wildlife Service**
70 Commercial Street, Suite 300
Concord, NH 03301-5094

CW0000006385

**Edward LeBlanc**
**U.S. Coast Guard**
MSO Providence
20 Risho Ave.
Providence, RI 02914

**Jack Terrill**
**National Marine Fisheries Service**
One Blackburn Drive
Glouster, MA 01930-2298

**Al Benson**
**Department of Energy**
Boston Regional Office
JFK Federal Building Room 675
Boston, MA 02203

**Barry Ducker**
**Minerals Management Service**
381 Elden Street
Mail Spot 4010
Herndon, VA 20170
Phone: (703) 787-1296

**Brona Simon**
**Massachusetts Historic Commission**
220 Morrissey Boulevard
Boston, MA 02125

**Beverly Wright**
**Wampanoag of Gay Head Aquinnah**
20 Black Brook Road
Aquinnah, MA 02535

**Maria Burks – Superintendent**
Cape Cod National Seashore
National Park Service
99 Marconi Site Road
Wallfleet, MA 02667

**Brian Nickerson**
**Massachusetts Military Reservation**
Building 1203
West Inner Road
Camp Edwards, MA 02542

CW0000006386

**John Pagini**
**Nantucket Planning & Economic Development Commission**
1 East Chesnut Street
Nantucket, MA 02554

**Colonel Michael W. Pratt**
**New England District Office**
696 Virgina Road
Concord, MA 01742-2751

**Horst Greczmiel**
**Associates Director for NEPA**
Council on Environmental Quality
722 Jackson Place NW
Washington, DC 20503

**Phillip Warburg**
**Conservation Law Foundation**
62 Summer Street
Boston, MA 02110 -1016

CW0000006387

62

CW0000006388



# CONSERVATION LAW FOUNDATION

June 10, 2004

Colonel Brian A. Green
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742

Re:   *May 25, 2004 Letter from the Alliance to Protect Nantucket Sound*

Dear Colonel Green:

In a letter to you dated May 25, 2004, the Alliance to Protect Nantucket Sound (Alliance) urged the Corps to conduct a programmatic EIS and to suspend any further review of Cape Wind's proposal for a wind farm on Horseshoe Shoals in Nantucket Sound. Of particular concern to the Conservation Law Foundation (CLF) is that the Alliance's letter misleadingly invokes arguments advanced by CLF in favor of a regional strategic assessment of the need for additional Liquefied Natural Gas (LNG) terminals in New England. The purpose of this letter is to highlight the fundamental differences between CLF's proposal for a regional strategic plan for siting new LNG terminals and the Alliance's call for a moratorium and programmatic EIS on offshore wind development.

First, CLF's proposal for regional planning for LNG is premised on a fundamental data gap in the LNG context that simply does not exist for offshore wind. There is tremendous variability in forecasts for New England's demand for natural gas. As a result, we do not know how much gas is needed and how many new LNG facilities would be required to meet the region's demand for gas. Quite the opposite is true in the context of wind power. We know that large-scale renewable energy development is essential to meet Massachusetts's obligations under the Renewable Portfolio Standard (RPS) and to achieve the dramatic reductions in greenhouse gas emissions needed to minimize the threat of severe climate change. It is well-known that New England needs a number of small and medium-sized renewable energy projects on land *and* at least one project of the size, scale and scope of the proposed Cape Wind project in order to meet the RPS and climate change goals. We also know that wind is the most economically viable renewable energy source and that the Cape Wind project is presently the *only* proposal for a project of this size, scale, and scope in the region. The Alliance's suggestion that the Long Island wind project site "is an alternative that must be considered to the Nantucket Sound locations" ignores the fact that the Long Island project by its nature (i.e., because it is in New York and sponsored by a New York State public authority) cannot supply renewable energy that counts towards Massachusetts' RPS obligations.

62 Summer Street, Boston, Massachusetts 02110-1016 • Phone 617-350-0990 • Fax 617-350-4030 • www.clf.org

MAINE: 120 Tillson Avenue, Rockland, Maine 04841-3416 • Phone 207-594-8107 • Fax 207-596-7706
NEW HAMPSHIRE: 27 North Main Street, Concord, New Hampshire 03301-4930 • Phone 603-225-3060 • Fax 603-225-3059
RHODE ISLAND: 55 Dorrance Street, Providence, Rhode Island 02903-2221 • Phone 401-351-1102 • Fax 401-351-1130
VERMONT: 15 East State Street, Suite 4, Montpelier, Vermont 05602-3010 • Phone 802-223-5992 • Fax 802-223-0060

PRINTED ON RECYCLED PAPER 

CW0000006389

# CONSERVATION LAW FOUNDATION
*Defending the Law of the Land*

Second, fundamentally different motives underlie CLF's proposal for regional planning for LNG and the Alliance's call for a programmatic EIS on offshore wind development. CLF recognizes a need for increasing the region's supply of natural gas as a transition fuel while we work to expand our use of renewable energy resources, and has called for a regional strategic analysis to ensure that proposals for new LNG terminals are based on well-documented regional need. A programmatic EIS would be one option of many for conducting the regional assessment. The Alliance, on the other hand, has made very clear that its mission is to stop the Cape Wind proposal from becoming a reality, and has called for a programmatic EIS in an attempt to stall or prevent the project from moving forward. Indeed, the Alliance has explicitly asked the Corps to *suspend* further consideration of the Cape Wind proposal as part of a programmatic EIS. By contrast, in the LNG context, CLF has stated that a clear regional assessment should precede a *decision* on any individual sites, but has not suggested that relevant review processes for individual sites should be put on hold.

I hope that this letter resolves any confusion that may have resulted from the Alliance's correspondence of May 25, 2004. CLF continues to support rigorous and timely review of the Cape Wind proposal under Section 10 of the Rivers and Harbors Act and under the National Environmental Policy Act (NEPA). Please feel free to contact me should you have any questions or wish to discuss this further.

Very truly yours,

Philip Warburg
President

Cc:   See attached distribution list

PRINTED ON RECYCLED PAPER ♻

Conservation Law Foundation

Distribution List:

Phil Dascombe
Cape Cod Commission
3225 Main Street
Barnstable, MA 02630

Theresa Flieger
Federal Aviation Administration
12 New England Executive Park
Burlington, MA 01803

Jim Fargo
Federal Energy Regulatory Commission
888 First Street NE
Washington, DC 20426

Timothy Timmerman
Environmental Protection Agency
1 Congress Street, Suite 1100
Boston, MA 02114-2023

Truman Henson
Massachusetts Coastal Zone Management Office
3225 Main Street
Barnstable, MA 02630

Arthur Pugsley
MEPA
100 Cambridge Street, Suite 900
Boston, MA 02114

Karen Kirk Adams
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742

Vernon Lang
U.S. Fish and Wildlife Service
70 Commercial Street, Suite 300
Concord, NH 03301-5094

Edward LeBlanc
U.S. Coast Guard
MSO Providence
20 Risho Ave.
Providence, RI 02914

Jack Terrill
National Marine Fisheries Service
One Blackburn Drive
Gloucester, MA 01930-2298

Al Benson
Department of Energy
Boston Regional Office
JFK Federal Building Room 675
Boston, MA 02203

Barry Ducker
Minerals Management Service
381 Elden Street
Mail Spot 4010
Herndon, VA 20170

Brona Simon
Massachusetts Historic Commission
220 Morrissey Boulevard
Boston, MA 02125

Beverly Wright
Wampanoag of Gay Head Aquinnah
20 Black Brook Road
Aquinnah, MA 02535

Maria Burks – Superintendent
Cape Cod National Seashore
National Park Service
99 Marconi Site Road
Wallfleet, MA 02667

*CLF: "Defending the Law of the Land"*

CW0000006391

Conservation Law Foundation                                    —

Brian Nickerson
Massachusetts Military Reservation
Building 1203
West Inner Road
Camp Edwards, MA 02542

John Pagini
Nantucket Planning & Economic Development
Commission
1 East Chestnut Street
Nantucket, MA 02554

Colonel Michael W. Pratt
New England District Office
696 Virginia Road
Concord, MA 01742-2751

Horst Greczmiel
Associates Director for NEPA
Council on Environmental Quality
722 Jackson Place NW
Washington, DC 20503

Susan Nickerson
Executive Director
Alliance to Protect Nantucket Sound
396 Main Street, Suite 2
Hyannis, MA 02601

Martin Walsh
Legislative Assistant
Office of Senator Edward Kennedy
317 Russell Senate Office Building
Washington, DC 20510

*CLF: "Defending the Law of the Land"*

CW0000006392

**63**

CW0000006393



**Alliance to Protect**
**Nantucket Sound**

396 Main St., Suite 2  Hyannis, MA 02601   508-775-9767
www.saveoursound.org

June 29, 2004

Lt. Col. Brian A. Green
U.S. Corps of Engineers
New England District
696 Virginia Road
Concord, Massachusetts  01742

**Re:   June 10, 2004 Letter From Conservation Law Foundation**

Dear Colonel Green:

On May 25, 2004, I wrote to you on behalf of the Alliance to Protect Nantucket Sound to express our support for the position of the Conservation Law Foundation (CLF) that a programmatic environmental impact statement is necessary to review the potential for developing liquefied natural gas (LNG) facilities throughout New England.  As stated in my letter, the Alliance strongly believes these same principles apply directly to the review of the Cape Wind project.  Mr. Phillip Warburg, President of CLF, wrote to you on June 10, 2004, clarifying CLF's position.  I am writing in response to his letter.

The Alliance strongly supports CLF's position regarding LNG facilities.  We commend CLF for taking this position, and by copy of this letter to the Federal Regulatory Energy Commission, the Alliance urges the federal agencies involved in LNG facility review to adopt the CLF position.  CLF has established an outstanding reputation over many years protecting the environment of New England.  The Alliance looks forward to many years of working with CLF to protect the natural resource values of Nantucket Sound and to develop a comprehensive program for protecting the coastal and ocean areas of Massachusetts.  Ad hoc decision-making on LNG facilities is a threat to the development of such a program, and we oppose the review of specific project proposals before an overall program to guide decision-making is created.  As explained below, the same principles also apply to offshore wind.

In the June 10 letter, CLF explains why it holds the Cape Wind project to a different standard.  As stated by Mr. Warburg, CLF's position derives principally from "Massachusetts' obligations under the renewable portfolio standard (RPS)."  Mr. Warburg states that "[i]t is well known that New England needs a number of small and medium-sized renewable energy projects on land *and* at least one project of the size, scale and scope of the proposed Cape Wind project in order to meet the RPS and climate change

CW0000006394

June 23, 2004
Page 2

goals." Thus, CLF is looking the Cape Wind project from the perspective of the RPS and alternative energy in New England. Further, CLF appears to have also made the internal policy determination that the Cape Wind proposal should be viewed only from the perspective of the need to bring online "at least one" large-scale wind energy project someplace in New England.

The Alliance takes a broader perspective. We believe that the issues presented by the Cape Wind proposal transcend the Massachusetts RPS. Indeed, because the Corps must make a decision on the Cape Wind project based upon the broad "public interest" test, advancing the Massachusetts RPS cannot be a limiting factor for the federal review. While CLF is free to base its position on the Cape Wind proposal on the project's relationship to the RPS, the Corps must define the scope of its action, and the alternatives considered, under much broader standards dictated by the overall public interest test.

The serious climate change problem does not, of course, lend itself to resolution on the local, or even regional, scale. To address this problem successfully, a coordinated effort is necessary on a widescale basis. Limiting potential solutions to a field as narrow as achieving the Massachusetts RPS or placing large-scale projects in New England, when more environmentally acceptable sites are readily available in other locations, is not the most effective way to proceed to address the global warming problem.

