**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

PUBLIC EMPLOYEES FOR                            )
ENVIRONMENTAL RESPONSBILITY,                    )
et al.,                                         )
                                                )
          Plaintiffs,                )
                                                )
      v.                                  )        Civil Action No. 10-1067 (RBW) (DAR)
                                                )
TOMMY P. BEAUDREAU, et al.,[1]                  )        Consolidated with:
                                                )
          Defendants,                )        Civil Action No. 10-1073
                                                )        Civil Action No. 10-1079
CAPE WIND ASSOCIATES, LLC,                      )        Civil Action No. 10-1238
                                                )
          Intervenor.                )
_____)
                                                )
ALLIANCE TO PROTECT                             )
NANTUCKET SOUND, et al.,                        )
                                                )
          Plaintiffs,                )
                                                )
      v.                                  )
                                                )
SALLY JEWELL, et al.,                           )
                                                )
          Defendants,                )
                                                )
CAPE WIND ASSOCIATES, LLC,                      )
                                                )
          Intervenor.                )
_____)
                                                )
TOWN OF BARNSTABLE,                             )
MASSACHUSETTS,                                  )
                                                )
          Plaintiff,                 )
                                                )
      v.                                  )

---

[1] Individuals sued in their official capacity have been replaced in the case caption and throughout this memorandum opinion in accordance with Federal Rule of Civil Procedure 25.

| | |
|---|---|
| SALLY JEWELL, et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| CAPE WIND ASSOCIATES, LLC, | ) |
| | ) |
| Intervenor. | ) |
| _____ | ) |
| | ) |
| THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH) | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TOMMY P. BEAUDREAU, et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| CAPE WIND ASSOCIATES, LLC, | ) |
| | ) |
| Intervenor. | ) |
| _____ | ) |

## <u>MEMORANDUM OPINION</u>

This consolidated case comprises four sets of interrelated claims concerning several administrative decisions made by federal agencies approving the construction of various aspects of an offshore wind energy project in Nantucket Sound, which is the first project of its kind in the United States. First, the Public Employees for Environmental Responsibility ("PEER"), the Cetacean Society International, the Lower Laguna Madre Foundation, Californians for Renewable Energy, Three Bays Preservation, the Alliance to Protect Nantucket Sound, and several individuals[2] (collectively, the "PEER plaintiffs") allege that defendants Tommy

---

[2] The individual plaintiffs are Cindy Lowry of Portland, Maine; Barbara Durkin of Northboro, Massachusetts; Martha Powers of West Yarmouth, Massachusetts; and Richard Largay of Cummaquid, Massachusetts.

Beaudreau, the Director of the United States Bureau of Ocean Energy Management ("BOEM");[3]

Sally Jewell, the Secretary of the United States Department of the Interior; Daniel Ashe, the

Director of the United States Fish and Wildlife Service ("FWS"); Penny Pritzker, the Secretary

of the United States Department of Commerce; Eileen Sobeck, the Assistant Administrator of the

National Marine Fisheries Service ("NMFS"); and Lieutenant General Thomas P. Bostick, the

United States Army Chief of Engineers and Commanding General of the United States Army

Corps of Engineers ("Corps of Engineers" or "Corps") have violated the Administrative

Procedure Act ("APA"), 5 U.S.C. § 701 (2006); the Endangered Species Act ("ESA"), 16 U.S.C.

§§ 1531-1544 (2006), the Migratory Bird Treaty Act, 16 U.S.C. § 703 (2006); and the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h (2006).  Second Amended

Complaint for Declaratory and Injunctive Relief, ECF No. 47, ("PEER Compl.") ¶¶ 1, 97-111.

Second, the Town of Barnstable, Massachusetts, alleges that Secretary Jewell; the United States

Department of the Interior; the BOEM; Director Beaudreau; Admiral Robert J. Papp, Jr., the

Commandant of the United States Coast Guard; the United States Coast Guard; Lieutenant

General Bostick; and the Corps of Engineers have violated the APA; the Outer Continental Shelf

Lands Act ("Shelf Lands Act"), as amended, 43 U.S.C. §§ 1331-1356a (2012); the NEPA; the

Coast Guard and Maritime Transportation Act of 2006, Pub. L. No. 109-241, 120 Stat. 516; the

---

[3] As explained by the Court of Federal Claims,

> In May 2010, the Secretary of the Interior announced that [the Minerals Management Service ("MMS")] would be split into three separate agencies:  the Bureau of Safety and Environmental Enforcement (BSEE), the Bureau of Ocean Energy Management (BOEM), and the Office of Natural Resources Revenue (ONRR).  In June 2010, MMS was renamed [the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE")].  The revenue-collection functions of BOEMRE were transferred to ONRR in October 2010, and BOEMRE was then divided into two new agencies, BSEE and BOEM, in October 2011.

Century Exploration New Orleans, LLC v. United States, 110 Fed. Cl. 148, 154 n.7 (2013) (citations omitted).  For the sake of clarity, this Court will refer throughout this memorandum opinion to the MMS and the BOEMRE by the Bureau's current name:  the BOEM.

Clean Water Act, 33 U.S.C. § 1344 (2006); and the Rivers and Harbors Act, 33 U.S.C. § 403 (2006). First Amended Complaint for Declaratory and Injunctive Relief, ECF No. 68 ("Barnstable Compl.") ¶¶ 1, 175-225. Third, the Alliance to Protect Nantucket Sound and several individuals[4] (collectively, the "Alliance plaintiffs") allege that Secretary Jewell; the United States Department of the Interior; Director Beaudreau; the BOEM; Admiral Papp; the United States Coast Guard; Lieutenant General Bostick; and the Corps of Engineers violated the APA; the NEPA; the Energy Policy Act of 2005, Pub. L. No. 109-58, § 388(a), 119 Stat. 594, 744-46 (codified at 43 U.S.C. § 1337(p) (2006)) (amending the Shelf Lands Act); the Coast Guard and Maritime Transportation Act of 2006; the National Historic Preservation Act ("Preservation Act"), 16 U.S.C. § 470f (2006); the Clean Water Act; and the Rivers and Harbors Act. First Amended Complaint for Declaratory and Injunctive Relief, ECF No. 69 ("Alliance Compl.") ¶¶ 1, 151-93. Finally, the Wampanoag Tribe of Gay Head (Aquinnah) alleges that Director Beaudreau; Secretary Jewell; and the BOEM[5] violated the Preservation Act; the NEPA; and the APA. Complaint for Declaratory and Injunctive Relief, 11-cv-1238, ECF No. 1 ("Wampanoag Compl.") ¶¶ 1, 127-43.

Currently before the Court are three sets of cross-motions for summary judgment, as well as the Plaintiffs' Rule 56(e) Motion for Discovery Necessary to Explain Defendants' Citation to Documents Withheld as "Deliberative" and Other Extra-Record Assertions or, in the Alternative,

---

[4] The individual plaintiffs are Ron Borjeson, Jeff Good, and James Keding of Plymouth, Massachusetts; Neil Good and Robert Bussiere of Mashpee, Massachusetts; Cameron Dawson of East Falmouth, Massachusetts; Patricia J. Dineen and David Moriarty of West Falmouth, Massachusetts; William H. Rypka of Sandwich, Massachusetts; Richard Klein and Pauline K. Klein of Yorktown Heights, New York; Heather Rockwell of Marstons Mills, Massachusetts; Barbara Jean Pennick of Marble Head, Massachusetts; Lou Gonzaga of Barnstable, Massachusetts; Frank Caruso of Forestdale, Massachusetts; James R. Powell of West Tisbury, Massachusetts; Christopher Birdsey of Hyannis, Massachusetts; and Crocker Snow, Jr. of Ipswich, Massachusetts.

[5] For ease of reference, the Court refers to all the federal officials and agencies collectively as the "federal defendants."

to Strike, ECF No. 316 ("Pls.' 56(e) Mot.").  Upon careful consideration of the parties'

submissions[6] and the several voluminous administrative records in this case, the Court grants

[6] In addition to those documents already identified, the Court considered the following filings made by the parties: (1) the PEER et al. Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment on Their Claims Under the Endangered Species Act and Migratory Bird Treaty Act, ECF No. 171 ("Pls.' ESA/MBTA Mem."); (2) the Federal Defendants' Cross-Motion for Summary Judgment and Opposition to PEER Plaintiffs' Motion for Summary Judgment, ECF No. 205 ("Fed. Defs.' ESA/MBTA Mem."); (3) the Combined Memorandum of Law in Support of Intervenor Cape Wind Associates LLC's Motion for Summary Judgment and in Opposition to the PEER et al. Plaintiffs' Motion for Summary Judgment, ECF No. 203, 204 ("Int. Def.'s ESA/MBTA Mem."); (4) the PEER et al. Plaintiffs' Memorandum in Opposition to Federal Defendants' and Intervenor Cape Wind Associates LLC's Motions for Summary Judgment, and Reply in Support of Their Motion for Summary Judgment, ECF Nos. 221, 222 ("Pls.' ESA/MBTA Opp'n"); (5) the PEER et al. Plaintiffs' Notice of Clarification, ECF No. 229; (6) the Federal Defendants' Reply in Support of Their Cross-Motion for Summary Judgment, ECF No. 231 ("Fed. Defs.' ESA/MBTA Reply"); (7) the Intervenor Cape Wind Associates LLC's Reply in Support of Its Motion for Summary Judgment Regarding the PEER et al. Plaintiffs' Claims, ECF No. 232 ("Int. Def.'s ESA/MBTA Reply"); (8) the Memorandum of Points and Authorities in Support of Plaintiff the Wampanoag Tribe of Gay Head (Aquinnah)'s Motion for Summary Judgment, ECF No. 177 ("Wampanoag Mem."); (9) the Federal Defendants' Memorandum in Opposition to Wampanoag Tribe of Gay Head (Aquinnah)'s Motion for Summary Judgment [ECF No. 177] and in Support of Federal Defendants' Cross-Motion, ECF Nos. 208, 209 ("Fed. Defs.' Wampanoag Mem."); (10) the Combined Memorandum of Law in Support of Intervenor Cape Wind Associates LLC's Motion for Summary Judgment and in Opposition to the Wampanoag Tribe of Gay Head (Aquinnah)'s Motion for Summary Judgment, ECF Nos. 210, 211 ("Int. Def.'s Wampanoag Mem."); (11) Plaintiff the Wampanoag Tribe of Gay Head (Aquinnah)'s Memorandum in Opposition to Federal Defendants' and Intervenor Cape Wind Associates LLC's Motions for Summary Judgment, and Reply in Support of Their Motion for Summary Judgment, ECF No. 223 ("Wampanoag Opp'n"); (12) the Federal Defendants' Reply in Support of Summary Judgment on Claims Brought by the Wampanoag Tribe of Gay Head (Aquinnah), ECF No. 226 ("Fed. Defs.' Wampanoag Reply"); (13) the Reply in Support of Intervenor Cape Wind Associates LLC's Motion for Summary Judgment Against the Wampanoag Tribe of Gay Head (Aquinnah), ECF No. 228 ("Int. Def.'s Wampanoag Reply"); (14) the Plaintiffs' Joint Motion for Summary Judgment on all Remaining Claims and Memorandum in Support of Motion for Summary Judgment, ECF No. 283 ("Pls.' Remain Mem."); (15) the Errata:  Corrected Memorandum in Support of Motion for Summary Judgment, ECF No. 286; (16) the Federal Defendants' Memorandum in Opposition to Plaintiffs Alliance to Protect Nantucket Sound et al.'s and Town of Barnstable's Motions for Summary Judgment and in Support of Cross Motions for Summary Judgment, ECF Nos. 300, 301 ("Fed. Defs.' Remain Mem."); (17) the Combined Memorandum of Law in Support of Intervenor Cape Wind Associates LLC's Motion for Summary Judgment and in Opposition to Plaintiffs' Joint Motion for Summary Judgment on all Remaining Claims, ECF Nos. 303, 304 ("Int. Def.'s Remain Mem."); (18) the Plaintiffs' Reply Memorandum of Law in Support of Their Motion for Summary Judgment, ECF No. 317 ("Pls.' Remain Opp'n"); (19) the Federal Defendants' Reply in Support of Motion for Summary Judgment on the Claims Brought by Plaintiffs Alliance to Protect Nantucket Sound et al. and Town of Barnstable, ECF No. 330 ("Fed. Defs.' Remain Reply"); (20) the Reply in Support of Cape Wind Associates LLC's Motion for Summary Judgment and in Opposition to Plaintiffs' Joint Motion for Summary Judgment on all Remaining Claims, ECF No. 328 ("Int. Def.'s Remain Reply"); (21) the Errata:  Corrected Reply in Support of Intervenor Cape Wind Associates LLC's Motion for Summary Judgment, ECF No. 329; (22) the Federal Defendants' Opposition to Plaintiffs' Rule 56(e) Motion for Discovery or, in the Alternative, to Strike, ECF No. 319 ("Fed. Defs.' 56(e) Opp'n"); (23) Intervenor Cape Wind Associates LLC's Opposition to Plaintiffs' Rule 56(e) Motion for Discovery and Motion to Strike, ECF No. 320 ("Int. Def.'s 56(e) Opp'n"); (24) the Plaintiffs' Reply to Defendants' Oppositions to Plaintiffs' Motion for Discovery or, in the Alternative, to Strike, ECF No. 321 ("Pls.' 56(e) Reply"); (25) the Brief Amicus Curiae of American Bird Conservatory in Support of the PEER et al. Plaintiffs' Motion for Summary Judgment, ECF No. 306; (26) the Amicus Curiae Brief of the National Trust for Historic Preservation in Support of the Joint Motion for Summary Judgment Filed by the Alliance to Protect Nantucket Sound, et al., ECF No. 307; (27) the [Proffered] Brief Amicus Curiae of Whale and Dolphin Conservation (North America), ECF No. 308; (28) the Amicus Curiae Brief of the Cape Cod Marine Trades
(continued . . . )

partial summary judgment to each party as outlined below, and the Court further denies the

plaintiffs' Rule 56(e) motion for additional discovery or, in the alternative, to strike.

## I. BACKGROUND

An initial overview of several statutes is necessary to provide context for the plaintiffs'

claims in this litigation.

### A.    Statutory Background

#### 1.    The ESA

The ESA is "the most comprehensive legislation for the preservation of endangered

species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).

Congress designed the ESA "to save from extinction species that the Secretary of the Interior

designates as endangered or threatened." Babbitt v. Sweet Home Chapter of Cmtys. for a Great

Or., 515 U.S. 687, 690 (1995). With the exception of certain insects, the ESA defines an

"endangered species" as "any species which is in danger of extinction throughout all or a

significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is defined as "any

species which is likely to become an endangered species within the foreseeable future throughout

all or a significant portion of its range." Id. § 1532(20). The ESA generally prohibits the taking

of an endangered or threatened species, id. § 1538(a)(1)(B)-(C), and the term "take" is defined as

---

(. . . continued)
Association, Inc. and Massachusetts Fishermen's Partnership, Inc. in Support of a Selected Aspect of Plaintiffs' Motion for Summary Judgment, ECF No. 309; (29) the Amicus Curiae Brief of the National Trust for Historic Preservation in Support of the Motion for Summary Judgment Filed by the Wampanoag Tribe of Gay Head (Aquinnah), ECF No. 186; (30) the Memorandum of the Conservation Law Foundation, the Natural Resources Defense Council, and Mass Audubon in Support of Defendants' Motions for Summary Judgment and in Opposition to PEER et al. Plaintiffs' Motion for Summary Judgment on Their Claims Under the Endangered Species Act and Migratory Bird Treaty Act and in Opposition to the Wampanoag Tribe of Gay Head (Aquinnah) Motion for Summary Judgment, ECF No. 212; and (31) the Memorandum of the Conservation Law Foundation, the Natural Resources Defense Council, and Mass Audubon in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment on all Remaining Claims, ECF No. 302; as well as the parties' notices of supplemental authority and replies thereto, ECF Nos. 227, 298, 305, 358, 360, 363, 364, 365, 367, 368, and 369.

"to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," id. § 1532(19).  However, the Secretary of the Interior or the Secretary of Commerce "may permit," under certain circumstances, "any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  Id. § 1539(a)(1)(B).

The Secretary of the Interior and the Secretary of Commerce have delegated the authority to administer the ESA to the FWS and the NMFS.  50 C.F.R. § 402.01(b).  Section 7(a)(2) of the ESA mandates that

> [e]ach Federal agency shall, in consultation with and with the assistance of the [FWS or NMFS, as appropriate], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . .

16 U.S.C. § 1536(a)(2).  In carrying out their duties under § 7, agencies "shall use the best scientific and commercial data available."  Id.

An agency action "jeopardize[s] the continued existence" of a species where the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  Accordingly, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species," and "[i]f such a determination is made, formal consultation" with the FWS and/or the NMFS is required.  Id. § 402.14(a).  The formal consultation process requires the FWS and/or the NMFS to review the proposed agency action and prepare a "biological opinion" that includes "[a] detailed discussion of the effects of the action on listed species," and also render an "opinion on whether the action is likely to jeopardize the continued existence of a listed species."  Id. §§ 402.14(h)(2)-(3).  Where the biological opinion concludes that an agency

action may result in the incidental taking of a listed species, the FWS and/or NMFS must "provide with the biological opinion a statement concerning incidental take that" specifies both "the amount or extent[] of such incidental taking on the species," as well as "terms and conditions . . . that must be complied with by the Federal agency or any applicant to implement" certain specified "reasonable and prudent measures" designed to minimize the impact of the incidental taking.  Id. §§ 402.14(i)(1)(i)-(ii), (iv); see also id. § 402.14(g)(7).  Any such "[r]easonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes."  Id. § 402.14(i)(2).

>        **2.        The Migratory Bird Treaty Act**

The Migratory Bird Treaty Act, unless otherwise "permitted by regulations," makes it "unlawful at any time, by any means or in any manner, to . . . take[7] . . . kill, [or] attempt to take . . . or kill . . . any migratory bird, any part, nest, or egg of any such bird . . . included in" certain bilateral treaties[8] adopted for the protection of migratory birds.  16 U.S.C. § 703(a).  Violations of the Act can result in criminal sanctions.  See id. §§ 706-707.  However, "the Secretary of the Interior is authorized," upon consideration of certain factors, "to determine when, to what extent, if at all, and by what means . . . to allow . . . [the] taking . . . [or] killing" of protected migratory birds.  Id. § 704(a); see also 50 C.F.R. § 21.11 (addressing the requirement for permits to, among other things, take or kill migratory birds).  The FWS, which implements and enforces the

---

[7] The term "take" is not defined in the Migratory Bird Treaty Act.  However, the implementing regulations of the Act provide that, among other things, "[t]ake means to . . . wound[] [or] kill."  50 C.F.R. § 10.12.

[8] The treaties comprise bilateral conventions between the United States and Great Britain; the United States and Mexico; the United States and Japan; and the United States and Russia, each concerning the protection of migratory birds.  16 U.S.C. § 703(a); see also 50 C.F.R. § 10.13(a).

Migratory Bird Treaty Act on behalf of the Secretary of the Interior, 50 C.F.R. § 10.1, maintains

a list of protected migratory birds as outlined in the Act's implementing regulations, id. § 10.13.

In addition to the protections outlined in the Migratory Bird Treaty Act,

[o]n January 10, 2001, President Clinton signed Executive Order (EO) 13186, [which addresses the] "Responsibilities of Federal Agencies to Protect Migratory Birds". One of the requirements of E.O. 13186 is that each Federal agency taking actions that have, or are likely to have, a measurable negative effect on migratory bird populations is directed to develop and implement a [Memorandum of Understanding] with the FWS that shall promote the conservation of migratory bird populations.

77 Fed. Reg. 60,381, 60,382 (Oct. 3, 2012); see also Exec. Order No. 13,186, 66 Fed. Reg. 3853

(Jan. 10, 2001), reprinted in 16 U.S.C. § 701 app.