The broader perspective adopted by the Alliance on this issue also is repeated in the recent report from the U.S. Commission on Ocean Policy. The Commission recommends the use of a programmatic approach for reviewing offshore wind energy projects and acknowledges the need to establish new legal authorities that are specifically directed at this issue. The Commission determined that current law is inadequate for this purpose, a position the Alliance has taken from the outset of the Corps' review.

Finally, even under CLF's own definition of the need to meet the Massachusetts RPS, the approach being used for the Cape Wind project is invalid. The Corps is yielding improperly to the profit-making objectives of the permit applicant and following an approach that violates the National Environmental Policy Act by looking only at large-scale projects within New England. The limitation to New England has no rational basis. In addition, CLF states that "a number of small and medium size renewable energy projects" also will be needed to meet the Massachusetts RPS. If helping Massachusetts achieve its RPS standards is indeed a factor to be considered in the review of the Cape Wind project proposal, then the permit application review should also take into account those "small and medium size" projects both on land and offshore. The Corps has failed to undertake the necessary alternatives review, thereby compromising the environmental impact statement.

CW0000006395

June 23, 2004
Page 3

Thank you for considering these concerns.  Please contact me if you have any questions regarding the Alliance's position.

Very truly yours,

Susan Nickerson
Executive Director
Alliance to Protect Nantucket Sound

cc:     see attached list

CW0000006396

Cooperating Agency Listing

**Patrick H. Wood, III**
**Federal Energy Regulatory Commission**

**Phil Dascombe**
**Cape Cod Commission**

**Theresa Flieger**
**Federal Aviation Administration**

**Jim Fargo**
**Federal Energy Regulatory Commission**

**Timothy Timmerman**
**Environmental Protection Agency**

**Truman Henson**
**Massachusetts Coastal Zone Management Office**

**Arthur Pugsley**
**MEPA**

**Karen Kirk Adams**
**U.S. Army Corps of Engineers**

**Vernon Lang**
**U.S. Fish and Wildlife Service**

**Edward LeBlanc**
**U.S. Coast Guard**

**Jack Terrill**
**National Marine Fisheries Service**

**Al Benson**
**Department of Energy**

**Barry Ducker**
**Minerals Management Service**

**Brona Simon**
**Massachusetts Historic Commission**

CW0000006397

**Beverly Wright**
**Wampanoag of Gay Head Aquinnah**

**Maria Burks – Superintendent**

**Brian Nickerson**
**Massachusetts Military Reservation**

**John Pagini**
**Nantucket Planning & Economic Development Commission**

**Colonel Michael W. Pratt**
**New England District Office**

**Horst Greczmiel**
**Associates Director for NEPA**

**Phillip Warburg**
**Conservation Law Foundation**

CW0000006398

**64**

CW0000006399

## UNITED STATES GOVERNMENT
## MEMORANDUM                               U.S. FISH AND WILDLIFE SERVICE

NEW ENGLAND FIELD OFFICE
70 COMMERCIAL STREET, SUITE 300
CONCORD, NEW HAMPSHIRE 03301-5087

TO:          Karen Adams, Regulatory Division, NED                    December 11, 2002

FROM:        Vernon Lang, Assistant Supervisor, NEFO

SUBJECT:     Cape Wind Alternatives Screening Meeting

As requested at the November 25, 2002 meeting, I have reviewed the materials that were discussed and/or presented at the alternatives screening meeting including the presentations you emailed to the cooperating agencies.

My concerns remain essentially the same as those I expressed verbally at the meeting and in my November 13, 2002 Memorandum to you. I believe the alternatives screening process we discussed on November 25 is fundamentally flawed because as it is currently structured, it is essentially a strawman analysis to justify the applicant's proposals in Nantucket Sound. On one hand, the Corps is defining the project purpose to be a commercial scale renewable energy project providing power to the New England grid. On the other hand, the Corps is defining commercial scale to be within ± 20% of the applicant's 420 mw proposal and/or in the range of 200-1500 mw corresponding to recent ISO-NE projects. These definitions exclude fossil fuel and nuclear projects and all other renewable energy projects except a large scale wind facility or a theoretical tidal project. Working off these definitions, the applicant's consultant prepared an assessment of renewable technologies and concludes that each of them (solar, tidal, biomass, hydro and wave) except for wind are either infeasible (tidal); not feasible at a commercial scale (solar, wave); would require construction of numerous facilities to generate 420 mw and result in significant detrimental environmental impacts (biomass); or resources not sufficient in New England to provide 420 mw of new generation (hydro). Consequently, none of these technologies are carried forward in the EIS for further evaluation.

In the next screening step, the applicant's consultant prepared a fatal flaw matrix to screen potential wind energy sites. Some of the criteria are questionable as fatal flaw criteria. For example, a wind power classification of 4 or greater is used on the matrix while in Section 3.3.2.6.3 of the Renewable Technology Chapter, it says that a wind class 3 is needed to produce electricity from wind and that class 4 is preferred for utility-scale applications. Thus, it would seem that a wind class 3 should be the fatal flaw criterion, not wind class 4.

CW0000006400

-2-

Sufficient excess transmission capacity to transport 200-1500 mw on the ISO-NE transmission system and sufficient land or water area to accommodate a 200-1500 mw wind energy project are not appropriate fatal flaw criteria for renewable energy projects. In my view, these are self-serving criteria designed to eliminate small- and medium-sized renewable energy projects from the list of reasonable alternatives. Once again, the fatal flaw criteria are contradicted by the Renewable Technology Chapter Section 3.3.2.6.2 where it states that wind installations range in size from 0.7-112.5 mw. This contradiction is further supported by the size of existing and proposed wind projects in the NE-NY area with the largest being in the 100 mw range exclusive of Cape Wind. In Vermont, recent proposals include projects with 5 (Little Equinox Mountain), 10 (East Haven Radar Base), 27 (Magic Mountain), and 30 turbines (Lowell Mountain). Recent proposals in upstate New York range in size from 11.5 mw (Madison County) to 100 mw (Lewis County). The Brodie Mountain Project in Massachusetts is, I believe, in the 13.5 mw range. Of course, you are aware of the 1- and 2-turbine projects in Hull and Princeton.

As I stated in my November 13 Memorandum and at the meeting, what constitutes a commercial-scale facility should be determined by the type of technology involved. A commercial-scale methane recapture project and other renewables, including those evaluated in the Renewable Technology Chapter, are at or below 1 mw in size. The transmission capacity to serve these commercial-scale facilities should be sized accordingly.

Under engineering and design limitations, I believe greater discussion is needed on the significant wave height criterion of <18 feet. As I recall, the Arklow Bank, Ireland, and an offshore facility in England are in unprotected ocean waters, and may be subject to wave heights >18 feet. I believe other unprotected open ocean sites are being developed off Denmark and Germany. Since much of this wind technology is of European design, it would be appropriate to understand the wave conditions they are designing projects to withstand. The Corps should independently verify the design limits of this technology in offshore environments.

I believe the AC transmission line criterion needs to be looked at more closely. As I recall at the meeting, the applicant used a 25-mile limit as measured from the land/ocean interface to the offshore facility as the maximum distance that an undersea AC cable could be operated feasibly. As I recall from the Winergy pre-application meeting, the shoal areas southeast of Nantucket Island are in the range of 7-15 miles offshore. This distance is well within the 25-mile criterion for Nantucket Island and perhaps as a direct cable connection to the Cape. In addition, as discussed at the meeting, either a buried or aerial cable could be used to cross Nantucket with a cable connecting the Island to the Cape. This would also seem to keep the AC cables under the 25-mile criterion. The last issue here deals with the dismissal of the DC transmission cable. I believe the Corps needs to independently verify the availability or lack thereof of underwater DC transmission cable technology for offshore energy facilities.

CW0000006401

-3-

Renewable Technologies Chapter, Draft #2

As a general comment on this chapter, I detect a tendency to focus on the negative aspects of the renewable technologies except for wind power. I believe a more balanced discussion is needed to enable reviewers to understand the technology, where the technology is applicable, the capabilities of the technology, and the environmental benefits and impacts associated with its use. The end result should be to identify which of these energy technologies are reasonable alternative renewable energy technologies in the New England Region that require further evaluation in the Cape Wind EIS.

As I discussed at the meeting and in the screening section above, I do not believe these alternative technologies should be evaluated against the 420 mw ± proposal advocated by the applicant. To do so only makes a strawman analysis out of the alternatives analysis and invites criticism.

The applicant should confine the alternatives analysis to the New England geographical area for all technologies. The hydro analysis leaped into Northern Quebec and a discussion on impacts to native people. If the geographic range is expanded for one alternative, it should be expanded for all.

Specific Comments on Technology

Tidal - In Section 3.3.2.2.3, a statement is made that there are no viable sites in New England. In the late 1970s, the New England Division was conducting a feasibility study of tidal power in Cobscook Bay, Eastport, Maine. The paragraph should be modified to be consistent with the second paragraph in this Section.

In addition to traditional tidal power projects, a new generation of tidal-powered turbines is under development. At least one in Maine and one in Massachusetts have been proposed/installed using a helical turbine design. These are also known as the Gorlov helical turbine.

Biomass - It was not clear whether the applicant was including methane recapture projects at landfills and methane generation projects using manure under the broad category of biomass projects. These technologies should be evaluated since we have these projects in New England.

I believe the Corps needs to independently verify whether biomass gasification and/or combined cycle technology for any biomass fuel is commercially available. This could have a bearing on the acceptability of some of this technology from an air quality perspective.

Questions may be directed to me at 603-223-2541 or email vernon_lang@fws.gov.

CW0000006402

**65**

CW0000006403



December 19, 2002

Ms. Karen Kirk Adams
U.S. Army Corps of Engineers
New England Division
696 Virginia Road
Concord, MA 01742-2751

**RE:    Comments on Alternatives/Screening criteria & Visual Assessment**

Dear Ms Adams:

This letter is intended to supplement our comments of December 9, 2002 on the draft
screening criteria and alternative sites proposed for the Cape Wind Project. These
additional comments are generated in response to information presented at the latest
Massachusetts Technology Collaborative (MTC) Stakeholders meeting held on
December 12, 2002.

Visual Impact Assessments
We hope that the Corps is intending to embark on a full visual impact assessment that
goes beyond the photo-simulations presented to date and includes a study similar to the 8-
step process outlined in the presentation given on behalf of Dr. R.C. Smardon at the
December 12, 2002 MTC meeting. Dr Smardon's framework for analysis uses photo-
simulations in conjunction with a number of other factors, including coastal
characteristics and viewer sensitivity, to establish the visual impacts of a project. This
methodology is appropriate in the context of the review of this project.

Regarding the photosimulations themselves, we believe that the Corps should establish
set times for the photographs to be taken for each location, to allow a consistent
comparison between sites. For instance, the visual simulations presented at the MTC
Stakeholders meeting on December 12, 2002, showed similarities between the
simulations of the proponents and opponents in terms of the turbines size and scale.
However, although the photographs were taken in the same general location, differences
in the time of day, season and elevation of the photographs accounted for a marked
difference in the apparent visibility of the project. It would therefore seem appropriate to
establish set times of day for a series of photographs to be taken for each location (e.g
photos every 4 hours). This would show the project in a range of lighting conditions (i.e.

CW0000006404

front lit and back lit) and environmental conditions (i.e. diffused light, bright sun etc.) and would meet the purpose of NEPA in providing objective information for decision-makers. The Corps should also require that photo-simulations account for changes in season, when the angle of the sun may affect the visibility of the towers.