### 3.     The NEPA

Under the NEPA, federal agencies must, "'to the fullest extent possible[,]' . . . prepare an

environmental impact statement (EIS) for 'every . . . major Federal actio[n] significantly

affecting the quality of the human environment.'"[9] Winter v. Natural Res. Def. Council, Inc.,

555 U.S. 7, 15-16 (2008) (quoting 42 U.S.C. § 4332(2)(C)) (alterations in original). "An agency

is not required to prepare a full EIS if it determines—based on a shorter environmental

assessment (EA)—that the proposed action will not have a significant impact on the

environment." Id. at 16 (citing 40 C.F.R. §§ 1508.9(a), 1508.13). The NEPA established the

Council on Environmental Quality, see 42 U.S.C. § 4342, which has the "'authority to issue

---

[9] The regulations interpreting the NEPA provide:

Human environment shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. . . . This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

40 C.F.R. § 1508.14.

regulating interpreting'" the Act, <u>New York v. Nuclear Regulatory Comm'n</u>, 681 F.3d 471, 476

(D.C. Cir. 2012) (quoting <u>Dep't of Transp. v. Pub. Citizen</u>, 541 U.S. 752, 757 (2004)); <u>see</u>

<u>generally</u> 40 C.F.R. pts. 1500-1508 (regulations interpreting the NEPA).

      **4.      The Preservation Act**

      Congress enacted the Preservation Act in 1966, finding that the preservation of the

nation's "heritage is in the public interest so that its vital legacy of cultural, educational,

aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future

generations of Americans." 16 U.S.C. § 470(b)(4). Under the Preservation Act, Congress

authorized the Secretary of the Interior to create and "maintain a National Register of Historic

Places composed of districts, sites, buildings, structures, and objects significant in American

history, architecture, archeology, engineering, and culture." <u>Id.</u> § 470a(a)(1)(A).

      To protect identified historic sites, Section 106 of the Preservation Act provides that a

federal agency undertaking action on a historic site or licensing such an undertaking must, prior

to the

> approval of the expenditure of any Federal funds on the undertaking . . . [,] take
> into account the effect of the undertaking on any district, site, building, structure
> or object that is included in or eligible for inclusion in the National Register. The
> head of any such Federal agency shall afford the Advisory Council on Historic
> Preservation . . . a reasonable opportunity to comment with regard to such
> undertaking.

<u>Id.</u> § 470f. The Advisory Council has promulgated regulations that set forth the procedures that

federal agencies must follow to comply with Section 106. <u>Id.</u> § 470s. The regulations in turn

require that federal agencies engage in "consultation . . . [with] other parties with an interest in

the effects of the undertaking on historic properties," 36 C.F.R. § 800.1(a), including "any Indian

Tribe . . . that attaches religious and cultural significance to" properties included on the National

Register as a result of their "traditional religious and cultural importance to [the] Indian Tribe," 16 U.S.C. § 470a(d)(6); see also 36 C.F.R. §§ 800.2(c), 800.3(f)(2).

The consultation process requires federal agencies to: (1) identify the historic properties that might be affected by the undertaking, 36 C.F.R. § 800.4; (2) evaluate the impact of any adverse effects on those properties, id. § 800.5; and (3) "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on" those properties, id. § 800.6; see also Corridor H Alts., Inc v. Slater, 166 F.3d 368, 370 (D.C. Cir. 1999). When the required consultation has concluded, the agency and consulting parties may sign a memorandum of agreement that "shall govern the undertaking and all of its parts." See § 800.6(c). The memorandum of agreement also "evidences the agency['s] . . . compliance with [S]ection 106." Id. However, if "[a]fter consulting to resolve adverse effects pursuant to 36 C.F.R. § 800.6(b)(2), the agency . . . may determine that further consultation will not be productive and terminate consultation. Any party that terminates consultation shall notify the other consulting parties and provide them the reasons for terminating in writing." Id. § 800.7(a). Where the agency decides to terminate consultation, the agency "shall request that the [Advisory] Council" provide comments and shall also "notify all consulting parties of the request." Id. § 800.7(a)(1). "The head of the agency shall take into account the [Advisory] Council's comments in reaching a final decision on the undertaking." Id. § 800.7(c)(4).

**5.      The Shelf Lands Act**

The Shelf Lands Act accords the United States jurisdiction over the "the outer Continental Shelf," 42 U.S.C. § 1333(a), which is defined as "all submerged lands lying seaward

and outside the area of lands beneath navigable waters as defined in section 1301 of this title,[10] and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control."  43 U.S.C. § 1331(a).  The Shelf Lands Act provides that the laws of the United States apply not only to the outer Continental Shelf, but also "to the subsoil and seabed of the outer Continental Shelf and to all . . . installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon."  Id. § 1333(a).  As amended by the Energy Policy Act of 2005, Pub. L. No. 109-58, 110 Stat. 594, the Shelf Lands Act provides that "[t]he Secretary [of the Interior], in consultation with the Secretary of the Department in which the Coast Guard is operating and other relevant departments and agencies of the Federal Government, may grant a lease, easement, or right-of-way on the outer Continental Shelf for activities" that, among other things, "produce or support production, transportation, or transmission of energy from sources other than oil and gas," including renewable energy sources.  Id. § 1337(p)(1)(C); see 30 C.F.R. §§ 585.100-.101.  "The Secretary of the Interior delegated to the Bureau of Ocean Energy Management (BOEM) the authority to regulate activities under" the Shelf Lands Act concerning such activities.  30 C.F.R. § 585.100.  See generally id. §§ 585.100-.1019 (regulations concerning leases, easements, and rights-of-way for non-gas and non-oil related activities on the outer Continental Shelf).

## 6.    The Coast Guard and Maritime Transportation Act of 2006

The Coast Guard Maritime Transportation Act of 2006, which was enacted on July 11, 2006, imposes specific duties on the Commandant of the Coast Guard with respect to offshore wind energy projects in the Nantucket Sound.  See Pub. L. No. 109-241, § 414, 120 Stat. 516, 540.  Section 414 of the Act reads in its entirety:

---

[10] The Shelf Lands Act generally defines "lands beneath navigable waters" as all underwater land extending outward from the coastline of the United States that is subject to the laws of the United States.  See 43 U.S.C. § 1301(a).

Sec. 414. Navigational Safety of Certain Facilities.

(a) Consideration of Alternatives.—In reviewing a lease, easement, or right-of-way for an offshore wind energy facility in Nantucket Sound under section 8(p) of the Outer Continental Shelf Lands Act (43 U.S.C. 1337(p)), not later than 60 days before the date established by the Secretary of the Interior for publication of a draft environmental impact statement, the Commandant of the Coast Guard shall specify the reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety with respect to the proposed lease, easement, or right-of-way and each alternative to the proposed lease, easement, or right-of-way considered by the Secretary.

(b) Inclusion of Necessary Terms and Conditions.—In granting a lease, easement, or right-of-way for an offshore wind energy facility in Nantucket Sound under section 8(p) of the Outer Continental Shelf Lands Act (43 U.S.C. 1337(p)), the Secretary shall incorporate in the lease, easement, or right-of-way reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety.

Id. at 540.

## B.    Factual Background[11]

At the center of this consolidated civil action is the Nantucket Sound (the "Sound"), a body of water located off the coast of Massachusetts.  See CW65034.  The Sound serves many functions, including the home to various endangered species, a commercial and recreational waterway, and a source of cultural and religious identity.  See CW65356, CW111969-78.

Intervenor-defendant Cape Wind, with the approval of the federal defendants, also seeks to make the Sound the location of the nation's first offshore wind energy project.  See CW201584.

---

[11] Three sets of administrative record documents were submitted to the Court—one for each set of cross-motions for summary judgment.  See Notice of Submission of Jointly Prepared Appendix of Administrative Record Pursuant to Local Civil Rule 7(N), ECF No. 234 (index to administrative record concerning claims by the Wampanoag Tribe of Gay Head (Aquinnah)); Notice of Filing of Appendix, ECF No. 237 (index to administrative record concerning ESA and Migratory Bird Treaty Act claims); Notice of Filing of Appendix, ECF No. 333 (index to administrative record concerning plaintiffs' remaining claims).  For ease of reference, the Court refers in this Memorandum Opinion to the Bates numbers assigned to the administrative record documents as outlined in the index for each administrative record.  The Bates numbers consist of alpha-numeric references.  Bates numbers beginning with (1) "CW" refer to documents from the BOEM; (2) "FWS" refer to documents from the FWS; (3) "NMFS" refer to documents from the NMFS; and (4) "USCG" refer to documents from the Coast Guard.

1.      **The Cape Wind Project**

The Cape Wind project has been described as "the first of its kind in the United States and is one of the largest offshore wind projects in the world." CW201584. Cape Wind "began preliminary work on siting and designing a wind energy project in 2000," NMFS1413, and proposed an offshore wind energy park, to be located on the outer Continental Shelf on Horseshoe Shoal[12] in the Sound, CW65037. As described in the Federal Register,

> [t]he proposed wind park would consist of 130 offshore wind turbine generators arranged to maximize the park's maximum potential electric output of approximately 454 megawatts. The wind-generated electricity from each of the turbines would be transmitted via a 33 kilovolt submarine transmission cable system to a centrally located electric service platform. This platform would transform and transmit electric power to the Cape Cod mainland (12+ miles) via two 115 kilovolt lines, where it would ultimately connect with the existing power grid.

71 Fed. Reg. 30,693, 30,693 (May 30, 2006); see also, e.g., NMFS1415-22 (providing a more detailed description of the Cape Wind's project proposal). Prior to its construction, and as discussed below, the Cape Wind project was and is subject to several regulatory and administrative procedures and approvals.

2.      **The Regulatory Approval Process**

"In November 2001, [Cape Wind] filed a permit application with the [Corps of Engineers], New England District, under section 10 of the Rivers and Harbors Act of 1899 . . . ." 71 Fed. Reg. at 30,693. The Corps issued a draft EIS in 2004. See CW142751. Upon the passage of the Energy Policy Act of 2005, the BOEM took over "as a lead agency for coordinating the permitting process with other Federal agencies." 71 Fed. Reg. at 30,693;

---

[12] A "shoal" is "a sandbank or sandbar that makes the water shallow." See Merriam-Webster Dictionary, available at http://www.merriam-webster.com/dictionary/shoal (last visited Mar. 4, 2014).

CW111956.  As outlined below, the BOEM subsequently initiated required consultation with various agencies.

### a.    Formal Consultation Under Section 7 of the ESA

### i.    The FWS's Biological Opinion and Incidental Take Statement

The BOEM consulted informally with the FWS from November 17, 2005, until May 19, 2008, when the BOEM requested initiation of formal consultation.  See FWS92-96.  The FWS issued its biological opinion on November 21, 2008.  See FWS1.  The biological opinion "only applies to the roseate tern and piping plover," two types of migratory birds, "as listed species under the ESA."  FWS3.  The FWS reached the following conclusion:

> After reviewing the current status of the Atlantic Coast piping plover and the northeastern population of the roseate tern, the environmental baseline for the action area, and all effects of the proposed Cape Wind Project, it is the Service's biological opinion that the project is not likely to jeopardize the continued existence of these species.  No critical habitat has been designated for the Atlantic Coast breeding ranges of these species; therefore, none will be affected.

FWS73.  The FWS included with its biological opinion an incidental take statement authorizing the taking of "four to five roseate terns per year (80-100 terns over the 20-year life of the project)" and "a maximum of 10 piping plovers . . . over the life of the [project]."  FWS75.  With respect to the taking of piping plovers, the FWS added:

> Because the formulation of mortality estimates is very complex, new empirical information demonstrating one or more of the following circumstances will constitute new evidence that estimated take of piping plovers has been exceed:
>
> 1. Annual flights across the project area exceed the total number of pairs breeding in and north of the action area.  This is equivalent to approximately 18% of migration flights by adults and young of the year (pairs x 5.5).
> 2. More than 20% of flights occur at rotor height.
> 3. Avoidance rates <0.95.

Id.  The FWS also "estimate[d] that implementation of the Bird Island restoration project[13] will offset any potential roseate tern mortality that may occur from the Cape Wind Project."  Id.

The incidental take statement included terms and conditions necessary to implement reasonable and prudent measures pursuant to the ESA.  See FWS75-78.  Among these measures was a discussion of an operational adjustment that the FWS had considered but ultimately decided against:

The [FWS] . . . considered as a reasonable and prudent measure[] an operational adjustment to the wind facility that would require the temporary and seasonal shut down of the [wind turbine generators] through the feathering of the rotors. Feather of the rotors causes them to face the wind and stop spinning, and would reduce the risk of collision by roseate terns and, to a limited extent, migrating piping plovers transiting the Horseshoe Shoal project area.  Although the [FWS] considered that result in this "operational adjustment" would be based on weather and day light parameters that reduce visibility, and would be limited in time to seasons when plovers and peak numbers of roseate terns are expected to be present (a few weeks in early to mid-May and a few weeks in late August to mid-September), it was determined by [the BOEM] and [Cape Wind] . . . to not be reasonable and prudent based on the following:

The operational adjustment (shut down of the turbine rotors to a neutral position) is not reasonable because it does not meet the [reasonable and prudent measure] regulatory definition as a "reasonable measure" as it modifies the scope of the project in a manner that is adverse to the project's stated purpose and need, that is to make a substantial contribution to enhancing the region's electrical reliability and achieving the renewable energy requirements under the Massachusetts and regional renewable portfolio standards.  [The BOEM] considers that this may involve more than a "minor change" (50 C.F.R. § 402.14(i)(2)[)].

[The BOEM] has also determined that the [reasonable and prudent measure] is not reasonable because the uncertainty regarding the project's ability to generate electricity during the two time frames (late April to mid-May and late August to mid-September) reduces the project's predicted potential electrical output in a

---

[13] According to the FWS biological opinion, "the Bird Island restoration project is to restore and repair the existing stone revetment in its current location on the island and to use clean dredged material to raise the elevation of 0.4 acre of habitat landward of the revetment."  FWS67.  The FWS opined that the "project is likely to have measurable beneficial effects for the roseate tern by preventing further loss of existing essential nesting habitat, by creating additional suitable nesting habitat, and by increasing the carrying capacity of the island which is the most productive breeding site for the species in Buzzards Bay."  Id.  The FWS acknowledged that "this project may not be completed . . . until some point after the Cape Wind Project is constructed."  FWS67-68.

significant enough way to have a deleterious effect on anticipated revenues, financing and power purchasing agreements.

Furthermore, [the BOEM] indicates that the proposed timeframes for the operational adjustment, although limited by season, visibility and time of day, constitute peak period hours, when the energy supplied to the [Independent System Operator of] New England (the regional transmission organization) has greater market value. Therefore, the [reasonable and prudent measure] may not be prudent because economic cost makes this measure not feasible for project proponents to implement.

FWS76-77 (citations omitted).

## ii. The NMFS's Biological Opinion and Incidental Take Statement

The "BOEM and [the] NMFS began discussing consultation requirements in January 2006." NFMS1414. The "NMFS provided technical assistance to [the] BOEM as they drafted a new [draft EIS][14] and draft [biological assessment]." Id. The "BOEM provide[d] NMFS with a final [biological assessment] and request for formal consultation in a letter dated May 19, 2008," and "[c]onsultation was initiated on May 22, 2008." Id. The NMFS issued its biological opinion on November 18, 2008 ("2008 biological opinion"), which

concluded that the proposed action was likely to adversely affect but was not likely to jeopardize the continued existence of loggerhead, Kemp's ridley, leatherback or green sea turtles. Additionally, [the] NMFS concluded that the proposed action was not likely to adversely affect right, humpback or fin whale species. Because no critical habitat is designated in the action area, none will be affected by the proposed action. The [biological] [o]pinion included an Incidental Take Statement exempting the incidental take by acoustic harassment of 3-7 sea turtles during each 4 hour pile driving event (130 events total) and 13-28 sea turtles during the geophysical survey.

. . . .

In the spring of 2010, over 90 North Atlantic right whales were observed in Rhode Island Sound and nearby waters, including areas to be transited by project vessels originating from the staging site at Quonset, [Rhode Island]. While right

---

[14] The NMFS had previously "provided comments on [a] [draft EIS] [prepared by the Corps of Engineers] and indicated to the [Corps] that consultation pursuant to Section 7 of the ESA would be necessary for the proposed project." NMFS1414.

whales were not sighted in the area proposed for construction (i.e., the project footprint on Horseshoe Shoal within Nantucket Sound), right whales were observed in nearby areas and along the route that would be used by vessels moving between the project footprint and the project staging area near Quonset, [Rhode Island]. When compared to sightings in previous years, these sightings represent a higher than average number of right whales in the action area and nearby areas. As noted in [the] BOEM's July 13, 2010 letter to [the] NMFS, these sightings represent new information that when analyzed may reveal effects of the action that may affect listed species in a manner or to an extent not previously considered. As such, [the] NMFS concurred with [the] BOEM's determination that reinitiation of consultation was appropriate; specifically, to consider the new information on the presence of right whales in the action area. Consultation was reinitiated on July 26, 2010.

NMFS1414-15. The reinitiation of consultation culminated in a second biological opinion, which the NMFS issued on December 30, 2010 ("2010 biological opinion"). NMFS1413. The 2010 biological opinion reached the same conclusions as the first opinion about the project's effects on listed whales and sea turtles. See NMFS1534. The NMFS issued with the 2010 biological opinion a second incidental take statement for listed sea turtles, which authorized the same level of take as the prior incidental take statement. See NMFS1536.

> **b.** **The BOEM and FWS Consultation Regarding the Impact of the Cape Wind Project on Migratory Birds**

The BOEM's final EIS[15] notes that "[a]vian resources that are likely to occur in the area of the proposed action are protected under the Migratory Bird Treaty Act." See CW157080 (citing also Executive Order 13,186). "From March 2002 through September 2006, aerial, boat, and radar surveys were conducted by [Cape Wind]. Additionally, the [Massachusetts Audubon Society] conducted aerial and boat surveys from August 2002 through September 2004." Id. Cape Wind and the Massachusetts Audubon Society "collectively flew 125 systematic aerial surveys to document avian species and distributions in Nantucket Sound," and the surveys took

---

[15] The final EIS, which was prepared pursuant to the NEPA and the Shelf Lands Act, is discussed in further detail below.

place "during the daytime throughout different seasons from March 2002 through March 2006." CW157081; see also CW66154 (tables summarizing survey results). "A total of 17 boat surveys were conducted from May 2002 [through] March 2005 during the same study periods as the aerial surveys," and Cape Wind "also conducted radar surveys during the spring and fall migration periods." CW157081. The BOEM concluded that the existing surveys were sufficient to inform its final EIS. See CW67697-67770 (responding to comments suggesting that the BOEM obtain additional information about the project's impacts on migratory birds).

> During the course of the Section 7 consultation, the FWS
>
> recommended several studies to more fully assess the project's impacts . . . on migratory birds. Certain information was collected, and some was not. While they would have generated information useful to assessment of migratory birds generally, the unimplemented studies would not necessarily yield information that would have significantly addressed the uncertainties in the analysis of impacts to the roseate tern and piping plover specifically.

FWS4. The FWS biological opinion did not specifically address other migratory birds not listed in the ESA. Id. However, one of the terms and conditions of the FWS biological opinion requires the BOEM, Cape Wind, and the FWS to "coordinate in the development of specific pre- and post-construction monitoring protocols . . . for [an] Avian and Bat Monitoring Framework for the Cape Wind Proposed Offshore Wind Facility." FWS77.

On June 4, 2009, the BOEM and the FWS signed a Memorandum of Understanding pursuant to section 3 of Executive Order 13,186. CW242438. The Memorandum "identifies specific areas in which cooperation between the agencies would substantially contribute to the conservation and management of migratory birds and their habitats." Id. Both agencies also reviewed drafts of the Avian and Bat Mitigation and Monitoring Plan prepared by Cape Wind. See CW242441. "The monitoring plan was developed in coordination with [the BOEM and the FWS] . . . and includes several monitoring requirements as a result of previous regulatory

review," including the required pre- and post-construction monitoring. CW237369. The lease for the Cape Wind project, which was issued by the BOEM on October 6, 2010, see CW119269; CW119275, states that the monitoring plan is "mandatory," CW119314, and the BOEM also conditioned approval of Cape Wind's Construction and Operation Plan "on an acceptable Avian and Bat Monitoring Plan," CW119704.[16]

### c.    The NEPA and Shelf Lands Act Review Process

"The Energy Policy Act of 2005 was enacted on August 8, 2005, giving the Department of the Interior authority for issuing leases, easements, or rights-of-way for alternative energy projects on the Outer Continental Shelf . . . ." 71 Fed. Reg. at 30,693. Accordingly, the BOEM began to "act as a lead agency for coordinating the permitting process with other Federal agencies." Id.; see CW111956.