Perhaps more importantly, the photo-simulations currently presented are limited in that they present a static view of a moving project. This is problematic given the lack of comparable projects that illustrate what 170 moving objects in the marine environment will look like. The Commission staff would suggest that an animated visual assessment would provide a clearer picture of the eventual appearance of such a facility. For example, an animation was prepared for the Middelgrunden wind farm in Denmark that places a moving, simulated turbine into a static photograph. [Two animated simulations can be downloaded and viewed at http://www.middelgrunden.dk/MG_UK/project_info/visualization.htm]. Similar animations could be employed in a limited number of locations to help inform participants in the process and also used to compare the different visual impacts of alternative turbine configurations.

Alternatives & screening criteria
Our letter dated December 6, 2002, we recommended that the Corps include alternative turbine configurations as part of the DEIS in accordance with the NEPA guidelines contained in 33 CFR Part 325, Appendix B, Section 9(b), 5(c). This seems particularly relevant in light of the information provided on the Middelgrunden wind farm at the MTC meeting. The Middelgrunden turbines are spaced 183 meters (600 feet) apart, considerably closer than the half to one third mile (2,638 – 1,758 feet) separation of the Cape Wind turbines. Although the spacing of the Cape Wind turbines is partly to allow the use of the interstitial area by boats, it would be valuable for the DEIS to consider what a tighter arrangement of turbines would look like. Presumably, an arrangement of turbines of the same capacity as Cape Winds project where the spacing is minimized would result in the wind farm occupying a far smaller area and present a much reduced visual impact. Conversely, tighter spacing between turbines might also allow far greater numbers of turbines to occupy the same area as Cape Wind's current proposal, and presumably provide significantly larger amounts of electricity than the current 420 MW capacity. Although these options may not be preferable for the applicant, they would allow the relative merits of the applicants project and each alternative to be gauged, in accordance with the requirements of NEPA.

Earlier drafts of the preliminary alternative sites had listed more urban areas as sites for consideration, particularly the offshore areas in the vicinity of Boston Harbor and New Bedford. Our recollection is that these were dismissed as they may be hazardous to navigation. However, the video presentation of the Middelgrunden project clearly showed large vessels sailing very close to the turbines. The commentary noted that there was little concern about collision as the shallow water in the vicinity meant that ships would run aground before hitting the turbines. Presumably, this same rationale could be applied to offshore locations in and around Boston and New Bedford, and therefore we believe that these alternative sites should remain on the preliminary list for the DEIS.

CW0000006405

Finally, we would refer to the presentation given by Mr. Bruce Bailey describing the Long Island Power Authority's alternatives study, that used a commercially viable capacity of 100MW as their preliminary screening criteria. This size is in sharp contrast to the current 200 to 1,500 MW capacity of the preliminary screening criteria used for the DEIS on Cape Wind's project. Mr. Bailey's presentation reinforced our belief that the capacity range needs to be tailored to renewable energy generators rather than the range typical of connections to the ISO-New England grid to date. This point is discussed more fully in our December 9, 2002 letter.

I hope that these additional comments are helpful to the Corps as you develop the DEIS, thank you again for the opportunity to comment.

Sincerely,

Margo Fenn,
Executive Director,
Cape Cod Commission

cc:     Cape Cod Commission Subcommittee Members (Aitchison, Ansel, Broidrick, Deane, Kadar, Taylor, Virgilio)
        Craig Olmstead, Vice President – Project Development, Energy Management, Inc, 75 Arlington Street, Suite 704, Boston, MA 02116.
        Charlie Natalie, ESS Inc., 888 Worcester Street, Suite 240, Wellesley, MA 02482
        Arthur Pugsley, EOEA – MEPA Unit, 251 Causeway Street, Suite 900, Boston, MA 02114
        Jane Mead, Massachusetts Coastal Zone Management, 251 Causeway Street, Suite 900, Boston, MA 02114
        Vernon Lang, US Fish and Wildlife, 70 Commercial Street, Suite 300, Concord, NH 03301
        Timothy Timmermann, EPA-New England, Region 1, 1 Congress Street Suite 1100, Boston, MA 02114-2023

66

CW0000006407



# CAPE COD COMMISSION

3225 MAIN STREET
P.O. BOX 226
BARNSTABLE, MA 02630
(508) 362-3828
FAX (508) 362-3136
E-mail: frontdesk@capecodcommission.org

October 9, 2003

Ms. Karen Adams
U.S. Army Corps of Engineers
New England Division
696 Virginia Road
Concord, MA 01742-2751

**RE:   EIS Alternatives**

Dear Ms Adams:

Thank you for the opportunity to participate in the inter-agency meeting at your offices
on September 24, 2003 to discuss the alternatives and screening criteria for the Cape
Wind Environmental Impact Statement (EIS). The following comments are those of the
Commission staff as the Commission subcommittee has not reviewed the materials
distributed at the September 24th meeting regarding the Corps approach to the EIS
alternatives analysis, and in regard to the draft Peer Review comments and EIS
appendices. The Commission staff continues to look forward to assisting the Corps in
developing a thorough and objective EIS for this project.

_Meeting Notes_
We have received the draft notes of the September 24, 2003 meeting and in general
believe they reflect the gist of much of the discussion. At the meeting, agencies
represented were asked to comment on whether the sites under consideration were
appropriate or could be excluded from further analysis. Commission staff at the meeting
felt uncomfortable with commenting on many of these sites, particularly as the exact
locus was undefined and that the participants had no opportunity to conduct their own
assessment of the constraints for each site. There was also some disagreement on whether
some of the identified constraints were accurate. For example, some questioned whether
navigation issues for shipping at New Bedford would eliminate that site from
consideration. Speaking for the Commission staff only, the fact that few comments were
offered for individual sites at the meeting was more a reflection of a lack of information
than a signal of agreement. Therefore, we would suggest that where it is indicated that
there was a consensus or agreement, it should be clear that there was only partial
agreement among the participants.

_Alternative Sites/Flexible application of Screening Criteria_
The Commission staff support the Corps recent more flexible application of the screening
criteria for the alternatives analysis portion of the DEIS, rather than the pass/fail
application previously proposed. In addition, we believe that the analysis of

1

CW0000006408

representative alternatives has merit for such a complex project and that as a broad concept, this approach is worth pursuing. In principal at least, this approach would seem to allow for a broader range of alternatives (and their relative impacts) to be evaluated in the DEIS. However, Commission staff have some concerns over the steps taken to arrive at the representative sites.

We are concerned that the list of alternatives has not been developed by any methodical analysis of viable wind sites in New England. Instead, the sites under consideration have been accumulated via suggestions made at meetings based on independent knowledge. While this has certainly identified potential sites, the methodology could be open to criticism in that it does not objectively look at the region as a whole. We recognize the difficulty in evaluating a large, geographical area such as New England, however, it seems that such an exercise is vital in order for the EIS Alternative Analysis to be supportable. An approach that would potentially address this concern was suggested by the Peer Review group: "What would be helpful would be some analysis showing areas in New England with the required wind speed, the amount of land required, and the cost of transmission upgrades needed for grid access." This would clearly provide an objective base for the start of the analysis, from which the screening criteria could be applied.

*Additional Suggestions*
We are encouraged by the consideration of multiple sites as an alternative to a single, large facility. We strongly believe that distributed facilities have many benefits, not the least of which is the potential for easier integration into the transmission system and potentially lesser environmental impacts. However, as we have commented in earlier correspondence, we don't believe that close geographical proximity is necessarily an appropriate factor when considering multiple sites, although it may affect the economic return on the project. Therefore, we would suggest that this constraint be reconsidered.

Based on the discussions at the September 24th meeting and the meeting we attended in Boston on September 29 and 30 sponsored by the Dept of Energy, it seems that a potential combination of sites worth considering would be a combination of Boston Harbor and New Bedford. The National Park Service has already begun a process of evaluating wind turbines in the Boston Harbor Islands Recreation Area and the Town of Hull is considering placing additional turbines offshore in the vicinity. It also appeared from the US Coast Guard that there would be room for turbines outside the navigational channels of New Bedford. This combination of smaller deployments would provide a more urban setting for offshore facilities and may in combination reach the lower end of the range of facilities.

Furthermore, as we have suggested in prior correspondence, we believe the following alternatives should also be considered:
- Smaller facilities (i.e. fewer turbines) at Horseshoe Shoals
- Alternative design configurations that may have less visual impact. For instance, the Middlegrunden facility was redesigned to be more visually pleasing. It would be useful to have an analysis of different sized turbines, particularly in locations closest to shore, that would potentially have less visual impact and keep the capacity within the range under consideration.

CW0000006409

- An analysis of whether choosing the largest machines available makes the most efficient use of the wind resource, at least as weighed against the watersheet area occupied, prevailing versus average wind conditions, turbine spacing, rotor diameter and visual impacts. For example, could a smaller turbine or rotor that operates at lower wind speeds produce sufficient energy to make a project viable and have less visual impacts and occupy less area of the Sound? Cape Wind is proposing to use the largest turbine currently available to maximize return on investment. The EIS should provide an assessment of whether this approach is in the public interest.

*Peer Review Summary*
With reference to the Draft EIS conclusions on alternatives, the Peer Review Summary notes that "there are many cases where the logic used to reach these conclusions is either flawed or is stretching reality" and that it "has the appearance of being written by advocates for the project rather than the USACE". The aim of the EIS is to provide unbiased and objective information, and as such, even the appearance of a conflict or subjectivity can severely undermine the integrity of the process. It is currently unclear to what extent the Peer Reviewers comments will be embraced, but our hope is that the Corps is able to remedy the situation by presenting a balanced view of the complex information available.

This comment could also be made in relation to the application of the screening criteria, and the Commission staff would suggest that the Corps make every effort to consistently apply the selected criteria. For instance, navigational issues and proximity to shipping lanes and flight paths are raised as constraints for a number of offshore sites, although they are not listed under the screening criteria and no description of what constitutes a conflict is included. In contrast, Table 3-6 which deals with the three Nantucket Sound sites, repeatedly references "minimal conflicts" with shipping and aviation for those sites, but provides no discussion of what constitutes a minimal conflict. At face value, it seems that this criterion has not been evenly applied and it would therefore be appropriate to expand on how the criteria are applied and the parameters of each.

As a number of independent sources have confirmed, including the Peer Reviewers, the relevance of these criteria depends on many factors. By some estimates an offshore project could be viable with as little as 100MW (or less) capacity. As the Commission pointed out in our December 19, 2003 letter, this figure is in sharp contrast to Cape Wind's capacity and the range of projects under consideration in the EIS (200MW-1,500MW). It is perhaps more appropriate for the range of facilities under consideration to be based on what is economically feasible for renewable facilities, rather than what has historically been connected to ISO-New England's grid. We have continually commented that the range currently being used is inappropriate to the project purpose and need. This concern seems to be shared by the Peer Reviewers who felt "that there are "utility scale" wind projects less than 200MW" and that "Many wind power plants with capacities under 100MW are installed in the US". We strongly recommend that the Corps reconsider whether this range is appropriate.

The size of the project has a direct bearing on the application of a number of the screening criteria, most notably the transmission surplus and land/watersheet area needed. At the September 24th meeting, many sites were shown to have insufficient capacity or

3

CW0000006410

available area to accommodate the range established (200-1,500 MW). However, this analysis would be different if a smaller area was needed and if a smaller surplus in the transmission capacity was applied. As mentioned in the Peer Review Summary, there are also some rules of thumb applied to this analysis (particularly regarding turbine spacing, rotor diameter and available area) that may be flawed which would further affect the viability of alternative sites. Therefore it seems that elimination of some sites at this stage may be premature, given the comments made by the Peer Review group.