> Once [the BOEM] became the lead agency for the [Cape Wind] project, [the BOEM] determined that a new [d]raft EIS was needed and developed the scope of the study for the [d]raft EIS by requesting comments on the Proposed Action in a public notice published in the Federal Register on May 30, 2006 (71 FR 30693). The [BOEM] treated all the comments previously made on the [Corps of Engineers'] [d]raft EIS as scoping comments for [the BOEM's] [d]raft EIS. The [BOEM] also considered the comments that were made at [Corps] public meetings held in Yarmouth, Martha's Vineyard, Cambridge, and Nantucket, Massachusetts.

CW111956. The BOEM issued a new draft EIS on January 18, 2008. See 73 Fed. Reg. 3482, 3482 (Jan. 18, 2008); CW111956. "The public comment period on the [d]raft EIS lasted 60 days (until March 20, 2008) and was then extended another 30 days (until April 21, 2008) in order to provide the public with additional time to consider and submit comments on the [d]raft EIS."

---

[16] "The final [Avian and Bat Monitoring Plan] was approved by [the] FWS on September 6, 2012, and by [the] BOEM on November 20, 2012." Fed. Defs.' ESA/MBTA Mem. at 8 & n.8 (citing http://www.boem.gov/Renewable-Energy-Program/Studies/Cape-Wind.aspx (last visited Mar. 4, 2014)).

CW111956.  The BOEM made the final EIS available to the public on January 21, 2009.  See id.;

74 Fed. Reg. 3635, 3635 (Jan. 21, 2009).

Subsequently, on March 8, 2010, the BOEM prepared an environmental assessment

("2010 Assessment").  See CW111957.  As explained by the BOEM,

> [t]he purpose of th[e] [2010 Assessment] was to determine whether there were significant new circumstances or information relevant to environmental concerns and impacts associated with the Proposed Action that were not fully addressed in the [f]inal EIS . . . .  The [BOEM] used this [2010 Assessment] to determine whether the [f]inal EIS needed to be supplemented.  The [BOEM] found that no significant new information existed that would necessitate a re-analysis of the range of the alternatives or the kinds, levels, or locations of the impacts of the Proposed Action on the human environment.  After considering public comments on the [2010 Assessment] and additional new information that was received after the [2010 Assessment] was made publicly available, [the BOEM] concluded that the analyses in the [f]inal EIS remained valid, and that, because a supplemental EIS was not required, it issued a Finding of No New Significant Impact (FONNSI) on April 28, 2010.

Id.

On April 28, 2010, the BOEM also issued a Record of Decision ("2010 ROD"), which

stated that "[t]he decision is hereby made to offer a commercial lease to [Cape Wind] in

accordance with . . . [the Shelf Lands Act], under the terms and conditions" specified in the 2010

ROD, id., and in a lease issued to Cape Wind by the BOEM on October 6, 2010, see CW119269;

CW119275.  The lease granted Cape Wind "the exclusive right and privilege" to construct,

operate, and eventually decommission the proposed wind energy facility on Horseshoe Shoal in

the Sound.  See CW119270.  Among the terms and conditions incorporated into the Cape Wind

lease are the terms and conditions which the Coast Guard deemed necessary pursuant to § 414 of

the Coast Guard and Maritime Transportation Act of 2006.  See CW119319.  The Coast Guard

had previously issued the §414 terms and conditions on August 2, 2007.  See CW66389;

CW66393.

The 2010 ROD required Cape Wind to submit to BOEM a Construction and Operations Plan. CW111957; see also CW119697. Cape Wind "submitted a [Construction and Operations Plan] for the project on October 29, 2010, and submitted a modified [Construction and Operations Plan] on February 4, 2011." CW119697. Thereafter,

> [o]n February 22, 2011, a "Notice of Preparation of an Environmental Assessment" was posted on the [BOEM] website to solicit public input in anticipation of the preparation of [a] 2011 [environmental assessment ("2011 Assessment")]. The purpose of the comment period was to provide the public with an opportunity to review and comment on the [Construction and Operations Plan] as well as to provide [the BOEM] with any significant new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts. The [Construction and Operations Plan] was made available for review on the [BOEM] website . . . . Consulting parties and local governments were informed of the comment period via email, which provided the location of the [BOEM] website and [the BOEM] mailing address for receiving comments.
>
> The purpose of the 2011 [Assessment] was to evaluate whether substantial changes in the proposed action that are relevant to environmental concerns or significant new circumstances or information relevant to environmental concerns and bearing on the proposed action had come to light since the [final EIS] and the 2010 [Assessment] were issued. If so, [the BOEM] would be required to prepare a[] [supplemental EIS] before taking action on [Cape Wind's Construction and Operations Plan]. Issues considered in the 2011 [Assessment] include: additional surveys and sampling; conflicts with aviation traffic and fishing use; emergency response; migratory birds; microclimate; oil within wind turbine generators; sloshing dampers; transition piece grout; permits issued by other Federal agencies; and consultations with other agencies. [The BOEM] did not directly address comments related to the content of the [Avian and Bat Monitoring Plan] in the [2011 Assessment]; rather it [did so] in its review of that plan.

CW119705; see also CW119743-86 (2011 Assessment). The BOEM "determined that the [final EIS] fully discussed the significant environmental consequences associated with the approval of" Cape Wind's Construction and Operations Plan, and approved the plan in a record of decision dated April 18, 2011 ("2011 ROD"). CW119705-06.

### d.     Consultation Under Section 106 of the Preservation Act

"The [Advisory Council on Historic Preservation] formally entered into the Section 106

consultation with the Corps [of Engineers] for the" proposed wind energy park "in March of

2005 upon its determination that the project would adversely affect historic properties on or

eligible for the National Register of Historic Places."  CW44617.  After the BOEM took over as

the lead agency, it

> commenced its Section 106 process in late 2005 and conducted more than twenty-
> one meetings through February 2010.  [The BOEM] invited the Massachusetts
> [State Historic Preservation Officer] to be a cooperating party on March 16, 2006,
> to which she replied "the [Massachusetts Historical Commission] is a consulting
> agency."

CW112019.  The Wampanoag Tribe of Gay Head (Aquinnah) and the Mashpee Wampanoag

Tribe were also consulting parties to the Section 106 process.  CW112021.  The BOEM

published a draft EIS pursuant to the NEPA in January of 2008, which "included its initial

identification of properties and its findings of adverse effects."  CW112021.  The comments to

the draft EIS objected to the methodology that the BOEM used to identify affected properties,

and the BOEM responded to the comments by revising its methodology and undertaking new

identification efforts.  Id.  "From that point forward, the NEPA and [S]ection 106 process

timelines" proceeded independently of one another.  Id.  As part of its Section 106 consultation,

the BOEM

> conducted interagency and intergovernmental consultation meetings, including
> tribes, to solicit comments and concerns related to the [Cape Wind] project,
> including issues related to cultural resources and historic preservation, in
> November 2005, June of 2006, and February of 2007[,] leading up to the
> circulation of the [draft EIS], and in July of 2008 to discuss concerns raised in
> comments to the [draft EIS].  One-on-one government-to-government meetings
> with tribes in advance of the [draft EIS] and its findings also took place in July of
> 2006, February of 2007 . . . and July of 2007.

Following its evaluation of [the draft EIS] comments, [the BOEM] resumed its Section 106 process with a series of consultation meetings specific to the [S]ection 106 process that began in July 2008. Upon completion of its second identification of properties effort and these consultations, the [BOEM] released a Finding of Adverse Effect as an individual document on December 29, 2008[,] to describe its new list of identified eligible properties and those adversely affected under the revised methodology. The December 2008 Finding identified 29 historic properties as being adversely affected, including one property of cultural[] importan[ce] to the Mashpee tribe and two [National Historic Landmarks]. The December 2008 Finding was included in the analysis of the [f]inal EIS for the project, [and] circulated for public comment in January 2009. Government-to-government consultation meetings and Section 106 consultations meetings with the parties followed throughout 2009 and in early 2010, as described below.

Through this process, [the BOEM] considered additional information from tribes and other consulting parties via meetings, written communications, and site visits. [The BOEM] also worked closely with the Advisory Council for Historic Preservation and the National Park Service (Keeper of the National Register and [National Historic Landmark] personnel) in a continued effort to assess the nature and level of adverse effects and to make determinations of the eligibility of additional properties, as well as to determine the appropriate scope of the [S]ection 106 process. As a result, [the BOEM] released a Revised Finding of Adverse Effect on January 13, 2010. The Revised Finding added Nantucket Sound and four individual onshore [traditional cultural properties] to the list of affected historic properties, and clarified the types of alterations that could occur to each.

A draft Memorandum of Agreement (MOA) was distributed at the June 16, 2009 consultation meeting. The draft MOA contained several proposed mitigation measures. [The BOEM] asked attendees to review the MOA and provide [the BOEM] with any comments on the document or other ideas to avoid, minimize or mitigate adverse effects. The draft MOA was re-circulated to consulting parties at the January 13, 2010 full Section 106 meeting. The [State Historic Preservation Officer] concurred with the revised Finding in February 2010. Following public review of the revised Finding and additional site visits and several meetings with parties in February 2010, the Secretary [of the Interior] determined that further efforts to agree on an MOA would not be productive, and on March 1, 2010, submitted a request to the [Advisory Council for Historic Preservation] for their comment to terminate the [S]ection 106 process.

CW112021-22. "The [Advisory Council for Historic Preservation] comment was received [by the Secretary of the Interior] on April 2, 2010." CW112024; see also CW112696.

### 3. The Current Litigation

The PEER plaintiffs, comprised of several environmental groups, members of those groups, and individuals who use the Nantucket Sound, PEER Compl. ¶¶ 3-29, assert three claims for relief based on alleged deficiencies in the FWS's and the NMFS's biological opinions and incidental take statements, id. ¶¶ 97-99. They also challenge the issuance of the records of decision, the lease, and the approval of the Cape Wind construction operations plan, on the grounds that each relies on invalid biological opinions. Id. ¶¶ 100-103. The PEER plaintiffs also allege that the BOEM and the Corps of Engineers should have obtained a permit for the take of migratory birds prior to approving the Cape Wind project. Id. ¶ 104. Finally, they claim that the BOEM violated the NEPA by failing to issue a supplemental EIS concerning the recent aggregations of right whales, by failing to address certain other data or effects of the project, and by relying on the Avian and Bat Monitoring Plan. Id. ¶¶ 106-110.

The Town of Barnstable "is a municipal corporation and political subdivision of Massachusetts" that "has jurisdiction over extensive lands on the south side of Cape Cod along Nantucket Sound." Barnstable Compl. ¶ 10. In its complaint, Barnstable asserts nine claims for relief based on the BOEM's alleged failure to adequately address the finding that the Sound is eligible for listing in the National Register or to survey all historic properties in and around the Cape Wind project area, in violation of the Preservation Act. Id. ¶¶ 200-08. Barnstable also challenges the adequacy of the BOEM's final EIS, as well as its failure to issue a supplemental EIS, id. ¶¶ 209-14, the BOEM's alleged failure to provide for safety[17] as required by the Shelf

---

[17] Specifically, the Town of Barnstable alleges that

> [t]he [d]efendants have . . . fail[ed] to ensure that the [Cape Wind project] . . . will be carried out in a manner that provides for the safety of parties engaging in: a) commercial and general aviation activities; b) commercial shipping and commercial transportation between the Cape and the

(continued . . . )

Lands Act, id. ¶¶ 215-19, and the Coast Guard's alleged failure to specify appropriate terms and conditions as to navigation safety in the Sound as required in § 414 of the Coast Guard and Maritime Transportation Act of 2006, id. ¶¶ 220-25.

The Alliance plaintiffs, a non-profit environmental group and several individuals who use or enjoy the Sound, Alliance Compl. ¶¶ 6-24, assert six claims under the NEPA, the Shelf Lands Act, § 414, and the Preservation Act similar to those asserted by the PEER plaintiffs and the Town of Barnstable, id. ¶¶ 151-76. The Alliance plaintiffs additionally allege violations of the Clean Water Act and the Rivers and Harbors Act. See id. ¶¶ 177-93.

The Wampanoag Tribe of Gay Head (Aquinnah) states in its complaint that "[t]he Tribe has lived on the shores of Nantucket Sound since time immemorial," and "depends on the Nantucket Sound for food, jobs, spiritual ceremonies, and cultural continuity, and the Sound is essential to the Tribe's religious ceremonies and traditional religious practices." Wampanoag Compl. ¶¶ 13-14. The Tribe's complaint asserts three claims for relief based on the federal defendants' alleged failure to consider the impact of the Cape Wind project on subsistence fishing, the failure to adequately consider the impact of the finding that the Nantucket Sound is eligible for listing in the National Register, and the failure to engage in timely and adequate Section 106 consultation with the Tribe. Id. ¶¶ 127-43.

The Court granted Cape Wind Associates, LLC's ("Cape Wind") unopposed motion for leave to intervene as a defendant. See September 8, 2010 Minute Order. The Court subsequently consolidated the cases filed by the PEER, Alliance and Town of Barnstable

---

(. . . continued)
Islands; c) oil spill prevention and response operations; and d) search and rescue operations.

Barnstable Compl. ¶ 216

plaintiffs,[18] see October 25, 2010 Minute Order, as well as the case filed by the Wampanoag Tribe of Gay Head (Aquinnah), see July 8, 2011 Minute Order.

The parties have now filed cross-motions for summary judgment: one concerning the PEER, Alliance, and Town of Barnstable plaintiffs' ESA and Migratory Bird Treaty Act claims; a second concerning the PEER, Alliance, and Town of Barnstable plaintiffs' remaining claims; and a third concerning the claims of the Wampanoag Tribe of Gay Head (Aquinnah). Additionally, the PEER, Alliance, and Town of Barnstable plaintiffs have filed a motion pursuant to Federal Rule of Civil Procedure Rule 56(e) seeking additional discovery concerning certain documents cited in the federal defendants' legal memoranda, or in the alternative to strike those same documents.

## II.  STANDARD OF REVIEW

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007), aff'd, 408 F. App'x 383 (D.C. Cir. 2010)); see also Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).  But due to the limited role of a court in reviewing the administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not applicable. Stuttering, 498 F. Supp. 2d at 207.  Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the

---

[18] Another case was consolidated at the same time, but was later dismissed with prejudice.  See Stipulation of Voluntary Dismissal of All Claims in Martha's Vineyard / Dukes County Fisherman's Ass'n v. Salazar, ECF No. 149; see also July 2, 2012 Minute Order.

evidence in the administrative record permitted the agency to make the decision it did.'" <u>Id.</u> (quoting <u>Occidental Eng'g Co. v. INS</u>, 753 F.2d 766, 769-70 (9th Cir. 1985)).  In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law."  <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

## III.  ANALYSIS

**A.    Whether the Coast Guard Violated § 414 of the Coast Guard and Maritime Transportation Act of 2006**

The Town of Barnstable and the Alliance plaintiffs have moved for summary judgment on their claims that the United States Coast Guard violated § 414 of the Coast Guard and Maritime Transportation Act of 2006.  Pls.' Remain Mem. at 15-16; Pls.' Remain Opp'n at 21; Alliance Compl. ¶¶ 167-70; Barnstable Compl. ¶¶ 220-25.  The federal defendants and Cape Wind each move for summary judgment on the ground that no final agency action resulted from the United States Coast Guard's issuance of terms and conditions for the Cape Wind lease pursuant to § 414, and thus there can be no APA challenge to those terms and conditions.[19]  Fed. Defs.' Remain Mem. at 14; Fed. Defs.' Remain Reply at 1; Int. Def.'s Remain Mem. at 19; Int. Def.'s Remain Reply at 1-2.  Alternatively, the federal defendants and Cape Wind argue that even if the issuance of the terms and conditions constitutes final agency action, the Coast Guard fully complied with the provisions of the Coast Guard and Maritime Transportation Act of 2006. Fed. Defs.' Remain Mem. at 14; Fed. Defs.' Remain Reply at 1; Int. Def.'s Remain Mem. at 19; Int. Def.'s Remain Reply at 1-2.

---

[19] Because the Court concludes that there has been no violation of § 414 of the Coast Guard and Maritime Transportation Act of 2006, the Court will not address whether the issuance of terms and conditions pursuant to § 414 constitutes final agency action.

Section 414 was passed in large part due to the pendency of Cape Wind's proposal. See 152 Cong. Rec. S6439-40 (daily ed. June 22, 2006) (statement of Senator Stevens). The legislative history discloses Congress' position that "[i]t must be left up to the Commandant of the Coast Guard to decide what is necessary to prevent negative impact to navigation, aviation, and communications caused by the proposed wind farm." Id. at S6439. To that end, § 414 provides that "the Commandant of the Coast Guard shall specify the reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety with respect to the proposed lease . . . and each alternative" to the proposal, and also that "the Secretary [of the Interior] shall incorporate into the lease . . . reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety." Pub. L. No. 109-241, 120 Stat. at 540 (emphasis added).

There is no case law construing § 414, and so the Court must turn to the familiar two-step analysis of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." Chevron, 467 U.S. at 842. And it is well established that

> [t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

Id. at 843 n.9 (citations omitted). Among the "traditional tools of statutory interpretation" are the "text, structure, purpose, and legislative history" of the statute." Pharm. Research & Mfrs. of Am. v. Thompson, 251 F.3d 219, 224 (D.C. Cir. 2001). If the Court determines that Congress'

intent is unclear, then the court proceeds to the second step under <u>Chevron</u>, which requires the court to "defer to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'" <u>Bluewater Network v. EPA</u>, 372 F.3d 404, 410 (D.C. Cir. 2004) (quoting <u>Chevron</u>, 467 U.S. at 843)).

As to step one of the <u>Chevron</u> analysis, the Court "begins, as always, with the text of the statute." <u>Chao v. Day</u>, 436 F.3d 234, 235 (D.C. Cir. 2006). And "[w]here, as here, [the text] is plain and unambiguous," the Court's "analysis ends with the text as well." <u>Id.</u> The mandatory language of § 414 makes clear that the Commandant "shall" communicate to the Secretary of the Interior the terms and conditions deemed necessary for navigational safety, and the Secretary of the Interior "shall" include those terms and conditions in any lease that might be issued pursuant to § 1337(p) of the Shelf Lands Act. Pub. L. No. 109-241, 120 Stat. at 540. The statute leaves no discretion to either the Commandant as to the decision to issue terms and conditions, or to the Secretary of the Interior regarding the decision to include those terms and conditions in a § 1337(p) lease. See <u>Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.</u>, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.").

What is less clear from the text of the statute is the effect of the Commandant's issuance of the terms and conditions. However, the legislative history is instructive:

> The arrangement dictated by section 414 of [the Coast Guard and Maritime Transportation Act of 2006] has precedence in the procedure for granting hydroelectric licenses under the Federal Power Act[, 16 U.S.C. § 797(e) (2012)]. This process requires the Federal Energy Regulatory Commission to include in the terms and conditions of its licenses for hydroelectric licenses any conditions deemed necessary to protect the interests of other agencies. The United States Supreme Court[, in <u>Escondido Mutual Water Co. v. La Jolla Band of Mission Indians</u>, 466 U.S. 765 (1984),] determined that such conditions had to be "reasonable" and the reasonability of the conditions was a matter to be determined by the courts, not the Commission.

152 Cong. Rec. at S6440. In <u>Escondido</u>, the Supreme Court addressed § 4(e) of the Federal

Power Act, 466 U.S. at 772, which provides that licenses such as the hydroelectric facility

license at issue in that case "shall be subject to and contain such conditions as the Secretary [of

the Interior] . . . shall deem necessary for the adequate protection and utilization" of the property,

16 U.S.C. § 797(e). The Supreme Court held that it was "clear enough that while Congress

intended that the Commission would have exclusive authority to issue all licenses, it wanted the

[Secretary of the Interior] to continue to . . . determin[e] what conditions would be included in

the license in order to protect the resources under [his] [] jurisdiction[]." <u>Escondido</u>, 466 U.S. at

775. The District of Columbia Circuit has elaborated that

> [i]f Congress had intended Interior to have authority to require prescriptions
> independent of the Commission's licensing process, it could easily have so
> specified. By providing instead that Interior's prescription is to be a FERC
> license requirement, Congress implicitly indicated that it would have to be
> supported as would any other Commission licensing requirement. The record
> before us, then, is no more and no less than what was presented to the
> Commission.

<u>Bangor Hydro-Elec. Co. v. Fed. Energy Regulatory Comm'n</u>, 78 F.3d 659, 662 (D.C. Cir. 1996).