A common thread that runs throughout the Peer Review summary refers to the economic considerations in developing this kind of project. These factors have a direct bearing on the applicability of the screening criteria. For instance, the economic viability of a project is as much related to the financier's return on investment, as it is to wind speed, water depth, land/water area and distance from shore, etc. Therefore, the EIS should also include a broad and generalized economic feasibility analysis for an offshore wind farm that is not specific to Cape Wind to provide an insight into these issues. This should include a detailed discussion of how the price paid for energy and "green attributes" affect the economic viability of a project and how wind resource relates to this analysis.

The Peer Review summary also raises a significant issue related to the long-term viability of the project and that should the project fail, it would be "the worst possible environmental outcome." It seems that this would also be the worst possible outcome for the emerging offshore wind energy industry, renewable energy advocates in general and for the users and neighbors of Nantucket Sound. This concern is shared by many and should be addressed in the EIS for this experimental technology. A "failed, bankrupt project" at the location selected by Cape Wind is likely to set renewable wind energy development back for decades and thus it is imperative that provision be made to address this issue. For instance, a phased installation would provide some degree of testing for the technology and would be consistent with the precautionary approach to emerging technologies. Similarly, although bonding for removal/decommissioning is traditionally a mechanism for dealing with abandoned facilities, it seems unlikely that Cape Wind would be willing to provide a bond sufficient to ensure complete site restoration.

We hope that the Corps will give careful consideration to the comments made by the Peer Review group as the Draft EIS is prepared, thank you for the opportunity to comment.

Sincerely,

Margo Fenn
Executive Director,
Cape Cod Commission

cc:   Cape Cod Commission Subcommittee Members (Aitchison, Ansel, Broidrick, Kadar, Taylor, Virgilio)
   Leonard Fagan, Cape Wind Associates, LLC, 75 Arlington Street, Suite 704, Boston, MA 02116.
   Charlie Natalie, ESS Inc., 888 Worcester Street, Suite 240, Wellesley, MA 02482

CW0000006411

Arthur Pugsley, EOEA – MEPA Unit, 251 Causeway Street, Suite 900, Boston, MA 02114

Jane Mead, Massachusetts Coastal Zone Management, 251 Causeway Street, Suite 900, Boston, MA 02114

Vernon Lang, US Fish and Wildlife, 70 Commercial Street, Suite 300, Concord, NH 03301

Tim Timmerman, EPA-New England, Region 1, 1 Congress Street, Suite 1100, Boston, MA 02114-2023

CW0000006412

**67**

CW0000006413

Boston Business Journal - October 25, 2004
http://boston.bizjournals.com/boston/stories/2004/10/25/story1.html

# Boston Business Journal

## EXCLUSIVE REPORTS

From the October 22, 2004 print edition

### New Mass. wind plans aloft

**As controversy swirls over Cape Wind, some look beyond horizon**
**Alexander Soule**
Journal Staff

As the Army Corps of Engineers finalizes a massive environmental report on wind-power turbines off Nantucket, Massachusetts policymakers are crank-starting a plan to site turbines in the deeper reaches of the Atlantic Ocean.

Last week, the nascent Offshore Wind Energy Consortium hired a Washington, D.C.-based consulting firm called Resolve Inc. to produce a feasibility study by January.

The project currently has a budget of $700,000 underwritten by General Electric Co., the Massachusetts Technology Collaborative and the U.S. Department of Energy.

The Offshore Wind Energy Consortium (OWEC) is initially considering the use of either floating platforms anchored to the ocean floor or, more likely, stilts set in up to 100 feet of water. But other possibilities could emerge as well.

Near-shore projects, such as the one promoted by Cape Wind Associates off Nantucket, have been limited to shallower waters with depths of up to 50 feet.

"Is this goal reasonable and realistic? We (want to) get the people to the table who will ask the thorniest questions," said Greg Watson, an MTC official who is spearheading OWEC. "The feedback we have gotten is right on -- this is doable, and it is something we should do."

But it could take until the end of the decade to pull it off, he said, as the consortium faces an array of engineering, environmental, climatic, regulatory and financial challenges.

Niskayuna, N.Y.-based GE Global Research originally approached MTC about the project 18 months ago. In January, 13 organizations attended an informational meeting in Boston. In August, MTC issued invitations for consulting firms to bid on the project.

OWEC's general goal is to produce plentiful supplies of electricity at 5 cents per kilowatt hour or less -- a price that would put it on a competitive stance with natural gas, but still about 2 cents per kilowatt hour more expensive than traditionally generated power.

But the organization also envisions building a cluster of Massachusetts businesses supporting wind farms across the globe. They might manufacture turbines, cabling, sensors and towers. Or they might mind the wind farms themselves, performing ocean surveying, construction, maintenance and ecological monitoring.

In a 67-page report issued last week, Washington, D.C.-based policy think tank Renewable Energy Policy

CW0000006414

Project said some 90 companies in 25 states currently manufacture components of wind turbine systems. While the wind power industry could create more than 3,000 new jobs in Massachusetts, REPP estimated, Massachusetts only barely cracked the top 20 among states nationally, trailing far behind California, Ohio and Texas.

Somerville-based Second Wind Inc., which produces sensors for use in wind farms and employs 25 people, was the only Massachusetts company listed by REPP with expertise in the sector. Northern Power Systems Inc. in Waitesville, Vt., produces wind turbines, and a pair of Rhode Island companies make rotor blades and turbine housings.

The report may have missed at least one other player: A system from Westborough-based American Superconductor Inc. is used in Scotland's Orkney Islands to deal with power fluctuations produced by wind farms off the coast there.

The limited commercial manpower did not deter GE Global Research from exploring the feasibility of a wind farm off the Massachusetts coast, Watson said. The state has a Renewable Energy Trust Fund to help support the project, and GE recognized that policymakers here are getting their regulatory sea legs as the Nantucket wind farm proposal, being promoted by Boston-based Cape Wind Associates, goes through its contortions.

GE was also drawn by the presence in Massachusetts of other organizations with experience in wind power research. The Massachusetts Institute of Technology, the University of Massachusetts and Woods Hole Oceanographic Institute are earmarked to receive research funding from OWEC.

Europe is far ahead of the United States in wind power companies, Watson said. But he said Europe's topography, with abundant shoals that stretch far out of sight of land, has not encouraged the development of deep-water power generation techniques.

"What we have discovered as a result of the permitting process around Cape Wind is there are not that many shallow water sites that are developable," Watson said. At 50 feet, "that pushes the limit of these things -- as the waves bash against towers, there is a constant shaking and vibration. We can make (towers) sturdier, but that adds to the cost. Deep water (wind power generation) will not be about taking on-shore technology, sealing it up, and moving it off-shore. It will mean developing whole new technologies."

Denmark, the only other country to undergo the 1973 Arab oil embargo, leads the European wind power industry today with some 20,000 workers, said James Gordon, president of Cape Wind.

Gordon termed OWEC's timeline "pretty optimistic" for producing deep-water wind power by the end of the decade and said that Cape Wind must succeed in order to provide a training laboratory for future U.S. wind power engineers and executives.

"We think we can make Massachusetts a worldwide leader in wind power generation," Gordon said. "But how the heck (is OWEC) going to be able to do that without the experience we would bring?"

*Alexander Soule can be reached at asoule@bizjournals.com.*

© 2004 American City Business Journals Inc.

·● Web reprint information

*All contents of this site © American City Business Journals Inc. All rights reserved.*