And "[i]f the Secretary [of the Interior] concludes that the conditions are necessary" then "the

court is obligated to sustain" the conditions "if they are reasonably related to [the Secretary's]

goal [of preserving reservations], otherwise consistent with the [Federal Power Act], and

supported by substantial evidence." <u>Escondido</u>, 466 U.S. at 778. The Circuit has interpreted this

standard of review as akin to arbitrary and capricious review under the APA. <u>See</u> <u>Bangor</u>

<u>Hydro-Elec. Co.</u>, 78 F.3d at 663.

Given the similarity between the statutory schemes of § 414 and § 4(e) of the Federal

Power Act, and given also the fact that the legislative history of § 414 specifically relies on the

Supreme Court's decision in <u>Escondido</u>, it seems inescapable that the Court must review the

imposition of the § 414 terms and conditions in the same manner dictated for review of § 4(e) of the Federal Power Act. In other words, if the Coast Guard has deemed certain terms and conditions necessary for the Cape Wind project pursuant to § 414, then "the [C]ourt is obligated to sustain" those terms and conditions "if they are reasonably related to [the Coast Guard's] goal, otherwise consistent with the [Shelf Lands Act], and supported by substantial evidence."[20] See Escondido, 466 U.S. at 778; see also Bangor Hydro-Elec. Co., 78 F.3d at 662-63.

As to the Coast Guard's objective, § 414 makes clear that its terms and conditions must "provide for navigational safety with respect to the proposed lease, easement, or right-of-way." Pub. L. No. 109-241, 120 Stat. at 540. The terms and conditions imposed by the Coast Guard address the design, positioning, arrangement, and operation of the Cape Wind project, and include required specified labeling, mechanisms for shutting down the wind turbine generators, and placement of safety equipment and mooring attachments on the wind turbine generators for emergency use. CW66379. The terms and conditions also require Cape Wind, prior to construction, to provide to the BOEM and the Coast Guard for their review and approval certain research analyses concerning, and recommended mitigation measures for, the project's impact on radar navigation of vessels in and around the project. CW66380. There are also provisions for breaking ice that might form in and around the project area. CW66381-82. Finally, the terms and conditions require Cape Wind to report periodically to both the BOEM and the Coast Guard about navigational safety, and the Coast Guard retains for itself the right to amend the terms and

---

[20] The defendants argue that the similarity between the two statutory schemes calls for the conclusion that the Coast Guard is not a proper party. See, e.g., Fed. Defs.' Remain Mem. at 14-17; Int. Def.'s Remain Mem. at 19-23. As this Circuit has stated, where parties levy a challenge to licenses issued under the Federal Power Act, "FERC is the appropriate named respondent even if the real defense is to be mounted by [the Department of the] Interior." Bangor Hydro-Elec. Co., 78 F.3d at 662 (citing 16 U.S.C. § 825 (b)). The Court thus need not address whether the Coast Guard is an appropriate party because even if it is not, the plaintiffs' claims concerning the § 414 terms and conditions are properly brought against the BOEM, and must therefore be reviewed by the Court in the manner set forth in Escondido.

conditions at any time. CW66380-83. The Court is satisfied that these terms and conditions are reasonably related to the Coast Guard's goal to provide for navigational safety.

The Court is also satisfied that the terms and conditions are otherwise consistent with § 1337(p) of the Shelf Lands Act. This Act requires, among other things, that any lease granted pursuant to § 1337(p) be "carried out in a manner that provides for . . . safety" and for "oversight, inspection, research, monitoring, and enforcement relating to" the lease. 43 U.S.C. § 1337(p)(4). The terms and conditions adopted by the Coast Guard provide for oversight, inspection, research, and monitoring, and also provide several safety measures. And while the terms and conditions do not explicitly address enforcement of the provisions, the Coast Guard has not only the right to amend the terms and conditions, but also to order that a wind turbine generator or a set of generators be shutdown "in instances where the Coast Guard determines that navigation safety may be impacted if the [wind turbine generator] were to continue to operate." CW66376. The Court finds that the Coast Guard's § 414 terms and conditions are consistent with the terms of the Shelf Lands Act.

Finally, there is substantial evidence to support the imposition of the Coast Guard's terms and conditions. As instructed by the Circuit, the Court assesses the substantial evidence issue by considering the record that "was presented to" the BOEM.[21] Bangor Hydro-Elec. Co., 78 F.3d at 662 (citing Escondido, 466 U.S. at 778 n.20 ("[T]he court is to sustain the conditions if they are

_____

[21] Cape Wind urges the Court to restrict its review "to the BOEM record and not the Coast Guard record." Int. Def.'s Remain Mem. at 22-23. However, the federal defendants do not make this argument, and "[t]he general rule in this Circuit is that '[i]ntervenors may only argue issues that have been raised by the principal parties.'" Ass'n of Battery Recyclers, Inc. v. EPA, 716 F.3d 667, 675 (D.C. Cir. 2013) (Silberman, J., concurring) (quoting Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC, 41 F.3d 721, 729 (D.C. Cir. 1994)). Indeed, the federal defendants rely heavily on Coast Guard documents in making their arguments, and the plaintiffs agree that the Coast Guard's documents are part of the administrative record. Pls.' Remain Opp'n at 18 & n.3. Presumably, these same documents were or would have been "presented to" the BOEM, and so in any event they can properly be considered by the Court. See Bangor Hydro-Elec. Co., 78 F.3d at 662 (denying request to remand the record so that the Department of the Interior could add material to the record and remarking that "Interior had no excuse for not including any evidence it wished to rely on[] in the court of appeals, in the record before the Commission. It is simply too late now to shore up its case").

consistent with law and supported by the evidence presented to the [agency], either by the Secretary or other interested parties." (emphasis added in Bangor Hydro-Elec. Co.))). Here, the BOEM's final EIS incorporates the Coast Guard's findings. See, e.g., CW65611-26 (discussing results of Coast Guard studies on navigational safety); CW66375-414 (Coast Guard responses to comments on the draft EIS); CW75940-86 (Coast Guard commissioned study of the Cape Wind project's impact on radar technology of vessels in and around the project area).

As to the navigational safety studies, the administrative record contains a Revised Navigational Risk Assessment ("Revised Assessment"), USCG907, which was an update of an initial risk assessment prepared for Cape Wind at the request of the Coast Guard, USCG916. The Revised Assessment "includes updated information to address topics requested by the [Coast Guard]" when the Corps of Engineers was functioning as the lead agency for the Cape Wind Project. Id. The Revised Assessment

> includes descriptions of the Nantucket Sound environment,[22] vessel traffic types and operating areas, the effects of the proposed Wind Park on navigation, an analysis of vessel impacts on the [wind turbine generators], historic search and rescue operations in and around the Wind Park, the effects of the proposed Wind Park on search and rescue operations, and the effects of the proposed Wind Park on communications. Various marine interests in Nantucket Sound, including the [Coast Guard] and the Steam Ship Authority [], and the proposed [wind turbine generator] vendor (General Electric) [] provided information to assist in the preparation of the . . . Assessment.

Id.; see also USCG917-61 (discussing observations and data concerning each of the listed considerations, including data obtained from currently operational offshore wind energy projects in other bodies of water). The Risk Assessment also includes several mitigation measures to which Cape Wind agreed in an effort to address any navigational safety issues. USCG961-62. The executive summary of the Risk Assessment ultimately concludes that "[t]he presence of the

---

[22] Environmental descriptions included the hydrography, currents, waves, and weather of Nantucket Sound. USCG918-20.

Wind Park at Horseshoe Shoal is not expected to create negative impacts to navigational safety." USCG913.

In addition to the Risk Assessment, the Coast Guard also considered guidance from the United Kingdom's Maritime and Coast Guard Agency, which "assess[ed] the impact on navigational safety from offshore renewable energy developments." See USCG409-23. Included in this guidance were standard design requirements, operational requirements, and operational procedures for offshore wind energy farms. USCG418-19 (requiring, among other things, that wind turbine generators be clearly marked, that "[t]hroughout the design process for a wind farm, assessments and methods for safe shutdown should be established and agreed," and that periodic testing of emergency communication and shutdown procedures be conducted). The Coast Guard adopted many of these recommendations as part of its own "guidance on information and factors the Coast Guard will consider when reviewing an application for a permit to build and operate an Offshore Renewable Energy Installation." USCG1087; see generally USCG1086-111 (Coast Guard's Navigation and Vessel Inspection Circular No. 02-07).

Given the results of the Risk Assessment, as well as the recommendations in the guidance from the United Kingdom and the Coast Guard's own guidance, it cannot be said that the terms and conditions deemed necessary by the Coast Guard pursuant to its § 414 obligation were unreasonable. Rather, the information available shows that there is a "rational connection between the facts" concerning navigational safety and "the choice made" as to the terms and conditions adopted by the Coast Guard for the Cape Wind project. See Bangor Hydro-Elec. Co., 78 F.3d at 663 n.3. The Court therefore finds that the terms and conditions chosen are supported by substantial evidence.

The plaintiffs do not confine their objections to the § 414 terms and conditions to the three prongs of the Escondido analysis, presumably because they do not believe that the analysis should apply here, and instead lodge attacks on other aspects of the terms and conditions. First, the plaintiffs contend that the terms and conditions "are little more than vague generalities and a promise to ensure navigational safety later." Pls.' Remain Mem. at 18. The Court disagrees. While it is true that certain terms and conditions require future action or studies, other terms and conditions impose mandatory design, positional, and operational requirements. See, e.g., CW66379 (providing that "each individual [wind turbine generator] shall be marked with private aids to navigation in accordance with" specified guidelines) (emphasis added); id. ("All [wind turbine generator] rotors (blade assemblies) shall be equipped with control mechanisms that can be operated from the control center of the [Nantucket Sound Wind Farm].") (emphasis added); id. ("Safety lines, mooring attachments (for securing vessels) and access ladders for use in emergencies shall be placed on each [wind turbine generator].") (emphasis added). Moreover, provisions for future action are actually consistent with the terms of the Shelf Lands Act. See 43 U.S.C. § 1337(p)(4)(L) (requiring that renewable energy activities be "carried out in a manner that provides for . . . oversight, inspection, research, monitoring, and enforcement relating to a lease . . . granted" under the Shelf Lands Act). Indeed, it strikes the Court that it would make little sense for the Coast Guard and the BOEM to approve the Cape Wind project only to abandon the possibility of future oversight, research, and monitoring of the impacts that the project might have on navigational safety. Perhaps most importantly, though, a great deal of deference is owed to the "Coast Guard's expertise . . . in maritime safety." Collins v. Nat'l Transp. Safety Bd., 351 F.3d 1246, 1253 (D.C. Cir. 2003); see also Cassidy v. Chertoff, 471 F.3d 67, 84 (2d Cir. 2006) ("Expert determinations by the Coast Guard . . . which are based on an

explicit Congressional delegation of legislative authority . . . are entitled to significant deference."). Accordingly, because the Coast Guard deemed provisions concerning future action to be appropriate, the Court must reject this challenge to the terms and conditions.

The plaintiffs next object to the Coast Guard's interpretation that § 414 requires the issuance of terms and conditions only for project proposals, see CW66378, and not for each NEPA alternative to the proposed action. Pls.' Remain Mem. at 23. The plaintiffs rely on the statutory language of § 414, which states:

> [T]he Commandant of the Coast Guard shall specify the reasonable terms and conditions the Commandant determines to be necessary to provide for navigational safety with respect to the proposed lease, easement, or right-of-way and each alternative to the proposed lease, easement, or right-of-way considered by the Secretary.

Pub. L. No. 109-241, 120 Stat. at 540 (emphasis added); see Pls.' Remain Mem. at 23-24. As noted above, the Court begins its analysis with the language of the statute. In this instance, while it is clear that the Commandant is required to specify terms and conditions for the project proposal, it is not clear, as the plaintiffs contend, that the definition of "alternative" as intended in § 414 has the same meaning that the word "alternative" has in the NEPA. See 40 CFR § 1502.14. To be sure, the terms and conditions must be specified "not later than 60 days before the date established . . . for the publication of a draft environmental impact statement," Pub. L. No. 109-241, 120 Stat. at 540, but the statute does not otherwise incorporate or reference the NEPA. "Alternative" as used in the NEPA context is a term of art addressed in that statute's implementing regulations. See 40 C.F.R. § 1502.14. If Congress had intended to direct the Commandant to consider specifically NEPA alternatives, it could easily and explicitly have drafted § 414 to refer to the applicable sections of the NEPA or its implementing regulations, but it did not. Furthermore, it would be odd to require the Coast Guard to provide terms and

conditions for each NEPA alternative, given that several alternatives were jettisoned without detailed consideration for various reasons.[23]  Although the plaintiffs' proposed reading of the statute is plausible, the Court is required to defer to an agency's permissible interpretation of an ambiguous statute.  Bluewater Network, 372 F.3d at 410.  Here, the Coast Guard interpreted § 414 to require only the issuance of terms and conditions for alternative proposals, as opposed to doing the same for each NEPA alternative to a proposal.  Because the statute does not specifically reference NEPA alternatives, the Court finds that the Coast Guard's interpretation is not impermissible.

Because the Coast Guard has deemed the § 414 terms and conditions necessary to provide for navigational safety in and around the Cape Wind project, CW66389, and because the terms and conditions "reasonably relate[] to [the Coast Guard's] goal, [are] otherwise consistent with the [Shelf Lands Act], and [are] supported by substantial evidence," see Escondido, 466 U.S. at 778, the Court must sustain the terms and conditions and dismiss the plaintiffs' claims against the Coast Guard that allege violations of the Coast Guard and Maritime Transportation Act of 2006.  Accordingly, the Court grants summary judgment to the defendants on the plaintiffs' § 414 claims.

**B.     Whether the BOEM Violated the Shelf Lands Act**

**1.     The BOEM's Reliance on the Coast Guard's Navigational Safety Findings**

The plaintiffs argue that the BOEM violated both the Shelf Lands Act and the NEPA by relying on the Coast Guard's navigational safety analyses.  Pls.' Remain Mem. at 45.  With respect to renewable energy projects like the Cape Wind project, the Shelf Lands Act requires the Secretary to

---

[23] The alternatives are discussed in detail below in the context of the Court's evaluation of the plaintiffs' NEPA claims.

ensure that [the] activity . . . is carried out in a manner that provides for--

(A) safety;

(B) protection of the environment;

(C) prevention of waste;

(D) conservation of the natural resources of the outer Continental Shelf;

(E) coordination with relevant Federal agencies;

(F) protection of national security interests of the United States;

(G) protection of correlative rights in the outer Continental Shelf;

(H) a fair return to the United States for any lease, easement, or right-of-way
under this subsection;

(I) prevention of interference with reasonable uses (as determined by the
Secretary) of the exclusive economic zone, the high seas, and the territorial
seas;

(J) consideration of--

(i) the location of, and any schedule relating to, a lease, easement, or right-of-
way for an area of the outer Continental Shelf; and

(ii) any other use of the sea or seabed, including use for a fishery, a sealane, a
potential site of a deepwater port, or navigation;

(K) public notice and comment on any proposal submitted for a lease, easement,
or right-of-way under this subsection; and

(L) oversight, inspection, research, monitoring, and enforcement relating to a
lease, easement, or right-of-way under this subsection.

43 U.S.C. § 1337(p)(4). The plain language of the Shelf Lands Act therefore suggests that it

would have been unlawful for the BOEM to rely on the Coast Guard's findings if those findings

did not further the Secretary of the Interior's obligation to ensure that the Cape Wind project "is

carried out in a manner that provides for safety." Id.

As to the findings themselves, the plaintiffs devote a substantial portion of their

memoranda to attacking the Coast Guard's evaluation of the navigational safety impacts

resulting from the Cape Wind project as arbitrary and capricious decisionmaking. Pls.' Remain

Mem. at 29-45; Pls.' Remain Opp'n at 21-31. First, the plaintiffs argue that the Coast Guard's

"assessment of navigational impacts is incoherent and contradicted by Coast Guard personnel."

Pls.' Remain Mem. at 29; see also id. at 30-33. They challenge the Coast Guard's conclusion in

a November 2008 safety assessment letter that the Cape Wind project "'will (1) have a moderate

impact on navigation safety, and (2) have a negligible adverse impact on Coast Guard

missions.'" Id. at 30 (quoting CW66389); see also id. at 31-33 (addressing the November 2008 letter's discussion of impacts on radar communications, the spacing of the wind turbines, inclement weather, and Coast Guard search and rescue missions). At bottom, the plaintiffs argue that the BOEM could not lawfully rely on the Coast Guard's findings because those findings represent arbitrary and capricious decisionmaking.

Under the APA, only "final agency action" is reviewable by the Court. See 5 U.S.C. § 704. The Supreme Court has stated that,

> [a]s a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations omitted). Here, it cannot be said that the Coast Guard engaged in arbitrary and capricious decisionmaking, because while the BOEM incorporated the Coast Guards' navigational safety findings into the final EIS, those findings did not, in and of themselves, "mark the 'consummation' of the [Coast Guard's] decisionmaking process," nor did those findings determine the "rights or obligations" of any party or result in "legal consequences." Bennett, 520 U.S. at 177-78. Rather, the Coast Guard's findings were simply meant to inform the BOEM of the impact that the Cape Wind project would have on navigational safety in and around the Nantucket Sound.

Even if the Coast Guard's findings do constitute reviewable final agency action, as this Court recently reiterated:

> "[t]he 'arbitrary and capricious' standard of review as set forth in the APA is highly deferential," and the Court must "presume the validity of agency action." Am. Horse Prot. Ass'n v. Yeutter, 917 F.2d 594, 596 (D.C. Cir. 1990). Although the "court is not to substitute its judgment for that of the agency[,] . . . the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice

made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citations and quotation marks omitted). And where, as here, a court is reviewing an agency's evaluation of "'scientific data within its technical expertise,'" the arbitrary and capricious standard of review is "'extreme[ly] deferential.'" Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1289 (D.C. Cir. 2004) (citation omitted). This is because courts "review scientific judgments of the agency 'not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.'" Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C. Cir. 1997).

Styrene Info. & Research Ctr., Inc. v. Sebelius, 944 F. Supp. 2d 71, 87 (D.D.C. 2013) (footnote omitted). And, in the matter currently before the Court, a great deal of deference is owed to the "Coast Guard's expertise . . . in maritime safety." Collins, 351 F.3d at 1253; see also Cassidy, 471 F.3d at 84 ("Expert determinations by the Coast Guard . . . which are based on an explicit Congressional delegation of legislative authority . . . are entitled to significant deference."). In evaluating whether the Coast Guard has engaged in arbitrary or capricious decisionmaking, the Court's role is to determine whether the record demonstrates that the agency has considered the "relevant data and articulate[d] a satisfactory explanation for its action," and whether the agency's choice reflects "a rational connection between the facts found and the choice made." Bluewater Network, 370 F.3d at 11.

Although the plaintiffs fault the Coast Guard for issuing the November 2008 safety assessment letter prior to the completion of radar studies, the letter itself acknowledges that the impact on radars "remains outstanding." CW66389. The letter also indicates the further steps the Coast Guard was taking in order to better understand the impacts on radars, and stated that "[t]he Coast Guard will review the study and provide any additional information at that time and requests that the information provided be addressed in the Record of Decision." Id. Contrary to what the plaintiffs indicate, the November 2008 letter does not state that the project "will not make navigation within the Project site more difficult," Pls.' Remain Mem. at 31, but instead

clearly states that the Coast Guard expected "a moderate impact on navigation safety," CW66389. Those impacts, and mitigation measures to lessen the impacts, are discussed in attachments to the letter. See, e.g., CW66407-08. Relying on the Risk Assessment discussed above, among other factors, the Coast Guard concluded that "navigation is capable of being done safely." CW66408. As far as concerns about inclement weather, the plaintiffs emphasize the Coast Guard's suggestion that smaller vessels will be "less prevalent" in poor weather, Pls.' Remain Mem. at 32, and ignore the Coast Guard's inclusion of "vessels of any size" as also being "less prevalent" in such conditions, CW66406. Indeed, the Coast Guard considers other weather-related factors, both in the Risk Assessment and in the attachments to the November 2008 letter. CW66406-07. Finally, the plaintiffs' contention that the Coast Guard did not adequately consider the effects on Coast Guard search and rescue operations is contradicted by the record. The plaintiffs focus, Pls.' Remain Mem. at 33, on the "four of 50 [search and rescue] cases (8%) [that] involved the use of an aircraft for rescue," without noting that "in only one case did the aircraft actually effect a rescue," CW66411. The Coast Guard concluded based on the small number of actual rescues affected and other factors that search and rescue efforts would not be adversely hindered. In short, there is substantial evidence in the record that the Coast Guard considered and addressed the concerns that the plaintiffs raised with respect to the November 2008 safety assessment letter, and thus, the Court finds that the Coast Guard did not engage in arbitrary and capricious decisionmaking through the issuance of the letter.