CW0000006415

68

CW0000006416

Exhibit TAH-1

Department of Energy 906 Data

| Power Supplier | Facility Name | State | Fuel | Source | Average Capacity MW | Capacity MW 2000 | Capacity MW 2001 | Capacity MW 2002 | Capacity MW 2003 | Generation (GWh) 2000 | Generation (GWh) 2001 | Generation (GWh) 2002 | Generation (GWh) 2003 | Capacity Factor % 2000 | Capacity Factor % 2001 | Capacity Factor % 2002 | Capacity Factor % 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kotzebue Electric Assn Inc | Kotzebue | AK | Wind | 906A | 0.62 | | | | | | | | 17,316 | | | | 16.3% |
| Atlantic Renewable Energy | Altamont Midway Limited | CA | Wind | 906N | 40.92 | | 10.9 | 10.9 | | 18,972 | | | 14,293 | | | 18% | 19.9% |
| Cabazon Wind Partners LLC | Cabazon Wind Partners | CA | Wind | 906N | 40.92 | | | | 30.8 | | | 87,697 | | | | | 19.5% |
| CalWind Resources Inc | Tehachapi Wind Resource II | CA | Wind | 906N | 9.00 | | | | 8.3 | | | | 14,421 | | | | 24.2% |
| CalWind Resources Inc | Tehachapi Wind Resource II | CA | Wind | 906N | 21.80 | | 21.8 | 21.8 | 10.0 | | 23,692 | 40,488 | 40,709 | | 21% | 24.5% |
| Cameron Ridge LLC | Cameron Ridge | CA | Wind | 906N | 57.0 | 57.0 | 57.0 | 57.0 | 9.8 | 180,941 | 168,686 | 181,520 | 172,350 | 36% | 36% | 25% | 18.9% |
| DiWind Farms Ltd V | DiWind Farms Limited V | CA | Wind | 906N | 11.77 | | 11.8 | 11.8 | 9.9 | | 22,733 | 21,134 | 17,823 | | 13% | 27% | 22.1% |
| DiWind Farms Ltd VI | DiWind Farms Limited VI | CA | Wind | 906N | 27.11 | | 27.1 | 27.1 | 13.4 | | 50,255 | 16,704 | 48,194 | | 21% | 14% | 21.8% |
| DiWind Farms Ltd VII | DiWind Farms Limited VII | CA | Wind | 906N | 24.60 | | 24.0 | 24.0 | 24.9 | | 54,725 | 49,301 | 41,886 | | 26% | 20% | 23.8% |
| DiWind Farms Ltd VIII | DiWind Farms Limited VIII | CA | Wind | 906N | 15.00 | | 15.0 | 15.0 | 12.0 | | 22,984 | 25,119 | 21,586 | | 20% | 17% | 43.7% |
| Enron | Green Power I | CA | Wind | 906N | 15.00 | | 16.5 | 16.5 | 13.7 | | 49,337 | 20,820 | 4,486 | | 34% | 29% | 18.6% |
| ESI Mojave LLC | Mojave 16 | CA | Wind | 906N | 30.00 | | 30.0 | 30.0 | 30.0 | | 52,746 | 62,491 | 53,456 | | 20% | 24% | 20.3% |
| ESI Mojave LLC | Mojave 17 | CA | Wind | 906N | 25.00 | | 25.0 | 25.0 | 30.0 | | 49,627 | 51,841 | 46,731 | | 24% | 24% | 24.9% |
| ESI Mojave LLC | Mojave 18 | CA | Wind | 906N | 30.00 | | 30.0 | 30.0 | 30.0 | | 48,883 | 65,770 | 65,478 | | 19% | 25% | 24.9% |
| EUI Management Pa Inc | EUI/PH Wind Farm | CA | Wind | 906N | 25.54 | | 25.5 | 25.5 | 14.8 | | 49,997 | 54,604 | 22,584 | | 22% | 24% | 17.4% |
| Flowind Corp | Altamont Power LLC | CA | Wind | 906N | 28.70 | | 28.7 | 28.7 | 8.1 | | 9,693 | 6,371 | 3,524 | | 24% | 3% | 1.4% |
| FPL Energy | PointWinds LLC | CA | Wind | 906N | 140.60 | | | | 6.7 | | | | 155,688 | | | | 9.1% |
| FPL Energy | South Dakota Wind Energy Center | CA | Wind | 906N | 40.00 | | | | 9.7 | | | | 29,284 | | | 4% | 50.0% |
| Green Ridge Service LLC | Montezuma Hills Windplant | CA | Wind | 906N | 3.00 | | 60.0 | 60.0 | | 96,072 | 92,224 | 96,332 | 3,211 | 18% | 18% | 22% | 3.8% |
| Green Ridge Services LLC | San Gorgonio Windplant | CA | Wind | 906N | 3.00 | | | | 1.5 | | | 1,576 | | | | 12% | |
| International Turbine Res | Windplant I | CA | Wind | 906N | 17.44 | | 17.4 | 17.4 | 24.8 | | 36,053 | 32,720 | 26,543 | | 17% | 15% | 12.2% |
| International Turbine Res Inc | Dinosaur Point | CA | Wind | 906N | 17.44 | | 17.4 | 17.4 | 24.0 | | 23,451 | 27,997 | 23,796 | | 18% | 18% | 15.6% |
| Kenetech Windpower Inc | Altamont Pass Windplant | CA | Wind | 906N | 312.80 | 312.8 | 312.8 | 312.8 | 299.7 | 462,335 | 652,988 | 263,610 | 507,359 | 17% | 24% | 26.7% |
| Northwind Energy Inc | Northwind Energy Incorporated | CA | Wind | 906N | 13.06 | | 13.1 | 13.1 | 11.9 | | 19,632 | 16,611 | 15,940 | | 17% | 15% | 15.2% |
| Oak Creek Energy Systems Incorporated | Oak Creek Energy Systems Incorporated | CA | Wind | 906N | 27.90 | | 27.9 | 27.9 | 25.5 | | 77,700 | 82,278 | 82,278 | | 44% | 34% | 33.6% |
| Pacific West I | Pacific West I | CA | Wind | 906N | 2.10 | | 2.1 | 2.1 | 2.1 | | 7,410 | 8,032 | 8,032 | | 44% | 40% | 43.7% |
| PCE Energy | Mountain View I | CA | Wind | 906N | 44.40 | | | | 4.4 | | | 134,252 | 129,203 | | | 46% | 33.2% |
| PCE Energy | Mountain View II | CA | Wind | 906N | 22.20 | | | | 22.2 | | | 67,574 | 62,984 | | | | 32.4% |
| Ridgetop Energy LLC | Cannon Energy Corp | CA | Wind | 906N | 22.20 | | 60.4 | 60.4 | 22.2 | 200,079 | 154,224 | 160,602 | 39,764 | 38% | 38% | 31% | 37.3% |
| Ridgetop Energy LLC II | Carwest Partners | CA | Wind | 906N | 13.00 | 13.0 | 13.0 | 13.0 | 13.0 | 42,899 | 36,901 | 39,057 | 39,764 | 38% | 38% | 34% | 34.9% |
| Sacramento Mun Util Dist | Solano | CA | Wind | 906N | 6.80 | 6.8 | 6.8 | 6.8 | 16.7 | 6,774 | 7,136 | 4,310 | 26,919 | 11% | 12% | 3% | 18.6% |
| Seawest Windpower Farms Inc | San Gorgonio Farms Wind Energy Pow | CA | Wind | 906N | 16.70 | | 16.6 | 16.6 | 14.7 | | 104,029 | 96,341 | 32,764 | | 20% | 15% | 17.4% |
| Seawest Windpower Inc | Altech III | CA | Wind | 906N | 32.39 | | 32.4 | 32.4 | 31.5 | | 31,522 | 55,994 | 38,247 | | 14% | 17% | 29.9% |
| Seawest Windpower Inc | San Gorgonio Westwinds II LLC | CA | Wind | 906N | 43.40 | | | | 39.7 | | | | 103,893 | | | | 29.9% |
| Southern Calif Sunbelt Devel | From Hill | CA | Wind | 906N | 11.02 | | 11.0 | 11.0 | 7.3 | | 14,851 | 17,462 | 4,162 | | 15% | 18% | 6.5% |
| TPC Power Corp | Victory Garden II | CA | Wind | 906N | 14.56 | | 14.5 | 14.5 | 2.4 | | 73,784 | 81,158 | 7,623 | | 55% | 36% | 3.9% |
| TPC 3/5 Inc | Mojave 3 | CA | Wind | 906N | 23.50 | | 23.5 | 23.5 | 23.5 | | 70,807 | 74,088 | 66,135 | | 34% | 36% | 32.1% |
| TPC 3/5 Inc | Mojave 5 | CA | Wind | 906N | 22.50 | | 22.5 | 22.5 | 22.5 | | 67,751 | 68,844 | 66,734 | | 35% | 35% | 33.9% |
| TPC 4 Inc | Mojave 4 | CA | Wind | 906N | 29.00 | | 29.0 | 29.0 | 29.0 | | 84,317 | 86,924 | 75,171 | | 33% | 34% | 29.6% |
| TPC 4 Inc | TPC 4 Inc | CA | Wind | 906N | 29.00 | | | | 29.0 | | | | 67,565 | | | | 26.6% |
| Victory Garden Phase IV Part | Victory Garden Phase IV Partnership | CA | Wind | 906S | 39.75 | | 22.1 | 22.1 | 16.6 | | 40,282 | 22,080 | 36,479 | | 28% | 28% | 20.1% |
| VMSO IV Corp | Cabazon Wind Farm | CA | Wind | 906N | 39.75 | | 39.8 | 39.8 | 10.0 | | 201,280 | 99,742 | 17,613 | | 34% | 30% | 20.7% |
| Westwind LLC | Westwind Trust | CA | Wind | 906S | 16.04 | | 16.0 | 16.0 | 14.7 | | 29,360 | 34,337 | 24,113 | | 21% | 24% | 18.7% |
| Windland Inc | Windpower Hill Wind Partners | CA | Wind | 906N | 61.50 | | | | 46.3 | | | | 24,173 | | | | 16.2% |
| Windland Inc | Windland, Incorporated | CA | Wind | 906N | 16.00 | | 16.0 | 16.0 | 14.6 | | 22,707 | 26,615 | 28,318 | | 16% | 20% | 20.2% |
| Windpower Partners 1993 LP | San Gorgonio Windplant WPP93 | CA | Wind | 906N | 34.50 | | 34.5 | 34.5 | 34.5 | | 104,230 | 134,242 | 106,206 | | 35% | 44% | 35.1% |
| Windpower Partners Ltd | Victory Garden Ltd | CA | Wind | 906N | 16.20 | | 16.2 | 16.2 | 16.0 | | 47,485 | 47,905 | 33,716 | | 33% | 37% | 28.0% |
| Zond Systems Inc | Victory Garden | CA | Wind | 906N | 28.62 | | 28.6 | 28.6 | 4.8 | | 29,815 | 27,495 | 3,713 | | 20% | 22% | 12.6% |
| Zond Systems Inc | Painted Hills Wind Developers | CA | Wind | 906N | 19.19 | | 19.2 | 19.2 | 3.2 | | 34,144 | 38,906 | 3,480 | | 19% | 20% | 12.4% |
| Zond Systems Inc | Santa Clara | CA | Wind | 906N | 18.00 | | 18.0 | 18.0 | 3.0 | | 30,354 | 33,495 | 982 | | 20% | 21% | 3.7% |
| Zond Systems Inc | Mesa Wind Developers (2PI) | CA | Wind | 906N | 19.19 | | 19.2 | 19.2 | 17.0 | | 44,323 | 44,323 | 6,555 | | 23% | 24% | 24.1% |
| Zond Systems Inc | Sky River Partnership | CA | Wind | 906N | 76.95 | 77.0 | 77.0 | 77.0 | 57.8 | 237,974 | 201,280 | 210,750 | 161,164 | 35% | 34% | 24.2% |
| Zond Systems Inc | 251 Project | CA | Wind | 906N | 19.41 | | 19.4 | 19.4 | 19.4 | | 38,123 | 40,613 | 41,185 | | 21% | 22% | 24.2% |
| Zond Systems Inc | 33 East 65-A | CA | Wind | 906N | 14.92 | | 14.9 | 14.9 | 14.9 | | 19,458 | 20,472 | 20,424 | | 15% | 16% | 15.6% |
| Zond Systems Inc | 33 East 65-B | CA | Wind | 906N | 21.60 | | 21.6 | 21.6 | 14.7 | | 27,400 | 30,547 | 30,547 | | 15% | 14% | 16.0% |
| Zond Systems Inc | Mesa Wind Partners LLC | CA | Wind | 906N | 10.40 | | 10.4 | 10.4 | 10.4 | | 22,759 | 24,667 | 25,873 | | 25% | | 28.0% |
| Zond Systems Inc | Hatzel and Schwartzkoff | CA | Wind | 906N | 1.80 | | | | 0.3 | | | | 468 | | | | 17.8% |
| Zond Systems Inc | K-Site | CA | Wind | 906N | 6.38 | | | | 0.1 | | | 214 | 877 | | | | 9.4% |
| Public Service Co of Colo | Ponnequin | CO | Wind | 906N | 29.70 | | 30.0 | 30.0 | 30.7 | | 59,987 | 77,159 | 77,159 | | 23% | 30% | 29.6% |
| Ridgecrest Wind Partners, LLC | Pettit Table Wind Farm | CO | Wind | 906N | 1.56 | 1.6 | 1.6 | 1.6 | 1.6 | 2,649 | 2,110 | 1,605 | 1,562 | 19% | 30% | 12% | 11.4% |
| Cedar Falls Utilities | Latamio | IA | Wind | 906N | 2.25 | | 2.3 | 2.3 | 2.3 | | 6,901 | 6,901 | 5,633 | | 35% | | 28.6% |
| IDWGP | IDWGP | IA | Wind | 906N | 98.00 | | 98.0 | 98.0 | 42.0 | | | | 237,530 | | 15% | | 27.7% |
| HawKeve Power Partners LLC | HawKeve County | IA | Wind | 906N | 42.00 | | 42.0 | 42.0 | 80.1 | | 90,804 | 118,438 | | | 24% | 32.2% |
| Northern Iowa Windpower, LLC | Top of Iowa | IA | Wind | 906N | 80.10 | | 80.1 | 80.1 | | | 168,992 | 93,929 | | | 13.4% |
| Waverly (City Of) | Seeds I | IA | Wind | 906N | 0.08 | | 0.1 | 0.1 | | | 185 | 214 | | | | |
| Waverly (City Of) | Northwest Iowa | IA | Wind | 906N | 1.50 | | 1.5 | 1.5 | 1.5 | | 3,667 | 3,324 | | | | |
| Gray County Wind Energy | Gray County Wind Energy | KS | Wind | 906N | 112.00 | | 112.0 | 112.0 | 112.0 | | | 321,539 | 364,288 | | 31% | 29% | |
| FPL Energy | FPL Energy | MI | Wind | Utility | 0.60 | 0.6 | 0.6 | 0.6 | 0.1 | 754 | 858 | | | 14% | 16% | |
| Traverse City Power & Light | TCLP | MI | Wind | 906N | 0.60 | 0.6 | 0.6 | | | | | 33,713 | | | 16% | |
| Dairyland Power Coop | CA-Nexus Wind | MN | Wind | 906N | 17.02 | 107.3 | 99.1 | 98.1 | 4.3 | 274,060 | 304,581 | 283,543 | 280,857 | 29% | 30% | 33% | 87.2% |
| Enron Wind Dev Corp L3 I | Lake Benton 1 Wind Power Facility | MN | Wind | 906N | 107.25 | 103.5 | 95.0 | 95.0 | 107.3 | 296,103 | 334,936 | 266,343 | 325,830 | 33% | 33% | 25.9% |
| Enron Wind Dev Corp L3 II | Lake Benton II Wind PO Facility | MN | Wind | 906N | 103.50 | | | | 103.5 | | | | | | | 37% | 35.9% |