Next, the plaintiffs contend that "the Coast Guard improperly dismissed the importance of marine radar to navigational safety." Pls.' Remain Mem. at 29; see also id. at 34-41; Pls.' Remain Opp'n at 42-45. In making this argument, they focus primarily on a report authored by the Technology Service Corporation analyzing the effect of the Cape Wind project, which was

attached as part of Appendix M to the final EIS.  <u>See</u> CW75940-86.  In advancing their arguments, the plaintiffs cherry pick quotes from the report, and invite the Court to examine maps, images, and videos depicting various radar functioning related scenarios.  <u>See, e.g.</u>, Pls.' Remain Opp'n at 34-35.  As an initial matter, it would be improper for the Court to delve into and analyze the scientific underpinnings of the report.  But even if it could, the Coast Guard's findings, which are also contained in Appendix M, <u>see</u> CW75970-86, acknowledge and address each of the points raised by the plaintiffs concerning the ability of radar operators to detect potential dangers, <u>compare</u> Pls.' Remain Mem. at 34-41 (raising concerns about false targets, radar reflections, and impacts on Automatic Radar Plotting Aid systems), <u>with</u> CW75976-86 (discussing impacts on Automatic Radar Plotting Aid systems, false targets, and radar reflections).  And while the plaintiffs additionally attempt to undermine the Coast Guard's findings by pointing to alterations made to the Technology Service Corporation's report and the Coast Guard's alleged failure to implement recommendations put forth by various individuals, Pls.' Remain Opp'n at 42-43, it is axiomatic that "the reasonableness of [an] agency's action is judged in accordance with its <u>stated reasons</u>" under the arbitrary and capricious standard of review, and "the actual subjective motivation of decisionmakers is immaterial as a matter of law—unless there is a showing of bad faith or improper behavior," <u>In re Subpoena Duces Tecum</u>, 156 F.3d 1279, 1279-80 (D.C. Cir. 1998).  The Court cannot discern that the Coast Guard engaged in improper behavior or acted in bad faith, and the plaintiffs have provided no basis for the Court reaching that conclusion.  The plaintiffs' disagreement with the ultimate findings made by the Coast Guard is not reason enough for the Court to deem the agency's decisionmaking arbitrary or capricious.  Lastly, although the plaintiffs challenge, Pls.' Remain Mem. at 37-41, the Coast Guard's finding that the impact on navigational safety would be

"moderate" with the implementation of the stated mitigation measures, CW75984-86, the Court

is not in a position to evaluate the adequacy of those measures. As the Court has already held,

there is substantial evidence to support the Coast Guard's § 414 terms and conditions, and the

mitigation measures similarly enjoy adequate support in the administrative record. See, e.g.,

USCG 907-62 (analyzing navigational safety and discussing mitigation measures with respect to

both the Cape Wind project and offshore wind farms in other parts of the world); USCG417

(United Kingdom's Maritime and Coast Guard Agency's suggested "safety and mitigation

measures recommended for [offshore renewable energy installations] during construction,

operation and decommissioning"); USCG1111 (setting forth "example risk mitigation strategies"

adopted as part of the Coast Guard's Navigation and Vessel Inspection Circular No. 02-07).

Accordingly, because there is a rational connection between the facts found and the decision

made, it was not arbitrary and capricious for the Coast Guard to find that the stated mitigation

measures would lessen the impact on navigational safety so as to render the impact moderate.

Finally, the plaintiffs argue that "the Coast Guard's finding that buffer zones are

unnecessary is contradicted by the record and by Coast Guard Policy and is fundamentally

indefensible from a safety perspective," thus resulting in arbitrary and capricious

decisionmaking. Pls.' Remain Mem. at 29, 41-45; Pls.' Remain Opp'n at 43-45. They contend

in essence that "the Coast Guard was required to address substantial questions raised by experts

regarding how a buffer zone would affect navigational safety in the Sound, not merely that it was

not necessary." Pls.' Remain Opp'n at 44. To the extent that the plaintiffs rely on experts'

comments that post-date the issuance of the Coast Guard's findings, see id. at 43-44 (citing

comments from 2009 and 2012), their reliance on the comments is misplaced because "[i]t is a

widely accepted principle of administrative law that the courts base their review of an agency's

actions on the materials that were before the agency at the time its decision was made," IMS, P.C. v. Alvarez, 129 F.3d 618, 623 (D.C. Cir. 1997). The remainder of the plaintiffs' arguments fail for the same reasons stated above, namely, that the Coast Guard's finding that a buffer zone was unnecessary is adequately supported by the record, see, e.g., CW75983 (analyzing the Technology Services Corporation report); CW75986 (finding that mitigation measures obviate the need for buffer zones), and significant deference is owed to those findings, Menkes v. DHS, 637 F.3d 319, 332 (D.C. Cir. 2011) ("[T]he potential ramifications of the agency's decision confirm that these are precisely the sort of complex, interstitial questions that the Coast Guard deserves deference to address."); Ill. Commerce Comm'n v. Interstate Commerce Comm'n, 749 F.2d 875, 882 n.10 (D.C. Cir. 1984) ("Because this conclusion required the agency to exercise its expert knowledge of . . . an area in which the agency possesses a comparative advantage vis-à-vis the courts, this court should accord substantial deference to the agency's interpretation."); see also Collins, 351 F.3d at 1253; Cassidy, 471 F.3d at 84. While the record reflects debate within the Coast Guard about the potential of a buffer zone, the Coast Guard's stated reasons for not including a buffer zone, which are what the Court must consider, In re Subpoena Duces Tecum, 156 F.3d at 1279, are adequately supported in the record.

In sum, the Coast Guard's findings provide a rational explanation for the conclusion that navigational safety will be only moderately impacted so long as the stated mitigation measures are implemented, and the explanation is adequately supported by the administrative record. This is all that the APA requires, and the plaintiffs' charge that the Coast Guard's findings are arbitrary and capricious therefore fails. By the same token, the plaintiffs' claim that the BOEM violated the Shelf Lands Act by relying on the Coast Guard's findings must also fail.

### 2. The BOEM's Approval of the Construction and Operations Plan Without First Obtaining Geotechnical and Geophysical Studies

The plaintiffs argue that the BOEM violated the Shelf Lands Act by approving Cape Wind's Construction and Operations Plan without first receiving certain geotechnical and geophysical studies from Cape Wind.[24] Pls.' Remain Mem. at 47-54; Pls.' Remain Opp'n at 63-66. The Court disagrees.

The implementing regulations of the Shelf Lands Act direct parties seeking to conduct renewable energy projects to submit, in addition to other documentation, a Construction and Operations Plan that includes "the results of [certain] . . . surveys for the proposed site(s) of [the] facility(ies)." 30 C.F.R. § 585.626(a). Specifically, the Construction and Operations Plan must include the results of shallow hazards, geographical, biological, geotechnical, and archaeological surveys, along with supporting data. Id. (detailing information required for each type of survey). Here, there is no dispute that the BOEM wanted Cape Wind to conduct additional and more detailed surveys than what it had provided to the agency during the review process. See, e.g., Pls.' Remain Mem. at 48-52; Fed. Defs.' Remain Mem. at 49-53; Int. Def.'s Remain Mem. at 52. And the record makes clear that Cape Wind represented to the BOEM that additional financing was required prior to conducting the surveys, see CW147710; CW235267, and that such financing would be unavailable absent approval of its Construction and Operations Plan, CW147710. The question thus centers on whether the BOEM appropriately approved a departure from its regulations.

BOEM's regulations provide for a departure from the general provisions of the regulations in certain circumstances, see 30 C.F.R. § 585.103(a), but

---

[24] The plaintiffs' NEPA and NHPA arguments concerning these data are addressed later in this memorandum opinion.

(b) [a]ny departure approved under this section and its rationale must:

(1) [b]e consistent with [43 U.S.C. § 1337(p)] . . . ;

(2) [p]rotect the environment and the public health and safety to the same degree as if there was no approved departure from the regulations;

(3) [n]ot impair the rights of third parties; and

(4) [b]e documented in writing.

30 C.F.R. § 585.103(b) (emphasis added).

Under 30 C.F.R. § 585.103(a), approval of a departure is appropriate to, among other things, "[f]acilitate the appropriate activities on a lease or grant under this part."  Id. § 585.103(a)(1).  The plaintiffs argue unconvincingly that obtaining financing "is not an 'activity on a lease.'"  Pls.' Remain Mem. at 53 (quoting 30 C.F.R. § 585.103(a)(1)).  The regulation, however, refers not to "activities on a lease" but to the facilitation of such activities.  30 C.F.R. § 585.103(a)(1).  Certainly, financing geophysical and geotechnical surveys is consistent with the facilitation of "appropriate activities on a lease."  And the plaintiffs' concern that granting a departure for financial reasons equates to providing "no meaningful limit on what [the] BOEM can approve without information [the] BOEM itself has determined to be required" under the Shelf Lands Act, Pls.' Remain Opp'n at 65, fails to take into account the substantive requirements of 30 C.F.R. § 585.103(b), which must all be satisfied in order to warrant a lawful departure.

Here, the requirements of 30 C.F.R. § 585.103(b) have been satisfied.  Conducting the surveys after approval of Cape Winds' construction and operations plan is consistent with the Shelf Lands Act's requirement that the project be carried out in a manner that provides for "safety" and for "protection of the environment."  See 43 U.S.C. § 1337(p)(4); 30 C.F.R. § 585.103(b)(1).  In arguing to the contrary, the plaintiffs seem to miss that the Secretary's

overall obligation under 43 U.S.C. § 1337(p)(4) to provide for safety is an obligation that applies not only to approving individual steps of the process, such as the timing of the collection of survey data, but rather to the entirety of the leasing process. And the plaintiffs' suggestion that the departure here is inconsistent with 43 U.S.C. § 1337(p) because it was not subject to notice and comment, Pls.' Remain Opp'n at 66, relies on a selective reading of the Shelf Lands Act, which requires "public notice and comment on any proposal submitted for a lease," 43 U.S.C. § 1337(p)(4)(K) (emphasis added). And a departure is not a lease proposal.

As to the remaining requirements, the Court does not find it inappropriate for the BOEM to allow collection of data after approving the Construction and Operations Plan, given that the data must still be collected and analyzed prior to commencing construction or otherwise disturbing the seafloor, see, e.g., CW241409, and thus, the departure "[p]rotect[s] the environment and the public health and safety to the same degree as if there was no approved departure from the regulations," 30 C.F.R. § 585.103(b)(2). The plaintiffs offer no argument that the departure will affect the rights of any third parties, id. § 585.103(b)(3), and the Court discerns none. Finally, the "rationale," id. § 585.103(b)(4), for the departure is documented in writing, see CW241409, and the departure itself is memorialized in the 2011 ROD, see CW119701-04, and the lease itself, see CW119300-03. Although the BOEM could have more explicitly drawn a connection between the departure and its rationale for granting it, the fact remains that both are documented in writing in the administrative record. The regulation requires nothing more. Accordingly, the Court finds that the BOEM complied with the Shelf Lands Act regulations concerning the approval of departures from those regulations, and therefore grants summary judgment to the defendants on the plaintiffs' Shelf Lands Act claims.

**C.**     **Whether the Federal Defendants Violated the ESA**

**1.**     **The Plaintiffs' Claims Against the FWS**

The plaintiffs contend that the FWS violated the ESA by improperly delegating to Cape Wind and to the BOEM decisions concerning certain reasonable and prudent minimization measures. Pls.' ESA/MBTA Mem. at 20-29; Pls.' ESA/MBTA Opp'n at 2-19. Specifically, they argue that "the statutory language" of the ESA "plainly imposes an unequivocal duty on [the] FWS to determine what [reasonable and prudent measures] are 'necessary or appropriate to minimize' an action's impact on listed species." Pls.' ESA/MBTA Mem. at 21 (quoting 16 U.S.C. § 1536(b)(4)). They maintain that the statute places that duty on the FWS to the exclusion of any other entities. Id. The Court agrees.

In determining whether the FWS complied with the statutory mandates of the ESA, the Court must again engage in the two-step inquiry set forth in Chevron, as discussed above. Turning to the first step of the Chevron analysis, there is no question that the FWS has been tasked with administering the ESA for certain species, 50 C.F.R. § 402.01(b), and that the Act requires the FWS to issue an incidental take statement where it finds that agency action will adversely impact a listed species, id. § 402.14(i). Moreover, it is clear that the FWS is required to "[s]pecif[y] those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact." Id. § 402.14(i)(1)(ii). Neither the ESA nor its implementing regulations explicitly state whether the FWS is required to render independent determinations concerning reasonable and prudent minimization measures included in incidental take statements. The ESA and its regulations do state, however, that incidental take statements must include "those reasonable and prudent measures that the Director [of] [the Fish and Wildlife Service] considers necessary or appropriate." Id. § 402.14(i)(1) (emphasis added); see

also 16 U.S.C. § 1536(b)(4)(ii) (requiring the Secretary to "specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate") (emphasis added).

This Circuit construed similar statutory and regulatory language in Gerber v. Norton, 294 F.3d 173 (D.C. Cir. 2002). In Gerber, the Circuit addressed Section 10 of the ESA, 294 F.3d at 175-76, which provides that the FWS shall issue a permit for a taking "[i]f the [FWS] finds, after opportunity for public comment, . . . that the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking," 16 U.S.C. § 1539(a)(2)(B)(ii). Gerber considered whether "the issuance of [an] incidental take permit violated [S]ection 10 of the ESA" where the FWS failed to make an independent determination concerning the applicant's mitigation of the impacts of the taking. 294 F.3d at 184-85. In that case, the FWS had considered a "Reduced Impact Alternative" to the developer's proposed project, but ultimately decided against the alternative. Id. at 185. However, the Circuit noted that there was "no evidence in the [administrative] record that the [FWS] ever made such a finding[, but the FWS] did repeatedly observe that the developer had rejected the alternative." Id. (emphasis in original). "And [the FWS] noted that [the developer] did so out of concern that changing the design would entail additional costs and delay the process of obtaining approval from" local government entities. Id. In holding that the FWS had violated Section 10 of the ESA, the Circuit stated that "[w]hen a statute requires an agency to make a finding as a prerequisite to action, it must do so." Id. at 185-86.

The defendants argue that Gerber is inapposite, because it construed a different section of the ESA, involved different required findings, and did not involve another federal agency. See Fed. Defs.' ESA/MBTA Mem. at 27-28; Int. Def.'s ESA/MBTA Mem. at 23 n.13. These arguments are unavailing. First, it is well established as a "normal rule of statutory construction

that identical words used in different parts of the same act are intended to have the same meaning." Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (citations and internal quotation marks omitted). Here, both Sections 7 and 10 of the ESA refer to considerations and findings that "the Secretary shall" make or reach. 16 U.S.C. § 1536(b)(4)(ii) (emphasis added); 16 U.S.C. § 1539(a)(2)(B). Moreover, neither the types of findings or considerations required in Sections 7 and 10 of the ESA nor the nature of the Section 7 consultation process have any bearing on the fact that the FWS is the entity that must make the ultimate determination in both instances.

Here, the FWS's incidental take statement discusses a potential "operational adjustment" as a reasonable and prudent measure. FWS76. Specifically, the incidental take statement notes that

> [t]he [FWS] also considered a reasonable and prudent measure, an operational adjustment to the wind facility that would require the temporary and seasonal shut down of the [wind turbine generators] through the feathering of the rotors. Feathering of the rotors causes them to face the wind and stop spinning, and would reduce the risk of collision by roseate terns and, to a limited extent, migrating piping plovers transiting the Horseshoe Shoal project area.

FWS76-77 (emphasis added). Thus here, as in Gerber, the FWS found that a particular mitigation measure would reduce take. However, also as in Gerber, the FWS went on to discard the proposed reasonable and prudent measure because "it was determined by [the BOEM] and [Cape Wind] . . . to not be reasonable and prudent based on" the failure to "meet the [reasonable and prudent measure] regulatory definition as a 'reasonable measure' as it modifies the scope of [a] project in a manner that is adverse to the project's stated purpose and need." FWS77 (first emphasis added). The FWS stated again that the "[BOEM] considers that this may involve more than a 'minor change'" under 50 C.F.R. § 402.14(j)(2). Id. (emphasis added). The remainder of the FWS's explanation for casting away the feathering measure is couched in phrases beginning with statements like "[the BOEM] has also determined" and "[the BOEM] indicates." Id.

However, nowhere in the explanation is there an indication that the FWS made an independent determination. This is unacceptable. While it is certainly possible that the feathering measure would not comport with 50 C.F.R. § 402.14(i)(2), the ESA and its implementing regulations require the FWS to make an independent determination. Because it seemingly did not do so, the Court must grant summary judgment to the plaintiffs on their ESA claims against the FWS.

The defendants try to avoid this conclusion by pointing to places in the administrative record where FWS personnel addressed the BOEM's reasons for rejecting the feathering reasonable and prudent measure. See Fed Defs.' ESA/MBTA Mem. at 22 (citing FWS215; FWS220). While it might be true that the FWS grappled with the issues raised by the BOEM, it is not clear from the reasonable and prudent measures issued by the FWS that its ultimate decision was based on its independent determination, or whether the FWS merely deferred to determinations made by the BOEM and Cape Wind. As noted before, the reasonable and prudent measures begin by observing that the proposed operational adjustment would reduce take, at least to some extent. The FWS then proceeds to rely exclusively on BOEM and Cape Wind determinations as the basis for not including the operational adjustment. Without any indication that the FWS in fact made an independent determination about whether the adjustment was appropriate, the Court cannot infer that such a determination ultimately factored into the FWS's decision.

The defendants also argue that language elsewhere in the statute and regulations suggests that the FWS can and indeed should consult other agencies or entities in making its determination. See, e.g., Fed. Defs.' ESA/MBTA Mem. at 19-20 (citing 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(g)(8)); Int. Def.'s ESA/MBTA Mem. at 21-23 (citing the same statutory and regulatory provisions). While these provisions undoubtedly direct the FWS to consult and

work with other agencies and entities in carrying out its Section 7 duties, they do not in and of themselves absolve the FWS of its responsibility to make an independent determination, albeit after consideration of its consultations. And the Joint Consultation Handbook is not inconsistent with this requirement. As the federal defendants point out, the Joint Consultation Handbook directs that "[r]easonable and prudent measures and terms and conditions should be developed in coordination with the action agency and the applicant," FWS31117, and urges the FWS to consult actively with action agencies based on the following understanding:

> Section 7 consultation is a cooperative process. The [FWS] do[es] not have all the answers. Actively seek the views of the action agency and its designated representatives, and involve them in your opinion preparation, especially in the development of reasonable and prudent alternatives, reasonable and prudent measures, terms and conditions to minimize the impacts of incidental take, and conservation recommendations.

FWS31010-11. While collaboration is encouraged, the Joint Consultation Handbook does not support the notion that the FWS should have deferred to the BOEM or Cape Wind when discarding the operational adjustment at issue without at least making clear that it was doing so based on its own independent determination of the issue. This is especially true given the explicit finding that implementing the operational adjustment as a reasonable and prudent measure would, at least to some extent, decrease the take of roseate terns and piping plovers. See FWS76. The ESA required the FWS to independently make that determination, and "it must do so." Gerber, 294 F.3d at 185.

### 2. The Plaintiffs' Claims Against the National Marine and Fisheries Service

The plaintiffs also contend that the NMFS violated the APA and the ESA by erroneously concluding in its biological opinion that the Cape Wind project is not likely to adversely affect right whales, failing to establish terms and conditions for the incidental take of right whales, and failing to analyze the effect of preconstruction geological surveys on listed sea turtles. Pls.'

ESA/MBTA Mem. at 34-45; Pls.' ESA/MBTA Opp'n at 29-44. The defendants argue that the considerations that went into and the resulting conclusions of the NMFS biological opinion complied with the ESA and the APA. Fed. Defs.' ESA/MBTA Mem. at 39-45; Fed. Defs.' ESA/MBTA Reply at 19-25; Int. Defs.' ESA/MBTA Mem. at 35-45; Int. Defs.' ESA/MBTA Reply at 17-25.

a. **Whether the NMFS's Biological Opinion is Arbitrary and Capricious**

As the Supreme Court recently reiterated,

[r]eview under the arbitrary and capricious standard is deferential; [courts] will not vacate an agency's decision unless it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. [Courts] will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (citations and internal quotation marks omitted).