Exhibit TAH-1

Department of Energy 906 Data

| Power Supplier | Facility Name | State | Fuel | Source | Average Capacity MW | Capacity MW | | | | Generation (GWh) | | | | Capacity Factor % | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2000 | 2001 | 2002 | 2003 | 2000 | 2001 | 2002 | 2003 | 2000 | 2001 | 2002 | 2003 |
| Enron Wind Dev Corp SL I | Storm Lake 1 Wind Power | MN | Wind | 906N | 112.0 | 112.0 | 112.5 | 112.5 | 112.5 | 206,149 | 207,270 | 305,222 | 303,696 | 23% | 23% | 31% | 26.6% |
| Enron Wind Dev Corp SL II | Storm Lake II Wind PO Facility | MN | Wind | 906N | 80.25 | 80.3 | 80.3 | 80.3 | 80.3 | 208,149 | | 229,634 | 192,459 | 29% | | 33% | 27.4% |
| Northern Alternative Energy | Lakota Ridge | MN | Wind | 906N | 11.25 | | 11.3 | 11.3 | 11.3 | | 30,482 | 33,030 | 28,277 | | 31% | 34% | 31.4% |
| Northern Alternative Energy | Shakopean Hills | MN | Wind | 906N | 11.88 | | 11.9 | 11.9 | 11.9 | | 37,079 | 41,023 | 33,655 | | 36% | 39% | 35.6% |
| Northern Alternative Energy | Tari Nicholas LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | 2.0 | | 2,766 | 6,458 | 5,921 | | 16% | 37% | 34.1% |
| Northern Alternative Energy | Sunflower LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | 2.0 | | 2,558 | 6,265 | 5,872 | | 15% | 36% | 33.9% |
| Northern Alternative Energy | Jula Hills LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | 2.0 | | 2,760 | 5,948 | 5,765 | | 16% | 34% | 33.2% |
| Northern Alternative Energy | Jessica Mills LLC | MN | Wind | 906N | 1.98 | | 2.0 | 1.8 | 6 | | 2,566 | 5,714 | 5,842 | | 15% | 36% | 33.7% |
| Northern Alternative Energy | Jack River LLC | MN | Wind | 906N | 1.98 | | 2.0 | 1.8 | 6 | | 2,641 | 6,170 | 5,728 | | 15% | 35% | 33.0% |
| Northern Alternative Energy | Autumn Hill LLC | MN | Wind | 906N | 1.98 | | 2.0 | 1.9 | 6 | | 2,605 | 6,160 | 5,647 | | 15% | 35% | 32.6% |
| Northern Alternative Energy | Winter Spawn LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | 1.3 | | 2,970 | 7,268 | 6,302 | | 17% | 42% | 36.3% |
| Northern Alternative Energy | Twin Lake Hill LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | | | 2,770 | 6,872 | 6,194 | | 16% | 40% | 35.7% |
| Northern Alternative Energy | Seahan Hills LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | | | 2,693 | 6,793 | 6,097 | | 16% | 39% | 35.2% |
| Northern Alternative Energy | Sabbathany Ridge LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.4 | | | 2,694 | 6,679 | 6,079 | | 16% | 38% | 35.0% |
| Northern Alternative Energy | Rutnon Ridge LLC | MN | Wind | 906N | 15.84 | | 15.8 | 15.8 | 15.8 | | 2,975 | 7,347 | 6,263 | | 2% | 5% | 4.5% |
| Northern Alternative Energy | Hope Creek LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | | | 2,753 | 6,757 | 6,008 | | 16% | 39% | 34.6% |
| Northern Alternative Energy | Hadley Ridge LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | | | 2,708 | 6,703 | 6,035 | | 16% | 39% | 34.8% |
| Northern Alternative Energy | Florence Hill LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | | | 2,601 | 6,573 | 5,850 | | 15% | 38% | 33.7% |
| Northern Alternative Energy | Agassiz Beach LLC | MN | Wind | 906N | 1.98 | | 2.0 | 2.0 | | | 2,525 | 5,270 | 5,649 | | 15% | 30% | 32.6% |
| Northern Alternative Energy | Wilmont Hill LLC | MN | Wind | 906N | 1.32 | | | 1.1 | 1.3 | | | 4,072 | 4,885 | | | 42% | 42.2% |
| Northern Alternative Energy | Buffalo Ridge Windplant WPP 1993 | MN | Wind | 906N | 21.90 | 21.9 | 21.9 | 21.9 | | 68,662 | 63,010 | 65,237 | | 36% | 33% | 34% |
| Basin Electric Power Coop | Woodstock Windfarm | ND | Wind | 906N | 10.20 | 10.2 | 10.2 | 10.2 | | 51,039 | 28,332 | 26,702 | | 57% | 32% | 29.5% |
| FPL Energy | Minot Wind | ND | Wind | 906N | 2.60 | | | 2.4 | | | | | 6,138 | | | | 29.5% |
| FPL Energy North Dakota Wind II | | NE | Wind | 906N | 61.50 | | | 1.3 | 10.3 | | | 2,737 | 39,210 | | 0% | 24% | 43.5% |
| Lincoln Electric System | Salt Valley | NE | Wind | 906N | 1.32 | | | | 0.3 | | | | 2,703 | | | | 23.4% |
| FPL Energy | New Mexico Energy LLC | NM | Wind | 906N | 204.00 | | | | 68.2 | | | | 182,735 | | | | 20.2% |
| NEG | Madison Windpower | NY | Wind | 906N | 11.20 | | | 1.0 | 11.2 | | | 1,887 | 18,884 | | 0% | 23% | 19.2% |
| FPL Energy | Somerset Power HCLLC | OK | Wind | 906N | 102.00 | | | | 27.9 | | 129,680 | 73,325 | 45,134 | | 59% | 34% | 30.2% |
| ESI Vansycle Partners LP | | OR | Wind | 906N | 24.90 | | 24.9 | 24.9 | 27.9 | | | 93,055 | 68,028 | | | 11% | 22.4% |
| Stateline Wind | | OR | Wind | 906N | 100.00 | | | 100.0 | 41.4 | | | | 81,193 | | | | 8.4% |
| FPL Energy | Vansycle | OR | Wind | 906N | 263.40 | | | | 132.8 | | | | 97,817 | | | | 43.1% |
| Klondike Wind Farm | | OR | Wind | 906N | 25.00 | | | 16.6 | 20.3 | | | 40,744 | 88,685 | | | 28% | 41.5% |
| SeaWest Wind Power Ind | Condon | OR | Wind | 906N | 26.40 | | | 19.6 | 24.2 | | | 41,518 | 83,685 | | | 24% | 32.4% |
| Mill Run Windpower, LLC | | PA | Wind | 906N | 15.00 | | | 13.7 | 13.7 | | | 34,430 | 39,014 | | | 29% | 32.6% |
| Somerset Windpower, LLC | | PA | Wind | 906N | 9.00 | | | 6.8 | 7.5 | | | 15,332 | 17,445 | | | 26% | 26.0% |
| Exelon Windpower | | SD | Wind | 906N | 2.60 | | | 2.6 | 2.6 | | | 6,563 | 5,635 | | | 27% | 25.0% |
| Tennessee Eastman Division | Tenn Eastman Division | TN | Wind | 906U | 2.10 | | | | | | | 4,084 | 4,149 | | | | |
| Tennessee Valley Auth | Buffalo Mountain | TN | Wind | 906U | 160.00 | | | | 1.1 | | 12,708 | | 1,832 | | | | 19.8% |
| AEP Texas Central Company | Desert Sky Wind Project (Indian Mesa) | TX | Wind | 906N | 160.00 | | | 166.8 | | | | | 344,962 | | | | 26.8% |
| King Mountain Wind Ranch 1 | | TX | Wind | 906N | 278.20 | | | 233.2 | 278.2 | | | 448,686 | 549,959 | | | 22% | 26.8% |
| Delaware Mountain Windfarm | | TX | Wind | 906N | 30.00 | 30.0 | 32.0 | 12.6 | 27.5 | | 74,017 | 24,038 | 56,116 | | 28% | 22% | 22.0% |
| El Paso Electric Co | Huecо Mount | TX | Wind | 906U | 1.32 | | | | 1.0 | | 416 | | 1,911 | | 7% | | |
| Formosa Plastics Corp | Formosa Utility Venture Ltd | TX | Wind | 906N | 80.00 | | 0.7 | | 80.0 | | | 149,791 | 159,064 | | | 23% | 22.7% |
| FPL Energy | Pecos Wind I (Woodward Mtn) | TX | Wind | 906N | 80.00 | | | 73.2 | 80.0 | | | 189,563 | 166,718 | | | 24% | 23.8% |
| FPL Energy Operating System | Pecos Wind I (Woodward Mtn) | TX | Wind | 906N | 74.90 | 74.9 | 74.9 | 73.2 | 74.9 | 237,103 | 232,451 | 189,563 | 169,540 | 36% | 35% | 29% | 25.6% |
| West Texas Windplant (SW Mesa) | | TX | Wind | 906N | 34.32 | | 31.4 | 31.4 | 74.9 | | 89,990 | 165,886 | 181,685 | 33% | | 30% | 30.1% |
| NWP Indian Mesa Wind Farm | | TX | Wind | 906N | 82.50 | | | 75.5 | 82.5 | | | 165,866 | 181,951 | | | 38% | 30.4% |
| Texas Wind Power Company | Texas Wind Power Company | TX | Wind | 906N | 80.00 | | | 80.0 | 80.0 | | | 276,744 | 269,263 | | | 39% | 38.4% |
| Tri-Cities | Llano Estacado Wind Ranch - White D | TX | Wind | 906N | 150.00 | 6.1 | 6.1 | 150.0 | 150.0 | 12,249 | 12,133 | 431,731 | 462,420 | 23% | 23% | 33% | 35.2% |
| Cielo Grande Power Corp | Trent Mesa Wind | TX | Wind | 906N | 6.10 | | | 6.1 | 140.6 | | | 11,726 | 160,729 | | | 15% | 34.6% |
| Energy Northwest | Nine Canyon Wind Turb | VT | Wind | 906N | 48.00 | | | 28.1 | 48.0 | | | 37,782 | 124,300 | | | 25% | 29.5% |
| FPL Energy | Nine Canyon | WA | Wind | 906U | 200.00 | | | 166.0 | 200.0 | | | 470,254 | 446,614 | | | 32% | 25.5% |
| Badger Windpower LLC | Stateline Wind | WA | Wind | 906N | 30.00 | | | 30.0 | 27.5 | | | 51,481 | 54,844 | | | 30% | 28.6% |
| FPL Energy | Byron | WI | Wind | 906N | 29.20 | 11.2 | 11.2 | 11.2 | 1.3 | | 21,868 | 29,228 | 127,544 | 2% | 22% | 28% | 26.3% |
| Wisconsin Electric Pwr | Lincoln Turbines | WI | Wind | 906N | 1.32 | 1.3 | 1.3 | 1.3 | 1.3 | | 2,787 | 3,266 | 3,018 | 4% | 24% | 28% | 26.1% |
| Wisconsin Public Service Corp | Genie Turbines | WI | Wind | 906U | 9.24 | | | 9.2 | 9.2 | | | 17,546 | 16,424 | | | 22% | 20.3% |
| Wisconsin Public Service Corp | Montfort Wind | WI | Wind | 906U | 30.00 | | | 12.2 | 1.2 | | 2,213 | 2,431 | 2,066 | | | 23% | 19.7% |
| FPL Energy | Glacier Hills Wind | WI | Wind | 906U | 1.50 | | | 5.6 | 0.0 | | 515 | 9,323 | 125,456 | | | 18% | 20.0% |
| Platte River Power Author | Medicine Bow | WY | Wind | 906U | 144.00 | | | | 12.2 | | | | 89 | | | | 0.1% |
| SeaWest Windpower Inc | Rock River I LLC | WY | Wind | 906N | 4.57 | 4.6 | 4.6 | 4.6 | 4.6 | | | 15,729 | 15,729 | | | 48% | 39.3% |
| SeaWest Windpower Inc | Foote Creek LLC | WY | Wind | 906N | 50.00 | | | 50.0 | 4.6 | | | 19,050 | 154,660 | | | 32% | 35.3% |
| SeaWest Windpower Inc | Foote Creek III | WY | Wind | 906N | 41.00 | | | | 41.0 | | | 141,390 | 127,544 | | | | 35.3% |
| SeaWest Windpower Inc | Foote Creek III | WY | Wind | 906N | 22.40 | | | | 11.3 | | | | 34,344 | | | | 34.7% |
| SeaWest Windpower Inc | Foote Creek IV | WY | Wind | 906N | 16.80 | | | | 8.5 | | | | 24,926 | | | | 33.6% |
| **Total Reporting Wind Farms** | | | | | 5,332.57 | 1,092.3 | 2,093.2 | 3,455.5 | 4,139.7 | 2,552,523 | 4,901,593 | 8,041,068 | 9,747,288 | 25.6% | 25.6% | 26.7% | 26.9% |