Here, it cannot be said that the NMFS "entirely failed to consider an important aspect of" the impact that the Cape Wind project might have on right whales. The NMFS biological opinion considers the status of the North Atlantic right whale, including birth rates, the availability of food, and the effects of human-caused mortalities from net entanglements, as well as incidents such as ship strikes, on the viability of the species. NMFS1424-32. While the biological opinion recognized that "right whale recovery is negatively affected by human sources of mortality, which may have a greater impact on population growth rate given the small population size and low annual reproductive rate of right whales," NMFS1432, the opinion stated also that "the population trend (i.e., whether increasing or declining) provides better information for assessing the effects of a proposed action on the species," NMFS1427. And

"[a]s described in previous [biological] [o]pinions, data collected in the 1990s suggested that right whales were experiencing a slow but steady recovery."  NMFS1427-28; see also NMFS1432 (citing data that indicates "an increasing population size of and positive growth rate for North Atlantic right whales").  The biological opinion also discussed "federal activities" and "numerous [other] recovery activities [that] are being implemented to decrease the adverse effects of private and commercial vessel operations on the species in the [Cape Wind project] area and during the time period of th[e] consultation," NMFS1477, as well as activities aimed at reducing the threat caused by entanglements, NMFS1481.

The biological opinion also took into account recent aggregations of right whales in Rhode Island Sound, Nantucket Sound, and other nearby bodies of water, NMFS1498-502, and ultimately concluded with respect to the recent aggregations that based on "a review of the available scientific literature[,] . . . the use of Nantucket Sound by any species of whales, including North Atlantic right whales is extremely limited" and there were "no observations within Horseshoe Shoal where the project will be constructed."  NMFS1501.  The biological opinion continued "that right whale use of Nantucket Sound is likely to be rare, sporadic and extremely limited in duration and frequency" and noted further that "the habitat within Nantucket Sound is inconsistent with the habitat where right whales are typically found."  NMFS1502.  The opinion acknowledged that

> as occasional whales have been documented off of Monomoy and Great Point and in the waters outside of Nantucket Sound that will be transited by project vessels (i.e., Rhode Island Sound and Buzzards Bay), it is reasonable to expect that these species may be present in those portions of the action area.

Id.

Importantly, the biological opinion also considered that the "increase in vessel traffic will result in some increased risk of vessel strike of listed species," including the right whale. NMFS1510. The opinion noted, however, that

> [i]n spite of being one of the primary known sources of direct anthropogenic mortality to whales, and to a lesser degree, sea turtles, ship strikes remain relatively rare, stochastic events, and an increase in vessel traffic in the action area would not necessarily translate into an increase in ship strike events. No vessel strike events have been reported in the action area.

Id. The NMFS took into account certain mitigation measures that the BOEM and Cape Wind proposed to further minimize any risk of ship strikes. NMFS1510-11; NMFS1514. After considering the various mitigation measures, the frequency and location of the recent whale aggregations, and the status of right whales generally, the NMFS biological opinion found that "there is not a reasonable likelihood that a construction vessel associated with the Cape Wind project originating from the Quonset, [Rhode Island] staging site will collide with a whale" and also that "the insignificant increase in traffic" represented by support vessels associated with the project would result in a "discountable" likelihood of ships striking right whales. NMFS1514.

The Court's role is not to second-guess the NMFS, but rather to ascertain whether the administrative record demonstrates that the agency has considered the "relevant data and articulate[d] a satisfactory explanation for its action" and whether the agency's choice reflects "a rational connection between the facts found and the choice made." Bluewater Network, 370 F.3d at 11. With respect to the data, the ESA requires the NMFS to consider and to evaluate the "relevant information" available, the "current status of the listed species," and the "cumulative effects" the project might have on listed species. 50 C.F.R. § 402.14(g). The NMFS is further directed to carry out its responsibilities using "the best scientific and commercial data available" and to "give appropriate consideration to any beneficial actions taken by" the BOEM or Cape

Wind.  Id. § 402.14(g)(8).  As demonstrated above and as evident in the NMFS 2010 biological

opinion, the agency considered the relevant required information.  And because the NMFS

ultimately concluded that danger to right whales, though not nonexistent, is "insignificant or

discountable," see NMFS1531; see also NMFS1514, the Court is satisfied that the biological

opinion represents "a rational connection between the facts found" and the choice made to issue

a finding that the Cape Wind project "is not likely to adversely affect listed whales in the action

area," NMFS1531.  Accordingly, the Court finds that the NMFS did not engage in arbitrary or

capricious decision-making by issuing its 2010 biological opinion.

   The plaintiffs' arguments to the contrary fall flat.  As support for their position, they

point first, Pls.' ESA/MBTA Mem. at 35, to an article entitled "Right Whales in Rhode Island

Sound: April 2010," see NMFS1021-25; a map depicting the location of right whale sightings in

early 2010, see NMFS1012-13, and also focus particularly on the number of mother-calf pairs

among the recent sightings, see NMFS1017; NMFS2138.  But as detailed above, the NMFS

considered the recent aggregations of right whales at length in its 2010 biological opinion.  See

NMFS1498-502.

   The plaintiffs next quibble with the biological opinion's treatment of the danger posed by

certain maintenance vessels that will be used during the life of the Cape Wind Project.  Pls.'

ESA/MBTA Mem. at 38-44.  The plaintiffs' contention that no consideration was given to the

increased traffic attributable to the Cape Wind project's maintenance vessels overstates the

conclusions reached in the biological opinion.  See, e.g., NMFS1514 (discussing the "large

number of commercial shipping and fishing vessels" transiting the same route and stating that

"[t]he small number of additional transits (2 per day) contributed by maintenance support vessels

represents a minimal increase in overall vessel traffic in the area"). Rather, the biological

opinion states that

> due to the limited information available regarding the incidence of ship strike[s] and the factors contributing to ship strike events, it is difficult to determine how a particular number of vessel transits or a percentage increase in vessel traffic will translate into a number of likely ship strike events or a percentage increase in collision risk.

NMFS1510. And, as noted above, such ship strikes are "relatively rare" and the minimal

increased traffic "would not necessarily translate into an increase in ship strike events." Id.

Despite the unlikely event of a ship strike, the BOEM and Cape Wind "proposed to implement . .

. mitigation measures to further reduce the likelihood of a project vessel interacting with a

whale." NMFS1510 (citing Appendix A to the 2010 biological opinion).[25] Among the

mitigation measures is a requirement that watercraft of different lengths adhere to varying speed

restrictions. See NMFS1576 (Appendix A to the 2010 biological opinion). It follows that the

NMFS considered speed restrictions, and concluded that the allowable speed for the maintenance

vessels was acceptable. Although the plaintiffs might wish for a clearer indication of speed

considerations in the NMFS decision, courts "uphold decision[s] of less than ideal clarity if the

agency's path may reasonably be discerned." Nat'l Ass'n of Home Builders, 551 U.S. at 658.

And here the Court finds the NMFS's path to its decision concerning speed restrictions to be

reasonably clear and thus rejects the plaintiffs' arguments that the agency must further consider

the issue.

---

[25] The plaintiffs erroneously state that the biological opinion "requires only one measure to minimize the risk that boats will hit right whales." Pls.' ESA/MBTA Mem. at 43 (citing NMFS1515). A list of mitigation measures is found in Appendix A to the 2010 biological opinion, NMFS1576-84, which in turn references and requires familiarity and training in accordance with certain agency implemented guidelines, NMFS1577. These guidelines comprise operational requirements, including instructions to decrease speed or alter course when a right whale is observed. See NOAA – National Marine Fisheries Service & National Ocean Service: Whalewatching Guidelines for the Northeast Region Including the Stellwagen Bank National Marine Sanctuary, available at NOAA, http://www.nmfs.noaa.gov/pr/pdfs/education/viewing_northeast.pdf (last visited Mar. 5, 2014).

### b. Whether the NMFS Should Have Issued an Incidental Take Statement Concerning Right Whales

The plaintiffs argue that the NMFS violated the ESA by failing to include an incidental take statement concerning the take of right whales with its 2010 biological opinion. Pls.' ESA/MBTA Mem. at 42; Pls.' ESA/MBTA Mem. at 38 (citing Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs, 538 F. Supp. 2d 242, 261 (D.D.C. 2008)). The Court agrees.

The implementing regulations of the ESA provide that one of the NMFS's responsibilities during formal consultation is to "[f]ormulate a statement concerning incidental take, if such take may occur." See 50 C.F.R. § 402.14(g)(7). While this Circuit has not addressed whether the regulations require the issuance of an incidental take statement where take is not reasonably certain, the Ninth Circuit has ruled that a statement is generally required. Ctr. for Biological Diversity v. Salazar, 695 F.3d 893, 910 (9th Cir. 2012) (stating that an incidental take statement is required where threatened or endangered species "are present in the [action] area" and the agency action is "reasonably certain to result in at least some nonlethal harassment"). And a former member of this Court explicitly held that an incidental take statement is required when take might occur, even where take is unlikely. In Pacific Shores Subdivision California Water District v. United States Army Corps of Engineers, the FWS and the Corps of Engineers had entered into formal consultation under Section 7 of the ESA. 538 F. Supp. 2d at 246. At the conclusion of the consultation, the FWS issued a biological opinion which found, among other things, that the proposed agency action "'[was] not likely to jeopardize the continued existence' of any of the listed species." Id. Although "the FWS established that brown pelicans [were] present in the affected area and admitted that the brown pelicans face a greater risk of take as a result" of the agency action, "the FWS failed to issue an

incidental take statement for the brown pelican." Id. at 261.  The defendants claimed that the

omission complied with the regulations due to "the low probability of take."  Id.  However, the

Court found that

> [t]his is a flawed interpretation of the FWS's statutory obligation.  The term
> "may" is broadly interpreted under ESA regulations and the FWS's obligation to
> issue an incidental take statement was triggered by the possibility of take of the
> brown pelican, regardless of how unlikely that possibility may have seemed.  51
> Fed. Reg. 19926, 19949 (June 3, 1986) (endorsing the definition of "may effect"
> for purposes of 50 C.F.R. § 402.14(a) as "[a]ny possible effect, whether
> beneficial, benign, adverse, or of an undetermined character.").  Accordingly, the
> FWS's biological opinion is arbitrary and capricious because it fails to consider
> incidental take of the brown pelican.

Id. (second alteration in original) (citation omitted).

The Joint Consultation Handbook is not to the contrary.  Rather, the Handbook includes a

standardized incidental take statement for situations "when no take is anticipated," which in turn

suggests that the incidental take statement read as follows:  "The Service does not anticipate the

proposed action will incidentally take any (species)."  FWS31115.

Here, the NMFS included no incidental take statement for right whales, despite the fact

that the whales have traversed the Cape Wind project area and appeared along routes that will be

traveled by project vessels.  And while the biological opinion states that the "NMFS [] concluded

that the proposed action is not likely to adversely affect right . . . whales and, therefore, is not

likely to jeopardize the[ir] continued existence," NMFS1534, the NMFS did not state that

incidental take would not occur or was "not anticipated."  Accordingly, because incidental take

"may occur," 50 C.F.R. § 402.14(g)(7), the NMFS was required to include an incidental take

statement with its biological opinion, and its failure to do so was arbitrary and capricious.

The federal defendants argue that no incidental take statement was required because the

"NMFS determined that [incidental] take [of right whales] would not occur," Fed. Defs.'

ESA/MBTA Mem. at 44 (citing NMFS1531; NMFS1534-37); see also Fed. Defs.' ESA/MBTA

Reply at 23 ("The administrative record shows that NMFS determined that take of right whales

was unlikely to occur."), and cite Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife

Service, No. Civ 99-0673PHX RCB, 1999 WL 33722331, at *13 (D. Ariz. Dec. 14, 1999), aff'd,

273 F.3d 1229 (9th Cir. 2001), as support for their position.  Contrary to the federal defendants'

assertions, the Ninth Circuit did not affirm the district court's holding in Arizona Cattle that "an

[incidental take statement] is appropriate only when a take has occurred or is reasonably certain

to occur." Fed. Defs.' ESA/MBTA Reply at 22-23.  Rather, the Ninth Circuit held that "it is

arbitrary and capricious to issue an [i]ncidental [t]ake [s]tatement when the Fish and Wildlife

Service has no rational basis to conclude that a take will occur incident to the otherwise lawful

activity." Arizona Cattle, 273 F.3d at 1242.  That holding was later clarified in Center for

Biological Diversity, where the Ninth Circuit said of its holding in Arizona Cattle:  "We held in

that case that the Service could not attach binding conditions on permittees via an [incidental

take statement] where no listed species were present in the area and thus the agency 'ha[d] no

rational basis to conclude that a take will occur incident to the otherwise lawful activity.'" Ctr.

for Biological Diversity, 695 F.3d at 910.  Here, unlike in Arizona Cattle where there was no

evidence of the endangered species in the action area, there is evidence in the record that right

whales traverse the action area as well as the routes traveled by the project vessels.  An

incidental take statement was therefore required.

The federal defendants also argue in a footnote that "[b]ecause Cape Wind has no

incidental take coverage for right whales, if there is a whale strike in the action area, which

would be the first of its kind in record history, NMFS1510, [the] NMFS would need to reinitiate

consultation." Fed. Defs.' ESA/MBTA Reply at 23 n.24.  In making that assertion, the federal

defendants cite 50 C.F.R. § 402.16, which requires reinitiation of formal consultation when, among other things, "the amount or extent of taking specified in the incidental take statement is exceeded" or "new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered." See 50 C.F.R. §§ 402.16(a), (b). The federal defendants' reading of the regulation does not make sense. In order for the "amount or extent of taking specified in the incidental take statement" to be "exceeded," it must be specified in the first place.[26] Id. § 402.16(a). Further, a single whale strike would not necessarily rise to the level of an "effect[] . . . not previously considered," id. § 402.16(b), where the danger of a whale strike has not been deemed impossible, but rather "not likely." At what number of whale strikes would the likelihood increase above "not likely" such that reinitiation of consultation would be required? The Court cannot answer that question, but rather the issue should have been addressed in an incidental take statement. Because the failure to include an incidental take statement was arbitrary and capricious, and the Court must thus grant summary judgment to the plaintiffs and remand the matter to the NMFS so that it can comply with the ESA and issue an incidental take statement for the take of right whales along with its biological opinion.

      **c.    Whether the NMFS Failed to Analyze the Effect of Construction on Listed Sea Turtles**

The plaintiffs contend that the federal defendants "violated the ESA and APA by failing to analyze the effect of noise from greatly expanded preconstruction surveys on listed sea turtles." Pls.' ESA/MBTA Mem. at 44; see also Pls.' ESA/MBTA Opp'n at 41-44. In particular, the plaintiffs challenge the notion that "an increase of 10 to 20 times as many survey hours and a

---

[26] To be sure, "[t]hat limit may be zero; that is, a valid [incidental take statement] may exempt no take." Town of Superior v. U.S. Fish & Wildlife Serv., 913 F. Supp. 2d 1087, 1143 (D. Colo. 2012) (citing Natural Res. Def. Council, Inc. v. Evans, 232 F. Supp. 2d 1003, 1051 (N.D. Cal. 2002)). However, whether a threshold of zero is what was intended is not for the Court to say, but rather for the NMFS.

larger survey area" considered in the 2010 biological opinion "could possibly result in the same level of harassment to turtles as the smaller survey" contemplated in the 2008 biological opinion. Pls.' ESA/MBTA Opp'n at 42. They are wrong.

To be sure, there is a considerable difference in the anticipated number of survey hours contemplated by the two biological opinions. Compare NMFS920 (considering "one 36-hour sampling event"), with NMFS1526 ("The applicant anticipates up to 5 months of survey activity to cover the survey area, with between 330 and 660 hours of survey effort during this time."). And there is no question that the incidental take statements in both biological opinions exempted the same number of turtles. Compare NMFS1414, with NMFS1536. But as the defendants point out, see Fed. Defs.' ESA/MBTA Mem. at 44, the NMFS exempted take of sea turtles with reference to the density of sea turtles that would be affected, see NMFS929 (2008 incidental take statement); NMFS1536 (2010 incidental take statement).[27] And although "Congress indicated its preference for a numerical value" in incidental take statements, "it anticipated situations in which impact could not be contemplated in terms of a precise number." Arizona Cattle, 273 F.3d at 1250.

The plaintiffs assert that the 2008 biological opinion and incidental take statement considered only the "project footprint," whereas the 2010 biological opinion and incidental take statement "include not only the footprint of the facility but also the transmission line to shore." Pls.' ESA/MBTA Mem. at 44. While it is true that one sentence in the 2008 biological opinion states that "[o]nly the project footprint on Horseshoe Shoal would be surveyed," NMFS920, the opinion states elsewhere that the surveys would cover "the offshore construction footprints and associated work areas for all facility components, including the [wind turbine generators], the

---

[27] Density is measured by the number of individuals of a species present within a given area. See, e.g., Davis. Latschar, 202 F.3d 359, 361 (D.C. Cir. 2000). It does not refer to the total population of a species. Id.

[electrical service platform], the inner array cables and the 115kV transmission cables to shore," NMFS830.  Furthermore, the 2008 and 2010 biological opinions each provide the same number of square kilometers that would be affected by the surveys.  Compare NMFS929 ("During the survey, an area of approximately 148 square kilometers will be surveyed."), with NMFS1536 (same).  Thus, although there is some contradiction within the 2008 biological opinion as to the area considered for the survey, the contradiction does not, on the whole, suggest that the NMFS considered a larger survey area in 2010 than it did in 2008.  Rather, there appears to be a "rational connection" between the facts found and the choice made, Bluewater Network, 370 F.3d at 11, and the Court therefore concludes that the NMFS's consideration of the effects of the preconstruction surveys on sea turtles complied with the ESA and was not arbitrary or capricious.  Accordingly, the Court grants summary judgment to the defendants as to the NMFS's incidental take statement for affected sea turtles.

**D.      The Plaintiffs' Migratory Bird Treaty Act Claims**

The plaintiffs also argue that they are entitled to summary judgment because the BOEM has violated the Migratory Bird Treaty Act by approving the Cape Wind project without first obtaining a permit from the FWS for the taking of migratory birds.  Pls.' ESA/MBTA Mem. at 29-34.  In particular, they argue that "where, as here, (1) [an agency] concede[s] that the project [it] was asked to approve will . . . [take] migratory birds . . . , and (2) no [Migratory Bird Treaty Act] permit authorizes that take, then" the agency approval of the project is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Pls.' ESA/MBTA Opp'n at 21 (quoting 5 U.S.C. § 706(2)(A)) (emphasis removed).  The defendants respond that the "BOEM was not required to obtain a[] [Migratory Bird Treaty Act] permit before approving

the Cape Wind project." Fed. Defs.' ESA/MBTA Mem. at 29; see also Int. Def.'s ESA/MBTA

Mem. at 27-32.[28] The Court agrees.

This Circuit "has held that the [Migratory Bird Treaty Act] applies to federal agencies."

Am. Bird Conservancy, Inc. v. FCC, 516 F.3d 1027, 1031 (D.C. Cir. 2008) (citing Humane

Soc'y of the United States v. Glickman, 217 F.3d 882, 885-86 (D.C. Cir. 2000)). And the

Migratory Bird Treaty Act's implementing regulations provide that "[a] special purpose permit is

required before any person may lawfully take . . . migratory birds, their parts, nests, or eggs for

any purpose not covered by the standard form permits" included elsewhere in the regulations. 50

C.F.R. § 21.27(a). But on its face, the Migratory Bird Treaty Act does not appear to extend to

agency action that only potentially and indirectly could result in the taking of migratory birds.

Rather, the text of the Act simply makes "unlawful" the taking of migratory birds, 16 U.S.C. §

703(a), and its implementing regulations provide for a "special purpose permit . . . before any

person may lawfully take . . . migratory birds," 50 C.F.R. § 21.27(a) (emphasis added). There is

no mention of which entities must obtain a special purpose permit, nor is there an explicit

requirement that the permit be obtained at any time except "before" the taking occurs. Id. Even

if the taking of migratory birds takes place at some point in the future, it is clear that no such

taking has yet occurred and is not imminent at this point because construction of the Cape Wind

project has not begun and the wind turbine generators that might take migratory birds are not

operational.