CW0000006418

**69**

CW0000006419

Exhibit TAH-2
**Danish Offshore Wind Turbine Performance**

| Online Date | Project Name | Capacity (kW) | Turbine Type | Location | Type | 2003 Generation kWh | 2004 Cumulative 11 month kWh | 2003 CF% 11 month | 2004 Capacity Factor 11 month |
|---|---|---|---|---|---|---|---|---|---|
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,358,824 | 4,472,683 | 24.9% | 27.9% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 27-Dec-00 | Middelgrunden | 2000 | Bonus 2 MW | København | HAV | 4,321,757 | 4,045,209 | 24.7% | 25.2% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |

Mølle karakteristika:

Exhibit TAH-2
Danish Offshore Wind Turbine Performance

| Online Date | Project Name | Melle karakteristika: Capacity (kW) | Turbine Type | Location | Type | 2003 Generation kWh | 2004 Cumulative Generation kWh | 2003 CF% | Capacity Factor 2004 CF% 11 month |
|---|---|---|---|---|---|---|---|---|---|
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2,3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |

Exhibit TAH-2
**Danish Offshore Wind Turbine Performance**

Mølle karakteristika:

| Online Date | Project Name | Capacity (kW) | Turbine Type | Location | Type | 2003 Generation kWh | 2004 Cumulative Generation kWh | 2003 CF% | 2004 Capacity Factor 11 month |
|---|---|---|---|---|---|---|---|---|---|
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 17-Jun-03 | Nysted | 2300 | BONUS 2.3 | Nysted | HAV | 2,585,261 | 7,138,592 | 23.8% | 38.7% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 1-Sep-91 | Vindeby | 450 | 450 offshore | Ravnsborg | HAV | 891,157 | 945,233 | 22.6% | 26.2% |
| 19-Dec-96 | Vindeby | 600 | V 44/600 KW | Ravnsborg | HAV | 1,093,839 | 1,074,012 | 20.8% | 22.3% |
| 4-Sep-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 11-Sep-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 10-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 16-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 19-Sep-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 8-Sep-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 24-Sep-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |

CW0000006422

Exhibit TAH-2
## Danish Offshore Wind Turbine Performance

Mølle karakteristika:

| Online Date | Project Name | Capacity (kW) | Turbine Type | Location | Type | 2003 Generation kWh | 2004 Cumulative Generation kWh | 2003 CF% 11 month | 2004 Capacity Factor |
|---|---|---|---|---|---|---|---|---|---|
| 29-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 29-Aug-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 12-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 12-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 12-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 19-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 7-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 24-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 26-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 2-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 29-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 29-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 6-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 16-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 2-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 18-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 7-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 3-Sep-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 16-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 7-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 18-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 4-Dec-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 15-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 7-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 7-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 16-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 29-Oct-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 21-Aug-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 20-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 4-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Nov-02 | Horns Rev | 2000 V-80 | 2000 V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |

CW0000006423

Exhibit TAH-2
## Danish Offshore Wind Turbine Performance

| Online Date | Project Name | Capacity (kW) | Turbine Type | Location | Type | 2003 Generation kWh | 2004 Simulation 11 month kWh | 2003 CF% 11 month | 2004 Capacity Factor |
|---|---|---|---|---|---|---|---|---|---|
| 17-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 15-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 20-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 7-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 16-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 15-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 15-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 17-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 19-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 19-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 15-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 18-Aug-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 19-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 19-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 24-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 4-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 19-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 20-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 19-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 15-Aug-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 30-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 1-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 4-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 6-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 20-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 27-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 29-Jul-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 20-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 10-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 25-Nov-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 11-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 5-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 10-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 4-Dec-02 | Horns Rev | 2000 | V-80 | Esbjerg | HAV | 5,747,215 | 3,859,115 | 32.8% | 24.1% |
| 9-Jan-03 | Horns Rev | 2000 | V80-2MW | Thyborøn-Harboør | HAV | 7,153,054 | 7,554,739 | 41.7% | 47.1% |

CW0000006424

Exhibit TAH-2
# Danish Offshore Wind Turbine Performance

| Online Date | Project Name | Capacity (kW) Mølle Karakteristika: | Turbine Type | Location | Type | 2003 Generation kWh | 2004 Generation Cumulative 11 month kWh | 2003 CF% 11 month | 2004 Capacity Factor CF% 11 month |
|---|---|---|---|---|---|---|---|---|---|
| 23-Dec-02 | | 2000 | V80-2MW | Thyborøn-Harboøl | HAV | 7,153,054 | 7,554,739 | 40.8% | 47.1% |
| 23-Dec-02 | | 2000 | V80-2MW | Thyborøn-Harboøl | HAV | 7,153,054 | 7,554,739 | 40.8% | 47.1% |
| 8-Jan-03 | | 2000 | V80-2MW | Thyborøn-Harboøl | HAV | 7,153,054 | 7,554,739 | 41.7% | 47.1% |
| 24-Jan-03 | | 2300 | 2,3MW | Thyborøn-Harboøl | HAV | 6,702,901 | 7,928,055 | 35.6% | 43.0% |
| 29-Jan-03 | | 2300 | 2,3MW | Thyborøn-Harboøl | HAV | 6,702,901 | 7,928,055 | 36.1% | 43.0% |
| 28-Jan-03 | | 2300 | 2,3MW | Thyborøn-Harboøl | HAV | 6,702,901 | 7,928,055 | 36.0% | 43.0% |
| 21-Jan-03 | | 2300 | 2,3MW | Thyborøn-Harboøl | HAV | 6,702,901 | 7,928,055 | 35.3% | 43.0% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 30-May-95 | Tunø Knob | 500 | V39 | Odder | HAV | 1,229,165 | 1,270,974 | 28.1% | 31.7% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 6,039,307 | 7,425,505 | 33.6% | 40.3% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 6,003,478 | 7,549,496 | 33.4% | 40.9% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 5,922,290 | 7,435,799 | 32.9% | 40.3% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 5,897,629 | 6,369,262 | 32.8% | 34.5% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 5,874,978 | 7,389,436 | 32.6% | 40.1% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 5,861,691 | 7,341,631 | 32.6% | 39.8% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 5,929,071 | 7,396,149 | 32.9% | 40.1% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 5,903,358 | 7,418,367 | 32.8% | 40.2% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 5,905,855 | 7,267,819 | 32.8% | 39.4% |
| 8-Feb-03 | Samsø | 2300 | Bonus 2,3 MW | Samsø | HAV | 5,942,948 | 7,547,967 | 33.0% | 40.9% |
| 16-Apr-03 | Frederikshavn | 2300 | 2,3MW | Frederikshavn | HAV | 4,160,190 | 6,155,063 | 29.1% | 33.4% |
| 20-Jun-03 | Frederikshavn | 3000 | V90-3.0MW | Frederikshavn | HAV | 1,965,318 | 4,356,378 | 14.1% | 18.1% |
| 28-May-03 | Frederikshavn | 2300 | N90-2300 | Frederikshavn | HAV | 2,620,038 | 6,771,398 | 21.9% | 36.7% |
| | Total | 423,950 | | | | 879,359,966 | 1,084,423,531 | 29.4% | 31.9% |

**Source:** Danish Government website for public assisted wind projects: http://www.ens.dk/graphics/ENS_StatistikogData/statistik/EnergiData/Vindregis

CW0000006425

**70**

CW0000006426

**Exhibit TAH-3**
**Cape Wind Estimated Performance**
**Estimated Using NOAA Wind Speed Data for Nantucket Sound**

NOAA Station 44018 - SE Cape Cod 30NM East of Nantucket, MA
41.3 N 69.2 W (41°15'30" N 69°17'42" W)

Monthly averages

| | Average Wind Speed (m/s) | | Per Turbine Gross Power Output (KWh) | | Gross Capacity Factor% | % Annual Power Output% |
|---|---|---|---|---|---|---|
| | Station | Adj | Raw | Adj | | |
| January '03 | 10.85 | 12.27 | 1,267,196 | 1,525,332 | 56.9% | 15.7% |
| February '03 | 10.20 | 11.54 | 1,131,121 | 1,367,095 | 56.5% | 14.1% |
| March '03 | 8.36 | 9.46 | 701,748 | 914,346 | 34.1% | 9.4% |
| April '03 | 8.02 | 9.07 | 662,907 | 885,326 | 34.2% | 9.1% |
| May '03 | 8.72 | 9.87 | 254,232 | 354,592 | 13.2% | 3.7% |
| June '03 | 4.46 | 5.04 | 186,764 | 262,102 | 10.1% | 2.7% |
| July '03 | 4.82 | 5.45 | 174,905 | 257,000 | 9.6% | 2.6% |
| August '02 | 5.80 | 6.56 | 230,874 | 338,114 | 12.6% | 3.5% |
| September '02 | 5.35 | 6.06 | 246,259 | 343,989 | 12.8% | 3.5% |
| October '02 | 8.61 | 9.74 | 627,090 | 839,285 | 31.3% | 8.6% |
| November '02 | 8.62 | 9.75 | 947,977 | 1,154,759 | 44.6% | 11.9% |
| December '02 | 10.55 | 11.93 | 1,218,839 | 1,472,690 | 55.0% | 15.2% |
| | 7.86 | 8.89 | 7,649,911 | 9,714,631 | 30.8% | 100.0% |

Cape Wind Total Project Maximum output before losses- MWh   1,262,902   30.8%
Estimated losses due to planned and unplanned outages- MWh   (212,023)
Total Net Project Output- MWh   1,050,879   25.6%

NOTE: Increased NOAA raw wind speed data by 13.1% to reflect Draft EIS average wind speed of 8.89 m/s

Army Corp Draft EIS Avg Wind Speed Adjustment
Avg wind spd
1.13   Adjustment factor

Losses- Planned and unplanned
9.7% Forced Outage Rate   Turbine Availability (97% for land based)
6.6% Icing/Fouling
1.6% Cold weather
3.7% Array losses
Transmission Losses (per EIS)