---

[28] Cape Wind additionally argues that the plaintiffs' reading of the statute is too broad and would lead to absurd results, Int. Def.'s ESA/MBTA Mem. at 32-34 ("The legislative history of the [Migratory Bird Treaty Act] makes clear that the Act was passed to restrict human activity[, i.e., hunting or poaching,] directed at wildlife" (original emphasis)), but "[t]he [f]ederal [d]efendants do not join and in fact strongly disagree with Cape Wind Associates' [] arguments regarding the scope of the [Migratory Bird Treaty Act] . . . ," Fed. Defs.' ESA/MBTA Reply at 14 n.13. "The general rule in this [C]ircuit is that '[i]ntervenors may only argue issues that have been raised by the principal parties.'" Ass'n of Battery Recyclers, Inc., 716 F.3d at 675 (quoting Nat'l Ass'n of Regulatory Util. Comm'rs, 41 F.3d at 729). Accordingly, the Court declines to address Cape Winds' statutory interpretation argument.

Given the statutory and regulatory text, the Court finds that the BOEM did not violate the Migratory Bird Treaty Act by merely approving a project that, if ultimately constructed, might result in the taking of migratory birds.   As the Circuit stated in <u>Glickman</u>, "[a]s § 703 is written, what matters is whether someone has killed or is attempting to kill or capture or take a protected bird, without a permit and outside of any designated hunting season."  217 F.3d at 885.  No such taking is yet reasonably certain.  The Court therefore grants summary judgment to the defendants on the plaintiffs' Migratory Bird Treaty Act Claims.

The plaintiffs cite several cases in support of their position that the BOEM's was required to obtain a permit prior to authorizing the Cape Wind project, but these cases are inapposite. <u>American Bird Conservancy</u> did not hold that a federal agency's "approval of actions in violation of" the Migratory Bird Treaty Act constitutes agency action that is "'contrary to law' under the APA."  Pls.' ESA/MBTA Mem. at 33 (citing <u>Am. Bird Conservancy</u>, 516 F.3d at 1031).  Rather, the Circuit merely stated that the Federal Communications Commission had "acted reasonably in deferring consideration of [the Migratory Bird Treaty Act] issue" in that case because the agency had indicated that it was in the midst of an "ongoing nationwide proceeding" concerning its approach to compliance with the Act.  <u>Am. Bird Conservancy</u>, 516 F.3d at 1032.  And the circumstances of <u>Glickman</u> are not analogous to this case, because there the agency <u>itself</u> was planning to take migratory birds.  217 F.3d at 884.  Indeed, the cases cited by the plaintiffs each involve cases where the violations of the Migratory Bird Treaty Act were attributed to the party who committed the taking.  <u>See</u> Pls.' ESA/MBTA Mem. at 31-32 (citing <u>United States v. Apollo Energies, Inc.</u>, 611 F.3d 679, 682 (10th Cir. 2010) ("Appellants are two Kansas oil drilling operators who were charged with violating the [Migratory Bird Treaty] Act after dead migratory birds were discovered lodged in a piece of their oil drilling equipment called a heater-treater.");

United States v. CITGO, 893 F. Supp. 2d 841, 842 (S.D. Tex. 2012) ("According to the Indictment, . . . [killed migratory] birds were found in tanks owned by [the defendants]."); United States v. Moon Lake Elec. Ass'n, 45 F. Supp. 2d 1070, 1071 (D. Colo. 1999) ("The government alleges that Moon Lake has failed to install inexpensive equipment on 2,450 power poles, causing the death or injury of 38 birds of prey . . . ."); United States v. Corbin Farm Serv., 444 F. Supp. 510, 514-15 (E.D. Cal. 1978) (charging the defendants with causing the death of several migratory birds by improperly applying pesticides to an alfalfa field)).

The plaintiffs argue that a recent NMFS application to the FWS for a permit authorizing incidental take of migratory birds lends support to their assertion that the BOEM should have applied for a permit in this case. See Pls.' ESA/MBTA Mem. at 29 (citing Special Purpose Application: Hawaii Longline Fishery, 77 Fed. Reg. 1501, 1502 (Jan. 10, 2012)). But the existence of this application does not save the plaintiffs' claims. The application concerned the Hawaii-Based Shallow-Set Longline Fishery, a third-party project regulated by the NMFS which became operational "in the late-1980s." 77 Fed. Reg. at 1502. Thus, even if it is necessary for the BOEM to apply for a permit from the FWS, it is not clear that the BOEM is required to do so prior to when the Cape Wind project becomes operational, or at least not until the construction has advanced to the point when the potential take of migratory birds would be considerably more imminent than it is now.

E.      **The Plaintiffs' Preservation Act Claims**

All of the plaintiffs argue that they are entitled to summary judgment on their Preservation Act claims because the federal defendants engaged in allegedly untimely and meaningless Section 106 consultation and failed to identify on-shore historic properties in good faith. Pls.' Remain Mem. at 60-66; Pls.' Remain Opp'n at 70-74; Wampanoag Mem. at 13-25;

Wampanoag Opp'n at 5-17. The PEER, Alliance, and Town of Barnstable plaintiffs additionally argue that the federal defendants violated the Preservation Act by failing to conduct geographical and geotechnical surveys in accordance with the Shelf Lands Act regulations. Pls.' Remain Mem. at 57-60; Pls.' Remain Opp'n at 58-66. The defendants unsurprisingly assert that the BOEM conducted timely and meaningful Section 106 consultation, properly identified historic properties, and did not otherwise violate the Preservation Act. Fed. Defs.' Remain Mem. at 58-68; Int. Def.'s Remain Mem. at 64-71; Fed. Defs.' Remain Reply at 15-17, 27-32; Int. Def.'s Remain Reply at 23-30, 34-36; Fed. Defs.' Wampanoag Mem. at 11-35; Int. Def.'s Wampanoag Mem. at 16-30; Fed. Defs.' Wampanoag Reply at 2-15; Int. Def.'s Wampanoag Reply at 3-17.

## 1. Whether the BOEM's Section 106 Consultation was Untimely

The Preservation Act is a procedural statute that requires federal agencies to "'stop, look, and listen,'" or stated another way, "it requires federal agencies to take into account the effect of their actions on structures eligible for inclusion in the National Register of Historic Places." Ill. Commerce Comm'n v. Interstate Commerce Comm'n, 848 F.2d 1246, 1260-61 (D.C. Cir. 1988). A federal agency is not required "to engage in any particular preservation activities; rather, Section 106 only requires that the [agency] consult the [State Historic Preservation Officer] and the [Advisory Council on Historic Preservation] and consider the impacts of its undertaking." Davis v. Latschar, 202 F.3d 359, 370 (D.C. Cir. 2000). And where, as here, the undertaking involves "historic properties of significance to Indian Tribes," the agency must also consult and consider the views of the affected tribes. See 36 C.F.R. § 800.2(c)(2)(ii). While an agency is required to "ensure that the [S]ection 106 process is initiated early in the undertaking's planning," there is little statutory guidance as to the appropriate timeline except that the timing should allow for "a broad range of alternatives [to] be considered during the planning process for

the undertaking." Id. § 800.1(c).  The regulations do suggest, but do not require, that an agency "should coordinate the steps of the [S]ection 106 process, as appropriate, . . . with any reviews required under other" statutes, including the NEPA.  Id. § 800.3(b).  An agency also "must complete the [S]ection 106 process 'prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license,'" but "[t]his does not prohibit [an] agency . . . from conducting or authorizing nondestructive project planning activities before completing compliance with [S]ection 106, provided that such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties."  Id. § 800.1(c).

The administrative record demonstrates that these criteria were satisfied.  The Section 106 consultation process began in 2005, CW112019, well before the 2010 Record of Decision documenting the BOEM's decision to issue a lease for the Cape Wind project.  The State Historic Preservation Officer and the Advisory Council were both included as consulting parties, see CW44617; CW112019, as was the Wampanoag Tribe of Gay Head (Aquinnah), CW112021. The 2010 Record of Decision acknowledges and explains its reasons for divorcing the NEPA and Preservation Act timelines, explaining that rather than proceeding with a historic property identification methodology that commenters found objectionable, the BOEM began its identification process anew with a different identification methodology.  CW112021.  The Section 106 consultation process thus involved the appropriate parties and was not conducted in an untimely fashion.

The plaintiffs cite several documents in the administrative record as support for their position that the consultation was subject to an arbitrary deadline.  Pls.' Remain Mem. at 62 (citing CW224910; CW359834; CW178879).  This is a red herring.  The documents comprise

emails in which BOEM personnel "jot[ted] down a rough timeline" that was "not cast[] in stone but rather can serve as points of discussion," CW224910, or other schedules for the completion of various pieces of the administrative process, see CW359832-34 ("Critical Action Dates"); CW178879 (schedule). The fact that the BOEM created schedules does not mandate the conclusion that the agency did not intend to comply with its obligation to appropriately consider the impacts of the Cape Wind project on historical properties. Neither the Preservation Act nor its implementing regulations forbid the creation of schedules, and the plaintiffs cite no support for their position to the contrary.

2. **Whether the BOEM's Section 106 Consultation was Meaningless or Otherwise not Conducted in Good Faith**

The plaintiffs first argue that the Cape Wind project "required far more" time to identify historic properties "than could be completed in five months." Pls.' Remain Mem. at 63; see also Wampanoag Mem. at 13-15. This disregards the facts. Even ignoring that consultation began in 2005, the administrative record is clear that comments on the draft EIS spurred the BOEM to renew efforts to identify affected historic properties and landmarks in 2008, and that consultation did not conclude until April 2010 with the Advisory Council comment terminating the consultation process. CW112021-24.

The plaintiffs also complain that the BOEM's renewed identification efforts were considered "insufficient" by the consulting parties, Wampanoag Mem. at 20-21; Pls.' Remain Mem. at 63, and cite, for example, an October 6, 2008 comment from the Martha's Vineyard Commission indicating that "hundreds, if not, thousands" of properties remained to be considered, CW224865. But these comments were taken into account. While the plaintiffs correctly note that the "BOEM's environmental consultant . . . agreed that these comments had 'merit,'" Pls.' Remain Mem. at 63 (citing CW195859-65), the consultant merely suggested that

the BOEM "re-evaluat[e] . . . the [area of potential effect]" and stated that if the BOEM "determines that a [good faith effort] to identify has been conducted," then the BOEM should respond as such to the comments, CW195859. Indeed, and as the consultant recognized, "[a]rbitrary statements such as 'there are other properties which were not included' are not specific enough to be helpful to the process of identifying properties." Id. And as this Circuit has stated, "[t]he regulations do not expressly require agencies in all cases completely to survey impact areas, and in fact recognize that the need for surveys will vary from case to case." Wilson v. Block, 708 F.2d 735, 754 (D.C. Cir. 1983). Where, as here, "both the . . . survey[s], and all other evidence, indicate that a complete survey would be fruitless," further surveys are not required. Id. In any event, the comments did not present "other evidence" which suggested that further surveys would be beneficial, but rather stated in general terms that "other properties" existed. This is not enough to render the BOEM's identification efforts inadequate. Importantly, the Advisory Council's final comment terminating the Section 106 consultation noted that while the BOEM's "initial investigation of historic properties" included only "'designated' historic properties," eventually "these important issues" were "resolved." CW112699. The Advisory Council also stated that "the survey effort appears to have been sufficient to assess the potential for archaeological resources." CW112700.

The Wampanoag Tribe of Gay Head (Aquinnah) additionally argues that the "BOEM dismissed the Tribe's position that the Sound itself, rather than the specific locations from which they viewed it, was a Traditional Cultural Property." Wampanoag Mem. at 16. This is incorrect. The final EIS and the 2010 Record of Decision each consider various cultural impacts, including "[t]he altered view of the eastern horizon" and the Wampanoag Tribe of Gay Head's "belie[f] that the [Cape Wind project] would destroy the archaeological evidence of their history

throughout the Sound, including Horseshoe Shoal." CW111975-76; see also CW157192; CW157196-201. And the final EIS discusses and acknowledges the fact that "[t]he Wampanoag consider the entirety of Nantucket Sound to be ancestral lands." CW157201. Thus, although the BOEM disagreed with the Wampanoag Tribe of Gay Head (Aquinnah)'s position that the Sound was eligible as a Traditional Cultural Property, there is evidence in the record that the agency took its view into account. The Preservation Act does not mandate a specific outcome, but rather requires only that an agency consider the impact of its actions. Davis, 202 F.3d at 370. The BOEM satisfied this requirement. And because it took these views into account, the subsequent determination by the Keeper that Nantucket Sound was in fact eligible for listing in the National Register does not change the Court's conclusion.

The Wampanoag Tribe of Gay Head (Aquinnah)'s remaining Preservation Act arguments fail for similar reasons. While the Tribe takes issue with the manner in which the Section 106 consultation occurred, see Wampanoag Mem. at 18-25, the administrative record demonstrates that its views were considered, see, e.g., CW157196-201; CW111975-76. Even the Advisory Council's final comment, though expressing displeasure with various aspects of the Section 106 consultation process, found that "in spite of" early problems with the process,

> the record shows that the tribes clearly identified their concerns about the effects of the undertaking on [traditional cultural properties] and about the importance of Nantucket Sound as a [traditional cultural property] and the location of former aboriginal lands in 2004. In 2009, [the BOEM] took steps to remedy deficiencies in the tribal consultation process by participating in site visits and consultation meetings on Cape Cod and the Islands.

CW112699-700. The plaintiffs' disagreement with the BOEM's decision to approve the Cape Wind project does not mandate the conclusion that Section 106 consultation was conducted in bad faith.

### 3. Whether the BOEM Violated the Preservation Act by Failing to Obtain Geotechnical and Geophysical Surveys Required by the Shelf Lands Act

Finally, the plaintiffs argue that the defendants' failure to obtain certain geophysical and geotechnical surveys required by the implementing regulations of the Shelf Lands Act renders inadequate the BOEM's survey efforts for potential cultural resources on the seabed. Pls.' Remain Mem. at 57-60; Pls.' Remain Opp'n at 58-66. While there is undoubtedly some overlap between the surveys required for compliance with the Preservation Act and the Shelf Lands Act, the plaintiffs have pointed to no requirement within the Preservation Act mandating the completion of Shelf Lands Act surveys prior to concluding surveys for subsurface archaeological resources.

Because Section 106 consultation was conducted with the appropriate parties, was neither untimely nor conducted in bad faith, and because the Preservation Act does specify that the Shelf Lands Act geophysical and geotechnical surveys be conducted prior to conclusion of Section 106 consultation, the Court grants summary judgment in favor of the defendants on the plaintiffs' Preservation Act claims.

## F. The Plaintiffs' NEPA Claims

The plaintiffs have moved for summary judgment on their NEPA claims on several grounds. The PEER, Alliance, and Barnstable plaintiffs argue that the final EIS was deficient because it lacked necessary information, did not sufficiently review alternatives, and did not sufficiently address cumulative impacts on wildlife. Pls.' Remain Mem. at 68-80; Pls.' Remain Opp'n at 93-99. They also argue that Cape Wind's Construction and Operation Plan constituted a new major federal action that required a new EIS or at the very least a supplemental EIS. Pls.' Remain Mem. at 81-89; Pls.' Remain Opp'n 86-92. The Wampanoag Tribe of Gay Head (Aquinnah) argues that the BOEM violated the APA and the NEPA by failing to address the

impact that the Cape Wind project would have on subsistence fishing, as well as by failing to prepare a supplemental EIS subsequent to the Keeper's determination that the Nantucket Sound is eligible for inclusion on the National Register of Historic Places. Wampanoag Mem. at 25-43; Wampanoag Opp'n at 17-21.

Like the Preservation Act, the "NEPA's mandate 'is essentially procedural.'" Nevada v. Dep't of Energy, 457 F.3d 78, 87 (D.C. Cir. 2006) (quoting Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558 (1978)). It "requires each agency to assess the environmental consequences of 'major [f]ederal actions' by following certain procedures during the decision-making process," including the preparation of an EIS. Id. (quoting 42 U.S.C. § 4332(2)(C)). "At the 'heart of the [EIS]' is the requirement that an agency 'rigorously explore and objectively evaluate' the projected environmental impacts of all 'reasonable alternatives' to the proposed action." Id. (quoting 40 C.F.R. § 1502.14).

**1.      The BOEM's Purpose and Need Statement**

The plaintiffs contend that the need and purpose statement contained in the EIS was deficient. Pls. Remain Mem. at 75-77. In evaluating the adequacy of an agency's NEPA decision-making, the Court "review[s] both [the] agency's definition of its objectives and its selection of alternatives." Theodore Roosevelt Conservation P'ship v. Salazar ("Theodore Roosevelt Conservation II"), 661 F.3d 66, 73 (D.C. Cir. 2011). So "long as the agency 'look[s] hard at the factors relevant to the definition of purpose,'" courts must "generally defer to the agency's reasonable definition of objectives." Id. (quoting Citizens Against Burlington v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991)). On the other hand, courts must also "reject an 'unreasonably narrow' definition of objectives that compels the selection of a particular alternative." Id. (quoting Citizens Against Burlington, 938 F.2d at 196).

Here, the final EIS defined the purpose and need for the project as follows:

> [T]o provide an alternative energy facility that utilizes the unique wind resources in waters offshore of New England using a technology that is currently available, technically feasible, and economically viable, that can interconnect with and deliver electricity to the New England Power Pool (NEPOOL), and make a substantial contribution to enhancing the region's electrical reliability and achieving the renewable energy requirements under the Massachusetts and regional renewable portfolio standards (RPS).

CW65082. Especially when considered in light of Cape Wind's proposal "to build, operate, and eventually decommission a wind energy facility . . . in Nantucket Sound," id., the statement of need and purpose in the final EIS is reasonable. While it is clear that the Cape Wind proposal seeks a particular outcome, the final EIS objectives are much broader. Namely, there is no mention of a specific body of water or of a specific type of energy facility. Rather, the statement calls for a facility that "us[es] a technology that is currently available, technically feasible, and economically viable." Id. The stated objective is even broader than the definition of objectives in Theodore Roosevelt Conservation II, which the Circuit found to be reasonable despite the fact that the objectives in that case concerned one specific project proposal. 661 F.3d at 73 (finding reasonable a stated purpose and need "to act upon the Proponents' proposal to revise . . . [a] [record of decision] to expand the level of development by drilling 4,399 new producing wells and to relax seasonal restrictions in certain areas" (internal quotation marks omitted)). The Circuit considered and rejected the appellant's argument in Theodore Roosevelt Conservation II that the objectives were "unreasonably narrow," after noting that "[t]he Bureau does not state a purpose to enact or adopt the Operators' proposal to some degree; rather, its purpose is to 'act upon' that proposal." Id. (emphasis in original). The stated objectives in this case are similarly broad. The BOEM does not seek to enact or adopt a specific proposal, but rather seeks to provide energy to a certain region of the country using an offshore alternative energy resource.

While it is true that the statement of purpose and need could have been even broader, the statement was not <u>unreasonably</u> narrow. Accordingly, the Court finds that the statement of need and purpose in the final EIS is not arbitrary or capricious.

### 2. The Range of Alternatives

The plaintiffs argue that the final EIS did not consider a reasonable range of alternatives. Pls.' Remain Mem. at 74. The Court disagrees. The final EIS lists ten alternative sites for the offshore wind project:

1. Offshore Portland, Maine
2. Offshore Cape Ann, Massachusetts
3. Offshore Boston, Massachusetts
4. Offshore Nauset, Massachusetts (east of Nauset Beach)
5. Nantucket Shoals (southeast of Nantucket Island, Massachusetts)
6. Phelps Bank (southeast of Nantucket Island, Massachusetts)
7. East of Block Island, Rhode Island
8. Monomoy Shoals (east of Monomy, Massachusetts)
9. South of Tuckernuck Island
10. Horseshoe Shoals (proposed action)

CW65138. The final EIS sets forth the BOEM's rationale for addressing the alternative sites:

> The sites were chosen based on geographic diversity, having at least some potential in terms of wind resources, and the necessary area required for the proposed facility size. The Phelps Bank site was chosen as a result of a comment/request from the Massachusetts Office of CZM that an alternative be evaluated for a site located more than 25 miles (40 km) offshore with water depths less than 150 feet. The Offshore Nauset site was chosen as a result of agency interests in comparing a deep water alternative.

<u>Id.</u> Additionally, several "[n]on-geographic alternatives," which include "design alternatives" such as "modifications to the proposed action that reduce the scope . . . or temporal impacts" were considered, including:

- Smaller Alternative (half of the [megawatt] capacity of the proposed action at the same location)
- Condensed Array Alternative
- Phased Development Alternative
- No Action Alternative.

CW65139.