CW0000006427

71

CW0000006428

# Exhibit TAH-4

## Cape Wind Output Projections Using Elevation Adjustment of Monitoring Tower Readings

| Month | Reading Minutes | Min/mo | % Availability Monitor | Avg Wind Speed m/s Monitor | Avg Wind Speed m/s @75M | Per Turbine Output:kWh unad-kWh | Per Turbine Output:kWh Adj-kWh | Max Potential CF unadj | Max Potential CF Adj |
|---|---|---|---|---|---|---|---|---|---|
| 2003  9 | 35,194 | 43,200 | 81% | 6.44 | 7.77 | 488,829 | 783,497 | 19% | 30.2% |
| 10 | 32,388 | 44,640 | 73% | 8.36 | 10.10 | 946,561 | 1,312,011 | 35% | 49.0% |
| 11 | 42,709 | 43,200 | 99% | 8.38 | 10.12 | 868,941 | 1,102,024 | 34% | 42.5% |
| 12 | 43,716 | 44,640 | 98% | 10.28 | 12.42 | 1,374,293 | 1,689,389 | 51% | 63.1% |
| 2004  1 | 12,024 | 44,640 |  | 11.60 | 14.01 | 1,676,995 | 2,013,597 | 63% | 75.2% |
| 2 | 40,116 | 41,760 | 96% | 7.49 | 9.05 | 717,464 | 1,032,333 | 29% | 41.2% |
| 3 | 38,424 | 44,640 | 86% | 8.68 | 10.49 | 993,408 | 1,404,158 | 37% | 52.4% |
| 4 | 40,491 | 43,200 | 94% | 7.28 | 8.80 | 705,508 | 1,039,012 | 27% | 40.1% |
| 5 | 40,496 | 44,640 | 91% | 6.47 | 7.81 | 511,900 | 830,533 | 19% | 31.0% |
| 6 | 41,380 | 43,200 | 95% | 6.34 | 7.65 | 482,032 | 772,179 | 19% | 29.8% |
| 7 | 43,192 | 44,640 | 97% | 5.82 | 7.03 | 366,503 | 610,968 | 14% | 22.8% |
| 8 | 43,737 | 44,640 | 98% | 6.46 | 7.80 | 472,420 | 793,863 | 18% | 29.6% |
| 9 | 41,829 | 44,640 | 94% | 6.93 | 8.37 | 607,701 | 884,093 | 23% | 33.0% |
| 10 | 44,645 | 44,640 | 100% | 7.66 | 9.25 | 873,076 | 1,173,468 | 33% | 43.8% |
| 11 | 43,195 | 43,200 | 100% | 8.01 | 9.68 | 925,214 | 1,219,363 | 36% | 47.0% |
| 12 | 14,238 | 44,640 |  | 9.34 | 11.28 | 1,193,467 | 1,594,251 | 45% | 59.5% |
| Annual | 597,773 | 704,160 | 90% | 7.75 | 9.36 | 9,525,689 | 13,367,816 | 30.1% | 42.3% |

Most of January 2004 data missing- Replaced with December 2003 data since NOAA December ar | (302,702) | (324,208)

Estimated 2004 Annual Gross Maximum Ouput per turbine before losses kWh | 9,222,987 | 13,043,610 | 29.2% | 41.2%

Cape Wind Total Project Maximum output before losses- MWh | 1,695,669 | 41.2%

Estimated losses due to planned and unplanned outages- MWh | (289,174)

Total Net Project Output- MWh | 1,406,495 | 34.3%

Note: Adjusted all Cape Wind Monitoring station raw wind speed data by 21% to reflect elevation difference between 75 and 20 meters

Elevation Adjustment between monitoring tower and proposed turbine height
Wind Turbine  75 meters
Monitoring T  20 meters
1.21 Adjustment factor

Losses- Planned and unplanned
95% Turbine Availability
9.7% Forced Outage Rate
0.5% Icing/Fouling
1.0% Cold weather
3.7% Array losses
5% Transmission Losses

CW0000006429

**72**

CW0000006430

# Exhibit TAH-4a

## Cape Wind Output Projections Based Upon 8.65 m/sec Average Wind Speed

| Month | Reading Minutes | Min/mo | % Availability | Avg Wind Speed m/s Monitor | @75M | Per Turbine Output-kWh unadj-kWh | Adj-kWh | Max Potential CF unadj | Adj |
|---|---|---|---|---|---|---|---|---|---|
| 2003 | | | | | | | | | |
| 9 | 35,194 | 43,200 | 81% | 6.44 | 7.38 | 488,829 | 701,325 | 19% | 27.1% |
| 10 | 32,388 | 44,640 | 73% | 8.36 | 9.59 | 946,561 | 1,212,994 | 35% | 45.3% |
| 11 | 42,709 | 43,200 | 99% | 8.38 | 9.61 | 868,941 | 1,050,734 | 34% | 40.5% |
| 12 | 43,716 | 44,640 | 98% | 10.28 | 11.79 | 1,374,293 | 1,609,394 | 51% | 60.1% |
| 2004 | | | | | | | | | |
| 1 | 12,024 | 44,640 | | 11.60 | 13.31 | 1,676,995 | 1,929,373 | 63% | 72.0% |
| 2 | 40,116 | 41,760 | 96% | 7.49 | 8.59 | 717,464 | 948,307 | 29% | 37.8% |
| 3 | 38,424 | 44,640 | 86% | 8.68 | 9.96 | 993,408 | 1,291,731 | 37% | 48.2% |
| 4 | 40,491 | 43,200 | 94% | 7.28 | 8.35 | 705,508 | 948,582 | 27% | 36.6% |
| 5 | 40,496 | 44,640 | 91% | 6.47 | 7.42 | 511,900 | 736,246 | 19% | 27.5% |
| 6 | 41,380 | 43,200 | 96% | 6.34 | 7.27 | 482,032 | 688,663 | 19% | 26.6% |
| 7 | 43,192 | 44,640 | 97% | 5.82 | 6.67 | 366,503 | 539,469 | 14% | 20.1% |
| 8 | 43,737 | 44,640 | 98% | 6.46 | 7.40 | 472,420 | 698,340 | 18% | 26.1% |
| 9 | 41,829 | 44,640 | 94% | 6.93 | 7.95 | 607,701 | 806,123 | 23% | 30.1% |
| 10 | 44,645 | 44,640 | 100% | 7.66 | 8.78 | 873,076 | 1,096,659 | 33% | 40.9% |
| 11 | 43,195 | 43,200 | 100% | 8.01 | 9.19 | 925,214 | 1,145,350 | 36% | 44.2% |
| 12 | 14,238 | 44,640 | | 9.34 | 10.72 | 1,193,467 | 1,493,910 | 45% | 55.8% |
| Annual | 597,773 | 704,160 | 90% | 7.75 | 8.89 | 9,525,689 | 12,322,712 | 30.1% | 39.0% |
| Most of January 2004 data missing- Replaced with December 2003 data since NOAA December and Janual | | | | | | (302,702) | (319,979) | | |
| Estimated 2004 Annual Gross Maximum Ouput per turbine before losses kWh | | | | | 8.67 | 9,222,987 | 12,002,734 | 29.2% | 37.9% |

Cape Wind Total Project Maximum output before losses- MWh    1,601,953    37.9%
Estimated losses due to planned and unplanned outages- MWh    (307,695)
Total Net Project Output- MWh    1,294,257    31.6%

Note: Adjusted all Cape Wind Monitoring station raw wind speed data by 15% to reach 8.89 m/s average wind speed reported in Draft EIS

Army Corp Draft EIS Avg Wind Speed Adjustment
Avg wind spd    8.89    m/s
1.15    Adjustment factor
Losses- Planned and unplanned
95%    Turbine Availability
9.7%    Forced Outage Rate
5.0%    Icing/Fouling

CW0000006431

**73**

CW0000006432

# Exhibit TAH-4b

## Cape Wind Output Calculations Based Upon 8.5 m/sec Average Wind Speed From New England Wind Map

| Month | Reading Minutes | Min/mo | % Availability | Avg Wind Speed m/s Monitor | @75M | Per Turbine Output-kWh unadj-kWh | Adj-kWh | Max Potential CF unadj | Adj |
|---|---|---|---|---|---|---|---|---|---|
| 2003 | | | | | | | | | |
| 9 | 35,194 | 43,200 | 81% | 6.44 | 7.06 | 488,829 | 627,064 | 19% | 24.2% |
| 10 | 32,388 | 44,640 | 73% | 8.36 | 9.17 | 946,561 | 1,122,682 | 35% | 41.9% |
| 11 | 42,709 | 43,200 | 99% | 8.38 | 9.19 | 868,941 | 999,027 | 34% | 38.5% |
| 12 | 43,716 | 44,640 | 98% | 10.28 | 11.28 | 1,374,293 | 1,534,154 | 51% | 57.3% |
| 2004 | | | | | | | | | |
| 1 | 12,024 | 44,640 | *(shaded)* | 11.60 | 12.72 | 1,676,995 | 1,850,692 | 63% | 69.1% |
| 2 | 40,116 | 41,760 | 96% | 7.49 | 8.22 | 717,464 | 871,543 | 29% | 34.8% |
| 3 | 38,424 | 44,640 | 86% | 8.68 | 9.52 | 993,408 | 1,190,920 | 37% | 44.5% |
| 4 | 40,491 | 43,200 | 94% | 7.28 | 7.99 | 705,508 | 866,320 | 27% | 33.4% |
| 5 | 40,496 | 44,640 | 91% | 6.47 | 7.09 | 511,900 | 654,600 | 19% | 24.4% |
| 6 | 41,380 | 43,200 | 96% | 6.34 | 6.95 | 482,032 | 615,669 | 19% | 23.8% |
| 7 | 43,192 | 44,640 | 97% | 5.82 | 6.38 | 366,503 | 476,947 | 14% | 17.8% |
| 8 | 43,737 | 44,640 | 98% | 6.46 | 7.08 | 472,420 | 615,900 | 18% | 23.0% |
| 9 | 41,829 | 44,640 | 94% | 6.93 | 7.60 | 607,701 | 737,413 | 23% | 27.5% |
| 10 | 44,645 | 44,640 | 100% | 7.66 | 8.40 | 873,076 | 1,025,602 | 33% | 38.3% |
| 11 | 43,195 | 43,200 | 100% | 8.01 | 8.79 | 925,214 | 1,075,363 | 36% | 41.5% |
| 12 | 14,238 | 44,640 | *(shaded)* | 9.34 | 10.25 | 1,193,467 | 1,399,181 | 45% | 52.2% |
| Annual | 597,773 | 704,160 | 90% | 7.75 | 8.50 | 9,525,689 | 11,380,150 | 30.1% | 36.0% |

Most of January 2004 data missing- Replaced with December 2003 data since NOAA December and January wind

Estimated 2004 Annual Gross Maximum Ouput per turbine before losses kWh ... 8.29 ... 9,222,987 | 11,063,613 | 29.2% | 35.0%

Cape Wind Total Project Maximum output before losses ........ 1,479,420 ........ 35.0%
Estimated losses due to planned and unplanned outages- MWh ... (302,702) | (316,538) Jan adj | (286,428)
Total Net Project Output- MWh ........ 1,192,992 ........ 29.1%

Note: Adjusted all Cape Wind Monitoring station raw wind speed data by 10% to reflect New England Wind Map average spped of 8.5 m/s for region at 70 meters

| NE Wind Map Avg Wind Speed Adj | |
|---|---|
| 8.50 | m/s |
| 1.10 | Adjustment factor |
| Losses- Planned and unplanned | |
| 95% | Turbine Availability |
| 9.7% | Forced Outage Rate |
| 5.0% | Icing/Fouling |
| 1.0% | Cold weather |
| 3.7% | Array losses |
| 3% | Transmission Losses |

CW0000006433