Seven of the geographic alternatives were "screened out" because they failed to comport with the statement of need and purpose. CW65139-42 (eliminating geographic alternatives due to, among other considerations, water depth, hostile seabed conditions, and distance from shore). Thus, "further detailed analysis was not conducted and the reasons that each site was eliminated" were briefly discussed in the final EIS. Id. The remaining geographic alternatives and all four non-geographic alternatives were subsequently described at length, compared to the proposed action (that is, to the Cape Wind proposal), and examined with an eye toward numerous environmental, safety, socioeconomic, and cultural considerations, among others. CW65626-81. Given this detailed and thorough analysis, the Court finds that the BOEM "selected a reasonable range of alternatives in light of its purpose." Theodore Roosevelt Conservation II, 661 F.3d at 74-75.

> **3. Whether the BOEM Acquired Information Sufficient to Characterize Environmental Impacts.**

The plaintiffs complain that the "BOEM repeatedly deferred critical studies that NEPA requires," including additional data that the FWS suggested be obtained to assess the impact on birds, Pls.' Remain Mem. at 68-73, and on "navigational safety, shallow hazards safety, site characterization and archaeological resources," id. at 73-74. The Wampanoag Tribe of Gay Head (Aquinnah) additionally argues that the potential impact on subsistence fishing was a factor not adequately considered by the BOEM. Wampanoag Mem. at 25-32.

As the Supreme Court has noted, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh v. Or.

Natural Res. Council, 490 U.S. 360, 378 (1989). Thus, "[a]lthough an agency should consider the comments of other agencies, it does not necessarily have to defer to them when it disagrees." Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 288 (4th Cir. 1999). Here, the record indicates that the BOEM considered the FWS's recommendation to collect additional data concerning the impact on birds, but ultimately the BOEM decided that it had enough data to complete its EIS. See CW67697-770 (responding to comments suggesting that the BOEM obtain additional information about the project's impacts on migratory birds). And while the plaintiffs are correct, Pls.' Remain Mem. at 70, that NEPA regulations require the inclusion of information in an EIS where the "information [is] relevant to reasonably foreseeable significant adverse impacts" and "is essential to a reasoned choice among alternatives," 40 C.F.R. § 1502.22(a), the plaintiffs have made no showing that the additional data was "essential." Indeed, the FWS did not characterize the missing data as essential when it referenced those data in its own biological opinion. See FWS4 ("[T]he unimplemented studies would not necessarily yield information that would have significantly addressed the uncertainties in the analysis . . . .").

The plaintiffs' concerns about "navigational safety, shallow hazards safety, site characterization and archaeological resources," are based on the same arguments advanced with respect to the Coast Guard's findings and the Shelf Lands Act. See Pls.' Remain Mem. at 73. Because the Court has concluded that the Coast Guard's findings are adequately supported by the administrative record, and because the Court has found that the BOEM did not violate the Shelf Lands Act, these arguments also cannot support the plaintiffs' NEPA claims.

As noted earlier, the Wampanoag Tribe of Gay Head (Aquinnah) argues that the BOEM failed to take a "hard look" at the Cape Wind project's impact on subsistence fishing. Wampanoag Mem. at 28. The Tribe contends first that the effects of "constant vibrations" were

not analyzed.  Id.  But this argument is directly contradicted by the final EIS.  See CW65518-19; CW65593.  The Tribe next argues that the BOEM "provided no analytical support for" its finding "that turbine-spacing would not significantly affect fishing activities or fish populations." Wampanoag Mem. at 29.  But while the phrase to which the plaintiffs point does not cite to studies about fish, see CW65593, there are discussions on the effects of the project on fish elsewhere in the final EIS, see CW65518-19.  And those discussions provide support for the BOEM's action, which discusses studies conducted with respect to operational offshore wind farms in other parts of the world.  Id.  Finally, the Tribe faults the BOEM for categorizing its comments concerning subsistence fishing as comments concerning commercial fishing. Wampanoag Mem. at 31.  The Tribe further argues that "conflating subsistence fishing with commercial fishing implicates" several factors that the BOEM was required to consider under the NEPA.  Id. at 31-32.  However, the final EIS does acknowledge the comments on subsistence fishing separately from commercial fishing.  See CW65593.  While the conclusions about the effects on the two types of fishing might be the same, the fact remains that both are considered in the final EIS.

**4.     Whether the EIS Adequately Addressed Cumulative Effects on Wildlife.**

The plaintiffs next argue that the BOEM "improperly constrained the scope of its analysis by limiting its consideration of cumulative effects to the immediate Project area."  Pls.' Remain Mem. at 79.  "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  As the Supreme Court has stated, "identification of the geographic area within which" cumulative environmental impacts "may occur[] is a task

assigned to the special competence of the appropriate agencies." <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 414 (1976). Indeed, "[e]ven if environmental interrelationships could be shown conclusively to extend across" a wider geographic scope than that chosen by an agency, "practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements." <u>Id.</u>

Aside from positing their own additional geographic areas for the BOEM's consideration, the plaintiffs have not presented the Court with a sufficient reason to invalidate the BOEM's choice. To be sure, in certain situations, a cumulative impact assessment should include inter-regional effects in the manner described by the Circuit in <u>Natural Resources Defense Council, Inc. v. Hodel</u>, 865 F.2d 288, 298-300 (D.C. Cir. 1988). However, in <u>Hodel</u>, the agency action involved "simultaneous development" in adjacent marine environments. <u>Id.</u> at 297. Accordingly, the Circuit agreed that the agency was required to address the inter-regional cumulative impact of the simultaneous developments in the EIS, given that the marine species at issue would "have to swim through each area, with no respite from the harmful effects of [the] development." <u>Id.</u> The Cape Wind project does not appear to implicate the same concerns, and so the Court finds no reason to disturb the BOEM's cumulative impact conclusions.

5. **Whether the Construction and Operations Plan Constituted a new Major Federal Action.**

The plaintiffs contend that the BOEM should have conducted another NEPA review of the Construction and Operations Plan for the Cape Wind project and issued another EIS. <u>See</u> Pls.' Remain Mem. at 81. Alternatively, they argue, the BOEM should have issued a supplemental EIS. <u>See</u> <u>id.</u> at 84-87.

A "major Federal action" is defined to include "projects and programs entirely or partly financed, assisted, . . . or approved by federal agencies." 40 C.F.R. § 1508.18(a). Approval of a

Construction and Operations Plan is undoubtedly federal action.  See id. § 1508.18(b)(2)

(including the "[a]doption of formal plans, such as official documents . . . approved by federal

agencies which guide or prescribe alternative uses of Federal resources" among the definitions of

"[f]ederal actions").  As used in the NEPA regulations, the term "[m]ajor reinforces but does not

have a meaning independent of significantly."  Id. § 1508.18(b).  And "[s]ignificantly as used in

NEPA requires considerations of both context and intensity."  Id. § 1508.27.  This requires,

among others, consideration of "the affected region, the affected interests, and the locality";

"[t]he degree to which the proposed action affects public health or safety"; "characteristics of the

geographic area such as proximity to historic or cultural resources"; and "[t]he degree to which

the possible effects on the human environment are highly uncertain or involve unique or

unknown risks."  Id.  Here, these were the same factors considered at great length in the final

EIS.  Indeed, "an agency need not supplement an EIS every time new information comes to light

after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable,

always updating information only to find the new information outdated by the time a decision is

made."  Marsh, 490 U.S. at 373 (footnotes omitted).  Accordingly, the Court finds that the

approval of the Construction and Operations Plan did not constitute a new major federal action.

The plaintiffs' references to BOEM regulations requiring NEPA review of such plans, Pls.'

Remain Mem. at 81, does not warrant a different conclusion because the regulations reference

only "an appropriate NEPA analysis," 30 C.F.R. § 585.628(b).  Such an analysis does not

necessarily entail a new EIS.

### 6.    Whether Any New Information Required a Supplemental EIS.

Courts review an agency's decision to issue a supplemental EIS under the arbitrary and

capricious standard.  City of Olmstead Falls v. FAA, 292 F.3d 261, 274 (D.C. Cir. 2002).  And

as the Circuit has explained, "a 'supplemental EIS is only required where new information provides a <u>seriously</u> different picture of the environmental landscape.'" <u>Nat'l Comm. for the New River v. FERC</u>, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (citation omitted); <u>see also</u> <u>Marsh</u>, 490 U.S. at 373 ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized."). "'Only those changes that cause effects which are significantly different from those already studied require supplementary consideration.'" <u>Davis</u>, 202 F.3d at 369 (citation omitted). The decision whether a supplemental EIS is required is reviewed under the arbitrary and capricious standard. <u>Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n</u>, 716 F.3d 183, 195 (D.C. Cir. 2013).

The plaintiffs complain that a supplemental EIS is required because the Construction and Operations Plan "includes a Safety Management System, Oil Spill Response Plan, Operations and Maintenance Plan, and other details regarding the Project and its environmental significance." Pls.' Remain Mem. at 84. This is incorrect for several reasons. First, these concerns are not entirely new and were addressed in the final EIS. <u>See, e.g.</u>, CW65381-86 (safety concerns and oil spills); CW66745-813 (draft oil spill response plan attached to final EIS); CW65119-126 (operation and maintenance). Moreover, the fact that the Construction and Operations Plan includes some new details or information on these subjects, or whether those or other details otherwise relate to environmental concerns, is not the point. Rather, the significance of the information is what drives the necessity for a supplemental EIS. And as this Circuit recently reiterated, "[t]he determination as to whether information is either new or significant 'requires a high level of technical expertise'; thus" courts should generally defer to the agency's "informed discretion." <u>Blue Ridge Envtl. Def. League</u>, 716 F.3d at 197 (quoting <u>Marsh</u>, 490 U.S. at 377). The plaintiffs have not demonstrated how the BOEM's analysis in its

2010 and 2011 Assessments was arbitrary or capricious. Instead, they list the new information considered in each and label it significant. This is not enough.

The plaintiffs also argue that the recent aggregations of North Atlantic right whales warranted a supplemental EIS. Pls.' Remain Mem. at 85-87. However, as discussed above, the NMFS completed a new biological impact statement in 2010, which addressed the recent aggregation. The NMFS concluded, as it did in its 2008 biological opinion, that the Cape Wind project was not likely to adversely affect the right whales. The BOEM subsequently included this information in its 2011 Assessment. See CW119760-61; CW119780. Considering that the NMFS's conclusion did not change, the Court finds that it was not arbitrary or capricious for the BOEM to decline to supplement its EIS as a result of the whale sightings.

The Wampanoag Tribe of Gay Head (Aquinnah) contends separately that the Keeper's determination that the Nantucket Sound is eligible for inclusion on the National Register was another independent ground for the issuance of a supplemental EIS. See Wampanoag Mem. at 32-33. However, as discussed above, the BOEM took into account the Tribe's comments that the entirety of the Nantucket Sound was a traditional cultural property. Although the BOEM disagreed and was ultimately incorrect about the Sound's eligibility for inclusion on the National Register, that does not mean that the BOEM did not take the comments seriously. See CW111975-76 (considering "[t]he altered view of the eastern horizon" and the Wampanoag Tribe of Gay Head's "belie[f] that the [Cape Wind project] would destroy the archaeological evidence of their history throughout the Sound, including Horseshoe Shoal"); see also CW157192 (addressing visual impacts of the Cape wind project on, among other things, the Wampanoag "ceremonies, spiritual and religious practices [that] are dependent upon maintaining the ability to view the first light, the eastern horizon vista and viewshed"); CW157196-201

(discussing historical and cultural impacts, and acknowledging that "[t]he Wampanoag consider the entirety of Nantucket Sound to be ancestral lands").  Thus, while the Keeper's determination was new information in a sense, it cannot be said that it was arbitrary and capricious for the BOEM to decline to supplement its EIS in light of that information.  Cf. Blue Ridge Envtl. Def. League, 716 F.3d at 198 (finding that new information did not create need for additional NEPA review where "the EIS addressed and dismissed precisely the risks that gave rise" to the concerns raised by the new information).

Finally, the plaintiffs fault the BOEM for failing to analyze alternatives in its 2010 and 2011 Assessments.  See Pls.' Remain Mem. at 74, 88-89 (citing 40 C.F.R. § 1502.14).  By its terms, however, the regulation cited by the plaintiffs requires the consideration of alternatives only when an agency issues an EIS.  The plaintiffs also take issue with the level of public comment sought on the 2010 and 2011 Assessments.  See id. at 87-89 (citing 40 C.F.R. § 1501.4(e)).  However, an "agency has significant discretion in determining when public comment is required with respect to [environmental assessments]."  Blue Ridge Envtl. Def. League, 716 F.3d at 189 (citation omitted).  Here, the BOEM did, in fact, invite public comment on both environmental assessments.  See, e.g., CW111956-57; CW119705.  Moreover, the CEQ regulations do not "impose a [finding of no significant impact] requirement" where "an agency [is] deciding, on the basis of an [environmental assessment], whether to issue a supplemental EIS.  The regulations require [findings of no significant impact] only when the agency employs an [environmental assessment] to decide whether to issue an initial EIS."  Del. Dep't of Natural Res. & Envtl. Control v. U.S. Army Corps of Eng'rs, 685 F.3d 259, 273 (3d Cir. 2012) (citing 40 C.F.R. § 1501.4(e)) (emphasis added); see also Natural Res. Def. Council v. Kempthorne, 525 F. Supp. 2d 115, 121 (D.D.C. 2007) ("[The] plaintiffs[] contend that [the agency] should have

circulated the draft [environmental assessments] for public comment because [it] deferred evaluating the site-specific environmental impacts of the project until proposals for development of specific well sites were submitted. This argument is also to no avail because neither the applicable regulations, nor relevant caselaw, require such notice and comment.") (citations omitted). In other words, where, as here, an agency "has prepared [an] [environmental assessment] . . . . to determine whether [it] can make a [f]inding of [n]o [n]ew [s]iginficant [i]mpact . . . or should prepare a [s]upplemental [EIS] . . . ," see CW119745, the requirements of 40 C.F.R. § 1501.4(e) do not apply to require the agency to submit the environmental assessment for public notice and comment, but rather require the agency to involve the public only "to the extent practicable," TOMAC, Taxpayers of Mich. Against Casinos v. Norton, 433 F.3d 852, 861 (D.C. Cir. 2006) (citing and comparing 40 C.F.R. §§ 1501.1, 1501.3, 1501.4).[29] Here, the BOEM undoubtedly involved the public in the review of both the 2010 and 2011 Assessments.

## G. The Plaintiffs' Remaining Claims

In its complaint, the Town of Barnstable advance in its first five claims for relief Shelf Lands Act and NEPA violations that center on the federal defendants' failure to take certain action concerning aviation safety. See Barnstable Compl. ¶¶ 175-99. However, these aviation related allegations are not addressed in the plaintiffs' briefs.[30] To the extent that the plaintiffs

---

[29] Even if 40 C.F.R. § 1501.4(e) does apply here, it is not clear that the BOEM violated that regulation. The 2010 Assessment was subject to notice and comment. See CW111956-57. And while the BOEM invited comments on the 2011 Assessment only by posting the assessment on its website, see CW119705, NEPA regulations require only public "review" of environmental assessments, not public "notice and comment." 40 C.F.R. § 1501.4(e)(2). The regulations elsewhere refer to "[r]equest[ing] comments from the public," see, e.g., id. § 1503.1(a)(4), which suggests that something less than the usual public notice and comment is not inappropriate for environmental assessments subject to § 1501.4(e)(2).

[30] The most that the plaintiffs do is refer to aviation safety once in the context of their NEPA claims, see Pls.' Remain Mem. at 73-74, while simultaneously acknowledging that the Circuit recently remanded the safety issue to the FAA in Town of Barnstable v. FAA, 659 F.3d 28, 36 (D.C. Cir. 2011), and indeed, the Circuit subsequently found that the Federal Aviation Administration's analysis was reasonable, Town of Barnstable v. FAA, 740 F.3d 681 (2014). In any event, even this passing reference to aviation safety was subsequently removed from the

(continued . . . )

fail to advance additional arguments concerning aviation safety, the Court deems these aspects of the plaintiffs' NEPA claims abandoned. See Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); Noble Energy, Inc. v. Salazar, 691 F. Supp. 2d 14, 23 n.6 (D.D.C. 2010) (same).

Similarly, the Alliance plaintiffs allege violations of the Clean Water Act and the Rivers and Harbors Act. See Alliance Compl. ¶¶ 177-93. While both statues are mentioned in passing in the plaintiffs' legal memoranda, see Pls.' Remain Mem. at 5, 8 n.6, 9; Pls.' Remain Mem. at 36, the plaintiffs advance no arguments concerning these claims. Even if the Court construed the plaintiffs' passing references to the Clean Water Act and the River Harbors Act as legal arguments, the plaintiffs fail entirely to support their arguments with citations to the administrative record. While it is true that a party does not abandon a claim by not briefing it in a partial motion to dismiss other claims, see Fund for Constitutional Gov't v. Nat'l Archives & Records Serv., 485 F. Supp. 1, 4 (D.D.C. 1978), aff'd, 656 F.2d 856 (D.C. Cir. 1981), the plaintiffs did not make any arguments concerning either statute in their first partial motion for summary judgment, and represented to the Court that their second partial motion for summary judgment addressed "all remaining claims presented in their consolidated cases," see Pls.' Remain Mot. at 1. Accordingly, the Court deems the claims abandoned. See Grenier, 70 F.3d at 678 ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); Noble Energy, 691 F. Supp. 2d at 23 n.6 (same).

---

(. . . continued)
plaintiffs' briefs through an errata. See Errata: Corrected Memorandum in Support of Motion for Summary Judgment, ECF No. 286 at 2 ("Change air safety to other statutory obligations." (emphasis in original)).

**H. The Plaintiffs' Rule 56(e) Motion for Additional Discovery or, in the Alternative, to Strike**

In light of the Court's finding above, based on the existing administrative record, that the BOEM complied with its Shelf Lands Act regulations for approving a departure, the plaintiffs' motion to strike the federal defendants' references to documents outside of the administrative record is denied. The Court need not strike documents that were not before it in the first place and moreover that were not considered.

The Court also denies the plaintiffs' motion for additional discovery. Although the plaintiffs may be correct that it was improper for the defendants to attempt to introduce the document in question into the record, the federal defendants did not concede that the document was or should have been a part of the administrative record. Rather, they referenced the document under the auspices of providing the Court with "an internal memorandum that was withheld from the administrative record as deliberative material" if the Court deemed the documents in the administrative record insufficient. Fed. Defs.' Remain Mem. at 55 n.26. The Court previously issued an order indicating that such memoranda are not part of the administrative record as a matter of law, and that the plaintiffs were not entitled to review them. See May 16, 2013 Order, ECF No. 273, at 4-5 (citing Nat'l Ass'n of Chain Drug Stores v. HHS, 631 F. Supp. 2d 23, 27 (D.D.C. 2009); In re Subpoena Duces Tecum, 156 F.3d at 1279). Further, as the Court stated, "[i]t is well established in this Circuit that the [APA] 'limits judicial review to the administrative record except where there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.'" Id. at 6 (quoting Theodore Roosevelt Conservation P'ship v. Salazar ("Theodore Roosevelt Conservation I"), 616 F.3d 497, 514 (D.C. Cir. 2010)). Here, there has been no showing or allegation of bad faith, and the Court was able to rule on the plaintiffs' claims based on the existing administrative

record and without considering the subject documents. Thus, additional discovery, whether in the form of allowing the plaintiffs access to documents outside of the administrative record or conducting depositions, Pls.' 56(e) Mot. at 3-4, is unwarranted.

## IV. CONCLUSION

For the foregoing reasons, the Court grants summary judgment to the plaintiffs on their claims that the FWS violated the ESA by failing to make an independent determination about whether the feathering operational adjustment was a reasonable and prudent measure, and the Court will therefore remand this case to the FWS for it can make the required independent determination on this point. The Court also grants summary judgment to the plaintiffs on their claims that the NMFS violated the ESA by failing to issue an incidental take statement for the take of North Atlantic right whales, and the Court will therefore remand that issue to the NMFS for the issuance of an incidental take statement on this subject. Otherwise, the Court grants summary judgment to the defendants on the plaintiffs' remaining claims. Finally, the Court denies the plaintiffs' Rule 56(e) motion for additional discovery or, in the alternative, to strike.[31]

**SO ORDERED** this 14th day of March, 2014.

REGGIE B. WALTON
United States District Judge

---

[31] The Court will issue an order contemporaneously with this Memorandum Opinion.